IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| Plaintiff, | |
| v. | |
| 1. JAYSON JEFFREY PENN, | |
| 2. MIKELL REEVE FRIES, | |
| 3. SCOTT JAMES BRADY, | No. 20-cr-00152-PAB |
| 4. ROGER BORN AUSTIN, | |
| 5. **TIMOTHY R. MULRENIN**, | |
| 6. WILLIAM VINCENT KANTOLA, | |
| 7. JIMMIE LEE LITTLE, | |
| 8. WILLIAM WADE LOVETTE, | |
| 9. GARY BRIAN ROBERTS, and | |
| 10. RICKIE PATTERSON BLAKE, | |
| Defendants. | |

**DEFENDANT TIMOTHY MULRENIN'S
MOTION TO DISMISS THE SUPERSEDING INDICTMENT**

Defendant Timothy Mulrenin, by and through undersigned counsel, respectfully moves to dismiss Count One of Superseding Indictment for failure to state an offense pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v). Couched in language that describes nebulous associations and exchanges of price information among representatives of broiler chicken suppliers, the allegations in the Superseding Indictment fall short of stating an agreement that amounts to a *per se* violation of the Sherman Act. That is, the Superseding Indictment fails to allege with the necessary particularity that there was an agreement to fix prices or rig bids. Further, even if the Superseding Indictment properly made such an allegation, it nevertheless fails to allege that Mr. Mulrenin knowingly joined any such agreement. Because the

Superseding Indictment fails to allege the requisite elements of the charged offense under Fed. R. Crim. P. 7(c)(1), it must be dismissed.[1]

## I.    FACTUAL BACKGROUND

On October 6, 2020, a grand jury returned a Superseding Indictment against Mr. Mulrenin and nine of his co-defendants, charging all defendants with one count of violating Section 1 of the Sherman Act, 15 U.S.C. § 1, and charging co-defendant Jimmie Little with two additional counts.  (Superseding Indictment ("SI") ¶¶ 1, 147, 151.)  The Superseding Indictment alleges that Defendants "entered into and engaged in a continuing combination and conspiracy" that "consisted of a continuing agreement, understanding, and concert of action[,] . . . the substantial terms of which were to rig bids and to fix, maintain, stabilize, and raise prices and other price-related terms for broiler chicken products sold in the United States." (*Id.* ¶¶ 1–2.) The Superseding Indictment alleges that Mr. Mulrenin and his co-conspirators carried out the "combination and conspiracy" by utilizing a "continuing network" to reach agreements and understandings to submit aligned bids; to participate in conversations and communications relating to non-public information; and to monitor bids, (*id.* ¶¶ 47, 48(a)-(c),) and leaves open the possibility that additional individuals and entities were also co-conspirators.  Specifically, the Superseding Indictment alleges:

> It was part of the conspiracy that Penn, Fries, Brady, Austin, Mulrenin, Kantola, Little, Lovette, Roberts, and Blake, together with their co-conspirators known and unknown to the Grand Jury, in the State and District of Colorado and elsewhere, participated in a continuing network of Suppliers and co-conspirators, ***an understood purpose of which*** was to suppress and eliminate

---

[1] In addition, Mr. Mulrenin incorporates by reference and adopts the arguments made by defendant William Kantola that "[d]ue process does not permit such a loose and changing formulation of what can be prosecuted as a crime," and as such, the Sherman Act charge is void-for-vagueness.  (Doc. 295 at 9-11.)

2

>     competition through rigging bids and fixing prices and price-related
>     terms for broiler chicken products sold in the United States.

*Id.* ¶ 47 (capitalization omitted, emphasis added).

This "continuing network" is alleged to have taken place over seven years related to multiple suppliers, customers, and products. (*Id.* ¶¶ 51-145.) The Superseding Indictment identifies 14 separate conspiratorial episodes that were allegedly carried out by the "continuing network" of suppliers. Mr. Mulrenin is implicated in only five out of the 14 episodes with allegations that Mr. Mulrenin participated in the claimed "continuing network" by receiving internal emails and texts from co-workers, and engaging in phone conversations, the substance of which is apparently unknown, since the Superseding Indictment is silent as to their content. In nearly all of the episodes implicating Mr. Mulrenin, it appears that Mr. Mulrenin is alleged to have "participated" by virtue of his awareness of a colleague's discussions with others to which he was not a party, or by virtue of a handful of phone calls with another co-defendant.

## II.   LEGAL STANDARD

Fed. R. Crim. P. 7(c)(1) requires that an indictment be "a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c); *United States v. Salazar*, 720 F.2d 1482, 1486 (10th Cir. 1983). An indictment is sufficient if it: (1) contains the elements of the offense charged, and fairly informs a defendant of the charge he must defend against and; and (2) enables him to plead an acquittal or double jeopardy. *Hamling v. United States*, 418 U.S. 87, 117 (1974). The sufficiency of an indictment is judged "by practical rather than technical considerations." *United States v. Dashney*, 117 F.3d 1197, 1205 (10th Cir. 1997) (internal citations omitted). Only "well-pleaded facts, as distinguished from conclusory allegations, must be taken as true" in an indictment. *See United States v. Morgan*, No. 02-454 JC, 2002 U.S. Dist. LEXIS 30116, at *1-2 (D.N.M. Oct. 1, 2002) (quoting *Swanson*

3

*v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984)).  Where an indictment fails to state essential facts constituting the charged offense, it is subject to dismissal.  *See Russell v. United States*, 369 U.S. 749, 765 (1962) ("An indictment not framed to apprise the defendant with reasonable certainty, of the nature of the accusation against him is defective, although it may follow the language of the statute.") (internal citations omitted); Fed. R. Crim. P. 12(b)(3)(B)(v).

The Supreme Court has held that parroting the language of the Sherman Act, without more, is insufficient to sustain a charge.  *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 438 (1978) ("The Sherman Act, unlike most traditional criminal statutes, does not, in clear and categorical terms, precisely identify the conduct which it proscribes.").  Accordingly, a Sherman Act charge must with some degree of particularity allege a "[1] contract, combination . . . or conspiracy, [2] in restraint of trade or commerce [3] among the several States," and (4) that the defendant "knowingly joined and participated in the conspiracy."  *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 480 (10th Cir. 1990) (citing *United States v. Metro. Enters., Inc.*, 728 F.2d 444, 450 (10th Cir. 1984)); 15 U.S.C. § 1.

**III.    ARGUMENT**

The Superseding Indictment's failure to sufficiently allege the Sherman Act's requisite elements manifest in two ways.  First, the Superseding Indictment fails to allege any "contract, combination . . . or conspiracy" that is cognizable as an agreement in restraint of trade under the *per se* rule and subject to criminal prosecution.  Instead, the Superseding Indictment details a number of instances in which suppliers may have shared pricing information, conduct which, on its own, cannot form the basis for a *per se* violation.  Second, the Superseding Indictment fails to allege that Mr. Mulrenin knowingly participated in any supposed agreement in restraint of trade, let alone an agreement that amounts to an unreasonable restraint of trade to be condemned under the *per se* rule as a crime.

### A.     The Superseding Indictment Fails to Allege an Agreement That is *Per Se* Unlawful under Section 1

The government's longstanding practice is that only *per se* violations of the Sherman Act qualify for criminal prosecution. *United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1274 (10th Cir. 2018). *Per se* liability is "reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (internal quotations omitted). An indictment's failure to plead *per se* violations of the Sherman Act with precision therefore raises serious due process concerns. *See Gypsum*, 438 U.S. at 440-42 (aside from *per se* violations, "the behavior proscribed by the [Sherman] Act is often difficult to distinguish from the gray zone of socially acceptable and economically justifiable business conduct," making "the use of criminal sanctions in such circumstances . . . difficult to square with the generally accepted functions of the criminal law"). This is precisely the defect of this charge—there are no allegations that illustrate that the communications cited were in furtherance of a *per se* unlawful agreement; rather, the Superseding Indictment does nothing more than quote the language of the statute and use generic terms to characterize normal business dealings and associations as nefarious, such as describing a "continuing network" "to reach agreements and understandings to submit aligned . . . bids and to offer aligned . . . prices." (SI ¶ 48(a).) At most, the Superseding Indictment describes situations whereby suppliers may have plausibly shared information relating to bids, and therefore the Superseding Indictment does not provide particulars or make specific factual allegations sufficient to compel Mr. Mulrenin to defend against the charged *per se* Sherman Act violation. *See Gypsum*, 438 U.S. at 441 n.16; *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113

(1975) (applying rule of reason rather than *per se* analysis to agreements among competitors to exchange pricing information).

> **1.  The Superseding Indictment Fails to Allege That There Was Any Agreement to Fix Prices**

To prove a criminal *per se* Sherman Act Section 1 violation, there must be a "meeting of minds."  *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 765, 768 (1984) (requiring a showing that a defendant made "a conscious commitment to a common scheme designed to achieve an unlawful objective"); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (in assessing a violation of Section 1 "the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express") (internal quotation marks omitted).  No such agreement exists in the four corners of the Superseding Indictment.

There is no reference to a "continuing network" in the statutory language of the Sherman Act, and the Superseding Indictment's conclusory reliance on that term is inadequate, and cannot make up for the omission of an allegation that a *per se* unlawful agreement was reached.  Even where the indictment repeats the "combination" and "conspiracy" language from the Sherman Act, (*see* SI ¶¶ 1, 2,) the Superseding Indictment does not go far enough to "precisely identify the conduct which it proscribes." *Gypsum*, 438 U.S. at 438.  It is not enough to merely state that conduct which bears no indicia of a conspiracy was, in fact, conspiratorial.  The Superseding Indictment must include factual allegations to support such conclusory assertions, but fails to do so in the fourteen separate episodes that were allegedly part of the charged conspiracy.

Specifically, the Superseding Indictment does not allege that Mr. Mulrenin agreed to fix prices or rig bids in any of the cited calls, texts, or emails, or that in participating in such communications, he did so with the aim to fix prices or rig bids.  At most, the Superseding

6

Indictment implies that in some of these calls or text messages, Mr. Mulrenin may have learned some information about what another supplier intended to bid, without ever providing similar information to the supplier.  For example, with respect to the episode described in the Superseding Indictment as "QSR-4's 2013 Freezing Charge," Mr. Mulrenin is alleged to have received an email on May 31, 2013, sent to him by a colleague and stating that "[Supplier-1] told me they would be around .025 to .03 on 8pc & dark meat and [Supplier-5] told me they were .025 on 8pc and at this time was not charging for dark but would probably change to .025 for next year."  (SI ¶ 68(c).)[2]  There are no allegations that Mr. Mulrenin responded to this email, nor how his receipt of this information implicated him in a broader "continuing network" to fix prices and rig bids.  Indeed, this is a consistent theme seen across the episodes implicating Mr. Mulrenin, rendering the allegations against him fatally deficient.

Importantly, the Superseding Indictment explicitly acknowledges that there are other legitimate reasons that Defendants were communicating throughout the seven year period, by indicating that price fixing and bid rigging was "***an*** understood purpose" of the "continuing network."  (*Id.* ¶ 47 (emphasis added).)  In other words, the government concedes that the alleged aim of price fixing and bid rigging was not the only purpose Defendants had for communicating with one another as part of this supposed "continuing network,"[3] and therefore Mr. Mulrenin's purpose in communicating with other suppliers could very well have been for a

---

[2] With respect to this episode, the Superseding Indictment also alleges that Mr. Mulrenin received: (1) an internal June 3, 2013 email from Mr. Roberts stating "I want to discuss this before we submit. I want to understand what the storage expectation is,"; and (2) a June 4, 2013 email from a Tyson employee, copying Mr. Mulrenin, to QSR-4-Employee-1 with pricing for frozen 8-piece and dark meat at $.03.  (*Id.* ¶¶ 69-70.)

[3] The definition of "a" or "an" provides that it is "[u]sed to indicate membership of a class of people or things."  A, An, LEXICO.COM, https://www.lexico.com/en/definition/a (last visited July 25, 2021).

purpose other than the price fixing and bid rigging alleged in the Superseding Indictment. That the government failed to set forth any allegations in the Superseding Indictment stating that Mr. Mulrenin's communications were for the unlawful purpose charged should be fatal to the Superseding Indictment.

At most, the allegations in the Superseding Indictment amount to information exchanges between competitors, and as such cannot amount to a *per se* criminal violation. *Gypsum*, 438 U.S. at 441 n.16 ("[t]he exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances *increase* economic efficiency and render markets more, rather than less, competitive.") (emphasis added). Exchanging prices or other competitively sensitive information with a competitor may give rise to an inference of an agreement, but it does not constitute an agreement to violate the Sherman Act standing alone. An example of a price information exchange not subject to the *per se* rule is exemplified in *In re Baby Food Antitrust Litigation,* where the conduct at issue was the exchange of information amongst baby food suppliers, specifically whether: (1) other competitors were "going to increase the wholesale list prices of their baby food products;" (2) the exchange of "future price information with various sales representatives" of competitors regarding whether they "were planning to announce future price increases;" and (3) generally the exchange of "pricing information with sales representatives of the other [baby food] companies." 166 F.3d 112, 119 (3d Cir. 1999). Although the plaintiffs sought to characterize such conduct as evidence of price fixing, the court found that this evidence "evinces only an exchange of information among the defendants." *Id.* at 121. Accordingly, the Third Circuit applied a rule of reason analysis in assessing the legality of the conduct at issue. *Id. See also Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999) ("Mere exchanges of

8

information, even regarding price, are not necessarily illegal, in the absence of additional evidence that an agreement to engage in unlawful conduct resulted from, or was a part of, the information exchange."); *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 474–75 (10th Cir. 1990).

An illustrative example that the conduct alleged falls short of anything more than information sharing can be seen with respect to the episode described as "QSR-5's 2014 Conversion to Antibiotic-Free Broiler Chicken Meat." Mr. Mulrenin's alleged involvement in this episode stems from a 12-minute phone call with co-defendant Scott Brady on April 18, 2014, and a text message Mr. Brady sent afterwards stating that he had a conversation with a "Tim" about "ABF," which the Superseding Indictment assumes refers to Mr. Mulrenin and antibiotic free pricing.[4] (SI ¶ 86.) There are no allegations that the information exchanged was actually used to fix prices or rig bids. Thus, even taking these facts as true, they amount *at most* to exchanging price information. *See In re Baby Food*, 166 F.3d at 126 ("mere possession of competitive memoranda" reflecting "advance prices of competition" is not "evidence of concerted action to fix prices" because, "[i]n a highly competitive industry, . . . it makes common sense to obtain as much information as possible of the pricing policies and marketing strategy of one's competitors").

### 2. The Superseding Indictment Fails to Allege That Mr. Mulrenin Knowingly and Intentionally Entered Into Any Agreement

Perhaps the most glaring deficiency in the Superseding Indictment is that it fails to allege that Mr. Mulrenin knowingly or intentionally joined the charged conspiracy. With respect to the five episodes implicating Mr. Mulrenin, the Superseding Indictment does not allege that he took

---

[4] Mr. Mulrenin notes that the government's assumption that reference to "Tim" in Mr. Brady's text message is speculative.

any action with respect to using price information to rig bids or fix prices.  As explained above, there are no facts alleged in the Superseding Indictment that can support a finding of an agreement to fix prices, an obvious pre-requisite for a finding that Mr. Mulrenin was aware of and involved in a conspiracy to do so.  Nor can the Superseding Indictment support an inference of an agreement.  *See Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publ'ns, Inc.,* 63 F.3d 1540, 1556 (10th Cir. 1995) ("ambiguous conduct that is as consistent with permissible competition as with illegal conspiracy does not by itself support an inference of antitrust conspiracy under Sherman Act section 1.").

With respect to three out of the five episodes implicating Mr. Mulrenin, he is not even alleged to have had *any* contact with any competitor.  Indeed, with respect to the allegations against Mr. Mulrenin concerning the episodes described as "QSR-4's 2013 Freezing Charge," "QSR-4's Quality Assurance Costs for 2014," and "QSR-2's 8-Piece COB Supply for 2018 and 2019," not only are there no allegations that Mr. Mulrenin spoke with any other supplier, but the Superseding Indictment is also devoid of any allegations that Mr. Mulrenin *was aware of* any communications with other suppliers for the purposes of fixing prices or rigging bids.  The closest allegation in this respect is made at paragraph 47, in which the alleged "continuing network" is described, and still there is no allegation that Mr. Mulrenin knew the "understood purpose" of this "continuing network" was to fix prices or rig bids.  (SI ¶ 47.)  As the Tenth Circuit has recognized, much more is required to sufficiently allege an agreement to violate the Sherman Act.  *See, e.g., United States v. Mobile Materials, Inc.*, 871 F.2d 902, 907 (10th Cir. 1989 ) (finding the indictment sufficiently alleged a Sherman Act violation because it alleged the defendants "1) discuss[ed] the submission of prospective bids on projects, 2) agree[ed] on the successful low bidder on projects, 3) submit[ed] intentionally high, noncompetitive bids or

withholding bids on construction projects and 4) submit[ed] bid proposals with false statements and entries."), *abrogated on other grounds by Bloate v. United States*, 559 U.S. 196 (2010).

## IV.    CONCLUSION

For the foregoing reasons, the Superseding Indictment fails to allege the necessary elements of the charged Section 1 violation, and it should be dismissed.

Dated: July 26, 2021                                                     Respectfully submitted,

s/ *Elizabeth B. Prewitt*
**LATHAM & WATKINS LLP**
Elizabeth B. Prewitt
Caroline A. Rivera
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Email: elizabeth.prewitt@lw.com
Email: caroline.rivera@lw.com

**Stimson Stancil LaBranche Hubbard, LLC**
Marci G. LaBranche
1652 N. Downing Street
Denver, CO 80218
Tel/Fax: (720) 689-8909
Email: labranche@sslhlaw.com

*Attorneys for Defendant Timothy Mulrenin*

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of July, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to all counsel of record.

s/ <i>Nancy Hickam</i>