**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1. JAYSON JEFFREY PENN,
**2. MIKELL REEVE FRIES,**
3. SCOTT JAMES BRADY,
4. ROGER BORN AUSTIN,
5. TIMOTHY R. MULRENIN,
6. WILLIAM VINCENT KANTOLA,
7. JIMMIE LEE LITTLE,
8. WILLIAM WADE LOVETTE,
9. GARY BRIAN ROBERTS, and
10. RICKIE PATTERSON BLAKE,

      Defendants.

---

## DEFENDANT MIKELL FRIES' MOTION FOR JUDGMENT OF ACQUITTAL

---

Defendant Mikell R. Fries ("Fries"), by and through his counsel, and pursuant to Fed. R. Crim. P. 29, respectfully requests the Court enter a judgment of acquittal on Count One of the Superseding Indictment.

## INTRODUCTION

No reasonable jury can find that Mikell Fries participated in a bid rigging or price fixing conspiracy. The government has a tall task. It is required to prove beyond a reasonable doubt: "(1) that two or more persons agreed to violate the law, (2) that [Fries] knew at least the essential objectives of the conspiracy, (3) that [Fries] knowingly and voluntarily became a part of it, and (4) that the alleged coconspirators were interdependent." *United States v. Carnagie*, 533 F.3d 1231, 1238 (10th Cir. 2008). The government has failed on all these elements. There is no

evidence of an agreement, much less of *when* Mr. Fries joined the alleged conspiracy, *with whom* he agreed to violate the law, or that Mr. Fries had *knowledge of the objectives* of the alleged conspiracy or voluntarily became a part of it.

The government's case is based upon a scattering of documents and a so-called "insider" – Robbie Bryant – who was supposed to testify about the innerworkings of the conspiracy. He came up empty. None of his testimony related to Mikell Fries. To the contrary, Mr. Bryant testified that he has no knowledge whatsoever implicating Mr. Fries in the alleged conspiracy.

The government's other evidence – phone calls and text messages – are equally deficient. Phone calls among competitors are not evidence of a conspiracy when there is no proof of what was discussed during those calls. Indeed, such evidence is even insufficient to survive a Rule 56 motion in a civil case, much less as proof in a criminal case. *See Kleen Products LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 938-939 (7th Cir. 2018). And while the government may attempt to rely on information exchanges, not a single text message shows an agreement involving Mr. Fries. At best, they show attempts to gain market intelligence, which are plainly not a *per se* violation of the Sherman Act without evidence of an agreement. *See United States v. United States Gypsum Co.,* 438 U.S. 422, 441 n. 16 (1978); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999). In short, the government has produced no evidence of an agreement to fix prices or rig bids involving Mikell Fries. No inference can be drawn that a conspiracy existed or that Mr. Fries knowingly participated in it. Accordingly, no reasonable jury could find Mr. Fries guilty of Count One, and this Court should enter judgment of an acquittal as to Mr. Fries.

## LEGAL STANDARD

In deciding a motion for judgment of acquittal, the Court must determine "whether taking the evidence – both direct and circumstantial, together with the reasonable inferences to be

drawn therefrom – in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Stiger*, 413 F.3d 1185, 1193 (10th Cir. 2005). A conviction cannot be obtained, however, "by piling inference upon inference. An inference is reasonable only if the conclusion flows from logical and probabilistic reasoning." *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998).

## BACKGROUND FACTS

The government offered the following evidence of Mr. Fries' knowledge of and participation in the alleged conspiracy at trial.

### I.   Testimony

As relevant to Mr. Fries, the government elicited testimony from purported co-conspirator Robbie Bryant, and purported victims Michael Ledford (RSCS), Robert Lewis (RSCS), Sara Fisher (RSCS), Meyer Skalak (Chik-Fil-A) ("CFA"), and Joe Brink (Pollo Tropical). None offered any specific evidence implicating Mr. Fries in the charged conspiracy.

### A.  Alleged Co-Conspirator Robbie Bryant

The government called Robbie Bryant, pursuant to an immunity agreement, to testify as the government's only purported percipient witness. Mr. Bryant, a Pilgrim's Pride employee, was the *sole* purported co-conspirator to testify about the purpose and scope of the alleged conspiracy, the manner in which he claimed the alleged conspiracy was carried out, and the identity and involvement of the alleged co-conspirators. However, Mr. Bryant admitted he had no knowledge regarding any involvement of Mr. Fries or anyone else at Claxton in the charged conspiracy. The government has no other insider witness to implicate Mr. Fries in any wrongdoing.

### B.  Michael Ledford (RSCS)

The government's purported victims at RSCS – Michael Ledford, Robert Lewis, and Sara Fisher – similarly testified they had no knowledge that Mr. Fries was involved in any wrongdoing. Instead, their testimony regarding Claxton's willingness to negotiate, its competitively low prices, and its practice of taking directional price guidance, exculpates Mr. Fries.

Mr. Ledford admitted to the leverage that RSCS had in its negotiations with Claxton, which made it virtually impossible for Mr. Fries to enter into any price fixing agreement. Mr. Ledford stated he could and did threaten to take away volume from suppliers to get the price he wanted, including with Claxton. He used that negotiation strategy to ratchet down the prices from round one through rounds three or four to ensure he had the supplier at a price that he, the buyer, believed was appropriate. The fact Mr. Ledford maintained control of the price negotiation process by using the available leverage he possessed negates the existence of a conspiracy in as much as the seller/supplier does not adhere to any purported agreed-upon price with his fellow suppliers, but rather succumbs to the dictates of the power buyer – indelible indicia of a monopsonist.[1]

*Reduced-weight bird*: Mr. Ledford admitted KFC's weight specifications were very specific (as are the weight specifications of other customers). He conceded the production machinery is designed to only process a chicken of a specific weight and size and is incapable of processing the size of bird he asked about. He conceded there is no market for birds at the low

---

[1]  Regarding the 2012 contract negotiations for the 2013 contract, Ledford admitted that he knew that *demand* was increasing for chicken and that *prices* were going to increase for chicken; that he needed to keep Claxton as a supplier because Claxton tended to offer more competitive pricing; that the 2012 negotiations for the 2013 contracts was very successful for RSCS; and that Claxton was even rewarded with additional volume for the contract because it came in the top three lowest-priced suppliers.

range of the bell curve he was asking for, and that his question to the suppliers was no more than a research project from Price Waterhouse Coopers.

Mr. Ledford, in fact, admitted that his whole request to the suppliers was laughable:

> Q. *And you would agree with me that what you were asking for is, in fact, laughable, right?*
> A. *Yes.*
> Q. Is it fair to say that this big ask, this laughable ask, was not a request to the suppliers to enter into a contract with you, right?
> A. No, certainly not, not at this point. (Ledford Testimony at p. 167:15-21)[2]

Mr. Ledford, in fact, knew the answer to the question of whether Claxton could provide a reduced-weight bird before he even asked it in his email, explaining that "Yes, I knew the answer that there was none available certainly when I asked it." He further admitted that "I don't think it would have surprised me" if the suppliers talked with one another about his request.

Mr. Ledford's testimony plainly demonstrates that the request of RSCS's suppliers – "what will it take" to produce this unusually small broiler chicken – was a product of the imagination of RSCS's accounting consultants to evaluate possible cost saving for their client. This was not a bona fide business transaction that Mr. Ledford expected to be responded to like a request for proposal or bid. Indeed, he stated that "certainly . . . at this point," he was "not request[ing] . . . the suppliers to enter into a contract. . .." *Id.* The request and the suppliers' replies had no tangible commercial impact. As such, there was no Sherman Act restraint in the purported response of Claxton to the "laughable" request of Mr. Ledford. This clearly was not an example of a horizontal market restraint like price fixing, customer allocation, territorial allocation, or output restriction that are presumed anticompetitive and obviate the need to inquire into the defendants' market power, actual anticompetitive effects, or pro-competitive

---

[2] The Ledford trial transcript is not official. Cites are provided to the Court for its convenience, not because they reflect a Certified Transcript.

justifications.[3] Even if this conduct could somehow be characterized as a horizontal restraint, it is indisputably a non-price horizontal restraint that arises in the context of unique product and industry conditions and must be evaluated under the Rule of Reason,[4] not as criminal conduct.

### C.  Robert Lewis (RSCS)

Robert Lewis of RSCS testified that in the 2014 price negotiations for KFC, he had no personal knowledge that Mr. Fries entered into any agreement with anyone to fix, raise, or maintain a price.

The little evidence that Mr. Lewis did offer regarding Mr. Fries' participation in the bidding process was exculpatory: Mr. Lewis admitted that Mr. Fries responded to Mr. Lewis' directional guidance about the price of chicken, that Mr. Fries has always been willing to negotiate prices, that Mr. Fries has never threatened to walk away from a negotiation, and that Mr. Fries has never threatened to switch from producing small bird to more profitable big bird (non-conforming for KFC). Such conduct is antithetical to a Sherman Act conspiracy.

### D.  Sara Fisher (RSCS)

Sara Fisher (RSCS), testifying about the 2017 KFC bidding, similarly had no knowledge of any involvement by Mr. Fries in any wrongdoing. To the contrary, Ms. Fisher admitted she was surprised to learn during the 2017 negotiations that the suppliers had more volume than she expected, which was a positive development for RSCS, that RSCS was able to negotiate prices down that year and were "happy [with] the prices that we received," that Claxton reduced its pricing round after round when negotiating with RSCS, and that Claxton agreed to RSCS's offer

---

[3] *U.S. v. Andreas*, 216 F.3d 645, 666-67 (7th Cir. 2000) (listing recognized *per se* restraints).
[4] *National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85, 100-101 (1984); *American Needle, Inc. v. National Football League*, 560 U.S. 183, 201-204 (2010).

regarding price decreases over a three-year contractual period. Ms. Fisher's testimony does not support the existence of the charged conspiracy on the part of Mr. Fries.

### E. Meyer Skalak (CFA)

Meyer Skalak of CFA testified regarding CFA's request to suppliers regarding pricing related to "no-antibiotic ever" ("NAE") chicken. He testified NAE and "antibiotic free" ("ABF") are similar, but are different USDA certified programs for raising chickens without antibiotics. While chicken suppliers were asked to estimate the cost for converting their programs to NAE in the early months of 2014, CFA did not even know (or advise suppliers) which program it would initiate – NAE or ABF – or the requirements for each until at least May 2014. He testified that suppliers needed to know which program CFA would use in order to determine estimated costs. Mr. Skalak estimated that the cost for suppliers to produce NAE chickens would be an additional 10-20%. Further, CFA encouraged suppliers to reach out to Perdue to obtain information about producing NAE chickens. He agreed that knowledge regarding the additional cost to suppliers for NAE production did not mean that each competitor knew the other competitor's ultimate price, rather the estimated cost increase. In short, Mr. Skalak had no information whatsoever regarding any price fixing conduct on the part of Mr. Fries associated with CFA's conversion to NAE chicken.

### F. Joseph Brink (Pollo Tropical)

The government called Joseph Brink, the buyer for Pollo Tropical. Mr. Brink testified he was "shocked" by the amount of the price increase in 2014, primarily because the cost of corn was lower than prior years. Mr. Brink testified that for the first time in his experience, buyers took a "take it or leave it" attitude about prices. On cross examination, Mr. Brink conceded he did not negotiate prices with Mr. Fries. Mr. Brink's testimony is telling of the larger government

case in that, like the government, he drew many conclusions that were factually incorrect. Indeed, he admitted that: 1) Claxton and Pilgrim's Pride had different prices; 2) corn price is not directly related to chicken cost and he is unaware of their correlation; 3) Claxton Poultry charged him $0.15 less than market average; 4) he expected and budgeted for a cost increase; 5) Claxton Poultry agreed to "stair step" its increase for six months, at the end of which, Mr. Brink reneged on the agreement he had reached, claiming it was unsigned, and proceeded to take volume from Claxton; 6) Claxton reduced its price $0.01 without being asked; and 7) Claxton never took a "take it or leave it," attitude towards negotiations. In short, Mr. Brink provided no testimony implicating Mr. Fries in the alleged conspiracy. To the contrary, his testimony established Claxton's pro-competitive behavior in trying to undercut Pilgrim's on both price and service to Pollo Tropical.  Trial Tr. Day 16.

## II.    Emails and text messages.

The government's case relies on text and email communications summarized in the summary exhibits. The few communications involving Mr. Fries in those summary exhibits were not even with a competitor of Claxton, but instead were between Mr. Fries and Claxton employee, Scott Brady.

The government relies on text messages and emails from Mr. Brady to Fries engaging in the legal practice of passing along mostly historical price information of competitors. These text messages, emails, and phone calls do not speak for themselves. They require context to understand and are not evidence of a conspiracy. The text message and email communications are insufficient to sustain a conviction of Fries. There is scant mention of Mr. Fries' name. Moreover, the phone records do not reflect the nature, substance, or purpose of any of the calls.

Government exhibit 3-1 shows an exchange of cost information between Mr. Brady and Mr. Mulrenin. Tysons, as testified by Mr. Skalak, submitted an *NAE* cost estimate in January 2014. Mr. Brady relates an *ABF* cost (live weight). Mr. Brady states, "I told him we were .31 to .32 per lb. on finished product." Mr. Fries responds, "Did he say what there [sic] finished increase would be." No jury can reasonably believe this to be evidence of an agreement given all testimony of Mr. Skalak and the differences between live cost and finished product, and NAE and ABF.

Government exhibit 9-1 relates Mr. Brady discussing Pilgrim's CFA cost-plus model to Mr. Fries.  However, as testified by Mr. Skalak, Claxton Poultry was on a market-based model in 2015, and not a cost-plus model.  The two models are different and unrelated. No jury can reasonably believe this to be evidence of an agreement given the differences in models and Mr. Skalak's explanation of them.

Government exhibit 10-1 shows that Mr. Fries received a cost model from RSCS on August 7, 2014. However, it does not otherwise involve or mention Mr. Fries. No jury can reasonably believe this to be evidence of an agreement, especially in light of the lack of corroborating evidence.

Government exhibit 10-2 shows Mr. Fries expressing surprise that "Greeley told him [Mr. Austin] not to come down on price," on August 26, 2014.  The next day, Mr. Fries states, "Tinch is at 11," a reference to the time of a scheduled meeting, not the price of chicken.  Mr. Fries knew "Koch is not moving." No jury can reasonably believe this to be evidence of an agreement since Claxton's price did come down, even armed with this knowledge, which Mr. Lewis's testimony confirmed.

Government exhibit 10-3 shows Mr. Brady calling Mr. Fries on September 3, 2014. On the same date, Mr. Brady texts Mr. Fries that he "told Bob [Lewis-RSCS] we would go down .02 he said someone moved down .04 it has to be George's or he is bluffing. Roger and bill [sic] are not moving." No jury can reasonably believe this to be evidence of an agreement since Claxton's price did come down, which once again Mr. Lewis's testimony confirmed.

Government exhibit 14-2 shows Mr. Fries calling Mr. Brady on November 13, 2012. Mr. Brady texts Mr. Fries that "George's is .30 back on dark meat." There is further discussion on period, current pricing. In response to the message, "He said to raise our prices, on wings he is market and market plus .10," Mr. Fries writes, "tell him we are trying!" No jury can reasonably believe this to be evidence of an agreement. In fact, defense exhibit A-560 shows that the instructions specifically tell the suppliers to insert market wing price. Further "plus .10" is standard for pre-counted wings, as testified by Mr. Ledford. "Tell him we're trying," is jocular bantor, at worst, since Claxton reduced its price the very next day, as stated in government exhibit A-560. Further, there is no evidence that Mr. Brady ever reached out to Mr. Austin again after this exchange.

Government exhibit 16-1 shows Mr. Brady texting Mr. Fries, "I talked to Roger about the KFC sizes and he is *in agreement with us*." (emphasis added). This language merely reflects a shared opinion expressed by Mr. Brady, not the formal meeting of the minds between two suppliers necessary to support a Sherman Act conspiracy.[5] The statement Mr. Brady is said to have relayed to Mr. Fries regarding bird size was no more than a confirmation that the

---

[5] Indeed, the lead definition of "agreement" in the Cambridge Dictionary, describes "agreement" as the "same opinion." The definition goes on to describe "agreement" as "the situation in which people have the same opinion," followed by an example that is analogous to Mr. Brady's statement regarding Claxton's and Pilgrim's shared opinion regarding bird sizes: "The whole family was *in agreement with he*r about/on what they should do." (emphasis added). https://dictionary.cambridge.org/dictionary/english/agreement (last visited November 15, 2021).

independent conclusion Claxton reached regarding its reduced weight bird size coincided with the same conclusion Pilgrim's reached. No jury can reasonably believe this to be evidence of an agreement.

Government exhibit 17-1 shows a telephone call with Mr. Brady on November 1, 2013. Mr. Brady texts him, "Just an FYI last year we were .32 back on dark meat and this year we are 3050 back." After a back and forth, Mr. Fries says, "Stay .305 then." No jury can reasonably believe this to be evidence of an agreement, since the parties never shared the main 8-piece cost that "dark meat" refers to, and fails to acknowledge that Claxton, yet again, reduced its price to the customer.

## ARGUMENT

**I.    No reasonable jury could find Fries guilty beyond a reasonable doubt.**

To prove a conspiracy, the government is required to establish: "(1) that two or more persons agreed to violate the law, (2) that the defendants knew at least the essential objectives of the conspiracy, (3) that the defendants knowingly and voluntarily became a part of it, and (4) that the alleged coconspirators were interdependent." *Carnagie*, 533 F.3d at 1238 (10th Cir. 2008). The government has failed to offer sufficient evidence upon which a reasonable jury could conclude that Mr. Fries entered into the conspiracy as alleged.

**A.  The evidence does not show Mr. Fries knowingly participated in any conspiracy.**

The government must prove Mr. Fries was personally aware of and participated in the charged conspiracy. The guilt as to each individual defendant must be shown. *See United States v. Record*, 873 F.2d 1363, 1368 (10th Cir. 1989) (for a conspiracy, it is "essential to determine that kind of agreement or understanding existed *as to each defendant*" (quotation omitted; emphasis added). The Tenth Circuit is "mindful to guard against the mass application of guilt

when conspiracy charges are involved because guilt is always dependent on personal and individual conduct, not on mere association or unknowing involvement." *United States v. Horn*, 946 F.2d 738, 741 (10th Cir. 1991). *See also United States v. Kendall*, 766 F.2d 1426, 1432 (10th Cir. 1985); *United States v. McMahon*, 562 F.2d 1192, 1196 (10th Cir. 1977). The evidence "supporting the conviction [of Fries] must be substantial and do more than raise a suspicion of guilt." *Valadez-Gallegos*, 162 F.3d at 1262. "It is of course difficult to prove illegal collusion without witnesses to an agreement[.]" *See In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015). That is exactly what the government failed to provide here – witnesses to an agreement.

### 1.  The government has offered no direct evidence of guilt against Mr. Fries.

As discussed above in Sections I (A)-(F), neither Mr. Bryant – the government's sole alleged "insider" – nor the few government witnesses who dealt with Mr. Fries and Claxton offered any testimony implicating Mr. Fries.

### 2.  The government's circumstantial case against Mr. Fries requires impermissible inferences be drawn from legal conduct.

With respect to Mr. Fries' communications, the government established, at best, that over a seven-year period Mr. Fries communicated with Claxton employee Scott Brady, who occasionally communicated with competitors, about pricing and other information. Without additional evidence implicating Mr. Fries in an actual agreement to fix prices, the mere reception of competitors' pricing information is perfectly legal. *See United States Gypsum Co.*, 438 U.S. at 441 n. 16; *Intracorp, Inc.*, 179 F.3d at 859; *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 475 (10th Cir. 1990); *United States v. B&H Maint. & Constr., Inc.*, 07-cr-90 (D. Colo. June 19, 2008), [Doc. 319-10, at 7]. Indeed, Mr. Fries is permitted to obtain competitors' pricing and even use those prices to price similarly, as long as he does not do so pursuant to an agreement. That is

lawful absent an *agreement* to fix the prices. *See In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015). At best, this is exactly what the government has established.

The government's evidence of phone calls having occurred fares no better. The record is devoid of evidence of what was actually said on a single call out of 99,000 pages of phone records, let alone the substance of any call Mr. Fries participated in. There is even less room to draw an inference of a conspiracy based on thousands of phone records of calls that occurred over a seven-year-period among competitors who were also customers routinely buying and selling to one another to cover shortages for their common customers. Phone call evidence among companies with a legitimate reason for their contacts do not allow an inference of conspiracy to be drawn. *See Kleen Products*, 910 F.3d at 938-939.

The government's fixation on the word "agreement" in the one text message quoted in Government exhibit 16-1 led it to the false conclusion that it had uncovered horizontal conduct of an "agreement" between suppliers responding to an informal customer request regarding the plausibility of producing a reduced weight broiler chicken. Because the government never spoke to the requesting customer, Mr. Ledford, about his request prior to presenting the Superseding Indictment, the scant amount of information in paragraphs 64 and 65 of the Superseding Indictment reflects the facts that apparently satisfied the government that this activity should be branded as criminal and a *per se* violation of the Sherman Act. It is neither.

While the government can rely on circumstantial evidence, the Supreme Court has cautioned against inferences of price-fixing or bid rigging from ambiguous evidence. *See Matsushita*, 475 U.S. at 596; *see also Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1179–80 (10th Cir. 2019). In particular, it is impermissible to infer a price fixing or bid rigging conspiracy if a defendant's "conduct is consistent with other, equally plausible explanations" such as rational

unilateral business behavior outside of an illegal agreement. *Matsushita*, 475 U.S. at 596. This is particularly important in the criminal context where the government must prove its case beyond a reasonable doubt, meaning that jurors may not convict on the basis of ambiguous evidence. *See Gypsum*, 438 U.S. at 441.

Courts recognize the "considerable danger" of allowing inferences of conspiracy to be drawn from circumstantial evidence in price fixing or bid rigging cases: i.e. such inferences "could deter or penalize perfectly legitimate conduct." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984); *United States v. Summers*, 414 F.3d 1287, 1295–96 (10th Cir. 2005). That is why "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita*, 475 U.S. at 588.

That considerable danger is present here. Mr. Fries' limited communications demonstrate nothing more than a legal business practice of obtaining price information. Sending these communications to a jury to see if it can infer what even the government's admitted co-conspirator insider could not testify to, i.e. Mr. Fries' illegal conduct, is to ask the jury for an unsupportable inference, one that should not be drawn at all, much less be drawn beyond a reasonable doubt.

### 3. The government must rely on "guilt by association" to find Mr. Fries guilty.

It is clear now, at the close of the government's evidence, how it will ask the jury to return a guilty verdict against Mr. Fries – by putting on evidence of a Pilgrim's conspiracy and tacking on Mr. Fries through guilt by association. Against Mr. Fries, the government will ask the jury to find his guilt not due to any circumstantial evidence inferred from the communications at all, but merely *due to his association* as the superior of Mr. Brady. This is an impermissible legal inference upon which to find guilt on the part of Mr. Fries.

14

Regarding the circumstantial evidence of communications, the government is not asking the jury to draw inferences, but to draw inferences upon inferences: that Mr. Fries was a knowing participant in the conspiracy based on his position as Mr. Brady's superior and the content-less communications with him. But this is precisely the type of guilt-by-association argument the Tenth Circuit warns against. *Horn*, 946 F.2d at 741.

This is not a case of conflicting evidence among the testimony of Mr. Bryant and the text and email communications offered by the government. The communications involving exchanges of price information do not permit an inference to be drawn that a conspiracy existed or that Mr. Fries knowingly participated in it. Accordingly, no reasonable jury could find Fries guilty of Count One.

## **CONCLUSION**

Accordingly, Defendant Fries respectfully requests that a judgement of acquittal be granted as to Count One.


Dated: November 29, 2021

Respectfully submitted,

*s/ Richard K. Kornfeld*
Richard K. Kornfeld
RECHT KORNFELD, P.C.
Attorney for Mikell Reeve Fries
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 573-1900
rick@rklawpc.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 29, 2021, I electronically filed the foregoing Motion with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record who have entered notices of appearance in this matter.

<u>s/ *Erin Holweger*</u>
Erin Holweger