IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA,

      Plaintiff,

v.

JAYSON JEFFREY PENN,

      Defendants.

No. 20-cr-00152-PAB

## MR. BLAKE'S MOTION FOR JUDGMENT OF ACQUITTAL

Viewing the evidence in the most favorable light to the Government, the evidence against Mr. Blake is insufficient to sustain a conviction. The Government adduced no direct evidence against Mr. Blake. There are no recordings of any telephone calls involving Mr. Blake. There are no text messages that were sent or received by Mr. Blake. There are no emails in which Mr. Blake communicated any information about bids. Importantly, the only supposed member of the alleged conspiracy who testified at trial, Mr. Bryant, said he had no dealings with Mr. Blake. *See* Nov. 2 Tr. 394:12-18 (Certified Transcript).[1]

The circumstantial case the Government presented against Mr. Blake falls well short of proving, as the Superseding Indictment charges, that he knowingly joined a conspiracy to restrain trade by aligning the bids of his employer, George's, with those of its competitors. For Mr. Blake to have participated in such a conspiracy, he would need to have shared with competitors what

---

[1] Mr. Blake has only certain portions of an official, certified transcript. Where applicable, he will rely on that transcript. For other testimony, he will cite to, but not quote from, the unofficial daily transcript for the Court's convenience. He defers to the Court's recollection if it differs from the unofficial transcript.

George's was contemplating bidding, received information from competitors about what they intended to bid, and then affected George's bids in an effort to align them with those of its competitors. The evidence that suggests Mr. Blake shared George's bid information with competitors is thin. The evidence that he received competitor bid information is non-existent. There is also no evidence Mr. Blake set George's bids, or that he influenced those who did to set George's bids in an effort to align George's bids with those of its competitors.

Accordingly, even taking the evidence in the light most favorable to the Government, a reasonable juror could not find Mr. Blake guilty. Mr. Blake is entitled to a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.

## LEGAL STANDARD

On the motion of a defendant at the close of the Government's case in chief, the Court "*must* enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Cr. P. 29(a) (emphasis added). "The evidence supporting the conviction must be substantial and do more than raise a mere suspicion of guilt." *United States v. Anderson*, 189 F.3d 1201, 1205 (10th Cir. 1999) (internal quotations omitted). The test is not whether a rational jury could decide that guilt "was more likely than not, but beyond a reasonable doubt." *United States v. Rufai*, 732 F.3d 1175, 1188 (10th Cir. 2013) (The court, viewing the evidence most favorably to the government, must determine whether a rational jury could have found each element of the crime proven beyond a reasonable doubt.) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)).

The Government's case cannot depend on piling inference on inference, and the "jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess

or mere possibility." *Id.* (quoting *United States v. Michel*, 446 F.3d 1122, 1127-28 (10th Cir. 2006)). Rather, the Court must be satisfied that "the inferences are sufficiently supported" to permit a rational juror to find the elements established beyond a reasonable doubt. *United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019); *United States v. Miller*, 178 F. Supp. 3d 114, 1120 (D. Colo. 2016) (granting defendant's Rule 29 motion for judgment of acquittal where "the direct and circumstantial evidence together with the reasonable inferences which can be drawn from the evidence" were insufficient to sustain conviction).

Mr. Blake was charged with a single violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits "a contract, combination or conspiracy that unreasonably restrains trade." *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d. 745, 756 (10th Cir. 1999). For a jury to find Mr. Blake guilty, the Government must prove beyond a reasonable doubt that (1) the conspiracy described in the indictment existed at or about the time alleged; (2) the defendant knowingly became a member of the conspiracy, knowing its goal and intending to help accomplish it; and (3) the conspiracy affected interstate commerce. *See*, *e.g.*, *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 440-43 & n.20 (1978); *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 473-78 (10th Cir. 1990).

It is the second element that is at issue in this motion. A criminal violation of the Sherman Act requires a two-pronged finding of intent. Not only must the Government prove that each defendant had the "basic intent to agree, which is necessary to establish the existence of the conspiracy," but it must also prove "the more traditional intent to effectuate the *object* of the conspiracy," which, under Section 1, is engaging in bid rigging or price fixing for the purpose of restraining competition. *Gypsum*, 438 U.S. at 443 n.20 (emphasis added); *see also Suntar Roofing*,

897 F.2d at 479; *United States v. Metro. Enters., Inc.,* 728 F.2d 444, 449 (10th Cir. 1984). Therefore, the Government must prove beyond a reasonable doubt that Mr. Blake voluntarily and intentionally joined a conspiracy to rig bids or fix prices, *and* that he did so with the specific intent to unlawfully restrain competition. *See Gypsum*, 438 U.S. at 435, 443; *United States v. Therm-All, Inc.*, 373 F.3d 625, 639 (5th Cir. 2004) (approving instruction that "[t]he Government has to prove beyond a reasonable doubt that the Defendant knowingly agreed with a competitor to raise, fix and maintain prices, and that the Defendant actually intended to carry out the agreement in fact") (citing *Gypsum*, 438 U.S. at 430).

## ARGUMENT

**I.      NO RATIONAL JURY COULD FIND MR. BLAKE GUILTY BASED ON THE CIRCUMSTANTIAL EVIDENCE THE GOVERNMENT ADDUCED.**

The Government's circumstantial evidence against Mr. Blake consists of: (1) a single document from 2016 containing period pricing (not bidding information) for George's and its competitors, which Mr. Blake emailed to another employee of George's; and (2) phone records reflecting calls between Mr. Blake and competitors, without evidence of what was said on those calls, and emails and text messages to which Mr. Blake was not a party, referencing George's without any mention of Mr. Blake.

### A.      Current and historical period pricing information

The Government adduced evidence that Mr. Blake sent period pricing of George's competitors to Mr. Keck, his superior at George's. *See* GX-6088 (cover email from Mr. Blake to Mr. Keck, dated August 15, 2016), GX-6089 (attached excel spreadsheet reflecting period prices from 2009 to August 2016). The information sent by Mr. Blake to Mr. Keck related entirely to the

prices charged by the various suppliers under current, executed contracts, not to bids any supplier was making in response to an RFP to obtain a future contract.[2]

Mr. Bryant, a Pilgrim's employee testifying with immunity, acknowledged that period pricing could be learned by suppliers in the process of covering a short. Nov. 2 Tr. 380:23-387:24 (Certified Transcript); *see* H-895; GX-1851 (text message from Roger Austin determining a bid based on price per case). Mr. Bryant opined that "[a]ll information from a competitor" could inform a future bid. Nov. 2 Tr. 226:5-227:25 (Certified Transcript). Mr. Bryant did not specify that in making this observation, however, he was referring to period pricing; nor did he explain how knowing competitor information could influence a future bid. Specifically, he did not testify that period pricing was used, or could be used, to align bids. Indeed, Mr. Bryant testified that Pilgrim's set its prices independently, regardless of the competitor information it had. *Id*. at 227:23-25 (Certified Transcript).[3]

---

[2]  It is apparent from the face of the documents that Mr. Blake was sharing only period pricing, not any information about future bids. GX-6089 is a spreadsheet that contains 20 tabs, each of which reflects yearly pricing for various competitors under existing, fully executed contracts. They are broken down by monthly periods for Popeye's and by thirteen 4-week periods (labeled P1, P2, P3, etc.) for KFC. The latest information in the spreadsheet is from August 2016, the month in which Mr. Blake sent the spreadsheet to Mr. Keck. There is no forward-looking information in the spreadsheet, reflecting bids made for any contract for calendar year 2017 or beyond, or even predictions of what might be bid.

[3] Mr. Bryant suggested that period pricing could be used after the fact to see "where everybody actually did end up." He then agreed with the prosecutor's suggestion that "it was a monitoring mechanism." Nov. 1 Tr. 28:6-16 (Certified Transcript). But Mr. Bryant did not testify that he knew *any* of the defendants did, in fact, use period pricing to enforce or monitor the alleged agreement. In any event, Mr. Bryant testified he had no dealings with Mr. Blake. *See* Nov. 2 Tr. 394:12-18 (Certified Transcript). Thus, regardless of whether period prices could be used, or were used, as an enforcement mechanism, Mr. Bryant provided no evidence that *Mr. Blake* used period prices as an enforcement mechanism. Nor did any other witness. Indeed, as this motion makes clear the Government presented insufficient evidence to establish that Mr. Blake knew of any agreement to align bids, much less that he used period prices to enforce such an agreement.

Mr. Ledford, a senior director of supply continuity at Chick-fil-A who previously worked for purchasing cooperative UFPC (which later became RSCS), testified that a supplier's period prices would *not* be useful in formulating a future bid in response to an RFP. Nov. 9 Tr. 102:3-103:7. Mr. Ledford also testified that he knew suppliers might learn each other's period prices with RSCS through the process of covering another supplier's shortages on an existing contract with RSCS. *Id.* at 100:10-19, 180:8-181:11. Mr. Ledford further testified that he was not concerned that suppliers might learn each other's period prices through the process of covering shorts. *Id.* at 99:18-100:9, 179:10-21. Mr. Ledford explained that period prices would not influence a bid for future business because period prices are derived from existing, fully executed contracts, reflecting pricing elements that fluctuate from period to period. Simply knowing the current or past period price of another supplier, Mr. Ledford testified, would not impact the competitive bidding process on any future RFPs. *Id.* at 102:3-10; Nov. 10 Tr. 112:20-25.[4]

In sum, period prices do not tell a competitor what another competitor will bid in response to an RFP for a future contract. The fact that Mr. Blake emailed period pricing to Mr. Keck does nothing to further the Government's effort to prove that Mr. Blake conspired to align George's bids for future contracts with those of its competitors.

---

[4] Ms. Fisher, who was Mr. Ledford's subordinate at RSCS, testified that she did not want suppliers communicating directly with each other to cover shorts. *See* Nov. 4 Tr. 197:14-22. But Ms. Fisher did not testify that suppliers could use knowledge of period prices in a way that would affect future bid submissions in an anti-competitive manner. Mr. Robert Lewis, also of RSCS, did not think one supplier should know another supplier's period prices, but he agreed that knowledge of period pricing alone would not tell one supplier what another might bid in response to an RFP for the following year's contract. *See* Nov. 4 Tr. 145:16-146:6. Mr. Ledford's testimony that period prices could not be used to affect the competitive bidding process was uncontradicted by any witness.

**B.      Phone records of calls involving Mr. Blake and emails and texts of competitors**

The Government introduced records to demonstrate that during the at least seven-year duration of the alleged conspiracy, there were fourteen occasions on which Mr. Blake or an employee of one of George's competitors contacted, or attempted to contact, each other during the portion of the year in which suppliers were negotiating with customers. *See* GX-766, GX-1234, GX-1236, GX-1248, GX-1426, GX-1428, GX-1429, GX-1430, GX-1431, GX-1440, GX-1441, GX-1960, GX-1961. Taking KFC and Popeye's alone, assuming three rounds of bids per year, George's would have submitted 42 rounds of bids during these years.[5]

These calls were not recorded, and no witness testified about their content. It is undisputed that there are legitimate reasons, wholly unrelated to the bidding process, for competitors to speak with each other. *See, e.g.*, Nov. 2 Tr. 277:15-278:22 (Certified Transcript) (testimony of R. Bryant); Nov. 9 Tr. 100:2-9, 179:10-21 (testimony of M. Ledford). Accordingly, the Government attempted to prove circumstantially that bids were being discussed on these calls by introducing a handful of texts or emails of competitors—communications to which Mr. Blake was not a party—that suggested that, at some point after speaking to Mr. Blake, a competitor was in possession of information about George's bids. None of these texts or emails, however, cites Mr. Blake as the source of the information about George's.

---

[5] This is a rough estimate. On the one hand, there were occasions where multiple-year contracts were signed. On the other hand, there were occasions where there were more than three rounds of bids. In any event, the number of calls involving Mr. Blake plainly falls well short of the number that would be needed for him to coordinate with his competitors and align George's bids with theirs.

While the information could have come from a customer, another employee of George's, or may have been nothing more than supposition, the Government seeks to draw an inference that, on each of these occasions, Mr. Blake was the source of the information and communicated it to a competitor in one of the unrecorded telephone calls. Whether this inference is based, impermissibly, on rank speculation, or is a permissible, reasonable inference, is, for purposes of this motion, of no moment. Assuming, *arguendo*, that on each of these occasions Mr. Blake shared competitive information about George's bids with employees of its competitors, the Government is nonetheless left with no evidence that Mr. Blake received bidding information from any of George's competitors or used such information to align George's bids with those of its competitors.[6]

*First*, there is no evidence that Mr. Blake *received* bid information from competitors. None of the emails or texts on which the Government relies indicates that a competitor shared its bid information with Mr. Blake or that Mr. Blake ever asked for such information. One could conclude

---

[6] While Mr. Blake need not argue for purposes of this motion whether he was, as the Government argues, the source of George's information obtained by competitors, it is apparent that the source of information in some of these texts and emails was *not* Mr. Blake. For example, the Government attempts to use phone records to tie Mr. Blake to GX-755 and GX-757, in which Mr. Pepper, several hours after speaking with Mr. Blake by phone, texted one of his colleagues at Tyson suggesting he had "a general idea what Georges is doing" in response to a Popeye's RFP in 2017. In fact, the evidence suggests the information obtained by Mr. Pepper actually came from a *customer,* not Mr. Blake. For example, GX-751 suggests that Mr. Pepper's information likely came from Kent Kronauge—the purchasing agent for Popeye's—who had given Mr. Pepper detailed information about what other companies had bid, down to the fourth decimal place.

Another communication on which the Government relies in arguing that Mr. Blake shared George's bid information with a competitor demonstrates that the information came from the customer and, even with the information, the competitor did not know George's bid. *See* GX-1238 (text between Brady and Fries, wherein Mr. Brady indicated, "[B]ob [Lewis] [KFC purchasing agent] … said someone moved down .04 *it has to be George's or he is bluffing*.") (emphasis added).

that Mr. Blake received bid information from competitors not through any reasonable inference from the evidence, but only through sheer speculation. Mr. Blake could not have aligned George's bids with those of its competitors if he did not know what its competitors were bidding. The complete lack of evidence that Mr. Blake learned, or even attempted to learn, what George's competitors were bidding is fatal to the Government's case.[7]

*Second,* there is no evidence, direct or circumstantial, that Mr. Blake ever agreed to align George's bids with competitors' bids. Mr. Blake did not have pricing authority at George's and did not negotiate prices on behalf of George's. Nov. 4 Tr. 141:19-143:9 (testimony of R. Lewis); Nov. 5 Tr. 24:17-25:11 (testimony of S. Fisher); Nov. 10 Tr. 113:11-114:14, 117:20-118:20 (testimony of M. Ledford); GX-710 (email from D. Bradley to K. Kronauge attaching Popeye's 2018 bid from George's); GX-1007 (email from D. Keck to R. Lewis attaching KFC presentation for 2014); GX-1120 (2014 contract between George's and RSCS, signed by Charles George); GX-1121 (2015-2017 contract between George's and RSCS, signed by Charles George); GX-1160 (email from R. Lewis to D. Keck regarding 2014 negotiations); GX-1405 (email from D. Keck to M. Ledford regarding 2012 negotiations); GX-1406 (email from D. Keck to M. Oechsli attaching 2013 bid proposal); GX-1515 (2013 pricing model signed by D. Keck); GX-9690 (submission for

---

[7] Evidence of a two-way exchange of pricing information between competitors would not be sufficient to establish a conspiracy to fix prices. *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999) ("Mere exchanges of information, even regarding price, are not necessarily illegal, in the absence of additional evidence that an agreement to engage in unlawful conduct resulted from, or was a part of, the information exchange."). Against Mr. Blake, however, the Government has failed to adduce evidence of a two-way exchange, much less additional evidence of an illegal agreement.

2013 RFP, sent by D. Keck); F-759 (2012 contract between George's and RSCS, signed by D. Keck); H-855 (invitation to D. Keck alone at George's to be part of 2013 RFP).[8]

Given that Mr. Blake lacked the ability to set George's bids, in order to align George's bids with those of its competitors, he would need to cause those who *did* have authority to set the bids—Darrel Keck and Charles George—to do so in a manner that aligned them with those of George's competitors. But there is no evidence that Mr. Blake communicated competitor bid information to Mr. Keck, Mr. George, or anyone else at George's who set George's bids. Nor is there evidence that in any other manner Mr. Blake attempted to influence the amount that George's bid, much less did so in an effort to align George's bids with competitors.

Finally, there is no evidence that George's bids were aligned with those of its competitors. Indeed, the evidence is to the contrary.

For example, in the negotiations for the 2013 KFC contract, George's submitted its first-round bid, in response to an RFP from UFPC (later known as RSCS, the purchasing cooperative for KFC) on October 10, 2012. GX-1406, GX-9690. In its first submission, George's bid 0.9694 on 8-piece COB and 0.28 back from the 8-piece COB price for dark meat. *See id.* In response to a request by Mr. Ledford to lower its bid, George's submitted a second-round bid on November 14, 2012, in which it *reduced* the bid for 8-piece COB to 0.9632 and reduced the bid for dark meat to

---

[8] Although Mr. Olson testified that Mr. "Blake was the only person at George's with whom he worked," Mr. Olson was not an employee of RSCS; he was the franchisee representative on RSCS's board. He did not, and could not, negotiate with individual chicken suppliers in their responses to RSCS's requests for proposals. *See* Oct. 27 Tr. 215:10-216:1. The remaining fact witnesses testified they had never worked with Mr. Blake. *See* Nov. 2 Tr. 394:12-18 (R. Bryant) (Certified Transcript); Nov. 8 Tr. 140:4-8 (T. Smith); Nov. 15 Tr. 137:11-19 (M. Skalak); Nov. 17 Tr. 130:13-21 (J. Brink); Nov. 22 Tr. 130:4-24 (M. Hoyt).

0.30 back. *See* C-023, C-024-1; Nov. 10 Tr. 134:16-135:6. Darrell Keck, Mr. Blake, and others from George's met with Mr. Ledford on November 28, 2012 to discuss the second-round bid. *See* C-064. Mr. Ledford asked George's to further reduce its bid for 8-piece COB by another .0015. Nov. 10 Tr. 142:19-25. After that meeting, George's agreed to reduce its COB bid at Mr. Ledford's direction, submitting a third-round bid for 8-piece COB that was .0015 lower than its second-round bid. *See* C-20, C-21-1. Through three rounds of negotiation, George's ultimately agreed to an 8-piece COB price of 0.9622, which was 0.0072 *lower* than its opening bid, with a dark meat price that was 0.02 lower than its opening bid. *See* GX-1515. Mr. Ledford testified that, through this negotiation, George's came down more than two times what the average suppliers came down. *See* F-808, Nov. 10 Tr. 159:6-160:15.[9]

Likewise, the evidence relating to the negotiations in 2014 for the 2015 KFC contract demonstrates that George's prices did not move in tandem with those of its competitors. Under the 2014 contract, George's had the second lowest price with RSCS for KFC, but the second highest profit margin. In 2015, George's had the lowest contract price and the lowest profit margin. *See* GX-10-4. While Pilgrim's Claxton, Tyson, and Mar-Jac's prices for 2015 increased by 15-20% from 2014, George's price increased by only 11%. *See id.*

These facts demonstrate a competitive negotiation with purchasers in the horizonal supply chain, not an unlawful agreement to rig bids and fix prices. *See Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1034 (8th Cir. 2000) (affirming judgment for defendants

---

[9] The Government points to phone records in which Mr. Blake appears to have called Mr. Austin on November 28, 2012, to suggest that Mr. Blake shared the amount that George's was bidding on the 2013 KFC contract. GX-1428; GX-1538. However, after the call allegedly took place, George's and Pilgrim's *both reduced* their bids for 8-piece COB at the direction of UFPC. *See* GX-1524, GX-1525, GX-1552.

where price increases did not result from price verification); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 125 (3d Cir. 1999) (granting judgment to defendants where information exchanges had no impact on pricing).

Of course, in a conspiracy case, the crime is the agreement. The Government is not required to prove that a conspiracy was successful, or even that the defendant undertook any significant efforts to achieve the objectives of the conspiracy. But the Government must show that the defendant knowingly joined the conspiracy, shared its objectives, and intended to further those objectives. The utter lack of evidence that Mr. Blake sought bid information of competitors, obtained such information, passed such information on to his superiors who set George's bids, otherwise attempted to influence those bids, or that George's bids were aligned with those of its competitors demonstrates the extent of the failure of the Government to prove its case. The circumstantial evidence presented is not only insufficient to prove the essential element of intent on the part of Mr. Blake, but there is also powerful circumstantial evidence negating any such intent.[10]

## II.   THE GOVERNMENT HAS FAILED TO PROVE THE ESSENTIAL ELEMENT OF INTENT.

In the absence of any direct evidence demonstrating beyond a reasonable doubt the essential element that Mr. Blake's intended to join a conspiracy to restrain trade by aligning or rigging bids, the Government failed to prove by circumstantial evidence that Mr. Blake

---

[10] Similarly, while the Government need not prove motive, evidence of motive might bolster an otherwise borderline case. The Government, however, introduced *no* evidence that Mr. Blake had a motive to join a bid-rigging conspiracy. For example, it offered no evidence about Mr. Blake's compensation or bonus structure, his workplace incentives, or that any part of his compensation was tied to the prices George's charged in its contracts with buyers.

participated in such a conspiracy. In *United States v. Guzman-Ortiz*, 975 F.3d 43, 48 (1st Cir. 2020)*, the court affirmed the grant of a Rule 29 motion for judgment of acquittal where there was no direct evidence the defendant agreed to participate in a conspiracy to distribute drugs, even though (1) the defendant was at an apartment that was used to carry out a heroin distribution conspiracy, (2) with individuals who were involved in that conspiracy, and (3) he fled from the scene when law enforcement arrived. *Id.* at 48. Even if the defendant "*knew* illegal … activity" was being conducted, the court found the "[m]ere *association* with conspirators or mere presence during conduct that is part of the conspiracy is insufficient to establish knowing participation; the defendant must … share[] his co-conspirators' intent." *Id.* (emphasis added; internal quotations omitted); *see also United States v. Evans*, 970 F.2d 663, 674 (10th Cir. 1992) (reversing conviction for conspiracy where evidence was insufficient to prove that the defendant "intended to join [the wide-ranging] conspiracy as alleged").

Similarly, in *United States v. Garcia*, 919 F.3d 489 (7th Cir. 2019)*, the court held that the defendant was entitled to a Rule 29 judgment of acquittal because the primary case against him was opinion testimony by an agent regarding the meaning of incriminating telephone conversations. Absent corroborating evidence, the court held that the agent's testimony "amounted to educated speculation rather than proof beyond a reasonable doubt." *Id.* at 496. The Government's case consisted entirely of "inferences" the Government argued could be drawn about the defendant's conversations, as well as "inferences focused on [the] defendant's presence or association with criminals or their criminal activity." *Id.* at 503 (internal quotations omitted). But even though some of the conversations were suspicious and might have supported applications

for search warrants or wiretaps, "cryptic conversations … without any corroboration" that the defendant was actually engaged in the alleged scheme were insufficient to support conviction. *Id.*

The same is true here. There is no evidence that Mr. Blake knew of the existence of a bid-rigging conspiracy, much less that he intended to join it. A rational juror could not conclude that the Government has proven the requisite intent on the part of Mr. Blake, based on either the evidence or on *reasonable* inferences from that evidence.

## **CONCLUSION**

The evidence is insufficient as a matter of law for a rational juror to conclude Mr. Blake knowingly joined a conspiracy to rig or align George's bids. The Government must prove beyond a reasonable doubt that Mr. Blake voluntarily and intentionally joined a conspiracy to rig bids or fix prices *and* that he did so with the specific intent to unlawfully restrain competition. *See Gypsum*, 438 U.S. at 435, 443. Taking the evidence in the light most favorable to the Government, Mr. Blake communicated with competitors and, on occasion, shared George's bid information with them. From there, a juror would need to infer that Mr. Blake did so because he knew his competitors were engaging in a bid-rigging conspiracy, that he knowingly joined that conspiracy, and that he did so intending to restrain competition. With no direct evidence, the Government relied on a circumstantial case. But that case lacks evidence that Mr. Blake received, or even sought to receive, competitor bid information; passed such information on to those who set George's bids; otherwise sought to influence George's bids to align them with the bids of its competitors; or that George's bids were aligned with those of its competitors. The Government thus asks the jury to stack unsupported inference upon unsupported inference to conclude that Mr. Blake knowingly joined a conspiracy to restrain competition. Because a jury is not permitted to do so, a rational

juror could not find that the Government proved beyond a reasonable doubt an essential element of the offense, Mr. Blake's intent. Accordingly, Rule 29 mandates the entry of a judgment of acquittal for Mr. Blake.

Date:  November 29, 2021                    Respectfully submitted,

*/s/ Wendy W. Johnson*_____          */s/ Barry J. Pollack*_____
Wendy W. Johnson                           Barry J. Pollack
RMP LLP                                    ROBBINS, RUSSELL, ENGLERT, ORSECK
5519 Hackett Road, Suite 300               & UNTEREINER LLP
Springdale, Arkansas 72762                 2000 K Street N.W., 4th Floor
Telephone: (479) 443-2705                  Washington, D.C.  20006
wjohnson@rmp.law                           Telephone: (202) 775 4500
                                           bpollack@robbinsrussell.com

                                           *Counsel for Mr. Blake*

## CERTIFICATE OF SERVICE

On this 29th day of November, 2021, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States District Court for the District of Colorado by using the Court's CM/ECF system, which will serve electronic notification of this filing on all counsel of record.

Respectfully submitted,


*/s/ Wendy W. Johnson*

Wendy W. Johnson


*Counsel for Mr. Blake*