IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA,

       Plaintiff,

v.

1.    JAYSON JEFFREY PENN,
2.    MIKELL REEVE FRIES,
3.    SCOTT JAMES BRADY,
4.    ROGER BORN AUSTIN,
5.    TIMOTHY R. MULRENIN,
6.    WILLIAM VINCENT KANTOLA,
7.    JIMMIE LEE LITTLE,
8.    WILLIAM WADE LOVETTE,
9.    GARY BRIAN ROBERTS, and
10.  RICKIE PATTERSON BLAKE,

       Defendants.

No. 20-cr-00152-PAB

**JAYSON JEFFREY PENN'S MOTION FOR JUDGMENT OF ACQUITTAL**

Despite years of investigation, the review of roughly 16 million documents, hundreds of interviews, and a month of trial involving thirty witnesses, the government introduced almost no evidence against Mr. Penn, and certainly none capable of proving beyond a reasonable doubt that he knowingly and intentionally agreed to conspire. The government's sole "percipient" witness to the alleged conspiracy, Robert Bryant, explained that Mr. Penn had no involvement in the activities about which Mr. Bryant testified and that he had no basis to think Mr. Penn agreed (or instructed others) to fix prices or rig bids. The government's other witnesses were all customers or records custodians who mentioned Mr. Penn only to say they knew nothing about him.

Rather, the government's case against Mr. Penn rests exclusively on a handful of emails, text messages, and toll records. But even evaluated in the light most favorable to the

government—and even ignoring Mr. Bryant's exculpatory testimony—those documents do not indicate Mr. Penn knowingly and intentionally agreed to conspire. Each email and text message is an internal communication between Mr. Penn and colleagues at Pilgrim's Pride, and each reflects innocuous behavior by Mr. Penn that cannot support a conviction. The documents reflect no sharing of information between Mr. Penn and competitors, no instructions by Mr. Penn telling colleagues to take any suspicious actions, and no agreement between Mr. Penn and a competitor to do anything, let alone to fix prices or rig bids. And in nearly a decade's worth of toll records, the government identified only four phone calls between Mr. Penn's phone number and the phone number of another supplier. But the mere fact of those calls—the content of which the government left unexplained—cannot rationally support a conviction, especially since customers repeatedly testified that they expected suppliers to have contact with each other for many different and legitimate reasons.

At bottom, the government's case against Mr. Penn was woefully deficient, devoid of any testimony, document, or data suggesting that he knowingly and intentionally agreed to join the charged conspiracy. No rational jury could find Mr. Penn guilty beyond a reasonable doubt. Any conclusion to the contrary would require a string of inferences staggering in its scope and at odds with the law. The Court should grant Mr. Penn's motion for judgment of acquittal.[1]

## LEGAL STANDARD

No jury has the "power to enter an unreasonable verdict of guilty." *Jackson v. Virginia*,

---

[1] Mr. Penn also incorporates by reference the arguments in Mr. Kantola's Memorandum in Support of Motion for Judgment of Acquittal that the government failed to prove (i) any conspiracy existed, but particularly the overarching conspiracy charged, (ii) any unreasonable restraint of trade, and (iii) any violation under the rule of reason. Doc. 876 at 5-6, 12-15 (Nov. 29, 2021).

443 U.S. 307, 317 n.10 (1979). Accordingly, the Court *must* enter a judgment of acquittal when "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Evidence—viewed in the light "most favorable to the government"—is sufficient only when a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Jones*, 44 F.3d 860, 864-66 (10th Cir. 1995) (reversing conspiracy conviction). No rational factfinder can convict based on a "mere modicum" of evidence, *Jackson*, 443 U.S. at 320 (quotation omitted), or evidence equally consistent with "both innocence and guilt," *United States v. Ortiz*, 445 F.2d 1100, 1103 (10th Cir. 1971). And evidence that rests on "speculation and conjecture" is insufficient because no rational jury can convict based on "a guess or mere possibility." *United States v. Rufai*, 732 F.3d 1175, 1188 (10th Cir. 2013) (quotation omitted).

## ARGUMENT

Guilt is always "individual and personal in conspiracy cases—it is not a matter of mass application." *United States v. Dickey*, 736 F.2d 571, 583 (10th Cir. 1984). There must be "clear and unequivocal" evidence of "personal and individual conduct" that violates the law before a jury can convict a defendant. *United States v. Morehead*, 959 F.2d 1489, 1500 (10th Cir. 1992), *reh'g on unrelated issues*, *United States v. Hill*, 971 F.2d 1461 (10th Cir. 1992) (quotations omitted). And because the "core" of any conspiracy is an unlawful agreement, *United States v. Esparsen*, 930 F.2d 1461, 1471 (10th Cir. 1991), "it is therefore essential to determine what kind of agreement or understanding"—if any—"existed as to each defendant . . . determined individually from what was proved as to him," *United States v. Borelli*, 336 F.2d 376, 384-85 (2d Cir. 1964); *accord United States v. Record*, 873 F.2d 1363, 1368 (10th Cir. 1989).

The government must also prove beyond a reasonable doubt that a defendant had both "knowledge of the anticipated consequences" of the conspiracy and the intent to effectuate the conspiracy's object. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 n.20, 446 (1978). "Knowledge alone" or "mere association" with alleged conspirators is not enough to prove a defendant's joinder. *United States v. Kendall*, 766 F.2d 1426, 1432 (10th Cir. 1985). These principles require "particular[] vigilan[ce] when the government seeks to bring many individuals under the umbrella of a single conspiracy" since "[t]he tactic of charging many defendants with a single massive conspiracy is fraught with the potential for abuse," *United States v. Evans*, 970 F.2d 663, 674 (10th Cir. 1992), a proposition apparent in this case.

## I.     The Trial Testimony Indicated That Mr. Penn Did Not Conspire.

The government called only one "percipient" witness to the alleged conspiracy, Pilgrim's Pride employee Robert Bryant. Mr. Bryant unequivocally testified that he had no basis to think Mr. Penn agreed to fix prices or rig bids. Bryant Tr. 372:14-21.[2] Mr. Bryant also had no knowledge of Mr. Penn (i) telling anyone to fix prices or to rig bids, (ii) instructing anyone to coordinate prices or bids with a competitor, or (iii) being aware that anyone was purportedly fixing prices or rigging bids. *Id*. at 372:22-373:9. Mr. Bryant explained that all of the specific pricing and bidding conduct to which he testified had nothing to do with Mr. Penn, since Mr. Penn was not involved in the relevant meetings, negotiations, strategy sessions, or telephone calls. *Id*. at 343:25-346:3. And when asked specifically who entered into a purportedly

[2] Citations to "Bryant Tr." refer to the official, certified excerpt of trial covering Mr. Bryant's testimony. Because Mr. Penn has no other official, certified transcripts, all other transcript citations—referred to as "Trial Tr."—are to the unofficial draft transcripts. Given their draft status, Mr. Penn defers to the Court's recollection if it differs from the drafts in any way.

4

conspiratorial agreement and engaged in any related conduct, Mr. Bryant named several individuals but not Mr. Penn. *Id*. at 22:16-22, 41:18-23. In fact, Mr. Bryant testified that another Pilgrim's Pride employee, Timothy Stiller, warned Mr. Bryant to be careful about what he put on his expense reports because they were being temporarily routed to Mr. Penn. *Id*. at 369:25-372:13. The only other times Mr. Bryant mentioned Mr. Penn were to note that some individuals ultimately reported to him—generally in response to the government's non-sequitur questions in the middle of testimony about those other individuals. *See, e.g.*, *id*. at 9:14-10:9, 14:13-22, 35:14-24, 143:18-19, 157:8-12.

The remaining twenty-nine trial witnesses were records custodians and customers. Records custodians testified only to the authenticity of documents and other records, and the government conceded that customers are not capable of speaking to an agreement between others. Trial Tr. 170:10-17 (Nov. 12, 2021). Still, only four customer witnesses even mentioned Mr. Penn. Two stated that they never met or spoke to Mr. Penn. Trial Tr. 59:1-5 (Nov. 8, 2021) (Telly Smith (Golden Corral)); Trial Tr. 129:24-130:3 (Nov. 17, 2021) (Joseph Brink (Fiesta Restaurant Group)). A third noted that Mr. Penn signed a sales contract. Trial Tr. 90:14-91:5 (Nov. 9, 2021) (Michael Ledford (RSCS)). And the fourth included Mr. Penn on an email she sent to Pilgrim's Pride about desired credit terms, but had no other contact with Mr. Penn about that issue and Mr. Penn had no involvement in the relevant negotiations. Trial Tr. 187:12-16 (Nov. 17, 2021) (Melissa Hoyt (Sysco)); Trial Tr. 111:5-112:1 (Nov. 22, 2021) (same).

## II.     The Government's Toll Records Are Not Evidence of Conspiratorial Activity.

The government identified three telephone calls between Mr. Penn's phone number and the phone number of a competitor, one of which lasted zero seconds and went to voicemail while

a second lasted only thirty seconds. GX10-1 at 1-2; *see* GX1231. It also identified one telephone

call between Mr. Penn's phone number and the main public number of a competitor company.

GX10-3 at 1. But there is no evidence in the record about the substance of those calls (if any) nor

any evidence linking those calls to the alleged actions of other individuals at any time. And the

mere fact of a telephone call does not rationally suggest Mr. Penn knowingly and intentionally

agreed to join the charged conspiracy, especially since customers explained suppliers have many

reasons to be in contact. *See, e.g.*, Trial Tr. 178:18-179:21 (Nov. 9, 2021) (Michael Ledford

(RSCS)); Trial Tr. 91:10-92:22 (Nov. 15, 2021) (Meyer Skalak (Chick-fil-A)). This evidence is

entirely consistent with legitimate business activity and cannot sustain a conviction. *See*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596-97 (1986) (no inference of

conspiracy if "conduct is consistent with other, equally plausible explanations"); *see also Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007) ("proof of a § 1 conspiracy must include

evidence tending to exclude the possibility of independent action"); *Kleen Prods. LLC v.*

*Georgia-Pacific LLC*, 910 F.3d 927, 938-39 (7th Cir. 2018) (mere fact of competitor calls

insufficient to send case to jury when companies had many potential reasons for contact). Any

other conclusion would require a string of improper and unsupported conjecture about the calls,

including their connection to pricing or bidding, a particular product, a specific customer, future

actions, and the alleged conduct of other individuals. *Direct Sales Co. v. United States*, 319 U.S.

703, 711 (1943) ("[C]harges of conspiracy are not to be made out by piling inference upon

inference.").

### III.    The Government's Case Against Mr. Penn Rests on Business Emails and Text Exchanges That Cannot Sustain a Conviction.

The government's entire case against Mr. Penn rests on a handful of emails and text

exchanges between Mr. Penn and his colleagues at Pilgrim's Pride. The government introduced almost all of those documents without any explanation from witnesses, leaving the jury with nothing but "speculation and conjecture" about their meaning and Mr. Penn's purported connection to the charged conspiracy. *Rufai*, 732 F.3d at 1188. Considered in the light most favorable to the government, these disembodied documents cannot sustain a conviction. They reflect only that Mr. Penn (i) received from colleagues information about competitors' suspected positions; (ii) twice asked questions to colleagues about competitors' suspected prices; (iii) referenced "legality" when discussing *other individuals'* actions; and (iv) discussed with colleagues ordinary business issues. All of the evidence against Mr. Penn is consistent with legitimate business behavior, which renders "impermissible" any inferences that Mr. Penn agreed to conspire. *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1179-80 (10th Cir. 2019); *see Twombly*, 550 U.S. at 554; *Matsushita*, 475 U.S. at 596.

     ***1. Passive Receipt of Information.*** Mr. Penn occasionally received from colleagues information about competitors' suspected prices. Jason McGuire, for instance, mentioned the potential "range" of competitors' offers to KFC in 2014. GX1074, GX9744, GX1075, GX1058 (all same email thread). The source of the information is unattributed and the record nowhere suggests that Mr. Penn was aware of its provenance, requested the information, or instructed anyone to gather it.[3] Equally important, the "mere possession" of competitors' advance pricing information is not "evidence of concerted action to fix prices." *In re Baby Food Antitrust Litig.*,

---

[3] Mr. McGuire's suggestion that Pilgrim's be a "leader" on pricing (GX1074) is consistent with independent conduct, and does not suggest Mr. Penn conspired. *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988) (Breyer, J.) ("One does not need an agreement to bring about [a] kind of follow-the-leader effect in a concentrated industry.").

166 F.3d 112, 126 (3d Cir. 1999). It "makes common sense to obtain as much information as possible of the pricing policies and marketing strategy of one's competitors," and a case that rests on such evidence is "sorely lacking" any basis to send the claim to a jury. *Id*. at 117, 126.

What is more, customer witnesses testified that suppliers received pricing information from a variety of innocuous sources, including the customers themselves. Michael Ledford, the lead purchaser for KFC's purchasing cooperative, explained that he regularly shared competitor pricing out to four decimal places during bidding and negotiation processes and would share the exact lowest price with suppliers. Trial Tr. 103:9-104:5 (Nov. 9, 2021); Trial Tr. 171:2-15 (Nov. 10, 2021); *see also* Trial Tr. 92:15-93:15, 160:13-19 (Nov. 8, 2021) (similar for Telly Smith (Golden Corral)); Trial Tr. 71:21-72:2 (Nov. 15, 2021) (similar for Meyer Skalak (Chick-fil-A)); Trial Tr. 22:14-25, 111:23-112:25 (Nov. 17, 2021) (similar for Joseph Brink (Fiesta Restaurant Group)); GX1051 (Mr. Penn receiving feedback about negotiations in which customers discussed "other suppliers"); GX1247 (same).

For example, during negotiations with Pilgrim's Pride in 2012 for 2013 contract pricing, Mr. Ledford did just that. Mr. Penn received an email from Roger Austin that recommended Pilgrim's *lower* its prices to be *more* competitive in light of Mr. Ledford's detailed feedback about competitor pricing and positions. *See* GX1544. While Mr. Austin made unexplained reference to "having some other discussions today to get the pulse," there is no evidence that Mr. Penn directed any action or had any knowledge about what Mr. Austin meant. *Id*.; GX1522, GX1523 (receiving and forwarding a spreadsheet showing impact of recommendation on revenue that also referenced unattributed information about competitors); *see also* GX1035 (separate instance of Mr. Penn receiving spreadsheet that referenced unattributed information

about competitors), GX1036, GX1036-1 (spreadsheet). Put simply, the fact that Mr. Penn received a few emails over the course of eight years referencing potential competitor prices is consistent with independent conduct and cannot sustain a conviction.

    *2. **Questions About Competitor Positions.*** On two occasions over the eight years of the alleged conspiracy, Mr. Penn asked a colleague about competitor prices. In the context of negotiations with KFC in 2012, Mr. Penn asked three Pilgrim's Pride colleagues, "Do we have TSN price idea?" GX1547. Notably, Mr. Penn did not instruct his colleagues to contact any Tyson employees, to offer a price consistent with Tyson, or to submit a bid aligned with Tyson's. Equally important, Roger Austin understood Mr. Penn's request simply to be one for market information, as he responded to Mr. Penn's question by stating, "I can give you an educated guess" of ".96 flat." DX E-570.

    Over a month after negotiations concluded for 2013 contract pricing with United Food Purchasing Co-op—a purchaser for KFC—Mr. Austin again sent Mr. Penn unsolicited and unattributed pricing information about Case Farms, to which Mr. Penn responded, "Figured they would be lower due to their need to gain access. What about rest of players?" GX1722. Nothing in the exchange suggests that Mr. Penn conspired; just the opposite. Mr. Penn knew nothing about his competitors' positions at the time of Pilgrim's bid. He attributed Case's price to its rational and independent business decision to offer a low price to a new customer (KFC) in a successful bid to take volume away from KFC's incumbent suppliers. *Id*. And the fact that Mr. Penn expressed interest in what prices other competitors had already negotiated is among the most basic of business behaviors. *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 875, 879 (7th Cir. 2015) ("Competitors in concentrated markets watch each other like hawks" and

factfinders should, "without suspecting illegal collusion, expect competing firms to keep close track of each other's pricing.").

   **3. References to "Legality."** Mr. Penn referenced the "legality" of *other individuals*' actions on three occasions, none of which demonstrates that he knowingly and intentionally conspired. In the first instance, Brenda Ray, a Pilgrim's employee, sent an email to several colleagues, including Mr. Penn, summarizing a conversation she supposedly had with a "friendly competitor" noting that it was "all over the market that Pilgrim's is taking contract pricing up." GX3037. That individual—who was never identified to Mr. Penn—thanked Ms. Ray "for taking the lead" and said his company was "following." *Id*. On its face, Ms. Ray's email indicated that Pilgrim's had already made a decision to raise prices and, once that move became public, a competitor decided to follow. There is no indication that Pilgrim's agreed to anything. *Clamp-All*, 851 F.2d at 484 ("follow-the-leader" pricing not indicative of conspiracy).

   Equally important, there is nothing in the document that rationally suggests Mr. Penn knew of a conspiracy or intentionally agreed to join it.[4] While Mr. Penn forwarded the email to Jason McGuire and wrote, "FYI. Do not fwd. not exactly a legal conversation," GX3037, there is no evidence that Mr. Penn asked for any coordination with a competitor, approved of Ms. Ray's actions, or had any other knowledge of or involvement in the matter. It is black letter law that neither his "mere association with" someone who engaged in a purportedly "illegal" conversation nor his "knowledge" of that conduct "is enough to convict him of conspiracy. The evidence must also show that [Mr. Penn] knowingly joined" the conspiracy as charged. *Kendall*,

---

[4] The "friendly competitor" portion of the email cannot be considered to prove whether any defendant joined the charged conspiracy. Trial Tr. 7:18-8:4 (Nov. 8, 2021).

766 F.2d at 1432; *see United States v. Horn*, 946 F.2d 738, 741 (10th Cir. 1991) (not a conspirator "merely by associating with conspirators known to be involved in crime").

This same dynamic was at play in a text message conversation between Mr. Penn and his colleague, Timothy Stiller. GX433-GX447. Mr. Stiller explained to Mr. Penn the state of a specific negotiation, the customer's feedback about competitor pricing, and the fact that Roger Austin and Scott Tucker were negotiating on behalf of Pilgrim's Pride. GX433-437. In that back and forth, Mr. Stiller said, "they are listening to my direction," GX439, to which Mr. Penn asked, "Who is they?" and "if they is illegal don't tell me," GX440, GX441. Mr. Stiller clarified that Pilgrim's negotiators were listening to Mr. Stiller. GX442. That quick clarification on its face demonstrates that there was nothing illegal afoot—just a misunderstanding.

Mr. Penn's expressed desire not to know about potentially "illegal" conduct—even if taken at face value—is not proof that he engaged in any such conduct himself, and it cannot stand in for proof that he knowingly and intentionally conspired. *See United States v. Scotti*, 47 F.3d 1237, 1243 (2d Cir. 1995) ("[I]t is logically impossible for a defendant to intend and agree to join a conspiracy if he does not know that it exists."). Sherman Act liability attaches only if the defendant had both a "meeting of the minds," i.e., "conscious commitment to a common scheme designed to achieve an unlawful objective," *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (quotation omitted), and the intent to effectuate the unlawful purposes of the conspiracy, *Gypsum*, 438 U.S. at 443 n.20. Neither is established by these documents.

Finally, Mr. Penn made a statement to his boss, William Lovette, that a competitor "was not listening to [Mr. Lovette's] illegal spiel on forward pricing" during remarks at the National Chicken Council, a trade association. GX3025. Even if read literally, Mr. Penn's statement

would only describe another individual's public signaling, a theory of liability the Court

excluded as unduly prejudicial. Doc. 603 at 5-6. The fact that Mr. Penn also mentions

unattributed information about a competitor's submitted bid is not proof that Mr. Penn

knowingly and intentionally conspired. The competitor's price was very different from Pilgrim's

price, the possession of competitor information is not indicative of conspiracy, and the jury

would, in any event, have to engage in improper speculation to attribute the information to any

discussion between Mr. Penn and a competitor, let alone to an unlawful agreement. The record is

clear that customers often shared exact pricing information of one supplier with another supplier,

especially when, as in this instance, the competing supplier's price was lower. *Supra* at 7-9.

    *4. Regular Business Behavior.* The remainder of the evidence purportedly involving Mr.

Penn either reflects facially innocuous business behavior or no action by Mr. Penn at all. On

February 18, 2017, for example, a colleague sent Mr. Penn an unsolicited text message asking if

Mr. Penn wanted an update on KFC negotiations. GX1855. Regardless of what that colleague

was doing on that day, there is no evidence—not a single email, text message, or toll record—

that Mr. Penn actually discussed the KFC negotiation with that colleague near that time.

    The government also introduced an October 2014 text message from Mr. Penn to his

colleague, Jason McGuire, recounting Mr. Penn's statements at a board meeting where he

praised Mr. McGuire for "leading the industry to higher '15 prices in FFS and $75M higher YoY

pricing." GX940. Praising a colleague to the board of directors for doing a good job is not

indicative of a conspiracy or of Mr. Penn's knowing and intentional agreement to join it. In fact,

the record is replete with evidence that the 2015 price increases were the result of market

dynamics. James Olson, the CEO of KFC franchisee Harman Management Corporation,

explained that in 2014 suppliers were rapidly moving from small birds to large birds because of better profit margins. Trial Tr. 116:14-117:6 (Oct. 27, 2021). That shift threatened to disrupt KFC's finances, business processes, and preferred supply, costing KFC significant revenue. *Id.* at 116:14-117:6, 186:19-187:4. Accordingly, Mr. Olson acknowledged that natural market conditions were poised to create a historic rise in prices. *Id.* at 211:8-15. Other customers agreed. *See, e.g.*, Trial Tr. 20:15-23:8 (Nov. 5, 2021) (Sara Fisher (RSCS)); Trial Tr. 68:16-69:16, 131:2-13 (Nov. 8, 2021) (Telly Smith (Golden Corral)); Trial Tr. 14:4-7 (Nov. 17, 2021) (Joseph Brink (Fiesta Restaurant Group)). The fact that Mr. Penn praised a colleague for achieving higher prices is consistent with normal business behavior and cannot sustain a conviction. *Driessen v. Royal Bank Int'l*, 2015 WL 1245575, at *3 (D. Conn. Mar. 18, 2015) ("setting one's own profit-maximizing price is entirely lawful under the antitrust laws" (quotation omitted)).

Neither can Mr. Penn's conversation with Mr. McGuire in August 2014, during which Mr. Penn wrote that "a few owners of small bird companies thank[ed] us via me for getting our act together." DX E-873, DX E-874 (original email and attachment), GX1056 (remainder of email chain). To read any kind of conspiratorial meaning into the statement would require the jury to infer the unidentified competitors were conspirators, that Pilgrim's got its "act together" pursuant to an agreement, that getting its "act together" had something to do with price fixing or bid rigging, and that Mr. Penn was involved in the unidentified action in some unidentified way. No evidence supports this impermissible inference stacking. *Direct Sales*, 319 U.S. at 711.

The balance of the evidence regarding Mr. Penn indicates that he generally sought to make money for Pilgrim's and to compete vigorously, neither of which suggests that he knowingly and intentionally conspired. *See* GX449-51, GX9707-09, GX9711-13 (internal text

exchange discussing setting a customer's price by giving them "*market price* plus the special A-Hole Premium" in light of "Brand Promise" (emphasis added)); GX448 (update about customer negotiations); GX2000 (discussing public financial analyst report about Tyson and the need for Pilgrim's to monitor competitors to learn from "successful" strategies); GX2001 (refusing to cover competitor short); GX2002 (same); GX2005 (same). There is nothing in these basic business activities indicating Mr. Penn conspired. *In re Text Messaging*, 782 F.3d at 879 (competitors lawfully "find it in their self-interest to imitate [competitor] behavior rather than try to undermine it"); *Driessen*, 2015 WL 1245575, at *3 (setting profit-maximizing prices lawful).

\* \* \* \* \*

The government fell far short of proving beyond a reasonable doubt that Mr. Penn knowingly and intentionally conspired. *All* of the trial testimony indicated Mr. Penn did not collude. And *all* of the documents upon which the government's case rests are consistent with ordinary business activity by Mr. Penn. Considered as a whole and in the light most favorable to the government, no rational jury could convict Mr. Penn based on the record against him.

The government tries to paper over this failure of proof with "summary" exhibits.[5] It groups the handful of innocuous business documents and toll records involving Mr. Penn with evidence about other individuals and other actions in an effort to induce the jury into finding meaning, relationships, and connections not otherwise proved against Mr. Penn. But there is *no evidence* that Mr. Penn had knowledge of or involvement in any of those other actions. *See* Trial Tr. 32:5-7 (Nov. 24, 2021) (instructing that "summaries" are not themselves evidence). In fact,

---

[5] The government mentions Mr. Penn in "summary" exhibits GX4-1, GX10-1, GX10-2, GX10-3, GX14-3, GX18-3, and GX20-1.

the government's reliance on the "summaries" underscores the Tenth Circuit's concern that when the government "bring[s] many individuals under the umbrella of a single conspiracy" there is "potential for abuse" by using evidence about "other alleged coconspirators" to keep the jury from "differentiat[ing] among particular defendants." *Evans*, 970 F.2d at 674.

Yet a rational jury can only convict based on "clear and unequivocal" evidence that Mr. Penn's "personal and individual conduct" violated the Sherman Act. *Morehead*, 959 F.2d at 1500. That assessment must be "determined individually from what was proved as to" Mr. Penn. *Borelli*, 336 F.2d at 385. And the record against Mr. Penn cannot sustain a conviction—there is no evidence that he knew of any conspiracy, was aware of its objectives, intentionally sought to effectuate them, or agreed to any price fixing or bid rigging. A jury could only convict Mr. Penn if it stitched together a series of impermissible inferences, unsupported by any evidence, about his knowledge, intent, actions, and relationships. *Direct Sales*, 319 U.S. at 711; *United States v. Summers*, 414 F.3d 1287, 1295-97 (10th Cir. 2005) (reversing conspiracy conviction).

## CONCLUSION

The Court should grant Mr. Penn's motion for judgment of acquittal.


Dated: November 29, 2021                 Respectfully submitted,

                                          *s/ Michael F. Tubach*
                                         Michael F. Tubach
                                         O'MELVENY & MYERS LLP
                                         Attorney for Jayson Jeffrey Penn
                                         Two Embarcadero Center, 28th Floor
                                         San Francisco, California 94111-3823
                                         (415) 984-8700
                                         mtubach@omm.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2021, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of this filing to all listed parties.

Dated: November 29, 2021

*s/ Michael F. Tubach*

Michael F. Tubach