# ATTACHMENT A

Robert Hood - Redirect

1   *A.*  The time would be -- UTC time is adjusted on a specific

2   set, so, you know, six hours or seven hours depending on

3   whether Central Time is in daylight savings time or not, so it

4   will adjust up seven hours or it will adjust up six hours.  I

5   am trying to make sure I am telling you accurately.  It may

6   adjust down seven or six hours, I don't remember specifically,

7   but there is a standard with which it changes, yes, ma'am.

8   *Q.*  So would it be fair to say that converting something into

9   UTC time is really just standardizing that time?

10  *A.*  I feel like that's a correct statement.

11         *MS. ROGOWSKI:*  Thank you.  No further questions.

12         *THE COURT:*  Thank you, Mr. Hood.  So you are subject

13  to recall by the defendants if they choose.  They will

14  presumably coordinate with you if they need to have you come

15  back some other day.  And assuming that the government is

16  releasing you for today's purposes, you are excused.  Thank you

17  very much, Mr. Hood.

18         The United States may call its next witness.

19         *MS. ROGOWSKI:*  The government calls Lumaker Challa.

20      (**Lumaker Challa** was sworn.)

21         *THE WITNESS:*  Yes.

22         *COURT DEPUTY CLERK:*  Please state your name and spell

23  your first and last name for the record.

24         *THE WITNESS:*  Lumaker Challa, L-U-M-A-K-E-R,

25  C-H-A-L-L-A.

1          THE COURT:  Mr. Challa, if I could ask if you could

2     try to lean into that microphone as best you can.  You can get

3     quite close to it, actually, just so we are able to hear you.

4          Go ahead.

5          MS. ROGOWSKI:  May we please have permission to hand

6     the binder and the exhibit list to Mr. Challa through

7     Mr. Keech?

8          THE COURT:  Yes.

9          COURT DEPUTY CLERK:  Both of these lists?

10         MS. ROGOWSKI:  One is for you, Mr. Keech.

11                         **DIRECT EXAMINATION**

12    BY MS. ROGOWSKI:

13    Q.  Mr. Challa, could you please describe your highest level of

14    education?

15    A.  I do have a dual master.  One is a master of computer

16    applications.  The second one I recently completed is an MBA

17    from CSU.

18    Q.  Do you work for Pilgrim's Pride?

19    A.  Yes.

20    Q.  And how long have you worked there?

21    A.  I have been with that company for 13 years.

22    Q.  And what is your job title?

23    A.  My title is IT director.

24    Q.  In your position as IT director, could you please briefly

25    describe your responsibilities?

Lumaker Challa - Direct

1    A.   Sure.  My job mainly is maintaining the administration of

2    the applications, so I have four different teams reporting to

3    me.  One is database administration.  That team takes care of

4    all the databases in the company.  The second team is SAP

5    Basis, so data responsive for all the SAP applications that we

6    have.  The third team is enterprise application team.  So that

7    team supports non-SAP applications, such as e-mail, SharePoint

8    and many other applications.  And the fourth team is the

9    archiving team, so they are responsible for the e-mail

10   archiving and SharePoint and SAP data archiving.

11   Q.   Mr. Challa, in front of you and to the side of you are

12   binders containing exhibits and also an exhibit list that's

13   been marked by the government as Government Exhibit 9551.

14        Are you familiar with those binders -- the documents

15   in those binders and also this exhibit list?

16   A.   Yes.  I was given these binders on Monday.  I did review

17   it.

18   Q.   And you are also familiar with the exhibit list?

19   A.   Yes.

20   Q.   How are you familiar with that?

21   A.   Again, this was given to me to satisfy this documents in

22   the binder, so that's when I saw the exhibit numbers and the

23   documents.

24   Q.   And did you review both the exhibit list and the documents

25   in the binders?

Lumaker Challa - Direct

1    A.   Yes.

2    Q.   As part of your position, Mr. Challa, are you familiar with

3    how Pilgrim's creates, maintains and stores e-mails and

4    attachments?

5    A.   Yes, I do.  So we have -- we use Microsoft Exchange as an

6    e-mail system, so every e-mail sending and receiving go through

7    the servers we have in our data center.  And we also have an

8    archiving solution in place.  Every e-mail sent and received

9    goes to that archiving system.

10   Q.   Let's talk about that archival system, Mr. Challa.  Can you

11   please describe how it works?

12   A.   Sure.  So we have a process called Generlink (ph).  Every

13   time an e-mail coming into our Exchange servers, a copy will be

14   sent into the archiving system.  So the archiving system stores

15   those e-mails and the users can go and check those e-mails.

16   Q.   And are the documents from the archival system ever copied

17   to any of Pilgrim's other systems?

18   A.   No.

19   Q.   To the best of your knowledge, Mr. Challa, are the

20   documents that are stored on the archival system in fact true

21   copies of the original e-mails and attachments?

22   A.   Yes, to the best of my knowledge, the product we use is

23   Simpana.  It's a product from CommVault, so the product is

24   supposed to keep an exact copy of the live system.

25   Q.   And is this product, Simpana, that Pilgrim uses, to the

Lumaker Challa - Direct

1    best of your knowledge, has that been functioning properly or

2    improperly?

3    A.   The system functions properly.  When there is a problem

4    with the system, we do get a notification, right?  So when I

5    say the system, our whole entire that -- all the servers we

6    have with data, we call it our system.  Sometimes we get a

7    server problem, but that's not a data inconsistency.  When

8    there is a data inconsistency, we do get notifications.  I have

9    a team who monitors that and makes sure it is working.

10   Q.   Could you please describe what a data inconsistency is?

11   A.   Let's say there is a time when the data is not storing in

12   the system, that's what we call it.  So you have an e-mail in

13   the live system, but it's not in the archive system, that's

14   what we consider as an inconsistency.

15   Q.   So just to make sure I am understanding correctly, if there

16   is a data inconsistency, documents are not, in fact, copied?

17   A.   Yes.

18   Q.   So there would be nothing that would actually alter the

19   documents.

20   A.   No.  There is no way the documents can alter or the e-mail

21   can alter.  Either it is copied or it is waiting to copy.  It

22   is in the queue.

23   Q.   Thank you.  Taking a step back from the archival system and

24   just talking about Pilgrim's servers generally, are Pilgrim's

25   servers monitors in any way to ensure that they are functioning

Lumaker Challa - Direct

1    properly?

2    A.   Yes.   We do have a monitoring system we use to know if a

3    server is up or down or a service, right?   We get an e-mail

4    notification in the system or sometimes if it is critical we

5    get a pager.   We go and see the system, what's wrong with the

6    system, and bring it up.

7    Q.   And if the server system goes down, Mr. Challa, is there

8    any sort of backup system?

9    A.   No, no.   So the e-mail system, as I mentioned earlier, the

10   e-mail system, if there is a problem, the e-mail is queuing in

11   a file.   It's not going down.   It takes time.   When the system

12   is up and running, it will dump everything back.

13   Q.   And what actually happens then when the system is up and

14   running again?

15   A.   So the data will start transferring.   It's like it was

16   waiting for some time when the system is down.   When the system

17   is up, the data will be processed and put into the archive

18   system.

19   Q.   During that time period when the data is waiting, is the

20   data altered in any way?

21   A.   No, no.   It's a system defined in the back end.   We don't

22   have any way to do anything in the back end.

23   Q.   Mr. Challa, does Pilgrim's have a domain name?

24   A.   It's pilgrims.com.

25   Q.   You said it's pilgrims.com?

528

Lumaker Challa - Direct

1    A.   Uh-huh.

2    Q.   Does it have any other domain names including a domain name

3    related to its parent company?

4    A.   So we may have other domain names for a marketing purpose

5    or having a website, but for the e-mail system we use

6    pilgrims.com.  So I heard of a pilgrimspride.com, but I don't

7    remember seeing it in the part of the e-mail system, but

8    marketing purpose and branding purpose you have multiple

9    domains.

10   Q.   And the Pilgrim's employees have -- I heard you say there

11   was pilgrims.com and also pilgrimspride.com.  Do Pilgrim's

12   employees have access to e-mails on both of those domain names?

13   A.   To my knowledge, it's only pilgrims.com.  I don't remember

14   seeing pilgrimspride.

15   Q.   Are e-mails with the domain name pilgrims.com saved and

16   stored on Pilgrim's e-mail server?

17   A.   That's correct.

18   Q.   How are they stored?

19   A.   So the e-mail, once a user starts sending a draft e-mail,

20   it's on the client system.  It's called Outlook.  Whenever they

21   click on the send button on the e-mail, that e-mail goes to our

22   servers we have in Richardson.  It stores a copy there.  And

23   then the users on the other end, they have to log it into their

24   system.

25   Q.   Is this the same process that happens for calendar invites

Lumaker Challa - Direct

1    or is it a different process?

2    A.  It is the same process.  How -- a user sees a different

3    format, but on the back end how we store it is the same format.

4    Q.  Can you briefly explain how e-mail addresses are assigned

5    to that domain name when a new Pilgrim's employee comes?

6    A.  Sure.  So we automated the process.  When we have a new

7    employee hired, HR will enter the information in SAP.  That

8    information passes to the application.  The system will check

9    if you have the same user name, first name and last name with

10   already an existing e-mail.  If it exists, it asks number to

11   the end and e-mail ID.  If the user with the same first name,

12   last name doesn't exist, it will create the e-mail ID, first

13   lame.last name@pilgrims.com.

14   Q.  Are you familiar, Mr. Challa with the e-mail address of a

15   Roger Austin?

16   A.  I did see the e-mails.

17   Q.  What is his e-mail address?

18   A.  Roger.austin@pilgrims.com.

19   Q.  Are you familiar with the e-mail address of Jayson Penn?

20   A.  I do.

21   Q.  What is it?

22   A.  Jason.penn@pilgrims.com.

23   Q.  What about Jimmie Little?

24   A.  Jimmie.little@pilgrims.com.

25   Q.  And what about Bill Lovette?

530

Lumaker Challa - Direct

1    A.   Bill.lovette@pilgrims.com.

2    Q.   Are e-mails to and from all of those e-mail addresses saved

3    on Pilgrim's' server systems?

4    A.   Yes.

5    Q.   And are e-mails from all of the pilgrims.com domain names

6    saved and stored on Pilgrim's server system?

7    A.   That's correct.

8    Q.   Mr. Challa, have you taken a look at the binders in front

9    of you and the documents in those binders to confirm whether

10   all of the e-mails in those binders actually did, in fact, come

11   from Pilgrim's servers?

12   A.   Yes.  I did go through the three binders.  So for me when I

13   see an e-mail ID from pilgrims.com, someone from pilgrims.com

14   in the entire e-mail chain, so that means it's coming from the

15   system, so I did review those.  And I see at least one of the

16   pages has someone from pilgrims.com, so that means either the

17   e-mail sent or received is there.

18   Q.   And does that mean that they were, in fact, saved on

19   Pilgrim's servers?

20   A.   So to say it is in the servers, this is a physical

21   verification that I looked at and I said to the best of my

22   knowledge, right?  Given short notice, we did start going

23   through the e-mails in the system with the sheet we had, the

24   From and To.  I think we did a majority of them, but I didn't

25   get a chance to finish everything because it's very short

Lumaker Challa - Direct

1  notice and too many e-mails.

2  Q.  Can you confirm, Mr. Challa, whether all of those e-mails

3  in those binders have a pilgrims.com e-mail address in them?

4  A.  Physically when I see the papers, yes.  But when you say

5  system, again I didn't get a chance to finish everything

6  because -- I think we had 70 to 80 percent.  We finished and

7  we -- whatever we saw we found in the system.

8  Q.  But you were, in fact, able to review all the binders and

9  confirm?

10  A.  Yes.

11  Q.  When you look at an e-mail, Mr. Challa, could you please

12  briefly tell the jury what kind of header information is at the

13  top of that e-mail?

14  A.  Yes.  So in general we see -- we have different attributes

15  in the e-mail.  The first and foremost is the exact e-mail ID,

16  which is first name.last name@pilgrims.com.  There is another

17  name called display name, so sometimes it only shows first

18  name, space, last name like that, so it's also an attribute.

19  So when I was looking at the binder, I did see the display

20  names, as well as sometimes I see additional -- some additional

21  information, so that depends on how you process the data.

22  Q.  So could you just explain a little bit more what happens

23  with the display name?  How is that information generated?

24  A.  So again when you have a contacts cache in the system,

25  every e-mail system has a contacts cache.  If someone's

532

Lumaker Challa - Direct

1    information is there in the contacts cache, then that display

2    name shows up, right?  But if you ever send an e-mail, it's not

3    cached, you don't see it.  You only see first name, last name

4    and the little circle.

5    Q.  Let's talk specifically about the date and the time

6    information on an e-mail.  Do you know how Pilgrim's' system

7    records that information?

8    A.  The information stores in the cental time zone because we

9    have servers in our Central Time Zone, but if the user is in

10   East Coast time zone, they see it in their time zone.

11   Likewise, if I am in the Mountain Time Zone, I see my time

12   zone.  It's based on the client.

13   Q.  Is that date and time information generated automatically

14   or not automatically?

15   A.  It is automatically.  As soon as the e-mail is delivered or

16   received, that's when the time stamp is at.

17   Q.  To the best of your knowledge, is the process that

18   generates that information reliable?

19   A.  Yes, it is.

20   Q.  Is it accurate?

21   A.  Yes.  We trust Microsoft, so that's how it is.

22   Q.  When you look at an e-mail, Mr. Challa, is there any way

23   for you to tell whether or not it has an attachment?

24   A.  Yes, yes.

25   Q.  Could you please explain?

533

Lumaker Challa - Direct

1   *A.* We have a metadata we call attachment. If it shows yes --

2   if it is an attachment, it would show yes. If it is not, it

3   will show no.

4   *Q.* And is that information, that metadata that says whether or

5   not there is an attachment, is that stored on the Pilgrim's

6   server?

7   *A.* Yes.

8   *Q.* And to the best of your knowledge, is that information

9   copied accurately when it's stored on the Pilgrim's server?

10  *A.* Yes, it is.

11  *Q.* When looking at an e-mail that is saved on Pilgrim's

12  server, let's focus on the text in the body of the e-mail.

13  *A.* Uh-huh.

14  *Q.* Is that text in the body of the e-mail to the best of your

15  knowledge that's stored on the server the same as the text when

16  the e-mail is either sent or received?

17  *A.* Yes. The e-mail will not alter in any shape or form,

18  right? So when an e-mail is sent, it is sent and the context

19  is still the same in the server.

20  *Q.* Mr. Challa, in response to a Grand Jury subpoena in

21  response to a different matter, did Pilgrim's Pride produce

22  documents from its servers?

23  *A.* There is access to vendors, so I don't remember at all, but

24  we do give vendors the requirement for e-mail to share, so we

25  give access to investors. Then they would extract the data

534

Lumaker Challa - Direct

1    from the archive systems.

2    Q.  What was the name of that vendor?

3    A.  Consilio.

4    Q.  Did you participate in helping to give Consilio access to

5    those documents?

6    A.  Yes, me and my team.

7    Q.  How did you participate?

8    A.  So we had to create an account.  Then we have to give VPN

9    access so that they can get into our network.  Then we have to

10   give access to the specific Simpana and such.

11   Q.  To the best of your knowledge, Mr. Challa, were the

12   documents that you gave access to Consilio to copy and extract,

13   were they in fact true copies of the original e-mails and

14   attachments from Pilgrim's servers?

15   A.  The archive system we gave has a true e-mail, but I do not

16   know the process they do, how they do it, but the system we

17   gave is the true copy.

18   Q.  So if I am understanding correctly, are you saying up until

19   the point where you gave the information to Consilio?

20   A.  Yes.  In my system the data is accurate, but I am not sure

21   after that what the process they did and how they collected the

22   information.

23   Q.  And is the same true for calendar invitations that were

24   stored on Pilgrim's servers?

25   A.  Yes.  So calendar, it's like an e-mail invite sent and

Lumaker Challa - Cross

1    received, so it should be the same.

2            MS. ROGOWSKI:  No further questions.

3            THE COURT:  Thank you.

4            Cross-examination?

5            Mr. Fagg, go ahead.

6                        **CROSS-EXAMINATION**

7    BY MR. FAGG:

8    Q.  Good afternoon, Mr. Challa.

9    A.  Good afternoon.

10   Q.  The documents that you testified about today that are in

11   those two binders, it's your testimony that all of the

12   documents that are in there are either e-mails, e-mails with

13   attachments or calendar entries; is that correct?

14   A.  That's correct.  That's what I saw.

15   Q.  And so for purposes of our discussion today, the questions

16   I want to ask you about are about e-mails, e-mails with

17   attachments and calendars, okay?

18   A.  Uh-huh.

19   Q.  And you testified that you looked at the e-mails, and you

20   believe that they are Pilgrim's documents because they appear

21   to be Pilgrim's documents because of the e-mail address.  But I

22   believe I heard you say that you did not look at the server to

23   confirm that all of those e-mails are, in fact, on the server,

24   correct?

25   A.  We did start the process.  We gathered the information.

Lumaker Challa - Cross

1    But since it's a very short notice, there is a lot of data.  We

2    did as much as we can until this point.  And we did find the

3    majority of it, right?  The rest of them we didn't get a chance

4    to see.

5    Q.  So the answer to my question is yes, you did not look to

6    see that all of them are on the server.

7    A.  Not all, not all.

8    Q.  Sir, do you remember executing certificates of authenticity

9    three different occasions over the last several months?

10   A.  Yes.

11   Q.  And you executed one on September 1st.  Does that sound

12   right?

13   A.  I do not remember the dates exactly, but yes.

14   Q.  And you executed one on July 6th?

15   A.  July 6th I remember, yes.

16   Q.  Okay, great.  And then one earlier this month on

17   October 7th.

18   A.  Yes.

19   Q.  And when you -- before you executed those certificates of

20   authenticity, did you review the documents that were referenced

21   in there?

22   A.  So the documents referenced looks like this, but we did

23   have internal counsel, had a conversation with them.  So they

24   said the date that we have in this we have given to the

25   Consilio.  That's what they extracted.  I didn't see all the

Lumaker Challa - Cross

1   data at the time, but it's based on my internal counsel, the

2   discussion.  That's what I did.

3   Q.  When you signed the certificate of authenticity, though,

4   sir, you were satisfied for yourself that those documents were,

5   in fact, authentic, correct?

6   A.  Because it's from our servers, yes.

7   Q.  And so I would like to talk with you first about the

8   certificate -- well, let me just talk to you more broadly.  In

9   those three different certificates of authenticity, some of

10  them have -- do you know what a Bates number is?

11  A.  Yes, the stamp with the date and -- yes.

12  Q.  So the Bates prefix is the letters that usually come before

13  the numbers.  Yes?

14  A.  I think so, yes.

15  Q.  And so for one of the sets of authenticity that you

16  submitted or that you executed has a Bates prefix that says

17  PILGRIMS-DOJ, correct?

18  A.  Yes.

19  Q.  And then for two others there are authenticities that you

20  signed that the prefix is just PILGRIMS, right?

21  A.  Pilgrim's with some dash 00s, some numbers.

22  Q.  Correct.  I would like to hand you -- excuse me one second.

23          MR. FAGG:  May I have one moment, Your Honor.

24          THE COURT:  Yes.

25  BY MR. FAGG:

538

Lumaker Challa - Cross

1    Q.  Sir, I am handing you a copy that is not yet stamped, Your

2    Honor, but will be stamped with a defense exhibit number.  And

3    on the first page, I will represent to you, sir, what this is

4    is excerpts from defendants' exhibit list in this case that

5    include documents that are -- were produced by Pilgrim's.  On

6    the first page we have included the first page of the exhibit

7    for ease of identification, so those documents were not

8    produced by Pilgrim's.

9         But if you look at the second page, sir, starting at

10   E-256.  Do you see that?

11   A.  Uh-huh.

12   Q.  So that is a document that is Bates numbered

13   PILGRIMS-DOJ-0000104930.  Do you see that?

14   A.  Yes.

15        MS. ROGOWSKI:  Your Honor, objection.  These documents

16   are outside the scope of the direct examination, and Mr. Challa

17   has not testified to the Bates numbers on direct.

18        THE COURT:  I am sorry, he didn't testify what?

19        MS. ROGOWSKI:  To the Bates numbers on the document.

20        THE COURT:  Response?

21        MR. FAGG:  The documents that he has authenticated he

22   said he reviewed by looking at the documents themselves.  And

23   they bear these two different sets of Bates numbers that we are

24   talking about, and I am just trying to seek some clarity from

25   him on the scope of his prior authentications that he submitted

Lumaker Challa - Cross

1    about these same set of documents.

2         THE COURT:  So, Mr. Fagg, the documents that you are

3    asking him about are within the Bates stamp range of what he

4    was asked on direct?

5         MR. FAGG:  They are within the Bates range of the

6    authenticities that he submitted for this case which cover the

7    documents that are -- he was asked about on direct.

8         THE COURT:  But -- I am not sure I understand.

9         Ms. Rogowski, are they within the range of what you

10   asked him about?

11        MS. ROGOWSKI:  No, Your Honor.  I didn't ask

12   Mr. Challa about the Bates ranges and the certificates of

13   authenticity.  And I don't believe that Mr. Fagg has been able

14   to confirm that all of these documents are within the Bates

15   ranges of the documents in the binder because this is --

16   frankly, there is just too many documents to confirm that.

17        THE COURT:  Maybe I am not quite following you,

18   Mr. Fagg.

19        MR. FAGG:  Sure, Your Honor.  We received from this

20   witness three different certificates of authenticity over the

21   course of --

22        THE COURT:  Which weren't asked about on direct.

23        MR. FAGG:  I understand.  What I am trying to do is

24   understand the process that he went through for purposes of his

25   preparation today, which was reviewing documents on their face,

Lumaker Challa - Cross

1   and what he did when he signed these certificates of

2   authenticity, because I believe that the process that he went

3   through was the same.

4        THE COURT:  It's beyond the scope if you are asking

5   him about anything that was not within the Bates stamp ranges

6   that he was asked on direct.

7        MR. FAGG:  Okay.  Fair enough.

8        THE COURT:  Go ahead.

9   BY MR. FAGG:

10  Q.  Mr. Challa, you were asked earlier by the prosecutor about

11  the documents in your binder.  And you testified that Pilgrim's

12  produced documents in response to some documents directly to

13  the government, correct?

14  A.  If I understand correctly, you are asking we give the

15  documents to the government?  I am not sure.

16  Q.  Okay.  So you don't know whether or not the documents in

17  there that you looked at were actually documents that were

18  provided to the government; is that correct?

19  A.  Again, we gave access to Consilio.  They processed it.

20  Beyond that, I don't know.  Sorry.

21  Q.  And so you don't know what Consilio did with the documents

22  that they obtained, correct?

23  A.  That's correct.

24  Q.  And you have not taken any work to try and verify what

25  happened after Consilio obtained the documents, correct?

Lumaker Challa - Cross

1   A.   That's not correct.  As I mentioned, I got the information

2   on Friday, so we started looking into the system.  And I got a

3   physical copy on Monday.  Since I don't have enough time, I

4   looked at each page with an e-mail ID associated with

5   Pilgrim's.  That's how I did it.

6   Q.   But you haven't completed that process.

7   A.   On the physical, yes; but on the system verification, that

8   process is -- still take some time because there is a lot of

9   e-mail.

10  Q.   As we sit here today, it's not complete, correct?

11  A.   No.

12  Q.   When I was referring earlier to Bates numbers about -- on

13  documents, just to make sure that we are talking on the same

14  page, Bates numbers are a stamp that can be applied to the

15  document so that they can later be identified.  Do you

16  understand that?

17  A.   I just saw the stamp on it, but I don't know all the

18  details.  Again, I did not get into the detail.  All I looked

19  at is whether we have an e-mail ID on a paper or not.

20         MR. FAGG:  No further questions.

21         THE COURT:  Thank you.

22         Additional cross?

23         Go ahead, Mr. Canty.

24                    **CROSS-EXAMINATION**

25  BY MR. CANTY:

Lumaker Challa - Cross

1    *Q.*  Mr. Challa --

2    *A.*  Yes.

3    *Q.*  -- good afternoon.

4    *A.*  Good afternoon.

5    *Q.*  I am Dennis Canty.  A couple questions.

6          You said you gave access to Consilio to the Simpana

7    archival system that the Pilgrim's servers are copied to,

8    right?

9    *A.*  Yes.

10   *Q.*  When did you do that?

11   *A.*  I don't remember exactly.  I think it's almost two years.

12   *Q.*  Did -- is that an ongoing access or were there periods of

13   time when access was granted and then withdrawn?

14   *A.*  It's a good question.  It's ongoing access.  However, we do

15   have a system where it will stop access in a certain -- two

16   months or three months on the VPN side.  Again, they have to

17   resubmit and send information, then we reactivate that account.

18   It's a security purpose.

19   *Q.*  With respect to the documents that have been identified on

20   Exhibit 9551, do you have information as to whether these

21   documents were the documents that were taken by Consilio from

22   the Simpana archival system?

23   *A.*  So if I see the document, I can tell, but I don't remember

24   on top of -- with a specific number.  So if there is an e-mail

25   ID, we can verify; but without that I cannot say exactly the

Lumaker Challa - Cross

1    number.  I don't remember all the numbers.

2    Q.  So you can go backward, right?  You can look at a number

3    and go see whether that document is on the server, right?

4    A.  Yes, we can, because we have a number, exhibit number, and

5    From, To, some type of date, we can go and search.

6    Q.  Do you have any knowledge in the other direction as in

7    whether the document that came off of the Simpana server was

8    actually pulled by Consilio or somebody else?

9    A.  We gave only access to Consilio, so they are the only one

10   that have access.  They are the only one that can take it.  If

11   somebody else, I don't have a clue.  There is no way without

12   access people can take e-mail from the system.

13   Q.  So do you know for sure that the only person that could

14   have created the documents that are identified by Bates number

15   here is Consilio?

16   A.  Yes.  But at the same time end users have access to

17   Simpana.  If I am a user in Pilgrim's, I have access to my own

18   e-mail, right?  So I can take it, I can download, so...

19   But end users do not have access to others' e-mail, but we have

20   access to our own e-mail.

21   Q.  Do you have any knowledge as to the collection process that

22   went into specifically creating the documents that you see here

23   on Government Exhibit 9551?

24   A.  I do not, sir.  I don't have an answer for that.

25   Q.  And to your knowledge, were there other people at Pilgrim's

544
Lumaker Challa - Redirect

1  that may have been involved with Consilio in selecting the

2  documents that appear on Government Exhibit 9551?

3  A.  I do not know if somebody else have access to Consilio.  I

4  do not.  I do not have an answer for that.

5          MR. CANTY:  Thanks.

6          THE COURT:  Thank you, Mr. Canty.

7          Additional cross?

8          Redirect?

9                     **REDIRECT EXAMINATION**

10  BY MS. ROGOWSKI:

11  Q.  Mr. Challa, would it be fair to say that only Pilgrim's

12  employees are the ones who would have access to a pilgrims.com

13  e-mail address?

14  A.  Pilgrim's users have their own access to their own e-mail.

15  Legal and my team have access to do a compliance search, so

16  when I say compliance search, we can search for other e-mails.

17  But we don't do such simply without any reason.  If we have

18  someone in legal or someone ask, then we will do it.

19  Q.  Let me rephrase the question.  That isn't what I meant to

20  ask.

21          If someone who doesn't work at Pilgrim's were trying

22  to get a pilgrims.com e-mail address, would they be able to?

23  A.  No.

24  Q.  You reviewed the binders in front of you in preparation for

25  today, correct?

Lumaker Challa - Redirect

1   A.   Yes.

2   Q.   What did you look for when you were looking through those

3   binders?

4   A.   So I was looking at the e-mail IDs, so that is the e-mail.

5   There are two pages, three pages.  I was looking do we have

6   anyone -- a listed e-mail ID associated with the pilgrims.com.

7   That's how I looked at it.

8   Q.   To the best of your knowledge, Mr. Challa, were the e-mails

9   in those binders associated with the pilgrims.com e-mail

10   address?

11   A.   That's correct.  That's what I noticed.

12   Q.   Could you please take a look at Exhibit 9254 in those

13   binders?  I believe it may be in the third one.

14          COURT DEPUTY CLERK:  What's the exhibit number?

15          MS. ROGOWSKI:  9254.  And I am happy to look for it if

16   that would be helpful.  If we could switch to my colleague's

17   screen on Trial Director.

18          COURT DEPUTY CLERK:  Just one moment.

19          THE COURT:  That's Mr. Keech's job, so he is tied up

20   for the moment.

21   A.   9254?

22   BY MS. ROGOWSKI:

23   Q.   Yeah.  Do you see the e-mail in the top from a

24   Mr. Walbusser?

25   A.   Yes.

Lumaker Challa - Redirect

1   Q.  After reviewing this e-mail, Mr. Challa, could you please

2   tell me if there is -- without saying the actual domain name,

3   another domain name associated with Pilgrim's Pride employees

4   but with its parent company?

5   A.  Yeah.  So let me a little bit explain how the system works.

6   So there is no separate e-mail systems for the different

7   business entities that we have.  JBSSA.com is the primary

8   domain for all e-mails, but based on the business unit

9   employee, if someone is from pilgrims.com, they will see that

10  as a primary.  So the JBSSA goes in the back end.

11  Q.  If you could, Mr. Challa, just don't say the domain name

12  itself.  Thank you.

13  A.  Sorry.  The primary domain becomes pilgrims.com, and then

14  the e-mail sent and received will be that e-mail ID.  But if

15  someone transferred from a different business unit, they may

16  have a primary e-mail with us before.  It may be there for some

17  time until they notify IT saying we have to change it to

18  pilgrims.com.

19  Q.  To the best of your knowledge, Mr. Challa --

20          MR. FAGG:  Your Honor, I object.  This redirect is

21  outside the scope of cross.

22          THE COURT:  It does seem to be outside of the direct,

23  so I will sustain that objection.

24          MS. ROGOWSKI:  My final question, I believe, is inside

25  the scope of the cross.

Sean King - Direct

1          THE COURT:  Go ahead.

2     BY MS. ROGOWSKI:

3     Q.  To the best of your knowledge, Mr. Challa, are the

4     documents that you provided to Consilio in fact true copies of

5     e-mails and attachments from Pilgrim's server?

6     A.  Whatever we gave access, yes.

7          MR. FAGG:  Your Honor, also outside of the scope.

8          THE COURT:  Overruled.

9     A.  So whatever the system we gave access to Consilio, which is

10    Pilgrim's.

11         MS. ROGOWSKI:  No further questions.

12         THE COURT:  Thank you, Mr. Challa.  Some of the

13    defendants may want you to -- may want to recall you, so they

14    will let you know that, but otherwise you are excused for

15    today.  Thank you very much.

16         THE WITNESS:  Thank you very much.  I appreciate it.

17         THE COURT:  The United States may call its next

18    witness.

19         MS. ROGOWSKI:  The government calls Sean King.

20      (**Sean King** was sworn.)

21         THE WITNESS:  I do.

22         COURT DEPUTY CLERK:  Please state your name and spell

23    your first and last names for the record.

24         THE WITNESS:  Sean King, S-E-A-N, K-I-N-G.

25                        **DIRECT EXAMINATION**

ATTACHMENT B

Sean King - Redirect

1   that was followed for the PILGRIMS-DOJ prefix documents.

2   *BY MS. ROGOWSKI:*

3   *Q.*  To the best of your knowledge, Mr. King, were the documents

4   that were copied with this PILGRIMS- Bates stamp in fact true

5   copies of the documents that Consilio received access to by

6   Pilgrim's?

7           *MR. CANTY:*  Objection, foundation.

8           *THE COURT:*  Overruled.

9   *A.*  They are true and accurate copies, yes.

10          *MS. ROGOWSKI:*  No further questions.

11          *THE COURT:*  All right.  Mr. King, some of the

12  defendants may wish to recall you at a later time, so they will

13  be in contact with you if that's true.  Otherwise, you are

14  excused for today.  Thank you very much.

15          *THE WITNESS:*  Thank you.

16          *THE COURT:*  The United States may call its next

17  witness.

18          *MS. ROGOWSKI:*  The government calls Ted Sangalis.

19      (**Theodore Sangalis** was sworn.)

20          *THE WITNESS:*  I do.

21          *COURT DEPUTY CLERK:*  Please state your name and spell

22  your first and last name for the record.

23          *THE WITNESS:*  Theodore Sangalis, T-H-E-O-D-O-R-E,

24  S-A-N-G-A-L-I-S.

25          *THE COURT:*  Go ahead.

Theodore Sangalis - Direct                                          560

1        MS. ROGOWSKI:  Thank you.  Your Honor, may I have

2   permission for my colleague to walk over a copy of the exhibit

3   list and the binder to Mr. Sangalis?

4        THE COURT:  Yes.

5        MS. ROGOWSKI:  Thank you.

6        And thank you, Mr. Keech.

7                       **DIRECT EXAMINATION**

8   BY MS. ROGOWSKI:

9   Q.  Mr. Sangalis, do you work for Pilgrim's Pride?

10  A.  I do.

11  Q.  How long have you worked there?

12  A.  Since April 2020.

13  Q.  Could you please briefly describe your job responsibilities

14  there?

15  A.  Yeah.  So I am in-house counsel, so I handle whatever sort

16  of legal needs the company has from contracts of all kinds to

17  litigation, M and A, corporate governance, all that.

18  Q.  In front of you, Mr. Sangalis, you have a list of exhibits

19  that's been labeled Government Exhibit 9557 and you also have a

20  binder of exhibits.  Inside that binder, if you open it up,

21  there should be a separate folder.  So you have a binder and

22  you have a folder.

23  A.  Uh-huh.

24  Q.  Do you recognize the list of exhibits, the binder and the

25  exhibits in that folder?

Theodore Sangalis - Direct

1    A.   I do, yes.

2    Q.   How do you recognize them?

3    A.   Because I was given these last week.

4    Q.   And can you please describe for the jury what's in that

5    folder?

6    A.   The folder has the native documents, which I don't have in

7    the folder but it says it was produced, and then a signed list

8    of antitrust training from 2019.

9    Q.   And could you please identify for the jury the exhibit

10   number for that native document?

11   A.   Sorry.  So there is three native documents.  There is

12   Exhibit 1053, Exhibit 7046 and Exhibit 9264.

13   Q.   And as part of your review for today, Mr. Sangalis, were

14   you able to receive electronic copies of those documents?

15   A.   I was, yes.

16   Q.   And were there any pricing spreadsheets in there?

17   A.   There was.

18   Q.   Was there a period pricing chart?

19   A.   There was, yes.

20        MR. FAGG:  Objection, Your Honor, leading.

21        THE COURT:  Sustained.  Is there another?

22        MS. ROGOWSKI:  There is one more, Your Honor.

23        THE COURT:  Can it be referred to by another term

24   since it has not been introduced?

25        MS. ROGOWSKI:  It has not been introduced, Your Honor.

Theodore Sangalis - Direct

1          THE COURT:  Does it have an exhibit number?

2          MS. ROGOWSKI:  It does, but Your Honor, I am not sure

3     from my list which one is actually which.

4          THE COURT:  Do you need to look at the documents?

5          MS. ROGOWSKI:  If I could have a moment, please, Your

6     Honor.

7          THE COURT:  Sure.

8     BY MS. ROGOWSKI:

9     Q.  Mr. Sangalis, do you recall what the fourth document was in

10    that folder when we provided it electronically to you?

11    A.  Yeah, there was also a contact spreadsheet, contact list.

12    Q.  Thank you.

13         Mr. Sangalis, when we provided the electronic copies

14    of those documents, were you able to compare them to any

15    documents on -- that you had access to through Pilgrim's?

16    A.  Yes.  So I was given access to a home drive for Roger

17    Austin, so I was able to pull the three spreadsheets from that

18    home drive and compare them to the documents that I got from

19    the government.

20    Q.  And what was the result of your comparison?

21    A.  They were the same.

22    Q.  And what about the sign-in sheet that you have in front of

23    you?

24    A.  The sign-in sheet I was able to pull from our compliance

25    shared files and compare it to the government and it was also

Theodore Sangalis - Direct

1    the same.

2    *Q.*  Let's take a look at the exhibit binder in front of you,

3    Mr. Sangalis.  Did you review the documents in those binders

4    before today?

5    *A.*  I did.

6    *Q.*  Could you briefly describe the contents of the documents,

7    the categories of documents that are in there?

8    *A.*  Yeah.  So there were kind of three categories.  There was

9    what I would call sort of a corporate governance category that

10   had board meeting minutes and 8-Ks with the SEC.  There were a

11   series of contracts and bids and offers and then there were

12   expense reports.

13   *Q.*  And are you familiar with these categories of documents

14   based on your position at Pilgrim's Pride?

15   *A.*  I am, yeah.

16   *Q.*  How are you familiar with them?

17   *A.*  So corporate governance, I usually attend the board

18   meetings and take those minutes.  And I review 8-Ks usually or

19   have outside counsel review them before they are filed.  On the

20   contracts I am either involved from the get-go in negotiating

21   the contracts or if a dispute arises, I will be brought in and

22   I will look at the -- whatever is sort of governing that

23   relationship.  And for expense reports it's the same across the

24   company, and I have filed my own expense reports for the

25   company -- with the company.

Theodore Sangalis - Direct

1    *Q.* And are you familiar, Mr. Sangalis, with bids and offers

2    that are e-mailed from Pilgrim's Pride employees of the

3    company?

4    *A.* I am, yes.

5    *Q.* Could you just explain how you are familiar with those?

6    *A.* So there have been some disputes that have arisen, so I

7    have had occasion to review some of the e-mails where the --

8    that govern the sales of our products to our customers.  But

9    like I said, I also review contracts up front before they are

10   signed and help negotiate them and make sure that the terms

11   comply with our risk tolerances.

12   *Q.* Could you briefly describe how sales contracts are made at

13   Pilgrim's?

14   *A.* So it can be varied on the sales side because usually the

15   customer dictates that process.

16        *MR. FAGG:* Objection, Your Honor, foundation.

17        *THE COURT:* Overruled.

18   *A.* So the process can be varied depending on the customer.  So

19   sometimes the customer will sign the contract and say this is

20   what we want signed, in which case you will negotiate that and

21   then come to sort of a full contract.  Sometimes they send a

22   spreadsheet that says give us your pricing and fill this out.

23   Sometimes it just asks what kind of pricing can you have for

24   these types of products.  And it can be as formal, as informal

25   as the customer wants, but at the end of the day, there is some

Theodore Sangalis - Direct

1   sort of e-mail confirmation of the agreement.

2   BY MS. ROGOWSKI:

3   Q.  And when you say it could be formal or informal, does

4   that -- can I take that to mean, Mr. Sangalis, that what you're

5   talking about now encompasses formal contracts and also e-mails

6   with bids?

7   A.  Yeah.  Those are in the binder.

8        MR. FAGG:  As to the time frame, Mr. Sangalis is going

9   from the last two years.

10       THE COURT:  Right.  He testified to that.  If that's

11  an objection, it's overruled.

12  BY MS. ROGOWSKI:

13  Q.  Mr. Sangalis, can you please describe how 8-Ks are usually

14  made?

15  A.  So an 8-K is required by the SEC for publicly-traded

16  companies when a material event occurs with the company between

17  the quarterly reports.  And so if the 8-K needs to be filed,

18  some form of either in-house legal, outside counsel and then

19  the accounting department will come together and, A, determine

20  if an 8-K needs to be filed; B, work on the language; and then

21  C, ultimately file it with the SEC.

22  Q.  Can you please explain how Pilgrim's board meeting minutes

23  are created?

24  A.  So board meeting minutes and in-house counsel will be in

25  the board meeting and will take notes.  Those minutes after the

Theodore Sangalis - Direct

1    meeting is over will be reviewed for any errors and then

2    submitted to the board for approval of those minutes, and then

3    they are signed after the board approves the minutes.

4    Q.  You mentioned earlier you created expense reports before.

5    Are you familiar with how generally expense reports are created

6    at Pilgrim's?

7    A.  Yes.

8    Q.  Could you please explain the process?

9    A.  So we have an app where you can sort of enter a trip or an

10   event that incurred those expenses.  And then you can -- well,

11   it's an app or a program, I suppose, where you can submit

12   receipts and basically supporting documentation to justify all

13   those expenses.  And then that is approved by your manager and

14   then ultimately given to accounting.  And it goes into SAP,

15   which is our payroll system, and that's how you get reimbursed

16   for those expenses.

17   Q.  And are you familiar with how all of these different types

18   of documents are stored at Pilgrim's?

19   A.  Yes.

20   Q.  Could you please briefly describe the process for sales

21   contracts?

22        THE COURT:  Why don't we take our mid-afternoon break

23   before we launch into that subject, all right?

24        Ladies and gentlemen, we will go ahead and take the

25   mid-afternoon break.  Why don't we plan on reconvening 25

Theodore Sangalis - Direct

 1    minutes to 4:00.  Keep the admonitions in mind.  The jury

 2    excused.  Thank you.

 3             (Jury excused.)

 4             Mr. Sangalis, you are excused until after the break.

 5    Thank you very much.

 6             Anything to take up briefly before we recess?

 7             We will be in recess.  Thank you.

 8        (Recess at 3:16 p.m.)

 9        (Reconvened at 3:37 p.m.)

10        THE COURT:  Let's get the jury back in.  Once I say

11    let's get the jury, we should also automatically get the

12    witness, assuming that someone is resuming their testimony.

13             Mr. Sangalis, if you don't mind resuming the witness

14    stand, that would be great.

15             (Jury present.)

16        THE COURT:  Go ahead.

17    BY MS. ROGOWSKI:

18    Q.  All right.  Mr. Sangalis, if you could briefly describe the

19    process that Pilgrim's engages in to store sales contracts.

20    A.  So it's mostly by e-mail.  So we have a backup system to

21    our e-mail that automatically stores a copy of every e-mail

22    that goes in or out of the company.  And because most of the

23    contracts are communicated by e-mail, that's how we go look for

24    contracts when we need to refer to them.

25    Q.  Would that include what you were talking about earlier,

Theodore Sangalis - Direct

568

1   contracts that were not formalized, but just an e-mail, and

2   also formalized contracts?

3   A.   Yeah, any kind of agreement whether it's a formal contract

4   that's signed or just an e-mail agreement.

5   Q.   Could you please describe how Pilgrim's 8-Ks are stored?

6   A.   So Pilgrim's 8-Ks are filed publicly with the SEC so the

7   SEC has it on their website, which is called EDGAR.  And then

8   Pilgrim's also takes -- anytime there is something posted on

9   EDGAR for Pilgrim's, then pulls it and puts it on our website

10   which is also publicly available.

11   Q.   What about Pilgrim's board meeting minutes, how are they

12   stored?

13   A.   So board meeting minutes, there is a shared file that the

14   legal department has access to, and they are stored by year and

15   date of the meeting.  So those minutes are available to the

16   legal department.

17   Q.   And what about expense reports, are you familiar with how

18   those are stored; and if so, can you explain?

19   A.   Yes.   Those are stored in SAP.  So the accounting team has

20   access to those expense reports, both the line items of the

21   expense as well as the supporting documentation.

22   Q.   Mr. Sangalis, we have discussed sales contracts, both

23   formal and informal.  We've discussed 8-Ks.  We've discussed

24   board meeting minutes and expense reports.  Are all of these

25   records made during the course of regularly conducted business?

Theodore Sangalis - Direct
569

1   A.  They are.

2   Q.  And does this include both executed contracts and

3   unexecuted contracts?

4   A.  Yes.

5   Q.  Are these documents kept in the course of regularly

6   conducted business?

7   A.  Yes.

8   Q.  And that includes all the categories of documents we just

9   discussed?

10  A.  Yes.

11  Q.  And is making all of these records a regular practice of

12  Pilgrim's?

13  A.  Yes.

14  Q.  Specifically with respect to expense reports, are these

15  expense reports made by people who have personal knowledge of

16  the information contained therein?

17  A.  So the person submitting the receipts would have the

18  personal knowledge, and then the manager would review that.

19  And the accounting team would rely on the receipts that were

20  submitted by the individual.

21  Q.  And when you say receipts, do you mean receipts that the

22  person is seeking reimbursement for?

23  A.  Correct.

24  Q.  So Mr. Sangalis, you mentioned that you started at

25  Pilgrim's somewhat recently.  Based on your position, do you

Theodore Sangalis - Direct

 1   ever review these categories of documents that were created,

 2   stored and maintained before you actually started?

 3   A.  So the documents that I have seen from before starting at

 4   Pilgrim's have arisen for me through various disputes outside

 5   of this that have given me occasion to review various e-mails

 6   and sales contracts, as well as some of the expense reports

 7   working with the accounting team to pull those.

 8   Q.  And based on your review of those documents because of

 9   disputes, are you familiar with how those documents from before

10   you started are actually created, stored and maintained?

11   A.  Yes.

12   Q.  And are you familiar with whether those were actually

13   created as a regular business practice of Pilgrim's?

14   A.  Yes.

15           MS. ROGOWSKI:  No further questions.

16           THE COURT:  Thank you.

17           Cross-examination?

18           MR. FAGG:  No, Your Honor.

19           THE COURT:  Okay.  Then thank you very much,

20   Mr. Sangalis.  You are excused.

21           You may be subject to recall by some of the

22   defendants, but someone will be in touch with you to let you

23   know about that testimony if that occurs, okay?

24           THE WITNESS:  Okay.

25           THE COURT:  Thank you very much.

# ATTACHMENT C

Sean King - Direct

1          *THE COURT:*  Go ahead.

2     *BY MS. ROGOWSKI:*

3     *Q.*  To the best of your knowledge, Mr. Challa, are the

4     documents that you provided to Consilio in fact true copies of

5     e-mails and attachments from Pilgrim's server?

6     *A.*  Whatever we gave access, yes.

7          *MR. FAGG:*  Your Honor, also outside of the scope.

8          *THE COURT:*  Overruled.

9     *A.*  So whatever the system we gave access to Consilio, which is

10    Pilgrim's.

11         *MS. ROGOWSKI:*  No further questions.

12         *THE COURT:*  Thank you, Mr. Challa.  Some of the

13    defendants may want you to -- may want to recall you, so they

14    will let you know that, but otherwise you are excused for

15    today.  Thank you very much.

16         *THE WITNESS:*  Thank you very much.  I appreciate it.

17         *THE COURT:*  The United States may call its next

18    witness.

19         *MS. ROGOWSKI:*  The government calls Sean King.

20       (**Sean King** was sworn.)

21         *THE WITNESS:*  I do.

22         *COURT DEPUTY CLERK:*  Please state your name and spell

23    your first and last names for the record.

24         *THE WITNESS:*  Sean King, S-E-A-N, K-I-N-G.

25                         **DIRECT EXAMINATION**

Sean King - Direct

1   *BY MS. ROGOWSKI:*

2   *Q.*   Good afternoon, Mr. King.

3   *A.*   Good afternoon.

4   *Q.*   Could you please describe your highest level of education?

5   *A.*   Bachelor of arts degree.

6   *Q.*   Mr. King, where do you work?

7   *A.*   At Consilio.

8   *Q.*   How long have you worked at Consilio?

9   *A.*   Specifically with them for the last several months, but

10  they've been acquired, so I have been with their previous

11  companies for seven years.

12  *Q.*   And what is your job title at Consilio, Mr. King?

13  *A.*   Vice-president of eDiscovery operations.

14  *Q.*   Could you please briefly describe your responsibilities as

15  vice-president of eDiscovery operation?

16  *A.*   Yeah.  Simply put, I oversee a team of people that deal

17  with what we call data processing, document hosting and

18  document production services related to electronic data.

19  *Q.*   And during your employment at Consilio and also your prior

20  employment with companies that were later bought by Consilio,

21  was Consilio ever retained by Pilgrim's Pride?

22  *A.*   Yes.

23  *Q.*   What services did Consilio perform on behalf of Pilgrim's

24  Pride?

25  *A.*   Consilio has performed services such as data forensics,

Sean King - Direct

1    which is data collection services, data processing of

2    electronic data, document hosting, so hosting documents in an

3    on-line hosting repository for document review, and document

4    production services.

5    Q.  Were you involved in the document production portion of

6    those services?

7    A.  Yes.

8    Q.  How were you involved?

9    A.  I oversaw a team of people that would execute on any of the

10   requests to produce documents at the direction of the client.

11   Q.  For this project could you generally describe how Consilio

12   produced these documents, how the execution occurred?

13   A.  So we use an on-line hosting tool called Relativity that

14   basically documents are prepared and made ready for a review by

15   counsel and the client.  Documents are identified in that tool

16   as being responsive according to whatever criteria the

17   reviewers are using to identify responsiveness.

18        Those documents are then identified to us through a

19   request for production.  We then take those documents and will

20   basically image them.  We will Bates stamp them so that every

21   page has a unique identifier and then deliver them according to

22   whatever specification is required.

23   Q.  When you were processing these documents or overseeing

24   others processing these documents, are you aware of the

25   software that was used to perform that service?

550

Sean King - Direct

1   A.   Yes.

2   Q.   What was it called?

3   A.   The processing portion used a tool called Nuix.

4   Q.   And are you generally familiar with how Nuix works?

5   A.   Yes.

6   Q.   How are you generally familiar with it?

7   A.   I've both used it, but I more specifically, I oversee a

8   team of people that engage it to perform data processing

9   services.

10  Q.   And at all times relevant to this Pilgrim's Pride project,

11  was this Nuix software to the best of your knowledge

12  functioning properly or improperly?

13  A.   Properly.

14  Q.   And was this data from this project that was processed

15  through Nuix eventually sent to the Department of Justice?

16  A.   Yes.

17  Q.   Mr. King, you mentioned earlier something called a Bates

18  stamp.  Could you please describe what a Bates stamp is?

19  A.   A Bates stamp is a unique identifier applied during

20  production that for the most part is applied to a page level.

21  So if you have a pile of documents, let's say a box of paper

22  that needed to be Bates stamped, every page would have its own

23  unique identifier.  If pretty much goes sequentially from the

24  beginning of your production all the way until you are

25  completely finished over time.

551

Sean King - Direct

1  *Q.* And are you familiar with the Bates stamps that were used

2  in this Pilgrim's Pride matter?

3  *A.* Yes.

4  *Q.* Could you please tell the jury?

5  *A.* The two main ones used were PILGRIMS, so pages were

6  endorsed with a prefix of what's called PILGRIMS and then I

7  believe it was an eight digit number after that, again

8  sequentially going up.  And then the other prefix used was

9  PILGRIMS-DOJ.  Again, I believe it was eight digits

10 sequentially going up.

11 *Q.* When processing the documents with these Bates stamps, is

12 there a way that Consilio linked the attachments to the

13 e-mails?

14 *A.* Yeah.  So during processing and then as well we do this

15 during production, we have what's called family relationship

16 fields.  So part of the production is to include a series of

17 fields that will tell a person receiving it what documents are

18 related to each other.  Documents that are part of the same

19 family, for example an e-mail and its attachments, they are

20 produced individually, but there is a family relationship field

21 that will tell the user that these two or three documents are

22 actually related to each other.  They have a consistent schema.

23 *Q.* And the family relationship field, was that based on

24 information that you got from Pilgrim's or how did you create

25 that field?

552

Sean King - Direct

1   A.   That's part of the data processing aspect.  So Nuix as a

2   processing tool will take the electronic data we receive, for

3   example an e-mail, and it will take an e-mail with its

4   attachments, it will break them out into individual documents

5   as a normal course of business.  But at the same time it will

6   also identify that these documents are related to each other

7   and have a family relationship field populated to advise

8   accordingly.

9   Q.   And are those fields populated automatically?

10  A.   Yes.

11  Q.   To the best of your knowledge, were those fields -- was the

12  relationship between the documents in the Pilgrim's Pride

13  server transferred to the family metadata field when the

14  documents were processed by Consilio using Nuix?

15          MR. CANTY:  Objection, foundation.

16          THE COURT:  Overruled.

17  BY MS. ROGOWSKI:

18  Q.   When processing the documents with this Pilgrim's and

19  PILGRIMS-DOJ Bates stamp, Mr. King, how did Consilio process

20  the information in the header of the e-mail, so the To and the

21  From and the date and time field?

22          MR. CANTY:  Objection, foundation.

23          THE COURT:  Sustained.  If you could lay foundation.

24  BY MS. ROGOWSKI:

25  Q.   When processing the documents with the Pilgrim's and the

553

Sean King - Direct

1    PILGRIMS-DOJ Bates stamps, Mr. King, did Consilio process any

2    of the header information of the e-mail?

3          *MR. CANTY:*  Objection, Your Honor.  We have not

4    established he knows about the process for both groups of Bates

5    stamps.

6          *THE COURT:*  Overruled.  He can answer.

7    *A.*  Can you repeat the question again, please?

8    *BY MS. ROGOWSKI:*

9    *Q.*  When processing documents with the Bates stamps Pilgrim's

10   and PILGRIMS-DOJ, did Consilio process the header information

11   in those e-mails?

12   *A.*  Yes.

13   *Q.*  And what header information?

14   *A.*  Well, there is a myriad of fields that come out.  It's all

15   part of the standard process that Nuix follows, but fields such

16   as To, From, CC, the date the e-mail is sent, subjects, any of

17   the metadata for the actual attachments files, they are all

18   extracted out during processing and populated into a series of

19   fields that a user can see during review and later production.

20   *Q.*  And is the information generated in the header fields

21   copied directly from the documents that you received from

22   Pilgrim's?

23   *A.*  Yes.

24   *Q.*  Are you familiar with how Consilio processed the time zones

25   with these productions?

Sean King - Direct

1    *A.*  Yes.

2    *Q.*  Could you please tell the jury how that occurred?

3    *A.*  So the time zone is a setting that we apply at the

4    beginning of data processing.  Typically we apply a single time

5    zone to a project as a whole, so something like this Pilgrim's

6    matter would be considered a project.  And so we identify that

7    the UTC, which is basically the equivalent of what we call

8    Greenwich Mean Time, was the time zone to be applied to these

9    documents.  It's sort of standard operating procedure to use

10   UTC, but it also is part of a conversation had with the client

11   as to what time zone they want to use for the documents during

12   processing.

13   *Q.*  And for this client, Pilgrim's Pride, was UTC in fact used?

14   *A.*  Yes.

15   *Q.*  To the best of your knowledge, Mr. King, is it fair to say

16   that the documents with the Bates stamp PILGRIMS and

17   PILGRIMS-DOJ that were processed by Consilio, in fact, true

18   copies of the original documents were made available to

19   Consilio by Pilgrim's?

20          *MR. CANTY:*  Objection, foundation.

21          *THE COURT:*  Sustained.  If you could lay foundation.

22          *MS. ROGOWSKI:*  Your Honor, I believe he did testify

23   earlier about the PILGRIMS and PILGRIMS-DOJ Bates stamps.

24          *THE COURT:*  He did, but I don't think he testified

25   about the question that you just asked him.

555

Sean King - Direct

1   *BY MS. ROGOWSKI:*

2   *Q.*  Mr. King, during this project did you receive access to

3   documents from Pilgrim's Pride?

4   *A.*  Yes.

5   *Q.*  And did you copy and -- extract and copy those documents as

6   part of your work with Consilio and as part of this Pilgrim's

7   Pride project?

8        *MR. CANTY:*  Objection.  Vague as to time.

9        *THE COURT:*  Overruled.

10  *A.*  Okay.  Ask that again, please.

11  *BY MS. ROGOWSKI:*

12  *Q.*  Did you extract and copy documents provided to you by

13  Pilgrim's Pride as a part of this Pilgrim's Pride project

14  through Consilio using the Nuix system?

15  *A.*  Yes.

16  *Q.*  And to the best of your knowledge, was this Nuix system

17  that you used during the extraction and copying, was it, in

18  fact, working properly or not properly?

19  *A.*  Properly.

20  *Q.*  And were the documents that you did, in fact, copy copied

21  accurately from Pilgrim's system, to the best of your

22  knowledge?

23  *A.*  To the best of my knowledge, yes.

24  *Q.*  Do you have any reason to believe they were altered from

25  the time that you received access to them from Pilgrim's Pride

Sean King - Cross

1    to the time that Consilio finished copying and extracting them?

2    A.  I have no reason to believe anything has been altered, no.

3         *MS. ROGOWSKI:*  No further questions.

4         *THE COURT:*  Thank you.

5         Cross-examination?

6         Mr. Canty?

7                        **CROSS-EXAMINATION**

8    *BY MR. CANTY:*

9    Q.  Good afternoon, Mr. King.

10   A.  Good afternoon.

11   Q.  We just heard some extensive testimony about Nuix'

12   capabilities and how you took data from Pilgrim's Pride that

13   Pilgrim's Pride allowed you to access and processed it, right,

14   through the tool Nuix?

15   A.  Correct, yes.

16   Q.  And did you oversee the production of data that bears a

17   Bates number PILGRIMS-DOJ prefix?

18   A.  Yes, I did.

19   Q.  Did you do the same for the prefix PILGRIMS?

20   A.  Not directly, no.

21   Q.  And, in fact, was that production not complete and made

22   before you took over duties here?

23   A.  Correct.

24   Q.  So you have no personal knowledge whatsoever about what

25   happened in that production; is that correct?

557

Sean King - Redirect

1    *A.*  I have spoken to the individuals that may have been

2    involved with that in the past that I now work with.

3    *Q.*  So the answer to my question when I asked you about your

4    personal knowledge is you have none, right?

5    *A.*  If you are defining personal as direct, then no.

6    *Q.*  Okay.  So you have no direct knowledge whatsoever that any

7    document that bears the prefix PILGRIMS is authentic, right?

8    *A.*  Again, I think I have answered that.  I have spoken to the

9    individuals that I now work with that have dealt with the

10   PILGRIMS documents, but I don't have the personal -- if you are

11   using personal as direct, then no.

12          *MR. CANTY:*  That's all I have.

13          *THE COURT:*  Thank you.

14          Additional cross-examination?

15          Redirect?

16                      **REDIRECT EXAMINATION**

17   *BY MS. ROGOWSKI:*

18   *Q.*  Mr. King, are you familiar with the procedures that were

19   used to copy the PILGRIMS- Bates stamped documents by Consilio?

20   *A.*  Yes.

21   *Q.*  Could you please explain what procedures were used?

22   *A.*  So Consilio --

23          *MR. CANTY:*  Objection, foundation.

24          *THE COURT:*  Sustained.  If you could lay a foundation

25   how he knows.

Sean King - Redirect

1   *BY MS. ROGOWSKI:*

2   *Q.*  How are you familiar?

3   *A.*  I've -- I work with individuals that have been involved

4   with the processing and production of the PILGRIMS prefix, as

5   the nature of my position is vice-president of eDiscovery

6   operations.  So through my conversations with them --

7           *MR. CANTY:*  Objection, Your Honor, hearsay.

8           *THE COURT:*  Overruled.

9   *A.*  So through my conversations with them, I understand what

10  the process is that Consilio has followed for both processing

11  and document production.

12  *BY MS. ROGOWSKI:*

13  *Q.*  And what processes do you now understand that Consilio

14  followed for this PILGRIMS- Bates stamped document production

15  set?

16          *MR. CANTY:*  Objection, Your Honor.  Calls for hearsay.

17          *THE COURT:*  Overruled.

18  *A.*  So the processing work followed was almost a mirror to what

19  was performed for the PILGRIMS-DOJ work that I talked about

20  earlier, so they leveraged Nuix as a data processing tool for

21  both data extraction of e-mail header and metadata.  Data was

22  loaded to a Relativity hosting platform.  Documents were

23  identified for relevancy, responsiveness, and produced through

24  Relativity to any of the parties that were subject to receiving

25  those productions.  Again, that was all the same exact process

Sean King - Redirect

1   that was followed for the PILGRIMS-DOJ prefix documents.

2   BY MS. ROGOWSKI:

3   Q.  To the best of your knowledge, Mr. King, were the documents

4   that were copied with this PILGRIMS- Bates stamp in fact true

5   copies of the documents that Consilio received access to by

6   Pilgrim's?

7            MR. CANTY:  Objection, foundation.

8            THE COURT:  Overruled.

9   A.  They are true and accurate copies, yes.

10           MS. ROGOWSKI:  No further questions.

11           THE COURT:  All right.  Mr. King, some of the

12  defendants may wish to recall you at a later time, so they will

13  be in contact with you if that's true.  Otherwise, you are

14  excused for today.  Thank you very much.

15           THE WITNESS:  Thank you.

16           THE COURT:  The United States may call its next

17  witness.

18           MS. ROGOWSKI:  The government calls Ted Sangalis.

19      (**Theodore Sangalis** was sworn.)

20           THE WITNESS:  I do.

21           COURT DEPUTY CLERK:  Please state your name and spell

22  your first and last name for the record.

23           THE WITNESS:  Theodore Sangalis, T-H-E-O-D-O-R-E,

24  S-A-N-G-A-L-I-S.

25           THE COURT:  Go ahead.

ATTACHMENT D

Matthew Bunch - Direct

1    THE COURT:  I am sorry, what about the checkmarks?

2    MS. ROGOWSKI:  It had some checkmarks on it as you

3  were reading the numbers.

4    THE COURT:  If you can provide a clean copy to

5  Mr. Keech.

6    COURT DEPUTY CLERK:  I just needed it to keep track of

7  what exhibits have been received.

8    THE COURT:  Yes, but it has been shown to the jury.

9  We will retain a copy of Exhibit 9556.  It hasn't been

10  admitted, but it has been displayed.  It's just a list of the

11  documents that were admitted through Ms. Sandoval.

12  Ms. Sandoval, thank you very much.

13    THE WITNESS:  Thank you.

14    THE COURT:  The United States may call its next

15  witness.

16    MS. BUTTE:  Laura Butte for the United States.  We

17  would like to call Matthew Bunch.

18     (**Matthew Bunch** was sworn.)

19    THE WITNESS:  I do.

20    COURT DEPUTY CLERK:  Please state your name and spell

21  your first and last for the record.

22    THE WITNESS:  It is Matthew Wayne Bunch,

23  M-A-T-T-H-E-W, B-U-N-C-H.

24                    **DIRECT EXAMINATION**

25  BY MS. BUTTE:

Matthew Bunch - Direct

1    *Q.*  Thank you, Mr. Bunch.

2          Could you please let me know the highest level of

3    education you have obtained?

4    *A.*  Master's degree.

5    *Q.*  And where do you work?

6    *A.*  Tyson Foods.

7    *Q.*  How long have you been employed at Tyson Foods?

8    *A.*  For over 24 and a half years.

9    *Q.*  What is your job title?

10   *A.*  Senior director of information security/cyber.

11   *Q.*  Could you describe your responsibilities in that position

12   at Tyson Foods?

13   *A.*  My responsibilities include establishing cyber security

14   risk for the organization, including all operational security

15   controls that we maintain.

16   *Q.*  In your role at Tyson Foods, are you familiar with how

17   Tyson creates, manages, stores and retrieves e-mails and

18   attachments?

19   *A.*  I am.

20   *Q.*  Calendar notations?

21   *A.*  Yes.

22   *Q.*  Are you familiar with the domain name for Tyson?

23   *A.*  I am.

24   *Q.*  What is Tyson's domain name?

25   *A.*  The primary domain name is Tyson.com.

Matthew Bunch - Direct

1    *Q.*  Are e-mails with that domain name stored on Tyson's

2    systems?

3    *A.*  They are.

4    *Q.*  How are they stored?

5    *A.*  They are stored in multiple ways.  One, on the device that

6    the e-mails are sent, so such as a tablet, a PC, phone,

7    anything like that.  They are stored on Tyson's servers that

8    store e-mail.  They are also stored in the Microsoft 365

9    environment, so it's stored there as well.

10   *Q.*  What is the process for assigning e-mail addresses at

11   Tyson?

12   *A.*  We retrieve various details from our human resources system

13   such as first name, nickname or preferred name, as well as last

14   name.  And we've got an automatic system that will create those

15   names to create a unique e-mail for every individual.

16   *Q.*  Thank you.  In front of you you have a binder of documents.

17   If you could turn to Government Exhibit 114.

18        Are you familiar with the e-mail addresses at the top

19   of the e-mail chain of this document?

20   *A.*  I am.

21        *MR. POLLACK:*  Your Honor, if they are going to show a

22   exhibit to the witness, can they put them up on the screen so

23   we can see them?

24        *THE COURT:*  That would be great.  I think that would

25   be appropriate so I can see them too.

Matthew Bunch - Direct

1          MS. BUTTE:  If I can move over to the document viewer,

2    Your Honor.

3          THE COURT:  Yes.

4          MR. POLLACK:  To be clear, this would not be for the

5    jury unless something is admitted, obviously.

6          THE COURT:  Obviously.

7          Ms. Butte, do you have a copy of that?  Now it's

8    appearing.  Never mind.

9          Ms. Call, that's not that helpful.

10         MS. CALL:  I will turn it and we can highlight certain

11   portions of it.

12         THE COURT:  Okay.

13   BY MS. BUTTE:

14   Q.  Mr. Bunch, are you familiar with the e-mail address that is

15   at the top of the e-mail of Government Exhibit 114?

16   A.  I am.

17         MR. TEGTMEIER:  Your Honor, I am sorry.  I am having

18   difficulty hearing counsel's questions.

19         THE COURT:  Okay.

20   BY MS. BUTTE:

21   Q.  Could you tell me the e-mail addresses at the top of the

22   e-mail chain of this e-mail?

23   A.  It is Brian.Roberts@tyson.com, Carl.Pepper@tyson.com,

24   Tim.Scheiderer@tyson.com, and Tim.Mulrenin@tyson.com.

25   Q.  And these are the e-mail addresses whose e-mails would be

Matthew Bunch - Direct

1  stored on Tyson's servers?

2  *A.*  That is correct.

3  *Q.*  How are e-mails that are sent or received from e-mail

4  addresses stored in Tyson's systems?

5  *A.*  As previously stated, they would originate from a client

6  device such as a computer, laptop, desktop, phone or tablet,

7  and they would be stored there.  They would then be transmitted

8  to Tyson's e-mail servers whether they be stored within Tyson's

9  data center on-prem or in the Microsoft 365 cloud environment.

10  *Q.*  When an e-mail has attachments, how are the attachments

11  stored in Tyson's system?

12  *A.*  They are stored the same way.

13  *Q.*  What is the process for e-mail transmissions when sending

14  an e-mail with a Tyson domain?

15  *A.*  The process is that the e-mail is sent from that

16  originating device through Tyson's e-mail systems whether they

17  be in our data center or through the Microsoft service.  They

18  are then sent and transmitted to the alternate domain, the

19  target domain for that e-mail.  It is stored on those servers

20  and then ultimately to whatever client device would ultimately

21  read those e-mails.

22  *Q.*  What about the process for receiving an e-mail with a Tyson

23  domain?

24  *A.*  It would be the same.

25  *Q.*  What about the process for a calendar invitation sent to

Matthew Bunch - Direct

1    someone with a Tyson domain?

2    A.   It would be the same.

3    Q.   And received by someone with a Tyson domain?

4    A.   The same.

5    Q.   What is the process if an employee with a Tyson domain name

6    sends or receives an e-mail from their Tyson e-mail address

7    with their mobile device?

8    A.   It's the same process.

9         THE COURT:  Ms. Butte, some people may be having some

10   trouble.  So if you can make sure the microphone is a little

11   closer to your mouth, and if you don't mind, if you could slow

12   down just a little bit.  Thank you.

13        MS. BUTTE:  Thank you, Your Honor.

14   BY MS. BUTTE:

15   Q.   Are e-mail messages and calendar invitations sent and

16   received from a Tyson e-mail domain automatically saved?

17   A.   Yes, they are.

18   Q.   Are they saved at the time they are sent by the person with

19   the Tyson e-mail?

20   A.   Yes, they are.

21   Q.   Where are they saved?

22   A.   They are saved both on the client device that sends the

23   e-mail, the tablet, the phone, the laptop computer or desktop,

24   and then they are also saved on the Tyson server storing the

25   e-mails.

Matthew Bunch - Direct

1   Q.  Are e-mails saved at the time they are received?

2   A.  Yes, they are.

3   Q.  And where are they saved?

4   A.  The same devices.

5   Q.  Continuing to review Government Exhibit 114, do you see the

6   date and time fields at the top of the e-mail?

7   A.  I do.

8   Q.  Does Tyson's e-mail system record that information for each

9   e-mail and calendar invitation that passes through its servers?

10  A.  They do.

11  Q.  Are those fields automatically generated?

12  A.  They are.

13  Q.  To the best of your knowledge, is the automatic generation

14  process reliable?

15  A.  To the best of my knowledge, yes.

16  Q.  Is it accurate?

17  A.  To the best of my knowledge, yes.

18  Q.  Are you knowledgeable about the time zone stamp that

19  appears at the top of each e-mail or calendar invitation?

20  A.  I am.

21  Q.  What is the time zone?

22  A.  In this instance, it is UTC, which is a universal time

23  irrespective of individual time zones across the world.

24  Q.  If the To, From or CC field on an e-mail does not list an

25  e-mail address but may list just a name, how is that name

Matthew Bunch - Direct

1   generated?

2   A.  That name is automatically generated by the system that

3   corresponds to the name and the e-mail address for that

4   individual.

5   Q.  Is that an automatic process?

6   A.  That is an automatic process.

7   Q.  To the best of your knowledge, is that automatic process

8   reliable?

9   A.  To the best of my knowledge, yes.

10  Q.  Is that process accurate?

11  A.  To the best of my knowledge, yes.

12  Q.  Further in your binder I would like you to take a look at

13  Government Exhibit 230, and then once folks have had a chance

14  to look at it, Government Exhibit 232.

15          Did you review each of these documents before today?

16  A.  I did.

17  Q.  When?

18  A.  Last Friday.

19  Q.  What are these documents?

20  A.  These documents appear to be a -- the sending of a pricing

21  schedule from Tyson to one of our customers.

22  Q.  Are you familiar with the process for how these documents

23  are stored and kept at Tyson?

24  A.  I am.

25  Q.  How are these records stored?

Matthew Bunch - Direct

1  A.  They are stored both on the device that originates the

2  e-mail, as well as the e-mail servers that they are sent

3  through.  And then any of these attachments which would have

4  been created, in this case a Microsoft Excel document, would

5  have been stored on that laptop or other client device.  It

6  would have potentially been stored on a file server or a

7  network file server that would store those.  And then it would

8  be ultimately stored as attached to this e-mail within the

9  e-mail system.

10  Q.  Is it a regular part of Tyson's business practice to send

11  monthly pricing to its customers?

12  A.  It is.

13  Q.  Are these documents made during the course of Tyson's

14  regularly conducted business?

15  A.  They are.

16        MR. POLLACK:  Your Honor, object to the last few

17  questions based on lack of foundation.

18        THE COURT:  Sustained.  If you could ask him for his

19  foundation.

20  BY MS. BUTTE:

21  Q.  So what do these documents look like to you?

22  A.  These documents appear --

23        MR. POLLACK:  Objection, same objection.  That doesn't

24  lay a foundation.

25        THE COURT:  Well -- sustained.  You have to ask the

Matthew Bunch - Direct

1    witness what basis he has to know about this type of document.

2    BY MS. BUTTE:

3    Q.  How are you knowledgeable about these types of documents?

4    A.  I spoke to our sales organization and they confirmed that

5    the documents that are --

6           MR. POLLACK:  Objection, Your Honor, hearsay.

7           THE COURT:  Sustained.

8    BY MS. BUTTE:

9    Q.  How did you become knowledgeable, without discussing what

10   you heard from other people, about these documents?

11   A.  These documents appear based upon the wording in them

12   called pricing --

13          MR. POLLACK:  Objection, Your Honor.  We still have

14   not laid a foundation.

15          THE COURT:  Let's have a side bar.

16      (At the bench:)

17          THE COURT:  Ms. Butte, can you hear me?

18          MS. BUTTE:  I hear you.

19          THE COURT:  Mr. Pollack, can you hear me?  Mr. Pollack

20   is indicating he can.  I can't hear him.

21          MR. POLLACK:  Can you hear me?

22          THE COURT:  Yes.

23          MS. BUTTE:  Can you hear me now, Your Honor?

24          THE COURT:  I can.  So I think you figured it out,

25   Ms. Butte, but there is just one earphone and the other one is

431

Matthew Bunch - Direct

1    just to keep on your head.

2           Okay.  Ms. Butte, the witness had mentioned that he

3    had talked to people.  What's your understanding of when he had

4    those discussions?

5           MS. BUTTE:  My understanding is as a custodian of

6    records, he had spoken to those people either the last week or

7    the week before to be knowledgeable about these documents.

8           THE COURT:  And what do you anticipate he is going to

9    say in regard to this particular exhibit and the pricing

10   information contained on it?

11          MS. BUTTE:  That it was the regular part of Tyson's

12   business practice to send them pricing to their customers and

13   these are kept in the ordinary course of business.

14          THE COURT:  Okay.  Mr. Pollack?

15          MR. POLLACK:  Your Honor, if the witness has

16   knowledge, personal knowledge, of that and is simply repeating

17   what other people have told him, one, that's hearsay; and two,

18   he cannot say that this is a business record.  He is just

19   simply saying that somebody else thinks it's a business record.

20          THE COURT:  Response, Ms. Butte?

21          MS. BUTTE:  Yes, Your Honor.  This is based on Your

22   Honor's order previously about witnesses being able to testify

23   when it comes to authenticating admissibility of certain

24   records, not necessarily based on their personal knowledge, but

25   becoming knowledgeable about that information and how that

Matthew Bunch - Direct

1    would be appropriate for a custodian of records.

2         THE COURT:  Well, what my order said was that a

3    custodian of records doesn't have to know each document,

4    doesn't have to be familiar with every document, but that does

5    not mean that the witness can familiarize himself with a

6    document that he otherwise is not familiar with simply by

7    talking to other people about it and learning about that

8    document through someone else.  That someone else would need to

9    come in and lay the foundation in terms of a business record

10   for it.

11        So unless this particular witness had some -- you

12   know, it was within the scope of his normal duties to know for

13   a fact that pricing information of this sort was sent, he might

14   be able to authenticate it.  But he couldn't -- this witness

15   just gained that by virtue of talking to people as part of the

16   litigation process.  That would not suggest that -- I don't

17   believe that that's an appropriate authentication as to the

18   regularity of sending business documents to customers, all

19   right?

20        MS. BUTTE:  Your Honor, and just a preview, then we

21   will be calling another Tyson witness to establish the

22   authentication of these documents in addition to other

23   documents.

24        THE COURT:  Understood.  The objection is sustained.

25      (In open court:)

Matthew Bunch - Cross

1        THE COURT:  The objection is sustained.

2        MS. BUTTE:  Your Honor, I have no further questions at

3    this time.

4        THE COURT:  Thank you.  Cross-examination,

5    Mr. Pollack?

6                        **CROSS-EXAMINATION**

7    BY MR. POLLACK:

8    Q.  Very briefly, Mr. Bunch, you were shown a document that was

9    marked as Government's Exhibit 232.  I think at the bottom of

10   that exhibit there was an e-mail from another organization, not

11   from Tyson's; is that correct?

12   A.  Could you be more specific about where in this document you

13   are referring to?

14   Q.  I believe it's at the bottom of the document.  Is it 230?

15   I apologize.

16        MS. CALL:  I believe 114 may be what you are referring

17   to.

18        MR. POLLACK:  Thank you.

19   A.  There is a non-Tyson domain that is mentioned in

20   Exhibit 114.

21   BY MR. POLLACK:

22   Q.  And am I correct that you do not have familiarity with the

23   systems of other organizations --

24   A.  That is correct.

25   Q.  -- besides Tyson?

Matthew Bunch - Cross

1   A.   That is correct.  But I will state that the vast majority

2   of organizations use the same type of e-mail systems and so

3   everything would work exactly the same.

4   Q.   Well, except it doesn't work exactly the same because you

5   will see that the time that is offered on that e-mail is in

6   Central Daylight Savings Time, whereas the time that's on the

7   Tyson document is a UTC time, correct?

8   A.   That's correct.  Central Daylight Time would be the

9   displayed time for that specific client, but at the end of the

10  day, all e-mails are designated and have time stamps in UTC

11  time.

12  Q.   On the Tyson's side of the equation.

13  A.   On the vast majority of systems in the world, yes.

14  Q.   I understand.  On Tyson's and in your experience on the

15  vast majority of systems, correct?

16  A.   That is correct.

17  Q.   But you don't know whether this organization, this other

18  organization is in that vast majority or is not in that vast

19  majority.

20  A.   I have no direct knowledge, correct.

21  Q.   And just lastly, Mr. Bunch, you referenced the Microsoft

22  365 environment?

23  A.   That's correct.

24  Q.   That's not the environment that has been in use throughout

25  your time at Tyson, I take it.

435

Matthew Bunch - Cross

1   A.   Correct.

2   Q.   There was previously an environment called Microsoft

3   Exchange?

4   A.   That is correct.

5   Q.   And there was a migration at some point from Microsoft

6   Exchange to Office 365?

7   A.   That is correct.

8   Q.   How long did that migration take?  When did that occur?

9   A.   It started approximately 2015 and lasted for well over a

10  year.

11  Q.   And in that migration were any files corrupted?

12  A.   Not to my knowledge.

13  Q.   When you say not to your knowledge --

14  A.   No.

15  Q.   Okay.  How do you know that?

16  A.   We have systems in place.  And the migration utility that

17  is used to move those documents and objects verifies that the

18  objects are intact and/or moved completely without

19  modification.

20  Q.   So at least on the Tyson side of the equation, nothing was

21  lost in the translation in that migration.

22  A.   That is correct.

23           MR. POLLACK:  Thank you, Mr. Bunch.

24           THE COURT:  Thank you, Mr. Pollack.

25           Additional cross?

Matthew Bunch - Cross

1             All right.  Redirect?

2             MS. BUTTE:  Nothing, Your Honor.  Thank you.

3             THE COURT:  Is Mr. Bunch excused?

4             MS. BUTTE:  We would like to hold him while we further

5    proceed with the other Tyson witnesses.

6             THE COURT:  Well, for rebuttal.

7             MS. BUTTE:  Yes.

8             THE COURT:  That's a long ways away, but you can talk

9    to Mr. Bunch about that.

10            MS. BUTTE:  Yes.  We will speak to Mr. Bunch.

11            THE COURT:  Thank you very much, Mr. Bunch.  You are

12   excused.

13            MR. POLLACK:  Your Honor, to be clear, he is not

14   released with respect to the defense case at this point.

15            THE COURT:  Oh, he is not.

16            MR. POLLACK:  No, Your Honor.  I thought I made that

17   clear the other day and I apologize if I did not.

18            THE COURT:  Has he been separately subpoenaed?

19            MR. POLLACK:  No, Your Honor.  With respect to the

20   custodians, we would ask that they not be released until we

21   work our way through this process and then we can confer.

22            THE COURT:  Okay.  So Mr. Bunch, you are subject to

23   recall by the defendants.  And they will be in touch with you

24   or working through the government to make sure you know about

25   when that may occur, but you don't have to be waiting around

437

Carolyn Arens - Direct

1   here all the time.

2          THE WITNESS:  Okay.

3          THE COURT:  Thank you very much, Mr. Bunch.

4          MS. BUTTE:  Your Honor, the government would like to

5   call Carolyn Sue Arens.

6          THE COURT:  You may.

7       (**Carolyn Arens** was sworn.)

8          COURT DEPUTY CLERK:  Please state your name and spell

9   your first and last name for the record.

10         THE WITNESS:  Carolyn Sue Arens, C-A-R-O-L-Y-N,

11   A-R-E-N-S.

12                     **DIRECT EXAMINATION**

13   BY MS. BUTTE:

14   Q.  Thank you, Ms. Arens.

15          Could you let us know your highest educational

16   background level?

17   A.  I have a bachelor's degree in human resource development.

18   Q.  Where do you work?

19   A.  I am employed by Tyson Shared Services which is a

20   subsidiary of Tyson Foods.

21   Q.  How long have you been employed there?

22   A.  Nine years.

23   Q.  What is your job title?

24   A.  Senior paralegal for litigation.

25   Q.  Could you describe your responsibilities in that position

ATTACHMENT E

Stephen Gresch - Direct

```
 1   witness.

 2            MS. BUTTE:  Yes.  We would like to call Steven Gresch.

 3            Your Honor, may I hand Mr. Keech the documents for

 4   Mr. Gresch?

 5            THE COURT:  You may.

 6         (Stephen Gresch was sworn.)

 7            THE WITNESS:  I do.

 8            COURT DEPUTY CLERK:  Please state your name and spell

 9   your first and last name for the record.

10            THE WITNESS:  Stephen Gresch.  That's S-T-E-P-H-E-N;

11   Gresch, G-R-E-S-C-H.

12                       DIRECT EXAMINATION

13   BY MS. BUTTE:

14   Q.  Thank you, Mr. Gresch.

15            Where do you work?

16   A.  I work at TransPerfect Legal Solutions.

17   Q.  How long have you been employed there?

18   A.  Approximately, four years.

19   Q.  What is your job title?

20   A.  I am a manager of forensic technology and consulting.

21   Q.  Could you describe your responsibilities in that position

22   at TransPerfect?

23   A.  Sure.  So I oversee the day-to-day operations of our lab in

24   Chicago, Illinois.  That includes the consulting on incoming

25   cases and incoming projects, also the collection of data,
```

Stephen Gresch - Direct

1  evidence handling and delivery of data to clients and to our

2  internal processing departments.

3  Q.  Was TransPerfect ever retained by Tyson Foods or its

4  counsel?

5  A.  It was, yes.

6  Q.  What was TransPerfect retained to do?

7  A.  So TransPerfect went on site to do forensic collections, as

8  well as to process data that was received from Tyson as well as

9  from the forensic collections, and to review and produce

10  documents.

11  Q.  As part of those forensic collections, did TransPerfect

12  process any e-mails?

13  A.  TransPerfect did process e-mails, yes.

14  Q.  How did TransPerfect process the time zones for those

15  documents?

16  A.  So the time zones were processed in UTC, which is

17  coordinated universal time.

18  Q.  You mentioned forensic collections.  Did TransPerfect ever

19  collect data directly from Tyson?

20  A.  We did, yes.

21  Q.  Where was that data collection from?

22  A.  So the data collections occurred at their headquarters, if

23  you are referring to the specific location, or like what types

24  of devices?

25  Q.  What particular devices were collected?

451

Stephen Gresch - Direct

1   *A.*  Sure.  So we collected from laptop data, as well as from

2   mobile devices.

3   *Q.*  With respect to the laptop data, could you generally

4   describe the data collection process for that?

5   *A.*  Sure.  So for laptop data we would create a forensic image.

6   And that's a bit for bit copy, almost like a photograph of the

7   hard drive, and that's an exact copy of all the data, system

8   files, user files that exist on the laptop.

9   *Q.*  Is the process for that data collection reliable?

10  *A.*  It is, yes.

11  *Q.*  Is the process for that data collection accurate?

12  *A.*  It is, yes.

13  *Q.*  You have a binder in front of you.  It contains Government

14  Exhibits 244, 3074, 9211, 9212, and 9214.

15         *MS. BUTTE:*  And, Your Honor, we also have a list of

16  these exhibits that has been marked as Government 9552.  I can

17  hand that to Mr. Gresch for you and I can pass out to counsel

18  if you would like.  We have sent them the native version

19  previously.

20         *THE COURT:*  Mr. Keech can hand that up and can hand me

21  a copy as well.

22  *BY MS. BUTTE:*

23  *Q.*  Are you familiar with the exhibits in your binder and

24  listed on Exhibit 9552?

25  *A.*  So I am familiar with the exhibits listed here.

452

Stephen Gresch - Direct

1    Exhibit 9552, I am sorry, is it in this binder?  Was I going to

2    receive something?

3    Q.  It is a list of documents which -- I have given out all my

4    copies.

5    A.  Thank you.  And that's the same as here.  Yes, so I am

6    familiar with these documents.

7    Q.  Where do these documents originate from?

8    A.  Sure.  So these are all documents from laptops that were

9    imaged either by The Oliver Group or by TransPerfect Legal

10   Solutions that the evidence was then received by TransPerfect

11   if we did not create the image.

12   Q.  And how did you become familiar with these documents?

13   A.  I was -- so the first time I became familiar with them as

14   relates to this was I received a list of documents that had

15   been produced and was told to look into them.  That was my

16   first introduction into them specifically.

17   Q.  Does that apply to all the documents within your binder?

18   A.  It does, yes.  I will take a quick look at the actual

19   documents, but that is correct from the index.

20   Q.  I will give you a moment to take a look at the binder.

21   A.  Thank you.  So that is correct.

22   Q.  To the best of your knowledge, are the documents in the

23   binder and listed on Exhibit 9552 true copies of the documents

24   originally stored on the laptops that TransPerfect and The

25   Oliver Group collected?

Stephen Gresch - Direct

1   A.  They are, yes.

2          MR. POLLACK:  Objection, lack of foundation, in

3   particular with documents that were collected by The Oliver

4   Group.

5          THE COURT:  I don't understand your objection,

6   Mr. Pollack.

7          MR. POLLACK:  As I understand it, Mr. Gresch received

8   documents, some of which he directly acquired from laptops at

9   Tyson.  Others he acquired information from an entity called

10  The Oliver Group.  And I don't know -- we haven't laid a

11  foundation as to which of the documents on this list he got

12  directly and which ones he got from The Oliver Group.

13         THE COURT:  Okay.  So the objection is that the

14  question is vague?

15         MR. POLLACK:  The question is vague.  And to the

16  extent that it's asking about documents obtained The Oliver

17  Group, there is a lack of foundation for him to give an answer,

18  the answer to the question called for.

19         THE COURT:  Okay.  I will sustain both aspects of the

20  objection.

21         If you could lay a foundation.

22  BY MS. BUTTE:

23  Q.  Do you recall which documents in this list The Oliver Group

24  collected that data for?

25  A.  I do, yes.  Would you like me to describe?

Stephen Gresch - Direct

1    Q.  Yes, please.

2    A.  So the first document, the e-mail chain between trial

3    Exhibit No. 244 was an e-mail taken from Brandon Campbell's

4    laptop.  That was collected by TransPerfect, I believe.  The

5    second, 3074, was from custodian Richard Collyar's laptop.

6    That I believe -- that was collected by The Oliver Group.  And

7    9211 and 9212 were taken from Carl Pepper's laptop.  That was

8    collected by The Oliver Group.  And 9214 was from Andrew

9    Lubert's laptop and that was collected by TransPerfect Legal

10   Solutions.  And to elaborate a little bit, the forensic images

11   that we received from The Oliver Group were full, true and

12   correct copies of the hard drive data from the laptop that we

13   were able to --

14        MR. POLLACK:  Objection, lack of foundation for this

15   answer which is not -- which I also object as not being

16   responsive to any question.

17        THE COURT:  Okay.  Let's limit the answers to just the

18   documents that are part of Exhibit 9552.

19   A.  Which is the same list that I am reading off of, if I

20   understand that correctly.

21   BY MS. BUTTE:

22   Q.  Yes.  If you could just explain what data that TransPerfect

23   received from The Oliver Group with respect to just the

24   documents that are listed on this list.

25   A.  Sure.  So the original answer -- so the first document was

455

Stephen Gresch - Direct

1   from The Oliver Group.  Excuse me, yeah, so the first -- okay.

2   So Oliver Group did the laptop for Carl Pepper and for Richard

3   Collyar, so TransPerfect did the laptops for trial Exhibit No.

4   244 and 9214.  And Oliver Group collected the data for 3074,

5   9211 and 9212.

6   Q.  And did TransPerfect process the data that it received from

7   The Oliver Group for those documents listed on this list that

8   The Oliver Group did the forensic image for?

9   A.  TransPerfect did process that data, yes.

10         MS. PREWITT:  Your Honor, we need maybe to have a side

11   bar on this, on the foundation question.

12         THE COURT:  Not right now.

13         Next question.

14   BY MS. BUTTE:

15   Q.  So the best of your knowledge, are the documents listed on

16   this list true copies of the documents that were originally

17   stored on the laptops?

18         MR. POLLACK:  Objection, lack of foundation with

19   respect to 3074, 9211 and 9212.

20         THE COURT:  Response?

21         MS. BUTTE:  Your Honor, we already have a certificate

22   of authenticity.  There was under 902(14) that was I believe

23   ruled authentic already for documents collected by The Oliver

24   Group.

25         THE COURT:  And where is that document?

Stephen Gresch - Direct

1          MS. PREWITT:  Your Honor, if I can be heard.  I

2     believe that that certification is from TransPerfect.  It's not

3     from The Oliver Group.

4          THE COURT:  Well, hold on, Ms. Prewitt.  Let's try to

5     find a copy of it so I can see that first, okay?

6          MS. PREWITT:  Of course, Your Honor.

7          THE COURT:  Ladies and gentlemen, let's go ahead and

8     take our mid-morning break at this time.  And why don't we plan

9     on reconvening at just shortly after 11:00 o'clock, all right?

10    Keep the admonitions in mind, ladies and gentlemen.  The jury

11    excused.  Thank you.

12          (Jury excused.)

13          THE COURT:  Mr. Gresch, you can go ahead and step down

14    at this time.  And if you could return just a little bit after

15    11:00 and be ready to go.  Thank you very much.

16          THE WITNESS:  Thank you.

17          THE COURT:  All right.  Was that certification found?

18          MS. BUTTE:  We will locate that right now during our

19    break, Your Honor.

20          THE COURT:  Okay.  Let's see if that can be found and

21    then we will take this issue up at -- if you can swing it.  If

22    counsel can't get back in time, we will obviously wait, but

23    let's see if we can be back so that at about five minutes of

24    11:00 we can take that up so we can deal with this before the

25    jury comes back in if possible, all right?

457

Stephen Gresch - Direct

1          The Court will be in recess.  Thank you.

2      (Recess at 10:44 a.m.)

3      (Reconvened at 11:00 a.m.)

4          THE COURT:  All right.  Ms. Butte, did we locate that?

5          MS. BUTTE:  Your Honor, my apologies.  I misspoke on

6  the record.  We have a declaration from The Oliver Group, but

7  we do not have a certification.  And we are not seeking to

8  introduce the declaration.

9          THE COURT:  I am sorry, what was the last part?

10         MS. BUTTE:  We are not seeking to enter the

11  declaration or discuss the declaration.

12         THE COURT:  Okay.  And then you still have some more

13  questions of the witness?

14         MS. BUTTE:  Just a few more questions, Your Honor.  I

15  will not over-promise and under-deliver, so I have a few more

16  questions.

17         THE COURT:  Anything else before we get the jury back

18  in?

19         MS. BUTTE:  That's all, Your Honor.

20         THE COURT:  Mr. McLoughlin?

21         MR. McLOUGHLIN:  Your Honor, my recollection is the

22  government indicated in front of the jury that it had a

23  certification, and so we would like the correction from the

24  government that that statement was inaccurate to be repeated so

25  that the jury has that information.

458
Stephen Gresch - Direct

1          THE COURT:  I will inquire of Ms. Butte whether she

2    located the certifications, and then she can respond to that.

3          MR. McLOUGHLIN:  Thank you, Your Honor.

4          MS. BUTTE:  Thank you.

5          THE COURT:  Mr. Keech, if the jury is ready, let's

6    bring the jury back in.

7          (Jury present.)

8          THE COURT:  Ms. Butte, did you locate that

9    certification?

10         MS. BUTTE:  Your Honor, I misspoke earlier.  We have a

11   declaration, but not a certification.  And we are not seeking

12   to enter that certification into evidence or discuss that

13   certification.

14         THE COURT:  All right.  Let's get Mr. Gresch back in.

15         Mr. Gresch, if you could resume the witness stand.

16         Go ahead, Ms. Butte.

17   BY MS. BUTTE:

18   Q.  Mr. Gresch, before you left you mentioned a hash value.  So

19   what is a hash value?

20   A.  Sure.  So a hash value is essentially a digital

21   fingerprint, so a series of letters and numbers that is derived

22   by an algorithm.  And if any of the contents of a file change,

23   if you run the algorithm on that file or group of files again,

24   you will get a different value.  We use that to validate the

25   contents of a file to make sure that metadata hasn't changed or

Stephen Gresch - Direct                                          459

1   the content hasn't changed.

2   Q.  Were you able to perform that hash value analysis on the

3   documents that TransPerfect collected from the laptops you

4   discussed earlier?

5   A.  So the hash value analysis is done on the forensic image of

6   the group of files.  There is also a hash value associated with

7   each individual file and that's done at a later time.

8   Q.  Did you perform either of those hash value analyses?

9   A.  We did.  So when the collection is running, the forensic

10  tool creates the hash value.  And then we run it a second time

11  to validate the content, so we do that as a quality control

12  measure.

13  Q.  Were you able to perform that hash value analysis on the

14  data collected by The Oliver Group?

15  A.  We did.  So they logged the hash value for the collection

16  and then they validated it on their side.  And then we also

17  revalidated it once we received the data.

18          MR. POLLACK:  Objection, Your Honor, as to the

19  testimony about what he was informed The Oliver Group did.

20          THE COURT:  That will be sustained as to testimony

21  regarding The Oliver Group.

22          Ladies and Gentlemen of the Jury, you should ignore

23  that testimony.

24          Go ahead, Ms. Butte.

25  BY MS. BUTTE:

Stephen Gresch - Cross

1   Q.  To the best of your knowledge with respect to the documents

2   where TransPerfect performed the hash value analysis and

3   TransPerfect collected the data, are those true copies of the

4   documents originally stored on the laptops?

5   A.  They are.

6   Q.  And how do you know that?

7   A.  I know that by the process of the forensic imaging and then

8   the validation of the images from the hash values, as well as

9   our best practices for extracting data from those forensic

10  images and delivering them to our processing team.

11  Q.  Turning back to the exhibits in your binder, can you let us

12  know which exhibits that analysis pertained to?

13  A.  Sure.  So that was the laptop data from Brandon Campbell,

14  so 244, and Andy Lubert, 9214.

15          MS. BUTTE:  Thank you.  I have no further questions at

16  this time.

17          THE COURT:  Thank you.

18          Cross-examination?

19          MS. PREWITT:  Yes.  Liz Prewitt for Timothy Mulrenin.

20                      **CROSS-EXAMINATION**

21  BY MS. PREWITT:

22  Q.  Good morning, Mr. Gresch.

23  A.  Good morning.

24  Q.  How are you?

25  A.  I am good.

Stephen Gresch - Cross

1   Q.  I have a few questions for you.  In relation to -- you

2   talked earlier when Ms. Butte was standing here about data

3   collection being accurate.  Do you recall that?

4   A.  I do.

5   Q.  But you in fact cannot testify to the accuracy of the data

6   collection performed by The Oliver Group; isn't that correct?

7   A.  I would say that the data collected by The Oliver Group

8   that was logged in a forensically sound manner when my team

9   validated it --

10       MR. POLLACK:  Your Honor, I am going to object.  He

11  has no personal knowledge and he cannot testify about something

12  he doesn't have personal knowledge of.

13       THE COURT:  Overruled.  He can testify, but that issue

14  can be explored obviously.

15       Go ahead.

16  BY MS. PREWITT:

17  Q.  Did you observe the extraction performed by The Oliver

18  Group?

19  A.  I did not.

20  Q.  Okay.  So you are not aware of specifically their

21  procedures that they use to extract data, do you?

22  A.  So while I did not permanently witness it --

23  Q.  That's my question to you, sir.  You don't work for The

24  Oliver Group.

25  A.  That's correct.

462

Stephen Gresch - Cross

1   *Q.*  And you weren't trained by The Oliver Group.

2   *A.*  That is correct.

3   *Q.*  And so you don't have any direct knowledge about the

4   procedures that The Oliver Group uses to extract data; isn't

5   that correct?

6   *A.*  I received their collection notes.

7   *Q.*  But you were not involved.  You didn't witness it.  And you

8   do not know what was actually done, do you?

9   *A.*  I know from the notes that they gave me, but I did not

10  personally witness it.

11  *Q.*  And that would --

12      *MS. PREWITT:*  Your Honor, under Rule 602, this witness

13  does not have personal knowledge of the extraction, wasn't a

14  witness to it.  He is not qualified to offer that --

15      *THE COURT:*  Well, this is -- I am not sure what the

16  purpose of this statement is.  Do you have any additional

17  questions?

18      *MS. PREWITT:*  I just have an objection to this witness

19  being used to lay a foundation given the fact that he does not

20  have personal knowledge with respect to the documents, the

21  exhibits the government is seeking to admit.

22      *THE COURT:*  The government hasn't moved to admit them

23  yet, so any objection is premature.

24      *MS. PREWITT:*  Thank you, Your Honor.

25  *BY MS. PREWITT:*

Stephen Gresch - Cross

1  Q.  Now, with respect to the -- to be clear, we are talking

2  about with respect to the extraction performed by The Oliver

3  Group you already testified that you didn't witness and did not

4  participate in, that's in reference to the laptop, HP laptop

5  Elite 840 G3 associated with Carl Pepper; isn't that correct?

6  A.  I would need the declaration that I wrote to verify the

7  model number you referenced, but the Carl Pepper laptop to the

8  best of my understanding, that's correct.

9  Q.  And if it's reflected, you know, in the certification, that

10  would be accurate, correct?

11  A.  Correct.

12  Q.  Okay.  And the same would apply for the Dell HPS by Ritchey

13  Collyar, also reflected in your certification?

14  A.  Correct.

15  Q.  Also performed by The Oliver Group, the extraction?

16  A.  Correct.

17  Q.  In your other certification you refer to an iPhone 8 Plus

18  owned by Carl Pepper.  And that was also -- the extraction was

19  performed --

20       MS. BUTTE:  Your Honor, objection.  This is improper

21  cross, outside of the scope of Mr. Gresch's testimony.  We did

22  not discuss any mobile device collection.

23       THE COURT:  Response?

24       MS. PREWITT:  Your Honor, it's within the scope of his

25  testimony in the sense that he is here to testify based on

Stephen Gresch - Cross

1    certifications and with respect to devices where there have

2    been collections by TransPerfect.

3            MS. BUTTE:  Your Honor, he was here with respect to

4    testifying to the five documents that are listed on our exhibit

5    list.

6            THE COURT:  Sustained.

7            MS. PREWITT:  Nothing further for this witness, Your

8    Honor.

9            THE COURT:  Thank you.

10           Additional cross-examination?

11           All right.  Redirect?

12           MS. BUTTE:  Your Honor, I have no further questions at

13   this time, but we would like to seek to admit into evidence

14   Government Exhibit 244 and 9214.

15           THE COURT:  Can you hand up hard copies of those to

16   me?  So something just happened that is causing some static.

17   If anyone has hot spots at your table, you have to be really

18   careful of those.  They could be the cause of the background

19   static.

20           MR. KOENIG:  Yesterday we unplugged our microphone, so

21   I don't think --

22           MR. FAGG:  I don't think the defense has a copy of

23   these exhibits.

24           MS. BUTTE:  They were listed on our exhibit list and

25   we provided you copies multiple times.

Stephen Gresch - Cross

1              THE COURT:  Hold on.  Ms. Butte, you have to use that

2    microphone.

3              MS. BUTTE:  All right, Your Honor.

4              THE COURT:  And also all comments need to be made to

5    me.  So Mr. Fagg made a comment to me.  You then need to make a

6    comment back to me.

7              MS. BUTTE:  Yes.

8              THE COURT:  The side conversations make for a bad

9    record, okay?

10             MS. BUTTE:  Yes, Your Honor.

11             THE COURT:  Response?

12             MS. BUTTE:  We did as we previously discussed with

13   defense counsel provide a list of the documents that we planned

14   to use with Mr. Gresch in advance.  And we have provided

15   electronic copies of these documents previously to them.

16             THE COURT:  But I thought that -- weren't you going to

17   have hard copies of the documents for counsel?

18             MS. BUTTE:  We provided them a full set of our hard

19   copy documents.  As per we agreed with them, we didn't have an

20   agreement that we provide copies in advance 10 copies for

21   defendants to try to cut down our paper printing.

22             THE COURT:  Okay.  Is there a hard -- are there hard

23   copies that Mr. Fagg can take a look at right now?

24             So Mr. Pollack, I am not asking for whether there is

25   objections yet.  I am still trying to look at these documents.

Stephen Gresch - Cross

 1   Did you have something that needs to be --

 2          MR. POLLACK:  If you are not ready for objections, no.

 3          THE COURT:  Okay.  First of all, let us take document

 4   244.  Any objections to the admission of document 244?

 5          Mr. Pollack?

 6          MR. POLLACK:  Yes, Your Honor.

 7          THE COURT:  What is that objection?

 8          MR. POLLACK:  So let me state part of it and there is

 9   another part that may be better done by a side bar.  But as an

10   initial matter, whether or not the custodian has established

11   authenticity, the custodian has not established admissibility.

12   There are multiple layers of hearsay in this document and it's

13   inadmissible for that reason.  We can deal with that if we need

14   to by side bar.

15          THE COURT:  Agreed.

16          Response by the government?

17          MS. BUTTE:  Then we will seek to admit it later in

18   time, Your Honor, but we have laid the foundation for

19   authenticity for this document.

20          THE COURT:  I am sorry, for what?

21          MS. BUTTE:  We believe we've laid the foundation for

22   authenticity for this document, so we will seek to admit it

23   later and establish relevance and the other hearsay objections.

24          THE COURT:  So you are not admitting -- moving to

25   admit 244.

Stephen Gresch - Cross

1          *MS. BUTTE:*  Yes.

2          *THE COURT:*  Okay.  Are you moving to admit 9214?

3          *MS. BUTTE:*  We are still moving to admit that.

4          *THE COURT:*  Any objections to 9214?

5          *MR. POLLACK:*  Yes, Your Honor.  We would have the same

6     objections.

7          *THE COURT:*  Okay.  Response by the government?

8          *MS. BUTTE:*  Then we will seek to admit that at a later

9     time when we establish relevance and meet any hearsay

10    objections, but we do believe we have laid the foundation for

11    authenticity for this document.

12         *THE COURT:*  Because there is a difference between

13    authenticity and admissibility, we will take up that issue

14    later as well.

15         All right.  Do you have any additional questions for

16    Mr. Gresch?

17         *MS. BUTTE:*  No further questions, Your Honor.

18         *THE COURT:*  Mr. Gresch, you are, Mr. Gresch, subject

19    to recall by the defendants.  Either the government or defense

20    counsel will get in contact with you in the event that you are

21    needed, but you don't need to wait around the courthouse today

22    unless the government is requesting that you do.  And I know

23    that's not crystal clear, but take your direction from them.

24    But otherwise you are excused.  Thank you.

25         The United States may call its next witness.

ATTACHMENT F

Carolyn Arens - Direct

1    here all the time.

2              THE WITNESS:  Okay.

3              THE COURT:  Thank you very much, Mr. Bunch.

4              MS. BUTTE:  Your Honor, the government would like to

5    call Carolyn Sue Arens.

6              THE COURT:  You may.

7         (**Carolyn Arens** was sworn.)

8              COURT DEPUTY CLERK:  Please state your name and spell

9    your first and last name for the record.

10             THE WITNESS:  Carolyn Sue Arens, C-A-R-O-L-Y-N,

11   A-R-E-N-S.

12                         **DIRECT EXAMINATION**

13   BY MS. BUTTE:

14   Q.  Thank you, Ms. Arens.

15             Could you let us know your highest educational

16   background level?

17   A.  I have a bachelor's degree in human resource development.

18   Q.  Where do you work?

19   A.  I am employed by Tyson Shared Services which is a

20   subsidiary of Tyson Foods.

21   Q.  How long have you been employed there?

22   A.  Nine years.

23   Q.  What is your job title?

24   A.  Senior paralegal for litigation.

25   Q.  Could you describe your responsibilities in that position

438

Carolyn Arens - Direct

1   at Tyson?

2   A.  My main responsibility is working with the attorneys to

3   respond to complaints and such, but also one of my main

4   responsibilities is eDiscovery.

5   Q.  In that role at Tyson Foods, are you familiar with how

6   Tyson stores their e-mails and attachments?

7   A.  Yes, I am.

8   Q.  In your role are you familiar with how Tyson retrieves and

9   produces documents in response to subpoenas?

10  A.  Yes.

11  Q.  To document requests from third parties?

12  A.  Yes.

13  Q.  What is that process?

14  A.  That process is that -- our protocol is that when our

15  in-house attorneys tell me of a matter, that they request

16  e-mail searches and structure data searches from me.

17  Q.  Are you familiar with how e-mails, attachments and other

18  documents were retrieved and copied by Tyson Foods so they

19  could be produced to the Department of Justice?

20  A.  Yes.

21  Q.  Could you describe that process?

22  A.  We have two different systems.  One is called Discovery

23  Accelerator, and then from there we went to Microsoft Exchange.

24  And I use both of those systems to pull e-mails for matters.

25  Q.  Is that process reliable?

439

Carolyn Arens - Direct

1    A.   Yes, it is.

2    Q.   Is that process accurate?

3    A.   Yes.

4    Q.   Are you familiar with how e-mails, attachments and other

5    documents were retrieved and copied so they could be produced

6    by Tyson Foods to third parties?

7    A.   Yes.

8    Q.   Could you describe that process?

9    A.   The process is we have a protocol and a process in that

10   once given the names of the custodians and the date range and

11   search terms if required, I go to those two systems and pull

12   the data.

13   Q.   Was that process reliable?

14   A.   Yes.

15   Q.   Was that process accurate?

16   A.   Yes.

17        MS. BUTTE:   Thank you.   Your Honor, I have a binder of

18   documents for the witness.

19        THE COURT:   All right.

20        MS. BUTTE:   And I also have a list of those same

21   documents that are in the binder, if I could hand it to

22   Mr. Keech.   And we have previously sent a native version to

23   defendants, but I have additional copies if anyone would like a

24   paper copy.   The list itself has been marked as Government

25   Exhibit 9549.

Carolyn Arens - Cross

1    *BY MS. BUTTE:*

2    *Q.*  Ms. Arens, do you recognize the documents in this binder?

3    *A.*  I do.

4    *Q.*  Are you able to verify that the originals of these

5    documents were stored on Tyson's document and e-mail systems?

6    *A.*  Yes, they are.  I have authenticated them.

7    *Q.*  How did you do that?

8    *A.*  I went back to our systems and I looked at each individual

9    e-mail and verified that it was an accurate copy as to what is

10   on our system.

11   *Q.*  Is that with respect to all the documents, not just

12   e-mails?

13   *A.*  Yes.

14   *Q.*  To your knowledge, are these exhibits true copies of the

15   e-mails, attachments and other documents that Tyson maintained

16   on its servers?

17   *A.*  Yes.

18           *MS. BUTTE:*  Thank you.  I have no further questions at

19   this time.

20           *THE COURT:*  All right.  Cross-examination of

21   Ms. Arens?  Any?

22           *MS. PREWITT:*  Your Honor, Elizabeth Prewitt on behalf

23   of Mr. Mulrenin.

24           *THE COURT:*  Go ahead.

25                           **CROSS-EXAMINATION**

Carolyn Arens - Cross

1   *BY MS. PREWITT:*

2   *Q.*   Good morning, Ms. Arens.

3   *A.*   Good morning.

4   *Q.*   How are you today?

5   *A.*   Very well, thank you.

6   *Q.*   I have a few questions for you regarding some documents.

7          Now, you testified that there was a group of documents

8   that the government has shown you in that binder that you

9   consider to be documents that are authentic, correct?

10  *A.*   Yes.

11  *Q.*   Now, do you remember that on July 24th you executed a

12  certification of authenticity as to a large number of

13  documents?  Do you remember that?

14  *A.*   Yes.

15  *Q.*   Do you need to see that or do you recall that?

16  *A.*   I recall that.

17  *Q.*   Okay.  Now, and that was not the only certification.  You

18  also certified another time on October 8th, 2021.  Do you

19  remember that?

20  *A.*   Yes.

21  *Q.*   And do I need to show that to you or do you remember it?

22  *A.*   I remember it.

23  *Q.*   Okay.  Now, in each of those certificates, you explain that

24  you are qualified to authenticate about 7 million documents.

25  Does that sound about right?  Many millions.

Carolyn Arens - Cross

 1   *A.*  There were 7 million pages of documents that have been

 2   produced.  It would take some time for me to authenticate each

 3   page, yes.

 4   *Q.*  Understood.  Thank you.

 5           Now, I am going to hand you what has been marked as

 6   Defense Exhibit H-675, okay?  I will just hand that to you.

 7           And we will provide copies to the government as well.

 8   Thank you so much.

 9           *MS. BUTTE:*  Your Honor, we object.  This is outside of

10   the scope of Ms. Arens' direct testimony.  This appears to be

11   defendants' exhibit list.

12           *THE COURT:*  Response, Ms. Prewitt?

13           *MS. PREWITT:*  I will represent to you that these are

14   all within the certification that she signed as being authentic

15   previously, so in the interest of moving along.

16           *THE COURT:*  Will the question have to do with

17   authentication issues that this witness may know about?

18           *MS. PREWITT:*  Exactly, Your Honor.

19           *THE COURT:*  Yes.  Objection is overruled.

20   *BY MS. PREWITT:*

21   *Q.*  Now, Ms. Arens, I will represent to you that this is an

22   excerpt of defendants' exhibit list that's been marked and it's

23   H-675 just for identification purposes for you to take a look

24   at.  Now, you will notice that the documents listed here are

25   all Bates stamped with a TY prefix.

Carolyn Arens - Cross

1   A.   Yes.

2   Q.   And that's the prefix that you affixed to these documents

3   as part of this production process you testified to, correct?

4   A.   I did not personally assign the numbers, but yes.

5   Q.   But you were part of that process and you know that that is

6   the prefix used --

7          MS. BUTTE:   Objection, Your Honor.   This is not the

8   subject of our direct examination.   This is Ms. Prewitt's

9   direct examination and not a proper cross-examination.

10         MS. PREWITT:   Your Honor, I can move through this

11  pretty quickly.

12         THE COURT:   I am going to overrule the objection.

13  Let's see where this is going.

14  BY MS. PREWITT:

15  Q.   Now, this is -- these documents all fall within the range

16  of TY documents that you certified to in July of 2020 and

17  October 2020, correct?

18  A.   Yes.

19  Q.   Now, based on your prior testimony as to the government's

20  exhibit list, you can testify that these Bates stamped

21  documents, the ones with the TY affixed to it, that Bates

22  number, are also authentic Tyson documents, correct?

23  A.   I am sorry, they were also what?

24  Q.   Based on your prior testimony when you were looking at the

25  documents that the government showed you which had the same

Carolyn Arens - Cross

1    prefix and fall under the same certification that you signed --

2    A.   Yes.

3    Q.   -- you can testify that these TY Bates stamped documents

4    are also authentic which you certified to previously, correct?

5    A.   I did not individually go through the defendants' list as I

6    did the government's list, but I believe our processes are

7    sound.  And so based on the knowledge of authenticating the

8    government's list, then I would believe -- it is my belief that

9    all TY documents are authentic.

10   Q.   Thank you.  Now, let's talk about the government's -- there

11   are also documents with a TF prefix, correct?

12   A.   Yes.

13   Q.   You testified that these are documents that Tyson produced

14   in connection with another matter, correct?

15   A.   That's right, a separate matter.

16   Q.   So would the same -- would your testimony be the same with

17   respect to those documents?  To the extent the government

18   provided you a list and asked you to testify that they were

19   authentic and you certified to that, the same would apply to

20   those documents in that Bates number range within the

21   defendants' exhibit list.

22   A.   Yes.

23   Q.   Just for clarity of the record, let me just show you that

24   list.

25            MS. PREWITT:  For the record, this is H-676.

Carolyn Arens - Cross

1   *BY MS. PREWITT:*

2   *Q.*  Those are the TF documents that you have testified were

3   authentic, correct?

4   *A.*  That's correct.

5   *Q.*  And that is your testimony as to these TF documents.

6         *MR. POLLACK:*  Your Honor, I am not sure if she has

7   testified that the TF documents.

8         *THE COURT:*  I am not sure she was asked about the TF

9   documents yet.  I am not sure, but why don't we clarify that.

10        *MS. PREWITT:*  Thank you, Your Honor.

11        *THE COURT:*  Oh, she did testify to the TF documents.

12  Sorry.  Go ahead, Ms. Prewitt.

13  *BY MS. PREWITT:*

14  *Q.*  To the extent you have testified previously that you

15  believe that the TF documents, the ones with the TF prefix were

16  authentic, correct, the ones you were shown by the government,

17  correct?

18  *A.*  Yes.

19  *Q.*  And you certified to as much in the certification, correct?

20  *A.*  In the certification, yes.

21  *Q.*  And these similarly are affixed with a TF label and you

22  also believe fall within that certification.  And it is your

23  testimony that they are also authentic, correct?

24        *MS. BUTTE:*  Objection, Your Honor.  I don't believe

25  the witness has copies of these documents available to her.

Carolyn Arens - Cross

1          MS. PREWITT:  I have a binder, Your Honor, if she
2     would like to look through them, but I haven't heard from the
3     witness that she feels she needs to do that.
4          THE COURT:  Right, if the witness asks to see them.
5     She has already indicated she is familiar with that series.
6     Objection is overruled.
7          MS. PREWITT:  Your Honor, I have no further questions
8     for this witness.
9          Thank you very much, Ms. Arens.
10         THE COURT:  Thank you, Ms. Prewitt.
11         Additional cross, Mr. Pollack?
12         MR. POLLACK:  Your Honor, can we have a brief side
13    bar?
14         THE COURT:  Yes.
15       (At the bench:)
16         THE COURT:  Ms. Butte, can you hear me?
17         MS. BUTTE:  I can hear you, Your Honor.
18         THE COURT:  All right.  Mr. Pollack, can you hear me?
19         MR. POLLACK:  I can, Your Honor.
20         THE COURT:  All right.  Mr. Pollack, go ahead.
21         MR. POLLACK:  So I apologize, Your Honor.  Maybe I am
22    confused or mis-recalling the testimony on direct, but all of
23    the documents on the government's list were from the TY series.
24    I do not recall any testimony on direct that was attempting to
25    authenticate anything from the TF series.

447

Carolyn Arens - Cross

1           THE COURT:  The witness testified that the TF series

2    were documents that Tyson produced in connection with another

3    matter.  And I can't recall whether there was some additional

4    testimony that that series were authentic, but there may have

5    been.  I am not looking at the transcript.  I am not quite sure

6    about that at the present time.  Ms. Butte, do you recall

7    whether the witness did so testify?

8           MS. BUTTE:  Her binder does include 12 documents that

9    do have the TF prefix that are listed on our list.  And we were

10   carefully trying to gauge her testimony since they were

11   documents produced in the civil litigation that we are trying

12   not to reference.

13          MR. POLLACK:  Your Honor, I am looking at Government

14   Exhibit 9549 which is the list that we were -- I do see there

15   are -- I apologize, Your Honor.  I thought these were all TY

16   documents.  This is the --

17          THE COURT:  Right.  There are some TF documents.

18   There is three listed on the bottom of the first column on the

19   first page and perhaps there are some additional ones.  Yes,

20   there are some additional ones, for instance, on Page 3, first

21   column, middle of the document there is some.

22          MR. POLLACK:  Thank you, Your Honor.

23          THE COURT:  Okay.  Side bar ended, thank you.

24      (In open court:)

25          THE COURT:  All right.  Anyone else,

Carolyn Arens - Cross

 1  cross-examination?  No?

 2          All right.  Then Ms. Arens --

 3          *MS. BUTTE:*  May we have a moment to confer?

 4          *THE COURT:*  Yes, before you do redirect, sure.

 5          *MS. BUTTE:*  Your Honor, we would like permission to

 6  recall the witness later this afternoon if we need to.

 7          *THE COURT:*  Normally there is no recalling in the

 8  government's case, so you should ask whatever questions you

 9  need to ask now.

10          *MS. BUTTE:*  Given that we were given the defendants'

11  exhibit list and Ms. Arens had not had a chance to look at it,

12  we would just like to have a chance to recall her and be able

13  to take a look at that and see if we have any additional

14  questions for her.

15          *THE COURT:*  Later today?

16          *MS. BUTTE:*  Yes.

17          *THE COURT:*  Well, I am not saying that you can, but if

18  you want to keep her around to try, that's fine.

19          *MS. BUTTE:*  Thank you, Your Honor.

20          Ms. Arens, you are excused subject to recall by the

21  defendants too.  Both sides will be in contact with you to let

22  you know if your testimony at a time other than today is

23  necessary, okay?  Thank you very much.

24          *THE WITNESS:*  Thank you.

25          *THE COURT:*  The United States may call its next

ATTACHMENT G

Bill Kent - Direct

1        *MS. ROGOWSKI:*  The government calls Mr. Bill Kent.

2        (**Bill Kent** was sworn.)

3            *THE WITNESS:*  I do.

4            *COURT DEPUTY CLERK:*  Please state your name and spell

5    your first and last name for the record.

6            *THE WITNESS:*  Bill Kent, B-I-L-L, K-E-N-T.

7                        **DIRECT EXAMINATION**

8    *BY MS. ROGOWSKI:*

9    *Q.*  All right, Mr. Kent.  Where do you work?

10   *A.*  I work for Restaurant Supply Chain Solutions.

11   *Q.*  How long have you worked there?

12   *A.*  Close to five years.  It will be five years in February.

13   *Q.*  What is your job title?

14   *A.*  I am the vice-president of business technology.

15   *Q.*  And as vice-president of business technology, could you

16   just please briefly describe your responsibility?

17   *A.*  Absolutely.  I am responsible for all things information

18   technology.  I lead the department and I am responsible for

19   strategy, all of its people, processes, right to policies.  We

20   have a help desk and IT operations group.  We have

21   infrastructure and security, so hardware, software, networks,

22   data centers, things of that nature.  I run that department.

23   *Q.*  And do your responsibilities also include maintaining

24   RSCS's servers?

25   *A.*  Yes, they do.

469

Bill Kent - Direct

1   Q.  Could you please briefly describe?

2   A.  Sure.  We have servers in the cloud and we have a small

3   on-premise environment.  Those servers are responsible again

4   for all hardware, so the security around those servers.  Some

5   of them run applications.  Others run e-mail and things of that

6   nature.  But overall I have, you know, overreaching

7   responsibility for all of that.

8       MS. ROGOWSKI:  I have a binder for the witness.  May I

9   pass it to the witness and Mr. Keech?

10      THE COURT:  Mr. Keech can, yes.

11      MS. ROGOWSKI:  And also a list of exhibits.

12  BY MS. ROGOWSKI:

13  Q.  Mr. Kent, we are showing you a list of exhibits marked 9554

14  and a binder of those exhibits.  Do you recognize both of those

15  items?

16  A.  I do.

17  Q.  How do you recognize them?

18  A.  I was provided this information over the weekend, and I was

19  responsible for the data collection for some of those, that

20  information.

21  Q.  Okay.  And as a part of your position, Mr. Kent, are you

22  familiar with how RS creates, stores and maintains e-mails and

23  attachments?

24  A.  Yes, I am.

25  Q.  How are e-mails and attachments stored?

Bill Kent - Direct

1    A.  We use a very common platform, Microsoft, in particular the

2    Microsoft 365 on-line Exchange environment.  Those e-mails are

3    stored on our server, what's called a tenant server that we pay

4    licenses for as a service, and those are in the Microsoft

5    cloud.

6    Q.  And is that system monitored?

7    A.  Absolutely, yes.

8    Q.  Is it verified to ensure that it's operating properly?

9    A.  Yes.

10   Q.  Mr. Kent, I would like to direct your attention to the time

11   period between 2009 and 2019.  I am just going to refer to this

12   as the relevant time period.  Throughout this relevant time

13   period, to the best of your knowledge, was the system that RSCS

14   used to monitor its servers functioning properly or not

15   properly?

16        MR. POLLACK:  Objection, lack of foundation.  The

17   witness testified he has only been at the company since

18   February of 2017.  He is being asked about the period back to

19   2009.

20        THE COURT:  Sustained.  If you can lay a foundation.

21   BY MS. ROGOWSKI:

22   Q.  Mr. Kent, are you familiar with how RSCS stored and saved

23   its e-mails and attachments from anytime before your -- could

24   you please explain?

25   A.  Yes.  As I was sort of coming onboard, I did a full review

471

Bill Kent - Direct

1  of the past history, the environment, the architecture.  They

2  certainly made changes.  Technology would progress over the

3  years, but I am familiar with how it was stored prior to my

4  tenure with RSCS.

5  Q.  Can you please explain what you reviewed specifically with

6  respect to servers and how the servers were maintained?

7  A.  Yeah.  At that point in time we did not have much in the

8  "cloud," whether it be Oracle or Microsoft or Amazon.

9        MR. McLOUGHLIN:  Objection, Your Honor.  He is merely

10  repeating hearsay.  This is hearsay upon hearsay.

11        THE COURT:  Overruled.

12        MR. McLOUGHLIN:  The period from 2009 to 2019, the

13  fact he got a briefing again is hearsay and he is merely

14  repeating it.

15        THE COURT:  He can testify about his review of this

16  system integrity.  Overruled.

17  A.  So at that point in time, yes, we did a thorough review of

18  sort of where the company was and had come to, certainly

19  created a new road map of where we were going.  At that point

20  in time servers were maintained within the four walls of our

21  office in Louisville, Kentucky.  We did not have a cloud

22  environment at that point in time.  We did have an Exchange

23  server, if you will, that held all of the e-mails for the

24  company at that time when I was there in 2017, and then we

25  migrated to the on-line environment thereafter.

Bill Kent - Direct

1   *BY MS. ROGOWSKI:*

2   *Q.* And at that previous point in time when you had physical

3   servers in your location in Kentucky, were those servers

4   monitored?

5   *A.* Yes, they were.

6   *Q.* And were they verified to ensure that they were functioning

7   properly?

8        *MR. McLOUGHLIN:* Objection, Your Honor, to practices

9   from 2017 to 2009 about monitoring and whether they functioned

10  properly. This is hearsay and speculation based on a review

11  years later. We haven't established that the information he is

12  being asked about was in that review.

13       *THE COURT:* Sustained as to the last part and in terms

14  of whether he reviewed information that would indicate the

15  integrity of those particular systems. Otherwise, the

16  objection is overruled.

17  *BY MS. ROGOWSKI:*

18  *Q.* Mr. Kent, when you were performing your review when you

19  came onboard to RSCS, what types of information did you review?

20  *A.* Well, I was able to review the actual -- not only the

21  vendors and the partners that we used. Clearly there were some

22  historical logs and things of that nature, and I had interviews

23  with my staff and others to assess what that current state was.

24  *Q.* And were you satisfied based upon this review that the

25  servers were, in fact, monitored during this previous time

Bill Kent - Direct

1   period?

2   A.  Yes, I was.

3         THE COURT:  Overruled.

4   BY MS. ROGOWSKI:

5   Q.  Were you satisfied that based upon your review that these

6   servers were, in fact, functioning properly in this previous

7   time period or improperly?

8         MR. McLOUGHLIN:  Objection.

9         THE COURT:  Overruled.

10  A.  The servers were functioning properly.  In my interviews,

11  one of the interviewees was an IT operations manager who had

12  been with the company now 25 years.  And it was part of his

13  responsibilities to monitor.  But we also had a third-party

14  vendor who was also providing security and monitoring to those

15  servers, so I had interviews with that vendor partner as well.

16  BY MS. ROGOWSKI:

17  Q.  What was the name of that third-party vendor?

18  A.  It was -- Trace3 is the current name.  It was a -- prior to

19  that it was a different name, but Trace3 is their current name.

20  Q.  Mr. Kent, are you familiar with the RSCS domain name?

21  A.  Yes, I am.

22  Q.  What is the domain name?

23  A.  It is -- we actually have the RSCS.com.  We also have a

24  domain name for mail historically called UFPC.com.

25  Q.  Could you please explain to the jury why it's called

474

Bill Kent - Direct

1   UFPC.com?

2   *A.*   Sure.  Our business was -- prior to 2013 our business was

3   known as Unified Foodservice Purchasing Co-op.  And our current

4   CEO came in around that time and we just -- we had a name

5   change, so we added the RSCS.com domain.  And we made sure --

6   all of the e-mail and all of the other correspondence still

7   flows to the same server, if you will, but we had two different

8   domains.  We continue to have two as well.

9   *Q.*   You anticipated my next question.  So is it -- am I

10  understanding correctly that both of those two domain names are

11  still active?

12  *A.*   Yes, they are.

13  *Q.*   And are e-mails with both of those two domain names stored

14  and saved on RSCS's e-mail server?

15  *A.*   They are, yes.

16  *Q.*   Mr. Kent, are you familiar with the process for assigning

17  e-mail addresses to employees of RSCS?

18  *A.*   Yes, I am.

19  *Q.*   Could you please explain?

20  *A.*   Sure.  The typical process is we are provided from our

21  human resources department a notification, an alert in the form

22  of electronic form that outlines the new employee to onboard.

23  It's at that time we normally establish their e-mail address.

24  That e-mail address is first name.last name@RSCS.com.  There

25  are aliases as well that we can enter and have for nicknames

Bill Kent - Direct

1 and things of that nature because the employees most often want

2 to go by a nickname versus a formal name.  But needless to say,

3 both of those e-mail addresses if there are two or even more

4 would go to the same mailbox.  It would go to the same person,

5 but that's typically the onboarding, done at the onboarding

6 process.

7 Q.  Are you familiar with the e-mail address of RSCS employee

8 Sara Fisher?

9 A.  Yes, I am.

10 Q.  Could you please tell it to the jury?

11 A.  That would be Sara, S -- should I spell it?

12 Q.  Yes, please.

13 A.  Sara.Fisher@RSCS.com.  Now, she is a long-time employee and

14 would likely have had a UFPC.com e-mail address as well.

15 Q.  Are you familiar with the e-mail address of a Mike Ledford?

16 A.  Yes.

17 Q.  Could you please tell it to the jury?

18 A.  It's Mike.Ledford, M-I-K-E, dot, L-E-D-F-O-R-D.

19 Q.  And could you finish the e-mail address, please?

20 A.  @RSCS.com.  Apologies.

21 Q.  Would Mr. Ledford also likely have had a UFPC e-mail

22 address?

23 A.  Yes.  He was a longer term employee.  He also would have

24 had that for a period of time, yes.

25 Q.  What about a Pete Suerken?

476

Bill Kent - Direct

1    *A.*  I am familiar with Pete.  And his e-mail address is

2    P-E-T-E, dot, S-E-U-R-E-K-E-N.  It's Suerken,

3    S-E-U-R-K-E-N@RSCS.com.  And he would too would have had a

4    UFPC.com.

5    *Q.*  Are you familiar with the e-mail address of Rich Eddington?

6    *A.*  Yes.

7    *Q.*  Could you please tell the jury?

8    *A.*  It's Rich.Eddington, R-I-C-H, dot,

9    E-D-D-I-N-G-T-O-N@RSCS.com.

10   *Q.*  And what about Mary Hester?

11   *A.*  I am familiar with Mary as well.  Mary.Hester, M-A-R-Y,

12   dot, H-E-S-T-E-R@RSCS.com.

13   *Q.*  And what about a Robert Lewis?

14   *A.*  I am familiar with Robert as well, Robert.Lewis,

15   R-O-B-E-R-T, dot, L-E-W-I-S@RSCS.com.

16   *Q.*  All right.  Mr. Kent, have you reviewed the e-mails and the

17   attachments in the binder in front of you and listed in

18   Exhibit 9554 to confirm whether they did, in fact, come from

19   RSCS's system?

20   *A.*  Yes, I did, and I did confirm that.

21   *Q.*  And when did you do this review?

22   *A.*  I did this review -- I received it electronically late last

23   week and reviewed it over the weekend and reviewed it again the

24   last few days.

25   *Q.*  And just to avoid any miscommunication, you said you did,

Bill Kent - Direct

1    in fact, confirm that?

2    A.  Yes, I did.

3    Q.  All right.  Mr. Kent, let's talk a little bit about e-mails

4    some more.  When you look at the header information on the top

5    of an e-mail, what type of information is usually shown?

6    A.  It's normally the To and From or Sender, Receiver, along

7    with the date, along with if there is any particular

8    attachment, that's normally shown within that header

9    information.  It could also be in the body, but that's the

10   typical header information that's shown in the e-mail for RSCS.

11   Q.  Regarding the date and time at the top of the e-mail, do

12   you know how RSCS's systems generate that information?

13   A.  I do.

14   Q.  Could you please explain?

15   A.  Yeah.  The date and time is generated based on the -- if

16   it's a sender from RSCS, it will be based on the date and the

17   time in which they hit the enter key, if you will, that they

18   sent the e-mail.  That's recorded within the Exchange on-line

19   system itself.  It's in the metadata, if you will.  It's based

20   on their location.  That's synced with Microsoft Windows and

21   the time and dates are synced, if you will.  And if you are the

22   receiver, it's at the point in time you receive that message.

23   That would be noted as well.

24   Q.  And how does RSCS store that information?

25   A.  All of the e-mails are stored in the Microsoft 365 Exchange

Bill Kent - Direct

1   on-line environment on our server.

2   Q.  And would that include the date and time?  Is that also

3   stored?

4   A.  Yes, it would.

5   Q.  And does the date and time that's stored reflect the date

6   and time that the e-mail was actually sent?

7   A.  Yes.  It's from -- depending on what I received or is it

8   from the sender or receiver, yes, that date and time matches.

9   Q.  And to the best of your knowledge, is the process of

10  recording and storing that information accurate or not

11  accurate?

12  A.  It's accurate.

13  Q.  Is it reliable?

14  A.  Yes, it is.

15  Q.  Let's go back to the top of the e-mail.  And you mentioned

16  something about the To field and From field.  How is that

17  information generated?

18  A.  The person who is composing an e-mail would basically fill

19  out -- they are defaulted to the To field at the center and

20  they would basically address a receiver by typing in their

21  e-mail address.  If it's an internal person, those things can

22  be found by just typing in their name and it resolves, but

23  that's how you basically would create an e-mail.  The sender is

24  defaulted to their e-mail address and the receiver is whatever

25  they type in.

Bill Kent - Direct

1    Q.  And how is that information, specifically with respect to

2    the To and the From and the CC and those fields, how is that

3    information stored?

4    A.  That information is stored -- again, it's the same answer.

5    It's on the Exchange server, the exchange server we use.

6    Q.  Would that be stored as the same information as was in the

7    e-mail when it was either sent or received?

8    A.  Identically, yes.

9    Q.  To the best of your knowledge, is that process accurate or

10   not accurate?

11   A.  It's accurate.

12   Q.  And is that reliable?

13   A.  It is reliable.

14   Q.  So you also mentioned something earlier about being able to

15   see if there is an attachment to an e-mail.  And I believe that

16   you mentioned that you could see sometimes in the body of the

17   e-mail.  Are there any other ways that you can see if an e-mail

18   has an attachment?

19   A.  Yes.  It would either be in sort of the header and would be

20   outlining a number of field names.  It may be in the body.  You

21   might see an icon along with the file name.  And then of course

22   behind the scenes there is the metadata that sort of provides a

23   digital footprint of things, but it will have an indicator

24   of -- I think it's a yes or no, does it have attachments.  It

25   may also list the attachment name within sort of the

1    configuration of that metadata that goes along with every

2    e-mail.

3    Q.  And when looking at an e-mail that is saved and stored on

4    RSCS's servers, specifically talking about the text within the

5    body of that e-mail, is the text that's sent or received to an

6    RSCS e-mail address the same as the text that's stored when the

7    e-mail itself is actually stored?

8    A.  Yes, it is.

9    Q.  Mr. Kent, as a part of your work at RSCS, did there come a

10   time when you worked on a project to help RSCS respond to a

11   Grand Jury subpoena?

12   A.  Yes, absolutely.

13   Q.  Could you please briefly describe that process.

14   A.  Specific to this, we were notified by our legal counsel,

15   our legal team, that we needed to place a legal or litigation

16   hold on records.  And I received that request both verbally and

17   via e-mail.  And it outlined specific things that we needed to

18   look for and do.  But we immediately placed the litigation hold

19   using the Microsoft tool.

20        And then we had to scan all of our mailboxes for our

21   entire enterprise and look for certain key words and dates and

22   times, look for certain sender names or e-mail addresses or

23   receiver names and e-mail addresses.  And we did that and

24   provided electronic information back to our legal team.

25   Q.  And once that information was provided to your legal team,

481

Bill Kent - Cross

1    are you aware of whether it was extracted and copied to the

2    Department of Justice?

3    A.  I don't have any indication of what happened thereafter,

4    but we provided that information.  It was called PST files, and

5    from there I wasn't privy to.

6    Q.  For the process of collecting and copying the information,

7    to the best of your knowledge was the process that you used

8    functioning properly or not properly?

9    A.  It functioned properly, yes.

10   Q.  Okay, Mr. Kent.  Just two more questions for you.

11           Have you reviewed the e-mails and attachments and

12   other documents that are in the binder in front of you?

13   A.  Yes, I did.

14   Q.  And that are also listed on Government Exhibit 9554?

15   A.  Yes, I did.

16   Q.  And have you been able to confirm whether they were, in

17   fact, true copies of the documents on RSCS's servers?

18   A.  I did confirm and they are true copies.

19           MS. ROGOWSKI:  No further questions.

20           THE COURT:  Thank you.

21           Cross-examination, Mr. Pollack?

22                      **CROSS-EXAMINATION**

23   BY MR. POLLACK:

24   Q.  Hello, Mr. Kent.  Just a couple of questions for you.

25           When you said that you confirmed that the documents

Bill Kent - Cross

1   that are listed on 9554 are, I guess, true and correct copies,

2   I take it what you mean by that is you took the electronic copy

3   that the prosecutor gave to you and then you personally went

4   back to the RSCS server and made sure that the metadata and all

5   of the other information matched up with what the government

6   had provided you?

7           MS. ROGOWSKI:  Objection, Your Honor.  I don't believe

8   that's what he said he did.

9           MR. POLLACK:  It was a question, Your Honor.

10          THE COURT:  He can answer the question.  Overruled.

11  A.  Yeah, that was one approach.  I also as part of before the

12  electronic information went out, I confirmed that the

13  information, all of the configuration that we used to pull the

14  information was accurate and it was what we were asked to do.

15  But I did -- and I also basically looked and I did kind of know

16  what I printed and what this information looks like.  The

17  various nuances where we have signature lines and headers and

18  things of that nature, I could see that it matches sort of our

19  template that we use as a company.

20  BY MR. POLLACK:

21  Q.  Okay.  It matches your -- the template that you use as a

22  company, but I guess I am asking something a little bit

23  different.  For each and every one of these items listed, did

24  you yourself go back and compare -- let me start over.

25          What you got from the Department of Justice was an

Bill Kent - Cross

1    electronic copy?

2    A.  And I have a hard copy as well.

3    Q.  Okay.  Did you go back to the RSCS server to compare the

4    electronic copy that you got from the Department of Justice for

5    each one of these documents and ensure that it matched what was

6    on the RSCS server?

7    A.  I did not go back and look at it since it was received.  I

8    did go back and look at it two years ago when we pulled the

9    information.

10   Q.  Okay.  These documents have a document ID?

11   A.  Uh-huh.

12   Q.  I take it that's not your document ID.  You did not put

13   that on.

14   A.  Did not, no.

15   Q.  So how do you know that the documents that are listed here,

16   each and every one of them, is one of the documents that you

17   reviewed two years ago?  How do you know that what the

18   Department of Justice gave you is identical to what you

19   reviewed two years ago?

20   A.  Just looking at it based on knowing the mailboxes that we

21   provided, and I am speaking specifically to mail, those were

22   the names of those individuals that we had provided them in

23   discovery.

24   Q.  So it's the same people that these documents pertain to.

25   A.  Correct.

Bill Kent - Cross

1  *Q.* But you didn't take this list and go back to the RSCS

2  servers.

3  *A.* No, I did not do that this week.

4  *Q.* Well, you didn't do it this week.  They didn't give you

5  this exact list two years ago, did they?

6  *A.* They did not.

7  *Q.* So you didn't do it two years ago either for this exact

8  list.

9  *A.* For this exact list, I did not.

10  *Q.* And then just one more thing, Mr. Kent.  You said that the

11  time that goes on in the e-mail that is sent from RSCS, it

12  depends on the location of the user; is that correct?

13  *A.* That's typical, yes, yes.  It would sync with the time on

14  their computer based on what their location is.

15  *Q.* And I just want to clarify that.  If I'm based in the

16  Central Time Zone, for example, but I am traveling for work and

17  I am in the Eastern Time Zone when I send an e-mail, is it

18  going to show the Eastern Time Zone time or is it going to show

19  the Central Time Zone time because that's where the IP address

20  is affiliated?

21  *A.* It will show the Eastern Time Zone time.  It will follow --

22  it is set to change the time based upon where it's located.  It

23  will follow it.

24  *Q.* So to know what time zone that time is reflecting, you

25  would have to know where the user was physically located at the

Bill Kent - Cross

1    time they sent the e-mail?

2    A.  Not exact physical location, but the time zone, yes, sir.

3    Q.  Which time zone they were physically located.

4         MR. POLLACK:  That's all I have.  Thank you, Mr. Kent.

5    I appreciate it.

6         THE COURT:  Thank you, Mr. Pollack.

7         Ms. Henry?

8                         **CROSS-EXAMINATION**

9    BY MS. HENRY:

10   Q.  Good morning.  I am Roxann Henry.

11        COURT DEPUTY CLERK:  Your Honor, I am sorry, I think

12   the battery is dead.

13        THE COURT:  Let's change the battery, Ms. Henry.  It

14   doesn't seem to be amplifying, so let's check on it.

15        MS. HENRY:  Thank you.

16   BY MS. HENRY:

17   Q.  Sir, you said on direct you were familiar with Robert

18   Lewis.  Didn't Mr. Lewis leave the employ of RSCS years before

19   you joined the company?

20   A.  He did.  He still was sort of connected.  And we have a lot

21   of legendary employees and people who didn't know who they are,

22   and we've met at parties and things of that nature.

23        MS. HENRY:  Thank you.

24        Mr. Fagg, go ahead.

25                         **CROSS-EXAMINATION**

486

Bill Kent - Cross

1    *BY MR. FAGG:*

2    *Q.* Good morning, sir.

3    *A.* Good morning.

4    *Q.* Just a couple of quick questions.

5            When you are talking about the time zones for e-mail

6    and where they -- whether it will be updated, I assume when you

7    were testifying about that and how it would update, that would

8    require the computer or the device to actually recognize that

9    it is in that time zone.

10   *A.* To be on-line, that's correct, to be connected to some sort

11   of service, an internet service of some sort, yes.

12   *Q.* On your servers does someone have the ability to send an

13   e-mail through a computer, for example, that would not

14   recognize the time zone where they were?

15   *A.* No.  You've got to be -- people can send an e-mail multiple

16   ways, right?  So you can be on your client, your e-mail client

17   which is on your laptop.  You can go to a web portal, which is

18   Microsoft on-line.  And in recent years a lot of people are

19   using mobile apps, so that's generally synced to a satellite

20   that has internet connectivity.  But as long as there is

21   internet connectivity, that's the time that is going to be

22   placed in the metadata and on the e-mail.

23   *Q.* But if you are connected to your portal as you said, it

24   would still recognize you as being the time zone where you are

25   physically located?

Bill Kent - Cross

1    A.  Yes.

2              MR. FAGG:  Thank you.

3              THE COURT:  Mr. Tubach, go ahead.

4                        **CROSS-EXAMINATION**

5    BY MR. TUBACH:

6    Q.  Good morning.  Michael Tubach.  Just a few questions.

7              If you are looking at a hard copy of an e-mail, how do

8    you know whether it came from the sender's account or the

9    receiver's account in determining what the time zone is?

10   A.  Just the hard copy itself?

11   Q.  Yes.

12   A.  Clearly the two -- based on what you look at, it starts

13   with a To -- or rather a From, which is the provider, the

14   person who composed that e-mail.  And that parent e-mail sort

15   of lives -- and there may be multiple attachments, but that's

16   one way of looking at it.  And clearly the header information

17   on the metadata can be reviewed as well and that can be

18   assessed to see that same information.

19   Q.  Let me ask my question a little more directly because you

20   know a lot more about this than I do.

21             Let's say someone is in New York and they send an

22   e-mail to someone in Denver and they are two hours apart.

23   A.  Uh-huh.

24   Q.  So if you are just looking at a hard copy of an e-mail,

25   how do you know whether it came from the sender's account and

Bill Kent - Redirect

1    it would be on your time or from the recipient's account and

2    would be on Denver time?

3    A.  It's from the sender's account if that's the e-mail you are

4    printing.  If you are printing from the receiver's, that's

5    different.

6    Q.  You would have to know which account it came from, right?

7    Because that same e-mail would reside in two places and would

8    have two different time stamps right?

9    A.  More than likely.  Depends on if the receiver is outside of

10   RSCS, I don't have privy or knowledge as to how that would be,

11   but I know how it would be for us.

12   Q.  Thank you for that.  I was just talking about two people

13   within RSCS.

14   A.  I see.

15   Q.  So you could potentially have the same e-mail with two

16   different time stamps.

17   A.  The metadata would reflect the actual -- whether it came

18   from the receiver or the sender.

19   Q.  You would have to look at the metadata.

20   A.  That's right.

21           MR. TUBACH:  Thank you.

22           THE COURT:  Thank you.

23           Additional cross-examination?

24           All right.  Redirect?

25                        **REDIRECT EXAMINATION**

Bill Kent - Redirect

1    *BY MS. ROGOWSKI:*

2    *Q.* Mr. Kent, earlier you said the e-mail address of a Mr. Pete

3    Suerken.

4    *A.* Yes.

5    *Q.* Are you sure you spelled his name correctly?

6    *A.* I am pretty sure. It's not sure, as in S-U-R-E, but it's

7    S-E-U-R-K-E-N. We kind of pronounce it Suerken.

8    *Q.* Mr. Kent, you said you were the vice-president of business

9    technology; is that correct?

10   *A.* That's correct.

11   *Q.* And in that position you are responsible for all IT

12   infrastructure, that's correct?

13   *A.* Correct.

14   *Q.* You also said you used the Microsoft Exchange cloud system

15   to monitor servers. Do you have a contract with the Microsoft

16   Exchange cloud system?

17   *A.* We do, yes.

18   *Q.* And are you the one who is responsible for that contract?

19   *A.* I am.

20   *Q.* And so you pay them as a part of the contract. Is part of

21   that contract to be accurate and to store information

22   accurately?

23   *A.* Yes, it is.

24       *MR. POLLACK:* Your Honor, I am going to object. One,

25   it's not proper redirect. It's not responsive to anything in

Bill Kent - Redirect

1    cross.  Two, I don't think it's relevant.  And three, to the

2    extent that they are trying to make a statement about the

3    accuracy of Microsoft, the witness is not able to do that.

4            *THE COURT:*  Overruled.

5    *BY MS. ROGOWSKI:*

6    *Q.*  So Mr. Kent, you said as part of your position you monitor

7    the contract.  You do pay Microsoft Exchange and part of that

8    is that you expect them to be accurate; is that correct?

9    *A.*  That is correct.

10   *Q.*  So in your position if there was a problem with this

11   Microsoft Exchange cloud service that does store and maintain

12   RSCS e-mails and attachments, would you be aware of that?

13   *A.*  Absolutely.

14   *Q.*  And to the best of your knowledge, when you pulled and

15   copied the information from RSCS's servers in response to the

16   Grand Jury subpoena, was that information, in fact, pulled and

17   copied correctly?

18   *A.*  It was, yes.

19           *MS. ROGOWSKI:*  Your Honor, may I have permission to

20   hand the witness a document?

21           *THE COURT:*  You may.

22   *BY MS. ROGOWSKI:*

23   *Q.*  Mr. Kent, could you please turn to Exhibit 1136?

24   *A.*  Sure.

25           *MR. POLLACK:*  Can I ask if we can put this up on the

491

Bill Kent - Redirect

1    screen?

2              THE COURT:  Let's display that.

3              THE WITNESS:  I have it as well.

4              THE COURT:  That means that someone from the

5    government needs to put that up on the document viewer unless

6    you have a way to -- here you go.  You did.  Go ahead.

7              MS. ROGOWSKI:  No problem.

8    BY MS. ROGOWSKI:

9    Q.  So Mr. Kent, if you could please look at the CC field of

10   this e-mail.

11   A.  Yes.

12   Q.  What's the first name that you see there.

13   A.  That's Pete Suerken's name.

14   Q.  If you take a look at the spelling of the name, does that

15   change any of the answers related to his e-mail address from

16   previously?

17   A.  No.  It's P-E-T-E, dot, S-U-E-R-K-E-N as opposed to

18   Sureken, S-U-R-E, but it's spelled correctly.

19             MS. ROGOWSKI:  No further questions.

20             THE COURT:  Mr. Kent, you are subject to recall by the

21   defendant.  Someone will be in contact with you if they wish

22   for you to come back and testify.  It wouldn't be today.  And

23   subject to whatever the government may have told you about

24   whether you might have to stay here today, you are otherwise

25   excused.  Thank you very much.

Bill Kent - Redirect

1          THE WITNESS:  Thank you.

2          MS. ROGOWSKI:  Your Honor, based on Mr. Kent's

3     testimony, if I may, the government respectfully moves for a

4     ruling on the authenticity of the documents listed in

5     Government's Exhibit 9554.

6          THE COURT:  I am not going to make rulings on

7     authenticity.  I will rule at the time that something is moved

8     into evidence.

9          MS. ROGOWSKI:  Thank you, Your Honor.

10         THE COURT:  The United States may call its next

11    witness.

12         MS. ROGOWSKI:  The United States calls Lumaker Challa.

13         THE COURT:  I am sorry, what was the name again?

14         MS. ROGOWSKI:  Lumaker Challa.

15       (**Robert Hood** was sworn.)

16         THE WITNESS:  I do.

17         COURT DEPUTY CLERK:  Please state your name and spell

18    your first and last name for the record.

19         THE WITNESS:  Robert Hood, R-O-B-E-R-T, H-O-O-D.

20         MS. ROGOWSKI:  Your Honor, I am sorry.  We called

21    Mr. Challa.

22         THE COURT:  Right.  I am not sure.  Mr. Hood, you are

23    a bit of a surprise.  We thought you were Mr. Challa.

24         MS. ROGOWSKI:  We can take Mr. Hood now, Your Honor.

25         THE COURT:  As long as Mr. Hood is comfortable there,

# ATTACHMENT H

Bill Kent - Redirect

1            THE WITNESS:  Thank you.

2            MS. ROGOWSKI:  Your Honor, based on Mr. Kent's

3    testimony, if I may, the government respectfully moves for a

4    ruling on the authenticity of the documents listed in

5    Government's Exhibit 9554.

6            THE COURT:  I am not going to make rulings on

7    authenticity.  I will rule at the time that something is moved

8    into evidence.

9            MS. ROGOWSKI:  Thank you, Your Honor.

10           THE COURT:  The United States may call its next

11   witness.

12           MS. ROGOWSKI:  The United States calls Lumaker Challa.

13           THE COURT:  I am sorry, what was the name again?

14           MS. ROGOWSKI:  Lumaker Challa.

15       (**Robert Hood** was sworn.)

16           THE WITNESS:  I do.

17           COURT DEPUTY CLERK:  Please state your name and spell

18   your first and last name for the record.

19           THE WITNESS:  Robert Hood, R-O-B-E-R-T, H-O-O-D.

20           MS. ROGOWSKI:  Your Honor, I am sorry.  We called

21   Mr. Challa.

22           THE COURT:  Right.  I am not sure.  Mr. Hood, you are

23   a bit of a surprise.  We thought you were Mr. Challa.

24           MS. ROGOWSKI:  We can take Mr. Hood now, Your Honor.

25           THE COURT:  As long as Mr. Hood is comfortable there,

Robert Hood - Direct

 1  so go ahead.  And if you could state your name and spell your

 2  first and last name for the record.

 3          *THE WITNESS:*  It's Robert Hood; R-O-B-E-R-T, H-O-O-D.

 4          *THE COURT:*  And I can't remember now, Mr. Keech, have

 5  you sworn him in?

 6          *COURT DEPUTY CLERK:*  Yes, he was sworn in.  When he

 7  stated and spelled his name --

 8          *THE COURT:*  That's when we realized, yes, that's

 9  correct.  Mr. Hood, we are going to break in just five minutes,

10  but we will get five minutes in.

11          *MS. ROGOWSKI:*  Your Honor, if we could please pass the

12  binder and the exhibit list over to the witness.

13          *THE COURT:*  Yes, you may.

14                          **DIRECT EXAMINATION**

15  *BY MS. ROGOWSKI:*

16  *Q.*  All right, Mr. Hood.  Could you please state and spell your

17  full name?

18  *A.*  It's Robert Hood, R-O-B-E-R-T, H-O-O-D.

19  *Q.*  Do you work for George's?

20  *A.*  Yes, I do.

21  *Q.*  How long have you worked there?

22  *A.*  16 and a half years.

23  *Q.*  And what is your job title?

24  *A.*  It's vice-president of IT.

25  *Q.*  As vice-president of IT, could you please briefly describe

Robert Hood - Direct

1  your responsibilities?

2  *A.*  Just oversee technology operations of servers, storage,

3  security, e-mail, network, et cetera.

4  *Q.*  Mr. Hood, in front of you there is a binder that contains

5  various exhibits and there is a list that's labeled

6  Government's Exhibit 9553.  Do you recognize both of those

7  items?

8  *A.*  Yes, ma'am, I do.

9  *Q.*  How do you recognize them?

10  *A.*  I reviewed these items.  They were given do me by counsel.

11  And I was sent the copies of what we had sent to counsel.  And

12  then through counsel DOJ sent copies of the trial exhibits, and

13  I used this document to cross-reference and from a high level

14  go through and look at each one of these documents.

15  *Q.*  And just to be clear, when you said the copies of documents

16  that you gave to counsel, were you -- what were you talking

17  about there?

18  *A.*  So that was from requests that came from counsel to us.  A

19  gentleman named, Keith Pennington, who I supervise goes out and

20  pulls e-mails from our system.  It may be an employee or former

21  employee, date range, key word, all three maybe.  We pull those

22  requests.  We take them, we put them into a PST file, and we

23  upload those to counsel's servers.

24  *Q.*  And Mr. Hood, you said you were able to page through the

25  documents.  Were you able to compare them to versions of the

Robert Hood - Direct

1  actual documents on George's servers?

2  *A.*  So I used the version that counsel sent me that they

3  assured me was copies of what we had sent them, and I compared

4  that to what we received from counsel -- through counsel from

5  you.  And again from a high level, I looked at those.  There

6  was 127 documents or 128 documents.  I received those Monday.

7  And I went through them and looked at, you know, basic length.

8  I looked at sender, recipient, subject, header information and

9  looked at those.  If there was an attachment, I looked at the

10  basics of an attachment to say this was 15 pages or this was 13

11  pages, so at that level I did review all of those.

12  *Q.*  And when you were doing your review, were you able to

13  confirm whether those documents in front of you did, in fact,

14  come from George's servers?

15       *MS. JOHNSON:*  Your Honor, Wendy Johnson for Mr. Blake.

16  If I understood the witness correctly, he is comparing

17  documents that came from outside counsel or counsel of some

18  sort that were sent to him to documents from the government

19  that were sent to him and did not go back to the server, so I

20  would object to a proper foundation.

21       *THE COURT:*  Overruled.  He can answer the question and

22  determine whether he has foundation or not.

23       Go ahead.

24  *A.*  So the question again was can I determine if they came from

25  our servers?

496

Robert Hood - Direct

1    *BY MS. ROGOWSKI:*

2    Q.  Yes.

3    A.  So I was told by counsel that the Bates --

4            *MS. JOHNSON:*  Objection, Your Honor, hearsay.

5            *THE COURT:*  Sustained.  So why don't we -- we are

6    going to go ahead and break for lunch now and then we will

7    resume after that.

8            So ladies and gentlemen, we will go ahead and take our

9    lunch break now.  Plan on reconvening at 1:30.  Keep the

10   admonitions in mind.  Keep those yellow juror buttons visible.

11   Make sure you don't confer or talk amongst yourselves about the

12   case.  And the jury is excused for lunch.  Thank you.

13           (Jury excused.)

14           Mr. Hood, you can step down.  Thank you very much.

15   And then you can come back in at 1:30.

16           Mr. Hood, was that the notebook that you brought in or

17   was that one you were handed?

18           *THE WITNESS:*  This is what I brought in.

19           *THE COURT:*  Okay.  Thank you, Mr. Hood.

20           Anything to take up before we recess?  We will be in

21   recess, then, until 1:30.  Thank you.

22       (Recess at 12:01 p.m.)

23       (Reconvened at 1:34 p.m.)

24           *THE COURT:*  Are we ready for the jury?  Okay.  Let's

25   bring the jury back.

Robert Hood - Direct

1        MS. ROGOWSKI:  Briefly one thing.  We just wanted to

2    mention, Your Honor, that in order to avoid mentioning directly

3    the civil litigation, we are going to be asking -- we have

4    asked our witnesses to refer to the civil litigation in this

5    matter as the litigation and we not to refer to the In re:

6    Broiler Chicken case.  And the law firm involved in that case

7    is Lockridge.  We wanted to avoid directly referencing that

8    litigation and that law firm, so we just want to call it the

9    litigation.

10        THE COURT:  Well, the litigation could be

11    misunderstood by the jury to mean this litigation.

12        MS. ROGOWSKI:  We could also say another matter.

13        THE COURT:  I think that that's a good phrase.  That

14    was the phrase used before.  I think that's better and it's so

15    neutral that it's probably the least likely to cause the jury

16    to speculate about things.

17        MS. ROGOWSKI:  We will use another matter.  Thank you.

18        THE COURT:  Mr. Fagg?

19        MR. FAGG:  Your Honor, just for a point of clarity for

20    the record, we would object to any reference to the litigation.

21    We don't have any objection to another matter.

22        MS. CARWILE:  Your Honor, Laura Carwile on behalf of

23    Mr. Austin.  Could we also have the witnesses admonished not to

24    mention their type of employment as a lawyer or paralegal to

25    the jury?

Robert Hood - Direct

1      THE COURT:  I don't know if they can or whether that

2  would affect their qualifications.

3      MS. CALL:  That's precisely what I wanted to raise,

4  Your Honor.  We have witnesses testifying as to where we

5  received documents from, which include a law firm in the civil

6  litigation, and a witness who is employed by that law firm,

7  which I think we can just refer to as a law firm and not by its

8  name or what matter it was in relation to, just by the matter

9  and a law firm.  I know it's vague and kind of makes an unclear

10  record, but I don't know if Your Honor has any suggestions on

11  how to handle that with the witnesses.

12      THE COURT:  I am not sure about that.  That wasn't

13  Ms. Carwile's point.  Her point is whether they could identify

14  themselves as something other than, say, a paralegal.

15      MS. CARWILE:  I am sorry, Your Honor.  I would ask

16  they not refer to themselves as lawyer, paralegal.  And I would

17  also that rather than using law firm, we use the word company.

18  I think that's perfectly reasonable given that it's not

19  relevant that there was a litigation involved.

20      THE COURT:  I don't know.  As long as that doesn't

21  prejudice the government's ability to establish authenticity,

22  that's the issue.  So, you know, if there is going to be an

23  objection from the defendants that they don't know anything and

24  it would make it all relevant.  On the other hand, if the

25  government is able to keep it all that neutral and still convey

Robert Hood - Direct

1      the fact that these are authentic documents, you know, that

2      seems fine to me, but I don't know exactly what type of

3      foundation the government needs to establish or wants to

4      establish.

5              MS. CARWILE:  Can I respond briefly to that, Your

6      Honor?

7              THE COURT:  Why don't we have Ms. call respond.

8              MS. CALL:  I think it will be difficult for the

9      individuals not to reference the law firm generally in

10     establishing --

11             THE COURT:  Why is that?

12             MS. CALL:  Just to establish chain of custody of

13     documents.  This is kind of a middle step, obviously, and I am

14     afraid that the term company might just be too vague,

15     especially when we are referring to --

16             THE COURT:  What about your firm?

17             MS. CALL:  That would be fine.

18             THE COURT:  Okay, firm.  How is that?

19             MS. CARWILE:  I will let other teams speak for

20     themselves, but I think it gets closer to a better compromise,

21     although I think the point remains that if they refer to

22     themselves as lawyer and paralegal, it's pretty obvious what a

23     firm is.  So I just ask -- I don't think that at least for my

24     cross about custody the fact that this is a law firm versus

25     another type of company is relevant.

Robert Hood - Direct

1          THE COURT:  Well, I'm not sure it's prejudicial

2     either.  It creates a risk that something else could be said

3     that could add -- cause the jury to put two and two together, I

4     am not sure.  But if the government can attempt to use -- and

5     you would have to mention this to your witnesses before they

6     come onto the stand, but some more neutral term because

7     ultimately I think the fact that they received documents, it

8     probably doesn't matter that they were part of a law firm at

9     all.  And their titles probably, I don't know, but probably

10    don't matter either.  I just -- I am not sure.

11          For instance, if we say some real neutral term, the

12    company or the firm or the partnership, but then they say "I am

13    a paralegal," you know, some of the benefit of the neutral

14    terms as to the place of employment is lost.

15          MS. CALL:  I think we would request to be able to

16    establish their involvement in eDiscovery or receipt of

17    documents and things of that kind at least.

18          THE COURT:  Obviously, the question once again is

19    whether in order to establish that, their title, their job

20    needs to -- and maybe that's true, but I just don't know.

21          MS. CALL:  I think we can certainly try to avoid it,

22    Your Honor.  And I think -- so these witnesses are a little

23    later down in the chain for today, but we did want to raise it

24    early.  So I think what the government would suggest is we'll

25    use the mid-afternoon to be able to instruct those witnesses in

Robert Hood - Direct

1   referring to the company as just the firm and anything else,

2   but I don't know that there was any additional instructions for

3   us.

4           THE COURT:  Okay.  Once again, I do not want to

5   condition the jury to think that every time we say that we're

6   going to come back at 1:30, it's never 1:30.  Did you tell

7   Mr. Keech that we had this issue?

8           MS. CARWILE:  The government --

9           THE COURT:  Yeah, anything else?  We have got to get

10  the jury back in here.

11          MS. CALL:  I think that was just it.  We just wanted

12  to flag it.

13          THE COURT:  Once again, if there is some issue that is

14  going to come up, you need to let Mr. Keech know so we can meet

15  early so we don't continually, you know, send a signal to the

16  jury that we never start on time because we almost never start

17  on time.

18          MS. CALL:  I apologize, Your Honor.

19          THE COURT:  Mr. Keech, let's get the jury.

20          (Jury present.)

21          THE COURT:  Let's get Mr. Hood back in here.  Can

22  someone from the government get Mr. Hood?

23          Mr. Hood, if you could please resume the witness

24  stand.

25          Go ahead.

Robert Hood - Direct

1          MS. ROGOWSKI:  Thank you, Your Honor.

2     BY MS. ROGOWSKI:

3     Q.  Good afternoon, Mr. Hood.  Do you still have the binder and

4     the list of exhibits that's labeled 9553 in front of you?

5     A.  Yes, ma'am, I do.

6     Q.  Mr. Hood, when we broke for lunch, you were -- we were

7     discussing the e-mails and the attachments in that binder and

8     whether or not they came from George's servers.

9          Did you in this matter and related to this matter sign

10    any certificates of authenticity?

11    A.  Yes, I did.

12    Q.  Did you sign multiple certificates of authenticity?

13    A.  Yes, ma'am, I did.

14    Q.  Do you recall if those certificates of authenticity said

15    anything about George's servers?

16    A.  I do not recall.  I would have to look at them again.  They

17    had Bates ranges associated that I worked with Stinson Law Firm

18    on to identify that those were document extracts that we had

19    sent to them and if they had assigned Bates ranges to.

20    Q.  If I shows you those certificates of authenticity, would

21    that perhaps refresh your recollection?

22    A.  Yes, ma'am.

23         MS. ROGOWSKI:  If I could perhaps ask permission to

24    hand them up to the witness through Mr. Keech.

25         THE COURT:  You may.

Robert Hood - Direct

1          MS. ROGOWSKI:  This is Government Exhibit 9531 and

2     9533.

3          THE WITNESS:  Yes, ma'am.

4     BY MS. ROGOWSKI:

5     Q.  Mr. Hood, let's look starting at Government Exhibit 9531.

6          MS. JOHNSON:  Your Honor, we don't have a copy.

7          MS. ROGOWSKI:  We are passing them around.  I can

8     wait.

9     BY MS. ROGOWSKI:

10    Q.  All right, Mr. Hood.  If you could take a look at

11    Government Exhibit 9531.  You mentioned there were a few Bates

12    ranges.  In your certificate, could you look at the line that

13    begins below the Bates ranges?  And could you just read to

14    yourself the sentence that starts with "To the" and just read

15    the rest of that sentence to yourself?

16    A.  Okay.

17    Q.  Does that refresh your recollection, Mr. Hood, on whether

18    or not this certificate has anything to say about George's

19    servers?

20    A.  Yes, ma'am.  I just didn't remember the verbiage.  Thank

21    you for providing it.

22    Q.  I am sorry, I didn't hear your answer.

23    A.  I just didn't remember the verbiage.  Thank you for

24    providing it.

25    Q.  Could you please tell the jury roughly what you said in

Robert Hood - Direct

1    your certificate of authenticity without reading the document

2    about George's servers and these documents?

3          MS. JOHNSON:  Objection, Your Honor.  The document is

4    hearsay.  The witness is here and can testify about the server

5    or his involvement in the documents pulled from the server, but

6    the document is hearsay.  And I believe she asked him to read

7    from it.

8          THE COURT:  She asked him not to do that.  Overruled.

9    A.  So I say here that these Bates ranges were pulled from the

10   George's e-mail servers during the normal course -- e-mails

11   that were stored on the George's e-mail servers during the

12   normal course of business.

13   BY MS. ROGOWSKI:

14   Q.  Thank you, Mr. Hood.  Could you look at what's been marked

15   as Government Exhibit 9553?

16   A.  9553?  Yes, ma'am.

17   Q.  And could you please read the sentence just to yourself

18   that continues after the Bates range?

19   A.  You are talking about Government Exhibit 9533, correct?

20   Q.  Yes.

21   A.  Okay.  Were retrieved --

22   Q.  Sorry, just to yourself.

23   A.  Sorry.  Yes, ma'am.

24   Q.  Does that refresh your recollection, Mr. Hood, on anything

25   about George's servers?

Robert Hood - Direct

1    A.   Yes, ma'am.

2    Q.   Can you tell the jury without reading from the document

3    what you certified to with respect to George's servers?

4    A.   That these Bates ranges were pulled from e-mail stored on

5    George's systems during the normal course of business.

6    Q.   Thank you, Mr. Hood.

7              Mr. Hood, as a part of your position at George's, are

8    you familiar with how George's creates, stores and maintains

9    e-mails and attachments?

10   A.   Yes, I am.

11   Q.   And how are they stored?

12   A.   They are stored on our Microsoft exchange servers.

13   Q.   Do you understand, Mr. Hood, that Microsoft has the

14   technical capability to store and maintain e-mails in the cloud

15   from George's?

16   A.   Yes, I do.

17   Q.   And does George's have an agreement with Microsoft to do

18   just that?

19   A.   Yes, we do.

20   Q.   Is this the same process that's used for calendar

21   invitations at George's?

22   A.   Yes, ma'am, it is.

23   Q.   Mr. Hood, I would like to direct your attention to the time

24   period between 2009 to 2019.  So I am going to refer to this as

25   the relevant time period.  During the relevant time period, to

506

Robert Hood - Direct

1   the best of your knowledge was the system that George's uses to

2   monitor George's servers functioning properly or improperly?

3   A.   Properly.

4   Q.   And to the best of your knowledge, were there any issues

5   with George's servers that would have caused any e-mails or

6   attachments to be altered?

7   A.   No, ma'am.

8   Q.   Mr. Hood, are you familiar with George's domain name?

9   A.   Yes, I am.

10  Q.   What is it?

11  A.   It's GeorgesInc.com.

12  Q.   And are all e-mails with that domain name saved on George's

13  server or the cloud as you mentioned?

14  A.   Yes, ma'am, unless they were deleted.

15  Q.   And unless they were deleted, how are these e-mails or

16  attachments stored on the cloud?

17  A.   When a message is sent or received, it's stored on

18  Microsoft systems.

19  Q.   Is that the same process for calendar invitations?

20  A.   Yes, ma'am, it is.

21  Q.   Mr. Hood, what's the process for assigning e-mail addresses

22  for employees at George's?

23  A.   A new user request form is completed requesting setup of

24  their account and part of that is an e-mail address.  We use

25  first name.last name at georgesinc.com is the standard.  If

Robert Hood - Direct

1   that's taken, then we would append a 2 to it, so first

2   name.last name2@GeorgesInc.com.

3   *Q.*  Are you familiar with a Ric Blake from George's?

4   *A.*  Yes, I am.

5   *Q.*  What is it?

6   *A.*  It's R-I-C.B-L-A-K-E@GeorgesInc.com.

7   *Q.*  Continuing on, when you look at an e-mail, is there usually

8   any header information at the top of that e-mail?

9   *A.*  Yes, ma'am.

10  *Q.*  Could you please tell the jury what type of header

11  information?

12  *A.*  So there is a subject.  There is a recipient.  There is a

13  Bates time stamp for received or sent and the sender.

14  *Q.*  And how are those fields generated?

15  *A.*  So when you send an e-mail, you have to enter the To

16  information or CC or BCC.  You have to enter the subject and

17  certainly the content.  The sender is automatically populated

18  and the date being sent is automatically populated.

19  *Q.*  And once that information is either automatically populated

20  or entered and the e-mail isn't actually sent, how is that

21  information stored?

22  *A.*  It's stored on Microsoft's Exchange servers.

23  *Q.*  Is the information that's actually stored the same as the

24  information that's entered or automatically populated?

25  *A.*  Yes, it is.

508

Robert Hood - Direct

1    Q.  And is that the same process for calendar invitations?

2    A.  Yes, ma'am.  You might put a location or something like

3    that, but it's the same process.

4    Q.  Could you explain how that works with location?

5    A.  Just with a calendar event, you might put it's going to be

6    in conference room A or conference room B or this site or that

7    site.

8    Q.  So would the user input that information?

9    A.  Yes, ma'am.

10   Q.  Would that information be automatically saved once the

11   calendar invitation is sent or received?

12   A.  Yes, ma'am.

13   Q.  Regarding both e-mails and calendar invitations, are both

14   types of those documents saved at the time that the e-mail

15   calendar invitation is actually sent or received?

16   A.  Yes, they are.

17   Q.  And to the best of your knowledge, is the process that

18   saves and maintains those accurate?

19   A.  Yes, ma'am.

20   Q.  Is it reliable?

21   A.  To the best of my knowledge.

22   Q.  Mr. Hood, is there any way that you can tell if an e-mail

23   that stays on George's servers has an attachment or not?

24   A.  I don't do this directly, but I supervise people who do.

25   You can go query.

509

Robert Hood - Direct

1          *MS. JOHNSON:*  Objection, Your Honor.  The witness said

2     he did not do whatever he is about to testify directly, that he

3     only supervises people that does it, so I would object to the

4     relevance of his testimony about whatever actions are about to

5     be testified about.

6          *THE COURT:*  Well, we haven't heard enough to know

7     whether he has foundation.  I think that's what you were

8     talking about.  So I will overrule it at this time.  Go ahead.

9     *A.*  I am sorry, go ahead.

10         *THE COURT:*  Ask a new question, please, Ms. Rogowski.

11    *BY MS. ROGOWSKI:*

12    *Q.*  When you are looking at an e-mail, Mr. Hood, is there any

13    way to tell whether or not it has an attachment?

14    *A.*  Yes.

15    *Q.*  How can you tell?

16    *A.*  It shows up in Outlook and shows that there is an

17    attachment.

18    *Q.*  Where does it show up in Outlook?

19    *A.*  At the header information, just below the header

20    information on the e-mail.

21    *Q.*  Is there any way to tell from the metadata?

22    *A.*  There is.

23    *Q.*  And how can you tell from the metadata?

24    *A.*  So this is where I supervise someone that does this, but

25    you can go out and run queries against the servers and it

510

Robert Hood - Direct

1    returns you back information.  And there would be a flag that

2    showed that there was an attachment or not.

3    Q.  Mr. Hood, when you are looking at an e-mail from George's

4    that's on George's servers, is the text that's contained in the

5    actual body of the e-mail that's stored on the server the same

6    as the text that was in the e-mail when it was either sent or

7    received?

8    A.  Yes, ma'am.

9    Q.  All right.  Mr. Hood, as a part of your work at George's,

10   did there come a time when you worked on a project -- a matter

11   with a firm to help George's produce documents?

12   A.  Yes, ma'am.

13   Q.  Could you please briefly describe the process?

14   A.  So we get requests from counsel to go pull e-mail for

15   certain date ranges or, like I spoke about earlier, date

16   ranges, employees or former employees or key words.  And we

17   gather that information and put it in a PST file and upload it

18   to counsel's servers.

19   Q.  And specific to this matter, Mr. Hood, were the Bates

20   ranges and the certificates that we just looked at a few

21   moments ago the same Bates ranges related to the matters we

22   were just discussing?

23   A.  These specific Bates ranges were part of a pull that we

24   did, yes, ma'am.

25   Q.  As a part of this project, did you say -- and I apologize

Robert Hood - Direct

 1  if you went over this a little bit -- but did you say that you

 2  collected and extracted documents from George's servers?

 3  A.   Yes.

 4  Q.   And did you copy those documents somewhere?

 5  A.   I just want to make sure I am clear.  When you say

 6  documents, you are talking about e-mails?

 7  Q.   E-mails and attachments.

 8  A.   Yes, we did.  We copied them to the Stinson share file

 9  server is where we sent those to.

10  Q.   What software did you use to copy those documents?

11  A.   Microsoft's eDiscovery tool is what goes out to the server

12  and grabs the e-mails and puts them into a PST.  And then we

13  take -- and you go to a website to upload them to the share

14  file server.

15  Q.   Are you generally familiar with how Microsoft eDiscovery's

16  tool works?

17  A.   I am high-level familiar with that.  Again, I supervise

18  someone who does these actions.

19  Q.   To the best of your knowledge, when you were working on

20  this matter was that Microsoft eDiscovery tool functioning

21  properly or improperly?

22       MS. JOHNSON:  Objection, Your Honor, to foundation.

23       THE COURT:  Sustained.  If you could ask him what the

24  basis of his knowledge is.

25  BY MS. ROGOWSKI:

Robert Hood - Direct

1  Q.  So how do you know about how this Microsoft eDiscovery tool

2  works, Mr. Hood?

3  A.  So I have worked in -- at George's for 16 and a half years

4  around our e-mail environment.  While I didn't administer it

5  directly, I have been involved in the administration of that

6  and been involved in, you know, upgrades and those kinds of

7  things.  And so I get requests frequently where we're asked to

8  go to the server and find e-mails, and so I -- that's how I

9  know about that.  I talk with someone that I supervise that

10  does that, but I am aware of the capabilities or at least the

11  primary capabilities of those tools.

12  Q.  Based on your knowledge of the Microsoft eDiscovery tool,

13  would you be able to tell if it was working properly or

14  improperly?

15        MS. JOHNSON:  Same objection, Your Honor, foundation.

16        THE COURT:  Overruled.  He can answer.

17  A.  I -- what I would say is that I am not using it directly,

18  but that the gentleman that does those pulls for me is very

19  versed with that.  And if there were -- if it wasn't opening or

20  working or pulling things correctly, then I would expect that

21  he would voice concern there.  He has used that for a number of

22  years.  So I can't -- I am trying to answer you, you know,

23  exactly here.  I don't use that tool, but he is very versed

24  with it, and I trust his ability to go out and use that tool

25  and to see if there are issues or problems with what it's

513

Robert Hood - Direct

1   pulling.

2   *BY MS. ROGOWSKI:*

3   *Q.*  Would you expect, Mr. Hood, that in your position at

4   George's as VP of information technology, you would be made

5   aware if there was some issue with the Microsoft eDiscovery

6   tool during the document pull?

7   *A.*  Yes, ma'am.

8   *Q.*  And were you made aware?

9   *A.*  I was not.

10  *Q.*  To the best of your knowledge, Mr. Hood, were the documents

11  that were copied and produced related to this matter true

12  copies of documents that were, in fact, pulled from George's

13  server?

14  *A.*  Yes, ma'am.

15  *Q.*  And were you able, Mr. Hood, to look through the documents

16  in the binder and compare them to the versions on George's

17  server?

18  *A.*  I looked through the documents on the binder and I compared

19  them to the Bates ranges that were given to me from counsel.

20  And I worked with them to identify that these Bates ranges were

21  from directly from the e-mail pulls that we had done.

22  *Q.*  And were you able to, in fact, confirm that they were true

23  copies when you compared them?

24  *A.*  As I said already, I compared them at a high level, so I

25  looked at each document and looked at subjects, looked at Bates

514

Robert Hood - Cross

1   time stamps, looked at length, looked to see if there was an

2   attachment on both.  If it was a direct, you know, direct

3   PowerPoint or something like that, I looked at the number of

4   pages for each one.  So at a high level I do feel comfortable

5   with that.

6        MS. JOHNSON:  I would object to the foundation.  This

7   witness is testifying at a high level.  He is also testifying

8   that he compared a document from another company to the

9   document that the government gave him and not to the metadata

10  or the PST files from the server.

11       THE COURT:  I am not sure what your point is.  He just

12  finished testifying and he ended his response, so assuming that

13  that's an objection, it's overruled.

14       Go ahead.

15  BY MS. ROGOWSKI:

16  Q.  To the best of your knowledge, Mr. Hood, were the e-mails

17  and attachments in the binder in front of you true copies of

18  the versions of the e-mails and attachments that you did, in

19  fact, have access to?

20  A.  Yes, ma'am, to the best of my knowledge.

21       MS. ROGOWSKI:  No further questions.

22       THE COURT:  Thank you.

23       Cross-examination?  Ms. Johnson.

24       MS. JOHNSON:  Thank you, Your Honor.

25                        **CROSS-EXAMINATION**

Robert Hood - Cross

1    *BY MS. JOHNSON:*

2    *Q.*  Good afternoon, Mr. Hood.

3    *A.*  Good afternoon.

4    *Q.*  In fact, wasn't this production ongoing and had already

5    started before you became vice-president?

6    *A.*  Yes, ma'am.

7    *Q.*  So the documents that would have been in the process of

8    being produced prior to your time as vice-president, you did

9    not have the administrative authority to supervise and be

10   involved in that production; is that true?

11   *A.*  I was not in the senior most IT role at George's at the

12   beginning of the production.

13   *Q.*  So when you just previously testified in your position as

14   vice-president you would have had authority over this from an

15   administrative standpoint, that authority would not have been

16   in place prior to you becoming vice-president, right?

17   *A.*  It's fair to say that I might not have -- yes, ma'am,

18   that's fair.

19   *Q.*  The government showed you two certificates of authenticity.

20   In fact, there were four involved in this matter, were there

21   not?

22   *A.*  I believe there were four total, but one preempted -- there

23   were four total, but one preempted another one, so I think

24   three official.

25   *Q.*  Specific to that, the last one that there was a preemption,

516

Robert Hood - Cross

1   was it because there were problems with the actual Bates number

2   in one of the certificates that the government has just asked

3   you about?

4   A.   It was because -- and I worked with Stinson Law Firm and

5   Zach Hemenway specifically to talk to this.  It was because

6   there were documents included in that that weren't stored on

7   our servers, and so they refined those Bates ranges to make

8   sure they were just talking about the e-mails.

9   Q.   So those documents that you had previously certified as

10  authentic were not stored on George's servers and certainly you

11  would not be able to authenticate those; is that correct?

12  A.   Yes, ma'am.

13  Q.   Isn't it true that there was a third-party vendor as well

14  as the counsel that you have already spoken about that were

15  involved in the production of these documents?

16  A.   There is -- when you say third-party vendor, you are not

17  talking about another law firm.  You are talking about -- I

18  guess I don't know what the third-party vendor would be.  We

19  take those files and we -- again they ask for, you know,

20  specifics of what they need.  We create the PST file.  We put

21  that PST file on their share file server, and from there we

22  don't have ownership of that.

23  Q.   Well, the government had listed George's vendor as a

24  third-party vendor, and I just thought if you were in the IT

25  department and you were working with this vendor, you would

517

Robert Hood - Cross

1   have knowledge of who that might be.

2   A.  I believe that that vendor, it works with Stinson.

3   Q.  So you are not involved or affiliated or know anything

4   about what they might have done with respect to these

5   documents.

6   A.  That's true.

7   Q.  Are you aware that some of the date/time stamps had been

8   altered such that that was the reason for a new certification?

9   A.  I am aware --

10          MS. ROGOWSKI:  Objection, Your Honor, foundation.

11          THE COURT:  He was asked if he was aware.  He said he

12   was.  Overruled.

13   A.  When you say that the date/time stamps were altered, are

14   you talking about how in these CLAs where they refer to the

15   time zone being applied, is that what you were referring to?

16   BY MS. JOHNSON:

17   Q.  Correct.

18   A.  So that's where they are changing -- at the header of the

19   e-mail where they are changing it to UTC time.

20   Q.  Is that done as part of the George's process or some other

21   vendor or law firm that you don't know anything about?

22   A.  That's done post, post the George's process after we have

23   handed it off to them.

24   Q.  So these documents, some of which were actually altered

25   after it left your control.

518

Robert Hood - Cross

1   A.  The time -- the date/time stamp and the header information

2   reflected UTC time, yes, ma'am.

3   Q.  Do you remember speaking with me briefly about this --

4   these documents?

5   A.  Yes, ma'am.

6   Q.  And do you remember, did you tell us that you did not have

7   firsthand experience how this operated until you became the

8   e-mail administrator?

9   A.  I am not the e-mail administrator, so I don't remember

10  saying that specifically.  I don't have firsthand knowledge on

11  how Microsoft stores on their systems, you know, how they deal

12  with -- how they deal with UTC time directly on the servers.

13  Q.  And did you tell us that your knowledge of this subject

14  matter was partly based on just speaking with others in the

15  department?

16  A.  Yes, ma'am.

17  Q.  And just so we're clear, when did you become

18  vice-president?

19  A.  It was late 2017.  Let me -- the title in late 2017 was a

20  director role.  It changed in -- I don't know the specific

21  date, around 2019, I think it was mid 2019, to be a VP role.

22  The responsibilities associated with it were the same.  It's

23  still the senior most position in IT.  So 2017 for a specific

24  director role, and 2019 for a VP role.

25  Q.  Mr. Hood, what is your understanding of how the George's

Robert Hood - Redirect

1  servers affix time stamps?  Say, for instance, a George's

2  employee is on the East Coast.  George's is in Central.  How

3  are the time stamps affixed?

4  *A.*  So my understanding of that is that the Outlook client

5  which runs on the computer looks at the local computer and

6  determines what time zone they are in and uses that time zone

7  as the time that it affixes to the e-mail when you send that.

8  When you're talking about how it persists to the Microsoft

9  Exchange servers, I do not know the specifics of how Microsoft

10  handles that in the background.  I have some ideas around it,

11  but I do not know specifically.

12  *Q.*  Finally, it's my understanding that the George's documents

13  that you were testifying about today have two prefixes, a GEO

14  prefix and a GEO-DOJ prefix.  Are you familiar with both?

15  *A.*  Yes, ma'am.

16  *Q.*  And were there documents with both of those prefixes that

17  had issues with the outside counsel such that you had to

18  recertify those authentications?

19  *A.*  I do not know the answer to that, ma'am.

20        *MS. JOHNSON:*  That's all I have.  Thank you.

21        *THE COURT:*  Thank you.

22        Additional cross-examination?

23        All right.  Redirect?

24                    **REDIRECT EXAMINATION**

25  *BY MS. ROGOWSKI:*

Robert Hood - Redirect

1  *Q.*  Mr. Hood, when did you say you became vice-president?

2  *A.*  It's around 2019 was when the title was vice-president.  I

3  believe it was mid 2019.

4  *Q.*  And before that?

5  *A.*  The director title was -- I believe it was around October

6  of 2017.  I don't have a specific date.

7  *Q.*  And before that what was your position?

8  *A.*  I was the manager of IT infrastructure.

9  *Q.*  Throughout all three of those positions did you have any

10  responsibilities related to the servers of George's?

11  *A.*  Yes, ma'am.

12  *Q.*  Could you describe not your current position, not the one

13  immediately prior, but the one before that could you describe

14  what your responsibilities related to George's servers were?

15  *A.*  So the manager of IT infrastructure role, my

16  responsibilities were making sure that our networks were

17  secure, that our servers were up-to-date and standing up new

18  servers and storage and those kinds of things for projects that

19  we had, as well as making sure our e-mail system worked

20  adequately.  And I supervised -- in that role as well, I

21  supervised a team of folks that were in charge of doing those

22  things.

23  *Q.*  So would it be fair to say that throughout that entire

24  time, those three positions, you had knowledge of George's

25  e-mail servers and whether or not they were functioning

Robert Hood - Redirect

1   properly?

2   *A.*   That's a fair statement.

3   *Q.*   Would it be fair to say that this knowledge was in part the

4   basis of your certificates of authenticity?

5   *A.*   I guess my answer to that would be that in that role and in

6   the role I'm in now, I worked with the gentleman that I

7   supervise and have trust in his ability to do that job and know

8   that he knows how to pull that information.

9   *Q.*   And, Mr. Hood, you mentioned a few problems with Bates

10  numbers earlier.  You briefly discussed them.  To the best of

11  your knowledge, were all of the problems with these Bates

12  numbers in fact corrected?

13  *A.*   Yes, ma'am, to the best of my knowledge.

14  *Q.*   And finally, Mr. Hood, you mentioned briefly UTC time.

15  Could you just explain a little bit more about what UTC time

16  is?

17  *A.*   I'll do my best.  So Universal Time Coordinate I believe is

18  what that stands for.  So to deal with people sending e-mails

19  from all sorts of different time zones around the world, there

20  has to be a standard with which you set a date/time stamp and

21  persist that.  I can't really go into more detail than that.  I

22  have not studied it, but that's my basic understanding of it.

23  *Q.*   Would it be fair to say that when an e-mail is converted to

24  UTC time, it is, in fact, just converted.  It's not altered.

25  The time isn't actually changed.

Robert Hood - Redirect

1    A.  The time would be -- UTC time is adjusted on a specific

2    set, so, you know, six hours or seven hours depending on

3    whether Central Time is in daylight savings time or not, so it

4    will adjust up seven hours or it will adjust up six hours.  I

5    am trying to make sure I am telling you accurately.  It may

6    adjust down seven or six hours, I don't remember specifically,

7    but there is a standard with which it changes, yes, ma'am.

8    Q.  So would it be fair to say that converting something into

9    UTC time is really just standardizing that time?

10   A.  I feel like that's a correct statement.

11        MS. ROGOWSKI:  Thank you.  No further questions.

12        THE COURT:  Thank you, Mr. Hood.  So you are subject

13   to recall by the defendants if they choose.  They will

14   presumably coordinate with you if they need to have you come

15   back some other day.  And assuming that the government is

16   releasing you for today's purposes, you are excused.  Thank you

17   very much, Mr. Hood.

18        The United States may call its next witness.

19        MS. ROGOWSKI:  The government calls Lumaker Challa.

20   (**Lumaker Challa** was sworn.)

21        THE WITNESS:  Yes.

22        COURT DEPUTY CLERK:  Please state your name and spell

23   your first and last name for the record.

24        THE WITNESS:  Lumaker Challa, L-U-M-A-K-E-R,

25   C-H-A-L-L-A.

# ATTACHMENT I

Robert Dawson - Direct

1         *THE COURT:*  Ms. Butte, go ahead.

2         *MS. BUTTE:*  The United States calls Robert Dawson.

3     (**Robert Dawson** was sworn.)

4         *THE WITNESS:*  I do.

5         *COURT DEPUTY CLERK:*  Please state your name and spell

6    your first and last name for the record.

7         *THE WITNESS:*  My name is Robert Francis Dawson,

8    R-O-B-E-R-T, F-R-A-N-C-I-S, D-A-W-S-O-N.

9                     **DIRECT EXAMINATION**

10   *BY MS. BUTTE:*

11   *Q.*  Good afternoon, Mr. Dawson.

12        Where do you work?

13   *A.*  I work at Sysco Foods.

14   *Q.*  How long have you worked at Sysco foods?

15   *A.*  Almost four years.

16   *Q.*  What is your job title?

17   *A.*  Senior cyber analyst.

18   *Q.*  Could you describe your responsibilities in that position?

19   *A.*  I conduct electronic investigations in support of Sysco

20   legal, HR, and ethics and compliance.

21   *Q.*  Where were you employed before Sysco?

22   *A.*  KPMG.

23   *Q.*  What did you do there?

24   *A.*  Similar role.  I supported the office of general counsel by

25   performing electronic investigations as well.

Robert Dawson - Direct

1    *Q.* Were you employed somewhere before KPMG?

2         *MR. SCHALL:* I would object to his relevance of his

3    prior employment as a custodian.

4         *THE COURT:* Overruled.

5    *A.* Prior to that I worked at the Harris County Precinct 5

6    Constable's Office in Harris County, Texas as a patrol deputy.

7    *BY MS. BUTTE:*

8    *Q.* And what were your responsibilities there?

9    *A.* As a patrol deputy, cover all aspects of law enforcement

10   out in the community as well as in the office including

11   training new officers.  And I was also assigned to the FBI's

12   computer forensics lab for almost three years at the end of

13   that job.

14   *Q.* As part your position at Sysco, are you familiar with the

15   domain name for Sysco?

16   *A.* Yes.  It's sysco.com.

17   *Q.* What is the process for assigning e-mail addresses at

18   Sysco?

19   *A.* The process currently is first name.last name@sysco.com.

20   *Q.* Was there a different process before that?

21   *A.* Yes.  It was.  Before then it was last name.first name@

22   your location.sysco.com.

23   *Q.* Are you familiar with how Sysco creates, manages, stores

24   and retrieves its e-mails and attachments?

25   *A.* I am.

Robert Dawson - Direct

 1   *Q.*  How are e-mails stored?

 2   *A.*  We use the Office 365.

 3   *Q.*  Are e-mails with the Sysco domain stored on Sysco's

 4   systems?

 5   *A.*  Yes.

 6   *Q.*  How are attachments to those e-mails stored?

 7   *A.*  Within the same system.

 8   *Q.*  Are e-mails and attachments that are sent from and received

 9   by an e-mail with a Sysco domain automatically saved on Sysco's

10   systems?

11   *A.*  They are.

12   *Q.*  Are you familiar with the header information in an e-mail

13   transmission?

14   *A.*  I am.

15   *Q.*  When you look at the header information in an e-mail, what

16   types of information is reflected?

17   *A.*  You'll see information about the sender, the recipient, the

18   subject and date, time.

19   *Q.*  For the date and time, are those fields recorded by Sysco's

20   systems for each e-mail and attachment that passes through its

21   system?

22   *A.*  They are.

23   *Q.*  Are those fields automatically generated?

24   *A.*  They are.

25   *Q.*  To the best of your knowledge, is that process reliable?

Robert Dawson - Direct

1    A.   Yes.

2    Q.   To the best of your knowledge, is that process accurate?

3    A.   It is.

4    Q.   For the names that are listed in an e-mail header, are

5    those fields automatically generated?

6    A.   They are.

7    Q.   To the best of your knowledge, is that process reliable?

8    A.   Yes.

9    Q.   And to the best of your knowledge, is that process

10   accurate?

11   A.   It is.

12   Q.   Did you have any responsibilities for collecting documents

13   for Sysco to produce in a matter?

14   A.   I have.

15   Q.   Are you familiar with how e-mails and attachments are

16   retrieved and copied by Sysco for that document collection?

17   A.   I am.

18   Q.   Could you describe that process?

19   A.   Yes.   The Office 365 has a content search portion and it's

20   the native to the Office 365.   It's their built-in collection

21   system.

22   Q.   And who retrieved and copied the documents for that Sysco

23   document collection?

24   A.   I did.

25   Q.   When did you do that?

Robert Dawson - Cross

1    A.  It was early 2019.

2    Q.  To the best of your knowledge, was that document collection

3    process reliable?

4    A.  Yes.

5    Q.  To the best of your knowledge, was that document collection

6    process accurate?

7    A.  Yes.

8    Q.  What did you do with the documents after you retrieved and

9    copied them?

10   A.  At the direction of Sysco legal, I uploaded them to the

11   vendor that was selected by Sysco legal department.

12   Q.  Did you alter or change the documents in any way before you

13   provided them to the vendor?

14   A.  No.

15   Q.  To the best of your knowledge, are the documents that you

16   provided to the vendor true and accurate copies of the original

17   e-mails and attachments that were maintained on Sysco's

18   systems?

19   A.  Yes.

20          MS. BUTTE:  May I have a moment to confer?

21          THE COURT:  You may.

22          MS. BUTTE:  No further questions.

23          THE COURT:  Thank you.

24          Mr. Schall, go ahead.

25                          **CROSS-EXAMINATION**

Robert Dawson - Cross

1    *BY MR. SCHALL:*

2    Q.  Mr. Dawson, my name is Frank Schall.  I represent

3    Mr. Lovette.  I just have a few questions for you.

4    A.  Sure.

5    Q.  So you started with Sysco in March of 2018; is that right?

6    A.  Yes.

7    Q.  And you discussed the process by which e-mails and their

8    attachments are captured and stored in the Microsoft 365,

9    correct?

10   A.  Yes.

11   Q.  But at some time prior to when you started at Sysco, Sysco

12   stored its e-mail in a different fashion, didn't it?

13   A.  As I understand it, yes.

14   Q.  And those were servers that were located at Sysco, correct?

15   A.  Correct.

16   Q.  And at some point before you started your job at Sysco,

17   Sysco transferred that information to the Microsoft 365,

18   correct?

19   A.  Yes.

20   Q.  You were not a part of that transfer process?

21   A.  I was not.

22   Q.  You don't know when it took place?

23   A.  Not specifically, no.

24   Q.  Okay.  And so -- okay.  So the documents that you -- that

25   Sysco produced, you said you collected those in early 2019?

Robert Dawson - Cross

1    A.  That's correct.

2    Q.  So anything that was produced recently within the last

3    month, you weren't a part of that production or collection?

4    A.  I don't remember anything from the last month.

5    Q.  Okay.  And so do you know when Sysco had its e-mails and

6    attachments stored at Sysco, do you know what time zone those

7    were stored in?

8    A.  I don't.

9    Q.  And so when Sysco moved to the Microsoft 365 servers, do

10   you know what time zone those e-mails were stored in at the

11   server?

12   A.  I was not part of the migration.  I don't know.

13   Q.  But even after that for anything after the migration, do

14   you know what time zone that the Microsoft servers capture the

15   e-mails in?

16   A.  I don't.

17   Q.  All of the documents that you identified, collected and

18   provided to the vendor, all of those documents were pulled

19   outside of the Microsoft 365 server, correct?

20   A.  Not outside.  They were extracted from the Office 365.

21   Q.  Thank you for clarifying.  So everything was from the

22   Microsoft 365 server.

23   A.  Yes.

24   Q.  So they would have to be all e-mails and their attachments?

25   A.  I am sorry?

Robert Dawson - Cross

1    *Q.* They were all e-mails and their attachments if there were

2    any attachments?

3    *A.* I didn't look inside of what was extracted, so I don't know

4    what was contained within.

5    *Q.* Okay.

6         *MR. SCHALL:* Your Honor, I would like to hand up a

7    binder of six documents through Ms. Grimm, if possible.

8         *THE COURT:* All right.

9    *BY MR. SCHALL:*

10   *Q.* Could you open that and take a look at the different

11   documents behind the tabs?

12   *A.* Okay.

13   *Q.* Are you through reviewing?

14   *A.* Yes, sir.

15   *Q.* Okay.  So just for the record, what I've handed you are

16   documents Defense Exhibit G-078, G-094, G-114, G-115, I-206,

17   and I-207; is that right?

18   *A.* I see tabs that are named that way, yes, sir.

19   *Q.* Do you recognize those documents as documents that are

20   produced by Sysco with a prefix on the bottom right?

21   *A.* I can't identify that because I was not part of this part

22   of the production.

23   *Q.* Okay.  Do you identify the documents that are in there

24   relate to the custodians that you were responsible for pulling

25   e-mails for?

Robert Dawson - Cross

1   A.   That I can't say either.  I didn't look at what was -- the

2   messages individually that were being extracted.  They were in

3   PST form, which is a container file with thousands of e-mails

4   that I didn't open and observe the contents.

5   Q.   Okay.  Do you remember the list of the custodians you were

6   responsible for identifying?

7   A.   Not all of them, no.

8   Q.   So in regard to your identification and collection of

9   e-mails and attachments from the Microsoft 365 server, you have

10  already testified about that process, correct?

11  A.   Yes.

12  Q.   You had already testified you thought that process was

13  accurate, was reliable?

14  A.   Yes.

15  Q.   I am sorry, going back to accurate as a verbal response,

16  was it accurate?

17  A.   Yes.

18  Q.   Yes.  And so all the documents that you identified,

19  collected and provided to the vendor all went through the exact

20  same process; would that be fair?

21  A.   Yes.

22  Q.   Same level of reliability?

23  A.   Yes.

24  Q.   Same level of accuracy to all those documents?

25  A.   Yes.

3362

Robert Dawson - Redirect

1        MR. SCHALL:  Your Honor, one moment.

2        THE COURT:  Yes.

3        MR. SCHALL:  No other questions, Your Honor.

4        THE COURT:  Thank you, Mr. Schall.

5        Additional cross-examination?

6        All right.  Redirect?

7                    **REDIRECT EXAMINATION**

8    BY MS. BUTTE:

9    Q.  Mr. Dawson you testified that Sysco's documents used to be

10   on servers that were on premises; is that correct?

11   A.  As I understand it, yes.

12   Q.  Are you aware of any issues with the transfer of documents

13   from Sysco's on-premises servers to the Microsoft 365 system?

14   A.  None that I'm aware of.

15       MS. BUTTE:  I have no further questions.

16       THE COURT:  Thank you very much, Mr. Dawson.  You are

17   excused.

18       Ladies and gentlemen, just in time for the

19   mid-afternoon break.  We will go ahead and break.  Let's plan

20   on reconvening 25 minutes to 4:00.  The jury is excused.  Thank

21   you.

22       (Jury excused.)

23       Recess at 3:15 p.m.)

24       (Reconvened at 3:39 p.m.)

25       THE COURT:  All right.  Let's get the jury back in.

# ATTACHMENT J

577

Theodore Sangalis - Direct

1          MS. ROGOWSKI:  The next document, Your Honor --

2          THE COURT:  Wait a minute.  So there was an objection.

3    I overruled it.  And so Exhibit Nos. 9504 and 9505 will be

4    admitted.

5          MS. ROGOWSKI:  The next document, Your Honor, is 9166.

6    It is a Pilgrim's Pride board meeting minutes document.

7          THE COURT:  Any objection to the admission of

8    Exhibit 9166?

9          Exhibit 9166 will be admitted.

10         MS. ROGOWSKI:  And the final document, Your Honor,

11   that the government is seeking to admit under 803(6) from this

12   list is document No. 9168.  It is a Pilgrim's Pride 8-K.

13         THE COURT:  Any objection to the admission of Exhibit

14   9168?

15         That exhibit will be admitted as well.

16         Do you have another witness?

17         MS. ROGOWSKI:  Yes, Your Honor, if I may transition to

18   one of my colleagues.

19         MR. KOENIG:  Thank you, Your Honor.  The government

20   calls Stewart Ward.

21      (**Stewart Ward** was sworn.)

22         THE WITNESS:  I do.

23         COURT DEPUTY CLERK:  Please state your name and spell

24   your first and last names for the record.

25         THE WITNESS:  Stewart Ward; S-T-E-W-A-R-T, Ward,

Stewart Ward - Direct

1   W-A-R-D.

2          *MR. KOENIG:*  May I pass to Mr. Keech the binder and

3   two documents?

4          *THE COURT:*  You may.

5                          **DIRECT EXAMINATION**

6   *BY MR. KOENIG:*

7   *Q.*  Good afternoon, Mr. Ward.

8   *A.*  Good afternoon.

9   *Q.*  Where do you work?

10  *A.*  I work for Koch Foods.

11  *Q.*  And what do you do at Koch Foods?

12  *A.*  I am the vice-president of information systems.

13  *Q.*  How long have you been there?

14  *A.*  17 years, 18 years, something like that.  I lost count.

15  *Q.*  Where did you go to college?

16  *A.*  Mesa State College which is now Colorado Mesa University

17  over in Grand Junction.

18  *Q.*  What was your major?

19  *A.*  Bachelor's in business administration with an emphasis in

20  computer information systems.

21  *Q.*  And so what did you do after you graduated college?

22  *A.*  I moved to Phoenix and went to work for a company called

23  Aspen Systems.  We developed software for the food industry, at

24  which point I was introduced to Koch Foods and started doing

25  their implementations.  Over the course of years, they

Stewart Ward - Direct

1   eventually invited me to come to work for them.  And I have

2   built basically all the systems that are within Koch Foods.

3   Q.  Okay.  So what year did you get hired do you think?

4   A.  1999.

5   Q.  So I am no mathematician, but you said you have been there

6   17 years.

7   A.  I had a two-year interlude where I went back to Aspen

8   Systems and helped them roll out their newest software package.

9   Q.  And what years was that?

10  A.  2003 to 2005.

11  Q.  So then in 2005 you went back to Koch Foods?

12  A.  I did.

13  Q.  What was your role when you went back to Koch Foods?

14  A.  It was the same as it was before.  I was the director of

15  IS.

16  Q.  And director of IS means what?

17  A.  Basically what it is now, vice-president of information

18  systems.  But as the company grew, the title grew too.

19  Q.  Okay.  And are you familiar with the e-mail servers at Koch

20  Foods and the storage systems?

21  A.  I am.

22  Q.  And how did you become familiar with those?

23  A.  Initially I built the first systems and put them into

24  place.  And then as the company evolved and we began to

25  transition the systems, I directed the people who put in the

580

Stewart Ward - Direct

1   system we currently have, which is Microsoft Exchange.

2   Q.   I am sorry, I couldn't hear that.

3   A.   The most recent system is Microsoft Exchange.

4   Q.   And what was your involvement in that?

5   A.   I directed the process of getting that installed and set

6   up.

7   Q.   Okay.  Could you just explain for the jury the process --

8   well, Microsoft Exchange, when did that go into effect?

9   A.   We started putting it in around 2008, 2009 time frame, but

10  it was a slow transition from the old system to the new system.

11  So we were fully implemented on it somewhere around 2012, 2013.

12  Q.   And during that four or five-year transition, was there any

13  significant loss of data?

14  A.   No.

15  Q.   Has there ever been a significant loss of data from the

16  Koch e-mail servers?

17  A.   In 2019 we suffered a ransomware attack and we lost about a

18  month's worth of data from the end of October through the first

19  of December, but that's the extent of the data loss we had.

20  Q.   And any data corruption issues?

21  A.   No.

22  Q.   How do you know that?

23  A.   Basically validation by users, by knowing the systems are

24  on-line, by running health checks on those systems continually.

25  If we were to find any kind of corruption or anything that may

581

Stewart Ward - Direct

1    have happened, then we would restore if necessary, but we

2    haven't had to.

3    Q.  Is it fair to say that the e-mail systems at Koch Foods are

4    reliable?

5    A.  Yes.

6    Q.  And they maintain data accurately?

7    A.  Yes.

8    Q.  Can you explain the process for when e-mails are sent

9    either internally within Koch or externally to and from Koch,

10   how that flow works?

11   A.  Microsoft Exchange manages all the flow of e-mail whether

12   it comes from outside or it's internal.  And it has two paths.

13   It will go to the end user's mailbox where they will see it in

14   Outlook and that kind of thing, and the other path is to go to

15   our vault server where a copy of the e-mail is recorded for

16   archival purposes and to be produced, if necessary, in other

17   kinds of matters.

18   Q.  And why is it called the vault?

19   A.  Because it truly is that.  It does -- there is no

20   modification to the e-mails when it goes in there.  There is no

21   structuring system or anything like that that a user might go

22   and assign inside of their Outlook.  It is strictly the e-mail

23   being recorded into the vault.

24   Q.  Does that include attachments to e-mails as well?

25   A.  It does.

Stewart Ward - Direct

1   Q.  So is it fair to say that every e-mail that comes in and

2   out of Koch or gets sent internally at Koch, there is a copy of

3   it in the vault.

4   A.  That is correct.

5   Q.  Have you ever had any breaches of the vault?

6   A.  No.

7   Q.  Any corruption?

8   A.  No.

9   Q.  Any hacking?

10  A.  Aside from the ransomware attack that we had that we

11  restored from, no.

12  Q.  Was that to the vault as well?

13  A.  It was to the vault as well, but it was fully restored.

14  Q.  How long has the vault been in place?

15  A.  Let's see.  I was gone -- it went in in 2004.  While I was

16  gone -- while I was at Aspen Systems it was installed into Koch

17  Foods, so it had been in there somewhere around 2004 and was

18  vaulting the old e-mail system as well.

19  Q.  So that's like the one thing at Koch you didn't design.

20  A.  Yeah, to a degree, but it's gone through evolution, so I

21  have even changed the design of that.

22  Q.  All right.  So can I ask you, do you have any knowledge of

23  the way e-mail addresses are assigned at Koch Foods?

24  A.  Yeah.  So initially when I first built the systems, we did

25  what was called a three-by-three.  It was the first three

Stewart Ward - Direct

1    letters --

2    Q.  I am sorry, a what?

3    A.  A three-by-three.  So it was the first three letters of the

4    first name, first three letters of the last name was the user

5    ID for the e-mail @kochfoods.com.  As we evolved the systems

6    and made them more sophisticated, we changed that naming

7    structure to be the first name.last name.

8    Q.  And why did you make that change?

9    A.  Mainly because people are more used to dealing with it, and

10   it seems to be kind of best practice as you move forward.

11   Q.  Does that mean some people have two e-mail addresses?

12   A.  No.  They all only have one.  Well, yes, they have two

13   e-mail addresses.  You can send an e-mail to either one of

14   those.  But they only have one e-mail box, so everything will

15   get routed into the same e-mail box.  So, for instance, I still

16   have my stewar@kochfoods.com and I have a

17   stewart.ward@kochfoods.com.  I get all that e-mail in my one

18   Outlook box from both of those addresses, so its alias.

19   Q.  So say you send an e-mail, how does it show up?  How does

20   the return address show up at the other end?

21   A.  It could be either way.  So no, if I send an e-mail today,

22   it will be stewart.ward@kochfoods.com as a return address.

23   Q.  When was the transition to the new e-mail address?

24   A.  I can't give you a specific date because again we did that

25   over a period of time, but it was in that 2013, '14 time frame.

584

Stewart Ward - Direct

1   Q.  So anything before the transition would show up the

2   three-by-three?

3   A.  Would be the three-by-three, correct.

4   Q.  Gotcha.  And in the e-mails you often see a date/time

5   stamp.

6   A.  Uh-huh.

7   Q.  How is that stored physically?  Is it stored in a certain

8   time zone?

9   A.  The older e-mails were Central Time Zone because those --

10  it was a Central Time Zone server.  Over time they've gone to

11  UTC, so that's just how they got recorded into Exchange.

12  Q.  Does that necessarily mean it shows up when -- you know,

13  say I send you an e-mail on your screen, does it pop up in UTC?

14  A.  No.  It will show as my time zone.  It will show wherever

15  I'm at.  So I am here right now, so I would see an e-mail

16  received as Mountain Standard Time.

17  Q.  And if an e-mail were printed off, let's say, would it be

18  printed off in mountain standard time?

19  A.  If I printed it in Mountain Standard Time, yes, it would

20  be.

21  Q.  Would it have a little thing that says MDT?

22  A.  Not usually.  It usually just has the time on it.

23  Q.  Let's talk about attachments for a second.

24          So e-mails have attachments, right?

25  A.  Uh-huh.

Stewart Ward - Direct

1    Q.  How can you tell if an e-mail has an attachment?

2    A.  You can see it in the e-mail usually below the subject line

3    in -- at least in Outlook that's where it will show is under

4    the subject line.

5    Q.  And how does the storage work?  How does an e-mail know

6    what its attachment is and vice versa?

7    A.  It's built into the metadata that's behind that e-mail,

8    tells it where it's at.  In many cases it might even be

9    embedded into that specific e-mail.

10   Q.  And in the vault you said e-mail and attachments are there?

11   A.  Correct.

12   Q.  And are they still connected to each other there?

13   A.  Yes.

14   Q.  Does the vault maintain the attachments as, you know,

15   accurately and reliably?

16   A.  Yes.

17   Q.  Did there come a time -- well, let's back up before we do

18   that.

19          Are you familiar with someone named Bill Kantola?

20   A.  I am.

21   Q.  Would you know him if you saw him?

22   A.  I would.

23   Q.  Do you see him in this courtroom?

24   A.  I am sure he is around somewhere.  There he is.

25          MR. KOENIG:  Can the Court please let the record

                                                                        586
Stewart Ward - Direct

 1   identify --

 2          THE COURT:  Why don't we have him describe an article

 3   of clothing or something so I know.

 4   BY MR. KOENIG:

 5   Q.  What color tie is he wearing?

 6   A.  I can't tell.  He is sitting behind this big bookshelf.  It

 7   looks like kind of an orangish tie, rust colored.  I'm color

 8   blind, so...

 9          MR. KOENIG:  Can the record reflect that the witness

10   identified Mr. Kantola?

11          THE COURT:  It shall.

12   BY MR. KOENIG:

13   Q.  So under the new e-mail system, what would Mr. Kantola's --

14   what is Mr. Kantola's address?

15   A.  He would be bill.kantola.

16   Q.  At?

17   A.  @kochfoods.com.

18   Q.  And under the old convention?

19   A.  He would be bilkan@kochfoods.com.

20   Q.  Thank you.

21          Are you familiar with the name Joe Grendys?

22   A.  I am.

23   Q.  Who is he?

24   A.  He is the CEO of Koch Foods.

25   Q.  How about Bruce MacKenzie?

Stewart Ward - Direct

1    A.  I am familiar with him.

2    Q.  Who is he?

3    A.  He is a salesperson -- or was a salesperson.  He no longer

4    works for Koch Foods.

5    Q.  When did he leave Koch Foods?

6    A.  A couple years ago, I think.

7    Q.  How about Mark Kaminsky?

8    A.  Yes.

9    Q.  Who is he?

10   A.  He is my boss.  He is the chief operating officer.

11   Q.  Is he the one who hired you away from your other job?

12   A.  He is.

13   Q.  All right.  Now, did there come a time when you were asked

14   to extract e-mails for production in a matter?

15   A.  Yes.

16   Q.  And approximately when was that?

17   A.  It started in 2016 and has continually progressed from

18   there.

19   Q.  And how were you involved?  Let's start at the beginning.

20   How were you involved?

21   A.  So initially I did the first extractions.  I went into the

22   vault.  I keyed in custodians that were requested and various

23   keywords and extracted those e-mails and produced them.

24   Q.  To whom?

25   A.  To various people who had asked for them.

588

Stewart Ward - Direct

1   Q.   If I had asked you for them, would you have produced them

2   to me?

3   A.   Yeah, most likely.

4   Q.   But in seriousness, was it a request that you had to like

5   send them to a vendor or something?

6   A.   Well, initially they were from -- for other matters that we

7   were asked to get involved with.

8   Q.   And the e-mails and attachments that you extracted, did you

9   have an understanding of whether the extraction was a true and

10  accurate copy of what was in the vault?  First of all, did they

11  come from the vault?

12  A.   They came from the vault.

13  Q.   Not from the end user system?

14  A.   None of the extractions I did came from the end user

15  system.  They all came from the vault.

16  Q.   And were the extractions true copies of what was in the

17  vault?

18  A.   Yes.

19  Q.   And how do you know that?

20  A.   You could just do a basic review of the documents as they

21  are being extracted.

22  Q.   What kind of volume are you talking about in sort of that

23  first wave?

24  A.   Initially I was pulling in the hundreds of thousands of

25  e-mails.  As time went on, it went into the millions.

Stewart Ward - Direct

1   Q.  But you didn't check every last document.

2   A.  No.

3   Q.  So was there some sort of --

4   A.  A sampling.  You just do a sampling test on them, check

5   them to see it's coming through, make sure you are not getting

6   errors when you are pulling them out.

7   Q.  After you produced those to the person who had requested

8   them, did you ever hear back that there was a problem with any

9   of them?

10  A.  No.

11  Q.  No corruption issues?

12  A.  No.  They kind of go into a black hole at that point.

13  Q.  Okay.  And did you apply Bates stamps to those numbers --

14  or documents?  I am sorry.

15  A.  I didn't.

16  Q.  Do you have an understanding of who did?

17  A.  It would either be other firms or it would be potentially

18  third-party vendors.

19  Q.  Okay.  Are you familiar with the actual Bates stamps

20  themselves, what code they used?

21  A.  I mean, I generally know just through other discussions

22  I've had in other matters, I have seen the Bates numbers come

23  back.  So I am familiar with the Bates numbers and I recognize

24  them when I see them.

25  Q.  Okay.  Is K-O-C-H dash one of them?

590

Stewart Ward - Direct

1   A.   K-O-C-H underscore.

2   Q.   I am sorry, underscore.

3   A.   Yes, that is one of them.

4   Q.   K-O-C-H-F-O-O-D-S is another one?

5   A.   Yes.

6   Q.   You said at first you were doing the extraction.  Did at

7   some point that change?

8   A.   Yeah.  The volume just got to a point where I couldn't keep

9   up with it, so we brought in a third party to help.  I directed

10  them how to do it, trained them on how to pull it.  They were

11  let in the door essentially, if you will, to do those

12  extractions through the vault system as I had done the

13  extractions.

14  Q.   And did you have -- where were they located when they were

15  doing it, at least at first anyway?

16  A.   In the very beginning, they actually came to my office in

17  Peoria, Arizona.  As time went on, I would let them in through

18  a machine that sets on my desk right behind me.

19  Q.   So they would come physically sit at your desk and do it?

20  A.   No.  When they came in physically, I have a conference

21  room.  And I would set them up in a conference room and give

22  them access in so they could do it.  And they did the

23  extractions there.  As time went on, they would just come in

24  through remote connection into a machine that I have setting on

25  my desk.

591

Stewart Ward - Direct

1   Q.  And then that -- and you trained them how to do it.

2   A.  Correct.

3   Q.  Did you ever hear that there were problems with the

4   documents that were extracted by the third-party vendor?

5   A.  Every once in a while they would come back and say, hey,

6   this isn't exporting the way I expected it to.  And so I would

7   go in and look at it and say -- most of the time what would

8   happen is the volume was so big, they were trying to dump it

9   off onto a drive that didn't have enough space.  And they would

10  get errors and saying, hey, we can't get this stuff extracted,

11  so I would have to go help them clean it up.

12  Q.  Anytime you weren't able to solve the problem?

13  A.  No.  We solved the problems.

14  Q.  And did you -- did there come a time when you produced

15  documents pursuant to a Grand Jury subpoena in this matter?

16  A.  I didn't, no.

17  Q.  Okay.  Did the vendor?

18  A.  They may have.  They were doing extractions for a number of

19  different matters, so I don't know specifically which ones they

20  were working on.

21  Q.  From your perspective it doesn't matter if it's a Grand

22  Jury subpoena or just whatever.  It's -- an extraction is an

23  extraction.

24  A.  Correct.

25  Q.  And at the time were you aware of a Grand Jury subpoena?

Stewart Ward - Direct

1    *A.*  I was aware of one, yes.

2    *Q.*  And at the time the extractions were being done for that,

3    was the vendor still operating under the process you had

4    trained them in?

5    *A.*  Yes.

6    *Q.*  And is it your belief, then, that whatever they extracted

7    under your supervision was a fair and accurate copy of what was

8    in the vault?

9    *A.*  Yes.

10         *MR. POLLACK:*  Objection, Your Honor, lack of

11   foundation, lack of personal knowledge.

12         *THE COURT:*  Overruled.

13   *BY MR. KOENIG:*

14   *Q.*  All right.  I put in front of you a binder.  And actually,

15   there is two sheets there that I think they are actually in the

16   binder themselves, so you can set those aside.

17   *A.*  Okay.

18   *Q.*  If you could open that.

19   *A.*  Yup.

20   *Q.*  Do you see what's been marked as Government Exhibit 9501?

21   *A.*  I do.

22         *MR. POLLACK:*  Your Honor, can we display these

23   documents?

24         *THE COURT:*  Is that possible, Mr. Koenig?

25         *MR. KOENIG:*  Yeah, we are working on it.  Sorry, I got

Stewart Ward - Direct

1   a step ahead of myself.

2          It looks like the margins somehow changed, the width

3   of the table.

4          *MR. TUBACH:*  I believe this is a different document

5   than the paper one we were just handed.

6          *MR. KOENIG:*  Let's put it on the viewer.  Sorry.

7          *THE COURT:*  And this bears an exhibit number,

8   Mr. Koenig?

9          *MR. KOENIG:*  Yes, 9501.

10         *THE COURT:*  Okay.  Go ahead.

11         Let's hold on for one second and make sure

12  Ms. Johnson -- okay.  Go ahead.

13         *MR. KOENIG:*  Thank you.

14  *BY MR. KOENIG:*

15  *Q.*  Aside from the last row that says 9595, do you see the list

16  of trial exhibit numbers and the Bates numbers?

17  *A.*  I do.

18  *Q.*  And have you reviewed all of those documents aside from the

19  last one?

20  *A.*  I have.

21  *Q.*  And are they the documents that are contained in the binder

22  except for the last one, of course.

23  *A.*  Yes, they are.

24  *Q.*  Okay.  And you've seen all those documents before?

25  *A.*  I have.

Stewart Ward - Direct

1    Q.  And when was that?

2    A.  I was first presented these earlier in the week.

3    Q.  All right.  And did you have an opportunity to compare

4    those documents that you just reviewed just now to documents

5    that are on Koch servers?

6    A.  I did.

7    Q.  And how did you do that?

8    A.  I went in and did a search in the vault for each and every

9    one of these documents.

10   Q.  And what did you discover?

11   A.  That each and every one of the e-mails was in the vault

12   server and this is a representation of what was on the vault

13   server.

14   Q.  So this is a -- each and every one of these documents is

15   true and accurate of what's on the vault server?

16   A.  Correct.

17   Q.  Let's turn to -- my apologies -- the last page, 9595.

18   A.  Is that the same as this 9595 that you just gave me?

19   Q.  Yes.

20   A.  Okay.

21   Q.  If you would just take a minute to look at that too.

22   A.  Okay.

23   Q.  Have you seen this list of documents before?

24   A.  I believe so, yes.

25   Q.  And when was that?

595

Stewart Ward - Direct

1   A.  Last week I believe I got a copy of this list.

2   Q.  Okay.  And did you do anything to verify that all of the

3   documents listed in 9595 are Koch documents?

4   A.  I did.

5   Q.  A couple things I would like to do.  If you could, let's go

6   back to 9501.  Do you see the document 1025 and 1026?

7   A.  I do.

8   Q.  If you could turn to those.

9   A.  In the binder?

10  Q.  Yes, please.

11       THE COURT:  Do you need to confer with Mr. Pollack?

12       MR. KOENIG:  Please.

13       THE COURT:  Yes, go ahead.

14  BY MR. KOENIG:

15  Q.  All right.  We are at 1025, I believe.

16  A.  Yes.

17  Q.  And does 1025 have an attachment?

18  A.  It does.

19  Q.  And is that attachment in 1026?

20  A.  I can't tell based on this information.

21  Q.  Okay.  What would you have to do to be able to tell?

22  A.  I would have to be able to see the metadata for the e-mail

23  so that I could be able to determine and be able to see an

24  actual file name on this.  The one with the 1026, there is not

25  an actual file name associated with this that would identify

Stewart Ward - Direct

1   that it's 3753001.PDF.

2   Q.  Is 1026, however, a document from the vault?

3   A.  It could be.  I was not able to verify the PDFs when I went

4   through this.

5   Q.  Okay.  So when you said before that you verified what was

6   in the vault, it was the e-mails, not necessarily the

7   attachments.

8   A.  Correct, because the vault server does not have a PDF

9   reader nor does it have an Excel Microsoft Office installation

10  on the server, so I can't open the --

11  Q.  Were you able to see when you looked at the e-mails whether

12  they did, in fact, have attachments?

13  A.  I did, yes.  I was able to see that they had attachments

14  and that they were valid attachments.  And I clicked on the

15  links to make sure that they would try to open.  And then it

16  just wants to know what kind of software to read that

17  attachment.

18  Q.  Okay.

19  A.  Just for the record, though, this 9501 that you gave me,

20  1025 and 1026 had different Bates numbers than they do on the

21  documents in the binder.

22  Q.  Oh, yeah.  Can you just for the record read in what the

23  Bates number in 1026 is?

24  A.  KOCHFOODS-0000227522.

25  Q.  And 1025, can you read that Bates number in, please?

Stewart Ward - Cross

1   A.   KOCHFOODS-0000227521.

2   Q.   And so in spite of the error in the table, the documents

3   are still the ones that you verified are accurate?

4   A.   They are.

5   Q.   And that's true for all of them regardless of the Bates

6   number that might have been --

7   A.   Yes, because I researched them outside of Bates numbers.  I

8   researched them Bates on the data and the e-mails.

9            MR. KOENIG:  Can I confer a minute?

10           THE COURT:  You may.

11           MR. KOENIG:  No further questions, thank you.

12           THE COURT:  Cross-examination.

13           Mr. Pollack?

14           THE WITNESS:  Shall I leave these binders here?

15           THE COURT:  You are not quite done, Mr. Ward.  A few

16   additional questions.

17           THE WITNESS:  I am ready to go, but...

18                        **CROSS-EXAMINATION**

19   BY MR. POLLACK:

20   Q.   I just wasn't able to hear.  With the numbers that were in

21   Exhibit 9595, was your answer that you did go back to the

22   servers at Koch and confirm that each and every one of these

23   documents was on the server at Koch or was your answer that you

24   did not do that?

25   A.   I did not do that.

598

Stewart Ward - Cross

1   *Q.*  Did not.

2   *A.*  Correct.

3   *Q.*  And with respect to the documents that are on 9501, if I

4   understand it, you were able to go back and see the e-mails on

5   the Koch server.

6   *A.*  Correct.

7   *Q.*  And if it was an e-mail, you compared it to the hard copy

8   document that you were provided and it had the same

9   information, correct?

10  *A.*  Yes.

11  *Q.*  But if it was an attachment to an e-mail, you could see on

12  the server that that e-mail had an attachment, but you couldn't

13  actually see the attachment.

14  *A.*  Correct.

15  *Q.*  So you couldn't compare the attachment on the server with

16  the attachment in 9501.

17  *A.*  Yes, that's correct.

18          *MR. POLLACK:*  I appreciate it.

19          Anyone else, cross-examination?

20          Redirect?

21          *MR. KOENIG:*  I have nothing further.  Thank you.

22          *THE COURT:*  Now, Mr. Ward --

23          *THE WITNESS:*  Thank you.

24          *THE COURT:*  Now, Mr. Ward.  Mr. Ward, it could be that

25  one or more of the defendants would want to recall you later in

Gregory Finch - Direct

1   the trial, but if so, presumably someone will get in touch with

2   you about that, but you are excused for today.  Thank you very

3   much.

4           THE WITNESS:  Thank you.  I appreciate it.

5           THE COURT:  The United States may call its next

6   witness.

7           MS. SWEENEY:  The government calls Greg Finch.

8       (**Gregory Finch** was sworn.)

9           THE WITNESS:  I do.

10          COURT DEPUTY CLERK:  Please state your name and spell

11  your first and last names for the record.

12          THE WITNESS:  Gregory Scott Finch; G-R-E-G-O-R-Y,

13  S-C-O-T-T, F-I-N-C-H.

14                      **DIRECT EXAMINATION**

15  BY MS. SWEENEY:

16  Q.  Good afternoon, Mr. Finch.

17  A.  Good afternoon.

18  Q.  Who is your employer?

19  A.  Norman W. Fries, Inc., d/b/a Claxton Poultry Farms.

20  Q.  Can you describe what you mean when you say d/b/a Claxton

21  Poultry Farms?

22  A.  Sure.  It's an abbreviation for doing business as.

23  Q.  Does your employer have a website?

24  A.  We do.

25  Q.  What's the domain of that website?

# ATTACHMENT K

Gregory Finch - Direct

1    the trial, but if so, presumably someone will get in touch with

2    you about that, but you are excused for today.  Thank you very

3    much.

4            THE WITNESS:  Thank you.  I appreciate it.

5            THE COURT:  The United States may call its next

6    witness.

7            MS. SWEENEY:  The government calls Greg Finch.

8        (**Gregory Finch** was sworn.)

9            THE WITNESS:  I do.

10           COURT DEPUTY CLERK:  Please state your name and spell

11   your first and last names for the record.

12           THE WITNESS:  Gregory Scott Finch; G-R-E-G-O-R-Y,

13   S-C-O-T-T, F-I-N-C-H.

14                       **DIRECT EXAMINATION**

15   BY MS. SWEENEY:

16   Q.  Good afternoon, Mr. Finch.

17   A.  Good afternoon.

18   Q.  Who is your employer?

19   A.  Norman W. Fries, Inc., d/b/a Claxton Poultry Farms.

20   Q.  Can you describe what you mean when you say d/b/a Claxton

21   Poultry Farms?

22   A.  Sure.  It's an abbreviation for doing business as.

23   Q.  Does your employer have a website?

24   A.  We do.

25   Q.  What's the domain of that website?

Gregory Finch - Direct                                    600

1   A.  www.claxtonpoultry.com.

2   Q.  And do you have a work e-mail address?

3   A.  Do I?

4   Q.  Yes.

5   A.  Yes, ma'am.

6   Q.  What's the domain name of your work e-mail address?

7   A.  Claxtonpoultry.com.

8   Q.  Is that the same for everybody who works at

9   claxtonpoultry.com?

10  A.  Yes.

11  Q.  What's your position?

12  A.  Chief financial officer.

13  Q.  How long have you been in that position?

14  A.  Since April of 2011.

15  Q.  I would like to direct your attention to the

16  responsibilities you have with regard to responding to legal

17  process.  Could you describe those to the jury, please?

18  A.  Responding to legal process?

19  Q.  Your responsibilities with regard to responding to legal

20  process.

21  A.  Sure.  That would fall under my purview.

22  Q.  So what does that include?

23  A.  Depends on what the legal matter is.  They are various and

24  sundry, testimony under oath, depositions, responding to

25  discovery, just depends on what the situation may be.

Gregory Finch - Direct

1   Q.   Does it involve the collection of documents?

2   A.   Yes.

3   Q.   Turning back to e-mail servers -- or to e-mails, are e-mail

4   addresses assigned to employees of Claxton Poultry Farms?

5   A.   Yes.

6   Q.   Do you know how?

7   A.   Yes.

8   Q.   How are e-mail addresses assigned?

9   A.   Well, depending on the employee and what their job function

10   will be, we have two types of e-mail accounts under Microsoft

11   365.  So we have a lower level account that cost us $5 a month.

12   That account will come with e-mail electronic calendar and then

13   a virtual version of Excel, Word and the other applications.

14   Then we got a next level up that's a $12 a month application

15   that comes with fully licensed applications as well as e-mail

16   and electronic calendars.

17   Q.   So for both of the types of accounts that you described, is

18   the employee assigned an e-mail address?

19   A.   They are.

20   Q.   And what's the domain name of the e-mail address assigned

21   to that employee?

22   A.   Claxtonpoultry.com.

23   Q.   Is there a naming convention for assigning e-mail addresses

24   to employees?

25   A.   Yes.

Gregory Finch - Direct

1   Q.   What is that naming convention?

2   A.   First name_last name@claxtonpoultry.com.

3   Q.   Mr. Finch, are you familiar with how Claxton stores its

4   e-mails?

5   A.   I am.

6   Q.   Can you describe how Claxton Poultry Farms stores its

7   e-mails?

8   A.   In the cloud.

9   Q.   And how -- what is the name of the server, the process

10  through which Claxton Poultry Farms stores its e-mails?

11  A.   It's Microsoft Office 365, so Microsoft controls the cloud.

12  And the e-mails and attachments and calendar entries and so

13  forth are saved in Microsoft cloud.

14  Q.   So just to confirm, you said e-mails are saved in the

15  cloud?

16  A.   Yes.

17  Q.   And e-mails with attachments?

18  A.   Yes.

19  Q.   And you said calendar invitations?

20  A.   Yes.

21  Q.   And the e-mails and e-mails with attachments and calendar

22  invitations you were describing, are they saved in the cloud

23  outgoing versions or in-coming versions or both?

24  A.   Both.

25  Q.   Has Claxton Poultry Farms always saved its e-mails and

Gregory Finch - Direct

1    e-mails with attachments and calendar invitations in the cloud?

2    A.   No.

3    Q.   What -- where else do they save their e-mails?

4    A.   We had an on-site Microsoft Exchange server until October

5    2015.  And at that time we were responsible for maintaining

6    that server, and the e-mails and calendar invites and so forth

7    were stored on that server on premises.

8    Q.   And so that included all of -- everything you described

9    before.  The e-mails, e-mails with attachments and calendar

10   invitations were stored on the server prior to October of 2015?

11   A.   Yes.

12   Q.   Did that include both incoming and outgoing?

13   A.   Yes.

14   Q.   Was there a transition from the server to the Microsoft

15   cloud?

16   A.   Yes.

17   Q.   Was any data lost in that transition?

18   A.   Quite possibly.

19   Q.   Are you aware of any data being lost in that transition?

20   A.   Yes.

21   Q.   Are you aware of any e-mail data being lost in that

22   transition?

23   A.   Yes.

24   Q.   What e-mail data was lost in that transition?

25   A.   I can't quantify it.  We had a server crash.  And so we did

604

Gregory Finch - Direct

1   our best to recover all the data we could recover from that

2   server and migrated over to the cloud, but unfortunately some

3   of the data that was on the server was corrupted and we were

4   not able to recover those and put those in the cloud.

5   Q.   When you talk about the e-mail information that's stored in

6   the server and in the cloud, what parts of the e-mail are saved

7   in the server and in the cloud?  Would that be the header

8   information?

9   A.   Yes.

10  Q.   Would it also include the body of the e-mail itself?

11  A.   Yes.

12  Q.   And have you ever -- aside from the crash that you

13  described, we will start with the server, have you ever known

14  of -- is that server reliable?  Was it reliable?

15  A.   Yes.

16  Q.   Was it maintained?

17  A.   Yes.

18  Q.   Turning now to the Microsoft cloud, has the Microsoft cloud

19  saving system been reliable?

20  A.   Yes.

21  Q.   Is the Microsoft cloud maintained?

22  A.   Yes.

23  Q.   Who maintains the Microsoft cloud?

24  A.   Microsoft.

25  Q.   Who maintained the e-mail server from October 15 and prior?

Gregory Finch - Direct

1   A.  Claxton Poultry employees.

2   Q.  I would like to now talk about a few Claxton Poultry

3   employees.  Are you familiar with someone by the name of Mikell

4   Fries?

5   A.  Yes.

6   Q.  Is Mikell Fries a Claxton Poultry employee?

7   A.  Yes.

8   Q.  And does he have an e-mail address?

9   A.  Yes.

10  Q.  And could you tell the jury what that e-mail address is?

11  A.  Sure.  It's mikell_fries@claxtonpoultry.com.

12  Q.  Are you familiar with someone by the name of Scott Brady?

13  A.  Yes.

14  Q.  Is Scott Brady an employee of Claxton?

15  A.  Yes.

16  Q.  Does Scott Brady have an e-mail address?

17  A.  Yes.

18  Q.  Can you share Scott Brady's e-mail address with the jury?

19  A.  Sure.  It's scott_brady@claxtonpoultry.com.

20  Q.  Focusing on e-mails themselves and the header information

21  we were talking about just a little bit ago, the date on an

22  e-mail, how is that assigned?

23  A.  By the Microsoft server.

24  Q.  So is that created by a computer?

25  A.  It's created by the software.

Gregory Finch - Direct

1    Q.   Is that date reliable?

2    A.   To my knowledge, yes.

3    Q.   Have you ever known the date assigned to be wrong?

4    A.   Not to my knowledge.

5    Q.   How about the time?

6    A.   It's assigned the same way.  The software assigns it.

7    Q.   Have you ever known the time to be unreliable?

8    A.   No.

9    Q.   Are there times on Claxton Poultry e-mails where the e-mail

10   address, the full e-mail address is not listed?

11   A.   Yes.

12   Q.   Can you describe what is listed instead of the full e-mail

13   address?

14   A.   It's hard to fully describe, but basically what happens if

15   there is a software differential between the computer and maybe

16   the cloud where it's on, say, version 10.1 on one and 10.0 on

17   the other, then sometimes that full e-mail address like

18   greg_finch won't show in the header.  It will say Greg Finch.

19   Then there will be a parenthetical that identifies the location

20   as Claxton Poultry and who the sender is as Greg Finch.

21   Q.   You said it would be your name followed by a lot of

22   characters.  How are those characters created?

23   A.   The server creates those.

24   Q.   I would like to direct your attention to Tab 1 in the

25   binder in front of you which is Government Exhibit 500 which we

Gregory Finch - Direct

1   will put up on the screen.

2   A.  I don't have a binder.

3   Q.  I apologize.  When you've identified it, if you can look up

4   at me and we will direct you to the From line on the very top.

5           Is this an example of the computer-generated name that

6   you were just describing?

7   A.  Yes.

8   Q.  And is the computer-generated name that you were

9   describing, have you ever known that to be unreliable?

10  A.  No.

11  Q.  I would now like to direct your attention to the list that

12  I hope is in front of you, and it's marked as Government's

13  Exhibit 9594.  Do you have that in front of you?

14  A.  Yes.

15  Q.  Have you seen this document before?

16  A.  Yes.

17  Q.  When did you see it?

18  A.  Tuesday evening about 7:15.

19  Q.  And what is it?

20  A.  It is a list of documents, Claxton documents, that the

21  government wishes to enter here, I guess.

22  Q.  You also have a binder in front of you; is that right?

23  A.  Yes.

24  Q.  You now have a binder in front of you?

25  A.  Yes, ma'am.

608

Gregory Finch - Direct

1   Q.  Have you seen that binder before?

2   A.  Not this exact one, but a replica.

3   Q.  How do you know that it was a replica?

4   A.  Well, this one looks like it has all the documents in it

5   and the one Tuesday night did not.

6   Q.  And the binder in front of you, what's in that binder?

7   A.  A bunch of tabs and papers.

8   Q.  What's behind the tabs, the documents that are marked as

9   government exhibits?

10  A.  Would you like me to look through all the tabs?

11  Q.  You can take your time and look through the tabs.

12  A.  It appears to be e-mails, contracts, addendums to

13  contracts, calendar notes, Word documents, Excel documents and

14  a few legal documents.

15  Q.  I apologize, I didn't mean to cut you off.

16  A.  A few legal documents as well.

17  Q.  Have you seen these documents before?

18  A.  Yes.

19  Q.  When have you seen them before?

20  A.  Tuesday night.

21  Q.  Did there come a time when Claxton Poultry produced

22  documents to the Department of Justice in response to a Grand

23  Jury subpoena?

24  A.  Yes.

25  Q.  And did Claxton Poultry produce those documents with the

Gregory Finch - Direct

1  prefix CLA underscore?

2  A.  Yes.

3  Q.  Now, with regard to the specific documents on government

4  Exhibit 9594 in front of you, and I believe it's a two-sided

5  document, for the CLA underscore documents, did you have any

6  role in gathering those documents?

7  A.  Yes.

8  Q.  What was your role?

9  A.  I oversaw the collection of those documents.

10 Q.  And where were the documents collected from, specifically

11 the CLA underscore documents on Government Exhibit 9594?

12 A.  They were collected by a third-party vendor from the

13 Microsoft cloud, our servers, from laptops and desktop work

14 stations and from cellular phones.

15 Q.  And so the documents here on Government's Exhibit 9594,

16 were these documents collected from all of those sources or

17 just from some of those sources?

18 A.  All of those sources.

19 Q.  So starting with the Microsoft cloud, what -- where on the

20 Microsoft cloud?  Was it the e-mail server or was it other

21 types of documents -- or a different server.  I apologize.

22 A.  The cloud is going to have the e-mails and the calendar

23 invites and the attachments that go with the e-mails.

24 Q.  The documents that were retrieved from the server, can you

25 specify what server you are talking about?

Gregory Finch - Direct

1    A.  From our file server, which would be like Excel documents,

2    Word documents, those kind of things.  And then a copy of the

3    crashed -- the backup that we had of the crashed server was

4    also on that server.

5    Q.  The file server that you were talking about, is that the

6    same as the e-mail server we were discussing earlier?

7    A.  No, ma'am.

8    Q.  So where -- who maintains the file server?

9    A.  Claxton Poultry employees.

10   Q.  And where is the file server located?

11   A.  It's on premises in Claxton, Georgia.

12   Q.  Is the file server -- data from the file server, is it

13   reliable?

14   A.  Yes.

15   Q.  Has it been maintained?

16   A.  Yes.

17   Q.  So were these documents with the Bates numbers CLA

18   underscore, were they produced to the Department of Justice?

19   A.  Yes.

20   Q.  Can you describe generally the process of how they got from

21   the different locations you mentioned of the servers and the

22   laptops to the Department of Justice?

23   A.  The third-party data collection and housing service

24   collected the data using whatever methods they use to do that.

25   Then they housed that data.  And once they had the data

611

Gregory Finch - Direct

1   downloaded, they ran it against the terms that had been agreed

2   to by the Department of Justice and counsel.  And then those --

3   once those were culled, they were Bates stamped with CLA

4   underscore number, and then they were produced through counsel

5   to the government.

6   Q.  Was this third-party vendor that you described, were they

7   hired by Claxton Poultry?

8   A.  Yes.

9   Q.  Did you receive reports as to how this process was going

10  throughout the process?

11  A.  Yes.

12  Q.  Did you receive any reports that there were any errors in

13  the collection of the documents?

14  A.  None that I remember.

15  Q.  Any errors in the stamping of the documents?

16  A.  None that I remember.

17  Q.  Any errors that you were told of in the production of the

18  documents?

19  A.  None that I remember.

20  Q.  If there had been errors, would you have been advised of

21  errors?

22  A.  Yes.

23  Q.  The documents in the binder in front of you, beginning with

24  the CLA underscore Bates stamp, have you confirmed that these

25  documents are true and accurate copies of those on the

Gregory Finch - Direct

1   server -- or those -- from where they were pulled?

2   A.   Yes.

3   Q.   And how did you do that?

4   A.   Myself and my legal team in conjunction with the

5   third-party vendor went to those source records and then

6   compared them to these records to make sure they were an

7   accurate copy.

8   Q.   And if we could just confirm, the source records, if you

9   could just describe what the source records are.

10  A.   That was the data warehousing company, the data collection

11  company, once they marked those Bates numbers, they maintained

12  those in their system.  So we went back to that system Tuesday

13  night and Wednesday morning and confirmed that the copies that

14  are in this binder are authentic and have not been in any way

15  modified from what was originally produced.

16  Q.   And you compared it to the government's exhibits with the

17  government exhibit numbers?

18  A.   Yes.

19  Q.   Now I would like to focus your attention to the entries on

20  Exhibit 9594 that begin with the Bates number C-L-A-X-T-O-N

21  underscore.  Were these documents that were gathered in another

22  matter?

23  A.   Yes.

24  Q.   Did you -- were you involved in gathering these documents?

25  A.   Yes.

Gregory Finch - Direct

1   Q.  Approximately if you could give us a year when in time the

2   collection of these documents started.

3   A.  Approximately, 2017.

4   Q.  Discussing specifically the Claxton underscore documents on

5   this list again on the front page and the back page, where were

6   they gathered from?

7   A.  The same locations as the CLA documents.

8   Q.  And if you could describe the process of gathering the

9   documents through the time when they received the Claxton

10  underscore stamp.

11  A.  It was the exact same as the process for the CLA.

12  Q.  The process you described before?

13  A.  Yes, ma'am.  The only difference is with that matter

14  Claxton underscore was the naming convention for the Bates

15  numbers instead of CLA, but the collection methods and process

16  were identical.

17  Q.  And was the same third-party vendor used?

18  A.  Yes.

19  Q.  Did you receive -- do you recall any reports in the error

20  in the collection of the Claxton underscore documents?

21  A.  No.

22  Q.  Do you recall any reports of error in the processing or

23  stamping of the Claxton underscore documents?

24  A.  None.

25  Q.  Would you have been informed of any errors in the

Gregory Finch - Direct

1  collection or processing and stamping of those documents?

2  A.  Yes.

3  Q.  And the documents in the binder in front of you that bear

4  the Bates stamp that begins with Claxton underscore, have you

5  been able to verify if those are true and correct copies?

6  A.  Yes.

7  Q.  And how have you done that?

8  A.  The same process that I just described Tuesday night and

9  Wednesday morning we did on the Claxton underscore documents

10  that we did on the CLA underscore documents.

11  Q.  Now, in the documents in front of you, are any of them

12  e-mails with attachments?

13  A.  Some of them.

14  Q.  And how do you know that?

15  A.  Some of them have the attachment as an exhibit number.

16  Q.  Is there any other way that you know that there is an

17  e-mail with an attachment?

18  A.  In the body of the e-mail, it may tell you that attached is

19  something or like that, you know, possible.

20  Q.  In the verification process that you described that you did

21  where you compared an e-mail with the government's exhibit

22  number with the prior list of e-mails, were you able to confirm

23  that there were attachments --

24  A.  Yes.

25  Q.  -- in certain e-mails?

615
Gregory Finch - Direct

1    A.   Yes.

2    Q.   I would like you to turn to Tabs 2 and 3 which is

3    Government's Exhibits 503 and 579 which we will put on the

4    screen.

5              Starting with Exhibit 579, which is behind Tab 3, is

6    there -- is it apparent on the face of this document that there

7    is an attachment to this document?

8    A.   On the face of the last document -- of the last e-mail on

9    this document, no.  The first e-mail on the document seems to

10   say -- seems to say that there was an attachment when that was

11   originally sent.

12   Q.   And when you verified, was there, in fact, an attachment to

13   this document?

14   A.   Yes.

15   Q.   And what was that attachment?

16   A.   The Exhibit 503 that's in front of me on the screen.

17   Q.   Okay.  Now I would like to turn your attention to Tabs 4

18   and 5 which are Government Exhibits 702 and 703.  And starting

19   with Government's Exhibit 702, you can just look up at me when

20   you are ready.

21   A.   Okay.

22   Q.   Is it clear on the face of this e-mail that there is an

23   attachment to this e-mail?

24   A.   Yes.

25   Q.   And is there, in fact, an attachment to this e-mail based

Gregory Finch - Direct

1   on your verification?

2   A.   Yes.   There are multiple attachments to this e-mail.

3   Q.   And is the document behind Tab 5, Government Exhibit 703,

4   is that one of the attachments to this e-mail?

5   A.   Yes.

6   Q.   Now I would like to direct your attention to Tabs 12 and

7   13.  And I apologize, but it's Government Exhibit 1500 and

8   1501.

9         Starting with Government's Exhibit 1500, is it

10  apparent on the face of this e-mail if there is an attachment

11  to this e-mail?

12  A.   No.

13  Q.   In your checking, your confirmation, is there actually an

14  attachment to this e-mail?

15  A.   Yes.

16  Q.   And what is the attachment to Government Exhibit 1500?

17  A.   It's Government Exhibit 1501.

18  Q.   Now I would like to direct your attention to Tabs 16 and 17

19  which is Government Exhibit 1506 and 1507.  We will start with

20  Government Exhibit 1507.  You can look up when you are ready.

21        Starting with Government's Exhibit 1507, is it

22  apparent on the face of this e-mail if there is an attachment?

23  A.   No.

24  Q.   In your checking did you learn if there actually was an

25  attachment to this e-mail?

Gregory Finch - Direct

1   *A.*  No.

2   *Q.*  You learned that there was not an attachment to this

3   e-mail?

4   *A.*  To the best of my recollection.

5   *Q.*  All right.  And that's I think because I directed you to

6   the wrong exhibit.  So if I could actually direct you to 1505

7   and 1506.

8         So if we can look at 1505, is it apparent from the

9   face of this e-mail if there is an attachment?

10  *A.*  No.

11  *Q.*  In your confirmation was there actually an attachment to

12  this e-mail?

13  *A.*  Yes.

14  *Q.*  And where was the attachment to this e-mail?

15  *A.*  It's Government Exhibit 1506.

16  *Q.*  Thank you.  I would now like to direct your attention to

17  Tabs 18 and 24.  That's Government exhibits 1508 and 3001.

18  We'll start with Exhibit 3001.

19        Is it clear from the face of this document, 3001, that

20  there is an attachment to this e-mail?

21  *A.*  No.

22  *Q.*  And in your confirmation and checking --

23        *MR. POLLACK:*  The documents you are discussing are not

24  on the screen.

25        *THE COURT:*  It should be now, Mr. Pollack.

Gregory Finch - Direct

1  *BY MS. SWEENEY:*

2  *Q.*  In your checking, did you learn if there was an attachment

3  to Government Exhibit 3001?

4  *A.*  Yes.

5  *Q.*  And what is that attachment?

6  *A.*  It's Government Exhibit 1508.

7  *Q.*  And finally, I would like to turn your attention to Tabs 7

8  and 8.  And we'll start with Tab 8 and Tab 8 is Government

9  Exhibit 900-1.  Tab 7 is Government Exhibit 900.

10  *A.*  We are starting with 900-1?

11  *Q.*  Yes.  Is it apparent from the face of this e-mail,

12  Government Exhibit 900-1, that there is an attachment to this

13  e-mail?

14  *A.*  No.

15  *Q.*  In your checking did you learn if there was an attachment

16  to this e-mail?

17  *A.*  Yes.

18  *Q.*  And what was that attachment?

19  *A.*  Government Exhibit 900.

20  *Q.*  I would actually like to stay on Government's Exhibit 900.

21  Have you seen this document before?

22  *A.*  Yes.

23  *Q.*  Generally what is it?

24  *A.*  This generally is the assistant secretary's contemporaneous

25  notes that she takes during our board meetings.

Gregory Finch - Direct

1   Q.  Are you personally familiar with how this document was

2   created?

3   A.  Yes.

4   Q.  Have you seen this document before?

5   A.  Yes.

6   Q.  And when did you first see this document?

7   A.  Sometime on or around the time it was created.

8   Q.  And when was it created?

9   A.  I don't know the exact date.  I can't tell from this

10  document.  The document itself is dated August 28th, but I am

11  not sure exactly when.  What was the other exhibit number?  I

12  may be able to help here.

13  Q.  901, it's in Tab 8.

14  A.  Sometime around November of '14.

15  Q.  Why do you say sometime around November of '14?

16  A.  Well, the e-mail that Susan sent to me with this document

17  was sent on 11/9 of 2014.

18  Q.  Are documents like this usually prepared in the course of

19  business, regular conducted business?

20  A.  The assistant secretary of the corporation would normally

21  do this as part of her job function.

22  Q.  And is this an example of what you just described?

23  A.  Yes.

24  Q.  Are you familiar with when documents like this are

25  prepared?

Gregory Finch - Direct

1    *A.*   Generally.

2    *Q.*   When are documents like this generally prepared?

3    *A.*   Generally a document like this is prepared at the time of

4    the board meeting, at least in written form.  The typewritten

5    form doesn't always get done right then, but sometime between

6    the time of the board meeting, in this case August 28th of

7    2014, and the next board meeting which is typically in October,

8    these would have been created from a transcribed copy into a

9    digital copy.

10   *Q.*   Are you personally familiar with how these notes are kept

11   or maintained?

12   *A.*   Yes.

13   *Q.*   How are you familiar with how these notes are kept or

14   maintained?

15   *A.*   Because I am responsible for what goes on our file server

16   and these get stored on our file server.

17   *Q.*   And are documents like this kept and maintained in the

18   regular course of business?

19   *A.*   Yes.

20   *Q.*   Is this a true and accurate copy?  You already said this

21   was a true and accurate copy of the version that you reviewed

22   earlier?

23   *A.*   Yes.

24           *MS. SWEENEY:*  The government at this point moves to

25   admit Government's Exhibit 900 into evidence.

621

Gregory Finch - Direct

1            THE COURT:  Any objection to the admission of

2     Exhibit 900?

3            MR. POLLACK:  Yes, Your Honor.  First of all, with

4     respect to authenticity, as I understand the testimony, the

5     witness is able to say that the document is the same as the

6     document that the third-party vendor collected, but he is not

7     able to say whether it is identical to what resided at Claxton.

8     He is just simply relying on the fact that hopefully the

9     third-party vendor did its job correctly.

10           Secondly, it's not clear that this is, in fact, an

11    attachment to this e-mail because the Bates numbers are not

12    sequential.  They skip one.  And then lastly, it doesn't meet

13    the business records exception.  The Court has already ruled

14    that board minutes don't meet the business record exception as

15    a general rule.  And here in particular it's not recorded

16    contemporaneously or near contemporaneously.  They are trying

17    to introduce a document that was created in November that's

18    reflecting events from August.

19           THE COURT:  Response?

20           MS. SWEENEY:  Your Honor, with regard to the

21    authenticity argument, the witness has testified that he

22    oversaw the process of extraction and of stamping and that he

23    would have received reports of errors, but he received none.

24    So when he confirmed that the document with the government

25    sticker was the same as the document preserved by the vendor,

Gregory Finch - Direct

1    he has established that full chain.

2            With regard to the business records, he testified

3    about his personal knowledge of the creation and the fact that

4    these notes were kept and maintained, and it was part of his

5    job function as his testimony came.

6            THE COURT:  The objections will be overruled.

7            In addition to what Ms. Sweeney noted about the

8    testimony of Mr. Finch in regard to the third-party vendor and

9    how he oversaw that and didn't receive any notifications of

10   errors, he testified that the assistant secretary kept

11   contemporaneous notes during the board meeting.  And then later

12   from what he described as a transcribed copy, the board minutes

13   were then formalized at a later time, namely before the next

14   board meeting, and that Mr. Finch was responsible for the

15   process of those being stored thereafter.

16           He also testified that the board meeting minutes are

17   kept in the regular course of business.  I find that those

18   board meeting minutes are -- have indicia of reliability to

19   them because that is the nature of board meeting minutes, and

20   as a result, I will admit Exhibit 900.

21           At this time we are past 5:00 o'clock and we'll go

22   ahead and recess for the day.

23           Mr. Finch --

24           MR. LAVINE:  Your Honor, may I be heard?  I apologize,

25   Your Honor, but Mr. Finch comes from Claxton, Georgia.

Gregory Finch - Direct

1           THE COURT:  That's what I was worried about.

2           MR. LAVINE:  We are talking about bringing him back

3    for, what, five, eight minutes on Monday.

4           THE COURT:  Well, normally we just are not going to do

5    that because when we do that, this will then happen all the

6    time.

7           Ladies and gentlemen, do you have -- can you do

8    another eight minutes to get him done?  Okay.  We will do it

9    here, but normally we will not.  But yeah, I appreciate that,

10   especially since we are not going to have court tomorrow.  So

11   let's try to expedite this and wrap Mr. Finch up so he can go

12   home and not have to come back on Monday.

13   BY MS. SWEENEY:

14   Q.  Mr. Finch, I would like to direct your attention to Tab 36

15   which is government Exhibit 9143.

16           Mr. Finch, do you recognize this document?

17   A.  I do.

18   Q.  Very generally what is it?

19   A.  It's a press release.

20   Q.  Do you have personal knowledge of how this document or

21   documents like this are prepared?

22   A.  This particular document, yes.

23   Q.  How about documents like this?

24   A.  Sometimes -- we don't do press releases very often in a

25   privately held company, but when press releases are done, at

Gregory Finch - Direct

 1   times I am involved with that, but not always.

 2   Q.  I would like to direct your attention to Tab 18, which is

 3   Government Exhibit 1508.

 4           Mr. Finch, do you recognize this document?

 5   A.  I do.

 6   Q.  Generally what is it?

 7   A.  This appears to be the pricing model as approved for

 8   calendar year 2013 for -- let's see -- KFC.

 9   Q.  When you say as approved, why do you say that?

10   A.  Because the document's executed.

11   Q.  By executed, what are you referring to?

12   A.  A signature by Mr. Brady and a signature by what looks like

13   Mike Ledford.

14   Q.  Are you familiar with these types of documents?

15   A.  Yes.

16   Q.  How are you familiar with these types of documents?

17   A.  Because I'm involved with the costing and pricing of our

18   products to KFC.

19   Q.  And are these types of documents prepared in the regular

20   course of business?

21   A.  Yes.

22   Q.  And are they created at or near the time of the information

23   contained in the document?

24   A.  Yes.

25   Q.  Are you familiar with how these types of documents are kept

625

Gregory Finch - Direct

1  and maintained?

2  *A.*  Yes.

3  *Q.*  And are they kept and maintained in the regular course of

4  business?

5  *A.*  Yes.

6  *Q.*  For what purpose?

7  *A.*  We keep contract information on file.

8  *Q.*  And why do you keep contract information on file?

9  *A.*  Well, we may have to refer back to it at some point in time

10  and we need to keep that record on file.

11        *MS. SWEENEY:*  The government now moves into evidence

12  Government's Exhibit 1508.

13        *THE COURT:*  Any objection to the admission of 1508?

14        *MR. KORNFELD:*  Your Honor, I don't object to it.  I

15  think the foundation has been laid.  However, I think it's

16  incomplete.  I believe there was an e-mail that it was attached

17  to which is Government's 3001 and I would ask that the complete

18  document be introduced, but we don't have an objection to this.

19  It's just incomplete.

20        *THE COURT:*  I am going to admit Exhibit 1508 at this

21  time and then we can deal with the e-mail to which it may have

22  been attached at some point in time at another time.  Anything

23  else?

24        *MS. SWEENEY:*  At this point the government has no

25  further questions.

Gregory Finch - Cross

1              THE COURT:  Thank you.

2              Cross-examination of Mr. Finch?

3              MR. KORNFELD:  Just very briefly, Your Honor.

4                         **CROSS-EXAMINATION**

5    BY MR. KORNFELD:

6    Q.  Mr. Finch, just a couple questions so we can get you home

7    and the jury home.

8              You talked about e-mails in general and testified

9    about the time zones.  Am I correct in understanding that the

10   time zones of Claxton e-mails will always be expressed in

11   Eastern Standard Time regardless of where the sender is?

12   A.  Well, typically those are from where the sender is, so --

13   and it depends on what device the sender is using.  So if the

14   sender is using a cellphone that has the setting to where the

15   time and date automatically update when they go to a new time

16   zone, then the date stamp and time stamp on that e-mail on that

17   device is going to be wherever they are.  So if I sent one

18   today, for instance, it's going to be approximately 5:10 or

19   whatever time it is Mountain Time, okay?

20             On our server it's going to say Eastern Time because

21   that's the way the Microsoft cloud works.  So most laptops are

22   set to where they stay with wherever they are from, right?  So

23   if the laptop is in Eastern Time, they are not set like phones

24   to automatically update typically as a general rule.  The

25   default setting from the software that operates that laptop,

627
Gregory Finch - Cross

1   you know, says don't change the time and date and zone when you

2   move around.

3   Q.  Got it.  And the same is true on the recipient side.  It

4   depends on where they are and what their setting is.

5   A.  Correct.

6   Q.  But at the server at Claxton it would be expressed as

7   Eastern Standard Time.

8   A.  Correct.

9   Q.  You talked about using a third-party vendor for the

10  production of documents both to the Department of Justice via

11  Grand Jury subpoena and also production in other matters.  Was

12  that third-party vendor Consilio?

13  A.  Yes.

14  Q.  And essentially you described the process, but basically

15  once you engaged Consilio, Consilio kind of took care of the

16  process, right, and ultimately produced the documents?

17  A.  Correct.

18  Q.  And finally, to the last document that got in, the binder

19  in front of you, you have reviewed all those documents,

20  correct?

21  A.  Correct.

22  Q.  There is approximately 35 to 40 exhibits give or take?

23  A.  Fair.

24  Q.  And it's true, is it not, that there are several examples

25  where there are e-mails that reflect or suggest there is an

628

1   attachment, but the attachment is missing, right?

2   A.   Yes.

3   Q.   And there is at least one by my count where there is an

4   attachment without the parent e-mail.  Is that consistent with

5   your review of the documents?

6   A.   Yes.  I found one that had -- I believe it was one that did

7   not have the parent.  I found several that had multiple

8   attachments.  Where there was only one attachment in this

9   document, I found others where there was an attachment and it's

10   not in the binder.

11   Q.   And to your knowledge, did you through corporate counsel

12   make that information available to the government?

13   A.   Yes.

14          MR. KORNFELD:  Thank you, sir.

15          THE COURT:  Additional cross-examination of Mr. Finch?

16          Redirect?  None?

17          MS. SWEENEY:  None, Your Honor.

18          THE COURT:  Hang on for just a second.  I am going to

19   dismiss the jury, but it looks like you might make your flight.

20          Ladies and Gentlemen of the Jury, I am going to excuse

21   you.  As was just mentioned, we are not going to have court

22   tomorrow, okay?  I am going to give you right now the schedule

23   for November because when you come back on Monday, it's

24   November 1st.

25          The week of November 1st will be a full week, okay,

1    all the way Monday through Friday.  The next week November 8th,

2    the Thursday the 11th is Veteran's Day.  That's a federal

3    holiday.  We won't have court then.  We will have court the

4    next day, Friday, November 12, all right?  Next week,

5    November 15, we will have trial Monday through Thursday, won't

6    have trial on the 19th.  The next week November 22nd, that's

7    the week of Thanksgiving.  As I mentioned to you, we will have

8    trial 22nd through the 24th, not Thanksgiving, not the Friday

9    after Thanksgiving.  The next week, the week of November 29,

10   that's going to be a strange week, one trial day, Monday the

11   29th.

12          December, I will talk to you about that later, but

13   basically we have two pretty full weeks.  I might as well tell

14   you now.  December 6, the week of December 6, we won't have

15   trial on that Friday the 10th.  The week of December 13th, we

16   will have a full week of trial, five days.  And then Tuesday

17   the 21st of the next week is the scheduled last day, okay?

18          Keep all those admonitions in mind, ladies and

19   gentlemen, over the course of the weekend.  Don't be tempted to

20   tell your people at home anything more than I told you at the

21   beginning.  Don't look stuff up.  If you want to go to work

22   tomorrow or work over the weekend or do whatever you want, of

23   course, that's totally up to you, all right?  Have a good next

24   three days.  See on you on Monday.  The jury is excused.

25          (Jury excused.)

1          *THE COURT:*  Please be seated except for Mr. Finch.

2          Mr. Finch, you are excused.  Thanks very much.

3          We only have about 10 minutes before we need to

4     recess.  Anything before we do?

5          *MR. McLOUGHLIN:*  Your Honor, there is one matter we

6     need to give you notice of.  There is one matter, Your Honor,

7     we want to give you notice of.  It took us a few days because

8     of the amount of work we all have to do, but it appears that on

9     October 21st and October 26 the government produced text

10    messages between Agents Koppenhaver and Taylor.

11         *THE COURT:*  Who?

12         *MR. McLOUGHLIN:*  Special Agent Taylor and Agent

13    Koppenhaver.  These text messages date for a fairly lengthy

14    period in and around the Indictment, thereafter and relate to

15    the investigation.  I think it is fair to say that a

16    significant number of these are inappropriate and raise issues

17    with respect to their conduct and the conduct of the

18    investigation.

19         We are not asking Your Honor for any relief right now.

20    We have written to the government today to ask for additional

21    information.  It appears from the tone of the messages that it

22    suggests that there may be others that have not yet been

23    produced, but we are waiting until we get additional

24    information from the government.  We think they are clearly

25    *Brady*.  We think they should have been produced before the

# ATTACHMENT L

652

1    exhibits being admitted.  So I don't think that these lists

2    would help in any way, assist the jury in any way, but -- so as

3    a result, I really -- I fail to see what the relevance of

4    admitting them would be.

5            MS. BUTTE:  Thank you, Your Honor.

6            THE COURT:  Once again, we haven't ruled on this

7    really specifically in front of the jury, but that's my view of

8    the subject.

9            We are one juror short and we are trying to reach that

10   juror.  She is here?  Okay.  Let's bring the jury in.

11           (Jury present.)

12           THE COURT:  Good morning, ladies and gentlemen.  I

13   hope you had a good weekend.  Hope you didn't eat too much

14   Halloween candy.  As you will recall, on Thursday we ended with

15   you staying just a little bit extra so that Mr. Finch could

16   wrap up, which means that the United States is in a position to

17   call its next witness.  We have that witness prepositioned at

18   the witness stand.

19           The United States may call its next witness.

20           MR. TORZILLI:  Thank you, Your Honor.  The United

21   States calls Larry Barela.

22           THE COURT:  I am sorry, what was the last name?

23           MR. TORZILLI:  Larry Barela.

24      (**Larry Barela** was sworn.)

25           THE WITNESS:  I do.

653

Larry Barela - Direct

1          *COURT DEPUTY CLERK:*  Please state your name and spell

2    your first and last name for the record.

3          *THE WITNESS:*  Larry Barela; first name spelled

4    L-A-R-R-Y, last name, B-A-R-E-L-A.

5                      **DIRECT EXAMINATION**

6    *BY MR. TORZILLI:*

7    *Q.*  Mr. Barela, good morning.

8    *A.*  Good morning.

9    *Q.*  Where do you work?

10   *A.*  I work for OpenText.

11   *Q.*  What's OpenText?

12         *THE COURT:*  I don't think that microphone is working.

13   I think we need to somehow -- Mr. Keech, do you mind, since you

14   are a resident microphone expert, do you mind taking a look at

15   that real quick?

16         *COURT DEPUTY CLERK:*  The lectern or witness stand?

17         *THE COURT:*  The lectern.  It doesn't seem to be

18   amplifying.

19         That's working.  Go ahead.

20   *BY MR. TORZILLI:*

21   *Q.*  What is OpenText?

22   *A.*  OpenText owns a number of different software applications.

23   And the software application in the division I work in is the

24   electronic discovery division within OpenText, so my division

25   is responsible for dealing with electronic discovery.

Larry Barela - Direct

1    *Q.*  In one sentence can you describe what electronic discovery

2    is?

3    *A.*  My definition would be it is really a workflow of

4    identifying, collecting, processing, reviewing and then

5    producing electronic -- electronically stored information.

6    *Q.*  Does it also involve hosting electronically stored

7    information?

8    *A.*  Yes.

9    *Q.*  Where is your office located?

10   *A.*  Downtown Denver, 1860 Blake Street.

11   *Q.*  What do you do for OpenText?

12   *A.*  I'm a cloud applications consultant.  And I work primarily

13   with our customers to formalize the plan for handling

14   electronic discovery and then working with my team to support

15   that customer.

16   *Q.*  How long have you been at OpenText, Mr. Barela?

17   *A.*  I have been with OpenText for three years, since

18   October 2018.  And prior to that I was with a company called

19   Catalyst from 2001 to 2018.  OpenText acquired Catalyst in

20   2018.

21   *Q.*  How long have you been in the field of electronic

22   discovery?

23   *A.*  About 25 years.

24   *Q.*  Are you familiar with Mar-Jac Poultry?

25   *A.*  Yes.

655

Larry Barela - Direct

1    Q.   How are you familiar with Mar-Jac Poultry?

2    A.   They are a customer of ours and we host electronic

3    documents for them.

4    Q.   What services does or has OpenText provided to Mar-Jac?

5    A.   Document processing, document hosting and document

6    production.

7    Q.   Mr. Barela, can you explain what you mean by document

8    hosting?

9    A.   Document hosting is providing an application that allows

10   the customer along with our counsel to review documents and tag

11   those documents as either relevant or nonrelevant, privileged,

12   confidential, and, you know, eventually leading to the

13   production of documents.

14   Q.   How do Mar-Jac documents get transmitted to OpenText?

15   A.   Mar-Jac documents are uploaded to our secure website.  It's

16   referred to as an FTP site.  And once documents are uploaded to

17   that site, then we have an automated process that moves those

18   documents to the hosting platform for review.

19   Q.   What does FTP stand for?

20   A.   File transfer protocol.

21   Q.   And what security measures are in place in the FTP site

22   that you maintained for Mar-Jac Poultry?

23   A.   User name and password is given to the customer, and then

24   the customer is responsible for uploading the documents.

25   Q.   Is the FTP site that OpenText created and maintained for

Larry Barela - Direct

1   Mar-Jac for Mar-Jac's exclusive use as opposed to other

2   OpenText clients?

3   A.   No.  This is the -- this is where all of our customers

4   would upload documents.  They just have a, like I said, a

5   separated folder where they are uploading those documents to.

6   Q.   So how can you tell when documents come in that the

7   documents are coming from Mar-Jac Poultry?

8   A.   By the use of the user name and password.

9   Q.   When OpenText receives documents loaded to the FTP site the

10  company maintains for Mar-Jac, where do the documents wind up?

11  A.   The documents will wind up in the review platform.

12  Q.   Does OpenText have a proprietary name for the review

13  platform that it uses for Mar-Jac documents?

14  A.   Yes.  The name of the application is Insight.

15  Q.   Mr. Barela, are you familiar with the term Bates number?

16  A.   Yes.

17  Q.   What is a Bates number?

18  A.   A Bates number is the number that if we were creating a

19  production that we are going to stamp on every page of every

20  document so that we can uniquely identify that page within a

21  document.

22  Q.   Was Bates numbering applied to the documents received from

23  Mar-Jac?

24  A.   Yes.

25  Q.   Is in your experience Bates numbering a reliable way to

Larry Barela - Direct

1   keep track of voluminous document productions?

2   A.   Yes.

3   Q.   Do you know whether OpenText delivered documents that it

4   was hosting for Mar-Jac after they were loaded onto OpenText's

5   Insight review platform?

6   A.   Yes.   We delivered and produced documents.

7   Q.   To whom were those documents delivered?

8   A.   The documents are placed on the secured website and then

9   they are downloaded by the customer or the customer's counsel.

10  So we place the documents on the FTP site.   Other than the user

11  name and password, we really don't know who downloaded the

12  documents, but we have to assume that with that user name and

13  password that it is the customer.

14  Q.   Is the process you described in your experience a secure

15  way in which clients at OpenText can download documents that

16  were being hosted by OpenText?

17  A.   Yes.

18  Q.   In preparation, Mr. Barela, for your testimony today, did

19  you review any of OpenText's records?

20  A.   Yes.

21  Q.   Could you generally describe what OpenText records you

22  reviewed in preparation for your testimony?

23  A.   There were four documents that I was asked to confirm that

24  the content of those documents matched what we received and the

25  content that was currently in the review platform.

658

Larry Barela - Direct

1  Q.  I am now going to with the assistance of Ms. Grimm hand a

2  document to you that's been marked as Government Exhibit 410.

3       Mr. Barela, have you had an opportunity to review

4  Exhibit 410?

5  A.  Yes.

6  Q.  Do you recognize Exhibit 410?

7  A.  Yes.

8  Q.  How do you recognize it?

9  A.  This was a document that was given to me by our in-house

10  counsel.

11  Q.  What did you do with a copy of Exhibit 410 after it was

12  provided to you?

13  A.  I looked for the Bates number which is at the bottom of

14  this page.  I took the Bates number, I logged into our secure

15  site, to the review site, looked for that Bates number.  And

16  the searches also returned were this document.

17  Q.  When you completed your search, did you compare the image

18  that appears in Government Exhibit 410 with the image of the

19  document that appears on your secure hosting platform?

20  A.  Yes.

21  Q.  And after you did that comparison, what did you conclude?

22  A.  That it was a hundred percent identical.

23  Q.  So Government Exhibit 410 is 100 percent identical to the

24  image of the document that appears on your hosting platform?

25  A.  Correct.

659

Larry Barela - Direct

1    Q.  You can put that exhibit aside, sir.  And again with the

2    assistance of Ms. Grimm, we are going to hand you a document

3    that's been marked as Government Exhibit 1028.

4         Mr. Barela, have you had an opportunity to review

5    Government Exhibit 1028?

6    A.  Yes.

7    Q.  Do you recognize Government Exhibit 1028?

8    A.  Yes.

9    Q.  What is it?

10   A.  This is another document that was given to me by our

11   in-house counsel.  And I was asked to confirm the content and

12   that was on our hosting platform.

13   Q.  What did you do to go about confirming the content of

14   what's been marked as Government Exhibit 1028?

15   A.  I looked for the Bates number in the lower right-hand

16   corner.  I used that Bates number to perform a search in the

17   Insight application, and the search results brought back this

18   exact document.

19   Q.  And once the search results brought back the document, did

20   you compare the image of the document that appears on your

21   secure document review platform with the image of the document

22   that's been marked as Government Exhibit 1028?

23   A.  Yes, I did.

24   Q.  And after you did that comparison, what did you conclude?

25   A.  That it was a hundred percent match to the document we're

660

Larry Barela - Direct

1    hosting.

2    Q.   What type of document is Government Exhibit 1028?

3    A.   This is an e-mail message.

4    Q.   Does the e-mail message in Government Exhibit 1028 have an

5    attachment?

6    A.   Yes.

7    Q.   How do you know it has an attachment?

8    A.   There is a field at the top of this e-mail which is called

9    Attachments and it has the name of the attachment listed.

10   Q.   Is the attachment field in what's known as the header

11   information?

12   A.   Yes.

13   Q.   Could you explain what header information is?

14   A.   Header information is -- represents a number of different

15   fields.  I think what we're most familiar with is the From, To,

16   CC, BCC, subject line, the send date and the name of the

17   attachments, so those are the header fields.

18   Q.   You can put that exhibit aside now.  Thank you.  And once

19   again, with the assistance of Ms. Grimm, we will hand you a

20   document that's been marked as government Exhibit 1029.

21        Mr. Barela, have you had an opportunity to review

22   what's been marked as Government Exhibit 1029?

23   A.   Yes.

24   Q.   Do you recognize it?

25   A.   Yes.

Larry Barela - Direct

1  Q.  How do you recognize it?

2  A.  This is the third document that was given to me by in-house

3  counsel to compare the contents of this document to what we

4  hosted in the review platform.

5  Q.  And what did you do to go about reviewing whether a version

6  of this document appears on your document review platform?

7  A.  Look for the Bates number which is stamped at the bottom of

8  the document, within the Insight application perform a search

9  for that Bates number.  The search result came back with this

10  document.

11  Q.  What did you do next?

12  A.  I then opened the document, compared the printed version

13  that I had to the version that was in the application and

14  confirmed that it's a hundred percent identical.

15  Q.  So the document that appears on OpenText document review

16  platform is an exact match to the image that appears in

17  Government Exhibit 1029?

18  A.  Yes.

19  Q.  Were you able to determine whether -- well, let me ask a

20  different question.

21        What type of document is Government Exhibit 1029?

22  A.  This is an Excel document, Microsoft Excel.

23  Q.  Is it also an e-mail attachment?

24  A.  Yes.  It is an attachment to the previous e-mail, what we

25  just discussed.

662

Larry Barela - Direct

1   Q.  So Government Exhibit 1029 is the attachment to the e-mail

2   that appears in Government Exhibit 1028?

3   A.  That's correct.

4   Q.  Thank you.  You can put that exhibit aside.  And now again

5   with the assistance of Ms. Grimm, we will hand you a document

6   that's been marked as Government Exhibit 1030.

7          Mr. Barela, have you had an opportunity to review

8   what's been marked as Government Exhibit 1030?

9   A.  Yes.

10  Q.  Do you recognize it?

11  A.  Yes.

12  Q.  How do you recognize it?

13  A.  This is the fourth document given to me by in-house counsel

14  that I was asked to review and compare contents to what we have

15  hosted.

16  Q.  What did you do to review the contents?

17  A.  Lower right-hand corner, I pulled the Bates number,

18  performed a search for the Bates number and the Insight

19  application and then retrieved the document.  The document did

20  come back in the search.

21  Q.  Did you compare -- after you retrieved the document, did

22  you compare the image that appears on OpenText document review

23  platform to the image that appears in Government Exhibit 1030?

24  A.  Yes.

25  Q.  After you did that review, what did you conclude?

663

Larry Barela - Direct

1    A.  This document is a hundred percent identical to the

2    document that we're hosting.

3    Q.  Mr. Barela, are you familiar with the term metadata?

4    A.  Yes.

5    Q.  In the electronic discovery profession, what does -- what

6    is metadata?

7    A.  Metadata represents the fielded information about the

8    document.  It's usually subjective information and objective

9    information.  So subjective is how the attorneys and the

10   customers may tag the document.  The objective information is

11   the information that is -- that comes with the document, so

12   things like the creation date, the last modified date, the

13   author of the document.  Depending on the document type, there

14   can be, you know, just a handful of metadata fields or there

15   can be hundreds of metadata fields.

16   Q.  Are there metadata fields associated with the document

17   that's been marked as Government Exhibit 1030?

18   A.  Yes.

19   Q.  Is one of those metadata fields known as the custodian

20   field?

21   A.  Yes.

22   Q.  In the electronic discovery profession, what does the

23   custodian field of metadata signify?

24   A.  The custodian field signifies ownership of the document.

25   So generally when the document is collected, it's collected

664
Larry Barela - Direct

1    from an individual.  That individual becomes a custodian.

2           MR. TUBACH:  Object as hearsay, Your Honor, testifying

3    about what other people do.

4           THE COURT:  Overruled.

5    BY MR. TORZILLI:

6    Q.  You can complete your answer, sir.

7    A.  So once again, the custodian field represents ownership of

8    the document, where did the document come from.  It could be an

9    individual, could be a server, but it indicates ownership.

10   Q.  Did you review the custodian field for the document on the

11   OpenText platform that is a duplicate of Government

12   Exhibit 1030?

13   A.  Yes.

14   Q.  Is that field populated?

15   A.  Yes.

16   Q.  What is contained in the custodian field for the document?

17          MR. TUBACH:  Objection, Your Honor.

18          THE COURT:  Hold on just one second.  Let's rule on

19   the objection.

20          Mr. Tubach?

21          MR. TUBACH:  It's hearsay, Your Honor.  This isn't

22   anything this witness created.  It would have been provided to

23   him by others.

24          THE COURT:  Let's do a side bar.

25       (At the bench:)

Larry Barela - Direct

1          THE COURT:  Mr. Tubach, can you hear me?

2          MR. TUBACH:  I can, Your Honor.

3          THE COURT:  Mr. Torzilli, can you hear?

4          MR. TORZILLI:  Yes, sir.

5          THE COURT:  Mr. Tubach, go ahead.  Let me ask

6   Mr. Torzilli the following.  So what answer, Mr. Torzilli, will

7   the witness provide?

8          MR. TORZILLI:  He is going to say the custodian field

9   is populated with Martin P.

10         THE COURT:  Indicating that the document was collected

11  from him?

12         MR. TORZILLI:  Yes.  I think what he would testify is

13  that it signifies that the ownership of this document is

14  attributable to Pete Martin.

15         THE COURT:  And how would this witness know that?

16         MR. TORZILLI:  He knows what appears in the custodian

17  field of the -- associated with this document.

18         THE COURT:  Right.  But would he have any reason to

19  know whether it's true or whether someone else provided the

20  document but said it was Martin's or how would he know anything

21  about that other than his testimony about the general

22  convention?

23         MR. TORZILLI:  He will be able to testify that when

24  the document was provided to OpenText via the FTP site he has

25  testified to, the custodian metadata appeared in the

Larry Barela - Direct

1    transmission of this document.

2         THE COURT:  Okay.  Mr. Tubach, what was the objection?

3         MR. TUBACH:  Your Honor, the objection is hearsay.  He

4    has no firsthand knowledge how that appeared.  It's clearly a

5    record of someone, someone, a lawyer, somebody else, we have no

6    idea, put on a document that was then loaded up to an FTP site.

7    He simply would be testifying about what other people said out

8    of court and then told him essentially through an FTP site.

9         THE COURT:  Mr. Torzilli, response?  Also responses to

10   lack of foundation.  Go ahead.

11        MR. TORZILLI:  Sure.  He's not testifying to what

12   someone else said.  He is testifying to what he observes.  And

13   he observes in a custodian field that the name Pete Martin

14   appears there.  And he will testify he observed that the

15   document in the state that it was transmitted to OpenText had

16   this information in it, so these are based on his personal

17   knowledge, personal observations he has made.

18        THE COURT:  Okay.  Both of the -- both as to hearsay

19   and also to foundation, both will be sustained.  Thank you.

20      (In open court:)

21        THE COURT:  Objection will be sustained as to

22   foundation and hearsay.

23        Go ahead, Mr. Torzilli.

24        MR. TORZILLI:  Thank you, Your Honor.

25   BY MR. TORZILLI:

Larry Barela - Cross

1    *Q.*  Mr. Barela, with respect to the documents that have been

2    marked as Government Exhibit 410, 1028, 1029 and 1030, can you

3    tell us whether or not those are true and correct copies of

4    documents that were loaded to OpenText's FTP site that it

5    maintains for production of documents from Mar-Jac?

6    *A.*  Yes, they are true copies.

7         *MR. TORZILLI:*  Your Honor, one moment to consult?

8         *THE COURT:*  You may.

9         *MR. TORZILLI:*  No further questions.

10        *THE COURT:*  Thank you.

11        Cross-examination.

12        Mr. Tubach?

13                        **CROSS-EXAMINATION**

14   *BY MR. TUBACH:*

15   *Q.*  Good morning, Mr. Barela.

16   *A.*  Good morning.

17   *Q.*  Let me just understand your general process.  As I

18   understand it, someone with a user name and password loads

19   documents up to an FTP site that your firm controls, and then

20   those documents are put on a Relativity platform; is that

21   correct?

22   *A.*  It's not Relativity.  It's Insight.  That's the platform.

23   *Q.*  Sorry, Insight.  I didn't mean to make a judgment as to

24   which is better.  Insight is a database platform used by

25   clients of yours, customers, to review documents that they have

Larry Barela - Cross

1   provided you and you have then uploaded to the site.

2   A.  Yes, correct.

3   Q.  You have no idea who the person is that's uploading the

4   documents up to the FTP site that you then put on Insight; is

5   that correct?

6   A.  We have a project manager that's going to work with those

7   clients or with our customers, so, you know, going back through

8   their e-mail and their communication, yes, we do have that

9   back-and-forth communication between the customer and the

10  project manager.

11  Q.  My question, though, is you sitting here don't have any

12  idea who loaded any of these documents up to the FTP site; is

13  that correct?

14  A.  That's correct?

15          MR. TORZILLI:  Objection, asked and answered.

16          THE COURT:  Objection is overruled.

17          Go ahead, Mr. Tubach.

18  BY MR. TUBACH:

19  Q.  And you have no idea where whoever that person is got those

20  documents from, no personal knowledge, right?

21  A.  Right.

22  Q.  So the only thing you're saying here today is that whatever

23  somebody loaded up to your FTP site is the same thing as the

24  physical documents you are looking at here; is that right?

25  A.  Correct.

669

Larry Barela - Cross

1   *Q.* One quick question about Exhibit 1029, if you have that in

2   front of you, sir.

3   *A.* Yes.

4   *Q.* I believe you testified this was a hundred percent

5   identical version to the Bates number document that you

6   reviewed on your platform; is that correct?

7   *A.* Correct.

8   *Q.* If you look at the bottom of 1029, is there a Bates number

9   on there that your firm applied?

10  *A.* Yes.

11  *Q.* The bottom reads Excerpt; is that right?

12  *A.* Yes.

13  *Q.* Is that an excerpt -- is that a description of a document

14  that your firm creates in putting documents on the Insight

15  website, database?

16  *A.* Generally not.  We would provide the number, but not

17  that -- not the excerpt.

18  *Q.* So this "Excerpt from" is not actually something that your

19  firm put on there; is that correct?

20  *A.* To the best of my knowledge, no.

21  *Q.* So can you tell me as you sit here today if Exhibit 29 is

22  just an excerpt of a document, what's missing?

23  *A.* There is nothing missing from this document compared to the

24  document that's -- that we're hosting.

25  *Q.* So you can't explain why 1029 uses the word excerpt rather

670

Larry Barela - Cross

1   than full copy or anything else?

2   *A.*  I cannot.

3   *Q.*  Turning to Exhibit 1030, your firm received Exhibit 1030 as

4   a PDF; is that correct?

5   *A.*  Yes.

6   *Q.*  And it looks to be handwritten documents, correct?

7   *A.*  Correct.

8   *Q.*  Now, the document didn't start out as a PDF.

9   *A.*  Correct.

10  *Q.*  You don't have any idea how the document got turned into a

11  PDF, right?

12  *A.*  Correct.

13  *Q.*  You didn't convert it to a PDF yourself?

14  *A.*  No.

15  *Q.*  And you have no idea, no personal knowledge about how this

16  photocopy was created, correct?

17  *A.*  Right.

18  *Q.*  Or what it represents?

19  *A.*  Right.

20  *Q.*  Or who wrote it, right.

21  *A.*  Right.

22          *MR. TUBACH:*  Thank you.  I have no further questions.

23          *THE COURT:*  Thank you, Mr. Tubach.

24          Additional cross?

25          Redirect?

671

Larry Barela - Redirect

1               **REDIRECT EXAMINATION**

2 *BY MR. TORZILLI:*

3 *Q.* Mr. Barela, can you clarify how OpenText knows that

4 documents from Mar-Jac are being produced to OpenText?

5 *A.* With the user name and password, the customer is allowed to

6 open or to upload documents that we presume belong to them.

7        *MR. TUBACH:* Objection, Your Honor, hearsay, lacks

8 foundation.

9        *THE COURT:* Overruled.

10 *BY MR. TORZILLI:*

11 *Q.* You can complete your answer, sir.

12 *A.* So once the documents are uploaded, there is communication

13 with the project manager from the customer. They will make

14 decisions on where documents are going to be stored for review.

15 So those documents, for instance, may be copied to a folder so

16 that attorneys could log in and review those documents.

17 *Q.* Thank you. And going back to Government Exhibit 1029 --

18 *A.* Yes.

19 *Q.* -- did you in your review use the Bates number that's

20 stamped on the lower right-hand corner of the document in the

21 process you used to determine that that is an exact match to

22 the document that appears on the Insight review platform?

23 *A.* Yes.

24 *Q.* And just to clarify with respect to Government

25 Exhibit 1030, you testified that's a handwritten note?

672
Larry Barela - Redirect

1   A.  To the best of my knowledge, it looks like a handwritten

2   note.

3   Q.  And just to clarify the process you undertook, you looked

4   at all the handwriting that appears in Government Exhibit 1030

5   and compared it to the handwriting that appears in the version

6   of the document on your Insight review platform?

7   A.  Yes.

8   Q.  And when you did that, what did you determine?

9           MR. POLLACK:  Objection, Your Honor.  Your Honor, a

10  witness cannot authenticate handwriting unless they have

11  knowledge it was -- prior to litigation.

12          THE COURT:  Overruled.  This is not a handwriting

13  comparison.  It's just to determine whether or not the

14  appearance of the document appears to be exact.

15          Go ahead.  Overruled.

16  BY MR. TORZILLI:

17  Q.  Complete your answer, sir.

18  A.  Yes, the document appears to be exact.

19  Q.  And after that did you determine whether it's a true and

20  accurate copy of the image that appears on your company's

21  document review platform?

22  A.  Yes.

23  Q.  And what did you determine?

24  A.  That it is a true and accurate copy.

25          MR. TORZILLI:  No further questions.

Simeon Morbey - Direct                                                            673

1          THE COURT:  Mr. Barela, you are excused.  However, you

2     are subject to recall if one of the defendants chooses to

3     recall you, so they will be in contact with you if that is

4     true.  Otherwise, however, you are excused for now.  Thank you

5     very much.

6          THE WITNESS:  Thank you.

7          THE COURT:  The United States may call its next

8     witness.

9          MS. ROGOWSKI:  Good morning, Your Honor.  The

10    government calls Simeon Morbey.

11       (**Simeon Morbey** was sworn.)

12         THE WITNESS:  I do.

13         COURT DEPUTY CLERK:  Please state your name and spell

14    your first and last name for the record.

15         THE WITNESS:  My name is Simeon Morbey.  Simeon is

16    S-I-M-E-O-N; Morbey, M-O-R-B -- as in boy -- E-Y.

17                        **DIRECT EXAMINATION**

18    BY MS. ROGOWSKI:

19    Q.  Good morning, Mr. Morbey.  Do you work at a firm,

20    Mr. Morbey?

21    A.  I do.

22    Q.  How long have you worked at that firm?

23    A.  About 10 years.

24    Q.  Could you please briefly describe for the jury your

25    responsibilities in that position with respect to eDiscovery?

ATTACHMENT M

673

Simeon Morbey - Direct

1          THE COURT:  Mr. Barela, you are excused.  However, you

2    are subject to recall if one of the defendants chooses to

3    recall you, so they will be in contact with you if that is

4    true.  Otherwise, however, you are excused for now.  Thank you

5    very much.

6          THE WITNESS:  Thank you.

7          THE COURT:  The United States may call its next

8    witness.

9          MS. ROGOWSKI:  Good morning, Your Honor.  The

10   government calls Simeon Morbey.

11      (**Simeon Morbey** was sworn.)

12         THE WITNESS:  I do.

13         COURT DEPUTY CLERK:  Please state your name and spell

14   your first and last name for the record.

15         THE WITNESS:  My name is Simeon Morbey.  Simeon is

16   S-I-M-E-O-N; Morbey, M-O-R-B -- as in boy -- E-Y.

17                         **DIRECT EXAMINATION**

18   BY MS. ROGOWSKI:

19   Q.  Good morning, Mr. Morbey.  Do you work at a firm,

20   Mr. Morbey?

21   A.  I do.

22   Q.  How long have you worked at that firm?

23   A.  About 10 years.

24   Q.  Could you please briefly describe for the jury your

25   responsibilities in that position with respect to eDiscovery?

Simeon Morbey - Direct

1   A.   Yes.  I am an eDiscovery specialist.  EDiscovery relates to

2   the identification of electronic information.

3   Q.   And could you just say a little bit more what you mean by

4   the identification of electronic information, please?

5   A.   Sure.  EDiscovery specialists will work with information

6   that's given to the firm.  I work with information that's given

7   to the firm electronically.  And we put that up on a document

8   review platform and we have reviewers go through the documents

9   and look at what they are and make summaries of those

10  documents.

11  Q.   Thank you, Mr. Morbey.

12       MS. ROGOWSKI:  At this time I would like permission to

13  through Ms. Grimm provide the witness with a binder and a list

14  of exhibits.

15       THE COURT:  You may.

16  BY MS. ROGOWSKI:

17  Q.   I will give you a moment to look through that list and to

18  page through that binder.

19       All right, Mr. Morbey.  Do you recognize the

20  government exhibit list 9555 and the binder that's sitting in

21  front of you?

22  A.   I do.

23  Q.   How do you recognize it?

24  A.   I was provided this list by the government to review in

25  preparation for my testimony.

675

Simeon Morbey - Direct

1    Q.  And do you recognize the binder in front of you?

2    A.  Yes.  I recognize it as the documents that are referenced

3    in the list of Government Exhibit 9555.

4    Q.  And you said that you referenced these documents.  When did

5    you do that referencing?

6    A.  On October 23rd and October 24th.

7    Q.  As a part of your work in eDiscovery, Mr. Morbey, at your

8    firm, did there come a time when your firm received documents

9    from broiler chicken suppliers in relation to a matter?

10   A.  Yes.

11   Q.  Could you please explain your involvement in that, if any?

12   A.  Yes.  My team and I at my firm received documents from

13   approximately 18 broiler producers, including Mar-Jac, Koch and

14   Claxton.  We received those documents and directly put them up

15   on the document review platform that I mentioned earlier for

16   the purposes of reviewing them.

17   Q.  And what's the name of that document review platform?

18   A.  CS Disco.

19   Q.  As a part of that same project, Mr. Morbey, are you aware

20   of any depositions that occurred in that matter?

21   A.  I am.

22   Q.  And as a part of that project, were you aware of the

23   deposition of --

24        MR. TUBACH:  Objection, Your Honor.  Can we have a

25   side bar?

676
Simeon Morbey - Direct

1          THE COURT:  Yes, let's do.

2       (At the bench:)

3          THE COURT:  Ms. Rogowski can you hear me?

4          MS. ROGOWSKI:  I can.

5          THE COURT:  Mr. Tubach?

6          MR. TUBACH:  Yes.

7          THE COURT:  Mr. Fagg?  I guess he doesn't have a

8    headset on.

9          Mr. Tubach, go ahead.

10         MR. TUBACH:  The Court has been abundantly clear there

11   is to be no reference to litigation here.  And he now testified

12   that he received documents from broiler producers, 18 of them,

13   and she has now elicited testimony from him that they were used

14   in a deposition.  This is outrageous.

15         THE COURT:  The witness did not say that the documents

16   were used in depositions, but even more concerning, I think, is

17   he testified that among the things that he received were

18   depositions.  Obviously, I am a little bit worried that there

19   has been testimony now about this witness receiving chicken

20   documents from 18 different sources, which seems to be

21   unnecessary, but also I don't understand the relevance of him

22   having received deposition transcripts.

23         Can you explain that, Ms. Rogowski?

24         MS. ROGOWSKI:  Yes, Your Honor.  I don't believe that

25   he testified that he did, in fact, receive deposition

Simeon Morbey - Direct

 1    transcripts.  The question that was asked was whether or not he

 2    was aware of depositions that occurred.  And then the next

 3    question, if I had been able to finish, Your Honor, was just

 4    going to be if a deposition occurred with respect to a Mr. Pete

 5    Martin.  And that is all that the government tends to elicit.

 6         And then the government intends to just further ask

 7    questions about the documents not in relation to any deposition

 8    or matter.  I am sure Your Honor understands that we are trying

 9    our best to avoid any references to the civil litigation.  It's

10    just specifically with respect to document No. 1030, Government

11    Exhibit No. 1030, it's just very difficult to explain how

12    Mr. Morbey came into the possession of these documents from

13    Mar-Jac without getting into any detail at all related to

14    litigation.  If Your Honor has any further suggestions, we

15    would certainly follow them.

16         THE COURT:  Let me ask you this, Ms. Rogowski.  In

17    regard to document 1030, does the government have a witness who

18    will be able to testify that the handwriting is Mr. Martin's?

19         MS. ROGOWSKI:  Not at this time, Your Honor.

20         THE COURT:  All right.  Then I am going to issue a

21    written order probably at the break, but I am going to exclude

22    1030.  I do agree with Mr. Tubach's argument that there is a

23    confrontation clause issue in regard to the deposition --

24    sorry, the use of the deposition transcript to authenticate the

25    handwriting.  While it's true that I wouldn't anticipate that

678

Simeon Morbey - Direct

1    Mr. Martin would give any other answer despite that fact, I

2    think that that essentially would be a clear err issue that the

3    Court of Appeals can take up, but not me, so I do think there

4    is a problem.  And if the United States doesn't have some

5    witness who could come in here and say, yup, that's his

6    handwriting, I don't think that it can be authenticated through

7    his civil deposition.

8            As a result, I don't see how the government could lay

9    the foundation necessary for authentication and also for

10   admissibility that that is what the government claims it is,

11   namely the handwriting of Mr. Martin.

12           MS. ROGOWSKI:  Understood, Your Honor.  Thank you.

13           THE COURT:  Thank you.

14           MR. POLLACK:  Your Honor, on behalf of Mr. Blake.

15           THE COURT:  Go ahead, Mr. Pollack.

16           MR. POLLACK:  Your Honor, separate and apart from this

17   specific issue relating to Government Exhibit 1030, the Court

18   had ruled unambiguously that reference to the civil litigation

19   would be prejudicial and for that reason directed the parties

20   not to elicit anything that would disclose the existence of

21   civil litigation.  I don't understand how the question about

22   depositions can possibly be a good faith question in conformity

23   with the Court's instruction, and unfortunately I can't really

24   think of a good limiting instruction to undo the prejudice

25   that's the very prejudice that the Court had wanted to avoid.

Simeon Morbey - Direct

1          So I would move on behalf of Mr. Blake for an

2    instruction in front of the jury that the question was improper

3    and move to strike the testimony of this witness as a sanction.

4          *THE COURT:*  I am going to reject that request.  Of

5    course, the good faith basis is exactly what Ms. Rogowski

6    mentioned, namely that the government was hoping to

7    authenticate the handwriting in Government Exhibit 1030 through

8    the use of Mr. Martin's deposition.  Apparently the government

9    obtained the deposition through documents produced in a way

10   that this witness would know about, so that was a good faith

11   basis.

12          I think that the government should make sure to lead

13   witnesses particularly like this so we don't have a discussion

14   about 18 separate sources, but I don't believe that the -- that

15   any limiting instruction would have -- would do anything other

16   than potentially call attention to the particular testimony.  I

17   don't think it merits an instruction to disregard the witness'

18   testimony and that's the reason I'm rejecting Mr. Pollack's

19   request, all right?

20          Thank you.

21          *MS. ROGOWSKI:*  If Your Honor -- if the government

22   could, the government does request to be heard further on the

23   issue of this document.  Specifically as you alluded to, we

24   cannot elicit testimony in front of the jury about this, but

25   this document was, in fact, discussed during Pete Martin's

Simeon Morbey - Direct

1    deposition.  It did come from Mar-Jac through Mr. Morbey's law

2    firm.  And due to Your Honor's rulings, we haven't been able to

3    elicit testimony that makes that clear which is -- which the

4    government accepts, but we do believe that the fact that this

5    document came from Mar-Jac, even if we are not able to

6    establish that it came from Mr. Martin, the fact that this

7    document came from the company Mar-Jac is, in fact, relevant.

8    And the government just simply requests to be heard further on

9    this issue at a later time.

10        THE COURT:  Well, unless you could explain to me right

11    now how the government would ever admit the document without

12    someone testifying as to whose handwriting it is, then I don't

13    know how you would get it in through any type of hearsay

14    exception.

15        MS. ROGOWSKI:  Your Honor, the government would seek

16    to establish if not able to tie the document directly to

17    Mr. Martin that the document came from a notebook in Mar-Jac's

18    file, that it specifically references competitor

19    communications.  And this document was, in fact, ruled upon

20    during the *James* hearing, the 801(d)(2)(E).  Your Honor has

21    already found that 801(d)(2)(E) does apply, I believe.

22        THE COURT:  Yeah, but we are going in circles.  This

23    has been the most litigated exhibit that we've had so far.  And

24    once again, the issue is how you would be able to establish

25    whose handwriting it is that's fundamental to the issue of

Simeon Morbey - Direct

1   authenticity and also the ability for the Court to be able to

2   apply some type of a hearsay exception to it that we are aware

3   of the author.  The document on its face does not indicate who

4   the author is.  And unless there is some evidence that's

5   admissible for establishing who wrote it, whose handwriting it

6   is, I can't see any basis for admission.  That's why I asked

7   you whether there was going to be some person who would

8   authenticate the handwriting other than the deposition which I

9   just ruled on.

10         MS. ROGOWSKI:  I certainly understand what Your Honor

11  is saying.  May I just have a brief moment to confer with my

12  colleagues?

13         THE COURT:  Well, I think we are kind of on a

14  different subject now.  We are talking about it generally.  But

15  you don't have any other questions with this witness as to that

16  exhibit, correct?

17         MS. ROGOWSKI:  Correct, Your Honor.

18         THE COURT:  So we will take that up later if there is

19  anything left to talk about, all right?

20         MS. ROGOWSKI:  Thank you, Your Honor.

21         THE COURT:  Thank you.

22     (In open court:)

23         Objection is sustained.

24  BY MS. ROGOWSKI:

25  Q.  Thank you, Mr. Morbey.

Simeon Morbey - Direct

1          You said earlier that the documents that your firm

2     received were uploaded into a platform called CS Disco,

3     correct?

4     A.   Yes.

5     Q.   How do you know they were unloaded into that platform?

6     A.   I or a member of my team directed CS Disco to upload them

7     to the platform.  And we reviewed the documents that were

8     uploaded and we had compared them with a description of what

9     was produced to us by the broiler producers.

10    Q.   Could you briefly describe the types of documents that were

11    uploaded into CS Disco?

12    A.   We uploaded e-mails, e-mail attachments, examples of

13    contracts, PDFs of price lists, that type of thing.

14    Q.   Were there also calendar invitations?

15    A.   Yes, there were.

16    Q.   Mr. Morbey, are you familiar with something called

17    metadata?

18    A.   I am.

19    Q.   How are you familiar with it?

20    A.   I work with metadata in part of my work in eDiscovery.

21    Q.   Could you briefly describe to the jury what metadata is?

22    A.   Metadata is information about a document.  For example, for

23    an e-mail the metadata would include the sender, the recipient,

24    the date it was sent, the subject of the e-mail, that type of

25    thing.

683

Simeon Morbey - Direct

1    Q.  And did you also receive the metadata for these documents

2    from the broiler chicken suppliers that you were discussing?

3    A.  Yes.

4    Q.  What kinds of metadata did the e-mails and attachments from

5    this group of documents that were uploaded into your review

6    database contain?

7    A.  As I said, they contained for e-mails information regarding

8    the person who sent the e-mail, the people who -- the

9    individuals who received the e-mail, including carbon copy and

10   blind copy, the date and time the e-mails were sent.  There may

11   be other things, but that's what comes to mind right now.

12   Q.  And how was this metadata populated?  Where did that

13   information come from?

14   A.  That information was provided to us in what is called a

15   load file by the broiler producers.  It was part of the

16   production packet that we received from the broiler producers.

17          THE COURT:  Let's have a side bar real quick, all

18   right?

19      (At the bench:)

20          THE COURT:  Am I correct that the only documents that

21   may be relevant to this trial that his firm received are those

22   from Mar-Jac, Koch and Claxton?

23          MS. ROGOWSKI:  Not entirely correct, Your Honor.  So

24   we established in previous testimony there are Pilgrim's and

25   Tyson documents that Mr. Morbey's firm received.  We had

Simeon Morbey - Direct

1   witnesses who could authenticate both the documents that came

2   from the Grand Jury productions and the documents that came to

3   DOJ through Mr. Morbey's firm.  The reason we have Mr. Morbey

4   only discussing documents from Koch, Claxton and Mar-Jac is

5   that we did not have the same types of witnesses from those

6   three companies.

7          THE COURT:  Right.  But once again, same question.

8   For purposes of his direct examination, are the only documents

9   of relevance ones from Mar-Jac, Koch and Claxton?

10          MS. ROGOWSKI:  Yes, Your Honor.

11          THE COURT:  Then you need to direct him through

12   leading questions so that he does not anymore mention the

13   chicken suppliers.

14          MS. ROGOWSKI:  Understood, Your Honor.  And I will do

15   that.

16          THE COURT:  Okay?  Because it's just irrelevant that

17   he -- to this case that he received documents from potentially

18   all sorts of non -- or from companies that aren't involved at

19   all in this litigation and none of the defendants worked for

20   those companies, okay?

21          MS. ROGOWSKI:  Yes.  Understood, Your Honor.  Thank

22   you.

23      (In open court:)

24   BY MS. ROGOWSKI:

25   Q.  Okay, Mr. Morbey.  Let's talk specifically about the

Simeon Morbey - Direct

1   documents your firm received from Koch, Claxton and from

2   Mar-Jac.

3          To the best of your knowledge, Mr. Morbey, where did

4   the metadata in those specific documents come from?

5          MR. TUBACH:  Objection, Your Honor, hearsay.

6          THE COURT:  If you could -- I think the issue is

7   really foundation.  Could you please lay foundation for that?

8   BY MS. ROGOWSKI:

9   Q.  Mr. Morbey, with respect to the specific documents from

10  Koch, Claxton and Mar-Jac, are you aware of those documents

11  containing metadata?

12  A.  Yes, I am.

13  Q.  And how are you aware of that?

14  A.  When I reviewed the documents on the Government's Exhibit

15  list, 955, I reviewed the metadata as well that was produced

16  with the -- along with the documents by the broiler producers.

17  Q.  Thank you, Mr. Morbey.  And just for the sake of clarity

18  for Government exhibit number, did you mean Government

19  Exhibit 9555?

20  A.  Yes, apologies, 9555.

21  Q.  And what types of metadata did you see in those documents

22  from Koch, Claxton and Mar-Jac that your firm received?

23          MR. TUBACH:  That's hearsay.  That's information

24  coming from a witness who is not --

25          THE COURT:  You will need to be more specific with the

Simeon Morbey - Direct

1   question because the metadata, I don't know what it would be.

2   It could include hearsay.  So you would have to limit it to

3   non-hearsay information that may be -- that the witness may

4   have seen as part of his review.

5   *BY MS. ROGOWSKI:*

6   *Q.*  Your Honor -- I am sorry.

7        Mr. Morbey, as part of your review of the documents

8   from Koch, Claxton and Mar-Jac, did you see any indications of

9   metadata in those documents?

10  *A.*  Yes.

11  *Q.*  And what types of metadata did you see in your review of

12  those documents?

13  *A.*  Including the types I have already mentioned, I saw for

14  each of them a hash value.  I saw -- you know, it depends on

15  the different documents, different types of documents, an

16  e-mail versus a scan of a hard copy document have different

17  types of metadata, but each one would have a hash value because

18  that is a -- it's an electronic fingerprint that identifies

19  each document as a unique document.

20  *Q.*  And did you see any time stamps on the e-mails in the

21  documents specifically from Koch, Claxton and Mar-Jac?

22  *A.*  I saw time stamps on e-mails on the face of the document

23  from Koch, Claxton and Mar-Jac.

24  *Q.*  To the best of your knowledge, Mr. Morbey, was the time

25  stamp on the documents that your firm received the same as the

Simeon Morbey - Direct

1    time stamp on the documents that came from the companies?

2              MS. CARWILE:  Objection, lacks foundation.

3              THE COURT:  Sustained.  If you can establish how he

4    would know that.

5    BY MS. ROGOWSKI:

6    Q.  Do you have an understanding, Mr. Morbey, of how the time

7    stamp was created on the documents that your firm received?

8    A.  No, I do not.

9    Q.  Mr. Morbey, after the documents from Koch, Claxton and

10   Mar-Jac were uploaded into your firm's database, did your law

11   firm receive any requests to produce those documents to the

12   Department of Justice?

13             MS. CARWILE:  I am going to object, Your Honor, on

14   multiple grounds.  If we can be heard on the side bar.

15             THE COURT:  On this question?

16             MS. CARWILE:  Yes.

17             THE COURT:  All right.

18      (At the bench:)

19             THE COURT:  Can you hear me Ms. Carwile?

20             MS. CARWILE:  I can.

21             THE COURT:  Ms. Rogowski, can you hear me?

22             MS. ROGOWSKI:  Yes, I can, Your Honor.

23             THE COURT:  Go ahead, Ms. Carwile.

24             MS. CARWILE:  Thank you, Your Honor.

25             I just wanted to renew the objection that we've now at

Simeon Morbey - Direct

1    this point discussed law firm, deposition, multiple broiler

2    chicken producers three times.  And we have asked and the Court

3    has ordered the government not to make those comments, and this

4    is again the third time it has happened.  We have settled on

5    the word firm.  The government is the one that used the word

6    law firm in that question.

7         THE COURT:  The government during the first part of

8    the question used the word firm, but then you are quite right,

9    then used the term law firm.  And what -- so what's your

10   request, Ms. Carwile?

11        MS. CARWILE:  I think as requested, the same as

12   Mr. Pollack made earlier, this is in violation of the Court's

13   ruling that there would be no mention of the civil litigation.

14   And if the Court would admonish the jury the question was

15   improper and have it be stricken.

16        THE COURT:  Well, once again, it's the same issue.  By

17   my doing that is really going to call attention to this issue

18   and make the jury sensitive.  The jury has actually heard quite

19   a bit on Thursday from the custodians about litigation,

20   eDiscovery, all sorts of things.  It's probably not surprising

21   that he works for a law firm, although it shouldn't have been

22   asked that way, especially since the witness is talking about

23   eDiscovery and other types of litigation issues.

24        I am going to refuse the request because I think that

25   the effect of it will be even worse than the question, but I

689

Simeon Morbey - Direct

1   would once again stress to the government that it needs to form

2   its questions carefully and it needs to ask leading questions

3   to make sure that the witness is -- does not stray off or

4   mention things that he shouldn't, all right?

5            MS. ROGOWSKI:  Thank you, Your Honor.

6        (In open court:)

7            THE COURT:  The objection will be overruled.

8            Go ahead.

9   BY MS. ROGOWSKI:

10  Q.  Mr. Morbey, after the documents were uploaded into the CS

11  Disco review database, did your firm receive a request to

12  produce those documents to the Department of Justice?

13  A.  Yes.

14  Q.  And how do you know that?

15  A.  I have seen the request.

16  Q.  And were you involved in the production of those documents

17  to the Department of Justice?

18  A.  I and members of my team were involved in the production,

19  yes.

20  Q.  How were you involved?

21  A.  I and members of my team create -- instructed CS Disco to

22  create production volumes that were downloaded to hard drives

23  which we directed to be sent directly to the Department of

24  Justice.

25  Q.  And were those hard drives in fact sent to the Department

690

Simeon Morbey - Direct

1   of Justice?

2           *MR. TUBACH:*  Objection, lacks foundation.

3           *THE COURT:*  Overruled.  He can answer.

4   *A.*  Yes, to the best of my knowledge, yes.

5   *BY MS. ROGOWSKI:*

6   *Q.*  Mr. Morbey, taking a look again at the binder and the list

7   of exhibits labeled Government Exhibit 9555, have you reviewed

8   the e-mails, attachments and the other documents in that

9   binder?

10  *A.*  I have reviewed the trial exhibits described on Government

11  Exhibit 9555, yes.

12  *Q.*  And did you compare those documents to any documents in

13  possession of your firm?

14  *A.*  Yes, I have.

15  *Q.*  How did you compare them?

16  *A.*  I looked at the exhibit provided by the government and

17  compared it to the document that was on the CS Disco system.

18  And in comparing those two things, as well as the metadata that

19  was on there, I was able to make the conclusion that the

20  documents were the same.

21  *Q.*  And so to the best of my knowledge, are the documents in

22  the binder in front of you from Koch, Claxton and Mar-Jac in

23  fact true copies of the documents that were produced to your

24  firm?

25  *A.*  Yes, to the best of my knowledge.

Simeon Morbey - Cross

1          *MS. ROGOWSKI:*  No further questions.

2          *THE COURT:*  Thank you.

3          Cross-examination?

4          Ms. Carwile?

5          *MS. CARWILE:*  Yes.

6          *THE COURT:*  Go ahead.

7                          **CROSS-EXAMINATION**

8    *BY MS. CARWILE:*

9    *Q.*  Good morning, Mister -- is it Morbey?

10   *A.*  Morbey.

11   *Q.*  Thank you.  Thank you for the correct pronunciation.

12          My name is Laura Carwile.  I represent Roger Austin

13   and I just have a few questions for you.  Let me get situated

14   here, please.

15          So Mr. Morbey, we have heard a lot of testimony prior

16   to you taking the stand regarding certain chicken companies

17   providing their documents to the government and the process

18   through which that occurs.  But it's correct that you do not

19   work for Claxton, Koch or Mar-Jac and that they are not your

20   employer; is that right?

21   *A.*  That is correct.

22   *Q.*  And is it fair to say that in the chain of the receipt of

23   these documents from Claxton, Koch or Mar-Jac to the Department

24   of Justice, ultimately your company sits somewhere in the

25   middle of that chain?

692

Simeon Morbey - Cross

1    A.  We are in that chain, yes.

2    Q.  And you are in the middle of it.

3    A.  I guess that would be fair.

4    Q.  Okay.  And let me see if I have the chain laid out

5    correctly.  So your company received documents from Claxton,

6    Koch and Mar-Jac from a vendor who had compiled those documents

7    for those three companies.

8    A.  We received the documents from -- yes, that would be

9    correct.

10   Q.  Okay.  So just so that I'm clear, you did not receive the

11   documents listed on Government's 9555 directly from Claxton,

12   Koch and Mar-Jac in that there was a vendor between those three

13   companies and your receipt of those documents.

14   A.  Yes.  However, we did receive transmittal letters from

15   Koch, Claxton and Mar-Jac describing the productions that were

16   received and in some cases providing passwords to access the

17   documents.

18   Q.  And I will get to letters in a second.  Thank you for

19   bringing that up.  But as to the documents themselves, my

20   statement about the fact that there was a vendor between the

21   three companies and you is correct.

22   A.  To the best of my knowledge, yes.

23   Q.  So as to these 71 documents, the government provided you

24   this list of documents, correct?

25   A.  Correct.

Simeon Morbey - Cross

1   *Q.* And as from Claxton, Mar-Jac and Koch, you actually

2   received more documents than is laid out on Government's 9555.

3   *A.* Correct.

4   *Q.* You received them is it correct to say in more than three

5   productions of documents?

6   *A.* I -- I don't know how many -- the number of productions,

7   but that probably is correct.

8   *Q.* Okay. So as you sit here today, you can't tell us how many

9   productions encompassed the documents listed on Government

10  Exhibit 9555.

11  *A.* That's correct.

12  *Q.* And it's either three or more than three. Given that there

13  are three companies, that's why I am asking for three.

14  *A.* That sounds right.

15  *Q.* All right. And is it correct that you received the

16  documents, the productions that contain the documents on

17  Government 9555 on hard drive or hardware via FTP link? How

18  did you receive these documents?

19  *A.* It would be either through hard drive or FTP link.

20  *Q.* Okay. And just to be clear, because please forgive me in

21  advance if I misstate any technical terms, but hardware meaning

22  physical storage compartments like USB, hard drive, thumb

23  drive, something to that effect is what I mean when I say

24  hardware. Is that all right?

25  *A.* Yes.

694

Simeon Morbey - Cross

1    Q.  So you either received the productions that contained these

2    documents -- and for the record going forward when I say these

3    documents, I am going to be referring to this list.  I am not

4    going to keep saying the number if that's all right.  So you

5    received the productions that contained these documents either

6    in hardware or via FTP link?

7    A.  I believe that's the case, yes.

8    Q.  Okay.  And you are unaware -- could you tell us as you sit

9    here today whether each document listed on this list came from

10   a hardware production or an FTP link?

11   A.  No, I could not tell you that today.

12   Q.  All right.  So it's correct to say that you're not privy to

13   the process by which Claxton, Koch and Mar-Jac compiled the

14   documents for production to anyone, but certainly to your

15   company.  Let me rephrase because I think that was a little

16   inartful.

17         You do not have personal knowledge about how the

18   companies, Claxton, Koch and Mar-Jac, compile and create the

19   sets of productions that ultimately make their way to you; is

20   that correct?

21   A.  Correct, I do not have personal knowledge.

22   Q.  And you talked about metadata on direct, and I will get

23   into that a little more, but is it correct, then, to say that

24   you cannot as you sit here today testify that the metadata that

25   exists on the servers for Claxton, Koch and Mar-Jac was

Simeon Morbey - Cross

1  identical to the metadata of the productions that you received

2  that ultimately made it onto this list?

3  A.  Correct.

4  Q.  So let's talk about -- let's start with the hardware

5  productions, Mr. Morbey.  Claxton, Koch and/or Mar-Jac would

6  have a vendor, which we have already established did the

7  compiling of these documents, create hardware for some of these

8  productions that would then make their way to your company,

9  correct?

10  A.  I'm not sure what you mean by compiling.

11  Q.  Okay.  So let me back up.  In order to create the

12  productions that ultimately housed the documents on your list,

13  Claxton, Koch and Mar-Jac ostensibly compiled certain documents

14  in their own companies, correct?

15  A.  I have no personal knowledge of that.

16  Q.  Okay.  Fair enough.  That was a fair point.

17          I guess my question, that I can make it a little

18  simpler.  You received hardware labeled as productions from

19  Claxton, Koch and Mar-Jac; is that correct?

20  A.  That is correct.

21  Q.  And alternatively, and we'll get into this as well, but you

22  received FTP links from the same companies at some point.

23  A.  That is correct.

24  Q.  So is it you, Mr. Morbey, who actually took physical

25  possession of any hardware that would have contained the

Simeon Morbey - Cross

1   documents on your list?

2   A.  I don't understand your question.  Could you please

3   rephrase?

4   Q.  So hardware is a physical object.  You would agree with me?

5   A.  I do.

6   Q.  It obviously somehow made its way to your office, your

7   company, correct?

8   A.  Yes.

9   Q.  Are you the person who took physical possession from the

10  Post Office or whoever brings documents and productions to your

11  company?  Are you the person who took possession of that

12  hardware?

13  A.  It would probably come to the company's mailroom, and then

14  it would be delivered to me or a member of my team.

15  Q.  Okay.  And I'm going to get into that phrase "me or a

16  member of my team" in a second, but my question is specific.

17  And let me ask it a different way so that I can be clearer.

18          It is correct to say that you did not personally take

19  possession from your mailroom of every production that contains

20  one or more documents on the list in front of you.

21  A.  I did not physically touch each hard drive, if that's what

22  you are asking.

23  Q.  That is what I am asking.  Thanks very much.

24          Could you tell us as you sit here today which of the

25  documents listed on this list you did take physical possession

Simeon Morbey - Cross

1    of, the hardware of, from the companies who sent them?

2    A.  No, I could not.

3    Q.  Okay.  On direct you stated that you or a member of your

4    team received either hardware or FTP link of productions from

5    these three companies.  And then you -- I have the exact

6    wording at some point, but you delivered in some respect those

7    productions to a third-party vendor called CS Disco; is that

8    right?

9    A.  We received the productions and I remember my team ingested

10   them into CS Disco.  The ingestion as far as -- the ingestion

11   of the documents we received from Claxton, Koch and Mar-Jac to

12   the best of my knowledge were uploaded to CS Disco by myself or

13   a member of my team.

14   Q.  Okay.  So I think -- forgive my naivety regarding

15   technological matters, but your testimony is you or a member of

16   your team took the physical hardware that you received from the

17   vendors from whom the three companies provided the documents,

18   and you or a member of your team uploaded them into a document

19   hosting platform called CS Disco?

20   A.  Correct.

21   Q.  There was no person in between.  You didn't send the

22   hardware, for instance, to the headquarters of CS Disco.

23   A.  To the best of my knowledge, the documents that are

24   contained on the Government Exhibit 9555 were not sent to CS

25   Disco to ingest.

Simeon Morbey - Cross

1   *Q.*   What is that knowledge based on?

2   *A.*   So when we received these documents from the broiler --

3   *Q.*   From these three companies?

4   *A.*   From these three companies, if it was a hard copy

5   production, it would come to my office.  And at that point I

6   would direct one of our support staff to work on uploading the

7   documents to the CS Disco platform.

8   *Q.*   Got it.  So two questions about what your answer just was.

9          You said hard copy documents.  Do you mean physical

10  pieces of paper?

11  *A.*   I'm sorry, I misspoke.  I meant hard drives.

12  *Q.*   That's okay.  I figured that's what you meant.  I just

13  wanted clarification in case I was misunderstanding something.

14         So to the best of your knowledge -- can you be certain

15  that all the productions that contained the documents on that

16  list were uploaded by you or a member of your team directly on

17  to the CS Disco platform?

18  *A.*   Yes, to the best of my knowledge.

19  *Q.*   Okay.  So to the best of your knowledge, but you can't say

20  that you're certain.

21  *A.*   Sitting here today I am not entirely sure which production

22  volumes each of these documents came from.

23  *Q.*   That's fair.  Thank you for that answer.

24         So okay.  So now we're on to the point where someone

25  at your company has possession of this hardware that contains

Simeon Morbey - Cross

1   the productions.  What I heard you say just now was that you

2   would direct a member of your support staff to upload those

3   documents into this platform called CS Disco, correct?

4   A.  Yes.

5   Q.  Of the exhibits or the list of documents on the list in

6   front of you, are there any for which you personally uploaded

7   the document you received onto the CS Disco platform?

8   A.  Sitting here today, I don't know.

9   Q.  Is it then fair to say given your previous testimony and

10  the answer before this that it's most likely that these -- this

11  list of documents was -- or the documents that are listed on

12  this list were uploaded by a member of your support staff onto

13  the CS Disco platform?

14  A.  Sitting here today, I can't say which was a support staff

15  person or which was me.  It is accurate to say that either I or

16  a member of my team did the uploading.

17  Q.  Okay.  In the productions that came from Claxton, Koch or

18  Mar-Jac, could you tell us what percent of the time you

19  personally were the one uploading documents onto the CS Disco

20  platform?

21  A.  I -- I don't have a good -- that would be a guess,

22  speculation on my part, and I'm not sure.

23  Q.  Is it below 50 percent?

24  A.  Still speculation.

25  Q.  What's your habit and practice when you receive productions

Simeon Morbey - Cross

 1  from anyone?  Do you often do it yourself or is it your support

 2  staff that uploads them onto the platform?

 3  A.  I generally have my support staff do it.  However, there

 4  are certain instances where due to time off or illness, I do it

 5  myself.  And that's why I cannot give you a complete answer.  I

 6  just don't have that number to give you right now.

 7  Q.  Okay.  But you don't recall, for instance, time off or an

 8  illness for your support staff when you received these

 9  productions that are containing the list of documents in front

10  of you?

11  A.  As I said, I don't remember which production volumes these

12  documents come from, and therefore I don't remember the time

13  period.  So I am unable to recall any particular time off for

14  support staff around those particular times.

15  Q.  Okay.  Thank you.  So once the documents have been

16  uploaded -- let me ask you so we can move on from this portion.

17  Is the same procedure correct with regards to the FTP link

18  documents, meaning someone from your support staff most likely,

19  although in certain cases you, would upload anything obtained

20  from an FTP link onto the CS Disco platform?

21  A.  Yes.  It would be the same process.  However, in certain

22  circumstances the FTP comes directly from counsel for the

23  broiler producers.

24  Q.  For one of these three companies?

25  A.  To the best of my recollection, that would happen.  But to

Simeon Morbey - Cross

1   be fair, I am not a hundred percent sure that it was for one of

2   these three companies, but from time to time that would happen

3   from -- for FTP links the documents provided by broiler

4   producers.

5   Q.  So my question actually isn't about the step from one of

6   these three companies to your company.  It's actually now about

7   the procedure from your company to the CS Disco platform.  My

8   question is as to documents provided to your company via FTP

9   link from one of these three companies, how is the uploading

10  procedure done and by whom regarding those documents?

11  A.  So similar to our discussion about hard drives, physical

12  hard drives, the uploading would be done by myself or a member

13  of my team.  Generally speaking, it would be a member of my

14  team.  However, from time to time I would do it.  And I don't

15  have again the information to give you when that was, but it

16  would be -- the documents would be uploaded directly to the CS

17  Disco database.  And in each case there would be a password to

18  access the documents that would be provided by counsel for the

19  broiler producers and I think including the three companies

20  here.

21  Q.  So just to be clear, when I am asking you questions, I am

22  only talking about these three companies, so if we can just

23  talk about these three companies.

24  A.  Understood.  I apologize.

25  Q.  So was there ever a time when you or a member of your staff

Simeon Morbey - Cross

1   forwarded an FTP link with the password directly to CS Disco?

2   A.  Not that I recall.

3   Q.  Okay.  All right.  So there is -- CS Disco is a vendor

4   company; is that right?

5   A.  Yes.

6   Q.  Your company employs CS Disco as sort of a contractor or a

7   vendor who oversees both the uploading and then any additional

8   actions taken regarding documents for your company, correct?

9   A.  I am not sure what you mean by any additional actions, but

10  they -- it is an electronic information platform for review

11  that we use, yes.

12  Q.  And we'll get into the other actions, but I guess my

13  question is CS Disco is not part of your company, correct?

14  A.  That's true.

15  Q.  It is a third-party separate company than your company.

16  A.  Correct.

17  Q.  You do not employ anyone who works for CS Disco in that you

18  are not the boss of someone at CS Disco in the lay terminology.

19  A.  Yes.

20  Q.  So the vendor -- and CS Disco I am going to maybe use

21  interchangeably with the vendor, if that's all right with you.

22  A.  Yes.

23  Q.  -- is physically located, the employees of that vendor are

24  physically located at a different location than your company,

25  correct?

Simeon Morbey - Cross

1    A.  They are not located at my company.

2    Q.  Right.  And ostensibly CS Disco is not a proprietary

3    software for your company.  It's used by other companies to do

4    the same thing it does for your company.

5    A.  That's my understanding.

6    Q.  So it's separate and apart from the company you work for.

7    A.  Yes.

8    Q.  We have gotten now to the point where these documents have

9    been uploaded by someone onto the CS Disco platform.  Now, let

10   me ask you this.  Are you -- well, I'll get to that in a

11   second.  Sorry about that.

12          At some point as you testified on direct the

13   government directed the group of people that include your

14   company to provide documents to it from Claxton, Koch and

15   Mar-Jac, correct?

16   A.  Yes.

17   Q.  And at this point in the chain the documents are ostensibly

18   uploaded onto the CS Disco platform handled by a third-party

19   vendor.  Am I correct that the process by which those documents

20   made their way to the Department of Justice was that you or a

21   member of your team told an employee at CS Disco to compile

22   documents from one of these three companies and to provide that

23   production or those productions from their physical office to

24   the Department of Justice?

25   A.  I remember my team instructed CS Disco to create production

Simeon Morbey - Cross

1  volumes of the documents that had been produced to us by

2  Claxton, Mar-Jac and Koch, download those to hard drives and to

3  send those hard drives to the offices of the Department of

4  Justice.

5  Q.  Got it.  So I think we are saying the same thing, but I

6  appreciate you gave me a little more detail.  I appreciate

7  that.

8          So when you directed or you or a member of your team

9  directed CS Disco to provide those production volumes, were

10  they always to your knowledge on a piece of hardware rather

11  than an FTP link?

12  A.  To the best of my knowledge, yes.

13  Q.  Okay.  But you didn't actually physically see the hardware

14  that CS Disco provided the government because that went

15  directly from CS Disco's office to the government.

16  A.  That is correct.

17  Q.  So you talked earlier -- I think it was during our

18  discussion, but I can't remember now -- about cover letters

19  that would accompany production volumes both to you and from CS

20  Disco but directed by your company; is that right?

21  A.  For documents produced by Mar-Jac, Claxton and Koch, we

22  received cover letters from counsel representing those

23  companies.  And accompanying the production volumes we sent to

24  the DOJ we had transmittal letters as well.

25  Q.  And how were those letters transmitted to the DOJ, the ones

705

Simeon Morbey - Cross

1  from your company?

2  A.  The letters were included in hard copy in the productions

3  sent to the DOJ.  They were also -- courtesy copies were

4  provided via e-mail with the password to access the documents

5  included in that courtesy copy.

6  Q.  So you provided CS Disco with a copy of a cover letter.

7  And CS Disco provided that letter to the Department of Justice

8  along with the hardware that it had compiled regarding the

9  production volume, correct?

10  A.  Yes.

11  Q.  All right.  So regarding the -- and am I correct -- and I

12  am sorry if I have already asked you this.  Am I correct that

13  you did not physically personally examine the hardware that was

14  sent from CV Disco to the Department of Justice regarding the

15  productions related in this list?

16  A.  I did not touch the hard drives, no.

17  Q.  Right.  Okay.  So fair to say also that your company did

18  not -- it was not your company -- let me take a step back.

19        Some of these production volumes contained errors of

20  some kind, is that fair to say, that were brought to your

21  attention?

22        MS. ROGOWSKI:  Your Honor, objection, beyond the

23  scope.

24        THE COURT:  I will overrule the objection.  And you

25  are talking about productions from Koch, Claxton and Mar-Jac?

Simeon Morbey - Cross

1        MS. CARWILE:  I am, yes.  I am sorry if I didn't make

2    that clear, but I am only talking about those three.

3        MS. ROGOWSKI:  Your Honor, objection to foundation as

4    well.

5        THE COURT:  That objection is overruled too.  If he

6    knows, he can answer it.

7        Go ahead.

8    BY MS. CARWILE:

9    Q.  Do you know the answer to that?

10   A.  I'm not clear whether you are referring to the production

11   that was made to my company or the production that we

12   instructed CS Disco to make to the DOJ.

13   Q.  Fair enough.  Were there errors in the productions that

14   came to your company from one of these three companies?

15   A.  Sitting here my recollection is yes, there were.

16   Q.  Okay.  And were there errors that were brought to your

17   attention from the government regarding productions you had

18   directed CS Disco to provide them that are relevant to this

19   list of documents in front of you?

20       THE COURT:  And you said from the government.  Do you

21   mean productions to DOJ?

22       MS. CARWILE:  Yes.  I also asked that inartfully.

23   BY MS. CARWILE:

24   Q.  I mean productions to DOJ.  What I mean is were you

25   provided information from the government regarding potential

Simeon Morbey - Cross

1    problems with the productions as relate to this list?

2    A.   I am aware that the DOJ asked my company certain questions

3    regarding the productions that were made.  To the best of my

4    knowledge, we referred those questions to CS Disco and all

5    those questions were satisfactorily addressed.

6    Q.   But you referred those questions directly to CS Disco,

7    right?  You just said that.

8    A.   Yes.

9    Q.   And those errors were corrected ostensibly by CS Disco.

10   A.   I don't know if there were errors or not, but the issues

11   that were raised were addressed.  And if there was a

12   reproduction of a particular volume of documents, CS Disco made

13   that reproduction.  I'm not sure if a reproduction was required

14   for the documents that are contained in the government's list,

15   9555, but again, to the best of my knowledge, each question

16   that the government raised was addressed satisfactorily by CS

17   Disco.

18   Q.   Right.  But you only know that from being the messenger

19   between the two; is that fair to say?  You received the message

20   from the government that there may be some error with one of

21   the productions relevant to this list.  You forwarded that

22   question on to CS Disco who then provided directly back to the

23   government updated production volumes, correct?

24   A.   And we understood.

25   Q.   Is that correct?

708
Simeon Morbey - Cross

1   A.  That's correct.  We also understood that there was nothing

2   further to do -- to discuss based on those production volumes.

3   The questions had been addressed.

4   Q.  Right.  Nothing had been brought to your attention as the

5   messenger to CS Disco again after some question from the

6   government regarding documents that they cared about, right?

7   A.  Yes.  Nothing further was raised.

8   Q.  Just a few more questions.

9        This may be obvious at this point, I don't mean to

10  belabor the point, but some of this hardware that was provided

11  to the government from CS Disco had passwords, correct?

12  A.  There were passwords associated with the productions to the

13  Department of Justice to access the documents on the hard

14  drives, yes.

15  Q.  And you did not create those passwords.  Your company did

16  not create those passwords.

17  A.  That is correct.

18  Q.  Let me just look at a few things.  So I would like you to

19  look at the list now and I am going to ask you about two

20  specific exhibits.  And I am going to start with Exhibit --

21  Government Exhibit 8010.

22        Do you see that on the list?

23  A.  I see that on the list.  Would you like me to turn to it in

24  the book?

25  Q.  That would be great.  Thank you.

Simeon Morbey - Cross

1   A.  Sorry.  It's going to take a second.

2   Q.  That's okay.  Take your time.

3        You have it in front of you?

4   A.  I have the native document place holder in front of me.

5   Q.  So do I.  So here is my question about this.  You had

6   testified on direct that you had taken a look at all of the

7   documents that the government directed you to to see if they

8   were accurate to some degree, and we'll discuss that in a

9   second, but you had looked at these documents in preparation

10  for your testimony today, correct?

11  A.  Yes.  I have looked at the native place holder and the

12  underlying Excel spreadsheet.

13  Q.  So you looked at the underlying of Exhibit 8010, correct?

14  A.  Yes.

15  Q.  And that is an Excel spreadsheet?

16  A.  I believe so.  And I believe it's on the screen in front of

17  me; is that right?  It looks like 8010.

18  Q.  I don't have a screen, so I am just going to take a brief

19  peek.  That looks right enough.

20       All right.  So do you know what this document purports

21  to be?  And I don't mean -- I don't want you to give any

22  identifiers.  I am just asking generally what the document

23  would be without naming individuals.

24  A.  It looks to be an extract of a cellphone that includes

25  contact information, call log information, chats, MMS messages

710
Simeon Morbey - Cross

1    and SMS messages.

2    Q.  So colloquially speaking, it's a cellphone doc; is that

3    right?

4    A.  I'm not -- I don't use that term, but, I mean, it is from a

5    cellphone, so...

6            MR. TUBACH:  I apologize.  Could we have a brief side

7    bar on this?

8            THE COURT:  Yes.  Actually, since it's almost time for

9    our mid-morning break, why don't we go ahead, ladies and

10   gentlemen, and take the mid-morning break at this time.  Why

11   don't we plan on reconvening 25 minutes to 11:00, all right?

12           The jury excused.  Thank you.

13           (Jury excused.)

14       Mr. Morbey, you are excused until the break is done.

15   Thank you very much.

16           THE WITNESS:  Thank you, Your Honor.

17           THE COURT:  Mr. Tubach, go ahead.

18           MR. TUBACH:  I just wanted to bring to the Court's

19   attention 8010 as reflected on -- our electronic person helper

20   here put on the screen is different than what we received which

21   I believe from the government is exactly three texts in 8010.

22   I don't know if there is some error in the printing process or

23   if there is some other explanation for this.  At least what I

24   have in the document is just three small texts -- I am happy to

25   show this to counsel -- and not the entire list of texts that

Simeon Morbey - Cross

1    were shown on the screen.

2         THE COURT:  The exhibit list that I have which is

3    Docket No. 669, I am not sure how recent that was, but that

4    description seems consistent with what was displayed to the

5    witness.

6         Ms. Rogowski, go ahead.

7         MS. ROGOWSKI:  Your Honor, the version we have in our

8    Trial Director software, which should be the most recent

9    version that you all have from the flash drives of last week,

10   it does, in fact, match the description that Mr. Morbey gave.

11   I'm not sure what happened with this exhibit that Mr. Tubach

12   just handed me.  It's not labeled, so I am not sure exactly

13   where this one came from, but I do believe that the version

14   that we provided in our flash drives last week to defense

15   counsel is, in fact, the same to the best of my knowledge.

16        THE COURT:  Do you have hard copies?

17        MS. ROGOWSKI:  I have a few, Your Honor, in a binder,

18   but it's just the native place holder because the document

19   itself is a big Excel spreadsheet.

20        THE COURT:  Right.  That would not help anyone.

21        Okay.  Mr. Tubach, anything else?

22        MR. TUBACH:  We can try and figure out if the error is

23   on our part in some way.  It just looked very different than

24   what I had.

25        THE COURT:  Okay.  Then we will be in recess until the

712

Simeon Morbey - Cross

1    time that I indicated.  Thank you.

2         (Recess at 10:17 a.m.)

3         (Reconvened at 10:36 a.m.)

4              THE COURT:  Are we ready for the jury?

5              Yes, Mr. Morbey, if you don't mind, you can come up

6    and resume the witness stand.

7              MR. TUBACH:  Briefly, I believe that the disconnect

8    was that the exhibit is a Excel spreadsheet with multiple tabs

9    and we only had one tab, so I think that's -- I think we are

10   fine.

11             THE COURT:  Okay, great.  Thank you for that update.

12             One other thing real quick, and I just -- I am in the

13   process of docketing a ruling as to Docket 1030, not that you

14   would necessarily be able to pull it up, but if you are able to

15   pull it up, you can do so.

16             MS. ROGOWSKI:  Your Honor, we did want to raise

17   something with respect to Exhibit No. 1030 before the jury

18   comes back out.  I understand you are in the process of

19   docketing and we don't know what you have planned to docket,

20   but we did want to raise a hash value comparison with our next

21   witness that relates to Exhibit 1030, but we wanted to raise

22   that now before the jury comes back out in case there is an

23   objection.

24             THE COURT:  Well, once again, I think the issue has to

25   go to whether you have anyone to authenticate the author.

Simeon Morbey - Cross

1          MS. ROGOWSKI:  That's another thing we wanted to

2     raise, Your Honor.  The government is considering calling a

3     witness who can testify to the handwriting of Mr. Martin.  We

4     have not made any decisions at this point, but we wanted to let

5     you know.  And we also wanted to let you know that depending on

6     what your ruling in the docket entry says, we do want to take

7     this issue up further.  And we would request that we could do

8     so in writing.  We think it could be more efficient for the

9     Court.

10          THE COURT:  I am sorry, do something in writing?  You

11    can.  The order will stand and we are not going to be in this

12    endless loop of motions for reconsideration, I guarantee you;

13    but on the other hand, the government can call a witness to

14    authenticate the handwriting.  There is no reason it can't.

15          MS. ROGOWSKI:  Understood, Your Honor.

16          THE COURT:  Subject to what the defendants may say.  I

17    mean, we will have to see what the objection, if any, would be.

18          Let's bring the jury in.

19          (Jury present.)

20          THE COURT:  Ms. Carwile, go ahead.

21    BY MS. CARWILE:

22    Q.  Mr. Morbey, I am going to wrap this up because I don't want

23    to keep you here too long.

24          So my final question to you is this.  As to the time

25    zone data and generally the metadata that accompanied the

Simeon Morbey - Cross

1   documents on that list, you cannot personally speak to the

2   accuracy of that information in terms of whether it's identical

3   to the metadata and the time zone data on the servers of the

4   Claxton, Mar-Jac and Koch companies, correct?

5   A.   I have no personal knowledge of the metadata information

6   contained on the Koch, Claxton and Mar-Jac servers.

7             MS. CARWILE:   Thank you.

8             THE COURT:   Additional cross?

9             Mr. Tubach.

10             MR. TUBACH:   Just on one document, Your Honor.

11                          **CROSS-EXAMINATION**

12   BY MR. TUBACH:

13   Q.   Good morning, Mr. Morbey.

14   A.   Good morning.

15   Q.   Could you turn to Document 1029, please, in your binder?

16   A.   I am almost there.

17   Q.   Take your time.

18   A.   I'm there.

19   Q.   Do you have Document 1029 in front of you?

20   A.   Yes.

21   Q.   You see it says at the bottom "Excerpt from" and then it

22   lists a Bates number?

23   A.   Yes, I do.

24   Q.   Do you have any idea whether this is the document as you

25   either received it from the company or produced it to DOJ?

Robert Bryant - Redirect

1   *A.*  My understanding based on my comparison is that this is

2   part of a document that was produced to my company that bears

3   the Bates stamp Mar-Jac_0000596413.  And when I made the

4   comparison, I looked at the complete document that was produced

5   and then saw that this was a portion of that.

6   *Q.*  So this is only a portion.  What's marked as Exhibit 1029,

7   it's only a portion of a document that is the Bates number that

8   you just read to us, right?

9   *A.*  That is my understanding.

10          *MR. TUBACH:*  Thank you very much.  No further

11  questions.

12          *THE COURT:*  Thank you.  Additional cross-examination?

13          All right.  Redirect.

14                       **REDIRECT EXAMINATION**

15  *BY MS. ROGOWSKI:*

16  *Q.*  Mr. Morbey, you were asked a lot of questions on

17  cross-examination, so I want to make sure I clarify a few

18  points.

19          Could you please clarify for the jury, you did, in

20  fact, take a look at each of the documents in your binder; is

21  that correct?

22  *A.*  I did, yes.

23  *Q.*  And for those documents that are -- that there is a native

24  spreadsheet, you did, in fact, take a look at the actual native

25  file that we sent you; is that correct?

716
Robert Bryant - Redirect

 1   A.  I took a look at the native file that was produced to my

 2   company from the broiler producer, I forget whether it's

 3   Mar-Jac or Claxton or Koch, whoever produced it, and I compared

 4   that to what the government sent me to compare.

 5   Q.  And what the government sent to you to compare was also a

 6   native file; is that correct?

 7   A.  Correct.

 8   Q.  And a native file just means the full spreadsheet?

 9   A.  Correct.

10   Q.  So you compared those two sets of documents.  What did you

11   conclude in your comparison?

12   A.  Are the two sets the full list that the government gave me?

13   Q.  Yes.

14   A.  I concluded that the list that the government gave me was

15   the same documents that were the documents that were produced

16   to my company.

17   Q.  Based on your review, do you have any reason to believe

18   there were any errors in the production that would have

19   affected how the documents were copied materially?

20   A.  I have no reason to believe there was any issue with the

21   copying.

22          MS. ROGOWSKI:  No further questions.

23          THE COURT:  All right.  Mr. Morbey, you are excused.

24   However, one or more of the defendants may ask that you testify

25   later, but for now -- and if so, they will be in contact with

Anna Bieganowska - Direct

 1   you.  But for now you are excused.  Thank you very much.

 2              THE WITNESS:  Thank you, Your Honor.

 3              THE COURT:  The United States may call its next

 4   witness.

 5              MS. BUTTE:  Thank you, Your Honor.  We call Anna

 6   Bieganowska.

 7      (**Anna Bieganowska** was sworn.)

 8              THE WITNESS:  I do.

 9              COURT DEPUTY CLERK:  Please state your name and spell

10   your first and last name for the record.

11              THE WITNESS:  Anna Bieganowska, A-N-N-A,

12   B-I-E-G-A-N-O-W-S-K-A.

13                         **DIRECT EXAMINATION**

14   BY MS. BUTTE:

15   Q.  Thank you, Ms. Bieganowska, and good morning.

16              What is your highest level of education?

17   A.  Bachelor's degree.

18   Q.  Where do you work?

19   A.  The U.S. Department of Justice, antitrust division.

20   Q.  How long have you worked at the Department of Justice?

21   A.  A little over two years.

22   Q.  What are your general responsibilities?

23   A.  I help organize the official file, take notes on calls and

24   help process incoming document productions.

25   Q.  What is a document production?

ATTACHMENT N

Anna Bieganowska - Direct

1   you.  But for now you are excused.  Thank you very much.

2           THE WITNESS:  Thank you, Your Honor.

3           THE COURT:  The United States may call its next

4   witness.

5           MS. BUTTE:  Thank you, Your Honor.  We call Anna

6   Bieganowska.

7       (**Anna Bieganowska** was sworn.)

8           THE WITNESS:  I do.

9           COURT DEPUTY CLERK:  Please state your name and spell

10  your first and last name for the record.

11          THE WITNESS:  Anna Bieganowska, A-N-N-A,

12  B-I-E-G-A-N-O-W-S-K-A.

13                         **DIRECT EXAMINATION**

14  BY MS. BUTTE:

15  Q.  Thank you, Ms. Bieganowska, and good morning.

16          What is your highest level of education?

17  A.  Bachelor's degree.

18  Q.  Where do you work?

19  A.  The U.S. Department of Justice, antitrust division.

20  Q.  How long have you worked at the Department of Justice?

21  A.  A little over two years.

22  Q.  What are your general responsibilities?

23  A.  I help organize the official file, take notes on calls and

24  help process incoming document productions.

25  Q.  What is a document production?

Anna Bieganowska - Direct

1    A.  A production is a -- a document production is a compilation

2    of documents given to a party such as the Department of Justice

3    during an investigation.

4    Q.  Does the Department of Justice receive document productions

5    from third parties?

6    A.  It does.

7    Q.  And what are your responsibilities with respect to incoming

8    document productions?

9    A.  When we receive an incoming document production, I will

10   usually take the production.  If it comes, for example, on hard

11   media such as a CD, it will come with a cover letter which

12   describes what's contained within the production.  It will also

13   sometimes come with a submission index, so just describing the

14   contents.  And so we'll scan the cover letter, that submission

15   index and a copy of the media.

16          We will take that information and input it into a

17   database called eRoom.  We will attach all attachments and

18   update that eRoom entry with any information about the

19   production, including the Bates range.  We will input that same

20   exact information into a system called CMTS for our case media

21   tracking system.  And through CMTS we can submit a ticket to

22   our LSS staff to actually process the production and put it on

23   a document review platform called Relativity.

24   Q.  What does LSS stand for?

25   A.  Litigation support system.

Anna Bieganowska - Direct

1          *MS. BUTTE:*  Through Ms. Grimm we would like to give

2      the witness a binder of documents and also an exhibit list,

3      Exhibit 9655.

4          *THE COURT:*  She may.

5      *BY MS. BUTTE:*

6      *Q.*  Turning to the list and the exhibits in front of you, were

7      you able to determine if the documents in this binder were

8      produced by third parties to the Department of Justice?

9      *A.*  I was, and they were.

10     *Q.*  How did you determine that for the documents with the MJ

11     Poultry, Mar-Jac, Koch, Koch, K-o-c-h, Koch Foods, CLA and

12     Claxton prefixes?

13     *A.*  I was able to look at the exhibit list and the

14     corresponding Bates numbers and find those Bates numbers in

15     Relativity.  I was then able to use the Bates number and any

16     other underlying information contained in Relativity to find

17     the same exact documents within CMTS and eRoom.  I was also

18     able through CMTS to find a load completion notice for all of

19     these files which is just a confirmation that the files were,

20     in fact, loaded to Relativity.

21     *Q.*  Do the exhibits in front of you with the MJ Poultry,

22     Mar-Jac, Koch, Koch Foods, CLA and Claxton prefixes appear to

23     be true copies of the documents produced by third parties to

24     the Department of Justice?

25     *A.*  They do.

Anna Bieganowska - Direct

1   Q.  Are you familiar with the term parent e-mail?

2   A.  Yes.

3   Q.  What does it mean?

4   A.  A parent e-mail is the main e-mail in a family of

5   documents, so any corresponding attachments with that parent

6   e-mail are referred to as children or family documents.

7   Q.  If you could turn to Tab 10 in your binder.  And this

8   contains Government Exhibit 1023.

9        Did you review this document?

10  A.  I did.

11  Q.  What is it?

12  A.  It's an e-mail.

13  Q.  Could you turn to Tab 11 in your binder.  And this contains

14  Government Exhibit 1024.

15       Did you review this document?

16  A.  I did.

17  Q.  What is it?

18  A.  It's another e-mail.

19  Q.  If you could turn to Tab 12 in your binder.  And this

20  contains Government Exhibit 1025.

21       Did you review 1025?

22  A.  I did.

23  Q.  What is it?

24  A.  It's another e-mail.

25  Q.  If you could turn to Tab 13 in your binder.  And this

Anna Bieganowska - Direct

1    contains Government Exhibit 1026.

2              Did you review this document?

3    A.   I did.

4    Q.   What is it?

5    A.   It's a spreadsheet.

6    Q.   If you could turn back to Tab 12 which also contains

7    Government Exhibit 1025-1.

8              Did you review 1025-1?

9    A.   I did.

10   Q.   What is this document?

11   A.   It's the underlying metadata for two of the e-mail

12   attachments.

13   Q.   Does this document indicate that Government Exhibit 1023 is

14   a parent e-mail of Exhibits 1024, 1025 and 1026?

15   A.   It does.

16   Q.   Did you also review these documents in Relativity?

17   A.   I did.

18   Q.   What did that show?

19   A.   It showed that they were the exact same documents and that

20   the underlying metadata was the same.

21   Q.   Did it show they were family members of each other?

22   A.   It did.

23   Q.   If you can turn to Tab 15 in your binder.  This contains

24   Government Exhibit 1410.

25              Did you review this document?

722

Anna Bieganowska - Direct

1   A.   I did.

2   Q.   What is it?

3   A.   It's an e-mail.

4   Q.   If you could turn to the next page which is Government

5   Exhibit 1410-1.

6         Did you review this document?

7   A.   I did.

8   Q.   What is it?

9   A.   It's the underlying metadata for that e-mail that I just

10   mentioned.

11   Q.   Does this indicate if Government Exhibit 1410 has an

12   attachment?

13   A.   It does.

14   Q.   If you could turn to Tab 16 in your binder.  And this is

15   Government Exhibit 1411.

16         Did you review this document?

17   A.   I did.

18   Q.   What is this document?

19   A.   It's a spreadsheet.

20   Q.   Is this an attachment of Exhibit 1410?

21   A.   It is.

22   Q.   Could you turn to Tab 18 in your binder.  And this contains

23   Government Exhibit 1521.

24         Did you review this document?

25   A.   I did.

Anna Bieganowska - Direct

1    *Q.*  What is it?

2    *A.*  It's an e-mail.

3    *Q.*  If you could turn to the next page which is Exhibit 1521-1.

4           Did you review this document?

5    *A.*  I did.

6    *Q.*  And what is it?

7    *A.*  It's a spreadsheet.

8    *Q.*  If you turn to the next page in that same tab which is

9    Government Exhibit 1521-2, did you review this document?

10   *A.*  I did.

11   *Q.*  What is this document?

12   *A.*  The underlying metadata for that spreadsheet showing that

13   it's an attachment of the previous e-mail.

14   *Q.*  Turning back to the list of exhibits that we gave you

15   that's marked as Government Exhibit 9655, have you reviewed

16   this list and the documents in your binders with a Bates prefix

17   GEO and GEO-DOJ?

18   *A.*  I did.

19   *Q.*  What did you do to review them?

20   *A.*  I used the list of Bates numbers and I was able to search

21   for them in Relativity.  I then also confirmed manually that

22   those Bates numbers were the same as the ones on this list.

23   *Q.*  To the best of your knowledge, were the documents with the

24   GEO and GEO-DOJ prefixes produced to the Department of Justice?

25   *A.*  Yes.

1          *MS. BUTTE:*  May I have a moment to confer?

2          *THE COURT:*  You may.

3          *MS. BUTTE:*  No further questions.

4          *THE COURT:*  Thank you.

5          Cross-examination?

6          *MS. CARWILE:*  Not for me.

7          *THE COURT:*  Okay.  Any?  Thank you very much,

8    Ms. Bieganowska.  You may step down.

9          The United States may call its next witness.

10         *MS. BUTTE:*  Your Honor, may I just clarify, is

11   Ms. Bieganowska excused?

12         *THE COURT:*  Given where she works, it would seem like

13   you can confer with the defendants as to whether or not she

14   should -- well, let me just ask, any reason that she may need

15   to be recalled?

16         *MR. TUBACH:*  The only reason might be if there is some

17   revisiting of the exhibit.

18         *THE COURT:*  Yeah, as long as she can receive some

19   advanced notice as to whether she needs to return.

20         Mr. Koenig?

21         *MR. KOENIG:*  Thank you, Your Honor.  The United States

22   calls Robert Bryant.

23     (**Robert Bryant** was sworn.)

24         *THE WITNESS:*  I do.

25         *COURT DEPUTY CLERK:*  Please state your name and spell

ATTACHMENT O

| on behalf of | Thomas Lane [Thomas.Lane@pilgrims.com] |
|---|---|
| **Sent**: | 2/6/2013 8:55:36 PM |
| **To**: | Bill.Lovette@pilgrims.com |
| **Subject**: | Fwd: KFC Boneless Model (3) (2).xlsx |

Sent from my iPhone

Begin forwarded message:

From: Roger Austin <Roger.Austin@pilgrims.com<mailto:Roger.Austin@pilgrims.com>>
Date: February 5, 2013, 6:25:40 PM MST
To: Thomas Lane <Thomas.Lane@pilgrims.com<mailto:Thomas.Lane@pilgrims.com>>
Subject: Fwd: KFC Boneless Model (3) (2).xlsx


Sent from my iPad

Begin forwarded message:

From: Jayson Penn <Jayson.Penn@pilgrims.com<mailto:Jayson.Penn@pilgrims.com>>
Date: February 5, 2013, 7:45:44 PM EST
To: Roger Austin <Roger.Austin@pilgrims.com<mailto:Roger.Austin@pilgrims.com>>
Subject: KFC Boneless Model (3) (2).xlsx

**Government Exhibit**

**20-cr-152-PAB**

**1705**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

PILGRIMS-0002567023

# ATTACHMENT P

| | |
|---|---|
| **From:** | "Pepper, Carl" <carl.pepper@tyson.com> |
| **Sent:** | Thu, 26 Dec 2013 14:24:23 +0000 (UTC) |
| **To:** | "Roberts, Brian" <Brian.Roberts@tyson.com>; "Mitchell, Jared"<Jared.Mitchell@tyson.com> |
| **Cc:** | "Mulrenin, Tim" <Tim.Mulrenin@tyson.com>; "Scheiderer, Tim"<tim.scheiderer@tyson.com> |
| **Subject:** | RE: Church's Chicken QA Requirements 2014 |

Talked to Jimmy Little and he said they were planning on adding to their cost to do this. They also didn't like it just showing up also.  I told Mike this should have been discussed during the contract and not just slipped in after the fact.

**From:** Roberts, Brian
**Sent:** Thursday, December 26, 2013 8:19 AM
**To:** Mitchell, Jared; Pepper, Carl
**Cc:** Mulrenin, Tim; Scheiderer, Tim
**Subject:** FW: Church's Chicken QA Requirements 2014

Brian Roberts
VP Sales, National Accounts
Tyson Foods
770 597-5779

**From:** Roberts, Brian
**Sent:** Thursday, December 26, 2013 9:18 AM
**To:** Lubert, Andy
**Cc:** Ramsey, Doug; Adcock, Bernie
**Subject:** RE: Church's Chicken QA Requirements 2014

Jared and I discussed this last week when we were together.  He is getting the estimated total cost which would include shipping and associated labor that together probably exceed the cost of the product.  Then we will know what the real impact is and add it to the QA line on the cost plus.  We will get it handled.

Brian Roberts
VP Sales, National Accounts
Tyson Foods
770 597-5779

**From:** Lubert, Andy
**Sent:** Tuesday, December 24, 2013 10:16 AM
**To:** Roberts, Brian
**Cc:** Ramsey, Doug; Adcock, Bernie
**Subject:** FW: Church's Chicken QA Requirements 2014

Thoughts on this?  This could expensive real quick.  Strips would be $3,000 per year + shipping for each sample barring no issues.  On Bone-In, It would be roughly $2,000 + shipping per plant?

We need to calculate what we could expect in cost and build it into the pricing.  If it was the cost of doing business like in the past, we would have already built it in.  Since it is "new", we need to be able to recoup our cost.

**From:** Ramsey, Doug
**Sent:** Monday, December 23, 2013 1:56 PM

> **Government Exhibit**
> **20-cr-152-PAB**
> **221**

CONFIDENTIAL

TY-000000101

**To:** Lubert, Andy; Adcock, Bernie
**Subject:** FW: Church's Chicken QA Requirements 2014

This was not in the pricing.

**From:** Bowlin, Darrell
**Sent:** Monday, December 23, 2013 1:21 PM
**To:** Ramsey, Doug
**Subject:** FW: Church's Chicken QA Requirements 2014

**From:** Bowlin, Darrell
**Sent:** Monday, December 23, 2013 1:18 PM
**To:** Scarrow, Travis; Hale, Mary; Leach, James; Ficklin, Cedric; Vick, Richard; Shannon, William; Martin, Lance; Whitten, LaDonna A.; Gill, Larry; Crum, James; Smith, Brad; Craig, Amanda
**Cc:** Davidson, Jeremy; Solomon, Charlie; Fulson, Melvin; Barnes, Stephan; Cullen, Steven; Campbell, Brandon W.; Baker, Debbie
**Subject:** FW: Church's Chicken QA Requirements 2014

Please see below and attachment for Bone-in product sold to Church's

**From:** Scheiderer, Tim
**Sent:** Saturday, December 21, 2013 6:38 PM
**To:** Sprouse, Phillip; Bowlin, Darrell
**Cc:** Hannigan, Mike
**Subject:** FW: Church's Chicken QA Requirements 2014

Just received this new QA inspection and cost that Church's is requiring for Strips and COB for 2014.  Please direct any questions you may have to Mike Hannigan.

**Tim Scheiderer**
**Director Business Management – National Accounts**
**Office 479-290-7374**
**Cell 479-595-3009**


Tyson Foods, Inc.

**From:** Hannigan, Mike
**Sent:** Saturday, December 21, 2013 9:16 AM
**To:** Pepper, Carl; Mitchell, Jared; Scheiderer, Tim
**Cc:** Mulrenin, Tim; Moix, Ed
**Subject:** Fwd: Church's Chicken QA Requirments 2014

See the attachments below; one for Strips, one for Bone In.  These are costs we have not incurred previously with a significant penalty for not maintaining quality.
I will send the requirements out to the plant FSQA managers.

Mike Hannigan - Mobile
Begin forwarded message:

**From:** Sarah Knust <SKnust@churchs.com>
**Date:** December 20, 2013 at 3:08:50 PM CST
**To:** "Hannigan, Mike" <mike.hannigan@tyson.com>
**Cc:** Grace Pope <GPope@churchs.com>, Dean Bradley <DBradley@churchs.com>
**Subject: Church's Chicken QA Requirments 2014**

Hello Mike,

I have attached Church's Chicken new QA Requirements for 2014 for your information.  This is for both strips and bone-in chicken.  Please contact me with any questions.

Regards,

CONFIDENTIAL

TY-000000102

Sarah

Sarah Knust
Sr. Director Quality Assurance
Church's Chicken
990 Hammond Drive
Suite 220
Atlanta, GA  30328
770-512-3928

---

CONFIDENTIALITY NOTICE : This e-mail contains information that is confidential, proprietary or legally privileged and is the property of Church's Chicken. If You are not the proper recipient of this Email, please notify the sender immediately by e-mail or call 770-350-3800 and delete the message.

CONFIDENTIAL

# ATTACHMENT Q

CONFIDENTIAL - FOIA EXEMPT

Message

| From: | Fisher, Sara [/O=UNIFIED FOODSERVICE PURCHASING COOP/OU=LOU_MAIL_MAIN/CN=RECIPIENTS/CN=SLOCKWOOD] |
|---|---|
| **Sent**: | 12/9/2016 9:26:26 AM |
| **To**: | Pepper, Carl [carl.pepper@tyson.com]; Mulrenin, Tim [Tim.Mulrenin@tyson.com]; Scheiderer, Tim [tim.scheiderer@tyson.com] |
| **CC**: | Eddington, Rich [rich.eddington@rscs.com] |
| **Subject**: | Next KFC COB Agreement |

Good Morning Tyson Team,

I hope you are doing well!  As we move into 2017, we are ready to begin conversations surrounding the next agreements beginning in 2018 for the KFC COB category .  We are targeting mid to late January for initial meetings and would like to discuss your detailed proposals at that time.  A couple of items to note in order to make the most of our meeting:

-	Use your current cost model template as basis for pricing discussion.
-	We will incorporate SCA modeling as the project progresses.
-	Provide a break out of your offered weekly production of 8 Pc/dark meat by plant.
-	When putting together your proposal, please keep in mind the importance to RSCS of offering the supplemental items as we look to award business.

Please let me know your best availability for the second half of January.  If you have any questions or if additional information is needed, please contact me.

We appreciate your partnership and look forward to speaking with you in early 2017!

Sara Fisher
Sr. Manager, Poultry Procurement
Restaurant Supply Chain Solutions
A Yum! Brands Co-op
Phone:  (502) 891-4711
Cell:  (502) 387-3868

**Government Exhibit**

**20-cr-152-PAB**

**1921**

RSCS018974

# ATTACHMENT R

**To:**       Kent Kronauge (kkronauge@smscooperative.com)[kkronauge@smscooperative.com]
**Cc:**       Brian.Coan@GeorgesInc.com[Brian.Coan@GeorgesInc.com]; Ric Blake
(ric.blake@georgesinc.com)[ric.blake@georgesinc.com]
**From:**    Dean Bradley
**Sent:**     2017-09-13T18:43:22Z
**Importance:**        High
**Subject:**   Revised Popeye's 2018 COB RFP-George's
**Received:**          2017-09-13T18:43:00Z
Popeye's 2018 COB RFP.xlsx

Kent,

Thank you for your time on the phone this afternoon.  George's is looking forward to continuing our partnership with Popeye's/SMS.  The following is an overview of our agreed upon proposal (attached) that we discussed:

        -$0.0075/lb decrease in cost model in year one and an additional $0.0075/lb decrease in cost model in year two
        -Our volume will be the same as this year for both 2018 and 2019 for 8pc and dark meat
        -You will continue to see the same mix between light and heavy 8pc
        -All freight rates will remain the same as 2017
        -Direct Store Door distribution increase of $.0050/lb in year one and $.0050/lb year two in order to account for increased costs (we are losing $.01/lb on direct store door distribution)

Thank you again for your time and this opportunity.

Regards,

**Dean Bradley | Director of National Accounts** | George's Inc. | PO Drawer G | Springdale, AR 72765-2030
Mobile: 479-231-6786 | www.georgesinc.com

Produced Pursuant to Grand Jury Subpoena # 19 GJ 256; Subject to Fed. R. Cr. P. 6(e)
May Contain Confidential Business Information; Not Subject to FOIA

GEODOJ_0166818

ATTACHMENT S

**To:**     Baine.Smith@perdue.com[Baine.Smith@perdue.com];Joe.gilmore@perdue.com[Joe.gilmore@perdue.com]
**From:**   Swain, Melissa 000
**Sent:**   Mon 4/25/2016 1:40:20 PM
**Subject:** Action Required - Sysco's Payment Terms Change for PERDUE
PERDUE_04.22.2016.docx

Dear Valued Supplier:

As communicated in the recent letter from Joel Grade, Sysco's Chief Financial Officer, Sysco's vision is "to be our customers' most valued and trusted business partner."  In support of this vision, we continue to invest in the efficiency of our end-to-end supply chain, which not only enables us to achieve our vision, it also enables us to be our suppliers' most effective platform for growth.

Payment terms reflect a company's creditworthiness and are a strategic enabler in creating efficiency within the supply chain. Sysco's accounts payable days sales outstanding (A/P DSO) is not reflective of our creditworthiness and is considerably "out of market" relative to other leading companies.  As a result, we have made the decision to extend and standardize payment terms with our suppliers effective immediately.  Based upon Sysco's payment terms policy, your new payment terms are as shown on the attached Payment Terms Change Form.

We appreciate that extending payment terms can be a sensitive topic for our suppliers.  Understanding this, Sysco is providing a way to enhance the cash flow for your company and reduce receivable times, by offering a Supply Chain Financing program with one of our partner banks, J. P. Morgan.  This program is completely optional; however, it makes it possible for your company to receive payment earlier by partnering with J. P. Morgan.  It allows you, the supplier, to receive payment within several days of the invoice being posted to the account and to receive your payments electronically.  Supply Chain Financing has the potential, in some cases, to save your company money on the cost of borrowing.

Within the next several days, I will contact you to answer any questions you may have and to assist you during your transition to Sysco's standardized payment terms.

I appreciate your cooperation on this important matter and look forward to building our mutual businesses.

Respectfully,

**Melissa Hoyt**
Sr. Director of Strategic Sourcing
Sysco Corporation
Swain.melissa@corp.sysco.com

T   281.584.4062
C   281.610.3283



# ATTACHMENT T

| | |
|---|---|
| **From:** | Bill Kantola(bilkan@kochfoods.com) |
| **To:** | Grendys, Joe |
| **CC:** | |
| **BCC:** | |
| **Subject:** | Past Bonus Plans |
| **Sent:** | 11/05/2012 12:00:00 AM -0700 (MST) |
| **Attachments:** | |

Joe, I looked everywhere and cannot find anything re: past bonus plans.

I'll attempt to give you a very brief overview of both the ConAgra and Pilgrim's plans as best I recall them.

ConAgra:

*Company had to generate a "Par" profitability to attain the necessary pool from which bonus monies would be accrued in order to pay by positional percentage levels, i.e. Sales Mgr at 25%, etc.

*The bonus levels varied by position, i.e. Sales Mgr were at 25%, Sales Directors were at 30%, VP's were at 50% (uncapped), SVP's /EVP's were at 75% (uncapped). I'm not sure about above that level. Basis the number of people in the pool, the percentage and associated dollar impact should "par" be achieved, monies were accrued to fund the pool. Obviously, no profit…no pool. ConAgra did pay if at least 70% of the "par" level was achieved, but obviously on a significantly reduced basis.

*80% of a person's bonus potential was basis overall company profitability and 20% was basis individual contribution to the company's profitability performance.

*The "par" level was typically set by a compensation committee predicated on projected earnings environment, anticipated significant company expenditures or significant acquisitions. These were typically achievable…with stretch…levels

Pilgrim's:

Until 2010, during my employment with Pilgrim's, bonus monies were limited to VP and above positions. The participant pool was greatly expanded beginning 2010.

*The pool accrual and pay-out was basically controlled in headquarters, but this is the way I understood it went.

*Typically 10% was accrued and placed into a pool. This number could fluctuate basis the number of participants, the level each participant could earn and frankly, if Bo wanted to retain some of it.

*VP earned 30%, SVP earned 50% EVP earned 75% and I don't know what the CFO, COO and CEO earned. These were all uncapped.

*Bonus payouts were 100% predicated on achieving the net profitability goal. There were no personal goals as the company made the assumption you were achieving your job duties if profits reflected. No adjustment…good or bad…was made for actual grain input costs versus estimated input costs. This wa strictly a profit-based incentive.

*Bo totally determined the final bonus pool allocation. Obviously this changed to a more widely known and determined number with the change of control.

**Government Exhibit**

**20-cr-152-PAB**

**9152**

# ATTACHMENT U

**From**: Scott Brady [/O=CLAXTON POULTRY FARMS/OU=CPF/CN=RECIPIENTS/CN=SCOTT_BRADY]
**Sent**: 11/28/2012 6:01:49 PM
**To**: Mikell Fries [mikell_fries@claxtonpoultry.com]
**Subject**: FW: KFC Bid

You might need this for the call.....

Scott Brady
Claxton Poultry
256-536-6120  office
678-640-1622  cell
Scott_Brady@Claxtonpoultry.com

**From:** Scott Brady
**Sent:** Wednesday, November 14, 2012 10:15 AM
**To:** Mark_oechsli@ufpc.com
**Subject:** KFC Bid

Mark,

Here is our updated form. On the wings we would like to be at market for the bulk packed and market plus .10 on the precounted. I plugged in what current market price is now. Please upload this information for me.

Thanks,

Scott Brady
Claxton Poultry
256-536-6120  office
678-640-1622  cell
Scott_Brady@Claxtonpoultry.com

**Government Exhibit**

**20-cr-152-PAB**

**1500**

CLA_0078000

# ATTACHMENT V

| **From:** | Kevin Grindle(kgrindle@marjacpoultry.com) |
|---|---|
| **To:** | Scott Brady (scott_brady@ClaxtonPoultry.com) |
| **CC:** | Greg Tench (gtench@marjacpoultry.com); Francis, Tommy (tfrancis@marjacpoultry.com) |
| **BCC:** | |
| **Subject:** | FW: KFC |
| **Sent:** | 02/14/2014 09:56:50 AM -0500 (EST) |
| **Attachments:** | |

**Scott, thanks. I will get you our number as soon as we have it.**
**Kevin**

**From:** Kevin Grindle [mailto:kgrindle@marjacpoultry.com]
**Sent:** Friday, February 14, 2014 9:52 AM
**To:** kgrindle@marjacpoultry.com
**Subject:** KFC
What is your number for KFC for period 3, our is 9085

**Kevin Grindle**
Mar-Jac Poultry
National Accounts/Foodservice
Cell: (678) 943-0783
Office: (770) 531-5046
Fax: (770) 531-5015
kgrindle@marjacpoultry.com

**Government Exhibit**
**20-cr-152-PAB**
**6155**

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                MAR-JAC_0000604476

# ATTACHMENT W

| | |
|---|---|
| **From:** | Kaminsky, Mark(/O=KOCHFOODS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MARK KAMINSKY) |
| **To:** | Grendys, Joe |
| **CC:** | |
| **BCC:** | |
| **Subject:** | Fwd: Pilgrim |
| **Sent:** | 08/06/2014 02:20:12 PM -0500 (CDT) |
| **Attachments:** | |

FYI

Sent from my iPhone

Begin forwarded message:

> **From:** "Kantola, Bill" <Bill.Kantola@kochfoods.com>
> **Date:** August 6, 2014 at 2:09:12 PM CDT
> **To:** "Kaminsky, Mark" <Mark.Kaminsky@kochfoods.com>
> **Subject: Re: Pilgrim**
>
> Pilgrims is Grain based...I understand everyone but Claxton is grain based...they are market based...but are going to grain based next year.
>
> Thanks
>
> Sent from my iPhone
>
>> On Aug 6, 2014, at 1:26 PM, "Kaminsky, Mark" <Mark.Kaminsky@kochfoods.com> wrote:
>>
>> Thanks
>>
>> Sent from my iPhone
>>
>>> On Aug 6, 2014, at 1:01 PM, "Kantola, Bill" <Bill.Kantola@kochfoods.com> wrote:
>>>
>>> Yes...be back to you
>>>
>>> Sent from my iPhone
>>>
>>>> On Aug 6, 2014, at 12:36 PM, "Kaminsky, Mark" <Mark.Kaminsky@kochfoods.com> wrote:

**Government Exhibit**
20-cr-152-PAB
**6131**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Can you find out if they are formula or grain based with CFA

Sent from my iPhone

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

KOCH_0001175648

ATTACHMENT X

**From**: Scott Brady [/O=CLAXTON POULTRY FARMS/OU=CPF/CN=RECIPIENTS/CN=SCOTT_BRADY]
**Sent**: 11/4/2013 7:46:10 PM
**To**: Mikell Fries [mikell_fries@claxtonpoultry.com]
**Subject**: FW: UFPC Round 1 Feedback

Scott Brady
Claxton Poultry
256-536-6120 office
678-640-1622 cell
Scott_Brady@Claxtonpoultry.com

**From:** Oechsli, Mark [mailto:Mark_Oechsli@ufpc.com]
**Sent:** Friday, November 01, 2013 4:33 PM
**To:** Scott Brady
**Cc:** Ledford, Mike; Hester, Mary; Campisano, Stephen
**Subject:** FW: UFPC Round 1 Feedback

As referenced in yesterday's e-mail below, here is the additional information.

You will find a "RFI 2014 Rnd 2" file as well as a "FOB Summary 2014 Rnd 2-supplier" file. Please review the RFI attachment for quotes on items being added to the FOB Summary. Please input quotes and capacities on the FOB Summary 2014 Rnd 2 file. To provide any additional details or clarifications about the new added RFI items, please respond in the yellow shaded area provided below each RFI question.

Also please update the FOB Summary file with revised quotes for all items based on the Round 1 feedback received.

Lastly, be sure to update the cost models (and add new ones for new items) so they match the Round 2 FOB Summary quotes.

All responses should be E-MAILED back to PoultryPurchasing@UFPC.com no later than Close Of Business on Tuesday November 5, 2014 and should include the following documents:

1.    "RFI 2014 Rnd 2"
2.    "FOB Summary 2014 Rnd 2-supplier"
3.    Cost Models that correspond Round 2 included all on one file with a different worksheet tab for each item.

Sincerely,

UFPC Poultry Purchasing Team

**Government Exhibit**
**20-cr-152-PAB**
**1703**

**From:** Oechsli, Mark **On Behalf Of** Poultry Purchasing
**Sent:** Thursday, October 31, 2013 6:31 PM
**To:** Scott Brady (scott_brady@claxtonpoultry.com)
**Cc:** Mike Ledford (Mike_Ledford@ufpc.com); Hester, Mary (Mary_Hester@ufpc.com); Campisano, Stephen
**Subject:** UFPC Round 1 Feedback

See attached feedback from the Round 1 Poultry RFP. We will be sending a request for additional information tomorrow (Friday).

HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

Let us know if you have questions.

Sincerely,

UFPC Poultry Purchasing Team

HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

CLAXTON_0012418

# ATTACHMENT Y

**From:**     Tommy Francis(tfrancis@marjacpoultry.com)
**To:**       John Davies
**CC:**
**BCC:**
**Subject:**  Fwd: Pricing model example
**Sent:**     08/19/2016 07:53:37 AM -0400 (EDT)
**Attachments:**

Print 3 copies of the emails and attachments I am sending please

Tommy Francis
Sent from my iPhone

Begin forwarded message:

> **From:** Scott Brady <scott_brady@ClaxtonPoultry.com>
> **Date:** August 19, 2016 at 6:38:51 AM CDT
> **To:** Tommy Francis <tfrancis@marjacpoultry.com>
> **Subject: FW: Pricing model example**

> fyi
> Scott Brady
> Claxton Poultry
> 256-536-6120 office
> 678-640-1622 cell
> Scott_Brady@Claxtonpoultry.com

> **From:** Scott Brady
> **Sent:** Friday, August 08, 2014 3:38 PM
> **To:** Mikell Fries <mikell_fries@ClaxtonPoultry.com>
> **Subject:** RE: Pricing model example
> Claxton pricing and overages. Filet overage is .70 and nugget overage is .75
> Filet Nugget
> Jan 2.48 2.53
> Feb 2.48 2.53
> March 2.49 2.54
> April 2.69 2.74
> May 2.8025 2.8525
> June 2.8690 2.9190
> July 2.9150 2.9650
> Aug 2.9050 2.9550
> Thanks,
> Scott Brady
> Claxton Poultry
> 256-536-6120 office
> 678-640-1622 cell
> Scott_Brady@Claxtonpoultry.com

> **From:** Scott Brady
> **Sent:** Friday, August 08, 2014 10:58 AM
> **To:** Mikell Fries
> **Subject:** RE: Pricing model example

**Government Exhibit**

**20-cr-152-PAB**

**6154**

Pilgrims overages;
Nuggets .58
Filets .51
Spicy .5385
Char .8385
Char nugget .7775
Tender .1885
Breakfast .53
Spicy breakfast .5385
Thanks,
Scott Brady
Claxton Poultry
256-536-6120 office
678-640-1622 cell
Scott_Brady@Claxtonpoultry.com

**From:** Scott Brady
**Sent:** Friday, August 08, 2014 10:20 AM
**To:** Mikell Fries
**Subject:** FW: Pricing model example
Pilgrims grain numbers. Breast meat increases in .0370 increments and tenders increase in .03 increments. I will call you.
Thanks,
Scott Brady
Claxton Poultry
256-536-6120 office
678-640-1622 cell
Scott_Brady@Claxtonpoultry.com

**From:** Justin Gay [mailto:Justin.Gay@pilgrims.com]
**Sent:** Thursday, August 22, 2013 12:37 PM
**To:** Scott Brady
**Subject:** FW: Pricing model example
This is the basic format we are using. We have a cost tab for each item that we are not planning to give them unless we have to give it. Last year they really just wanted to see the matrix page and the cover page.
Thanks,
Justin

**From:** David Rothmeier [mailto:david.rothmeier@chick-fil-a.com]
**Sent:** Wednesday, October 03, 2012 10:58 AM
**To:** Justin Gay
**Subject:** FW: Pricing model example
David Rothmeier | Chick-fil-A, Inc.
Supply Chain - Proteins, Seasonings, Dairy
P: 404.305.7684
F: 404.765.7879



**From:** David Rothmeier
**Sent:** Friday, June 15, 2012 2:56 PM
**To:** Scott Brady (Scott.Brady@pilgrims.com)

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Subject:** Pricing model example

Scott,

Attached is the example of the pricing model that we would like for you to consider. This is the grain based matrix model. If you have any questions, please do not hesitate to ask.

Have a great Father's Day weekend,

David

David Rothmeier | Chick-fil-A, Inc.

Supply Chain - Proteins, Seasonings, Dairy

P: 404.305.7684

F: 404.465.7879





HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# ATTACHMENT Z

1    permitted to stand.  And they know it's wrong at this point.

2    They know that those prices in his handwritten notes match up

3    to current prices, not future.

4         THE COURT:  Well, that's what trials are for.  The

5    witness doesn't know that.  In fact, he testified just the

6    opposite.  He assumed that they were true.  And logically it

7    would seem, you know, he had a logical basis to assume that.

8    Whether or not the government feels otherwise or whether or not

9    the government has some obligation in the search for the truth

10   to disabuse the jury's view is something that I can't talk

11   about, but certainly the defendants in the course of their case

12   or through cross-examination of other witnesses may be able to,

13   so I am not sure why we are holding the witness up for that

14   reason now.

15        MR. FELDBERG:  Understood, Your Honor.  Thank you.

16        THE COURT:  Thank you very much, Mr. Bryant.  You are

17   excused.

18        MR. KOENIG:  Your Honor, is he subject to recall?

19        THE COURT:  Is he?  Hearing none, no.

20        The United States may call its next witness.

21        MS. BUTTE:  The United States calls Mr. Philip Fanara.

22      (**Philip Fanara** was sworn.)

23        THE WITNESS:  I do.

24        COURT DEPUTY CLERK:  Please state your name and spell

25   your first and last name if the record.

Philip Fanara - Direct

1    THE WITNESS:  Philip Fanara, P-H-I-L-I-P, F-A-N-A-R-A.

2    THE COURT:  Ms. Butte, go ahead.

3                    **DIRECT EXAMINATION**

4    BY MS. BUTTE:

5    Q.  Good morning, Mr. Fanara.

6    A.  Good morning.

7    Q.  Where do you work?

8    A.  I am a trial analyst for AT&T.

9    Q.  What are your responsibilities as a trial analyst?

10   A.  Provide testimony for them in court.

11   MS. BUTTE:  Your Honor, I would like permission to

12   hand Ms. Grimm a binder of the exhibits for the witness and a

13   list of those documents.

14   THE COURT:  Yes, you may.

15   BY MS. BUTTE:

16   Q.  I will give you a moment to look through that.

17   A.  I have seen this before.  It was yesterday and also on a

18   couple of conference calls prior to that.

19   Q.  And what does this binder of documents contain?

20   A.  It shows different parts of reports from AT&T.

21   Q.  And what types of reports?

22   A.  They are considered billing reports, but they are mobility

23   usage reports, subscriber information and the like.

24   Q.  Does it include toll records?

25   A.  Yes, mobility usage, yes.

Philip Fanara - Direct

1    *Q.*  Are you familiar with how AT&T creates toll records?

2    *A.*  Yes.

3    *Q.*  Could you describe that process?

4    *A.*  Once the information is in our database and once a request

5    for a report is needed, we print out a report or send it

6    electronically.

7    *Q.*  Is that an automated process?

8    *A.*  It's an automated process to collect the information, but

9    when a report is generated, it's a request via like, for

10   example, a subpoena.

11   *Q.*  Is it a manual process to generate those documents?

12   *A.*  Yes.

13   *Q.*  Are you familiar with how toll records are stored?

14   *A.*  Yes.

15   *Q.*  Could you explain how they are stored?

16   *A.*  Once information is captured whether it's voice or data or

17   text, it's captured within our databases and all that

18   information is stored and ready for request.

19   *Q.*  Are toll records generated at or near the time calls are

20   made and received?

21   *A.*  Yes.

22   *Q.*  Are they kept in the course of AT&T's regularly conducted

23   business?

24   *A.*  Yes.

25   *Q.*  Are they kept as a regular practice?

Philip Fanara - Direct

1    A.   Yes.

2    Q.   Are the systems that generate these toll records reliable?

3    A.   Yes.

4    Q.   Are they accurate?

5    A.   Yes.

6    Q.   And does AT&T rely on that information, the information in

7    the toll records, in the course of its regularly conducted

8    business?

9    A.   Yes.

10   Q.   In your role at AT&T, are you familiar with subscriber

11   information?

12   A.   Yes.

13   Q.   What is subscriber information?

14   A.   Subscriber information is showing the financial liable

15   person who is responsible for the AT&T wireless service for

16   paying the AT&T wireless service.

17   Q.   Are you familiar with how subscriber information is stored?

18   A.   It's stored within a database just like all the other

19   reports.

20   Q.   And how does AT&T generate subscriber information?

21   A.   When a request is made, we generate a report for that.

22   Q.   Is subscriber information kept in the course of AT&T's

23   regularly conducted business?

24   A.   Yes.

25   Q.   Does AT&T rely on the information in the subscriber records

Philip Fanara - Direct

1    in the course of its regularly conducted business?

2    A.   Yes.

3    Q.   Are the systems that generate the subscriber information

4    reliable?

5    A.   Yes.

6    Q.   Are they accurate?

7    A.   Yes.

8    Q.   Are you familiar with how the subscriber information listed

9    in the binder in front of you was retrieved and copied in

10   response to the Department of Justice's subpoena?

11   A.   Say that again?

12   Q.   Yes.  Are you familiar -- so the subscriber information in

13   the binder in front of you, are you familiar with how that was

14   generated to respond to the subpoena by the Department of

15   Justice?

16   A.   Yes.

17   Q.   Could you describe that process?

18   A.   Once a subpoena was sent, we then created a report that was

19   sent to law enforcement, and they had that report in front of

20   them.

21   Q.   To the best of your knowledge, are the records in the

22   binder in front of you true copies of the original records that

23   were stored in AT&T's systems?

24   A.   Yes.

25   Q.   In your role at AT&T, are you familiar with the type of

Philip Fanara - Cross

1    account called a post-paid account?

2    *A.*   Yes.

3    *Q.*   What is a post-paid account?

4    *A.*   A post-paid account is an account set up for a customer who

5    pays on a monthly basis.

6    *Q.*   What does AT&T require to set up a post-paid account?

7    *A.*   With a post-paid account we do a credit background check on

8    a person.

9    *Q.*   Do you require any other information?

10   *A.*   Generally ask for name and address, other contact

11   information.

12   *Q.*   Is there any proof that a subscriber must give to provide

13   their name and address and contact information?

14   *A.*   There is government ID that is needed for a post-paid

15   account.

16          *MS. BUTTE:*   Thank you.  May I have a moment to confer?

17          *THE COURT:*   You may.

18          *MS. BUTTE:*   No further questions.

19          *THE COURT:*   Thank you.

20          Cross-examination?

21          *MR. SCHALL:*   Your Honor, may I hand up a binder to

22   Mr. Fanara?

23          *THE COURT:*   You may, or Ms. Grimm will hand it to him.

24                         **CROSS-EXAMINATION**

25   *BY MR. SCHALL:*

Philip Fanara - Cross

1   Q.  Mr. Fanara, can you hear me?

2   A.  Yes.

3   Q.  My name is Frank Schall.  I want to ask you a few questions

4   about the documents that you have in front of you.

5   A.  Okay.

6   Q.  First what I would like to talk to you about is just better

7   understanding the records and the information contained in

8   there.

9   A.  Okay.

10  Q.  Can you help me walk through some of them?

11  A.  I'll do my best.

12  Q.  I'm sorry, what was that?

13  A.  I'll do my best.

14  Q.  Perfect.  So what all type of information is contained in

15  toll records itself?

16  A.  Well, generally speaking when people say toll records, they

17  are sometimes called call details, mobility usage report,

18  subscriber information, wire line information.  There is a

19  number of different reports.

20  Q.  Okay.  Why don't we take a look at one of those -- it might

21  help -- walk through it.

22          Can you turn to Tab 31 in the binder in front of you?

23  Do you have that up?

24  A.  Yes, I do.  Yes.

25  Q.  So what is this report?

Philip Fanara - Cross

1    A.  It's a mobility usage report.

2    Q.  I just want to run through some of the headers so we

3    understand what's in here.

4    A.  Sure.

5          MS. BUTTE:  Your Honor, I believe this is outside the

6    scope of Mr. Fanara's examination.

7          THE COURT:  It is outside of the scope.

8          Response?

9          MR. SCHALL:  Your Honor, Mr. Fanara is here to verify

10   the authenticity of the documents.  These questions are meant

11   to elicit his familiarity with these documents and then get

12   into how he verified these are authentic.

13         THE COURT:  And why would he have to be familiar with

14   the content of the documents?

15         MR. SCHALL:  Well, Your Honor, the only thing that

16   Mr. Fanara has testified to is that he is familiar with the

17   process.  He has not laid a foundation as to how he has

18   verified these document came from the process.

19         THE COURT:  He testified that the documents that he

20   was asked to look at were true copies.

21         MR. SCHALL:  Yes, Your Honor, without a foundation for

22   how he considered them true copies.

23         THE COURT:  Okay.  And why would questions about

24   header information go to the issue of true copies?

25         MR. SCHALL:  Your Honor, these questions, if they are

Philip Fanara - Cross

1 | outside the scope, were just meant for all of us to better

2 | understand what sort of information is in the documents.  If

3 | the government objects to us trying to figure out what's in

4 | there, I can move on.

5 |        THE COURT:  Yeah, I am not sure why header information

6 | would have anything to do with whether or not they are true

7 | copies.  Sustained.

8 | BY MR. SCHALL:

9 | Q.  So Mr. Fanara, you testified that these are true copies of

10 | documents out of AT&T; is that correct?

11 | A.  Yes.

12 | Q.  What did you do to verify that?

13 | A.  I had several conference calls with people within the AT&T

14 | compliance center reviewing the documentation that was sent to

15 | law enforcement, along with reviewing these documents prior to

16 | coming here today as well.

17 | Q.  Okay.  And what did you specifically review?  Did you

18 | review hard copies?  Did you review electronic copies?

19 | A.  Both, actually.

20 | Q.  Okay.  And the electronic copies that you reviewed, where

21 | did you obtain those?

22 | A.  With AT&T compliance center.  They had the electronic

23 | copies.

24 | Q.  So you obtained those copies from AT&T, not from the

25 | government that you reviewed?

Philip Fanara - Cross

1  A.  No.  I shared them with -- they shared them with me.  I

2  didn't have them physically in my hand.  The physical copies

3  here I have seen before and I reviewed them with AT&T

4  compliance center.

5  Q.  So when you say they shared --

6  A.  Right, they shared via -- I don't know if it's Zoom.  I

7  forget whatever the format was that we used to share the

8  documentation.

9  Q.  I am just trying to understand who they is.

10  A.  AT&T compliance center.

11  Q.  Okay.  Thank you.  Now, in your review of these documents

12  that the government provided you, there were some that you

13  couldn't authenticate; is that correct?

14  A.  Some that I couldn't authenticate?

15  Q.  Yes.  Were there some documents that you could not

16  authenticate?

17  A.  No, I don't believe so.

18  Q.  None of the documents that you reviewed in preparation for

19  your testimony were you unable to authenticate?

20  A.  Nothing from this binder here.

21  Q.  Overall, not just the binder.

22  A.  Oh, there were probably other documentations that I can't

23  authenticate.

24  Q.  Do you remember why you couldn't authenticate those?

25  A.  Well, some in particular in a .TXT form, that's a delimited

Philip Fanara - Cross

1   form, and that stuff can be manipulated, so I can't testify to

2   that.

3   Q.  So did you look at the underlying documents provided from

4   AT&T to verify whether or not those were produced as PDFs or

5   produced as .TXTs or delimited files?

6   A.  Yes.

7   Q.  All the other ones were produced as PDFs?

8   A.  The ones that I can attest to are the PDFs.  I can't attest

9   to the .TXTs.

10  Q.  Can you pull up Government Exhibit 9656 in front of you

11  that the government handed you?

12  A.  What number?

13  Q.  It is I believe just 9656, an individual document the

14  government handed you.

15  A.  Okay.

16  Q.  Do you see that in front of you?

17  A.  Yes.

18  Q.  Is that a list of the documents that the government said is

19  in the binder that they handed you?

20  A.  I believe so, but I can't attest to this.

21  Q.  Okay.  Why don't we turn to one of those, then.  Can you

22  pull up Document GX-8000 in the binder in front of you?

23  A.  You said GX?

24  Q.  Just government exhibit.  It should be just 8000.

25  A.  Do you know where it's located specifically?

1206

Philip Fanara - Cross

1 | Q. I don't in the government's binder, but it's also in the

2 | binder that I handed you as well. Do you have that?

3 | A. Yes.

4 | Q. What is that document?

5 | A. It's a place holder document.

6 | Q. Is there anything behind it?

7 | A. No, there is nothing behind it.

8 | Q. Okay. Is that a document you reviewed to authenticate

9 | GX-8000 or did you review something else?

10 | A. No, the report, the mobility usage report I reviewed. This

11 | is just a place holder image.

12 | Q. Do you remember how big that document was?

13 | A. If I remember correctly, it's fairly big. I don't remember

14 | the number of pages. It was thousands, if I am not mistaken.

15 | Q. Does over 99,000 sound correct?

16 | A. It might be. I don't remember the exact page number.

17 | Q. Can you turn to Tab 8000 in the binder that I provided to

18 | you, sir?

19 | A. Yes.

20 | Q. What is that document?

21 | A. A place holder image and documentation for a mobility usage

22 | report.

23 | Q. And how many pages are behind that document?

24 | A. This one has 124 pages and for the -- let's see --

25 |         MS. BUTTE: Your Honor, it appears these are not

Philip Fanara - Cross

1  consecutively paginated, so I am not sure the question, if the

2  witness can answer it.

3        THE COURT:  He can answer if he knows.  Overruled.

4  A.  It just shows up to Page 124 on the text messages.  Voice

5  message section goes up to 630 -- 1630 pages.

6  BY MR. SCHALL:

7  Q.  Okay.  So is that a complete document of GX-8000 of those

8  over 99,000 pages?

9  A.  It's an excerpt from the report.

10 Q.  But AT&T keeps and stores its records on excerpts, but has

11 entire documents, correct?

12 A.  Yes.

13 Q.  Will you turn back to Government Exhibit 9656?  If you look

14 at the first couple of pages and the first word in the

15 description, what is that word?

16 A.  They say Excerpts.

17 Q.  The second page?

18 A.  Excerpt.

19 Q.  Top of the third page?

20 A.  Excerpt.

21 Q.  And then if you go to the last page, the last entry.

22 A.  Excerpt.

23 Q.  Okay.  AT&T doesn't keep and store their documents as

24 excerpts, correct?  They keep the entire toll records?

25 A.  That's correct.

1208
Philip Fanara - Redirect

1      MR. SCHALL:  May I have one moment, Your Honor?

2      THE COURT:  You may.

3      MR. SCHALL:  Your Honor, no further questions for the

4  witness, but we would request under Rule 106 of the entire

5  documents that are understating these excerpts are admitted

6  into evidence if Your Honor rules they are business records as

7  opposed to just the excerpts.

8      THE COURT:  Well, we haven't had anyone move them into

9  evidence yet, so we will wait until that time.

10      MR. SCHALL:  Understood, Your Honor.  We are just

11  trying to not have to recall the witness.  No further

12  questions.

13      THE COURT:  Thank you, Mr. Schall.

14      Additional cross?

15      All right.  Redirect?

16                    **REDIRECT EXAMINATION**

17  BY MS. BUTTE:

18  Q.  Mr. Fanara, were you able to review the full set of toll

19  records that were produced to the Department of Justice?

20  A.  Yes.

21  Q.  And you were able to review the excerpts that are in your

22  binder?

23  A.  Yes.

24  Q.  Are the excerpts true and accurate copies of those full

25  toll records, the portions of them?

1209

Philip Fanara - Redirect

1  A.  Yes.

2         MS. BUTTE:  Your Honor, at this time we would like to

3  move into evidence the exhibits listed on Mr. Fanara's exhibit

4  list which is marked as Government Exhibit 9656.

5         MR. SCHALL:  Again, we would like to object to the

6  extent that only excerpts are admitted.  We would request under

7  Rule 106 the full records that AT&T produced would be admitted

8  as business records.

9         THE COURT:  Let's first of all take up -- we will get

10  to that, Mr. Schall, in just one second.  But first of all,

11  let's determine -- and I don't have a copy of 9656, but I need

12  one.  All right.  So let me do this in a shorthand way.  To the

13  extent we have documents admitted, I will then read those to

14  the jury, but any objection to the exhibits listed on

15  Exhibit 9656 subject to Mr. Schall's point?

16         MR. SCHALL:  That would be our objection,

17  completeness.

18         MS. PREWITT:  Your Honor, I would like to join that

19  objection as well, just looking at the snippets that the

20  government has selected of the full set of records.

21         THE COURT:  Then those will be admitted.  I will read

22  those in just one moment.

23         Now let's take up the issue of whether documents of

24  which are listed -- and I believe that they are described on

25  9656 as being excerpts; is that right, Mr. Schall?

1210

Philip Fanara - Redirect

1        MR. SCHALL:  Yes, Your Honor.  I believe there are 36

2   of the 66 listed as excerpts.

3        THE COURT:  And do you have those, Mr. Schall?  Do you

4   have those in a form that would be admissible?  I mean, do you

5   have those exhibits?

6        MR. SCHALL:  Yes, Your Honor.  We can provide those.

7   Also I believe the underlying records are on here for those

8   documents.  They are seeking to submit the records, but also

9   excerpts as well.  We haven't been able to verify all of them

10   on this list are the full records, though.

11        THE COURT:  Okay.  So in other words, you think that

12   the complete records may be part of this even though other

13   exhibits are described as excerpts?

14        MR. SCHALL:  Yes, Your Honor.  There is an overlap of

15   both the excerpts and a full record that appears on 9656.

16        THE COURT:  Ms. Butte, let's get clarification of that

17   issue first.

18        MS. BUTTE:  Yes.  We have sought to admit into

19   evidence the full sets of toll records, but as Mr. Schall

20   noted, some of them are quite voluminous.  And for that reason

21   we have also sought to excerpt out portions that are relevant

22   because the voluminous records are not easy to show to

23   witnesses and also not easy to print out.

24        THE COURT:  And are there -- of the documents

25   described on 9656 as being excerpts, are any of those the

Philip Fanara - Redirect

1    complete version of any of those listed elsewhere on 9656?

2              MS. BUTTE:  They should be listed by the Bates number.

3    For example, Government Exhibit 8000 is a complete set of toll

4    records that is over 99,000 pages.  And many of these excerpts

5    are from that toll record in particular.

6              THE COURT:  And so Exhibit 8000, you actually intend

7    if I admit it to send back to the jury 8,000 pages of just

8    numbers?

9              MS. BUTTE:  So I think that's the question, Your

10   Honor.  We do have a native copy of that document that we

11   provided to defense counsel and to Your Honor.  I do not think

12   it would be wise to probably try to print out 99,000 pages of

13   documents.

14             THE COURT:  How would you give it to the jury?

15             MS. BUTTE:  If Your Honor prefers, we can just --

16             THE COURT:  I am saying like what utility would that

17   have with the jury, 8,000 pages?  How many pages?

18             MS. BUTTE:  It's 99,000 pages.

19             THE COURT:  99,000 pages of numbers?  I mean, why

20   would you do that?

21             MS. BUTTE:  That's why we are -- we do want to submit

22   the excerpts into evidence because we believe those are more

23   readily available to read and to be able to look at rather than

24   a 99,000-page document.

25             THE COURT:  But Exhibit 8000 is that.  You've moving

Philip Fanara - Redirect

1   to admit it.

2          MS. BUTTE:  Yes.  We sought to admit it in order --

3   for completeness to have the entire toll record where many of

4   these excerpts are from.

5          THE COURT:  Yeah, but why would completeness do the

6   jury any good?  I mean, why would we do that other than some

7   bugaboo of completeness?

8          MS. BUTTE:  We are happy to withdraw 8000 and rely on

9   the excerpts.

10          THE COURT:  Same question for you, Mr. Schall.  What

11   would be the purpose -- is there anything that's outside of

12   those excerpts that you think is going to be brought up during

13   this trial?

14          MR. SCHALL:  Yes, Your Honor.

15          THE COURT:  Okay, which ones?

16          MR. SCHALL:  Your Honor, we would like all the toll

17   records entered in because we anticipate performing and

18   presenting an analysis through a witness that we've already

19   identified, and we need all of the underlying documents to do

20   that, not just excerpts of what the government deems relevant.

21          THE COURT:  Right, but you have that already.

22          MR. SCHALL:  I'm sorry, Your Honor?

23          THE COURT:  You have that information already through

24   discovery, correct?  Why can't whoever might be preparing a

25   summary exhibit do that already?

Philip Fanara - Redirect

1          MR. SCHALL:  Your Honor, what we are attempting to do

2    is have to recall this witness to authenticate those exact same

3    underlying toll records.

4          THE COURT:  Well, why can't you ask him questions now.

5    And actually I think he has already answered the question as to

6    Exhibit 8000, he has already testified about that.  That's not

7    an excerpt.  That apparently is the whole thing.  You could ask

8    him additional questions if you didn't think they had already

9    been properly authenticated, but if they have been properly

10   authenticated through this witness, he wouldn't need to be

11   recalled, right?  You could move the admission of everything

12   or, you know, a summary and those underlying documents would

13   have already -- the authenticity would have already been

14   established.

15         MR. SCHALL:  Your Honor, we would love to move through

16   this witness all the AT&T records that we previously identified

17   before the government --

18         THE COURT:  I am just asking, and I haven't heard a

19   good answer, why would the jury need 99,000 pages of numbers?

20         MR. SCHALL:  Your Honor, the underlying information

21   would need to be admissible for that.

22         THE COURT:  Admissible isn't admitted.  It's

23   admissible, all right?  And if you don't have an objection to

24   the admissibility of that or if you want to establish the

25   authenticity of that through the witness, then it would seem

Philip Fanara - Redirect

1   that you wouldn't have a problem under the rule having a

2   summary exhibit.

3        MR. SCHALL:  So, Your Honor, just so that I

4   understand, you would be willing for us to authenticate

5   additional AT&T documents through this custodian so he doesn't

6   have to be recalled or --

7        THE COURT:  If Exhibit 8000, which seems to be

8   everything, has already been authenticated, which it sounds

9   like it has, then what additional foundation would need to be

10  laid through Mr. Fanara in order to prepare a Rule 1006

11  exhibit?

12       MR. SCHALL:  So to be clear, Your Honor, Exhibit 8000

13  is not the entirety of the AT&T records.  There are a number of

14  underlying toll records.  All the non-excerpted documents on

15  this, as well as additional records that we have identified, so

16  8000 isn't all encompassing the AT&T records.  It's just one

17  complete toll record.

18       THE COURT:  The bottom line is that until you are able

19  to have Mr. Fanara authenticate whatever is outside of the

20  excerpts that he looked at or ask him questions that would

21  establish that despite the fact that he was only asked to

22  authenticate excerpts that he has looked at the rest of the

23  documents, not just the excerpts, and can authenticate that, I

24  don't see a way for us now to be able to prevent his return.

25  But if you have additional questions for him, I would be happy

Philip Fanara - Redirect

1   to entertain those so that we can save Mr. Fanara a return

2   trip.

3           MR. SCHALL:  Our questions would necessarily go

4   outside the scope, if Your Honor is okay with that.

5           THE COURT:  Any objection to that, Ms. Butte?

6           MS. BUTTE:  We would like to have some notice of --

7           THE COURT:  You have notice.  Every one that says

8   Excerpt on your list, those.

9           MS. BUTTE:  We don't object to the authentication of

10  those documents and --

11          THE COURT:  The entirety of those?  You will stipulate

12  to the authenticity of the documents that -- for everything

13  that's listed on 9656 that says Excerpt, you are stipulating to

14  the authenticity of the entirety of that document?

15          MS. BUTTE:  Yes.  And I believe Your Honor actually

16  already previously ruled on these records as part of your

17  ruling on the 902(14) as authentic records.

18          THE COURT:  Yeah, I don't know that, but that may be

19  true.  The question is you are stipulating to the authenticity?

20          MS. BUTTE:  Yes.  We believe these documents are

21  authentic.  And just for point of clarification, there are

22  excerpts on here.  There are also full sets of toll records.

23  But there is also subscriber information which is a different

24  form of record that Mr. Fanara has testified about.  And the

25  subscriber information we have listed here are not excerpts of

Philip Fanara - Redirect

1    those documents.  They are not voluminous.  They vary from 10

2    to 20, 30 pages.

3         THE COURT:  I understand, but what we are talking

4    about now are the excerpts.

5         MS. BUTTE:  I just wanted to make sure that it was

6    clear that --

7         THE COURT:  We don't want to go too far afield.  We

8    are trying to pin this one down.  So we are only talking about

9    excerpts.

10        Mr. Schall, does that then satisfy the concern that

11   you had?

12        MR. SCHALL:  The stipulation as to authenticity of

13   excerpts?

14        THE COURT:  No, the authenticity of the entirety of

15   the record, you know, because your concern was going outside of

16   the excerpt; not just the authenticity of the excerpt, but the

17   authenticity of whatever the entirety of that particular

18   document was.  And Ms. Butte has stipulated to the authenticity

19   of the entirety of the document for everything listed on 9656

20   that says Excerpt.

21        MR. SCHALL:  Yes, that would help with the

22   authenticity of the underlying records identified here.  I

23   think we were also talking about additional AT&T records to

24   avoid recalling this custodian which would be necessarily

25   outside the scope as well.

Philip Fanara - Redirect

1          THE COURT:  Additional records that aren't listed

2     here.

3          MR. SCHALL:  Yes, Your Honor.

4          THE COURT:  I don't know how we avoid that.

5          Ladies and gentlemen, we are way past what the break

6     should have been, and as a result, let's go ahead and take our

7     break now.  We will plan on reconvening at quarter of, all

8     right, quarter of 11:00.

9          The jury is excused for the mid-morning break.

10          (Jury excused.)

11          We will be in recess.

12     (Recess at 10:25 a.m.)

13     (Reconvened at 10:48 a.m.)

14          THE COURT:  Let's bring the jury back in and let's

15     bring Mr. Fanara back in.

16          (Jury present.)

17          THE COURT:  All right.  So here is my ruling, and that

18     is I am admitting each of the exhibits, those listed on

19     Exhibit 9656.  I am also going to admit 9656 which is the list.

20     And Ladies and Gentlemen of the Jury, you'll remember that we

21     displayed a list of documents to you way back when, it was last

22     week, that had a long list of exhibits.  I am going to admit

23     that document too.  It was shown to you, so we are going to go

24     ahead and admit that.  That was Exhibit 9556.

25          And Mr. Schall, as to your request, I am going to deny

Philip Fanara - Redirect

1    that because I can't figure out what those documents actually

2    are.  But once again, if you wanted to lay some additional

3    foundation with Mr. Fanara right now, you can, but right now I

4    just don't see how we could necessarily prevent Mr. Fanara from

5    having -- from being subject to recall.

6            MR. SCHALL:  Yes, Your Honor, if I can ask maybe a

7    handful of questions.

8            THE COURT:  You may do so right now.  Go ahead.

9            MS. BUTTE:  May I just have one clarification?  The

10   exhibit list is 9656.

11           THE COURT:  Yes, I am sorry.  If I misspoke, the

12   exhibit list that we're talking about right now is 9656, but I

13   admitted 9556 from last week.

14           MS. BUTTE:  Thank you.

15           THE COURT:  Mr. Schall, go ahead.

16   BY MR. SCHALL:

17   Q.  Mr. Fanara, the process you talked about AT&T going through

18   collecting and producing documents, is that the same process

19   AT&T uses for all subpoenas that it receives?

20   A.  Yes.

21   Q.  The exact same collection, the exact same production?

22   A.  Well, it's a different report and so forth.

23   Q.  But it would follow the exact same process?

24   A.  Yes.

25           MR. SCHALL:  No further questions, Your Honor.

Kenneth Oliver - Direct

1       *THE COURT:*  Any additional follow-up questions as to

2   Mr. Schall's question?

3       *MS. BUTTE:*  No further questions, Your Honor.

4       *THE COURT:*  So Mr. Fanara, you're subject to recall,

5   we'll see, but if that's necessary, someone will let you know.

6   Thank you very much, Mr. Fanara.  You are excused.

7       And Ms. Butte, if you would like at this time to -- in

8   fact, I will ask that you display through the document viewer

9   Exhibit 9656.

10      *MS. BUTTE:*  Thank you, Your Honor.

11      *THE COURT:*  Okay.  We can do that for the second page.

12  And third page.  Everyone done with that?  Okay, and the fourth

13  page.  And last, but not least, the fifth page.

14      All right.  Thank you, Ms. Butte.  Anything else?  You

15  have a next witness?

16      *MS. BUTTE:*  Our next witness is ready, Your Honor.

17      *THE COURT:*  You may call your next witness.

18      *MS. BUTTE:*  The United States calls Ken Oliver.

19      (**Kenneth Oliver** was sworn.)

20      *THE WITNESS:*  I do.

21      *COURT DEPUTY CLERK:*  Please state your name and spell

22  your first and last name for the record.

23      *THE WITNESS:*  Kenneth Oliver, K-E-N-N-E-T-H,

24  O-L-I-V-E-R.

25                      **DIRECT EXAMINATION**

# ATTACHMENT AA

Melissa Sandoval - Direct

1    excused.

2         Normally even with 10 minutes left we would call a

3    witness, but I am wondering whether or not it would be

4    efficient given the nature of the witness to be called whether

5    we should or not.

6         The government's view?  We can.

7         *MS. ROGOWSKI:*  Your Honor, next we intend to call just

8    a Verizon custodian of records.  I believe we could get done

9    within a relatively short amount of time.

10        *THE COURT:*  Well, the question is whether that

11   relatively short amount of time is within the next 10 minutes.

12   We can if you want.

13        Okay.  Let's go ahead and call the witness.  We may

14   not finish, but we can start the witness.

15      (**Melissa Sandoval** was sworn.)

16        *THE WITNESS:*  I do.

17        *COURT DEPUTY CLERK:*  Please state your name and spell

18   your first and last name for the record.

19        *THE WITNESS:*  Melissa Lee Sandoval, M-E-L-I-S-S-A,

20   S-A-N-D-O-V-A-L.

21                     **DIRECT EXAMINATION**

22   *BY MS. ROGOWSKI:*

23   *Q.*  Ms. Sandoval, before we begin, do you also have a copy of

24   what's been marked as Government Exhibit 9556?

25   *A.*  Yes, I do.

Melissa Sandoval - Direct

1   Q.  Great.  Ms. Sandoval, can you please give the jury an idea

2   of your education?

3   A.  I have attended high school.  I have attended some college.

4   I do not currently have a degree.

5          MR. TUBACH:  Your Honor, I am having a really tough

6   time hearing the witness.

7          THE COURT:  Ms. Sandoval, if you don't mind, scoot

8   your chair in, and then lean into the microphone just a little

9   bit.  The masks obviously have a bit of an effect.  You might

10  even try raising the microphone a tad so it's closer to your

11  mouth.  Great.  Thank you very much.  And then speak up too.

12         THE WITNESS:  Okay.  I will try.

13  BY MS. ROGOWSKI:

14  Q.  Ms. Sandoval, where do you work?

15  A.  I work at Verizon Wireless.

16  Q.  How long have you worked there?

17  A.  I have worked there for 23 years.

18  Q.  What's your job title?

19  A.  I am a senior analyst with the executive relations team.

20  Q.  Could you please briefly describe your responsibilities as

21  a senior analyst?

22  A.  Certainly.  So part of my duties and responsibilities

23  include I appear as a custodian of records to authenticate

24  Verizon's business records.  I also handle small claims

25  litigation, arbitrations, mediations, executive level

Melissa Sandoval - Direct

1  complaints and agency disputes.

2  Q.  So Ms. Sandoval, I would like to direct your attention to

3  what's been marked as Government Exhibit 9556 and the binder

4  that's been placed in front of you.  Do you recognize both this

5  exhibit and the binder placed in front of you?

6  A.  Yes, I do.

7  Q.  How do you recognize it?

8  A.  These are Verizon records that I had an opportunity to

9  review prior to my testimony today.

10  Q.  And you also -- how do you recognize the exhibit?

11  A.  I am sorry, can you repeat that?

12  Q.  How do you recognize Exhibit 9556?

13  A.  Actually, I apologize.  I think I am looking at something

14  other than that piece of paper that's in front of you.

15       MS. ROGOWSKI:  I have an extra copy, Your Honor.

16  Permission to approach the witness?

17       THE COURT:  Mr. Keech will hand it up.

18  BY MS. ROGOWSKI:

19  Q.  And once you have had a chance to look, could you please

20  let the jury know how you recognize the list and if you do?

21  A.  This is essentially a list of all the exhibits that are

22  part of the binder that I had an opportunity to review prior to

23  today.

24  Q.  Could you give the jury an idea of what is in the binder

25  that you had an opportunity to review for today?

Melissa Sandoval - Direct

1   *A.* So the binder contains toll records, subscriber

2   information, call detail records, text detail records.  There

3   are also activation and deactivation date information, device

4   ID information.  I believe there is also some other numbers

5   that are associated with specific accounts, explanation sheets.

6   I am trying to think if there was anything else that I recalled

7   seeing in the binder.  There may be one or two other items that

8   are included.

9   *Q.* Well, if you remember anything later on, please feel free

10  to let me know, but that's all as far as I am aware of what's

11  contained in the binder.

12          In your role with Verizon, Ms. Sandoval, are you aware

13  of whether Verizon creates toll records?

14  *A.* Yes, we do.

15  *Q.* Could you please explain to the jury what a toll record is?

16  *A.* A toll record is essentially a billing record.  It provides

17  information about calls placed and received, dates, times,

18  minutes of use.  Things like that are included in the toll

19  record.  It's essentially a bill that the consumer receives.

20  *Q.* Are you familiar with how Verizon creates toll records

21  which you say are essentially a bill?

22  *A.* Yes.

23  *Q.* Could you please explain?

24  *A.* Certainly.  Basically our network captures all of the call

25  activity on the switches in a specific area.  That information

Melissa Sandoval - Direct

1    is then downloaded into a billing file and that billing record

2    is then created depending on where the subscriber is

3    geographically.  The bill might have a little bit of a

4    different formatting or based on their plan, but essentially

5    that's how the toll record comes into play.

6    Q.  And are you familiar with how these toll records are

7    stored?

8    A.  Yes.

9    Q.  Could you please explain?

10   A.  The records are essentially stored electronically on a

11   network.

12   Q.  Are toll records made during the course of the regularly

13   conducted course of Verizon's business?

14   A.  Yes.

15   Q.  When are toll records generated, Ms. Sandoval?

16   A.  The actual records are generated at or near the time that

17   the calls are placed or received on our network.  Same thing

18   with text information, or shortly thereafter.

19   Q.  Is the making of the toll records a regular practice of

20   Verizon?

21   A.  Yes.

22   Q.  You touched on this briefly, but I wanted to ask again, you

23   said the Verizon toll records are sort of like a bill,

24   essentially a bill.  So how does Verizon use the toll records?

25   A.  The toll records are used primarily for billing purposes.

Melissa Sandoval - Direct

1   Q.  Let's move on to subscriber information.

2          In your role at Verizon, are you familiar with what

3   subscriber information is?

4   A.  Yes.

5   Q.  Could you please briefly explain what it is to the jury?

6   A.  Certainly.  So subscriber information would be the

7   consumer's first and last name.  We do take middle initial if

8   it's available.  It also includes their address, any contact

9   information so we can have a way to reach them.  Let's see what

10  else is included.  Subscriber information also includes

11  activation and deactivation dates as well for an account, as

12  well as the account number and the phone numbers that are

13  associated with their account.

14  Q.  Are you familiar with how this information is created?

15  A.  Yes.

16  Q.  Could you please explain?

17  A.  So the subscriber information is essentially obtained from

18  the subscriber or the consumer.  And it's essentially put into

19  the computer system so that we can ensure that that information

20  is associated with the appropriate toll record.

21  Q.  And are you familiar with how this information is stored?

22  A.  Yes.

23  Q.  Could you please explain?

24  A.  Certainly.  So the information is also stored

25  electronically.

Melissa Sandoval - Direct

1   *Q.* And when is the subscriber information generated?

2   *A.* Well, the subscriber information is obtained at the time

3   the service is set up.  That information can be modified at a

4   later time.  If, for example, the subscriber moves or has a

5   phone number change, things like that, then they would either

6   advise us or they can make the changes on line.  However, they

7   can't change their name, for example.  That remains as is, as

8   well as Social Security information would also remain

9   unchanged.

10  *Q.* How does Verizon use the subscriber information?

11  *A.* We use that information to essentially bill the customer

12  and also to make sure we have the appropriate contact

13  information that we need to reach them.

14  *Q.* And is making the subscriber information a regular practice

15  of Verizon?

16  *A.* Yes.

17  *Q.* Ms. Sandoval, are you familiar with how this -- particular

18  to the subscriber information in that binder, are you familiar

19  with how it was retrieved and copied in response to a subpoena

20  by the Department of Justice?

21  *A.* Can you repeat the question?

22  *Q.* Are you familiar with how the subscriber information in the

23  binder in front of you, just particularly subscriber

24  information, was retrieved and copied and given to the

25  Department of Justice?

1    A.   Yes.

2    Q.   Could you please explain?

3    A.   So when there is a request made for records, it goes

4    through our Verizon security assistance team.  They ensure that

5    the proper legal process is followed and that information is

6    then essentially downloaded from our computer system and then

7    sent over by way of -- generally it's a CD.  It can also be

8    e-mailed or hard copy mailed to the requester.  I believe in

9    this case some information was sent via CD and there may have

10   been some e-mailed as well.

11   Q.   To the best of your knowledge, Ms. Sandoval, is this

12   process of copying the information to a CD, is that process

13   accurate or not accurate?

14   A.   To my knowledge, it's accurate.  I have seen it done

15   before.

16           THE COURT:  Sorry, now we are at 5:00 o'clock.  So

17   would this be a convenient time to break?

18           MS. ROGOWSKI:  Yes, Your Honor.

19           THE COURT:  Ladies and gentlemen, we will go ahead and

20   recess for the day.  Let me mention a couple of things.

21           Mr. Kahler, how are you doing down there?

22           JUROR:  I am all right.

23           THE COURT:  I don't want you to strain anything while

24   you are leaning.

25           Here is one thing I wanted to mention to the jurors.

1   So those of you who are fully vaccinated, if you wish, if you

2   feel comfortable as time goes on, you can, if you wish, move

3   closer to people.  If, once again, totally if you wish, and it

4   could provide Mr. Kahler with a seat, you don't have to do

5   that.  If you are good where you are, that's fine, or you are

6   also free -- I would like those of you who are over at the

7   right-hand side, my right-hand side, to stay in the same order.

8   But for those of you who are on the end, if you want to come up

9   with a rotation system to avoid Mr. Kahler hanging out, I mean,

10  Mr. Kahler, great microphone passer, yesterday was a great door

11  holder.  You know, he steps up like that, but I am just saying

12  that you can do that if you want.

13          JUROR:  I appreciate it.

14          THE COURT:  Ladies and gentlemen, same rules as

15  before.  I want to emphasize to you again you can't talk about

16  the case at all amongst yourselves.  When you get home, don't

17  talk to anyone.  Don't let -- you have to be vigilant about

18  that because it's going to be a while.  You have to keep that

19  up.  At the end of the trial, you can let loose on family

20  members, tell them everything you want, but maintain your

21  vigilance up to that point.  Don't look up any information.

22          And as Mr. Perez just did, the best way to get past

23  those monitors when you are leaving or coming back in is to

24  turn them so that they're sideways, not sideways as they are

25  now, but Mr. Tumminello, turn it the other way and push it back

1   towards the seat back.  I think that will allow you to get past

2   them easier.  They should turn all the way so they are facing

3   back.  Well, if they don't, don't try it.  Of course, we don't

4   want to push our luck.  They should be able to do that because

5   that way people could look at them.  Okay, great.  Have a good

6   evening ladies and gentlemen.  The jury is excused.

7           (Jury excused.)

8           Ms. Sandoval, you are excused.  Can you be back here

9   so we can resume at 8:30 tomorrow?

10          *THE WITNESS:*  Yes, your Honor.

11          *THE COURT:*  Great.  Thank you very much.

12          Just a few things.  This is for everyone including the

13  audience too.  We have had a few, as I count, three instances

14  today where cellphones have gone off.  I don't want to get to

15  the point where I order that everyone have their cellphones

16  off, but if you're in here, regardless of who you are, the

17  attorneys too, you have to have the cellphones silenced.  They

18  can't go off, okay?  On the whole people have been great about

19  it and everyone has been very quiet, and I very much appreciate

20  that, but just try to remember that about your phones, okay?

21          Also a number of exhibits were presented today that

22  aren't on my exhibit list.  We don't have them.  They are not

23  on any thumb drive that you have given to the Court and copies

24  weren't given to me when they were presented, so that's not

25  good.  So you need to figure out a way to correct that problem.

Melissa Sandoval - Direct

1          *MS. ROGOWSKI:*  Yes, Your Honor.

2          *THE COURT:*  All right.  Go ahead.

3      (**Melissa Sandoval** was previously sworn.)

4              **DIRECT EXAMINATION CONTINUED**

5   *BY MS. ROGOWSKI:*

6   *Q.*  Good morning, Ms. Sandoval.

7   *A.*  Good morning.

8   *Q.*  Ms. Sandoval, in your work at Verizon, are you familiar

9   with the type of account called a post-paid account?

10  *A.*  Yes.

11  *Q.*  Can you please explain what it is?

12  *A.*  Certainly.  A post-paid account is essentially a consumer

13  account that is billed monthly for services.

14  *Q.*  Are post-paid accounts paid before or after calls are

15  actually made?

16  *A.*  Well, you are billed in advance for access to the service,

17  but the calls that you make typically appear on the following

18  statement, so you are essentially paying ahead to have the

19  service available to you.

20  *Q.*  And in order to set up a post-paid account, is there

21  anything in particular you need to do or provide to Verizon

22  Wireless?

23  *A.*  Yes, there is.

24  *Q.*  Could you please explain?

25  *A.*  Certainly.  In order to set up a post-paid account, you

Melissa Sandoval - Direct

1    would need a government issued ID, so it could be a driver's

2    license or a state identification card, and we do ask for the

3    Social Security number.

4         MS. ROGOWSKI:  No further questions, Your Honor.

5         THE COURT:  Thank you.

6         Cross-examination anyone?

7         All right.  May Ms. Sandoval be excused?

8         MS. ROGOWSKI:  Before Ms. Sandoval is excused, just

9    because we are not quite sure where we are with stipulations,

10   we would like to respectfully request a ruling on the 803(6)

11   foundation of the subscriber information and the toll records.

12   And we would also respectfully request a ruling on the 901

13   authenticity of just the subscriber information.

14        THE COURT:  Well, I can't do that, but what I can do

15   is you can offer into evidence certain exhibits and then we

16   will figure that out.  Is that what you intend to do?

17        MS. ROGOWSKI:  Yes, Your Honor.  We would like to

18   offer into evidence the exhibits that are on what's been marked

19   as Government's Exhibit 9556.

20        THE COURT:  I don't have a copy of that.

21        MS. ROGOWSKI:  May I provide you with a copy?

22        THE COURT:  Mr. Keech can hand it up.

23        MS. ROGOWSKI:  Provide Mr. Keech with a copy?

24        THE COURT:  Okay.  Let me ask whether defendants have

25   a copy of what is marked as Government's Exhibit 9556 which

Melissa Sandoval - Direct

1   contains and which consists of a list of government trial

2   exhibits listing various what I assume to be Verizon records on

3   it.  And the question then becomes whether there is any

4   objection to the admission of the exhibits listed on

5   Exhibit 9556.

6          MS. ROGOWSKI:  Your Honor, I believe the defendants do

7   have an electronic copy.  I am happy to provide a paper copy if

8   anyone needs one, but I will let them speak to whether they

9   have any objections.

10         THE COURT:  Okay.  Any objection?  I don't hear any

11  objection.

12         So ladies and gentlemen, this is a bit lengthy, but I

13  don't want to just be admitting a bunch of exhibits that you

14  don't hear about, so I am going to read to you those exhibits

15  that are admitted.  Exhibit 352, Exhibit 352-1, Exhibit 495,

16  Exhibit 495-1, Exhibit 496, Exhibit 497, Exhibit 497-1,

17  Exhibit 499, Exhibit 499-1 -- actually, why don't we do this.

18  This might actually be a little bit more efficient.

19  Ms. Rogowski, can you display Exhibit 9556 on the document

20  viewer?

21         MS. ROGOWSKI:  Yes, Your Honor.

22         COURT DEPUTY CLERK:  Your Honor, if I could get a copy

23  of that at some point too, please.

24         THE COURT:  Yes.  Exhibit 9556 is not admitted, but it

25  will be made part of the record to indicate that these

Melissa Sandoval - Direct

1    particular exhibits have been admitted.  So why don't we

2    reorient that document.  Is there a way to reorient it and then

3    also turn it around?  If we can't --

4           MS. ROGOWSKI:  No, Your Honor, I don't believe there

5    is a way.

6           THE COURT:  Let's just do it like that, then.  All

7    right.  And Ms. Rogowski, if you can then flip that document

8    over and show it to the jury.

9           All right.  Thank you, Ms. Rogowski.

10          So ladies and gentlemen, each of those exhibits has

11   been admitted, all right?

12          Ms. Sandoval, any request that Ms. Sandoval remain?

13          MR. PLUMLEE:  Your Honor, Chris Plumlee for Mr. Blake.

14   I would just note Ms. Sandoval is under subpoena by the

15   defense.  And we will certainly address with her whether there

16   is a need for her at a later time.

17          THE COURT:  Yes, thank you.  Ms. Sandoval, it sounds

18   like you have another subpoena, so if you can just make sure to

19   be in contact with Mr. Plumlee or whoever.

20          THE WITNESS:  Absolutely.

21          THE COURT:  Thank you.  You are excused.

22          MS. ROGOWSKI:  Just one thing if I may, Your Honor.

23   The copy that I showed to the jury that I showed through the

24   document viewer actually has some checkmarks on it.  If you

25   like, I can provide that copy to Mr. Keech.

Matthew Bunch - Direct

1          THE COURT:  I am sorry, what about the checkmarks?

2          MS. ROGOWSKI:  It had some checkmarks on it as you

3     were reading the numbers.

4          THE COURT:  If you can provide a clean copy to

5     Mr. Keech.

6          COURT DEPUTY CLERK:  I just needed it to keep track of

7     what exhibits have been received.

8          THE COURT:  Yes, but it has been shown to the jury.

9     We will retain a copy of Exhibit 9556.  It hasn't been

10    admitted, but it has been displayed.  It's just a list of the

11    documents that were admitted through Ms. Sandoval.

12    Ms. Sandoval, thank you very much.

13         THE WITNESS:  Thank you.

14         THE COURT:  The United States may call its next

15    witness.

16         MS. BUTTE:  Laura Butte for the United States.  We

17    would like to call Matthew Bunch.

18       (**Matthew Bunch** was sworn.)

19         THE WITNESS:  I do.

20         COURT DEPUTY CLERK:  Please state your name and spell

21    your first and last for the record.

22         THE WITNESS:  It is Matthew Wayne Bunch,

23    M-A-T-T-H-E-W, B-U-N-C-H.

24                        **DIRECT EXAMINATION**

25    BY MS. BUTTE:

# ATTACHMENT BB



Executive Relations
P.O. Box 3190
Chandler, AZ  85244

January 31, 2022

To Whom It May Concern:

After careful consideration, the decision has been made to restrict all Custodian of Record travel until further notice, due to COVID 19 and recent variants increasing infections amongst our staff.

Our Verizon Security Assistance Team (VSAT) provide records pursuant to legal process, with certification that the records produced are authentic business records. The purpose of the certification is to help the requesting party establish that the records are reliable, and more specifically can be admitted under the business records exception to the hearsay rule and as self-authenticating. In the vast majority of cases for which we produce records, no witness is required to introduce them into evidence in court. That is, the certification is sufficient.

Due to the restrictions mentioned above, in previous travel bans within the company, Senior Analysts from our Executive Relations Court Team have used web conferencing technology, such as Webex, Zoom, Google Meet, and BlueJeans, as an acceptable substitute to live testimony. We have also provided declarative testimony in tandem with certified records to assist with their admission into evidence.

We understand you have been working with Melissa Sandoval, one of our Senior Analysts, in Court Case No. 1:20-cr-00152-PAB, United States of America v. Jayson Penn et al. While they are subject to the restrictions of travel and field visits to external locations, Verizon is happy to partner with you to find a safe way to assist with getting the certified business records entered into evidence.

Respectfully,

*Jody Citizen*

Jody Citizen
Sr. Manager - Executive Relations & ECE/HUM
Verizon Wireless

# ATTACHMENT CC

Kenneth Oliver - Direct

 1          *THE COURT:*  Any additional follow-up questions as to

 2   Mr. Schall's question?

 3          *MS. BUTTE:*  No further questions, Your Honor.

 4          *THE COURT:*  So Mr. Fanara, you're subject to recall,

 5   we'll see, but if that's necessary, someone will let you know.

 6   Thank you very much, Mr. Fanara.  You are excused.

 7          And Ms. Butte, if you would like at this time to -- in

 8   fact, I will ask that you display through the document viewer

 9   Exhibit 9656.

10          *MS. BUTTE:*  Thank you, Your Honor.

11          *THE COURT:*  Okay.  We can do that for the second page.

12   And third page.  Everyone done with that?  Okay, and the fourth

13   page.  And last, but not least, the fifth page.

14          All right.  Thank you, Ms. Butte.  Anything else?  You

15   have a next witness?

16          *MS. BUTTE:*  Our next witness is ready, Your Honor.

17          *THE COURT:*  You may call your next witness.

18          *MS. BUTTE:*  The United States calls Ken Oliver.

19      (**Kenneth Oliver** was sworn.)

20          *THE WITNESS:*  I do.

21          *COURT DEPUTY CLERK:*  Please state your name and spell

22   your first and last name for the record.

23          *THE WITNESS:*  Kenneth Oliver, K-E-N-N-E-T-H,

24   O-L-I-V-E-R.

25                        **DIRECT EXAMINATION**

Kenneth Oliver - Direct

 1   *BY MS. BUTTE:*

 2   *Q.*  Good morning, Mr. Oliver.  Where do you work?

 3   *A.*  I work at FTI Consulting as a managing director in the

 4   digital forensics investigations team.

 5   *Q.*  Where did you work before FTI Consulting?

 6   *A.*  Before FTI Consulting I spent two years working for

 7   Consilio.

 8   *Q.*  Where did you work before Consilio?

 9   *A.*  Before Consilio I worked at The Oliver Group.

10   *Q.*  What were your responsibilities at The Oliver Group?

11   *A.*  At The Oliver Group I was vice-president and partner for

12   the data acquisition and forensics team which I managed for our

13   international group.

14   *Q.*  Was The Oliver Group retained by Tyson Foods or a firm on

15   behalf of Tyson Foods?

16   *A.*  It was.

17   *Q.*  What was The Oliver Group retained to do?

18   *A.*  It was retained to forensically collect evidence.

19   *Q.*  What type of evidence did The Oliver Group forensically

20   collect?

21   *A.*  In this matter, computer hard drives.

22   *Q.*  Did that include laptops of Tyson Foods employees?

23   *A.*  It did.

24   *Q.*  What did The Oliver Group do to collect data from those

25   laptops?

Kenneth Oliver - Direct

1   *A.* We had the custodians meet us in a conference room where I

2   was -- where I had them log into their devices.  And I used FTK

3   imager to perform a live forensic image.

4   *Q.* Did you image the laptop of Richard Collyar?

5   *A.* I did.

6   *Q.* When did that occur?

7   *A.* That was on July 10th, 2019.

8   *Q.* Could you briefly explain the process for imaging

9   Mr. Collyar's laptop?

10  *A.* Sure.  Again, as described, I met with the custodian in a

11  private conference room where they logged into their device to

12  give us access to the file system.  We then used a forensic

13  tool called FTK imager to create a bit level image of the

14  device.

15          *THE COURT:* Mr. Oliver, do you mind, if you could lean

16  into that microphone just a little bit.

17  *BY MS. BUTTE:*

18  *Q.* Did you do anything to verify the image once you collected

19  it?

20  *A.* Yes.  As part of our standard process, we provide a hash

21  verification of the forensic image.

22  *Q.* What is a hash verification?

23  *A.* Basically it's a -- it would be considered to be a digital

24  fingerprint of the image -- the forensic image file which

25  identifies it as being unique.

Kenneth Oliver - Direct

1   *Q.*  And is your imaging process and hash verification value

2   analysis a reliable process?

3   *A.*  It is.

4   *Q.*  Is it accurate?

5   *A.*  It is.

6           *MS. BUTTE:*  I would like permission to hand the

7   witness through Ms. Grimm Government Exhibit 3074.

8               *THE COURT:*  You may.

9           *MR. TUBACH:*  Do you have a copy for counsel?

10          Can we be heard briefly on side bar?

11              *THE COURT:*  Yes.

12       (At the bench:)

13              *THE COURT:*  Mr. Tubach, go ahead.

14       *MR. TUBACH:*  Your Honor, I believe we had a rule in

15  place that the government was to provide two days' notice of

16  any exhibit they intended to show a witness.  I don't believe

17  we got this within two days.  I believe this came in late last

18  night sometime.  And this witness is a new witness that was

19  disclosed to us just recently.

20              *THE COURT:*  All right.  And for relief what are you

21  seeking?

22          *MR. TUBACH:*  That the witness not be allowed to be

23  shown the document.

24              *THE COURT:*  Response, Ms. Butte?

25              *MS. BUTTE:*  Yes, Your Honor.  These were documents

Kenneth Oliver - Direct

1   that we had tried to authenticate with Mr. Gresch.  He

2   testified Mr. Oliver was the one who actually performed the

3   database collection process for these; and as a result, we

4   sought to call Mr. Oliver.  Unfortunately, due to his travel

5   schedule, today was the only day he is available to testify

6   within the next week and a half.  He is going to be flying to

7   London tomorrow.

8          THE COURT:  Okay.  Anything else, Mr. Tubach?

9          MR. TUBACH:  No, Your Honor.

10         THE COURT:  All right.  I will overrule the request.

11  It seems as if this is one of those instances where due to

12  witness availability, the government could not give the

13  appropriate advance notice.  That does, of course, happen in

14  the course of a trial.  And Ms. Butte has described his

15  availability as being -- would only be available after the

16  point that the government finished its case according to its

17  most recent estimation.

18         Thank you.

19     (In open court:)

20  BY MS. BUTTE:

21  Q.  Mr. Oliver, have you reviewed Government Exhibit 3074?

22  A.  I have.

23  Q.  When did you review it?

24  A.  Yesterday.

25  Q.  What did you do to review it?

Kenneth Oliver - Direct

1    *A.*  We -- I looked at the evidence in the review platform and

2    was able to understand that it came from a forensic image that

3    we were then able to look at the file path.  And we were able

4    to validate the image file using the hash values of the

5    original versus what was ingested into the review platform?

6    *Q.*  And where did the document originate from?

7    *A.*  Mr. Collyar's laptop.

8    *Q.*  To the best of your knowledge, is this document a true and

9    accurate copy of the original that was from Mr. Collyar's

10   laptop?

11   *A.*  It is.

12   *Q.*  And how do you know that?

13   *A.*  Because we were able to validate it back through the

14   forensic validation process using the hash value from the

15   original image.

16   *Q.*  Did you ever image the laptop of Carl Pepper?

17   *A.*  Yes.

18   *Q.*  When did that occur?

19   *A.*  July 10th, 2019.

20   *Q.*  Could you briefly explain the process for imaging

21   Mr. Pepper's laptop?

22   *A.*  Sure.  We had Mr. Pepper meet us in a private conference

23   room where I required him to log into his machine to give us

24   access to the file system.  We then used FTK imager to write

25   out his forensic level image to an external USB hard drive.

1225

Kenneth Oliver - Direct

1  Q.  Did you perform any other verification analysis once you

2  created the image?

3  A.  Once the image is completed, there is a self-validation

4  process that runs through and calculates the MD5 and SHA-1

5  Checksum, which is the -- which validates the image as

6  identical.  We also open up the image to validate that we're

7  able to access the information.

8  Q.  Is the imaging and hash verification value process

9  reliable?

10  A.  It is.

11  Q.  Is it accurate?

12  A.  It is.

13       MS. BUTTE:  Permission to hand the witness through

14  Ms. Grimm Government Exhibits 9211 and 9212.

15       THE COURT:  You may.

16  BY MS. BUTTE:

17  Q.  And Mr. Oliver, have you reviewed Government Exhibits 9211

18  and 9212?

19  A.  I have.

20  Q.  When did you review them?

21  A.  Yesterday evening.

22  Q.  What did you do to review them?

23  A.  We were able to -- I was able to log into the review

24  platform where these documents were produced from and follow

25  the logical file path back to the original image which it was

Kenneth Oliver - Direct

1    captured from.  We were able to then validate the hash values

2    of the image to ensure that they were identical to the original

3    evidence that was captured on July -- in July.

4    Q.  And where did the document originate from?

5    A.  A PST file located on Mr. Pepper's laptop.

6    Q.  To the best of your knowledge, are these documents true and

7    accurate copies of the originals that were on Mr. Pepper's

8    laptop?

9    A.  They are.

10   Q.  And how do you know that?

11   A.  Because we could validate the evidence through the

12   verification process using the hash values.

13          *MS. BUTTE:*  May I have a moment to confer?

14          *THE COURT:*  You may.

15          *MS. BUTTE:*  No further questions.

16          *THE COURT:*  Thank you.

17          Cross-examination?

18          All right.  Thank you very much, Mr. Oliver.  You are

19   excused.  One or more of the defendants may request that you be

20   called in the event that they choose to present evidence, but

21   someone will get ahold of you in the event that that is

22   necessary, all right?

23          *THE WITNESS:*  Great.

24          *THE COURT:*  All right.  Thank you.

25          The United States may call its next witness.

# ATTACHMENT DD

| Bates Number | Trial Exhibit Number | Producing Party | Document Type |
|---|---|---|---|
| CLA_0192999 | 1747 | Norman W. Fries, Inc. d/b/a Claxton Poultry Farms | Email |
| CLA_0193000 | 1748 | Norman W. Fries, Inc. d/b/a Claxton Poultry Farms | Attachment |
| CLA_0193038 | 1749 | Norman W. Fries, Inc. d/b/a Claxton Poultry Farms | Email |
| CLA_0193039 | 1750 | Norman W. Fries, Inc. d/b/a Claxton Poultry Farms | Attachment |
| CLA_0193048 | 1751 | Norman W. Fries, Inc. d/b/a Claxton Poultry Farms | Email |
| CLA_0193049 | 1752 | Norman W. Fries, Inc. d/b/a Claxton Poultry Farms | Attachment |
| GEO_0000813739 | 1447 | George's, Inc. | Email |
| GEODOJ_0225762 | 1459 | George's, Inc. | Email |
| GEODOJ_0225763 | 1460 | George's, Inc. | Attachment |
| KOCHFOODS-0000249843 | 1254 | Koch Foods | Email |
| KOCHFOODS-0000249844 | 1255 | Koch Foods | Attachment |
| KOCHFOODS-0000549046 | 1753 | Koch Foods | Email |
| KOCHFOODS-0000549048 | 1754 | Koch Foods | Attachment |
| MJPoultry-0000077703 | 1253 | Mar-Jac Poultry Inc. | Email |
| MJPoultry-0000189079 | 1743 | Mar-Jac Poultry Inc. | Email |
| MJPoultry-0000189080 | 1744 | Mar-Jac Poultry Inc. | Attachment |
| PILGRIMS-0000033197 | 9790 | Pilgrim's Pride | Attachment |
| PILGRIMS-0002933524 | 1736 | Pilgrim's Pride | Email |
| PILGRIMS-0002933525 | 1737 | Pilgrim's Pride | Attachment |
| PILGRIMS-0003619232 | 6331 | Pilgrim's Pride | Email |
| PILGRIMS-0005254569 | 1738 | Pilgrim's Pride | Email |
| PILGRIMS-0005254570 | 1739 | Pilgrim's Pride | Attachment |
| PILGRIMS-0005813309 | 9791 | Pilgrim's Pride | Email |
| PILGRIMS-0005813310 | 9792 | Pilgrim's Pride | Attachment |
| PILGRIMS-0005827819 | Forthcoming | Pilgrim's Pride | Email |
| PILGRIMS-0005827827 | 9870 | Pilgrim's Pride | Email |
| PILGRIMS-0006001191 | 6329 | Pilgrim's Pride | Email |
| PILGRIMS-0009010718 | 6332 | Pilgrim's Pride | Email |

| | | | |
|---|---|---|---|
| PILGRIMS-0009014733 | 6330 | Pilgrim's Pride | Email |
| PILGRIMS-0009357813 | 9867 | Pilgrim's Pride | Email |
| PILGRIMS-0009357814 | 9868 | Pilgrim's Pride | Attachment |
| PILGRIMS-DOJ-0000513769 | 1446 | Pilgrim's Pride | Email |
| PILGRIMS-DOJ-0001527819 | 6342 | Pilgrim's Pride | Email |
| PILGRIMS-DOJ-0001533192 | 6346 | Pilgrim's Pride | Email |
| PILGRIMS-DOJ-0001739266 | 6343 | Pilgrim's Pride | Email |
| PILGRIMS-DOJ-0001739267 | 6344 | Pilgrim's Pride | Attachment |
| PILGRIMS-DOJ-0002731132 | 1257 | Pilgrim's Pride | Email |
| PILGRIMS-DOJ-0002731134 | 1256 | Pilgrim's Pride | Email |
| PILGRIMS-DOJ-0002732328 | 6347 | Pilgrim's Pride | Email |
| PILGRIMS-DOJ-0002916974 | Forthcoming | Pilgrim's Pride | Email |
| PILGRIMS-DOJ-0002916975 | 9865 | Pilgrim's Pride | Attachment |
| PILGRIMS-DOJ-0003843930 | 9803 | Pilgrim's Pride | Email |
| PILGRIMS-DOJ-0003843931 | 9804 | Pilgrim's Pride | Attachment |
| PILGRIMS-DOJ-0004180550 | 9866 | Pilgrim's Pride | Email |
| PILGRIMS-DOJ-0006242981 | 6348 | Pilgrim's Pride | Email |
| RSCS000189 | 1448 | Restaurant Supply Chain Solutions, LLC | Attachment |
| RSCS000325 | 1461 | Restaurant Supply Chain Solutions, LLC | Attachment |
| RSCS000628 | 1449 | Restaurant Supply Chain Solutions, LLC | Attachment |
| RSCS000933 | 1450 | Restaurant Supply Chain Solutions, LLC | Attachment |
| RSCS001112 | 1451 | Restaurant Supply Chain Solutions, LLC | Attachment |
| RSCS001122 | 1740 | Restaurant Supply Chain Solutions, LLC | Attachment |
| RSCS001272 | 1452 | Restaurant Supply Chain Solutions, LLC | Attachment |
| RSCS001284 | 1453 | Restaurant Supply Chain Solutions, LLC | Attachment |
| RSCS001533 | 1454 | Restaurant Supply Chain Solutions, LLC | Attachment |

| RSCS002143 | 1455 | Restaurant Supply Chain Solutions, LLC | Attachment |
|---|---|---|---|
| RSCS002155 | 1456 | Restaurant Supply Chain Solutions, LLC | Attachment |
| RSCS030061 | 9871 | Restaurant Supply Chain Solutions, LLC | Attachment |
| TF-0003607746 | 9800 | Tyson Foods, Inc. | Email |
| TF-0003607747 | 9801 | Tyson Foods, Inc. | Attachment |
| TY-000130111 | 984 | Tyson Foods, Inc. | Email |
| TY-000142344 | 985 | Tyson Foods, Inc. | Email |
| TY-000647049 | 986 | Tyson Foods, Inc. | Email |
| TY-000647050 | 987 | Tyson Foods, Inc. | Attachment |
| TY-000647085 | 988 | Tyson Foods, Inc. | Email |
| TY-000647086 | 989 | Tyson Foods, Inc. | Attachment |
| TY-000647989 | 990 | Tyson Foods, Inc. | Email |
| TY-000647991 | 991 | Tyson Foods, Inc. | Attachment |
| TY-000649202 | 992 | Tyson Foods, Inc. | Email |
| TY-000649203 | 993 | Tyson Foods, Inc. | Email |
| TY-000649204 | 994 | Tyson Foods, Inc. | Attachment |
| TY-000693096 | 9809 | Tyson Foods, Inc. | Email |
| TY-000693098 | 9810 | Tyson Foods, Inc. | Attachment |
| TY-000694682 | 9811 | Tyson Foods, Inc. | Email |
| TY-000694683 | 9812 | Tyson Foods, Inc. | Attachment |
| TY-000694805 | 9813 | Tyson Foods, Inc. | Email |
| TY-000694806 | 9814 | Tyson Foods, Inc. | Attachment |
| TY-000695236 | 9815 | Tyson Foods, Inc. | Email |
| TY-000695237 | 9816 | Tyson Foods, Inc. | Attachment |
| TY-000695391 | 9817 | Tyson Foods, Inc. | Email |
| TY-000695394 | 9818 | Tyson Foods, Inc. | Attachment |
| TY-000695395 | 9819 | Tyson Foods, Inc. | Attachment |
| TY-000695396 | 9820 | Tyson Foods, Inc. | Attachment |
| TY-000695397 | 9821 | Tyson Foods, Inc. | Attachment |
| TY-000697452 | 9822 | Tyson Foods, Inc. | Email |
| TY-000697453 | 9823 | Tyson Foods, Inc. | Attachment |
| TY-000697454 | 9824 | Tyson Foods, Inc. | Email |
| TY-000697455 | 9825 | Tyson Foods, Inc. | Attachment |
| TY-000697768 | 9826 | Tyson Foods, Inc. | Email |
| TY-000697769 | 9827 | Tyson Foods, Inc. | Attachment |
| TY-000697771 | 9828 | Tyson Foods, Inc. | Email |
| TY-000697772 | 9829 | Tyson Foods, Inc. | Attachment |
| TY-000716895 | 9830 | Tyson Foods, Inc. | Email |
| TY-000716897 | 9831 | Tyson Foods, Inc. | Attachment |
| TY-000716992 | 9832 | Tyson Foods, Inc. | Attachment |
| TY-000716993 | 9833 | Tyson Foods, Inc. | Email |
| TY-000716995 | 9834 | Tyson Foods, Inc. | Attachment |
| TY-000716996 | 9835 | Tyson Foods, Inc. | Email |
| TY-000716998 | 9836 | Tyson Foods, Inc. | Attachment |
| TY-000720691 | 9847 | Tyson Foods, Inc. | Email |
| TY-000720693 | 9846 | Tyson Foods, Inc. | Attachment |
| TY-000720745 | 9845 | Tyson Foods, Inc. | Email |

| TY-000720749 | 9844 | Tyson Foods, Inc. | Attachment |
|---|---|---|---|
| TY-000720763 | 9843 | Tyson Foods, Inc. | Email |
| TY-000720767 | 9842 | Tyson Foods, Inc. | Attachment |
| TY-000720774 | 9841 | Tyson Foods, Inc. | Attachment |
| TY-000720944 | 9837 | Tyson Foods, Inc. | Email |
| TY-000720946 | 9838 | Tyson Foods, Inc. | Attachment |
| TY-000720947 | 9839 | Tyson Foods, Inc. | Email |
| TY-000720949 | 9840 | Tyson Foods, Inc. | Attachment |
| TY-000721156 | 9848 | Tyson Foods, Inc. | Email |
| TY-000721158 | 9849 | Tyson Foods, Inc. | Attachment |
| TY-000722573 | 9850 | Tyson Foods, Inc. | Email |
| TY-000722574 | 9851 | Tyson Foods, Inc. | Attachment |
| TY-000743223 | 9852 | Tyson Foods, Inc. | Email |
| TY-000743226 | 9853 | Tyson Foods, Inc. | Attachment |
| TY-000745907 | 9854 | Tyson Foods, Inc. | Email |
| TY-000745909 | 9855 | Tyson Foods, Inc. | Attachment |
| TY-000745910 | 9856 | Tyson Foods, Inc. | Attachment |
| TY-000746268 | 9857 | Tyson Foods, Inc. | Email |
| TY-000746272 | 9858 | Tyson Foods, Inc. | Attachment |
| TY-000746296 | 9859 | Tyson Foods, Inc. | Email |
| TY-000746298 | 9860 | Tyson Foods, Inc. | Attachment |
| TY-000746512 | 9861 | Tyson Foods, Inc. | Email |
| TY-000746515 | 9862 | Tyson Foods, Inc. | Attachment |
| TY-000797680 | 9863 | Tyson Foods, Inc. | Email |
| TY-000797681 | 9864 | Tyson Foods, Inc. | Attachment |
| TY-000939545 | 9793 | Tyson Foods, Inc. | Email |
| TY-000942344 | 9794 | Tyson Foods, Inc. | Email |
| TY-000975971 | 9795 | Tyson Foods, Inc. | Email |
| TY-000975973 | 9796 | Tyson Foods, Inc. | Attachment |
| TY-000975974 | 9797 | Tyson Foods, Inc. | Attachment |
| TY-001035733 | 1252 | Tyson Foods, Inc. | Email |
| TY-001041831 | 995 | Tyson Foods, Inc. | Email |
| TY-001188541 | 1457 | Tyson Foods, Inc. | Email |
| TY-001188542 | 1458 | Tyson Foods, Inc. | Attachment |
| TY-001230711 | 9798 | Tyson Foods, Inc. | Email |
| TY-001230712 | 9799 | Tyson Foods, Inc. | Attachment |
| TY-001240967 | 996 | Tyson Foods, Inc. | Email |
| TY-001240968 | 997 | Tyson Foods, Inc. | Email |
| TY-001240969 | 998 | Tyson Foods, Inc. | Attachment |
| TY-001295000 | 1741 | Tyson Foods, Inc. | Email |
| TY-001295003 | 1742 | Tyson Foods, Inc. | Attachment |
| TY-003871943 | 9802 | Tyson Foods, Inc. | Email |
| TY-004260784 | 1965 | Tyson Foods, Inc. | Email |