1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO

2

Criminal Action No. 20-CR-00152-PAB

3

UNITED STATES OF AMERICA,

4

     Plaintiff,

5

vs.

6

JAYSON JEFFREY PENN,

7  MIKELL REEVE FRIES,
   SCOTT JAMES BRADY,

8  ROGER BORN AUSTIN,
   TIMOTHY R. MULRENIN,

9  WILLIAM VINCENT KANTOLA,
   JIMMIE LEE LITTLE,

10 WILLIAM WADE LOVETTE,
   GAR BRIAN ROBERTS,

11 RICKIE PATTERSON BLAKE,

12      Defendants

13 _____

                    REPORTER'S TRANSCRIPT
14                   Trial to Jury, Vol. 17

15 _____

16         Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 8:32 a.m., on the 18th day of November,

19 2021, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24 Proceeding Recorded by Mechanical Stenography, Transcription
   Produced via Computer by Janet M. Coppock, 901 19th Street,
25     Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                         APPEARANCES
 2          Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3     Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of
 4     Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing
 5     for Plaintiff.
 6          Anna Tryon Pletcher and Michael Tubach of
 7     O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 8     San Francisco, CA 94111-3823;
 9          Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10     N.W., Washington, DC 20006, appearing for Defendant Penn.
11          David Beller, Richard Kornfeld and Kelly Page of
12     Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13     CO 80202, appearing for Defendant Fries.
14          Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15     LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16          Laura Kuykendall and Megan Rahman of Troutman Pepper
17     Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18     appearing for Defendant Brady.
19          Michael Felberg of Reichman, Jorgensen, Lehman,
20     Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21     10017;
22
23
24
25
```

```
 1                       APPEARANCES (Continued)

 2              Laura F. Carwile of Reichman, Jorgensen, Lehman,

 3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

 4    CA 94065; appearing for Defendant Austin.

 5              Elizabeth B. Prewitt of Latham & Watkins, LLP,

 6    555 11th Street, N.W., Suite 1000, Washington, DC 20004;

 7              Marci Gilligan LaBranche of Stimson, Stancil,

 8    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

 9    80218, appearing for Defendant Mulrenin.

10              James A. Backstrom, Counselor at Law, 1515 Market

11    Street, Suite 1200, Philadelphia, PA 19102-1932;

12              Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13    Bethesda, MD 20814, appearing for Defendant Kantola.

14              Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15    Street, Suite 1100, Los Angeles, CA 90017;

16              Dennis J. Canty, Canty Law Corporation,

17    1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18    appearing for Defendant Little.

19              John Anderson Fagg, Jr. and James McLoughlin of

20    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25
```

```
 1                   APPEARANCES (Continued)

 2            Craig Allen Gillen and Anthony Charles Lake of

 3      Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

 4      Atlanta, GA 30339;

 5            Richard L. Tegtmeier of Sherman & Howard, LLC,

 6      633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

 7      for Defendant Roberts.

 8            Barry J. Pollack of Robbins, Russell, Englert, Orseck

 9      & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10      DC 20006;

11            Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12      5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13      for the Defendant Blake.

14

15                         PROCEEDINGS

16           THE COURT:  Back on the record in 20-CR152.  Some of

17      the defendants, although certainly not all, have opted not to

18      be here.  Actually, most are here but don't need to be.  The

19      jury is not present.  We're going to be going through some

20      government exhibits today.

21            So Ms. Call, why don't we start.

22           MS. PREWITT:  Your Honor, before we start, just one

23      moment.  I just wanted to make the Court and counsel aware

24      there was a brief interaction with Juror Perez yesterday

25      leaving the building.  We were getting in the elevator.
```

3441

1          THE COURT:  Which Perez?

2          MS. PREWITT:  Alan Perez.

3          THE COURT:  Mr. Perez.  Go ahead.

4          MS. PREWITT:  My suspicion is he may be waiting for a

5     ride.  We were surprised to see him when we were entering the

6     elevator at 5:30.

7          THE COURT:  He was in the building by the elevator?

8          MS. PREWITT:  Toward the back, Your Honor.  We were

9     going -- towards to take the elevator down with some boxes.

10         THE COURT:  Yeah.

11         MS. PREWITT:  I am sorry.  So he tried to hold the

12    door of the elevator open.  We declined.  And that was really

13    the beginning and end of it.  So I just wanted to make sure

14    everybody is aware.

15         THE COURT:  That sounds like that's almost an

16    inevitable coincidental encounter but handled perfectly

17    appropriately by everyone, so no problem.

18         MS. PREWITT:  Thank you, Your Honor.

19         MS. CALL:  All right.  If everyone is ready to get

20    started on exhibits, the first is Government's Exhibit 948.

21         If we could have the government's computer connected

22    to the monitors, please, Ms. Grimm.

23         Government's Exhibit 948 was contained on the *James*

24    log entry 111 which was ruled on favorably.

25         THE COURT:  All right.  Objections to 948?

1    Mr. Beller?

2         MR. BELLER:  Thank you, Your Honor.

3         Your Honor, Mr. McGuire's statements were certainly

4    considered by the Court in the James log, but I believe that

5    the rest of the statements are hearsay.

6         THE COURT:  Yes.  We've got the statements of Mr. Bean

7    from the Cheesecake Factory -- well, let's see.

8         MS. CALL:  I believe there is Ms. Proctor from

9    Pilgrim's, as well as Mr. Chalmers from the Cheesecake Factory

10   and Ms. Bean from Pilgrim's as well.

11        MR. BELLER:  The other position, if I may, is that I

12   believe any reference to the Cheesecake Factory or discussion

13   regarding productions to the Cheesecake Factory is also 404(b).

14        THE COURT:  Response on that point, Ms. Call?

15        MS. CALL:  On the 404(b), clearly this is some

16   discussion about the Cheesecake Factory's purchases of chicken

17   which would be within the scope of the Indictment.  But I would

18   like to briefly respond on the hearsay statement.  I think this

19   is really a prime example of effect on the listener here.

20        What happens is this customer, Mr. Chalmers, is saying

21   Pilgrim's is shorting Cheesecake Factory because their contract

22   is less profitable than others which leads to this internal

23   discussion at Pilgrim's about what pricing they will offer

24   Cheesecake Factory for the next year, at which point

25   Mr. McGuire then makes this statement that was contained in the

1   government's *James* log.

2        I will note this is really at the core of a

3   non-hearsay purpose.  So if you look at Rule 801, it actually

4   cites to a Seventh Circuit case for the proposition like this

5   which is an antitrust case, *Emich Motors Corporation v. General*

6   *Motors Corporation,* and it is 181 F.2d 70.  And essentially

7   what happened in that case was the defendants were actually

8   trying to introduce evidence of customer complaints, and they

9   were letters in that case, for the purpose of showing the

10   effect, meaning the actions they took after receiving those

11   complaints.

12        In that case obviously the defendants were trying to

13   show something other than an agreement and they were responding

14   to the complaints for some other reason, but it's really the

15   same thing here that the complaints from the customer spur an

16   effect, which here is this discussion in this very e-mail about

17   pricing for Cheesecake Factory, which leads to the

18   conspiratorial act.  So based on that non-hearsay use that it's

19   really the effect of the complaints that they have within

20   Pilgrim's, we would say this is a non-hearsay purpose for

21   Mr. Chalmers statements.  For Ms. Proctor and Ms. Bean, those

22   are simply not being offered for the truth and are just context

23   for the other conversations here.

24        THE COURT:  Anything else, Mr. Beller?

25        MR. BELLER:  Your Honor, I would simply note that my

1    understanding of the *James* log is that it's that top line from

2    Mr. McGuire that was offered, tendered to the Court and

3    considered by the Court.  I don't believe that the remaining

4    statements including the statements of Mr. McGuire were, in

5    fact, contained in the *James* log, so I maintain my position.

6         THE COURT:  The objections will be overruled.  The

7    statements of Mr. Chalmers, Mr. Bean and Ms. Proctor will be --

8    I will limit them not for the truth of the matters asserted,

9    but rather for the effect on the listener, but 948 will be

10   admitted.

11        Next one?

12        MS. CALL:  Next is Government Exhibit 1056.  Your

13   Honor, this was contained on the government's *James* log as

14   entry 106 and it was ruled on favorably.

15        Go ahead, Ms. Pletcher.

16        MS. PLETCHER:  Thank you, Your Honor.

17        We object under the rule of completeness to this

18   particular e-mail.  We believe you need to include the photo

19   attachment that was referenced in this e-mail.  The entire

20   thread gets kicked off with an e-mail from Mr. Penn that

21   includes just a photo attachment.  And I have that e-mail which

22   I am happy to hand up to the Court and to counsel.  Even the

23   subject line, "This will be in my deck tomorrow," and the

24   response by Jason McGuire at 2:19 p.m. details his point of

25   view on this particular attachment.  So in order to understand

1    the whole e-mail here, I think it's really important to include

2    the attachment.

3          THE COURT:  Let's take a look at that.  Ms. Grimm, if

4    you don't mind handing that up.

5          MS. PLETCHER:  The discussion about the small bird

6    industry, and that's what Mr. Penn is referring to, and

7    Mr. McGuire is referring to how they are going to change the

8    small bird industry with respect to this particular issue.

9          MS. CALL:  So as you see on the slide, this is

10   relating to a customer presentation for H-E-B, which is a

11   grocer.  But you may recognize the content of this slide as

12   extremely similar to Government's Exhibit 1055 which Robbie

13   Bryant previously testified about when referencing a slide he

14   developed for a KFC presentation at the end of July that year.

15   This e-mail and this slide was sent I think August 7th.

16         So essentially Mr. Bryant testified about how

17   Mr. McGuire, who is in this e-mail chain, had said they would

18   blitz the customer and how he prepared a slide to basically

19   preview for the customer price changes that needed to come,

20   meaning these very large price increases that they were seeking

21   in 2014.

22         And this is that precise -- or at least similar slide

23   being used with another customer just weeks later.  And this

24   very e-mail actually says "I used this with KFC last week" or

25   something.  So I agree it's context.  I don't think the e-mail

1    itself is misleading in any way without the slide.  If

2    anything, it's additional inculpatory material showing the same

3    conspiracy and the same justification about the need for price

4    increases being given to additional customers.

5         MS. PLETCHER:  Your Honor, I disagree entirely with

6    the government's interpretation of this.  It has no connection

7    whatsoever to Mr. Bryant's testimony.  This is Mr. Penn's slide

8    that he initiated this conversation with Mr. McGuire with and

9    it's a discrete conversation.  It needs to be viewed entirely

10   in context, otherwise the subject line has no mean without

11   understanding what the attachment was.  And both of their

12   conversation has no meaning without the attachment.

13        THE COURT:  But why do we know that E-873 which is at

14   8:00 p.m. is the photo that Mr. Penn attaches at approximately

15   5:00 p.m.?

16        MS. PLETCHER:  Right, Your Honor.  What I printed out

17   for you -- I should have been more clear about this -- was the

18   original e-mail that kicked off this e-mail chain.  So what I

19   would propose to offer is actually just E874 because that

20   itself is the attachment.  And E-873 is actually redundant

21   because that is the e-mail that's listed at the very bottom of

22   the Exhibit 1056.

23        THE COURT:  I didn't see the correspondence between

24   1056 and E-873, although how many pages of the exhibit is it?

25   I am not sure.  Is it just one?

1           *MS. CALL:*  1056 is one page, if that's what you are

2    referring to.  The entire e-mail chain?

3           *THE COURT:*  Right.  But maybe -- can we go back to

4    1056?

5           *MS. CALL:*  I understand the context here and sometimes

6    context can be an exception to the hearsay rule, but 106 which

7    gives an adverse party the ability to almost require that other

8    evidence be considered isn't just based on context.  It's based

9    on something being unfair and misleading.  And I believe we

10   discussed the *United States v. Lemon* 10th Circuit standard on

11   that.  And I don't see how this is misleading in any way when

12   the discussion is all the words are there.  There is simply a

13   picture that's not contained.

14          *MS. PLETCHER:*  Your Honor, I think there might be a

15   bit of confusion about the time stamp on Exhibit 873 versus

16   what's seen on 1056.  The time stamp on 873, on E-873 is

17   7:58 p.m., but that would be in UTC time.  The time on the

18   Exhibit 1056 is 3:58 p.m.  It's the same e-mail just translated

19   from UTC time to the local time for the 1056 e-mail.

20          *THE COURT:*  There is no subject line.  The subject

21   line of E-873 is, "This will be in my deck tomorrow.  Can you

22   provide the talking points so we are on the same page?

23   Thanks."  Is that on 1056?

24          *MS. PLETCHER:*  Yes, it is, Your Honor.  It's the same

25   subject line.

3448

1              THE COURT:  Oh, at the very top.

2              MS. PLETCHER:  Uh-huh.

3              THE COURT:  Okay.

4          MS. CALL:  I think the government actually has no

5      objection to introducing E-873.  We would put a government

6      exhibit sticker on it though.

7              MS. PLETCHER:  And E_874 as well?

8              MS. CALL:  Yes.

9              MS. PLETCHER:  Thank you.

10             THE COURT:  How are you going to remark those two,

11     then, with dashes?

12         MS. CALL:  I think we would actually put a yellow

13     government's exhibit sticker on it and put new numbering

14     totally.  And when I introduce it, I can refer back to this

15     number if that would be helpful for the Court.

16             THE COURT:  Ms. Pletcher?

17         MS. PLETCHER:  Your Honor, we could just use the

18     Defense Exhibit Nos. E-873 and E874, as long as the two

19     documents are introduced together at the point of introduction

20     if the government is amenable to that.

21             THE COURT:  Ms. Call?

22         MS. CALL:  I'm just questioning kind of the

23     speculation that the jury might have when the government is

24     offering defense exhibits.  I think we would prefer to put a

25     government exhibit sticker on something we are offering against

 1    another party.

 2            THE COURT:  I think we shouldn't add additional

 3    confusion.  I don't think the jury will draw anything from that

 4    whatsoever.  I really don't.  So let's use the defense exhibit

 5    stickers and the government can introduce -- will introduce all

 6    three of those at the same time.

 7            MS. CALL:  If I may inquire, does the government have

 8    electronic copies of E-873?

 9            MS. PLETCHER:  We will make sure that the government

10    has a copy.

11            THE COURT:  Okay.

12            MS. PLETCHER:  Thank you very much.

13            THE COURT:  So as I understand it, 1056 will be

14    admitted and also E-873 and E-874.

15            MS. CALL:  Correct.

16            THE COURT:  Okay.

17            MS. CALL:  Whether it's an efficiency or inefficiency,

18    Exhibit 2000 actually appeared twice on the list.  And we have

19    already gone over it, so we can skip that and move on to

20    Exhibit 3003.

21            THE COURT:  Okay.

22            MS. CALL:  This is a record of antitrust training at

23    George's that was sent to Defendant Blake.  The government

24    offers that.

25            THE COURT:  And not on the *James* log?

1          *MS. CALL:*  Correct.  There is no statements by

2     Mr. Blake.

3          *THE COURT:*  Mr. Pollack?

4          *MR. POLLACK:*  Yes, Your Honor.  We do object.  As I

5     understand it, the government wants to introduce this e-mail

6     but without any attachment that would show what antitrust

7     training was provided, which just simply invites the jury to

8     speculate as to what was provided.  What was provided might

9     have said it was perfectly okay to share or be aware of period

10    pricing.  It might have said it's okay to talk about competitor

11    bids as long as you don't agree or it might have said

12    absolutely nothing that is relevant to the issues at hand in

13    this case.  So without knowing what training was provided, I

14    would object on 401 and 403 grounds.

15         *MS. LaBRANCHE:*  Your Honor, I am going to add an

16    objection because this is going to come up for my client next,

17    I believe.  I think this is also just hearsay.

18         *THE COURT:*  I can't remember.  Mr. Keck, he is not

19    identified as a co-conspirator, is he?

20         *MR. POLLACK:*  He was not identified as a

21    co-conspirator at the *James hearing* and the Court made no

22    finding with respect to Mr. Keck.  I think the government

23    subsequently in a footnote in a pleading said they consider him

24    to be a co-conspirator, but they have offered no evidence and

25    the Court made no finding.

1              *THE COURT:*  Mr. Beller?

2              *MR. BELLER:*  Thank you.  Finally, Your Honor, I would

3       offer a relevance objection as to this.  While we know that

4       there was based on this document at least an invitation sent

5       out, we don't know even that Mr. Blake attended this particular

6       training in addition to everything that Mr. Pollack indicated

7       regarding not knowing the underlying content, so it's relevance

8       and also speculation.

9              *THE COURT:*  I can't remember, but -- yeah, that's

10      right.  It comes up later in regard to Mr. Mulrenin with the

11      fact that he was trying to schedule it, but nothing as to

12      Mr. Blake, right?  Okay.

13             *MR. POLLACK:*  And thank you, Mr. Beller, the point I

14      should have made as well.

15             *THE COURT:*  Response?

16             *MS. CALL:*  I will attempt to go in reverse order.

17      First as to relevance, Your Honor already found in ECF No. 603

18      that evidence of antitrust training is relevant.  I don't think

19      there is a requirement as to what that evidence is, whether it

20      be a PowerPoint presentation or a calendar invitation to

21      antitrust training.

22             As to the non-hearsay purpose, notice and knowledge on

23      Defendant Blake of the applicability of the antitrust laws to

24      his kind of day-to-day work is a non-hearsay purpose for

25      introducing this.  So the fact that he was required to attend

1    an antitrust training and the fact that someone even told him,

2    you know, this is ethical issues that we face daily from our

3    side of the business puts him on notice of that applicability

4    of the antitrust laws to his line of work and his conduct.  I

5    think I addressed everything, but if I didn't, I am happy to go

6    on.

7                THE COURT:  Mr. Pollack?

8                MR. POLLACK:  Well, Your Honor, first of all, it is an

9    invitation.  It does not say it's mandatory training.  But more

10   importantly, again what matters is the content.  It's not the

11   fact that some kind of training was offered.  It's what that

12   training consisted of.  And without knowing that, we don't know

13   if it's relevant or it's not relevant and it simply invites the

14   jury to speculate, and that's why I would seek to exclude it

15   under both 401 and 403.  And that's even assuming he attended

16   it, which we don't know.

17               THE COURT:  Okay.

18               Anything else, Ms. Call?

19               MS. CALL:  No, Your Honor.

20               THE COURT:  Okay.  The objections are really in the

21   nature of a motion to reconsider.  I have already ruled on this

22   particular issue.  So the issue is whether or not -- well, for

23   one thing, I always have the freedom to overrule myself.  And I

24   am actually going to do that in this particular instance

25   because I do agree that not only do we have the issue about

1    whether there was attendance, but we don't know -- maybe we do

2    know, but I haven't been informed of the contents of any

3    training.  And for that reason I am just not quite sure of how

4    that particular issue would interact with the general principle

5    that you're responsible to know what the law is, which I think

6    is probably the more apt principle in operation here as opposed

7    to some training the content of which we just don't know.  So I

8    will sustain the objections.

9            MR. POLLACK:  Thank you, Your Honor.

10           THE COURT:  Next?

11           MS. CALL:  Your Honor, just for clarification, so that

12   ruling is not on the hearsay nature, but on just the particular

13   document and a lack of context?

14           THE COURT:  On relevance, on relevance because it

15   just -- we know so little about it.  The proposition boils down

16   to simply whether a defendant's participation or attendance at

17   antitrust training would be admissible for some proper purpose.

18   And just in general that fact I don't think has relevance

19   because there is no indication about what that consisted of.

20           MS. CALL:  All right.

21           THE COURT:  And as I said before, you know, ignorance

22   of the law is no excuse, but to flip that over and then suggest

23   that there may have been some -- I am not sure -- notice or

24   some information when we don't know of exactly what it

25   consisted of or whether they even got to it or who knows, I

1   consider it to be insufficient based upon what we know of this

2   particular training to be relevant.

3          MS. CALL:  All right.  The next exhibit is

4   Government's Exhibit 3062.  If I may look at it briefly, I

5   think your ruling just now may apply similarly to this

6   document.

7          THE COURT:  Yeah, I think that there are two exhibits

8   that apply to Mr. Mulrenin after this.

9          MS. LaBRANCHE:  3087 is the second one, Your Honor.

10         MS. CALL:  Your Honor, for this I believe we actually

11   may have the content of the training.  And it's not been marked

12   I don't believe as a government's exhibit, but if we were to go

13   follow up this afternoon with the actual training, it sounds

14   like that may affect Your Honor's determination.

15         THE COURT:  Ms. LaBranche?

16         MS. LaBRANCHE:  Yes, Your Honor.  I suppose I would

17   have to see what it is, but I believe what the government is

18   going to give us is a PowerPoint presentation which really

19   doesn't change the analysis at all.  Mr. Mulrenin's e-mail

20   talks about he could hear the presentation from the road.

21   There is no indication that he saw anything.

22         THE COURT:  It wasn't an audio PowerPoint?

23         MS. LaBRANCHE:  It was an audio portion, not a

24   PowerPoint.  I have not seen the audio portion in the

25   discovery.

1          THE COURT:  Right.  I will give the government an

2    opportunity to look into that, and if you would let

3    Ms. LaBranche know what that consisted of.  So why don't we

4    hold off on those, but we will swing back to them after lunch.

5          MS. CALL:  I don't know we have a recording of the

6    training, but I would presume that the PowerPoint would give an

7    indication of what the content of that training was sufficient

8    to show the relevance for Defendant Mulrenin, but we will

9    follow up on that when it's proper to address.

10          THE COURT:  Right.  Well, you know, hard to say.  As

11    the attorneys know with CLEs, the listening to it in the car

12    may not be a perfect substitute for attending, but still you

13    get the credit for it.

14          MS. CALL:  How many code words there were.

15          The next is Government Exhibit 3074.

16          THE COURT:  Okay.

17          MS. CALL:  3074 is a contract between Tyson Foods and

18    Church's.  It's signed by Defendant Roberts and is being

19    offered as an item simply of independent legal significance and

20    non-hearsay on that grounds.

21          THE COURT:  Any objections to 3074?

22          MS. LaBRANCHE:  May we have just one moment, Your

23    Honor?

24          THE COURT:  Yes.

25          MS. LaBRANCHE:  No objection.

1          *THE COURT:*  Anyone else?  All right.  That will be

2    admitted.

3          Next?

4          *MS. CALL:*  The next one we will skip for now is 3087,

5    the e-mail Defendant Mulrenin relating to his antitrust

6    training.  So then we move on to 9010 which itself is a native

7    Excel file, and then there is exhibit -- there is a paper

8    version which is excerpts of that exhibit.

9          *THE COURT:*  And is the paper version -- I can't

10   remember, I think there is a paper version that's separately

11   marked, right?

12         *MS. CALL:*  The paper version I believe is marked with

13   the same number, but the Bates says an excerpt of blank,

14   whatever the correct Bates number is, which is one that I think

15   Ms. Henry may have identified earlier in the week as at one

16   point having the incorrect Bates number, but that has since

17   been fixed.  Now that I am looking at the paper copy, I believe

18   we do need to add an excerpt designation to the bottom right

19   which we will do.

20         *MR. FELDBERG:*  I did not hear the last thing Ms. Call

21   said.  I apologize.

22         *MS. CALL:*  I had misspoken and believed it to say

23   excerpt on the bottom right, but it is not there.  And we will

24   add that because I believe this is six pages or so of an

25   80-some page Excel file if it were to be printed in its

1    entirely.

2         THE COURT:  So just so I understand, Exhibit 9010 is a

3    paper excerpt of a native file; is that correct?

4         MS. CALL:  Yes, Your Honor.  We currently have them

5    both marked as 9010, but perhaps to prevent any confusion, we

6    could mark the paper as 9010-1.

7         THE COURT:  But the implication, then, is that 9010 is

8    a native file.

9         MS. CALL:  Correct.  It's an Excel.

10         THE COURT:  But it's not the entirety of it.  It would

11   just be a native excerpt consisting of this one page?

12         MS. CALL:  The native excerpt is the entirety.

13         THE COURT:  Well, then it's not an excerpt.

14         MS. CALL:  The printed version is the excerpt, so that

15   is actually why we should mark it differently.  So we will mark

16   that as 9010-1 and specifically indicate on the lower right

17   that is an excerpt, but the native version would be the full

18   file.

19         THE COURT:  What's the purpose of putting in the

20   native version?

21         MS. CALL:  It was simply requested by counsel for

22   Defendant Brady and the government doesn't object.

23         THE COURT:  All right.  So first of all, let's talk

24   about -- unless it's helpful to talk about them together, which

25   you can, otherwise let's focus on 9010, first.

1          Mr. Pollack?

2          MR. POLLACK:  I am sure others may have substantive

3    objections.  I just want to address in terms of authenticity, I

4    know the Court has already ruled with respect to authenticity

5    for Claxton in this case and others.  I would like to not have

6    to renew authenticity objections for each exhibit, but I also

7    want the record to be clear that when we raised authenticity,

8    it wasn't with respect to the particular document at issue

9    there.  It also extends to other documents that are being

10   introduced based on the same authenticity, the same evidence of

11   authenticity.

12         THE COURT:  Well, I will give you a continuing

13   objection if authenticity has been ruled on already as to a

14   group of documents including this one.  So if that's true, then

15   we shouldn't raise it.  On the other hand, if there hasn't been

16   an authenticity objection as to some exhibit, we should

17   probably tackle it to make a record as to a given offered

18   exhibit.

19         MR. POLLACK:  Okay.  I understand, Your Honor.  And

20   frankly, I am not sure if the Court's authenticity ruling

21   extended specifically to 9010.  If it did, I will just stand on

22   the prior objection.  If not, I will make the specific

23   objection now.

24         MS. CALL:  I am happy to clear the record on this one.

25   9010 was subject to the government's supplemental 902(14)

1    motion I believe within the past week.  And the Court in open

2    court the other day granted that motion.  The minutes from that

3    day reflect that in ECF-837, and I believe there was no

4    objection to authenticity at the time.

5              THE COURT:  Mr. Pollack, any reason to doubt that, in

6    which case I will give you the continuing objection and

7    overrule it.

8              MR. POLLACK:  I have no reason to doubt it and accept

9    Ms. Call's representation.

10             THE COURT:  Thank you.

11             Mr. Lavine?

12             MR. LAVINE:  If I can have one moment.

13             THE COURT:  No problem.

14             MR. FAGG:  Your Honor, while he is conferring may I

15   make a point?

16             THE COURT:  Sure.

17             MR. FAGG:  I apologize if I am not tracking here, but

18   it appears to me that 9010 is actually a printout because if

19   you look in the bottom right-hand corner, it appears to have

20   Claxton Bates numbers on each sequential page.  And so I am not

21   sure it's an excerpt from anything that's electronic, but

22   perhaps I am misreading it.

23             THE COURT:  Well, obviously the native spreadsheet

24   does not have Bates stamp numbers on it, but you are right, the

25   visual on what we are looking at right now does.  But I believe

1     that's going to be remarked as 9010-1.

2          MS. CALL:  Yes, Your Honor.  I will note with

3     regarding the Bates numbering, that was just in accordance with

4     Your Honor's instructions from the trial preparation conference

5     that if you excerpt voluminous documents, to insert page

6     indications.  So I believe that's what the dash one, dash two,

7     dash three on each page were intended to convey, but we will

8     clarify and note excerpt there in the printed copy of 9010

9     which will be marked as 9010-1.

10         THE COURT:  Does that clear that up?

11         MR. FAGG:  Yes, it does.

12         THE COURT:  Mr. Lavine?

13         MR. LAVINE:  I would have objections on foundation and

14    relevance grounds, Your Honor.

15         MR. GILLEN:  And we would object on foundation,

16    relevancy and hearsay and do note that these entries are for

17    2017 after Mr. Roberts left Tyson.

18         THE COURT:  Okay.  And specifically what is the

19    foundation objection?

20         MR. LAVINE:  Your Honor, just in light of the fact it

21    may have been authenticated, there is no basis for its

22    admissibility.  There is no foundation for its admissibility,

23    Your Honor.

24         THE COURT:  All right.  Responses?  Anything else,

25    Mr. Lavine?

1         *MR. LAVINE:* If Your Honor is going to rule in their

2 favor, then instead of just an excerpt, they might as well put

3 the whole thing in.

4         *THE COURT:* They are putting the whole thing in

5 through 9010 in native format.

6         *MR. LAVINE:* It's still relevance, as far as we are

7 concerned.

8         *MS. HENRY:* I am unclear. What is the basis for the

9 admission of the document? Is this supposed to be a

10 co-conspirator statement? If so, I don't believe it was on the

11 *James* log.

12         *THE COURT:* There was no indication that it was.

13 You're right.

14         Mr. Gillen?

15         *MR. GILLEN:* Yeah, to affirm, reaffirm our position

16 regarding no *James* log. It's not a co-conspirator declaration.

17 As I indicated before, it would be hearsay. So in that respect

18 we would move for its exclusion.

19         *THE COURT:* Go ahead, Ms. Call.

20         *MS. CALL:* Yes, Your Honor. This goes to a line of

21 cases we discussed several times that the co-conspirator's

22 knowledge of the means of contacting each other is non-hearsay

23 when offered for that purpose. And the two cases we have been

24 discussing are *United States v. Anello* and *United States v.*

25 *Ruiz*, which is a Second Circuit case.

3462

1          But to be even more particular, cellphone contact

2    lists of this kind have been found to be non-hearsay for that

3    same purpose.  And I will cite you to the Fourth Circuit in

4    *United States v. Akwei*, A-K-W-E-I.  It's 514 F.Appx. 291, as

5    well as *United States v. Munguia*, M-U-N-G-U-I-A, which is

6    273 F. Appx. 517.  That's the Sixth Circuit saying a contact

7    list was properly admissible for the non-hearsay of linking the

8    defendant to his conspirators.

9          Exhibit 9010 shows Defendant Brady's knowledge of his

10    means in contacting several competitors and conspirators

11    including Defendant Kantola, Defendant Lovette, Defendant

12    Blake, Defendant Mulrenin, and Conspirator Scott Tucker, Searcy

13    Wildes -- and that's S-E-A-R-C-Y, last name W-I-L-D-E-S --

14    Robbie Bryant and Tim Stiller.  And what matters is not

15    necessarily the truth that this is their phone number, but it's

16    his knowledge that when he called that number, he believed he

17    was contacting his competitors.

18          THE COURT:  Do you mind blowing up some of the lines

19    at least on the right-hand side of whatever is being displayed?

20          MS. CALL:  Yes, Your Honor.  The first page is only

21    excerpted to show the bottom left-hand which shows Scott Brady

22    iPhone report.  It's a screen-shot of the Excel spreadsheet.

23          But if we could turn to the second page, Ms. Pearce,

24    and zoom in on Lines 487 through 488.  Those all contain

25    entries for Defendant Kantola.  And I am happy to point to more

1    if that would be helpful.  With respect to time period, I

2    believe this cellphone is extracted in 2017 and some of the

3    2017 dates there.

4         THE COURT:  So it's not a contact list which, you

5    know, for instance which would be a list of persons in one's

6    phone, but this is actually a phone log, is that right, of

7    contacts made with people who may be also listed in the phone

8    as contacts?

9         MS. CALL:  I believe it is the former.  So if we go

10   back to the first page screen-shot, the lower left shows Scott

11   Brady iPhone report, which I believe is the text created when

12   you run the Cellebrite or whatever software used for this

13   extraction.  You will see this tab that this printout is from

14   are called contacts, so I believe it is his contact list from

15   his phone.

16        THE COURT:  Oh, okay.  So the fact that they are

17   associated with dates, the dates don't mean a phone call, but

18   perhaps date added.

19        MS. CALL:  The date associated with the entry or

20   pulled from the phone itself when the extraction was done.

21   There are about five different dates in each entry.

22        THE COURT:  Mr. McLoughlin?

23        MR. McLOUGHLIN:  Two points, Your Honor.  Everything I

24   think that has just been proffered by the government is not

25   supported by any testimony, and so therefore we have a

3464

1   significant foundation problem.  And, you know, the government

2   had the opportunity to put someone on who could have explained

3   all of this in an admissible form, but they chose not to do

4   that.

5         But on a bigger issue here, we keep getting citations

6   to cases that are given so fast I cannot write them down and

7   the government is not providing us copies.  I object to the

8   citation of any case in argument before the Court where the

9   government has not given us -- is not providing us a copy of

10  the case.  *Anello* is an excellent example.  The government has

11  cited *Anello* at least three times and each time it is

12  inapposite.  If we weren't sitting here and I could pull them

13  out on Lexis while the government is throwing out these

14  citations, we wouldn't know if -- for example, the last time

15  they used it, it was utterly irrelevant.  If the government is

16  going to cite a case, we request that they provide paper copies

17  and hand them out so that we can review them and respond.

18        *THE COURT:*  All right.

19        Ms. Henry?

20        *MS. HENRY:*  Your Honor, I would note that the document

21  is very misleading without a sponsoring witness and it will, in

22  fact, deny us our confrontation rights to put it in in this

23  manner.  Just to give some flavor of that, if you look at what

24  the government indicated with regard to this somehow showing

25  that Mr. Brady knew a phone number to contact Mr. Kantola, the

 1     date on there, the only dates -- and there are a lot of them.

 2     There is four of them.  I have no idea exactly what all four

 3     mean -- but all of them are dates that postdate any of the

 4     phone calls for which the government is putting in evidence of

 5     between Defendant Brady and Mr. Kantola.  And the information

 6     is completely misleading.

 7              THE COURT:  Mr. Lavine?

 8              MR. LAVINE:  Your Honor, first off, there is no

 9     evidence as to when these contacts were created.  But more

10     importantly, the argument that the government has advanced as

11     far as contacts are knowledge with other individuals, they have

12     all of Mr. Brady's phone records.  And every single one of

13     those phone records, phone logs show whoever he may have spoken

14     to during this entire period of time from 2012 to 2018 or '19.

15              This is merely cumulative.  There is no basis for --

16     there is no foundation or basis for this to be admitted.  And

17     they've already got it already in the record with the phone

18     records, Your Honor, which is a little bit more explicit than

19     what the government is talking about here.  And we don't know,

20     as I said, we don't even know when these things were created.

21              THE COURT:  Ms. Call, if you want to respond to those

22     points.

23              MS. CALL:  As far as the foundation point, phone

24     records, as I believe most folks in this room are aware, list

25     phone numbers, not names of people that being contacted in any

1   given phone call.  I will point to particular relevance of the

2   fact here that Mr. Brady lists the number.

3          If we could go to the second page, Ms. Pearce, and

4   back to Mr. Kantola's entry.  If we could zoom in on Line 487.

5   Mr. Brady associates the No. 770-536-8818 with Defendant

6   Kantola.  Defense counsel have been willing to agree, which we

7   do appreciate, that this is a number associated with Koch

8   Foods, Mr. Kantola's employer.  But it is important that when

9   Mr. Brady was calling this number, he believed it to be

10  associated with Defendant Kantola and not just the company.

11          THE COURT:  Ms. Henry?

12          MS. HENRY:  I think actually that makes exactly the

13  point that this is misleading.  I certainly know that when I

14  put phone numbers in on a phone number log, do you actually

15  look at whether it says home, office, whatever?  You just stick

16  in the number.  And without the right of confrontation to

17  understand how this was created or what was done, this is

18  misleading.  The government knows it's misleading.  And they

19  are seeking to put it in for the truth of the matter, not for

20  any other purpose, because what she just -- what Ms. Call just

21  said was that she wants this in for the truth of the matter,

22  not for any issue of intent.

23          THE COURT:  All right.  Mr. Lavine?

24          Then I will get to you, Mr. Gillen.

25          MR. LAVINE:  We just checked on some of the cases

1    counsel was referencing to.  There were sponsoring witnesses

2    for the contact list.  And I think they were drug cases which

3    has a little different basis for people contacting one another.

4        But the other point, Your Honor, is counsel is raising

5    this question.  They are not going to know -- the jury is not

6    going to know who they are calling.  We've stipulated to all

7    these phone numbers, Your Honor.  That stipulation is going

8    into evidence.  And I will quote Ms. Call on November 16, she

9    said "The jury can read the phone numbers and they can see the

10   differences and figure out."  I mean, they've got everything in

11   there.  They've got the phone records.  They've got a

12   stipulation as far as everyone's telephone numbers.  There is

13   no basis and there is no foundation for this.

14        *THE COURT:*  Mr. Gillen?

15        *MR. GILLEN:*  To give an example of how this document

16   is misleading and specifically misleading as to Mr. Roberts,

17   the entry here in this exhibit from Mr. Roberts was -- one of

18   them was created on November the 9th, 2016, and that's several

19   months after he had left Tyson.  The other entry is August the

20   10th, 2017, well after Mr. Roberts having left Tyson and at

21   that time was employed at Case Farms.

22        And to illustrate the nefarious nature of this kind of

23   misleading evidence, I would point the Court to the fact that

24   during the trial of this case, there has been no evidence, for

25   example, of Mr. Roberts in any way being involved in activity

1    that or listed in the various episodes in the Indictment

2    subsequent to the 2015 KFC negotiations.  And specifically

3    during the 2017 KFC negotiations, of course he wasn't mentioned

4    at all.

5              Now, this creates a false impression that whatever

6    weight the Court -- the jury might give to other subsequent

7    episodes alleged by the government in their Indictment,

8    certainly this is misleading because on the face of it it shows

9    Mr. Roberts in the contact.  Create a date would indicate that

10   this was created after he left Tyson and after the activity, at

11   least that we have been on notice of through the Indictment of

12   what Mr. Roberts is alleged to have -- violations he has

13   alleged to have committed.

14             Thus, again for us we say that it is -- it's hearsay,

15   that it wasn't on the *James* log.  It's 403.  And for all those

16   reasons earlier stated by myself and counsel, I would ask that

17   this exhibit be excluded.

18             *THE COURT:*  Mr. Pollack?

19             *MR. POLLACK:*  Your Honor, I don't want to sidetrack

20   the current discussion, but I may have been too quick to accept

21   Ms. Call's representation with respect to the authenticity.

22   Going back and looking at the docket entry and the Court's

23   ruling that she cited, I believe that involved Exhibit 8010,

24   not 9010, and that 9010 was a document that was discussed by a

25   witness, Ms. Morbey, a custodial witness.  But I don't think

1    there has been a specific ruling on the authenticity of --

2         THE COURT:  My recollection is that the

3    government's -- there was some filing, but I think it was a

4    typo.  I think that the 8010 was a typo that the government

5    then corrected.

6         MR. POLLACK:  So the 8010 was intended to be 9010?

7         THE COURT:  Yes.

8         MR. POLLACK:  So the Court has ruled on 9010?  Got it.

9    Thank you, Your Honor.  I appreciate the clarification.

10        THE COURT:  I am going to overrule the objections.

11   9010, first of all, as I just discussed with Mr. Pollack, I

12   have ruled on the authenticity issue before.  The particular

13   exhibit has a bunch of contact information.  It's in the nature

14   of a contact list.  I do agree with the government in terms of

15   the fact that there is a non-hearsay basis to admit contact

16   lists of this type to demonstrate that a given conspirator had

17   contact information for another conspirator.  I don't

18   believe -- and I believe that most of the information on the

19   list would not in any way be misleading.  In fact, it would, if

20   anything, oftentimes prove a point that a defendant may want to

21   bring up about it.

22        I don't believe that the mere fact that it could under

23   some circumstances appear to be misleading would justify an

24   exclusion under, for instance, Rule 403 because it doesn't

25   substantially overcome the probative valuable of this

1    particular exhibit.  And for that reason I believe that it is

2    admissible.  9010, the native version, will be admitted and

3    also 9010-1, what I understand to be a one-page excerpt, will

4    be admitted as well.

5            Ms. Call, does the excerpt include all the information

6    on that particular page or is anything cut off that would have

7    otherwise appeared on the far side?

8            MS. CALL:  Two corrections, Your Honor, and I will

9    answer your question.  The paper version of 9010 which will be

10   marked as 9010-1 is six pages.  But to answer your question,

11   there is information cut off.  There are many columns in a

12   device extraction that don't readily make themselves accessible

13   for paper form.

14           THE COURT:  The question would be whether it cuts off

15   anything of substance or whether those are just -- if there is

16   a column with a bunch of blank cells, that's one thing.  But if

17   there is some information that got cut off that was material,

18   it could be a different one.

19           MS. CALL:  May I pull up the native version and

20   confirm?

21           THE COURT:  Let's just take a look at that.  I want to

22   confirm that.  Hold on one second, Mr. Lavine and Ms. Henry,

23   and let Ms. Call focus on that issue.

24           MS. CALL:  They appear to be largely blank, but -- not

25   able to scroll through the several hundred entries, there might

1    be entries in several others.  The one substantial one I am

2    seeing is marking whether entries have been deleted and I think

3    the source file path has the information.

4         *THE COURT:* Mr. Lavine, go ahead.

5         *MR. LAVINE:*  Your Honor, I understand Your Honor's

6    ruling and I respect that, but just for the record, I'd like to

7    make a point here, Your Honor.  You have on here some of these

8    things deleted.  We don't know when they were deleted.  There

9    is no way to determine what this is.  And in a sense by

10   allowing this in, it's creating that this is some sinister type

11   of document, which is what the government in a sense is

12   alleging.

13        You're talking about a person who is a salesperson who

14   has all these contacts in their phone because they are normal

15   business.  Putting aside anything as far as any type of

16   co-conspirator thing, which as you know we don't agree with,

17   Your Honor, but the bottom line is that's just a normal

18   run-of-the-day contact list that Mr. Brady is using in his

19   sales in his business.  Presenting it this way, especially with

20   some of these deleted things, we don't know what's deleted, it

21   creates the aura that this is some sinister document and it's

22   not.

23        And I guess the trouble I have with this is -- with

24   the government's arguments, we've stipulated to all these phone

25   numbers.  They've got all the phone records.  The jurors can

1    look at it.  And therefore, again not only do I think it's not

2    relevant, I think it is repetitive.

3            THE COURT:  Right.  I don't think that the

4    stipulation, though, would cover the fact that a given

5    defendant had a contact list that contained co-conspirator

6    contacts, right?

7            MR. LAVINE:  Well, I understand, Your Honor, but at

8    the same time you are talking about somebody who, as I said, is

9    a salesperson who is going to have contacts all over the place

10   in order to conduct day-to-day business.  Putting aside any

11   alleged allegations of co-conspirator, this is just a normal

12   business type of situation.  Every salesperson is going to have

13   it.  I, on my phone, I am not a salesperson, but I have got all

14   my contact list.  There is nothing sinister about that.

15           THE COURT:  See, that's the point.  There is nothing

16   sinister about that.  That's why I don't think that the nature

17   of the exhibit itself is going to be considered in the sinister

18   way, or at least it's subject to argument, but by its nature

19   this is what it is, which is simply a contact list.

20           MR. LAVINE:  I guess my argument, Your Honor, and I

21   respect Your Honor's decision, but my argument is what the

22   government is arguing here is that this shows contacts with

23   co-conspirators.  It shows nothing more than contacts with

24   business people.

25           THE COURT:  Yeah, it's subject to being argued both

1    ways, but by its nature I don't think it's misleading or

2    sinister or anything of that nature.

3         MS. CALL:  If I could just note for the record, Your

4    Honor, the original paper version the government intended to

5    introduce as an excerpt did not contain the deleted column, and

6    that was a request of Defendant Brady that the entire native be

7    provided.  So to the extent they believe it's misleading or

8    anything to include the deleted column, that had not been the

9    government's original intention.

10        THE COURT:  Well, in any event, the native is being

11   included, so that would contain all of that different

12   information.

13        Okay.  Next?

14        MS. CALL:  Next is Government's Exhibit 9217.  This is

15   an offer letter from Tyson Foods to Defendant Mulrenin.

16        MS. LaBRANCHE:  Objection.  First is relevance, Your

17   Honor.  This is an offer letter from September.

18        THE COURT:  Hold on, Ms. LaBranche.  Let me have an

19   opportunity to take a look at it, and let's also give Ms. Call

20   an opportunity to provide the government's argument for

21   purposes of introducing it.

22        MS. CALL:  Yes, Your Honor.  This is an offer letter

23   from when Defendant Mulrenin joined Tyson Foods in 2007.  It

24   includes his bonus and the fact that was tied to the company's

25   EBIT performance which is related to Tyson's profits.  It is an

1    item of independent legal significance and is non-hearsay for

2    that purpose.

3           THE COURT:  All right.  Ms. LaBranche?

4           MS. LaBRANCHE:  So this is from 2007.  This is an

5    offer that was made to Mr. Mulrenin when he first came over

6    with Tyson.  It's at least five years before any of the

7    allegations in this case, before the alleged conspiracy even

8    starts.  It is not accurate and is not an accurate description

9    of what his job was or what his contract was at the time of the

10   alleged conspiracy.

11          And, Your Honor, putting to one side the 401 issue,

12   it's clearly 403.  What the government wants to do here is they

13   want to try and make an argument that somehow Mr. Mulrenin was

14   motivated to make sales so that he could get a higher bonus or

15   stock options.  You have heard testimony repeatedly that what

16   this actually relates to, what EBIT relates to, is to global

17   Tyson sales, not to his specific sales group.  So I would

18   object under 401 and 403.

19          THE COURT:  Can we put up the second page of this?  We

20   can go back to the first page which Ms. LaBranche was focusing

21   on.

22          All right.  Response?

23          MS. CALL:  Yes, Your Honor.  It's an offer letter.

24   It's essentially evergreen.  There is no like expiration period

25   on the terms that are offered in this letter.  So I don't

1    believe the date of it, which is obviously contemporaneous with

2    Mr. Mulrenin or around the time that he then joined Tyson that

3    year, I don't believe the date should affect a relevance

4    determination because these are the terms he was offered when

5    he came to the company.

6          As to the global nature of the sales, I don't think

7    there has been any contention that profits specific to the

8    small bird group aren't a part of that global sales.  And Your

9    Honor has previously ruled in Docket 603 that evidence of how

10   each defendant would benefit from higher chicken prices is

11   relevant to motive for the alleged price-fixing conspiracy and

12   will be admitted.

13         THE COURT:  Mr. McLoughlin?

14         MR. McLOUGHLIN:  Yes, Your Honor, a couple points.

15   The argument that it is of independent legal significance I

16   think is simply not correct.  The significance of this document

17   is only for the inference with respect to the alleged motive to

18   conspire as a result of the bonus, which is completely

19   ordinary.

20         And to the point already made, the notion that this is

21   "evergreen" is again testimony by the government.  If the

22   government wants to show in some way what someone's

23   compensation is and this model is still working, that is a fact

24   they have to prove.  In this case the government simply wants

25   it assumed as the result of a letter that clearly precedes the

1    relevant period by at least five years.

2          Now, we also have a situation where Tyson at this

3    point has annual revenue of $27 billion.  So without

4    explanation as to how all of these things are calculated and

5    the rest, it becomes virtually meaningless with respect to

6    this.

7          And this -- you know, the cases on motivation as a

8    result of gain, most of them are in the fraud context.  And the

9    lack of a connection between the way this might have been

10   calculated in 2007 and any additional revenue generated by the

11   conduct at issue in this case simply also is not even remotely

12   connected.  And so with respect to relevancy, with respect to

13   hearsay, the lack of independent legal significance, I think

14   the document fails on virtually every test for admissibility.

15         THE COURT:  Thank you, Mr. McLoughlin.

16         Mr. Beller?

17         MR. BELLER:  Your Honor, I'll be brief.

18         The underlying relevance as indicated by the

19   government presumes facts that are simply not in evidence.  And

20   one of those facts that it presumes is that Mr. Mulrenin did,

21   in fact, go to Tyson as a result of this particular offer

22   letter and that there wasn't any further negotiation.  That is

23   a fact simply I don't know.  I am not meaning to suggest that

24   that is untrue.  I don't know, No. 1.

25         No. 2, that also presumes, as stated by Mr. McLoughlin

1    and the government, that this is, in fact, evergreen and that

2    there was not additional modifications made to his pay and/or

3    his bonus in the subsequent years.  I think had this come from

4    his HR file, those would be presumptions that we could make if

5    we had his HR file in its entirety and we could look to see if

6    there were additional modifications or changes made in the

7    subsequent years.  But given the attenuation from the date of

8    signature on this document, the lack of any additional

9    addendums, we don't know if there were any modifications,

10   changes, et cetera, I believe the probative value of this is

11   simply outweighed by the speculative prejudice.

12           *THE COURT:*  All right.

13           Anything else, Mr. LaBranche?

14           *MS. LaBRANCHE:*  I think it goes without saying that I

15   adopt all of those arguments.  And, Your Honor, Mr. Mulrenin

16   did have a new position as a director beginning by '14.  So I

17   think this is so highly prejudicial, so likely to confuse the

18   jury.  If, in fact, he had the -- well, first of all, I don't

19   have anybody I can ask these questions to because the

20   government is choosing to just put this in in their case

21   without a witness.  I don't have anybody who I can get up and

22   ask about what actual bonuses Mr. Mulrenin got or what actual

23   stock options he got.  And I know from looking at the discovery

24   in this case that if we were to look at his entire personnel

25   file, he is not receiving bonuses based on any of the sales

1    that are at issue in this case.

2         But again, I shouldn't have to put someone on.  I

3    shouldn't have to put someone on to put that defense on for my

4    client.  So the government is asking you to make a lot of

5    assumptions and make a lot of inferences about what they want

6    to believe this document is about.  And without any evidence, I

7    just think it is totally prejudicial for it to be admitted to

8    the jury.

9         THE COURT:  Ms. Call?

10        MS. CALL:  First, I am a little puzzled about the lack

11   of evidence of when Mr. Mulrenin joined Tyson given that last

12   night and this morning all 10 defendants stipulated to him

13   beginning employment at Tyson in October of 2007, which is

14   within a month of this letter.  Second, we did provide in

15   discovery Mr. Mulrenin's HR file as it was produced by Tyson

16   Foods, so to the extent there is confusion regarding what is in

17   that file, defendants do have it.

18        What matters in this letter is Mr. Mulrenin's belief

19   upon his offer and entry to Tyson that his bonus would be tied

20   to the company's profits, and that's precisely what the

21   non-hearsay purpose is.  Rather than the truth of what his

22   particular bonus structure is, what matters is what motivates

23   him and his beliefs regarding how his bonus structure would

24   work at the company.

25        THE COURT:  Mr. McLoughlin?

1          Were you done Ms. Call?

2               *MS. CALL:*  Yes, Your Honor.  Thank you.

3               *MR. McLOUGHLIN:*  So that last comment I think by the

4    government is particularly disturbing.  If the argument is

5    what's relevant here is what Mr. Mulrenin's belief was, you get

6    first to the question of what is the relevant time period with

7    respect to his belief.  Second, you get how do you connect this

8    document to his belief.  The government has not offered what

9    evidence he had with respect to discussions with the personnel

10   department at Tyson in 2007 and as to how this would be

11   calculated or used, not to repeat the point as to 2011 to 2019.

12        And the leap the government wants to make is what he

13   believed about his conversation based on a 2007 letter to try

14   and get to motive without a witness, without a foundation as to

15   what he understood, what his reading of this ever was or

16   anything else really demonstrates the argument of independent

17   legal significance is meaningless and a subterfuge.  And the

18   relevancy and the 403 and 404 issues are paramount.

19               *THE COURT:*  So what -- the state of the evidence right

20   now, does it indicate what Mr. Mulrenin's position was during

21   the conspiracy period?

22               *MS. CALL:*  One moment, Your Honor.

23        Your Honor, I don't believe Mr. Mulrenin's title is in

24   his e-mail signature or other documents that would reflect his

25   particular position.  I'll note his HR files do note changes in

1    position, but I don't believe they note any changes in his

2    bonus structure.  That's what I recall from my review of the

3    files.

4           THE COURT:  For instance, are there contracts that

5    Mr. Mulrenin signed?  Because typically those would have his

6    position on them.

7           MS. CALL:  Not at the top of my head at the moment.  I

8    will note that national accounts is the name of the group that

9    is relevant for much of the conspiracy period and the title on

10   this letter is national account executive.

11          THE COURT:  Ms. LaBranche?

12          MS. LaBRANCHE:  Your Honor, in fact, on the third page

13   the offer for employment has national account executive in

14   2007.  Mr. Mulrenin became director of sales in either 2013 or

15   2014.

16          THE COURT:  All right.  I am going to exclude this one

17   because the issue really goes to the position.  He is obviously

18   hired into Tyson with a position.  It's identified in the first

19   sentence of the letter, national account executive.  It

20   appears -- and I think that there probably are documents that

21   indicate what his position was during the conspiracy period.

22   It seems that if those particular exhibits don't note what it

23   is, I accept Ms. LaBranche's representation that at least as of

24   2013 he had a different position.  And given that fact, while

25   there could be some type of assumption that people at that high

1    of an executive level would have similar ones, there really

2    isn't any existing evidence that would indicate that it really

3    is.

4           So while this would be evidence of a compensation

5    structure including bonus structure for the position that he

6    was hired into, it does not appear that there is evidence of

7    what his position was during the conspiracy period -- or at

8    least the bonus structure during the conspiracy period.  And as

9    a result, I find that it is not relevant.

10          MS. CALL:  Your Honor, I do think -- I don't believe

11   he received a new offer letter when he was promoted, so I don't

12   think there is an indication of how his belief would have

13   changed.  So I think this offer letter would still have

14   probative value as to his belief regarding bonus structures in

15   his position that would have continued during his employment.

16          THE COURT:  I've ruled.

17          Next issue?

18          MS. HENRY:  Your Honor, with the Court's indulgence, I

19   have a question.  And I realize I am going backwards a little

20   bit.  With regard to 9010 which was the Brady contact list, is

21   it correct that that is not being admitted for the truth of the

22   matters asserted therein?

23          THE COURT:  I think it was offered for a non-truth

24   issue.

25          MS. HENRY:  And then will there be a limiting

1     instruction on it?

2          THE COURT:  No, because I'm not sure -- it's being

3     admitted because by its nature it's non-hearsay, but I don't

4     think a limiting instruction would be appropriate for this

5     exhibit because I think that that would completely confound the

6     jury because it consists of names and numbers.  And if the jury

7     were told it's not admitted for the truth, they would not even

8     know what that means.  So by the nature of the document, that

9     limiting instruction would not be appropriate.

10          MS. HENRY:  I would respectfully request that it be

11     given, and I understand that you've determined otherwise.

12          THE COURT:  Right.  I will refuse that request.

13          Next exhibit?

14          MS. CALL:  The next is Government Exhibit 9224 which

15     is Defendant Roberts' offer letter from Tyson Foods.  The date

16     of this is 2012 which is during the conspiracy period.

17          THE COURT:  Can you show me the second page?

18          MS. CALL:  Yes, Your Honor.

19          Ms. Pearce, if you can turn to that.

20          THE COURT:  All right.  Anything else, Ms. Call?

21          MS. CALL:  No, Your Honor.

22          THE COURT:  Objections to 9224?

23          MR. GILLEN:  Yes, Your Honor.  We would object to the

24     introduction of 9224 for the following reasons.

25          As the Court has previously addressed issues

1    concerning the relevance of compensation in terms of whether or

2    not a particular defendant had some sort of motive to join the

3    conspiracy, I would note the following.  What has not been

4    redacted -- the initial base salary has been redacted by the

5    government, but they do not -- under discretionary bonus they

6    do not redact the potential bonus target should be.  That's a

7    potential target.  It has nothing to do with specifically the

8    charges in this case.

9            The reality of it is --

10           THE COURT:  One second, Mr. Gillen.

11           Can you switch back to the first page?

12           Go ahead, Mr. Gillen.

13           MR. GILLEN:  The reality of it is, Your Honor, is that

14   the government has failed to show that any bonuses as it

15   relates to Mr. Roberts or frankly anyone else in this case is

16   tied to what they claim to be specific events and episodes in

17   terms of violations of antitrust law.  They haven't done that.

18           Example.  What they could have done and failed to do

19   is they could have called in someone from Tyson and said:

20           What's your job?

21           I'm with HR, or I am Mr. Roberts' superior.

22           I would like to address you to the 2015 time period

23   and regarding the KFC negotiations.  In that respect, can you

24   delineate for us what bonuses, if any, Mr. Roberts received as

25   a result of that specific contract or the Church's QA or the

1    Church's frozen issue?

2          They didn't because I don't think they can.  And the

3    reason is, is that Tyson is, as we know, an international

4    company with massive global international revenues.  The

5    general structure, as I understand it, of bonuses has to do

6    with the overall rise and fall of the corporate well-being and

7    that the KFC structure was a, very frankly, small amount of the

8    overall revenue for the company.

9          But the inferences they are trying to draw here are

10   sinister in that they could have and maybe they did talk to

11   someone from Tyson and maybe they knew exactly what I am

12   representing to the Court about the motive about the bonus

13   structure and chose rather than to put someone on the stand and

14   listen to them explain it, they choose to draw an inference

15   which I believe that they know and we know are inaccurate.

16         So as it relates to the target amount of 86,000, that

17   should certainly be redacted.  The sign-on bonuses, the

18   emphasis of what the Court initially discussing this issue with

19   others indicated that information that would be relevant to

20   someone's motive to join a conspiracy, that is something the

21   Court might consider to be relevant.

22         Here if they are saying, for example, the sign-on

23   bonus, as part of your acceptance of employment with Tyson, you

24   will receive a sign-on bonus of $20,000.  What does that have

25   to do with the motive to allegedly join a conspiracy on KFC

1    back in 2015?  That's an incentive for him to join then.  It

2    has nothing to do with any sort of connection or some sort of

3    motive to join a conspiracy.

4           The same thing applies to the restricted stock.  They

5    indicate you will receive an initial stock award with a value

6    of $125,000.  That doesn't have anything to do with any sort of

7    improper motive that he might have to join some conspiracy.

8    Welcome aboard.  This is your package.  You've got $125,000

9    worth of stock.  But the failure to redact these portions tells

10   us, it gives us an insight to what the government really wants

11   to do, and what they really want to do is impermissible.  And

12   what they really want to do is say, look over at Mr. Roberts.

13   He got a sweetheart package.  He has a nice financial package

14   of a sign-on bonus and stock incentives, and please go and

15   convict him because he got a very -- not a very lucrative, but

16   a lucrative contract in the minds perhaps of some of the

17   jurors.  All of that has nothing to do with how the Court had

18   structured earlier admissible evidence concerning bonuses that

19   had to do with incentive to join a conspiracy.

20          So for that reason I would ask the Court to exclude

21   the entire document.  And if the Court does not exclude the

22   entire document, then I would ask that the target bonus

23   position be excluded, the 86,000, the sign-on bonus of 20,000

24   be excluded, the restricted stock bonus of $125,000 be

25   excluded.

3486

1          What this document does show, and I would suggest that

2     perhaps it could be redacted so that the only thing that really

3     is -- they are looking for here is to say your position is

4     vice-president of sales national accounts for Tyson and you

5     report to Mr. Lubert.  That's basically it.  Other than that,

6     the whole document is being offered for an impermissible

7     purpose to prejudice the jury against Mr. Roberts because of

8     whatever financial package he had on May the 24th, 2012.

9          Thank you, Your Honor.

10          THE COURT:  Thank you, Mr. Gillen.

11          Mr. Lavine?

12          MR. LAVINE:  Yes, Your Honor.  If we could scroll down

13     to the bottom of this letter, please.

14          THE COURT:  The first page?

15          MR. LAVINE:  Yes.  The second page, please, all the

16     way at the bottom, signature please.

17          Your Honor, the problem I have with this, is the

18     government proposing this is a draft?  Because, No. 1, it's not

19     signed by anybody.  It's not accepted by Mr. Roberts.  And if

20     you go to the top, it has in the first paragraph it has a date

21     and it's not even filled in.  So we don't even know if this was

22     ever signed, if this was actually a bonus, and plus the fact

23     the bonus that's set forth is nothing more than a discretionary

24     bonus.  And it's basically tied to the individual performance,

25     as well as to the company performance.  And as I think

1    Mr. McLoughlin may have referenced, Tyson is a huge company,

2    but we are talking about a draft letter here.  And I think that

3    putting something like this in here without even knowing

4    whether it was ever finalized or not I think is more

5    prejudicial than probative.  And for that reason I would move

6    that it be excluded.  Thank you.

7         THE COURT:  Mr. McLoughlin?

8         MR. McLOUGHLIN:  I was going to make the point that

9    Mr. Lavine made so well that this is an undated draft.  So it

10   can have no independent legal significance because it is on its

11   face a draft.  Also Mister -- this is not a contract case.  And

12   the doctrine of independent legal significance and the contract

13   language is only relevant where the contract itself is in

14   dispute, as the cases indicate.  And I can provide Your Honor

15   with some citations to that.  Where it is for proof of motive,

16   it must by definition be offered for the truth of the matter

17   asserted, and so therefore it cannot come in under the

18   independent legal significance doctrine.

19        But again, the point is this is a draft.  Again, we

20   have a failure of a witness who can say I ever communicated

21   this to the defendant.  There is no such evidence whether those

22   terms changed or anything else.  So without those fundamental

23   foundational issues, this is not a business record.  It's not a

24   contract.  So it can't be any other exception to the hearsay

25   rule.  And so it fails on every count for admissibility,

1    relevancy and materiality.

2            THE COURT:  Thank you.

3            Mr. Gillen?

4            MR. GILLEN:  And one more point.  There is no

5    signature here by Mr. Roberts that would indicate that he

6    accepted the terms that are delineated in 9224.  So it's a

7    draft that isn't signed by the HR person, Mr. Tooley, nor is

8    there any sort of indication on the document tendered to the

9    Court that these terms were acceptable or accepted by

10   Mr. Roberts.

11           For all the reasons articulated by my colleagues and

12   the ones that I had articulated previously, I would ask the

13   Court to exclude 9224.

14           THE COURT:  All right.  Can you go back to the first

15   page, top?

16           And then go ahead, Ms. Call.

17           MS. CALL:  Yes.  I will try to address everything.

18           First, there was a date on the document.  It says

19   May 24, 2012.  I think what counsel was pointing to, that there

20   was not a date listed for the first date of employment.  This

21   is simply how the record was maintained in Tyson's files.

22   Ms. Bunch and Ms. Arens both testified to the authenticity of

23   the files in Tyson's systems.

24           The fact that it is unsigned does not necessarily go

25   to the independent legal significance.  The cases, as

1    Mr. McLoughlin stated, the cases on independent legal

2    significance do discuss draft items and offers rather than

3    signed contracts as a part of those negotiations giving them

4    legal significance.

5            I think we've cited before to *United States v.*

6    *Arteaga,* 117 F.3d 388, Ninth Circuit 1997, with respect to

7    offers, and that I think is a price offer being an item of

8    independent legal significance.  So I don't think the

9    significance changes by the fact that this isn't signed.  That

10   was simply how it was maintained by the company.

11           Third -- I think second maybe -- as far as the

12   accuracy of the information here, I'll point out that the title

13   here VP Sales of National Accounts for Tyson is in the

14   evidence, at least in Exhibit G-629, in 2014 as Roberts' title

15   at the time of some of the conspiratorial acts.

16           As far as the bonus -- oh, I will also note that this

17   offer letter is attached to an e-mail to Defendant Roberts.

18   And let me confirm one thing.  This specific document was

19   attached to an e-mail to Defendant Roberts showing that this is

20   what he received.  We are happy to introduce the underlying

21   e-mail as well.

22           As to the numbers, I think this was an oversight and

23   we will redact the numbers of 86,000, 20,000, 125,000 and

24   20,000 contained in the letter because it was not the

25   government's intention to show any general wealth of Defendant

1    Roberts, but rather his motive.

2          And then I will point to the actual bonus terms here

3    saying both individual and company performance.  So this does

4    reflect his belief that his own performance in his role on the

5    contracts that he negotiated and worked on would be relevant to

6    his bonus.

7          THE COURT:  One second, Mr. Gillen.

8          Do you have the e-mail that supposedly transmitted

9    this to Mr. Roberts?

10         MS. CALL:  Let me see if we are able to pull it up.  I

11   will have to check.  I was handed a laptop.  I don't believe we

12   have it marked as an exhibit.  For counsel's reference the

13   Bates number is TY-000957987.  It is an e-mail from Ms. Linda

14   Ray at Tyson to Defendant Roberts on June 6th, 2012, so a week

15   or two after this letter date.

16         And let me confirm one item.  I believe the Bates

17   number of the attachment is slightly different, so I do want to

18   confirm that it is the same letter.  It appears it happens to

19   have different Bates numbers, so if I misspoke earlier, it is

20   not the precise same document, but we are checking to see if we

21   can see if the content is the same as what was received by

22   Defendant Roberts via e-mail.

23         THE COURT:  Why don't we skip this one.  We have the

24   break coming up.  We won't take it now, but maybe that one can

25   be looked into.  Yeah, I would be surprised if a cover e-mail

1    from a few weeks later would contain the same attachment, but

2    you can check on that.  And then for what it's worth, we'll

3    consider it at that point.

4        *MR. GILLEN:*  One quick point that puts the final

5    harpoon in this document to show that it's a draft, to show

6    that it was incomplete.  When you read on the third line down,

7    "Your mutually agreed upon start date should be on or before"

8    and then it has "(Date)."  They haven't even filled out a date

9    in this alleged draft of when he is going to start.  This is

10   simply not a complete document.  It's not anything that should

11   be admissible.  If they have got something that's signed,

12   that's filled out and complete, then they should have tendered

13   that, but they didn't.  So I throw that into the mix.

14       *THE COURT:*  Yeah, I think that was a point made by

15   maybe Mr. McLoughlin that there seemed to be this unfilled out

16   portion of it which was indicative of a draft.  All right.

17   We'll skip that one.

18       Next?

19       *MS. CALL:*  Next is Government Exhibit 9264 which is a

20   native file, and there is an excerpt which is stickered as

21   9275.  This is a contact list belonging to Defendant Austin.  I

22   will note for this one this will be offered for the same

23   purposes as 9010 and 9010-1.

24       *THE COURT:*  So let me make sure I am clear.  So 9264,

25   is that a native version?

1          *MS. CALL:*  Yes, Your Honor.

2          *THE COURT:*  Okay.  And 9725 is as displayed an

3    excerpt.  How many pages is that?

4          *MS. CALL:*  Let me inquire.

5          9275 is one page.  I will note a distinction with how

6    this excerpt is done, that I believe it only contains certain

7    columns and certain entries because it was quite a large Excel

8    spreadsheet rather than trying to print out like we did with

9    9010 an entirety of certain pages.

10         *THE COURT:*  Okay.  I am sorry, whose contact list does

11   this purport to be?

12         *MS. CALL:*  Defendant Austin.  And there was testimony

13   on the record from Mr. Sangalis that this was pulled from the

14   home drive of Defendant Austin on Pilgrim's servers.

15         *THE COURT:*  Which drive?

16         *MS. CALL:*  I believe he called it the home drive of

17   Roger Austin.

18         *MR. FELDBERG:*  Can we just continue to scroll down so

19   I can see the bottom?

20         Your Honor, Michael Feldberg for Mr. Austin.

21   Mr. Austin, like Mr. Brady where the issue came up, similarly

22   is a salesman.  His job is to sell chicken to customers.  The

23   fact that he has a contact list, and in this instance the

24   excerpts from the contact list include many of his colleagues,

25   is simply not relevant to any issue in dispute in this case.

1              If there are e-mails that the government seeks to

2       offer, and they have, we'll deal with those e-mails as they

3       come up and they represent communications.  The fact that he

4       knows or has in his phone contacts is -- doesn't prove or

5       disprove any fact in dispute in this controversy, so we object

6       to this document.

7              THE COURT:  Thank you, Mr. Feldberg.

8              Ms. Henry?

9              MS. HENRY:  I have looked at the native, Exhibit 9264,

10      and looked at the excerpt, and I can't match them up.  So if

11      there is a way in which somebody could suggest that they do

12      match because they just don't seem to that I can see on the

13      screen.

14             THE COURT:  Okay.  Ms. Call, on that point?

15             MS. CALL:  I noted that this excerpt was done a

16      slightly different way because the number of columns, that I

17      believe what happened are several columns were hidden so that

18      columns that had the substance in them would show on one page.

19      That may be what is causing confusion for Ms. Henry.

20             THE COURT:  Can you repeat that again?  I am not quite

21      sure.

22             MS. CALL:  The natives of these contain like 30

23      columns and then hundreds of rows, so I believe to create this

24      excerpt certain columns were hidden so you are only viewing

25      certain columns of the spreadsheet, as well as several rows.

3494

1   So the entries, for example, for the -- for two folks that

2   appear next to each other here weren't necessarily next to each

3   other in the contact list, but these are certain of the

4   contacts that were just pulled out and excerpted from the large

5   native file.

6       MS. HENRY:  My concerns go beyond that.  I am just not

7   seeing, even as you scroll over, the information that is on the

8   excerpt is not in the native file that I got, what is marked as

9   the native file.  It's not there.

10      MS. CALL:  I believe this is maybe a technical

11  expertise question in Excel.  So if you look at the native,

12  sometimes the cell may be collapsed and not showing all of the

13  contents.  You may need to highlight all and expand the rows to

14  see all the information contained in each cell.  I apologize

15  for any confusion, but Excel is not always the most easily

16  viewable.  I think for Mr. McGuire particularly there is a

17  column over to the right that contains a significant amount of

18  information that you do need to expand the row to view.

19      THE COURT:  Mr. Gillen?

20      MR. GILLEN:  Your Honor, if my understanding is that

21  this exhibit is a shortened or a truncated version of the

22  larger file, and if that's correct, then I would object for

23  this reason.  If you have a large, a very, very large database

24  of contact points for virtually everyone that you know, then by

25  extracting -- if that's the way it is, if I understand this

1    exhibit correctly, if they've done that, then what they have

2    done is they have improperly highlighted and accentuated

3    certain contact points in a morass of much larger data of

4    information.  So to that extent because Mr. Roberts' name is

5    mentioned in the exhibit, I would object on that basis.

6              THE COURT:  Okay.  Mr. Feldberg?

7              MR. FELDBERG:  Your Honor, I agree with Mr. Gillen's

8    objection and adopt it.  It's misleading to highlight a handful

9    of contacts in a much larger universe.  And while I am not -- I

10   am hardly a technical expert, it does strike me that the points

11   that Ms. Henry made about the fact that the original document

12   and the -- the native and the original do not exactly match up

13   leads to significant questions as to whether this is an exhibit

14   that should be admitted.

15             Beyond that, Your Honor, the point that Ms. Call made

16   that it shows contact details of the relationship if -- well,

17   potential relationship between Mr. Austin and Mr. McGuire,

18   there are lots of e-mails in evidence between Mr. Austin and

19   Mr. McGuire.  So the question I would ask is what is the point?

20   What is the relevance of showing Mr. Austin has some

21   information about Mr. McGuire in his contact list, particularly

22   when juxtaposed against all of the problematic issues, both

23   technical and as a result of the excerpt process that arise.

24   Objection.

25             THE COURT:  Thank you, Mr. Feldberg.

1          Mr. Lavine?

2          MR. LAVINE:  Your Honor, I am going to raise this

3     issue, and I know you have ruled on 9010 and I am not going to

4     ask for reconsideration.  If they are taking this excerpt out

5     and the excerpt is not exactly the same as what is on the

6     phone, this should not be allowed.  If this in any way alters

7     anything or if the jurors have to figure out how to expand

8     this, I think the prejudicial aspect outweighs any type of

9     benefit one way or the other -- or probative value, excuse me.

10          THE COURT:  Sure.

11          Ms. Call?

12          MS. CALL:  Very briefly, just to be clear, the content

13     in terms of what are in the cells that are in the excerpt is

14     precisely the same as the content in the native.  All that has

15     been done is the rows expanded.  So it's frankly making the

16     evidence more viewable for the jury because they may not see

17     the information in the rolls of the native Excel spreadsheet if

18     they did not know to expand it.  So I don't believe it's

19     misleading in any way.

20          THE COURT:  That's in relationship to information in a

21     given role -- sorry, given row?

22          MS. CALL:  Yes, Your Honor.  So there is certain items

23     that have like, let's say, 10 lines of information, but the

24     Excel is only showing the first.  So the jury wouldn't know the

25     content was there if it was not expanded as has been done in

3497

1    the excerpt.  So I do think the evidence needs to be presented

2    to the jury in a way they can understand it and view it.  And

3    when the non-hearsay purpose for the introduction of this is

4    showing the association with conspirators, that's exactly the

5    information they should be able to see.

6            As for the, I suppose, relevance and foundation

7    points, there is several items here that aren't already on the

8    record.  One thing I will note and point to is the number or

9    numbers that Defendant Austin has in his phone for Defendant

10    Ric Blake, which includes an office line for George's, that

11    absent this the jurors would not know that Defendant Austin

12    specifically associated with Defendant Blake.

13            THE COURT:  So there is a contact specifically for

14    Mr. Blake or for his company?

15            MS. CALL:  It's for Mr. Blake.

16            THE COURT:  Okay.  Let me ask you this, Ms. Call.  So

17    is 9725, the extract, does it remove various rows and thereby

18    essentially pull different names that would otherwise be, you

19    know, if you were to look at the native version many pages

20    apart, but then collapse all those names into one or into --

21    yeah, one page?

22            MS. CALL:  I believe that's correct.  I believe they

23    are typically alphabetical in order.  I could be wrong.  I will

24    note as an alternative, and I realize we kind of treated the

25    two different, not on purpose, but we could do the kind of

1    pages at a time in an excerpted form like was done with 9010;

2    but as it is right now, it is pulling closer together separate

3    entries.

4             *THE COURT:*  Because that to me is almost treating it

5    like some type of a summary exhibit that's just an edited

6    spreadsheet.

7             Okay.  Mr. Lavine?

8             *MR. LAVINE:*  The same thing applies, Your Honor, to

9    9010, but I think listening to government counsel, the idea of

10   having to explain to the jury, the jury is going to have enough

11   issues to deal with in this case with all the limiting

12   instructions.  And to have to then try to explain how they have

13   to try and change the format on this in order to see all of the

14   columns and everything, it's just unreasonable, Your Honor.

15            *THE COURT:*  Mr. Feldberg?

16            *MR. FELDBERG:*  Balanced against the entirely

17   unreasonable effort that the jury might be asked to go through

18   is the extraordinarily limited, if any, relevance of the

19   proposed exhibit.  I thought I heard Ms. Call say that there is

20   an office number for George's on the document as one of her

21   examples.  The fact that Mr. Austin may have an office number

22   for a company in his contact list hardly shows a relationship

23   with an individual employee of that company.

24            *THE COURT:*  I think she said that there was a number

25   for the individual.  I think that's what she said.

1          MR. FELDBERG:  I think she may have said both.

2          THE COURT:  One second.

3          MS. CALL:  What is on the screen right now on the top,

4     the entry for Ric Blake, there is a number associated with him

5     that ends in 2449, and that is an office number for George's.

6     The defendants have stipulated that is an office number for

7     George's, but it is relevant here that when Defendant Austin

8     called that number, that he did associate that number with

9     Defendant Blake in particular.

10         MR. FELDBERG:  I am sorry, I just didn't follow that

11    argument, Your Honor.  The fact that he has an office number

12    for a company does not reflect a relationship with an

13    individual employee of that company.  Is that an 800 number by

14    the way?

15         THE COURT:  It is.  I think the argument is that

16    because the contact list is not for the company, but rather

17    that 800 number is associated with Mr. Blake, that that is then

18    a contact number for Mr. Blake, not his personal number or

19    anything or direct number, but rather a number for Mr. Blake.

20         MR. FELDBERG:  And what exactly does that prove, that

21    he has an 800 number for a company in his list?  I suggest that

22    in these circumstances given all the problems that have been

23    articulated with this proposed exhibit, the probative value is

24    substantially outweighed.

25         THE COURT:  Okay.  Ms. Johnson, did you still have a

1   point?

2          MS. JOHNSON:  No, Your Honor.  The point has been

3   made.  This is a 1-800 number for the company and not

4   associated directly with Mr. Blake.

5          THE COURT:  Ms. Call, anything else?

6          MS. CALL:  Very briefly on relevance, I will note on

7   August 18, 2014, Defendant Austin called that number on the day

8   before KFC bids were due.  And later that day an e-mail

9   circulated containing George's bid number for KFC, so it is

10  entirely probative that Mr. Austin associated that specific

11  number with Defendant Blake.

12         MR. FELDBERG:  That's exactly our point, Your Honor.

13  On August 18 of 2014 Mr. Austin, rather than calling

14  Mr. Blake's cellphone, called an 800 number at George's, hardly

15  evidence of conspiratorial behavior.

16         THE COURT:  Here is my ruling.  The objections will be

17  overruled in terms of relevance.  There is some relevance to

18  it, enough to be admissible.  However, I am going to reserve

19  ruling on 9725.  That document will have to be in multiple

20  pages that do not collapse the row information because that, I

21  think, alters the original in a way that not only the jury

22  couldn't ever figure out, like Ms. Henry had the problem, but

23  also I think it could potentially be misleading.

24         I do think that 9264 is admissible for the same

25  reasons that I thought that 9010 would be admissible, but I

 1    will reserve ruling on 9725.  If the government could -- I

 2    don't know if you can do this over the lunch hour, but perhaps

 3    put those in separate pages that don't collapse the rows so

 4    that we can -- everyone can take a look at that one more time.

 5            MS. CALL:  Yes, Your Honor.

 6            THE COURT:  Why don't we go ahead and take the

 7    mid-morning break at this time.  I will get to you in one

 8    second, Mr. Fagg.  We will plan on 15 minutes.  Let me hear

 9    first from Mr. Fagg.

10            MR. FAGG:  Just briefly.  Our colleague, Catherine

11    Prater, filed a notice of appearance in this matter this

12    morning.  We would just seek the Court's permission.  It hasn't

13    been ruled on yet, Your Honor, but she would like to sit at

14    counsel table after the break.

15            THE COURT:  A notice of appearance does not require a

16    ruling by me, so there is no problem with that.  Prater is it?

17            MR. FAGG:  Prater, P-R-A-T-E-R.

18            THE COURT:  Sure.  We will be in recess until -- we

19    will take 15 minutes from now, so plan on 25 minutes to 11:00,

20    all right?  Well be in recess.

21        (Recess at 10:18 a.m.)

22        (Reconvened at 10:38 a.m.)

23            THE COURT:  Ms. Call, when you are ready?

24            MS. CALL:  The next is Government Exhibit 1721.  I

25    will note for this one a slightly separate document was on the

1   *James* log which was Government Exhibit 1722.  So I think for

2   today's purposes it makes sense to offer 1722 instead.  I do

3   have paper copies if any counsel need it.  The distinction

4   between the two is just the top e-mail.

5          THE COURT:  Could we display 1722?

6          MS. CALL:  Perhaps, Ms. Pearce, could you display 1721

7   and 1722 side by side?  That may be helpful.

8          And I am reminded to tell you the *James* log entry

9   number which was No. 40.

10          MS. LaBRANCHE:  Your Honor, my monitor doesn't seem to

11   be working.

12          MS. CALL:  1722 is the document that is in the *James*

13   log and that the government is offering.  1721 is what had been

14   on the list for today.

15          THE COURT:  Okay.  Any objections to the admission of

16   Exhibit 1722?

17          MS. PLETCHER:  No objections, Your Honor.

18          THE COURT:  All right.  Exhibit 1722 will be admitted.

19          MS. PLETCHER:  Just to be clear, no additional

20   objections other than those that are the standing objections to

21   the *James* log.

22          THE COURT:  To the *James* log, yes, right.

23          MS. HENRY:  And we don't have to repeat that every

24   time?

25          THE COURT:  You do not.  If an objection was made

1   during the course of the *James hearing*, that does not need to

2   be repeated.

3          Next?

4          MS. CALL:  Next is Government Exhibit 9703.  I will

5   note an alternate version was previously considered in a

6   hearing by Your Honor.  It was Government's Exhibit 1158.  We

7   had argued its use -- its non-hearsay introduction for effect

8   on the listener, which is Defendant Roberts, as the complaints

9   that he received from the customer that day which is the day

10  that Tyson submitted its first round bid for KFC.

11         I believe Your Honor had denied it saying that there

12  was no effect apparent on the face of the document.  So we now

13  have a more full e-mail chain showing that actual effect, which

14  is that Defendant Mulrenin and Roberts actually did respond to

15  this message and had follow-up work done within Tyson following

16  the receipt of this e-mail from the customer.  So the e-mails

17  here show the intended effect.

18         THE COURT:  Can you scroll down to the very bottom, if

19  you don't mind?

20         MS. CALL:  Yes, Your Honor.

21         So the very bottom e-mail is Defendant Roberts sending

22  Tyson's first round bid in, which I believe is already in

23  evidence as a stand-alone e-mail with its attachment.  The next

24  e-mail is the response which had been contained in 1158, and

25  then the rest of the chain is what follows.

3504

1          THE COURT:  And not *James* log, right?

2          MS. CALL:  Correct.

3          THE COURT:  Objections to 9703?

4          MR. GILLEN:  As the government stated, the real

5     reason, frankly, in our view that they want to introduce this

6     exhibit is to circumvent the ruling that had been made

7     excluding the Eddington e-mail where he is saying, "Are you

8     trying to get me fired before I even move here?"  And the Court

9     ruled that to be hearsay and that was excluded previously.  I

10    thought the exhibit was 1148.  Maybe it was 1158, but I thought

11    it was 1148.  In any event, the Court excluded that as hearsay.

12         Now the government has come back to visit this again

13    with this e-mail saying, oh, this is the effect it had on the

14    listener, which is sort of the telesmatic way in which they are

15    attempting to get virtually all hearsay in before the jury.

16         We would object in that under 403 it's clear what they

17    really care about is this line about, "Are you trying to get me

18    fired here?"  And what they also know and I believe that we

19    addressed earlier with the Court is that the declarant here,

20    Mr. Eddington, told the government when they showed him this

21    document, he told the government he was just being sarcastic.

22    So what the government is trying to do under the rubric or

23    under the guise of effect on the listener essentially is to try

24    to get this statement in that they know the declarant is

25    basically saying, hey, I was being sarcastic.

1          He has known Brian Roberts since 2005, worked for him.

2     And they know that what they're trying to do here is try to get

3     in the jury box a false inference concerning Eddington's,

4     quote, fear that he is going to lose his job over the proposal

5     that was sent on August the 11th.  For that reason we would say

6     to exclude this.  In addition, the Declarant Milbrodt is not I

7     don't believe identified as a co-conspirator declarant.  And

8     for those reasons we would say that the document should be

9     excluded.

10          Do you have any additions?

11          MS. LaBRANCHE:  No, nothing additional.

12          THE COURT:  Can you zoom out so I can see the whole

13     document?

14          Go ahead, Mr. McLoughlin.

15          MR. McLOUGHLIN:  Your Honor, this document is being

16     admitted for the effect on the listener and we are talking

17     about Mr. Mulrenin's response.  It says, "Thanks, Mark.  Brian,

18     see below."  It's clear there is no particular intended effect

19     to use the government's phrase.  And merely acknowledging

20     receipt cannot under any reasonable interpretation of that

21     exception to the hearsay rule be deemed an intended effect on

22     the listener, so it's clear that the exception simply has no

23     place in this argument.

24          THE COURT:  Can you go to Page 2?  I am not seeing

25     that phrase, are you trying to get me fired.

1              MR. GILLEN:  Your Honor, before the end, "You trying

2      to get me fired before I even move here?"  And then,

3      "Seriously-recap the 'reality' of what you are asking for.  So

4      that's in the e-mail of Mr. Eddington.

5              THE COURT:  Okay.  If you could pull out from that.

6              Is this the second page?

7              MS. CALL:  Yes, Your Honor.

8              THE COURT:  And that's the last page?

9              MS. CALL:  That's the third page.

10             THE COURT:  Can we go to the first page, then?

11             MS. CALL:  I will give you some time, Your Honor, but

12      I would like to respond.

13             THE COURT:  Yes, absolutely.

14             Okay.  Go ahead, Ms. Call.

15             MS. CALL:  Yes, Your Honor.  I believe there is much

16      more in here than just a thanks acknowledging receipt.  There

17      is Defendant Roberts requesting that a response be prepared,

18      Defendant Mulrenin ordering another colleague to prepare that

19      response, and then that same response being circulated followed

20      by the thanks.

21             I will note there is almost, I think, two different

22      e-mails in here that would be offered for effect on the

23      listener.  The first is the one we have been discussing with

24      the "trying to get me fired" comment, which I think Mr. Gillen

25      essentially concedes is really not being offered for the truth

3507

1    because it is sarcastic, and that is the way of reading this

2    e-mail by most rational people would read it.

3            But second, it shows how Tyson responds after this

4    initial bid submission by responding and Mr. Milbrodt's

5    preparation specifically shows that the justification Tyson is

6    preparing for this response and request from the customer is

7    saying that the margin increase that was proposed is consistent

8    with current average margins for small bird

9    equivalent/competing sales, which goes to some of this small

10   bird/big bird justification we have been talking about for much

11   of this trial.

12           So, you know, Defendant Roberts' and Mulrenin's

13   knowledge that this is the explanation that is going to be

14   given to the customer in response to their request and really

15   complaint is relevant and is a non-hearsay purpose.  I will

16   just point again to the case I cited earlier which is cited by

17   the advisory committee in Rule 801, which is the *Emich Motors*

18   *Corporation v. General Motors Corporation* antitrust case from

19   the Seventh Circuit.  That's a 1950 case, but it did -- it said

20   the Court should have introduced for a non-hearsay purpose the

21   kinds of complaints from a customer, which in that case was a

22   letter, here is an e-mail, that said this really is a

23   non-hearsay purpose when you are introducing it to show how the

24   supplier, the company, reacted to it.

25           *THE COURT:*  And is it 1158?  Do you have that?  Can we

1    display that?

2         MS. CALL:  Yes, we may.  And we will confirm whether

3    it was 1158 or 1148, but let us pull that up side by side.

4         MR. McLOUGHLIN:  Again, I would object to the

5    government repeatedly citing cases where they don't provide

6    copies to the defense.  And I can share this copy with the

7    defendants.

8         MS. CALL:  I will request the same from Mr. McLoughlin

9    to the extent he will continue citing cases without citations

10   or paper copies.

11        THE COURT:  Mr. Gillen, do you need more time to take

12   a look at that one?  If so, go ahead.

13        MS. LaBRANCHE:  Your Honor, while he is looking, based

14   upon what the government just articulated, I would now also

15   raise an objection to the e-mail on the first page from Mark

16   Milbrodt as hearsay.

17        MR. GILLEN:  Your Honor, this is the document the

18   Court has previously excluded and for good reason we continue

19   to maintain because of the hearsay nature of it.  I thought it

20   was 1148.  If it's 1158, that's a little matter.  What is an

21   important matter, when we had argument on this before, the

22   Court excluded this as hearsay.  And now what they are doing is

23   they are tagging this onto an e-mail string to try to bring it

24   in for all of the purposes that I articulated earlier.  So

25   therefore we think the exhibit should be -- it doesn't really

1    have an effect on the listener when someone else, this other

2    gentleman within Tyson who is not a co-conspirator or alleged

3    to be, is drafting up an e-mail in response.  That doesn't show

4    the effect on the listener on Mr. Roberts or Mr. Mulrenin.

5          What it does show is the government trying its best to

6    really circumvent the earlier ruling so that they can get that

7    line in, "You trying to get me fired before I even move here."

8    Now, it's interesting outside the presence of the jury the

9    Court -- the government is prone to say, oh, they all know

10   that's a joke or, oh, they know that's sarcastic.  The jury

11   doesn't know that, but the government does and we do.  And the

12   403 impacts on that have to have -- have to be considered.

13         They don't tell the jury the fact that they

14   interviewed Mr. Eddington right before this trial started and

15   he told them that he was being sarcastic.  And that's sort of

16   the problem that has been endemic throughout this case.

17         *THE COURT:*  Can we go back to 9203?

18         *MS. CALL:*  I believe it is seven.

19         *THE COURT:*  Sorry, 9703.  The objections will be

20   overruled.  The 9703 contains much more of the subsequent

21   responses to what had previously -- or what is 1157.  I do find

22   that while the statements of Mr. Eddington and Mr. Milbrodt

23   cannot be and will not be admitted for the truth of the matters

24   asserted, that the response by Mr. Mulrenin -- and can we go to

25   Page 2 -- and Mr. Roberts are appropriately introduced.  And

3510

 1   for that reason I will overrule the objections.

 2          I don't believe that Mr. Gillen's point about 403

 3   exists with this particular document.  Even that Eddington

 4   statement about getting fired, his very next words are

 5   "Seriously," which I think read in context would suggest that

 6   he is doing what Mr. Gillen suggests, namely just providing

 7   some overly dramatic type of response.

 8          Mr. Gillen?

 9          MR. GILLEN:  Your Honor, would the Court be giving a

10   limiting instruction as to statements made by Mr. Eddington in

11   this document?

12          THE COURT:  Yes.  Eddington and Milbrodt I think are

13   the two persons who are making statements who are not

14   co-conspirators, and therefore I would only be admitting this

15   with those limiting instructions.

16          MR. GILLEN:  Thank you, Your Honor.

17          THE COURT:  Hold on one second while I annotate that.

18          MR. FAGG:  Your Honor, we would request a further

19   limiting instruction as it relates to this exhibit for the

20   other defendants other than Mr. Mulrenin and Mr. Roberts.

21          THE COURT:  Oh, because this was not -- yeah, that's

22   right, not on the James log.  I think that is absolutely

23   appropriate and I will do so.

24          MS. CALL:  May I respond?

25          THE COURT:  Yes.

 1            MS. CALL:  You know, if an exhibit is offered as

 2     non-hearsay, I don't believe a limiting instruction is

 3     necessary unless it was only admitted under 801(d)(2)(A).  Here

 4     this is offered for effect on the listener which is these two

 5     particular defendants, but under Anderson and Lutwik Supreme

 6     Court precedent, L-U-T-W-I-K which we have briefed previously,

 7     admissible non-hearsay relevant probative evidence is

 8     admissible against all 10 defendants.

 9            THE COURT:  Yeah, I am going to overrule that

10     particular point.  I think the government does want the

11     statements of the two defendants mentioned in here, their

12     responses to be considered for the truth of the matter

13     asserted.  Otherwise, I am not quite sure -- if there is an

14     effect on the listener, their responses indicate what the

15     effect is.  And for that reason, I believe it is appropriate to

16     limit it only to those two defendants.

17            If you could leave that up for just one second.  If

18     you could scroll over to the very top of it.

19            MS. CALL:  I will note I don't believe "Thanks" or

20     "Please create a response," not the precise word Defendant

21     Roberts used, but I don't think they are offered for the truth

22     of thanks and please direct a response.  It's a command and

23     then just acknowledgment of receipt.

24            MR. LAVINE:  A points of clarification.  Government

25     counsel just said that the statements of Mr. Mulrenin and

1    Mr. Roberts are not being offered for the truth of the matter

2    asserted.  Then I am not sure I understand the basis here

3    because then it can't be the effect on the listener.  And

4    that's exactly what government counsel just said, we are not

5    offering it for the statements of Mr. Mulrenin and Roberts as

6    far as the truth of the matter asserted.  Then how can it have

7    an effect on the listener?

8           THE COURT:  That's why I just rejected that argument.

9           MS. CALL:  I am happy to respond and quote Rule 801,

10    but I understand Your Honor has ruled.

11           THE COURT:  Next one?

12           MS. CALL:  The next is Government Exhibit 9704.  And

13    this is in a similar vein a follow-on showing some effect at

14    Tyson of a statement and complaint by the customer.  Your Honor

15    did previously consider this.  And I believe these are the only

16    two today that are chains from something that Your Honor did

17    previously consider.  1193 was the previous exhibit.  This is

18    now 9704.

19           We had argued the statement in Mr. Suerken's e-mail

20    for effect on the listener and Your Honor had not found an

21    effect.  This shows Defendant Roberts acting on that and

22    forwarding it to Defendant Mulrenin essentially incorporating

23    Mr. Suerken's statement into his e-mail.  And this is the same

24    kind of customer complaint that Tyson acted on following this.

25    This is I believe the day of the final bid submission, if I am

3513

1   correct, for KFC.

2          But I will just repeat the argument.  I won't belabor

3   it that nothing in Mr. Suerken's e-mail is offered for the

4   truth either, particularly the "YOU ARE SCREWED" comment.  It's

5   just the response of the customer that was then received and

6   acted on by Tyson.

7          THE COURT:  Response -- or objections, rather, to

8   Exhibits 9704?

9          MR. GILLEN:  Your Honor, again this was excluded by

10  the Court.  When I say this, the e-mail from Mr. Suerken was

11  excluded.  They tendered it at 1193.  It was rejected as

12  hearsay.  Again what they are trying to do -- there is nothing

13  in here that when Roberts merely is quoting this, there is no

14  effect on Mr. Roberts other than simply to sort of kind of set

15  up whatever meeting may have taken place.

16         This is an example yet again of the government trying

17  to circumvent the hearsay rule.  And again, "Tyson informs RSCS

18  --- Really, YOU ARE SCREWED."

19         "GO from there."

20         The 403 -- it's hearsay, and the 403 analysis should

21  prevail here.  This is another e-mail, Your Honor, of what the

22  government knows that the declarant, Mr. Suerken, told them

23  when they were secretly recording him in his den, he was told

24  that he was just kind of being a smart aleck with Mr. Roberts

25  with whom he has a good relationship.

1              So this is the sort of thing again that I mentioned

2     prior to the Court regarding the Eddington e-mails, that this

3     should be excluded.  It is not -- does not really reflect an

4     effect on the listener.  There are no more narratives other

5     than Mr. Roberts setting up a meeting which does not, should

6     not bring in under the exception this sort of e-mail, hearsay

7     e-mail, prejudicial e-mail, into the record.

8              THE COURT:  Ms. LaBranche, go ahead.

9              MS. LaBRANCHE:  Yes, Your Honor.  I would just add

10    that at 9704 the e-mail on the bottom from Mr. Suerken to

11    Mr. Roberts still remains hearsay.

12             THE COURT:  Okay.  Mr. McLoughlin?

13             MR. McLOUGHLIN:  Your Honor, very briefly.

14             If one looks at cases on the effect on the listener,

15    one of the core assumptions of the exception is that the effect

16    on the listener is relevant and material to the issue in

17    controversy in the case.  Where the government is offering this

18    type document and the fact that Mr. Roberts sends this response

19    for a communication, a meeting where that is not in any way,

20    shape or form relevant or material to an issue in the case

21    demonstrates that the exception isn't relevant here.

22             And as has been said, the reality here is that is the

23    loophole by which they want to get the material portion of the

24    earlier e-mail into evidence for another purpose.  So we object

25    because there is no dispute with respect to the response as

1    material in this case, and so therefore it's completely

2    irrelevant and the rule doesn't apply.

3             THE COURT:  Mr. Feldberg?

4             MR. FELDBERG:  I would just add one point, Your Honor.

5    In the top half of this page, there is a line that indicates

6    "Response Status: Not Responded."  So it's -- the document is

7    clearly hearsay and the "not responded" emphasizes the point

8    that there was no effect on anybody.

9             MR. McLOUGHLIN:  And I apologize, Your Honor.  The

10   entry at the top does not show that he responded by setting up

11   the meeting.  In fact, all he did was forward the plan.  So the

12   notion that there is some controversy over forwarding a plan in

13   this case is self-evident.

14            THE COURT:  Go ahead, Ms. Call.

15            MS. CALL:  May I first inquire as to whether

16   Mr. McLoughlin has a case cite for materiality requirement on

17   effect on the listener?

18            MR. McLOUGHLIN:  I think, Your Honor, if you look at a

19   number of the cases as I said in totality, but I can point the

20   government to the case that I think is pertinent which is

21   United States v. Ballou, 59 F.Supp.3d 1038, United States

22   District Court for the District of New Mexico.

23            I would also cite the Court to the case the government

24   relies on, the Emich case, in which the issue was the

25   admissibility of complaints received by a franchisee where

3516

1     the -- where General Motors wanted them admitted not for the

2     purpose of showing the substance of the complaint, but to

3     demonstrate that they had notice of complaints and therefore

4     responded by terminating the franchisee, where again this

5     notice and the fact that they had notice was the critical fact

6     in their rationale for terminating the franchisee, again at

7     issue, a material issue in the case, which is a stark contrast

8     to this exhibit.  So I would rely on both of those decisions.

9               THE COURT:  Ms. Call, anything else?

10              MS. CALL:  Just two points.  I am looking for the word

11    materiality in *Ballou*.  But first just to go back to Rule 801,

12    essentially if the significance of an offered statement is

13    solely for the fact that it was made and there is not an issue

14    as to the truth of anything asserted, as here a statement is

15    not hearsay, and that's kind of a basic principle.

16              So when you receive a complaint from the customer and

17    the offered reason is that this complaint was made to the

18    pricing from the company, that's just not hearsay.  And that's

19    what the cases go to on effect on the listener essentially,

20    that it's not hearsay.  The statement was made.  Defendants or

21    plaintiffs in that case were on notice of it.  By that case I

22    mean the *Emich Motors* case.  That's the purpose it's offered

23    for making it not hearsay.

24              As to some particular relevance here, I believe

25    Ms. Prewitt in opening had stated that Defendant Mulrenin was

3517

1    in no way involved in the KFC negotiations, and that's what the

2    evidence will show where this evidence is directly

3    contradictory to that and is extremely relevant on that basis.

4         Mr. Gillen?

5         MR. GILLEN:  The government forgets the Court has

6    already ruled on whether or not the Suerken e-mail is hearsay.

7    It ruled it was hearsay.  So we work from that premise.  And

8    based on that premise, we would ask the Court to exclude this

9    exhibit.

10        THE COURT:  What about Ms. Call's point that this --

11   that the effect on the listener would be the response of

12   Mr. Roberts is that he forwards it to Mr. Mulrenin who would

13   thereby arguably at least have notice of or involvement in the

14   KFC negotiations?

15        MR. GILLEN:  Well, Your Honor, the response would be

16   as my colleague mentioned, Response Status:  Not Responded.  In

17   other words, this isn't something in which they are setting up

18   and they are going to take some sort of action.  This is

19   something in which virtually no effect on -- the effect on the

20   listener is who?  Is it the effect on the listener on

21   Mr. Roberts or is it the effect on the listener on Mr. Mulrenin

22   when Mr. Roberts sends him something?

23        I will note if they thought that the argument they

24   articulated to the Court now had merit, one would have thought

25   that they would have argued at the *James hearing* that any

1    communication from Mr. Roberts to Mr. Mulrenin would have been

2    a co-conspirator declaration and they would have put it on the

3    *James* log.  They didn't for obvious reasons.  It isn't.  So we

4    would ask you to exclude it, Your Honor.

5              THE COURT:  Ms. LaBranche?

6              MS. LaBRANCHE:  Your Honor, if the effect that the

7    government is trying to show is that there was a phone call,

8    then I would ask the Court at a minimum to remove the lower

9    e-mail from Mr. Suerken.  That is clearly not relevant to any

10   of the issues I believe that are currently before the Court,

11   especially when you consider the prejudicial effect of it.  If

12   what they want to show is that Mr. Suerken and Mr. Mulrenin and

13   Mr. Roberts decided to have a call at a certain point in time,

14   you can do that without putting the hearsay content of that

15   e-mail in.

16             THE COURT:  All right.

17             Mr. Beller?

18             MR. BELLER:  Your Honor, just a final note, and that

19   is this isn't an invitation to Mr. Mulrenin to join in a call.

20   And, in fact, if you look at the subject line, the subject line

21   specifically says "Brian to Call Pete," along with a telephone

22   number.  So the way I'm reading this e-mail is Mr. Roberts is

23   forwarding notice that he himself had a call with Mr. Suerken,

24   but I do not believe the document on its face actually includes

25   Mr. Mulrenin being a part of that discussion at all.

3519

1           THE COURT:  Mr. Fagg?

2           MR. FAGG:  One other point on that.  It appears to me

3   that this message was sent at -- if you look at UTC at the top,

4   it was sent at 18:23 UTC.  This call was to have occurred at

5   17:30 UTC.  So it's sent almost an hour after this call was

6   even supposed to have occurred.

7           THE COURT:  Ms. Call, anything else?

8           MS. CALL:  I am still doing the math on the time

9   zones, but I don't think that affects any argument of the

10  notice and invitation.  I don't think we are necessarily

11  arguing that the call, in fact, occurred, but it is notice of

12  the complaints from the customer and the fact that further

13  discussion was happening on these contracts for both Defendant

14  Roberts and Mulrenin.

15          THE COURT:  Mr. Feldberg, last point.

16          MR. FELDBERG:  If they are not arguing that a call

17  occurred, then there is no effect on the listener.  And

18  therefore the Court's prior ruling that this document is

19  inadmissible hearsay stands.

20          THE COURT:  No doubt that the Suerken e-mail is --

21  statements asserted by Mr. Suerken are hearsay.  No doubt about

22  that.  I do -- I will overrule the objections.  The fact that

23  Mr. Roberts is copied on the Suerken e-mail, that Mr. Roberts

24  then forwards them to Mr. Mulrenin has some evidentiary value,

25  not to set up a call, that doesn't matter, but he is copied on

1    the e-mail.

2            And I will provide a limiting instruction along with

3    this particular exhibit that the statements of Mr. Suerken are

4    not to be considered for the truth of the matters asserted, but

5    rather only for the effect on the listener.  And I believe that

6    since this is not on the *James* log, we need a limitation as to

7    the fact that it can only be considered as against Mr. Roberts

8    and Mr. Mulrenin.

9            *MS. LaBRANCHE:*  Your Honor, if I may just clarify,

10   Mr. Mulrenin is not on that original Pete Suerken e-mail.  I

11   don't know what effect that would have on him, the fact that it

12   then gets forwarded by Mr. Roberts later when he is setting a

13   time.  Would the Court consider including Mr. Mulrenin in the

14   limiting  instruction?

15           *THE COURT:*  No.  I think it's appropriate that it be

16   considered against him as well.

17           Next exhibit?

18           *MS. CALL:*  Next is Government's Exhibit 617.

19           *THE COURT:*  Go ahead, Ms. Call.

20           *MS. CALL:*  617 contains initially an e-mail from

21   Popeye's buyer Kent Kronaugue followed by statements by

22   Conspirator Carl Pepper sent to Defendant Mulrenin and their

23   colleague Tim Scheiderer and Steven Cullen.  This was contained

24   on the *James* log as entry 205 and was favorably ruled on.

25           *MS. LaBRANCHE:*  Your Honor, although only the top two

1    portions were, in fact, contained on the *James* log, not the

2    bottom one, we nonetheless don't have an objection.

3              THE COURT:  Mr. Beller, go ahead.

4              MR. BELLER:  Other than the objections that have

5    already been made regarding confrontation issues related to

6    Popeye's and Mr. Kronaugue and others that have been made

7    regarding Popeye's and Mr. Kronaugue, there is no further

8    objection.

9              THE COURT:  Okay.  Mr. Lavine, have you had a chance

10   to take a look at it?

11             MR. LAVINE:  I am sorry.  I agree with Mr. Beller.  No

12   objection, Your Honor.

13             THE COURT:  Then Mr. Beller's objections that he

14   referred to earlier will be overruled and Docket No. 617 will

15   be admitted.

16             MS. CALL:  Next is Exhibit 933.  933 contains I

17   believe a calendar invitation from Sheri Garland at Pilgrim's

18   to Defendants Penn, Lovette, Little, Conspirator Jason McGuire

19   and then Mr. Joe Waldbusser at Pilgrim's.  Defendant Little

20   then forwarded it on to Jason McGuire.  This was contained in

21   the government's *James* log at entry 103 and was favorably ruled

22   on.

23             THE COURT:  Any objection to the admission of

24   Exhibit 933?

25             MS. PLETCHER:  Yes, Your Honor.  We object to the

1    statement of Sheri Garland as hearsay.  She is not a

2    conspirator, an alleged conspirator.

3              THE COURT:  Right.  That's correct.

4              Ms. Call?

5              MS. CALL:  The government does not offer that for its

6    truth, and I think a limiting instruction along the lines of

7    what Your Honor has done for other statements of this kind

8    would be appropriate.

9              THE COURT:  Anyone else?

10             Exhibit 933 will be admitted but for the limited

11   purpose, namely not for the truth of the matters that

12   Ms. Garland asserts, but rather only for the effect that her

13   statements have on the listener.

14             MR. FAGG:  One point of clarification on that.  I

15   assume that the listener there would be Mr. Little?

16             THE COURT:  I think so.  The exhibit is not on my

17   monitor anymore.

18             MR. FAGG:  Mr. Little was the one that forwarded it to

19   Mr. McGuire.

20             THE COURT:  Yeah, I assume so.  But this is a *James*

21   log entry, so it would be admissible against all the

22   defendants.

23             Ms. Call, go ahead.

24             MS. CALL:  Next is Government Exhibit 959.  959

25   contains an e-mail from Defendant Roberts to Defendant Mulrenin

 1    and others at Tyson.  It was contained on the government's

 2    *James* log as entry 143 and was favorably ruled on.

 3            *THE COURT:*  Any objection to the admission of

 4    Exhibit 959?

 5            *MR. GILLEN:*  None other than the objections we made at

 6    the *James hearing*, Your Honor.

 7            *THE COURT:*  Yeah, and those will be preserved as

 8    indicated.

 9            *MS. CALL:*  There is attachment to this e-mail and that

10    is Government Exhibit 960.  If Ms. Pearce could pull it up side

11    by side.  They were both on the *James* log.

12            *THE COURT:*  Are you going to be offering 960?

13            *MS. CALL:*  Yes, Your Honor.

14            *MR. GILLEN:*  I don't believe that was on the exhibit

15    list that was sent out.  We have not had an opportunity to

16    examine that and would ask that we after lunch respond to this.

17    This is a new one for us.

18            *THE COURT:*  Yes.  Could you pull back on that one?

19    Okay.  And what's 960?

20            *MS. CALL:*  Well, 959 describes it as the agreed upon

21    model for Popeye's, so it's the Popeye's pricing model.

22            *THE COURT:*  Is that a native file?

23            *MS. CALL:*  It is.

24            *THE COURT:*  Just so people know, that's a native file.

25    But yes, I agree with Mr. Gillen, we should defer that to allow

1   the defendants to have an opportunity to take a look at that

2   one.

3            Okay, next?

4            So 959 will be admitted.

5            *MS. CALL:*  The next is Government's Exhibit 1177.

6   This is an e-mail from Defendant Mulrenin apparently to

7   Defendant Mulrenin.  It was not contained on the *James* log and

8   is only being introduced under 801(d)(2)(A) with respect to

9   Defendant Mulrenin.

10           *THE COURT:*  Ms. LaBranche, go ahead.

11           *MS. LaBRANCHE:*  Yes, Your Honor, I would object on

12  hearsay grounds.  This is clearly -- it says in the subject

13  line, "RSCS Meeting notes."  It is apparently notes that

14  Mr. Mulrenin took during a meeting that he sent to himself.  I

15  do not believe it qualifies under 801(d)(2)(A) because it's not

16  a statement because it's not intended as a version.  It's

17  merely the notes he wrote to himself about this e-mail.

18           *THE COURT:*  Mr. McLoughlin?

19           *MR. McLOUGHLIN:*  Your Honor, I'd just note that the

20  exceptions to which the government relies has now become a

21  black hole in which an individual's notes merely because he

22  stored those notes by sending himself an e-mail becomes an

23  exception under the hearsay rule with respect to a

24  communication.  The exception applies to a communication for

25  the effect on someone else.  It is impossible to make the

1   argument the government is making.

2         *THE COURT:*  Ms. Call?

3         *MS. CALL:*  I will respond first to Ms. LaBranche that

4   if this is not an assertion or not a statement, it's not

5   hearsay.  To be hearsay, it has to be a statement that's

6   intended to be an assertion, so I don't quite get the hearsay

7   argument there.  With respect to any -- and I don't know that I

8   quite heard it -- but an embedded hearsay argument, this

9   appeared to be Mr. Mulrenin's own notes to himself.  He doesn't

10  seem to be attributing statements to anyone else.  It's a list

11  of action items.

12        He has notes on the conversation, but refers to RSCS

13  as "they," which seems to be his own beliefs following this

14  meeting as to, you know, what is occurring or his beliefs about

15  the status of negotiations, but it doesn't seem to attribute a

16  statement to anyone else that was at that meeting.

17        I don't know that I quite followed Mr. McLoughlin.

18  This is not being offered for effect on the listener, if that's

19  what he was saying.  This is simply a statement by Defendant

20  Mulrenin under 801(d)(2)(A).

21        *THE COURT:*  Anything else?

22        *MR. TUBACH:*  I am sorry, I just --

23        *THE COURT:*  You couldn't help yourself.

24        *MR. TUBACH:*  Ms. Call in the same paragraph said it's

25  not a statement and then at the end said it was a statement.

1    She can't have it both ways.  Either it's not a statement and

2    therefore it's not hearsay or it is a statement and she is

3    offering it under 801(d)(2)(A), but she can't state both in the

4    same paragraph.

5         THE COURT:  Well, I think what she is saying is that

6    either way you look at it, it would be admissible because it's

7    a statement of a defendant and therefore admissible.

8         MR. TUBACH:  It is not a statement under 801(d)(2)(A).

9         THE COURT:  Not a statement because it purports to

10   take meeting notes?

11        MR. TUBACH:  Yes, Your Honor.  It's hearsay of what

12   other people have told him presumably.

13        THE COURT:  I am going to take a look at that issue

14   over lunch.  I don't think I have seen that situation before,

15   so I will take a look at that.  It's an interesting -- it's an

16   interesting point.  I'm not 100 percent sure, but my guess is

17   there probably would be some case law on the subject.  I just

18   don't think I have seen it.  So I will take that one under

19   advisement.

20        Next one?

21        MS. CALL:  The next is Government's Exhibit 5016.

22   It's an e-mail between Defendant Little and Carl Pepper at

23   Tyson.  This is contained on the James log as entry 211 and was

24   favorably ruled on.

25        THE COURT:  Any objections to the admission of

1   Exhibit 5016?

2            *MS. LaBRANCHE:*  No additional objections, Your Honor.

3            *THE COURT:*  Exhibit 5016 will be admitted.

4            Next?

5            *MS. CALL:*  The next is Exhibit 6264.  6264 I believe

6    was contained on the *James* log at entry 4, but it was not

7    favorably ruled on.  I will note that it is still the

8    government's position that this would be 801(d)(2)(E) as it

9    shows association between the conspirators and shows their

10   coordination albeit apparently in this e-mail not on price.

11   This relates to them coordinating and holding firm relating to

12   spoilage claims for I believe Church's, if I am remembering

13   correctly.  And not every piece of evidence that's admissible

14   under 801(d)(2)(E) would need to be a stand-alone violation.

15   But I would note it would at least be admissible under

16   801(d)(2)(A) with respect to Defendants Little and Blake as

17   their own statements.

18            *THE COURT:*  Go ahead, Mr. Pollack.

19            *MR. POLLACK:*  Thank you, Your Honor.

20            So it is correct that this was No. 4 on the *James* log.

21   It is also clear that the Court ruled that this was not a

22   statement in furtherance of the conspiracy and with good

23   reason.  The Court also ruled that there was no evidence

24   including taking this statement into account that Mr. Blake was

25   in a conspiracy at the time he was making these statements.

1    The Court found that there was not evidence even at a

2    preponderance that he was in it until years later.  And the

3    statements are simply not relevant to the issues in the case.

4         The reason I believe that the Court found that these

5    statements had nothing to do with the conspiracy is because

6    they had nothing to do with pricing.  They had nothing to do

7    with bids.  And I think that Agent Taylor acknowledged that in

8    the *James hearing*.  What they have to do with is quality

9    assurance issues and specifically with spoilage.

10        On the face of the document, what's being discussed is

11   if Church's, who is not a customer that Mr. Blake is alleged to

12   have fixed prices against, if Church's is going to make claims

13   about spoilage, that they should share with the suppliers the

14   data about how much spoilage there has been.  It simply has

15   nothing to do with a conspiracy to rig bids, which is why I

16   think it was not a statement in furtherance, but it's also why

17   it's simply not relevant to any issue in dispute in this case.

18        *THE COURT:*  Ms. Henry?

19        *MS. HENRY:*  It was not anything that was in the

20   Indictment.  And I believe that the government's witness,

21   Mr. Ledford, testified that he actually liked the idea that the

22   suppliers would coordinate on best practices with regard to

23   quality issues.

24        *THE COURT:*  Mr. Byrne?

25        *MR. BYRNE:*  We adopt all the same arguments and

1  objections.  And we also don't think it's a statement against

2  Mr. Little because there is nothing to hold against him for

3  this statement.

4          THE COURT:  Anyone else?

5          Ms. Call, go ahead.

6          MS. CALL:  Your Honor, it's entirely relevant and

7  probative for this case that Defendant Little and Blake when

8  confronted with an issue with a customer reach out to each

9  other.  Defendant -- let me make sure I say the right person --

10  Little says that he will hold firm against the customer and

11  Blake agrees.  "I am in."

12          Although it's not about price here, that's the exact

13  same kind of coordination we are seeing in the conspiracy where

14  the competitors hold firm together with respect to pricing, so

15  it's relevant and probative and I think should be admissible

16  against both Little and Blake.

17          THE COURT:  Mr. Pollack's objections will be

18  sustained.  As he corrected predicted, I don't find any

19  relevance to this one.  The fact that there may be something

20  similar going on in terms of holding firm, this is a very

21  separate issue.  And as a result, I don't find it has any

22  relevance.  Mr. Pollack's objections will be sustained.

23          Next?

24          MS. CALL:  Next is Government's Exhibit 6282.  This is

25  an e-mail chain between Defendant Brady and Defendant Roberts,

1     both competitors.  It was on the *James* log as entry 64 and was

2     favorably ruled on.

3                 THE COURT:  Ms. LaBranche, go ahead.

4                 MS. LaBRANCHE:  I would object under 403.  Although I

5     recognize that the Court did find this admissible as a

6     non-hearsay statement under 801(d)(2)(E), I don't think that

7     gets us past the 403 issue, which is I don't understand what

8     this e-mail means and I don't know how the jury is going to

9     understand what this means.

10          The subject line is "RE:"  There is a list of perhaps

11    prices down below.  There is a P, Pil, a C.  Are those

12    different companies?  I can't understand what this is.  And

13    because the government again has chosen not to put on witnesses

14    to actually testify about a lot of these *James* statements, I

15    think there is a real danger that the jury won't understand

16    what this is either.  So I would object on 403 grounds.

17                THE COURT:  Okay.

18          Yes, Mr. Gillen?

19                MR. GILLEN:  Your Honor, again I would join in the 403

20    objection and note I believe the government said that this was

21    an e-mail exchange between Mr. Roberts and Mr. Brady.  If

22    that's what they said, there is no exchange.  I don't see any

23    response back from Mr. Roberts to Mr. Brady in this exhibit nor

24    have I seen any in the evidence.

25          This is a classic situation which I do not believe

1    that the evidence has shown that this period of the July 2013

2    has any sort of -- and I could be corrected -- but I don't

3    believe it has any time period in which there is a pending bid

4    for matters.  And again as counsel stated, it's simply

5    confusing.  What does P stand for?  What does Pi?  What does C

6    stand for?

7            It is the 403 analysis in this case, I believe, really

8    compels a decision about -- understanding the Court had

9    previously ruled on the *James* log, that a 403 analysis would

10   drive this out of the government's case.  Because one of the

11   things that -- for the record, the morass of evidence that we

12   have seen over a nine-year period with snippets of e-mails that

13   aren't tied up to specific bids or projects in our view amounts

14   to essentially a constructive amendment of the Indictment, and

15   therefore we were not put on notice, nor was the Grand Jury, to

16   my knowledge put on notice about what the meaning of this

17   document is other than the government wants to throw it in the

18   jury box and hope they can say, huh, it must be conspiratorial

19   or the government wouldn't have admitted it.  For all those

20   reasons we move to exclude it.

21           *THE COURT:*  Ms. Call, go ahead.

22           *MS. CALL:*  As for I suppose putting on a witness to

23   testify, of course, Defendant Roberts and Brady are not

24   available for the government to put on the stand in this case

25   and they are the ones on this e-mail communication, but I will

1   note that on July 15, the date of this e-mail, there is a phone

2   call between Defendant Brady and Roberts which Special Agent

3   Taylor did testify in regard to at the *James hearing* and is

4   currently in evidence.

5        Third, if -- I don't quite follow the prejudice

6   argument that -- if the jury won't understand what is in this

7   e-mail, I am not sure what the prejudice would be.  But if the

8   argument is instead that they might draw the inference that the

9   letters here refer to Defendant Brady's employer Claxton as C,

10   Pilgrim's, which begins with a P-I-L or Perdue, all companies

11   that have been discussed in the course of this trial, I believe

12   that would be a proper inference for the jury to draw.

13        *THE COURT:*  That's a tie, but since Mr. Lavine is

14   deferring to Ms. LaBranche, I will too.

15        Ms. LaBranche, go ahead.

16        *MS. LaBRANCHE:*  Thank you, Your Honor.  What I would

17   just say in response to that is it may well be that there was a

18   call that took place on that day, but again the testimony in

19   this case is that these individuals, these co-defendants, are

20   all having conversations with each other all the time for a ton

21   of legitimate reasons.  So again, I don't think that the Court

22   should consider what the government wants you and the jury to

23   infer took place on that call in making this decision.

24        *THE COURT:*  Mr. Lavine, go ahead.

25        *MR. LAVINE:*  I would agree with that, Your Honor.  And

1        what government counsel has just done is said that they are

2        going to construe a telephone call that they have no idea what

3        was on that call.  They have no idea what was said, which is a

4        problem with all these calls going in here.  They are not going

5        to argue without any substantiation as to what these numbers

6        are.  Are they current?  Is there a basis for it?  Are they

7        covering?  Are there shorts?  Are there problems?  And they are

8        just going to put it on.  The prejudicial effect of this

9        document clearly outweighs anything else, Your Honor.

10               *THE COURT:*  Mr. Gillen?

11               *MR. GILLEN:*  The government essentially said a few

12       minutes ago and then began to give their interpretation of what

13       the letters P, Pil and C stood for.  They could have, if they

14       had done it the right way and wanted this document in, they

15       could have put together what was happening in the industry,

16       whether or not these numbers match up to any specific bid or

17       whether they match up to any specific pricing for any specific

18       buyer, but they didn't.

19               And what they want to do is to say, well, now let's

20       have the jury, since we're not -- we don't put a witness up, we

21       don't have a sponsoring witness, we don't have an expert

22       witness to get up and opine about the meaning of all this, we

23       just want the jury to guess they're guilty because that's all

24       really we've got.  So for those reasons, Your Honor, we believe

25       403 compels exclusion of this document.

1          THE COURT:  Anything else, Ms. Call?

2          MS. CALL:  I think counsel's arguments are just that,

3    arguments, which would only affect the weight.  And there are

4    multiple interpretations to statements like this that are in

5    furtherance or the conspiracy, but nothing further.

6          THE COURT:  The objections will be overruled.  There

7    is no question that the document is relevant.  The arguments,

8    rather, are that there is a 403 issue.  There could be -- I

9    think the issue really in terms of those initials that seem to

10   correspond to different companies perhaps is whether a

11   reasonable jury could use those for some proper purpose.  I

12   think that there is.

13         I don't think that there is -- the issue under 403 is

14   whether the probative value is substantially outweighed by the

15   danger of one or more the following:  Unfair prejudice,

16   confusing the issues, misleading the jury, so forth.  I don't

17   find that any of those possible prejudices to the defendants

18   substantially outweigh the probative value of this particular

19   document.  And obviously, of course, the government could not

20   have called either of the two people who are in this particular

21   e-mail, so I will rule that Exhibit 6282 is admitted.

22         Next one?

23         MS. CALL:  The next is Government's Exhibit 6283.

24         THE COURT:  Go ahead, Ms. Call.  Anything else?

25         MS. CALL:  Yes.  One moment.  So this is an e-mail

1    from Mr. Tommy Francis.  I will note I am a bit perplexed at

2    the *James* record on this one.  It was entry No. 46, but I

3    believe it was withdrawn which may frankly be because it was a

4    question and we may not have considered it an assertion.  But I

5    will note the Court did actually rule on it in ECF-559 at Page

6    17.

7            It was the subject of Agent Taylor's testimony at the

8    hearing that the Court considered.  And the Court found

9    Mr. Francis a member of the conspiracy as of the date of this

10   e-mail and that the statement was in furtherance of the

11   conspiracy.  So while it was for some reason withdrawn on the

12   *James* log, it was subject to testimony at the hearing.  The

13   Court did favorably rule on it in finding Mr. Francis to be a

14   participant in the conspiracy at this time.

15           MR. GILLEN:  Your Honor, at the *James hearing* even the

16   government didn't think it was a co-conspirator declaration.

17   That's the reason why they withdrew it.  It was log 4046.  And

18   then during the proceedings before we were getting into this,

19   they then withdrew.  They had a series of declarations they

20   initially put up and this was one of them.  And they withdrew

21   it.  So we did not have the ability to then address this issue

22   at the *James hearing* because we agreed with the government that

23   it shouldn't belong in the *James* log.  We didn't think it

24   belonged in the *James* log when we had the *James hearing* and we

25   don't think it belongs in the jury box because it's hearsay.

3536

1          So now to go into a *James hearing* and to withdraw a

2    declaration because in good sense they knew that they didn't

3    have a basis for it and now come in and say they want to admit

4    it as a co-conspirator declaration is a bit disingenuous from

5    our view.  Please, Your Honor, hold the government to its

6    withdrawal of this statement made during the *James hearing* and

7    keep this out as hearsay.

8          *THE COURT:*  Ms. Call, response?

9          *MS. CALL:*  Yes, Your Honor.  I will just note it was

10   subject to testimony and cross-examination, so I believe it is

11   on the record for the *James hearing*.  And it was contained in

12   the Court's ruling finding that this was in furtherance and

13   that Mr. Francis was a member of the conspiracy as of this

14   date.

15         *THE COURT:*  I think the question is whether given the

16   fact it was withdrawn, whether I essentially overlooked that

17   fact in a ruling on the -- in my *James* order.  That would seem

18   to be the case, that unless there was some independent evidence

19   regarding Mr. Francis that would have led me to find that he

20   was a conspirator, that the withdrawal of the entry would

21   suggest that whether he was a member of the conspiracy was no

22   longer an issue.

23         *MS. CALL:*  I think it's a bit of a technical

24   distinction, so bear with me, but as much as the document I

25   think was withdrawn from the log itself, it was introduced at

1   the hearing and it was testified about.  And I believe Your

2   Honor did consider it and found it to be in furtherance of the

3   conspiracy.  So I don't know exactly what the standard is for

4   your consideration of it and now offering it under

5   801(d)(2)(E), but I think the finding stands that it was in

6   furtherance.  And perhaps it was an error on our end that we

7   withdrew it.

8         THE COURT:  Well, as we have talked about at various

9   times, the *James hearing* was not a hearing to determine who was

10  in or who was out for all different -- for any purpose.  It was

11  instead limited to determining co-conspirator statements that

12  may come in as hearsay exceptions.

13        So it would seem to be relevant that if the testimony

14  by Special Agent Taylor was focused on this particular exhibit

15  and identifying and having the Court rule on it as a statement

16  by a co-conspirator, then if it was withdrawn, there wouldn't

17  be any -- the fact that I might have overlooked that fact in

18  coming out with the order would seem to be an inadvertent error

19  and therefore if this was withdrawn, it should be considered

20  withdrawn.

21        MS. CALL:  Sure.  I will take whatever your ruling is,

22  but I will point you to Page 7 of your order.  You did with

23  particularity describe this particular e-mail.

24        THE COURT:  Yeah, I'm sure, but once again my guess is

25  that the reason, the only reason I think I would have discussed

1    it would not be once again for some independent reason.  It

2    would have been focused on this particular exhibit.  And if

3    Mr. Francis was not relevant to any other exhibit, then the

4    withdrawal of this exhibit would seem to have some

5    significance, namely that my ruling wouldn't have any relevance

6    other than for this particular exhibit which was withdrawn.  So

7    for that reason I will exclude it.

8         MS. CALL:  I will outside of the 801(d)(2)(E) context

9    just note that I don't believe the question of whether someone

10   has a Popeye's price is an assertion at all, so it would be the

11   government's position that it's also similar not hearsay, but I

12   will respect Your Honor's view on that.

13        THE COURT:  Next one?

14        MS. CALL:  Next is Government's Exhibit 7046, which is

15   a native file.  I don't know that we actually have a paper

16   printout.  The document is not quite amenable to paper form

17   because it has very many tabs.  We may perhaps try to create

18   one, but we don't have one at the moment.

19        This is an Excel spreadsheet containing apparently

20   competitors' prices for a very long period of time.  This was

21   not on the government's *James* log.  I will note this is

22   attributable to Defendant Austin.  And we have testimony from

23   Mr. Sangalis of Pilgrim's that this was pulled from Defendant

24   Austin's home drive at Pilgrim's and that he compared it to

25   what is there and it is a true and accurate copy.

1          Although it was not on the *James* log, I will note that

2     now we have the additional testimony of Mr. Bryant during this

3     trial stating that he had been told by Defendant Austin that he

4     monitored competitors' prices going back to the nineties.  And

5     this spreadsheet itself contains prices back to 1999, so it

6     appears like it might be that spreadsheet that Defendant Austin

7     had described to Mr. Bryant.

8          Mr. Bryant further testified that based on his

9     experience over the years, he understood the purpose of

10    tracking competitors' prices like this would be to keep score

11    on where the competitors were and if they submitted prices in

12    line with what they had told Pilgrim's.  And this really

13    appears to be just that.  So we would seek to introduce it

14    under 801(d)(2)(E) given the testimony in the course of this

15    trial.  Alternatively, we would seek to admit it under

16    801(d)(2)(A) as to Defendant Austin.

17         *THE COURT:*  All right.  And Mr. Sangalis

18    specifically -- is this a document he specifically looked up?

19         *MS. CALL:*  Yes, Your Honor.  I believe there were

20    three Excel spreadsheets he testified regarding, and 7046 I

21    believe is on the record as one of them.

22         *THE COURT:*  Go ahead, Mr. Feldberg.

23         *MR. FELDBERG:*  Thank you, Your Honor.

24         First of all, the metadata I am informed indicates

25    that this document was last modified on October 24th of this

1    year by a Suzanne Golshanara.  I don't know who that is, but

2    it's not Roger Austin.  So I have a question as to why the

3    document was modified the day before trial started and whether

4    this is the document that the government claims it is that was

5    taken from Mr. Austin's home drive.

6           Beyond that, and without commenting at this time on

7    Mr. Bryant's testimony, I don't think there is a dispute that

8    this is a historical record created after the fact of

9    historical pricing information, much of which -- virtually all

10   of which was widely available to those with access to industry

11   sources, meaning published reports.  So I am not sure what the

12   relevance of this document is, but my initial question is why

13   was it modified the day before trial started.

14           THE COURT:  Ms. Call, go ahead.

15           MS. CALL:  Your Honor, I don't take lightly the

16   implication that the government is modifying documents.  I will

17   state quite clearly the doc is saved as 9010 at the exhibit

18   name, and I am sure any modification is just saving it to a

19   flash drive to provide our exhibits in native form to the

20   defendants.  The defendants have it produced in its original

21   form with its Bates number and are free to compare it, but

22   there have been no modifications to the content of this

23   document.  Ms. Golshanara is a paralegal at the Department of

24   Justice who has been sitting at the government's table nearly

25   this entire week and I will say would never do that.  And I

3541

1    don't appreciate her work being implied to be modifying the

2    government's exhibits.

3              Second, I will just note that the prices referred to

4    in this refer to blue label and other products that are

5    specific to KFC.  There is no evidence yet in this trial that

6    KFC's prices are publicly available in any industry reports

7    that have been discussed or put in evidence in the course of

8    this trial.

9              THE COURT:  Mr. Feldberg?

10             MR. FELDBERG:  Let me respond to Ms. Call's point.  I

11   was not making -- intending to make any implication other than

12   noting that the metadata indicates exactly what I said, the

13   document was modified on October 24th, and I asked a question

14   as to why that was.

15             THE COURT:  Yeah, I took it just as a question, not as

16   an accusation, and Ms. Call's responded to that.

17             MR. FELDBERG:  Fair enough.  Again, the notion that a

18   document that essentially is a historical record of pricing,

19   which is a perfectly normal thing for any salesperson to keep,

20   I am not sure what bearing it has on any issue in dispute here.

21             THE COURT:  Mr. Fagg?

22             MR. FAGG:  Your Honor, if the government is seeking to

23   introduce this under 801(d)(2)(E), we would object to that.

24   This could have been included on the James log.  It was not.

25   Obviously, there is a different standard for the James hearing.

 1    The government could have proffered evidence where this

 2    document -- where they had obtained this document, where

 3    Pilgrim's had obtained the document.  It wasn't included and so

 4    we would object to its admissibility under 801(d)(2)(E).

 5         THE COURT:  Mr. Pollack?

 6         MR. POLLACK:  Your Honor, in addition to Mr. Fagg's

 7    point, and obviously if it comes in under 801(d)(2)(A), we

 8    would ask for a limiting instruction.  I had a separate

 9    question if we can just inquire.  Does the government have any

10    information about when this document was created?  I understand

11    that they are saying that they pulled it from Mr. Austin's

12    computer, but I haven't heard anything about the circumstances

13    of its creation.

14         MS. CALL:  The metadata was the creation date in 1999

15    and the author was Roger Austin.

16         MR. POLLACK:  I am sorry I couldn't hear you.

17         MS. CALL:  The author is Defendant Austin.

18         MR. POLLACK:  Thank you.

19         MS. CALL:  May I make one more note?

20         THE COURT:  Go ahead, Ms. Call.

21         MS. CALL:  I have been reminded this is also subject

22    of the Court's prior ruling in docket entry 692 finding that

23    this specific document was made during and in furtherance of

24    the conspiracy, referred to by Bates number there, Pilgrim's

25    DOJ0000509305, and this was with respect to a 404(b) issue.

 1          MR. BELLER:  And, Your Honor, prior to the Court's

 2    ruling, I would also note just the overall scope of this

 3    particular document being outside of the conspiracy relevancy

 4    period as charged.  And certainly I agree with everyone else in

 5    objecting to this document, but to the extent that it is

 6    admitted, Your Honor, I believe anything outside of the

 7    relevant period of time is 404(b) simply by the implications

 8    that the jury is going to be invited to make as to this

 9    document.

10          THE COURT:  Ms. Johnson, go ahead.

11          MS. JOHNSON:  Your Honor, for point of clarification,

12    I think the government, Ms. Call may have just cited to the

13    next document on the list which is 9057 when she read the Bates

14    number ending in 9305?  I just want to make sure we are talking

15    about the right document.

16          MS. CALL:  We were skipping a line in there.  I

17    believe it was not subject to the Court's ruling, so I

18    apologize for that statement.  And thank you for the

19    correction, Ms. Johnson.

20          THE COURT:  Response to Mr. Beller's point about

21    historical pricing that may have been gathered before the

22    charged conspiracy period?

23          MS. CALL:  Yes, Your Honor.  So the document contains

24    tabs numbered from the year 2000 through 2018 including the

25    conspiracy period, so I don't believe there is anything in this

3544

1     that would be improper to be put before the jury.

2           THE COURT:  Well, but what about the fact that, you

3     know, prices were gathered before the conspiracy period?  Does

4     that create an issue or is it, as Mr. Beller explained, really

5     404(b)?  Because if it is admitted under 404(b), then typically

6     a limiting instruction would accompany it.

7           MS. CALL:  Your Honor, I think the fact that it

8     includes data contained -- I don't know you can excise portions

9     of one document that was maintained for many years.  And to

10    determine that may be 404(b), the fact Defendant Austin was

11    doing this longer than the alleged conspiracy I don't think

12    creates a 404(b) implication, but I'd frankly have to look into

13    it.  But we can't redact out portions of this native file.

14          THE COURT:  That's not the issue.  The issue would be

15    if that's true, if it's true, then what would be the nature of

16    the appropriate limiting instruction?

17          MS. CALL:  One moment, Your Honor.

18          THE COURT:  Hold on one second, Mr. Feldberg.  We

19    can't talk while Ms. Call is trying to pay attention to

20    something else.

21          MS. CALL:  I can't quite imagine what a proper

22    limiting instruction would be given the time period that is a

23    part of the conspiracy alleged, but I will note there is also

24    the alternative of just admitting it under 801(d)(2)(A), but I

25    struggle to come up with a limiting instruction.  I don't know

1    if Mr. Beller had a suggestion as to that.

2           THE COURT:  Mr. Feldberg, go ahead.

3           MR. FELDBERG:  Your Honor, this is the first and I

4    suspect only time I'm going to disagree with Mr. Beller.  But

5    if Your Honor is inclined to admit this document, we would

6    prefer to have the whole thing in which demonstrates that this

7    is just something that Mr. Austin did that had nothing to do

8    with the conspiracy.

9           THE COURT:  If it comes in, the whole thing would come

10   in.  The question would just be whether given the fact that the

11   entirety of the document contains to some periods before the

12   charged conspiracy, whether a limiting instruction would be

13   appropriate.

14          Why don't we think about that issue over lunch.  We

15   are going to break for lunch.  Normally as we did last time

16   when we took a full day to go over documents, we limited lunch

17   to just an hour.  I can't do that today because I have a

18   hearing at 12:30 on an unrelated matter.  So we will have to

19   reconvene at 1:30.

20          Anything else?

21          MR. BELLER:  Is your other matter in your home

22   courtroom such that we can leave our items?

23          THE COURT:  Yes.  That is one, I hate to say, luxury

24   of us holding it here is no one has to move anything because,

25   yes, it will take place on the seventh floor, okay?

1          We will be in recess until 1:30.  Thank you.

2      (Recess at 12:02 p.m.)

3          (Reconvened at 1:40 p.m.)

4      THE COURT:  Why don't we try to close the loop on the

5  ones that we left hanging.

6      MS. CALL:  We could perhaps start with the antitrust

7  training.

8      THE COURT:  Yes.  What exhibit number was that one?

9      MS. CALL:  3062 and 3087 were both e-mails linking

10  Mr. Mulrenin and antitrust training.  Over the break the

11  government did identify the underlying training in a PowerPoint

12  presentation.  It's a PowerPoint we are happy to bring up and

13  show in its native form.  It does contain one video, but I can

14  also pass out the paper version if Your Honor would prefer.

15      THE COURT:  Okay.  What was the exhibit number again?

16      MS. CALL:  3062 and 3087 were the two e-mails.  We now

17  have the training marked as 9754.

18      THE COURT:  3087, right, that was on the list before.

19  But you had said that there was something else.  Wasn't there

20  something else?

21      MS. CALL:  Yes, Your Honor.  Your Honor indicated a

22  desire to see the actual training, so we did find the training

23  and marked that.  And it's being pulled up in its form as a

24  PowerPoint and we will have it on the screen momentarily.

25  Perhaps we could go slide by slide.  We are happy to do so.

1          THE COURT:  Just on the antitrust part of it.

2          MS. CALL:  Yes.  I believe that starts at slide 21.

3          If you can move to slide 22, please.

4          THE COURT:  Okay.  You can go through these pretty

5     fast.

6          MS. CALL:  If you can pause when we get to 31, we will

7     play the video.

8          MS. LaBRANCHE:  Your Honor, before we get too far with

9     this can I ask the government -- can I ask the Court to inquire

10    of the government for the offer of proof that this is, in fact,

11    the one that was even related to Mr. Mulrenin's training?

12    There were four different trainings that year.  My

13    understanding is this is dated May 5th of '14.

14         THE COURT:  When you say this, what do you mean?  The

15    PowerPoint?

16         MS. LaBRANCHE:  The deck we have been provided is

17    May 5th of '14.  The one he attended was in September of '14.

18    I don't believe there is any kind of an evidentiary basis for

19    them to believe this is the one he attended.

20         MS. CALL:  Exhibit 3087, the subject line was "Make-Up

21    Session: Anticorruption & Antitrust Live Training."  This

22    training has the exact same name, Anticorruption & Antitrust

23    Live Session Training.  It does then say May 15, 2014.

24    Exhibit 3087, which was the e-mail, said this was the last of

25    five scheduled sessions, which I think leads to a reasonable

3548

1    inference that the fifth one was just three or four months

2    after the first would have been done in May of 2014.

3         MS. LaBRANCHE:  I would ask if I could just respond to

4    that quickly and have Exhibit 3062 pull up.

5         THE COURT:  Yes.

6         MS. LaBRANCHE:  What the Court is going to see there

7    is approximately halfway down that e-mail, Mr. Mulrenin is

8    being informed there will be four training sessions which will

9    be held in the corporate auditorium and a live web cast will be

10   available for those not on the campus.  I think that is very

11   easily read that there will be four different live trainings.

12   So there is no dispute the one he went to was on the 16th and

13   that this deck that they are about to show you was from May.

14   There is no indication in this e-mail that, in fact, it was the

15   same one being replayed.  Why would you be doing a live webinar

16   repeatedly four times?

17        MS. CALL:  I think the e-mail says choose the one of

18   four that fits your schedule best.  I may not be following the

19   argument, though.

20        THE COURT:  Mr. McLoughlin?

21        MR. McLOUGHLIN:  Your Honor, in addition here to the

22   issue that -- the document itself, 9754, is hearsay and hearsay

23   within hearsay so in and of itself it's inadmissible, it is

24   impossible to put this in front of the jury without a

25   conclusion that they will read it for the truth of the matter

1    asserted in it which confuses the jury as to the instructions

2    that Your Honor will give.

3          THE COURT:  I don't think we are talking about

4    admitting the deck.  I think the deck was background.  That was

5    my understanding.  If we are going to admit the deck -- I am

6    not sure it's being offered -- but I think that that's

7    problematic.

8          MR. McLOUGHLIN:  It was a little unclear from the

9    government's position exactly what they are doing here, but if

10   it's background and they are not trying to publish it to the

11   jury at all, even then we are left with the government's

12   argument that, well, it seems to us that it's the right one

13   because there is a reference in the heading and the title.

14   This is not the kind of speculation that should be the basis

15   of, you know, establishing that this is the same document.

16   There are witnesses who could have done that.  They didn't call

17   them.  And we should not be determining admissibility here

18   based on the speculation of the government which is a bit

19   self-interested.

20         THE COURT:  Ms. Call, go ahead.

21         MS. CALL:  I am trying to recall what all the

22   arguments were at this point.

23         THE COURT:  One is whether or not the training session

24   on the PowerPoint is the same one being discussed in the two

25   exhibits, 3062 and 3087.  And then the next argument is whether

1    or not, if the PowerPoint is being offered, there would be

2    objections to that.  We haven't explored those yet.  And then

3    the third is what we had talked about in regard to the previous

4    antitrust training.

5             MS. CALL:  Yes, Your Honor.  So I think the evidence

6    establishes that this would be the same training.  3062 notes

7    four trainings, gives the employee the option to attend

8    whichever one of four they want.  And then 3087, the subject is

9    "Makeup," implying that none of those four trainings were

10   attended by Defendant Mulrenin who then says he listened in.

11   So I don't see how Tyson -- there is any inference that Tyson

12   would have made a new antitrust training just for the folks who

13   missed the one being done four times beginning in May.

14            And I think the file names of the name of the training

15   make that pretty clear in that it's Anticorruption & Antitrust

16   Live Session Training in both, except the word "session"

17   doesn't appear in 3087 I'll note.

18            So that I think establishes that that is indeed the

19   training.  As far as whether 9754 is being offered, my

20   understanding of Your Honor's prior ruling on training was that

21   the fact of the training was only relevant if we knew what the

22   training was.  I perhaps was a little unclear on whether you

23   meant that the underlying training should be admitted to

24   provide the jury with that understanding or whether it just

25   affected Your Honor's understanding.  I think we would offer

1  it, 9754, but that's our position.

2          THE COURT:  Okay.  I am going to sustain the

3  objections.  For the same reasons that I did regarding the

4  previous exhibit regarding antitrust training, it's a

5  reconsideration of my opinion in one of my previous orders.

6  Here I think that Ms. Call is right that the session that is

7  being referred to is inferentially the same one.  The first

8  part of 3062 talks about it's offered each year.  That's an

9  e-mail from February.  The dates in 3087 are from September.

10         However, even though we now know what the contents of

11  it would be, it would be very difficult to display that because

12  it would -- it would just contradict the -- it would be very

13  problematic in terms of the jury being informed of the law in

14  that regard.  And I don't think that the fact of the training

15  itself is -- has a relevance that would -- that wouldn't be

16  substantially outweighed by the danger of undue prejudice, so I

17  will sustain the objection to 3062, 3087 and 9754.

18         Did you have a chance, Ms. Call, to redo those --

19         MS. CALL:  Yes.

20         THE COURT:  I am trying to look for the exhibit

21  number, but --

22         MS. CALL:  I believe it was 9264 and 9725 being the

23  hard copy.

24         THE COURT:  I think so, yes.

25         MS. CALL:  So we have made a new printout of the

1    contact sheet that includes the entire -- each row of it to fit

2    on paper.  Some of the columns did have to remain hidden and

3    all of the ones that are hidden do not include phone number

4    information.  And I will pass this out to counsel now.  And if

5    the Court since it is quite voluminous would like the paper

6    copy, I can pass that up through Ms. Grimm.

7         MR. TUBACH:  I am sorry, I am having a hard time

8    hearing Ms. Call.

9         THE COURT:  Can you tap on the mic?

10        MS. CALL:  Yes.  It was user error.

11        MR. FELDBERG:  May I inquire which exhibit number are

12   we talking about here?

13        MS. CALL:  The native is 9264 which is the Excel

14   spreadsheet containing Defendant Austin's contact sheet, and I

15   will pass out to counsel the revised printout form.

16        Would Your Honor want a paper copy?

17        THE COURT:  No.  Let's have counsel have an

18   opportunity to look at that and we'll see he if there are any

19   objections, and then perhaps I will.

20        MR. FELDBERG:  Your Honor, this is 31 pages.  I would

21   like to have more than a 10-second look at it.

22        THE COURT:  We can come back to it if you want.

23        MR. FELDBERG:  That would be appreciated.

24        THE COURT:  If it's longer, that's understandable.

25        Why don't we shift our attention, then, over to

1    Exhibit 1170.  That was the document that were notes of I

2    believe Mr. Mulrenin of a meeting.  And I had indicated I

3    wanted to take a look at that.

4              *MS. CALL:*  1177, I believe, Your Honor.

5              *THE COURT:*  1177.  Okay.  Got it.

6              *MR. TUBACH:*  Your Honor, in addition to the notes

7    aspect of it, it's also hearsay within hearsay.

8              *THE COURT:*  Okay.  Anyone else?

9              I will overrule the objections.  I don't find there

10   would be any type of exception to the exception.  I don't

11   believe that that's hearsay and I will admit 1177.

12             *MR. McLOUGHLIN:*  Your Honor, may we provide you with a

13   few cases?

14             *THE COURT:*  Yeah, if you had them.  I didn't realize

15   that you did.

16             *MR. McLOUGHLIN:*  Your Honor, we provided the Court

17   with two cases.  The first is *Schnelling v. Thomas*, 2005 U.S.

18   Dist. Lexis 6465, and *In Re: Acceptance Insurance Company*

19   *Securities Litigation,* 352 F.Supp.2d 940.  We won't go through

20   them right now if Your Honor viewed them.  They all stand for

21   the proposition that the kind of notes that are involved here

22   involve hearsay upon hearsay.  There is no good exception.  And

23   in both cases the Courts ruled that the document was

24   inadmissible.

25             *MS. CALL:*  Mr. McLoughlin, did either of these involve

1    documents created by the defendant?

2         THE COURT:  Actually, why don't we not take the time

3    to look at them now, but I will withdraw my ruling because I

4    didn't realize that someone had some cases to look at.  So I

5    will continue to take that under advisement and try to look at

6    these if possible before the end of the day, but if not, I will

7    try to rule first thing on Monday.

8         MS. CALL:  The government did attempt to start looking

9    at cases over the break as well.  I think the proposition we

10   got was to the extent the document contains embedded hearsay,

11   you do need a hearsay exception.  I think what we have here,

12   though, the government's continued assertion there is no

13   embedded hearsay because it doesn't appear to attribute

14   statements to any other person.  And regardless, frankly we are

15   not offering this for the truth at the end of the day, and it's

16   just showing Defendant Mulrenin's involvement in these meetings

17   which the government is seeking to introduce to rebut what was

18   stated in opening that he wasn't involved in these

19   negotiations.

20        THE COURT:  Mr. McLoughlin?

21        MR. McLOUGHLIN:  Yes, Your Honor.  By definition notes

22   of a meeting are inherently reflective of statements and events

23   that occurred within that meeting.  So the distinction the

24   government seeks to draw here that it is not hearsay within

25   hearsay is I think inconsistent with the cases.

1          THE COURT:  Okay.  All right.  I think those were the

2    follow-up ones that we had, although if I am missing something,

3    we can go to that next.

4          MS. CALL:  I believe we had one or two more.  One was

5    9224.  That was the offer letter to Defendant Roberts.  We did

6    identify the e-mail transmitting that same offer letter,

7    although I note it's a different Bates number because we have

8    it both how it was maintained by the company and how it was

9    sent to him, but it was sent to Defendant Roberts in an undated

10   and unsigned form.  But we do have that available and I can

11   pass that out.

12         THE COURT:  Go ahead.

13         MR. GILLEN:  Your Honor, they have handed us a June

14   the 6th, 2012 e-mail from Ms. Ray to Mr. Roberts saying "Follow

15   up."  Interestingly enough, the attachment she states in this

16   e-mail says, "Also attaches a report with your team members and

17   their compensation/HR data."  There is nothing in here about

18   forwarding any sort of contract for him to sign.

19         So what we have here is we have a June 6 e-mail where

20   the government is purporting to represent that the May the 24th

21   letter to Mr. Brian, which was clearly a draft, was sent to

22   him, although it's not reflected in the body of this document.

23         So we have -- it actually makes it worse for the

24   government because it doesn't appear to be referencing the

25   document or forwarding the document.  We don't have a signed

1    document.  We don't have a finished document.  We still have

2    the draft problem that we had before and the effective date

3    blank, no signature by a Tyson representative, no signature by

4    Mr. Roberts, none of that.

5           So the e-mail to which the government refers that they

6    think saves the document actually continues to erode its

7    viability as a document that would be admissible in this case.

8    It's still a draft and it's not even referenced in the e-mail

9    that they sent.

10          MS. CALL:  There are two attachments to the e-mail.

11   And as you see on the face of 9756, it references both an Excel

12   and a PDF.  I have the Excel, but it's essentially salary

13   information of Mr. Roberts' entire group, so we would not seek

14   to introduce that.  But the untitled PDF is the letter.  And in

15   terms of admissibility, this is still just a non-hearsay

16   purpose of notice of what Defendant Roberts was aware of

17   regarding his bonus structure, so I still believe the letter he

18   received both in hard copy and in this e-mail would establish

19   that and would be admissible for that purpose.

20          MR. GILLEN:  There is no reference in this e-mail to

21   any sort of incentive package that the Court has deemed to be

22   relevant in this case.  What the e-mail talks about is a

23   confirmation of stock grant valued as $125,000.  That's what

24   the e-mail talks about.  Then it talks about his direct deposit

25   stubs.  It goes on to talk about the report concerning his team

1    members.

2          None of this has to do with this case.  This document

3    should not be admitted.  It apparently -- either they can't

4    find a file, a signed file, a completed file, and this is

5    simply a draft, unsigned draft that we would ask to be

6    excluded.

7          MS. LaBRANCHE:  Your Honor, I would just also note

8    that Exhibit 9756, I would object on hearsay grounds.  And I

9    would note that there is no Bates number on this document, so I

10   think the government has authentication issues as well.

11         THE COURT:  There does appear to be a Bates stamp

12   number on it.

13         MS. LaBRANCHE:  Not the versions that we got.

14         MS. CALL:  I believe the printout might have been from

15   the native.  I apologize.

16         THE COURT:  Mr. Beller?

17         MR. BELLER:  In addition, I think the same issue

18   exists with this document as the last that we were talking

19   about as to Mr. Mulrenin in that we don't know if this was

20   somehow negotiated, which as the Court is aware frequently

21   happens with executives that offer letters are negotiated, that

22   there are modifications to an original offer letter.

23         The reason I wanted to address the Court briefly is my

24   understanding is that the United States is relying on the

25   *Arteaga* case, A-R-T-E-A-G-A, 117 F.3d 388.  Your Honor, I

1    actually have triple checked that against the real-time a

2    couple of times because what the *Arteaga* case reads that I am

3    able to pull up deals with a Wells Fargo deposit slip and

4    whether that form, the deposit slip form is a business record

5    once it is modified by an individual making a deposit and

6    handwriting in a dollar amount.  So that's being analyzed under

7    a hearsay ground specific to a business record.

8            So the United States indicated that that case stands

9    for the proposition that a price offer is an item of

10   independent legal significance.  So I point this out only to

11   say that truly perhaps I got the citation wrong, but I don't

12   believe that the case as cited by the United States does, in

13   fact, stand for that proposition and I think it's inapposite of

14   the piece of evidence that the parties here are analyzing.

15           *THE COURT:*  Mr. Gillen?

16           *MR. GILLEN:*  Briefly, Your Honor, the case the

17   government cites has to do with a drug conspiracy in which

18   people were sending wire transfers to one another, $500, and

19   whether or not that information, the customer information that

20   was filled out on the wire transfer form was a business record.

21   It then gets into whether or not someone who had been in

22   possession of certain information regarding wire transfer

23   forms, one of the defendants, whether or not that information

24   could be attributed against the defendant.

25           I have read it twice.  It's bewildering to me that the

3559

1    government would cite this case for the proposition that a

2    draft letter to Mr. Roberts that's unsigned and not finished is

3    admissible against him in any form whatsoever.

4              *THE COURT:*  Ms. Call, go ahead.

5              *MS. CALL:*  One second.  I reviewed the various cases

6    on independent legal significance this morning in the 10th

7    Circuit, and I will say there are only, I think, three or four.

8    But between the 10th Circuit and others there is this -- I

9    suppose to use a word from Mr. McLoughlin -- like a quantum of

10   what the law establishes, that the back-and-forth of

11   negotiations are part of this thing that establishes

12   independent legal significance.

13             And I think the other day Your Honor cited a case, and

14   I have to recall exactly which one exactly it was, for the

15   proposition that a bid would be a part of that because a bid is

16   an offer that provides a legal significant moment that's

17   binding on the parties.

18             There is other cases that stand for this same

19   proposition.  So another is *Adonai Communications, Ltd. v.*

20   *Awstin Investments, LLC.*  And that is 2011 WL 4712246 in the

21   Northern District of Texas.  That involved a canceled check

22   being a legally operative act for the purposes of an unsigned

23   offer having independent legal significance.

24             And I think it goes across a various number of kind of

25   types of negotiations where there is this principle that offers

1   for its acceptances are this item of legally binding

2   significance whether it's a bid or a check.  I think there is

3   another case having to do with FDIC certificates.  It's a 10th

4   Circuit one.  May I confer one moment?

5          And the cite I meant to cite in *Arteaga* is I believe

6   Footnote 16 that says, for example, the statement of a merchant

7   that he is willing to sell a hundred pounds of coffee for $300

8   may be legally operative as an offer in an action on the

9   contract.  The truth of the statement is not an issue.

10          So perhaps I should have provided a pin cite earlier,

11   but that was the language in *Arteaga* I was referring to as an

12   offer being something that is of legally binding significance.

13          *THE COURT:*  I am going to sustain the objection.  The

14   problem here, and this makes this a little bit of a different

15   character than the cases that Ms. Call just cited where you

16   might have an offer, an acceptance or a bid and a counter bid,

17   something of that nature, is that this is a description of

18   Mr. Roberts' terms of employment.

19          Were we to know that this was, in fact, a signed

20   document or that this was the final, then it could indeed come

21   within a hearsay exception and form evidence of what his terms

22   of employment were.  The problem is that as we've discussed

23   before, this is a draft.  I don't find help from Exhibit 9756,

24   the transmittal letter.  Although it does refer to one term,

25   the other terms aren't referred to.  And in and of itself that

3561

1    doesn't really confirm that this, that the bonus terms in fact

2    did form part of his employment contract.  That would be the

3    significance of it.  So for that reason because we still just

4    have a draft, I don't find that it has legal significance; and

5    as a result, I will sustain the objection.

6            *MS. CALL:*  And, Your Honor, I don't know if I had

7    noted it before because we did get off on a tangent on legal

8    significance, but I think the other proffered non-hearsay

9    purpose was the type of effect on the listener that essentially

10   at least as of this time, which is during the conspiracy

11   period, Defendant Roberts had notice of his bonus being tied to

12   the company's profits at the time he came to Pilgrim's.  So

13   it's kind of a -- it doesn't necessarily rely on the

14   significance, but I just wanted to make sure that had been

15   noted.

16           *THE COURT:*  Right.  That's part of it is that we would

17   have to know that in fact it was a term of his employment, and

18   we still don't have proof of that, so that therefore would not

19   form any type of justification for its being admitted.

20           *MS. CALL:*  I believe I may have misspoke and said

21   Pilgrim's rather than Tyson.

22           *THE COURT:*  All right.  Should we get back to the

23   list, then?

24           *MS. CALL:*  Let me double-check.  I think we had one

25   more item to follow up on which is 960, the attachment to 959

1    that counsel wanted an opportunity to review.

2           THE COURT:  Right.  That was a native.  960 was a

3    native document, okay.

4           MS. CALL:  Okay.

5           THE COURT:  Have people had a chance to take a look at

6    that?

7           MR. GILLEN:  Your Honor, over the lunch we did look at

8    960.  We are not convinced that this is the attachment to this

9    particular document.  There is no date on it that we've gotten,

10   that we've printed out.  And on its face it appears to be

11   different.

12          For example, in 959 the e-mail says, "Popeye's is

13   done. Here is the agreed upon model for Popeye's.  Almost a

14   $.14 increase."  And then when you look at the document that

15   they say is the attachment to here, it says "2015 price

16   increase .1697.  On the face of the document it contradicts the

17   e-mail that they say is attached to it.  So for that reason

18   there is no foundation and we would object to its admission.

19   It's simply not connected up.

20          THE COURT:  Ms. Call?

21          MS. CALL:  Ms. Arens and Ms. Bunch of Tyson both

22   testified as to this document which is an attachment to 959.

23   It has sequential Bates numbering.  It is associated as a

24   family by the metadata.  If counsel wants to confirm -- I

25   understand that is not in evidence, but I will note that the

3563

1    testimony did verify the authenticity of these records.

2            MR. GILLEN:  The problem is on the face of it the

3    e-mail doesn't refer to this document.  How can the government

4    with a straight face argue that an e-mail that says almost a

5    $.14 increase and then the document attached says "price

6    increase .1697."

7            MR. McLOUGHLIN:  For the record, we would make an

8    objection to the government's argument in this instance and any

9    other instances arguing facts that are not in the record such

10   as metadata and its reading of metadata.

11           MS. CALL:  Of course, the native of this Excel file

12   would be in evidence.

13           THE COURT:  So did Ms. Bunch or Ms. Arens testify

14   specifically as to what's now marked as 960?

15           MS. CALL:  Yes.  They were on their list.  And one of

16   them, and the name is escaping me, did testify as to Tyson's

17   e-mail servers and how e-mails and attachments were stored.

18   And that was Ms. Bunch.

19           MR. GILLEN:  I don't have a recollection of specific

20   testimony as to 960.  If counsel is certain about that, that's

21   one thing.  But again we renew our objection that clearly this

22   refers to two different documents.

23           MS. CALL:  Ms. Arens was the one who testified to a

24   list of documents that 959 and 960 were both on.

25           MR. McLOUGHLIN:  I am sorry, Your Honor.  We are

1    having a hard time hearing Ms. Call.

2         *MS. CALL:*  Yes.  Ms. Arens testified she had a list of

3    documents and that she reviewed the documents provided by the

4    government and compared it to the originals on Tyson servers,

5    and she believed them to be true and authentic copies.

6         *THE COURT:*  Did she do a check of attachments?  I

7    think that ultimately that's what Mr. Gillen is getting at is

8    it may be authentic, but the issue would be whether there is

9    any testimony that identifies that as the attachment.

10        *MS. CALL:*  So I think it's a bit of a mix of the two

11   that Ms. Bunch was the one that testified about how the server

12   stores e-mails with their attachments, and Ms. Arens testified

13   to reviewing the documents.  I don't know how -- precisely what

14   form she reviewed them in, whether it was an e-mail and she

15   opened up the attachment from it or reviewed it in database

16   structure.  I would have to check.

17        *THE COURT:*  I am going to take that under advisement.

18   I do want to double-check the testimony of Ms. Arens on that

19   point.  I am not sure she provided that level of detail in

20   terms of her testimony.

21        *MS. CALL:*  I will also note, and I will have to see

22   the points made by Mr. Gillen a little more specifically in the

23   document, but as far as a price increase goes, I think there is

24   different kinds of things that statement could talk about.

25   There is a per pound price increase.  There is a price increase

1    from the last year's contract.  There may be one from the

2    current period price.  There is also increases on case weights,

3    but that likely wouldn't be 14 cents.  But to the extent the

4    document appears contradictory, it may just be an improper

5    reading of what's being referred to.

6          MR. GILLEN:  One last statement, Your Honor.  On its

7    face the e-mail says "almost a $.14 increase."  Then on the

8    face of 960, "2015 price increase, .1697."  It's about as

9    simple as you can imagine.  So there is no amount of juggling

10   that can go on here that can make these two documents line up

11   with one another.

12         THE COURT:  Let's go to the next document unless you

13   had any response to that, Ms. Call.

14         MS. CALL:  One moment, Your Honor.

15         Just reviewing Ms. Arens' testimony, she said that she

16   went to each individual e-mail on Tyson's servers and looked at

17   it and confirmed the accuracy.  I don't know that she made a

18   statement specific to attachments to the e-mail, but she did

19   testify to reviewing the e-mails and to each exhibit on the

20   government's list.

21         I don't know if this is a point that needs to be made

22   on the record, but there is a chance that there is a typo just

23   in the e-mail and 14 cents means 16 cents.  I don't think there

24   is a question as to the veracity of this document and

25   authenticity.  It's simply a -- you know, does the statement in

3566

1    the e-mail make sense, and that's not a question as to the

2    admissibility of these materials.

3         THE COURT:  Well, of course the presumption would be

4    otherwise.  It's a business record and the company would have

5    every incentive to make sure that the numbers were correct.

6         MR. GILLEN:  When in doubt, the government defaults to

7    a typo.  So we would stand on our objections.

8         MS. CALL:  If we may, Your Honor, we will review the

9    current period price because there is a chance it is 14 cents

10   off the period as opposed to the previous contract year.

11        THE COURT:  And I will look at Ms. Arens' testimony.

12        MS. CALL:  That is all the items I had for follow-up.

13        THE COURT:  Okay.  Let's go back to the list, then.

14        MS. CALL:  The next exhibit is Government

15   Exhibit 9057.  Exhibit 9057 was contained on the government's

16   *James* log as entry 7.  It was favorably ruled on.

17        THE COURT:  Go ahead, Ms. Pletcher.

18        MS. PLETCHER:  Thank you, Your Honor.

19        I understand this was ruled on in the *James* log.  I

20   don't seek to rehash all of those rulings, but this document in

21   particular raises some important questions particularly with

22   respect to relevance and 403 and also on hearsay grounds.  So

23   what this document is, it's an e-mail.  It takes place between

24   December 6, 2011 and December 7, 2011, which I know right away

25   is outside the relevant period.

1      It's an e-mail started from Charles Von der Heyde, who

2  is a senior executive in the export division at Pilgrim's.

3  Mr. Von der Heyde writes to Mr. Lovette questioning the value

4  of participating in an organization called USAPEEC.  USAPEEC is

5  the USA Poultry and Egg Export Council.  It's an industry

6  organization that promotes poultry and egg products and

7  advocates for industry on trade policy issues.  Many of the

8  members are export traders.

9      Mr. Lovette responds to this e-mail suggesting that

10 Mr. Penn should get involved in this conversation because

11 Mr. Penn had been on the executive committee of USAPEEC.  And

12 Mr. Penn, it's true, he had been involved in the USAPEEC

13 organization actually between 2001 and 2010 when he was at Case

14 Farms before he even came to Pilgrim's.

15     Mr. Penn responds in an e-mail at 7:48 p.m. with his

16 take on the value of this organization.  He talks about his

17 relationships there, the approach he took to price discovery.

18 Mr. Von der Heyde then writes back saying he has a different

19 opinion.  He doesn't think this is a useful organization to be

20 part of.

21     And then finally the e-mail chain ends with Mr. Penn

22 saying that he actually did think there was some value to this

23 organization, but things have changed with respect to the way

24 he conducts price discovery now because Mr. Penn had since

25 moved to Pilgrim's and things were different at Pilgrim's.

3568

1          So I go through this because the timing of these

2    communications and the substance of the communications show

3    that it does fall outside of 801(d)(2)(E).  The time it was

4    written again before the relevant period about conduct that

5    took place prior to the relevant period means it could in no

6    way be in furtherance of the charged conspiracy.  It also

7    raises relevance issues.  What Mr. Penn was doing prior to the

8    charged conspiracy has no relevance to the charges at hand.

9          It's also prejudicial, quite frankly, under 403

10   because there could be an inference that could be suggested

11   that Mr. Penn's views of USAPEEC and the relationships he made

12   there may in some way be relevant to his approach to price

13   discovery during the charged conspiracy period for which there

14   is no evidence.

15         So for those three reasons, hearsay, relevance and

16   403, I object to this document.

17         *THE COURT:*  Thank you, Ms. Pletcher.

18         Ms. Call?

19         *MS. CALL:*  In Your Honor's *James* hearing ruling,

20   docket entry 559 -- if I could scroll I would tell you the

21   page -- Page 11, Your Honor found that Defendants Lovette and

22   Penn had joined the conspiracy as of August 2011, which I

23   believe is the time frame of this document.

24         *THE COURT:*  Mr. Fagg, go ahead.

25         *MR. FAGG:*  Sure, Your Honor.

1          Just to add on to Ms. Pletcher's point, a couple other

2     points.  What this e-mail is about is a trade organization

3     which deals with exports, which at the time of the *James*

4     hearing the Court did not know whether that was going to be

5     germane to the issues in this case.  Clearly it's not.  And

6     two, what these gentlemen are all talking about is traders.

7     Information would come from traders.

8          Mr. Von der Heyde apparently thinks the traders all

9     make too much money and fly in private jets while the folks in

10    Pilgrim's have to fly in coach, but that's what this e-mail is

11    about is traders and information that would come from traders.

12    There haven't been any allegations in the case about

13    information coming through third parties like --

14         *THE COURT:*  That's true.  I think this had to do with

15    means and methods of the a conspiracy.

16         *MS. CALL:*  I believe we are about to zoom in on a

17    portion that has not been referenced by counsel.  First I will

18    note they had the opportunity to cross-examine Special Agent

19    Taylor regarding the industry group they are representing.

20    Second, they fail to note the sentence saying "The

21    relationships I developed through the organization allowed me

22    to pick up the phone any time and call multiple friends to

23    flush out current and forward pricing from friendly

24    competitors."  So it doesn't clearly seem to be representative

25    of traders.  It seems to say the information is coming from

1    competitors.

2         MS. PLETCHER:  To that point, Your Honor, it is clear

3    this is written in the past tense, "allowed me to pick up the

4    phone any time."  And then in the very top e-mail, Mr. Penn is

5    very clear where he says, "My former setup was not nearly as

6    sophisticated as Pilgrim's.  I had to reach out to these

7    contacts for price discovery."  Then he says, "At Pilgrim's we

8    have more intellectual options for information discovery,"

9    implying whatever methods he used for price discovery when he

10   was a member of USAPEEC are no longer applicable to his

11   business practice.

12        MR. FAGG:  Your Honor, to follow up on that point, I

13   think that top e-mail from Mr. Penn hits the nail on the head.

14   "The best information I always got was from traders."  I don't

15   think there is any allegation that the individuals who are

16   facing trial here were prohibited from getting information from

17   traders.  That sort of price discovery is exactly the type of

18   information flow that is perfectly permissible under the

19   antitrust laws.  So if we're talking about means and methods,

20   this is actually talking about a perfectly legal way to obtain

21   price discovery information through traders.

22        MS. HENRY:  Your Honor, the screen is not actually

23   showing the top part of the e-mail, which I think is very

24   important of what is being discussed.  So it would I think help

25   if we could shift to see what is says, the top part.

3571

1          THE COURT:  Yeah, I am familiar with what's at the

2     top, but if you would like to see it, we can ask that it be --

3          MS. CALL:  Can you zoom in on the top e-mail?  And if

4     any counsel would like that done, please just request.

5          THE COURT:  Ms. Pletcher?

6          MS. PLETCHER:  Thank you.

7          I wanted to point out one other line that Mr. Penn

8     mentions in the 7:48 p.m. e-mail at the center of the document.

9     In the third major paragraph he says, "I always had multiple

10    friends to call on that provided market guidance and direct

11    price knowledge of our competition."  And to follow on

12    Mr. Fagg's point that there is nothing illegal about speaking

13    to traders or other members who might be knowledgeable about

14    price discovery in the industry about other competitors, and

15    that's pretty clearly what's happening in here.

16         THE COURT:  Ms. Call?

17         MS. CALL:  Just very briefly on this nothing illegal

18    point.  I think as Your Honor has recognized I believe even in

19    the *James* ruling, there are items that on there standing alone

20    may not be illegal, but can certainly be a part of an illegal

21    price-fixing agreement that may include, for example, sharing

22    current prices.  It may also include using a third party to

23    find information about your competitors if part of an

24    agreement.  So I don't know that this argument about the source

25    of the information, whether it's clear or not on the face of

3572

1    the document, means there is nothing illegal about it and

2    nothing in furtherance of the conspiracy.

3          MS. PLETCHER:  To that point, if there is something

4    that the government is alleging that is illegal about the

5    conduct Mr. Penn describes in this e-mail, it would have to be

6    noticed under 404(b).  It's clearly well in advance of the

7    alleged conspiracy.  Again, Mr. Penn was only a member of

8    USAPEEC from 2001 to 2010.  The conduct he is describing would

9    have taken place then and would be -- would have to have been

10   noticed under 404(b) or is otherwise irrelevant and

11   prejudicial.

12         Mr. McLoughlin?

13         MR. McLOUGHLIN:  Your Honor, to the point of

14   relevancy, of course, conduct with respect to means and methods

15   is only relevant to the extent you are talking about the same

16   conduct in the same market.  When you have traders, the

17   information platform that you have, which is in commodities

18   trading chicken, eggs for export where you have traders who are

19   doing price discovery, which is to say bids and offers on a

20   trading platform, whether it be electronic or it be the CME or

21   another trading platform, the process of price discovery

22   involves the exchange of bid and offer, other transaction

23   information that's available from various platforms to give you

24   an idea, A, of your forward pricing, which is to say if I'm

25   going to sell chicken in an international market in Argentina

1   for delivery three months from now, what is my forward pricing

2   for that?  And therefore how do I make sure I have good forward

3   pricing?  I take other traders and say, okay, what is the

4   market telling me about forward pricing at that point.

5          So to say the means and methods of dealing with

6   trading of agricultural commodities in an international market

7   where a trader's job is to do that, and that is, in fact, the

8   way the system is set up as contrasted to an analogy I assume

9   they are making between forward pricing and a bid is, you know,

10  apples and grapefruit or something else.  So the means and

11  method argument fails because of the different operation and

12  characteristics of the markets that they are talking about.

13         THE COURT:  All right.  I am going to take this under

14  advisement too.  For some reason I have this dim recollection

15  that as part of the *James* briefing, there was something more to

16  this because on its face, this is Mr. Penn talking about

17  something that he used to do.  But in connection with the *James*

18  ruling, I did find that that was an appropriate statement and I

19  thought that it had something to do with means and methods.  So

20  I want to look back at that to see -- that briefing to see if

21  that jogs my memory as to why I considered that to be a

22  co-conspirator statement.

23         MS. CALL:  Yes, Your Honor.  And I'll just briefly

24  note two things.  I also recall the same thing.  One thing I

25  will note, the term friendly competitor has been contained in

3574

1    other e-mails in furtherance of the conspiracy, one being

2    Government Exhibit -- I believe 3037.

3         THE COURT:  That coincidence wouldn't necessarily make

4    it relevant.  It could just be just a phrase, but...

5         MS. CALL:  And I simply mean that as an indication of

6    the meaning of the term within Pilgrim's where both of those

7    correspondences did take place and I believe they are within

8    several months of each other.

9         The second is that even if Your Honor is inclined to

10   be done with your ruling from the *James* hearing where this was

11   all presented and counsel had multiple opportunities to provide

12   their arguments, this would also be admissible under

13   801(d)(2)(A).

14        THE COURT:  Well, we would see how the relevance

15   issue, but I will take it under advisement.

16        Next?

17        MS. CALL:  Next is Government Exhibit 7037.  And this

18   was contained on the government's *James* log entry 306 and was

19   ruled on favorably.

20        THE COURT:  Objections on 7037?

21        MS. LaBRANCHE:  Your Honor, I object on relevance

22   grounds and on hearsay.  I recognize that the Court ruled

23   favorably for the government on this, at least I believe as it

24   related to Carl Pepper's pieces of the string.  I don't believe

25   that Daniel Sullivan is someone who is alleged to be a

1    co-conspirator.

2            *THE COURT:*  He is not.

3            *MS. LaBRANCHE:*  The other thing I would say about the

4    relevance too, I recognize, Your Honor, that you made the

5    ruling you made at the *James* hearing.  However, based upon the

6    way that the evidence has come in in this case, which is

7    primarily through throwing documents in front of the jury with

8    zero context, I don't think that this is now relevant.  To the

9    extent it is relevant, I think that the danger of unfair

10   prejudice is outweighing any kind of probative value that this

11   may have.

12            This right now has zero context.  I don't even know

13   that I can tell you for sure what's going on here.  I have an

14   idea because I have been working on this case for a year.  The

15   jury is not going to know what this has to do with anything.

16   And frankly, it doesn't have anything to do with any of the

17   charges in this case.

18            *THE COURT:*  Go ahead, Ms. Call.

19            *MS. CALL:*  Yes, Your Honor, so this is -- 7037, and we

20   are about to get to 759 which it relates to, but it's a hunting

21   trip being coordinated by Carl Pepper at Tyson Foods involving

22   Defendant Mulrenin.  And this is after he left for Tyson Foods

23   when he is now working for competitor at Perdue and involves

24   customers Mr. Ledford and I believe Kent Kronaugue.

25            So this e-mail shows the arranging of the trip which

3576

1    is the continued association between these individuals, which

2    is one of the permissible legal bases for admission under

3    801(d)(2)(E), but I believe what probably affected Your Honor's

4    opinion was the next -- and if we could perhaps pull 759 up to

5    the side -- is an e-mail from Defendant Mulrenin to Carl Pepper

6    saying, "We need to make sure he and Kent keep it quiet.  We

7    are going together."  So there was some evidence that they were

8    trying to conceal their continued association and the fact that

9    they were going on this trip together.

10           MS. LaBRANCHE:  Your Honor, that is so incredibly

11   misleading.  I would like to ask if we could have both -- okay,

12   they are, they are both up together.  So what's going on here

13   is that Mr. Pepper is talking to Dan Sullivan in an e-mail

14   about a hunting trip that he and Tim Mulrenin had taken in the

15   past and were planning on taking that year.  The people who

16   were going to be invited with them on the hunting trip were

17   Kent Kronaugue who was a customer and Mr. Ledford, also a

18   customer.

19           No one is denying that Mr. Pepper and Mr. Mulrenin

20   know each other.  We have heard testimony that all of the

21   gentlemen in the room know each other and have ongoing business

22   relationships.  The fact that Mr. Pepper and Mr. Mulrenin are

23   taking two customers who are, by the way, the "victims" in this

24   case on a hunting trip together, I have absolutely no idea how

25   the government can think that is somehow in furtherance of the

1    conspiracy.  Are we now arguing that there is going to be

2    conversations during this trip with the victims in this case

3    about furthering the conspiracy?  This makes absolutely no

4    sense to me.

5              THE COURT:  Ms. Call, response?

6              MS. CALL:  I see we have changed from having no idea

7    what's going on in the e-mail exchange, but I think Your

8    Honor's rulings stand that the bases under 801(d)(2)(E),

9    including association, but compounded by 759 which shows

10   concealing that association still provides for admissibility of

11   these two e-mails.

12             THE COURT:  Let's sharpen the association.  So the

13   association is whom?

14             MS. CALL:  Carl Pepper and Defendant Mulrenin.  So at

15   the time of the two e-mails, they are no longer working

16   together.  They are arranging a trip together, however.  And

17   then 759 --

18             THE COURT:  You said that Mr. Mulrenin had retired?

19   He was with Perdue by this time.

20             MS. CALL:  Correct.

21             THE COURT:  And your theory about him not -- now being

22   with Perdue is that -- is what?  Why does the association for

23   purposes of this hunting trip bear on matters relevant to this

24   case?

25             MS. CALL:  Well, I suppose one reason is that they are

3578

1    now competitors.  We do know they had antitrust training

2    knowing that contacts with any competitors may face issues.  I

3    am not saying this on its own does.  But let me confirm, make

4    sure I am not missing anything.  One moment, Your Honor.

5             I am hesitant to bring in things outside the record,

6    but as we just heard a lot about industry groups that are not

7    in the record, I will note the government did hear from Carl

8    Pepper that the companies did not want folks going on trips

9    with their competitors because of these issues, and that is the

10   basis for why in 759 he wanted to keep it quiet.

11          THE COURT:  I can hear people say under their breath,

12   what issues?  Maybe Mr. Gillen.

13          MS. CALL:  I believe I heard it as well.

14          THE COURT:  But let's ask that question.  What issues?

15   So what are they trying to not have be apparent to others?

16          MS. CALL:  Yeah.  As I understand from our

17   recollection, and I am sure we are pulling up the interview

18   report, but as I believe we understood it from Mr. Pepper, his

19   statement as to why he was trying to keep it quiet was his own

20   understanding and expectation that competitors should not be

21   going on these kind of trips together.  And I will pull it up

22   to confirm because I don't want to misspeak, but that is my

23   understanding.

24          THE COURT:  Ms. LaBranche?

25          MS. LaBRANCHE:  Your Honor, speaking of Mr. Pepper,

3579

1    who I know the Court has heard was repeatedly interviewed 12

2    times and then ultimately not been given immunity, and I don't

3    think the government was happy with what they were going to

4    hear from him during the trial, what they did hear from him

5    when they were interviewing him is that when he was talking

6    about this hunting trip, he specifically told the government

7    that he and Mr. Mulrenin would not talk about business on these

8    hunting trips.  And he also specifically told the government

9    that he and Mr. Mulrenin did not share information that would

10   be a part of this case after Mr. Mulrenin left Tyson.

11        THE COURT:  Mr. Tubach?

12        MR. TUBACH:  The other thing I was going to say, it's

13   obvious that on this keep this quiet, the person who is

14   supposed to be keeping it quiet with them is Kent Kronaugue,

15   the customer.  I don't know how in the world anyone can think

16   that's conspiratorial.  What they are saying is someone and the

17   customer have to keep this quiet.  I am just baffled.

18        THE COURT:  Ms. LaBranche?

19        MS. LaBRANCHE:  I just strenuously object under 403,

20   Your Honor.

21        THE COURT:  Strenuously gets you nowhere.  If we did

22   the adjective game, we would be getting all sorts of hyperbole.

23        But Mr. McLoughlin, go ahead.

24        MR. McLOUGHLIN:  I will simple note, Your Honor, that

25   the government's arguments with respect to this document is

1    like watching improvisational theater.  If someone throws out a

2    proposition and, oh, let's do a riff on what make it relevant.

3    And it is clear from the presentation by the government that

4    there is no comprehensive theory of the case under which this

5    document is relevant.  It is for atmospherics and it is not

6    relevant and admissible.  And their spinning a new theory as we

7    stand should not be persuasive.

8         *THE COURT:*  Ms. Call, last word?

9         *MS. CALL:*  Yes, your Honor.  I believe and continue to

10   assert that the association between competitors and their

11   closeness, whether it be through friendship or otherwise, is

12   entirely relevant to this case.  And I don't want to add

13   further for fear of being called out for spinning new webs, but

14   I think it's entirely relevant and I believe that was the basis

15   of the Court's prior ruling on this document.

16        *THE COURT:*  I am going to sustain the objection on

17   relevance.  It is -- it would be baffling, especially for

18   Mr. Mulrenin having already left Tyson albeit he is now working

19   for another chicken supplier, to have -- there is relevance to

20   keeping things quiet between the buyers.  I think that there is

21   a danger of it being -- of misleading people, and especially

22   if, as Ms. LaBranche indicates, Mr. Pepper's statements

23   wouldn't support the association in any event, then I think

24   that that danger of a misimpression or confusion by the jury

25   becomes especially important.  So I will refuse both 7037 and

1    759.

2         MS. CALL:  Thank you.  If I may make a request because

3    we do have very competent attorneys in this courtroom, if they

4    could not giggle or make comments under their breath at counsel

5    for the government, I would appreciate it.

6         THE COURT:  Well, that shouldn't be going on, period,

7    because it's unprofessional.

8         Okay.  Next?

9         MS. CALL:  The next is Exhibit 6047.  And this is

10   perhaps a good time, I will pass it off to my colleague,

11   Mr. Koenig.

12        MR. KOENIG:  Thank you.  Before we get into that, I

13   will note that there are a few offenders who every time they

14   pop up say we are acting in bad faith.  And I think it's more

15   of the non-professionalness that I think just needs to be

16   damped down.  It's just wrong.

17        THE COURT:  Here is the thing.  As things draw on,

18   people's nerves get frayed and people really have to bear up on

19   both sides.  I am not accusing people of things.  And I don't

20   want to poison our proceedings by trying to enforce rules of

21   professionalism because everyone here is a professional and

22   really through the bulk the trial have been acting accordingly.

23   So we need to continue to maintain the high standards to be

24   professional and, you know, as the -- as people get tired, not

25   avoid slipping into emotionalism or snide comments or anything

3582

1    else.  I am convinced that everyone can and will do that.

2          Go ahead, Mr. Koenig.

3          MR. KOENIG:  Before we go to the next exhibit, to the

4    extent Your Honor is going to consider 9057 whether it's

5    relevant or not, we would like to -- I mean, we can submit a

6    short brief on relevance of it because I would hate to forego

7    an opportunity to explain why it's very, very relevant,

8    although I think we did that in the *James* log.  That's the

9    USAPEEC e-mail.

10         THE COURT:  Yeah, you can.  I am going to refresh my

11   memory on that, but if you want to submit something short, real

12   short and sweet on that issue, that's fine.

13         Ms. Pletcher?

14         MS. PLETCHER:  Your Honor, the government would like

15   to also hit a couple key points on that as well.

16         MR. KOENIG:  The government?

17         MS. PLETCHER:  I apologize, Your Honor.  We were

18   colleagues for a very long time.

19         THE COURT:  I am not going to entertain any correction

20   on the record or changing of the record, but I obviously

21   understood what Ms. Pletcher meant.

22         MS. PLETCHER:  Thank you, Your Honor.  I apologize for

23   that.  But if we also may submit just a --

24         THE COURT:  That's fine.

25         MR. KOENIG:  6047.

1          MS. PLETCHER:  And the timing on that brief, Your

2     Honor, just to wrap up that loop.

3          THE COURT:  End of the day tomorrow.

4          MS. PLETCHER:  Thank you.

5          THE COURT:  Argument, Mr. Koenig?

6          MR. KOENIG:  First of all, it was ruled on favorably

7     in James log entry 59.  And I think it's, you know, it's

8     plainly relevant that this I do believe is current pricing, but

9     what they are talking about also is exchanging current pricing

10    and for the purpose of -- for manipulating their position in

11    the ranking of where they are in current pricing.  And we've

12    also heard testimony that current pricing is, in fact, relevant

13    to the broader price-fixing conspiracy.  So I just think that

14    it's -- there is not much question on the relevance of it.

15         THE COURT:  Ms. Henry?

16         MS. HENRY:  I completely disagree what the government

17    said this shows.  On the other hand, we have made our

18    objections at the James hearing and will stand on those.

19         THE COURT:  Thank you, Ms. Henry.

20         Mr. Beller?

21         MR. BELLER:  Thank you, Your Honor.

22         Your Honor, I respectfully disagree with Mr. Koenig's

23    statement regarding relevancy for a couple of different

24    reasons.  The primary one is because we heard directly from

25    Mike Ledford.  And Mr. Ledford had indicated that learning each

1    other's current price happened and it would always happen if

2    there was a cover or a short.  I believe there was a follow-up

3    question as to whether or not current pricing can be used for

4    purposes of manipulating future bids and his testimony was no.

5           However, that is all very factually intensive and the

6    Court has already considered this insofar as the *James* hearing

7    goes.  Your Honor, the concern that I have is that this

8    particular e-mail has not been authenticated.  Mr. Finch was

9    placed on the stand.  Mr. Finch was asked about Government

10   Exhibit 9594.  Your Honor, Government Exhibit 6064 as well as

11   the accompanying Bates list is not something that was included

12   on 9594.  Mr. Finch was not asked about it, and I do not

13   believe that it's authenticated under 901 and the subsequent

14   rulings from this Court regarding authentication of e-mails.

15          *THE COURT:*  Mr. Koenig?

16          *MR. KOENIG:*  One moment, please.

17          *MR. BELLER:*  Your Honor, I am being told that perhaps

18   I may have said wrong numbers on the record.  This is

19   Exhibit 6047, and I was referring to Government's Exhibit 9594

20   in terms of talking about Mr. Finch's authentication.  So on

21   the authentication document 9594, 6047 does not appear.

22          *THE COURT:*  Okay.  Mr. Koenig?

23          *MR. KOENIG:*  Sure.  Well, two things.  Mr. Finch did

24   talk about the extraction process generally, you know, and so

25   there is -- he definitely talked along the lines of, you know,

1  like Challa and these others.  And a lot of the witnesses had,

2  you know, a shorter list sampling, so I think it's

3  authenticated under his testimony.

4          There is also the testimony of Ms. Bieganowska who if

5  you recall is the DOJ paralegal who verified that these are

6  what we received from the production, from the company.  So I

7  think there is sufficient indicia of authenticity.  There is

8  certainly no -- you know, there is no reason to think that this

9  is anything other than what it purports to be.  And I would say

10  the bar for authenticity is not terribly high, so I think all

11  those things combined, it's authenticated.

12          THE COURT:  Mr. Beller?

13          MR. BELLER:  Thank you, Your Honor.

14          And I trust the Court's memory of Mr. Finch's

15  testimony, but my memory of Mr. Finch's testimony is that he

16  was asked to compare documents in a binder against this list

17  and authenticate only the documents in his binder against this

18  list.  So I do not believe that there was greater or larger or

19  more general testimony from him regarding any documents outside

20  of those that he was asked specifically to authenticate.

21          THE COURT:  Anything else, Mr. Koenig?

22          MR. KOENIG:  Well, I am going off memory, but I do

23  believe it is true that he looked at specific documents, but he

24  did also talk about the extraction process and how no problems

25  were reported to him.  And then if you couple that with

3586

1    Ms. Bieganowska -- hold on one second, please, if I may.

2          Yeah, more specifically, he talked about the

3    extraction of the CLA prefixed documents in particular.  So

4    that part of the testimony coupled with Ms. Bieganowska's

5    testimony that, yes, we did, in fact, receive these and this is

6    what we received at this Bates number and it looks just like

7    this I think is more than enough for authenticity.

8          THE COURT:  Mr. Beller, is one last thing.  Go ahead.

9          MR. BELLER:  Final thing, Your Honor.  And that is

10   Mr. Finch also discussed at length the server crash that

11   Claxton suffered in 2015.  And I would note that this

12   particular e-mail is from 2013.  So there was some concerns

13   that he expressed regarding his ability to be able to

14   authenticate.  And that was the reason why we went through the

15   exercise or part of the reason from my understanding as to why

16   we went through the exercise of having him actually compare

17   documents against Government's Exhibit 9594.

18         THE COURT:  The objections will be overruled.

19   Mr. Finch testified specifically, as Mr. Beller indicated, in

20   reference to what was marked as Exhibit 9594.  And I trust

21   Mr. Beller when he indicates that this particular exhibit,

22   namely 6047, was not listed on it.  However, Mr. Finch did

23   testify generally.

24         It's true, he did testify about the -- that there was

25   a corruption of the server that took place at some point in the

1    past.  However, Mr. Finch talked generally about his overseeing

2    the production of documents under -- that bear a Bates stamp of

3    CLA and those were produced to the Department of Justice.  A

4    third-party vendor was used.  The third-party vendor had a duty

5    to report to him Mr. Finch said.  No errors were reported to

6    Mr. Finch by the third-party vendor.  And Mr. Finch testified

7    that he would have been advised and Mr. Finch testified that

8    the documents as part of that production were true and

9    accurate.

10        And in reference specifically to those CLA documents,

11   he indicated -- I am sorry.  He was testifying additionally

12   about ones that were a Claxton prefix -- those aren't these --

13   but he testified as to the CLA documents that they were -- that

14   no errors were reported.  I find that the government has made a

15   prima facie indication of authenticity in regard to

16   Exhibit 6047, so I find it is -- it meets the authenticity and

17   I will admit the document.

18        Mr. Koenig?

19        *MR. KOENIG:*  3025, please.  So 3025 was *James* log 65

20   that was ruled upon favorably.  It's certainly relevant.  It's

21   talking -- it's two defendants talking about another defendant

22   about an illegal forward pricing spiel, so I think the

23   relevance is pretty obvious on its face and the *James* hearing

24   ruling should stand.

25        *THE COURT:*  Any objection to the admission of Exhibit

3588

1    3025?

2            Ms. Pletcher?

3            *MS. PLETCHER:*  We disagree with the government's

4    characterization of the contents of this e-mail, but we do not

5    object other than the objections I already stated to the *James*

6    log.

7            *THE COURT:*  Yes, certainly.

8            Anyone else?

9            All right.  Exhibit 3025 will be admitted.

10            Go ahead, Mr. Koenig.

11            *MR. KOENIG:*  The next one I think we already covered.

12    It's 1144 and that's the different iteration of, "Are you

13    trying to get me fired before I even move here" e-mail.  So I

14    think --

15            *MR. GILLEN:*  Your Honor, that was earlier this morning

16    the Court allowed this in with a little bit more above it at

17    9703.

18            *THE COURT:*  Yeah, I remembered that some of the same

19    language was there.  Okay.  Thank you.

20            9703 was it, Mr. Gillen?

21            *MR. GILLEN:*  Yes, Your Honor, 9703.

22            *THE COURT:*  Okay.

23            *MR. KOENIG:*  So we won't move to offer.

24            *THE COURT:*  That's withdrawn, then.

25            *MR. KOENIG:*  If I could just skip over the 6300 series

1    because those all kind of go together and come back to those.

2    I think it will just be more efficient.  1035, 1036, 1036-1 and

3    1036-2 I believe we have already covered.  Those were the ones

4    with the hidden rows or hidden columns in the Excel

5    spreadsheet.

6            THE COURT:  We may have had several of those, but

7    today that we looked at?

8            MR. KOENIG:  I think it was previously.

9            MS. CALL:  They are all subject to ruling, so we can

10   skip over 1035 and 1036.

11           THE COURT:  Okay.  And not come back to them?

12           MR. KOENIG:  219.

13           THE COURT:  All right.

14           MR. KOENIG:  219 was *James* log entry 315 ruled upon

15   favorably.  I don't have a copy in front of me, but I think

16   it's Jimmie Little --

17           THE COURT:  It's on the screen now.

18           MR. KOENIG:  It's Jimmie Little reporting to two

19   co-conspirators, Robbie Bryant and Jason McGuire, on

20   competitors' FOB pricing.  So again I think the relevance speak

21   for itself.

22           THE COURT:  Any objection to the admission of

23   Exhibit 219?

24           MR. BYRNE:  No objection.

25           THE COURT:  Exhibit 219 will be admitted.

3590

1              MR. KOENIG:  Then there is 9026 and its attachment

2    9718 which is the native.  I e-mailed defendants over the lunch

3    hour.  We just -- we haven't -- we created a PDF printout of

4    the native 9718 and marked it as 9718-1.  May I hand it up

5    through Ms. Grimm?

6              THE COURT:  You may.

7              MR. KOENIG:  The cover e-mail 9026 was not on the

8    James log, but we would offer it as against Mr. Lovette under

9    801(d)(2)(A).

10             THE COURT:  Objections to that series?

11             Mr. Fagg, go ahead.

12             MR. FAGG:  Sure, Your Honor.  So we would note that

13   this is outside of the charged conspiracy.  This is an e-mail

14   between -- at least at the top is Mr. Lovette to Mr. Sandri who

15   is the CFO, the current CEO of Pilgrim's, but the time period

16   November 16, 2011 is outside the charged conspiracy.

17             Also if you look at the attachment, what this is

18   talking about is pricing for the period 12 in 2011, if you look

19   at the top.  What it says is that it's effective October 30th

20   to November 26, 2011.  And so Your Honor, we would object to

21   this e-mail, this document on relevance grounds, and we are

22   talking about period pricing that predates the charged

23   conspiracy.

24             MS. PLETCHER:  Your Honor, I would add that this

25   document is not on the James log, that it essentially involves

1    the transmission of hearsay statement from Ms. Stacey Crump,

2    and that Mr. Penn forwards it on to Mr. Lovette without making

3    any statement at all.  So there is hearsay embedded in here

4    that I object to as well.

5         THE COURT:  Mr. Koenig, go ahead.

6         MR. KOENIG:  Sure.  It was not on the James log.  It's

7    not necessarily offered in furtherance of the conspiracy, which

8    it doesn't need to be to be admissible under 801(d)(2)(A).

9    It's simply that Mr. Lovette thought that this was profitable

10   at this -- the prices were profitable at this level.  And

11   that's very relevant, especially given that, you know, over the

12   course of the next couple years he was complaining about the

13   profitability.  So I think it's clearly relevant for that

14   point.

15        Also even if this was 801(d)(2)(E), Your Honor did

16   rule as we pointed out -- I think Ms. Call pointed out -- that

17   they had joined as of August 2011, so it falls well within that

18   time period.  And then I do have to make a correction to the

19   exhibit numbers, but we can maybe hold off on that.

20        THE COURT:  On a different exhibit?

21        MR. KOENIG:  No, it's on this one.  So this one is a

22   little different that the first page is like that place holder

23   sheet which indicates -- I don't think that's up on the screen,

24   but the first page is the place holder sheet indicative of

25   native Excel.  But then I didn't look and see that there are

3592

1    more pages beyond that, Pages 2 through 6 that are actually

2    PDFs of what the native is.  So I don't think we need 9718-1.

3    I think 9718 is a hybrid native PDF version.

4        THE COURT:  And you would be offering both through

5    9718?

6        MR. KOENIG:  Yeah.

7        THE COURT:  Okay.  I am going to overrule the

8    objections, admit it only against Mr. Lovette and admit 9026

9    and 9718, both the native and the printout.

10        MR. FAGG:  Your Honor just one point of clarification

11   on that.  So I just wasn't tracking with Mr. Koenig where he

12   was talking about how it was a multi-page document.  And I

13   apologize, I just can't see the screen.  As it relates to I

14   think 9718?  I have the one page, what I believe is the first

15   substantive page which talks about period pricing.  I don't

16   know what the other pages are.

17        THE COURT:  If you may recall, Mr. Fagg, although you

18   may have been gone that day, but there have been some exhibits

19   that are in native but they have some -- they have pages that I

20   think are not the native as well.  Maybe I am not explaining

21   that too well.

22        MR. FAGG:  I do understand that.  My point is that I

23   think what the government handed us this afternoon was a

24   one-page document, and I am just trying to figure out what are

25   the other pages.  I don't know if I would have an objection to

3593

1    those other pages.

2         *MR. KOENIG:*  The other pages are just other tabs of

3    the spreadsheet.  I don't think they are of any particular use.

4    If you want, if Your Honor would like, we could just have the

5    -1 exhibit and not have the other one which --

6         *THE COURT:*  And dispense with --

7         *MR. KOENIG:*  9718.

8         *THE COURT:*  I think that's infinitely better for the

9    jury because otherwise they are going to be getting -- and also

10   it will be very complicated once we get to making sure what

11   goes back to the jury is accurate.  Once we start sending back

12   native files, it's going to be very logistically complicated

13   and require very careful attention and be time consuming.

14        And despite the fact that I've warned all of you that

15   the jury is not likely to wade through all these documents

16   during their deliberations, nonetheless, my guess is when you

17   tell the jury that the exhibits are coming back, it's kind of

18   like they are waiting for their dinner to come.  People are

19   just like, when is it coming?  Even though when it comes, they

20   may be like, you know, fall over.  But still you don't want to

21   have -- if we can get those exhibits back to the jury more

22   quickly, then they won't worry about it as much.  And the

23   natives are going to be a little bit complicated, I think.

24        *MR. KOENIG:*  So the government then would be

25   withdrawing 9718, substituting 9718-1 as the relevant portion

3594

1    of the attachment to 9026.

2          THE COURT:  Okay.

3          MR. FAGG:  So Your Honor, again, I am sorry, I am

4    trying to look at this on the screen on the fly, but I think we

5    would object to 9718-1 to the extent that it is only part of

6    the attachment that Mr. Lovette sent on.  To the extent the

7    attachment is going to be included, we think the entire

8    attachment should be included.

9          I don't think that this is a particular example where

10   we are talking about hundreds of pages.  We are not even

11   talking about 10 pages.  I think, if I understood Mr. Koenig

12   correctly, it's a six-page document which is not dissimilar

13   from a number of other attachments that have already been

14   admitted.  And we would ask that whatever the version is here

15   that's being displayed on the right-hand side of the screen,

16   that that be provided as well.

17         THE COURT:  Mr. Koenig, is it a six-page?

18         MR. KOENIG:  It is the place holder sheet and there

19   is, I think, five tabs to the a spreadsheet and the subsequent

20   pages are the PDF versions of those tabs.  So if we want the

21   whole thing in, then we could also scrap 9718-1 and go back to

22   9718 but without the native.

23         MR. FAGG:  No objection other than those already

24   stated that you ruled on.

25         THE COURT:  9718 will be that portion consisting of

1   the PDFs, but not the native Excel spreadsheet.  I am not

2   telling you what to do.  I am just saying is that acceptable to

3   the government?

4           MR. KOENIG:  Yes.

5           THE COURT:  Okay.  Are we now going back?

6           MR. KOENIG:  Sure.  And the reason I skipped those is

7   because they are all the same and they are -- they are not the

8   same, but they are similar and they are these Ric Blake's

9   spreadsheets of pricing information spanning a number of years.

10  And one of them has already been admitted as Government

11  Exhibit 6089.  They are all the same -- or again I mean same

12  loosely -- they are all of the same nature.  And so we would

13  move them all into evidence.

14          THE COURT:  Do you mind pulling up 6089?

15          MR. KOENIG:  Now I think we have it displayed.

16          THE COURT:  You say it's been admitted?

17          MR. KOENIG:  Yes.

18          MS. CALL:  I believe it was subject to one of our

19  prior hearings and it was deemed admissible.  It has not yet

20  been offered.

21          MR. KOENIG:  6088 is the cover e-mail.  I am sorry, I

22  misspoke.

23          THE COURT:  So these are being offered as a group

24  because of their similar nature.

25          Mr. Pollack, go ahead.

3596

1           *MR. POLLAK:*  Thank you, Your Honor.

2           I do think they need to be considered individually

3     even though they are in some ways similar, in other ways

4     identical.  There are two problems with them.  One, some of

5     them on their face, there is no reason to affiliate them with

6     Mr. Blake.  We don't have a cover e-mail.  We don't have

7     metadata that has been shared.  We just know that it's a

8     spreadsheet.

9           In other cases whether or not it's affiliated with

10    Mr. Blake, it's simply cumulative.  For example, if you look at

11    6210, which I think is the first of the government's exhibits

12    in this vein, 6120 is simply a spreadsheet.  There is not a

13    cover e-mail affiliated with it or metadata showing who created

14    it.  But if you look at 6089 and you go to the Popeye's 2009

15    tab on 6089, you will see that it is identical to the first

16    page of 6120 which says Popeye's.

17          And if you look at the Church's 2009 page of 6120, you

18    will find it identical to the 2009 Church's page, et cetera.

19    In other words, 6120 is simply the 2009 tabs from 6089, so they

20    are already going to be in evidence in 6089.  It's entirely

21    duplicative.  The only difference is for 6089, we know that

22    Mr. Blake e-mailed it to Mr. Keck in 2016, whereas for 6120

23    there is no action affiliated with Mr. Blake, much less any

24    particular time frame affiliated with Mr. Blake.

25          *THE COURT:*  Okay.  As one example.  So why don't we

1    take that issue up.  And then, Mr. Pollack, you may have some

2    more.  We will take those up in just a minute.

3            Mr. Koenig, as to Mr. Pollack's argument?

4            MR. KOENIG:  Well, I haven't done the side-by-side

5    comparison, but if I could back up my previous statement that

6    it had been admitted, what I meant was admissible.  And that

7    was *James* log 228, so it would be 801(d)(2)(E).  But again --

8            MR. POLLAK:  What is, 6089 is or 6120 is?

9            MR. KOENIG:  6088 and 6089 were the *James* log entry

10   228.

11           THE COURT:  Okay.  Sorry, go ahead, Mr. Koenig.

12           MR. KOENIG:  So as with Mr. Austin's spreadsheets of

13   prices and so forth, it's clearly relevant.  The fact that

14   there is not a cover e-mail -- you know, I think that these

15   are -- there is sufficient indicia, especially because the

16   metadata which we could offer as an exhibit, I suppose, the

17   metadata shows that Mr. Blake modified the exhibit.  And I

18   think we are talking about here 6120; is that right?

19           THE COURT:  Yes, that's what Mr. Pollack was talking

20   about.  I think part of Mr. Pollack's point was that the

21   association with Mr. Blake for 6120 can only refer back to

22   6089, but I am not sure if 6089 essentially incorporates 6120.

23           MR. POLLAK:  It does.  First of all, Your Honor, let

24   me be clear.  I am not asking the Court to revisit its ruling

25   as to the admissibility of 6089.  What I am saying is that

3598

1    given 6089 is being admitted, 6120 is entirely duplicative of

2    the information in 6089.  You simply would be admitting the

3    exact same information twice in two different exhibits, but

4    this exhibit unlike the other exhibit, at least to date, the

5    government hasn't established any relationship between this

6    exhibit and Mr. Blake other than 6089.  So there is just no

7    additional value to this exhibit if we are already admitting

8    6089.

9              THE COURT:  Right.

10             MR. KOENIG:  If I may?

11             THE COURT:  Sure.

12             MR. KOENIG:  So the metadata thing I mentioned was

13   6088, 6089, not the 6120.  But I don't know -- I take counsel's

14   representation that there might be some duplication, but the

15   duplication itself speaks to the association with Mr. Blake.

16   And we would have to go through it, and I apologize for not

17   having done that in advance.  I didn't think they were

18   duplicates or one was a subset of the other.  If Your Honor

19   would like, we could essentially table the issue while we, you

20   know --

21             THE COURT:  While we take a break, the afternoon

22   break?

23             MR. KOENIG:  Well, I think it's about that time.

24             THE COURT:  Yeah.  In fact, it's past that time.  I

25   apologize.  Let's do that.  Let's hold the argument,

1    Mr. Pollack, and let's have the government have a chance over

2    the break to take a look at that issue.  Why don't we plan on

3    taking 15 minutes and plan on reconvening 20 minutes of 4:00.

4    Thank you.

5          (Recess at 3:23 p.m.)

6          (Reconvened at 3:42 p.m.)

7          THE COURT:  Mr. Koenig, did you have a chance to look

8    at that?

9          MR. KOENIG:  Yes, Your Honor.  And, you know,

10   obviously these are large spreadsheets, so the duplication

11   issue, I want to address both things, duplication and then also

12   connection to Mr. Blake.  But what I would respectfully suggest

13   is for the ones that are associated with Ric Blake either

14   through a cover e-mail or a metadata that's in the Excel

15   spreadsheet itself, we could have perhaps asked for

16   admissibility rulings, and then it would give us a chance to

17   look at the substance and then not offer ones that are

18   duplicative of other ones we've offered.

19         And I think all --

20         THE COURT:  I am not sure.  Mr. Pollack, did you find

21   duplication in any of the other ones that were part of this

22   so-called series?

23         MR. POLLAK:  Yes, Your Honor.  I think it is one

24   spreadsheet that is added to -- you have got 2009, 2010.  So

25   they put in one from 2016 that goes all the way back to 2009.

1    And the Court held that because it was a single spreadsheet

2    even though it went back prior to the period of the alleged

3    conspiracy, you were going to allow in the entirety of the

4    spreadsheet.  But now what the government is trying to do is

5    piecemeal put in each subset of the same spreadsheet

6    separately.

7          MR. KOENIG:  That's not really what I was suggesting.

8    What I was suggesting is that I think all these things are

9    admissible.  And we would seek a ruling that they are

10   admissible, but then not offer anything that's duplicative.

11         Now, I don't think we -- maybe what counsel was

12   getting at was that, you know, it's a big huge spreadsheet.  It

13   has everything.  You know, why do they need the individual

14   ones?  Although I think for ease of presentation to the jury,

15   not having the big historical cumulative one for the jury would

16   actually make it easier.  But I don't see any prejudice putting

17   in, you know, a smaller spreadsheet when we could have put in a

18   bigger spreadsheet that contains that information and more.

19         THE COURT:  Well, let me ask this.  Is 6089 the

20   master?  Is that the big spreadsheet?

21         MR. KOENIG:  I think it is.  I think it is.

22         THE COURT:  Okay.  And then the rest in this series

23   are portions of that.

24         MR. KOENIG:  I believe that to be the case.  I do,

25   yes.

3601

1          THE COURT:  Okay.  Right.  So we -- are you going to

2    offer 6089?

3          MR. KOENIG:  We had planned on it, although Ms. Call

4    just informed me that it may not be the master because there is

5    one that's from 2018.  So my understanding is that the one we

6    were just talking about, 6089, goes from 2009 to 2016.

7          THE COURT:  Okay.  There may be some in the rest of

8    the so-called series that are more recent and therefore not

9    derivative of 6089.

10         MR. KOENIG:  Right.  We would also just as a side note

11   withdraw 6325.  That one we were not able to establish a

12   connection to Ric Blake, just to Darrell Keck.

13         THE COURT:  Okay.  Let me hear from Mr. Pollack or

14   Ms. Johnson as to whether there are some other issues even if

15   we assume that many of these are subsets of 6089.

16         MR. POLLAK:  Well, Your Honor, it's very difficult for

17   me to do this in a vacuum.  And I kind of hear the government

18   asking the Court to give an advisory opinion about exhibits

19   that I am not sure what we are talking about.  I don't know

20   which one he is talking about that's the 2018.  I don't know

21   how that compares, whether that itself includes everything

22   that's in 6089.

23         I have no objection if the government wants to reserve

24   on this and take some time to look at them again and sort of

25   figure out what they actually are before trying to get a ruling

1    on admissibility and figure out what's duplicative and what's

2    not.  I have no objection to that.  But I am not really sure

3    how the Court makes a ruling at this point based on the proffer

4    that's been made at this point.

5              THE COURT:  Mr. Koenig?

6              MR. KOENIG:  And I apologize.  I did not realize that

7    there was the duplication issue that Mr. Pollack has raised.

8    So if that is something that the Court would allow us to come

9    back and just -- I think it could be very quickly resolved.  In

10   fact, we could probably work with Mr. Pollack to reach a

11   resolution on this and not use the Court's time going through

12   each and every single one of them.

13             THE COURT:  Does that sound like it might be

14   productive, Mr. Pollack?

15             MR. POLLAK:  Yes, Your Honor.  I think if the

16   government wants to reserve, I am certainly happy to talk to

17   them and see if we can reach some agreement.

18             THE COURT:  Okay.  Well, the reason I think that that

19   could be good as opposed to working through it today is because

20   we still have our summary exhibits, and I would very much like

21   to make progress on that front.  Okay.  So would that then

22   conclude the list with the exception of our one exhibit --

23   well, maybe there are two, but for instance, 9057 where some

24   supplemental briefing will be tendered?

25             I will say on 9057, in my ruling on 404(b), Docket No.

1    692, I believe, that particular exhibit was addressed.  And so

2    I think that the government had identified it as -- thought it

3    was intrinsic, but in the event that it wasn't it would be

4    404(b).  I found that it was intrinsic.  I wanted to call that

5    to your attention.

6         Mr. Koenig, are we ready to move on to summary

7    exhibits?

8         MR. KOENIG:  We will pass it off to Ms. Call, if

9    that's okay.

10         THE COURT:  Ms. Call, go ahead.

11         MS. CALL:  The notebook contains the summaries that we

12   discussed, and these are the same ones that defense counsel

13   have that I noted were provided via e-mail yesterday.  I

14   suppose I am wondering perhaps what the best use of this time

15   is.  We are offering the summaries under a witness and with the

16   slight changes to the form, and I am happy to note that these

17   are the same as the ones that have been briefed multiple times

18   and ruled on twice by Your Honor.

19         I will note the probably most significant change to

20   the form is to the summaries that are -- I will hit 90-10 in a

21   moment, but what I will start referring to as the multi-color

22   summaries, so those are contained in Tabs 1 through 19 of Your

23   Honor's binder.  The change to the form that has occurred is

24   because the parties have been able to reach a stipulation with

25   respect to individuals associated with phone numbers and

3604

1    employers of those same individuals, many of the kind of

2    additional sources that had been reflected in the exhibit

3    number column are removed.

4           So for the most part at this point the sources are now

5    just the e-mail or the phone call or the text message that is

6    being excerpted in the excerpt column.  But aside from that,

7    not much of the substance or the volume of the underlying

8    materials being those that are actually being excerpted has

9    changed.

10          I will note per our discussion on the record several

11   days ago, I believe there are a couple citations to testimony.

12   And the charts had not previously done that.  One is I believe

13   perhaps that February 3rd, 2017 bid deadline.  There would be

14   one other one which is a change which we believe makes these

15   charts more accurate and understandable for the jury is

16   Pilgrim's produced documents have now been converted to.

17   Eastern, and there is a citation to Mr. King's testimony there.

18   And that simply there were a number of instances where things

19   appeared out of order when they just weren't.  So the times are

20   a little more understandable now.

21          THE COURT:  Ms. Henry?

22          MS. HENRY:  I just want to be certain we are all

23   working off the same draft, that's all.  Does everybody still

24   have -- are you talking about the draft that was circulated

25   last night?

1           *MS. CALL:*  Yes.

2           *MS. HENRY:*  And that's the one everybody has.

3           *MS. CALL:*  Yes.

4           *THE COURT:*  Okay.  And then how do the defendants

5   think it would be the most efficient and logical way to move

6   through these?

7           Ms. LaBranche?

8           *MS. LaBRANCHE:*  Can I actually approach the podium for

9   a second?

10          *THE COURT:*  Yes.

11          *MS. LaBRANCHE:*  So Your Honor, I think the most

12  logical and efficient way to do this is going to be to go

13  through each of the exhibits one by one.  But I did just want

14  to have a little bit of a conversation with the Court before we

15  did that so the Court would understand what our concerns were

16  as we walked through each exhibit.

17          So the government just talked about how there have

18  been two motions filed and ruled on and that's correct.  If the

19  Court recalls, there was a motion filed before trial which is

20  Docket 715.  That was filed on October 22nd where the

21  defendants tried to exclude all the summary exhibits.  On

22  10/27 when we were just a few days into trial, the Court ruled

23  against the defendants on that as it relates to these charges

24  1-1 through -- sounds like 1-19 in your book.

25          At the time the Court issued its order at 741, the

3606

1    exhibits were labeled differently.  But essentially what the

2    Court said in that order was that the exhibits that summarized

3    voluminous records, such as toll records, in a straightforward

4    and non-argumentative way were admissible as were summary

5    exhibits that the government intended to offer through a fact

6    witness with personal knowledge, but that exhibits would be

7    inadmissible if they didn't summarize voluminous materials or

8    they were presented in an argumentative way.

9        So after that ruling, you know, court proceeds.  And

10   on -- let me make sure I have the right date -- on October 31st

11   in Docket No. 760 the defendants moved to exclude newly

12   identified summaries.  So what the government did is they

13   essentially took A-4, which was their original, and so it looks

14   like the Court knows what I am talking about.  We objected on

15   those grounds.  And the Court deemed that to be a motion for

16   reconsideration because it was really just that big long

17   exhibit broken out.

18       So the next thing that happened was that on

19   November 3rd the defendants -- I don't know if the Court

20   recalls, but there was an exchange on the record about agents

21   testifying and how we were going to be using these summary

22   charts.  Following court the defendants filed a joint objection

23   to the way that the government had proposed to bring the

24   testimony in about the summary charts.

25       At that point in time everyone was anticipating that

3607

1    it was going to be through the agents.  Now we know that it's

2    going to be through a paralegal.  But in its response to that

3    motion, the government laid out how it anticipated having the

4    agents up on the stand, having them highlight certain things,

5    having them direct to certain exhibits.

6         And the Court then came back on the record the next

7    day and talked to the government about how there was a

8    difference between on one hand a fact witness with personal

9    knowledge who could highlight portions of a document or who

10   could testify about a connection between two different

11   documents and having an agent who really doesn't have any

12   personal knowledge get up and read stuff to the jury.  And Your

13   Honor said that was basically akin to more of a closing

14   argument.

15        So that's really the concern we still have.  And I

16   think that we should walk through the exhibits one by one, but

17   I think we would all benefit from hearing how it is that the

18   government anticipates presenting these summary charts through

19   their paralegal because I get it's not an agent now, but she

20   doesn't have personal knowledge of this either.  So I think if

21   we had an idea of what that process is going to look like, we

22   would have a better idea of what objections we would be making

23   to the exhibits.

24             THE COURT:  Okay.  Thank you, Ms. LaBranche.

25             Ms. Call, it sounds like -- will the summaries be

3608

1    admitted through the witness, is it Ms. Evans?

2         MS. CALL:  Yes, Ms. Evans.

3         THE COURT:  So that's correct.  How do you envision it

4    would take place?

5         MS. CALL:  Yes, Your Honor.  I imagine she would

6    essentially testify to her review process, reviewing these

7    charts for accuracy.  And in terms of actually then presenting

8    them, I don't think it would be much more than showing the

9    charts, perhaps, you know, walking through the time line.  Did

10   you review phone calls on X date?  But I don't know that it

11   would be anything much more than that.

12        THE COURT:  And if she were asked about reviewing a

13   phone call on a particular date, why would she be doing that,

14   to double-check the accuracy of the summary exhibit?

15        MS. CALL:  Yes.

16        THE COURT:  But it's not as if she were performing

17   some sort of investigation and independently decided that

18   something was of significance and now here it is, anything of

19   that nature, correct?

20        MS. CALL:  Correct.

21        THE COURT:  All right.  And then -- okay.  Well, why

22   don't we just go through them one by one, then, if that's the

23   suggestion.  And I'm not sure that there is anything more that,

24   Ms. Call, you need to do, but you can respond.  We'll see.

25   Ms. LaBranche or whoever else wants to go, why don't we take up

1  1-1.

2          MS. LaBRANCHE:  Thank you.

3          MS. CALL:  I presume that the purpose of this is to

4  discuss any legal issues because, of course, accuracy would be

5  the purpose of cross-examination of the witness.

6          MS. LaBRANCHE:  Your Honor, we aren't here to debate

7  accuracy at all.  I agree that would be part of cross.

8          THE COURT:  Okay.  Go ahead.

9          MS. LaBRANCHE:  All right.  So looking at Exhibit 1-1,

10  if I understand what the government is saying, they are going

11  to put their paralegal on the stand, have her verify what are

12  the sections in -- I am going to call it orange on this chart.

13  But as the Court will see, all the sections in green aren't

14  toll records.  They are e-mails or they are texts.

15          And here is frankly my concern with this.  So No. 1,

16  this is taking these documents and putting them into a time

17  line where they are asking for inferences to be made.  The

18  government is asking for the jury to infer that these orange

19  phone calls interspersed between these exhibits somehow relate

20  to the exhibits.  I think that is argumentative.

21          And this is again not a witness who has personal

22  knowledge who can put this into context.  This is highlighting

23  things that the government obviously thinks is important and

24  that they want the jury to infer as being talked about on the

25  orange calls.  So that's part of my concern.

1          And frankly Your Honor, the other part of the concern

2    is as you look at 1-1, you will see there is four exhibits

3    total there, 108, 109, 114 and 120.  All four of those exhibits

4    were moved in without a witness, were published to the jury on

5    November 17th.  I would object to them being published again in

6    this format in this chart with this witness who has no personal

7    knowledge.

8          THE COURT:  Okay.  Anyone else?

9          All right.  Those will be overruled.  I have already

10   ruled on this issue and I don't find any basis for

11   reconsideration.

12         Next?

13         MR. BELLER:  Your Honor, if I may, I think the Court

14   ruled a bit quicker than what defense counsel -- I think you

15   had multiple counsel stand up.

16         THE COURT:  I didn't see it.  Ms. Henry, go ahead.

17         MS. HENRY:  Your Honor, when you had ruled, the

18   government has certainly the ability to decide when and how

19   they wish to present their evidence.  They did make that choice

20   yesterday when they spent a long time having the jury read each

21   and every one of these documents in full.  So this is not a

22   situation where we looked at it earlier where the question was

23   taking a document and presenting it to the jury in the summary

24   form because that made sense because there were a lot of

25   documents.

1          So here they have made a conscious choice to spend the

2    time so have the jury go through and read each and every one of

3    these documents.  At this point the cumulative aspect of having

4    them go through the documents again is unwarranted, and then

5    there is the issue of it really becomes a situation of

6    argumentative issues.

7          I also would point out it was Mr. Torzilli in the

8    testimony earlier who objected when there was a possibility of

9    putting two exhibits -- the defense were going to put two

10   exhibits up on the monitor side by side for the jury, and he

11   objected on the basis that that was argumentative.  And Your

12   Honor relied on that objection and sustained the objection.  So

13   we really do see this as different from just a reconsideration

14   issue.  The facts have changed.  How they are putting in their

15   evidence has changed.

16          *THE COURT:*  Mr. Torzilli, real brief.  Go ahead.

17          *MR. TORZILLI:*  I don't recall ever making an objection

18   like that.  I do recall yesterday during the Joe Brink

19   testimony when there were two documents up side by side

20   objecting to their admission into evidence on hearsay grounds,

21   which I think Your Honor refused both of those, but I don't

22   remember making an argumentative point.

23          *THE COURT:*  I don't recall what Ms. Henry mentioned

24   either, not that it didn't happen.  I just don't recall it.

25          Mr. Tubach?

1          MR. TUBACH:  Your Honor, the only thing I would say is

2     if the Court is treating this as a motion for reconsideration,

3     but I think our argument is really different from what the

4     Court had ruled on previously because at the time the Court

5     ruled previously, none of these documents had been admitted and

6     published to the jury.  Having been published to the jury

7     already and having spent the time have the jury read these

8     documents, these summary charts are pure argument.  And there

9     is no basis for them to be admitted into evidence and sent back

10    to the jury room.

11         It's taking snippets of documents and asking them to

12    draw inferences, especially on 1-1 where all of the underlying

13    exhibits have already been admitted into evidence.  And the

14    Court had not previously ruled that that was a proper basis

15    upon creating summary charts that have already been admitted.

16    By definition they can't be 1006 if they've been published to

17    the jury.  They can't be voluminous because the jury has

18    already seen them.  And we know 1-1 can't be voluminous because

19    there is only four of them.  So if the Court is ruling on the

20    basis that it's a motion for reconsideration, we would ask the

21    Court not to do that, but rather treat our arguments on the

22    merits.

23         THE COURT:  Mr. Byrne?

24         MR. BYRNE:  Your Honor, to follow up on Mr. Tubach's

25    argument, when you ruled previously there were a lot more

1    exhibits on this and now there are a lot fewer.  So I would

2    reiterate it's not a 1001 summary of voluminous records.  We

3    have a fewer number of exhibits that have already been

4    published to the jury.

5             THE COURT:  Mr. Beller?

6             MR. BELLER:  Thank you, Your Honor.  In addition to

7    what my colleagues have argued, my concern is that all of the

8    exhibits with the one exception of the telephone calls are

9    subject to the Court's limiting instructions.  And while we

10   have raised concerns in the past to the number of limiting

11   instructions and the idea that a jury, while the case law says

12   that juries are presumed to be reasonably able to manage the

13   Court's limiting instructions, in this particular case we are

14   taking certain evidence that was admitted for very limited

15   purposes in some cases or very specific reasons in other cases.

16   We are now causing them to be cumulative by now not putting

17   them on a -- simply a demonstrative, but actually on a 1006

18   summary, and we are now giving them to the jury with an

19   asterisk at the bottom that says per judge's limiting

20   instruction or per judge's instruction.

21             Your Honor, in some cases not only have these been

22   admitted for a limited purpose, but they have also been limited

23   to only be against a specific defendant.  And so that is the

24   reason why on behalf of Mr. Fries and I think joined by the

25   others, we are not particularly on paper on virtually any

3614

1    document certainly and very few of the summary exhibits.  And

2    all of this is being admitted against my client despite the

3    fact that much of this evidence is only admissible as to

4    certain defendants.  And I don't believe that that's clear on

5    this document nor do I believe that the jury is going to be

6    able to reasonably be expected to follow the Court's earlier

7    limiting instructions when it's presented to the jury in this

8    format.

9          Certainly I have no problems other than the objections

10   that have already been made on toll records.  Toll records

11   obviously fall within 1006, but the rest of this evidence does

12   not fall under 1006 and does not comport with the Court's

13   limiting instructions.

14         *THE COURT:*  Mr. Gillen?

15         *MR. GILLEN:*   We would argue that 1006 is not for

16   summary exhibit of documents that have been admitted.  1006 is

17   for voluminous documents that otherwise would be admissible

18   that are not admitted, and that's why you have a summary

19   exhibit that is entered into evidence.  So under 1006 it is our

20   view that admitted documents cannot be summarized and

21   highlighted, if you will, which is really what they are doing

22   is highlighting it.

23         Rather, if it were to be under -- a demonstrative

24   under 611, then it still has the problems that counsel has

25   articulated about limiting instructions, the morass that would

3615

1    cover.  Because if this goes back out to the jury, we cannot

2    expect a jury to then understand and remember all the limiting

3    instructions.  They are simply going to take whatever excerpts

4    have been highlighted by the government and rely on them.

5         And to give you an example of how this particular

6    exhibit could be, I would reference the -- on 1-1 the portion

7    down here at the bottom, Brian Roberts, "I want to discuss this

8    before we submit.  I want to understand what the storage

9    expectation is."

10        The government has taken a sliver from his e-mail and

11   did not include what Mr. Roberts was really interested in which

12   is in 114 where he goes on to say, "Is this a cut, freeze and

13   ship deal and then the distributor stores in frozen state or

14   are we going to have it longer than a month frozen?"  That's

15   what Mr. Roberts was really interested in.

16        But the government took that out.  And that just shows

17   you the kind of dangerous ground that we plow when we allow

18   these documents first to be published to the jury, which they

19   have been published already, read and paused over so that they

20   can absorb it.  And then now they summarize it in their own

21   vision of the world and yet leave out the important part of

22   what Mr. Roberts was really interested in.

23        That example regarding what they did with Mr. Roberts'

24   e-mail is a perfect e-mail of the dangers of allowing as an

25   exhibit this sort of chart to go out over documents that have

3616

1    already been admitted and have been published.  So we would ask

2    the Court -- that is our view on 1-1.

3              THE COURT:  Are you done, Mr. Gillen?

4              MR. GILLEN:  Yes, Your Honor.

5              THE COURT:  Ms. Henry, go ahead.

6              MS. HENRY:  Another point, and I think Mr. Beller

7    started to make this, where there are limiting instructions on

8    this document they have put asterisks.  To give some idea of

9    the confusion that is created by this, I didn't understand that

10   per judge's instruction meant per judge's limiting instruction

11   even.  It's not clear at all.  And there is certainly no way

12   that when the jury sees it on here they are going to be able to

13   understand what was the limiting instruction with regard to

14   that particular document.

15             In fact, the per judge's instruction is actually on

16   this document looking like it is an endorsement of the

17   document, and that is the most logical way in which it will be

18   read by the jury.  And we find that that is extraordinarily

19   prejudicial to the defendants.

20             THE COURT:  Mr. McLoughlin?

21             MR. McLOUGHLIN:  Your Honor, just very few specifics.

22   So first, with respect to 1006, if that's what this is, as Your

23   Honor is aware, the advisory committee notes say that the

24   admission of such summaries must offer, quote, offer the only

25   practicable means of making the contents available to judge and

3617

1    jury.  That is what the predicate is for 1006.  Obviously, if

2    we are only talking about five exhibits, that doesn't fit.

3          They also make reference to Mr. King testimony without

4    reference to what that testimony is.  But I would respectfully

5    submit that testimony, which the Court has heard, is not an

6    appropriate element of a Rule 1006 or even a 611 chart.  What

7    is specific about this is there are five exhibits referenced.

8    Four of those exhibits are subject to limiting instructions

9    which means they are not admissible against Mr. Lovette or as

10   to Mr. Lovette.

11         This chart, of course, is offered by the government

12   against Mr. Lovette.  The one document that is not subject to a

13   limiting instruction is a telephone record.  It is simply a

14   telephone bill.  The prejudice and confusion with respect to

15   Mr. Lovette for this chart with four of the five documents that

16   are the basis not applicable to him is, I think, apparent.

17   Thank you.

18         THE COURT:  Thank you, Mr. McLoughlin.

19         Mr. Beller?

20         MR. BELLER:  Last for me, Your Honor, but for purposes

21   of I think explanation of limiting instruction, Your Honor,

22   Exhibits 109, which is the first three entries is admissible

23   only against Mr. Little based on the Court's order.

24   Specifically Mr. Bradley's statements are admissible for effect

25   on the listener.  The next exhibit, 120, was introduced only

3618

1    for effect on the listener.  120 again is cited.  108 was

2    admissible only as against Mr. Little.  And 114 was admissible

3    only for effect on the listener.  So I would note that and in

4    hindsight realized that as the Court advised the jury of these

5    limiting instructions, while the Court did advise the jury that

6    it was effect on the listener, we never actually told the jury

7    who the listener is and why it would only be an effect on that

8    particular person.

9         And for this reason I guess I continue in my

10   objection, but I point this out only for the Court to

11   understand the concern that I have regarding the admissibility

12   of this particular document.  And, of course, there is many

13   others that we're going to be getting to, but since we are

14   starting with this one, with rare exception there is very

15   little evidence here that is admissible at least against my

16   client.

17        Thank you.

18        *THE COURT:*  Thank you, Mr. Beller.

19        Ms. Call?  Why don't we hear from Ms. Call, and then I

20   will take additional objections.

21        *MS. CALL:*  If there is one more, I am happy to sit

22   down.

23        *THE COURT:*  Well, we never know, but why don't we --

24   Ms. LaBranche, go ahead.

25        *MS. LaBRANCHE:*  Just very quickly, Your Honor.  I

3619

1    wasn't sure once I sat down that I completely made the point I

2    was trying to make, which is I don't think this should be

3    considered a motion for reconsideration either.  The reason I

4    went through the timing with the Court is because when I got

5    the government's summary exhibits last night, I went through

6    and looked at them to figure out when the pattern of just

7    putting chunks of documents in became apparent.

8            And my review of these summary exhibits, that really

9    started on the 8th.  That is days after we last raised this

10   issue with the Court.  And I think that the development of how

11   the evidence came in over time really does justify the Court

12   perhaps considering this not as a motion for reconsideration,

13   but based upon what the evidence is now.  We couldn't have

14   known it was going to come in like this.  Had we, maybe we

15   would have made this argument at that point in time, but we

16   didn't know that.  Frankly, at the end of the day on the 4th,

17   we were expecting the agents to take the stand the next day and

18   try to get a bunch of exhibits in.

19           THE COURT:  Right, but I don't understand the point

20   about how it would have come in.  I mean, if it came in through

21   the agent, the agent wasn't going to know anything anyway, so

22   why would that be a surprise?

23           MS. LaBRANCHE:  It's that we didn't realize there were

24   going to be a bunch of exhibits that came in with absolutely no

25   one to ask a single question about, and that's what ultimately

1    happened.

2          THE COURT:  I think that was the presumption all

3    along.  That's why there are lots of complaints about that.

4          Mr. Tubach?

5          MR. TUBACH:  Your Honor, I think part of what

6    Ms. LaBranche is saying is that in the prior order, the initial

7    order the Court entered regarding exhibits, one of the bases

8    for ruling as it did was that the agents would be available for

9    cross-examination.  The agents are presumably familiar with the

10   facts of the case.  I believe that's part of what Ms. LaBranche

11   was getting at.

12         And I guess I am also unclear whether this is being

13   offered as substantive evidence as 1006 to go back to the jury

14   or is it a demonstrative under 611 not to go back to the jury?

15         THE COURT:  I think the presumption has been all along

16   that it has been a substantive exhibit, but Ms. Call can

17   correct me if I'm wrong.

18         MS. CALL:  Yes, Your Honor.  I guess to address that

19   first, as we have briefed and the Court has found, there is a

20   kind of hybrid summary chart under both 1006 as well as Rule

21   611 that circuit courts have found may be admitted into

22   evidence and sent back to the jury as long as they are so

23   accurate that the accuracy isn't questionable and they can't go

24   back.  So it would be under both of those rules.

25         To address other points briefly, I think as an initial

3621

1    matter, I haven't heard any directive to any change in the law,

2    change in evidence or clear error that does justify

3    reconsideration under *Randall* and the 10th Circuit's

4    requirement for that.  That said, I do think there are some

5    things worth discussion that have been raised including how to

6    handle the limiting instructions.

7           What we have done here is just note instruction.  I

8    think it is fair and we are happy to add the word limiting.

9    And then if there is any additional guidance, I think perhaps

10   one thing that could be helpful, particularly for instructions

11   with respect to evidence admitted under 801(d)(2)(A), I believe

12   it may make sense for us to provide a separate sort of asterisk

13   or other indicator noting that that is only to be considered

14   with respect to an additional defendant.  Because I think there

15   is competing items here that I think it is important for that

16   evidence to be included in these summaries so that the jury can

17   still understand evidence in context even if parts of it are

18   only to be considered against one defendant, but I do

19   understand the concerns about those limiting instructions.

20          A point was made about summary charts permissibly

21   summarizing testimony.  And I believe this was already in Your

22   Honor's ruling, I am not sure if it was 781 or 741, but *United*

23   *States v. Renteria* in the 10th Circuit did specifically

24   contemplate summary charts including references to testimony.

25          On the agent point regarding cross-examination, I

1    believe all the law regarding 1006 simply states a requirement

2    that a preparer of the chart be available for cross-examination

3    in order for counsel to properly test the accuracy of the

4    chart.   Since there will be Ms. Evans who will be available for

5    cross-examination on that topic, I don't believe there is any

6    sort of issue regarding the ability of defendants to

7    cross-examine.

8             On the point about admission, and I think I already

9    noted it a bit with the hybrid 1006 and 611 chart point, but

10   second I will just note that the 10th Circuit pattern

11   instructions do specifically contemplate underlying evidence

12   being admitted as well, so there is no issue under the law with

13   the underlying evidence being admitted.   It can go either way.

14            *THE COURT:*  Under what?  Under 1006?

15            *MS. CALL:*  Even under 1006, yes.  There are some

16   circuits that I believe go otherwise.  I believe there might

17   be -- and I have somewhat become an expert on this issue I feel

18   in the last several weeks, but I know I believe under at least

19   this circuit's law, and I can go back to the briefing, but Your

20   Honor has previously considered it.  At least in the 10th

21   Circuit what matters is the evidence is admissible.  It can be

22   either admitted or not.

23            And that doesn't change the admissibility of the

24   summaries so long as under the test which the 10th Circuit

25   borrowed or took from the Fourth Circuit, *United States v.*

1    *Johnson*, they do consider the complexity of the trial and other

2    factors in determining whether a summary chart would assist the

3    jury in the understanding of the evidence, which I think is

4    clearly the case here with the amount of evidence, the amount

5    of defendants, the length of the trial, particularly now with

6    the number of hearings we've had on exhibits, the amount of

7    time that has spanned between the defendants -- the jury seeing

8    relevant evidence which may be days or even in some cases, I

9    think, weeks apart from relevant testimony, that seeing it all

10   in a time frame will be very helpful for their understanding of

11   evidence in context.

12          Let me see if there is anything I have not yet

13   addressed.  On just the slight points about some of these

14   exhibits being shown, you know, it wasn't actually the

15   government's intention to display all of them, but because of

16   the need to ensure that the jury did understand the limiting

17   instructions, Your Honor, I think the government agrees it was

18   proper to display some.

19          But not all of the exhibits in these charts and I

20   don't believe even the majority have been displayed to the

21   jury.  So I think there is still much that has not been seen

22   that would take significant amount more court time to display

23   those exhibits.  So I believe this summary fashion is really

24   the best way for an efficient use of the Court's time, but

25   really for the jury's understanding to help them see the

1    evidence in context.

2              THE COURT:  But to the extent that on any of these

3    summary exhibits there is a quote from a person, that exhibit

4    from which the quote is taken has been admitted.

5              MS. CALL:  Yes.  Well, by the time on Monday yes.  I

6    think we still have a number to admit.

7              THE COURT:  So here is what we are going to do on this

8    one.

9              Ms. Henry, go ahead.

10             MS. HENRY:  I just wanted to say that with regard to

11   this particular chart, I do believe that it would be clear

12   error to admit it against my client when there are -- when

13   really the bulk of the charts' excerpts have limiting

14   instructions that preclude them from being considered against

15   my client.

16             THE COURT:  Okay.  So I do agree that the one thing

17   that has changed in my opinion is that there have been limiting

18   instructions as to a number of them and those are important

19   limiting instructions.  And, you know, if this were even a

20   demonstrative or this was something being displayed during

21   closing, for instance, reminding the jury of those limitations

22   wouldn't be quite as important.

23             If it's coming in as substantive evidence, it is

24   important, because this is a piece of evidence the jury is

25   going to be looking at and I think properly has to know that it

1    is subject to a limiting instruction more than just the mere

2    asterisk, in particular in regard to certain exhibits that

3    cannot be considered against -- or can only be considered

4    against certain defendants, for instance, Exhibits 108 and 109.

5              So as a result, I will require the government to redo

6    1-1 in order to figure out the way to appropriately indicate

7    that those exhibits -- whatever exhibits are subject to

8    limiting instructions, what those are.  And then I will rule on

9    that once I have the ability to see that refashioned exhibit.

10             MS. CALL:  Would it be helpful for any exhibits to

11   which that applies if we submit them in a filing perhaps

12   tomorrow so you can see it ahead of Monday's testimony?

13             THE COURT:  Yes.

14             MS. CALL:  We will do that.

15             THE COURT:  Then let's shift over to 2-1.

16             Ms. LaBranche, go ahead.

17             MS. LaBRANCHE:  I'm assuming everyone is going to say

18   all the same objections.  I will note the four exhibits the

19   government seeks to show or that it relies on in 2-1 were both

20   published to the jury on November 17 without a witness and all

21   four are subject to limiting instructions also.

22             THE COURT:  I am sorry, which were the two that you

23   just referenced?

24             MS. LaBRANCHE:  2-1 is the summary exhibit, and all

25   four of those exhibits were shown to the jury without a witness

1   and had limiting instructions.

2          THE COURT:  Okay.  Understood.

3          And Ms. LaBranche, were the limiting instructions in

4   the nature of that certain portions of them could not be

5   considered for the truth or were some of them could not be

6   considered as against other defendants?

7          MS. LaBRANCHE:  Your Honor, honestly, I don't know.  I

8   will tell you I assume this is going to be a problem that comes

9   up on all of the charts, but because of the ruling we just got

10  today, while I have been doing objections, I haven't been

11  tracking all of the limiting instructions as well.

12         THE COURT:  We can obviously double-check them for

13  limiting instructions.

14         MR. BYRNE:  Your Honor, I think the answer to your

15  question, the answer is yes, I think there are limiting

16  instructions and they can all be used against certain people.

17  The only thing I would add is I agree with Ms. LaBranche that

18  this is going to come up with every single one of these

19  exhibits.  I also would just note that Ms. Call, actually her

20  argument made the argument that we've been worried about which

21  is this is basically going to be another closing argument

22  that's made through these summary charts versus a demonstrative

23  that doesn't go back to the jury.

24         THE COURT:  Mr. Fagg, go ahead.

25         MR. FAGG:  To follow up on the point from Mr. Byrne,

3627

1    so Exhibit 224, my understanding is that the Court ruled that

2    the statements of Sara Knust and Hannigan was not admitted for

3    the truth, but are admitted solely for the purpose of the

4    effect on the listener.  And then the same ruling would apply

5    as to 227.

6           THE COURT:  Yeah, there are asterisks, so I assume

7    they are subject to limiting instructions and I am also

8    assuming that they are probably of that nature.  But to the

9    extent that they would be admissible only against a given

10   defendant, that might be worth noting.  Otherwise, I will

11   presume that the bulk of them were probably effect on the

12   listener.

13          MR. FAGG:  Understood, Your Honor.  And I have the

14   prior example in my notes.

15          MR. BYRNE:  For example, 247 has been ruled only to be

16   admitted against Mr. Little.  I may be mistaken, but --

17          THE COURT:  Mr. Beller?

18          MR. BELLER:  Your Honor, three quick points.  The

19   first of those three points being the rule under 1006 does not

20   turn on whether or not something was published to the jury.

21   The question is that the whole reason for the chart is that it

22   cannot be conveniently presented to the jury.  So the fact that

23   the government may choose in the interest of time or otherwise

24   to not publish certain exhibits does not then, in my opinion,

25   give them license to actually introduce those to the jury

1    through 1006.

2          No. 2, and I agree with Ms. Call completely on her

3    analysis of the law in terms of the underlying evidence needing

4    to be admissible.  The concern that I have with the limiting

5    instructions, and that is if Mr. Fries was being tried

6    independently by himself, this evidence would not, in fact, be

7    admissible based on those limiting instructions.  So now

8    including this particular chart, even with additional limiting

9    instructions on the face of the chart, unnecessarily calls the

10   jury's attention to otherwise inadmissible evidence as to my

11   client.

12         With that, Your Honor, what makes these especially

13   complicated or problematic and prejudicial is that this

14   inadmissible evidence is now being used as a time line.  And it

15   is the time line and the structure that is really problematic.

16   It's not simply the addition of the statement.  It's rather

17   couching that inadmissible evidence into a time line with other

18   arguably inadmissible statements.

19         Your Honor, as to this exhibit specifically, if the

20   Court looks at the date of the actual 1006 summary, we go from

21   an e-mail from Carl Pepper to Mr. Mulrenin and Mr. Roberts in

22   December of 2026 (sic).  That e-mail is subject to a limiting

23   instruction.

24         Then we have at the end of January 2014 three

25   telephone calls that the government without context and without

1    any testimony indicating its relevance to the earlier e-mail

2    now includes as a summary exhibit.  And that goes back to my

3    time line argument which is the prejudicial effect of this type

4    of an exhibit being far different than a demonstrative that

5    would be used at closing which is the government's argument and

6    inference that the government makes from the exhibits.

7            Thank you.

8            THE COURT:  Thank you, Mr. Beller.

9            Anyone else?

10           MR. BYRNE:  Just to follow up to what Mr. Beller just

11   said.  His point is a good one because there is an e-mail from

12   December 26 of '13, and then there is these phone calls more

13   than a month later and the inference is that these phone calls

14   are related to the e-mail.  This is all part of a pattern.

15   That is pure argument.  And if this is a demonstrative, that's

16   one thing, but it's not summarizing anything per 1006.

17           Go ahead, Mr. Lavine.

18           MR. LAVINE:  Your Honor, I just want to make sure -- I

19   am repeating here, but an objection by one is an objection for

20   all.  Because the significance of this issue, I am not going to

21   get up and object to all, but I echo exactly what Mr. Beller

22   said.  This is the same problem against my client.  My biggest

23   concern that I've had with this is this is nothing more than

24   argument or it's the government's interpretation.  And it gives

25   them two bites at the apple as far as closing.  And I think

3630

1    that these last two -- last three phone calls which are a month

2    from the last e-mail clearly are the straight dead issues.

3    Thank you, Your Honor.

4            THE COURT:  Ms. Call, go ahead.  Anything else?

5            MS. CALL:  Not much.  Just to correct the record, I

6    think Ms. LaBranche said every e-mail in this was subject to a

7    limiting instruction.  Exhibit 6134 is not.  Aside, I think

8    these things have been fully briefed already.

9            THE COURT:  So I am going to take this under

10   advisement because I want to see how the government once again

11   does their limiting instruction revision.  So the same as 1-1?

12           MS. CALL:  Yes, Your Honor.

13           THE COURT:  Okay.  3-1.

14           MS. LaBRANCHE:  Your Honor, the exhibits that are

15   offered in 3-1 are also documents that were published without a

16   witness on November 16 of 2021, so all the objections I have

17   previously made related to that.  3-1, frankly I would also

18   like to lodge a 403 objection.  The Court may recall, I think

19   it was yesterday, we had some discussion about -- maybe it was

20   this morning, but we had some discussion about documents, one

21   of which was an e-mail that Mr. Mulrenin had forwarded to his

22   co-workers related to CFA where my concern was that the

23   government was going to take our conversations with CFA which

24   are, of course, confidential out of context, and I made the 403

25   argument about just the document in general at that point in

1     time which I know that the Court overruled.

2          However, in 3-1 what we now see is exactly as I

3     suspected.  The government had made -- has put that into a

4     summary chart for February 11, 2014.  Then over two months

5     later is the next entry where there was a phone call between

6     Mr. Mulrenin and Mr. Brady.  Now, 4/18, I could understand how

7     the government could logically believe all of those relate to

8     each other and that would be a reasonable inference to relate

9     to the jury, but 2/11 to 4/18 is just completely argumentative.

10    It's 403.  I think it is so unduly prejudicial just in the way

11    that we thought it would be, so I just want to make sure my

12    record is clear on that.

13         THE COURT:  Okay.

14         Go ahead, Mr. Tubach.

15         MR. TUBACH:  Just briefly, just to follow up on what

16    Mr. Lavine said earlier.  I just want to make sure an objection

17    for one is an objecting for all even in this particular hearing

18    because we are no longer doing the actual exhibits.

19         THE COURT:  Yes, it is, because obviously lots of

20    similar interests and it's appropriate that an objection for

21    one applies to all.

22         MR. TUBACH:  Thank you, Your Honor.

23         THE COURT:  Once again, there is at least one document

24    that is -- has a limiting instruction.  I am not sure what that

25    limiting instruction is, but I'll take a look at how the

1    government redoes that.

2         MR. LAVINE:  Pardon me.  It's only applicable to

3    Mr. Mulrenin.

4         THE COURT:  Okay.  Let's go on to the next.  This is

5    4-1.

6         MS. LaBRANCHE:  Same general objections, Your Honor.

7    I do not know if any of these are subject to limiting

8    instructions.  The government has a notation -- yeah, it looks

9    like at least one is.  I would also note that there are under

10   exhibit number references to King testimony.  And I don't

11   believe that it would be appropriate, even if the Court were to

12   allow these exhibits to be used, for the jury to be directed to

13   specific testimony when what is actually being listed is a

14   direct quote from the document.  If they want to include the

15   reference number to that document, fine.  I don't think it's

16   appropriate in this kind of a chart to refer back to who the

17   witness was who testified about the document.

18        MR. LAVINE:  One additional thing about the King

19   testimony, that's a custodian.  I am not really sure I see the

20   basis and I agree with what has just been said about that, but

21   there is no reason, reasonable basis to even include a

22   reference to King testimony.

23        THE COURT:  Mr. Beller?

24        MR. BELLER:  Thank you, Your Honor.

25        Your Honor, the Court has heard a great deal of

1    testimony regarding all the different things that were

2    happening in the late summer and fall of 2014 and the number of

3    different contracts and number of different companies that were

4    in the process of negotiating during that period of time.  The

5    Court also heard multiple reasons as to why --

6    non-conspiratorial reasons as to why individuals may be

7    contacting one another.

8            Your Honor, I would note for the Court that

9    Exhibit 4-1 spans from September the 30th of 2014 until

10   November the 10th of 2014 and intersperses a series of

11   telephone calls during the course of this particular event.

12   The concern that I have, and as the Court knows, there is at

13   least an underlying theme from the defendants that the

14   government is cherry-picking certain pieces of evidence and

15   putting them into a time line without a substantial basis to be

16   able to do so.  That is certainly what a demonstrative can be

17   used for and that is to advance a theory.

18           On the other hand, in a 1006 when we are talking about

19   substantive evidence, that's something that's different when

20   it's put together in this time line.  So I would simply offer

21   that to the Court as yet an additional reason as to not allow

22   this to be submitted as a 1006.

23           *THE COURT:*  Ms. Henry, go ahead.

24           *MS. HENRY:*  With regard to the notation King

25   testimony, just to help clarify, it is extraordinarily

1  misleading because it will make the jury feel that there was

2  some testimony on that specific quote there and there is not.

3  At minimum it's confusing, but it really is extremely

4  misleading and very prejudicial in that sense.

5         THE COURT:  Thank you.

6         Ms. Pletcher?

7         MS. PLETCHER:  Thank you, Your Honor.

8         Following up on Mr. Beller's testimony, Ms. Call

9  rightly stated that the purpose of a 1006 summary is to assist

10  the jury.  And I am really struggling with how these selections

11  from exhibits assist the jury.  And to illustrate that, in

12  particular on this exhibit, there is a series of texts

13  exchanged between Mr. Penn and Mr. Stiller.  It's about a dozen

14  texts that are listed here.  And I just don't understand how

15  the jury would not be able to understand that on their own were

16  the government to introduce it or to discuss it in their

17  closing argument, what this arrangement of these texts adds to

18  the jury's understanding of a very simple exchange between two

19  individuals.

20         THE COURT:  All right.

21         Ms. Call, go ahead.

22         MS. CALL:  Regarding the testimony reference, I just

23  did want to cite Your Honor back to the Renteria case that was

24  in Your Honor's ruling, I believe it was Docket 741.  The cite

25  to the case, however, is 220 F.3d 1245.  And it essentially did

3635

1   with testimony the exact same thing that is in these charts,

2   which is an agent added dates to transactions that came from

3   testimony.  But the King testimony, it is just a time zone

4   conversion that Mr. King testified.  What may perhaps allay

5   some concerns is rather than putting it in the exhibit column,

6   we could perhaps add a footnote every time Eastern is mentioned

7   for one of those that has been changed based on the testimony

8   for time zone, and that may clarify any speculation on the

9   jury's part as to why the testimony is referenced.

10          THE COURT:  Mr. McLoughlin?

11          MR. McLOUGHLIN:  Yes, Your Honor.  Again, if we are

12   going to be trading case citations and authority, we would

13   request that the government provide a copy so that we can test

14   them and their particular argument.  And we are not receiving

15   that and it makes it very difficult to respond timely.

16          THE COURT:  Well, the government noted that in their

17   briefing on this issue and I cited that case as well, if we are

18   talking *Renteria*.

19          MR. McLOUGHLIN:  Understood, Your Honor, but at this

20   point we don't know the particular page, the particular point,

21   and it just makes it very difficult to respond.

22          THE COURT:  Well, I think that people have to be up on

23   the law at least on orders that have already been issued on

24   this subject, so I don't think that there was a real issue with

25   her mentioning *Renteria*.

1          Mr. Byrne?

2          MR. BYRNE:  Just to follow up on what Ms. Call said.

3    On the King testimony, as I looked at this, I mean, I know he

4    testified about some of the e-mails.  And if you read through

5    his testimony, you can figure out that it's a time conversion

6    thing, but the jury doesn't know that.

7          THE COURT:  I agree.  The King reference is

8    problematic.  I really do think that the jury would just

9    construe King testimony, they would think, yeah, I remember

10   King.  And some jurors are taking notes and they may be able to

11   go back on it.  But even for those jurors who remember who

12   Mr. King was, I think that the last thing they would do is

13   understand it was a reference to a time conversion.

14         So I think that -- I question why we would need a

15   reference to King in the first place, to tell you the truth,

16   because I don't think it's necessary.  But if there was or if

17   some reference needed to be made as to time conversion, I think

18   it probably would need to come in some other fashion, but maybe

19   the government can think about that.

20         Mr. Beller?

21         MR. BELLER:  A very minor point, and that is if I can

22   correct the record on the citation for the Renteria case.  The

23   proper citation is 720 F.3d 1245.

24         THE COURT:  You are absolutely correct.  Yeah, I am

25   looking at my order and I am assuming I am correct, so...

3637

1          MS. CALL:  I was looking at the same, so it may have

2    been my inability to read.  Just for Mr. McLoughlin's benefit,

3    it is Docket 741, Pages 2 to 3 where Your Honor cited that.

4          THE COURT:  So I will look for the redo of that one as

5    well.

6          Why don't we go to 5-1.

7          MR. TUBACH:  Your Honor, Michael Tubach.

8          THE COURT:  Sorry, Mr. Tubach.  If I could just make

9    one comment.  We are getting towards 5:00 now, so we are not

10   going to get through these.  It's obvious.  Maybe we don't even

11   get to 5-1 right now because I think we need to figure out our

12   game plan for Monday.

13         So we have the jury coming back at 8:30 and -- but at

14   the same time we need to get to these things because the

15   government is getting close to resting.  So I will entertain

16   proposals about how we are going to get through the rest of the

17   summaries.

18         I don't know if you have any, Mr. Tubach.

19         MR. TUBACH:  That was actually something else.  I was

20   just going to say, this is a more broader point, that the

21   objections we made with respect to 1-1, that they are

22   argumentative, cumulative, not proper 1006 and already

23   published to the jury, we want to make those objections, we're

24   also making those for every other exhibit so we don't need to

25   remake them every time we talk about another exhibit.

1            THE COURT:  Yes.  Anything that naturally carries over

2    because it's the exact same issue that, for instance, we talked

3    about with 1-1.  So what I am looking for in regard to 5-1 and

4    all the rest of them is some additional or new point.

5            MR. TUBACH:  Thank you, Your Honor.

6            THE COURT:  Okay.  Then does the government have a

7    suggestion on how we are going to get through the rest of the

8    summaries and when we should appropriately do that in light of

9    the remaining testimony?

10           Hold on one second.

11           Mr. Fagg, if you have a suggestion.

12           MR. FAGG:  Something out of the box, you suggested the

13   other day that we propose something out of the box, and that

14   would be we are not scheduled to have court tomorrow, but just

15   wanted to inquire as to whether or not that would be a

16   possibility for us to have a hearing tomorrow.  And I have done

17   this without consulting with anyone.

18           THE COURT:  Yeah, I had a full docket tomorrow on,

19   believe it or not, my other cases, but there are some gaps in

20   the schedule, but I am not -- I don't know what people's

21   availability would be for that.

22           MS. CALL:  The government is available and we are

23   amenable however best to handle these.

24           MR. GILLEN:  We would be available.

25           MS. PREWITT:  We would be available.

1          MR. TUBACH:  As would we, Your Honor.

2          THE COURT:  Ms. Henry?

3          MS. HENRY:  We could be available.

4          MR. POLLAK:  Your Honor, I will be breaking for the

5    airport, but Ms. Johnson will be here.  And as long as I can be

6    excused from the proceedings, we will be well represented.

7          THE COURT:  Mr. Feldberg?

8          MR. FELDBERG:  I am in the same position as

9    Mr. Pollack, Your Honor, but my colleagues will be present.

10         THE COURT:  No problem, as long as we've got someone

11   here.

12         Okay.  Mr. Kornfeld?

13         MR. KORNFELD:  I can be here.  I think Mr. Beller has

14   a conflict, but at least one if not two members of the Fries

15   team would be available at the Court's convenience.

16         MR. BYRNE:  I think we are going to do the paper,

17   rock, scissors, but one will be available.

18         MR. LAVINE:  Your Honor, I can be here.

19         THE COURT:  So everyone could have someone here is

20   what I am hearing?

21         Let me think on my schedule.  Do you have the -- can

22   you print out, Ms. Grimm, our docket for tomorrow?

23         MR. BYRNE:  Not to get greedy, but the earlier the

24   better.

25         THE COURT:  Earlier is bad for me.  I know for a fact

3640

1    that I am scheduled between 7:30 and I think 11:00.  And then I

2    have a 1:30 too.  So it wouldn't be great.  It would be

3    11:00 to 12:00 and then in the afternoon.  The 1:30 is a trial

4    preparation conference on a trial that I think is set for

5    December 6, so they are going to be getting some bad news.  But

6    on the other hand, I am going to rule on some things during the

7    course of that particular hearing.

8            So what we could do, and this might make the most

9    sense unless you wanted to come in -- well, actually, yeah, the

10   10:00 o'clock hearing may not take more than an hour, although

11   there is a possibility.  My guess is that we could probably

12   safely meet at 3:00.  We could try for 2:30, but I could not

13   guarantee that I would be available, but we could shoot for

14   3:00 o'clock and then go through to the end of the day.  It

15   looks like maybe that will be a good plan.

16           And once again, I could offer you 11:00 to 12:00 as

17   well, although we might be starting a little bit late.  It

18   would be -- once again, if you wanted to, I could do that.

19   That doesn't look like it's gaining too much attraction.

20           MR. GILLEN:  I would be in favor of that as well, so

21   we would go 11:00 to 12:00 and come back at 3:00.  That would

22   be fine with us.  We want to get through this material.

23           THE COURT:  We might as well if we are trying to get

24   ourselves queued up for next week.  So there is a chance I

25   could be a little bit late on the 11:00, but I think there

1   is -- it's more likely than not we could start at 11:00.  So

2   we'll go ahead and plan on that.  Does that -- that works for

3   the government?

4           MS. CALL:  Yes, Your Honor.

5           THE COURT:  Okay.  Then do you want to take up 5-1

6   right now with our remaining time?  Might as well.  Go ahead.

7   I will open it up.  Objections to 5-1, anything new.  Some of

8   them are subject to limiting instructions.

9           Mr. Beller?

10          MR. BELLER:  Thank you, Your Honor.  Your Honor,

11  similar to the last episode, we now have a different time

12  period -- or excuse me, an overlapping time period that the

13  government has now chosen phone calls that they believe go to

14  this particular episode as opposed to another one over the same

15  time period.  Again, misleading and cumulative.  This one goes

16  from August 13, 2014 and concludes with October the 8th of

17  2014.  And again, the same concerns with limiting instructions

18  as the others.

19          THE COURT:  I am sorry, Mr. Beller, I am kind of

20  missing your point.  What do you mean by overlapping time

21  periods?

22          MR. BELLER:  From I believe it was 4-1, Your Honor.

23          THE COURT:  Overlapping as to a previous summary?

24          MR. BELLER:  As a previous summary, but ascribing

25  telephone calls on a previous summary to be consistent with

3642

1   that set of facts versus telephone calls between sometimes the

2   same individuals or at least related individuals the government

3   has now organized into a different episode to say this is

4   consistent with, for example, the Pollo Tropical discussion as

5   opposed to this would be the same phone call that would be

6   attributable to the KFC negotiation.

7       THE COURT:   Okay.   Specifically do you happen to know

8   which phone calls?

9       MR. BELLER:   I suppose that that's my concern or

10   that's my problem, Your Honor.   And that is the government has

11   looked at certain telephone calls and said, well, based upon

12   the individuals involved, they must be speaking in this episode

13   regarding the KFC contract.   For example, Jimmie Little and

14   Walter Cooper here are being ascribed as discussing the Pollo

15   Tropical contract as opposed to the KFC contract, for example.

16   It's late in the day.   I'm sorry.

17       THE COURT:   No, I understand your point.   Thank you,

18   Mr. Beller.

19       Ms. Henry?

20       MS. HENRY:   I was going to elaborate on Mr. Beller's

21   point.   I think the point he is making is that that reflects

22   why these are argumentative charts because of this very careful

23   picking out these phone calls that are in the exact same time

24   frame as the other time frame, but they are put in different

25   contexts.   So that's why it is clear that this is simply

1    arguing.

2            *THE COURT:* Mr. Byrne?

3            *MR. BYRNE:* I am just going to echo the same thing

4    they said.  They are cherry-picking things and organizing

5    things in different order.  There is a whole bunch of phone

6    calls, but these according to them relate to Pollo Tropical.

7    That's pure argument.

8            *THE COURT:* Ms. Call, go ahead.

9            *MS. CALL:* Yes, Your Honor.  I was looking between 4-1

10   and 5-1 as to the overlapping dates, but Mr. Beller may have

11   been referring to other exhibits.  There are not phone calls

12   between the same individuals on either of these exhibits, and

13   the phone calls selected are all in very near time to

14   communications generally involving those individuals on the

15   call.  So I am not sure that I see the confusion created by

16   this.  While it may draw an inference, we previously briefed

17   the fact that these summaries can properly summarize

18   information favorable to one party.

19           *THE COURT:* But you're not using -- citing in one

20   summary a phone call between two people as having something to

21   do with that series and then using the same phone call in

22   another summary to suggest something different.

23           *MS. CALL:* I don't believe so, Your Honor.

24           *MR. BELLER:* And I agree.  To the extent I explained

25   that inaccurately, that's on me.

3644

1          THE COURT:  No problem.  It would seem unusual, but I

2     wanted to make sure that that was not the case.  So then the

3     question would be -- we'll get through this, but if the

4     government has an idea about how to redo the limiting thing and

5     even overnight that would be helpful.

6          Mr. Byrne, one loose end we haven't tied up is

7     informing the jury about the fact that the count against him

8     individually is no longer the case.  I am inclined to give the

9     Ninth Circuit opinion model instruction as to that.  I will

10    obviously modify it as to Mr. Little.  We won't work it out

11    right now, but if you could take a look at that.  And then if

12    you want to propose some language, I will work on some language

13    too.

14         MR. BYRNE:  I think the language would be the language

15    that you agreed to already.

16         THE COURT:  I am not going to do that.  That's what I

17    am trying to signal to you.  I am not going to do that because

18    the pattern instructions all suggest something different, so I

19    was inclined to go with the Ninth Circuit suggestion.  I think

20    that Ms. Call may have submitted that to you, but if you wanted

21    to think about that and maybe have some proposed language, I

22    will do the same.

23         MR. BYRNE:  We can weigh in on that and maybe we can

24    even file something very, very short.

25         THE COURT:  Yeah, that's fine.  Thank you.

1          Mr. Feldberg, go ahead.

2          MR. FELDBERG:  Your Honor, may I just raise briefly

3   one point of clarification since I am not available tomorrow?

4          THE COURT:  Yes.

5          MR. FELDBERG:  With respect to Exhibit 14-3, the last

6   entry on Page 1 is Exhibit 1546.  And Your Honor may recall

7   there was litigation over the rule of completeness with respect

8   to that exhibit.  And the Court ruled that Defense Exhibits

9   D-839 and I-141 were admissible to make that exhibit complete.

10  And I am just inquiring as to whether Exhibit 1546 in the

11  government's view, which has not yet been published to the

12  jury, now includes 839 and 141 or whether they will simply be

13  admitted at the same time?

14         THE COURT:  This is on summary -- rather 14-1?

15         MR. FELDBERG:  14-3, Your Honor.

16         THE COURT:  Sorry.  Hold on one second.

17         MR. FELDBERG:  It's the last entry on Page 1.

18         THE COURT:  Ms. Call, do you know the answer to that

19  one?

20         MS. CALL:  Yes, Your Honor.  As far as offering and

21  publishing the exhibits, the government will offer and publish

22  D-839 and I-141 at the same time as 1546.

23         THE COURT:  I remember that.  I think that they had

24  agreed to do that, I think, yeah.

25         MR. FELDBERG:  That's fine.

1           THE COURT:  All right.  So Ms. Call, go ahead.

2           MS. CALL:  Very briefly, and we did make the request

3    of defendants this morning, but -- and I recognize things are

4    in flux as the government is concluding its case, but we would

5    request some clarification on the defendants' witness list

6    since it is nine pages organized alphabetically by first name.

7    We do not know which of those many witnesses to start preparing

8    for.

9           THE COURT:  Mr. Beller?

10          MR. BELLER:  Thank you, Your Honor.

11          Judge, I believe that the understanding of the parties

12   is 48 hours.  The defense has absolutely every reason to comply

13   with that.  It's premature at this point.  We are not playing

14   games with the government here, Judge.  There are 10

15   defendants.  So something as simple as who goes first is

16   sometimes not nearly as easy as a rock, paper, scissors game.

17   So we will certainly comply.  The government has made that

18   request with us a few times and it's not falling on deaf ears.

19          THE COURT:  Ms. Prewitt?

20          MS. PREWITT:  I think we discussed yesterday what the

21   anticipated length of testimony for Ms. Evans was going to be

22   because that would help us plan for logistics.  I am sure you

23   are planning for that.

24          THE COURT:  Right.  So I don't need to hear it right

25   now, but once again, as we talked yesterday at the end of the

3647

 1   day, that would be relevant to planning purposes.  And then, of

 2   course, the wild card is what progress we make tomorrow too.

 3   But hopefully -- I do think it's a good idea and I am glad that

 4   the suggestion was made to utilize tomorrow.  I think that

 5   that's a good idea, so we'll do that.

 6          So unless anyone has anything else, we will reconvene

 7   hopefully at 11:00 o'clock tomorrow, all right?  The Court will

 8   be in recess.  Thank you.

 9      (Recess at 5:05 p.m.)

10                    REPORTER'S CERTIFICATE

11      I certify that the foregoing is a correct transcript from

12   the record of proceedings in the above-entitled matter.  Dated

13   at Denver, Colorado, this 31st day of January, 2022.

14

15                         S/Janet M. Coppock

16

17

18

19

20

21

22

23

24

25