IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.    JAYSON JEFFREY PENN,
2.    MIKELL REEVE FRIES,
3.    SCOTT JAMES BRADY,
4.    ROGER BORN AUSTIN,
5.    TIMOTHY R. MULRENIN,
6.    **WILLIAM VINCENT KANTOLA**,
7.    JIMMIE LEE LITTLE,
8.    WILLIAM WADE LOVETTE,
9.    GARY BRIAN ROBERTS, and
10.   RICKIE PATTERSON BLAKE,

      Defendants.

**DEFENDANT WILLIAM KANTOLA'S MOTION FOR JUDGMENT OF ACQUITTAL**

COMES NOW, Defendant William Kantola, by and through his undersigned counsel, and, pursuant to Fed. R. Crim. P. 29(a), respectfully requests the Court to enter a judgment of acquittal. Acquittal is required because the evidence is insufficient to prove Mr. Kantola violated the Sherman Act, 15 U.S.C. § 1, by participating in an agreement to fix prices and rig bids and because of the improper variance of the evidence from the indictment and the unconstitutional application of the Sherman Act.

**I.    LEGAL STANDARD**

    **A.    SUFFICIENCY OF THE EVIDENCE UNDER FED. R. CRIM. P. RULE 29**

Acquittal is appropriate "if the evidence that defendant committed the crime is nonexistent

1

or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982). "While undoubtedly deferential, this review has some bite: if the evidence does no more than raise a mere suspicion of guilt or requires piling inference upon inference to conclude the defendant is guilty, we will reverse the conviction." *United States v. Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015) (citations omitted). "While the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable." *Id.*

### B.   SHERMAN ACT SECTION ONE

"The essence of a claim of violation of Section 1 of the Sherman Act is the agreement itself." *Champagne Metals v. Ken-Mac Metals, Inc.,* 458 F.3d 1073, 1082 (10th Cir. 2006). "The crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (internal citation omitted). An information exchange alone does not fall into the category of restraints considered *per se* offenses. *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999); *United States v. SuntarRoofing, Inc.*, 897 F.2d 469, 475 (10th Cir. 1990).

The Government must also prove intent beyond a reasonable doubt for each individual. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 (1978). "An alleged conspirator . . . lacks the requisite criminal intent if he does not know the conspiracy's objective; this knowledge must be shown by clear, unequivocal evidence." *United States v. Anderson*, 981 F.2d 1560, 1563 (10th Cir. 1992) (citations and quotation marks omitted); *United States v. Rahseparian*, 231 F. 3d 1257, 1262 (10th Cir. 2000); *United States v. Metro. Enters., Inc.*, 728 F.2d 444, 453 (10th Cir. 1984). The intent must be to join and to effectuate an agreement, not merely to raise prices, increase profits, or understand competitor positions. *Gypsum*, 438 U.S. at 443 n.20.

## II.     INSUFFICIENCY OF THE EVIDENCE FOR A REASONABLE JURY TO FIND BEYOND A REASONABLE DOUBT THAT MR. KANTOLA IS GUILTY

### A.     IMPERMISSIBLE USE OF INFERENCES

The Government failed in its burden to show the existence of a price-fixing agreement; that Mr. Kantola knowingly joined any such agreement; or that he had the requisite intent. Not a single witness testified that he entered into an agreement with Mr. Kantola to fix prices or rig bids or that he had knowledge of anyone else entering into such an agreement with Mr. Kantola. Similarly, no witness testified to knowledge of a seven-year plus price-fixing conspiracy, and not a single document provides direct evidence of an agreement or Mr. Kantola entering into any conspiracy.

In this vacuum of proof, the Government relies on piled inferences. The Government asks first for an inference that competitors exchanged bid submission information on phone calls, and second, for an inference from this *inferred* bid submission sharing that it was pursuant to an agreement to fix prices and rig bids. This strategy first fails because the Government's case rests upon inferences from ordinary behavior.[1] The Government failed to present direct evidence of Mr. Kantola's guilt. As the Court instructed the jury at the first trial, "[w]here circumstantial evidence is just as consistent with unilateral action as with concerted action, it does not, standing alone, support an inference of antitrust conspiracy." (Instruction 17, 12/8/2021 TR 13:8).[2]

Antitrust law limits the range of permissible inferences to prohibit drawing the inference that price fixing has occurred from evidence that is consistent with ordinary behavior. *Matsushita*

---

[1] *See, e.g., In re Baby Food Antitrust Litigation*, 166 F.3d 112, 124-126 (3rd Cir. 1999) (information exchanges are permissible, and court would not infer evidence of unlawful agreement from intense efforts to ascertain what competitors would be doing in terms of pricing, promotions and products, or from efforts of salesman in "chit chat" and "shop talk"). *See also, e.g., Kleen Products LLC v. Intern. Paper et al.,* 276 F.Supp.3d 811, 837-39 (refusing to infer a conspiracy from phone calls between competitors, even when close in time to price increases).

[2] References to TR are to unofficial draft transcripts with respect to which, of course, Mr. Kantola defers to the Court's recollection.

3

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596-97 (1986) (impermissible to draw inference of price-fixing conspiracy when "conduct is consistent with other, equally plausible explanations"). Moreover, the Tenth Circuit further limits inferences that can be drawn in conspiracy cases involving underlying conduct that is not presumptively unlawful. *See United States v. Carnagie*, 533 F.3d 1231, 1239 n.5 (10th Cir. 2008) ("[B]ecause the underlying transaction is generally lawful, one cannot infer an illegal common purpose in the same way that a common purpose could be found in a drug conspiracy. Instead, interdependence must be proved more precisely.") Further, the Court "cannot sustain a conspiracy conviction if the evidence does no more than create a suspicion of guilt or amounts to a conviction resulting from piling inference on top of inference." *United States v. Funez*, 13-CR-00160, 2014 WL 3707991, at *12 (D. Colo. July 25, 2014) (quoting *United States v. Hernandez,* 509 F.3d 1290, 1295 (10th Cir. 2007)).

The evidence in this case established that Mr. Kantola and those with whom he spoke on the phone were expected to, and did, communicate on a regular basis for numerous legitimate business reasons, particularly regarding buying and selling chicken to each other. *See, e.g.*, Ledford (3/1/2022 TR 97:9-99:12); Pepper (3/3/2022 TR 102:23-105:10); Bryant (3/9/2022 TR 179:7-21). With Mr. Kantola, the Government faces the further obstacle that his and his employer's actions directly conflict with any inference of an agreement to fix prices. Mr. Kantola did not decide his employer's prices.[3] After alleged phone calls with competitors, he repeatedly sought additional volume, negotiated with customers, and undercut competitors to pursue the Koch Foods ("Koch"), strategy to grow its volume at its competitors' expense.[4] Moreover, references to Koch's bid prices or negotiation strategy in other suppliers' documents are irrefutably inaccurate,[5] and thus fail to

---

[3] Ledford (3/1/2022 TR 221:19-25).
[4] Ledford (3/1/2022 TR 19:19-20); Suerken (3/2/2022 TR 160:10-162:6); Lewis (3/14/2022 TR 63:7-10, 206:14-24, 207:9-11; 207:15-17); Fisher (3/8/2022 TR 113:4-114:16, 116:17-21).
[5] *See, e.g.,* Ex. 1539 compared to Ex. F-808 (showing Koch *never* bid $0.9561 throughout the 2012

4

provide any support for the inference that Mr. Kantola provided the information, much less provided information in furtherance of any alleged illegal agreement. These inferences fail further because of alternative plausible explanations.[6]

Mr. Robert Bryant's testimony demonstrates how the Government's requested inferences amount to speculation. When questioned about his "understanding" that Mr. Austin shared pricing with other suppliers, Bryant felt comfortable calling it a guess.[7] But "an inference must be more than speculation . . . to be reasonable. A jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility. Such [an inference] is infirm because it is not based on the evidence." *United States v. Hill*, 786 F.3d 1254, 1261-2 (10th Cir. 2015) (quoting *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995)). Further, the Government's elicitation of testimony it knows is wrong cannot provide a basis for any permissible inference. Instead, the Government has an obligation to correct testimony that it knows to be false. *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

### B.  KFC NEGOTIATIONS

The Government focused on three negotiations for KFC. In each instance, the inferences the Government asks are unsupported and require impermissible speculation. Viewing the evidence as a whole and in the light most favorable to the Government, no reasonable juror could infer that Mr. Kantola knowingly joined and participated in the alleged agreement.

---

KFC negotiations); Ex. 9744 compared to Exs. 1122 and 1026 (showing Koch's proposed increase during the 2014 KFC negotiations was *not* in the .14-.16 range); Ex. 1919 compared to Exs. C-465, C-364, C-265, C-207 (showing Koch *never* bid $1.0125 during the 2017 KFC negotiations).
[6] Mr. Austin knew distributors, franchisees and a lot of people at RSCS. Bryant (3/10/2022 TR 14:18-15:1). Additionally, customers acknowledged providing the suppliers with detailed pricing guidance about their prices relative to their competitors' prices. *See, e.g.,* Ledford (2/28/2022 TR 172:5-21, 180:18-181:2, 200:13-22, 203:9-204:12); Lewis (3/14/2022 TR 176:2-10).
[7] Bryant testified that he never saw or heard the actual price sharing that he was guessing about. Bryant (3/10/2022 TR 14:15-17).

### 1.     THE 2012 KFC NEGOTIATIONS

The only witness who testified concerning the 2012 negotiations for KFC 2013 supply was Mr. Ledford. To try to create an inference of information sharing from phone calls, the Government first relies upon an ordinary business document communicating that the decision was made to try a slightly higher dark meat formula. Ex.1409. But the Government ignores the uncontroverted evidence that (1) Mr. Kantola explicitly says in the document that he doesn't think it will stick (Ex. 1409); (2) Koch immediately lowered its price of dark meat from its initial proposal (Ex. F-808 at 16); and (3) Koch undercut its competition to increase its volume of dark meat. (Exs. F-768, F-769). The Government also asks for an inference of price sharing from phone calls based on inaccurate Koch information. An internal Pilgrim's document lists "8 Piece Price Quotes" for a number of suppliers, including Koch at $0.9561. Ex.1539. But this inaccurate information was not Koch's bid at any time during the 2012 negotiations.[8] This contradicts any speculation that the information came from Mr. Kantola, and there is no basis to layer additional speculation that it was in furtherance of price-fixing when the bids were not aligned (Ex. F-808).

### 2.     THE 2014 KFC NEGOTIATIONS

The Government relied on Bryant to meet its burden of proof. Bryant testified that, during the 2014 negotiations, he overheard Mr. Austin talking on the phone purportedly to Mr. Kantola and that this formed the entire basis of his belief that Mr. Kantola participated in coordination regarding KFC in 2014.[9] Bryant (3/8/2022 TR 153:13-154:1, 3/9/2022 TR 126:14-21).

---

[8] *See supra* note 5.
[9] As the Court appropriately ruled, Mr. Bryant did not have any foundation to support an understanding that the competitors, including Mr. Kantola, had an agreement to raise prices in 2014. Bryant (3/8/2022 TR 237:17-238:14). Bryant testified that the basis for his understanding that others participated in conduct was conversations with Roger Austin, Justin Gay, Scott Tucker, Jimmie Little and overhearing the two phone calls. Bryant (3/8/2022 TR 153:13-154:1). But, not

6

Specifically, Bryant testified that on August 22, 2014, following Pilgrim's bid submission to RSCS, he twice overheard Mr. Austin bragging into the phone, I told them the price is the price. I just need to know how many loads they want at that price. *Id.* (03/08/2022 TR 217:20-218:7; 03/10/2022 TR 61:20-62:2). Mr. Austin told Bryant the calls were with Mr. Kantola and Mr. Brady. *Id.* (03/08/2022 TR 217:20-218:18; 03/09/2022 TR 92:18-93:10). Bryant testified that Mr. Austin did *not* ask anyone to agree with him on anything during those calls; he did *not* hear Mr. Austin provide Pilgrim's price or price range; and he did not hear anything that Mr. Kantola may have said. *Id.* (03/09/2022 TR 93:11-20; 03/10/2022 TR 6:21-7:12). What Bryant heard does not evidence a criminal conspiracy. *Id.* (3/10/2022 TR 59:20-61:7, 61:20-62:4); Ex. 1237.[10]

Bryant also testified that his understanding of price sharing was that it would not be used to undercut or take volume away from Pilgrims. Bryant (3/8/2022 TR 153:13-154:1; 184:3-8;

---

only did Bryant never testify to any conversations with Messrs Gay, Tucker or Little about Mr. Kantola, Bryant confirmed that the only conversations he had with Mr. Austin that formed the basis for his allegation that Mr. Austin was part of some conspiracy in 2014 were the two identical statements he overheard Mr. Austin say purportedly to Mr. Brady and Mr. Kantola, respectively. Bryant (3/9/2022 TR 126:14-21). Accordingly, the *only* basis for his understanding that Mr. Kantola participated in an agreement to raise prices in 2014 was the single call of Mr. Austin purportedly talking to Mr. Kantola.

[10] Bryant also testified that during a pre-bid customer meeting in the summer of 2014 among Mr. Bryant, Mr. Austin and Mr. McGuire, Mr. McGuire instructed Mr. Austin to put "this" out to the industry, which was in reference to two points contained in a customer presentation justifying a price increase: (1) there was a severe supply shortage and (2) big birds were more profitable than small birds. Bryant (3/8/2022 TR 195:5-11, 197:12-17). No inference can be drawn from this testimony. First, the Government did not present any evidence that Mr. Austin communicated these points to Mr. Kantola. Second, both Mr. Suerken and Mr. Lewis testified that Mr. Kantola's negotiation strategy during 2014 was to secure more volume and that his justification for a price increase was to support investments that Koch was making to *grow* its capacity to supply KFC. Suerken (3/2/2022 TR 61:7-16, 160:10-162:6); Lewis (3/14/2022 TR 63:7-10, 203:22-205:11, 207:9-11). Third, Bryant testified that the term industry can include customers and distributors. Bryant (3/10/2022 TR 5:20-23). And finally, both of these points were well known to customers. Ledford (3/1/2022 TR, 24:12-17, 102:14-22); Suerken (3/2/2022 TR 112:13-114:16, 115:24-116:11, 132:8-13,); Lewis (3/14/2022 TR 11:6-13, 36:21-37:16, 169:4-9). Putting these messages out to the industry, even if industry meant the other suppliers (and there is no evidence that it did), would be like saying the sky is blue.

3/9/2022 126:2-21). He claimed that Mr. McGuire reassured him in an email that this would not happen by noting that it seemed that all suppliers had increased their prices. Ex. 1066; Bryant (3/8/2022 TR 212:22-214:7). But the email supposedly giving this "reassurance" contained no reference to Koch, nor any reference to the source of the information, which even Bryant conceded would have been known to people at RSCS with whom Mr. Austin was close. Ex. 1066; Bryant (3/10/2022 TR 14:21-15:1). Peter Suerken explained that what actually happened was exactly what Bryant felt reassured would not happen---Mr. Suerken reduced Pilgrim's volume as much as he could and gave it to the lower priced suppliers (Suerken (3/2/2022 TR 147:14-20)), and Koch was among those lower priced suppliers and received the largest increase in volume. Ex. J-008; Lewis (3/14/2022 TR 206:14-207:2). Bryant's testimony, taken in the light most favorable to the Government, fails to support, and, in fact, contradicts, the Government's speculative theory.

Nor can phone calls or the documentary evidence here fill the requisite inference of a price-fixing agreement. There are equally plausible ordinary business reasons for the calls, and un-contradicted evidence explodes the Government's requested inferences. For example, Mr. Kantola and Mr. Little were both involved in handling shorts for their employers, but neither decided bid prices, and Mr. Little was not even involved in the KFC negotiations. Ledford (3/1/2022 TR 221:19-25, 224:2-12). And the internal Pilgrim's email that indicated Koch would increase by $.14-.16/lb. (Ex. 9744) was just wrong about Koch's actual number, precluding any inference that it came from Mr. Kantola.[11] Documents established unequivocally that Koch increased its price only around $.11. *See* Exs. 1122, 1123. Similarly, internal Claxton texts erroneously claiming to report Koch was "not moving" on its bid pricing, whatever their source, were wrong. Mr. Lewis

---

[11] Bryant explained that Mr. Austin knew a bunch of people at RSCS, providing an equally plausible inference of the source of the information as well as the equally plausible inference that it was an educated guess. Bryant (3/20/2022 TR 14:21-15:1).

8

testified that, like its competitors, Koch *negotiated* and *decreased* its price during the negotiations, and the Government's documentary evidence confirms this. Lewis (3/14/2022 TR 191:16-192:3, 223:14-224:2); Exs. 1026, 1123, H-684.

Koch's uncontroverted pricing and negotiation strategy to undercut competitors and gain volume at their expense directly refutes the speculation the Government asks. Mr. Lewis testified that Koch was making substantial investments to increase supply to KFC, and Koch would need financial support for the investment. Mr. Lewis remembered how he and Mr. Kantola worked together for Koch's Chattanooga facility to supply additional product. Lewis (3/14/2022 TR 203:22-205:11). Koch's prices were among the *lowest* prices for 2015 (Ex. H-684), and Koch substantially *increased* its volume from 2014 to 2015, while Pilgrim's *lost* volume. Lewis (3/14/2022 TR 206:14-207:2, 207:15-17). It is undisputed that Mr. Kantola aggressively and consistently sought additional volume at the expense of competitors.

### 3. THE 2017 KFC NEGOTIATIONS

The requested inferences regarding the 2017 negotiations rest entirely upon testimony that is demonstrably wrong, as the Government knows. Bryant purported to "understand" that he received bid submission information from other suppliers and that because of that he understood that there had been information sharing. Bryant (3/9/2022 TR 6:1-15). Bryant recorded numbers received from Mr. Austin, including Koch's ($1.0125 for 8-piece FOB). *Id.* (3/9/2022 TR 6:16-21, 7:8-10:12, 16:6-15); Ex. 1919. As with other speculation, Bryant's inferences or guesses about the meaning and source of these numbers are not supported, and equally or more plausible inferences are available, particularly because these numbers closely resemble the suppliers' *current*, period pricing and not bid submissions. Exs. 7046; I-054. While Bryant claimed that he understood his written request to Mr. Austin to be a request to get information from other suppliers, the actual document does not say that, and Bryant's "understanding" is not grounded in fact—

9

which is the document itself. Ex. 1882. Again, any speculation that these numbers came from Mr. Kantola is further contradicted by the fact that the number was *not* Koch's bid at any point during the 2017 negotiations. *See* Fisher (3/8/2022 TR 112:23-113:3, 114:5-16; 116:8-16); Exs. C-465, C-265, C-207. Bryant further testified that he was not aware of any competitor communications following the first round bids. Bryant (3/9/2022 TR 23:21-24:1). No other evidence was adduced even to suggest that Mr. Kantola was involved in any collusive activity regarding this negotiation.

### C. OTHER EVIDENCE

Most of what was presented at the trial did not pertain to Mr. Kantola. The evidence regarding Mr. Kantola was primarily limited to bids to a single customer, KFC. Aside from the testimony of Bryant discussed above, the Government's only other percipient witness was Mr. Carl Pepper (formerly of Tyson) who had little to say about Mr. Kantola. Mr. Kantola and Koch were glaringly absent from most of Pepper's testimony; in fact, Pepper did not even know that Koch was a KFC supplier during the 2015 contract negotiations. Pepper (3/3/2022 TR 37:24-38:7). His only testimony regarding Mr. Kantola was that Pepper believed he asked Mr. Kantola about Koch's freezing charges at a time Pepper had no idea what Tyson might do on the subject and would not be the one to decide that. *Id.* (3/3/2022 TR 163:24-164:22, 191:25-192:3). This testimony is no basis for an inference of any agreement, and certainly not to fix pricing. Moreover, Pepper said he believed freezing would be a pass-through cost. Pepper (3/7/2022 TR 99:12-100:22), and the Government failed to present any evidence that Koch was asked by the customer or ever did implement any freezing charges or even what Koch's actual freezing charges were.

Likewise, the vast majority of exhibits offered by the Government had nothing to do with Mr. Kantola, including a majority of the Government's summary exhibits.[12] The few documents

---

[12] *See* Government Summary Exhibits 3, 4, 5, 7, and 9.

10

connected to Mr. Kantola specifically do not support the Government's requested inferences.[13] For example, Mr. Kantola telling a colleague about how Koch had been undercut on pricing, does not imply an agreement to fix prices and contradicts any such inference as it indicates that Koch did not know the pricing in advance.[14] Ex. 6134.[15]

### D.  FAILURE OF PROOF ON MR. KANTOLA'S INTENT TO UNREASONABLY RESTRAIN TRADE

The Government was required to provide proof from which a reasonable jury could find beyond a reasonable doubt that Mr. Kantola intended to unreasonably restrain trade. The Government failed to meet its burden. The evidence established that Mr. Kantola's intent was to grow sales volume for Koch, and his negotiating efforts were consistent with that understanding.[16]

### E.  FAILURE OF PROOF ON ELEMENT OF UNDUE RESTRAINT ON TRADE AND ABSENCE OF BASIS TO APPLY *PER SE* PRESUMPTION

The Government did not even attempt to satisfy the element that a restraint of trade must be "unreasonable" or "undue," relying instead upon a *per se* presumption. Yet, the requested and unproven inference related only to information exchanges without support for a further layer. As a matter of law, information exchanges are judged by the rule of reason. *Gypsum*, 438 U.S. at 441 n.16 (*per se* presumption did not apply when the Government only proved an agreement to

---

[13] Document references to Koch cannot automatically be connected to Mr. Kantola (the evidence established he was not the only salesman at Koch and did not decide its prices), but even if they were, the Government has adduced nothing on which to rest its charge of price fixing.

[14] And Ex. 6134 did not contain the accurate numbers of other suppliers. Exs. G-422, G-423.

[15] The Government has failed before in this Circuit to prove that a defendant "agreed to participate in a conspiracy of such extensive scope as the one charged." *United States v. Evans*, 970 F.2d 663, 673 (10th Cir. 1992). Like this case, the Government in *Evans* "made a tactical decision to charge [many] defendants . . . with involvement only in a single large conspiracy, rather than a series of separate smaller conspiracies"—a tactic "fraught with the potential for abuse." *Id.* at 674. As in *Evans*, the Government here "is hoisted with its own petard[,]" with a total absence of evidence that Mr. Kantola intended to join the alleged global conspiracy. *Id.*

[16] Ledford (3/1/2022 TR 19:19-20, 218/5-220:17); Suerken (3/2/2022 TR 161:16-162:6); Lewis (3/14/2022 TR 63:7-10, 207:9-17); Fisher (3/8/2022 TR 112:10-19, 113:22-114:4, 116:17-21).

11

exchange information).

### F. FAILURE OF PROOF THAT MR. KANTOLA'S ALLEGED CONDUCT WAS WITHIN THE STATUTE OF LIMITATIONS

The vast bulk of the trial evidence predated October 6, 2015, the statutory timeframe for Mr. Kantola. It would have been obvious to competitors before October 6, 2015 that Mr. Kantola successfully competed to undercut them,[17] constituting evidence of withdrawal (if there had been any evidence of his involvement in the alleged conspiracy to begin with).[18] Additionally, there was no evidence from which a reasonable jury could find that any supplier engaged in any conspiratorial conduct within the statutory time period or that Pilgrim's prices, or those of the other suppliers, were artificially inflated as a result of any agreement. Thus, even the argument that continuing receipt of payments continues a conspiracy, does not apply.[19]

### G. FUNDAMENTAL FAILURE ON SUFFICIENCY OF THE EVIDENCE

The Government studiously avoided describing what it alleges was the illegal agreement among suppliers.[20] The Supreme Court in *Twombly* found a lack of any independent allegation of actual agreement because allegations that defendants "agreed not to compete with one another" were "merely legal conclusions".[21] *Twombly*, 555 U.S. at 564 & n.2, 10. In this case, the

---

[17] *See supra* Section II.B.2. *See also* Brink (3/10/2022 TR 189:3-21).
[18] Withdrawal can be by conduct inconsistent with the objectives of the alleged conspiracy, including resumption of competition. *Gypsum*, 438 U.S. at 464-65.
[19] *See United States v. Kissel*, 218 U.S. 601, 607-08 (1910) (Sherman Act conspiracy continues until abandonment or success, but mere continuance of the result of a crime does not continue the crime); *United States v. Evans & Assoc. Constr. Co.*, 839 F.2d 656, 661 (10th Cir. 1988) (receipt of payments can continue a conspiracy *if* at non-competitive levels).
[20] The Government explained during trial that its case is not that information sharing is indicative of a conspiracy, but rather among the chicken suppliers that information was a means and methods of effectuating the agreement that they had that they have been charged with in this case. 3/7/2022 TR 50: 7-11.
[21] "Beginning at least as early as February 6, 1996, and continuing to the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a contract, combination or conspiracy to prevent competitive entry…by, among other things, agreeing not to compete with one another and to stifle attempts by others to compete with them and otherwise

Government has the burden of proof but it has not provided any basis that its evidence is sufficient. Pepper appeared to believe in one concept of a mutual understanding with competitors, which would not be cognizable as a violation of the Sherman Act (and did not involve Mr. Kantola). Bryant had his own, different, personal understandings, but they were unsupported and directly contradicted by the factual evidence. No reasonable jury could convict Mr. Kantola on this record.

### III.   IMPROPER VARIANCE WITH INDICTMENT

When "a single conspiracy is charged in the indictment, [but] the government proves only multiple conspiracies, a defendant who suffers substantial prejudice must have his conviction reversed." *United States v. Edwards*, 69 F.3d 419, 432 (10th Cir. 1995). (citing *Kotteakos v. United States*, 328 U.S. 750, 773-74 (1946)).[22] Such a variance occurs when there is insufficient evidence "that *each* defendant was a member of the *same* conspiracy"—i.e., "that each [alleged] co-conspirator must have a shared criminal objective, not just similar or parallel objectives between similarly situated people." *Hill*, 786 F.3d at 1266. A single conspiracy requires interdependence among all of the alleged co-conspirators. *See Edwards*, 69 F.3d at 432. The "[G]overnment must prove that the coconspirators intended to act together for their shared mutual benefit within the scope of the conspiracy charged, [and that] each co-conspirator's activities constituted ***essential and integral steps*** toward the realization of a common, illicit goal." *United States v. Cushing*, 10 F.4th 1055, 1066 (10th Cir. 2021) (internal citations omitted) (emphasis added).

Here, the Government failed to prove *any* conspiracy, but—at best—attempted to prove

---

allocating customers and markets to one another in violation of Section 1 of the Sherman Act." *Twombly*, 555 U.S. at n.2 (dismissing this complaint).

[22] "The government has the power to define the scope of the conspiracy as broadly as it thinks the facts will justify, but if it fails to prove the conspiracy as charged, it will fail to obtain a conviction. And, if the government is nevertheless able to persuade a jury to convict a defendant on evidence that does not prove the large conspiracy and connect the defendant to it, the district judge and the appellate courts are obligated to reverse that conviction." *Evans*, 970 F.2d at 674 n.13.

*multiple* separate and distinct conspiracies, each allegedly involving different defendants, different products and customers, different conduct, and taking place at different time periods.[23] But no evidence tied Mr. Kantola to any conspiracy, let alone over the course of seven years. *See Hill*, 786 F.3d at 1266-67 (finding conspiracy variance where there was insufficient evidence to tie the defendant to "any larger conspiracy"). Further, there is no evidence that Mr. Kantola shared a criminal objective with respect to co-conspiratorial conduct for which Mr. Kantola had neither knowledge nor involvement.[24]

This conspiratorial variance substantially prejudices Mr. Kantola "by causing the jury to [weigh his] guilt by relying on evidence presented against other defendants[.]" *Hill*, 786 F.3d at 1266. This issue becomes especially problematic when statements have been admitted under Fed. R. Evid. 801(d)(2)(E) because such admission rests upon a distinct scope of the conspiracy, and permitting the evidence so admitted to be used against a defendant who was not involved in the separate conspiracy violates the due process rights of that defendant. In this case, hundreds of statements were admitted based on the finding of a broad conspiracy, including many that were relevant to narrow episodes unrelated to Mr. Kantola. Dkts. 559, 1050. Likewise, the complex nature of the evidence and dissimilar nature of the alleged conspiracies create improper spillover against Mr. Kantola.[25] *See Kotteakos*, 328 U.S. at 774 ("The dangers of transference of guilt from

---

[23] Indeed, the alleged conspiratorial actions could not constitute "essential and integral steps" toward a *common goal*, as each separate incident allegedly had *different goals*. As examples: (1) The testimony established that each year of contract negotiation rested upon the market conditions *at that specific time* (2) No evidence was adduced that communications among suppliers for 2013 (if any) had any effect upon contract negotiations for 2015; and (3) No evidence has been proffered of *quid pro quo* conduct involving Mr. Kantola.

[24] Evidence with no link to Mr. Kantola included matters related to Sysco, Golden Corral, Pollo Tropical, Popeye's, Church's QA costs, and Chick-fil-A.

[25] Indeed, the Tenth Circuit has mandated that courts "must be particularly vigilant when the government seeks to bring many individuals under the umbrella of a single conspiracy, [as the] risk is that a jury will … fail to differentiate among particular defendants. The government must not be allowed to use conspiracy as a tool to circumvent the fundamental principle that 'guilt with

14

one to another across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place.").

## IV.   CONSTITUTIONAL INFIRMITY OF THE PROSECUTION

The trial testimony demonstrated that the application of the Sherman Act in this case is unconstitutional under the void-for-vagueness doctrine, which requires that a person must know what conduct may bring punishment. *See Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391-93 (1926); *Skilling v. United States*, 561 U.S. 358, 402-03 (2010). The Government's evidence in this case proved that ordinary people were unable to understand what constitutes a violation of the Sherman Act.  *See* Dkt. 876. The Government formulated its case in a manner to blur any conceivable distinction between information sharing and price fixing, and the two principal witnesses, Bryant and Pepper, similarly confused these concepts in their "understandings".

## V.   CONCLUSION

For the foregoing reasons, Defendant Kantola respectfully requests the Court pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure to enter a judgment of acquittal.

| | |
|---|---|
| Dated:  March 21, 2022 | Respectfully submitted, |
| ROXANN HENRY, ESQ. | JAMES A. BACKSTROM, COUNSELLOR |
| 5410 Wilson Lane<br>Bethesda, MD 20814-1342<br>Tel: (202) 489-9556<br>Henry.Roxann@me.com | *s/ James A. Backstrom*<br>1515 Market Street, Suite 1200<br>Philadelphia, PA 19102-1932<br>Tel: (215) 864-7797<br>jabber@backstromlaw.com |

*Counsel for Defendant William Kantola*

---

us remains individual and personal.... It is not a matter of mass application.'" *Evans*, 970 F.2d at 674 (quoting *Kotteakos,* 328 U.S. at 772).

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of March, 2022, I filed the foregoing **Defendant William Kantola's Motion for Judgment of Acquittal** with the Clerk of Court using the CM/ECF system, which will serve notice of such filing on all counsel of record.

At:  Denver, Colorado                                             *s/ James A. Backstrom*
                                                                                    James A. Backstrom