IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. JAYSON JEFFREY PENN,
2. MIKELL REEVE FRIES,
3. SCOTT JAMES BRADY,
4. ROGER BORN AUSTIN,
5. **TIMOTHY R. MULRENIN**,
6. WILLIAM VINCENT KANTOLA,
7. JIMMIE LEE LITTLE,
8. WILLIAM WADE LOVETTE,
9. GARY BRIAN ROBERTS, and
10. RICKIE PATTERSON BLAKE,

    Defendants.

No. 20-cr-00152-PAB

**DEFENDANT TIMOTHY MULRENIN'S MOTION FOR JUDGMENT OF ACQUITTAL**

The government's entire case against Tim Mulrenin hinges on the credibility and testimony of one star witness, Carl Pepper—Mr. Mulrenin's former supervisee—whose testimony amounted to nothing more than conclusory assertions that he discussed a "substantial price increase" for 2015 KFC pricing with competitors, after Mr. Mulrenin supposedly directed him to do so following a meeting in a colleague's office. But Mr. Pepper could not recall any specifics about his alleged competitor communications. Further, evidence shows unequivocally that both Mr. Pepper and Mr. Mulrenin lacked any authority that would be necessary to fix prices or rig bids, and that they did not seek to influence anyone with such authority, thereby further discrediting any argument the government could make that Mr. Pepper's testimony regarding any "understanding" with competitors rose to the level of an agreement in violation of the Sherman Act.

Even when evaluated in the light most favorable to the government, the phone calls, text messages, and email correspondence admitted into evidence show, at most, that Mr. Mulrenin and other salespeople then-employed by Tyson communicated with representatives of other suppliers from time to time about mutual customer accounts. The government's attempts to boot strap the communications involving Mr. Pepper to Mr. Mulrenin similarly fall short, as they also failed to show that any of Mr. Pepper's communications with competitors went beyond legitimate purposes of collecting competitive intelligence and serving customer accounts. Simply put, there has been no proof offered that any communications were in furtherance of any unlawful objective, let alone the conspiracy charged. The government has provided no evidence that Mr. Mulrenin, or any Tyson salesperson, ever shared final pricing information with a competing supplier, or that they were able to influence Tyson's pricing in conformity with any sort of anticompetitive agreement.

Amid the dearth of evidence needed to satisfy the requisite elements of a Sherman Act charge, the government invites the jury to stack inference upon inference to find a conspiracy based on legitimate business communications. However, no reasonable jury could find Mr. Mulrenin guilty of knowingly joining the charged conspiracy based on this body of evidence and in accordance with the law of this Circuit.

I.     LEGAL STANDARD

    A.     FRCP Rule 29

"[T]he court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In considering a motion for judgment of acquittal pursuant to Rule 29, acquittal is proper if the evidence implicating the defendant is nonexistent or is "so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. White*, 673 F.2d 299, 301 (10th Cir.

1982). Further, "if the evidence does no more than raise a mere suspicion of guilt or requires piling inference upon inference to conclude the defendant is guilty" the conviction cannot stand. *United States v. Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015).

### B. Sherman Act Section 1

To establish a price-fixing conspiracy under Section 1 of the Sherman Act, the government must establish: (1) that a conspiracy existed between two or more competitors to fix prices and rig bids for broiler chicken products; (2) that the defendant knowingly joined the conspiracy; and (3) that the conspiracy involved interstate trade or commerce. 15 U.S.C. § 1. The government must show that a defendant knew the essential objectives of the conspiracy and shared with his co-conspirators a common purpose or design to circumvent price competition and enhance profitability. *United States v. Metro. Enters., Inc.*, 728 F. 2d 444, 450-51 (10th Cir. 1984); *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 n.20, 446 (1978). A conspiracy conviction cannot be sustained by "mere association or unknowing involvement" that creates a mere suspicion of guilt. *United States v. Funez*, 2014 WL 3707991, at *12 (D. Colo. July 25, 2014) (citing *United States v. Horn*, 946 F.2d 738, 741 (10th Cir. 2007)); *United States v. Horn*, 946 F.2d 738, 741 (10th Cir. 1991) ("guilt is always dependent on personal and individual conduct…[O]ne does not become a member of a conspiracy merely by associating with conspirators known to be involved in crime."); *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir. 1990) ("Mere association with conspirators, even with knowledge of their involvement in crime, is insufficient to prove participation in their conspiracy.").

Proof of information sharing in the context of normal business practice is not enough to establish that a conspiracy existed. *See Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999); *see also United States v. Suntar Roofing, Inc.,* 897 F.2d 469, 475 (10th Cir. 1990). In fact, when "conduct is consistent with other, equally plausible explanations" in the course of ordinary

3

business, the case law prohibits drawing the inference that price fixing has occurred. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596-97 (1986). The Tenth Circuit limits drawing inferences of conspiracy when the underlying conduct (i.e., price sharing) that is not presumptively unlawful. *See United States v. Carnagie*, 533 F.3d 1231, 1239 n.5 (10th Cir. 2008).

Finally, conduct by an individual employee without the requisite authority to fix prices of his employer forms no basis for a legitimate inference of participation in a price-fixing conspiracy. *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 137 (3d Cir. 1999) (finding no inference of conspiracy where there was "no evidence of record showing reciprocal exchange of information by any executive of the defendants with price-fixing authority."); *Pevely Dairy Co., v. United States*, 178 F.2d 363, 369 (8th Cir. 1949), cert. denied 339 U.S. 942 (1950) (finding insufficient evidence to sustain a conspiracy conviction where "neither of [the employees] had any power of authority to fix prices and the information given was not with reference to any purpose to fix prices in the future but with reference to prices which had already been fixed."); *see also United States v. Ward Baking Co.*, 243 F. Supp. 713, 715-16 (E.D.Pa. 1965) (no finding of conspiracy where alleged co-conspirator was "clearly not an employee with sufficient authority to make defendant liable for any conspiracy he aided, abetted or joined.").

## II.   ARGUMENT

Mr. Mulrenin is charged with a single count of conspiracy to violate the Sherman Act. (ECF No. 101.) In deciding whether the Government has shown Mr. Mulrenin knowingly joined in a conspiracy to fix prices and rig bids, only evidence about Mr. Mulrenin's actions can be considered—i.e., his own conduct and what he personally said or did. Mr. Mulrenin cannot be found guilty based on what others may have said or done to allegedly join any conspiracy.

4

*Funez*, 2014 WL 3707991, at *12. There is no evidence that Mr. Mulrenin said or did anything in furtherance of a conspiracy, or even that he would have been capable of doing so.

### A. There Is No Evidence That Mr. Mulrenin Had the Ability to Enter Into An Agreement to Fix Prices or Rig Bids

To prove its charge against Mr. Mulrenin, the government must necessarily establish that Mr. Mulrenin had the ability to conspire to fix prices or rig bids. The government has failed to put forth any evidence that Mr. Mulrenin—or anyone at Tyson involved in competitor communications, including other salespeople like Mr. Pepper and Brian Roberts—had the authority to set or influence prices at Tyson. In fact, Mr. Pepper repeatedly conceded that the opposite is true—that he and other salesmen such as Mr. Mulrenin did *not* have the authority to set price. (*See, e.g.,* March 7, 2022 Rough Tr. at 56:7-15; 61:13-19; 65:6-16.) For this reason, the government's charge against Mr. Mulrenin fails. *See In re Baby Food*, 166 F.3d at 137; *Pevely*, 178 F.2d at 369; *Ward Baking Co.*, 243 F. Supp. at 715-16.

### B. The Government's Evidence Does Not Support an Inference that Mr. Mulrenin Knowingly Joined Any Conspiracy

The government must show that Mr. Mulrenin knew the essential objectives of the conspiracy and shared with his co-conspirators a common purpose or design to fix prices or rig bids. The government failed to present any evidence from a fact witness showing that Mr. Mulrenin communicated with any competitor to achieve such an outcome.

#### 1. No Witness Testified That Mr. Mulrenin Knowingly Joined Any Conspiracy

The government presented two witnesses who claimed to have personal knowledge of the alleged conspiracy, and five fact witnesses from the customer side of the broiler chicken business. In addition, Special Agent LaNard Taylor testified. Not a single one of these witnesses offered testimony that Mr. Mulrenin joined or participated in the charged conspiracy.

5

### a. *Carl Pepper (Tyson Foods)*

Mr. Pepper was the government's chief witness against Mr. Mulrenin, but his testimony fell far short of implicating Mr. Mulrenin in the charged conspiracy. With respect to the KFC 2015 bid, Mr. Pepper could not recall *any* specifics of *any* conversation he had with *any* competitor. (*See e.g.,* March 3, 2022 Rough Tr. at 42:10 ("I don't remember the specific calls, no, ma'am."); *id.* at 64:13-16 ("Q. When they showed you the phone records, you at the time during those interviews did not have an independent recollection of what was discussed on those calls?" "A. Not specific."); *id.* at 75:8-10 ("Q. Do you have a general recollection about the call at 4:30 p.m. with Defendant Mulrenin on August 15?" "A. Not the specific.").)

Second, while Mr. Pepper testified as to his conversations with competitors regarding other pricing and cost episodes such as the Popeyes 2018-2022 contract bid, and freezing and quality assurance costs quoted to Church's, that is the extent of his testimony. Mr. Pepper never indicated that Mr. Mulrenin directed him to get such information, that Mr. Mulrenin otherwise asked for such information pursuant to some agreement with competitors to fix those prices or costs, or that the Tyson pricing unit ever relied on any information he received.

Third, Mr. Pepper's testimony about receiving competitor information does not amount to an agreement to fix prices. For example, with respect to the Popeye's 2018-2020 contract, Mr. Pepper testified that he "called a couple different suppliers" and "asked them if they had sent in their bids . . ." (*id.* at 140:25-141:3,) and that after receiving such information about George's from Defendant Blake, he passed that information on to Mr. Mulrenin. (*Id.* at 143:13-144:9.) But Mr. Pepper never said that these conversations were pursuant to some agreement to set the price similarly or in a particular way, that Mr. Mulrenin knew of any agreement regarding the same, or that the Tyson pricing unit relied on this information.

6

### b.     *Robert Bryant (Pilgrim's Pride)*

Pilgrim's Pride employee Robert Bryant did not mention Mr. Mulrenin's name during his testimony, and his testimony overall is, at best, of marginal value to support the government's theory of the charged conspiracy. While Mr. Bryant offered extremely vague testimony about how he believed Roger Austin and Mr. Pepper discussed competitor pricing (March 8, 2022 Rough Tr. at 186:11-18,) he did not have any information about what was discussed or the timing of the call or even the bid or customer, and he never identified Mr. Mulrenin as someone involved.

### c.     *Pete Suerken (RSCS), Robert Lewis (RSCS)*

Pete Suerken and Robert Lewis testified about being negotiators during the 2014 KFC bid process. Mr. Suerken testified that Mr. Roberts was the primary contact at Tyson that he negotiated with, and never referenced Mr. Mulrenin by name. (March 2, 2022 Rough Tr. at 21:8-9.) Mr. Lewis similarly did not refer to Mr. Mulrenin's involvement in the 2014 KFC bid.

### d.     *Michael Ledford (RSCS, Chick-fil-A)*

Michael Ledford testified that he worked with both Mr. Mulrenin and Mr. Roberts during his time at RSCS. (Feb. 28, 2022 Rough Tr. at 156:23-157:1.) Mr. Ledford did not otherwise mention Mr. Mulrenin's name during the direct portion of his testimony. Mr. Ledford admitted that he agreed to Mr. Mulrenin continuing to service Chick-fil-A as a salesperson, even after reviewing the superseding indictment that contained specific allegations relating to Mr. Mulrenin. (March 1, 2022 Rough Tr. at 222:22-223:13.)

### e.     *Sara Fisher (RSCS)*

Sara Fisher testified as to the RFP process for KFC in 2017. She testified that Tyson's 2017 proposal—submitted by Mr. Mulrenin—reflected a strategy to offer greater discounts for more volume and would have allowed KFC to scale up in volume to a discount of $.02-.03 per

pound, which translated into several million dollars in savings in KFC. (March 8, 2022 Rough Tr. at 106:2-109:15.)

### f. *Special Agent LaNard Taylor, Joseph Brink (Pollo Tropical)*

Special Agent Taylor testified as to the investigation at a high-level. He did not reference Mr. Mulrenin specifically during his testimony. Joseph Brink did not mention Mr. Mulrenin during his testimony and, on cross-examination, admitted that nothing he testified about had anything to do with Mr. Mulrenin. (March 10, 2022 Rough Tr. at 188:15-22.)

### 2. Phone Toll Records Did Not Show That Mr. Mulrenin Knowingly Joined Any Conspiracy

The government in its summary exhibits identified only 8 phone calls between Mr. Mulrenin and colleagues at competitor chicken suppliers during the entirety of the alleged conspiracy of seven years. (GX 3, 10, 12, 17.) But the government introduced no evidence as to the substance of these calls, and neither the witness testimony nor documents support an inference that those conversations were conspiratorial. Where chicken suppliers may confer with other suppliers in the ordinary course of business—to discuss supply shortages, quality standards, or best practices when converting to antibiotic free (ABF or NAE) products, for instance—the government calls upon the jury to make inference upon inference, which cannot sustain a conspiracy conviction. *Bell Atl. Corp. v. Twombly,* 550 U.S. 554 (2007); *Matsushita,,* 475 U.S. at 596 (finding that inference of independent action is reasonable where "conduct is consistent with other, equally plausible explanations"); *Direct Sales Co. v. United States,* 319 U.S. 703, 711 (1943) ("[C]harges of conspiracy are not to be made out by piling inferences upon inference."). Indeed, Mr. Ledford testified that he knew competitors talked to each to discuss things such as product shortages. (March 1, 2022 Rough Tr. at 97:9-12.)

Nor can the jury properly draw conclusions about Mr. Mulrenin's conduct based on the toll records of Mr. Pepper. *See Horn*, 946 F.2d at 741 ("guilt is always dependent on personal and individual conduct…") Further still, the cross examination of the government's paralegal witness, Rachel Evans, revealed how the government's summary charts reflecting calls were misleading, calling into question their reliability in supporting such inferences. (*See, generally, e.g.,* Feb. 28, 2022 Rough Tr. at 86:15-266:8.)

### 3. No Documents Demonstrate That Mr. Mulrenin Knowingly Joined Any Conspiracy

As further explained below, the body of documentary evidence offered by the government as proof of Mr. Mulrenin's involvement in the charged conspiracy—amounting to a fraction of the over 600 exhibits admitted—show Mr. Mulrenin on communications that do not suggest anything remotely conspiratorial. The majority of the documents involve Mr. Mulrenin only by virtue of him being copied, without anything more, and do not relate in any way to competitor pricing. Finally, the few documents which do show his awareness that Mr. Pepper sourced competitor information do not even suggest that there was any conspiracy with any competitor to fix prices or that the information was obtained for any improper purpose.

#### a. *Mr. Mulrenin Was Passively Included on a Number of Communications That Show No Unlawful Purpose*

All of the documents Mr. Mulrenin was copied on were either with customers, or were internal, and most made no reference whatsoever to competitor pricing. None suggest an unlawful purpose or show Mr. Mulrenin encouraging or directing anyone to reach out to competitors to even source pricing information. Several communications identified by the government are merely communications with customers regarding a particular cost or contract, with Mr. Mulrenin as a passive recipient. (*See, e.g.*, GX-114, GX-920, GX-1190, GX-9703, GX-748, GX-1921.) Other communications merely show him included on internal discussions with

Tyson colleagues regarding customers. (*See, e.g.,* GX-751, GX-959, GX-752 to -758.) Lastly, in communications where competitor pricing is discussed, Mr. Mulrenin is similarly silent. (*See, e.g.,* GX-120, GX-221, GX-224.) That Mr. Mulrenin is in possession of such information, as the passive recipient of what appears to be legitimate competitive intelligence, without more, is not proof of his involvement in any conspiracy. *See In re Baby Food*, 166 F.3d at 133 (rejecting inference of agreement from "communications despite lack of independent evidence tending to show an agreement and …uncontradicted testimony that only informational exchanges took place") (internal citations omitted).

        **b.**      *Communications Mr. Mulrenin Participated in Were Not Regarding Competitor Pricing*

The communications in which Mr. Mulrenin does participate are similarly unremarkable, and fail to show Mr. Mulrenin's participation in any agreement to fix prices or rig bids. For example, GX-1175 is an August 14, 2014 email from Rich Eddington to Mr. Mulrenin asking for a call to discuss Tyson's submitted cost model. Mr. Mulrenin responds the next day: "Will do." This document is a communication between a supplier and customer; it does not contain any information regarding competitors. In GX-744, in August 2017, Mr. Pepper forwards an RFP from Popeye's for its bone-in chicken to Mr. Mulrenin, who responded that Popeye's appeared to believe Tyson dropped prices more than they actually had for another customer. No competitors are referenced in this document, and Mr. Mulrenin is only communicating with other Tyson employees. Other examples of such communications include GX-9703, GX-1177, and GX-9714.

In the limited communications in which competitor pricing is discussed, there is no evidence that Mr. Mulrenin ever collected or received information to fix prices or rig bids. Indeed, even in these innocuous communications, Mr. Mulrenin is either a passive recipient (*see* GX-120, GX-221, GX-224,) or acknowledges it, but without any evidence that the information

was used for the purposes of effecting any agreement. (*See, e.g.,* GX-617.) While the government's theory is that Mr. Pepper gathered competitor information with Mr. Mulrenin's knowledge or at his direction, this alone does not establish the personal knowledge of Mr. Mulrenin. *See Funez*, 2014 WL 3707991, at *12. Furthermore, there is no evidence Mr. Pepper acquired competitor information for any nefarious reason and indeed, the evidence suggests that it was collected as competitive intelligence. This cannot form the basis of a conviction against Mr. Mulrenin. *See Mitchael*, 179 F.3d at 859; *Suntar Roofing, Inc.,* 897 F.2d at 475.

### c. *There Are No Documents Showing Tyson's Future Pricing*

At trial, the government introduced a handful of exhibits purporting to show that competitors possessed Tyson's future pricing. But in no instance does a competitor have Tyson's correct, future pricing. For example, GX-1919 purports to be Mr. Bryant's handwritten notes that include future pricing for 2018—but the numbers reflected therein are in fact current 2017 pricing. (*Compare* GX-1919 ("97.83 Tyson") *with* I-054 (RSCS 2017 Price Sheet ("Tyson $0.9783")).)

### 4. The Evidence Reflected on Summary Charts Do Not Demonstrate That Mr. Mulrenin Knowingly Joined Any Conspiracy

### a. *Church's Chicken 2013 Freezing Charge*

The summary chart at GX-1 outlines the government's evidence regarding the 2013 Church's freezing charge event. The record contains no evidence that would support an inference that any price fixing or bid rigging occurred related to the freezing charges submitted to Church's by any of the suppliers, including Tyson. As it relates to Mr. Mulrenin, the government's evidence shows that his only involvement was being copied on two emails sent by Mr. Pepper that reflect that he sourced competitive intelligence. There is no evidence that Mr. Mulrenin, or anyone, took any action based on these emails. No evidence shows that Mr.

Mulrenin knowingly and intentionally joined in a conspiracy to fix prices related to the 2013 Church's freezing charge. *See Horn*, 946 F.2d at 741; *Fox*, 902 F.2d at 1514.

      **b.**      ***2013 KFC/UFPC Bid Process***

The summary charts at GX-15 and GX-17 set out the government's evidence relating to KFC/UFPC's bid process in fall 2013. Notably, the superseding indictment does not allege that Mr. Mulrenin was involved in any price fixing related to this event. (ECF No. 101 at 17-18.) GX-15 includes GX-1427, which purports to show Defendants Brady and Fries discussing that Tyson was "31 back" on dark meat for its forthcoming bid, but there is no evidence that this number is correct. Further, the only reference to a competitor communication involving Mr. Mulrenin on GX-17 are two phone calls (one of which was 0 seconds in length) with Scott Brady from Claxton on November 1, 2013, the day after UFPC sent out feedback from the Round 1 Poultry RFP. (GX-9716.) The government presented no evidence related to the substance of this phone call, nor to the phone calls Mr. Mulrenin had with his supervisor, Mr. Roberts. No communications from November 1, 2013 suggest Mr. Mulrenin and Mr. Brady discussed pricing information or anything related to an agreement to fix prices or rig bids.

      **c.**      ***Church's 2013 Quality Assurance ("QA") Charge***

The summary chart at GX-2 outlines the government's evidence regarding the 2013-2014 QA charge to Church's Chicken. There is no evidence that competitors submitted inflated pricing or that competitor pricing was unexpectedly aligned. While GX-2 shows that Mr. Mulrenin was copied on three internal emails between Tyson employees, he makes no statement in the admitted exhibits and there is no evidence that he took any action based on the emails he received. There is no evidence showing that Mr. Mulrenin or anyone from sales was involved in Tyson's decision-making process regarding the Church's QA charge.

12

### d. *Chick-fil-A Transition to Antibiotic Free or No Antibiotics Ever ("ABF" or "NAE")*

The only evidence presented by the government in summary chart GX-3 is a communication between Mr. Mulrenin and a competitor purporting to be about preliminary thoughts on pricing for conversion to ABF or NAE chicken. (GX 356, GX 354, GX 355.) The chart shows that on April 18, 2014, Mr. Mulrenin had a phone call with Scott Brady, after which Mr. Brady sent a text message to his boss with Tyson's "work in progress" cost pricing assumption for "live weight" that would be used for Tyson to arrive at a "finished" cost price for ABF chicken. Mr. Brady also said in the text message that he told Mr. Mulrenin what "we [presumably Claxton] were doing, Perdue, and Pilgrims." (GX-355.) This text exchange and related calls are the sum total of the government's evidence of Mr. Mulrenin's involvement in this claimed conspiratorial episode. Significantly, this communication with Mr. Brady is the only evidence that refers to Mr. Mulrenin communicating with another supplier about anything relating to price. And it only involves preliminary thoughts on pricing for ABF chicken weeks before specifications were set and Tyson's cost price was quoted. This is not evidence of a *per se* violation. *See Gypsum*, 438 U.S. at 441 n.16.

The government presented no evidence that Mr. Mulrenin's conversation with Mr. Brady resulted in Tyson (or Claxton) altering its price for ABF chicken. In fact, the government presented *no* evidence regarding the prices submitted by Tyson for the transition to ABF or NAE chicken.

### e. *2015 8-Piece COB KFC/RSCS Bid Process*

Summary charts GX-10, GX-11, and GX-12 set out the government's evidence as it relates the 2015 KFC bid process. Summary chart GX-10 cobbles together calls between Mr. Mulrenin, on the one hand, and his boss (Mr. Roberts) and Scott Brady at Claxton. The intention

is undoubtedly to suggest some sort of impropriety before Tyson submitted its round 1 proposal to KFC on August 11, 2014, but there is no evidence whatsoever as to what was discussed on these calls. Indeed, emails quoted later in chart GX-10 omit any Tyson pricing information. (GX 1035, 1036-1, 9744.)

Summary chart GX-12 shows that RSCS asked Mr. Roberts at Tyson for his final pricing by September 2-3, 2014. The government presented no evidence showing that Mr. Mulrenin was involved in Tyson's final pricing or that he even knew the pricing that was submitted by Mr. Roberts on behalf of Tyson.

### f. *2017 Popeye's Bone-in Chicken*

The summary chart at GX-7 outlines the evidence purporting to show an agreement to limit discounts during negotiations with Popeye's in 2017 for the 2018-2020 contract. With respect to Mr. Mulrenin, the only evidence involves internal communications with Mr. Pepper. One communication is an email exchange with Mr. Pepper regarding Popeye's impression that prices had dropped more than they had in reality, which has nothing to do with competitor pricing. (GX-744.) Other communications include texts from Mr. Pepper to Mr. Mulrenin regarding what Georges "is doing," (GX-755) and "some info from Popeyes" regarding what "everyone seems to be doing." (GX-751.) Based upon the information in evidence, no reasonable juror could find that Mr. Mulrenin knowingly joined a conspiracy to fix prices related to the 2017 Popeye's bid process. There is no evidence that Mr. Pepper acquired this information for the purpose of fixing prices or rigging bids, or that Mr. Mulrenin directed him to do so. Indeed, it was a customer—Popeye's—that provided some of the competitor pricing information to Mr. Pepper.

### III.  CONCLUSION

For the foregoing reasons, the Court should grant Mr. Mulrenin's motion for judgment of acquittal.

Dated: March 21, 2022

Respectfully submitted,

*s/ Elizabeth B. Prewitt*
**Latham & Watkins LLP**
Elizabeth B. Prewitt
Caroline A. Rivera
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Email: elizabeth.prewitt@lw.com
caroline.rivera@lw.com

*s/Marci G. LaBranche*
**Stimson Stancil LaBranche Hubbard, LLC**
Marci G. LaBranche
Jamie Hubbard
1652 N. Downing Street
Denver, CO 80218
Tel : (720) 689-8909
Email: labranche@sslhlaw.com
hubbard@sslhlaw.com

*Attorneys for Defendant Timothy Mulrenin*

15

## CERTIFICATE OF SERVICE

  I hereby certify that on March 21, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

 *s/ Nancy Hickam*
 Nancy Hickam