IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.   JAYSON JEFFREY PENN,
2.   MIKELL REEVE FRIES,
3.   SCOTT JAMES BRADY,
4.   ROGER BORN AUSTIN,
5.   TIMOTHY R. MULRENIN,
6.   WILLIAM VINCENT KANTOLA,
7.   JIMMIE LEE LITTLE,
8.   WILLIAM WADE LOVETTE,
9.   GARY BRIAN ROBERTS, and
10.  RICKIE PATTERSON BLAKE,

    Defendants.

## DEFENDANT ROGER AUSTIN'S RULE 29 MOTION FOR ACQUITTAL

Pursuant to Federal Rule of Criminal Procedure 29(a), Defendant Roger Austin moves for a judgment of acquittal because the evidence that the Department of Justice ("DOJ") has presented is insufficient to sustain a conviction.

### I.    Legal Standard

"After the government closes its evidence . . . the court on the defendant's motion must enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29 ("Rule 29"). In considering a Rule 29 motion, courts view the evidence "in the light most favorable to the government, and without weighing conflicting evidence or considering the credibility of witnesses, determine whether that evidence, if

1

believed, would establish each element of the crime." *United States v. Fuller*, 751 F.3d 1150, 1153 (10th Cir. 2014) (quotations omitted). A Rule 29 motion must be granted "if the evidence that [the] defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Id.* (quotations omitted). While the government may satisfy its burden through circumstantial evidence, the Tenth Circuit has "repeatedly iterated that a conviction cannot be sustained if obtained by piling inference on inference." *United States v. Summers*, 414 F.3d 1287, 1293 (10th Cir. 2005) (quotation omitted).

To sustain a conviction, "there must be direct or circumstantial evidence that [Mr. Austin] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). "Mere exchanges of information, even regarding price, are not necessarily illegal, in the absence of additional evidence that an agreement to engage in unlawful conduct resulted from, or was part of, the information exchange." *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999). But the existence of a conspiracy cannot be inferred if "conduct is consistent with other, equally plausible explanations." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596-97 (1986); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007) ("proof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action").

### II.   There Is No Evidence From Which a Reasonable Jury Could Find that Mr. Austin Entered Into a Conspiracy to Agree to Rig Bids or Fix Prices.

The DOJ has presented insufficient evidence from which a reasonable jury could find beyond a reasonable doubt that Mr. Austin entered into a conspiracy to agree to rig bids or fix prices. Instead, the only rational inference from DOJ's evidence is that Mr. Austin aided his employer, Pilgrim's Pride, in making competitive and independent business decisions. Mr.

Austin sought information from many sources to pass along to his superiors. The evidence that DOJ has presented shows that suppliers' bidding strategies were competitive and independent. Those strategies simply are inconsistent with price fixing. Finally, the testimony of two supposed insiders is insufficient to support a conclusion of the existence of a conspiracy.

### A.     Gathering Competitive Information for Independent Decisions

DOJ's evidence shows Mr. Austin doing what any good salesperson would do—gathering information from many sources about market prices and conditions and passing it on to his superiors for them to make decisions about Pilgrim's bids. In reality, most of the information about competitors that Mr. Austin collected was from his main customer, RSCS. For example, in 2011, Mike Ledford told Roger he was "the highest priced supplier. Per pound and per case," threatening to move volume. (DX D-509.) In 2012, Mr. Ledford was "disappointed" and informed Mr. Austin that Pilgrim's was "80 cents higher than the best price and 48 cents higher than the average price." (DX D-546). In 2013, Mr. Ledford again told Mr. Austin directly – "if you went down 1.5 cents you'd still be higher than average but not in a different ball park like now." (DX E-799). And in 2013, RSCS formally provided "detailed feedback" on a line-by-line basis for over a dozen Pilgrim's products with a precise "% from competitive price." (DX D-564). Pilgrims would consider and respond to this directional guidance to make independent decisions about its bidding strategy. (GX 1051). In fact, as acknowledged by Mr. Suerken and Mr. Ledford, Mr. Austin did not have pricing authority for Pilgrims and, in 2014 and 2015, RSCS insisted on a phone call and a face-to-face meeting with Bill Lovette to negotiate. Suerken Mar. 2, 2022 Tr. 66:02-70:22; Ledford Mar. 1, 2022 Tr. 128:08-13.

Ignoring these facts, DOJ has focused on a handful of isolated documents taken out of context. But these fail to move the needle for DOJ. Each of them shows, at most, competitors sharing market intelligence, which is perfectly legal in the absence of an agreement. Dkt. 921 at 19-20 (Instruction No. 17) ("[M]ere similarity of conduct among various persons, or the fact that they may have associated with one another and may have met or assembled together and discussed common aims and interests, does not necessarily establish the existence of a conspiracy.") And the fact that the communications do not indicate the existence of a conspiracy is driven home by the fact that the information about competitors often turned out to be wrong. For example, on the "Price Reduction Impact" spreadsheet (GX 1538) associated with the email in which Mr. Austin said he did not want to suggest to Mr. Penn or Mr. Lovette that Pilgrim's meet competitors' prices (DX D-839), the spreadsheet lists a number for Koch of $.9561. None of Koch's bids or its final price were $.9561. (GX 9691, bidding a price of $.9710, and DX F-769, with a final price of $.9662). In 2014, Koch bid a price increase of $.1330 (GX 1026) and agreed to a price increase of $.1150 (GX 1122) both are below the range of $.13–.15 listed on the email sent by Jason McGuire to Mr. Penn which stated Roger did some checking around. (GX 1074). And when Scott Brady told Mikell Fries that Mr. Austin "said to raise our prices, on wings he is market and market plus .10," (GX 1427), Claxton Poultry actually did the exact opposite and *lowered* its bid on wings. (GX 1501).

None of this evidence would allow a jury permissibly to infer the existence of a conspiracy, because it is inconsistent with one. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 596.

### B.     The Evidence Proves Competition, Not Collusion.

The evidence DOJ presented also shows that the various suppliers' bidding strategies were inconsistent with a conspiracy. Rather, the prices charged and the volume awarded because of those prices prove competition. Of course, the burden is on DOJ to prove the existence of a conspiracy, not on Mr. Austin to prove the existence of competition. But DOJ's own evidence, taken in the light most favorable to DOJ, actually shows the existence of *competition*. The math simply does not add up for DOJ's alleged conspiracy.

During the time frame of the alleged conspiracy, RSCS would send out invitations to bid to a small number of approved suppliers.  Suerken Mar. 2, 2022 Tr. 20:24-21:02; Ledford Feb. 28, 2022 Tr. 159:14-17, 161:04-12.[1] Due to plant location and capacity and the amount of chickens KFC needed, each supplier would be awarded some volume. Ledford Feb. 28, 2022 Tr. 157:24-158:02. RSCS considered a number of factors in awarding volume, including reliability of supply and the quality and safety of product. RSCS was also looking for the "lowest landed" price for its franchisees, which is determined by cost of freight and cost of the product (Price per Pound x Case Weight + Freight). Suerken Mar. 2, 2022 Tr. 32:17-33:25, 56:06-57:04, 100:23-25. All the evidence in the record shows that when a supplier bid a higher price, RSCS took business away from it and awarded that business to a lower-priced competitor. Suerken Mar. 2, 2022 Tr. 54:23-55:20, 60:14-62:05; Ledford Mar. 28, 2022 Tr. 192:01-16, 194:14-18, 213:03-18; DX J-008. Fundamentally, this is competition. Pilgrim's lost nearly half of its volume to KFC, Mr. Austin's customer—hardly what one would expect if the suppliers were conspiring.

---

[1] Transcript citations are to the unofficial transcript because an official, certified transcript is not yet available. To the extent the Court's recollection differs from the draft transcript in any way, Mr. Austin defers to the Court's recollection.



(GX 1552, GX 1729, GX 1126, DX E-014, DX F-796.)

Moreover, the evidence has proven that the suppliers had different business strategies and acted on them. For the key event, the negotiations for the 2015 contracts, Pilgrims wanted to improve its margins for small birds because otherwise it would not make sense to continue to grow them when margins were higher on big birds and Chick-Fil-A birds. It wanted to be the price leader even if it lost volume. As a result, in 2015, it lost approximately 20% of its volume. Suerken Mar. 2, 2022 Tr. 73:03-06. And in 2015, Pilgrims decided to convert a key plant away from KFC to produce for Chick-Fil-A. Suerken Mar. 2, 2022 Tr. 69:07-16, 151:06-23. By contrast, in 2015 George's had the opposite strategy and bid low. Suerken Mar. 2, 2022 Tr. 171:19-22. It won volume and increased production to provide that volume. Suerken Mar. 2, 2022 Tr. 176:11-14.

Other suppliers had yet other strategies. Claxton only sold small bird and was a one plant regional supplier with small market share. Suerken Mar. 2, 2022 Tr. 155:11-18. It did not want to

6

be undercut by offering the highest price nor was it trying to gain substantial market share. Claxton wanted to be above the middle range but not at the top and was explicit with RSCS about its goals. Suerken Mar. 2, 2022 Tr. 51:18 -19. Koch Foods, on the other hand, was willing to increase its capacity for small birds. Suerken Mar. 2, 2022 Tr. 161:25-162:06. And Tyson submitted its bid for 2015 a week early and wanted to finalize its contract before the other suppliers even bid, but Tyson wanted to be paid for marinated weight and tare weight which were not factors in any of the other suppliers' bids. Suerken Mar. 2, 2022 Tr. 93:13-18, 94:11-18, 96:02-12. The evidence in the record shows independent decision-making based on real business strategies that were affected by market forces.

Additionally, DOJ's theory that Mr. Austin knowingly entered into a conspiracy to raise prices is belied by what actually happened to prices during the relevant time frame. Sometimes prices went up and sometimes prices went down. Pilgrim's prices to KFC went down in three years, 2014, 2017 and 2018. (GX 1729, DX F-796). Its prices went up in two years, 2013 and 2015. (GXs 1552, 1126). And suppliers' prices did not always move in the same direction. For the 2013 contracts three suppliers lowered their prices and four suppliers raised their prices.[2]

Moreover, the contract prices were all different and in 2015, the heart of the DOJ's case, the range of prices among competing suppliers widened substantially going from less than one cent in 2014 to 5.5 cents in 2015.[3] It is uncontroverted that this widened gap reflects

---

[2] The suppliers' price changes are reflected in demonstrative exhibit DX I-241 identified by Mr. Ledford (Mar. 1, 2022 Tr. 155:16-156:20) which is a compilation of contracts (DX F-790, GX 1552, DX F-750, GX 1503, DX F-759, GX 1515, DX F-768, DX F-769, DX F-708, DX F-799, DX F-777, DX F-778, DX F-786, DX F-787).
[3] GXs 1729, 1126, 1728, 1119, 1120, 1121, 1122, 1123, 9871, 1127, 1124, 1125, DX F-743, DX F-744.

meaningfully different business choices by suppliers because even a difference of a penny in this industry is significant. Suerken Mar. 2, 2022 Tr. 107:25-108:07, 145:01-146:16; Ledford Mar. 1, 2022 Tr. 112:19-113:04. These price differences and movements demonstrate independent decision-making, not a conspiracy among suppliers to fix prices or rig bids.

Finally, the evidence shows that it was RSCS that had the market power. When market conditions changed in 2017, RSCS was able to force the suppliers back to the table for a mid-year price decrease despite the existing contracts. Suerken Mar. 2, 2022 Tr. 24:11-25:06.

### C. Percipient Witness Testimony Offers No Basis to Find Mr. Austin Joined A Conspiracy

DOJ has largely framed its case around the testimony of two supposed "conspiracy insiders" that DOJ immunized for the purpose of testifying against Defendants. Neither provided testimony that would allow a reasonable jury to conclude that Mr. Austin joined a price-fixing conspiracy.

#### i. Carl Pepper

Carl Pepper provided generalized and often contradictory testimony about a supposed understanding involving a "substantial price increase" in 2014. His testimony was insufficient to prove the existence of a conspiracy to rig bids or fix prices.

Importantly, Mr. Pepper did not include Mr. Austin in the list of Defendants with whom he supposedly discussed anything involving the 2014 QSR negotiations. In fact, Mr. Pepper agreed that "there were very few times that [he] talked to Roger Austin except at food shows" or "golf tournament, stuff like that[.]" Pepper Mar. 7, 2022 Tr. 133:6-9. Mr. Pepper testified that a call between him and Mr. Austin, on July 8, 2014, involved "covering a short," which was corroborated by DX I-932 and DX I-933. Pepper Mar. 7, 2022, Tr. 135:18-21.

8

When confronted with the representation that the only other two calls between Mr. Pepper and Mr. Austin in the summer of 2014 occurred the following day, July 9, 2014, and both lasted under one minute, Mr. Pepper agreed that he remembered no other calls with Mr. Austin that summer, because "like I said, I didn't talk to Roger Austin that many times." *Id.* at 137:1-7. No other evidence was introduced through Mr. Pepper's testimony that linked Mr. Pepper and Mr. Austin at any point during the alleged conspiracy.

### ii. Robert Bryant

Robert Bryant, the other "conspiracy insider" sponsored by DOJ, is an admitted liar with an incentive to testify in such a way that DOJ would not use its discretion to charge him with at least one felony. Bryant Mar. 9, 2022 Tr. 98:20–99:21, 100:17-21, 101:13-20.

However, even if a reasonable juror were to credit the entirety of his testimony and to view it in the light most favorable to the prosecution, Mr. Bryant's testimony does not constitute evidence that Mr. Austin entered into a conspiracy to fix prices or rig bids, either during the 2014 RSCS negotiations or the 2017 RSCS negotiations.

The two phone calls of Mr. Austin's that Mr. Bryant allegedly overheard on August 22, 2014 – one with Mr. Brady, and the other with Mr. Kantola – do not provide a basis that a reasonable juror could use to support a conviction. Mr. Bryant's testimony amounted to having allegedly overheard Mr. Austin tell each of these co-defendants that he had "just told" RSCS that Pilgrim's "price is the price. I just need to know how many loads you want at that price." Bryant Mar. 8, 2022 Tr. 218:1-21. There is nothing conspiratorial about this statement. Mr. Austin is not alleged to have told either Mr. Brady or Mr. Kantola what Pilgrim's price was, nor is he alleged to have asked either of them what their company's price was. (And even if he were, this would

9

be insufficient to support a finding of price fixing.) Importantly, Mr. Austin is not alleged to have asked either of these two men to agree to anything.

The alleged conversations between Jason McGuire and Roger Austin – one at a customer meeting, and one in an email – do not provide evidence that a reasonable juror could use to find Mr. Austin guilty of entering into a conspiracy. As to the customer meeting, Mr. Bryant testified that the conversation had occurred at either a meeting with Church's or Popeye's at which both Mr. McGuire and Mr. Austin were present; Mr. McGuire allegedly told a supposedly non-reactive Mr. Austin, "I need you to put this [referencing a customer-facing PowerPoint presentation] out to the industry." Bryant Mar. 8, 2022 Tr.193:2-17, 195:9-11, 198:4-14. Assuming such a meeting even occurred, Mr. McGuire's instruction – which was vague, unclear, and did not involve asking Mr. Austin to enter into an agreement of any kind – does not rise to the level of evidence of a conspiracy.

As to the e-mail exchange outlined in GX 1066, Mr. Austin responded to Mr. McGuire's question, "Any word *from them* on our proposal?" (emphasis added) with "I heard they made a couple of calls and were surprised." Mr. Bryant testified that Mr. McGuire forwarding him this email exchange was done to "reassure me that the strategy was working and that our competitors were, in fact, increasing prices similar or along with Pilgrim's." Bryant Mar. 8, 2022 Tr. 214:5-7. But a parallel, independent price increase – which is the only reasonable conclusion to be drawn from Mr. Bryant's testimony – does not provide evidence of an illegal agreement. In fact, if Mr. Austin had entered into such an agreement with his competitors, he would have already known, prior to this email, what each planned to bid, and his response to Mr. McGuire's question would not make logical sense.

10

Mr. Bryant's conclusory claim that he had an understanding that Pilgrim's and its competitors entered into an agreement in 2014 to fix prices or rig bids was stricken from the record, because there was no factual basis to underlie such testimony. Bryant Mar. 8, 2022, 223:25–239:24.

The 2017 RSCS negotiation was the only other event involving Mr. Austin about which Mr. Bryant testified.[4] Even if a reasonable juror were to credit Mr. Bryant's testimony about Mr. Austin during those negotiations, the story Mr. Bryant told does not support a conviction in this case. Assuming Mr. Austin actually provided Mr. Bryant with the competitor pricing data that Mr. Bryant wrote in his notes (GX 1919), it was undeniably proven that said prices were current prices for the period during which Mr. Bryant wrote them down (specifically, Period 2 of 2017, which are outlined in DX I-054 and, except for one apparent transcription error, are identical to the prices listed in GX 1919). Multiple government witnesses testified that current prices were markedly distinct from future bid prices, and no reasonable juror could find that knowledge of current prices could be useful in determining what a competitor's bid would be for the following contract negotiation.

Even if, however, knowledge of a competitor's current period price could assist Mr. Bryant in understanding what that competitor's future bid would be, Mr. Bryant's testimony, viewed in the light most favorable to the prosecution, amounted to him admitting that Pilgrim's used that information to independently determine its own first-round bid, without coming to any

---

[4] Despite DOJ's repeated attempts to improperly suggest on direct examination that Mr. Austin was in any way involved in the US Foods activity about which Mr. Bryant testified (Bryant Mar. 9, 2022 31:19-23, 32:22-23), Mr. Bryant's uncontroverted testimony was that the "pricing conduct related to US Foods…didn't have to do with anyone in this courtroom at all except [Bryant]." Bryant Mar. 10, 2022 Tr. 5:10-19.

11

agreement with its competitors. The sum of Mr. Bryant's testimony regarding the 2017 RSCS negotiation amounted to: (1) Mr. Austin provided competitor price information to Mr. Bryant; Bryant Mar. 8, 2022, 174:6-22; (2) Mr. Bryant used that information to place Pilgrim's first-round bid in the second-highest spot among its competitors, *id.* at 16:6-15; (3) Mr. Austin suggested that Pilgrim's should in fact reduce its bid even further, *id.* at 20:12-17; and (4) upon receiving feedback on said bid from the customer, Mr. Stiller allegedly told Mr. Austin to tell competitors that Pilgrim's was not going to concede any more on its price and would "rather walk away from the business than concede on price." *Id.* at 22:5-23, when the evidence shows that Pilgrim's did in fact concede on price. There is absolutely no evidence from the totality of that testimony that a reasonable juror could find that Mr. Austin entered into a conspiracy to rig bids or fix prices in 2017.

## CONCLUSION

For the foregoing reasons, Mr. Austin respectfully asks that this case be dismissed.

Dated:  March 21, 2022                                  Respectfully submitted,

*s/ Michael S. Feldberg*
Michael S. Feldberg
REICHMAN JORGENSEN LEHMAN &
FELDBERG LLP
Attorney for Roger Born Austin
750 Third Avenue, Suite 2400
New York, NY 10017
(212) 381-1965
mfeldberg@reichmanjorgensen.com

## CERTIFICATE OF SERVICE

       I hereby certify that on March 21, 2022, I electronically filed the foregoing motion with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record who have entered notices of appearance in this matter.

                                                           s/ *Michael S. Feldberg*
                                                           Michael S. Feldberg