IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 21-cr-00152-PAB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1. JAYSON JEFFREY PENN,
**2. MIKELL REEVE FRIES,**
3. SCOTT JAMES BRADY,
4. ROGER BORN AUSTIN
5. TIMOTHY R. MULRENIN,
6. WILLIAM VINCENT KANTOLA,
7. JIMMIE LEE LITTLE,
8. WILLIAM WADE LOVETTE,
9. GARY BRIAN ROBERTS, and
10. RICKIE PATTERSON BLAKE

      Defendants.

### DEFENDANT MIKELL R. FRIES' MOTION FOR
### JUDGMENT OF ACQUITTAL

Defendant Mikell R. Fries, by and through his counsel, and pursuant to Federal Rule of Criminal Procedure 29, respectfully requests the Court to enter a judgment of acquittal on Count One of the Superseding Indictment.

### INTRODUCTION

No reasonable jury could find that Mr. Fries participated in a bid-rigging or price-fixing conspiracy. The government has a tall task: it must prove beyond a reasonable doubt "(1) that two or more persons agreed to violate the law, (2) that [Mr. Fries] knew at least the essential objectives of the conspiracy, (3) that [Mr. Fries] knowingly and voluntarily became a part of it, and (4) that the alleged coconspirators were interdependent." *United States v. Carnagie*, 533 F.3d 1231, 1238

(10th Cir. 2008). The government has failed on all elements. There is scant evidence of an agreement, and no evidence that Mr. Fries knowingly and voluntarily joined an agreement or knew of its objective. Nor is there evidence establishing *when* Mr. Fries joined the alleged agreement or *with whom* Mr. Fries agreed to violate the law.

The government's case is based upon a scattering of documents and so-called "insiders"—Carl Pepper and Robbie Bryant—who were supposed to testify about the innerworkings of the conspiracy. But neither witness's testimony related to Mr. Fries. To the contrary, Mr. Pepper and Mr. Bryant both testified that they had no knowledge whatsoever implicating Mr. Fries in the alleged conspiracy.

The government's leading document against Mr. Fries is a text message he sent to Scott Brady in response an alleged request by Pilgrim's to "raise" prices to KFC on wings. Mr. Fries responded: "Tell him we are trying!" But the exact opposite happened. Less than 24 hours after sending that message, Claxton submitted a price for wings of $1.76—which was significantly lower than its first-round submission of $1.812. No prices were "raised." Simply put, this exchange demonstrates the opposite of an "agreement"—it demonstrates competition and bluffing.[1] Moreover, there is no evidence that Scott Brady ever responded to Mr. Austin—not by email, phone, or text. The lack of response is evidence of no conspiracy, just as much as the government's argument that the text is evidence of the existence of a conspiracy.

---

[1] In the context of the disjointed discussion reflected in the text messages, and because Claxton reduced its prices for wings, the "tell him we are trying" text aptly fits the definition of "bluffing" and is not indicative of a bid-rigging conspiracy. Indeed, the Supreme Court has cautioned against inferences of price fixing from ambiguous evidence and has recognized the "considerable danger" of allowing inferences of conspiracy to be drawn from circumstantial evidence in such cases. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 596 (1986). As the Court has observed, allowing such inferences "could deter or penalize perfectly legitimate conduct," especially where—as here—a defendant's "conduct is consistent with other, equally plausible explanations," such as rational unilateral business behavior outside of an illegal agreement. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984); *Matsushita*, 475 U.S. at 596.

The government's other evidence—non-descript phone calls and emails, numbering in the single digits—are equally deficient. Phone calls among competitors are not evidence of a conspiracy when there is no proof of what was discussed during those calls. Such context-less evidence is insufficient even to survive a Rule 56 motion in a civil case, much less to serve as adequate proof of guilt in a criminal case. *See Kleen Products LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 938–39 (7th Cir. 2018). And while the government places considerable weight on exchanges of price information, not a single text message or email shows an agreement to fix prices or rig bids on the part of Mr. Fries. At best, these communications reflect attempts to gain market intelligence, which, absent evidence of an agreement, are plainly not *per se* violations of the Sherman Act. *See United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("The exchange of price data and other information among competitors does not invariably have anticompetitive effects [and] such exchanges . . . do not constitute *a per se* violation of the Sherman Act."); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999) ("Mere exchanges of information, even regarding price, are not necessarily illegal, in the absence of additional evidence that an agreement to engage in unlawful conduct resulted from, or was a part of, the information exchange.").

In short, even with admittedly low standard of a motion for judgment of acquittal, the government has produced no evidence of an agreement to fix prices or rig bids involving Mr. Fries for which a reasonable jury could find Mr. Fries guilty, and this Court should enter judgment of an acquittal as to Mr. Fries.

## LEGAL STANDARD

In deciding a motion for judgment of acquittal, the Court must determine "whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn

therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Stiger*, 413 F.3d 1185, 1193 (10th Cir. 2005). A conviction cannot be obtained, however, "by piling inference upon inference. An inference is reasonable only if the conclusion flows from logical and probabilistic reasoning." *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998).

## **BACKGROUND FACTS**

At trial, the government offered the following evidence of Mr. Fries' knowledge of and participation in the alleged conspiracy. Since the government's evidence as to Mr. Fries is limited, without context, and conjecture at best, there is an insufficiency of evidence to support a conviction.

### I. Testimony

As relevant to Mr. Fries, the government elicited testimony from Special Agent LaNard Taylor, purported co-conspirators Carl Pepper and Robbie Bryant, and purported victims Michael Ledford (RSCS), Pete Suerken (RSCS), Sara Fisher (RSCS), Robert Lewis (RSCS), and Joseph Brink (Pollo Tropical). Not a single witness offered any specific evidence implicating Mr. Fries in the charged conspiracy.

#### A. Special Agent LaNard Taylor

The government called Special Agent LaNard Taylor to testify about the mechanics of the investigation into the defendants' alleged price-fixing and bid-rigging conspiracy. The agent did not mention Mr. Fries, much less provide testimony suggesting that Mr. Fries engaged in an unlawful conspiracy. Instead, Special Agent Taylor testified about subjects such as the time covered by the investigation, the types of evidence the government looked for during the investigation, and how it collected and reviewed that evidence.

4

### B. Alleged Co-Conspirators Carl Pepper and Robbie Bryant

The government elicited lengthy testimony from Carl Pepper, a former employee at Tyson's, and Robbie Bryant, formerly of Pilgrim's Pride, both of whom have immunity agreements. In his 25 interviews with the government, Mr. Pepper never said Mr. Fries was a party to an illegal agreement. Further, Mr. Pepper testified that his participation in a price fixing conspiracy amounted to calling competitors and asking if there would be a substantial price increase in 2015. He did not testify about any underlying facts of an intention for a quid pro quo, or that one competitor's price increase is predicated on agreement or activity of a competitor also increasing pricing.

Mr. Bryant, meanwhile, admitted to lying to federal prosecutors on multiple occasions in the past. Mr. Bryant admitted he had no knowledge regarding involvement of Mr. Fries in the charged conspiracy. He admitted that he did not "hav[e] any conversations about pricing with Mr. Fries," that he "never talked to Mr. Fries about Claxton's volume of business," and that he never "spoke[] to Mr. Fries about other suppliers' pricing at all." (Bryant 3/9/2022 Testimony at 83:13-84:20.)[2] Under Mr. Bryant's version of the conspiracy, members agreed to not take volume from each other. However, Mr. Bryant was proved wrong repeatedly, year after year, as competitors were undermining each other and taking volume from the other.

In sum, the government's only witnesses with purported knowledge of the alleged conspiracy had absolutely no knowledge of Mr. Fries' participation in, or awareness of, any conspiracy at all. Perhaps most blatant is that the two "inside conspirators" describe *different objectives* of the conspiracy and both are incorrect based on the bids and contracts admitted into evidence.

---

[2] The trial transcripts cited to herein are not official. Cites are provided to the Court for its convenience, not because they reflect a Certified Transcript.

5

### B. Alleged "Victims" at RSCS

The government's purported victims at RSCS—Michael Ledford, Pete Suerken, Sara Fisher, and Robert Lewis[3]—all testified that they had no knowledge that Mr. Fries was involved in any wrongdoing. Instead, their testimony demonstrates Claxton's willingness to negotiate, its competitively low prices, and its practice of taking directional price guidance. Such testimony *exculpates* Mr. Fries.

### 1. RSCS Employees

Mr. Ledford admitted to the leverage that RSCS had in its negotiations with Mr. Fries and Claxton, which made it virtually impossible for Mr. Fries to enter into any price-fixing agreement. Mr. Ledford was asked if he had any personal knowledge of Mr. Fries conspiring with anyone to fix prices or rig bids, and Mr. Ledford responded, "No, I do not." (*Id.* at 108:18-109:1.)

Mr. Ledford stated he could—and did—threaten to take away volume from suppliers, including Claxton, to get the price he wanted. Mr. Ledford made clear to the jury this strategy worked with Mr. Fries and Claxton. In fact, he testified that RSCS "needed Claxton Poultry" because Claxton "tended to offer more competitive pricing than the larger competitors." (Ledford 3/1/2022 Testimony at 26:10–20.)

Mr. Ledford's testimony establishes RSCS utilized its considerable leverage to maintain control of the price negotiation process, which negates the existence of a conspiracy. In addition to using its negotiating leverage to put downward pressure on suppliers' prices, RSCS used this leverage to ensure that its suppliers' final contract prices were within a tight range of one another. This testimony suggests that pressure from price-setting purchasers such as RSCS, not any

---

[3] In the defense case in chief, RSCS employee Richard Eddington also testified, not relevant to this motion at this time.

supposed agreement between the suppliers, explains the suppliers' prices at times being within a tight range of each other.

Mr. Suerken's role at RSCS brought him into frequent contact with Mr. Fries. And yet, like his predecessor at RSCS, Mr. Suerken was not able to point to any anticompetitive conduct committed by Mr. Fries. Mr. Suerken testified he regularly met with Mr. Fries to negotiate chicken prices on behalf of RSCS, including in 2014 related to fresh chicken on the bone product. As Mr. Suerken explained to the jury, Claxton's prices went down over the course of those negotiations. Mr. Suerken did not identify anticompetitive conduct committed by Mr. Fries.

Sara Fisher served as the senior manager for poultry procurement at RSCS from 2016 through 2019. She met and negotiated with Mr. Fries in this capacity. Like the RSCS employees who testified before her, Ms. Fisher had no knowledge of Mr. Fries being a party to any anticompetitive agreement or being involved in any wrongdoing. Ms. Fisher's testimony does not support the existence of the charged conspiracy on the part of Mr. Fries.

Mr. Lewis testified that in the 2014 price negotiations for KFC, he had no personal knowledge that Mr. Fries entered into any agreement with anyone to fix, raise, or maintain a price. The little evidence that Mr. Lewis did offer regarding Mr. Fries' participation in the bidding process was exculpatory: Mr. Lewis admitted that Mr. Fries responded to Mr. Lewis' directional guidance about the price of chicken, that Mr. Fries has always been willing to negotiate prices, that Mr. Fries has never threated to walk away from a negotiation, and that Mr. Fries has never threatened to switch from producing small birds to more profitable big birds (non-conforming for KFC). Such conduct is antithetical to a Sherman Act conspiracy.

2. **Joseph Brink (Pollo Tropical)**

Mr. Brink provided no testimony implicating Mr. Fries in the alleged conspiracy as he "did not negotiate at all with" Mr. Fries in 2014 or "at any [other] point." (Brink 3/10/2022 Testimony at 154:16–23.)

## II. Phone calls, text messages, and emails.

Lacking testimonial evidence implicating Mr. Fries, the government's case hinges on phone records, text messages, and email communications, most of which are displayed in the government's "summary exhibits." The few text messages and emails displayed in these exhibits never show Mr. Fries talking to a competitor. Instead, these communications are between Mr. Fries and fellow Claxton employee, Scott Brady. Moreover, nearly all of them simply reflect Mr. Fries engaging in the legal practice of receiving competitors' price information, and even then, period pricing—meaning, pricing that was already in effect; not future pricing.

In short, the government's evidence of communications is not adequate evidence of Mr. Fries' membership in the alleged conspiracy. There is scant mention of Mr. Fries' name in this evidence. In addition, these communications do not speak for themselves. They require context to understand, which the government failed to provide because it had no percipient witness to call for almost all the evidence underlying the summary exhibits.

Government Exhibit 3 shows a phone call between Mr. Mulrenin and Mr. Brady. Hours after that phone call, Mr. Brady texts Mr. Fries and relates Tyson's per-pound *ABF* cost (live weight). Mr. Brady then states, "I told him we were .31 to .32 per lb. on finished product." Mr. Fries responds, "Did he say what there [sic] finished increase would be." The government did not call a percipient witness for this text exchange, and no jury could reasonably interpret it as demonstrating an agreement on the part of Mr. Fries to fix prices or rig bids. The *only* way a jury

can consider this as evidence of a conspiracy is if they speculate on the meaning of ABF and the timing of the exchange.

Government Exhibit 9 relates to Mr. Brady discussing Pilgrim's CFA cost-plus model to Mr. Fries. However, Claxton Poultry was on a market-based model in 2015, and not a cost-plus model. These two models are conceptually different and unrelated. No jury could reasonably believe this communication to be evidence of an agreement on the part of Mr. Fries to fix prices or rig bids given the differences in models.

Government Exhibit 10 shows Mr. Fries received a request for a cost model from RSCS on August 7, 2014. The exhibit does not otherwise involve or mention Mr. Fries. No jury could reasonably believe this exhibit to be evidence of an agreement on the part of Mr. Fries to fix prices or rig bids, especially considering the lack of corroborating evidence and the fact that the request for a cost model was made by one of Claxton's purchasers, not one of its competitors.

Government Exhibit 11 shows Mr. Fries expressing surprise that "Greeley told him [Mr. Austin] not to come down on price" on August 26, 2014. The next day, Mr. Fries states, "Tinch is at 11," a reference to the time of a scheduled meeting between Mar-Jac and RSCS, not the price of chicken. No jury could reasonably believe this to be evidence of an agreement on the part of Mr. Fries to fix prices or rig bids. At most, this evidence shows Mr. Fries engaging in the legal practice of obtaining information about competitors' prices. Moreover, despite Mr. Fries possessing this limited knowledge about his competitors' prices, Claxton's prices went down during the 2014 negotiations with RSCS.

Government Exhibit 12 shows Mr. Brady calling Mr. Fries on September 3, 2014. On the same date, Mr. Brady texts Mr. Fries that he "told Bob [Lewis-RSCS] we would go down .02 he said someone moved down .04 it has to be George's or he is bluffing. Roger and bill [sic] are not

9

moving." No jury could reasonably believe this to be evidence of an agreement on the part of Mr. Fries to fix prices or rig bids. At most, this evidence shows Mr. Fries engaging in the legal practice of obtaining information about competitors' prices—some of which Mr. Fries received not from a rival supplier, but from a purchaser. And again, Claxton's prices went down during the 2014 RSCS negotiations, despite Mr. Fries possessing this price information.

Government Exhibit 15 shows Mr. Fries calling Mr. Brady on November 13, 2012. Later that day, Mr. Brady texts Mr. Fries that "George's is .30 back on dark meat." There is further discussion on pricing. Then, in response to the message, "[Mr. Austin of Pilgrim's] said to raise our prices, on wings he is market and market plus .10," Mr. Fries writes, "tell him we are trying!" No jury could reasonably believe this to be evidence of an agreement on the part of Mr. Fries to fix prices or rig bids. This text from Mr. Fries pertains to Claxton's prices for wings during the 2012 negotiations with RSCS/UFPC. The government argues that it demonstrates Mr. Fries' agreement to the alleged price-fixing and bid-rigging conspiracy, but that is out of line with what occurred during those negotiations. Throughout that bidding process, Claxton *lowered* its prices for wings and other products, undercutting Pilgrim's price and taking away Pilgrim's volume of sales. *See* government exhibit 1501. Indeed, less than 24 hours after sending the message, Claxton submitted a price for wings of $1.760—down from its first-round proposal of $1.812.

Government Exhibits 1614 and 1615 show phone calls between Mr. Austin and Mr. Brady and a text from Mr. Brady to Mr. Fries stating, "I talked to [Mr. Austin] about the KFC sizes and he is *in agreement with us*." (emphasis added). The emphasized language merely reflects a shared opinion between Mr. Fries, Mr. Brady, and Mr. Austin. Critically, this shared opinion does not pertain to bird *price*, but rather to bird *size*. More specifically, the statement Mr. Brady is said to have relayed to Mr. Fries regarding bird size was simply a confirmation that Pilgrim's had reached

10

the same independent conclusion as Claxton regarding an inquiry from RSCS/UFPC about the feasibility of supplying KFC with 2lb 4oz birds—*i.e.*, that supplying a bird so small was not feasible. It does not appear that even Mr. Ledford viewed this inquiry as realistic.

Government Exhibit 17 shows a telephone call between Mr. Fries and Mr. Brady on November 1, 2013. Weeks later, Mr. Brady texts Mr. Fries, "Just an FYI last year we were .32 back on dark meat and this year we are 3050 back." After a back and forth, Mr. Fries says, "Stay .305 then." No jury could reasonably believe this to be evidence of an agreement on the part of Mr. Fries to fix prices or rig bids. This exchange is a formula entry- not a price. Additionally, the pricing discussions captured in government exhibit 17 relate to negotiations with UFPC in 2013— negotiations that, once again, resulted in Claxton reducing its prices.

## ARGUMENT

### I. No reasonable jury could find Mr. Fries guilty beyond a reasonable doubt.

To prove a conspiracy, the government is required to establish: "(1) that two or more persons agreed to violate the law, (2) that the defendants knew at least the essential objectives of the conspiracy, (3) that the defendants knowingly and voluntarily became a part of it, and (4) that the alleged coconspirators were interdependent." *Carnagie*, 533 F.3d at 1238 (10th Cir. 2008). The government has failed to offer sufficient evidence upon which a reasonable jury could conclude that Mr. Fries entered the conspiracy as alleged.

### A. The evidence does not show Mr. Fries knowingly participated in any conspiracy.

The government must prove Mr. Fries was personally aware of and participated in the charged conspiracy. The guilt as to each individual defendant must be shown. *See United States v. Record*, 873 F.2d 1363, 1368 (10th Cir. 1989) (for a conspiracy, it is "essential to determine that kind of agreement or understanding existed as to each defendant"). The Tenth Circuit is "mindful

11

to guard against the mass application of guilt when conspiracy charges are involved because guilt is always dependent on personal and individual conduct, not on mere association or unknowing involvement." *United States v. Horn*, 946 F.2d 738, 741 (10th Cir. 1991); *see also United States v. Kendall*, 766 F.2d 1426, 1432 (10th Cir. 1985) (neither knowledge alone nor mere association with conspirators enough to convict of conspiracy). The evidence "supporting the conviction [of Mr. Fries] must be substantial and do more than raise a suspicion of guilt." *Valadez-Gallegos*, 162 F.3d at 1262. "It is of course difficult to prove illegal collusion without witnesses to an agreement[.]" *See In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015). That is exactly what the government has failed to provide in this case—witnesses to Mr. Fries knowingly and voluntarily entering an unlawful agreement.

        **1. The government has offered no direct evidence of guilt against Mr. Fries.**

As discussed above in Sections I (A)–(D), none of the government's witnesses offered any testimony implicating Mr. Fries. Not Mr. Pepper or Mr. Bryant—the governments only purported "insiders"—and not the few government witnesses who frequently dealt with Mr. Fries and Claxton.

        **2. The government's circumstantial case against Mr. Fries requires that impermissible inferences be drawn from legal conduct.**

With respect to Mr. Fries' communications, the government established, at best, that over an eight-year period Mr. Fries communicated with Mr. Brady, who is alleged to have communicated with competitors about pricing and other information. Without additional evidence implicating Mr. Fries in an actual agreement to fix prices, the mere receipt of competitors' pricing information is perfectly legal. *See Intracorp, Inc.*, 179 F.3d at 859 ("Mere exchanges of information, even regarding price, are not necessarily illegal, in the absence of additional evidence

that an agreement to engage in unlawful conduct resulted from, or was a part of, the information exchange."); *see also United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978).

The government's phone call evidence does nothing to alter this conclusion. The record is devoid of evidence establishing what was said on any single call out of 99,000 pages of the defendants' phone records, let alone the substance of any call that Mr. Fries participated in. There is even less room to draw an inference of a conspiracy given the presence of thousands of phone records of calls that occurred over an eight-year period among competitors who were routinely buying and selling to one another to cover shortages for their common customers. Phone call evidence among companies with a legitimate reason for their contacts do not allow an inference of conspiracy to be drawn. *See Kleen Products*, 910 F.3d at 938–39.

While the government can rely on circumstantial evidence, the Supreme Court has cautioned against inferences of price-fixing or bid-rigging from ambiguous evidence. *See Matsushita*, 475 U.S. 574, 596 (1986); *see also Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1179–80 (10th Cir. 2019) ("The Supreme Court has long warned courts to be hesitant about inferring concerted action from evidence that is merely circumstantial."). Indeed, courts recognize the "considerable danger" of allowing inferences of conspiracy to be drawn from circumstantial evidence in price-fixing or bid-rigging cases, as such inferences "could deter or penalize perfectly legitimate conduct." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984). That is why "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita*, 475 U.S. at 588. It is impermissible to infer a price-fixing or bid-rigging conspiracy if a defendant's "conduct is consistent with other, equally plausible explanations," such as rational unilateral business behavior outside of an illegal agreement. *Matsushita*, 475 U.S. at 596. This all holds especially true in the criminal context, where the government must prove its

13

case beyond a reasonable doubt, and jurors cannot convict based on ambiguous evidence. *See Gypsum*, 438 U.S. at 441.

It would be especially dangerous to allow inferences of Mr. Fries' participation in a price-fixing and bid-rigging conspiracy to be drawn from the meager circumstantial evidence that the government has produced in this case. Mr. Fries' limited communications demonstrate nothing more than his engagement in the legal business practice of obtaining market intelligence often in the form of price information. The government has utterly failed to prove that these communications were made pursuant to an agreement on the part of Mr. Fries to fix prices or rig bids. Indeed, the government's "insider" witnesses had no knowledge that Mr. Fries was involved in any conspiracy. The government should not be given the opportunity to send Mr. Fries' scant communications to a jury and see if it can infer what the government's co-conspirator insiders could not testify to.

The government is asking the jury to make an inference about Mr. Fries' guilt that cannot be drawn beyond a reasonable doubt. The jury should not be put in a position where they are called to speculate, particularly with Mr. Fries' freedom on the line.

### 3. The government must rely on "guilt by association" to find Mr. Fries guilty.

Even if the Court finds that the government introduced sufficient evidence establishing the existence of a conspiracy, the government's evidence still falls woefully short of connecting Mr. Fries and Claxton to that conspiracy. Mr. Fries cannot be convicted unless it is proven that *he* agreed to join the conspiracy with a full knowledge and understanding of its objectives. *See Record*, 873 F.2d at 1368. The government is attempting to hold Mr. Fries criminally liable for an elusive conspiracy that its own star witnesses cannot support purely through his association with others. This is an impermissible legal inference upon which to find Mr. Fries guilty. The Tenth

14

Circuit has squarely rejected this type of guilt-by-association theory of liability. *See Horn*, 946 F.2d at 741. And a conviction cannot be obtained "by piling inference upon inference," which is exactly what is required to find Mr. Fries guilty in this case. *Valadez-Gallegos*, 162 F.3d at 1262.

## CONCLUSION

This is not a case where the testimony of witnesses demonstrates one thing, and the text and email communications offered by the government say something else. The evidence is not in conflict with respect to Mr. Fries, and it simply does not permit an inference to be drawn that he knowingly participated in the alleged conspiracy. Accordingly, no reasonable jury could find Mr. Fries guilty of Count One, and the Court should order a judgment of acquittal with respect to Count One.

Dated: March 21, 2022

Respectfully submitted,

*s/ Richard K. Kornfeld*
Richard K. Kornfeld
RECHT KORNFELD, P.C.
Attorney for Mikell Reeve Fries
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 573-1900
rick@rklawpc.com