IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.   JAYSON JEFFREY PENN,
2.   MIKELL REEVE FRIES,
3.   SCOTT JAMES BRADY,
4.   ROGER BORN AUSTIN,
5.   TIMOTHY R. MULRENIN,
6.   WILLIAM VINCENT KANTOLA,
7.   JIMMIE LEE LITTLE,
8.   **WILLIAM WADE LOVETTE**,
9.   GARY BRIAN ROBERTS, and
10.  RICKIE PATTERSON BLAKE,

      Defendants.

## WILLIAM LOVETTE'S MOTION FOR JUDGMENT OF ACQUITTAL

Mr. Lovette respectfully submits this brief in support of his motion for acquittal pursuant to Rule 29.[1] An individual cannot be convicted of conspiracy based merely on association. *United States v. Riggins*, 15 F.3d 992, 994 (10th Cir. 1994). Guilt is "dependent on personal and individual conduct." *United States v. Horn*, 946 F.2d 738, 741 (10th Cir. 1991). The government must introduce sufficient evidence as to *each defendant* to prove a conspiracy charge against that defendant. *See United States v. Evans*, 970 F.2d 663, 674 (10th Cir. 1992). The evidence must do

---

[1] Mr. Lovette submits this written motion to supplement his oral motion made on March 15, 2022.

1

more than "'create a suspicion of guilt or amount[] to a conviction resulting from piling inference on top of inference.'" *Riggins*, 15 F.3d at 994 (citation omitted). Applying these principles, the government has failed to introduce evidence sufficient to convict Mr. Lovette. No witness implicated him in the charged conspiracy. Neither Robert Bryant nor Carl Pepper—the purported "conspiracy insiders"—identified him as a participant in any conspiracy or said that he even had awareness of such a conspiracy.

The government's case against Mr. Lovette rests exclusively on a handful of documents, a telephone call, and *possible* (but largely unproved) discussions, the overwhelming majority of which were internal with other Pilgrim's employees. Documents and call records were admitted with no sponsoring witness in a misguided effort to connect the document, discussion, or call to the charge. Guilt cannot be inferred from these documents without "impermissible speculation and conjecture." *Cf. United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998). Even affording the government all reasonable inferences, a jury could conclude only that: (1) Mr. Lovette discussed with Pilgrim's colleagues holding firm on a price increase with a customer notwithstanding the risk of losing business; (2) on two occasions, he received suppliers' pricing information that *may* have been obtained from competitors but no evidence even suggests he was informed of the source; and (3) he supported Pilgrim's independent, "hard nosed competition" strategy not to support other suppliers' shortfalls to customers. (Day 10 Trial Tr. 173:25-174:4 (Bryant).) This conduct is at least "as consistent with permissible competition" as it is with a Section 1 violation (*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)) and shows only that Mr. Lovette and other Pilgrim's employees sought "to implement a single, unitary" strategy, which "does not raise the antitrust dangers that § 1 was designed to police."

2

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984). Mr. Lovette's sole communication does not pertain to a bid or price of chicken and is regarding Sysco, a customer in a business sector the government's witness carved out of the alleged conspiracy. The communication is not relevant to Mr. Lovette's purported membership in the charged conspiracy.

## ARGUMENT

### I. THE TESTIMONY DOES NOT PROVE MR. LOVETTE'S KNOWING PARTICIPATION IN THE CHARGED CONSPIRACY.

#### A. Neither "Conspiracy Insider" Testified Mr. Lovette Joined the Charged Conspiracy.

The government offered two purported "conspiracy insiders" to support its allegations: Robert Bryant and Carl Pepper. (Day 2 Trial Tr. 135:4-6, 136:6-7.[2]) First, in opening, the government characterized Mr. Bryant as "part of Defendant Lovette's crew." (*Id.* 135:4-6.) Mr. Bryant claimed that he and others at Pilgrim's "cooperat[ed]" with competitors "to formulate bids and shar[e] those prices amongst competitors to either increase or limit a decrease in pricing." (Day 9 Trial Tr. 152:12-14.) When asked who at Pilgrim's participated in such conduct, Mr. Bryant did *not* mention Mr. Lovette. (*Id.* 152:23-153:1.) Mr. Bryant later admitted that he had no personal knowledge that Mr. Lovette ever told anyone to coordinate with a supplier about a bid or a price, or that Mr. Lovette ever agreed with any competitor to increase or decrease a price or rig a bid. (Day 11 Trial Tr. 20:4-17.) Mr. Bryant did not even know if Mr. Lovette had a role in pricing for fast-food restaurants, the only sector in which he claimed price fixing had occurred. (Day 9 Trial

---

[2] Mr. Lovette cites the unofficial, draft transcripts for the convenience of the Court. Mr. Lovette defers to the Court to the extent its recollection differs from what is included in the draft transcript.

3

Tr. 154:3-9, 182:25-183:10.)[3] Mr. Bryant did not testify that anyone, including himself, had ever told Mr. Lovette about any alleged price or bid-related phone calls with other suppliers' employees. (Day 11 Trial Tr.19:12-14.) Mr. Bryant's testimony could be credited by the jury only to prove that Mr. Penn reported to Mr. Lovette, (Day 9 Trial Tr. 181:13-17), and that Mr. Lovette worked in Pilgrim's corporate headquarters (Day 10 Trial Tr. 45:7-9).

Mr. Pepper did not mention Mr. Lovette, let alone implicate him in any charged misconduct. Mr. Pepper testified to conversations with former Pilgrim's employee Jimmie Little, and he referred generally to Pilgrim's, which is insufficient to prove that *Mr. Lovette* knowingly participated in the charged conduct. *See Evans*, 970 F.2d at 674. The government offered no evidence that Mr. Lovette knew about or directed any conversation between Mr. Pepper and any person, or that Mr. Lovette ever learned about any such conversation.

### B. None of the Other Government Witnesses Offered Any Evidence of Mr. Lovette Knowingly Participating in Any Conspiracy.

Of the other government witnesses, all but one either did not mention Mr. Lovette or acknowledged that they had never spoken to or interacted with him in negotiations between 2012 and 2018. (*See, e.g.*, Day 9 Trial Tr. 99:23-100:4 (Fisher).)

The only witness outside Pilgrim's who interacted with Mr. Lovette during the relevant period was Pete Suerken of RSCS. Mr. Suerken had a phone call in late August or September 2014 with RSCS CEO Steve McCormick and Mr. Lovette regarding Pilgrim's planned price increase

---

[3] Mr. Bryant admitted his alleged one-off agreement with Mr. Stiller related to U.S. Foods involved only the two of them and did *not* involve Mr. Lovette. (*See* Day 11 Trial Tr. 18:18-21; 19:5-8.)

for KFC.[4] (Day 6 Trial Tr. 66:2-21, 145:20-22.) During the call, Mr. Lovette reiterated that Pilgrim's would not lower its new price. (*Id.* 67:14-68:1.) Mr. Suerken testified that Mr. Lovette had confirmed that position in a subsequent meeting with Mr. Suerken and Todd Imhoff of RSCS. (*Id.* 68:2-69:16.)

There was a universal understanding within the chicken industry—buyers and sellers—that various market forces in 2014 necessarily would lead to an increase in small bird prices. These circumstances and the price increases they generated led Mr. McCormick to reach out to Mr. Lovette, which was unique. (Day 6 Trial Tr. 67:1-6 (Suerken); Day 12 Trial Tr. 147:2-11 (Lewis).) Mr. Suerken acknowledged freely that Mr. Lovette had presented a "very methodical economic case" for the 2014 small bird price increase that "made sense" and was tough to argue against.[5] (Day 6 Trial Tr. 146:2-16.)

Evidence that Mr. Lovette confirmed to Mr. McCormick a Pilgrim's decision to seek a price increase in response to well-known market forces does not prove a Sherman Act violation. Mr. Lovette's authority within Pilgrim's is similarly insufficient. Individuals are not guilty because of their position or title, or any authority that either conveys. *See United States v. Kalahar*, No. 06-20514, 2007 WL 1500536, at *10 (E.D. Mich. May 23, 2007) (granting a Rule 29 motion to set aside the guilty verdict of a business owner when a supervisor, not the owner, had directed an

---

[4] Mr. Lovette also had a call with Steve McCormick in May 2014 when KFC was seeking 30-40 loads per week. (*See* GX9991.) Mr. Lovette's reference to "chicken wars" in that communication connotes competition, not cooperation. Mr. Suerken believed that Mr. Lovette had final authority on whether Pilgrim's could lower its price. (Day 6 Trial Tr. 70:11-18.)

[5] Mr. Lewis, by contrast, admitted that his expectation of a three to five cent price increase in 2015 was based on the 2013 and 2014 contract prices; he did not consider various market forces at work in 2014 or the work of RSCS's own consultants analyzing market conditions. (*See* Day 12 Trial Tr. 171:4-20.)

5

employee to commit the misconduct and with no support in the record that the owner had "knowingly directed [the charged activity] at issue."); *United States v. Recognition Equip. Co.*, 725 F. Supp. 587, 589-90 (D.D.C. 1989) (granting Rule 29 motion with respect to two executives when the government did not produce sufficient evidence that they knew and voluntarily joined the conspiracy, even though lower-level employees had criminally conspired).

## II.     THE OTHER LIMITED EVIDENCE CANNOT SUSTAIN A CONVICTION.

The government must rely upon a handful of documents, a single phone call, and several possible, but unproved, internal conversations. The government's circumstantial case against Mr. Lovette, unsupported by witness testimony, "can in no way lower the standard of proof which this Court must hold the government to in establishing its prima facie case." *Recognition Equip.*, 725 F. Supp. at 596.

### A.     The 2014 RSCS Negotiations Are Insufficient to Prove Mr. Lovette's Alleged Agreement to Violate the Sherman Act.

Much of the government's circumstantial case against Mr. Lovette focuses on Pilgrim's negotiations with RSCS in 2014. The few documents the government relies upon are insufficient to establish Mr. Lovette's participation in price fixing without "piling inference upon inference" and inviting "impermissible speculation and conjecture." *Valadez-Gallegos*, 162 F.3d at 1262.

In GX1074, Mr. Penn receives an email that appears to contain a suppliers' range of prices for various suppliers for RSCS. Importantly, the numbers quoted are two digits, not the four digits required of bids, and all are ranges—suggesting that the numbers are self-generated estimates, not actual offers shared among competitors. (GX1074.) Mr. Penn writes that he would "review with

6

Bill in am."[6] The government submitted no direct evidence, such as a subsequent communication reporting any result of such a review, to prove that any such discussion ever took place and, if it had, what was discussed. This message requires a jury to rely upon a series of inferences that Rule 29 is designed to protect against: first, that Mr. Lovette, in fact, reviewed the numbers in an email that he never received; second, the numbers are bids by competitors, not internally-generated estimates; third, Mr. Lovette learned that competitors had provided the information; fourth—since information sharing alone is not illegal—he knew the sharing was pursuant to an agreement among competitors to coordinate a "substantial price increase"; fifth, Mr. Lovette by word or action endorsed that strategy; and sixth, he did so knowing he was joining an effort to restrict competition. Of course, since RSCS used such range-based information strategically to push suppliers to lower prices, and with no direct evidence that a supplier had provided any of the pricing, a jury could not reasonably infer Mr. Lovette knew that competitors had provided such information and apply the beyond a reasonable doubt standard. But even if a jury could make that inference, the jury would have to make several additional inferential and speculative leaps that Mr. Lovette caused Pilgrim's to agree with competitors to rig the bids or fix prices, rather than Mr. Lovette using the information so that Pilgrim's could decide a price based upon its own independent analysis.[7]

---

[6] The government also offered a summary exhibit listing a series of communications internal to Pilgrim's and with individuals at competitors that occurred before Mr. Penn claimed he would "review with Bill in am." (GX10.) Mr. Lovette is not involved in any of these communications and no evidence permits an inference that Mr. Lovette directed or knew about any of these communications; or that, if he did know about them, he did anything with the information that would support an inference that he knowingly joined the charged conspiracy. *See United States v. Butler*, 494 F.2d 1246, 1249 (10th Cir. 1974) ("[M]ere knowledge or approval of or acquiescence in the object and purpose of a conspiracy without an agreement to cooperate in achieving such object or purpose does not make one a party to a conspiracy.").

[7] Government witnesses confirmed that customers shared suppliers' bids with other suppliers. (*See, e.g.*, Day 8 Trial Tr. 35:9-20, 37:7-22 (Pepper); Day 11 Trial Tr. 125:25-127:5 (Brink).)

Rule 29 does not permit a case to proceed to the jury when a conviction is contingent on a string of inference after inference—all irreconcilable with the evidence that two-digit ranges are estimates, not competitor-disclosed bids. The Tenth Circuit's decision in *Riggins* is persuasive in showing the limits of relying upon too many inferences. *See Riggins*, 15 F.3d at 994. In reversing a drug conspiracy conviction, the Court reasoned, "even if the jury inferred [defendant] knew her mother and sister were hiding drugs . . . that evidence is not sufficient to establish that [defendant] knowingly and voluntarily became part of the conspiracy" because "evidence of mere presence at the scene of the crime or association with co-defendants is not enough to support a conspiracy conviction." *Id.*

The principles in *Riggins* apply with greater force here because, unlike in *Riggins*, the conduct that the government uses to drive its inferences is not inherently illegal like the possession and sale of cocaine. Setting of prices and discussing pricing strategy with coworkers are legal, run-of-the-mill business activities. The "review" can establish Mr. Lovette's violation of the Sherman Act *only* if a jury were to make six consecutive, mutually dependent inferences, despite there being a legitimate alternative to each one. Both *Matsushita* and this Court's jury instruction from the first trial protect against this over-reliance on such sequential shaky inferences. *Matsushita Elec. Indus. Co.*, 475 U.S. at 588.[8] Mere receipt of that information, however, is insufficient as a matter of law to prove price fixing. *See, e.g.*, *United States v. Nat'l Gypsum Co.*, 438 U.S. 422, 435-36, 441 (1978) (price exchanges alone are not a *per se* violation of the Sherman Act). Assuming, in

---

[8] Prior to deliberations, Mr. Lovette anticipates the jury will receive Instruction No. 17, which binds them to follow the principles of *Matsushita*. (ECF No. 921 at Instruction No. 17) (stating, in part, "[w]here circumstantial evidence is just as consistent with unilateral action as with concerted action, it does not, standing alone, support an inference of antitrust conspiracy").

8

following the government's logic in *Riggins*, Mr. Lovette also knew that others at Pilgrim's obtained suppliers' ranges for individual bids from other suppliers, that would still not be enough. There is no evidence, direct or circumstantial, indicating that Mr. Lovette instructed, sanctioned, or otherwise approved efforts to obtain this information, much less that he did so knowingly with the intention that Pilgrim's employees use it to fix a price or rig a bid with competitors.

The government also highlights a communication purportedly reflecting Mr. Austin relaying to Scott Brady that "Greeley told him not to come down on price" after Mr. Austin had a variety of communications, including a phone call with Mr. Lovette. (GX11; *see also* GX1238.) Again, to find guilt, the jury must make a precise string of inferential leaps to fill in evidentiary gaps. The jury must infer all the following: first, "Greeley" is Mr. Lovette; second, Mr. Lovette spoke to Mr. Austin that day about the bidding and not another subject; third, Mr. Lovette instructed Mr. Austin to hold firm on price *and* to relay that information to Mr. Brady, or at least Mr. Lovette knew and expected Mr. Austin would share that information with Mr. Brady; and fourth, Mr. Lovette gave Mr. Austin that instruction knowing the result would be an agreement to fix the bid prices. The ordinary inference is "Greeley" (if anyone at all) was someone else with greater role in pricing, not Mr. Lovette. Mr. Bryant's testimony that he was not aware of Mr. Lovette having a role in pricing supports this simpler inference. In addition, there is no evidence that "Greeley's" instruction to hold firm was meant for anyone other than the customer. The jury would also have to infer that "Greeley" acted pursuant to an agreement to rig bids when instructing to hold firm and to communicate that information to Mr. Brady.

The inferences required from the call are rendered even less likely by the facts that Mr. Lovette's call with Mr. Austin occurred *after* Mr. Austin had already communicated to RSCS that

9

Pilgrim's would not reduce its bid. (GX11; GX1051 GX1237.) Prior to speaking with RSCS, Mr. Austin predicted that Mr. McCormick would call Mr. Lovette "after I hold firm." Mr. Austin spoke with Messrs. Penn and Lovette shortly after his call with RSCS. (GX11.) The most reasonable inference from the call between Messrs. Lovette and Austin is that they spoke about the conversation between Mr. Austin and RSCS and the anticipated call from Mr. McCormick to Mr. Lovette, which did occur, so Mr. Lovette would know the status of the negotiations and the temperature of the RSCS CEO before speaking to him. (Day 6 Trial Tr. 66:2-21, 145:3-13, 145:20-22 (Suerken).) Again, the government's case against Mr. Lovette depends upon a string of inferences for which there is not sufficient evidence to get to the jury, even with Rule 29's presumption in favor of the government.

### B. No Document Shows Mr. Lovette Engaged in, Directed, or Sanctioned Legal Price Sharing, Let Alone Agreed to Fix a Price or Rig a Bid.

The law is clear that merely knowing about others' illegal conduct cannot establish membership in a conspiracy. *Riggins*, 15 F.3d at 994. Nor is "mere association with conspirators" enough when, as in most conspiracy cases, there is no purpose for the association other than engaging in illegal conduct. Here association is the result of purely legal employment with and conducting the ordinary business of Pilgrim's. *Cf. United States v. Jones*, 44 F.3d 860, 866 (10th Cir. 1995); *see also U.S. v. Lorenzo*, 534 F.3d 153, 159 (2d. Cir. 2008) ("mere association with" conspirators "is not enough to prove knowing involvement"); *U.S. v. Esquivel-Ortega*, 484 F.3d 1221, 1229 (9th Cir. 2007) (same). The government must offer sufficient evidence that Mr. Lovette knowingly engaged in the conduct in furtherance of an agreement to fix prices.[9] They failed.

---

[9] The Court has rejected the government's request in the first trial for a "deliberate ignorance" because of a lack of a "factual predicate[.]" (Day 23 2021 Official Tr. 4696:12-14.)

The government's exhibits may, at most, support an inference that Mr. Lovette (i) received pricing information in select instances and (ii) engaged in business conduct at Pilgrim's that was at least "as consistent with permissible competition"—if not plainly legitimate. *See Matsushita*, 475 U.S. at 588. Even assuming that Mr. Lovette "received" pricing information, there is no evidence that he instructed or otherwise sanctioned efforts to obtain such information or to use it to fix prices. When, as here, the evidence "tending to establish that [a defendant] participated in price-fixing activities . . . was insufficient in quantity and quality to enable a reasonable jury to conclude beyond a reasonable doubt that such conduct occurred," granting a Rule 29 motion is proper. *See United States v. Berger Indus.*, No. 79-278, 1983 WL 725, at *6 (E.D. Pa. Feb. 25, 1982) (acquitting where defendant participated in price discussions with conspirators, but evidence that he engaged in price fixing discussions was "sparse, vague, and inconclusive").

        **1.**     **Receipt of Pricing Is Insufficient Evidence of Knowing Agreement to Join in the Charged Conspiracy with the Intent to Restrain Trade.**

The jury must make several inferential leaps because the documents provide incomplete narratives and were admitted with no foundational context. The government's exclusive reliance on a few documents invites the jury to engage in "a degree of speculation and conjecture that makes an inference unreasonable." *Rahseparian*, 231 F.3d at 1263.

Consider the 2012 email in which a colleague sent to Mr. Lovette what appears to be other suppliers' pricing information for the RSCS bidding for the 2013 contract year. (*See* GX1522-23.) Attached to the email (titled "Price Reduction Impact – KFC") is a model of financial outcomes of various price reductions Pilgrim's might offer. (GX1522-23). The government offers a summary to show that Mr. Austin communicated with individuals at other suppliers in the two days before Mr. Lovette received the Pilgrim's pricing model information on November 30, 2012. (GX16.)

11

Again, too long of a string of inferences is required for a jury to conclude that Mr. Lovette entered into the charged conspiracy. First, the jury must infer that Mr. Austin obtained the information in GX1523 from other suppliers, but the fact that calls occurred is insufficient evidence, especially since Mr. Austin also spoke with RSCS's Ledford and Mark Oeschli, who are possible sources of the other suppliers' bids. (GX1428). Moreover, the numbers are wrong. The spreadsheet forwarded to Mr. Lovette shows that Koch Foods' current bid was $0.9561 (GX1523), but Koch Foods' actual bid as of this timeframe was $0.9710 according to the bid Koch submitted to RSCS. (GX1410; GX9691.) Second, the jury must infer Mr. Lovette read the email, then followed-up about it with knowledge the information came from other suppliers. Third, the jury must infer any follow-up by Mr. Lovette was for the purpose of fixing prices in a knowing effort to restrict competition. When the email was forwarded to Mr. Lovette, there is no mention of the suppliers' pricing information, any use of the information, communication with any other supplier, or any agreement with any competitor that might influence a Pilgrim's pricing decision. The only evidence is that the email was sent to Mr. Lovette, which is consistent with Pilgrim's independently deciding a possible price reduction to KFC in order to compete successfully. *See Kalahar*, 2007 WL 1500536, at *10. No evidence has been offered that Mr. Lovette ever read the email, communicated with anyone about it, or directed any strategy based upon it. None of the text of GX1523 or any communication at or about November 30, 2013 implies that Pilgrim's pricing decision is cabined by any agreement with other suppliers. (GX1523). Other exhibits suffer the same failings:

- GX920 & GX9: This is a classic innocuous business communication. With the announcement from Chick-fil-A that KFC's buyer, Mr. Ledford, has been hired away, Mr. Lovette asks Mr. Gay for his view. Mr. Gay notes Mr. Ledford's focus on low cost at KFC, predicting Mr. Ledford may sharpen the examination of

12

supplier costs, but at the time of the email, May 9, 2014—in the midst of the "Mother's Day Crisis" and the spike in the spot market from $1.30 to $1.45—makes the common-sense observation supported by volumes of evidence presented to the jury that the "players in the arena"—which good syntax and grammar indicate refers to buyers—recognize continued supply depends upon equalizing the price for small birds.

- GX3025: While Mr. Lovette is sent (unsolicited) Tyson's apparent pricing for two customers, there is no evidence that a supplier provided this information, that he or anyone at Pilgrim's acted on it, or that it was provided pursuant to an agreement among suppliers to fix prices—much less one to which Mr. Lovette was a knowing participant.

- GX1864: Mr. Penn invites Mr. Stiller to "Come to BL office" to "discuss KFC" in 2017. The government would have the jury make inferences based upon calls that allegedly took place between others at Pilgrim's and individuals at competitors before and after the invitation to Mr. Stiller to come to "BL office." (GX19.) However, no evidence connects those calls with the meeting, as the participants to the calls were not invited to it, and there is no evidence that the subjects of the calls relate to an agreement to fix prices. Again, the jury must make a lengthy string of inferences unsupported by evidence: first, that a meeting took place; second, there was a discussion of other suppliers' pricing; third, there was a discussion of an agreement with other suppliers as to how or what to bid; and fourth, Mr. Lovette directed or approved a decision to fix prices. There is no known communication that would support any of these inferences.

## 2. Internal Communications Reflecting Pilgrim's Independent Strategies Cannot Prove Mr. Lovette's Membership in the Charged Conspiracy.

Compounding its evidentiary failures, the government draws on communications that are "as consistent with permissible competition as with illegal conspiracy" that do not "without more, support even an inference of conspiracy." *See Matsushita*, 475 U.S. at 588. The government relies upon strained inferences based on conduct that, at most, shows Pilgrim's setting its own internal and independent strategy decisions. *Copperweld*, 467 U.S. at 769.

Consider internal Pilgrim's communications refusing to cover Tyson's supply shortage. (*See* GX2000-02, 2005.) Mr. Lovette explained Pilgrim's business strategy to compete against Tyson to secure customers' long-term business by demonstrating an ability to meet the customers'

13

needs. (*See* GX2000-02, 2005.) Mr. Bryant confirmed this unilateral strategy, nicknamed "Otis" (Day 10 Trial Tr. 170:24-172:2; *see also* GX2002), and that it was "hard nosed competition." (*Id.* 173:25-174:4.)  Further, Mr. Bryant confirmed that this strategy was not limited to Tyson, (*id.* 172:15-17), so it could not be retaliatory to Tyson. Mr. Bryant volunteered that the strategy succeeded in winning business. (*Id.* 173:16-24.) The government has not ruled out, as it must, the explanations "consistent with permissible competition." *See Matsushita*, 475 U.S. at 588.

      **C.**    **An Isolated Discussion About a Customer in a Different Sector Cannot Prove Mr. Lovette's Membership in an Eight-Year Conspiracy.**

The government offers a single example (GX803) in which Mr. Lovette communicated with a competitor: one email exchange with Joseph Grendys, the Koch Foods CEO, in 2016 related to Sysco's request for new credit terms. The government offered no witness and no document to prove any connection between the "65 day terms" referenced in the document or the email exchange and price fixing of broiler chicken products. The opposite is true. Fatal to the government's case is testimony from Mr. Bryant that there was *no conspiracy* involving the broadline sector, which housed the Sysco relationship. (Day 9 Trial Tr. 150:5-7; 154:3-9.) The government offered no evidence of subsequent communications between Mr. Lovette (or anyone else at Pilgrim's) and Mr. Grendys (or anyone else at Koch Foods) on Sysco's credit terms. *Cf. United States v. Bestway Disposal Corp.*, 724 F. Supp. 62, 68, 70 (W.D.N.Y. 1988) (acquitting defendants for lack of agreement because there was no "meeting of the minds" where defendants "did not, and knew they could not, trust each other enough to work together").[10] *Per se* culpability

---

[10] Yet again, the government puts communication before the jury in defiance of its irrelevance. The testimony of Sysco's Melissa Hoyt at the first trial demonstrated that Pilgrim's and Koch were never asked to give Sysco 65 day terms; Pilgrim's negotiated new terms with Sysco within weeks without Mr. Lovette's involvement in the negotiations; and Koch and Sysco negotiated for years

14

can exist only when competitors agree to fix credit terms or to deny credit. *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 650 (1980). Even taking the evidence in the light most favorable to the government, neither Mr. Grendys nor Mr. Lovette asked the other to agree to fix a term for the sale of broiler chickens or any other chicken product, to deny credit to Sysco, or to refrain from negotiating terms with the customer. Even if the jury could conclude the men agreed in 2016 to inform one another if their respective company's negotiating position were to change, as a matter of law no jury could conclude that Mr. Lovette thereby knowingly agreed to rig bids or fix prices for QSR broiler chicken contracts. *See Evans*, 970 F.2d at 670 (a co-conspirator must have "general awareness of both the scope and the objective of the enterprise").

## CONCLUSION

For all these reasons, Mr. Lovette respectfully moves for a judgment of acquittal.

Dated:  March 21, 2022                               Respectfully submitted,

*s/ John A. Fagg, Jr.*
John A. Fagg, Jr.
James P. McLoughlin, Jr.
Kaitlin M. Price
MOORE & VAN ALLEN PLLC
Attorneys for William Wade Lovette
100 North Tryon Street, Suite 4700
Charlotte, NC 28202
(704) 331-3622
johnfagg@mvalaw.com
jimmcloughlin@mvalaw.com
kaitlinprice@mvalaw.com

---

until they reached agreement on different terms. (Day 19 2021 Official Tr. 3885:9-12, 3882:9-11, 3884:21-3885:8). The defense was forced to call Brenda Ray to explain the complete disconnect. She testified that Pilgrim's never received 65-day terms and that Mr. Lovette was not involved in any way with the Sysco negotiations. (Day 16 Trial Tr. 143:20-22; 151:25-152:10.)

15

**CERTIFICATE OF SERVICE**

I hereby certify that on March 21, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

Dated:  March 21, 2022                                         *s/ John A. Fagg, Jr.*