IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.     JAYSON JEFFREY PENN,
2.     MIKELL REEVE FRIES,
3.     SCOTT JAMES BRADY,
4.     ROGER BORN AUSTIN, and
5.     WILLIAM WADE LOVETTE,

    Defendants.

## DEFENDANT ROGER AUSTIN'S SUPPLEMENTAL RULE 29 MOTION FOR ACQUITTAL

Pursuant to the Court's Order, Dkt. 1218 at 3, Defendant Roger Austin files this Supplement to his motion for acquittal pursuant to Federal Rule of Criminal Procedure 29. As explained in his Rule 29 Motion for Acquittal, Dkt. 1210 ("Rule 29 Motion"), even when viewed in the light most favorable to the prosecution, the Department of Justice ("DOJ") has failed to present evidence sufficient to sustain a conviction. The additional evidence presented by the Defendants underscores this inescapable conclusion, as outlined below.[1]

### I.     Legal Standard

"After . . . the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a

---

[1] This Supplemental Rule 29 Motion incorporates by reference Mr. Austin's Rule 29 Motion.

1

conviction." Fed. R. Crim. P. 29(a) ("Rule 29"). In considering a Rule 29 motion, courts view the evidence "in the light most favorable to the government, and without weighing conflicting evidence or considering the credibility of witnesses, determine whether that evidence, if believed, would establish each element of the crime." *United States v. Fuller*, 751 F.3d 1150, 1153 (10th Cir. 2014) (quotations omitted). A Rule 29 motion must be granted "if the evidence that [the] defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Id.* (quotations omitted). While the government may satisfy its burden through circumstantial evidence, the Tenth Circuit has "repeatedly iterated that a conviction cannot be sustained if obtained by piling inference on inference." *United States v. Summers*, 414 F.3d 1287, 1293 (10th Cir. 2005) (quotation omitted). "While the jury may draw a reasonable inference from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable." *United States v. Dewberry*, 790 F.2d 1022, 1028 (10th Cir. 2015) ("While undoubtedly deferential, this review has some bite: if the evidence does no more than raise a mere suspicion of guilt or requires piling inference upon inference to conclude the defendant is guilty, we will reverse the conviction.").

To sustain a conviction, "there must be direct or circumstantial evidence that [Mr. Austin] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). "A conspiracy to fix prices is an agreement or mutual understanding between two or more competitors to fix, control, raise, lower, maintain, or stabilize the prices charged, or to be charged, for goods or services." Jury Instruction No. 21. "Mere exchanges of information, even regarding price, are not necessarily illegal, in the absence of additional evidence that an agreement to engage in unlawful

conduct resulted from, or was part of, the information exchange." *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999); *see also* Jury Instruction No. 21 ("It is not illegal for a competitor to obtain, rely upon, and act on pricing and other information received from competitors, customers….and others involved in the production and sale of broiler chicken products so long as there is no agreement to fix prices or to rig bids."). The existence of a conspiracy cannot be inferred if "conduct is consistent with other, equally plausible explanations." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596-97 (1986); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007) ("proof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action").

## II. A Reasonable Jury Could Not Find that Mr. Austin Entered Into a Conspiracy to Agree to Rig Bids or Fix Prices.

As Mr. Austin explained in his Rule 29 Motion, DOJ failed to present sufficient evidence from which a reasonable jury could conclude that Mr. Austin entered into a conspiracy to agree to rig bids or fix prices. Rule 29 Motion at 2-12. The evidence presented by the Defendants further demonstrates the existence of independent decision making by the Defendants' employers. If the suppliers were making independent decisions, then there was no agreement or mutual understanding, and therefore no conspiracy. *See* Jury Instruction No. 21. The evidence also further demonstrates that the centerpiece of DOJ's case—the bidding for the 2015 KFC contract—is neither anomalous nor the result of an anticompetitive scheme. Similarly, the evidence shows that the suppliers all competed and the result, lower prices at the end of the supposed conspiracy than at the beginning, is fundamentally inconsistent with the existence of a conspiracy. The only way to get from the evidence that DOJ has presented—a small number of ambiguous communications that DOJ presented without context—to a conclusion that Mr.

Austin joined the alleged conspiracy is by improperly "piling inference on inference," *Summers*, 414 F.3d at 1293. Defendants' evidence easily knocks over DOJ's shaky tower of conjecture.

### A.   Each Supplier Engaged in Independent Decision-Making.

As Mr. Austin explained in his Rule 29 Motion, DOJ's evidence simply showed Mr. Austin engaging in the legally permissible conduct of gathering information from any source he could (mostly his customer) so that his superiors at his employer could make *independent* decisions. Rule 29 Motion at 3-4. Moreover, DOJ's evidence shows that the various suppliers pursued independent and different strategies, resulting in divergent prices and suppliers taking volume from each other. Rule 29 Motion at 5-8. This conclusion, that the chicken suppliers were acting independently rather than pursuant to an agreement, is driven home by additional evidence introduced by the Defendants.

First, Mr. Austin introduced a series of 23 spreadsheets which show in painstaking detail how Pilgrim's price for the 2015 KFC contract was actually derived. These internal analyses show Pilgrim's independent decision-making process and its unique business strategy in connection with the 2014 negotiations for the 2015 KFC contract. The documents first show Pilgrim's pricing team's forecasts for costs across Pilgrim's six KFC plants. *See, e.g.*, DX D-138. They then demonstrate a methodical and detailed process for using these forecasts to create the KFC cost model. For example, on August 15, 2014, Thomas Lane ("a business analyst…[who] would help [Pilgrim's] develop the pricing cost model for KFC among other customers," Bryant Mar. 8, 2022 Tr. 200:25-201:6) circulated an analysis predicting a $.0658 increase in costs, including for chicks, processing and grower pay, but forecasting that HAACP and food safety costs would not rise. DX D-147. These spreadsheets show the progression of the pricing

4

decisions made before the bid was submitted.[2] On August 16, 2014, Mr. Lane circulated a model showing a $0.1858 per pound increase, with $0.12 of the increase attributed to margin. DX D-149. On Aug. 18, 2014, Mr. Lane changed the model to add a small bird adjustment line of $0.12 and no increase in margin. DX D-151. Later that day, Mr. Austin sent a spreadsheet to Mr. Lane, Justin Gay and Jason McGuire with a reduced margin of $0.10 and asked for their comments. DX D-154. Multiple changes to the model continued through the middle of the night before the bid was due. DX D-157, DX D-159, DX D-161. The spreadsheets demonstrate that pricing decisions were being made independently and not pursuant to an agreement with other suppliers. In sum, these analytics demonstrate Pilgrim's independent decision-making.

Second, Greg Finch, Chief Financial Officer of Claxton, testified at length about how Claxton reached independent decisions on pricing and bids. This testimony demonstrated that Claxton consistently pursued a strategy of keeping its previous volume and "grow[ing] that volume…by following [the QSR's] directional guidance on price,"[3] and to "be somewhere in the middle of the pricing…oftentimes undercutting others in the supply chain in order to get that volume." Finch Mar. 16, 2022 Tr. 249:15-250:20. Mr. Finch made clear that Claxton "cannot go toe to toe with any of the big boys in the industry. We know that. We can't possibly do that. They would crush us. So there is no absolutely no reason for us to try to compete at that level. Instead we try to compete in the middle… [and] we tell the QSR that." *Id.*; *id.* at 250:21-251:20.

---

[2] The analytics were admitted pursuant to the Court's granting Mr. Austin and Mr. Penn's motion (Dkt. 1199) as DXs D-138, D-407-410, D-146-152, D-154, D-157-162, D-164, D-165, E-545, and E-546.

[3] As with Mr. Austin's Rule 29 Motion, this Supplemental Rule 29 Motion cites to the unofficial transcript of the trial beginning February 22, 2022. To the extent the Court's recollection differs from what is cited in the motion, Mr. Austin defers to the Court.

5

In fact, Claxton had not, to Mr. Finch's knowledge, "ever taken a position with a QSR buyer of the price is the price" because Claxton is "roughly 1 percent of the industry… We can't dictate to [the QSRs] what our price is." *Id.* at 255:21-256:17. Mr. Finch specifically referenced relevant negotiations with KFC as falling within its consistent strategy to "follow their directional guidance as to where we need to be on price in order to keep the volume that we currently have and also to pick up additional volume." Finch Mar. 17, 2022 Tr. 47:13-48:10. This testimony is particularly important for Mr. Austin because a large portion of DOJ's case concerning Mr. Austin relates to communications between Mr. Austin and Scott Brady of Claxton, as well as Mr. Brady's communications with his boss, Mikell Fries. *See, e.g.*, GX 1427[4]; GX 1734[5]; GX 1615[6]. Mr. Finch also testified that, for the first-round bid for the KFC 2015 contract negotiations, he was the person who "determined what the number was going to be sometimes around the end of July" and that he transmitted that number to Mr. Fries "on August the first of 2014" (Finch Mar. 17, 2022 Tr. 61:18-62:3), well before Pilgrim's had even decided what it would bid. Finally, Mr. Finch testified that "market intelligence" was "just a data point," and he was steadfast in his answer that Claxton's prices were "always" "calculated, considered, and set independently."

---

[4] Importantly, Mr. Finch's testimony made clear that in GX 1427, Mr. Brady was relaying, at least in part, information about current pricing to Mr. Fries. DX A-552, DX A-553, DX I-296, DX I-297; Finch Mar. 17, 2022 Tr. 7:18-13:3. DOJ placed significant weight on its insinuations that GX 1427 contained only bid information. Of course, exchanging bid information is not by itself illegal, *see, e.g.*, Jury Instruction No. 21, but to the extent DOJ relied on GX 1427 to argue that only bid information was exchanged, this was proven untrue during Mr. Finch's testimony.

[5] Mr. Finch explained the context surrounding GX 1734, and unequivocally denied that "Claxton [was] trying to raise its prices based on direction from Mr. Austin at Pilgrim's Pride." Finch Mar. 17, 2022 Tr. 52:1-55:10.

[6] Despite DOJ not asking its own witness, Mr. Ledford, a single question about RSCS's reduced-weight bird request relevant to GX 1615 and surrounding events, Mr. Finch testified extensively that Claxton made an independent determination that "growing a smaller bird [was] impossible." Finch Mar. 17, 2022 Tr. 65:16-71:21.

Finch Mar. 17, 2022 Tr. 107:3-108:9. Given the evidence demonstrating Claxton was acting independently rather than pursuant to a price-fixing agreement, these communications cannot be evidence of Mr. Austin's involvement in a conspiracy.

Third, two witnesses from Tyson Foods spoke about how the price of Tyson's COB was determined by Tyson's business unit and pricing unit, and that the sales unit did not have "the ability to decide and set prices." Bowlin Mar. 15, 2022 Tr. 207:3-11. This is particularly important because Mr. Austin was accused of participating in a conspiracy that involved Tyson, despite unrebutted evidence that Tyson's pricing decisions were made by two witnesses not alleged to have been involved in any way in the supposed conspiracy, or to have communicated with other suppliers. Darrell Bowlin, who worked in the small bird business unit, testified that he had no recollection of any person in the sales unit (including Tim Mulrenin and Brian Roberts) telling the business unit to "increase the price above where [the business unit] wanted to quote[.]" *Id.* at 193:21-194:6; 203:14-22. In fact, Mr. Bowlin testified that Mr. Mulrenin and Mr. Roberts, as well as others in the sales unit, actually tried to "push down [the] price on a regular basis," so much so that Mr. Bowlin admitted to making "accusations to them, hey, sometimes it feels like you work for the customer and not Tyson Foods." *Id.* at 203:8-206:6. Notably, Mr. Bowlin testified that neither Mr. Mulrenin nor Mr. Roberts, the only two Tyson Defendants,[7] were involved in determining the 2015 KFC margin increase, the issue at the heart of DOJ's case against all ten Defendants. Bowlin Mar. 16, 2022 Tr. 4:8-20.

---

[7] On March 31, 2022, DOJ moved to dismiss the indictment against the two Tyson Defendants, among others, because "[t]here have been two trials in this matter, both of which ended in mistrials after the respective juries were unable to reach a unanimous verdict as to any of the ten defendants." Dkt. 1238 at 2. The Court granted that motion the same day. Dkt. 1239.

Brandon Campbell, who helped the Tyson business unit put together the model for the KFC 2015 contract negotiations (*id*. at 211:16-24), worked in Tyson's pricing unit, during which time he priced Tyson's small bird products. Campbell Mar. 16, 2022 Tr. 36:8-38:11. Mr. Campbell testified that it was his responsibility to create the cost model, including the margin, that was ultimately presented to KFC for the 2015 contract; the sales team "didn't have responsibility to tell me what the price was." *Id.* at 42:2-44:23; 46:7-15. Mr. Campbell also testified about how he had decided on the 19 cent per pound margin that Tyson included in its first-round bid to KFC in 2014. DX G-624, DX G-824; Campbell Mar. 16, 2022 Tr. 47:5-52:9; 57:14-61:15. Importantly, Mr. Campbell testified that he had simply provided Mr. Roberts, a sales unit employee, with the margin number, and was not "asking for any kind of modification of this cost model from Mr. Roberts[.]" DX G-521; Campbell Mar. 16, 2022 Tr. 52:10-55:1. When KFC (through its negotiating cooperative, RSCS) "rejected the proposal," Mr. Campbell explained the process that Tyson went through to update the cost model based on RSCS' feedback; notably, the 19 cent margin was not reduced in subsequent bidding, and Mr. Campbell was unequivocal about that margin number being "something that I generated on my own." DX G-570; Campbell Mar. 16, 2022 Tr. 83:4-89:15; 91:24-92:23.

This defense evidence is consistent with what DOJ's own evidence showed regarding the independent decision-making among suppliers. Mr. Ledford agreed that it was "a fair statement" that the "Koch Foods owner is an outsider to the industry from Chicago and known for being cut throat[.]" Ledford Mar. 1, 2022 Tr. 221:12-17. GX 1544 makes clear that during the 2015 KFC contract negotiations, Koch had been "pretty aggressive" with their pricing. In fact, Mr. Suerken testified that RSCS awarded Koch, along with Tyson and George's, a total of approximately 20

8

additional truckloads of COB in volume *per week* as a result of those negotiations – volume that was taken from Pilgrim's due to its higher cost. Suerken Mar. 2, 2022 Tr. 54:16-55:25; 146:18-147:22. In addition, Koch offered to increase its capacity of small birds for RSCS. *Id.* at 161:16-162:6. This was in direct contrast to other suppliers' business strategies regarding the small bird market in 2014-2015. *See, e.g.*, *id.* at 150:10-151:23 (Pilgrim's discussed shutting down a small bird plant in Mayfield, Kentucky in response to RSCS' negotiations in 2014).

Finally, as to George's independent decision-making, DOJ introduced no evidence showing that Mr. Blake, or any decision-maker at George's, knew of its competitors' bids. Mr. Suerken stated that George's had received some of Pilgrim's volume in 2015 in part because of George's "price." Suerken Mar. 2, 2022 Tr. 61:22-62:2; 146:18-147:22. In fact, Mr. Suerken described George's as a "complete outlier because of how low their bid was compared to the other suppliers" and that, unlike other suppliers, Mr. Suerken "thought George's did a wonderful job for us and they were absolutely amazing at what they did." *Id.* at 171:13-22; 173:7-16.

### B. Market Conditions Drove the 2015 KFC Price Increase.

The centerpiece of DOJ's case has been the negotiation for 2015 contracts for KFC. DOJ's theory is that these negotiations resulted in a historically large price increase that was the result of an agreement between the Defendants. In his Rule 29 Motion, Mr. Austin explained why DOJ completely failed to show that is the case and why, in particular, the testimony of the two supposed "insiders" was insufficient to support such a conclusion. Rule 29 Motion at 8-12. Again, evidence presented by the Defendants further demonstrates why no reasonable jury could convict Mr. Austin.

Richard Eddington, the former lead negotiator for RSCS, confirmed what every witness

9

said, exactly what Defendants have argued, and what their employers were saying at the time of the negotiations for the 2015 QSR contracts: a price increase was necessary to stabilize the market for small birds. Eddington Mar. 15, 2022 Tr. 106:15-18. Without the price increase, more suppliers would have moved away from small bird and the supply would have dried up. *Id.* at 79:2-4. In 2014, big bird was yielding a profit of approximately $1.00 per bird or $0.34 per pound more than small bird. *Id.* at 79:2-4; 150:8-22. By making small birds profitable for the suppliers, the 2015 price increase laid the groundwork for a subsequent *decrease* in 2018. *Id.* at 137:9-22. The 2015 increase may have been more than some buyers wanted, but of course raising prices is not a crime. And Mr. Eddington confirmed that, far from being the result of anti-competitive price fixing, the price increase was the natural result of market conditions. *Id.* at 77:22-78:22. Specifically, RSCS was facing pressure from two sides: diminished supply of small birds in the market and increased competition among QSRs and deli for that supply. *Id.*

Additionally, Defendants' expert witness, Edward Snyder, demonstrated that DOJ's premise is incorrect. There was nothing historic about the 2015 price increase. Rather, it looked very much like previous price increases in 2008 and 2011, years untainted by DOJ's price-fixing allegations. Snyder Mar. 17, 2022 Tr. 200:12-203:24; DX J-208. Non-expert individuals with a limited historical understanding, like DOJ's supposed insiders, might have a different view, but the unrebutted fact is that the 2015 price increase was not unprecedented. Because the supposedly unprecedented nature of the 2015 price increase is the foundation for DOJ's case, its falsity is yet another reason that DOJ has failed to carry its burden.

**C. The Suppliers Competed with Each Other.**

As Mr. Austin explained in his Rule 29 Motion, the suppliers competed with each other.

10

They pursued different business strategies in a way that is fundamentally inconsistent with a price-fixing conspiracy, including competing vigorously in the bidding process. Rule 29 Motion at 5-8. The evidence, viewed as a whole, reinforces this point. Mr. Eddington testified that Pilgrim's was adamant that it was determined to push through the highest price increase in 2015 and lost volume as a result. Eddington Mar. 15, 2022 Tr. 112:2-10. Koch, on the other hand, was seeking additional volume. *Id.* at 114:18-22. George's came down significantly during the course of the negotiation, while others stayed close to their initial bid. *Id.* at 163:18-164:12. Claxton pursued its strategy of maintaining volume, potentially obtaining more, and remaining in the middle of all suppliers' pricing based on feedback from the QSR. Finch Mar. 16, 2022 249:15-22, 250:2-251:20. And Tyson made the decision to "try to get the [KFC] business into a profitable state" and to stop "losing money," via a proposal "to change the existing KFC model." Campbell Mar. 16, 2022 Tr. 44:7-16; 49:24-52:9. This competition led to suppliers taking volume from each other. *See, e.g.*, DX J-008-1, copied here in part:

**KFC Pricing and Volume Award: 2014 and 2015 Contracts**

| Company | 2014 Contract Price (per lb) | 2014 Contract Margin | 2015 Contract Price (per lb) | 2015 Contract Margin | 2014 Contract Volume (lbs per week) | 2015 Contract Volume (lbs per week) | Difference in Volume |
|---|---|---|---|---|---|---|---|
| Pilgrim's | $0.9250 | $0.1175 | $1.0856 | $0.2175 | 2,670,435 | 2,110,500 | -559,935 |
| Claxton | $0.9275 | $0.0673 | $1.0669 | $0.1940 | 459,040 | 536,000 | 76,960 |
| Tyson | $0.9299 | $0.0750 | $1.0762 | $0.1931 | 577,575 | 837,500 | 259,925 |
| Koch | $0.9219 | $0.0900 | $1.0369 | $0.2200 | 679,500 | 1,139,000 | 459,500 |
| Mar-Jac | $0.9254 | $0.0900 | $1.0775 | $0.2300 | 599,700 | 1,172,500* | -38,750** |
| Marshall Durbin | $0.9204 | $0.1050 | * | * | 611,550 | * | * |
| Case Farms | $0.9202 | $0.1100 | $1.0310 | $0.2161 | 339,750 | 268,000 | -71,750 |
| George's | $0.9215 | $0.0967 | $1.0307 | $0.1798 | 1,080,405 | 1,105,500 | 25,095 |
| Exhibits | 1120, 1122, 1124, 1728, 1729, 9871, F-743, F-788 | | 1119, 1121, 1123, 1125, 1126, 1127, F-744 | | 1120, 1122, 1124, 1728, 1729, 9871, F-743 | 1119, 1121, 1123, 1125, 1126, 1127, F-744 | |

### D. Percipient Witness Testimony Offers No Basis to Find Mr. Austin Joined a Conspiracy.

As Mr. Austin explained in his Rule 29 Motion, DOJ has built its case around the testimony of two supposed "conspiracy insiders" that it immunized for purposes of testifying

11

against Defendants. But neither provided testimony that would allow a reasonable jury to conclude that Mr. Austin joined a price-fixing conspiracy. Rule 29 Motion at 8-12. Evidence presented in the defense case only strengthens this inescapable conclusion. First, Mr. Bryant's assertion that the alleged conspirators agreed "not…to take volume" (*see, e.g.*, Bryant Mar. 8, 2022 Tr. 165:1-166:13, 167:22-25) was belied by testimonial and documentary evidence proving that Pilgrim's consistently lost volume to its competitors during each year of the alleged conspiracy. *See, e.g.*, Eddington Mar. 15, 2022 Tr. 112:2-10. *See also* GX 1552, GX 1728, GX 1126, DX E-014, DX F-796, which contain volume data presented in this demonstrative chart:



Second, Mr. Bryant's allegation that he overheard Mr. Austin's calls to Mr. Brady and Mr. Kantola on August 22, 2014 was undermined by the fact that the calls pointed out by DOJ (GX 1237; Bryant Mar. 10, 2022 Tr. 57:11-62:4), listed on Mr. Austin's Verizon call logs as lasting one minute each, were not actually even one minute long. *See* Dkt. 1070-1 and 1073; DX J-232 (stipulating that calls under one minute are listed on Verizon logs as one minute). In fact, the calls actually lasted only 19 seconds and 24 seconds, respectively, and there is no proof that either call actually connected. GX 8000 (Kantola records); GX 8003 (Brady records). Moreover,

both calls were in the early morning, before the RSCS-Pilgrim's meeting (DX J-081), even though Mr. Bryant's testimony was that he supposedly overheard Mr. Austin say, "I *told* them…" Bryant Mar. 9, 2022 Tr. 92:18-20 (emphasis added). More importantly, even if Mr. Bryant's testimony is credited, there is nothing collusive or conspiratorial about Mr. Austin simply stating Pilgrim's negotiating position.

Third, defense witness Kent Kronauge – on pointed questioning from DOJ, no less – testified without any dispute that current pricing is factually distinct from future bid decisions.[8] Kronauge Mar. 22, 2022 Tr. 44:16-46:15 (Mr. Kronauge testified, *inter alia*, that there was "a difference between current or past pricing and bid or RFP information" and that during an RFP, "price is still being negotiated" whereas "current and past prices are part of contracts that have already been negotiated"). This belated admission on the part of DOJ, coming during cross-examination of the final defense witness, makes crystal clear that GX 1919 – the document at the heart of Mr. Bryant's allegations and DOJ's attempt to prove that Mr. Austin conspired with his competitors regarding future bids – is no evidence of a conspiracy in any way, since it quite clearly lists each supplier's current price. *Compare* GX 1919 *with* DX I-054. And despite DOJ's dubious and shifty attempts to cherry-pick language from DX F-852 and GX 1930 in order to somehow "prove" that the Claxton and Tyson prices listed on GX 1919 were actually future bids (Bryant Mar. 10, 2022 Tr. 65:8-70:20), even a cursory review of the evidence proves DOJ's argument was, at best, misleading and wrong. DX F-853 (proving that, unlike "99.43" listed on GX 1919, Claxton's first-round bid for COB was 0.9939); GX 1930 (listing pricing discounts

---

[8] DOJ conceded as much in its closing argument, stating, "This case is not about current prices." Mar. 22, 2022 Tr. 170:16.

from Tyson's current pricing model between "$.0025/lb" and "$0.01/lb" depending on number of loads awarded).

Defense evidence strengthened the unassailable conclusion that Mr. Bryant's testimony was insufficient to sustain a conviction against Mr. Austin, and DOJ's reliance on his testimony as the basis for its case against Mr. Austin is baffling. The state of the evidence makes clear that no reasonable jury could find Mr. Austin guilty of participating in the alleged conspiracy.

### E. COB Prices Went Down Over the Period of the Alleged Conspiracy.

Finally, there is something curious about DOJ's allegation of a price-fixing conspiracy– prices were actually lower at the end of the supposed conspiracy than at the beginning, as shown in this demonstrative chart based on evidence introduced in part during Defendants' case:[9]

**KFC 8-Piece Pricing By Year**

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017* | 2018 |
|---|---|---|---|---|---|---|---|
| Pilgrim's | 0.9678 | 0.9703 | 0.9250 | 1.0856 | 1.0856 | 0.9998 | 0.9621 |
| Claxton Chicken | 0.9618 | 0.9625 | 0.9275 | 1.0669 | 1.0369 | 0.9809 | 0.9371 |
| Georges | 0.9686 | 0.9622 | 0.9215 | 1.0307 | 0.9585 | 0.9537 | 0.9455 |
| Koch Foods | 0.9397 | 0.9662 | 0.9219 | 1.0369 | 1.0369 | 0.9988 | 0.9487 |
| Tyson | 0.9723 | 0.9681 | 0.9299 | 1.0762 | 1.0762 | 0.9486 | 0.9486 |
| Case Farms | No bid | 0.9618 | 0.9202 | 1.0310 | 1.0282 | 0.9757 | 0.9531 |
| Mar-Jac | 0.9687 | 0.9675 | 0.9254 | 1.0775 | 1.0775 | 0.9650 | 0.9410 |
| Marshall Durbin | 0.9625 | 0.9683 | 0.9204 | Acquired by MarJac | | | |

*Some but not all suppliers offered a mid-year price decrease.

The only reasonable conclusion, in light of all the evidence, is that there was no conspiracy.

### F. The Supposed "Victims" Testified for the Defense.

---

[9] GXs: 1119-1127, 1129, 1503, 1515, 1552, 1728-1729; DXs: B-963, C-207, E-014, F-742, F-743, F-744, F-745, F-747, F-750, F-754, F-756, F-759, F-763, F-768, F-769, F-777, F-778, F-781, F-783, F-786, F-787, F-788, F-790, F-796, F-798, F-799, G-474.

14

Given the foregoing, it is not surprising that the only "victims" of the so-called conspiracy who testified at the trial – KFC owners and franchisees Bruce Bagshaw and Marcus Shelton – testified for the defense. And, as the Court instructed the jury, the evidence they provided of Mr. Austin's reputation for honesty, integrity, and good character could provide a basis for a finding of reasonable doubt. Jury Instruction Nos. 12, 13.

### III. Failure of Proof of Unreasonable Restrain on Trade

In order to sustain a conviction, DOJ must show an unreasonable restraint on trade. *See, e.g.*, Jury Instruction No. 19. But here, DOJ has introduced no evidence to show that any alleged restraint was "unreasonable," instead relying on the *per se* presumption. As a matter of law, however, information exchanges are judged by the rule of reason, not a *per se* presumption. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("[W]e have held that such exchanges of information do not constitute a *per se* violation of the Sherman Act."). Since DOJ only presented evidence of information exchanges and not an agreement, and failed to present evidence necessary to prove a rule of reason case, it has failed to show an unreasonable restraint on trade.

### CONCLUSION

For the foregoing reasons, Mr. Austin respectfully asks that this case be dismissed.

Dated: April 4, 2022                                  Respectfully submitted,

*/s/ Michael S. Feldberg*
REICHMAN JORGENSEN LEHMAN &
FELDBERG LLP
Attorney for Roger Born Austin
750 Third Avenue, Suite 2400
New York, NY 10017
(212) 381-1965
mfeldberg@reichmanjorgensen.com

15

## CERTIFICATE OF SERVICE

      I hereby certify that on April 4, 2022, I electronically filed the foregoing motion with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record who have entered notices of appearance in this matter.

                                        s/ *Michael S. Feldberg*
                                        Michael S. Feldberg