IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. JAYSON JEFFREY PENN,
**2. MIKELL REEVE FRIES,**
3. SCOTT JAMES BRADY,
4. ROGER BORN AUSTIN
5. WILLIAM WADE LOVETTE,

    Defendants.

## DEFENDANT MIKELL R. FRIES' RENEWED MOTION FOR JUDGMENT OF ACQUITTAL

Defendant Mikell R. Fries, by and through his counsel and pursuant to Federal Rule of Criminal Procedure 29, respectfully requests the Court enter a judgment of acquittal on Count One of the Superseding Indictment[1]. Even when viewed in the light most favorable to the government, the evidence fails to establish that a rational trier of fact can find the essential elements of 15 U.S.C. §1 proven beyond a reasonable doubt.

## INTRODUCTION

On March 21, 2022, Mr. Fries filed a written Motion for Judgment of Acquittal (Doc. No. 1212), supplementing an oral motion made at the close of the government's case. Since that time, the Court heard the testimony of additional witnesses, and reviewed additional exhibits. While the Court may rely solely on the arguments in Doc. No. 1212 in granting a Fed. R. Crim. P. 29 motion,

---

[1] This motion is made following the presentation of all evidence and incorporates arguments made in Doc. No. 1212.

the additional evidence admitted since that time leaves no question about the government's failure to prove its case. *See United States v. Khanu,* 675 F. Supp. 2d 55, 61 (D.D.C. 2009). Following the testimony of Richard Eddington, Gregory Finch, and Prof. Edward Snyder, it is clear that no reasonable jury could find that Mr. Fries participated in a bid-rigging or price-fixing conspiracy beyond a reasonable doubt. *United States v. Tennison,* 13 F.4th 1049, 1059 (10th Cir. 2021). Moreover, two separate juries comprised of 24 Coloradans of disparate backgrounds and experiences agreed, failing to convict *any* defendant in either trial. *See* Docs. 920 and 1231 (Courtroom Minutes, dated Dec. 16, 2021, and Mar. 29, 2022). *United States v. Fuller,* 751 F.3d 1150, 1153 (10th Cir. 2014).

While a conviction that precedes a Court Rule 29 motion is said to be entitled to some deference, the court's review of the sufficiency of the evidence is, nonetheless, said to have "bite." *United States v. Mullins,* 613 F.3d 1273, 1280 (10th Cir. 2010) ("[I]f the evidence does no 'more than raise a mere suspicion of guilt' or requires 'piling inference upon inference' to conclude the defendant is guilty, we will reverse the conviction"); *United States v. Dewberry*, 790 F.3d 1022 (10th Cir. 2015). Here, on the contrary, there have been back-to-back mistrials and the government's voluntary dismissal *with prejudice* of five of 10 defendants, and counsel has found no case that even hinted that a mistrial is entitled to the same deferential treatment as a conviction. Further, judgments of acquittal under Rule 29 are to be treated uniformly and, accordingly, the Double Jeopardy Clause bars appeal from an acquittal entered under Rule 29(c) after a jury mistrial. *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 575 (1977).

*Per se* violations of 15 U.S.C. §1 include those types of restraints on competition that are in and of themselves considered unreasonable because "their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable." *United States v.*

2

*Cargo Service Stations, Inc.*, 657 F.2d 676, 682 n. 4 (5th Cir. 1981) (quoting *Northern Pacific Ref. v. United States*, 356 U.S. 1, 5 (1958)). However, when the evidence consists of mere exchanges of information the presumption vanishes. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n. 16 (1978). Exchanges of information are not considered a *per se* violation because "such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." *Id.* at p. 441 n. 16.

As the government conceded, "this case is not about shortages, current prices, collecting market intelligence. This case is about competitors collaborating, cooperating, conspiring on bids—future prices." (Tr. 3/22, 32:1-4). Here, just as in *In re Baby Food Antitrust Litigation,* 166 F.3d 112, 126 (3rd Cir. 1999), the mere possession of competitive [information] is not evidence of concerted action to fix prices. "In a highly competitive industry [like the broiler chicken industry that is] intensely dependent on market strategy, it makes common sense to obtain as much information as possible of the pricing policies and strategy of one's competitors." *Id.* It is well established law that collection of information "on the street" by sales representatives is far removed from a concerted and reciprocal exchange of important pricing and marketing information by the officers of major companies, particularly an exchange pursuant to an agreement. *Id.* at 135[2].

The government has not alleged any conspiratorial conduct by Mr. Fries after September 3, 2014. Therefore, counsel addresses the evidence to that date. However, a consideration of all evidence establishes a single and important fact: no reasonable jury could find the existence of a conspiracy during that time frame, or that Mr. Fries knowingly joined the charged conspiracy.

---

[2] If Mr. Fries *agreed* –which he did not—one cannot ignore the independent action that Claxton took with each round of bidding—lowering its price at the direction of the customer. Thus, it is not simply a question of whether Mr. Bryant and Mr. Pepper says there was an agreement—Mr. Fries' conduct shows there was not.

## LEGAL STANDARD

In deciding a motion for judgment of acquittal, the Court must determine "whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Stiger*, 413 F.3d 1185, 1193 (10th Cir. 2005); *Dewberry*, 790 F.3d at 1028 (10th Cir. 2015) ("While undoubtedly deferential, this review has some bite: if the evidence does no more than raise a mere suspicion of guilt or requires piling inference upon inference to conclude the defendant is guilty, we will reverse the conviction." *Id.* (quotations omitted). "…[A]n inference must be more than speculation and conjecture to be reasonable...." *United States v. Arras,* 373 F.3d 1071, 1073 (10th Cir.2004) (quotations omitted). And "The evidence presented to support a conviction must be substantial." *United States v. Morales,* 108 F.3d 1213, 1221 (10th Cir.1997).")

## THE GOVERNMENT'S EVIDENCE

Mr. Fries hereby incorporates facts from the Government's case in chief, outlined in Doc. 1212. Focusing on 2012 to 2014, the period in which Mr. Fries is alleged to have participated in the conspiracy, there is a lack of evidence of the existence of a conspiracy, let alone that Mr. Fries knowingly and intentionally participated in the conspiracy. In addition to the facts advanced in Doc. 1212, for purposes of this motion, the following facts from the Government's case-in-chief are important to the Court's analysis:

### A. Robert Bryant

Notably, Mr. Bryant did not implicate Mr. Fries in a price fixing conspiracy. Mr. Bryant testified about cooperating with competitors to formulate bids and share those prices amongst competitors to either increase prices or limit a decrease in pricing. (Tr. 3/8, 152:12-14). Mr. Bryant

4

did not testify to any knowledge of the 2012 or 2013 RSCS/KFC negotiations. As to 2014, the entirety of Mr. Bryant's "knowledge" is limited to hearing Mr. McGuire tell Mr. Austin to "put this out to the industry"; Mr. Austin supposedly informing a representative of RSCS/KFC, "the price is the price"; and Mr. Bryant's having overheard Mr. Austin tell Mr. Kantola and Mr. Brady "I just told them the price is the price. I just need to know how many loads you want at that price." (Tr. 3/8, 195:9-11; 216:23-217:2; 218:1-12; 218:1-5). However, Mr. Bryant never testified that Mr. Austin conveyed a bid price or an agreement to do so. (Tr. 3/9, 91:9, 91:11, 91:13, 91:19). Significantly, Mr. Bryant was not aware that Claxton reduced its price and undercut Pilgrim's by four cents from the initial bid to the final contract. (Tr. 3/9, 95:18). Time and time again, question after question, the cracks in Mr. Bryant's vague and unsupported narrative started to show. Mr. Bryant testified that the purpose of the conspiracy was to not undercut or take volume of business from competitors. (Tr. 3/8, 165:24-166:3, 170:24). However, for the entire conspiracy, for every single year, competitors did just that. That evidence is uncontroverted. *See, e.g.,* DX J-008-1.

Mr. Bryant's knowledge of the purpose of the conspiracy was never more undermined than when looking at the contracts themselves. The 2015-2017 Pilgrim's contract with RSCS/KFC reflects a loss of volume of more than 500,000 pounds of chicken per week and the weekly volume went from 2.6 million pounds a week of chicken to 1.3 million pounds. (Tr. 3/9, 139:4-6; 142:24-143:3). Claxton, Tyson, Koch, and George's all took volume from Pilgrims. (Tr. 3/9, 194:18-20; 200:16-19; 201:19-23; 206:18-21). *See* J-008.

Not only did Mr. Bryant lack knowledge about a conspiracy, but he also equally lacked knowledge both generally and specifically of Mr. Fries. Mr. Bryant never spoke with Mr. Fries about Claxton's pricing, bidding, volume, or other competitors' pricing. (Tr. 3/9, 83:14-15; 84:2;

5

84:12; 84:13-14; 84:17). He also never received Claxton pricing from Mr. Brady or provided pricing to Mr. Brady. (Tr. 3/9, 86:17; 86:20).

### B. Carl Pepper

Like Mr. Bryant, Mr. Pepper, an employee of Tyson Foods, in no way implicated Mr. Fries in any price fixing conspiracy. Mr. Pepper does not describe illegal conduct for the time period involving Mr. Fries. Mr. Pepper testified to having conversations in "2014 for the RSCS/KFC 2015 contract and it was concerning a substantial pricing increase that I talked to Jimmie Little…Scott Brady…and Ric Blake…to see if they had basically heard or if they were looking to also have a substantial pricing increase for the…2015 contract." (Tr. 3/2, 244:12-18). Mr. Pepper did not share any pricing information. (Tr. 3/3, 194:19-20). As for Claxton, Mr. Pepper remembers conversations with Mr. Brady at the beginning of August 2014. (Tr. 3/2, 256:11-13). He states that "Claxton was also going to agree to have a substantial pricing increase." (3/2, 257:9-12). Mr. Pepper stated he told Mr. Brady about Tyson's plans for a substantial price increase (Tr. 3/3, 44:20-24). Conceding that Mr. Pepper could not possibly have the dates and times of the supposed calls with Mr. Brady correct, the Government stated, "Maybe Mr. Pepper misremembered exact timing of the calls…" (Tr. 3/22, 33:25). While Mr. Pepper repeatedly used the ambiguous and vague word, "substantial," what he meant by that was never communicated to Messrs. Blake, Brady, or Little. (Tr. 3/3, 49:22-25). Finally, as it relates to Mr. Fries, Mr. Pepper did not testify about him at all, other than to say that he met him "a few times." (Tr. 3/3, 31:24-25).

### DEFENSE'S WITNESSES[3]

---

[3] Kent Kronauge, President of SMS, testified that to his knowledge, none of the defendants conspired to fix bids or rig prices in relation to Popeye's at any point from 2014 to the present. Because these allegations do not involve Mr. Fries, and because the government apparently abandoned the Popeyes episodes during its closing arguments, Mr. Kronauge's testimony is not summarized herein.

6

### A. Richard Eddington

Mr. Eddington joined RSCS/KFC in 2014. (Tr. 3/15, 73:11). When Mr. Eddington joined RSCS/KFC, the negotiations for the 2015 contract were still in the initial stages. (Tr. 3/15, 76:21-22). In the months leading up to the negotiations, RSCS/KFC was paying between $1.30 and $1.40 per pound to try and get incremental product. (Tr. 3/15, 78:1-3). At this same time, a "big bird" was yielding a profit of approximately $1 per bird more than a small bird. (Tr. 3/15, 79:2-4). Claxton lowered its price $.043 between its initial 2015 bid, and its final bid. (Tr. 3/15, 100:12-15). The negotiations and the higher profit stabilized the market. (Tr. 3/15, 107:15-18). In the following years, and despite the contract, Claxton reduced its price at the request of RSCS/KFC. (Tr. 3/15, 110:1-7). Mr. Eddington explained how both buyers and suppliers bluffed each other during the negotiation process and suppliers learned pricing information from each other through covering shortages of supply. (Tr. 3/15, 120:21-25; 118:23-119:16). Finally, he said, these types of transactions are routine. (Tr. 3/15, 121:2-5).

### B. Greg Finch.

In the Government's own words, Mr. Finch "explained away" the evidence the Government relies on to try to convict Mr. Fries. (Tr. 3/22, 40:17-20). As he stated, Claxton's prices were calculated, considered, and set independently. (Tr. 3/17, 107:8-10). Further, Mr. Fries never agreed with any other suppliers on the prices of broiler chicken products Mr. Finch was calculating and putting into the pricing models. (Tr. 3/17, 108:6-9).

Mr. Finch articulated the way Claxton goes about pricing its products. "On the QSRs we have a couple of different ways we price those….So for [QSRs] I take the cost-plus model that they dictate that we use that has probably somewhere between 40 and 60 variables in it and I put our actual costs into each one of those lines on that variable. And then if I know what costs are

7

coming…I will add that into what our actual cost is and then we give that to the QSR." (Tr. 3/16, 249:2-14). Claxton Poultry tries to be in "the middle of the pricing." (Tr. 3/16, 250:11). By doing so, Claxton undercuts the others in the supply chain to be awarded more volume. (Tr. 3/16, 250:19-20). Claxton has never told a buyer, "the price is the price." (Tr. 3/16, 255:25-256:1).

Mr. Finch explained the cost-plus system is transparent, allowing a buyer to see and compare cost factors, identifying changes from year to year and from supplier to supplier. (Tr. 3/16, 259:2, 263:7-16). Mr. Finch also testified to the following relevant facts:

    i.    <u>Period Pricing</u>

As to GX1426, Mr. Finch explained that period pricing is also known as current pricing. (Tr. 3/17, 5:2-3). Further, when suppliers buy from each other, they buy at the seller's period price. (Tr. 3/17, 5:9-10). Knowing a competitors' period price does not factor into calculating costs. (Tr. 3/17, 50:6).

    ii.    <u>Covering Shorts</u>

Covering shorts happens "all of the time," and can occur daily. (Tr. 3/17, 15:1; 14:24). All poultry suppliers are not just competitors of Claxton Poultry, but are also customers. (Tr. 3/17, 18:17-20). Claxton Poultry does millions of dollars a year in business with other chicken suppliers. (Tr. 3/17, 18:24-19:4).

    iii.    <u>2013 KFC Contract</u>

As to GX1427, "this month" means period pricing. (Tr. 3/17, 8:4-5). As to the same exhibit, Mr. Finch testified that Claxton's period price was indeed three cents lower than Pilgrims. (Tr. 3/17, 12:8). Mr. Finch and Mr. Ledford testified that for wings, the instructions from RSCS directed the parties to input "market price." (Tr. 3/17, 54:1-43; 3/1, 47:1-6). Further, Claxton Poultry reduced its wing price at the direction of the customer. (Tr. 3/17, 55:1-2).

8

During every single negotiation with KFC in 2012 for the 2013 contract, Claxton never raised its price. (Tr. 3/17, 55:3-5). Despite, "we're trying," contained in GX1427, Claxton never "tried" to raise its prices based on direction from Mr. Austin of Pilgrim's Pride and, in fact, reduced its price the very next day. (Tr. 3/17, 55:5-7; 3/1, 45:20-22).

    iv.    2014 KFC Contract

As to GX1734, Mr. Finch testified that while Claxton's dark meat *formula* remained at $.3050 "back," the eight-piece *price* consistently came down. (Tr. 3/17, 53:6-11). On cross-examination, Mr. Finch was asked about the 8-piece price mentioned in GX10651. He stated, "if .9250 were an eight-piece price, then if whoever gave that information was telling the truth, then you could conceivably take 30 cents off of that if Roger [Austin] is really at .30 back. We don't know if Roger is really at .30 back or not. We don't know who is bluffing and who's not." (Tr. 3/17, 161:20-24). The source of the information contained in GX10651 is "speculative." (Tr. 3/17, 181:25-182:1). The exhibit reflects no information that anyone at Claxton Poultry agreed with anyone to fix or maintain a price. (Tr. 3/17, 182:2-5). Claxton relied on the customer to assist [Claxton] by telling them where to be priced. (Tr. 3/17, 184:15-14). Claxton always follows the customer's directional guidance. (Tr. 3/17, 184:17-18). GX1734 establishes this fact.

    v.    2015 KFC Contract

Mr. Finch testified that he was involved in the 2015 KFC negotiation. (Tr. 3/17, 56:1-2). Claxton Poultry received a "big bird adjustment" to incentivize suppliers to remain in the market. (Tr. 3/17, 59:18-20). Mr. Finch stated he calculated the big bird adjustment and margin on behalf of Claxton Poultry. (Tr. 3/17, 60:11-23, 61:5-6). Mr. Finch calculated this number. (Tr. 3/17, 61:24-25).

9

Mr. Finch testified that customer feedback "is what [Claxton] goes off of. We follow their directional guidance as to where we need to be on price in order to keep the volume that we currently have and also to pick up additional volume." (Tr. 3/17, 48:7-10). The final contract price had a margin of $.10, and a big bird adjustment of $.094. (Tr. 3/17, 64:18-20). Claxton reduced its price by more than four cents between bids. (Tr. 3/17, 65:6-10). These reductions were at the direction of the customer. (Tr. 3/17, 106:6-7). Remarkably, the Government looks to GX1238 as evidence of an agreement, but as Mr. Finch explained, the number "11" does not relate to pricing but rather Mar-Jac's meeting time with RSCS. (Tr. 3/17, 105:19-25).

      vi.    <u>Reduced Weight Bird</u>

Mr. Finch testified about KFC's request to produce a smaller bird than the standard small bird that was available in the market. (Tr. 3/17, 16:et. al.) He testified about his knowledge of GX1615. (Tr. 3/17, 65:21-24). According to Mr. Finch, Mr. Ledford sent an e-mail and asked Claxton to produce a very small chicken in the 2.4-pound range. (Tr. 3/17, 68:5-11). This was not possible. (Tr. 3/17, 68:16). It was also not possible for [any other supplier]. (Tr. 3/17, 69:2-3). Further, KFC abandoned the request because the request was impossible. (Tr. 3/17, 69:10-19). Mr. Ledford's request was not part of contract negotiation, and it was not a contractual requirement or term. (Tr. 3/17, 71:3-8).

      vii.    <u>Chick-fil-A's Conversion to NAE</u>

Mr. Finch testified that in February of 2014, Chick-fil-A announced a conversion to selling antibiotic-free chicken. (Tr. 3/17, 81:12-14). The conversion was to happen over six years. (Tr. 3/17, 82:4-5). Chick-fil-A did not decide on an antibiotic-free USDA program until August of 2014, and ABF and NAE are different USDA programs. (Tr. 3/17, 84:5-12). Claxton was going to pay the initial cost, but Chick-fil-A would reimburse the company once production started in 2017.

(Tr, 3/17, 84:14-85:1). Claxton Poultry contacted other suppliers, including Tyson and Perdue, for direction on the cost of growing an antibiotic-free bird at Chick-fil-A's direction. (Tr. 3/17, 86:4-12). GX355 is dated April 18, 2014, before Chick-fil-A decided which program it would use and three years before Claxton started production. (Tr. 3/17, 4-11). GX355 reflects an ABF cost, not an NAE cost. (Tr. 3/17, 14-22).

      viii.    <u>Chick-fil-A Breast/Market/Grain-based Models</u>

A breast or market-based model uses the Urner-Barry select boneless price, with an "adder" to set the price of chicken. (Tr. 3/17, 98:24-99:1). The grain-based model changes based on the price of soy meal and corn, giving Chick-fil-A more control over the pricing. (Tr. 3/17, 99:4-12). In 2014, Claxton was the last supplier using the breast model and the other suppliers were on the grain-based model (Tr. 3/17, 100:9-10; 162:11-12). It is impossible for a supplier on the grain-based model to impact the pricing of a supplier on the breast model or to align prices. (Tr. 3/17, 101:16-18, 102:6-8).

    **C.  Professor Edward Snyder, Ph.D.**

Professor Snyder testified that based on objective economic evidence, which economists analyze and can observe, the evidence contradicts the government's alleged price-fixing theory. (Tr. 3/17, 190:22-24). Dr. Snyder's conclusion is that an analysis of objective economic data does not support a price fixing conspiracy during the relevant time period charged in the Superseding Indictment. *Id,* et.al.

## **ARGUMENT**

**I.   No reasonable jury could find Mr. Fries guilty beyond a reasonable doubt.**

To prove a conspiracy, the government must prove beyond a reasonable doubt: (1) the conspiracy existed at or about the time alleged; (2) Mr. Fries knowingly became a member of the

conspiracy, knowing its goal and intending to help accomplish it; and (3) the conspiracy affected interstate commerce. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978). The government has failed to offer sufficient evidence upon which a reasonable jury could conclude that Mr. Fries entered into the conspiracy as alleged.

      a. <u>No conspiracy existed between 2012 and 2014, the dates in which Mr. Fries is alleged to have participated in a conspiracy.</u>

The Court "cannot sustain a conspiracy conviction if the evidence does no more than create a suspicion of guilt or amounts to a conviction resulting from piling inference on top of inference." *United States v. Horn,* 946 F.2d 738, 741 (10th Cir. 1991), *United States v. Hernandez,* 509 F.3d 1290, 1295 (10th Cir. 2007). Here, the government's evidence does just that. And the defense's evidence rebuts the government's evidence such that even when considering the direct and circumstantial evidence, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, no reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Stiger*, 413 F.3d 1185, 1193 (10th Cir. 2005).

Neither Mr. Bryant's nor Mr. Pepper's testimony about actual conduct in 2012-2014 establishes an illegal agreement. Both described in vague and general terms certain limited conduct and labeled it conspiratorial. However, "…a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *In re Aftermarket Filters Antitrust Litigation,* 2009 WL 3754041 (N.D. Ill., Nov. 5, 2009), citing *Bell Atlantic Corp. Twombly,* 550 U.S. 544 at 556-57 (2007). There must be some factual context suggesting an agreement. *Id.*

Mr. Finch testified that Claxton Poultry acted independently and set prices independently. The evidence is uncontroverted that Claxton's pricing strategy was to tell customers it wanted to be priced "in the middle" and would follow its customers' directional guidance to do just that by

reducing its prices time and time again. There is no evidence that Claxton ever refused to negotiate to a lower price, or hold its price.

While the Government points to GX1427 as evidence of Mr. Fries' agreement, the fact that Claxton Poultry reduced its price the very next day, without any further external communication or correspondence undermines that very notion. The salient question for analysis is one of concerted versus independent action. Here, the question is not one of success or failure of the conspiracy. The success of the conspiracy is not a requirement; the mere agreement to conspire is the illegal conduct. *United States v. Miller,* 771 F.2d 219 at 1226 (9th Cir. 1985). But to determine if Mr. Fries *agreed* –which he did not—one cannot ignore the independent action that occurred the very next day. *Monsanto Co.* v. *Spray-Rite Serv. Corp.,* 465 U.S. 752 (1984). Thus, *Miller* does not mean that the intent of the participant is irrelevant. *United States v. Evans*, 970 F.2d 663, 674 (10th Cir. 1992). Rather, when "conduct is consistent with other, equally plausible explanations" in the course of ordinary business, the case law prohibits drawing the inference that price-fixing has occurred. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596-97 (1986).

Neither is the rest of the text exchange enough to sustain a conviction beyond a reasonable doubt as at most, it shows information and current, period-price information sharing. Proof of information sharing in the context of normal business practice is not enough to establish that a conspiracy existed. *See Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999); *see also United States v. Suntar Roofing, Inc.,* 897 F.2d 469, 475 (10th Cir. 1990). The Tenth Circuit limits drawing inferences of conspiracy when the underlying conduct (*i.e.*, price sharing) is not presumptively unlawful. *See United States v. Carnagie*, 33 F.3d 1231, 1239 n.5 (10th Cir. 2008).

    b.  <u>Mr. Fries did not enter into a conspiracy.</u>

13

There is no evidence Mr. Fries knew of the existence of a bid-rigging conspiracy, much less intended to join it. *See United States v. Guzman-Ortiz*, 975 F.3d 43, 48 (1st Cir. 2020) ("Mere association with conspirators or mere presence during conduct that is part of the conspiracy is insufficient to establish knowing participation; the defendant must…share[] his co-conspirators' intent."); *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019). The Government's scant case rests on text communications without a single participating witness. There is no evidence that Mr. Fries *ever* shared Claxton pricing or directed anyone else to share pricing.

The government must prove Mr. Fries was personally aware of and participated in the charged conspiracy. The guilt of each individual defendant must be established, and the government has failed to do so. *See United States v. Record*, 873 F.2d 1363, 1368 (10th Cir. 1989). The Tenth Circuit is "mindful to guard against the mass application of guilt when conspiracy charges are involved because guilt is always dependent on personal and individual conduct, not on mere association or unknowing involvement." *United States v. Horn*, 946 F.2d 738, 741 (10th Cir. 1991); *see also United States v. Kendall*, 766 F.2d 1426, 1432 (10th Cir. 1985) (neither knowledge alone nor mere association with conspirators enough to convict of conspiracy); *United States v. McMahon*, 562 F.2d 1192, 1196 (10th Cir. 1977). The evidence "supporting the conviction [of Fries] must be substantial and do more than raise a suspicion of guilt." *United States v. Valadez-Gallegos*, 162 F.3d 1256, at 1262 (10th Cir. 1998). "It is, of course, difficult to prove illegal collusion without witnesses to an agreement[.]" *See In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015). That is exactly what the government has failed to provide in this case, i.e., actually witnesses to Mr. Fries entering into an unlawful agreement.

It would be especially dangerous to allow inferences about Mr. Fries' participation in a price fixing and bid rigging conspiracy to be drawn from the meager circumstantial evidence the

14

government has produced. Mr. Fries' limited communications demonstrate nothing more than his engagement in the perfectly legitimate business practice of obtaining competitive price information. In drawing favorable inferences from underlying facts, a court must remember that often a fine line separates unlawful concerted action from legitimate business messages. *Petruzzi's IGA Supermarkets v. Darling Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993). The government has utterly failed to prove that these communications were made pursuant to an agreement on the part of Mr. Fries to fix prices or rig bids, and two juries have so found.

## CONCLUSION

The evidence is not in conflict concerning Mr. Fries; it simply does not permit an inference to be drawn that he knowingly participated in the alleged conspiracy. Accordingly, no reasonable jury could find Mr. Fries guilty of Count One, and the Court should order a judgment of acquittal with respect to Count One.

Dated: April 4, 2022

Respectfully submitted,

*s/Richard K. Kornfeld*
Richard K. Kornfeld
RECHT KORNFELD, P.C.
Attorney for Mikell Reeve Fries
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 573-1900
Rick@rklawpc.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of April, 2022, I electronically filed **DEFENDANT MIKELL R. FRIES' RENEWED MOTION FOR JUDGMENT OF ACQUITTAL** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

*s/ Erin Holweger*
Erin Holweger