1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
   Criminal Action No. 20-CR-00152-PAB
3
   UNITED STATES OF AMERICA,
4
        Plaintiff,
5
   vs.
6
   JAYSON JEFFREY PENN,
7  MIKELL REEVE FRIES,
   SCOTT JAMES BRADY,
8  ROGER BORN AUSTIN,
   TIMOTHY R. MULRENIN,
9  WILLIAM VINCENT KANTOLA,
   JIMMIE LEE LITTLE,
10 WILLIAM WADE LOVETTE,
   GAR BRIAN ROBERTS,
11 RICKIE PATTERSON BLAKE,

12      Defendants

13 _____

                  REPORTER'S TRANSCRIPT
14                  Status Conference

15 _____

16          Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 12:32 p.m., on the 14th day of April,

19 2022, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24 Proceeding Recorded by Mechanical Stenography, Transcription
    Produced via Computer by Janet M. Coppock, 901 19th Street,
25     Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                          APPEARANCES
 2          Jonathan Kanter, Leslie Wulff, Carolyn Sweeney,
 3   Heather Call, Paul Torzilli, Richard Powers, Hetal Doshi and
 4   Carol Sipperly,, U.S. Department of Justice, 450 Fifth Street
 5   N.W., Washington, DC 20530, appearing for Plaintiff.
 6          Anna Tryon Pletcher and Michael Tubach of
 7   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 8   San Francisco, CA 94111-3823;
 9          Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10   N.W., Washington, DC 20006, appearing for Defendant Penn.
11          David Beller, Richard Kornfeld and Kelly Page of
12   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13   CO 80202, appearing for Defendant Fries.
14          Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16          Megan Rahman of Troutman Pepper Hamilton Sanders, LLP,
17   1001 Haxall Point, Richmond VA 23219, appearing for Defendant
18   Brady.
19          Michael Felberg of Reichman, Jorgensen, Lehman,
20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21   10017;
22          Laura F. Carwile of Reichman, Jorgensen, Lehman,
23   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,
24   CA 94065; appearing for Defendant Austin.
25
```

APPEARANCES (Continued)

Dru Nielsen of Eytan Nielsen, 3200 Cherry Creek Drive South, Suite 720, Denver, CO 80209;

John Anderson Fagg, Jr. and James McLoughlin of Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700, Charlotte, NC 28202-4003, appearing for Defendant Lovette.

```
1                          PROCEEDINGS

2          THE COURT:  The matter before the Court is United

3   States of America versus Jayson Jeffrey Penn and others.  This

4   is Criminal Case 20-CR-152.

5          I will take entries of appearances, please.

6          MR. KANTER:  Your Honor, Jonathan Kanter for the

7   United States of America.  With me today at counsel table is

8   Leslie Wulff, Carolyn Sweeney, Heather Call, Paul Torzilli, my

9   three deputies, Richard Powers, Hetal Doshi and Carol Sipperly.

10         THE COURT:  Good afternoon to you.

11         And on behalf of Mr. Penn?

12         MS. PLETCHER:  Good afternoon, Your Honor.  Anna

13  Pletcher and Michael Tubach is appearing VTC and Brian Quinn

14  for Jayson Penn.

15         THE COURT:  Good afternoon to you.

16         And on behalf of Mr. Fries?

17         MR. KORNFELD:  Good afternoon, Your Honor.  Rick

18  Kornfeld, David Beller, Kelly Page on behalf of Mr. Fries.  He

19  is appearing on VTC, Your Honor.

20         THE COURT:  And good afternoon to you.

21         On behalf of Mr. Brady?

22         MR. LAVINE:  Good afternoon, Your Honor.  Bryan Lavine

23  and Megan Rahman appearing on behalf of Mr. Brady.  Mr. Brady

24  is appearing via VTC.

25         THE COURT:  Yes, I see that.
```

1          And on behalf of Mr. Austin?

2          *MR. FELDBERG:*  Your Honor, Michael Feldberg, Julie

3    Withers and Laura Carwile.  Mr. Austin is present.

4          *THE COURT:*  And good afternoon to you.

5          And on behalf of Mr. Lovette?

6          *MS. NIELSEN:*  Good afternoon, Your Honor.  I am Dru

7    Nielsen on behalf of Mr. Lovette.  Present at counsel table is

8    Frank Schall.  Also in the courtroom is Kaitlin Price.  And

9    John Fagg and Jim McLoughlin appear via VTC.

10         *THE COURT:*  All right.  And good afternoon to each of

11   you too.  Strange without masks, isn't it, but here we are.

12         Okay.  Well, let me, first of all, thank Mr. Kanter

13   for coming.  And Mr. Kanter, why don't you go to the podium if

14   that would suit you.

15         Okay.  So Mr. Kanter, as you know, on March 29th when

16   I declared a mistrial in this case, I asked that the Department

17   have you come and talk to me about why you thought it was

18   appropriate for the government to try this case a third time

19   after two mistrials.  And I mentioned at that time that the

20   Department of Justice has an internal standard which is

21   Section 9-27.220 that is the grounds for commencing or

22   declining a prosecution.  Undoubtedly, you are aware that I was

23   interested in that particular standard and how that may apply

24   in this particular proceeding.

25         First of all, I assume, Mr. Kanter, that you have

1    taken a look at that.

2            MR. KANTER:  Yes, Your Honor.

3            THE COURT:  And so tell me this.  Is that a standard

4    that applies not only to the District of Colorado AUSAs, but

5    does that apply to the attorneys at main justice too?

6            MR. KANTER:  The guidelines that you reference, the

7    justice manual, apply to all the cases that we bring.

8            THE COURT:  Okay.  And so it applies in the antitrust

9    division.

10           MR. KANTER:  Absolutely.

11           THE COURT:  And it's something that you apply.

12           MR. KANTER:  It's something that we consult the

13   justice manual on a regular basis.

14           THE COURT:  And you follow it in the antitrust

15   division?

16           MR. KANTER:  We consult the justice manual all the

17   time and we use it as guidance to determine which cases to

18   bring forward.

19           THE COURT:  But it's obviously not something that I

20   could apply against the Department, but you're talking about it

21   as a guidance.  Is it something that someone in the antitrust

22   division has to follow?  Is it discretionary for them?

23           MR. KANTER:  The justice manual is extremely important

24   in terms of guiding our decisions.  It is therefore a reason

25   and we consult it.  And it is something that I've considered

1    both in context of this case and many other cases, every other

2    case.

3          THE COURT:  Okay.  So as you know from the standard,

4    that talks about the attorney for the government should

5    commence federal prosecution if he or she believes that the

6    person's conduct constitutes a federal offense and that the

7    admissible evidence will probably be sufficient to obtain a

8    conviction.  So what does the word probably mean to you?

9          MR. KANTER:  It means that the -- when I look at that,

10    the justice manual, when I consider a decision whether to

11    authorize a case going forward, first and foremost, I want to

12    make sure that the evidence can establish beyond a reasonable

13    doubt that the defendants have committed a crime.  And so it is

14    important that we dispatch our resources responsibly and

15    deliberately and with great care.

16          THE COURT:  You say can sustain, but that's not the

17    standard.  The standard is probably, not just can like one out

18    of 20 times maybe, but probably, right?  I mean, what does

19    probably mean?

20          MR. KANTER:  Probably means we are confident that it

21    will result in a conviction.

22          THE COURT:  Okay.  Now, let's move forward in this

23    case and we have our first trial.  And it results in a mistrial

24    and we know what the splits are.  And even as to the so-called

25    strongest case against any given defendant, the Department fell

1    four votes short, not one, four.

2         *MR. KANTER:*  Yes, Your Honor.

3         *THE COURT:*  So how after one trial did the department

4    determine that it was probably going to convict any of the

5    defendants in the second trial.

6         *MR. KANTER:*  Sure.  I appreciate the question, Your

7    Honor.  It's an important question.  Certainly both in the

8    first case and in the second case the granting of a mistrial

9    does not establish reasonable doubt.  And what we look at is

10   the evidence, our ability -- the admissible evidence and our

11   belief whether we can get the case to court to a jury and

12   render a verdict.  Certainly in the first case we are aware of

13   the splits.  These are complicated cases and there was not a

14   single conviction, but there is also not a single acquittal

15   either.

16        *THE COURT:*  Yeah, but that is not the standard.  The

17   standard isn't whether or not there might be an acquittal.

18   That's not the standard for commencing a case or persisting

19   with a case.  It's whether the Department will probably obtain

20   a conviction, right?

21        *MR. KANTER:*  We believe that we will probably -- more

22   than probably.  We believe that we will obtain a conviction.

23        *THE COURT:*  Well, so what happens in the second

24   trial -- one thing that we know about the first trial, right,

25   because we can tell from the questions that the jury sent back,

1    that the jury carefully looked over all the evidence.  As a

2    matter of fact, let me see exactly what some of the notes

3    talked about.

4              So interestingly enough, at the end of the second day

5    of deliberations a note comes out indicating, "We are trying to

6    work our way past differences but not making much headway.  Can

7    we get some guidance?"  The jury then deliberates another day

8    and then a note comes out on, I think, day four.  "We have

9    reread the instructions, gone back through the evidence and

10   matched it to individual groups of defendants and discussed the

11   meaning of it all to each of us.  Unfortunately, we cannot

12   reach consensus on the defendants," and then talks about can't

13   even reach a consensus about an overarching conspiracy.

14             And then the next day, the last note, "Many of us have

15   looked through every document in the binders and we have

16   discussed as a group every document anyone found important.  We

17   have tried creating graphic summaries of our thoughts and using

18   evidence to prove guilt or innocence respectively.  After

19   scouring the evidence we have firm -- still have firm

20   convictions on both sides of the debate.  We do not believe we

21   can reach consensus on any of the 10 defendants."

22             So we know after the -- that that first jury, they

23   looked over all the evidence and they said that they scoured

24   the evidence, no reason to believe that that's not true, and no

25   verdict as to any -- no conviction as to any single defendant.

1    So in that situation obviously the department goes ahead with a

2    second trial.  How does the second trial get changed?

3         MR. KANTER:  Sure.  The trial counsel is here with me

4    at the table.

5         THE COURT:  Well, we all know, but you may not.

6         MR. KANTER:  I understand.  I will answer to the

7    greatest extent of my ability, but I also want to make sure I

8    defer to the folks who were closest to the evidentiary record.

9    My understanding is that the second case involved additional

10   witnesses and the -- but the evidence underlying the second

11   case was the same basic evidence that underlying our charges

12   which we believe were efficient to sustain a conviction.  Now,

13   it's the case the third time around we have made substantial

14   changes, namely dismissing five of the 10 defendants, which we

15   think will have a material effect on the way the evidence --

16        THE COURT:  Why would that change anything in a

17   conspiracy case?

18        MR. KANTER:  Because complex cases -- well, let me

19   take a step back.  How we present the information to the jury

20   will change dramatically.  So going to five witnesses only from

21   two different companies will change the complexion and the

22   nature and the volume of evidence that has to go in.  As we all

23   know from our own experience, trials involving 10 defendants,

24   while they could benefit judicial economy, can be difficult for

25   juries to understand.  Cases among five witnesses that are more

1    streamlined --

2         THE COURT:  Five defendants.  You said witnesses, but

3    five defendants.

4         MR. KANTER:  Sorry, five defendants, pardon me,

5    present differently to a jury.  And, you know, we are happy to

6    discuss today or as appropriate the changes that we think will

7    flow from those -- that significant modification both in terms

8    of the number of witnesses, as well as the companies that they

9    are associated with.

10        And so we've also taken very significant steps, I

11   have, to speak with my -- the line attorneys, prosecutors, my

12   deputies, my front office, fresh ears.  You'll notice some

13   fresh faces at the table today.  It's not to suggest we don't

14   have complete confidence in our existing trial team.  We do.

15   But fresh perspectives often lead to fresh approaches, but we

16   still have every bit of confidence just as we did the day we

17   charged the case that the evidence supports a conviction.

18        THE COURT:  Okay.  In my experience when an attorney

19   wins a case, the stories at the cocktail parties the next

20   weekend are all about the great trial work that he or she did.

21   You know, that seemed to be what did it.  If you lose a case,

22   then it's all the evidence, he had such bad evidence.  Of

23   course, in reality it's almost always the evidence.  There is

24   probably very few cases that turn on the attorneys.  Attorneys

25   don't like to say that, but it's probably true.

1          So assuming that's true and if the first jury scoured

2     the evidence, and after all, after a point in time you would

3     anticipate that a jury, especially one that is dedicated to

4     looking at the evidence, the influence of the smash-bang

5     closing or something is probably going to wane over time.  So

6     days later in all likelihood, you know, it's going to be what I

7     suspect as almost always the case, the evidence.  And the first

8     jury scoured the evidence and hung.  And the second jury, we

9     don't know if they scoured the evidence, but presumably they

10    focused on the evidence.  They seemed to be -- seemed to have

11    been doing their job and they hung.

12         So why would fresh perspectives -- I don't know if

13    there is going to be new attorneys on the team, but, you know,

14    what -- why does the department believe that, you know, simply

15    getting a fresh perspective is going to change anything as

16    opposed to getting new evidence?

17         *MR. KANTER:*  Yeah.  So, Your Honor, I am looking at

18    this from the perspective of doing my job, which is to fulfill

19    my obligation to make sure that I am mindful of the expense of

20    the department's resources, the burden that it places on the

21    Court and the strain when the Court is already -- nationwide we

22    are seeing this -- burdened with busy dockets and the effect on

23    the defendants.  So as part of my process, which I won't go

24    into in detail because it's deliberative, it's important for me

25    to undertake fresh perspectives when examining whether after a

1    second mistrial it's important to move forward.

2            So the justice manual as you cited, Your Honor, lists

3    a number of factors including the substantial federal interest,

4    deterrent value, a number of others.  And I wanted to undertake

5    a very thorough examination to determine whether this was the

6    appropriate step forward in light of some of the conditions

7    that Your Honor conveyed.

8            I do have a hundred percent confidence in our team.

9    They are exceptionally hard-working, dedicated public servants.

10   But fresh perspectives are always valuable when making

11   decisions and it's something that I do on a regular basis.  But

12   as Your Honor noted, at the end of the day it's about the

13   evidence.  And the evidence in this case after looking at it

14   again and again and again supports a conviction just as it did

15   the day we charged it.

16           THE COURT:  Why isn't that, given the fact that two

17   separate juries have focused hard on the evidence, why isn't

18   that just to try and put hope over experience?

19           MR. KANTER:  Because deadlocked juries do not create a

20   basis for reasonable doubt.  The evidence --

21           THE COURT:  Once again, the standard isn't reasonable

22   doubt under the internal standard that you said that you

23   operate under.  It's whether or not you will probably be able

24   to convict.

25           MR. KANTER:  And that is the examination that I

1  undertook along with my team, and I remain confident that we

2  meet that standard.

3          THE COURT:  Okay.  So is there a limiting principle in

4  how many times the Department of Justice can keep retrying

5  cases that because of the nature of them they continually hang?

6  They don't try well?  Like you said, there weren't any

7  acquittals, but for whatever reason the jurors polarize.  And

8  if you look at the timing of both trials, it's scarily the

9  same.  After a relatively brief period of hours of

10  deliberation, a note comes out that they are worried about

11  reaching a unanimous verdict and then it doesn't change.

12          And so if you've got a case that plays that way, and

13  we've got two examples, you know, two times polarized, hung,

14  how can you say that it's not going to happen again?  And why

15  can't the Department of Justice keep doing it over and over

16  again?

17          MR. KANTER:  Certainly there is a question about

18  whether there is a breaking point.  I don't believe we have hit

19  that breaking point, Your Honor.

20          THE COURT:  What about a fourth time?  What if the

21  trial goes a third time and it hangs once again?  I mean, how

22  many times does the Department say we believe in our case as

23  opposed to let's look at the evidence.  Let's look at the fact

24  that, you know, we know how it plays out because the jury hangs

25  every time.

1          MR. KANTER:  Your Honor, in this instance, and that's

2    an important policy question and it's an important practical

3    question, but first and foremost, the question is whether we

4    should proceed in this instance, and that's the question that I

5    had to undertake answering.  And that involved a very

6    deliberate considered process.  It was not reactionary.  It was

7    not reflexive.  And it resulted in some changes to the way in

8    which we are approaching this case, but at the end of the day,

9    what's important for me is to represent our client, which is

10   the United States of America.  And I believe justice will be

11   served by giving the jury the ability to reach a verdict and

12   that the evidence supports a conviction and that we can achieve

13   a conviction and a decision from a jury.

14          THE COURT:  Well, let me hear what changes are in the

15   works.

16          MR. KANTER:  Would you like --

17          THE COURT:  Yeah, whoever wants.

18          MR. KANTER:  I will defer to Ms. Call.  Your Honor, I

19   know my limitations and strengths and I know that Ms. Call is

20   way better informed than I am.

21          THE COURT:  Perfectly fine.

22          Ms. Call, go ahead.  Ms. Call, I don't want you to lay

23   cards on the table that are part of the Department's strategy

24   if you want to preserve them, but to the extent you can

25   describe what changes the Department plans.

1          MS. CALL:  Of course, Your Honor.  And as Mr. Kanter

2     said, many of these changes are somewhat going to be the

3     natural result of the focusing of the case against five

4     defendants.  Like Mr. Kanter already said, the defendants, it

5     had been 10 defendants from five different companies.  I think

6     we all know the jurors from the get-go from the first case were

7     expressing how am I going to keep these defendants apart from

8     each other.

9          Now we have five defendants from two companies and,

10     you know --

11          THE COURT:  Yeah, but the fact that they can't

12     remember names -- and you are right, both of the juries were

13     kind of confused at the beginning, but by the end they figured

14     out who people were, so certainly that can't be a reason that

15     the trials would hang.

16          MS. CALL:  Well, I think, Your Honor, one kind of

17     underlying premise, we don't know exactly why the jury hung.

18     We had some notes giving us some insight into what was going

19     on, but the inability to reach a verdict is not a commentary on

20     the government's evidence.  I know Mr. Kanter cited the no

21     reasonable doubt which comes from *Arizona v. Washington*, the

22     Supreme Court.  Other circuits have said a jury's hanging is

23     not even a commentary on the government's evidence.

24          So I think when we are talking about hanging, we don't

25     know why it happened.  We don't know if there was a legal

1    issue.  We don't know if it was a factual issue.  So I think an

2    underlying premise, assuming that there is an evidentiary issue

3    here that's causing the hang, is one that perhaps is taking too

4    many assumptions.

5            *THE COURT:*  I don't think so.  We know that the

6    evidence couldn't persuade 12 people in favor of a conviction

7    both times.  We know that.  That is an established fact.  We

8    also know that from the notes that in both trials there was a

9    polarization, some people for acquittal, some people for

10   conviction.  We know that because there were no acquittals

11   either.  So we know that.  That's how the trial plays.  That's

12   how the evidence plays.  We know that.

13           It's not a question of some type of due process

14   standard or something of that nature, but that's how this case

15   plays for whatever reason.  You are right, we don't know

16   exactly why, but that's how it plays out.  And we have seen it

17   happen twice.  So the question is what is the Department of

18   Justice going to do the third time to make it play different?

19           *MS. CALL:*  Yes.  And let me actually answer your

20   question this time.  So I do think that even the same evidence,

21   the same facts taken in a different circumstance under

22   different considerations could be viewed and taken in and

23   digested differently by a different jury, including the

24   testimony which is something we haven't really been talking

25   about today.  So I do think the jury will see things

1    differently when their kind of window is narrowed and how they

2    are considering the evidence.

3         *THE COURT:*  But why is the window narrowed?  Here is

4    what happens.  I will have drug cases.  This isn't a drug case,

5    of course, but, you know, 10 defendants.  By the time of trial,

6    one defendant.  We set it for a 10-defendant trial, three weeks

7    long.  And then I say to the prosecutor at the trial prep

8    conference, "Okay.  Now we only have one defendant.  I assume

9    the trial is going to be shorter?"

10        "No, it's a conspiracy case, Your Honor.  Same

11   evidence."

12        *MS. CALL:*  Yes, Your Honor.  To comment on the perhaps

13   length of the trial, which I think may be appropriate because

14   it surrounds some of the issues we are talking about, if we go

15   back and look at, for example, the courtroom minutes of the

16   second trial, the government's presentation of evidence here is

17   actually quite compact.  If you look at the time that witnesses

18   were on the stand not counting time with side bars, it was two

19   and a half days about of testimony, maybe three.  So the fact

20   that this gets drawn out into a five-week trial I think does

21   inevitably create some juror confusion.

22        So I would submit that perhaps for a third trial a

23   shorter time may be merited and sufficient for all the parties

24   to present their case given the lessened argument time,

25   probably lessened side bar time, and I think a three-week trial

1    could be appropriate for the trial.

2         THE COURT:  Well, I don't want to look a gift horse in

3    the mouth, but on the other hand, what we had in the first

4    trial, of course, because we were trying to get all the

5    evidence in and there were lots of disputes over the evidence

6    and so we have like four and a half days of down time where the

7    jury was sent home, and so it was even more attenuated than the

8    second trial.  The second trial we didn't have to do that.  And

9    we didn't have as many discussions because I adopted the same

10   evidentiary rulings, so we didn't have to go through that same

11   brain damage in terms of the exhibits, so that did make it more

12   compact.  Result, the same.  So why -- if shorter produced no

13   different result in the second trial, why does even shorter

14   offer the promise of producing a different result in the third

15   trial?

16        MS. CALL:  Yes, Your Honor.  I think what may be

17   helpful, I don't think there is any basis to presume it's

18   something about at least the case in chief of the government

19   that creates jury confusion.  This is a 10-defendant case and

20   there is no question that many defendants can create confusion.

21   The 10th Circuit has recognized that in *United States v.*

22   *Gunter,* which is a case I am happy to provide a citation for in

23   a moment.

24        THE COURT:  You don't need to because, once again, I

25   am not kind of worried about those cases because you're right,

1    but I am not asserting that there is some due process reason

2    that the government can't proceed.  I am once again more

3    focused on that internal standard that Mr. Kanter had said that

4    you all follow, and that requires that there be, you know, that

5    it be probable that there is a conviction, not just, hey, you

6    know, we can infer something.

7            MS. CALL:  Yeah, I think the importance of those

8    cases, though, because understanding there is not a due process

9    issue with retrial following a hung jury, but what those cases

10   on that subject do recognize is two things.  First, that

11   following a hung jury retrials are permissible.  And then based

12   on these cases, and there is at least six circuits that have

13   over -- cases involving two hung juries following to a trial

14   leading in a conviction, including the 10th Circuit, so it

15   certainly happens.  And like I said, the Supreme Court -- other

16   precedent says it's not a commentary on the sufficiency of the

17   evidence.  So sometimes it is just the circumstances of the

18   case.  Maybe here the number of defendants, as the 10th Circuit

19   has said, multi-defendant cases inevitably cause juror

20   confusion, and that's the word the 10th Circuit used.

21           THE COURT:  Okay.  So let me hear now, so why does the

22   fact that there are now five defendants instead of 10

23   defendants change anything?  Why is that going to somehow

24   prevent the jury from being confused leading to a hung jury?

25           MS. CALL:  Yes, Your Honor.  I think the jury is going

1    to be able to view the evidence from the perspective of these

2    defendants much easier.  It's, okay, what was happening at

3    Claxton at this time, what was happening at Pilgrim's at this

4    time and what were these defendants' roles.  And that's much

5    less of a mental hurdle, if there ever was one, even though it

6    is a pretty simple case than concerning five companies and 10

7    defendants.  It's just difficult for a jury to get through

8    that.

9         THE COURT:  But why isn't the evidence from the other

10   five defendants coming in?  Aren't the same e-mails coming in?

11        MS. CALL:  Sure.  And I did not mean to imply that if

12   I did.  I think it will be much of the same evidence although

13   it will be narrowed.  It will be focused in a way.  For

14   example, some of the summary exhibits will not be introduced in

15   the third trial.  Some episodes while they may be relevant like

16   you said for a conspiracy, they are going to be much less of a

17   focus both in terms of the government's presentation of

18   evidence and the jury's understanding of it.  So I think there

19   are just the ways the evidence will be digested in a third

20   trial that is more focused against five defendants that will

21   make -- that we believe will make a jury much more likely and

22   able to reach a verdict here.

23        THE COURT:  But in the first trial we know from the

24   scouring note that they didn't appear to be overwhelmed.  They

25   went through all the evidence really carefully.  They scoured

1    the evidence.  You would think that if they were overwhelmed by

2    the number of defendants or something, that there would be

3    people who would at least be acquitted, for instance.  Yeah,

4    burden of proof, who knows?  I can't figure this thing out, but

5    that hurts the government.  And some of the defendants will be

6    gone, but that didn't happen either.

7         So why does more -- I mean, why would you assume, you

8    know, if the government couldn't convict presumably the five

9    defendants who remain two times, why would we assume that that

10   occurred because of lack of focus?  Why couldn't the jury focus

11   in the first trial on people as they seem to do?  They looked

12   at all the evidence really carefully.

13        MS. CALL:  Well, I think we all know the jury's

14   consideration of the evidence is not just sitting in the

15   background during deliberations.  It includes sitting in this

16   courtroom watching the witnesses explain the evidence.  And in

17   the first trial, the jury did ask to get a transcript of the

18   testimony of a cooperator to help them putting that evidence

19   into context for what they heard six weeks before.  So I think

20   there are things about the length of time, the number of

21   defendants, that made it more difficult when they were in the

22   back deliberating, considering the evidence, to put it all in

23   perspective.

24        THE COURT:  But you are certainly not thinking that if

25   the jury the third go-around asks for a transcript, that I

1    would actually give it to them, are you?

2         MS. CALL:  I do think it's legally supported.  I

3    understand that that is not Your Honor's perspective.

4         THE COURT:  Okay.  So what are the other changes that

5    will make a difference?

6         MS. CALL:  But I will note, for example, as I said,

7    Mr. Bryant's testimony was six weeks before deliberations.  We

8    then, of course, made changes in the second trial.  His

9    testimony was much closer to the end.  There is things that we

10   have learned to help present this case to a jury in an

11   understandable way, and I am sure it will be even more refined

12   in the third trial.

13        THE COURT:  Yeah, but why is there going to be a

14   different result?  Okay, so there are five defendants.  What

15   else?  What are the other changes that make the Department

16   think that now there is a probability of conviction?

17        MS. CALL:  Sure.  And I think we have noted over time

18   most of these changes, but I will try to put it succinctly and

19   not need to take up too much time.  Like we said, you know, 10

20   to five defendants, fewer summary exhibits, certain conduct --

21   or certain conduct will be much less of a focus, may come into

22   evidence, may not.  I don't want to promise every action that

23   we will take in the third trial this time, but there is

24   certainly areas of focus that created a lot of time in the

25   first and second trial that we don't think will be presented in

1  a way by the government or necessitate cross-examination in the

2  same way that just takes up time and creates a lot of room for

3  confusion.

4       THE COURT:  Anything else?

5       MS. CALL:  I don't believe so, not on that topic, no.

6       THE COURT:  Okay.  All right.  Mr. Kanter, back to

7  you.

8       MR. KANTER:  Thank you, Your Honor.

9       THE COURT:  So here is what I am going to ask you to

10  do, Mr. Kanter.  Let me first of all ask you this.  Why is that

11  standard that we started off talking about, why do you think --

12  why does the Department of Justice put that in a public

13  document like the U.S. Attorneys manual?

14       MR. KANTER:  It's designed to ensure that we are using

15  our powers responsibly.

16       THE COURT:  Okay.  Why does the Department of Justice

17  hold itself to a standard that it doesn't necessarily have to?

18       MR. KANTER:  Because we believe that as officers of

19  the Court and representatives of the United States of America

20  we have an obligation to use our powers responsibly and provide

21  transparency in how we make our decisions.

22       THE COURT:  Do you think it's one of the pillars of

23  the reputation of the Department of Justice?

24       MR. KANTER:  I believe so.

25       THE COURT:  Okay.  Here is what I would like you to

1    do, Mr. Kanter, and that is despite the fact that I dragged you

2    out to Denver is, you know, go back to Washington and just

3    think about that and think about, you know, what that principle

4    really standards for, you know, not anything that I can hold

5    you to, but it's obviously something that's important to the

6    Department of Justice that the Department of Justice has

7    decided that it is going to publish to the world because it's a

8    standard that the department feels is important.  It's a

9    limitation, but it's one that I think makes -- should make all

10   Americans proud that there is a Department of Justice out there

11   that's upholding high standards.  And what I would ask you to

12   do is just -- you know, I know you talked to all sorts of very

13   capable people and you brought in some fresh perspectives, but

14   I would ask that you reflect on that and ask yourself based

15   upon our conversation today whether, in fact, a third

16   prosecution of this particular -- a third trial would uphold

17   that standard.

18        MR. KANTER:  I most certainly will, Your Honor.  And I

19   certainly don't want to leave you with the impression that I

20   have not taken that seriously because I have.

21        THE COURT:  Oh, I believe that you have.  I seriously

22   believe that you have.

23        MR. KANTER:  And these issues are -- we are charged

24   with protecting the public from antitrust crimes.  And in an

25   area of agriculture, meat packing, meat processing that

1   affects -- it's a kitchen table issue, we have to take that

2   obligation seriously as well.  And deciding not to proceed with

3   a meritorious case comes at an expense for our client, the

4   United States of America.  So we have to weigh these.  These

5   are hard decisions.  We reflect on them.  And I commit to you,

6   Your Honor, that I will continue to reflect on them as you have

7   asked, but I don't want you to be left with the impression that

8   this is being done lightly or reflexively.  We are taking this

9   seriously and I take this seriously.  It's my obligation, one

10  that I have committed to, and I believe with every fabric of my

11  being is necessary to protect the American public.

12          THE COURT:  Anything else, Mr. Kanter?

13          MR. KANTER:  No, Your Honor.

14          THE COURT:  All right.  We will be in recess.  Thank

15  you.

16      (Recess at 1:05 p.m.)

17                  REPORTER'S CERTIFICATE

18      I certify that the foregoing is a correct transcript from

19  the record of proceedings in the above-entitled matter.  Dated

20  at Denver, Colorado, this 15th day of April, 2022.

21

22                          S/Janet M. Coppock

23

24

25