IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

**PUBLIC VERSION**

1. JAYSON JEFFREY PENN,
2. MIKELL REEVE FRIES,
3. SCOTT JAMES BRADY,
4. ROGER BORN AUSTIN,
5. WILLIAM WADE LOVETTE,

    Defendants.

---

**UNITED STATES' MOTIONS *IN LIMINE* FOR THIRD TRIAL**

---

The government respectfully submits the following motions *in limine* as prescribed by the Court's April 15, 2022 Order Re-Setting Trial Dates and Deadlines (ECF 1263), and to supplement evidentiary rulings from the prior trials.

**I.   Allow Evidence on What Constituted a Competitive Bid.**

The government is seeking to clarify the Court's prior ruling regarding the government's ability to elicit customer testimony about what constituted a "competitive" bid.

The indictment charges the chicken-supplier Defendants with fixing prices and rigging bids solicited by Defendants' customers, including quick-service restaurants (QSRs) like Kentucky Fried Chicken (KFC). Whether a bid is "rigged" turns on whether competitors agreed to "eliminate, reduce, or interfere *with competition* for something

that is to be awarded" in that bid. (Jury Instruction No. 21, ECF 1232 at 24 (emphasis added)); *accord, e.g.*, *United States v. Reicher*, 983 F.2d 168, 172 (10th Cir. 1992) (holding that "in a bid rigging conspiracy, the determination of a per se antitrust violation depends on whether there was an agreement to subvert the competition"). To determine if competition was interfered with, the jury must first determine what constitutes "competition" and a competitive bidding process.

What it means to harm "competition" depends on the requirements underlying a good faith bid—in other words, it is the customers who define the competitive bidding process. As the Tenth Circuit has explained, customers who solicit bids are "entitled to assume that bids actually submitted [are] bona fide." *Reicher*, 983 F.2d at 172. And whether a bid is "bona fide," *i.e.*, competitive, turns on the specific process relating to the bid at issue. Where, as here, defendants have "lull[ed] the [customer] into the belief it had the benefits of true competition," defendants have "subvert[ed]" competition. *Id.*

For example, if a customer bars price coordination between bidders, bids resulting from prohibited coordination "eliminate, reduce, or interfere with competition." (Jury Instruction No. 21.) But if a customer knowingly solicits price coordination before submitting a bid, the resulting bid would be bona fide. *See*, *e.g.*, *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 863 F. Supp. 2d 1066, 1088 (D. Colo. 2012) (no bid rigging where the customer voluntarily "bypass[ed] a competitive bidding process"). So, in order to understand whether price fixing or bid rigging occurred, the jury must be allowed to hear from customers their description of the competitive bidding process, what makes it competitive, and why the system was created that way.

2

Moreover, excluding this customer testimony about the specific bids at issue threatens to confuse the jury. *See* Fed. R. Evid. 403. Without testimony from customers regarding the competitive bidding process, the jury could incorrectly conclude that the competitive bidding process included price sharing between suppliers before bids were submitted. That confusion is compounded by the fact that Defendants have been allowed to introduce evidence that customers sometimes shared prices with bidders. (*See* Order at 7, ECF 642 (Oct. 14, 2021) (admitting evidence that customers "shared price information with suppliers [*i.e.*, the bidders] and, in certain circumstances, instructed suppliers to align prices so that customers could provide consistent prices to their franchises and affiliates.").) Introduction of such evidence could confuse the jury into believing that customers welcomed *bidders* sharing prices amongst themselves *without the customers' involvement*.

The government does not seek to relitigate the Court's prior rulings, but is looking for clarification that it may introduce evidence regarding the competitive bidding process with respect to the specific bids at issue in the case. Such evidence will enable the jury to determine what the competitive bidding standards were, why the system was created that way, and whether Defendants subverted those standards. The government would present this evidence of specific bidding practices without eliciting testimony that price sharing was "wrong, immoral, or otherwise improper" that could cause the jury to conflate moral "aversion" with a legal standard. (ECF 1069 at 5.)

## II. Allow Introduction on Cross and Rebuttal Regarding Price-Sharing Prohibitions.

The Court should reconsider its prior ruling to allow the government to rebut Defendants' evidence and argument that the boiler chicken industry had a norm of sharing price information. The government is not seeking reconsideration of the Court's ruling that evidence of industry norms is admissible. However, the government asks that, in this trial, the Court apply its rulings regarding industry norms and expectations equally to Defendants' evidence. Once the Defendants are allowed to introduce and elicit evidence of industry norms, the government must be allowed to mount a rebuttal case demonstrating that, to the contrary, it is neither expected nor standard practice to share price information amongst competitors. If Defendants' industry norm evidence is admitted, the Court should reconsider the admissibility of evidence to rebut this claim, including training materials, Nick White's testimony, and other relevant evidence, on cross and in rebuttal.

Last trial, Defendants were permitted to admit evidence on purported norms of price sharing in the chicken industry. This evidence was separate and unrelated to the specific bids at issue and instead addressed general, industry-wide norms. For instance, Defendants admitted testimony that sharing price information is "expected in the broiler chicken industry and therefore it's not an indicator of bid-rigging or price-fixing." (US Mot. to Rebut at 3, ECF 1206 (Mar. 21, 2022) (quoting Professor Edward Snyder's testimony at R. Tr. 3/16/2022 at 199:15–18 and other similar testimony)). Defendants also elicited from their witness, Claxton CFO Gregory Finch, that

4

*distributors* would share suppliers' prices with Claxton. (*See, e.g.*, *id.* (citing 3/16/2022 R. Tr. at 250:11–18, 252:4–24, 253:2–13, 254:13–255:20).)

Although the Defendants were allowed to introduce evidence that amounts to an "everybody was doing it" defense, the Court excluded on relevancy grounds more tailored evidence on price-sharing norms. For example, the Court excluded the testimony of Nick White, Pilgrim's General Counsel, who would testify that Defendants Lovette and Penn reviewed—and approved—Pilgrim's policy against price sharing. (US' Mot. to Rebut Defs. Args. at 3, ECF 1206.) The Court also excluded evidence suppliers' training and policies against price sharing, which would contradict evidence that price sharing is either expected or an industry-norm. (*See* ECF 1087 at 3.) The government would also seek to introduce additional evidence probative of the fact that price sharing was not an industry norm or expectation, including communications from RSCS during that time when Michael Ledford was in charge of the KFC negotiations. For example, in GX-9989 and GX-9990, Ledford's team invited suppliers to bid on COB and other products. Bidders were asked to "*agree to treat all of the data in this process as restricted and confidential*." GX-9990 (emphasis added). The government would also seek to introduce into any additional evidence relevant to rebut the defendants' misleading, unsupported, and unfairly prejudicial assertion that price sharing was commonplace in the industry.[1]

---

[1] The government would also seek to introduce into any additional evidence relevant to rebut the defendants' misleading, unsupported, and unfairly prejudicial assertion that price sharing was commonplace in the industry.

5

The government respectfully asks for reconsideration to allow the government to introduce evidence to rebut Defendants' claim that price sharing is an industry norm, including training material proscribing information sharing during the bid process and Nick White's testimony (and related evidence). Defendants are on notice of White's possible testimony in the upcoming trial, alleviating the timeliness concern raised by Defendants in the last trial. (Defs. Joint Mot. to Exclude Nicholas White at 1 n.1, ECF 1049 (Feb. 14, 2022) (Government sought to introduce White only "after the motions *in limine* deadline passed").) Defendants have now been on notice of White's prospective testimony for several months, and the government seeks to introduce him in accordance with the Court's deadline for motions in limine. This timely disclosure reduces any possible prejudice to Defendants here.

### III. Exclude Evidence That *Customers* Shared Pricing Information with Each Other.

The government seeks clarification of the Court's prior ruling regarding the admissibility of evidence, elicited by defendants, that customers, such as KFC and Popeyes, shared supplier cost information with each other.

The Court previously ruled that the defendants can admit evidence that customers share *cost* information with each other. (*See*, *e.g.*, GX-744, discussing costs of corn and meal.) That ruling, however, is not the same as allowing evidence that customers shared future *pricing* information from suppliers with one another. Any evidence or arguments that customers shared *pricing* information must be excluded as irrelevant, prejudicial, and confusing.

Although price sharing between *suppliers* is probative of the charged conspiracy, price sharing between *customers* is irrelevant as the customers were not charged with price fixing and there is no evidence that they were engaged in price fixing.

Unfair prejudice and confusion could also result from an inference that customers were wrongdoers. Fed. R. Evid. 403. If customer price-sharing were admitted here, the jury would be invited to evaluate whether customers also fixed prices, which would risk jury nullification. Courts "categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent." *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) (quoting Federal Judicial Center, Benchbook for U.S. District Court Judges 225 (4th ed. 1996)). Thus, courts routinely prevent defendants from presenting evidence that other individuals may also have committed crimes, but were not charged. *See, e.g.*, *United States v. Clay*, 618 F.3d 946, 956 (8th Cir. 2010).

Accordingly, the government seeks clarification that any evidence (and argument) that customers shared *pricing* information with each other will be excluded.

### IV. Exclude Any Evidence or Argument on Carl Pepper's Invocation of the Fifth Amendment.

The government seeks reconsideration of the Court's ruling regarding government witness Carl Pepper's invocation of the Fifth Amendment. Pepper invoked the Fifth Amendment in a declaration responding to a *James* hearing subpoena. The Court allowed defense counsel to repeatedly cross-examine Pepper about this invocation, over the government's objections. (*See, e.g.*, 3/3/20222 R. Tr. 252:23–253:6, 258:3–259:16, 262:5–264:15, 267:5–18.)

Reconsideration of this issue would "correct clear error." (Order, ECF 1069 at 4 (quoting *United States v. Christy*, 739 F.3d 534, 539 (10th Cir. 2014).) The Tenth Circuit has "long held [] that the jury cannot draw inferences from a prosecution witness' decision to invoke his Fifth Amendment privilege. Thus, [the witness's] prior refusal to testify [is] inadmissible because it lack[s] legitimate probative value." *United States v. Larranaga*, 787 F.2d 489, 499–500 (10th Cir. 1986) (citations omitted); *accord, e.g.*, *United States v. Karoly*, No. 08-cr-00592, 2009 WL 2004657, at *6 (E.D. Pa. July 1, 2009) (collecting cases). Indeed, the Court itself gave a curative instruction following Pepper's testimony, citing *Larranaga* to find that:

> [Pepper] is put in a terrible position of trying to answer extremely awkward questions regarding his indication of a constitutional right. And that – those questions had no probative value at all. [. . .] am going to inform the jury right off the bat as follows, that the questions that were asked of Mr. Pepper related to whether – remind him that he was asked questions related to whether he invoked his Fifth Amendment right in relation to a declaration that he had previously filed in this case. I will then inform the jury that a witness' indication of his Fifth Amendment rights is not an admission of anything and no inference of any kind may be drawn from the fact that a witness previously invoked that right. Therefore, Mr. Pepper's decision not to answer certain questions should not be taken as any type of admission that he lied to the government or did anything improper.

(Rough Transcript Day 8 at Tr. 1:2-3:5 (colloquy), Tr. 26:23-27:12 (instruction to jury).)

Accordingly, the Court should reconsider its former ruling to exclude any evidence or argument on Pepper's invocation of the Fifth Amendment.

**V.** █████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████







████████████████████████████████████

████████████████████████

VI.     **Admission of GX 1700 and 1713 as Coconspirator Statements.**

The government respectfully moves the Court to reconsider its rulings regarding GX-1700 and GX-1713. Although the Court previously ruled that the statements by defendants Brady and Austin appearing in these exhibits are admissible only against each of the speakers and not against the remaining defendants, Fed. R. Evid. 801(d)(2)(A), the statements memorialized in those exhibits are coconspirator statements admissible under Fed. R. Evid. 801(d)(2)(E).

Coconspirator statements are admissible at trial under Rule 801(d)(2)(E) where the government establishes by a preponderance of the evidence that the statement was made during the course and in furtherance of the conspiracy. As set forth below, the government has met that burden, and the defendants' statements contained in GX-1700 and GX-1713 are coconspirator statements admissible against all defendants as members of the conspiracy.

Following are the facts underlying the coconspirator statements in question:

In **GX-1700**, on October 31, 2012, Mark Oeschsli from UFPC (the purchasing cooperative for KFC) provided feedback to defendant Brady on Claxton's first-round bid for the 2013 contract. Oeschsli's e-mail stated that he planned to request additional information from Claxton the following day. Early the next morning—November 1, 2012—defendant Brady forwarded Oechsli's e-mail to his boss, defendant Fries, stating that he "will make some calls." Phone records show subsequent phone calls and SMS

11

messages between defendant Brady and his coconspirators Timothy Mulrenin, Jimmie Little, and William Kantola. (GX-9716, GX-9720, GX-9722.)

In **GX-1713**, on November 18, 2013, Michael Ledford, the UFPC employee in charge of negotiations, e-mailed defendant Austin, regarding Austin's bid submitted on behalf of Pilgrim's. Ledford wrote that the bid defendant Austin submitted was "so far out of line" that the feedback he had previously provided to defendant Austin appeared to be ignored. Later that evening defendant Austin forwarded Ledford's message to Austin's coconspirators within Pilgrim's, writing that they could talk in the morning but that he would first "d[o] some scouting." Phone records show that on the following morning, defendants Austin and Brady had two phone calls totaling 17 minutes in duration. (GX-1733.)

The documents also show what defendants Austin and Brady discussed on the calls they had following the statements defendant Austin made in GX 1713—which confirm that his statements were made in furtherance of the conspiracy. After the calls concluded, defendant Brady texted defendant Fries that "Ledford told roger to be at .9250." (GX-10651.) Defendant Brady later texted defendant Fries that, during the prior year, Claxton was 32 cents back on dark meat and that presently Claxton was bidding 30½ cents back. (*Id.*) Defendant Fries responded with his approval of a bid at 31 cents back. As defendant Fries was sending that text, defendant Brady sent a crossing text of his own stating: "Roger is at .30 back and not moving" to which Fries rescinded his approval of the 31-cent discount and instead texted his approval of remaining at the (higher) 30½ cent-back bid. (*Id.*)

12

At the recently concluded trial, Ledford testified that he never asked defendant Austin to communicate with any competitor about his bids to UFPC. That was because Ledford did not want suppliers talking to each other about their bids. Instead, he wanted the most-competitive price he could obtain. (Day 4 R. Tr. at 216-17 (Feb. 28, 2022).)

The statements that defendants Brady and Austin made in their emails in GX-1700 and GX-1713 were made during the course of and to further the conspiracy's objective to reduce price competition during the 2013 KFC bidding and negotiations. Both statements, contained in internal emails, show that defendants Brady and Austin did not intend to respond to the feedback that UFPC provided with an independently devised revised bid, but rather sought to consult with the competitors before decided what their bid submission would be.

The Court has previously ruled that the government did not show that the defendants' statements in GX-1700 and GX-1713 were made during the course and in furtherance of the charged conspiracy. (Docket No. 559 at 26; Docket No. 1050 at 7.) As a consequence, these statements were received into evidence only as party admissions and were accompanied by limiting instructions. The Court also ruled that party admissions may not be reflected in summary exhibits.

There are good reasons for the Court to reconsider its prior ruling. First, the statements from defendants Brady and Austin are *clearly* coconspirator statements. The communications are core to the conspiracy's operation and function. Second, the Court ruled elsewhere that statements of this type—communications forecasting one conspirator getting in touch with conspirators at competing companies about prices—

13

were admissible under Rule 801(d)(2)(E). (*See, e.g.*, GX-224 (James Log Entry 78) (Pepper: "Might call a couple of them [meaning other suppliers] and ask.").) Third, though the summary exhibit for the conspirators' collusion over KFC bidding and negotiations without defendants Brady and Austin's statements are helpful to the jury in assimilating voluminous information about the conspiracy, it would be substantially more helpful if these two statements were included, as they provide the missing piece of the puzzle—what led to the coconspirators reaching out to one another by phone and text to set the price of the bids, *e.g.*, a request from UFPC for a lower/revised bid.

The government does not lightly ask the Court to reconsider prior rulings especially in connection with the highly litigated *James* hearing and *James* logs. But here, where it is clear from the documents, calls, and testimony that the statements in GX-1700 and GX-1713 were coconspirator statements, it is appropriate for the Court to reconsider its prior rulings. Therefore, the government respectfully requests that the Court reconsider its prior rulings to determine that defendant Brady's statement in GX-1700 and defendant Austin's statement in GX-1713 were made in the course and in furtherance of the conspiracy and are admissible as coconspirator statements under Rule 801(d)(2)(E).

|  |  |
|---|---|
| Dated: May 9, 2022 | Respectfully submitted,<br><br>/s/ Matthew Chou<br>KEVIN HART<br>LESLIE WULFF<br>PAUL TORZILLI<br>DANIEL LOVELAND, JR. |

MATTHEW CHOU
Antitrust Division
U.S. Department of Justice
450 Fifth Street NW, Suite 11048
Washington D.C. 20530
Tel: (202) 598-8242
Email: matthew.chou@usdoj.gov
*Attorneys for the United States*