1    IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLORADO
2
Criminal Action No. 20-CR-00152-PAB
3    In Re: Penn II
UNITED STATES OF AMERICA,
4
       Plaintiff,
5
vs.
6
JAYSON JEFFREY PENN,
7    MIKELL REEVE FRIES,
SCOTT JAMES BRADY,
8    ROGER BORN AUSTIN,
TIMOTHY R. MULRENIN,
9    WILLIAM VINCENT KANTOLA,
JIMMIE LEE LITTLE,
10   WILLIAM WADE LOVETTE,
GARY BRIAN ROBERTS,
11   RICKIE PATTERSON BLAKE,

12       Defendants

13   _____

                    REPORTER'S TRANSCRIPT
14                  Trial to Jury, Vol. 8

15   _____

16       Proceedings before the HONORABLE PHILIP A. BRIMMER,

17   Chief Judge, United States District Court for the District of

18   Colorado, commencing at 8:02 a.m., on the 7th day of March,

19   2022, in Courtroom A201, United States Courthouse, Denver,

20   Colorado.

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
       Produced via Computer by Janet M. Coppock, 901 19th Street,
25       Room A257, Denver, Colorado, 80294, (303) 335-2106

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  |                     APPEARANCES                              |
| 2  |          Michael Koenig, Carolyn Sweeney, Heather Call and Paul |
| 3  | Torzilli,, U.S. Department of Justice, 450 Fifth Street N.W., |
| 4  | Washington, DC 20530, appearing for Plaintiff.              |
| 5  |          Anna Tryon Pletcher and Michael Tubach of          |
| 6  | O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor, |
| 7  | San Francisco, CA 94111-3823;                               |
| 8  |          Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street |
| 9  | N.W., Washington, DC 20006, appearing for Defendant Penn.   |
| 10 |          David Beller, Richard Kornfeld and Kelly Page of    |
| 11 | Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver, |
| 12 | CO 80202, appearing for Defendant Fries.                    |
| 13 |          Bryan B. Lavine of Troutman Pepper Hamilton Sanders, |
| 14 | LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308; |
| 15 |          Laura Kuykendall and Megan Rahman of Troutman Pepper |
| 16 | Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219, |
| 17 | appearing for Defendant Brady.                              |
| 18 |          Michael Felberg of Reichman, Jorgensen, Lehman,    |
| 19 | Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY   |
| 20 | 10017;                                                      |
| 21 |                                                            |
| 22 |                                                            |
| 23 |                                                            |
| 24 |                                                            |
| 25 |                                                            |

1      APPEARANCES (Continued)

2          Laura F. Carwile of Reichman, Jorgensen, Lehman,

3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4    CA 94065; appearing for Defendant Austin.

5          Elizabeth B. Prewitt of Latham & Watkins, LLP,

6    555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7          Marci Gilligan LaBranche of Stimson, Stancil,

8    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9    80218, appearing for Defendant Mulrenin.

10         James A. Backstrom, Counselor at Law, 1515 Market

11   Street, Suite 1200, Philadelphia, PA 19102-1932;

12         Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13   Bethesda, MD 20814, appearing for Defendant Kantola.

14         Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15   Street, Suite 1100, Los Angeles, CA 90017;

16         Dennis J. Canty, Canty Law Corporation,

17   1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18   appearing for Defendant Little.

19         John Anderson Fagg, Jr. and James McLoughlin of

20   Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21   Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

1    APPEARANCES (Continued)

2        Craig Allen Gillen and Anthony Charles Lake of

3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4    Atlanta, GA 30339;

5        Richard L. Tegtmeier of Sherman & Howard, LLC,

6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7    for Defendant Roberts.

8        Barry J. Pollack of Robbins, Russell, Englert, Orseck

9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11       Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                    PROCEEDINGS

16       THE COURT:  We are back on the record in 20-CR-152.

17   The jury is not present.  We are going to take up some issues,

18   maybe even get to the summaries, but we'll see.  So why don't

19   we take up, first of all, the government's motion for a

20   curative instruction regarding the questioning of Mr. Pepper

21   about the declaration.  This is Docket No. 1122.  The

22   defendants filed a response late last night.  I am just going

23   to rule on it.  It's been thoroughly briefed.

24       So it is true that there was a lack of contemporaneous

25   objection by the government, and what the government cites is a

1    contemporaneous objection was not.  That doesn't mean, though,

2    that it's not appropriate to inform the jury of what the law

3    is.  It's probably not a curative instruction since we are not

4    curing something that was somehow improper because there was a

5    lack of contemporaneous objection, but I think it is

6    appropriate that the jury be informed of the appropriate legal

7    significance of Mr. Pepper's responses, because as you could

8    tell on Thursday, he is put in a terrible position of trying to

9    answer extremely awkward questions regarding his indication of

10   a constitutional right.  And that -- those questions had no

11   probative value at all.

12          Neither side cited, but there is a case, 10th Circuit

13   case, directly on point, *United States v. Larranaga*,

14   L-A-R-R-A-N-A-G-A, reported at 787 F.2d 489, 10th Circuit case

15   from 1986 where a very, very similar situation occurred in

16   trying to cross-examine I think maybe it might have been a

17   co-defendant who then cooperated.

18          But the opinion at page 499 states as follows:  The

19   defendant also claims that the trial court erred in preventing

20   cross-examination into Garcia's prior assertion of her

21   privilege against self-incrimination.  While *Larranaga* argues

22   that this restriction violated his Sixth Amendment rights of

23   confrontation and effective assistance of counsel, we disagree.

24   The threshold requirement for the admission of evidence is that

25   it had some probative value, citing Rules 401 and 402.  We have

1    long held, however, that the jury cannot draw inferences from a

2    prosecution witness' decision to invoke his Fifth Amendment

3    privilege.   Thus, Garcia's prior refusal to testify was

4    inadmissible because it lacked legitimate probative value.   The

5    same is true in this case.

6         I am going to inform the jury right off the bat as

7    follows, that the questions that were asked of Mr. Pepper

8    related to whether -- remind him that he was asked questions

9    related to whether he invoked his Fifth Amendment right in

10   relation to a declaration that he had previously filed in this

11   case.

12        I will then inform the jury that a witness' indication

13   of his Fifth Amendment rights is not an admission of anything

14   and no inference of any kind may be drawn from the fact that a

15   witness previously invoked that right.   Therefore, Mr. Pepper's

16   decision not to answer certain questions should not be taken as

17   any type of admission that he lied to the government or did

18   anything improper.   And I will indicate that they must not draw

19   any inferences from Mr. Pepper's decision to invoke his Fifth

20   Amendment privilege in his declaration.

21        All right.   Now let us move on to summary exhibits.

22   Ms. Call, where were we?

23        *MR. TUBACH:*  One point on that.   The Court has ruled,

24   and I am not rearguing the point.   The government also asked

25   for the right to redirect Mr. Pepper, to ask Mr. Pepper on

 1    redirect about that issue.  If the issue is irrelevant, the

 2    government should not be allowed to ask about that.

 3              *THE COURT:*  What?

 4              *MR. TUBACH:*  So the government should not be allowed

 5    to ask about it at all.

 6              *THE COURT:*  The government didn't indicate precisely

 7    what the redirect would be.  There's not necessarily a reason

 8    that you couldn't redirect, but you're right, I mean, I don't

 9    know what it's going to consist of.

10              Mr. Koenig?

11              *MR. KOENIG:*  Sure.  I think the questions would be

12    along the lines of, when you signed that declaration, were you

13    intending to admit the conduct described in the question?

14    Ms. Sweeney probably has a better idea of the question on

15    redirect?

16              *THE COURT:*  Well, I don't know if you would really

17    need that if I have just informed them of that very thing,

18    because now you're trying to shift it from a, you know, the

19    Court's advised the jury of what the legal significance of the

20    answers is and now you're asking about his intent, so I am not

21    sure why that would be relevant.

22              *MR. KOENIG:*  Yeah, I think I summed up the question,

23    but we'll see how it rests.

24              *THE COURT:*  We can.

25              Okay.  Ms. Call's summaries.  Go ahead.

1          *MS. CALL:*  Thank you, Your Honor.

2          I think we are left off at the objections to

3   Government's Exhibit 16 starting at page 8 of the defendants'

4   motion ECF-1106.  I am going to go in reverse order on this

5   starting in the second paragraph at the bottom of page 8 of the

6   defendants' motion just because that's the order of the

7   summary.

8          They objected to the addition of two exhibits, and

9   that is 1403 and 1404, which were timely based on the Court's

10   ruling regarding the government's changes to the summaries, but

11   they objected to the addition of the government's evidence in

12   the government's possession at the first trial that was not

13   admitted at the first trial, and I believe they cited *Irwin* for

14   this proposition.

15          As I believe the parties are aware, *Irwin* stands for

16   the proposition that a summary is only admissible in evidence

17   if the underlying evidence is admissible.  And, of course, the

18   defendants have actually stipulated to the 803(6) foundation

19   for those two documents, 1403 and 1404, so I don't believe

20   there is a basis in the objection that they are somehow not

21   admissible.

22          I will move on to the second exhibit, and that is

23   Government Exhibit 1722, which is the last entry on

24   Government's Exhibit 17.  Defendants state that it is clearly

25   not connected in any way to the preceding entries while it

 1    clearly is.  Government Exhibit 16 is the conclusion of the KFC

 2    negotiations in 2012.  The previous entry, which is 1403 and

 3    144 we were just talking about, is some of the final bid

 4    submissions.  And Exhibit 1722 shows Defendant Austin checking

 5    in with Defendant Penn following those final bids as to where

 6    competitors landed on their pricing.

 7            There is a reference to Case, which defendants noted

 8    was not previously mentioned in the summary, but, of course,

 9    that's because they were actually a new entrant at this time to

10    KFC as Mr. Ledford testified last week, and essentially this is

11    Roger Austin following up on where the competitors landed

12    following these negotiations.

13            So I believe it's certainly relevant.  It's certainly

14    contextually relevant to the other entries in this exhibit and

15    should be admitted into the exhibit on that basis.

16            THE COURT:  Ms. Call, what's -- those last three

17    entries that Exhibit 1722 is cited for, what are the dates of

18    those?

19            MS. CALL:  So those are exactly where my hole punch is

20    on my page, but it's January.

21            MR. FELDBERG:  29.

22            MS. CALL:  Thank you, Mr. Feldberg.  January 29, 2013.

23            THE COURT:  Response, Mr. Tubach?

24            MR. TUBACH:  Yes, Your Honor.  The Court anticipated

25    our objection to the very last three entries, which is this is

1    essentially two months after the prior entry.  And Ms. Call, as

2    she did previously, basically argued, well, this is all

3    relevant, but relevance is not what drives whether something

4    belongs on a summary chart.  It's got to be connected to the

5    event, directly connected to the event.  And here we have

6    almost a two-month gap, so we do not believe that this last

7    text which occurs, you know, January 29th can belong on this

8    chart.

9            The government, of course, is free to argue that this

10   is relevant in some way, but the -- just the fact that it

11   relates to the KFC bid alone wouldn't be sufficient to put it

12   on this chart.  That's the last three entries.

13           The prior entry, our objection is that the December 3

14   entry only lists one of seven bids, and it's not clear -- I

15   mean, that is sort of obviously and apparently intentionally

16   not listing the other bids that are there.  And that is pure

17   argument.  And my suspicion is that the only reason the

18   government listed that one and not any of the others is because

19   it's similar -- it's the same price as listed in the e-mail

20   immediately above it, which is eight-piece purple is 9620.

21           That's argument.  It's perfectly fine argument for

22   Ms. Call to make.  It just doesn't belong in a summary exhibit

23   of evidence.  If they want to put in the bids that everyone

24   submitted around that time, they should put all the bids in,

25   not just one bid, to make the argument they want to make.

1     THE COURT:  Mr. Feldberg, go ahead.

2     MR. FELDBERG:  With respect to the last three entries,

3  Your Honor, 1722, in many respects we like those documents

4  because they show that long after the contracts were finalized

5  Mr. Austin didn't know what the prices were.  That said, and we

6  can have an argument with the government about that exhibit, it

7  doesn't -- that exhibit doesn't belong on the summary chart.

8  It's not unrelated.  It's two months later and it's on a

9  different subject.  It's a reflection on what happened on the

10  things that are on the earlier edition of the summary chart.

11  So we would join in that objection.

12     THE COURT:  Thank you.

13     Anyone else?

14     Ms. Call?

15     MS. CALL:  Yes, Your Honor.  I think the standards

16  that defense counsel are articulating whether something is

17  directly connected to an event or the one-month or five-week

18  distinction making it not sufficient for inclusion in a summary

19  just isn't any standard based in any of the law on summary

20  exhibits.

21     These summaries show context during particular time

22  periods relating largely to certain events, and I think the

23  direct relation of Exhibit 1722 to the negotiations that

24  immediately preceded it make it entirely proper to include in

25  the summary as it is, as Mr. Feldberg said, a reflection on

1    exactly what is summarized elsewhere in this exhibit.  So I do

2    believe it's entirely proper.

3            As to Mr. Tubach's point regarding the inclusion of

4    certain bids and not others, seven bids would take up probably

5    nearly two pages on a summary, and I don't think there is any

6    standard that the government has to include every summary -- or

7    every bid in each of their summaries, and they, frankly,

8    wouldn't be much of summaries if they did.

9            But we do believe it is extremely relevant and

10   extremely proper to put in the bid submission following an

11   e-mail containing competitors' quotes and a bid submission that

12   does contain exactly the number indicated in that prior e-mail

13   from Mr. Penn that was forwarding an e-mail from Mr. Tucker

14   showing the accuracy of the information that Mr. Austin

15   received from his competitors.

16           THE COURT:  All right.

17           Yes, Ms. Henry.

18           MS. HENRY:  Your Honor, I would just point out that

19   while she talked about seven, there are actually only four bids

20   that are noted on the prior exhibit, the prior entry.  One of

21   them, of course, is Koch's bid, and it has come out in the

22   trial very clearly that the number that's reflected there is

23   not Koch's number and has no relation to Koch's number, but

24   they very carefully have left that off, and I think that was

25   the point of argument that Mr. Tubach was making.

1      *THE COURT:*  In terms of the entry, which is

2    Exhibits 1403 and 1404, I am going to overrule the objections.

3    Once again, the summaries are justified on the grounds that

4    they are summarizing voluminous information.  And I agree with

5    the government that if you had to list every single one, it's

6    not much of a summary, so I think that that entry is proper.

7          I am going to sustain the objection as to 1722.

8    That's a long -- that's a large time gap, and so as a result --

9    perhaps that could be summarized somewhere else if the

10   government had done so, but the large gap in time makes it more

11   argumentative.  And as a result, I will sustain the objection

12   to those three entries related to 1722.

13         Ms. Call, next exhibit?

14     *MS. CALL:*  The next is Government's Exhibit 17 with

15   the defendants' objections on page 9 of their motion.  First

16   the defendants object to the inclusion of Mr. Ledford's

17   statements in Government's Exhibit 1713 on the basis that the

18   Court excluded it from the summary at the last trial and that

19   the government has, I believe they said, flouted the Court's

20   ruling.

21         In the last trial, Exhibit 1713 was admitted as one

22   document where the top e-mail, I believe, was admissible only

23   against Defendant Austin under 801(d)(2)(A); and the middle

24   portion, meaning Mr. Ledford's statements, was admitted not for

25   the truth of the matter asserted but only for effect on the

1    listener.  It was on that basis that the Court excluded it from

2    the prior summaries.

3         This trial we are in a different situation where

4    Exhibit 1713 was admitted last week during the testimony of

5    Mr. Ledford in a redacted form, not including Roger Austin's

6    statement, and that was actually admitted as 1713-1, so it is

7    admissible against all defendants now as opposed to the Court's

8    ruling in the previous trial.

9         So the government would argue that as the basis for

10   its proper inclusion here and would seek to amend, of course,

11   the reference to 1713-1.  I will note 1713 is one of the

12   documents pending that the government is seeking to admit under

13   801(d)(2)(A) still in the form including Roger Austin's e-mail,

14   but 1713-1 has already been admitted just for Mr. Ledford's

15   statements that are contained in this summary.

16        The defendants also state or cite correction of a line

17   item that I believe had previously read "phone call" to

18   indicate "SMS text messages."  I believe this is an error that

19   Ms. Evans had discovered when reviewing these charts for

20   accuracy.  Essentially a phone record looks almost exactly the

21   same as a log of text messages as it does for a log of phone

22   calls, so it was simply an error that she recognized and

23   corrected in revising these summaries, so we believe it would

24   be proper to amend that to be more factually accurate.

25             THE COURT:  And what was the nature of the correction?

1          *MS. CALL:*  I believe it had previously listed a "phone

2     call" where it now lists "SMS message" next to Government's

3     Exhibit 9722 in the fourth row of Exhibit 17.

4          The defendants further state that it's not proper for

5     inclusion because the government doesn't list the content of

6     the text messages.  That's simply because the government does

7     not have the content of the text messages.  However, they are

8     reflected on phone bills and are entirely relevant in the same

9     way that a phone call is relevant even if the government

10    doesn't have a recording of the phone call.

11         It's the timing and the nature of the communications

12    being between competitors just after -- well, this happens to

13    be just after Scott Brady said that he would make some calls to

14    his boss, Defendant Fries, which is not encapsulated in the

15    summary, but these are calls between competitors following that

16    statement and text messages with Scott Brady and competitor

17    Jimmie Little at that same time, and they are relevant for that

18    purpose that they are reaching out to each other the day after

19    receiving feedback from RSCS on their round one bid.

20         *THE COURT:*  Response?

21         Mr. Tubach?

22         *MR. TUBACH:*  Your Honor, just focusing on

23    Exhibit 1713-1, the Court had excluded it from the prior

24    summary exhibit.  The only change in circumstances is

25    Ms. Call's statement that the whole exhibit is now admissible

1    at the trial as a whole rather than simply on a limited basis,

2    but that doesn't change the nature of whether or not that

3    belongs on the chart.  Whether or not you have a limiting

4    instruction isn't determinative of whether or not it's

5    relevant.

6          And the fact that a customer has expressed

7    disappointment in the fact that someone has bid higher, I think

8    as Mike Ledford testified when he was here in the second trial,

9    his expression of disappointment is something he did

10   frequently.  I don't think it has any real probative value as

11   it belongs on this chart.  The government is free to argue it,

12   but I don't believe it goes to any of the issues on the chart.

13          THE COURT:  Anyone else?

14          I will overrule the objection.  1713-1 has now been

15   admitted.  It's as to all defendants.  And I think it's

16   appropriate because that expression by Mr. Ledford of his

17   renewed disappointment, you know, I think is relevant to this

18   chart and why there may be phone calls in reaction to it.

19          So, Ms. Call, though, I think that given what you say

20   about 1713-1, which I will give you the ability to revise the

21   entry on the summary, the limiting instruction, then, I don't

22   believe is accurate; is that right?

23          MS. CALL:  Correct, Your Honor.

24          THE COURT:  So that can be corrected as well.

25          All right.  Next one?

1          *MS. CALL:*  The next is the defendants' objections to

2    changes on Government's Exhibit 18, and that is found on page 9

3    of their motion.  They object to a change from a reference to

4    the testimony of Ms. Fisher regarding the February 3rd bid

5    submission which now cites rather than testimony an actual

6    document showing the date of the bid submission, and that's

7    F-852 contained on the second page of Government's Exhibit 18,

8    the second to the last entry.

9          As the government noted in its filing, ECF-1102, we do

10   not believe it would have been proper to have Ms. Evans testify

11   to testimony in a prior trial.  Ms. Fisher had not yet

12   testified in this trial, so instead of citing her testimony,

13   the government changed the citation to an underlying exhibit,

14   which is F-852.

15         The admissibility of F-852 I believe has now been

16   stipulated to by the parties in ECF-1107.  So the government

17   does believe that that change would be proper.

18         *THE COURT:*  Mr. Tubach?

19         *MR. TUBACH:*  Your Honor, our objection goes solely to

20   the Court's order, which after much consideration the Court

21   said, Whatever the government was doing on February 10, that's

22   what they're stuck with.  And this is after February 10.

23   That's our only argument.

24         *THE COURT:*  And what did it look like before?  What

25   was the pre-February 10 or the February 10 entry?

1    MR. TUBACH:  It just said "Fisher testimony" and

2  underneath that said "H-853."

3    THE COURT:  Ms. Call?

4    MS. CALL:  Just to be clear, the content of the entry

5  that says "excerpt" is precisely the same as it was on

6  February 10.  It is solely the change from "Fisher testimony"

7  to a citation to "F-852."  That is the change.

8    THE COURT:  I will overrule the objection.  It's a

9  small change, it's more accurate, and "testimony" I think is a

10  little bit confusing, so I will overrule that objection.  I

11  will allow that particular correction to be made.

12    Next?

13    MS. CALL:  Next objections are changes to time stamps.

14  Those objections are contained on page 9 through 10 of

15  Defendants' ECF-1106.  These changes were made based on

16  additional new testimony expected in this trial which now has

17  happened in the form of Mr. Gresch's testimony regarding an

18  extraction from Carl Pepper's iPad stating that that iPad, the

19  messages were processed in UTC.  That testimony did not come

20  out in the prior trial, and it is now specific evidence as to

21  the time zone of the specific entries the defendants claim or

22  complain of in Government's Exhibit 7.  I believe those are

23  Exhibits 757 -- or 757 was actually a correction to the time,

24  and then time zones in remaining text messages.  So we believe

25  that is proper based on the additional evidence that has come

1    out.

2              As I noted, the time from 11:34 to 11:44 they note in

3    Government's Exhibit 757 is a typo that Ms. Evans corrected,

4    and we believe that would be a proper change.

5              THE COURT:  Mr. Tubach?

6              MR. TUBACH:  Just briefly, Your Honor.  I believe

7    these were all changes that were made after February 10,

8    although I can be corrected.  If that's the case, again our

9    argument is the Court gave a hard deadline and we should stick

10   with it.

11             THE COURT:  I will overrule that objection.

12             Mr. McLoughlin, go ahead.

13             MR. McLOUGHLIN:  Yes, Your Honor.  Can we be heard on

14   our objections to Exhibit 9?

15             THE COURT:  Yes, but hold on one second.  Let me rule.

16             Was it in connection with what Mr. Tubach just said?

17             MR. McLOUGHLIN:  No, Your Honor.

18             THE COURT:  So let me rule on the last summary point.

19   Given the fact that those are -- that is evidence that came in

20   through Mr. Gresch in the trial, the fact that the government

21   didn't do it before February 10th is understandable, and as a

22   result, I will overrule the objections to those entries.

23             Ms. Call, anything more on the summaries?

24             MS. CALL:  So, Your Honor, the defendants had

25   additional objections to color coding and changes to limiting

1    instructions.  I believe Your Honor has already ruled on the

2    color coding.

3            THE COURT:  Yes, that's correct.

4            MS. CALL:  And I believe the changes to limiting

5    instructions would be entirely proper based on rulings on

6    evidence at this trial.

7            THE COURT:  Yes.

8            Mr. McLoughlin, go ahead.

9            MR. McLOUGHLIN:  Thank you, Your Honor.

10           Our objection to Exhibit 9 is to the inclusion of the

11   entry based on Exhibit 920 that appears at the top of the page.

12   That entry is from May 9, 2014, and it is the excerpt of an

13   e-mail exchange in which Mr. Lovette asks Mr. Gay about the

14   fact that Mr. Ledford has now joined Chick-fil-A, and

15   Mr. Ledford -- Mr. Lovette simply asked, well, what does that

16   mean?  This is a very small part and, we would argue, a

17   misleading excerpt of that exchange between Mr. Gay and

18   Mr. Lovette in May.

19           We then jump two months to July in which there are

20   several phone calls and then a text message in which Mr. Brady

21   said, Justin says they, being Chick-fil-A, are getting their

22   CFA grain model based on.  Now for 2015 I will check with

23   Perdue and Tyson.  So what we have is a message at the top

24   talking about Mr. Ledford joining Chick-fil-A and then we have

25   a series of messages about a grain model several months later.

1           Now, the government called Mr. Ledford and in theory

2    could have tried to connect these up using Mr. Ledford to

3    provide testimony about his joining Chick-fil-A and something

4    related to grain models.  And, of course, they made no effort

5    while Mr. Ledford was on the stand to talk about his time at

6    Chick-fil-A, what his perspective at Chick-fil-A was or how it

7    might have changed.

8           So we are in a circumstance where not only is it very

9    remote as to time as Your Honor has previously on a number of

10   exhibits based a strike, but also there is -- it appears there

11   will be no testimony or other evidence to connect Mr. Ledford's

12   going to Chick-fil-A to any of these other exchanges.

13          So what we are really talking about is this is the

14   government trying to take the opportunity to have Mr. Lovette's

15   name on the chart even though his communication here has

16   absolutely nothing to do with any of the subsequent exchanges

17   months later.  And it is not merely argument of a connection

18   that is remote in time and without basis, but argumentative in

19   a sense that it is not permissible under 1006.  If they are

20   saying it's a 611(a) chart, it still fails.

21          THE COURT:  Thank you.

22          Ms. Call?

23          MS. CALL:  Yes.  To start, this is just a, first off,

24   extremely untimely objection.  Exhibit 920 was included in the

25   summaries admitted at the last trial.  I believe these same

1    arguments were made then.  I don't think exhibits to 920 were

2    mentioned in either of the three motions that were filed

3    related to the summaries at this trial.

4        First, it's just extremely late in the game to be

5    bringing this; but, second, it's entirely relevant.  At this

6    time period Mr. Ledford was moving from KFC to Chick-fil-A, and

7    the suppliers' discussions about him moving and prices that

8    should be charged to Chick-fil-A are the subject of this

9    summary regarding the negotiations with Chick-fil-A that then

10   ensued after Mr. Ledford moved there.

11       So it's entirely relevant, entirely relevant context

12   even if the discussion of his moving was, you know, slightly

13   less than two months before the negotiations, but this is what

14   the defendants' state of mind was at the time of negotiation as

15   properly included in this summary.

16       THE COURT:  Do you recall, Ms. Call, what the exhibit

17   number of this particular summary was?

18       MS. CALL:  It was 9-1.

19       THE COURT:  9-1?  Okay.

20       MS. CALL:  Mr. McLoughlin did make these same

21   arguments during the last trial, and Your Honor overruled them.

22       THE COURT:  I was just looking at that from before,

23   last trial.  The same objection was denied in the past.  I will

24   deny it now.  This is something that we've spent time on

25   already.

1          All right.  Let's see, I think we are getting close in

2    terms of the jury.  Anything else real quick to take up?

3          MR. GILLEN:  For the record, we would object to the

4    Court's curative instruction and the ruling made, so we want --

5    for all the reasons articulated in the pleading filed

6    yesterday.

7          THE COURT:  And just for the record on that pleading,

8    those cases cited in the pleading filed late last night are all

9    distinguishable.  Almost all of them have to do with either

10   implications in civil cases or talking about the indications of

11   Fifth Amendment rights in the course of interviews regarding

12   defendants and whether or not there might be some implication

13   from their silence, but the 10th Circuit case that I relied on

14   is much more on point, so -- but I do note, Mr. Gillen, as you

15   say, that you preserve your objections to that.

16         Mr. McLoughlin?

17         MR. McLOUGHLIN:  And with all due respect, just so the

18   record is clear, our position would be that *Larranaga* does not

19   survive *Crawford*, comes 20 years later, and that after *Crawford*

20   the scope of confrontation clause rights is so much broader

21   that the issue of whether a witness called by the government

22   has taken the Fifth Amendment right prior is a

23   cross-examination that after *Crawford* is an issue that should

24   be left to the jury, and the curative instruction winds up

25   being a restriction on the defendants' rights under *Crawford*,

1    so we want to just make it clear that that legal point is in

2    the record.

3            THE COURT:  Sure.  Once again, I will overrule that as

4    well.  When you have a situation, particularly in a criminal

5    case, where someone in this case, a person who was potentially

6    considered a suspect who was worried about self-incrimination,

7    quite properly so, I think it is important to put that in

8    proper perspective for the jury.  And his indications of the

9    Fifth Amendment, as the Court noted in *Larranaga*, have no

10   probative value.

11           We will be in recess.

12           Mr. Feldberg, did you have something?  Sorry, a slight

13   lean forward, I thought you might be ready to launch.

14           Mr. Beller?

15           MR. BELLER:  Thank you, Your Honor.  Only taking

16   advantage of the fact we have a few minutes.

17           Last night the government had filed a notice with the

18   Court of intention to introduce Exhibit 9782.  I don't know if

19   the Court wishes to take that up now.

20           THE COURT:  We can take that up now.

21           MR. BELLER:  I don't know if the Court wishes for me

22   to go.

23           THE COURT:  Why don't you go first, and we will hear

24   the government respond.

25           MR. BELLER:  I went through late last night the

1    government's notice of intent to offer.  I would note for the

2    Court I believe that this is actually a motion to reconsider an

3    earlier ruling of the Court.

4           Your Honor, in going through both the government's

5    motion as well as the transcript of the last hearing -- or,

6    excuse me, the last trial, the Court spent approximately 10

7    pages of the transcript hearing the exact same arguments as

8    argued by the people -- or argued by the government, excuse me.

9           Your Honor, in that case, the Court heard arguments

10   from the government that the defendants opened the door in

11   their opening statement to this particular document, that the

12   defendants opened the door through cross-examination during

13   this particular argument.  The Court argued that the National

14   Chicken Council conference argument was a red herring.  The

15   government also argued in those 10 pages that there was an

16   opportunity of the defendants to conspire, and that's the

17   reason why this is particularly relevant since this occurred

18   prior to the August KFC submissions.

19          Your Honor, the government has now made two additional

20   arguments that were not previously argued before.  One of them

21   is that this is now relevant to bolster the Claxton board

22   meeting minutes and also to bolster 1030.

23          Your Honor, I would note for the Court the basic time

24   frame and that is this lunch happened at a national conference

25   in which all defendants and, to the best of my knowledge, all

1    witnesses, meaning every single customer, was also present for

2    and that occurred on July the 19th of 2014.  The board meeting

3    minutes, Your Honor, is from August the 28th, and Exhibit 1030

4    is from August the 29th, so its relation time-wise is tenuous

5    at best.

6          Your Honor, I do have a copy of the 10 pages in which

7    this was argued.  The Court ultimately found that this was

8    simply not relevant to anything.  The Court notes, "It's just a

9    reference back to a meeting in July, and that's the type of

10   meeting that competitors would be at.  It's just way too much

11   of a stretch and inference to suggest that there is any

12   relevance to this particular document, so I am going to exclude

13   that one."

14         Your Honor, I don't believe that the government has

15   articulated a new basis that would overrule or, rather, give

16   the Court reason to reconsider its earlier ruling.  So to the

17   extent the Court would like those 10 pages printed out, I have

18   them for the Court.

19         But nonetheless, despite the *Bruton* arguments having

20   been raised and a whole lot of additional arguments, the Court

21   ultimately ruled that this particular document was simply

22   irrelevant.

23         *THE COURT:*  Thank you.

24         Mr. Gillen?

25         *MR. GILLEN:*  Quickly, Your Honor, I wish to emphasize

1       the time period between the July for all the reasons that

2       Mr. Beller articulated and cited to the record where the Court

3       had ruled this out.  What they are really trying to do now is

4       come back and say, well, now, Your Honor, because you have

5       entered into evidence 1030, therefore please reconsider your

6       ruling about a meeting that took place in July the 19th.

7            Well, as we can see, as the Court indicated, there is

8       nothing particularly sinister about everybody going to a

9       conference where virtually everyone in the industry would be,

10      but remarkable in the sense that 1030, the one that -- sort of

11      the new exhibit that they think now allows them to revisit this

12      issue, and it really is a motion for reconsideration, is on

13      August the 29th, some 40 days after the conference.  And not

14      only is it 40 days after the conference, but in the interim we

15      have had the -- are the August the 11th Tyson bid which took

16      place, and then we've had the second round of bids that have

17      taken place.  So a lot has taken place.  Not only is it 40

18      days, but, frankly, all of the bids have also taken place.

19           They also in their motion simply speculate without any

20      basis that as it relates to 1030 they say, Oh, well, Tyson, a

21      1.0976 per Tommy, and they just sort of assume that has to be

22      Tommy Francis.  There is no basis for that.  There is no

23      evidentiary basis for that whatsoever.

24           Same way where they reference the situation where

25      they're saying the inference should be that Mitch should be

 1   Mitch Mitchell.  There is no evidence to support their leap in

 2   that respect.

 3          So what they are really doing is stretching, asking

 4   for reconsideration, which we would ask the Court not to give

 5   them, for all the reasons, they haven't really tied this

 6   July 19 document up and the inference that they are trying to

 7   draw is an inappropriate one.  So we would ask that the Court

 8   remain with the ruling that it made in the first trial.  Thank

 9   you.

10          *THE COURT:*  Thank you, Mr. Gillen.

11          Mr. Torzilli, go ahead.

12          *MR. TORZILLI:*  Thank you, Your Honor, and good

13   morning.  I think the comments that Mr. Gillen just made all go

14   to the weight of the evidence to be assigned to 9782 and to the

15   inferences to be drawn from that document in conjunction with

16   the others.  9782 is clearly relevant, relevant to show that

17   two defendants and two other conspirators from four different

18   chicken companies had an opportunity to communicate with one

19   another just like if we had two or four or six or eight phone

20   records from July 19 of 2014 showing telephone connections

21   between those individuals.

22          The way in which this has become additionally relevant

23   in this trial relative to the other, of course, are twofold:

24   One, Mr. Pepper is testifying here at this trial and didn't at

25   the last and has been cross-examined on the facts that relate

1    to the time frame that Defendant Roberts wants to put before

2    the jury and the inferences that he wants drawn from the time

3    line that is his preferred time line; and then second is the

4    admission of 1030.  And in 1030, there are references to Mitch

5    and a reference to Tommy, and the information contained in 9782

6    helps to corroborate I would use as opposed to the word

7    "bolster," but to corroborate the information contained in

8    1030.

9           THE COURT:  All right.  Thank you.

10          So a problem with 9782 is the fact that the e-mail

11   from Terry Sherman is still just hearsay.  It is true that

12   there are a couple of questions there, but what is asserted in

13   the Sherman e-mail is the names Mike Fries, Tommy Francis,

14   Mitch Mitchell.  And despite the government's argument,

15   Mr. Roberts' response does not somehow adopt those statements,

16   endorse those statements, anything of the sort.  There is no

17   reference to those people whatsoever.

18          So the bottom e-mail is inadmissible hearsay.  And

19   then the top e-mail, because there is no context to it, I stick

20   with the same ruling that I had in the previous trial, so I

21   don't find that it is admissible.

22          The jury is here.

23          Mr. Kornfeld?

24          MR. KORNFELD:  A quick question, Your Honor.  I think

25   the first week of trial we had made inquiry of the Court about

1     the possibility of witnesses testifying without masks.  I think

2     the Court indicated that the Court as a whole, the District

3     Court, was going to meet.  And I am just wondering if any

4     protocols have changed which might allow for witnesses to

5     testify without a mask.

6          THE COURT:  General orders have not come out yet, and

7     so there has been no change as of the present.  One thing I did

8     pose to people as something to think about is whether for

9     witnesses who were going to be testifying for a longer block of

10    time and, therefore, potentially if they were contagious,

11    whether they would be given -- administer a rapid test, and I

12    asked whether people might have rapid tests.  So I haven't

13    heard a response back on that.

14          Anything on that front, Mr. Kornfeld?

15          MR. KORNFELD:  Not to my knowledge, Your Honor, but we

16    can circle up at the break.  And if there is anything to

17    report, we will do so.

18          THE COURT:  That might be a good idea.  As I

19    indicated, the Court doesn't have any supply of rapid tests,

20    but that would be at least for those witnesses who are going to

21    be on the witness stand for a longer period of time and,

22    therefore, potentially at least posing a greater risk were they

23    to testify for hours and hours.  That would give us some

24    additional assurance for the safety of others in the courtroom.

25          MR. KORNFELD:  Thank you, Your Honor.

1    THE COURT:  All right.  Anyone need to take a quick

2    break before we begin?  Real quick, we will take five minutes

3    because the jury is all present.  Thank you.  We will be in

4    recess.

5         (Recess at 8:45 a.m. until 8:51 a.m.)

6    THE COURT:  Why don't we get Mr. Pepper.  Mr. Gillen

7    can get set up if he would like.  Why don't we go ahead and

8    bring the jury in.

9         (Jury present.)

10   THE COURT:  Good morning, ladies and gentlemen.  I

11   hope you had a good weekend.  Let me let you know about one

12   thing.  You will remember that last Thursday Mr. Pepper was

13   asked some questions about a declaration that he had signed

14   that -- where he invoked his Fifth Amendment right.  Let me

15   give you the following information.

16        A witness' indication of his Fifth Amendment rights is

17   not an admission of anything, and no inference of any kind may

18   be drawn from the fact that a witness previously invoked his

19   Fifth Amendment right.  Therefore, Mr. Pepper's decision not to

20   answer certain questions posed to him in that declaration

21   should not be taken as any type of admission that he lied to

22   the government or did anything improper.  You must not draw any

23   inferences from Mr. Pepper's decision to invoke his Fifth

24   Amendment privilege in his declaration.

25        Mr. Gillen, go ahead.

Carl Pepper - Cross

1    MR. GILLEN:  Thank you, Your Honor.  We have no

2  further questions of Mr. Pepper.

3    THE COURT:  Thank you very much, Mr. Gillen.

4    Additional cross-examination?  Ms. Prewitt?

5    MR. PREWITT:  Thank you, Your Honor.

6   (**Carl Pepper** was previously sworn.)

7                      **CROSS-EXAMINATION**

8  BY MS. PREWITT:

9  Q.  Good morning, Mr. Pepper.  I will just take a moment to set

10  up here.

11    MR. PREWITT:  Your Honor, if I may approach, I have a

12  binder for the witness and for the Court.

13    THE COURT:  Yes, you may.

14    MS. PREWITT:  And I have copies also for the

15  government, Your Honor.

16  BY MS. PREWITT:

17  Q.  You have your binders there, Mr. Pepper?

18  A.  Yes.

19  Q.  Now, Mr. Pepper, we met briefly before last week.  My name

20  is Elizabeth Prewitt, and I represent and am standing up here

21  for Mr. Mulrenin over there, okay?

22  A.  Yes, ma'am.

23  Q.  I am going to have some questions for you along some of the

24  areas that Ms. Sweeney from the prosecution asked you about,

25  okay?  So we are going to cover some of that again, okay?

Carl Pepper - Cross

1    A.  Yes, ma'am.

2    Q.  And I want to start today with some questions for you about

3    the Popeye's big box promotion, okay?

4    A.  Yes, ma'am.

5    Q.  Now, and, Mr. Pepper, I do speak quickly, so if there is a

6    point in time -- I mean, I think everybody has heard that at

7    this point.  At some point in time if you feel I am speaking

8    too quickly so you don't understand the question, I am going to

9    ask you to just say, Stop, I don't understand your question,

10   and then we can go from there, okay?

11   A.  Yes, ma'am.

12   Q.  My objective here is to just ask you questions and get your

13   clear, honest testimony back, okay?

14   A.  Yes, ma'am.

15   Q.  All right.  So let's talk about that big box promo in 2015.

16   Popeye's wanted a price reduction for one month in September,

17   right?

18   A.  Yes, ma'am.

19   Q.  And that was for just the eight-piece, right?

20   A.  Yes, ma'am.

21   Q.  The chicken on the bone?

22   A.  Yes, ma'am.

23   Q.  Now, the buyer for Popeye's at the time was a person by the

24   name of Kent Kronauge?

25   A.  Yes, ma'am.

Carl Pepper - Cross

 1   Q.  He worked at a buying cooperative called SMS, correct?

 2   A.  Yes, ma'am.

 3   Q.  Now, Mr. Kronauge had a way of negotiating, didn't he, his

 4   own particular way would you say?

 5   A.  Yes, ma'am.

 6   Q.  And, in fact, his way of negotiating was he would pressure

 7   Popeye's suppliers like Tyson to agree to the same discounts or

 8   reductions, correct?

 9   A.  Would you say that again, please?

10   Q.  Sure.  His way of negotiating, Mr. Kronauge on behalf of

11   Popeye's, was to pressure or push all suppliers to offer the

12   same discounts or price reductions.

13   A.  He basically asked us -- asked us to give him a price.  I

14   don't know -- I can't say that he --

15   Q.  Let me -- I am going to ask you the question, and I am

16   going to ask you to just listen to the question and respond,

17   okay?

18   A.  Okay.

19   Q.  Now, Mr. Kronauge, as part of his negotiation approach, how

20   he did things as a negotiator, he would try to pressure all the

21   suppliers to offer the same level of price reduction or

22   discount, correct?

23   A.  Yes, ma'am.

24   Q.  And that's what, in fact, Mr. Kronauge did for this

25   Popeye's big box promotion.

Carl Pepper - Cross

1  *A.*  Not at the beginning.

2  *Q.*  But he did do that, didn't he?

3  *A.*  Yes, ma'am.

4  *Q.*  Now, in fact, Mr. Kronauge asked if everyone, each

5  supplier, including Tyson, was able to offer the 2-cent

6  discount for this promotion.

7  *A.*  Yes, ma'am.

8  *Q.*  And Popeye's needed to -- needed the amount of the discount

9  to be the same across all the suppliers in the country for the

10  discount to take effect the way he wanted it to be as a

11  nationwide discount, correct?

12  *A.*  Yes, ma'am.

13  *Q.*  Now, I want -- I am going to ask you some questions about

14  how that came to be, how it came to be that the discount was

15  the same across all the suppliers, okay?

16  *A.*  Okay.

17  *Q.*  Now, when I say the "amount," I say the 2-cent discount.

18  We are talking about the same thing for the big box promotion.

19  So I'm going to ask you to take a look at Government's Exhibit

20  618.  This is a document the government showed you.

21          And, Your Honor, it has been admitted, so it can be

22  published to the jury if Your Honor agrees.

23          *THE COURT:*  Yes, it has been admitted.  It may be

24  displayed to the jury.

25          *MR. PREWITT:*  Thank you.

Carl Pepper - Cross

1   *BY MS. PREWITT:*

2   *Q.*  Now, we are just going to take a look at this.  We have an

3   e-mail chain from March 2015.  Can we agree about that?

4   *A.*  Yes, ma'am.

5   *Q.*  And this is about that Popeye's big box discount, the one

6   that Mr. Kronauge on behalf of Popeye's asked for.

7   *A.*  Yes, ma'am.

8   *Q.*  So we are going to start here at the bottom, all right?  So

9   the bottom is sort of the first e-mail in time, and we will

10  work our way up, okay?

11  *A.*  Okay.

12  *Q.*  Now, this first e-mail here is from Kent Kronauge, and it's

13  cc'ing Kent Kronauge.  But, you know, isn't this just his way

14  of reaching out to all suppliers at once?

15  *A.*  Yes, ma'am.

16  *Q.*  So this e-mail is being sent to not just you at Tyson, but

17  the other suppliers he is looking for that discount from,

18  correct?

19  *A.*  Yes, ma'am.

20  *Q.*  Now, in this e-mail he says he is looking for the big box

21  promotion.  And you forward this e-mail on, right?

22  *A.*  Yes, ma'am.

23  *Q.*  And you say, in fact -- and this is the second e-mail up in

24  the chain, the one at 7:17:43, okay, just so we are on the same

25  one.  You say here at the top:  What do you think?  We have

Carl Pepper - Cross

1    done this over the years.

2          Correct?

3    A.  Yes, ma'am.

4    Q.  And I am reading that right?

5          Okay.  Now, in fact, to Ms. Sweeney's testimony last

6    week -- in response to her questions last week, you testified

7    that Popeye's had asked for this periodically over the years,

8    and most of the time it was 2 cents a pound that they were

9    usually looking for.  Does that sound right to you as your

10   testimony?

11   A.  Yes, ma'am.

12   Q.  And that's what you are referring to when you say "we have

13   done this over the years" in that e-mail; is that correct?

14   A.  Yes, ma'am.

15   Q.  Okay.  Now, in fact, when you testified last week in

16   response to those questions, you testified that even before you

17   got the approval for the discount, you were pretty sure that

18   Tyson would probably do the same price at 2 cents a pound

19   because of past histories.  Do you recall that as your

20   testimony?

21   A.  Yes, ma'am.

22   Q.  Okay.  So at this point in time when you have Mr. Cullen

23   responding here, you had an understanding that this was going

24   to be; it was going to be a 2-cent discount as had been done in

25   the past.

Carl Pepper - Cross

1    *A.*  You said after?

2    *Q.*  At the time Mr. Cullen responds, it was your expectation it

3    was going to be 2 cents a pound just like it always was.

4    *A.*  Yes, ma'am.

5    *Q.*  Now, I am skipping ahead a little bit, but you did

6    forward -- we got to Mr. Cullen in this e-mail chain after you

7    had forwarded it to him, right?  And Mr. Cullen -- I am sorry,

8    I will let you respond.  I apologize.  I go quickly.  I

9    apologize.  So just you forwarded it on.

10   *A.*  Yes, ma'am.

11   *Q.*  Okay.  And you forward it on to Steven Cullen because he is

12   in the business unit, correct?

13   *A.*  Yes, ma'am.

14   *Q.*  And Mr. Cullen, in fact, is someone called the senior

15   margin manager.  Does that sound right to you?

16   *A.*  You're talking about Mr. Cullen?

17   *Q.*  Mr. Cullen.

18   *A.*  I don't really know what his exact title was.

19   *Q.*  But you know it's his job to make the call, the decision on

20   the discounts and prices, correct?

21   *A.*  Yes, ma'am.

22   *Q.*  And that's why you needed to reach out to him, because he

23   is the one who made the decision, right?

24   *A.*  Yes, ma'am.

25   *Q.*  Because you -- you did a lot of things.  You testified

Carl Pepper - Cross

1   about a lot of things you did for Tyson, Mr. Pepper, but you

2   did not have the authority to make this kind of decision,

3   correct?

4   A.   Correct.

5   Q.   In fact, it's not just you; nobody in sales had the ability

6   to make the final decision, correct?

7   A.   Correct.

8   Q.   And that is why -- that's why you are reaching out to

9   Mr. Cullen here.

10   A.   Yes, ma'am.

11   Q.   Okay.  Now, let's talk a little bit about where it moved

12   from here, okay, after you have Mr. Cullen saying, Okay, we

13   know we've done it in the past, but I am going to give the

14   final say so you can do it here.

15          Now, let's look -- and that sounds about right to you?

16   A.   Ma'am?

17   Q.   That sounds right to you?

18   A.   Yes, ma'am.

19   Q.   So we are going to look at his response.  He authorizes

20   that 2-cent discount.  And so in the end Popeye's got the

21   discount that Mr. Kronauge asked from all the suppliers, the

22   2-cent discount, correct?

23   A.   Yes, ma'am.  Can I rephrase it?  As far as I know,

24   everybody.  I don't --

25   Q.   We will get to that, Mr. Pepper.

Carl Pepper - Cross

1      So you said earlier that Mr. Kronauge pushed suppliers

2  to give the same discount and price reductions, correct?

3  *A.*  Yes, ma'am.

4  *Q.*  And he didn't try to hide the fact that he was reaching out

5  to all suppliers at once to get the same discount level,

6  correct?

7  *A.*  Yes, ma'am.

8  *Q.*  Instead, isn't it the case that Mr. Kronauge broadcast the

9  fact that all six suppliers gave the same 2-cent discount to --

10  all six suppliers to Popeye's?

11  *A.*  Yes, ma'am.

12  *Q.*  And so let's take a look, and this is not for the jury,

13  it's for identification purposes and for the witness, Exhibit

14  I-777.  And we have copies for the government.

15      Now, Mr. Pepper, I would like you to take a look at

16  this document.  Do you see what I am referring to, the I-777?

17  *A.*  Yes, ma'am.

18  *Q.*  And it's an e-mail from Kent Kronauge, right?

19  *A.*  Yes, ma'am.

20  *Q.*  And it's addressed to you.

21  *A.*  Yes, ma'am.

22  *Q.*  It's addressed to you, isn't it?

23  *A.*  I am one of them, yes, ma'am.

24  *Q.*  You are one of many here, correct?

25  *A.*  Yes, ma'am.

1580

Carl Pepper - Cross

1 | Q. In fact, it's addressed to a bunch of different people at

2 | seven different suppliers, correct?

3 | A. Yes, ma'am.

4 | Q. Now, in your earlier testimony, you talked about reaching

5 | out to three of these suppliers, correct?

6 | A. Yes, ma'am.

7 | Q. But -- and that they all agreed to the 2-cent discount as

8 | well.

9 | A. Yes, ma'am.

10 | Q. But there are -- in this list there are additional

11 | suppliers you didn't testify about, correct?

12 | MS. SWEENEY: Objection as to further questions when

13 | the document is not in evidence.

14 | THE COURT: Sustained.

15 | MS. PREWITT: I will move to admit I-777, Your Honor.

16 | THE COURT: Any objection to the admission of I-777?

17 | MS. SWEENEY: No objection.

18 | THE COURT: All right. I-777 will be admitted.

19 | MS. PREWITT: Permission to publish to the jury, Your

20 | Honor?

21 | THE COURT: You may.

22 | BY MS. PREWITT:

23 | Q. Now, just to -- taking a look at this document here, let's

24 | review it together. What Mr. Kronauge is doing here is sending

25 | an e-mail to a bunch of suppliers, thanking them all for

Carl Pepper - Cross

1    providing the same 2-cent discount, correct?

2    A.  Yes, ma'am.

3    Q.  In fact, he says -- and this, in fact, is not the only time

4    that he pushed all suppliers to provide the same discount, is

5    it?

6    A.  No, ma'am.

7    Q.  And this is not the only time that he reaches out to all

8    suppliers at once and thanks them, in fact, for the same

9    discount being provided by each one of those suppliers.

10   A.  Yes, ma'am.

11   Q.  Because that's something he expected to happen; is that

12   right?

13   A.  Yes, ma'am.

14   Q.  Now, I want to move on to the Popeye's -- we are still

15   sticking with Popeye's and Mr. Kronauge, okay?

16   A.  Yes, ma'am.

17   Q.  All right.  So I want to ask you some questions about the

18   negotiations in 2017 to supply chicken on the bone to Popeye's

19   in 2018.  Do you remember that?

20   A.  Yes, ma'am.

21   Q.  It was that chicken-on-the-bone 2018 contract, and the

22   discussions were in 2017.

23   A.  Yes, ma'am.

24   Q.  With Mr. Kronauge.

25   A.  Yes, ma'am.

Carl Pepper - Cross

1   Q.  Okay.  So when Popeye's was in its RFP process for that

2   2018 chicken-on-the-bone contract, Mr. Kronauge reached out to

3   you; isn't that right?

4   A.  Yes, ma'am.  I was one of them, yes, ma'am.

5   Q.  You were his primary contact at that point in time,

6   correct?

7   A.  Yes, ma'am; yes, ma'am.

8   Q.  The day-to-day responsive person to the needs of Popeye's,

9   correct?

10  A.  Yes, ma'am.

11  Q.  Now, he reached out to you on behalf of Popeye's because he

12  was aware that Tyson had lowered its pricing in negotiations

13  with another supplier, right?

14  A.  Yes, ma'am.

15  Q.  And you testified last week that that other supplier was

16  KFC.

17  A.  Yes, ma'am.

18  Q.  Okay.  And I am just trying to orient you for the

19  questions --

20  A.  It wasn't supplier; it was --

21  Q.  I am so sorry.  Thank you for correcting me.

22          He reached out to another buyer?

23  A.  Yes, ma'am.

24  Q.  So, in essence, KFC and Popeye's are, in fact, competitors.

25  They are both buyers for chicken on the bone, correct?

Carl Pepper - Cross

1    A.  Yes, ma'am.

2    Q.  Okay.  Thank you for correcting me.  I appreciate that.

3          So let's take a look at Government Exhibit 744, and it

4    will show on your monitors.  It's also in your book, if you

5    prefer, Mr. Pepper, a hard copy version, whichever you prefer.

6          MS. PREWITT:  Your Honor, I would like to publish this

7    to the jury as an already admitted document.

8          THE COURT:  You may.

9          MS. PREWITT:  Thank you, Your Honor.

10   BY MS. PREWITT:

11   Q.  So let's take a look at this.  This is an e-mail, and we

12   are going to go -- this will be our habit to go from the very

13   earliest and work our way up.

14   A.  Yes, ma'am.

15   Q.  We are going to start with that e-mail from Kent Kronauge.

16   It's your understanding he is not just reaching out to you, is

17   he?

18   A.  No, ma'am.

19   Q.  I am sorry, apologies.

20   A.  No, ma'am.

21   Q.  He is reaching out to a whole bunch of suppliers, correct?

22   A.  Yes, ma'am.

23   Q.  In fact, all the suppliers that are supplying -- that would

24   be supplying this particular product in respect -- with respect

25   to this RFP, correct?

Carl Pepper - Cross

1    A.  Yes, ma'am.

2    Q.  Now, he says in the e-mail:  I am aware of what went on

3    with brand X and the fact -- and, in fact, the change took

4    place during the current agreement year.

5            Does that read right to you?

6    A.  Yes, ma'am.

7    Q.  Okay.  And, again, you testified that brand X was KFC.

8    A.  Yes, ma'am.

9    Q.  Okay.  And you, in fact, believed that Mr. Kronauge spoke

10   with somebody about KFC and learned this information, correct?

11           MS. SWEENEY:  Objection, foundation, Mr. Pepper's

12   belief of someone else's conversation with a third party.

13           THE COURT:  Response?

14           MS. PREWITT:  Your Honor, I believe this is what he

15   testified to yesterday -- last week.  And I can refresh his

16   recollection if he knows, Your Honor.

17           THE COURT:  Yes.  I will sustain the objection, and

18   you can refresh or you can ask another question.

19   BY MS. PREWITT:

20   Q.  Mr. Pepper, do you have an understanding or belief as to

21   whether Mr. Kronauge found out about this pricing to KFC

22   because he learned about it from KFC?

23   A.  I had a belief, but I didn't know for sure.  That was my

24   belief.

25   Q.  Was it, in fact, your belief?

Carl Pepper - Cross

1    *A.*   That was my belief.

2    *Q.*   Now, Mr. Kronauge, he was using this knowledge of the KFC

3    discount that he referred to, brand X, to place pressure on

4    Tyson for a reduction, correct?

5            *MS. SWEENEY:*   Objection, basis.

6            *THE COURT:*   Overruled.

7    *A.*   Repeat?

8    *BY MS. PREWITT:*

9    *Q.*   I will repeat the question.

10           In fact, here in this e-mail, Mr. Kronauge is using

11   his knowledge about a lower price offered to KFC to pressure

12   suppliers, including Tyson, to lower the price, correct?

13           *MS. SWEENEY:*   Objection as to relevance in the prior

14   order.

15           *THE COURT:*   Overruled.

16   *A.*   Yes, ma'am.

17   *BY MS. PREWITT:*

18   *Q.*   And, in fact, Mr. Kronauge, and the way in which he did

19   things, the way in which he negotiated is he sourced

20   competitive intelligence about other quotes from suppliers to

21   other buyers.

22   *A.*   Yes, ma'am.

23   *Q.*   And, in fact, in this e-mail chain, if you move up just a

24   little bit -- in fact, it says:  Guys, please turn in your

25   current model.

Carl Pepper - Cross

1    And, Mr. Pepper, when Mr. Kronauge says "guys, please

2  turn in your model," he is referring to all the suppliers,

3  correct?

4  A.  Yes, ma'am.

5  Q.  So we'll move just up from that a little bit to more recent

6  in the chain, and you loop in Mr. Mulrenin here.  You say:  You

7  get this?

8  A.  Yes, ma'am, I sent it.

9  Q.  Thank you.

10    And, in fact, the reason why you're doing this is

11  because in the past you knew Mr. Kronauge would just blast out

12  these e-mails and there would be a lot of suppliers on the BCC

13  line that wouldn't appear in the e-mail and so you just didn't

14  know.

15  A.  Yes, ma'am.

16  Q.  You didn't know if he received it or not because --

17  A.  Right.

18  Q.  -- they weren't listed at the time.  You couldn't see it.

19  A.  Right.

20  Q.  Now, and Mr. Mulrenin is not the front-line person dealing

21  with Mr. Kronauge on the Popeye's contracts, correct?

22  A.  Correct.

23  Q.  Okay.  So I would like to ask you some questions about

24  another time that Mr. Kronauge tried to push down Tyson's price

25  based on information he learned from another buyer, so that's

Carl Pepper - Cross

1    what I am going to go to next just to let you know where I'm

2    going here.

3             So, in fact, in 2015 Mr. Kronauge pushed back against

4    the price Tyson quoted Popeye's by mentioning that he heard

5    about a Church's price quote.  Do you remember that?

6             MS. SWEENEY:  Objection as to scope.

7             THE COURT:  Overruled.

8    BY MS. PREWITT:

9    Q.  I am happy to repeat the question if that helps you,

10   Mr. Pepper.

11   A.  Yes, ma'am.

12   Q.  So in 2015, Mr. Kronauge was pushing back on a Tyson price

13   quote saying he had learned something about a Church's price

14   quote.

15   A.  I'm not sure I remember that.

16   Q.  Okay.  Can I show you something to refresh your

17   recollection?

18   A.  Yes, ma'am.

19            MR. PREWITT:  Okay.  Could I have H-461, please?  I am

20   being told I have it.

21   BY MR. PREWITT:

22   Q.  I am so sorry, Mr. Pepper.  It is actually in your binder,

23   if you flip your binder to H-461.

24            MR. PREWITT:  And if this can be displayed only to the

25   witness and the attorneys and not to the jury at this point.

1588

Carl Pepper - Cross

1        *THE COURT:*  Yes.

2   *BY MS. PREWITT:*

3   *Q.*  All right.  I will give you a moment.  I can just provide

4   it to you, hand it up, if that's helpful.

5   *A.*  I haven't been able to find it.  Is it 84 --

6   *Q.*  I am sorry, H-461.

7        *MS. PREWITT:*  Your Honor, may I approach?

8        *THE COURT:*  You may.

9        *MS. PREWITT:*  I will hand up a hard-copy version.

10  *BY MS. PREWITT:*

11  *Q.*  So, Mr. Pepper, just take your time, read through it, and

12  then if you would just put it down for a second.

13  *A.*  No, ma'am, I don't remember.  I mean, it's very evident

14  that it was said to me.  I just don't -- I just don't remember

15  this e-mail.

16  *Q.*  Okay.  Let's work through that.

17       *MS. SWEENEY:*  Objection, Your Honor.  This document

18  was shown to Mr. Pepper to refresh his recollection.  He says

19  he doesn't remember.

20       *THE COURT:*  We haven't heard the next question yet, so

21  overruled.

22  *BY MS. PREWITT:*

23  *Q.*  Mr. Pepper, let's just work through this.  I am going to

24  ask you some questions about this document, so you can look at

25  it now, okay?

Carl Pepper - Cross

1    A.   Okay.

2    Q.   This is a document from Mr. Kronauge to you, correct?

3    A.   Yes, ma'am.

4    Q.   And this is about the Popeye's bone-in RFP?

5    A.   Yes, ma'am.

6    Q.   And it's about those -- his negotiations with Tyson

7    regarding that.

8    A.   Yes, ma'am.

9    Q.   Now, Mr. Pepper, you in the course of your work for Tyson

10   would send and receive e-mails like this as part of your

11   discussions with buyers like Mr. Kronauge, correct?

12   A.   Yes, ma'am.

13   Q.   And it was part of your duty and responsibility to be

14   accurate when it came to the information that you sent and

15   received in the course of your conversations with other -- with

16   the customer.

17   A.   Yes, ma'am.  To the best of my knowledge, yes, ma'am.

18   Q.   And, in fact, here in this e-mail, the feedback or

19   information you're getting from Mr. Kronauge, it's something

20   that would influence your thinking about how to respond to him,

21   correct?

22   A.   Yes, ma'am.

23   Q.   So, in fact, this e-mail from him would have forced a

24   response from you.  You would need to do something in response

25   to a request like this or a statement like this by

Carl Pepper - Cross

1   Mr. Kronauge, your customer, correct?

2   *A.*  Yes, ma'am.

3   *Q.*  And, in fact, this would have an effect on how you would

4   approach negotiations as you worked that up through getting the

5   permissions at Tyson, correct?

6   *A.*  Yes, ma'am.

7       *MS. PREWITT:*  Your Honor, I offer this as a statement

8   for the effect on the listener.

9       *THE COURT:*  All right.  Any objection to the admission

10  of H-461?

11      *MS. SWEENEY:*  Yes, Your Honor, hearsay grounds.  There

12  is no effect that has been proven.  And the government has an

13  objection to this document and the questioning on the relevance

14  on prior order grounds, specifically ECF-642, and I am happy to

15  be heard on side bar on those two grounds.

16      *THE COURT:*  Response?

17      *MS. PREWITT:*  Your Honor, I think he has clearly

18  stated that this type of a statement or a push from a customer

19  would have caused him to react and move through Tyson to

20  address that in the RFP proposals, Your Honor.  He is the

21  front-line contact for this customer.

22      *THE COURT:*  Objection is sustained.  He doesn't

23  remember this e-mail, and as a result, it can't be any type of

24  effect on the listener, which in this case wouldn't establish a

25  hearsay exception in any event.

Carl Pepper - Cross

1    *BY MS. PREWITT:*

2    *Q.* All right.  So, Mr. Pepper, isn't it true that Tyson had

3    actually come down in prices for Church's -- had come down in

4    prices for Church's in that year because Mr. Roberts wanted to

5    give Church's a good deal?

6           *MS. SWEENEY:*  Objection as to scope.  We are talking

7    about 2015, I believe, Church's contract, which was not

8    addressed on direct.

9           *THE COURT:*  Response?

10          *MS. PREWITT:*  Your Honor, this is all part of the

11   negotiations with Mr. Kronauge at the time and the way in which

12   he utilized price quotes supplied to other buyers and

13   information he sourced from other buyers to push down Tyson's

14   price.

15          *MS. SWEENEY:*  And, Your Honor, that argument

16   respectfully is, I believe, the government believes in

17   violation of court order 642 and is not relevant to this trial.

18          *THE COURT:*  Go ahead, Ms. Prewitt.

19          *MS. PREWITT:*  Your Honor, I am not suggesting anything

20   inappropriate whatsoever about buyers talking to each other

21   about other suppliers' prices, Your Honor.

22          *THE COURT:*  We can go side bar.

23       (At the bench:)

24          *THE COURT:*  Ms. Sweeney, go ahead.

25          *MS. SWEENEY:*  Yes, Your Honor.  In our original

Carl Pepper - Cross

 1    motions *in limine*, the government moved to exclude evidence

 2    that customers spoke to each other both as irrelevant, that

 3    spoke to each other about pricing and about negotiations is

 4    irrelevant.  And the defendants responded, not to that exact

 5    point, but they responded that they did not intend to introduce

 6    evidence that customers were complicit in the conspiracy to fix

 7    prices.  So Your Honor denied the government's motion as moot

 8    in ECF-642.

 9         Moreover, the government, understanding that

10    Ms. Prewitt may not be making that exact point, it is a very

11    close related point as to the communications between the

12    customers regarding their price negotiations.  And the

13    government just contends this is under 401 and 403, this is

14    confusing to the jury and not relevant to their consideration

15    of whether the defendants fixed prices themselves in response

16    to those requests from the customers.

17         *THE COURT:*  Ms. Prewitt?

18         *MS. PREWITT:*  Your Honor, it is the government that,

19    in fact, elicited testimony from Mr. Pepper on direct about the

20    fact that brand X was, in fact, KFC and that was his

21    understanding, so...  And in addition to that, Your Honor, the

22    where, how, why of negotiations and how prices were arrived at

23    are absolutely at issue here, because the government's theory

24    is that the price, for example, for the big box promotion, the

25    2 cents was arrived at because of collusion when, in fact,

Carl Pepper - Cross

1    through our evidence we will show that was not the case.  And,

2    in fact, Mr. Kronauge was the person that was driving that

3    price level rather than any collusive efforts from the

4    suppliers.

5            And, Your Honor, moreover, I am not remotely

6    suggesting that there is anything improper or complicit about

7    the buyers in this case sourcing information from other buyers

8    when they are considering how to respond to RFPs that have been

9    supplied.

10           THE COURT:  Anything else, Ms. Sweeney?

11           MR. McLOUGHLIN:  Your Honor, Jim McLoughlin, if I may.

12           THE COURT:  Go ahead.

13           MR. McLOUGHLIN:  With respect to this argument by the

14   government on a broader level, the government's entire case is

15   built and its case with respect to Mr. Pepper is built on the

16   fact that information sharing is indicative of a conspiracy and

17   information sharing is in effect improper and, you know, a

18   precursor to any legal agreement.  The defendants are entitled

19   to show that in this industry generally all parties, including

20   buyers, engaged in information exchanged to their competitive

21   or negotiating advantages.

22           For the government to say that it can put in extensive

23   information about information sharing with respect to the

24   defendants, but the defendants are not allowed to show that the

25   buyers engaged in the same conduct for their tactical advantage

Carl Pepper - Cross

1  puts the defendants at a tremendous disadvantage and gives the

2  jury a very inaccurate picture of how this industry operated.

3      THE COURT:  Ms. Sweeney?

4      MS. SWEENEY:  Yes, Your Honor.

5      To take Mr. McLoughlin's first, I think his point

6  misses the focus of the government's case, which is not that

7  information sharing is indicative of a conspiracy, but rather

8  among the chicken suppliers that information was a means and

9  methods of effectuating the agreement that they had that they

10 have been charged with in this case.

11     The government -- and any information sharing, if you

12 would like to call it that, between the customers who are the

13 victims of the alleged conspiracy the defendants are being

14 charged with is not relevant to whether or not the defendants

15 actually did engage in this conspiracy and entered into this

16 agreement.

17     Moreover, moving to Ms. Prewitt's points, the Popeye's

18 2015 discount has nothing to do with what she is now -- with

19 what the questions are now relating to, which is information

20 sharing among the -- potential information sharing among the

21 purchasers of chicken, the 2015 discount.  I believe the point

22 she made was that it had to do with Popeye's negotiation style,

23 which were not questions that were objected to, but rather the

24 government is objecting to the continued questioning of

25 Popeye's potentially receiving information about KFC or

1595

Carl Pepper - Cross

 1   Church's or other chicken supplier -- chicken purchaser, excuse

 2   me, prices just is simply not relevant to the question of

 3   whether these defendants engaged in or knowingly agreed to fix

 4   prices in their negotiations with the chicken purchasers.

 5              THE COURT:  One second, Ms. Sweeney.  So if I sustain

 6   your objection on the scope, then do you know Mr. Pepper's

 7   schedule if he gets recalled in the defendants' case?  Is he

 8   available?

 9              MS. SWEENEY:  I do not know Mr. Pepper's schedule.

10   That said, I do not know of any impediments to his being called

11   back.  I am not aware of any big blocks of time in his schedule

12   where he is unavailable during this trial.

13              THE COURT:  Mr. McLoughlin, go ahead.

14              MS. PREWITT:  Your Honor, I will just add I don't have

15   many more questions on this topic.  I just -- the breadth of

16   the government's objection is what is concerning here.

17              MR. McLOUGHLIN:  Your Honor, the last point here is

18   the government has made a very strong feature of its case

19   testimony from the buyers that they did not want information

20   shared.  So the government has opened the door here to the

21   question about information-sharing practices within the

22   industry.  And for the government to elicit testimony from

23   every customer that they did not information share because it

24   was confidential, but then to exclude evidence that these

25   customers did exactly the same thing which is to share

Carl Pepper - Cross

1   information about suppliers' bids and contract prices when it

2   was to their tactical advantage again creates a tremendously

3   misleading view of the industry and practices.  And we are

4   entitled to impeach and to demonstrate that that testimony is,

5   shall we say, self-serving to the jury.

6        THE COURT:  All right.  I am going to sustain the

7   objection.  The government did file a motion *in limine* last

8   trial and -- but the defendants indicated that they weren't

9   going into that subject, and that's why the Court didn't rule

10  on it.  I don't find that it is relevant.  I will allow

11  Ms. Prewitt, however, to ask a few more questions on 2015.  I

12  do think that they are probably outside the scope.  But if they

13  are that limited and they also abide by my last ruling, then I

14  think that it's -- I will indulge that because I don't want to

15  have Mr. Pepper come back for just some very, very small piece

16  of testimony.

17       All right.

18       MR. TUBACH:  Just for clarification, is the Court

19  saying that we cannot, defendants cannot inquire at all about

20  whether buyers of chicken engaged in market intelligence

21  gathering with their competitors?

22       THE COURT:  Well, this is an issue that came up in the

23  last trial.  There was a motion *in limine* to that effect, and

24  the defendants said they were not going to go into that.  And

25  that's why we never got to that issue, because the Court

Carl Pepper - Cross

1    declared that particular motion *in limine* moot.  Now it's

2    coming up at the last minute by surprise.

3         *MS. PREWITT:*  Your Honor, may I speak for one moment

4    on this?  Just to be absolutely clear, Your Honor, we are not

5    remotely suggesting that there is anything complicit about

6    these discussions between suppliers.  It's purely about market

7    intelligence to inform pricing decisions, so, Your Honor, we

8    are abiding by that order.  There is no suggestion whatsoever

9    on that score, and I don't expect that there would be.  It's

10   simply the process by which information is collected to

11   evaluate pricing proposals.

12        *THE COURT:*  Mr. Tubach?

13        *MR. TUBACH:*  The motion *in limine* suggests that we

14   should not be allowed to inquire whether they were facilitating

15   the collusion in some way.  That is not -- we are doing

16   precisely the opposite of suggesting that they were

17   facilitating collusion, so that's why this line of inquiry and

18   this type of evidence does not in any way violate the Court's

19   prior order or the government's prior motion *in limine*.

20        *THE COURT:*  Well, what do you mean, Mr. Tubach, by

21   "facilitating the collusion"?  I don't recall exactly.

22        *MS. HENRY:*  Your Honor, perhaps we should brief this

23   and let us go forward with Mr. Pepper now because we are really

24   getting pretty far afield, but we do have -- it would perhaps

25   be helpful to brief.

Carl Pepper - Cross

1          THE COURT:  Well, the issue is coming up while

2    Mr. Pepper is on the witness stand, so I am not sure how

3    briefing is going to get us past Pepper.  As I said before, I

4    am going to sustain the objection as to Mr. Pepper.  Thank you.

5          (In open court:)

6    BY MS. PREWITT:

7    Q.  Mr. Pepper, let's turn back to Government Exhibit 744.

8    This is just an e-mail that the government showed you last

9    week, correct?

10   A.  Yes, ma'am.

11   Q.  And when you got this e-mail, you understood that he wanted

12   a similar price reduction for Popeye's, correct?

13   A.  Yes, ma'am.

14   Q.  Now, he was inviting suppliers to provide that reduction to

15   spread out over two years.  If we can scroll down the e-mail,

16   are you able to see that, Mr. Pepper?

17   A.  Yes, ma'am.

18   Q.  So you were being -- I will put the question to you again.

19   And he was inviting suppliers to provide price reductions that

20   are spread out over two years instead of just a lump sum,

21   correct?

22   A.  Yes, ma'am.

23   Q.  And it's really another example of Mr. Kronauge just

24   telling suppliers what he wanted.

25   A.  Yes, ma'am.  He eventually did that.

Carl Pepper - Cross

1    *Q.*  Okay.  So moving forward with considering this discount,

2    let's move forward from there, and I am going to show you

3    Government Exhibit 751.

4        *MS. PREWITT:*  Your Honor, I believe this has been

5    admitted already.

6        *THE COURT:*  Yes, it has, and it may be displayed if

7    you like.

8        *MS. PREWITT:*  Thank you, Your Honor.

9    *BY MS. PREWITT:*

10   *Q.*  Now, the text says:  Just got some info from Popeye's.

11       Do you see that?

12   *A.*  Yes, ma'am.

13   *Q.*  And you say this information came from Kronauge at

14   Popeye's.

15   *A.*  Yes, ma'am.

16   *Q.*  And he was telling everybody -- and everybody is all

17   suppliers, correct?

18   *A.*  Yes, ma'am.

19   *Q.*  -- where they should come in at, right?

20   *A.*  Yes, ma'am.

21   *Q.*  And you got that information and passed that on.

22   *A.*  Yes, ma'am.

23   *Q.*  And, in fact, you passed it on to Steven Cullen.

24   *A.*  I believe so.

25   *Q.*  And you passed it on to Mr. Cullen because he was the

Carl Pepper - Cross

1   person who could make the decision on price, correct?

2   A.  He was one of them, yes.

3   Q.  Well, he was one of the people in the business unit, the

4   pricing unit that you would need to go through to get approval

5   on a price, correct?

6   A.  Yes, ma'am.

7   Q.  And this was just not a decision you could make.

8   A.  Say that again.

9   Q.  This was not a decision you could make.

10  A.  No, ma'am.

11  Q.  And, in fact, it wasn't a decision that Mr. Mulrenin could

12  make.

13  A.  No, ma'am.

14  Q.  Or Mr. Roberts?

15  A.  No, ma'am.

16  Q.  Or anyone in the sales team.

17  A.  No, ma'am.

18  Q.  And the date of this text is September 6, 2017.  Can you

19  see that?

20  A.  Yes, ma'am.

21  Q.  Now, do you recall that the pricing unit had a meeting to

22  discuss this the next day?

23  A.  I don't remember.

24  Q.  Okay.  Now, I would like you -- and not for publication of

25  the jury.  I would like you to take a look at G-356.

Carl Pepper - Cross

1   A.  Could you say that number again?

2   Q.  I am sorry, that is G-356.

3          MS. PREWITT:  We will pass up a copy.

4   BY MS. PREWITT:

5   Q.  Now, and so you see the document or I can also --

6          MR. PREWITT:  May I approach the witness?  It may be

7   simpler if I just pass it up.  Is that okay?

8          THE COURT:  Ms. Grimm can hand it to him.

9   A.  They don't seem to be in very good order.  Yes, ma'am.

10  BY MS. PREWITT:

11  Q.  So what is this?

12  A.  It's a meeting planner.

13  Q.  And it is -- and you received it.  It was sent to you.

14  A.  I was one of them, yes, ma'am.

15  Q.  And generally speaking, what is this about?

16  A.  All about Popeye's 2018 eight-piece pricing.

17  Q.  And what is the date on it?

18  A.  September the 6th, 2017.

19  Q.  What date is the call set for?

20  A.  September the 7th, 2017.

21  Q.  And this includes all the sort of decision-makers on this

22  type of a price for Popeye's, correct?

23  A.  Yes, ma'am.

24         MS. PREWITT:  Your Honor, I move to admit Defense

25  Exhibit G-356.

Carl Pepper - Cross

1    THE COURT:  Any objection to the admission of G-356?

2        MS. SWEENEY:  Yes, Your Honor, hearsay.

3        THE COURT:  Response?

4        MS. PREWITT:  Your Honor, this is a business record.

5    It's a calendar invitation for a meeting.  I can lay a

6    foundation if Your Honor would like.

7        THE COURT:  I will overrule the objection.  There is

8    no hearsay.  It's just a meeting notice, and I find that it is

9    admissible as a business record.

10        MS. PREWITT:  Thank you, Your Honor.

11        Your Honor, may we publish it to the jury?

12        THE COURT:  You may.

13   BY MS. PREWITT:

14   Q.  Now, looking at this document, it shows the Tyson pricing

15   team held a meeting the morning of September 7 to discuss this

16   Popeye's pricing for 2018, correct?

17   A.  Yes, ma'am.

18   Q.  And then you all participated in this conference call about

19   this pricing decision, correct?

20   A.  Yes, ma'am.  I guess everybody was on this call.

21   Q.  But you didn't cover this -- you didn't cover this meeting

22   with Ms. Sweeney when you testified last week, did you?

23   A.  No, ma'am.

24   Q.  Now, so at this point in time, a decision hadn't been made

25   about whether -- what the price would be that would be quoted

Carl Pepper - Cross

1    to Popeye's, correct?

2    A.   Yes, ma'am.

3    Q.   Because that's what this meeting is about.

4    A.   Yes, ma'am.

5    Q.   And it has not just Steven Cullen who we talked about as

6    within the business unit, but it also had Darrell Bowlin,

7    correct?

8    A.   Yes, ma'am.

9    Q.   And Darrell Bowlin, he is also within the business unit.

10   A.   Yes, ma'am.

11   Q.   Now, let's -- after this point you actually received -- it

12   was after this meeting that you see reflected in this exhibit

13   that you received the pricing models that you were authorized

14   to send on to Popeye's, correct?

15   A.   I believe so.

16   Q.   Okay.  Now, why don't we take a look at -- it's an

17   exhibit -- should be in your binder, Mr. Pepper.

18        MR. PREWITT:  And it's not to display to the jury,

19   Your Honor, but for identification only, Exhibit 1-778.  My

20   apologies.  I have been corrected.  It's I-778.

21   BY MR. PREWITT:

22   Q.   So if you have trouble finding it, it's on me.

23        Do you see it?

24   A.   I got it here.

25   Q.   Okay.  Now, what is this, generally speaking?

1604

Carl Pepper - Cross

1  | A.  It's an e-mail.

2  | Q.  And it's an e-mail from who?

3  | A.  Shane Free.

4  | Q.  Who is he?

5  | A.  He was associate director of the foodservice poultry

6  | pricing.

7  | Q.  And he is involved in pricing.

8  | A.  Yes, ma'am.

9  | Q.  This is to you.

10 | A.  Ma'am?

11 | Q.  This is -- was it addressed to you?

12 | A.  Yes, ma'am.

13 | Q.  And it's in relation to this contract, correct?

14 | A.  Yes, ma'am.

15 | Q.  This contract proposal, correct?

16 | A.  Yes, ma'am.

17 | Q.  And the Popeye's 2018 RFP.

18 | A.  Yes, ma'am.

19 | Q.  Now, I would like you to look -- and the timing of this, is

20 | it fair to say this is less than an hour after that meeting?

21 | A.  Yes, ma'am.

22 | Q.  The calendar invitation we showed you earlier that was

23 | Exhibit G-356?

24 |     MS. SWEENEY:  Objection as to questions about this

25 | document that is not yet in evidence in relation to other

1605

Carl Pepper - Cross

1    documents that are in evidence.

2            THE COURT:  Sustained.

3    BY MS. PREWITT:

4    Q.  Now, do you recall, Mr. Pepper, whether you actually sent

5    the models reflected in this document on after this?

6            MS. SWEENEY:  Objection, again questions about a

7    document not in evidence.

8            THE COURT:  Sustained.

9    BY MS. PREWITT:

10   Q.  Did you send pricing models on to Popeye's?

11   A.  Yes, ma'am.  If I got them, I sent them.

12   Q.  Would it have been -- so if you received models, you would

13   send them on, correct?

14   A.  If I received one, yes.

15   Q.  And you wouldn't change them?

16   A.  I wouldn't what?

17   Q.  You wouldn't change them.

18   A.  No, ma'am.

19   Q.  You would send them on as provided to you?

20   A.  However I received it, that's how I would send it.

21   Q.  Now, do you recall receiving pricing models from Shane

22   Free?

23   A.  No, ma'am.

24   Q.  But if he sent you pricing models, you would forward them

25   on to the customer.

1606

Carl Pepper - Cross

1   *A.* Like I said, if I received it and I was told I could send

2   it, I would send it on to the customer.

3   *Q.* Okay. Now, let's turn to Government Exhibit 748.

4       *MS. PREWITT:* Your Honor, I believe this has been

5   admitted.

6       *THE COURT:* It has, and it may be displayed if you

7   wish.

8       *MS. PREWITT:* Thank you, Your Honor. Yes, I would

9   like that.

10  *BY MS. PREWITT:*

11  *Q.* Mr. Pepper, this is your e-mail on July 7th to

12  Kent Kronauge, correct?

13  *A.* Yes, ma'am.

14  *Q.* And you, after the meeting that we discussed earlier

15  reflected in that calendar invitation, now have the models that

16  you have been allowed to send on, correct?

17  *A.* Yes, ma'am.

18  *Q.* And that's, in fact, what you did.

19  *A.* Yes, ma'am.

20  *Q.* And you sent this after you were provided those models.

21  *A.* Yes, ma'am.

22  *Q.* And it was your habit to send them on pretty promptly after

23  you received them, correct?

24  *A.* Yes, ma'am.

25  *Q.* Do you have a recollection of -- well, strike that.

1607

Carl Pepper - Cross

1    So looking at this, Mr. Pepper, ultimately Tyson gave

2  Kronauge the discount he asked for spread out over two years,

3  correct?

4  A.  Yes, ma'am.

5  Q.  And you stated that -- and, in fact, in your testimony that

6  you gave last week in response to the prosecutor's questions,

7  Ms. Sweeney, you said that you gave Kronauge for Popeye's the

8  discounted price he was asking for, a penny from the bottom

9  spread over two years.  Do you recall that?

10  A.  Yes, ma'am.

11  Q.  So this is what he asked for.

12  A.  Yes, ma'am.

13  Q.  Now --

14  A.  Can I come back to that?  He raised --

15  Q.  Mr. Pepper, I asked you a question and you provided a

16  response.

17  A.  Okay.

18  Q.  We are going to move on to Church's quality assurance.  I

19  want to switch gears now.

20    And so do you remember when Church's -- when Church's

21  came to you with these new quality assurance specifications,

22  and that was in 2013?

23  A.  Yes, ma'am.

24  Q.  Okay.  And just to be clear, this was raised by Church's

25  after the yearly contract was negotiated and the pricing had

1608

Carl Pepper - Cross

1  been set.

2  *A.*  Yes, ma'am.

3  *Q.*  So they are coming to you after the fact.

4  *A.*  Yes, ma'am.

5  *Q.*  And, in fact, they are coming to you after the fact just

6  after that contract had been negotiated, immediately after.

7  *A.*  Yes, ma'am.

8  *Q.*  So, in fact, it's your opinion that Church's should have

9  brought up the quality assurance issue during the contract

10  negotiations.

11  *A.*  Yes, ma'am.

12  *Q.*  And that's because this is a new expense that Church's --

13  they seem to be expecting that Tyson was just going to absorb

14  this, right?

15  *A.*  Can you ask it again, please?

16  *Q.*  I am sorry.  That's because this is a new expense that

17  Church's was just expecting that Tyson was going to cover.

18  *A.*  Yes, ma'am.

19  *Q.*  And this was about -- this is about new standards required

20  for each plant to ship a case of chicken per week to some third

21  party for testing, correct?

22  *A.*  That was part of it, yes, ma'am.

23  *Q.*  And, again, Tyson is a supplier.  It seemed that they were

24  expecting Tyson was just going to pay for this, correct?

25  *A.*  Yes, ma'am.

1609

Carl Pepper - Cross

1   Q.  And it would cover the cost for all of that, the shipping

2   the chicken?

3   A.  Yes, ma'am.

4   Q.  Okay.  Costs like this are the type of thing you would

5   normally expect in dealing with Church's to be included in the

6   negotiations that already occurred, right?

7   A.  Yes, ma'am.

8   Q.  And it should have been done before the model was finalized

9   in your view.

10  A.  Yes, ma'am.

11  Q.  But the decisions about how much of a cost to absorb and

12  cover yourself versus pass on to the customer, that's not a

13  decision that you make, correct?

14  A.  No, ma'am.

15  Q.  And, in fact, it's a decision that all of these people with

16  the calculators do in the pricing unit and the business unit,

17  correct?

18  A.  Yes, ma'am.

19  Q.  Not the sales team, not the sales team and not anyone from

20  the quality assurance team or the food safety team either.

21  A.  No.  They just give input.  That's it.

22  Q.  Right.  So if -- so if Church's had sent this letter from

23  Sara Knust -- and we can look at it in a moment -- why don't we

24  do that so we can orient ourselves, and that's Government

25  Exhibit 224.

Carl Pepper - Cross

1    MS. PREWITT:  Your Honor, I believe this has been

2    admitted.  May it be displayed?

3         THE COURT:  It has.  Yes, you may.

4         MS. PREWITT:  Thank you, Your Honor.

5    BY MS. PREWITT:

6    Q.  Okay.  So my point here is if Church's had sent this

7    letter, the one if we go all the way to the bottom with

8    Ms. Knust -- so she is the representative at Church's that's

9    giving this -- making this announcement about this new

10   requirement to Mr. Hannigan, correct?

11   A.  Yes, ma'am.

12   Q.  And he is with food safety and he is with quality

13   assurance, right?

14   A.  Yes, ma'am.

15   Q.  But if Church's had sent this exact letter -- I mean, there

16   is an attached letter to this, right?  We talked about that?

17   A.  Yes, ma'am.

18   Q.  If this request had come in a week or so before, this could

19   have been something that the business unit and the pricing unit

20   got their pencils and calculators out and calculated a price

21   for, but they didn't.  Church's didn't.  It came after the

22   fact.

23   A.  Right, right.

24   Q.  So what I would like to do is start at the bottom of the

25   chain right where we are here, and you can see, Hello, Mike,

Carl Pepper - Cross

 1   and we are going to go from there.

 2         Now, this went to this guy Mike Hannigan.  We talked

 3   about him in food safety.  He would handle the customer

 4   complaints and the quality assurance audits for Tyson, right?

 5   A.  Yes, ma'am.

 6   Q.  And particularly with respect to Church's, among other

 7   customers, correct?

 8   A.  Yes, ma'am.

 9   Q.  Okay.  And so he gets this e-mail about this demand or this

10   requirement from Church's because he is the quality assurance

11   guy.

12   A.  Yes, ma'am.

13   Q.  Not the pricing guy.

14   A.  Right.

15   Q.  And what we have here as we move up the chain is we have

16   Mike Hannigan is curious about the fact that this extra QA cost

17   was not mentioned during the negotiations, correct?

18   A.  Yes, ma'am.

19   Q.  So we can kind of go up a little bit.

20         And he says to you that he wonders how other suppliers

21   will react, right?  That's in an e-mail to you, correct?

22         MR. PREWITT:  We can scroll down a little bit so

23   Mr. Pepper can see the top of the e-mail as well.

24   BY MR. PREWITT:

25   Q.  And, in fact, Mr. Hannigan says that these are costs that

Carl Pepper - Cross

1    we haven't previously paid for before, correct?

2    A.   Correct.

3    Q.   So Mr. Hannigan is talking about wondering how to react,

4    but he doesn't tell you to go talk to other competing suppliers

5    here, does he?

6    A.   No, ma'am.

7    Q.   He doesn't suggest that you do it.

8    A.   No, ma'am, not that I remember.

9    Q.   It just -- he is curious about it.  He is wondering, and he

10   says that in an e-mail, right?

11   A.   Yes, ma'am.

12   Q.   In fact, nobody from the Tyson business unit or pricing

13   unit asks you to go talk to -- to find out what other suppliers

14   thought about this?

15   A.   Not that I remember.

16   Q.   And no one on the sales team or from food safety made

17   decisions about what -- whether Church's would even have to pay

18   for this particular cost, correct?

19   A.   Correct.

20   Q.   And, in fact, you were the one that decided to reach out

21   and find out what one of your suppliers was thinking about

22   this.

23   A.   Yes, ma'am.

24   Q.   Or the other suppliers.

25   A.   Yes, ma'am.

Carl Pepper - Cross

1   *Q.* And you testified in response to Ms. Sweeney's questions

2   that you didn't like them just slipping it in. Do you recall

3   that testimony?

4   *A.* That I didn't what?

5   *Q.* You didn't like they, Church's, just slipping this in after

6   the contract had been negotiated.

7   *A.* Correct.

8   *Q.* And that's -- you recall testifying to that.

9   *A.* Yes, ma'am.

10  *Q.* Now, Ms. Sweeney in her direct examination of you had you

11  focus on the top portion of this e-mail. You see the very top

12  portion: I would be surprised if they don't say something.

13  Might call a couple of them and ask.

14        Does that -- as it's written there, that's what you

15  testified about, correct?

16  *A.* Yes, ma'am.

17  *Q.* And that's what you were focusing on when your

18  examination -- when Ms. Sweeney examined you, correct?

19  *A.* Yes, ma'am.

20  *Q.* Now, I would like you to look at -- I would like you to

21  switch for a moment, and let's look at Exhibit -- Government

22  Exhibit 221.

23        *MR. PREWITT:* Now, again -- and, Your Honor, I believe

24  this has been admitted. May I display it to the jury?

25        *THE COURT:* You may.

Carl Pepper - Cross

1    *BY MS. PREWITT:*

2    Q.   So let's look at the top portion of this e-mail.

3    A.   Yes, ma'am.

4    Q.   If we could blow it up so you could see.

5         The top portion of this e-mail is from you to other

6    people here, and it says -- and this is a portion that

7    Ms. Sweeney focused on.  This is the December 26th at 14:24,

8    correct?

9    A.   Yes, ma'am.

10   Q.   Just looking at the top, sorry.

11   A.   Yes, ma'am.

12   Q.   So you spent a lot of time looking and discussing this with

13   Ms. Sweeney on direct examination.  I would like to go through

14   the earlier part of that exchange, okay?

15        So we are going to start now from the bottom.  Before

16   we do that, I just want to ask one question of you on this.

17   This is Mr. Roberts forwarding this whole exchange below to you

18   to make you aware of what's been going on, correct?  You see

19   just below -- just below, I talked to Jimmie Little, and we

20   were planning on -- they were planning on adding this to their

21   cost as well.  They didn't like it showing up.

22        And, in fact, you testified you also didn't like it

23   being slipped in after the fact, correct?

24   A.   Correct.

25   Q.   Right.  But there is a whole exchange below that's just

Carl Pepper - Cross

1   being forwarded to you by Mr. Roberts, correct?

2   A.  Yes, ma'am.

3   Q.  And he is doing that to loop you in because you're the

4   front-line guy who is interacting with Church's on this,

5   correct?

6   A.  Yes, ma'am.

7   Q.  Okay.  So let's go through and we'll just -- let's go all

8   the way to the beginning of that exchange.  And, in fact, it's

9   not just you being added to this.  You also have Jared Mitchell

10  being added into this, correct?

11  A.  What?

12  Q.  Jared Mitchell, he is also being brought into the loop

13  here?

14  A.  Yes, ma'am.

15  Q.  He is being brought into the loop because you handle the

16  fresh chicken, chicken on the bone, and he handles the further

17  processed, the strips, correct?

18  A.  Yes.

19          MS. SWEENEY:  Objection, basis.

20          THE COURT:  Overruled.

21  BY MS. PREWITT:

22  Q.  You can respond.

23  A.  Yes, ma'am.

24  Q.  So you are both being looped in because this covers the

25  fresh chicken on the bone is your area; and then the strips,

Carl Pepper - Cross

1     the processed stuff is Jared's area, correct?

2          Okay.  So from this exchange that was forwarded to you

3     by Mr. Roberts, you learned that there was already this whole

4     discussion about figuring out how this new quality assurance

5     testing was going to -- it was going to cost Tyson something,

6     correct?

7     A.  Yes, ma'am.

8     Q.  Now, so before we go through this e-mail, I want to talk

9     about the people who are all involved in this chain because

10    there are a lot of folks here.  And feel free -- if you want to

11    flip through and take a look, please do so.

12         Now, we've got -- involved in this whole discussion

13    about what's this requirement going to cost, we've got

14    Darrell Bowlin, correct?

15    A.  Yes, ma'am.

16    Q.  And we've got Doug Ramsey?

17    A.  Yes, ma'am.

18    Q.  And he is --

19    A.  I didn't see Darrell Bowlin's name.

20    Q.  You didn't see Darrell Bowlin?

21    A.  Oh, okay, yes, ma'am.

22    Q.  You see it earlier in the chain?

23    A.  I see it now, yes, ma'am.

24    Q.  I am going to ask you some general questions about this

25    whole exchange that's happening before you get looped in, okay?

Carl Pepper - Cross

1    A.  Yes, ma'am.

2    Q.  So feel free to stop and look at the document if you need

3    to.  But so we talked about Darrell Bowlin.  He is in the

4    business unit?

5    A.  Yes, ma'am.

6    Q.  He is involved in this discussion?

7    A.  Yes, ma'am.

8    Q.  We even have got Doug Ramsey involved in this discussion?

9    A.  Yes, ma'am.

10   Q.  He was a big shot at Tyson, correct?

11   A.  Yes, ma'am.

12   Q.  He is the VP of the small-bird unit.

13   A.  Yes, ma'am.

14   Q.  Okay.  And then we've got Andy Lubert?

15   A.  Yes, ma'am.

16   Q.  He is your boss's boss's boss.

17   A.  Are you talking about Brian's boss?

18   Q.  He is -- Andy Lubert, he is like three levels up from you.

19   A.  Yes, ma'am, from me.

20   Q.  He is much more senior?

21   A.  Yes, ma'am.

22   Q.  And more senior than Tim Mulrenin, Brian Roberts.  He is

23   above them.

24   A.  That's news to me.  I didn't know Andy was above Brian.

25   Q.  He is a senior guy.

1618

Carl Pepper - Cross

1  *A.*  Oh, okay.

2  *Q.*  He is a senior person in the sales group, right,

3  Mr. Lubert?

4  *A.*  At that time I thought they were both same level, so I

5  really don't know.

6  *Q.*  All right.  But you don't know.

7  *A.*  Right, right.

8  *Q.*  Because what you know is he is several levels above you.

9  *A.*  Oh, definitely, yes, ma'am.

10  *Q.*  So you are being brought into this conversation to make you

11  aware.  In this whole exchange that happens before Mr. Roberts

12  kind of loops you in, you and Jared Mitchell in, you were not a

13  participant to these discussions, were you?

14  *A.*  No, ma'am.

15  *Q.*  And, in fact, no one invited you to weigh into these

16  earlier discussions that happened.

17  *A.*  Correct.

18  *Q.*  That are reflected in this e-mail chain, right?

19  *A.*  Yes, ma'am.

20  *Q.*  And, you know, there is no -- in any of the communications

21  you looked at in preparation for your testimony today, there is

22  no indication that anyone was actually interested in any

23  information that came from Pilgrim's on this.

24  *A.*  According to these e-mails, no.

25  *Q.*  But based on your recollection, you haven't seen anything

Carl Pepper - Cross

1    that indicates anybody at Tyson was even interested in the

2    information he was supplying?

3    A.  I don't know if I can answer it, but according to these, it

4    looks like that.

5    Q.  It looks like no one here is interested in what any of the

6    other suppliers is doing when they are finding out what to

7    quote for this, right?

8    A.  Correct.

9    Q.  There is not even a mention of what others might be doing?

10   A.  Correct.

11   Q.  No one seems to care.

12   A.  Right.

13   Q.  Let's look at the top of Government Exhibit 221.  This is

14   the part the government focused you on.  So if you look at the

15   language, they also didn't like it showing up.  They are

16   planning on adding it to their cost.  This is just you -- you

17   reached out to Jimmie Little, and you were just griping about

18   this.  This is unfair, right?

19   A.  Well, yes, ma'am.  I called him just to see if he was

20   getting the same --

21   Q.  But you were griping about it.  You didn't like it.  You

22   didn't think it was fair, correct?

23   A.  Correct.

24   Q.  And you wanted to talk about that with Jimmie Little?

25   A.  Correct.

Carl Pepper - Cross

1    Q.  Now, in fact, you testified -- either you asked Little if

2    he had seen this request from Church's concerning the extra

3    quality control issues for strips and bone-in chicken if he had

4    seen it then, what they were thinking about, what their opinion

5    was of getting this information to Church's.  Do you remember

6    that?  Do you remember testifying to that last week?

7    A.  Would you read that again?

8    Q.  You were interested in finding out what -- essentially what

9    Jimmie Little's opinion was of getting this information from

10   Church's, right?  Do you recall that testimony?

11   A.  Yes, ma'am.

12   Q.  Because you didn't -- they didn't like it showing up late

13   in the day, and you didn't like it showing up either, right?

14   A.  Correct.

15   Q.  And no one -- I would like you to look at -- let's go back

16   in the earlier part of the chain of Government Exhibit 221.  We

17   will go from the bottom, and we will go right from the -- from

18   the outreach from Sara Knust to Mike Hannigan, again, in

19   quality assurance, the exchange just above that says:  These

20   are costs we have not incurred previously without a significant

21   penalty for maintaining quality.

22        Do you see that?

23   A.  Yes, ma'am.

24   Q.  And then he says he is going to send the requirements out

25   to the plant managers, correct?

Carl Pepper - Cross

1    A.   Yes, ma'am.

2    Q.   So there is a concern here about new costs that could

3    result in a penalty, correct?

4    A.   Yes, ma'am.

5    Q.   And if we go up from that, we have the chain forwarded.

6    And we see -- if we go up a little bit, we see Mr. Bowlin added

7    in and a whole bunch of other people, so the group starts

8    expanding from there, right?

9    A.   Yes, ma'am.

10   Q.   Lots of interested folks here.  And then Mr. Bowlin, he

11   forwards it on to Doug Ramsey, the VP of small bird.  Do you

12   see that part?  We will sort of scroll up from that so you can

13   see.  A little bit more.  I think you got it there.  And we

14   will go up from there.  Scroll to the more recent e-mails, with

15   the one Andy Lubert, if you scroll up a little more.  Okay.

16        So here you've got Mr. Lubert is saying:  Any thoughts

17   on this?  This could get expensive real quick.  Strips could be

18   $3,000 per year plus shipping for each sample barring no

19   issues.

20        And they are talking about the cost of this, right?

21   It could be a significant cost.

22   A.   Yes, ma'am.

23   Q.   And he says:  We need to calculate what we could expect in

24   cost and build it into the pricing.  Since this is new, we need

25   to be able to recoup our cost.

Carl Pepper - Cross

1    Do you see that?

2   A.  Yes, ma'am.

3   Q.  So here the whole plan is we are going to be charging for

4   this, correct?

5   A.  Correct.

6   Q.  No discussion about what any other suppliers are doing.

7   A.  Correct.

8   Q.  No stated interest on what are the other suppliers doing,

9   how, you know, we should factor that in.

10  A.  Correct.

11  Q.  Nothing like that.

12       Okay.  And then going up to the e-mail where

13  Mr. Roberts is in the chain here and weighing in, he wants to

14  know what the real impact is and wants to add it to the QA line

15  on the cost plus.  He needs to know what it is to find out what

16  to charge for, right?

17  A.  Yes, ma'am.

18  Q.  He is concerned that the total cost which would include

19  shipping and associated labor that together probably exceed the

20  cost of the product, he is worried about that.  He is worried

21  that this could be a really big cost that Tyson is going to

22  have to deal with, right?

23  A.  Yes, ma'am.

24  Q.  So here everybody is talking about finding out what the

25  cost impact is and charging it to Church's, correct?

Carl Pepper - Cross

1    A.  Correct.

2    Q.  No discussion about anything anyone else is doing, correct,

3    any other suppliers is doing, correct?

4    A.  Correct.

5    Q.  And so after this -- in fact, there are no -- you send this

6    e-mail regarding what your kind of -- I will call it a sort of

7    a gripe session a little bit with Jimmie Little about this call

8    coming up.  You testified to that, correct?

9    A.  Yes, ma'am.

10   Q.  And there is no discussion after this.  You kind of get

11   this information.  You throw it out there.  And there is no

12   response to it, is there?

13   A.  Correct.  Yes, I sent the e-mail to them just to let them

14   know that I heard it --

15   Q.  You spent a lot of time preparing with the government, and

16   you have seen a lot of e-mails.  There is no follow-up from

17   this, is there?

18   A.  No, ma'am.

19   Q.  Now, so after Tyson's pricing unit had done the work and

20   figured out what it was going to cost, isn't it true that you

21   didn't even realize that the QA charge had been added to the

22   model that you sent on to Dean Bradley?

23   A.  Say that again, please.

24   Q.  So the pricing team works together at the business unit and

25   they come up with a cost for this quality assurance requirement

Carl Pepper - Cross

1   that Church's is asking for, correct?

2   A.   Yes, ma'am.

3   Q.   And a decision is made to charge Church's for it, correct?

4   A.   Yes, ma'am.

5   Q.   And you sent the model on to Church's, correct?

6   A.   Yes, ma'am.

7   Q.   Because that's your job.  You're the front-line guy, right?

8   A.   Yes, ma'am.

9   Q.   You're the one that's interfacing with Bradley on this,

10  correct?

11  A.   Yes, ma'am.

12  Q.   And you send it on.  But you did not even realize that the

13  model you sent on had a quality assurance cost included in it;

14  isn't that right?

15  A.   Yeah, I believe I realized it.  I saw down over there it

16  had a QA cost.

17  Q.   So your testimony today is you believed at the time you

18  sent the cost model that you had seen that there was a QA

19  charge added to that cost model.  Is that your testimony today?

20  A.   I guess I don't remember if I noticed it or not.

21  Q.   So you don't recall --

22  A.   I don't remember.

23  Q.   -- whether you noticed whether it had been included or not.

24  A.   Yes.

25  Q.   Okay.  Now, I will have you look at -- and it's going to be

Carl Pepper - Cross

1    in your binder, Mr. Pepper, it's going to be G-444.  And this

2    is just for identification purposes only, not to display to the

3    jury at this time.

4            Now, Mr. Pepper, this is dated January 27, 2014,

5    right?

6    A.  Yes, ma'am.

7    Q.  And you, in fact, sent this e-mail, correct?

8    A.  Yes, ma'am.

9    Q.  And it is to a person by the name of Cody Tooley.

10   A.  Yes, ma'am.

11   Q.  And who is Cody Tooley?

12   A.  He worked in the pricing group at that time.

13   Q.  Is he a guy that works on models?

14   A.  Yes, ma'am.

15   Q.  He is one of the guys with the calculators and the pencils?

16   A.  Yes, ma'am.

17   Q.  And puts them together, right?

18           Now, and you looped in Mr. Tooley because you didn't

19   know that the quality assurance cost had been added to the

20   model, correct?

21   A.  Correct.

22           MR. PREWITT:  Your Honor, I move to admit G-444.

23           THE COURT:  Any objection to the admission of G-444?

24           MS. SWEENEY:  No objection.

25           THE COURT:  G-444 will be admitted.

Carl Pepper - Cross

1    MS. PREWITT:  Your Honor, may we display it to the

2    jury?

3    THE COURT:  Yes, you may.

4    MS. PREWITT:  Thank you.

5    BY MS. PREWITT:

6    Q.  So in the e-mail below, and let's go down all the way to

7    the bottom so you can kind of follow this in time, okay?

8    So you from your iPad forward to Mr. Bradley the

9    Church's pricing for February 2014, correct?

10   A.  Yes, ma'am.

11   Q.  And that is -- that's the period pricing.  In other words,

12   this is the February pricing for the 2014 contract, correct?

13   A.  Yes, ma'am.

14   Q.  So any sort of changes month to month, grain changes,

15   add-ons, that would be reflected in this.

16   A.  Yes, ma'am.

17   Q.  But it's based on the model for 2014 that was agreed to

18   prior to this, correct?

19   A.  Correct.

20   Q.  Now, the e-mail went up from that.  Later that same day --

21   not that much later, pretty quick you get a response back.  You

22   get a response back:  Carl, what is this QA audit charge of

23   .0009 that is added to the cost plus?  This was not agreed to.

24   Please advise.

25   Do you remember that?

Carl Pepper - Cross

1   A.   Yes, ma'am.

2   Q.   And your response is you forward the e-mail to Cody Tooley

3   cc'ing Brandon Campbell also in the pricing unit, correct?

4   A.   Yes, ma'am.

5   Q.   And you say:  Cody, any idea where the Church's audit

6   charge came from?

7          Correct?

8   A.   Yes, ma'am.

9   Q.   That's because you sent the model on, right?

10  A.   Right.

11  Q.   But you didn't read the model.

12  A.   No, ma'am.

13  Q.   You just took what you were given and you forwarded it

14  along.

15  A.   The only thing I look at usually is the bottom price.

16  Q.   You were looking at the bottom price, but you didn't look

17  at all the components of cost, correct?

18  A.   Correct.

19  Q.   So you didn't even know that there was an audit charge

20  added here, did you?

21  A.   No, ma'am.

22  Q.   Okay.  So attached to this are -- is that February pricing,

23  correct?

24  A.   Yes, ma'am.

25  Q.   And that is reflected --

Carl Pepper - Cross

1    MR. PREWITT:  And just for -- not for publication to

2    the jury, but, Your Honor, I would like to display to the

3    witness G-446.  And this is the cost model.  I would like to

4    move for its admission.

5    THE COURT:  I am sorry, Ms. Prewitt.  Did you move for

6    its admission?

7    MS. PREWITT:  I am sorry, Your Honor.  I move for its

8    admission.

9    THE COURT:  Any objection to the admission of G-446?

10    MS. SWEENEY:  No objection.

11    THE COURT:  G-446 will be admitted.

12    MS. SWEENEY:  Your Honor, so for G-446, no objection.

13    MR. PREWITT:  Your Honor, may I display it to the

14    jury?

15    THE COURT:  You may.

16   BY MS. PREWITT:

17   Q.  So, Mr. Pepper, we are just going to move quickly down, I

18   think it's three-quarters of the way down the page.  And you

19   can see where it says QA audit.  Do you see that part?

20   A.  Yes, ma'am.

21   Q.  And that's the price there, right?

22   A.  Yes, ma'am.

23   Q.  And that's something you didn't notice when you sent it on

24   to Mr. Bradley?

25   A.  Not until he pointed it out.

Carl Pepper - Cross

1    Q.   Thank you.

2         Now, let's talk about -- we have established you

3    didn't like check all the price models, right?

4    A.   No, ma'am.

5    Q.   That was not your job.

6    A.   No, ma'am.

7    Q.   And so let's talk about what you did do at Tyson, all

8    right?  I am going to ask you some questions because you did a

9    lot of things, a lot of things related to production issues,

10   correct?

11   A.   Yes, ma'am.

12   Q.   Because we can talk about price, but if the chicken isn't

13   on the truck the way the client wants it, that's a huge

14   problem, correct?

15   A.   Yes, ma'am.

16   Q.   So you handled -- you did it early in the mornings, you

17   started dealing with the fresh plant operations?

18   A.   Yes, ma'am.

19   Q.   And you were on the phone, and you dealt with every problem

20   that could be related to that chicken getting to where it needs

21   to be, right?

22   A.   Every problem that had to do with my customers, yes, ma'am.

23   Q.   I am sorry.  Thank you.  With respect to -- you were the

24   problem solver for stuff like this, right?

25   A.   Yes, ma'am.

Carl Pepper - Cross

1    *Q.* Like shortages, for example, and oversupply or even just

2    possible shortages, you were there on the phones making sure

3    that was handled, correct?

4    *A.* Yes, ma'am.

5    *Q.* You did this throughout the day. You worked to cover

6    shorts by purchasing products from other suppliers?

7    *A.* Yes, ma'am.

8    *Q.* And you even offered if you had overstock and they needed

9    supply, you supplied that, didn't you?

10   *A.* If somebody was looking for it, yes, ma'am.

11   *Q.* When it came to your customers too.

12   *A.* Yes, ma'am.

13   *Q.* And you worked with the plants. You made sure that like

14   the quality assurance specs, if there was an issue that needed

15   to be negotiated with the customer, you would get on the phone

16   and talk to them about that, right?

17   *A.* Yes, ma'am.

18   *Q.* And you would get approval on changes if things needed to

19   be changed. You would go through the process of working it

20   through Tyson and working with the customer, correct?

21   *A.* Yes, ma'am.

22   *Q.* And, you know, if there were complaints or issues with the

23   product, you were the guy dealing with that problem, correct?

24   *A.* Yes, ma'am.

25   *Q.* And some of these issues, I mean, they could keep you busy

Carl Pepper - Cross

 1  all day long.

 2  A.  Yes, ma'am.

 3  Q.  Some of them were pretty urgent?

 4  A.  Yes, ma'am.

 5  Q.  So, for example, later missing trucks of fresh chicken,

 6  that was a big problem.

 7  A.  Yes, ma'am.

 8  Q.  And you were the guy that dealt with that.

 9  A.  Yes, ma'am.

10  Q.  When you did your job, you did your job.  You didn't have

11  anyone that you could just delegate tasks to to take care of it

12  for you?

13  A.  Yes, ma'am.  It was just me.

14  Q.  It was just you.  And you, you know -- but you did all

15  these things that were critical to these customers, correct?

16  A.  Yes, ma'am.

17  Q.  But you didn't handle the pricing models.  We talked about

18  that.

19  A.  Correct.

20  Q.  And you were not the guy leading the negotiations with

21  these customers, even your customers, correct?

22  A.  What?

23  Q.  You were not the person leading the negotiations, were you?

24  A.  Correct.

25  Q.  Your job was about, first and foremost, about servicing

Carl Pepper - Cross

1    your customers, correct?

2    A.  Yes, ma'am.

3    Q.  Now, I want to talk a little bit about -- more about this

4    QA cost.  I mean, this is an issue, almost a change in spec

5    that you were the front-line guy dealing with on behalf of

6    Tyson, correct?

7    A.  Yes, ma'am.

8         THE COURT:  Ms. Prewitt, perhaps if that's a new

9    subject, maybe we could go into that after the break?

10        MS. PREWITT:  Sure.

11        THE COURT:  Ladies and gentlemen, we will go ahead and

12   take our mid-morning break, so keep the admonitions in mind.

13   The jury is excused.  Thank you.

14        (Jury excused.)

15        THE COURT:  Mr. Pepper, you are excused for the break.

16   Thank you.

17        THE WITNESS:  Thank you.

18        THE COURT:  Anything to take up before we break?  I

19   don't see any takers.  We will be in recess.  Thank you.

20     (Recess at 10:16 a.m. until 10:31 a.m.)

21        THE COURT:  I have had a chance to look over that

22   issue that was brought up on Ms. Sweeney's objection concerning

23   so-called customer complicity and price sharing.  In the

24   government's motion, which is Docket No. 543, I was worried

25   about the following:  Defendants may attempt to argue and

1    introduce evidence that customers or their representatives were

2    complicit in the defendants' bid-rigging and price-fixing, and

3    their complicity excuses the defendants for their actions,

4    which the government argued was irrelevant.

5          The defendants' response, which is Docket No. 560,

6    indicated as we talked about:  The defendants do not intend to

7    argue or introduce evidence that customers or their

8    representatives were complicit in the charged price-fixing or

9    bid-rigging conspiracy.  However, the defendants do plan to

10   introduce evidence showing that there was no such agreement,

11   and the conduct of customers and their representatives has

12   relevance to that showing.

13         For example, defendants intend to introduce evidence

14   that customers routinely shared pricing information among

15   suppliers and that in some instances customers instructed

16   suppliers to align their pricing.  It goes on.

17         And my order in response to that after noting those

18   various positions was that the Court believes that the evidence

19   the defendants mention in their response is relevant to whether

20   defendants had an agreement to fix prices.  Moreover,

21   defendants do not intend to introduce evidence that customers

22   were complicit in the conspiracy to fix prices.

23         So bottom line is because I did not -- because I don't

24   believe that Ms. Prewitt was going into the -- trying to

25   suggest through her questions that there was some type of

Carl Pepper - Cross

1    effort by customers to join in with any type of charged

2    conspiracy among the suppliers, I do change my ruling on that

3    issue, and Ms. Prewitt may explore that line of questioning if

4    she chooses to do so.

5           All right.  Why don't we bring the jury in.  And let's

6    get Mr. Pepper.

7           (Jury present.)

8           THE COURT:  Ms. Prewitt, go ahead.

9           MS. PREWITT:  Thank you, Your Honor.

10   BY MS. PREWITT:

11   Q.  Hello, Mr. Pepper.  I am going to backtrack for a moment

12   and ask you about Popeye's, okay?

13   A.  Yes, ma'am.

14   Q.  In your discussions and experience with Mr. Kronauge,

15   Kent Kronauge who was negotiating on behalf of Popeye's

16   throughout this period, okay?

17   A.  Yes, ma'am.

18   Q.  I asked you a question regarding, you know, your knowledge

19   about Mr. Kronauge learning that Tyson had given Church's a

20   lower price and then asking you at Tyson to go forward and

21   bring forth a proposal with that low price to Popeye's in mind.

22   Do you remember that?

23   A.  I remember you showing me the e-mail, but I just don't

24   remember that.

25   Q.  You don't remember that.

Carl Pepper - Cross

 1   A.  No, ma'am.

 2   Q.  Okay.  Now, is it possible -- can I show you something that

     might refresh your recollection?

 4   A.  Yes, ma'am.

 5   Q.  In your binder you will see H-996, H-996.  Now, before you

 6   look at that --

 7          I am sorry, Your Honor.

 8          Hold off for a second before I give you documents,

 9   Mr. Pepper.  I will just ask you some questions, okay?

10   A.  Okay.

11   Q.  I am going to ask you some questions about your interview

12   with the government team here, okay?

13   A.  Okay.

14   Q.  And I know you had a lot of interviews, so I will try to

15   orient you, okay?

16   A.  Yes, ma'am.

17   Q.  Now, do you recall being interviewed by the government in

18   November 2019?  Thereabouts?

19   A.  Yes, ma'am.

20   Q.  Does that sound right?

21   A.  Yes, ma'am.

22   Q.  And a number of these lawyers were present, the government

23   attorneys, in fact, correct?

24   A.  Yes, ma'am.

25   Q.  The antitrust prosecutors at this table.

Carl Pepper - Cross

1   A.  Yes, ma'am.  That I can remember, yes, ma'am.

2   Q.  And a bunch of agents as well?

3   A.  Yes, ma'am.

4   Q.  And you had one of the federal agents, at least one, taking

5   notes.

6   A.  Yes, ma'am.

7   Q.  And you observed them taking notes of what you were saying,

8   correct?

9   A.  I saw them writing something, yes.

10  Q.  And it was -- and you understood that this was an important

11  meeting, correct?

12  A.  Yes, ma'am.

13  Q.  And you were expected to tell the truth, correct?

14  A.  Yes, ma'am.

15  Q.  And be candid and forthcoming about what you knew.

16  A.  Yes, ma'am.

17  Q.  Okay.  Now, during that November 2019 interview, you said

18  that Mr. Roberts gave Church's a good deal in order to improve

19  that relationship.  Do you recall that?

20  A.  No, ma'am.

21  Q.  Now, do you recall during that -- do you have any reason to

22  think that that's not accurate if it was written in notes by an

23  agent during that meeting?

24  A.  Well, I never seen the notes, and I don't -- I don't

25  remember saying that.

Carl Pepper - Cross

1    *Q.* Do you have any reason to doubt that those notes are

2    accurate?

3    *A.* All I know is I haven't seen -- I didn't see the notes,

4    and, yeah, there could be a possibility it could have been

5    worded differently than what I said.

6    *Q.* So let's talk about your -- because those are not your

7    notes.

8    *A.* No, ma'am.

9    *Q.* Let's talk about another -- something else you said during

10   that November -- well, something else that was recorded based

11   on your statements in that interview.  Kronauge found out about

12   the offer to Church's and demanded that Tyson reevaluate

13   pricing for Popeye's.  Kronauge threatened to give business to

14   an extra supplier that Pepper said was OK Foods.

15          Do you recall that?

16          *MS. SWEENEY:*  Objection, Your Honor, reading from the

17   report without any impeachment or refreshing basis.

18          *THE COURT:*  I think that he indicated he didn't

19   recall, so I will overrule the objection.

20   *BY MS. PREWITT:*

21   *Q.* Would you like me to read it again to you?

22   *A.* Yes, ma'am.

23   *Q.* Okay.  In that interview, you said:  Kronauge found out

24   about the offer to Church's and demanded that Tyson reevaluate

25   pricing for Popeye's.  Kronauge threatened to give business to

Carl Pepper - Cross

1    an extra supplier that Pepper said was OK Foods.

2         Does that sound like something you said during that

3    interview?

4    A.  I remember something about OK Foods, but I don't remember a

5    lot of that conversation.

6    Q.  Okay.  To be clear, Popeye's is a competitor of Church's,

7    correct?

8    A.  Yes, ma'am.

9    Q.  Okay.  Well, we can move on.  We will move on to another

10   topic here.  We'll go back to Church's, okay?

11   A.  Okay.

12   Q.  Now, when we discussed earlier the e-mail exchange that you

13   had with Cody Tooley regarding the QA audit charge, do you

14   recall that?

15   A.  Yes, ma'am.

16   Q.  And you had asked Mr. Tooley:  Do you have any idea where

17   the Church's audit charge came from, and that was in the e-mail

18   we showed you, G-444.  Do you recall that?

19   A.  Yes, ma'am.

20   Q.  So even when Mr. Bradley pointed out that that new charge,

21   that .0009 charge for the quality assurance audit was in the

22   price model, you didn't even know what that was related to, did

23   you?

24   A.  I don't think I connected it, no, ma'am.

25   Q.  And that's why you had to ask Tooley about it, but you

Carl Pepper - Cross

1   just -- you had no idea.

2   A.  Yes, ma'am.

3   Q.  Okay.  Now, we just looked at e-mails about that QA audit

4   charge, right?  That's where we are right now just to orient

5   you, Mr. Pepper, okay?

6   A.  Yes, ma'am.

7   Q.  We are talking about that.  And, in fact, Tyson ended up

8   removing the quality assurance audit charge.

9   A.  I didn't know that.

10  Q.  So your testimony is you did not have any idea that they

11  actually removed that, and they removed it in response to the

12  complaint by Church's, correct?

13  A.  Well, I guess they did, but I didn't know --

14  Q.  You weren't even aware of it.

15  A.  Once it was in there, I just -- I hardly ever look at the

16  cost model.

17  Q.  The fact that it was taken out, you sitting here today, you

18  didn't know that.

19  A.  No, ma'am.

20  Q.  So I would like you to look at -- in your binder it's

21  I-807.

22      MR. PREWITT:  And this is just for -- this is just for

23  identification purposes, Your Honor, not to display to the jury

24  yet.

25  BY MR. PREWITT:

Carl Pepper - Cross

1    Q.   Now, Mr. Pepper --

2    A.   Yes, ma'am.

3    Q.   This is an e-mail from you to Mr. Bradley and someone else

4    at Church's, correct?  And take your time.

5    A.   Janie Tucker is at Tyson Foods.

6    Q.   Thank you for correcting that.  So Janie Tucker is at

7    Tyson, not with Church's.  Thank you.

8             And this is regarding the Church's pricing for

9    May 2014, right?

10   A.   Yes, ma'am.

11   Q.   This is the period pricing model based on the 2014 pricing,

12   but just whatever small changes needed to be made?

13   A.   Yes, ma'am.

14   Q.   If there were grain changes or additional costs that would

15   be added, those would be reflected in this period pricing for

16   May, right?

17   A.   Yes, ma'am.

18   Q.   Okay.  And attached to this are Excel files that reference

19   cost changes as well as the Church's pricing for May 2014

20   period pricing, right?

21   A.   Yes, ma'am.

22   Q.   So you, in fact, are sending this along to Mr. Bradley,

23   correct?

24   A.   Yes, ma'am.

25             *MS. PREWITT:*  Your Honor, I move to admit I-807.

1641

Carl Pepper - Cross

1   THE COURT:  Any objection to the admission of I-807?

2        MS. SWEENEY:  No objection.

3        THE COURT:  I-807 will be admitted.

4        MS. PREWITT:  Your Honor, may I publish to the jury?

5        THE COURT:  You may.

6   BY MS. PREWITT:

7   Q.  So, Mr. Pepper, this is the e-mail you have in front of

8   you.

9   A.  Yes, ma'am.

10  Q.  And this is you sending this on to Mr. Bradley.

11  A.  Yes, ma'am.

12  Q.  And this is the -- these are the cost changes reflected in

13  May 2014.

14  A.  Yes, ma'am.

15  Q.  Okay.  Now, I would like you to take a look at -- and I am

16  sorry.  Before I do that, Mr. Pepper, there are two attachments

17  to this e-mail, correct?  And I will just reference to you they

18  are just thereafter.  They are I-822 as well as I-821.  Do you

19  see those, Mr. Pepper?

20  A.  Yes, ma'am.

21  Q.  And these were attached to the e-mail.  These were the

22  models that are attached, correct?

23  A.  Yes, ma'am.

24        MS. PREWITT:  Your Honor, I move to admit I-822 and

25  I-821.

Carl Pepper - Cross

1    THE COURT:  Any objection to the admission of I-821

2  and I-822?

3           MS. SWEENEY:  No objection.

4           Your Honor, if I may just note, the government's

5  screen appears not to be working.  We can turn it off and back

6  on.

7           THE COURT:  Yes, why don't you try that and see how

8  that works.

9           Both of those exhibits will be admitted.

10  BY MS. PREWITT:

11  Q.  So, Mr. Pepper, what I would like to do for you is to try

12  to pull up G- -- Defense Exhibit G-446, which has already been

13  admitted, unless I am mistaken.

14           MR. PREWITT:  And I just want to confirm that, Your

15  Honor.  Yes, it's been admitted.

16           THE COURT:  Yes, it has been.

17           MS. PREWITT:  I would like to pull it up and display

18  it to the jury alongside I-822, so side by side.

19  BY MS. PREWITT:

20  Q.  I am afraid it's going to be a little small.  Can you read

21  it on your screen?

22  A.  Yes, ma'am.

23  Q.  If you look at G-446, that's the February pricing which

24  included that QA cost, right?

25  A.  Yes, ma'am.

Carl Pepper - Cross

1    *Q.* And we talked about that, right?  That's the one you just

2    didn't know was in there, right?

3    *A.* I didn't know it was in there, yeah.

4    *Q.* And so that's the .0009 QA charge.

5         *MR. PREWITT:* Maybe we could highlight that because

6    it's a little hard to follow otherwise.  Thank you.  It's in

7    Excel.  Can everybody see that?

8    *A.* Yes, ma'am.

9    *BY MR. PREWITT:*

10   *Q.* So you can see that.  That's the line right there.

11        And now we have -- I would like you to find where the

12   QA audit charge is in I-822.  That's the document to the right

13   that we just described which is the Church's pricing, period

14   pricing for May 2014.

15   *A.* It's not there.

16   *Q.* It's not there.  Because it's been removed, right?  It's

17   been removed.

18   *A.* Yes, ma'am.

19   *Q.* And you didn't know it had been removed, correct?

20   *A.* Not that I remember, no, ma'am.

21   *Q.* Because you didn't create the pricing models.  You didn't

22   make the pricing decisions.  And, in fact, you just took the

23   models that you were given by people whose business it was to

24   do those things with the pencils and the calculators and you

25   just passed it on, correct?

Carl Pepper - Cross

1    A.   Yes, ma'am.

2    Q.   So, in fact, it was never charged.

3    A.   It looks like it was charged for the month of February,

4    but --

5    Q.   But it's not there.  It's been removed from the model.

6    A.   Right.  I don't know when it got pulled out, if it got

7    pulled out --

8    Q.   And just -- I am sorry, Mr. Pepper.  You had nothing to do

9    with the decision to pull it out.  In fact, you had no

10   awareness that it had been pulled out.

11   A.   No, ma'am.

12   Q.   And the prosecutor didn't show you these documents, did

13   she?

14   A.   Yes, ma'am.  She showed me the one where it was in there.

15   Q.   The one that was in there, but she didn't show you the one

16   where it had been taken out.

17   A.   No, ma'am.

18   Q.   Now, I would like to -- we are going to shift gears just

19   ever so slightly.  We are going to stay on Church's, okay?  We

20   are going to talk about the freezing charge, right, that

21   freezing charge cost?

22   A.   Yes, ma'am.

23   Q.   That's a cost pass-through?

24   A.   Yes, ma'am.

25   Q.   And it's something you discussed with Ms. Sweeney when she

Carl Pepper - Cross

1    was examining you last week, correct?

2    A.   Yes, ma'am.

3    Q.   And so just to orient you, this is the freezing cost

4    pass-through quote that you were being asked for from Church's

5    back in May of 2013.

6    A.   Yes, ma'am.

7    Q.   Okay.  And this was supposed to be based on Tyson's actual

8    cost of freezing the chicken as, you know, based on the

9    specifications of Church's, correct?

10   A.   Correct.

11   Q.   Okay.  And it's something that Church's expected to pay

12   for, right?

13   A.   Yes, ma'am.

14   Q.   So, for example, the people in Tyson who did these things,

15   who came up with cost figures, they were supposed to come up

16   with the actual cost, pass it to you.  You would pass it to

17   Church's, and Church's would pay it, right?

18   A.   That's the way it was supposed to work.

19   Q.   And, in fact, we talked a bit about Darrell Bowlin in the

20   business unit.  Do you recall that?

21   A.   Yes, ma'am.

22   Q.   And, in fact, Mr. Bowlin was the person who helped collect

23   information about what it really cost to freeze the product and

24   store the product that Church's was asking for a quote from?

25   A.   Yes, ma'am.

1646

Carl Pepper - Cross

1   *Q.*  And that quote was just straight cost, a pass-through of

2   Tyson's actual cost to Church's that Church's would pay for.

3   *A.*  Yes, ma'am.

4   *Q.*  And, in fact, Mr. Bowlin, he collected this information,

5   and then he would work with the pricing unit to actually come

6   up with that figure, the "get the calculators and the pencils

7   out and come up with the figure" of the actual cost, correct?

8   *A.*  Yes, ma'am.

9   *Q.*  And considerations that factored into this cost included

10  how much you were freezing, you know, how much time it would

11  take to freeze it -- sorry, how much time you keep it in the

12  freezer, right?

13  *A.*  Yes, ma'am.

14  *Q.*  That's a component, right?  And just other factors about

15  what it would cost to basically freeze and then store chicken,

16  right?

17  *A.*  Yes, ma'am.

18  *Q.*  Okay.  So let's talk about the e-mails the government

19  showed you about a freezing cost quote to Church's in June of

20  2013, okay?  So let's just take a look at the Government

21  Exhibit 114, okay?  You saw this yesterday, but we will show it

22  to you again.

23          *MS. PREWITT:*  Your Honor -- actually, before we do

24  that, I apologize, Your Honor, if I could just switch gears a

25  little bit.  Government Exhibit 120 I believe has been admitted

Carl Pepper - Cross

1    into evidence.  May I display that to the jury first?

2              THE COURT:  You may.

3         MS. PREWITT:  Thank you, Your Honor.

4    BY MS. PREWITT:

5    Q.  So, Mr. Pepper, this is the e-mail that you spent some time

6    testifying to in response to Ms. Sweeney's questions, correct?

7    A.  Yes, ma'am.

8    Q.  And it talks about the freezer cost.

9    A.  Yes, ma'am.

10   Q.  Okay.  And now I would like to turn to Government

11   Exhibit -- or GX-114.

12             MR. PREWITT:  Your Honor, I believe this is in

13   evidence.  May I display it?

14             THE COURT:  You may.

15        MS. PREWITT:  Thank you.

16   BY MS. PREWITT:

17   Q.  Now, Mr. Pepper, this is -- you know, in the e-mail just

18   below this, you're reporting about where you thought Pilgrim's

19   would be around and what -- and then also, you know, a mention

20   of another supplier and what they would probably charge, right?

21   A.  Yes, ma'am.

22   Q.  Now, Mr. Roberts' response to you was:  I want to discuss

23   this before we submit.  I want to understand what the storage

24   expectation is.

25             Correct?

Carl Pepper - Cross

1   A.  Yes, ma'am.

2   Q.  Does he really -- he wants to know:  Is it a cut, freeze,

3   and ship deal and then the distributor stores in frozen state;

4   or are we going to have to have it longer than a month frozen.

5        Right?

6   A.  Yes, ma'am.

7   Q.  So he is trying to figure out what this is going to cost,

8   right?

9   A.  Yes, ma'am.

10  Q.  He doesn't react or reference at all anything about what

11  any other supplier is thinking about, right?

12  A.  He doesn't mention it, no, ma'am.

13  Q.  This is -- you are in the e-mail below sort of offering up

14  what you can offer up, but there is no response about any

15  interest about what other suppliers are doing here, is there?

16  A.  No, ma'am.

17  Q.  It's just about what this could cost.

18  A.  Yes, ma'am.

19  Q.  Okay.  Now, let's look at GX-118.

20       MS. PREWITT:  Your Honor, this, I believe, has been

21  admitted into evidence, so may I display it to the jury?

22       THE COURT:  You may.

23  BY MS. PREWITT:

24  Q.  And if you go -- I am not going to have you go all the way

25  to the beginning of this chain, but let's just look at the

Carl Pepper - Cross

1  e-mail from Tim Mulrenin to you and Brian Roberts.  And it

2  says:  I get it, but he's going to ask what happens when we run

3  a bunch because it's available.

4       Mr. Mulrenin is concerned about the cost of holding

5  this product, isn't he?

6  *A.*  Yes, ma'am.

7  *Q.*  There is no reference to what the other suppliers might be

8  thinking about doing.

9  *A.*  No, ma'am.

10  *Q.*  Okay.  In fact, in any of these e-mails around this, there

11  is no indication that Brian Roberts or Tim Mulrenin cared at

12  all about what other suppliers might quote Church's for frozen.

13  There is nothing in these e-mails.

14  *A.*  No, ma'am.

15  *Q.*  This is just information you offered up to be helpful.

16  *A.*  Yes, ma'am.

17  *Q.*  But there is no one that's saying it's helpful, is there?

18  *A.*  No, ma'am.

19  *Q.*  Because it's the pricing group that determined the actual

20  cost of the freezing charge, right?  They figured out what the

21  cost was and what would be passed on, right?

22  *A.*  Yes, ma'am.

23  *Q.*  And so let's move on to one more.  Let's move on to GX-119.

24       *MR. PREWITT:*  And so, Your Honor, may -- I believe

25  this has been admitted into evidence.  May I display it to the

Carl Pepper - Cross

1  jury?

2         *THE COURT:*  Yes, you may.

3          *MS. PREWITT:*  Thank you, Your Honor.

4  *BY MS. PREWITT:*

5  *Q.*  So here we have this June 4th, 2013 e-mail from you to

6  Mr. Bradley, correct?

7  *A.*  Yes, ma'am.

8  *Q.*  And you are cc'ing Tim Mulrenin because he is your

9  supervisor, correct?

10  *A.*  Yes, ma'am.

11  *Q.*  And this is about that frozen eight-piece dark meat cost

12  quote for freezing, right?

13  *A.*  Yes, ma'am.

14  *Q.*  And the quote here for 3 cents is what the freezing costs

15  ended up being.  That's the quote that actually went to

16  Church's, correct?

17  *A.*  It's less than what the pricing group gave us.

18  *Q.*  That's right, because the pricing group said that actually

19  the cost was much higher than 3 cents, didn't they?

20  *A.*  Yes, ma'am.

21  *Q.*  And, in fact, they said Tyson's actual cost at the time was

22  5 cents.  Do you recall that?

23  *A.*  I know it was -- it was more than 4 and somewhere between 4

24  and 6.  I didn't remember exactly what the number was.

25  *Q.*  Somewhere between 4 and 6.  But, in fact, the quote you

Carl Pepper - Cross

1    were providing to Church's that's been worked up by your

2    pricing team is actually lower, lower than the actual cost,

3    correct?

4    A.  Yes, ma'am.

5    Q.  And let's walk back through some of this.  I mean, you

6    mentioned between 4 and 6 cents was the actual cost, and you

7    were charging less than the actual cost for Church's, right?

8    A.  Yes, ma'am.

9    Q.  And, in fact, back in December 2012, seven months before

10   this 3-cent cost quote, Tyson had calculated 5 cents a pound

11   for the same type of freezing charges -- for the same type of

12   freezing charge to Church's.  That's what they quoted to

13   Church's back in -- seven months earlier, correct?

14   A.  Like I said, I don't remember that.

15   Q.  You don't remember the exact date, but is it, in fact, the

16   case that --

17   A.  I don't remember the 5 cents.  That's what I am saying.  I

18   know it was somewhere between 4 and 6.

19   Q.  So you remembered somewhere between 4 and 6 cents was the

20   actual cost.

21          Okay.  Now, I would like you to take a look, and this

22   is just for identification purposes, G-897.  Actually, if you

23   just turn that over for a second, Mr. Pepper.  Would looking at

24   something refresh your recollection as to what the actual cost

25   quote back in that time was?

Carl Pepper - Cross

1   A.   Yes, ma'am.

2   Q.   Okay.  And I will show you that document, and I will take

3   another look.  I apologize for taking that out of order.

4        Does this refresh your recollection that the actual

5   cost quote to Church's seven months before the quote of 3 cents

6   was actually 4 cents?

7   A.   For that first e-mail, I wasn't even on that one.

8   Q.   Well, why don't we do this.  Let's take a look at another

9   document, okay?  Let's look at -- let's look at I-782 in your

10  binder, and that is just for identification purposes only, at

11  least at this point in time, I-782, I-782, Mr. Pepper.

12  A.   Yes, ma'am.

13  Q.   Now, this is an e-mail from Mr. Scheiderer to you, correct?

14  A.   Yes, ma'am.

15  Q.   And this is regarding the cost and blast charges for frozen

16  food to Church's?

17  A.   Yes.

18  Q.   That's regarding the eight-piece and dark, the same as what

19  we were talking about in June of 2013, correct?

20  A.   Yes, ma'am.

21  Q.   And is this -- since you were the front-line person in

22  dealing with Church's in response to quotes like this, is this

23  something that you would need to use in deciding in your

24  negotiations with Church's?

25  A.   Well, I wasn't the main one doing the negotiating, but what

Carl Pepper - Cross

1   are you asking me, I guess?

2   Q.   Well, I understand.  So thank you, Mr. Pepper.

3        So does this -- does this refresh your recollection

4   about what the actual freezing charge cost was back in December

5   of 2012?

6   A.   Yes, ma'am.  Now I see the e-mail.  I didn't remember it.

7   Q.   But you remember it sitting here today now looking at this.

8   Your recollection has been refreshed, correct?

9   A.   No, I recollect it because I see it.  I don't remember it,

10  but I see it.

11  Q.   But you remember between 4 and 6 cents it was.

12  A.   Yes, ma'am; yes, ma'am.

13  Q.   And the person who would be involved in calculating aspects

14  of freezing costs at Tyson would be Rollin Barnes?

15  A.   Yes, ma'am.

16  Q.   Is that what you recall from the time period?

17  A.   Well, it was Rollin Barnes and a couple of other people in

18  the pricing, so I really don't know all the different people

19  that would be involved.

20  Q.   Because there are loads of people at Tyson that are

21  involved in crunching the numbers and getting the calculators

22  out for any charge like this or any price, in fact?

23  A.   Yes, ma'am.

24  Q.   Because it was sort of a serious thing at Tyson.  They had

25  lots of people who were crunching the numbers before you could

Carl Pepper - Cross

1   send any cost model over to a customer, correct?

2   A.  Yes, ma'am.

3   Q.  Even if it was for a tiny thing, right?

4   A.  Yes, ma'am.

5   Q.  Because that was their job.

6   A.  Yes, ma'am.

7   Q.  So I would like to turn your attention to, in your binder,

8   Mr. Pepper, G-748.  And there is an attachment with it which is

9   G-749.

10          Now, what is this generally?

11  A.  It's an e-mail.

12  Q.  And what are the attachments to the e-mail, generally

13  speaking?

14  A.  It's a Tyson and Yum or KFC COB bid summary for 2012 and

15  2013.

16  Q.  And it was sent -- these models were sent on or about

17  October 2012, October 10th; is that right?

18  A.  Yes, ma'am.

19          MS. PREWITT:  Your Honor, I would move to admit G-748

20  and the attachments that include -- well, it's G-749.

21          THE COURT:  All right.  Any objection to the admission

22  of G-748 and G-749?

23          MS. SWEENEY:  Not to the admission, Your Honor, but to

24  further questioning of Mr. Pepper on the document that he is

25  not on.

Carl Pepper - Cross

1    MS. PREWITT: Your Honor, I am just going to refer to

2    the cost model, but not the e-mail itself.

3    THE COURT: Well, right. Right now all we are dealing

4    with is the exhibit. So no objection to both?

5    MS. SWEENEY: No objection, Your Honor.

6    THE COURT: G-748 and G-749 will be admitted.

7    MS. PREWITT: Your Honor, may I display it to the

8    jury?

9    THE COURT: You may.

10   BY MS. PREWITT:

11   Q. Mr. Pepper, I am just going to ask you to look at G-749.

12   This is a cost model being sent to Yum Brands, correct?

13   A. Yes, ma'am.

14   Q. And this is in relation to --

15   A. It's UFPC really.

16   Q. Thank you very much, sir.

17          And I just want to direct your attention to the second

18   page of G-749. And you'll see a UFPC feed flow-through pricing

19   for Period 1, 2013, okay? Do you see that? It's going to be

20   a -- I will just hold it up so you can see. It's going to be

21   the --

22   A. Oh, yes, ma'am.

23   Q. -- the insert, the Excel sheet.

24   A. Yes, ma'am.

25   Q. Okay.

Carl Pepper - Cross

1    *MS. PREWITT:*  If we could display that portion to the

2    jury because I think it's going to be the Word document as

3    opposed to the model.

4    *BY MS. PREWITT:*

5    *Q.*  If you look at the right column, the middle of the way

6    through, it says:  Injected dark meat frozen.

7    *A.*  Yes, ma'am.

8    *Q.*  And what do you see the freezer charge?  Do you see a

9    freezer charge there?

10           *MS. SWEENEY:*  Objection as to foundation.  I don't

11   believe it's been established the witness has ever seen this

12   document before.

13           *THE COURT:*  Sustained.

14   *BY MS. PREWITT:*

15   *Q.*  Have you seen documents like this before?

16   *A.*  Yeah, I have seen documents like this, but not this one

17   that I can remember.

18   *Q.*  But these are the kind of things you would review and look

19   at on occasion?  Or maybe not.  Mr. Pepper, you testified

20   earlier you didn't look at the models, did you?

21   *A.*  Well, I didn't look -- most of the time I looked at this

22   part, but as far as the actual model, the cost model, no,

23   ma'am.

24   *Q.*  You didn't have your eye on these things, did you?

25   *A.*  No, ma'am.

Carl Pepper - Cross

1    Q.   Okay.  So you testified that the 3 cents that Tyson quoted

2    to Church's for frozen, the freezing charge, the pass-through,

3    that 3-cents charge was actually a reduction from what you

4    understood was a higher price, between 4 and 6 cents price in

5    terms of a cost, right?

6    A.   Yes, ma'am, and because Dean Bradley questioned the price

7    and he wanted to see a breakdown.

8    Q.   He wanted to see a breakdown of it.

9    A.   Yes, ma'am.

10   Q.   And, in fact, for cost quotes buyers like people like

11   Mr. Bradley wanted to see the backup, didn't they?

12   A.   Yes, ma'am.

13   Q.   So because he was supposed to be paying for a cost

14   pass-through, your actual cost, right?

15   A.   Yes, ma'am.

16   Q.   So when Tyson was working up these costs, for example, for

17   Church's, it knew that it was going to have to show its backup,

18   correct?

19   A.   Yes, ma'am.

20   Q.   It would have to show the numbers to justify how that cost

21   was arrived at, correct?

22   A.   Yes, ma'am.

23   Q.   So Tyson was always going to have to be a little

24   transparent about how they came up with their cost numbers,

25   right?

Carl Pepper - Cross

1    A.   Yes, ma'am.

2    Q.   Because they would have to show it to the customer.

3    A.   If they questioned it, correct.

4    Q.   So in your testimony today is there is a point in time

5    where Mr. Bradley questioned what the cost figure was, the cost

6    quote for the freezing charge, and Tyson had to provide its

7    backup, how it arrived at that?

8    A.   Yes, ma'am.

9    Q.   And, in fact, it did.

10   A.   I don't remember if they ever --

11   Q.   Okay.  Fair enough, Mr. Pepper.  You didn't know if they

12   did, but you knew that the customers expected to get the backup

13   whenever cost pass-throughs were quoted.

14   A.   Yes, ma'am.

15   Q.   And the folks at Tyson in the pricing unit, the sales team

16   all knew that?

17   A.   Would you say that again?

18   Q.   The people at Tyson knew that customers like Mr. Bradley

19   would want to see the backup to justify how they came to their

20   cost figures, correct?

21   A.   Yes, ma'am.

22   Q.   Now, you talked about -- a moment ago about a time when

23   Mr. Bradley questioned a 4-cent figure, correct?

24   A.   Yes, ma'am.

25   Q.   And that was, in fact, in October 2013, right?

Carl Pepper - Cross

1  A.  I don't remember the exact date, no, ma'am.

2  Q.  But it was after this May 2013 event.

3  A.  Yes, ma'am.

4  Q.  So you've got a -- somewhere a cost figure between 4 and 6

5  cents, correct?

6  A.  Yes, ma'am.

7  Q.  Back in May, June period of time, right?  The quote ends up

8  being 3 cents --

9  A.  Yes, ma'am.

10  Q.  -- for Tyson.  And then there is another request from

11  Church's for another quote back in -- well, in October of 2013

12  or thereabouts.

13  A.  For freezer charge?

14  Q.  For freezer charge for Church's.

15  A.  I don't remember all the dates.

16  Q.  Okay.  Well, but you know that after this June 3-cent

17  quote, which is a reduction off the cost, after then

18  Mr. Bradley comes again and asks for another cost quote for

19  freezing Church's -- for freezing charge for Church's, correct?

20  A.  I was just saying I don't remember it.  I just remember he

21  was happy with the 3 cents.

22  Q.  He was happy with the 3 cents at the time?

23  A.  Yes, ma'am.

24  Q.  It was less than Tyson's actual cost.

25  A.  Yes, ma'am.

Carl Pepper - Cross

1   Q.  So let's look at GX-541.  It's in your binder.  Sorry, it's

2   not GX.  It's a defense exhibit.  It's G-541.

3           Now, Mr. Pepper, it's a long e-mail chain, okay?

4   A.  Okay.

5   Q.  So just take your time.  And I will just ask when you have

6   a few minutes -- a minute to look through it, I will ask you

7   some questions, okay?

8   A.  Yes, ma'am.  Okay.

9   Q.  So you have had an opportunity to review it?

10  A.  Yes, ma'am.

11  Q.  Now, did you review these documents in preparation for your

12  testimony today?

13  A.  No, ma'am.

14  Q.  So this is -- you're seeing these -- the prosecution didn't

15  show you these documents to prepare you for your testimony, did

16  they?

17  A.  No, ma'am.

18  Q.  So I am going to ask you some questions generally about

19  this, okay?

20  A.  Okay.

21  Q.  This is about -- an e-mail exchange between Tyson employees

22  working on a freezer charge quote to Church's in October of

23  2013, right?

24  A.  Yes, ma'am.

25  Q.  And, you know, just looking away from the document, this

Carl Pepper - Cross

1  is -- just look away from the document just so I can talk to

2  you, Mr. Pepper.

3  A.  Okay.

4  Q.  So you testified earlier about your recollection of

5  Mr. Bradley coming back to you and saying, Where did you get

6  this 4 cents from, right?

7  A.  Yes, ma'am.

8  Q.  Was that -- was that connected to this particular event

9  reflected in these e-mails?

10  A.  Yes, ma'am.

11  Q.  Okay.  And so, in fact, Mr. Bradley came to you -- you

12  had -- let me just back up one second.  So Mr. Bradley had gone

13  to you with a request for a price quote for a freezing charge

14  again after the June 2013, now we are in October 2013, and he

15  is coming back and saying, Can I have another quote.

16  A.  Yes, ma'am.

17  Q.  And, in fact, what's quoted back to him is 4 cents, right?

18  A.  Yes, ma'am.

19  Q.  But he comes back to you, right?

20  A.  Yes, ma'am.

21  Q.  And, in fact, he tells you, I've got other suppliers coming

22  in between 2 and 3 cents, right?

23  A.  Yes, ma'am.

24  Q.  And he is using that to push your price down, correct?

25  A.  He is telling us, yeah, what he has got other people at,

Carl Pepper - Cross

1    yes, ma'am.

2    Q.  And that's from Mr. Bradley, the buyer.  He is mentioning,

3    I got other suppliers between 2 and 3 cents, and you're at 4,

4    correct?

5              MS. SWEENEY:  Objection, hearsay as to what

6    Mr. Bradley is saying.

7              THE COURT:  Sustained.

8    BY MS. PREWITT:

9    Q.  So you understood that Mr. Bradley wanted Tyson to come

10   down on its price.  Instead of looking at the prosecutor,

11   please look at me.

12   A.  Okay.

13   Q.  Now, when Mr. Bradley said for you -- said to you, I have

14   got other supplier prices, or let's say -- let me back up.  You

15   understood Mr. Bradley was hearing from other suppliers at a

16   lower price and wanted you to come down from 4 cents.  That's

17   what you understood, correct?

18   A.  Yes, ma'am.

19   Q.  And, in fact, you understood that Mr. Bradley wanted to see

20   how Tyson came up with that 4-cent cost quote, correct?

21   A.  Yes, ma'am.

22   Q.  And, in fact, from that point on there are people at Tyson

23   who were trying to pull together the backup for that 4-cent

24   cost quote, correct?

25   A.  Yes, ma'am.

Carl Pepper - Cross

1   Q.   And, in fact, Mr. Mulrenin was one of the people leading

2   the charge to say, We've got to provide this backup to

3   Mr. Bradley, correct?

4        MS. SWEENEY:   Objection, calls for hearsay statements

5   of Defendant Mulrenin.

6        THE COURT:   Sustained.   If you can rephrase.

7   BY MS. PREWITT:

8   Q.   It was your understanding at the time that Mr. Mulrenin

9   was -- in fact, he was trying to get the backup together to

10  help explain to Mr. Bradley how Tyson quoted a 4-cent charge,

11  correct?

12  A.   Both of us were, yes.

13  Q.   I am sorry?

14  A.   I said both of us were.

15  Q.   But you both felt you had to justify -- you both believed

16  you had to justify the 4 cents, correct?

17  A.   Yes, ma'am.

18  Q.   Because he was getting other information you understood,

19  correct?

20  A.   Yes, ma'am.

21  Q.   And that other information was the other suppliers had come

22  in at lowest quotes, correct?

23  A.   Yes, ma'am.

24  Q.   And, in fact, there were a lot of people who were -- at

25  Tyson who were involved in this discussion getting that backup

1664

Carl Pepper - Cross

1  together, right?

2  *A.*  Yes, ma'am.

3  *Q.*  And, in fact, people like Mr. Bowlin were involved?

4  *A.*  Oh, yes, ma'am.

5  *Q.*  And Mr. Rollins was involved?

6  *A.*  Yes, ma'am.

7  *Q.*  Lots of folks.  And even folks that worked in the

8  warehouses were involved, correct?

9  *A.*  Yes, ma'am.

10  *Q.*  And even a person by the name of Mister -- I think it was

11  Mister -- correct me if I'm wrong -- Burkett.  Who was

12  Mr. Burkett?

13  *A.*  He was over distribution frozen warehouses.

14  *Q.*  And at the time you felt pressure to justify this to your

15  customer, correct?

16  *A.*  Yes, ma'am.

17  *Q.*  And, in fact, the backup was provided.  The justification

18  was provided, correct?

19  *A.*  Yes, ma'am.

20  *Q.*  And that involved -- the justification involved getting

21  information from all different sorts of people, people who

22  worked at warehousing, people who worked in the pricing unit,

23  people who worked in the business unit, right?

24  *A.*  Yes, ma'am.

25  *Q.*  Because the customer expected to see the workup, the

Carl Pepper - Cross

1    homework that got to that 4-cent, correct?

2    A.   Yes, ma'am.

3    Q.   And as a result, you lowered -- Tyson lowered its price

4    from 4 cents.

5    A.   Yes, ma'am.

6    Q.   Because that was -- well, let me just ask you a question,

7    Mr. Pepper.  Was the price cost quote 4 cents at the time, or

8    was it higher than that?

9    A.   It was higher than that.

10   Q.   So it was more than 4 cents?

11   A.   Yes, ma'am.

12   Q.   How much was it, Mr. Pepper?

13   A.   It was probably 5 -- it was over 5 cents.

14   Q.   Over 5 cents.  But -- and this backup, the cost, the actual

15   cost of 5 cents or more than 5 cents potentially was provided

16   to Mr. Bradley as justification.

17   A.   Yes, ma'am.

18   Q.   But at the end of the day, you came down to 3 cents, didn't

19   you, Mr. Pepper?

20   A.   Yes, ma'am.

21   Q.   And that was something that Mr. Mulrenin pushed for; isn't

22   that right?

23   A.   Yes, ma'am.

24   Q.   And you didn't testify that there was any discussion with

25   competitors last week about this freezer charge, did you?

Carl Pepper - Cross

1  *A.* Did I?

2  *Q.* October 2013, right?  We are talking about you've got

3  5 cents or more actual cost, right?

4  *A.* Yes, ma'am.

5  *Q.* The supplier comes to you and communicates to you that he's

6  getting lower price quotes from other suppliers and wants to

7  see how you got to 4 cents, correct?

8  *A.* Yes, ma'am.

9  *Q.* And you come down to 3 cents, correct?

10  *A.* Yes, ma'am.

11  *Q.* But you didn't testify that you had any communications with

12  any competitors or anybody had any communications with

13  competitors about this October 2013 freezing charge, correct?

14  *A.* No, ma'am.

15  *Q.* Okay.  I would like to show -- if you'd take a look in your

16  binder to -- this would be Defense Exhibit G-320.  And let me

17  know when you see that.

18  *A.* Do you want me to read the whole thing?

19  *Q.* Just one second.  Before you do -- and thank you for

20  asking, Mr. Pepper.  So isn't it a fact that it was

21  Mr. Mulrenin who asked you -- and just look at me, not at the

22  document.  Isn't it a fact that Mr. Mulrenin is the one who

23  suggested you should go down to 2.7 cents?

24      *MS. SWEENEY:*  Objection, calls for hearsay.

25      *THE COURT:*  Sustained.

Carl Pepper - Cross

1   *BY MS. PREWITT:*

2   *Q.* Do you recall who in the pricing group encouraged you to

3   quote less than -- to quote 3 cents?

4           *MS. SWEENEY:* Objection, calls for hearsay.

5           *THE COURT:* Overruled. He has already testified about

6   that.

7   *BY MS. PREWITT:*

8   *Q.* You can answer.

9   *A.* Ask me again, please.

10  *Q.* Do you recall who at Tyson urged you to quote less than

11  4 cents?

12  *A.* Not that I can remember, no, ma'am.

13  *Q.* Okay. I would like for -- and you can't remember.

14  *A.* I can't remember, no, ma'am.

15  *Q.* I would like you to take a look now at G-320. You had it

16  just in front of you, and I asked you to look away, so I will

17  ask you to look again.

18  *A.* Yes, ma'am.

19  *Q.* Does that refresh your recollection regarding who asked you

20  to go -- who urged you to go less than 3 cents?

21  *A.* Yes, ma'am.

22  *Q.* Who asked you to do that?

23  *A.* Tim Mulrenin.

24  *Q.* And from your recollection, what do you recall he asked you

25  to do?

Carl Pepper - Cross

1        MS. SWEENEY:  Objection, calls for hearsay.

2        THE COURT:  Sustained.

3   A.  I don't --

4        THE COURT:  Mr. Pepper, I sustained the objection, so

5   you can't answer that question.

6        MS. PREWITT:  Your Honor, I move to admit G-320.

7        THE COURT:  Any objection to the admission of G-320?

8        MS. SWEENEY:  Yes, Your Honor, on hearsay grounds.

9        THE COURT:  Sustained.

10        MS. PREWITT:  Your Honor, may I offer --

11        THE COURT:  Sure.

12        MS. PREWITT:  This is offered for effect on the

13   listener.  It was sent to Mr. Pepper, and Mr. Pepper is the

14   lead account representative for his client.  And I believe we

15   have phone calls immediately after this from Mr. Bradley after

16   which the 3-cent charge -- so it is effect on the listener,

17   Your Honor.

18        THE COURT:  Objection is sustained.  There is no --

19   the e-mail itself doesn't -- is several e-mails from

20   Mr. Mulrenin.  Those are hearsay.  There is no --

21        MS. PREWITT:  Your Honor, we could redact everything

22   below.  And, in fact, it's a question mark.  I would say it's

23   not an assertion, Your Honor.  But we would be fine with

24   redacting everything below the top e-mail line, Your Honor.

25            That's not the right one, I am sorry, Your Honor,

Carl Pepper - Cross

1    G-320.  It's the top of that, if you take the redaction away.

2    We would redact everything but the e-mail from Mr. Mulrenin to

3    Mr. Pepper.

4         THE COURT:  I guess I don't quite understand.  So you

5    are offering just the "from" line at the very top?

6         MS. PREWITT:  Your Honor, I think we are having a

7    little bit of technical difficulty.  I think if we could

8    unredact the top portion for the Court to be able to see the

9    full e-mail.

10        Your Honor, may I approach with a copy?

11        THE COURT:  Sure.  I am looking at the document on the

12   monitor.

13        MS. PREWITT:  I am afraid the top portion is redacted,

14   Your Honor, so you are not able to see the top portion.

15        THE COURT:  I understand.  Yes, Ms. Grimm will hand

16   that up.

17        Okay.  So, Ms. Prewitt, what's the suggestion, then?

18        MS. PREWITT:  Your Honor, we would just ask to have

19   the top e-mail, and everything else could be redacted.  It

20   would just be for the effect on the listener, and there are, in

21   fact, phone calls immediately after this that I can talk to

22   Your Honor about.

23        THE COURT:  Response, Ms. Sweeney?

24        MS. SWEENEY:  Yes, Your Honor.  The question clearly

25   contains a truthful assertion from the defendant and is not --

Carl Pepper - Cross

1    it is not being introduced for effect on the listener, but

2    rather the facts and the words that are in the question itself,

3    and so the government maintains it's hearsay.

4          MS. PREWITT:  It's actually not a truthful assertion

5    because the price was actually, Mr. Pepper testified, 3 cents,

6    and this is less than 3 cents.

7          THE COURT:  The objection is sustained.

8    BY MS. PREWITT:

9    Q.  We are moving off from Church's, Mr. Pepper.

10          Mr. Pepper, I want to talk to you about the Cullen

11   meeting regarding the KFC contract that you discussed -- you

12   testified about last week, okay?

13   A.  Yes, ma'am.

14   Q.  We are going to go back in time, not that far back in time,

15   but -- not too far back in time from now, but not so far from

16   the Church's episode in 2013.  So this is -- you testified

17   about a meeting about a Tyson price increase that the pricing

18   team was considering and had come up with regarding that 2015

19   to 2018 Tyson -- Church's contract, okay?  That's where we are

20   at.  We are at that KFC -- I am sorry.  I am confusing it.  I

21   am throwing different names around.  I am going to start from

22   the beginning, okay?

23          So my questions are about the discussions around the

24   meeting in Mr. Cullen's office you testified that were all

25   about this KFC 2015 to 2018 contract, okay?

1671

Carl Pepper - Cross

1   A.  Yes, ma'am.

2   Q.  So the pricing group and business unit at Tyson had come up

3   with the price increase.  That's what was discussed in that

4   meeting --

5   A.  Yes, ma'am.

6   Q.  -- right?

7        And you and other salesmen within Tyson, you were

8   concerned about how the customer, in this case RSCS on behalf

9   of KFC, you were concerned about how they might react to that

10  type of price increase, weren't you?

11  A.  Yes, ma'am.

12  Q.  And you at -- the sales group raised those concerns in that

13  meeting, in that sort of Cullen meeting with all those folks

14  from the pricing unit, business unit present, right?

15  A.  Yes, ma'am.

16  Q.  In fact, you testified yesterday, I wanted to make sure

17  everybody was sure -- they were -- really wanted to go after

18  that type of price increase.  Do you recall that?

19  A.  Yes, ma'am.

20  Q.  And at the time the pricing team had laid out the reasons

21  that they had to go with that price increase, correct?

22  A.  Yes, ma'am.

23  Q.  And they talked about how expenses went up.

24        MS. SWEENEY:  Objection, hearsay.

25        THE COURT:  Response?

Carl Pepper - Cross

1      *MS. PREWITT:*  I am just asking about his recollection

2   from the meeting, not what people actually said.

3            *THE COURT:*  Sustained.

4   *BY MS. PREWITT:*

5   *Q.*  Without discussing what was actually said, do you recall

6   there being -- do you recall the pricing team and the business

7   unit discuss -- do you recall them discussing that costs have

8   gone up and that the price of small bird would have to go up

9   too?

10           *MS. SWEENEY:*  Objection, hearsay.

11           *THE COURT:*  Sustained.

12  *BY MS. PREWITT:*

13  *Q.*  In any event, you understood that they were going for this

14  increase.  The pricing unit and the business unit had decided

15  what they were going to charge.

16  *A.*  Yes, ma'am.

17  *Q.*  And the meeting ended.  And you understood that that was --

18  the business unit pricing people, Cullen, Bowlin, Campbell were

19  moving forward with that price increase and that worried you.

20  *A.*  Yes, ma'am.

21  *Q.*  And the concern -- back up a moment.

22           Your job was to service Tyson's customers, right, your

23  customers at Tyson, correct?

24  *A.*  Yes, ma'am.

25  *Q.*  And, in fact, Mr. Pepper, you cared about how a customer

Carl Pepper - Cross

1    might react to a price increase, correct?

2    A.   That size of one, yes, ma'am.

3    Q.   But it wasn't just about losing the sales, was it?  Your

4    concern was not just about losing sales.  It was about the

5    relationship, wasn't it, your relationship with your customers?

6    A.   I mean, I had a good relationship with them, but the

7    biggest thing was to lose the sales for Tyson Foods.

8    Q.   Right.  But for you, it's not just about -- you cared about

9    your customers.

10   A.   Yes, ma'am.

11   Q.   You cared about what they would think of you, right?

12   A.   Well, yes, ma'am.

13   Q.   And so -- and you know that other Tyson salespeople cared

14   about how the customer might react to a price increase,

15   correct?

16   A.   Yes, ma'am.

17   Q.   And you testified earlier that when Tyson was considering a

18   price increase, it would give you comfort to get an

19   understanding of about where the nature of the marketplace was

20   at the time concerning pricing.  Do you remember testifying to

21   that?  It's a yes or no.  Do you remember testifying to that?

22   And I could repeat it if you like.

23   A.   Yes, ma'am.

24   Q.   So you recall that.  You recall testifying to that, or do

25   you want me to repeat it to you?

Carl Pepper - Cross

1    A.  Please repeat that again.

2    Q.  Okay.  So you testified earlier that when Tyson was

3    considering a price increase, it would give you comfort to get

4    an understanding about where the nature of the marketplace was

5    at the time concerning pricing.  Do you recall testifying to

6    that last week?

7    A.  I recall testifying that --

8    Q.  Just the question is, do you recall testifying about

9    wanting to have comfort knowing about -- through knowing what

10   the marketplace was doing?

11   A.  Yes, ma'am.

12   Q.  And so, in fact, it would provide you comfort if you had an

13   understanding about where the market was.  It would comfort you

14   to know that Tyson was not out of line, correct?

15   A.  Yes, ma'am.

16   Q.  And it would be -- provide you comfort to know that Tyson

17   was in the same ballpark as the rest of the market.  That would

18   provide you comfort, right?

19   A.  Yes, ma'am.

20   Q.  And it could alleviate concern or provide comfort if you

21   were going to learn that the price increase that the Tyson

22   pricing team was going for with that contract was not

23   completely out of line with what the market was doing.

24   A.  Ask that again, please.

25   Q.  It would provide comfort or alleviate concern if you were

Carl Pepper - Cross

1   to learn that the pricing increase that the Tyson pricing team

2   was going for was not completely out of line with what the rest

3   of the market was doing.

4   A.  Yes, ma'am.

5   Q.  Now, you testified about conversations you had with other

6   suppliers about that KFC 2018 contract, correct?

7   A.  Yes, ma'am.

8          MS. SWEENEY:  Objection, misstates testimony.  I

9   believe she said 2018 contract.

10   BY MS. PREWITT:

11   Q.  I apologize.  I meant to say 2015 to 2018.

12          THE COURT:  I will have her restate.

13          MS. PREWITT:  Thank you, Ms. Sweeney.

14   BY MS. PREWITT:

15   Q.  I am going to move to the topic of your discussion with

16   other competitors relating to that -- other suppliers relating

17   to that contract, okay?

18   A.  Okay.

19   Q.  You testified about those conversations with those other

20   suppliers relating to that 2015 to 2018 contract, right?

21   A.  Yes, ma'am, '17.

22   Q.  2015 to 2018.

23   A.  Yes, ma'am.

24   Q.  Thank you.  So we are on the same page.

25   A.  Yes, ma'am.

Carl Pepper - Cross

1    Q.  Okay.  So you testified that you talked to some of the

2    suppliers to see if they had basically heard or if they were

3    looking to also have a substantial price increase for the 2015

4    contract.  Do you recall that?

5    A.  Yes, ma'am.

6    Q.  And you were asked by Ms. Sweeney about your reasons for

7    talking to them, right?  Do you recall she asked you about your

8    reasons?

9    A.  Yes, ma'am.

10   Q.  Okay.  And then what you testified is:  It was that I

11   knew -- it was that I knew what Tyson's foods contract was

12   going to be pricing-wise, and I talked to those three because I

13   could -- to see if they were basically hearing if there was

14   going to be a substantial price increase on that price.

15        Does that sound about right?

16   A.  Yes, ma'am.

17   Q.  And you had testified you heard a rumor that other

18   suppliers were considering also raising prices vis-a-vis that

19   contract from 2014 on to the new contract in 2015?

20   A.  Yes, ma'am.

21   Q.  And it would provide you comfort to confirm that they were

22   actually true, correct?

23   A.  Yes, ma'am.

24   Q.  Okay.  Now, I want to move forward a little bit -- or

25   actually backward, however you -- you testified that

Carl Pepper - Cross

1   Mr. Mulrenin had asked you to confirm that other suppliers were

2   also looking for a price increase after that Cullen meeting.

3   Do you remember that?

4   A.   Yes, ma'am.

5   Q.   And you testified that after the meeting Tim asked me to

6   talk to some of the people that I knew to see if they were

7   considering doing the same thing.  Does that sound right to

8   you?

9   A.   Yes, ma'am.

10  Q.   And you testified:  He just asked me to see if those

11  companies were talking about if they were considering a

12  substantial price increase also.

13         Do you remember that?

14  A.   Yes, ma'am.

15  Q.   And then you were asked by Ms. Sweeney why you made those

16  calls to those three individuals.  And you testified that there

17  was reason to see if they were considering doing a substantial

18  price increase for the upcoming RSCS contract.  Do you remember

19  that?

20  A.   Yes, ma'am.

21  Q.   Okay.  So the Tyson sales team was looking for comfort that

22  its pricing team was not going to be the -- make Tyson the only

23  supplier to quote a substantial price increase to KFC, right?

24  A.   Yes, ma'am.

25  Q.   And you testified that from your contacts at George's,

Carl Pepper - Cross

1    Pilgrim's, and Claxton, you gained an understanding that Tyson

2    would not be the only supplier quoting a substantial price

3    increase, correct?

4    A.  Yes, ma'am.

5    Q.  But you did not talk about Tyson's actual price or even

6    Tyson's price range, did you?

7    A.  Correct.

8         MS. PREWITT:  That's all I have for this witness, Your

9    Honor.

10        THE COURT:  Thank you very much, Ms. Prewitt.

11        Mr. Feldberg.

12        MR. FELDBERG:  Thank you, Your Honor.

13                        **CROSS-EXAMINATION**

14   BY MR. FELDBERG:

15   Q.  Mr. Pepper, I am Michael Feldberg.  I represent

16   Roger Austin.

17        In your interviews with the prosecutors and agents,

18   you told them, did you not, that there were very few times that

19   you talked to Roger Austin except at food shows?

20   A.  Yes, sir, that or a golf tournament, stuff like that, yes,

21   sir.

22   Q.  Now, I would like to invite your attention to the summer of

23   2014, okay?  Your phone records are in evidence here, and we

24   can show them to you if you need them to refresh your

25   recollection.  But would you accept my representation that on

Carl Pepper - Cross

1  July 8th, 2014, you called Roger Austin and spoke for 4 minutes

2  and 45 seconds?

3  A.  If you say so.  I don't remember, yeah.

4  Q.  Would you accept my representation that your phone records

5  show that?

6  A.  If you can show them to me, yeah.

7  Q.  Would you accept my representation that, I am sorry,

8  Mr. Austin's phone records show that?

9  A.  No, sir.

10  Q.  You have no reason to doubt that, do you?

11  A.  No, sir.

12  Q.  You don't recall what that 4-minute-and-45-second phone

13  call on July 8, 2014 was about, do you?

14  A.  No, sir.

15        MR. FELDBERG:  Could we call up, not for the jury,

16  Defense Exhibit I-932?

17        THE COURT:  Their monitor is not working,

18  Mr. Feldberg.

19  BY MR. FELDBERG:

20  Q.  Do you see Exhibit I-932, Mr. Pepper?

21  A.  Yes, sir.

22  Q.  That's an e-mail from you to Mr. Austin on July 8, 2014,

23  correct?

24  A.  Yes, sir.

25        MR. FELDBERG:  Your Honor, we would offer I-932.

1680

Carl Pepper - Cross

1    THE COURT:  Any objection to the admission of I-932?

2    MS. SWEENEY:  Yes, Your Honor, on two grounds:  First,

3    it's hearsay; and relevance with regard to Mr. Pepper's

4    testimony.

5    MR. FELDBERG:  Your Honor, it's an e-mail from the

6    witness who is on the stand.

7    THE COURT:  One moment, Mr. Feldberg.

8    Objection is overruled.  I-932 is admitted.

9    MR. FELDBERG:  And could we call up, please, Defense

10   Exhibit I-933?

11   BY MR. FELDBERG:

12   Q.  Mr. Pepper, this is an e-mail exchange between you and

13   Mr. Austin on July 8th, 2014, correct?

14   A.  Yes, sir.

15   MR. FELDBERG:  Your Honor, we would offer the portions

16   of this e-mail that were written by Mr. Pepper -- portions of

17   this e-mail string, excuse me.

18   THE COURT:  If we could scroll down to the bottom of

19   that.  I am just seeing it on the screen.  Now if we could

20   scroll back up.

21   Okay.  Any objection to those portions of I-933 that

22   just contain Mr. Pepper's e-mails?

23   MS. SWEENEY:  Only to relevance to Mr. Pepper's prior

24   testimony, but no other objection.

25   THE COURT:  Then as redacted, I-993 will be admitted.

Carl Pepper - Cross

1        MR. FELDBERG:  Could we publish I-932 to the jury,

2   please, Your Honor?

3        THE COURT:  You may.

4   BY MR. FELDBERG:

5   Q.  Mr. Pepper, would it be fair to say, sir, that your

6   conversation with Roger Austin on July 8th, 2014 was about

7   covering a short?

8   A.  Yes, sir.

9   Q.  And in I-932 you advise various people in the middle e-mail

10  the amount of -- the number of cases that are going to be

11  involved in covering the short?

12  A.  Yes, sir.

13  Q.  The billing weight of those cases?

14  A.  Yes, sir.

15  Q.  The total weight of the coverage?

16  A.  Yes, sir.

17  Q.  The product?

18  A.  Yes, sir.

19  Q.  And the price, correct?

20  A.  Yes, sir.

21        MR. FELDBERG:  Then could we publish, please, to the

22  jury the portion of I-933 that's been admitted?

23        THE COURT:  You may.

24  BY MR. FELDBERG:

25  Q.  In 933, Mr. Pepper, also on July 8th, 2014, you thank

Carl Pepper - Cross

1    Mr. Austin for the help, correct?

2    A.   Yes, sir.

3    Q.   Now, Mr. Pepper, I am going to represent to you, and please

4    feel free to disagree with me if you think I'm wrong, that on

5    July 9th, 2014, the next day, you called Mr. Austin for a total

6    of 23 seconds and Mr. Austin called you back an hour or so

7    later for a total of 35 seconds.  Will you accept my

8    representation as to that?

9    A.   Yes, sir.

10   Q.   And, sir, will you accept my representation that there are

11   no other phone calls between you and Mr. Austin in the entire

12   summer of 2014?

13   A.   Yeah, like I said, I didn't talk to Roger Austin that many

14   times.

15   Q.   Do you have any reason to doubt that other than the three

16   calls we've mentioned on July 8th and 9th, there are no other

17   phone calls between you and Mr. Austin in the summer of 2014?

18   A.   Not that I remember.

19   Q.   Thank you.

20        MR. FELDBERG:  No further questions for this witness,

21   Your Honor.

22        THE COURT:  Thank you, Mr. Feldberg.

23        Ms. Johnson.

24        MS. JOHNSON:  Thank you, Your Honor.

25                      **CROSS-EXAMINATION**

Carl Pepper - Cross

1    *BY MS. JOHNSON:*

2    *Q.*  Mr. Pepper, my name is Wendy Johnson, and I represent

3    Ric Blake.

4    *A.*  Yes, ma'am.

5    *Q.*  You know Mr. Blake, right?

6    *A.*  Yes, ma'am.

7    *Q.*  You have known him for a long time?

8    *A.*  Yes, ma'am.

9    *Q.*  We all live in the same area, don't we?

10   *A.*  Yes, ma'am.

11   *Q.*  And he considered you a friend at one point, didn't he?

12   *A.*  Yes, ma'am.

13   *Q.*  You knew Mr. Blake to be a sales guy from George's, right?

14   *A.*  Yes, ma'am.

15   *Q.*  And during the years that you have been testifying about

16   between 2012 and 2018, Mr. Blake held titles of sales manager

17   or director of national accounts, right?

18   *A.*  I never really knew his title, but, yes, ma'am.

19   *Q.*  And that was your position at Tyson, right, those same

20   years, a sales guy?

21   *A.*  A sales guy, yes, ma'am.

22   *Q.*  You never knew Mr. Blake to make the decisions as to what

23   George's charged for their chicken, did you?

24   *A.*  I can't answer that.  I don't know.

25   *Q.*  Did you ever see a contract signed by Mr. Blake?

Carl Pepper - Cross

1   A.  Well, I never really seen one of their contracts, so ...

2   Q.  Okay.  You didn't make those decisions for Tyson either,

3   did you?

4   A.  No, ma'am.

5   Q.  Did you know Darrell Keck?

6   A.  Who?

7   Q.  Darrell Keck.

8   A.  No.  If I do, I don't remember him.

9   Q.  What about Brian Coan?

10  A.  Yes, ma'am.

11  Q.  He was Mr. Blake's boss, wasn't he?

12  A.  Yes, ma'am.

13  Q.  And Mr. Coan's boss was Charles George.  You know

14  Mr. George, right, and his brother, his twin brother, Carl?

15  A.  Yes, ma'am.

16  Q.  And their father, Gary George?

17  A.  I've met him, yes, ma'am.

18  Q.  They are the owners of the company, are they not?

19  A.  Yes, ma'am.

20  Q.  Do you know them to make the ultimate pricing decisions?

21  A.  I have no idea.  I have never been around them to do it,

22  so ...

23  Q.  You have discussed it in your testimony last week and also

24  with Ms. Prewitt, but you knew and understood that the pricing

25  unit at Tyson made those decisions, right?

Carl Pepper - Cross

1    *A.*  Yes, ma'am.

2    *Q.*  And you are not a part of that unit.

3    *A.*  No, ma'am.

4    *Q.*  Have you ever compared the pricing between Tyson and

5    George's?

6    *A.*  Yes, ma'am.

7    *Q.*  Because if you had, you would be aware that George's

8    contract prices have been lower than Tyson's for every single

9    year of this alleged conspiracy.  You know that, don't you?

10   *A.*  I don't remember, but a lot of times I believe they were.

11   I just don't remember.

12   *Q.*  But you did just testify that you had compared them, right?

13   *A.*  Yes, ma'am, if I received them.

14   *Q.*  Right.  And they were lower.  That's fair to say?

15   *A.*  That I can remember to my best knowledge, yes, ma'am.

16   *Q.*  Okay.  Thank you.

17         Would you agree with me that the general pricing

18   information that you've testified about in front of this jury

19   is something akin to shop talk or water cooler or rumors?

20         *MS. SWEENEY:*  Objection as to vague, what pricing

21   information.

22         *THE COURT:*  Overruled.

23   *BY MS. JOHNSON:*

24   *Q.*  You can answer, sir.

25   *A.*  Can you ask that --

Carl Pepper - Cross

1    Q.   Absolutely.

2         Would you agree with me that the general pricing

3    information, the increase in prices that you discussed with the

4    jury last week, that kind of talk between the competitors is

5    akin to shop talk or water cooler talk or rumors?

6    A.   Discussing -- yes, ma'am.

7    Q.   And, in fact, I think you said "rumor" in your direct

8    testimony, didn't you?

9    A.   Yes, ma'am.

10   Q.   And that's fair.

11   A.   Yes, ma'am.

12   Q.   You testified that you talked to Mr. Blake, and I am trying

13   to recollect your testimony from last week, okay?  And you

14   wanted to see if he had basically heard or if they, George's,

15   was looking to also have a substantial price increase.  Do you

16   remember that testimony?

17   A.   Yes, ma'am.

18   Q.   So would you agree with me that you were just trying to see

19   what Mr. Blake had heard?

20   A.   What he heard and what they were going to do, yes, ma'am.

21   Q.   Sure.

22        And then you went on in your testimony, and you said:

23   I talked to those three.  And I believe you were referring to

24   Mr. Brady, Mr. Little, and Mr. Blake.  I talked to those three

25   to see if they were basically hearing if there was going to be

Carl Pepper - Cross

1   a substantial increase.

2   A.  Yes, ma'am.  Yes, ma'am.

3   Q.  You said it that way, sir, because that's the best you

4   could get from Mr. Blake, what he had heard, right?

5   A.  No, ma'am.  I asked basically if it was an understanding --

6   that an understanding that there was going -- that they were

7   going to do a substantial pricing increase.

8   Q.  And I understand, sir, the word "understanding" is

9   important for you to get out, but your testimony last week was

10  that you heard a rumor, and you wanted to see what they had

11  heard.  Would you agree with me?

12  A.  Yes, ma'am.

13  Q.  Mr. Pepper, I know we've gone long, and I have a few

14  questions about the interviews that you had, the meetings that

15  you had with the government, the government lawyers and the

16  government agents, okay?  I am not going to go through all of

17  them, I promise you, but I want to talk about just a few

18  specifics.  So I want to ask you what you recall about those,

19  okay?  If you don't remember, then I can try to refresh your

20  recollection.  That's sort of the process.  I know you are

21  probably used to it by now, but I wanted to tell you where we

22  were going, okay?

23  A.  Yes, ma'am.

24  Q.  Back in July the 9th of 2020, do you remember meeting with

25  the government back then?

Carl Pepper - Cross

1   A.  I don't remember the date.

2   Q.  Okay.  That's fair.  I believe you started meeting with

3   them back in 2019; is that right?

4   A.  Yes, ma'am.

5   Q.  And you met with them throughout the course, through 2020;

6   is that right?

7   A.  Yes, ma'am.

8   Q.  Okay.  And in this meeting -- there were several other

9   meetings, but in this meeting you discussed the 2015 price

10  increase with KFC.  Do you remember discussing that with the

11  government?

12  A.  I remember discussing it.  I can't tell you if it was that

13  exact date.

14  Q.  That's fair.

15        Do you remember telling the government that you

16  thought all of Tyson's competitors were planning to increase

17  prices, but you did not know the actual amount because nobody

18  told you?

19  A.  Yes, ma'am.

20  Q.  And that's what you told the jury here is that you didn't

21  know the exact amount from anyone, right?

22  A.  All I knew was that rumor of 10 cents or greater, that's

23  it.

24  Q.  The rumor?

25  A.  Yes, ma'am.

Carl Pepper - Cross

1    Q.   Sure.

2         And do you remember the government then showing you

3    some phone records?  Have you looked at phone records

4    throughout your interviews?

5    A.   Yes, ma'am.

6    Q.   And this particular phone record was from August 6 of 2014.

7    And in this phone record you called Mr. Blake.  Do you remember

8    discussing this August 6th, 2014 time period?

9    A.   Not specifically, no, ma'am.

10   Q.   Do you remember telling the government that you could not

11   recall if you actually spoke to Mr. Blake?

12   A.   No, I don't remember, because the time log would have told

13   me that, how long the call actually was.

14   Q.   Okay.  We'll come back to that because I think you're

15   absolutely right about that.  But even so, do you remember

16   making the assumption that the call was probably regarding RSCS

17   contracts?

18   A.   Yes, ma'am.

19   Q.   Okay.  So you just assumed that.

20   A.   From the time frame and -- yes, ma'am.

21   Q.   Fast-forward -- we are going to come back to that in just a

22   minute if that's okay.  Fast-forward to February 14th, 2022.

23   Do you remember telling the government that you had these

24   pricing discussions, the ones we have just been talking about,

25   to ensure that Tyson did not lose business due to other

Carl Pepper - Cross

1  companies undercutting them?  Do you remember saying that?

2  A.  Yes, to that extent, yes, ma'am.

3  Q.  So is it fair, sir -- how long have you worked for Tyson?

4  A.  33 years, almost 33 years.

5  Q.  You were trying to protect Tyson.  You were trying to do

6  your best to make Tyson money; is that correct?

7  A.  Well, yes, ma'am.  That's what I was there for.

8  Q.  That's what you were there for, absolutely.  So you were

9  gathering this information to benefit Tyson, correct?

10  A.  Yes, ma'am.

11  Q.  Okay.  Your motive was to ensure Tyson succeeded; is that

12  fair?

13  A.  Yes, ma'am.  Make sure I didn't lose any business or --

14  yes, ma'am.

15  Q.  You wanted to make sure that they did not lose any volume

16  to the other competitors; is that fair?

17  A.  Yes, ma'am.

18  Q.  Sir, would you agree that you were competing with these

19  other competitors?  You were competing.

20  A.  I'm always competing with other competitors.

21  Q.  Precisely.

22       Let's keep going and talk about Church's, August 12th

23  of 2020.  Would you take me at my word that this was another

24  time that you met with the government?

25  A.  Yes, ma'am.

Carl Pepper - Cross

1   Q.  And in that meeting you were shown a couple of more phone

2   calls that you and Mr. Blake had in mid-September of 2014.  Do

3   you have independent recollection of these phone calls?

4   A.  Not specific, no, ma'am.

5   Q.  Exactly.  That is what you told the government, you had no

6   specific recollection of the calls.  Do you remember telling

7   the government that?

8   A.  Yes, yes, ma'am.

9   Q.  To be fair, it was a long time ago, wasn't it, Mr. Pepper?

10  A.  Yes, ma'am.

11  Q.  But then in that same interview, you told the government

12  that these phone calls were most likely regarding the Popeye's

13  or the Church's contracts because those bids were not yet

14  complete.  Do you remember saying something like that?

15  A.  Yes, ma'am.

16  Q.  And then in that same interview you told them that Church's

17  was a customer of yours, but also of Mr. Little's and

18  Mr. Blake's.  Do you remember saying that?

19  A.  I don't remember exactly, but if we were talking about

20  Church's, I would have said that they were suppliers of them,

21  yes, ma'am.

22  Q.  So, Mr. Pepper, did you forget that George's didn't even do

23  business with Church's in 2014?  Had you forgotten that?

24  A.  Yes, ma'am, I probably did.

25  Q.  Well, like I said, it's a long time ago.  But let's walk

Carl Pepper - Cross

1    through this because it's important.  Actually, George's hadn't

2    done business with Church's on their COB contract since 2011,

3    some three years earlier.  Do you now remember that?

4    A.  No, ma'am, I don't.

5    Q.  Okay.  So I am going to show you an exhibit that the

6    government showed you and we talked about in front of this jury

7    last week, Exhibit 9743.

8         MS. JOHNSON:  Your Honor, I believe this has

9    previously been admitted.

10        THE COURT:  Let me check.  Yes, it has been admitted,

11   and you may publish it to the jury.

12        MS. JOHNSON:  Thank you, Your Honor.

13   BY MS. JOHNSON:

14   Q.  Mr. Pepper, do you see this e-mail?

15   A.  Yes, ma'am.

16   Q.  Do you remember talking about it with the government last

17   week?

18   A.  Yes, ma'am.

19   Q.  If you will scroll up a little, sir.  What information did

20   you receive from Ric Blake?

21   A.  That they were going to call Church's and tell them that

22   they were getting out of business.

23   Q.  George's is calling Church's today, September 11, 2011,

24   right?

25   A.  Yes, ma'am.

Carl Pepper - Cross

 1  *Q.*  And telling them they are getting out the end of the year.

 2  *A.*  Yes, ma'am.

 3  *Q.*  And then what?  Ric told me he would call me this afternoon

 4  and let me know how it went.

 5  *A.*  Yes, ma'am.

 6  *Q.*  Do you recall a conversation with Mr. Blake telling you how

 7  it went?

 8  *A.*  No, ma'am.

 9         *MS. JOHNSON:*  Scroll up, please, Mr. Brian.

10  *BY MS. JOHNSON:*

11  *Q.*  It looks like Ric called you and told you how it went,

12  didn't it?

13  *A.*  It is -- he is talking about what the dark meat pricing was

14  going to be, yes, ma'am.

15  *Q.*  Yeah.  So would you agree with me that this was right after

16  the call that you heard that Mr. Blake had with the customer?

17  Right?

18  *A.*  Yes, ma'am.

19  *Q.*  So that information came from the customer, correct?

20  *A.*  No.  I mean, from the customer from Church's?

21  *Q.*  Uh-huh.  Would you agree with me that we've just talked

22  about Ric is going to call the customer.  I'll call you back,

23  Carl, and let you know how it goes.  And that's the

24  information.  It stands to reason it came from that

25  conversation, doesn't it?

1694

Carl Pepper - Cross

1   A.  Well, I don't know if everyone means Church's or everyone

2   meant other poultry suppliers.

3   Q.  Right.

4   A.  If he had that information from other poultry suppliers.  I

5   don't know what he was thinking.

6   Q.  Okay.  If all you knew was everybody is .28 back, .28 back

7   of what, sir?

8   A.  .28 back of eight-piece price.

9   Q.  Is there anywhere that shows or discusses or talks about an

10  eight-piece price?

11  A.  No, ma'am, but that's what that means.

12  Q.  No, I agree.  .28 back of something.

13  A.  Yes, ma'am.  And it means eight-piece.

14  Q.  What I am trying to get at, sir, would you agree with me

15  there is no discussion about the eight-piece price?

16  A.  That's a common knowledge.

17  Q.  I understand.  What I am trying to say is if I tell you I

18  am .28 back, if I am $2 and you're .28 back of $1, we're not

19  the same, are we?

20  A.  No, ma'am.

21  Q.  And if you don't know I'm $2, you don't know what I am .28

22  back of, do you?

23  A.  If you look at it that way, no.

24          THE COURT:  Ms. Johnson, can you look for a convenient

25  breaking spot?

1695

Carl Pepper - Cross

1      *MS. JOHNSON:* I can stop right here, sir.

2      *THE COURT:* Okay. We will go ahead and break for

3  lunch at this time. We will plan on reconvening at 1:30. Keep

4  the admonitions in mind, the yellow juror buttons visible, and

5  the jury is excused for lunch. Thank you.

6      (Jury excused.)

7      *THE COURT:* Mr. Pepper, you're excused for lunch.

8  Thank you.

9      Anything to take up at this time?

10      Ms. Call?

11      *MS. CALL:* Would it be possible to have a technician

12  come over the lunch hour?

13      *THE COURT:* We have got someone to look at that, and I

14  think there may be a monitor among the jury who is out too, so

15  we will hopefully get that problem fixed.

16      Ms. Henry?

17      *MS. HENRY:* Could we know who the next witness is

18  planned?

19      *THE COURT:* Why don't we take up the issue of knowing

20  who the witnesses are. First of all, in response to

21  Ms. Henry's question, can -- the government doesn't have to

22  tell me, but can you let her know if you know who that person

23  is?

24      Second of all, the government filed a motion to compel

25  witness list and also Rule 26.2 statements. Are defendants in

Carl Pepper - Cross                                                1696

1   a position to address that?  If not, that's okay, but the

2   government is going to need to know this.  I mean, the

3   government is a hundred percent right.  My practice standards

4   have a requirement to have a witness list.  That's not just an

5   inflated list of all sorts of people.  If both sides did that,

6   there would be no meaning to it whatsoever.

7        When do the defendants think that they can give the

8   government a realistic witness list?

9        MR. TUBACH:  Your Honor, why don't we discuss it over

10  the lunch break because we can get back to the Court.  We are

11  sitting here at lunch and we don't know who the next witness is

12  from the government because they won't tell us.  They have to

13  have decided by now.

14       MR. KOENIG:  Your Honor, we explained to the

15  defendants last night that the next two witnesses on notice are

16  Agent Koppenhaver and then Ms. Fisher.  We wanted to see the

17  full extent of Mr. Pepper's testimony before we decided whether

18  we would call Agent Koppenhaver immediately after him or

19  reserve him for -- his testimony for rebuttal.  And so we don't

20  know how much longer this is going to go on, but that's

21  basically the best answer I can give you.

22       THE COURT:  Okay.  By the way, how much more do we

23  anticipate?  Any idea with Mr. Pepper?

24       MS. JOHNSON:  Your Honor, I am going to guess I have

25  30 minutes.

Carl Pepper - Cross

1        THE COURT:  How many other crosses do we anticipate?

2        MR. BYRNE:  Your Honor, I have 30 minutes.

3        MR. TUBACH:  If I go more than two minutes, it will be

4    long.

5        MR. LAVINE:  25, 30 minutes, Your Honor.

6        MR. KORNFELD:  No more than 10 minutes, Your Honor.

7        MS. PREWITT:  The defendants did meet over the weekend

8    about the defense witnesses and how we could be efficient, so I

9    don't want the Court to think that we haven't been working on

10   that, that we are not focused on that.

11       THE COURT:  I appreciate it.  Like last trial, the

12   defendants came up with a much pared down witness list.

13       Anything more on the next witness issue?  I think that

14   that should answer the question.

15       All right.  We will be in recess until 1:30, then.

16   Thank you.

17   (Recess at 12:05 p.m. until 1:32 p.m.)

18       THE COURT:  Let's go ahead and get Mr. Pepper.

19       (Jury present.)

20       THE COURT:  Ms. Johnson, go ahead.

21       MS. JOHNSON:  Thank you, Your Honor.

22   BY MS. JOHNSON:

23   Q.  Good afternoon, Mr. Pepper.

24   A.  Good afternoon.

25   Q.  When we left you and I were discussing the Church's RFP.

Carl Pepper - Cross

1   We established that you had forgotten that George's was no

2   longer doing business with Church's.  Do you remember that

3   testimony?

4   A.  Yes, ma'am.

5   Q.  And I showed you an exhibit that Ric Blake had sent you an

6   e-mail telling you just that, that George's was going to not do

7   business with Church's anymore, right?

8   A.  Yes, ma'am.

9   Q.  And he was going to talk to Church's and then call you and

10  let you know how it went, right?

11  A.  Yes, ma'am.

12  Q.  So the information about the .28 back, you don't know where

13  that came from, do you?  You don't know where Mr. Blake got

14  that information, do you?

15  A.  No, ma'am.

16  Q.  Would you agree with me it could have been from the call

17  with Church's?

18  A.  Yes, ma'am, it could have been.

19  Q.  But on this point, just a couple things we do know for

20  certain, okay?  Would you agree with me that you know

21  100 percent for certain that after 2011 George's, the company,

22  was not competing for Church's business?  Correct?

23  A.  Yes.  I just didn't remember.

24  Q.  That's fine.

25          So one other thing that we know for certain is that

Carl Pepper - Cross

 1   when you were talking with the government and you said that

 2   these calls with Ric may have been about the Church's RFP, you

 3   are 100 percent incorrect about that, right?

 4   A.  Yes, ma'am.

 5   Q.  To be fair, you were trying to speculate about what the

 6   calls may have been about, but you were just wrong.  Would you

 7   agree with me?

 8   A.  Definitely on the Church's side, yes, ma'am.

 9   Q.  Thank you, sir.

10        February 2nd you were interviewed by the government

11   again in preparation for your testimony.  That's just a few --

12   a couple weeks ago, right?

13   A.  Yes, ma'am.

14   Q.  And you talked about the 2018 Popeye's COB.  Do you

15   remember talking about that?

16   A.  Yes, ma'am.

17   Q.  And I believe you have actually testified about it already

18   with Ms. Prewitt and even on your direct, the brand X e-mail

19   from Kent Kronauge?

20   A.  Yes, ma'am.

21   Q.  And that's sort of what started the RFP process; is that

22   fair?

23   A.  Yes, ma'am.

24   Q.  And in that e-mail, Mr. Kronauge asked if you, the

25   supplier, and all the other suppliers, quite frankly, would

Carl Pepper - Cross

1    entertain a two-year deal, right?

2    A.  Yes, ma'am.

3    Q.  And that was new for Popeye's, wasn't it?

4    A.  The best I remember, yes, ma'am.

5    Q.  And then in your interview with the government, you told

6    them that you called around on September 6th, 2017, and that

7    you were trying to find out what the other companies were

8    doing, right?

9    A.  Yes, ma'am.

10   Q.  And they showed you some phone records from September 6,

11   2017; is that right?

12   A.  Yes, ma'am.

13   Q.  And it was then you looked at the phone records and you

14   told the government that Ric Blake indicated George's was doing

15   a two-year deal; is that right?

16   A.  Yes, ma'am.

17   Q.  In past interviews you told the government the same thing,

18   that all Ric Blake told you was that George's planned to do a

19   two-year deal, right?

20   A.  Yes, ma'am.

21   Q.  You never discussed specifics, you never discussed price,

22   you never discussed volume; is that right?

23   A.  Correct.

24   Q.  Okay.  Then the government shows you a series of text

25   messages, and I am going to show them to you right now, and

1701

Carl Pepper - Cross

 1  we're going to just walk through them.  They are very short.

 2  We will start with Exhibit 752.

 3          MS. JOHNSON:  Your Honor, I don't know how the Court

 4  wants me to do it.  All these exhibits have been previously

 5  admitted on March 3rd, 752, -53, -54, -55, -56, and -57.

 6          THE COURT:  Let me just check that, and you can

 7  display them in whatever way you want to.

 8          MS. JOHNSON:  Thank you, Your Honor.

 9  BY MS. JOHNSON:

10  Q.  We will start with 752, okay, Mr. Pepper?

11          THE COURT:  Yes, and they have been admitted.

12          MS. JOHNSON:  Thank you, sir.

13  BY MS. JOHNSON:

14  Q.  This is a text from you to Mr. Mulrenin, right?

15  A.  Yes, ma'am.

16  Q.  You with your customers.

17          753?

18  A.  Tim Mulrenin is not my customer.

19  Q.  We can go back one.  I think that's what the text said, I

20  am sorry.

21  A.  Oh, okay.  Excuse me.

22  Q.  I am going too fast.  So do you want to go back and see

23  that?

24  A.  No, I saw it.

25  Q.  Okay.  So the next response is:  Yes.  What's up?

Carl Pepper - Cross

1                Right?

2    A.   Yes, ma'am.

3    Q.   754?  Popeye's proposal is what you told him, right?

4    A.   Yes, ma'am.

5    Q.   755?  Got a general idea what George's is doing; is that

6    correct?

7    A.   Yes, ma'am

8    Q.   756?  You receive an instruction, right?

9    A.   Yes, ma'am.

10   Q.   Okay.  Call Cullen.  And you have told us who Mr. Cullen

11   is.  He was a superior to you.  Is that fair to say?

12   A.   Yes, ma'am.

13   Q.   And then Mr. Mulrenin says:  I will call as soon as I can.

14            And this text is at 3:34:59 p.m.; is that right?

15   A.   Yes, ma'am.

16   Q.   On September 6th?

17   A.   Yes, ma'am.

18   Q.   Okay.  And then the very next one, I think 757, if I have

19   not lost count, about 10 minutes later, what did you write?

20   A.   You want me to read it?

21   Q.   You called Cullen, and you told him you heard what George's

22   was doing; is that right?

23   A.   Yes, ma'am.

24   Q.   And you told him some things about Mar-Jac, but I want to

25   stick with George's.  Is that okay?

Carl Pepper - Cross

 1    A.  Okay.

 2    Q.  Now, when you look at this text series, would it indicate

      to you that you and Mr. Cullen spoke?

 3

 4    A.  Yes, ma'am.

 5    Q.  So, Mr. Pepper, we have taken a look at your phone records

 6    for that day.  They were produced in discovery by the

 7    government, the same records that you were shown from time to

 8    time throughout your interviews.  And I would like to show you

 9    what I have marked as Defendants' Exhibit I-805.

10         MS. JOHNSON:  Your Honor, this is an excerpt from the

11    phone records that have been previously stipulated to and

12    admitted.  May I introduce this and publish to the jury?

13         THE COURT:  Because it's marked as a separate exhibit,

14    let's find out if there is any objection.  Any objection to the

15    admission of I-805?

16         MS. SWEENEY:  No objection.

17         THE COURT:  I-805 will be admitted, and you may

18    display it to the jury.

19         MS. JOHNSON:  Thank you, Your Honor.

20    BY MS. JOHNSON:

21    Q.  Mr. Pepper, I am going to direct your attention -- the far

22    left is the item number.  And if you will look at item

23    No. 103636.  Do you see it?  It's about four or five up from

24    the bottom.

25    A.  1036 -- 63.

Carl Pepper - Cross

1    *Q.*  Do you see that?

2    *A.*  Yes, ma'am.

3    *Q.*  What is the date of this call?

4    *A.*  September 6, 2017.

5    *Q.*  This is shown in UTC time, but if you take four hours off,

6    would you agree with me that that's 15:36?

7    *A.*  Yes, ma'am.

8    *Q.*  Which is 3:36 Eastern time, correct?

9    *A.*  Yes, ma'am.

10   *Q.*  Do you recognize that number, 479-651-8316, as

11   Steve Cullen's?

12   *A.*  No, I don't remember it now.  If I had my phone that I had,

13   I would, because I hadn't called it in four years, five years,

14   but ...

15   *Q.*  I understand.  I can refresh your memory if you would like,

16   or you can take my word that that's Steve Cullen's number.

17   *A.*  I will take your word.

18   *Q.*  We will move on, then.  Thank you.

19        You can see on this same line you spoke for over

20   18 minutes; is that right?

21   *A.*  Yes, ma'am.

22   *Q.*  So if I tell you that this is the only call between you and

23   Mr. Cullen this day, would you agree with me that it probably

24   happened about the same time as this text?

25   *A.*  Yes, ma'am.

Carl Pepper - Cross

1    Q.  That makes sense, fair?

2           Did the government show you this call in relation to

3    these texts?

4    A.  I don't remember -- I mean, I saw all my phone logs.  I

5    just don't remember if I saw -- I believe I saw this, but I

6    don't remember for sure.

7    Q.  Okay.  Let's look now at Exhibit 766.  These are the calls

8    on September 6, the same day that we are discussing.  Can you

9    look at line 1 --

10          MS. JOHNSON:  I am sorry, Your Honor.  I think I got

11   ahead of myself.  This is also an excerpt of phone records, and

12   I believe it's been previously introduced, but if not, we would

13   like to introduce it and publish to the jury.

14          THE COURT:  It has been admitted, and you may publish

15   it.

16          MS. JOHNSON:  My apologies.

17   BY MS. JOHNSON:

18   Q.  So, Mr. Pepper, can you take a look at line 103623.  It's

19   the second from the bottom on the third page.

20   A.  Yes, ma'am.

21   Q.  Do you see that?

22   A.  Yes, ma'am.

23   Q.  Do you recognize that as your number, 479-879-2092?

24   A.  Yes, ma'am.

25   Q.  And do you recognize the other number as a number of

Carl Pepper - Cross

1    Kent Kronauge?

2    A.   I believe so.

3    Q.   Okay.  Now, take a look at this, and I know this is small,

4    and I apologize.  The time is 17:41:16, which converted to

5    Eastern time is 13:41 -- or, excuse me, if you take off for

6    UTC, it's 13:41, which converts to 1:41 Eastern.  Would you

7    agree with me?

8    A.   Yes, ma'am.

9    Q.   Now, let's take a look back.  Remember this time, 1:41,

10   okay?

11   A.   Okay.

12   Q.   Let's take a look back at the text messages, just the first

13   one, Exhibit 752.  You with your customers, remember?

14        What's the time on this call?

15   A.   1:48.

16   Q.   1:48.  It's about seven minutes after 1:41, isn't it?

17        MS. SWEENEY:  Objection, Your Honor.  May we be heard

18   on side bar?

19        THE COURT:  Yes.

20      (At the bench:)

21        THE COURT:  Ms. Sweeney, go ahead.

22        MS. SWEENEY:  Yes, Your Honor.  As has been put into

23   evidence by Mr. Gresch, these text messages and these specific

24   exhibits that were used with Mr. Gresch were processed in UTC.

25   Ms. Johnson is trying to translate the phone records to Eastern

Carl Pepper - Cross

1  time and compare the Eastern time to the UTC time which is on

2  the text messages which is misleading based on the evidence

3  that's already been put before the jury.

4       THE COURT:  Ms. Johnson, response?

5       MS. JOHNSON:  Your Honor, that's exactly what I'm

6  trying to do.  The evidence comes in in various ways.  I don't

7  believe the defense is bound by Mr. Gresch's testimony.  The

8  government put these text messages up, and they asked for the

9  time from this witness.  It's readily apparent and people can

10 understand the conversion from UTC.  And I think it's more than

11 fair, we have one call, one call to Mr. Cullen that matches

12 these texts.  To assume that Mr. Gresch is correct over the

13 obvious evidence in front of the jury is incorrect, and I feel

14 like we are completely entitled to go into this.

15      MR. BYRNE:  Your Honor, this is Mark Byrne.  There was

16 an order that you entered, and unfortunately my copy doesn't

17 have a date, on October 8th where you took judicial notice of

18 UTC time and Daylight Standard Time.  It's dated October 8th,

19 and I think that's relevant to this conversation.

20      THE COURT:  Okay.

21      MR. McLOUGHLIN:  Your Honor, I may be mistaken, but I

22 believe that Ms. Evans might have testified that some of the

23 call records that are included on the government's summary

24 exhibits are records that she converted in a similar manner.  I

25 may be misremembering that, but I think -- I do recall that.

1708

Carl Pepper - Cross

 1          *THE COURT:*  Ms. Sweeney?

 2          *MS. SWEENEY:*  Yes, Your Honor.  The records that

 3    Mr. McLoughlin referred to are not these AT&T records which

 4    specifically say at the top they are in UTC.  They are records

 5    from other telephone companies that do not specify the time

 6    zone.

 7          With regard to Mr. Byrne's comment about the item of

 8    transfer with the judicial notice, that's exactly our point

 9    that the times -- there is testimony that the times on the text

10    messages were processed, and not just generally, but the times

11    on these specific text messages were processed in UTC time.  So

12    using that judicial notice to translate from UTC to Eastern

13    time is what is not happening in this line of questioning.  And

14    so the government believes that it's misleading and presenting

15    evidence to the jury in a misleading way.

16          *THE COURT:*  Well, I think that Ms. Johnson's point was

17    that the jury does not necessarily have to accept Mr. Gresch's

18    testimony.  What's your response to that?

19          *MS. SWEENEY:*  I understand the argument.  I think the

20    only point is just that -- apologies, the Court's brief

21    indulgence -- is that the information -- Mr. Pepper doesn't

22    know how the phone was processed.  He doesn't know the time

23    zone of the text messages and how they were processed.  So our

24    objection would be to the foundation of Mr. Pepper's knowledge

25    of what time -- what the time of the top of the text messages

Carl Pepper - Cross

1    represent.

2        THE COURT:  Okay.  I am going to overrule the

3    objection.  I think that Ms. Johnson can explore this topic,

4    and then on redirect you can go over those points that you

5    mentioned.  Obviously, that would be fair too, all right?

6        MS. SWEENEY:  Thank you.

7        (In open court:)

8        THE COURT:  Go ahead.

9    BY MS. JOHNSON:

10   Q.  So, Mr. Pepper, I believe where we left off was that a

11   Kent Kronauge call happened some seven minutes before this text

12   series.  Would you agree with me?

13   A.  Yes, ma'am.

14   Q.  Actually, you've told the government that you got

15   information, pricing information from Kent Kronauge, haven't

16   you?

17   A.  Yes, ma'am.

18   Q.  Would you agree with me based on what you just saw that you

19   could have gotten the information about George's from

20   Kent Kronauge?

21   A.  I could have, but I don't remember it coming from

22   Kent Kronauge.

23   Q.  You don't?

24   A.  No, ma'am.  I don't remember, no, ma'am.

25   Q.  Actually, do you remember, do you recall telling the

Carl Pepper - Cross

1    government that Kent Kronauge told you all suppliers were doing

2    the two years?

3    A.   He told me that -- he eventually told me that, yes.

4    Q.   So the same information that the government is alleging you

5    got from George's, you got the exact same information from the

6    customer, Kent Kronauge; is that fair?

7    A.   Yeah, I am not sure.  I think it was at a later date.

8    Q.   But it's the same information?

9    A.   Basically, yes, ma'am.

10   Q.   Just a couple more points, sir.

11   A.   Okay.

12   Q.   February 16, 2022, again you are meeting with the

13   government in preparation for your testimony.  You again

14   discuss the 2015 KFC contracts.  Do you remember this?

15   A.   Yes, ma'am, I guess.

16   Q.   They all run together; is that fair?

17   A.   Yes, ma'am.

18   Q.   You were shown a copy of your phone records where you

19   identified you had a call with Mr. Blake on August the 6th,

20   2014.  Do you remember this date?  Do you have any independent

21   recollection of that call?

22   A.   Not the specifics, no, ma'am.

23   Q.   And this was the call that you and I started with,

24   remember, and I told you we would come back to it.

25   A.   Yes, ma'am.

Carl Pepper - Cross

1    Q.  So now we are back to it.  Let's talk about it for just a

2    minute.  In your interview with the government, you said:  This

3    call was to touch base with Mr. Blake and see how George's

4    meeting went with RSCS.

5            That's KFC, Yum.  I mean, there is many names for it,

6    right?

7    A.  Yes, ma'am.

8    Q.  Do you remember saying that and telling the government

9    that?

10   A.  I don't remember the exact words, but, yes, ma'am.

11   Q.  I think the exact words are more along the lines of talked

12   with Blake about how meeting with RSCS went.  Does that sound

13   familiar?

14   A.  Yes, ma'am.

15   Q.  Because as you know, this was around the time that Tyson

16   and George's and other suppliers were having their meetings

17   with RSCS, right?

18   A.  Yes, ma'am.

19   Q.  In fact, Tyson had their meeting on August 5th, correct?

20   A.  Yes, ma'am.

21   Q.  Do you remember what all you and Mr. Blake discussed on

22   that day?  What all did he say during that call?  Do you have

23   any independent recollection?

24   A.  No, ma'am, not specifics, no, ma'am.

25   Q.  But -- go ahead.  I didn't mean to interrupt you.

1712

Carl Pepper - Cross

1  *A.*  It would have been about the KFC -- the contract.  It would

2  have been probably how the meeting went, and I don't -- there

3  could have been a lot of other things, I don't remember, but I

4  am sure of those.

5  *Q.*  But you are sure of those two.

6  *A.*  Yes, ma'am, I am pretty sure.

7  *Q.*  Okay.  Well, let's take a look at Defense Exhibit I-872.

8  And, again, these are similar phone records that you've been

9  shown or I am assuming the government showed you this phone

10 record.

11       *MS. JOHNSON:*  Your Honor, again, this is an excerpt of

12 the phone records that have been stipulated to and admitted.  I

13 don't know if this particular exhibit has been admitted, but we

14 would offer I-872.

15       *THE COURT:*  Any objection to the admission of I-872?

16       *MS. SWEENEY:*  No.

17       *THE COURT:*  I-872 will be admitted.

18       *MS. JOHNSON:*  Your Honor, may we publish to the jury?

19       *THE COURT:*  You may.

20       *MS. JOHNSON:*  Thank you.

21 *BY MS. JOHNSON:*

22 *Q.*  Mr. Pepper, let's look at line 49032.  Do you see that?

23 *A.*  Yes, ma'am.

24 *Q.*  It shows to be 14:01:58?

25 *A.*  Yes, ma'am.

1713
Carl Pepper - Cross

1        *MS. JOHNSON:*  And we may have to zoom back out to

2    where Mr. Pepper can see the headings just briefly, Mr. Brian.

3    *BY MS. JOHNSON:*

4    *Q.*  If you will look at this entire document, you've got the

5    connect date, the seizure time, and then ET, that's the

6    amount -- that's the length of the call.

7    *A.*  Okay.

8    *Q.*  What's the length of this call?

9    *A.*  Eight minutes.

10   *Q.*  Try again.  That's eight seconds?

11   *A.*  Oh, excuse me, eight seconds.

12   *Q.*  Sir, are you asking the jury to believe that you called

13   Ric Blake, you talked about the RSCS meeting, you talked about

14   the contracts and I think your words were maybe some other

15   things in 8 seconds; or is it possible you are misremembering?

16   *A.*  Possibly I guess I misremembered.  You can't talk much in

17   8 seconds.

18   *Q.*  July 21st, 2020, and you've gone over a lot of this with

19   Ms. Prewitt.  This was the 2-cent discount, so I am not going

20   to replow that ground.  I am going to try to move through this

21   quickly.  Is it fair to say that it was Mr. Kronauge who asked

22   everyone to do 2 cents?

23   *A.*  He eventually did, yes.

24   *Q.*  And did you tell the government that the 2 cents came from

25   Mr. Kronauge himself, the customer?

Carl Pepper - Cross

1    *A.*  I don't remember if I told him that at a later date that

2    it -- that Kent eventually told everybody it was going to be

3    2 cents, yes, ma'am.

4    *Q.*  Let me see if these words sound similar to you.  Kronauge

5    asked everyone -- if everyone was able to do a 2-cent-per-pound

6    discount.  Kronauge always made sure the discount was the same

7    across suppliers.

8          Is that something you told the government?

9          *MS. SWEENEY:*  Objection, Your Honor.  I believe this

10   is improper impeaching.  If not, we can have a side bar.  But

11   this is verifying what Mr. Pepper said in interviews, but not

12   what he testified to on direct.

13         *THE COURT:*  Overruled.

14   *BY MS. JOHNSON:*

15   *Q.*  I am going to ask you again.  I am going to ask if these

16   words sound familiar because I asked you if you told the

17   government this and you couldn't remember.  Kronauge asked if

18   everyone was able to do a 2-cent-per-pound discount.  Kronauge

19   always made sure the discount was the same across suppliers.

20         Does that sound familiar?

21   *A.*  Yes, ma'am.

22   *Q.*  Okay.  And is that what you told the government?

23   *A.*  I told them he usually tried to keep it the same across the

24   suppliers.

25   *Q.*  So if everyone did a 2-cent discount, would you agree with

Carl Pepper - Cross

1    me that you were all doing exactly what the customer asked you

2    to do?

3    A.  When he came back and told us that, yes, yes, ma'am.

4    Q.  One more thing.  During this same interview, the government

5    then showed you some phone calls from 3/26 and 3/27 of 2015.

6    And I would like to show you Exhibit 9980.  Do you remember

7    telling the government that on this day you don't remember the

8    specifics, but you believe the calls to Mr. Blake were about

9    the 2-cent discount?  Do you recall saying that to the

10   government?

11   A.  Yeah, yes, ma'am.

12   Q.  Okay.  Are you aware, sir, that similar to the last one,

13   this call was 25 seconds long?

14   A.  Which one are we talking about?

15   Q.  Let me see if I can find it.  I am sorry.  That's more than

16   fair.  Okay, the third one from the bottom -- I apologize,

17   Mr. Pepper, is that your number?

18   A.  Yes, ma'am.

19   Q.  The 479-879-2092?

20   A.  Yes, ma'am.

21   Q.  And the 479-927-7270 is Mr. Ric Blake's office number,

22   correct?

23   A.  I guess.  I don't remember.

24   Q.  Okay.  Well, would you take my word for it that it's his

25   office number?

Carl Pepper - Cross

1    A.   Okay.

2    Q.   Otherwise, we can try to show you -- okay.  We will try to

3    move on.  Are you aware, sir, that Mr. Blake was not in the

4    office that day?

5    A.   No, ma'am.

6    Q.   Because you don't remember specifically talking to him, do

7    you?

8    A.   I guess I don't, no, ma'am.

9    Q.   Would it surprise you to learn Mr. Blake was in Louisville,

10   Kentucky, at an RSCS meeting the exact time of this call?

11   A.   No, ma'am, I wouldn't have any idea.

12   Q.   So, Mr. Pepper, you have told the jury on your direct that

13   you talked to Mr. Blake about Church's contracts, and now we've

14   established that that was not correct; is that right?

15   A.   Yes, ma'am.

16   Q.   You told the jury you talked to Mr. Blake in an 8-second

17   call in which you talked about the contract and how the meeting

18   went, and now we have established that that's not correct.

19             MS. SWEENEY:  Objection, misstates prior testimony.

20   On direct he did not testify about the call.

21             MS. JOHNSON:  If I said direct, Your Honor, I

22   apologize.  His previous testimony.

23             THE COURT:  I think that that was phrased incorrectly.

24   Sustained.

25   BY MS. JOHNSON:

Carl Pepper - Cross

1   Q.  You've told the jury you talked to Mr. Blake, and we've

2   established it was an 8-second phone call; is that right?

3   A.  I guess so, if that was the particular call, yes, ma'am.

4   Q.  Well, I mean, we saw the call.  It was 8 seconds, right?

5   A.  Right.

6   Q.  And that was the call that you told the government you

7   talked about the RSCS meeting and the RSCS contract, right?

8   A.  Okay.  Yes, ma'am.

9   Q.  And we've just talked about a 20-second call to the home

10  office.  And I believe your testimony was you don't know if you

11  talked to him at all, is that right, him being Mr. Blake?

12  A.  Correct.  I hardly remember calling their office.  Okay.

13  Q.  And the most important thing, you've never told this jury

14  one time that Ric Blake shared any specifics about price or

15  volume or anything with you, and you didn't share that with

16  him, did you?

17  A.  Say that again.

18  Q.  You've told the jury with your testimony Ric Blake never

19  shared any specifics related to actual price of George's for

20  contracts, volume, and you never shared that with him, did you?

21  A.  Are you talking about contract for --

22  Q.  Any of them.

23  A.  Oh, no.

24  Q.  No.  And you didn't share any specific information from

25  Tyson's with Ric Blake, did you?

Carl Pepper - Cross

1    *A.*  No, ma'am.

2          *MS. JOHNSON:*  That's all I have.  Thank you, Your

3    Honor.

4          *THE COURT:*  Thank you.

5          Mr. Byrne, go ahead.

6          *MR. BYRNE:*  I have some binders, Your Honor, if I may

7    hand them up through Ms. Grimm.

8          *THE COURT:*  Sure.

9                        **CROSS-EXAMINATION**

10   *BY MR. BYRNE:*

11   *Q.*  Good afternoon, Mr. Pepper.

12   *A.*  Good afternoon.

13   *Q.*  My name is Mark Byrne, and, along with Dennis Canty, we

14   represent Jimmie Little who is sitting right in front of you.

15   *A.*  Yes, sir.

16   *Q.*  So the first thing I want to do is follow up on

17   Ms. Prewitt's discussions about some of the QA charge and some

18   of the monthly pricing for Church's and Tyson.

19          So if I could have -- if you could turn to Tab 3 of

20   your binder, there is a tab in front there.  And if you could

21   look at what's been marked G-422.

22          Do you recognize that e-mail?

23   *A.*  I don't recognize it, no, but I see that it was sent to me,

24   yes, sir.

25   *Q.*  And do you remember that Dean Bradley -- that you sent the

Carl Pepper - Cross

1   Church's pricing for January 2014 to Dean Bradley on

2   December 18th?

3   A.  Yeah, I am usually the one that would send it to him, yes,

4   sir.

5   Q.  Okay.

6          MR. BYRNE:  Your Honor, I don't have G-423.  I believe

7   that's a separate document.  But I have it also in Tab 3.

8   BY MR. BYRNE:

9   Q.  So if you could turn the page, Mr. Pepper, and tell me if

10  that looks familiar.  Is that the Church's January 2014 pricing

11  that you sent to Mr. Bradley?

12  A.  Yes, sir.  That's what the date shows, yes, sir.

13  Q.  And that was on December 18 of 2013, correct?

14  A.  Yes, sir.

15  Q.  And then after about five days, I guess on December 23rd,

16  Dean Bradley responded to you and Mr. Mulrenin, and he said,

17  I'm going with this version, meaning --

18         MS. SWEENEY:  Objection to asking questions about a

19  document not in evidence.

20         THE COURT:  It's also hearsay.  Sustained.

21         MR. BYRNE:  Your Honor, I believe that the parties

22  have an agreement on this.

23         THE COURT:  On which one?

24         MR. BYRNE:  Both of these, Exhibit G-422 and Exhibit

25  G-423, which is the pricing.

1720

Carl Pepper - Cross

1        THE COURT:  All right.

2        MR. BYRNE:  We have an agreement that it's a business

3   record, and there is an order to that effect.

4        THE COURT:  Okay.  Why don't we do them one at a time.

5   Any objection to the admission of G-422?

6        MS. SWEENEY:  Yes, Your Honor, not on the business

7   records grounds, but the foundation grounds.  Mr. Pepper

8   testified he did not recognize or remember this document.

9        THE COURT:  Well, is G-422 being displayed right now?

10        MR. BYRNE:  Not to the jury, I don't think.

11        THE COURT:  Right, no, but just to me.

12        MR. BYRNE:  Yes, it is.

13        THE COURT:  I don't see an exhibit sticker on it.

14        MR. BYRNE:  It's down further, if we scroll down.

15   There we go.  It's in your notebook too.

16        THE COURT:  If there is no objection to it being a

17   business record, then Exhibit G-422 is admitted.

18        MR. BYRNE:  Your Honor, I would also ask that G-433 be

19   admitted.  That's the Church's pricing that was sent along with

20   this.  I believe that's part of the stipulation as well.

21        THE COURT:  Mr. Byrne, is that G-423 or G-433?

22        MR. BYRNE:  G-423.  I am sorry if I misspoke.

23        THE COURT:  Any objection to the admission of G-423?

24        MS. SWEENEY:  No, Your Honor.

25        THE COURT:  That will also be admitted.

Carl Pepper - Cross

1    *BY MR. BYRNE:*

2    *Q.* So that shows Pepper that --

3          *MR. BYRNE:* Could those be published to the jury?  Why

4    don't we start with G-422.

5          *THE COURT:* Yes, it may be.

6          *MR. BYRNE:* Thank you.

7    *BY MR. BYRNE:*

8    *Q.* So you sent -- this shows you sent the pricing over to

9    Dean Bradley on December 18, correct?

10   *A.* Yes, sir.

11   *Q.* And we will get to it in a second, but the pricing is

12   what's in G-423.  And he responded on the 23rd of December:

13   Carl and Tim, you and Mr. Mulrenin, I am going with this

14   version.

15          Correct?

16   *A.* Yes.

17   *Q.* So you sent it on the 18th.  It was kind of pending for

18   five days.  And then he said, I'll go with that.  He had a

19   slight issue, he wanted to take off something, but otherwise

20   that was the Church's pricing for January 14, correct?

21   *A.* Yes, sir.

22          *MR. BYRNE:* If we could quickly display it to the

23   jury, G-423, Your Honor.

24          *THE COURT:* You may.

25          *MR. BYRNE:* Thank you.

1722

Carl Pepper - Cross

 1  *BY MR. BYRNE:*

 2  *Q.*  Mr. Pepper, that's the actual pricing that was attached to

 3  this, correct?

 4  *A.*  Yes, sir.

 5       MR. BYRNE:  Thank you.  We can take both of those

 6  down.

 7  *BY MR. BYRNE:*

 8  *Q.*  So I am going to follow up on a couple of different things

 9  relating to this meeting at RSCS, okay?

10  *A.*  Yes, sir.

11  *Q.*  Now, the meeting, I believe you testified on direct and on

12  cross, was on August 5th of 2014, correct?

13  *A.*  Yes, sir.

14  *Q.*  And that was about -- Tyson was presenting to RSCS the

15  terms of the proposed contract, right?

16  *A.*  Yes, sir.

17  *Q.*  That meeting was in Louisville, Kentucky, correct?

18  *A.*  Yes, sir.

19  *Q.*  And it was at the offices of RSCS, correct?

20  *A.*  Yes, sir.

21  *Q.*  And it was scheduled for 1:00 to 3:00 p.m. in the

22  afternoon, right?  It was a lunch meeting?

23  *A.*  Yes, sir.

24  *Q.*  Now, Louisville, Kentucky, is in the Eastern time zone.  I

25  believe we just established that with Ms. Johnson, correct?

Carl Pepper - Cross

1  A.  Yes, sir.

2  Q.  So during several interviews with the government, you were

3  asked about a phone call that you made to Jimmie Little that

4  same day, August 5th, the same day as the RSCS meeting.  Do you

5  remember being asked about that in the interviews?

6  A.  Yes, sir.

7  Q.  So specifically on July 9th of 2020, you were asked about

8  that interview.  Do you remember that?

9  A.  No, sir.

10  Q.  You don't remember the date, right?

11  A.  Correct.

12  Q.  But you remember being asked about it during the interview,

13  correct?

14  A.  Yes, sir.

15  Q.  So do you remember telling the government that there were

16  discussions with Little about meetings with RSCS and how they

17  reacted to the proposed price increase?  Do you remember that?

18  A.  I believe -- yes, sir.

19  Q.  Okay.  And that you came out of the meeting and immediately

20  called Little to see where Pilgrim's Pride was in the

21  discussions with RSCS.  Do you remember telling the government

22  that during this interview?

23  A.  I remember talking to them and telling them that -- I let

24  Jimmie know how their reaction was and when theirs was going to

25  be, I believe.

Carl Pepper - Cross

1    *Q.*  And that was after the meeting, correct?

2    *A.*  Yes, sir.

3    *Q.*  Because before the meeting it wouldn't make sense to call

4    him.  It would have made sense to call him after the meeting so

5    you could have told him what happened at the meeting, correct?

6    *A.*  Yes, sir.

7    *Q.*  The agents also showed you some phone records, didn't they,

8    during one or more of these interviews to pin down that date?

9    Is that right?

10   *A.*  Yes, sir.

11   *Q.*  Okay.  So if you could look at Tab 8.

12          *MR. BYRNE:*  And if I could have I-815 displayed, but

13   not to the jury, please, at least not as of yet.

14          So, Your Honor, this is an excerpt of the AT&T

15   records, and I believe that these have all been admitted

16   previously.  This is an excerpt, so I would ask that this be

17   admitted into evidence.

18          *THE COURT:*  Any objection to the admission of I-815?

19          *MS. SWEENEY:*  No objection.

20          *THE COURT:*  I-815 will be admitted.

21          *MR. BYRNE:*  Can we publish that to the jury, please?

22          *THE COURT:*  Yes.

23          *MR. BYRNE:*  Thank you very much.

24   *BY MR. BYRNE:*

25   *Q.*  Now, do you remember being -- can you take a look at this

Carl Pepper - Cross

1  quickly, at least the first page is what I am referring to

2  right now, and tell me if you remember looking at this during

3  your interview, something similar to this.

4  A.  Yes, sir.

5  Q.  So let's look at this document.  If you could look at -- up

6  at the top there are these columns that Ms. Johnson was just

7  asking you about.  And there is an item number, and that's the

8  far left column.  And then there is a date in the next column.

9  And then there is this UTC time that we've been talking about,

10  correct?

11  A.  Yes, sir.

12  Q.  Okay.  So if you look down toward the bottom, three from

13  the bottom, in fact, look at item No. 48997.  Do you see that?

14  A.  Yes, sir.

15  Q.  Do you see the date 8/05/14?

16  A.  Yes, sir.

17  Q.  That's the date we are talking about, right?  That's the

18  RSCS meeting in Kentucky, that date, right?

19  A.  Yes, sir.

20  Q.  And that shows 13:11:30 as the time of the connection, the

21  time when the call was initiated, correct?

22  A.  Yes, sir.

23  Q.  Okay.  And these are your phone records, so you made the

24  call at that time, correct?

25  A.  Yes, sir.

Carl Pepper - Cross

1   Q.   Okay.  If you follow that along, it shows your number,

2   that's your 479 number, correct?

3   A.   Yes, sir.

4   Q.   And then it shows the 214 number that you called, and

5   that's Jimmie Little's number, correct?

6   A.   Yes, sir.

7   Q.   Okay.  Now, if you look right below that, there is another

8   line, 48998 -- maybe I need glasses -- and that looks like it's

9   the same time.  You see that?

10  A.   Yes, sir.

11  Q.   So I think that that's probably a -- duplicative, and

12  that's what they told you in the interview, correct?

13  A.   Yes, sir.

14  Q.   It's a dup.  Okay.

15       Now, the ET, so another column over after the seizure

16  time is the time of the call, correct, the estimated time of

17  the call?

18  A.   Yes, sir.

19  Q.   And so one of them shows 7 minutes, 52 seconds; the other

20  shows 7:53, correct?

21  A.   Yes, sir.

22  Q.   So it's either 7:52 or 7:53, the duration of the call?

23  A.   Yes, sir.

24  Q.   Was that a long joke by Mr. Little?

25  A.   There could have been one in there, I don't know.

Carl Pepper - Cross

1    *Q.* Did he tell long jokes, short jokes?

2    *A.* All kinds of jokes.

3    *Q.* Were they funny at least?

4    *A.* Yeah, usually.

5    *Q.* Oh, good.

6         Okay.  Now, UTC time we have just established or we

7    can establish, and I can ask the Court to take judicial notice

8    of the fact that during Daylight Savings Time, which is when

9    August is, UTC time is four hours from Eastern time.  Will you

10   accept that representation?

11        *MR. BYRNE:*  Your Honor, I think I would actually like

12   to ask the Court to take judicial notice of that.  On Tab 7, I

13   believe, in the binder is the Court's order concerning judicial

14   notice of UTC time and Daylight Savings Time and then how that

15   interacts with the different time zones.  And maybe I could

16   refer the Court to page 3 of its order.

17        *THE COURT:*  Page 2?  Maybe it's in paragraph 3.

18        *MR. BYRNE:*  Yeah, paragraph 3 on page 3, if I could

19   ask the Court -- or I could read that, it depends on how the

20   Court wants to do it, obviously.

21        *THE COURT:*  My suggestion, Mr. Byrne, obviously you

22   wouldn't have it prepared right now, but I would suggest that

23   we put the three paragraphs of that order into an exhibit, and

24   then we can mark it and simply have it available for the jury's

25   use during deliberations.  But the part that you're interested

Carl Pepper - Cross

1    in right now is on paragraph 3 of page 3; is that correct?

2           *MR. BYRNE:*  Yes, it is.  It's the fact that during

3    Daylight Savings Time, Eastern Daylight Time is four hours

4    behind UTC time.

5           *THE COURT:*  Yes.  And ladies and gentlemen, part of

6    that particular order that I entered taking judicial notice

7    indicates that during Daylight Savings Time, Eastern Daylight

8    Time was four hours behind UTC.

9           *MR. BYRNE:*  Thank you, Your Honor.

10   *BY MR. BYRNE:*

11   *Q.*  So, Mr. Pepper, so my math is not good, but 13:11, is that

12   what I said, 13:11 minus 4 would be 9:11, correct?

13   *A.*  Yes, sir.

14   *Q.*  So that would be 9:11 in the morning Eastern time, correct?

15   *A.*  Yes, ma'am -- yes, sir.

16   *Q.*  So the 7-minute-and-something-second phone call with

17   Mr. Little that you told the agents and the government and some

18   of the lawyers sitting here today was about what happened at

19   the RSCS meeting which hadn't happened yet, that was wrong,

20   correct?

21   *A.*  If that's the way -- Eastern time, yes.

22   *Q.*  Okay.  Now, you told the government that and the agents

23   that in another interview, didn't you, the same thing, that the

24   call was after the RSCS meeting, and you briefed Jimmie Little

25   on what happened during the RSCS meeting.  You told them that

Carl Pepper - Cross

1   again in an interview on February 16th, less than a week before

2   this trial started, correct?

3   A.   I guess so, yes, sir.

4   Q.   And they showed you the same phone record, and you looked

5   at it and you said, Yup, that call was after the RSCS meeting,

6   and it was to brief Jimmie Little, correct?

7   A.   Yes, sir.

8   Q.   Okay.  And the government never corrected you that you had

9   it wrong, right?

10  A.   No, sir.

11  Q.   So maybe this is obvious, but that call could not have been

12  about the RSCS reaction to the Tyson proposal because the call

13  happened before the meeting, correct?

14  A.   Yes, sir.

15  Q.   Okay.  I am going to switch topics slightly.

16        So you had some communications over the years with

17  Church's about spoilage issues.  Do you remember those?

18  A.   Not exactly when, but, yeah, I've had some.

19  Q.   There were some communications with Church's?

20  A.   Yes, sir.

21  Q.   If I am saying "spoilage issues," what do you understand

22  that to mean?

23  A.   That the product is not good enough to -- you could not use

24  it for cooking.

25  Q.   For cooking, okay.  And what are the various things that

Carl Pepper - Cross

1    cause spoilage?  Is it because, for example, it's too old; it's

2    not fresh?

3    A.  Yes, sir.

4    Q.  What about if it's torn or something like that?  Is that a

5    spoilage issue?

6    A.  No, sir.

7    Q.  No.  Okay.  So just if it's not fresh, is that the only

8    thing?

9    A.  It's not fresh or it's spoiled, say, in the cooler and out

10   of date, product got hot somewhere along the line.  Those are

11   mainly the things that are going to cause it.

12   Q.  Now, do you remember an individual named Rodrigo Santibanez

13   from Church's?  Does that ring a bell?

14   A.  No, sir.

15   Q.  Okay.  Let me show you in Tab 5 -- if you could turn to

16   Tab 5, an exhibit marked I-812.

17        MR. BYRNE:  If I could bring that up but not to the

18   jury, Your Honor.

19   BY MR. BYRNE:

20   Q.  Can you take a look at that and see if that refreshes your

21   recollection about whether you remember Rodrigo Santibanez

22   Rivera?

23   A.  I recognize the name, but like I said, did she tell me his

24   name?  I wouldn't remember his name.  But seeing this in the

25   e-mail, yes, sir.

Carl Pepper - Cross

1    Q.  So does that refresh your recollection that he was the

2    director of quality assurance at Church's?

3    A.  Yes, sir.

4    Q.  And that was in the August of '14 time period, correct?

5    A.  Yes, sir.

6    Q.  Okay.  Does this refresh your recollection that he actually

7    sent you an e-mail about a spoilage credit that Church's was

8    trying to get from Tyson?

9    A.  Reading it, yes, sir.

10   Q.  Okay.  And this is an e-mail that he sent to you, correct?

11   A.  Yes, sir.

12   Q.  Okay.

13        MR. BYRNE:  Your Honor, I would ask that I-812 be

14   offered and admitted into evidence.

15        THE COURT:  Any objection to the admission of I-812?

16        MS. SWEENEY:  Yes, Your Honor.  It's hearsay.

17        THE COURT:  Response?

18        MR. BYRNE:  We are not offering it for the truth.  We

19   are not offering it to show the spoilage.  We are offering it

20   to show the effect on the listener, because what happened next

21   is this is the basis for the conversation that Mr. Pepper and

22   Mr. Little had because Mr. Little got the exact same e-mail

23   from Mr. Santibanez the same day.  Then they had a conversation

24   about it the next morning, which is the conversation we just

25   discussed.

Carl Pepper - Cross

1    THE COURT:  Well, I haven't heard of that yet, so

2  objection sustained.

3  BY MR. BYRNE:

4  Q.  Do you know, Mr. Pepper, whether Mr. Little received a

5  similar e-mail from Mr. Santibanez?

6  A.  I don't remember, but -- I don't remember that, no, sir.

7  Q.  Do you remember having a conversation with Mr. Little about

8  this issue?

9  A.  I don't know -- I remember having a conversation with

10  Mr. Little before about some spoilages with Church's.  I just

11  don't remember exactly which one it is.

12  Q.  Okay.  Can you please look at Tab No. 6?

13    MR. BYRNE:  And if I could show it to everyone but the

14  jury, Exhibit I-817.

15  BY MR. BYRNE:

16  Q.  Does that refresh your recollection that Mr. Little

17  received a similar e-mail from Mr. Santibanez?  Can you look at

18  that?

19  A.  I can look at that and I can recognize it, but I can't tell

20  you I remember it from every e-mail that I have gotten in 33

21  years, no, sir.

22  Q.  Okay.  If you look at the top, this shows, in fact, that

23  this e-mail was forwarded to you by Mr. Little, correct?

24  A.  Yes, sir.

25  Q.  Okay.

Carl Pepper - Cross

1      MR. BYRNE:  Your Honor, I would offer I-817 to show

2  effect on the listener, not hearsay, because, in fact, what

3  Mr. Pepper did was forward this e-mail to Mr. Little right

4  after they had that phone call.

5      THE COURT:  Any objection to the admission of I-817?

6      MS. SWEENEY:  Yes, Your Honor.  It's hearsay, not only

7  are the statements from Mr. Santibanez, but also from

8  Mr. Little.

9      MR. BYRNE:  Your Honor, they are not offered for the

10 truth.

11     THE COURT:  Objection is sustained.  Mr. Pepper

12 doesn't remember this e-mail.  Therefore, it can't show any

13 effect on him.

14 BY MR. BYRNE:

15 Q.  Mr. Pepper, do you have any reason to believe that you did

16 not receive this e-mail?

17 A.  No, I don't have any reason to not believe it.  It's just I

18 don't remember it.

19 Q.  So that's your e-mail address at the top?  I am referring

20 now to I-817, correct?

21 A.  Yes, sir.

22 Q.  Okay.  That's your e-mail address at the top that you send

23 that -- or Jimmie Little sends that to you.  Do you see that?

24 A.  Yes, sir.

25 Q.  And your e-mails as far as you know were kept in the normal

Carl Pepper - Cross

1    course of business at Tyson?

2    A.   What do you call "normal"?

3    Q.   Well, that's a good question, I suppose.  All the e-mails

4    are regularly maintained by Tyson.  Nobody destroys them, so

5    they don't get lost or anything.  Is that your understanding?

6    A.   My understanding is I would keep my e-mails in certain

7    folders for a period of time, and then eventually I would

8    probably delete them.

9    Q.   Okay.  Do you see at the bottom right of I-817, do you see

10   that TY dash and a whole bunch of numbers?

11   A.   Yes.

12   Q.   Is that how you keep your e-mails?  Do you put a little

13   stamp on there and everything?  So to the extent that this

14   e-mail is produced, do you remember producing this e-mail to

15   the government?

16   A.   No, sir.

17   Q.   So can we assume that Tyson produced this e-mail to the

18   government?

19   A.   I guess, yes, sir, I guess so.

20   Q.   So does that suggest to you that Tyson kept your e-mails in

21   addition to you in the normal course of business?

22        MS. SWEENEY:  Objection, basis, foundation.

23        THE COURT:  Sustained.  He said, "I guess so."

24   BY MR. BYRNE:

25   Q.   Is it your understanding that Tyson keeps all of your

Carl Pepper - Cross

1    e-mails in the regular course of business?

2    A.  They keep everybody's, I guess, yes, sir.

3    Q.  Okay.  Do you guess or do you know that?

4    A.  I probably know it from everything that's gone on over the

5    last three, four years, you know, that they keep -- I guess

6    they keep everybody's e-mails.

7        MS. SWEENEY:  Objection as to foundation basis and

8    what Tyson --

9        THE COURT:  Overruled.  He answered the question.

10        MR. BYRNE:  Your Honor, if I am not going to be able

11    to introduce the entire exhibit, I-817, then I would like to

12    introduce just the top portion and redact the bottom portion.

13        THE COURT:  When you say "top portion," the very top

14    header information?

15        MR. BYRNE:  Well, it would be -- it would show from

16    Jimmie Little to Carl Pepper.  It would show the date, and then

17    it would be "begin forwarded message."  That's the top e-mail,

18    I believe.  Then also the "from Jimmie Little to Rodrigo" --

19    no, not that part.  I am sorry.

20        THE COURT:  Okay.  As redacted, then, any objection to

21    the admission of I-817?

22        MS. SWEENEY:  Yes, just on the same foundation grounds

23    that the witness does not recall the message.

24        THE COURT:  Response?

25        MR. BYRNE:  Well, this is effect on the listener, and

Carl Pepper - Cross

1   it ties into his phone call.  This happened about three minutes

2   before the phone call with Mr. Little.

3         THE COURT:  It's not a business record.  E-mails are

4   hardly ever business records, and this is not a business

5   record.  For that reason alone, sustained.

6         MR. BYRNE:  What about for effect on the listener,

7   Your Honor?

8         THE COURT:  Well, there is no foundation for it

9   because the witness doesn't remember it.  It's also not

10  authentic.

11  BY MR. BYRNE:

12  Q.  So, Mr. Pepper, do you remember that you had a phone call

13  with Mr. Little the morning of August 5th at 9:11, the phone

14  call reflected on these phone records that lasted 7 minutes and

15  30-something seconds about the Church's spoilage issue?

16  A.  No, sir, I don't remember the specific call.  But from the

17  records, I see.

18  Q.  But we know it wasn't about the RSCS meeting because this

19  call happened before that, correct?

20  A.  As part of the RSCS -- okay, this thing would not have

21  lasted seven minutes and something to talk about a Church's

22  spoilage.  It could have been a conversation about us going to

23  have our -- having our RSCS meeting, and I was explaining

24  telling Jimmie at that time that we were going to have -- we

25  were going to have our RSCS meeting with them that day, because

Carl Pepper - Cross

1   this would not take almost eight minutes of discussion.

2   *Q.*  I thought you said Jimmie Little told long jokes.  Okay.

3   Let's go back, then.

4          *MR. McLOUGHLIN:*  Your Honor, I have an objection and

5   move to strike the witness' answer because he is saying I could

6   have done this.  It is pure speculation.

7          *THE COURT:*  The request will be denied.

8          *MR. BYRNE:*  I am sorry, what?

9          *THE COURT:*  Mr. McLoughlin's request was denied.

10         *MR. BYRNE:*  Okay.

11  *BY MR. BYRNE:*

12  *Q.*  So let's go back, then, real quickly.  Mr. Pepper, I don't

13  want to belabor this, but I believe you already testified that

14  this call was not about the RSCS meeting and what happened

15  because it happened beforehand, correct?

16  *A.*  Yeah.  This call was before the meeting, yes, sir.

17  *Q.*  Right.  Okay.  Can you direct your attention to Tab 13?

18         *MR. BYRNE:*  If that could be shown to everybody but

19  the jury.  That's I-667.

20  *BY MR. BYRNE:*

21  *Q.*  And that's an interview that you had with the government on

22  February 16 of 2022, just a week before the trial started.  Do

23  you remember having an interview on that date?

24         *MS. SWEENEY:*  Objection to showing this document to

25  the witness.  He hasn't been asked to refresh his recollection,

1738

Carl Pepper - Cross

1  and I don't imagine that counsel is moving to admit this

2  document.

3          THE COURT:  We will see what the question is about it.

4  Overruled.

5  BY MR. BYRNE:

6  Q.  So without looking at that, you told the agents on that day

7  that the call that we're talking about was regarding a

8  substantial -- RSCS reaction to the substantial price increase,

9  correct?

10  A.  I don't remember -- that call at 9:00 o'clock?

11  Q.  I am asking what you told the agents now about the call

12  during the interview.  And if you said you don't remember, then

13  I would direct your attention to page 3 of the exhibit that I

14  just showed you, I-667, and about maybe just below halfway on

15  the bottom.

16          THE COURT:  What page, Mr. Byrne?

17          MR. BYRNE:  Page 3.  I am sorry, yeah, they are not

18  numbered.

19  A.  I don't know which one you are talking about.

20  BY MR. BYRNE:

21  Q.  Can you read the section that states:  Pulled up Bates

22  ATT-ATR001- and just read the last couple lines to yourself.

23  A.  Oh, just read it?

24  Q.  Read it to yourself, not out loud to refresh your

25  recollection about what you told the agents about what the call

Carl Pepper - Cross

1   was about.  Tell me when you're done.

2   A.  Yes, sir, I'm done.

3   Q.  So do you remember telling them that the call was regarding

4   the substantial -- RSCS reaction to the substantial price

5   increase for KFC?

6   A.  To my best recollection, I guess -- yes, sir.

7   Q.  Okay.  I want to switch topics slightly and ask you about

8   Boston Market.  Do you remember your direct testimony about

9   Boston Market and about billing weights?  Do you remember that?

10  A.  Yes, sir.

11  Q.  The government showed you Exhibit 5016 and discussed that

12  with you.  I don't expect you to remember that, so if you can

13  look at Tab 9, please, in your binder there, Exhibit 5016.  Do

14  you remember that the government showed that to you during your

15  direct testimony, asked you some questions about that?

16  A.  Yes, sir.

17        MR. BYRNE:  Your Honor, I believe that's been admitted

18  in evidence, if I could publish that to the jury, 5016.

19        THE COURT:  Let me just double-check real quick.  Yes,

20  you may.

21        MR. BYRNE:  Thank you.

22  BY MR. BYRNE:

23  Q.  So this is the e-mail you discussed where you asked

24  Jimmie Little what the next quarter billing weight would be.

25  He told you -- you told him, and then he said, Close enough.

Carl Pepper - Cross

1    Do you see that?

2    *A.*   Yes, sir.

3    *Q.*   Now, the billing weight is one of the factors that

4    determines how much Boston Market pays for its chicken,

5    correct?

6    *A.*   Yes, sir.

7    *Q.*   And Boston Market pays by the pound, right?

8    *A.*   Yes, sir.

9    *Q.*   And each case of chicken weighs a certain number of pounds,

10   correct?

11   *A.*   Yes, sir.

12   *Q.*   But Tyson doesn't bill by the actual weight of each case,

13   correct?

14   *A.*   No, sir.

15   *Q.*   It assumes an average case weight and it bills that weight,

16   right?

17   *A.*   Yes, sir.

18   *Q.*   The billing weight changes quarterly, right?

19   *A.*   Yes, sir.

20   *Q.*   And it changes quarterly based upon the last quarter's

21   average weight, correct?

22   *A.*   It takes the amount of cases that were produced and the

23   amount of pounds that were produced, and that's how they get

24   it, yes, sir.

25   *Q.*   And that is determined by the accounting department, the

Carl Pepper - Cross

1  bean counter, so to speak.  They come up with that based on the

2  prior quarter weight, correct?

3  *A.*  Yes, sir.

4  *Q.*  So where did you get that billing weight number that you

5  gave Mr. Little in 5016, Exhibit 5016?

6  *A.*  Where did I get our billing weight?

7  *Q.*  Yeah, where did you get your billing weight from?

8  *A.*  It was off -- it was off the thing the pricing group gave

9  me -- not the pricing group, but the -- I can't remember which

10  group gives me the billing weight.  Production group gives me

11  the billing weight.

12  *Q.*  The accounting people, people who calculated it.

13  *A.*  Yes, sir.

14  *Q.*  Got it.

15         Now, if you could look at Tab 10.  And there is an

16  exhibit there that's an e-mail marked I-964.  Can you take a

17  look at that?

18  *A.*  Yes, sir.

19  *Q.*  Now, who is Cameron McAhren?

20  *A.*  He was the one that basically gave me what the billing

21  rates would be for any of the customers I had.

22  *Q.*  So, in fact, is this an e-mail chain where you were asking

23  the accounting people, so to speak, for that billing weight?

24  *A.*  Yes, sir.

25         *MR. BYRNE:*  Your Honor, I would ask to move I-964 into

Carl Pepper - Cross

1    evidence.

2              THE COURT:  Any objection to the admission of I-964?

3              MS. SWEENEY:  Yes, sir.  Yes, Your Honor, it's

4    hearsay.

5              THE COURT:  Response?

6              MR. BYRNE:  It's not offered for the truth.  It's

7    offered for the fact that it was sent to Mr. Little right

8    before he sent numbers to -- I am sorry, it was sent to

9    Mr. Pepper right before he sent numbers to Mr. Little, so it's

10   offered for effect on the listener.  We don't care about how

11   many cases were produced.  We care about the fact that it was

12   communicated to Mr. Pepper.

13             THE COURT:  And, Mr. Byrne, what's your -- what

14   exhibit are you talking about?

15             MR. BYRNE:  I-964.

16             THE COURT:  I am looking at that, but you said there

17   is some effect.  Where is the effect shown?

18             MR. BYRNE:  The exhibit that's in evidence that I was

19   just talking about, let me find it, is 5016.  He got the

20   billing weight information --

21             THE COURT:  If you could go back, if I could see 5016.

22             MR. BYRNE:  It's Tab No. 9.

23             THE COURT:  Ms. Sweeney, response?

24             MS. SWEENEY:  Simply that the information, the actual

25   amount that Mr. Pepper was given is information that is the

Carl Pepper - Cross

1  purpose for wanting to introduce this document, so it is for

2  the truth purpose as opposed to the non-hearsay effect purpose.

3       THE COURT:  I am going to sustain the objection to

4  I-964 because it does seem to be for the truth of the matter

5  asserted, and in any event, the effect on the listener is

6  already reflected in 5016.

7  BY MR. BYRNE:

8  Q.  So, Mr. Pepper, Cameron McAhren, he is one of the

9  accounting guys that gives you the billing weight, correct?

10  A.  Yes, sir.

11  Q.  Who is Darrell Bowlin?

12  A.  He is in the production group.

13  Q.  And you talked about that, about him with Mister -- with

14  Ms. Prewitt when I was asking you questions, correct?

15  A.  Yes, sir.

16  Q.  Just to be clear, you don't come up with the billing weight

17  number; the accounting people do, correct?

18  A.  Yes, sir.

19  Q.  And the number is what the number is, right?  It's based

20  upon the previous quarter's average, correct?

21  A.  Yes, sir.

22  Q.  And the average case weight is something that happened in

23  the past that you can't change, correct?

24  A.  Correct.

25  Q.  So you understand that the case weight is calculated the

Carl Pepper - Cross

1    same way by all the chicken suppliers?  Do you understand that?

2    A.  I have no idea how everybody does it.  I know how Tyson

3    does theirs.

4    Q.  Now, the billing rate determines the price that each

5    Boston Market restaurant pays for a case of chicken, correct?

6    A.  Yes, sir.

7    Q.  And there are the same number of chickens in every case,

8    correct?

9    A.  Yes, sir.

10   Q.  And they buy by the pound and sell by the piece, right?

11   A.  Yes, sir.

12   Q.  Boston Market does.

13   A.  Yes, sir.

14   Q.  So if one Boston Market restaurant pays more for its case,

15   then they are paying more for the same number of chickens,

16   correct?

17   A.  Yes, sir.

18   Q.  If there is a big difference between what different

19   Boston Market restaurants pay for a case of chicken they

20   receive from Tyson and a case of chicken they receive from

21   Pilgrim's, then some of those restaurants are going to have a

22   problem, right?  Some are going to pay more than others, and

23   they are going to be complaining, correct?

24   A.  Yes, sir.

25   Q.  And as a result, if the Boston Market customers complain,

Carl Pepper - Cross

1   then Boston Market isn't going to be happy with you or

2   whichever chicken supplier is different, correct?

3   A.   I'm not sure what you're asking right there.

4   Q.   Well, you just said that Boston Market wants those weights

5   and those prices to be similar so the franchise or the

6   Boston Markets don't pay different prices, correct?

7   A.   Well, if they -- yes, they would be complaining, yes.

8   Q.   And if they were complaining, then you have a customer

9   service issue, right?  That's part of what you did in your job,

10  correct, customer service?

11  A.   Well, I did -- yes, sir.

12  Q.   You took care of customers when they had complaints no

13  matter what they were, right?

14  A.   Okay, yes, sir.

15  Q.   So by knowing whether or not there is a big difference in

16  case weights, you can see how you stack up against your

17  competition, right?

18  A.   Yes, sir.

19  Q.   And you could see whether you are going to have a problem

20  potentially with Boston Market if your case weight is a lot

21  higher, for example, than Pilgrim's, right?

22  A.   Yeah, I guess so.

23  Q.   And then you would know also whether you were about to get

24  in trouble with your customer because your case weights are

25  higher than your competition, right?

1746

Carl Pepper - Cross

1    *A.*  Well, the customers know that everybody is not going to be

2    the same case weight.

3    *Q.*  But the customers -- Boston Market in this case tries to

4    make sure that the case weights are as close as possible,

5    correct?

6    *A.*  If they were way out of line, yes, sir, they would be.

7    *Q.*  And so knowing Mr. Little's case weight is a way for you to

8    check on whether Tyson is staying competitive when it sells to

9    Boston Market, correct?

10   *A.*  I'm not sure.  That could be true.  The problem is we did

11   80 percent of their business, so I am not sure there would have

12   been an issue there.

13   *Q.*  Well, in this instance with respect to Exhibit 5016 which

14   you've seen, you asked Mr. Little specifically about that.  And

15   you had that conversation with him because Boston Market was

16   complaining about the billing weight; isn't that true?

17   *A.*  I don't -- I don't remember how much they were complaining.

18   They were just curious -- they were complaining, but it was not

19   that big of -- I mean, it wasn't something that was a heated

20   argument, I guess, basically.

21   *Q.*  They were complaining, though, right?

22   *A.*  Yes, sir.

23   *Q.*  And, in fact, during an interview with the government, you

24   told the government that they were complaining, correct?

25   *A.*  Yes, sir; yes, sir.

Carl Pepper - Cross

1    Q.   And that's why you wanted to check with Mr. Little to check

2    his case weights to see whether the complaint was valid or

3    whether you could correct their complaint, correct?

4    A.   Well, I couldn't correct their complaint, but I would see

5    if it was valid, yes, sir.

6    Q.   Now, when you were on direct exam, none of this case

7    weight, billing weight, you weren't asked any of that on direct

8    exam, were you?

9    A.   I don't know.  What do you mean I wasn't asked?

10   Q.   Everything that I just asked you to go into detail about,

11   case weight based upon prior quarter, none of that was asked on

12   the direct exam by Ms. Sweeney, correct?

13   A.   The only thing that was asked was how we arrive at it.

14   Q.   Right.  And that you exchanged that information with

15   Mr. Little, correct?

16   A.   Yes, sir.

17            MR. BYRNE:   I have no other questions, Your Honor.

18            THE COURT:   Thank you, Mr. Byrne.

19            Mr. Tubach, go ahead.

20                        **CROSS-EXAMINATION**

21   BY MR. TUBACH:

22   Q.   Good afternoon, Mr. Pepper.

23   A.   Good afternoon.

24   Q.   My name is Michael Tubach.  I represent Jayson Penn.

25   A.   Okay.

Carl Pepper - Cross

1    *Q.*  You anticipated my questions.  You don't know Jayson Penn

2    at all, do you?

3    *A.*  No, sir.

4    *Q.*  You have never met him?

5    *A.*  Not that I know of.

6    *Q.*  You have never spoken to him?

7    *A.*  I am almost sure of that.

8    *Q.*  And you have never communicated with him in any way as far

9    as you know.

10   *A.*  No, sir.

11        *MR. TUBACH:*  Those are all the questions I have.

12   Thank you.

13        *THE COURT:*  Thank you, Mr. Tubach.

14        Additional cross?

15        Ms. Henry.

16                  **CROSS-EXAMINATION**

17   *BY MS. HENRY:*

18   *Q.*  Hi, Mr. Pepper.  My name is Roxann Henry, and I represent

19   Mr. Bill Kantola.

20        This may be as easy as the last one.  You are aware,

21   aren't you, that for 2015 Koch Foods was a company that took

22   some significant fast-food volume that had previously gone to

23   Tyson?

24   *A.*  Not that I can remember, but, no, ma'am.  I don't really

25   remember who it was, what customer it was, no, ma'am.

Carl Pepper - Cross

1              MS. HENRY:  No problem.  Thank you.

2              THE COURT:  Thank you, Ms. Henry.

3              Additional cross?

4              Mr. Lavine.

**CROSS-EXAMINATION**

BY MR. LAVINE:

7    Q.  Mr. Pepper, my name is Bryan Lavine, and I represent

8    Scott Brady.

9    A.  Yes, sir.

10   Q.  How are you doing today?

11   A.  Good.

12   Q.  Good.  I know it's been a long day, but I want to go over

13   some of these documents and some of the things you said as they

14   pertain to Mr. Brady, all right?

15   A.  Yes, sir.

16   Q.  And one of the things I want to try and go through, and if

17   you bear with me, I want to try and see if we can't put a

18   little specificity or some details on when certain things

19   happened, all right?

20   A.  Yes, sir.

21   Q.  And I sometimes have a tendency to ask convoluted

22   questions.  If you don't understand my question, please just

23   tell me and I will repeat it, okay?

24   A.  Yes, sir.

25   Q.  Great.  Now, Mr. Pepper, you testified on Thursday, I think

Carl Pepper - Cross

1   it was, about a meeting in Mr. Cullen's office in the summer of

2   2014.

3   A.   Yes, sir.

4   Q.   And you testified on Thursday that at this meeting the

5   planned price increase for KFC was discussed?

6   A.   Yes, sir.

7   Q.   And Mr. Mulrenin, according to you, asked you to contact

8   other suppliers at the end of this meeting?

9   A.   Yes, sir.

10   Q.   And Steve Cullen attended this meeting, right?

11   A.   Yes, sir.

12   Q.   And, in fact, he called the meeting.

13   A.   Yes, sir.

14   Q.   And Darrell Bowlin attended?

15   A.   Yes, sir.

16   Q.   Debbie Baker?

17   A.   Yes, sir.

18   Q.   Tim Mulrenin?

19   A.   Yes, sir.

20   Q.   Brian Roberts?

21   A.   I don't know if Brian was there or if he was on the phone,

22   yes, sir.

23   Q.   You are not even sure if he was even on the phone.

24   A.   Yes, sir.

25   Q.   Right.  And there were other people that you couldn't

Carl Pepper - Cross

1  remember?

2  A.  There was a whole room full of people.

3  Q.  There was a whole -- right.  And this was a meeting, as we

4  said, that was attended by a lot of different people, correct?

5  A.  Yes, sir.

6  Q.  And you also attended this meeting.

7  A.  Yes, sir.

8  Q.  And the meeting invite would have come from Mr. Cullen or

9  sent on his behalf, correct?

10  A.  I believe so.

11  Q.  Right.  And it was your regular practice to accept meeting

12  invites when you were able to?

13  A.  Yes, sir.

14  Q.  Now, when you mentioned Mr. Cullen's office, given the

15  number of people attending, it was most likely in a conference

16  room near Mr. Cullen's office.  Would that be fair to say, sir?

17  A.  It was supposed to be in a conference room, but it ended up

18  being in his office.

19  Q.  In his office?

20  A.  Because he had a big office.

21  Q.  Okay.  Even though there was quite a number of people

22  there, it was in his office?

23  A.  Yes, sir.

24  Q.  And you testified that the purpose of the meeting was to

25  discuss the presentation for the price increase to RSCS/KFC,

Carl Pepper - Cross

1    correct?

2    *A.*   Yes, sir.

3    *Q.*   Now, you were discussing the response to the RFP that was

4    going to be presented to RSCS for the 2015 contract.

5    *A.*   Yes, sir.

6    *Q.*   All right.  And Tyson was presenting to RSCS on August the

7    5th in Kentucky.

8    *A.*   Yes, sir.

9    *Q.*   And you attended that August 5th meeting in Kentucky,

10   correct?

11   *A.*   Yes, sir.

12   *Q.*   And you remember this meeting in Mr. Cullen's office during

13   the summer of 2014.

14   *A.*   Best I -- yes, sir.

15   *Q.*   And Mr. Cullen's office is in -- I think it's Springdale,

16   Arkansas?

17   *A.*   Yes, sir.

18   *Q.*   All right.  And you remember this meeting because you

19   attended this meeting in person.

20   *A.*   Yes, sir.

21   *Q.*   And it was at the meeting in Mr. Cullen's office that

22   you -- and I am not trying to quote you, but basically you said

23   you wanted to make sure everybody was really wanting to go

24   after a substantial price increase.

25   *A.*   I used pretty close to those words, yes, sir.

Carl Pepper - Cross

1    Q.  And you made your feelings known about this, your concern

2    more than anything about this?

3    A.  Yes, sir.

4    Q.  And you were concerned that going up it could jeopardize a

5    lot of Tyson's business?

6    A.  Yes, sir.

7    Q.  And you even said so, which we just talked, at the meeting,

8    correct?

9    A.  Yes, sir.

10   Q.  Now, it was after this meeting in Mr. Cullen's office that

11   according to you Mr. Mulrenin asked you to reach out to some

12   people.

13   A.  Yes, sir.

14   Q.  And that was to see if others were also thinking about a

15   substantial price increase.

16   A.  Yes, sir.

17   Q.  Now, Mr. Brady was one of the people that you reached out

18   to?

19   A.  Yes, sir.

20   Q.  And one of the people you reached out to after the meeting

21   in Mr. Cullen's office.

22   A.  Yes, sir.

23   Q.  Now, it was after this meeting in Mr. Cullen's office that

24   you had multiple telephone conversations with Mr. Brady.

25   A.  Over a period of time, yes, sir.

Carl Pepper - Cross

1    Q.  And multiple telephone conversations with Mr. Brady about

2    the substantial price increase.

3    A.  Yes, sir.

4    Q.  And I believe you testified there were like four or five

5    telephone conversations.

6    A.  Somewhere in that neighborhood, yes, sir.

7    Q.  Right.  And that's what you told the members of this jury

8    on Wednesday and Thursday of last week.

9    A.  Yes, sir.

10   Q.  Okay.  Now, you have also testified that this meeting

11   occurred sometime in the summertime, correct, of 2014?

12   A.  Yes, sir.

13   Q.  And you don't remember exactly the date or time of this

14   meeting.

15   A.  No, sir.

16   Q.  All right.  And you testified that the calls with Mr. Brady

17   were in the beginning of August of 2014.

18   A.  Yes, sir.

19   Q.  And the meeting, then, in Mr. Cullen's office was also in

20   the beginning of August of 2014.

21   A.  Yes, sir.

22   Q.  Before the August 5th presentation to RSCS/KFC, correct?

23   A.  Yes, sir.

24   Q.  All right.  Now, you didn't reach out to Mr. Brady about

25   the substantial increase until after Mr. Mulrenin asked you to.

Carl Pepper - Cross

1    A.  Yes, sir.

2    Q.  If you can bear with me for one minute, please.

3            MR. LAVINE:  Your Honor, may I approach?

4            THE COURT:  You may.

5    BY MR. LAVINE:

6    Q.  Now, Mr. Pepper, we have just given you a notebook of

7    documents, and I wonder if you could please do me the favor of

8    turning to Tab A in that notebook right there.

9    A.  Yes, sir.

10   Q.  Now, Mr. Pepper, bear with me because I know this is many

11   years ago so I am going to try to take you through this, see if

12   we can't get -- find out when these meetings occurred.  Now, if

13   you look at Tab A, this is a meeting invite, correct?

14   A.  Yes, sir.

15   Q.  And this is a meeting invite that you received?

16   A.  Yes, sir.

17   Q.  And this is the type of meeting invite that you would

18   receive during the ordinary course of business, correct?

19   A.  Yes, sir.

20   Q.  This is also the type of invite that you would respond to.

21   A.  Yes, sir.

22   Q.  And you would either accept or decline the meeting,

23   correct?

24   A.  Yes, sir.

25   Q.  And this meeting invite is for the KFC deck presentation.

1756

Carl Pepper - Cross

1   A.  Yes, sir.

2   Q.  And you recall receiving this meeting invite, sir?

3   A.  I guess I do.  My name is on it, but ...

4   Q.  Right.  This is your name and your address on here?

5   A.  Yes, sir.

6   Q.  And it's dated August the 1st?

7   A.  Yes, sir.

8   Q.  And this is the type of meeting invite that you would rely

9   on in doing your business in going to meetings at Tyson; would

10  it not be, sir?

11  A.  Yes, sir.

12          MR. LAVINE:  I would move for its admission.

13          THE COURT:  Any objection to the admission of I-954?

14          MS. SWEENEY:  No objection.

15          THE COURT:  I-954 will be admitted.

16          MR. LAVINE:  Your Honor, may I publish?

17          THE COURT:  You may.

18          MR. LAVINE:  Thank you.

19  BY MR. LAVINE:

20  Q.  If we look at this meeting invite, Mr. Pepper, it calls for

21  a meeting on August the 1st, 2014, correct?

22  A.  Yes, sir.

23  Q.  And if you look at the subject matter, it's a KFC deck

24  discuss.

25  A.  Yes, sir.

Carl Pepper - Cross

1    Q.  And what's being discussed here is the presentation that's

2    going to be made to RSCS; is that correct?

3    A.  Yes, sir.

4    Q.  All right.  And you were invited to this meeting.

5    A.  Yes, sir.

6    Q.  And Tim Mulrenin sent this invitation out, correct?

7    A.  Yes, sir.

8    Q.  And Mr. Brian Roberts was also invited?

9    A.  Yes, sir.

10   Q.  And a Mark Milbrodt is also invited?

11   A.  Yes, sir.

12   Q.  It's M-I-L-B-R-O-D-T.

13   A.  Yes, sir.

14   Q.  I apologize if I wasn't accurate in its pronunciation.

15          Now, sir, if you would turn to Tab B.

16   A.  Yes, sir.

17   Q.  If you would look at this, please.  Now, this is an

18   acceptance, isn't it, from you?  Isn't that correct?

19   A.  Yes, sir.

20   Q.  And you are responding to the meeting invite that was in

21   the prior exhibit which was Exhibit I-954.

22   A.  Yes, sir.

23   Q.  And you actually accept this meeting, do you not?

24   A.  Yes, sir.

25   Q.  And this is something that you normally would do in the

Carl Pepper - Cross

1    ordinary course as far as accepting the meeting?

2    A.  Yes, sir.

3            MR. LAVINE:  Your Honor, I would move for its

4    admission.

5            THE COURT:  Any objection to the admission of I-953?

6            MS. SWEENEY:  No objection.

7            THE COURT:  I-953 will be admitted.

8            MR. LAVINE:  If we can now publish it, please.

9            THE COURT:  You may.

10   BY MR. LAVINE:

11   Q.  You accepted this meeting; is that right?

12   A.  Yes, sir.

13   Q.  And this is acceptance for the August 1st meeting.

14   A.  Yes, sir.

15   Q.  And this is a meeting -- it's a telephone conference call,

16   is it not?

17   A.  Yes, sir.

18   Q.  And it's not an in-person meeting.

19   A.  I guess not, no, sir.

20   Q.  And Mr. Cullen is not listed as an attendee at this

21   meeting, is he?

22   A.  No, sir.

23   Q.  And this is the meeting to discuss the KFC presentation to

24   RSCS that you referenced -- I apologize, it would either be

25   Wednesday or Thursday last week when you testified?

Carl Pepper - Cross

1    A.   Yes, sir.

2    Q.   The meeting was not in Mr. Cullen's office.

3    A.   It might not have been this one, but there was a big

4    meeting.

5    Q.   No, no, I understand.  I am talking about this meeting in

6    particular, sir.

7    A.   It's not.

8    Q.   I don't question your recollection on that.  I am just

9    talking about this meeting in particular.  And Mr. Cullen was

10   not, as I said, he was not even invited to this meeting,

11   correct?

12   A.   No, sir.

13   Q.   Now, this is August the 1st, this is Friday.

14   A.   Yes, sir.

15   Q.   So then we have the weekend which is August 2nd and 3rd,

16   that's a Saturday and Sunday.

17   A.   Yes, sir.

18   Q.   And Monday is the 4th of August, and that's when you left

19   for Kentucky to attend the RSCS meeting.

20   A.   Yes, sir.

21   Q.   So your calendar shows no other meetings in early August to

22   discuss the KFC presentation except for this one.

23   A.   Well, I don't know.  Where -- I don't know where my

24   calendar would show that.

25   Q.   Well, if you think about it, sir, this is right before the

Carl Pepper - Cross

1  RSCS presentation which is on August the 5th?

2  A.  Yes, sir.

3  Q.  So on Friday, August the 1st, you are discussing the

4  presentation deck.

5  A.  Yes, sir.

6  Q.  On Monday, the 4th, you leave for Kentucky.

7  A.  Yes, sir.

8  Q.  And on Tuesday, the 5th, you have the meeting with RSCS,

9  correct?

10 A.  Yes, sir.

11 Q.  So does that bring it back, sir, that you discussed the

12 RSCS presentation on the 1st for the meeting on the 5th?

13 A.  I guess so.  Like I said, I don't remember.  I don't

14 remember dates, no, sir.

15 Q.  Well, I am just looking at the dates here.

16 A.  Yes, sir; yes, sir.

17 Q.  But you do remember going to Kentucky on August the 5th.

18 A.  Yes, sir; yes, sir.

19 Q.  All right.  Now, I want to show you another document, sir.

20 If you will turn to Tab C.  And I want you to take a look at

21 this.  It's another meeting invite, but I want you to take a

22 look at the whole thing, please, and just take your time.  You

23 can take the other document down, please.

24 A.  Yes, sir.

25 Q.  Did you have a chance to look at this?

Carl Pepper - Cross

1    *A.*  Yes, sir.

2    *Q.*  And this is a meeting invitation, isn't it?

3    *A.*  Yes, sir.

4    *Q.*  This is a meeting invitation that you would have received?

5    *A.*  Yes, sir.

6    *Q.*  Because your name is on it.

7    *A.*  Yes, sir.

8    *Q.*  And this is coming from or on behalf of Steve Cullen, is it

9    not?

10   *A.*  Yes, sir.

11   *Q.*  And this is the type of meeting invitation that you would

12   receive in the ordinary course of business?

13   *A.*  Yes, sir.

14   *Q.*  While working at Tyson's?

15   *A.*  Yes, sir.

16   *Q.*  And when you got an invitation like this for this meeting,

17   you would respond to it.  You would either accept or decline

18   the meeting, correct?

19   *A.*  Yes, sir.

20        *MR. LAVINE:*  Your Honor, I would move for its

21   admission.

22        *THE COURT:*  Any objection to the admission of

23   Exhibit 9876?

24        *MS. SWEENEY:*  Yes, Your Honor.  The contents of the

25   meeting invitation are statements by Mr. Cullen which are

Carl Pepper - Cross

1   hearsay.

2           THE COURT:  Mr. Lavine, could you scroll down on this

3   one?  I guess it's Tab C, right?  Never mind.  I have that.

4           Response, Mr. Lavine?

5           MR. LAVINE:  I am perfectly fine to redact the lower

6   portion.  I am looking at the meeting invite for August 19.

7           THE COURT:  And, Mr. Lavine, are you suggesting then

8   that you would just introduce the top half -- literally about

9   the first half of the page and not the e-mail that looks like

10  it's from Mr. Cullen?

11          MR. LAVINE:  That's correct, sir, Your Honor.

12          THE COURT:  With that limitation, any objection to the

13  admission of Exhibit 9876?

14          MS. SWEENEY:  No objection with that limitation.

15          THE COURT:  Then just the top half of the first page

16  of 97 -- 9876 will be admitted.

17  BY MR. LAVINE:

18  Q.  Now, as I said, sir --

19          MR. LAVINE:  Can we publish this, Your Honor?

20          THE COURT:  Yes, you may.

21  BY MR. LAVINE:

22  Q.  This is a meeting invitation for August the 19th.

23  A.  Yes, sir.

24  Q.  And this is a meeting -- it's listed as a conference room

25  in the Tyson's offices, is it not, sir?

Carl Pepper - Cross

 1   *A.*   Yes, sir.

 2   *Q.*   And this is really from Mr. Cullen.

 3   *A.*   Yes, sir.

 4   *Q.*   And you were invited to this meeting.

 5   *A.*   Yes, sir.

 6   *Q.*   And this is the meeting to discuss the planned price

 7   increase negotiations for various customers, not just RSCS,

 8   isn't it, sir?

 9   *A.*   Yes, sir.

10   *Q.*   And a lot of people attended this meeting.

11   *A.*   Yes, sir.

12   *Q.*   And you attended this meeting.

13   *A.*   Yes, sir.

14   *Q.*   And this is the meeting you are talking about in

15   Mr. Cullen's office, is it not, sir?

16   *A.*   Yes, sir.

17   *Q.*   And that's August the 19th.

18   *A.*   Yes, sir.

19   *Q.*   Now, if you would turn to Tab D, please.  Did you turn to

20   Tab D?

21   *A.*   Yes, sir.

22   *Q.*   Now, this is an acceptance of that meeting on August 19th?

23   *A.*   Yes, sir.

24   *Q.*   And you did accept it?

25   *A.*   Yes, sir.

1764

Carl Pepper - Cross

1   *Q.* And this is the type of acceptance you would send in

2   response to a meeting invite, correct?

3   *A.* Yes, sir.

4        *MR. LAVINE:* Your Honor, I would move for admission of

5   I-958, please.

6        *THE COURT:* Any objection to the admission of I-958?

7        *MS. SWEENEY:* No objection.

8        *THE COURT:* I-958 will be admitted.

9   *BY MR. LAVINE:*

10  *Q.* Now, this is the meeting where you were discussing the

11  increases for a lot of your customers, correct?

12  *A.* Yes, sir.

13  *Q.* And this is the one you were concerned about where you

14  voiced your own concern about the increase.

15  *A.* Yes, sir.

16  *Q.* This is not the same as that telephonic or telephone

17  conference on August the 1st to discuss the KFC deck; is that

18  correct?

19  *A.* It's not the same meeting, no, sir.

20  *Q.* Right. And this is the meeting where you were able to

21  voice your concern about the price increase to everybody there,

22  correct?

23  *A.* Yes, sir.

24  *Q.* And you had that concern because you're talking about KFC.

25  You're talking about Popeye's. You're talking about Church's.

Carl Pepper - Cross

1    These are the customers that you deal with and you care about.

2    A.   Yes, sir.

3    Q.   And you wanted everybody to know, I have got a little bit

4    of a concern here.

5    A.   Yes, sir.

6    Q.   All right.  Now, the purpose of this meeting in

7    Mr. Cullen's office was not to discuss the KFC presentation,

8    but to discuss negotiations for multiple customers.

9    A.   Yes, sir.

10   Q.   And a lot of people attended this meeting.

11   A.   Yes, sir.

12   Q.   Mr. Cullen, Mr. Bowlin, Mr. Campbell, correct?

13   A.   Oh, yes, sir.

14   Q.   And so the meeting took place on August 19th, and this is

15   after the meeting on August the 5th with RSCS, right?

16   A.   Yes, sir.

17   Q.   Now, at this point by August the 19th, Tyson had already

18   turned in or submitted its bid to RSCS on August the 11th.  Do

19   you recall that, sir?

20   A.   I recall seeing that the other day.  I didn't know that was

21   the date it was actually turned in.

22   Q.   Okay.  Will you take my word for it that it was turned in

23   on the 11th?

24   A.   Yes, sir.

25   Q.   Thank you.

Carl Pepper - Cross

1          And it was after this meeting on August the 19th that

2   you testified that Mr. Mulrenin asked you to reach out to the

3   suppliers.

4   A.  Yes, sir.

5   Q.  But it's this meeting on August the 19th that you are

6   referring to when you testified Wednesday and Thursday of last

7   week as to the big meeting in Mr. Cullen's office.

8   A.  Yes, sir.

9   Q.  So it would be after this meeting on August 19th that you

10  had calls with Mr. Brady about substantial price increase,

11  correct?

12  A.  Yes, sir.

13  Q.  All right.  Now, Mr. Pepper, I am going to ask you to turn

14  to Tab E.  I will represent this is your phone bill.

15          MR. LAVINE:  Your Honor, this is I-919.  This is part

16  of an excerpt from Government Exhibit 8000, which are the phone

17  logs.

18          THE COURT:  And are you moving the admission?

19          MR. LAVINE:  I am moving its admission, Your Honor.

20          THE COURT:  Any objection to I-919?

21          MS. SWEENEY:  No objection.

22          THE COURT:  I-919 will be admitted.

23  BY MR. LAVINE:

24  Q.  Now, sir, you testified on direct that you scoured your

25  phone bills at the government's direction to identify calls.

Carl Pepper - Cross

1   Do you recall that, sir?

2   A.  Yes, sir.

3   Q.  Now, there are two calls highlighted on this bill on

4   page 2810.  And I want you to look at 2810, if you would,

5   please.

6           MR. LAVINE:  Could we publish this, Your Honor?

7           THE COURT:  Yes, you may.

8   BY MR. LAVINE:

9   Q.  Do you see there are two calls that are highlighted on this

10  bill on that page?

11  A.  Yes, sir.

12  Q.  Now, do you recognize the number that you called on August

13  the 15th?

14  A.  I think that's Scott Brady's.

15  Q.  It is Mr. Brady's cellphone number.  That's the number you

16  would have called; is that correct?

17  A.  Yes, sir.

18  Q.  And that's the number you would have called when you were

19  trying to reach Mr. Brady?

20  A.  Yes, sir.

21  Q.  And the date of these calls, and there are two there, is

22  August the 15th, 2014, correct?

23  A.  Yes, sir.

24  Q.  Now, Mr. Pepper, I would like you to look at the rest of

25  your calls.  If you would look through this bill and tell me

Carl Pepper - Cross

1  whether or not there are any other calls with Mr. Scott Brady

2  of Claxton Poultry for the month of August 2014.

3         *MR. LAVINE:*  Your Honor, if the government would like

4  to stipulate there are no other calls, we can do that and avoid

5  Mr. Pepper going through all the bills.

6         *THE COURT:*  We'll see what the government wants to do.

7         *MR. LAVINE:*  Yes, Your Honor.

8         *MS. SWEENEY:*  Your Honor, without notice, the

9  government can't stipulate to that.

10        *THE COURT:*  That's fine.  Mr. Pepper is looking

11  through it.

12  *BY MR. LAVINE:*

13  *Q.*  Mr. Pepper, instead of you going through each and every one

14  of the pages which is going to take a lot of time --

15  *A.*  Yeah.

16  *Q.*  -- will you take my representation that there are no other

17  calls in the month of August from you to Mr. Brady or vice

18  versa except for those two calls on the 15th of August?

19  *A.*  Yes, sir.

20  *Q.*  So, Mr. Pepper, the only time you spoke with Mr. Brady in

21  August of 2014 was on August the 15th; isn't that correct, sir?

22  *A.*  According to these logs, yes, sir.

23  *Q.*  And you have no reason to doubt what I have just said or

24  looking at the logs, sir?

25  *A.*  No, sir.

Carl Pepper - Cross

1   *Q.*   Now, let's look at those two logs that are on page 2810.

2   And both of those calls you called Mr. Brady.

3   *A.*   Yes, sir.

4   *Q.*   Mr. Brady didn't call you, did he?

5   *A.*   No, sir.

6   *Q.*   Now, the first call on August the 15th where you called

7   Mr. Brady is at 20:18:32 UTC time, which I will represent to

8   you is 4:18 p.m. Standard time.

9   *A.*   Yes, sir.

10  *Q.*   And the call is for 2 minutes and 27 seconds.  Do you see

11  that under the column that's listed ET?

12  *A.*   Yes, sir.

13  *Q.*   And then you called him again about seven minutes later at

14  20:28:18 USTC, which I will represent to you is 4:28 p.m.

15  Eastern Standard time.  That call is for 1 minute and 25

16  seconds.  Do you see that under the column labeled ET?

17  *A.*   Yes, sir.

18  *Q.*   So on August the 15th, you spoke to Mr. Brady for a total

19  of 3 minutes and 52 seconds.

20  *A.*   Yes, sir.

21  *Q.*   3 minutes and 52 seconds spread over two phone calls seven

22  minutes apart.

23  *A.*   Yes, sir.

24  *Q.*   Your telephone records show that you spoke to Mr. Brady in

25  the entire month of August of the year 2014 for a total of

Carl Pepper - Cross

1   3 minutes and 52 seconds.

2   A.   Yes, sir.

3   Q.   And as you sit here today, you don't have any specific

4   recollection of either one of these calls, do you, sir?

5   A.   No, sir.

6   Q.   And you have no specific recollection of what was discussed

7   on these calls.

8   A.   No, sir.

9   Q.   Now, if you were to even guess, you would be speculating as

10  to what was said between you and Mr. Brady on these two calls

11  on August the 15th, wouldn't you be, sir?

12  A.   Would I what?

13  Q.   You would be speculating.  It would be a guess is all it

14  would be.  You have no idea.

15  A.   Exact -- yes, sir.

16  Q.   You talked to Mr. Brady four days before the August 19th

17  meeting in Mr. Cullen's office.

18  A.   Yes, sir.

19  Q.   Four days before the meeting that you testified that

20  Mr. Mulrenin specifically asked you to reach out to others

21  about the substantial price increase.

22  A.   Yes, sir.

23  Q.   And, Mr. Pepper, I know you testified, but you don't

24  remember the exact dates of the calls with Mr. Brady, correct?

25  A.   Yes, sir.

1771

Carl Pepper - Cross

1    Q.  Just that you remember that those calls occurred after the

2    meeting in Mr. Cullen's office.

3    A.  Yes, sir.

4    Q.  And we've just established that that meeting was on

5    August 19, 2014.

6    A.  Yes, sir.

7    Q.  Now, I know you have been interviewed a lot by the

8    government, but in prior interviews the government showed you

9    documents relating to this meeting, didn't they?

10   A.  Yes, sir.

11   Q.  In fact, they showed you the August 19th meeting invite

12   from Mr. Cullen that we just looked at.

13   A.  Yes, sir.

14   Q.  And do you also recall, sir, that they showed you some

15   e-mails that you said would have come after the August 19

16   e-mail -- I am sorry, 19th meeting, correct?

17   A.  Yes, sir.

18   Q.  And the oldest date I believe on those e-mails was

19   August 20th, 2014?

20   A.  Yes, sir.

21   Q.  And you told the government that you believed that those

22   e-mails were drafted right after the meeting in Mr. Cullen's

23   office.

24   A.  Yes, sir.

25   Q.  And you told the government that the meeting in

Carl Pepper - Cross

1   Mr. Cullen's office that you recalled was on August the 19th.

2   A.   Yes, sir.

3   Q.   And that's what you told the government.  And as you said,

4   you were telling the government the truth.

5   A.   As I believed it, yes, sir; as I remembered, yes, sir.

6   Q.   And you believed it was on the 19th of August.

7   A.   Yes, sir.

8   Q.   Yes.  And you have repeatedly told the government as

9   recently as last month that it was after the meeting in

10  Mr. Cullen's office that you reached out to suppliers about the

11  substantial price increase.

12  A.   Yes, sir.

13  Q.   But, Mr. Pepper, you didn't have any calls with Mr. Brady

14  in August after August the 15th, did you?

15  A.   According to this, no, sir.

16  Q.   So you couldn't have had a call with Mr. Brady after

17  talking with Mr. Mulrenin after the August 19th meeting in

18  Mr. Cullen's office.

19  A.   That's -- yes.

20  Q.   Because, sir, there are no calls between you and Mr. Brady

21  after the meeting on August the 19th.

22  A.   Yes, sir.

23  Q.   The government never showed you that your phone calls with

24  Mr. Brady took place before the August 19th meeting, did they?

25  A.   Not that I remember.

1773

Carl Pepper - Cross

1    Q.  And you have been very consistent in your discussions with

2    the government and in testifying in this court that the phone

3    calls did not take place until after the meeting at

4    Mr. Cullen's office.

5    A.  Yes, sir.

6    Q.  And that, Mr. Pepper, is the truth.

7    A.  I said -- I guess I got confused with when I thought the

8    actual Cullen meeting was.

9    Q.  Well, but we've established with no question that the

10   Cullen meeting was on the 19th of August.

11   A.  Yes, sir.

12   Q.  And that's what you told the government.

13   A.  Yes, sir.

14   Q.  And you told the government you didn't recall your

15   conversations with Mr. Brady; isn't that correct?

16   A.  Yes, sir.

17   Q.  And the government didn't tell you that the only phone

18   calls you had with Mr. Brady were before the August 19th

19   meeting.

20   A.  Not that I remember.

21   Q.  They didn't tell you that, did they?

22   A.  Not that I remember.

23   Q.  Which would have let you know that you didn't have a call

24   with Mr. Brady about the substantial price increase.

25   A.  Yes, sir.

Carl Pepper - Redirect

1    MR. LAVINE:  Thank you, sir.

2    THE COURT:  Would this be a convenient time?

3    MR. LAVINE:  This would be a perfect time to break,

4  Your Honor.

5    THE COURT:  Ladies and gentlemen, why don't we take

6  our mid-afternoon break at this time.  Keep the admonitions in

7  mind.  We will reconvene at 3:30.  The jury is excused.  Thank

8  you.

9    (Jury excused.)

10    (Recess at 3:15 p.m. until 3:32 p.m.)

11    THE COURT:  Ready, Mr. Lavine?  Once we get

12  Mr. Pepper, that is.

13    MR. LAVINE:  We need a witness, Your Honor.

14    (Jury present.)

15  BY MR. LAVINE:

16  Q.  Mr. Pepper, thank you for your honesty.

17    MR. LAVINE:  Your Honor, I tender the witness.

18    THE COURT:  Thank you.

19    MR. KORNFELD:  No questions.  Thank you.

20    THE COURT:  Thank you, Mr. Kornfeld.

21    Anyone else?  I think that may be everyone.

22    Redirect.

23                    **REDIRECT EXAMINATION**

24  BY MS. SWEENEY:

25  Q.  Good afternoon, Mr. Pepper.

Carl Pepper - Redirect

1    *A.*   Good afternoon.

2    *Q.*   So, Mr. Pepper, on cross-examination you were asked about

who at Tyson had authority for pricing.  Do you recall that?

4    *A.*   Yes, ma'am.

5    *Q.*   Between 2012 and 2019, which group was responsible for

negotiations with the customer?

7    *A.*   Sales.

8    *Q.*   And whose job was it to get the customers to accept Tyson's

proposed pricing?

10   *A.*   Sales.

11   *Q.*   The sales group?

12   *A.*   Yes, ma'am.

13   *Q.*   And did you work in that group?

14   *A.*   Yes, ma'am.

15   *Q.*   And what about Defendant Roberts?

16   *A.*   Yes, ma'am.

17   *Q.*   And Defendant Mulrenin?

18   *A.*   Yes, ma'am.

19   *Q.*   On cross-examination Mr. Gillen asked you about the timing

20   of when you started receiving pricing information as opposed to

21   when Defendant Roberts started working at Tyson.  Do you

22   remember that?

23   *A.*   Yes, ma'am.

24   *Q.*   When did Defendant Roberts start working at Tyson?

25   *A.*   I believe it was in 2012.

Carl Pepper - Redirect

1    *Q.* And where did Defendant Roberts work before he joined

2    Tyson?

3    *A.* I believe it was Marshall Durbin.

4    *Q.* And what kind of company is Marshall Durbin?

5    *A.* A poultry company.

6    *Q.* Is it a chicken supplier?

7    *A.* Yeah, yes, ma'am.

8    *Q.* So he came to Tyson after working at a different chicken

9    supplier.

10   *A.* Yes, ma'am.

11   *Q.* Did Defendant Roberts have contacts with other chicken

12   suppliers?

13              *MR. GILLEN:* Objection, Your Honor, leading.

14              *THE COURT:* Overruled.

15              *MR. GILLEN:* Objection, Your Honor, foundation.

16              *THE COURT:* Sustained.

17   *BY MS. SWEENEY:*

18   *Q.* Mr. Pepper, do you have an understanding of whether

19   Defendant Roberts had contacted other chicken suppliers?

20              *MR. GILLEN:* Objection, Your Honor, foundation.

21              *THE COURT:* Overruled.  He can answer if he knows.

22   *A.* Yes, ma'am.

23   *BY MS. SWEENEY:*

24   *Q.* What's the basis for your understanding?

25   *A.* Because I had conversations.  I saw him at food shows

Carl Pepper - Redirect

1    talking to other poultry suppliers.

2    Q.  So did Defendant Roberts have contacts with other chicken

3    suppliers?

4    A.  Yes, ma'am.

5    Q.  And he had -- did he work at other chicken suppliers before

6    Marshall Durbin?

7    A.  Yes, ma'am.  I don't know who.

8    Q.  Now, I would like to focus your attention on the time

9    period 2012 to 2019.  I believe you testified on

10   cross-examination that there were meetings about price strategy

11   in those years; is that right?

12   A.  Could you ask that again, please?

13   Q.  Sure.  We are focusing on the time period 2012 to 2019.  I

14   believe you testified on cross-examination that Tyson Foods had

15   meetings about price strategy?

16   A.  Yes, ma'am.

17   Q.  What groups within Tyson were typically involved in those

18   meetings?

19   A.  It would be the pricing group.  It would be the production

20   group.  It could also be quality control group.  It could

21   sometimes possibly be the credit department.  That's basically

22   it.

23   Q.  Was sales involved in those meetings?

24   A.  Oh, sales, yes, ma'am.

25              MR. McLOUGHLIN:  Objection, Your Honor, leading the

                                     1778
                          Carl Pepper - Redirect

 1   witness.  Move to strike.

 2          THE COURT:  Overruled.  Request denied.

 3   A.  Sales group, yes, ma'am.

 4   BY MS. SWEENEY:

 5   Q.  Did you attend those meetings?

 6   A.  Some of them.

 7   Q.  When you attended those meetings, did you provide any

 8   input?

 9   A.  Yes, ma'am.

10   Q.  Can you describe what you mean by "input"?

11   A.  Well, I would give input from just the customers'

12   perspectives of what they were looking for, if it happened to

13   be more supply, less supply, if they were happy with

14   everything, if they had any issues, and basically looking

15   forward to the contracts that were coming up.

16   Q.  Did defendant -- when you attended these meetings, were

17   others from the sales group also at those meetings?

18   A.  Yes, ma'am.

19   Q.  Who from the sales group were at the pricing strategy

20   meetings that you also attended?

21          MR. KORNFELD:  Objection, Your Honor, foundation.  We

22   are talking meetings over a seven-year period.

23          THE COURT:  Overruled.  He can answer.

24   A.  Would you ask me that again, please?

25   BY MS. SWEENEY:

Carl Pepper - Redirect

1    Q.   Sure.  So who from the sales group attended the price

2    strategy meetings that you attended?

3    A.   Sometimes --

4         MR. McLOUGHLIN:  Your Honor, objection, lack of

5    foundation as to date, time, place, number of meetings, which

6    ones he attended.

7         THE COURT:  He can answer generally.  If you want to

8    ask him specifically, you need to ask specific questions.

9         MS. SWEENEY:  Yes, Your Honor.

10   BY MS. SWEENEY:

11   Q.   So generally for the pricing strategy meetings you attended

12   in 2012 to 2019, who else from the sales group generally

13   attended?

14   A.   A lot of times it would be Brian Roberts, and he might not

15   always be there, and sometimes it would be Tim Mulrenin.

16   Sometimes it would be all three of us.

17   Q.   And in those meetings, you testified that you provided

18   input.  Did anyone else from the sales group provide input?

19   A.   Yes, ma'am.  They would probably give it a perspective of

20   what they felt that the customer would also think.

21   Q.   Did that include Defendant Roberts when he attended?

22   A.   Yes, ma'am.

23   Q.   Did that include Defendant Mulrenin when he attended?

24   A.   Yes, ma'am.

25        MS. SWEENEY:  I would like to pull up Exhibit G-356,

Carl Pepper - Redirect

1   which, Your Honor, I believe was admitted this afternoon or

2   this morning, perhaps.

3           THE COURT:  What was the exhibit number again?

4           MS. SWEENEY:  G-356.

5           THE COURT:  Yes, those have been admitted, and you may

6   display it.

7           MS. SWEENEY:  Thank you.

8   BY MS. SWEENEY:

9   Q.  If we could just focus on the header information, please.

10  So, Mr. Pepper, is this exhibit that's up on your screen, is

11  this one that you discussed with Ms. Prewitt earlier today?

12  A.  Yes, ma'am.

13  Q.  Is this an example of one of the price strategy meetings

14  you were just describing?

15  A.  Yes, ma'am.

16  Q.  And are you listed on this as an attendee?

17  A.  Yes, ma'am.

18  Q.  And is Defendant Mulrenin listed on this same meeting

19  invite as an attendee?

20  A.  Yes, ma'am.

21  Q.  Thank you.

22          MS. SWEENEY:  We can take that down.

23  BY MS. SWEENEY:

24  Q.  Mr. Pepper, now I would like to ask you some questions

25  about the quality assurance charge to Church's.

Carl Pepper - Redirect

1      MS. SWEENEY:  Your Honor, permission to publish

2   Government Exhibit 221?

3      THE COURT:  You may.

4      MS. SWEENEY:  If we could focus on the top e-mail,

5   please.

6   BY MS. SWEENEY:

7   Q.  Now, Mr. Pepper, do you remember that Ms. Prewitt asked you

8   about this document?

9   A.  Yes, ma'am.

10  Q.  And she asked you if Defendant Roberts ever responded to

11  this e-mail.

12  A.  Yes, ma'am.

13  Q.  And to your memory, how -- did Defendant Roberts ever

14  respond to this e-mail?

15  A.  I don't know if it was this specific one, but there was an

16  e-mail, I believe.

17  Q.  After you sent this e-mail, did Defendant Roberts ever tell

18  you to stop getting information from Defendant Little?

19  A.  No, ma'am.

20  Q.  More broadly, in the time period from 2012 to 2019, did

21  Defendant Roberts ever ask you to stop providing him

22  information from competitors?

23  A.  No, ma'am.

24  Q.  Did Defendant Mulrenin ever ask you to stop providing

25  information from competitors?

Carl Pepper - Redirect

1    A.  No, ma'am.

2         MS. SWEENEY:  You can take this down.

3    BY MS. SWEENEY:

4    Q.  Now I would like to talk about the 2018 contract with

5    Popeye's on the negotiations of which were in 2017.

6    A.  Yes, ma'am.

7         MS. SWEENEY:  Your Honor, permission to publish

8    Government's Exhibit 744?

9         THE COURT:  You may.

10        MS. SWEENEY:  If we could start with the bottom

11   document, please, the bottom e-mail.

12   BY MS. SWEENEY:

13   Q.  Mr. Pepper, I would like you to focus your attention on the

14   sentence in the first paragraph that begins with "instead of."

15   Can you read that out loud, please.

16   A.  Instead of a big cut next year, I would entertain a

17   two-year price adjustment.  Let me see what you can come up

18   with.

19   Q.  So Mr. Pepper, do you understand whether Mr. Kronauge was

20   asking Tyson to do one thing or one thing specifically?

21   A.  He is asking for either one.

22   Q.  When you say "either one," can you describe what it is you

23   mean, the two options?

24   A.  If we could either do one big discount for one year or

25   spread it out over two years.

Carl Pepper - Redirect

1   Q.  Now, do you recall being asked if Tyson gave Mr. Kronauge

2   exactly what he asked for?

3   A.  Oh, yes, ma'am.

4   Q.  You had some clarification that you wanted to provide on

5   that.  Can you provide that clarification now?

6           MR. McLOUGHLIN:  Objection to form, Your Honor.

7           THE COURT:  Overruled.

8   A.  Could you ask that again, please?

9   BY MS. SWEENEY:

10   Q.  Sure.  I believe there was some clarification you wanted to

11   provide in response to if Mr. Kronauge -- if Tyson gave

12   Mr. Kronauge exactly what he was asking for.  If you recall

13   that clarification, I am asking you to give it now.

14   A.  Well, the clarification was that he came back and told

15   everybody that they could do it over a two-year period.

16   Q.  And in this initial e-mail request, what was the request?

17   A.  The initial -- this request here was either do it one full

18   year or just split it out over two years.

19           MS. SWEENEY:  Your Honor, permission to publish

20   Government's Exhibit 757.

21           THE COURT:  You may.

22           MS. SWEENEY:  Thank you.

23           If we could zoom in on the text.

24   BY MS. SWEENEY:

25   Q.  So, Mr. Pepper, I believe you were -- also discussed this

Carl Pepper - Redirect

1    document on cross-examination.  Do you recall that?

2    A.  Yes, ma'am.

3    Q.  I would like to direct your attention to the time stamp.

4    Do you see that?

5    A.  Yes, ma'am.

6    Q.  Do you know what time zone this text message is in?

7    A.  Central.

8    Q.  And why do you say that?

9    A.  Because it came from myself.

10   Q.  Is there an indication of time zone listed on this text

11   message?

12   A.  No, ma'am.

13   Q.  Now, Mr. Pepper, this text message begins with the words

14   "called Cullen."  Do you see that?

15   A.  Yes, ma'am.

16   Q.  Do you recall calling Mr. Cullen about this?

17   A.  Yes, ma'am.

18   Q.  I would now like to ask you some questions about the

19   Popeye's promotional discount request in 2015.

20        MS. SWEENEY:  So if we could take this down.

21        And, Your Honor, permission to publish Government

22   Exhibit 618?

23        THE COURT:  You may.

24        MS. SWEENEY:  If we could focus on the bottom e-mail,

25   please, from Mr. Kronauge.

Carl Pepper - Redirect

1  *BY MS. SWEENEY:*

2  Q.  Now, Mr. Pepper, in this bottom e-mail from Mr. Kronauge,

3  is there a specific discount amount that Mr. Kronauge is

4  seeking?

5  A.  No, ma'am.

6  Q.  Did Mr. Kronauge ever ask you to reach out to other

7  suppliers to provide the same discount?

8          *MR. LAVINE:*  Objection, hearsay, Your Honor.

9          *THE COURT:*  Overruled.

10  A.  Ask that again, please.

11  *BY MS. SWEENEY:*

12  Q.  Did Mr. Kronauge ever ask you to reach out to other

13  suppliers to provide the same discount?

14  A.  No, ma'am.

15          *MS. SWEENEY:*  We can take that down.

16  *BY MS. SWEENEY:*

17  Q.  Now, Mr. Pepper, on cross-examination you were asked about

18  a number of phone calls.  Do you recall that?

19  A.  Yes, ma'am.

20  Q.  And I would like to start with Exhibit I-919 which we were

21  just looking at.

22          *MS. SWEENEY:*  Your Honor, I may have to ask for

23  Mr. Brian's help.  I don't believe we have I-919

24  electronically.

25          *THE COURT:*  You may display it.

Carl Pepper - Redirect

1          *MS. SWEENEY:*  Thank you.

2          If we could pull the page, I believe it is page 2810

3     with the highlighting.  If we could focus on I believe it's the

4     bottom half of the page starting with line 49446, if that's

5     possible.  Thank you very much, sir.

6          Your Honor, permission to publish this to the jury?

7          *THE COURT:*  You may.

8     *BY MS. SWEENEY:*

9     *Q.*  Now, Mr. Pepper, if you have the white binder in front of

10    you, this is also behind Tab E, if it's easier for you to look

11    at.

12    *A.*  I can see this.

13    *Q.*  Okay.  I would like to draw your attention to line 49446.

14    Do you see that line?

15    *A.*  Yes, ma'am.

16    *Q.*  Do you recognize the phone numbers in that line?

17    *A.*  Yes, ma'am.

18    *Q.*  Whose phone numbers are they?

19    *A.*  Tim Mulrenin's and myself.

20    *Q.*  And by looking at this, who called whom?

21    *A.*  Tim Mulrenin called me.

22    *Q.*  And this was in UTC listed at 19:49; is that correct?

23    *A.*  Yes, ma'am.

24    *Q.*  Looking at the next line, who were those phone -- which is

25    49447, who were those phone calls between?

Carl Pepper - Redirect

1   A.  I'm not -- I am not sure who 292-486 because I don't have

2   my Tyson phone anymore and the other one is myself.

3   Q.  Shortly after the call from Defendant Mulrenin, I direct

4   your attention to the first highlighted line.  Who is that call

5   with?

6   A.  The first highlighted line?

7   Q.  Yes.

8   A.  That's myself to Scott Brady.

9   Q.  And the next highlighted line?

10  A.  Is myself to Scott Brady.

11  Q.  And the last line of the sheet.

12  A.  Is myself to Tim Mulrenin.

13  Q.  From whom to whom?

14  A.  It's from myself to Tim Mulrenin.

15  Q.  So you were shown a lot of phone records.  You were shown a

16  lot of meeting invites.  Putting all that aside, putting those

17  dates aside, do you remember talking to Defendant Brady about a

18  substantial increase?

19       MR. LAVINE:  Objection, Your Honor.  It's not what the

20  witness has testified to.  He specifically had no recollection

21  of these phone calls nor did he know anything about these phone

22  calls.  He was very clear about that, Your Honor.

23       THE COURT:  He testified arguably about two different

24  things.  Therefore, the question is proper.  Overruled.

25       MS. SWEENEY:  So we can take this down, please.

Carl Pepper - Redirect

1   *A.* Can you ask that again, please?

2   *BY MS. SWEENEY:*

3   *Q.* Yes, sir.

4          Putting dates aside, do you remember talking to

5   Defendant Brady about the substantial price increase to KFC

6   during those 2014 negotiations?

7   *A.* Yes, ma'am.

8   *Q.* And are those the communications that you testified about

9   on direct examination?

10  *A.* Yes, ma'am.

11         *MR. LAVINE:* Your Honor, I would object to this line

12  of questioning. The witness testified that he only had calls

13  after the 19th of August. These are the 15th. And government

14  counsel is mischaracterizing the evidence, Your Honor.

15         *THE COURT:* That's an issue for the jury. Overruled.

16  *BY MS. SWEENEY:*

17  *Q.* Now, Mr. Pepper, you were asked about a number of other

18  phone calls on cross-examination. Do you recall that?

19  *A.* Yes, ma'am.

20  *Q.* Does the answer to any of those questions that you talked

21  about on cross-examination change your testimony about the

22  calls that you had with Defendants Blake, Brady, and Little

23  regarding the 2014 negotiations with KFC?

24         *MR. LAVINE:* Your Honor, I am going to object again to

25  this line of questioning. The witness was very clear with

Carl Pepper - Redirect

1    regard to those conversations regarding any price increase.  It

2    occurred after the 19th of August.

3              THE COURT:  Overruled.  Same reason.

4    A.  Ask that again, please.

5    BY MS. SWEENEY:

6    Q.  Yes, sir.  Does any of the testimony that you gave on

7    cross-examination about phone calls, does that change your

8    testimony about the calls that you had with Defendants Blake,

9    Brady, and Little in the summer of 2014 regarding the KFC

10   contract negotiation?

11             MR. KORNFELD:  Objection, Your Honor.  The question

12   said does your testimony change your testimony.  Testimony on

13   direct is testimony.  Testimony on cross is testimony.

14             MS. SWEENEY:  Your Honor, I am happy to rephrase.

15             THE COURT:  Go ahead, rephrase.

16   BY MS. SWEENEY:

17   Q.  Does any of the -- you discussed with defense counsel a

18   number of calls on cross-examination; is that right?

19   A.  Yes, ma'am.

20   Q.  Do you now change your testimony -- any of that cause you

21   to change your testimony about the calls that you had with

22   Defendants Blake, Brady, and Little regarding the 2014

23   negotiations for the KFC contract?

24             MR. KORNFELD:  Objection, Your Honor, improper

25   bolstering.

Carl Pepper - Redirect

1          *THE COURT:*  Overruled.

2     *A.*  I guess I didn't understand what you asked me.  Could you

3     ask it one more time, please.

4     *BY MS. SWEENEY:*

5     *Q.*  Yes, sir.  So I will ask a different question.

6          In the summer of 2014, do you recall having

7     conversations with Defendant Blake about the substantial price

8     increase?

9     *A.*  Yes, ma'am.

10    *Q.*  Do you recall having conversations with Defendant Little

11    about the substantial price increase?

12    *A.*  Yes, ma'am.

13    *Q.*  Now, focusing on the conversations that you had with

14    Defendant Blake, on cross-examination you were asked about

15    conversations with Defendant Blake, about rumors, about whether

16    or not you were competing.  So when you spoke with Ms. Johnson

17    about the conversation with Defendant Blake to get an idea of

18    what George's was going to do on the contract, was that the

19    only conversation that you had with Defendant Blake about the

20    KFC contract negotiations?

21         *MS. PREWITT:*  Objection, Your Honor, compound

22    question.  Objection as to form.

23         *THE COURT:*  Overruled.

24    *A.*  Was that the only conversation?  No, ma'am.

25    *BY MS. SWEENEY:*

Carl Pepper - Redirect

1   *Q.*  Did you have other conversations with Defendant Blake about

2   the KFC contract in the summer of 2014?

3   *A.*  Yes, ma'am.

4   *Q.*  And did you describe those further conversations with

5   Defendant Blake on direct examination?

6   *A.*  Yes, ma'am.

7   *Q.*  Now, Mr. Pepper, you talked on cross-examination about the

8   interviews you had with the government prior to receiving your

9   non-prosecution agreement.  Do you remember that?

10  *A.*  Yes, ma'am.

11  *Q.*  Did you have your own lawyer present at each of these

12  meetings?

13  *A.*  Yes, ma'am.

14  *Q.*  Did you have more than one lawyer at each of these

15  meetings?

16  *A.*  Yes, ma'am.

17  *Q.*  I would like to ask you some questions about the meetings

18  you had with the government before August of 2021, okay?

19  *A.*  Yes, ma'am.

20  *Q.*  Were the majority of these meetings in person or virtual?

21  *A.*  The majority were virtual.

22  *Q.*  And approximately how long were those meetings?

23  *A.*  Three, four -- three hours average.

24  *Q.*  And you've been testifying here for longer than three

25  hours; is that fair?

Carl Pepper - Redirect

1   A.  Yes, ma'am.

2   Q.  Did you review all of the topics of your testimony here

3   today in each and every one of those three- or four-hour

4   meetings?

5   A.  No, ma'am.

6   Q.  Were there some meetings where you just reviewed and went

7   over documents?

8   A.  Yes, ma'am.

9   Q.  Now, Mr. Pepper, you spoke with Mr. Gillen and possibly

10  others on cross-examination about the second interview that you

11  gave to the Department of Justice on November 24th, 2019.  Do

12  you remember that?

13  A.  Yes, ma'am.

14  Q.  And do you recall talking about -- talking to Mr. Gillen

15  about how you told the government in November of 2019 about

16  that meeting in Mr. Cullen's office?

17  A.  Yes, ma'am.

18  Q.  And do you recall also in that same interview telling the

19  government about the 2017 Popeye's discount?

20  A.  Yes, ma'am.

21  Q.  Do you recall specifically what you said to the government

22  about your purpose for reaching out to competitors in

23  connection with the Popeye's 2017 contract?

24          MR. LAVINE:  Objection, Your Honor, vague.

25          THE COURT:  Overruled.

Carl Pepper - Redirect

1    *A.*  Ask that again, please.

2    *BY MS. SWEENEY:*

3    *Q.*  Do you recall specifically what you told the government

4    about your purpose for -- about what your purpose was for

5    reaching out to competitors in connection with that Popeye's

6    2018 contract?

7    *A.*  I don't remember specifically, but it was concerning --

8         *MS. PREWITT:*  Objection, Your Honor, non-responsive.

9    He was asked if he specifically recalls.

10        *THE COURT:*  That's true.  Yes or no.  If you can ask

11   that question yes or no.

12        *MS. SWEENEY:*  Yes, Your Honor.

13   *BY MS. SWEENEY:*

14   *Q.*  So yes or no, do you recall specifically what you told the

15   government about what your purpose was for reaching out to

16   competitors in connection with the Popeye's 2018 contract?

17   *A.*  No.

18   *Q.*  Is there a document that I can show you that would refresh

19   your recollection?

20   *A.*  Yes, ma'am.

21        *MS. SWEENEY:*  I would like to pull up Government's

22   Exhibit 10018, and I have copies for counsel.

23        *MR. McLOUGHLIN:*  Can we have a side bar?

24        *THE COURT:*  Yes.

25        (At the bench:)

Carl Pepper - Redirect

1        THE COURT:  Go ahead, Mr. McLoughlin.

2        MR. McLOUGHLIN:  Your Honor, I would object to this

3   line of questioning because it's appropriate for the government

4   to say, Do you remember what you said, and then have him say,

5   Yes, this is what I said.  But once the witness says he does

6   not recall, they cannot bolster the witness by -- with a prior

7   consistent statement that is recorded in an FBI interview

8   summary that he doesn't recall and ask him to read something

9   written by somebody else and say, Well, does that look like

10   what you said or does that refresh.

11        So if they are going to have him -- if they've gotten

12   the testimony that he doesn't remember, I think they have the

13   obligation to move on, because they can't prove a prior

14   consistent statement when the man doesn't remember what his

15   testimony was.

16        THE COURT:  Response, Ms. Sweeney?

17        MS. SWEENEY:  Yes, Your Honor.  The prior consistent

18   statements, the door has been open as you have ruled on

19   cross-examination and on openings.  The government is

20   attempting to refresh the witness with the report to see if he

21   recalls what it is that he told the government.  At that point

22   if he is unable to be refreshed, obviously the government will

23   move on.

24        But until that point, it's entirely proper to refresh

25   a witness with a document, and it does not need to be their

Carl Pepper - Redirect

1    document.  And I believe the law school phrase is it could be

2    not a document at all, with a song or sandwich, something along

3    these lines.

4         MR. McLOUGHLIN:  Once this witness reads what he said,

5    what the FBI reports, there is zero probability he is not going

6    to say, Oh, yes, that's what I said, regardless if his

7    recollection is, in fact, refreshed.  So we would object

8    because this is simply a form of leading the witness.

9         THE COURT:  All right.  Objection is overruled.

10   Mr. Pepper has looked at some FBI interview memos and has not

11   necessarily just quickly endorsed the interview.  And as a

12   matter of fact, he has pushed back against it.  I think it's

13   appropriate that he be asked to see if it refreshes his memory.

14        But, Ms. Sweeney, you will need to be careful that he

15   is not just reading the testimony that's outlined in the memo

16   that you have to make sure you do a proper refreshment.  Thank

17   you.

18        MS. SWEENEY:  Of course, Your Honor.  Thank you.

19        (In open court:)

20        MS. SWEENEY:  Your Honor, may I approach Ms. Grimm

21   with a copy of Government Exhibit 10018?

22        THE COURT:  You may.

23   BY MS. SWEENEY:

24   Q.  Now, Mr. Pepper, I direct your attention to page 5 of 7.

25        MS. SWEENEY:  Your Honor, I apologize, I think we need

1796

Carl Pepper - Redirect

1    to transfer the screen back to the government's computer.

2         THE COURT:  All right.

3    BY MS. SWEENEY:

4    Q.  Mr. Pepper, I direct your attention specifically to the

5    paragraph that begins "Pepper tried to relate," and if you

6    could read that paragraph quietly to yourself.

7    A.  Yes, ma'am.

8         MS. SWEENEY:  If we could blank the screen, please.

9    BY MS. SWEENEY:

10   Q.  Mr. Pepper, does that refresh your recollection as to what

11   you told the government in November of 2019?

12   A.  Yes, ma'am.

13   Q.  And what did you tell the government in November of 2019

14   about the purpose for reaching out to competitors in connection

15   with the Popeye's 2018 contract?

16   A.  Trying to find out if everybody was going to do a one-year

17   or a two-year deal for the contracted price for Popeye's.

18        MR. LAVINE:  Objection, representation to everybody,

19   that is not what he says in the document.

20        THE COURT:  Overruled.

21   BY MS. SWEENEY:

22   Q.  Mr. Pepper, in November of 2018, did you describe to the

23   government the purpose of those communications?

24        MR. McLOUGHLIN:  Objection, Your Honor, asked and

25   answered.

Carl Pepper - Redirect

1          THE COURT:  Why isn't it asked and answered?

2          MS. SWEENEY:  Your Honor, I believe he testified --

3     the Court's brief indulgence.  Your Honor, I believe he

4     testified about what he talked about as opposed to his purpose.

5          MS. PREWITT:  Your Honor, the question is about the

6     purpose.

7          MR. TUBACH:  The answer is what he was trying to do.

8     It sounds a lot like purpose.

9          THE COURT:  Objection is sustained.  You can try to

10    rephrase if you think you can.

11         MS. SWEENEY:  Yes, Your Honor.

12    BY MS. SWEENEY:

13    Q.  Mr. Pepper, what did you tell the government in November of

14    2019 as to what you wanted relating to those communications

15    with competitors?

16         MR. McLOUGHLIN:  Same objection, Your Honor.  The

17    government just didn't like the answer.

18         MR. KORNFELD:  Asked and answered, Your Honor.

19         MS. SWEENEY:  Your Honor, I believe "purpose" and

20    "wanted" are slightly different questions.

21         THE COURT:  The objection is sustained.

22         MS. SWEENEY:  Brief moment to confer?

23         THE COURT:  Sure.

24         MS. SWEENEY:  Thank you.

25    BY MS. SWEENEY:

Carl Pepper - Redirect

1    Q.  Mr. Pepper, you can put that document aside.

2         Now, you testified about the agreement that you had

3    with the government where the government would not prosecute

4    you.  Do you recall that?

5    A.  Yes, ma'am.

6    Q.  I have some questions about that agreement.

7         MS. SWEENEY:  So I would like to pull up what's been

8    marked, just for the witness and for counsel, Government

9    Exhibit 9977.

10   BY MS. SWEENEY:

11   Q.  And, Mr. Pepper, if you still have your binder in front of

12   you, I believe that's Tab 44.

13   A.  I don't think I have it.

14   Q.  Otherwise, it's up on the screen.

15   A.  Okay.  Yes, ma'am.

16   Q.  Do you recognize this document?

17   A.  Yes, ma'am.

18   Q.  Generally what is it?

19   A.  It's a letter.

20   Q.  What's the date of the letter?

21   A.  February the 7th, 2022.

22   Q.  And who is the letter addressed to?

23   A.  To myself.

24   Q.  Is the letter signed?  If we could flip to the third page,

25   please.

Carl Pepper - Redirect

1    A.  Yes, ma'am.

2    Q.  What is the general subject matter of this letter?

3    A.  The general subject is the not being prosecuted.

4         MS. SWEENEY:  The government moves to admit Government

5    9977.

6         THE COURT:  Any objection to the admission of

7    Exhibit 9977?

8         Exhibit 9977 will be admitted.

9    BY MS. SWEENEY:

10   Q.  If we could go to the first page.

11        MS. SWEENEY:  Your Honor, permission to publish?

12        THE COURT:  You may.

13   BY MS. SWEENEY:

14   Q.  So, Mr. Pepper, what is this document?

15   A.  It's a non-prosecution agreement.

16   Q.  Now, I would like to direct your attention to paragraph 1.

17        MS. SWEENEY:  If we could zoom in on paragraph 1,

18   please.

19   BY MS. SWEENEY:

20   Q.  Could you read the last sentence that begins with "your

21   full" aloud, please?

22   A.  Your full, truthful, and continuing cooperation will

23   include, but not be limited to:

24   Q.  I would like to turn to the next page.  If we could look

25   at -- focus on Subsection C.

1800

Carl Pepper - Redirect

1    Mr. Pepper, do you see that Subsection C says:

2    Responding fully and truthfully to all inquiries of the

3    United States in connection with any federal proceeding,

4    without falsely implicating any person or intentionally

5    withholding any information?

6    Do you see that language?

7    A.   Yes, ma'am.

8    Q.   What does that mean?

9    A.   That means that --

10   MR. KORNFELD:  Objection to the extent that that calls

11   for a legal conclusion.  If he wants to talk about his

12   understanding, I have no objection to that.

13   MS. SWEENEY:  I am happy to rephrase.

14   THE COURT:  Objection will be sustained.  You can

15   rephrase.

16   BY MS. SWEENEY:

17   Q.   Mr. Pepper, what is your understanding of that portion of

18   Subsection C?

19   A.   It's about falsely accusing a person and also any false

20   statements.

21   Q.   And what about false accusations and false statements?

22   A.   It would -- it would void the non-prosecution agreement.

23   Q.   It would void the non-prosecution agreement with the

24   government?

25   A.   Yes, ma'am.

Carl Pepper - Redirect

1   *Q.* I would like to direct your attention to the second half of

2   that section where it says:  Subject to the penalties of making

3   a false statement or declaration, obstruction of justice or

4   conspiracy to commit such offenses.

5           Do you see that?

6   *A.* Yes, ma'am.

7   *Q.* What did you understand that portion of Subsection C to

8   mean?

9   *A.* It's basically not being truthful and I guess a

10  conspiracy -- a conspiracy to commit such offense.  I am not

11  sure, exactly sure what the second one means, but not being

12  truthful is the main part.

13  *Q.* And what do you understand not being truthful, not falsely

14  implicating others, and intentionally withholding information,

15  what do you understand that to relate to?

16  *A.* Basically not telling the truth.

17  *Q.* So what do you understand your obligations are under this

18  letter with regard to false implication of others,

19  intentionally withholding information or false statements?

20  *A.* My obligation is to tell the truth and not falsely accuse

21  anybody.

22  *Q.* Now I would like to direct your attention to Subsection F.

23          *MS. SWEENEY:*  If we can blow that up, please.

24  *BY MS. SWEENEY:*

25  *Q.* I would like to direct your attention to where it says:

Carl Pepper - Redirect

1  When called upon to do so by the United States in conjunction

2  with any federal proceeding, trial, and other judicial

3  proceedings, fully, truthfully and under oath subject to the

4  penalties of perjury, making a false statement or declaration,

5  obstruction of justice and contempt.

6       What do you understand Subsection F to mean?

7       MR. KORNFELD:  Your Honor, objection, outside the

8  scope, improper bolstering, and, most importantly, I think it

9  invades the province of the jury asking the witness to assess

10  his own truthfulness.  That's the job of the jury.

11       THE COURT:  To all three, overruled.

12  A.  The whole thing is basically to tell the truth and not to

13  falsely accuse anybody.

14  BY MS. SWEENEY:

15  Q.  And do you understand those to be your obligations under

16  this letter?

17  A.  Yes, ma'am.

18       MS. SWEENEY:  All right.  We can put this down,

19  please.

20  BY MS. SWEENEY:

21  Q.  Now, finally, Mr. Pepper, do you recall talking with

22  Mr. Roberts' counsel about what you told the government on that

23  very first interview in October 4th of 19?  Do you recall

24  having that discussion with Mr. Gillen?

25  A.  I remember having the discussion, but I don't remember the

Carl Pepper - Redirect

1    whole thing.

2    *Q.*  Sir, you told Mr. Gillen that you started receiving pricing

3    information in 2011.  Do you recall that?

4    *A.*  Yes, ma'am.

5    *Q.*  What specifically, what pricing information were you

6    talking about?

7    *A.*  Monthly pricing for three or four different poultry

8    companies.

9    *Q.*  And where did you get that monthly pricing from three or

10   four different poultry companies?

11   *A.*  From Ric Blake.

12   *Q.*  And that monthly pricing, was that current pricing?  Was

13   that upcoming bid pricing or something else?

14   *A.*  It would be current pricing.

15   *Q.*  And how did you get that information?

16        *MS. JOHNSON:*  Objection, Your Honor.  This is beyond

17   the scope.

18        *THE COURT:*  Overruled.

19   *A.*  Ric Blake would call and give it to me.

20   *BY MS. SWEENEY:*

21   *Q.*  Did you provide -- did Ric Blake ask you for anything?

22   *A.*  Yes, ma'am.

23   *Q.*  What did he ask you for?

24   *A.*  For Tyson's price.

25   *Q.*  What customers did this price relate to?

Carl Pepper - Redirect

1   A.  For Popeye's and KFC.

2   Q.  How frequently did you talk with Defendant Blake about

3   these monthly prices?

4   A.  A lot of times it would be every month.  Sometimes it might

5   be two or three months in a row if he was traveling a lot or

6   whatever.  I don't know.

7   Q.  And how long did this practice continue?

8   A.  Up until the time I believe that he retired.

9   Q.  Do you recall if Defendant Blake ever told you anything

10  about his company finding his competitor --

11       MS. JOHNSON:  Objection, Your Honor, calls for a

12  leading question.

13       THE COURT:  Sustained.

14  BY MS. SWEENEY:

15  Q.  Mr. Pepper, did Mr. Blake ever tell you anything about how

16  he kept this information -- if he kept this information?

17  A.  He told me he kept it, yes, ma'am.

18  Q.  And did he tell you how he kept it?

19  A.  He kept it in a book, a book.

20  Q.  Did he tell you if others within his company knew that he

21  kept this information?

22       MS. JOHNSON:  Objection, Your Honor.  Calls for

23  hearsay and also for speculation.

24       THE COURT:  Overruled.

25  A.  I don't think he ever mentioned he told anybody else.

Carl Pepper - Redirect

1  *BY MS. SWEENEY:*

2  *Q.*  So this current pricing information that you received from

3  Defendant Blake, is that the same information that you

4  testified about regarding the 2015 RSCS/KFC contract?

5  *A.*  Can you ask me that again?

6  *Q.*  Sure.  I can ask it more clearly.

7          So the monthly information that you received from

8  Mr. Blake, is that the same pricing -- the same type of pricing

9  information that you discussed with Defendant Blake regarding

10  the 2015 contract?

11  *A.*  Yes, ma'am.

12  *Q.*  How is it the same type --

13  *A.*  No, excuse me.  Okay.  No, the pricing that Ric Blake was

14  telling me was monthly period pricing or monthly pricing and

15  2014 contract was for an entire year -- one-year or two-year

16  contract.

17  *Q.*  When you say the "2014 contract," can you clarify what you

18  mean?

19  *A.*  The 2014 contract for 2015.  2013 for 2014 contract for

20  UFPC/KFC.

21  *Q.*  And what about the monthly pricing you received from

22  Defendant Blake, is that the same as the discussions that you

23  testified about earlier with regard to the 2015 contract that

24  was negotiated in 2014?

25          *MS. JOHNSON:*  Objection, Your Honor.  This is

Carl Pepper - Redirect

1   completely beyond the scope.

2         THE COURT:  Let's have a side bar.

3      (At the bench:)

4         THE COURT:  Go ahead, Ms. Johnson.

5         MS. JOHNSON:  Your Honor, this is completely beyond

6   the scope of the government's direct.  They did not get into

7   any detail about period pricing.  And if the Court is going to

8   allow them to continue down this path, I would request to

9   redirect on this specific issue because it was not discussed in

10   direct over the course of the last six to eight to ten hours.

11         THE COURT:  Response, Ms. Sweeney?

12         MS. SWEENEY:  Yes, Your Honor.  Mr. Gillen, I believe

13   the first set of questions he asked was about this October

14   interview and the pricing information that Mr. Pepper received

15   and the pricing information he shared within Tyson, which was

16   not the pricing information that he testified about on direct

17   but was actually this monthly pricing he received from

18   Mr. Blake.

19         So I am simply attempting to clarify for the jury that

20   the two are distinct and separate and that the conversations

21   that he had regarding the 2014 proposed pricing strategy are

22   not the same as this monthly pricing information where he

23   testified that he never told anybody at Tyson's about the

24   prices.

25         THE COURT:  Ms. Johnson?

Carl Pepper - Redirect

1          MS. JOHNSON:  Your Honor, if the Court allows this

2     testimony, we would like to recross on the specific issues.

3     There is much more to this story, and if this is anything but

4     clarifying to the jury, this is confusing the jury, and it's

5     conflated period pricing with the contracts yet again.

6          THE COURT:  Yeah, I think that this testimony was

7     not -- that Mr. Gillen's questioning did not open the door to

8     this.  This sounds like a whole new topic that he is now

9     talking about.  And for that reason I am going to allow

10    Ms. Johnson some recross on this subject.

11         Also, by the way, I am going to allow the -- anyone

12    who wants to recross as to the non-prosecution agreement, 9977.

13    I did something similar with Mr. Bryant, you will recall, in

14    the last trial.

15         Anything else, Ms. Sweeney?

16         MS. SWEENEY:  Nothing further.  Thank you.

17         (In open court:)

18    BY MS. SWEENEY:

19    Q.  So, Mr. Pepper, we have been talking about monthly pricing.

20    Is there a distinction between monthly pricing and future

21    pricing or future pricing strategy?

22    A.  Monthly pricing is like basically every month the price is

23    put together by how they buy grain and soy and all that.

24    Future pricing is a cost model, is put together with all the

25    different line items that the pricing group comes up with to

1808

Carl Pepper - Redirect

 1   put in it.

 2   Q.  So which of the two were you -- did you testify about

 3   talking to Defendant Blake about in the summer of 2014?

 4   A.  That was the future pricing.

 5   Q.  Finally, in your conversation with Mr. Gillen about the

 6   October 4th interview, you were asked about whether you

 7   reported pricing information within Tyson.  Do you remember

 8   that?

 9   A.  Yes, ma'am.

10   Q.  And specifically you testified that at that first interview

11   you told the government you never shared prices with anyone at

12   Tyson.

13          MR. TUBACH:  Your Honor, I object to the

14   characterization as the "first interview."  I believe this is

15   at least the fourth interview of Mr. Pepper.

16          MR. McLOUGHLIN:  Object to leading, Your Honor.

17          THE COURT:  If you could clarify.  I will sustain the

18   objection for Mr. Tubach.  If you can clarify when this

19   interview took place.

20   BY MS. SWEENEY:

21   Q.  You testified that in that October interview you told the

22   government you never shared pricing with anyone at Tyson.  Do

23   you recall that?

24   A.  Yes, ma'am.

25   Q.  What pricing information were you talking about?

Carl Pepper - Redirect

1    *A.*  Pricing information in the monthly pricing that I got, I

2    never gave anybody that information actually at Tyson.  Also,

3    the pricing for the contract, the RSCS, I didn't give anybody

4    any actual pricing numbers for that one.

5    *Q.*  I am sorry, go ahead.

6    *A.*  I didn't give anybody any pricing numbers for the RSCS

7    contract because I didn't have any.

8    *Q.*  Specific numbers, is that what you are talking about?

9    *A.*  Yes, ma'am.

10   *Q.*  In the conversations you had with Defendant Blake

11   specifically regarding the substantial price increase during

12   the summer of 2014, did you report those conversations to

13   anyone within Tyson?

14   *A.*  Yes, ma'am.

15   *Q.*  And who did you report those two?

16        *MS. PREWITT:*  Objection, Your Honor, asked and

17   answered multiple times on direct.

18        *THE COURT:*  Overruled.

19   *A.*  Ask me that one more time, please.

20   *BY MS. SWEENEY:*

21   *Q.*  So the conversations you had with Defendant Blake regarding

22   the substantial price increase in the summer of 2014, who did

23   you report those conversations to?

24   *A.*  Tim Mulrenin.

25   *Q.*  Did you report the conversations you had with Defendant

Carl Pepper - Redirect

1   Brady regarding the substantial price increase during the 2014

2   negotiations to anyone within Tyson?

3        MR. LAVINE:  Objection, Your Honor.  That's not what

4   the witness has testified to.  There were no conversations.  He

5   said they had to be after the 19th of August.

6        THE COURT:  Overruled.  It's up to the jury.

7   A.  Yes, ma'am.

8   BY MS. SWEENEY:

9   Q.  Who did you report those conversations to?

10  A.  Tim Mulrenin.

11  Q.  And did you report the conversations you had with

12  Defendant Little regarding the substantial price increase

13  during the summer of 2014 to anyone within Tyson?

14  A.  Yes, ma'am.

15  Q.  And who did you report those conversations to?

16  A.  Jimmie Little -- Tim Mulrenin.

17       MS. SWEENEY:  No further questions.

18       THE COURT:  Ms. Johnson, I will allow you -- normally

19  I don't allow any recross, but I will allow Ms. Johnson some

20  questions, if you wish, as to some of the testimony about

21  conversations with Mr. Blake.

22       MS. JOHNSON:  Thank you, Your Honor.

23       THE COURT:  And also, Ms. Johnson, if you wish, you

24  can also -- I will allow each of the defendants an opportunity

25  to ask Mr. Pepper about Exhibit 9977.

Carl Pepper - Recross

1      *MS. JOHNSON:*  Thank you, Your Honor.

2                  **RECROSS-EXAMINATION**

3   *BY MS. JOHNSON:*

4   Q.  Mr. Pepper, I am back up here with you again.  It will be

5   brief.

6           For the first time in two-and-a-half days, the

7   government has just now asked you about period pricing.  Isn't

8   that what you know it to be called?

9   A.  Yes, ma'am.

10  Q.  I believe when you first told -- at the very beginning of

11  your interviews, you told the government about this period

12  pricing you received from Mr. Blake, right?

13  A.  Yes, ma'am.

14  Q.  And you told them he got it from a distributor,

15  Kelly's Food, right?

16  A.  Yes, ma'am.

17  Q.  And you told them it had nothing to do with bids or

18  contracts or future pricing, didn't you?

19  A.  Yes, ma'am.

20  Q.  In fact, you have told the government multiple times period

21  pricing has nothing to do with bids or contracts for future,

22  right?

23  A.  Yes, ma'am.

24  Q.  That's crystal clear in your mind, is it not?

25  A.  Yes, ma'am.

Carl Pepper - Recross

1    Q.  And you tried to tell the government that.

2    A.  Yes, ma'am.

3    Q.  And you talked for months and months and months with

4    Mr. Blake about these period pricing, right?

5    A.  Yes, ma'am.

6    Q.  You shared information.  Mr. Blake shared the period

7    pricing.

8    A.  Yes, ma'am.

9    Q.  Right?

10   A.  Yes, ma'am.

11   Q.  But to be clear, those prices are already set under a

12   contract; is that not correct?

13   A.  Yes, ma'am.

14   Q.  They only fluctuate based on grain primarily, right?

15   A.  Yes, ma'am.

16   Q.  One more point, sir.  At some point in time you told the

17   government that you began giving Mr. Blake false information;

18   isn't that correct?

19   A.  Every once in a while.

20   Q.  So it's fair to say you and Mr. Blake weren't agreeing on

21   anything because you were providing false information; is that

22   true?

23   A.  Yes, ma'am.

24        MS. JOHNSON:  That's all I have.  Thank you, Your

25   Honor.

Carl Pepper - Recross

1       THE COURT:  Thank you, Ms. Johnson.

2              Recross on Exhibit 9977?  Mr. Kornfeld.

3       MR. KORNFELD:  Thank you, Your Honor.

4                       **RECROSS-EXAMINATION**

5   BY MR. KORNFELD:

6   Q.  I am Rick Kornfeld.  I am Mr. Fries' lawyer.  I wanted to

7   ask you some questions.

8              You were asked a moment ago on redirect about your

9   understanding of your non-prosecution agreement, Government

10  Exhibit 9977.  Do you remember that brief discussion?

11  A.  Yes, sir.

12  Q.  We are going to put that up in front of you.

13         MR. KORNFELD:  Thank you.

14             Since this has been admitted, may I also publish this

15  to the jury?

16         THE COURT:  Yes, you may.

17  BY MR. KORNFELD:

18  Q.  So the first thing I wanted to ask you, so the letter is

19  dated 7th of February.  And you testified that you and your

20  attorney executed it on February the 8th of this year, correct?

21  A.  Yes, sir.

22  Q.  Just about a month ago, correct?

23  A.  Yes, sir.

24  Q.  Now, you were interviewed prior to executing this

25  agreement -- backing up, you've sat down with the government

Carl Pepper - Recross

1  well north of 20 times, correct?

2  A.  Yeah, I guess, sir.  I don't know exactly the number.

3  Q.  Well, I counted, and it's more than 20.  You don't quibble

4  with that, do you?

5  A.  No, sir.

6  Q.  Okay.  And you were asked -- some of these were on -- a lot

7  of them especially I guess during the pandemic, the height of

8  the pandemic, were on Zoom or Webex and some were in person,

9  correct?

10  A.  Yes, sir.

11  Q.  As to the Webex one, that was -- those were no less

12  important or no less serious to you because they were on Webex,

13  were they, than if they were in person?  Right?

14  A.  Right.

15  Q.  And on those Webex interviews, was it fair to say there

16  were a number of prosecutors, number of federal agents present?

17      MS. SWEENEY:  Objection, Your Honor, as to the scope.

18  This is about rehashing what was testified on ...

19      THE COURT:  Overruled.

20  BY MR. KORNFELD:

21  Q.  On the screen you are like on Zoom like everybody else the

22  last couple of years, right?

23  A.  Yes.

24  Q.  You saw a bunch of boxes with a bunch of different people,

25  right?

Carl Pepper - Recross

1   A.   Yes, sir.

2   Q.   In fact, I think you were asked on redirect, well,

3   sometimes you had more than one lawyer.  What was the largest

4   number of lawyers representing you on any of these 20-plus

5   interviews, two?

6   A.   Yes, sir, more likely.

7   Q.   And fair to say you were always outnumbered even when you

8   were with two lawyers by the government team?

9   A.   Yes, sir.

10  Q.   I think you testified last week that you talked about the

11  conference table, the first time you came to Washington, and a

12  bunch of people sitting around a table.  Do you remember that?

13  A.   Yeah, yes, sir.

14  Q.   Okay.  And then you execute this agreement on February the

15  8th.  And at that point it's your understanding, is it not,

16  that you are protected from prosecution under the terms of this

17  document?  Correct?

18  A.   Yes, sir.

19  Q.   And then you were asked a bunch of questions about your

20  understanding of the document, and the gist of your testimony

21  on redirect is that you needed to be truthful with the

22  government, correct?

23  A.   Yes, sir.

24  Q.   Now, this is an agreement between you and the U.S.

25  Department of Justice, right?  You and the DOJ are the two

Carl Pepper - Recross

1    parties to this contract, right?

2    A.   Yes, sir.

3    Q.   It doesn't involve the Court, correct?

4    A.   Correct.

5    Q.   It doesn't involve any of the defendants, correct?

6    A.   Yes, sir.

7    Q.   It's between you and the government, right?

8    A.   Yes, sir.

9    Q.   And let me direct your attention to --

10        MR. KORNFELD:   Yes, thank you, the highlighted

11   portion.

12   BY MR. KORNFELD:

13   Q.   So it's between you and the United States.  And if you

14   scroll down to the first sentence of paragraph 1, it says you

15   agree to cooperate fully and truthfully with the United States.

16   Do you see that?

17   A.   Yes, sir.

18   Q.   Now, you understand, do you not, that the ultimate judge of

19   whether you are being truthful are these very folks who work

20   for the DOJ and their, you know, superiors?  Correct?

21   A.   Ask that again, please.

22   Q.   Yeah.  This is between -- this agreement is between you and

23   the Department of Justice, right?

24   A.   The United States, yes, sir.

25   Q.   And if the Department of Justice doesn't think you're being

Carl Pepper - Recross

1    truthful, then all bets are off, and you're not protected,

2    right?

3    A.  Yes, sir.

4    Q.  So it's not whether the Court thinks you are being truthful

5    or the jury thinks you're being truthful; the only folks that

6    matter as to this agreement is the Department of Justice.  They

7    are the ones who decide whether you are being truthful,

8    correct?  That's what this says, right?

9    A.  Yes, sir.

10   Q.  And they are the ones that decide if you're being,

11   quote/unquote, fully truthful, correct?

12   A.  Yes, sir.

13   Q.  And if they decide that you're not being fully truthful,

14   then they can revoke the agreement, correct?

15   A.  Yes, sir.

16   Q.  And, in fact, if you look at the third page, paragraph 3,

17   the second sentence, it says:  In the event that you fail to

18   comply fully with any of your obligations of this agreement,

19   the United States, meaning the Department of Justice, will

20   notify you or your counsel in writing of its intent to void

21   this agreement, right?

22   A.  Yes, sir.

23   Q.  So that in black and white on page 3, it basically says

24   it's up to these folks and these folks alone to decide whether

25   or not you are being truthful, correct?

1818
Carl Pepper - Recross

1  *A.*  Yes, sir.

2  *Q.*  And so when you met with the government after executing

3  this agreement, you certainly wanted to do everything in your

4  power to make sure that the government did not feel the need to

5  notify you or your counsel in writing that they didn't think

6  you were complying and to revoke this agreement, right?  You

7  wanted to honor the agreement.

8  *A.*  And I wanted to make sure to tell the truth.

9  *Q.*  That's right, the truth as interpreted by the Department of

10  Justice, right?  That's what this says, right?

11  *A.*  Yes.

12  *Q.*  And on the second page -- well, beginning on the first

13  page, but at subparagraph A and then continuing for most of the

14  second page, there is kind of a laundry list of things that

15  you're supposed to do when the government tells you to do it,

16  right?

17  *A.*  Yes, sir.

18  *Q.*  You are supposed to produce documents when they ask you to

19  or when they tell you to, right?

20  *A.*  Yeah, that -- yes, sir.

21  *Q.*  At paragraph B at the top of page 2, you are supposed to

22  make yourself available at your expense, not at the

23  government's, to meet with the government when they want to

24  meet with you, right?

25  *A.*  Yes, sir.

1819

Carl Pepper - Recross

 1   Q.  And they did that 20-plus times.  They asked you to either

 2   get on a Zoom or show up in person somewhere, and as you

 3   testified on direct a couple days ago, you did what they asked

 4   you to do, right?

 5   A.  Yes, sir.

 6   Q.  And we talked about paragraph C, responding fully and

 7   truthfully as determined by the government, right?

 8   A.  Yes, sir.

 9   Q.  If you had any materials at paragraph D, you are supposed

10   to produce those when they tell you to, right?

11   A.  Yes, sir.

12   Q.  At paragraph E, if they want to what's called wire you up

13   or ask you to make a call or do something surreptitious, they

14   could ask you to do that under this agreement, right?

15   A.  Yes, sir, they could ask me.

16   Q.  And, in fact, you did do that the prior -- a couple years

17   ago prior to signing this agreement, right?

18   A.  Yes, sir.

19   Q.  In an effort to curry their favor, correct?

20   A.  They asked me to do it, and they asked me did I want -- did

21   I want to do it.  They didn't force me to do it.

22   Q.  I am not suggesting they put a gun to your head.  But you

23   weren't secretly recording a call out of the goodness of your

24   heart.  You didn't want to get prosecuted, right?

25           THE COURT:  Mr. Kornfeld, it's beyond the scope of

Carl Pepper - Recross

 1   this agreement.

 2           *MR. KORNFELD:*  Sorry, Your Honor.

 3   *BY MR. KORNFELD:*

 4   *Q.*  With respect to the next paragraph, when called to do so by

 5   the United States, testifying as you have done for the last

 6   three days, correct?

 7   *A.*  Yes, sir.

 8   *Q.*  And then at the top of paragraph 2, on page 2, it says,

 9   subject to your satisfaction of these obligations, the

10   United States will not bring any criminal charges against you,

11   correct?

12   *A.*  Yes, sir.

13   *Q.*  And, sir, it's true, is it not, that the entity that

14   decides whether or not you have satisfied your obligations

15   under this agreement are these prosecutors and federal agents,

16   correct?

17   *A.*  Yes, sir.

18           *MR. KORNFELD:*  Thank you, sir.

19           *THE COURT:*  Thank you, Mr. Kornfeld.

20           Additional cross?

21           Mr. Gillen?

22                        **RECROSS-EXAMINATION**

23   *BY MR. GILLEN:*

24   *Q.*  Good afternoon, Mr. Pepper.

25   *A.*  Good afternoon.

Carl Pepper - Recross

1    *Q.* Let's go through this very quickly because counsel

2    addressed this letter in detail.

3          You told us on Thursday that in the summer of 2021

4    after all the many interviews that you had with the Department

5    of Justice, that they wouldn't -- that you felt that they

6    weren't going to give you your desired and hoped-for

7    non-prosecution agreement, correct?

8    *A.* Yes, sir.

9    *Q.* And at that time that you -- I believe you told us that

10   your eyes teared up, correct?

11   *A.* Yes, sir.

12   *Q.* And at that time you became concerned and worried that you

13   might be charged and indicted like the people out here and then

14   charged and indicted by the decision-makers here at this table,

15   correct?

16   *A.* It crossed my mind, yes, sir.

17   *Q.* And that they would have the decision, these people would

18   have the decision as to whether you would be out here indicted

19   facing charges or whether they would give you a

20   non-prosecution, correct?  Correct?

21   *A.* Yes, sir.

22   *Q.* And then what happened is we've seen the document here on

23   February the 7th, and I am not going to go through all of the

24   details of it again, but only to say this.  You understand this

25   is not an agreement where you are -- they are ironclad bound to

1822

Carl Pepper - Recross

1  give you non-prosecution.  You understand that, don't you?

2  *A.*  Yes, sir, if I don't tell the truth, yes, sir.

3  *Q.*  You understand that if they don't like what you say and

4  they think that just like last summer that they didn't believe

5  you, and you get up and give testimony, then they can put you

6  back in the suit and put you out here in this courtroom as a

7  defendant, correct?

8       *MS. SWEENEY:*  Objection to characterization of what

9  the government can do and cannot do.

10      *THE COURT:*  Overruled.

11  *BY MR. GILLEN:*

12  *Q.*  You understand if the government doesn't like what you say

13  or they have a problem with your testimony, that you don't have

14  a deal with them that you are -- that you are scot-free right

15  now, do you?  You understand that, right?  Right?

16  *A.*  As long as they don't think I told the truth, yes, sir.

17  *Q.*  And you understand that if they think that your testimony

18  in this trial, that they're unhappy with that, what they can do

19  under this agreement is they can say, We don't think that you

20  have fully complied.  They can notify you and your counsel in

21  writing.  And based upon their own decision, not a court, not a

22  jury, nobody but the Department of Justice, based upon their

23  decision, they can write you and say, This deal is done; it's

24  void.  You understand that, don't you?

25  *A.*  Yes, sir.

Carl Pepper - Recross

1   *Q.*  So you're still under their direction, their discretion,

2   their decision-making about your future, aren't you, sir?

3   Aren't you?

4   *A.*  Yes, sir.

5          *MR. GILLEN:*  That's all I have, Your Honor.  Thank

6   you.

7          *THE COURT:*  Thank you, Mr. Gillen.

8          Additional recross?

9          Is Mr. Pepper subject to recall?

10         *MR. LAVINE:*  Yes, Your Honor, he is.

11         *THE COURT:*  Thank you, Mr. Pepper.  You are excused,

12  but you are subject to recall, so people will be in touch with

13  you if they need you again, all right?  Thank you.

14         The United States may call its next witness.

15         *MS. CALL:*  The government would seek to publish just

16  two documents before the next witness.  The first is Government

17  Exhibit 355.

18         *THE COURT:*  Yes, you may do so.

19         *MS. CALL:*  Thank you, Your Honor.

20         The next exhibit the government wishes to publish is

21  Government's Exhibit 6282.

22         *THE COURT:*  You may.

23         *MS. CALL:*  And, Mr. Berlin, if you could please zoom

24  in on the lower e-mail of the chain.

25         *THE COURT:*  All right.

Sara Fisher - Direct

1      MS. CALL:  Mr. Berlin, if you could zoom in on the top

2   e-mail in the chain, please.

3      THE COURT:  Okay.

4      MS. CALL:  Thank you, Your Honor.

5      The United States will now call its next witness,

6   Sara Fisher.

7     (**Sara Fisher** was sworn.)

8      THE WITNESS:  I do.

9      COURT DEPUTY CLERK:  Please state your name and spell

10  your first and last name for the record.

11      THE WITNESS:  Sara Fisher, S-A-R-A, F-I-S-H-E-R.

12                    **DIRECT EXAMINATION**

13  BY MS. SWEENEY:

14  Q.  Good afternoon, Ms. Fisher.

15  A.  Good afternoon.

16  Q.  Are you employed?

17  A.  Yes.

18  Q.  What's your employer?

19  A.  Restaurant Supply Chain Solutions.

20  Q.  I am sorry, could you just lean into the microphone a

21  little bit?  Maybe you can pull it up closer to your mouth.

22  A.  Restaurant Supply Chain Solutions.

23  Q.  Is there a short name that Restaurant Supply Chain

24  Solutions goes by?

25  A.  Yes, RSCS.

Sara Fisher - Direct

1   Q.  If I call your employer RSCS, will you understand what I am

2   referring to?

3   A.  Yes.

4   Q.  What's the city and state of your current work location?

5   A.  Louisville, Kentucky.

6   Q.  What's the city and state of RSCS's headquarters?

7   A.  Louisville, Kentucky.

8   Q.  Do you work at headquarters?

9   A.  Yes.

10  Q.  How long have you been employed at RSCS?

11  A.  Since 2008.

12  Q.  So how many years has that been approximately?

13  A.  14.

14  Q.  Briefly what does RSCS do?

15  A.  We are the sole supply chain arm for Yum Brands.

16  Q.  And what are the Yum Brands?

17  A.  KFC, Pizza Hut, Taco Bell, and Habit Burger.

18  Q.  What does RSCS do with regard to the -- can you explain

19  what it means to be the sole supply chain for the Yum Brands?

20  A.  We are responsible for the purchasing of food and

21  packaging, equipment, responsible for national promotions, just

22  supply chain assurance.

23  Q.  And what is your current position at RSCS?

24  A.  Senior director of distribution and Habit Burger Grill.

25  Q.  How long have you been in that position?

Sara Fisher - Direct

1   A.  Since April 2021.

2   Q.  Did you have a different position prior to April of 2021?

3   A.  Yes.

4   Q.  And what was that?

5   A.  I was director of food procurement.

6   Q.  How long were you the director of food procurement?

7   A.  About two years.

8   Q.  What were those years?

9   A.  2019 to 2021.

10  Q.  Did you hold a position before that?

11  A.  Yes.

12  Q.  And what was that position?

13  A.  Senior manager of poultry procurement.

14  Q.  When were you senior manager of poultry procurement?

15  A.  June 2016 through March of 2019.

16  Q.  About how long were you in that role?

17  A.  About two-and-a-half years, longer than two-and-a-half

18  years.

19  Q.  Did you hold any positions at RSCS before you were the

20  senior manager of poultry procurement?

21  A.  Yes.

22  Q.  What were those roles?

23  A.  Came in the accounting and credit department for about four

24  years and then worked on the KFC team for about four years.

25  Q.  Ms. Fisher, do you have any education after high school?

Sara Fisher - Direct

1    A.   Yes.

2    Q.   Where did you study?

3    A.   Western Kentucky University.

4    Q.   And what did you study?

5    A.   Finance.

6    Q.   Did you receive a degree?

7    A.   I did.

8    Q.   Did you have any employment after college and before you

9    joined RSCS?

10   A.   Yes.

11   Q.   What was that?

12   A.   I worked at First Investors for a short time and then

13   worked for Chase Bank.

14   Q.   So during your role as the senior manager of poultry

15   procurement, who did you report to?

16   A.   Rich Eddington.

17   Q.   What were your responsibilities?

18   A.   I was responsible for contract negotiations, supplier

19   relationship management, and just the day-to-day supply

20   assurance.

21   Q.   Was there any part of Yum Brands in particular you had

22   responsibilities for?

23   A.   KFC, Pizza Hut, and Taco Bell.

24   Q.   Focusing on KFC, what products were you responsible for

25   procuring?

Sara Fisher - Direct

1    *A.*  The KFC chicken on the bone.

2    *Q.*  Were there any other products aside from the KFC chicken on

3    the bone?

4    *A.*  For KFC, no.

5    *Q.*  What types of products were in the KFC chicken on the bone?

6    *A.*  Eight-piece, supplemental dark meat, supplemental wings,

7    supplemental split breasts, and livers and gizzards.

8    *Q.*  Let's take those piece by piece.  Starting with COB, what

9    is COB?

10    *A.*  It's chicken on the bone.

11    *Q.*  What is the eight-piece COB that you described?  What is

12    that used for?

13    *A.*  Fried chicken product.

14    *Q.*  What size bird does it come from while you were the senior

15    manager of poultry procurement?

16    *A.*  Small bird.

17    *Q.*  You also mentioned supplemental dark meat.  What is that

18    used for?

19    *A.*  It's used for fried chicken as well.

20    *Q.*  What size bird did supplemental dark meat come from in the

21    time when you were senior manager of poultry procurement?

22    *A.*  Small bird.

23    *Q.*  What about supplemental split breast, what is that used

24    for?

25    *A.*  Same thing, for fried chicken.

Sara Fisher - Direct

1   Q.   And what size birds did that come from?

2   A.   Small bird.

3   Q.   You also mentioned supplemental wings.  What were those

4   used for?

5   A.   Fried chicken product as well.

6   Q.   What size bird did those come from?

7   A.   Small bird.

8   Q.   And finally, I believe you mentioned livers and gizzards.

9   What were those used for?

10  A.   They were fried and served at the restaurants.

11  Q.   And what size birds did the livers and gizzards come from?

12  A.   Small.

13  Q.   So when you were the senior manager for poultry

14  procurement, KFC only purchased small-bird products?

15  A.   For the chicken on the bone, yes.

16  Q.   And the chicken on the bone, is that what you had

17  responsibility for?

18  A.   Yes.

19  Q.   So of the chicken products that you just described related

20  to KFC specifically, which was the largest by volume?

21  A.   The eight-piece.

22  Q.   Was eight-piece an important product for KFC?

23  A.   Yes.

24  Q.   And why is that?

25  A.   It was and it still is their top menu item.

Sara Fisher - Direct

1    Q.  When you were the senior manager of poultry procurement

2    from I believe you said June of 2016 through March of 2019,

3    about how much chicken did KFC purchase per year?

4    A.  It was typically between 400 and 500 million pounds.

5    Q.  That's 4- to 500 million pounds per year?

6    A.  Yes.

7    Q.  So as a senior manager of poultry procurement, you

8    testified you had responsibility for fresh chicken for KFC.

9    Practically what does that mean?

10   A.  It was a fresh product that was shipped from supplier to

11   distributor to the restaurants.

12   Q.  And what aspects of the supply did you have responsibility

13   for?

14   A.  The contract negotiations, day-to-day supply assurance, and

15   just the supplier relationships.

16   Q.  At that time, did you actually buy the chicken for the KFC

17   restaurants?

18   A.  No.

19   Q.  So how did chicken get from the supplier to the

20   restaurants?

21   A.  RSCS was responsible for the contracting of the volume, and

22   then distributors would order from suppliers based on our

23   direction, and then the restaurants would order from the

24   distributors.

25   Q.  And could the restaurants or the franchises buy chicken

Sara Fisher - Direct

1    outside of these contracts?

2    A.   No.

3    Q.   Why not?

4    A.   Because it was a specific product or a specification that

5    came from KFC and only -- they only allow purchase through

6    approved distributors and suppliers.

7    Q.   Were you the only person who worked in poultry procurement

8    back when you were the senior manager of poultry procurement?

9    A.   No.

10   Q.   Who else did you work with?

11   A.   Steve Campisano, and then our team leader was

12   Rich Eddington.

13   Q.   So focusing on Mr. Campisano for a second, what was his

14   role?

15   A.   He was responsible for further processed poultry products

16   at that time.

17   Q.   And were those products that KFC purchased?

18   A.   Yes.

19   Q.   And then you mentioned someone by the name of

20   Mr. Eddington.  What was his role?

21   A.   He was our team leader.  He was responsible for the poultry

22   department.

23   Q.   Are you familiar with someone by the name of Peter Suerken?

24   A.   Yes.

25   Q.   How are you familiar with Mr. Suerken?

Sara Fisher - Direct

1   *A.*   He was Rich's boss at that time.

2   *Q.*   When you say "Rich's boss," can you clarify who you are

3   talking about?

4   *A.*   Rich Eddington.

5   *Q.*   So what was Mr. Suerken's role at that time in terms of

6   procurement?

7   *A.*   He was the VP of the food and packaging team.

8   *Q.*   I would like to direct your attention to the year 2017.

9   Were you involved in negotiating an RSCS/KFC contract during

10   that year?

11   *A.*   Yes.

12   *Q.*   Generally what were your responsibilities for that

13   negotiation?

14   *A.*   I was new to the team at that time, so my role was more of

15   a kind of behind-the-scenes analysis and then just the

16   communication.

17   *Q.*   When you say "communication," can you describe what you

18   mean?

19   *A.*   Communication to the suppliers.

20   *Q.*   In 2017, can you describe how the contracting process

21   worked?

22   *A.*   We went through an RFP, which is just kind of a formalized

23   contract negotiation process.  We had a kickoff and then

24   multiple rounds of bids that were received from the suppliers.

25   *Q.*   I would like to take that step by step.

Sara Fisher - Direct

1           Starting with the RFP, what is an RFP?

2    A.  It's a request for proposal.  It's just a formal contract

3    negotiation process.

4    Q.  Then you mentioned the kickoff.  What was the kickoff?

5    A.  I sent an e-mail to all the suppliers that we wanted to

6    participate just letting them know that we were ready to start

7    the contract negotiations.

8    Q.  After the kickoff, what happened next?

9    A.  We requested that each of the suppliers come in to present

10   their first round of bids, and then we provided feedback for

11   multiple rounds after that and eventually awarded contracts.

12   Q.  Now, when you said that the suppliers presented their bids,

13   what is a bid?

14   A.  It's just a proposal for, you know, volume, included

15   volume, pricing, plant locations and product that they were

16   offering up.

17   Q.  And it's a proposal for what?

18   A.  Business.

19   Q.  You mentioned multiple rounds of bids.  Can you describe

20   what you mean when you said "round"?

21   A.  So round one, each supplier would present a bid.  We would

22   do some analysis behind the scenes, give the suppliers feedback

23   and request that they provide a second round of bids and then

24   if needed a third and so on.

25   Q.  So for this contract specifically that we are talking

Sara Fisher - Direct

1  about, was there more than one round of bids?

2  A.  Yes.

3  Q.  Were there more than two rounds?

4  A.  I would say probably depended by supplier.  I think it was

5  a little bit different by supplier.

6  Q.  Did some suppliers have more than two rounds of bids?

7  A.  Yes, I believe so.

8  Q.  You also mentioned the word providing "feedback."  Can you

9  describe to the Ladies and Gentlemen of the Jury what you mean

10  by "feedback"?

11  A.  Yes.  So we would do kind of behind-the-scenes analysis.

12  If pricing wasn't where we were looking for it to be and volume

13  wasn't what we were looking for, plant locations, we would

14  provide feedback to them and a request that they submit another

15  proposal.

16  Q.  And what type of feedback would you provide?

17  A.  We would give them -- it could range.  We could ask them

18  for adding of additional plants, additional volume, let them

19  know that their pricing wasn't where we thought it should be.

20  It just depended.

21  Q.  Now, at the end of the RFP process, what was the ultimate

22  outcome?

23  A.  We awarded contracts to suppliers.

24  Q.  And in this specific contract negotiation that you were

25  talking about that took place in 2017, how many contracts were

Sara Fisher - Direct

1   awarded?

2   *A.*  Eight.

3   *Q.*  And so were there eight chicken suppliers who each got a

4   contract?

5   *A.*  Yes.

6   *Q.*  Did you understand those eight suppliers to be competitors?

7   *A.*  Yes.

8   *Q.*  If all of the suppliers won business, could you explain why

9   you understood them to be competitors?

10  *A.*  They were separate entities.

11  *Q.*  So what were they competing to get?

12  *A.*  Our business.

13       *MS. SWEENEY:*  Your Honor, may I approach the witness

14  and Your Honor with a document?

15       *THE COURT:*  You may.

16  *BY MS. SWEENEY:*

17  *Q.*  So, Ms. Fisher, you should have a binder in front of you of

18  documents.  I would like you to take a look at Tabs 1 through 8

19  and look up at me when you are ready.

20       *MS. SWEENEY:*  For the record, these are Government

21  Exhibits 1921, 1922, 1923, 1924, 1926, 1927, 1928, and 1929.

22  *BY MS. SWEENEY:*

23  *Q.*  Have you reviewed those documents?

24  *A.*  Yes.

25  *Q.*  Do you recognize those documents?

Sara Fisher - Direct

1    A.   Yes.

2    Q.   What types of documents are they?

3    A.   E-mails.

4    Q.   Who are they from?

5    A.   Me.

6    Q.   And who were they sent to?

7    A.   Each of the suppliers that we wanted to include in the

8    contract negotiations.

9    Q.   The -- were they the same suppliers that ultimately

10   received contracts that you testified about?

11   A.   Yes.

12   Q.   Are these e-mails related to the formal RFP process that

13   you described?

14   A.   Yes.

15   Q.   And what day -- how were they related to the formal RFP

16   process?

17   A.   It was the kickoff e-mail that I sent to each of them.

18   Q.   And what day did you send each of these e-mails?

19   A.   December 9, 2016.

20        MS. SWEENEY:   The government moves to admit Government

21   Exhibits 1921, 1922, -23, -24, 1926, 1927, 1928, and 1929.

22        THE COURT:   Exhibit 1923 is already admitted.

23        Any objection to the admission of Exhibit 1921, 1922,

24   1924, 1926, 1927, 1928, and 1929?

25        Each of those will be admitted.

Sara Fisher - Direct

1    *BY MS. SWEENEY:*

2    *Q.*  Now, Ms. Fisher, were these documents the kickoff e-mails

3    you were describing earlier?

4    *A.*  Yes.

5    *Q.*  I would now ask you to take a look through Tabs 9 through

6    17 of your binder.

7          *MS. SWEENEY:*  For the record, these are 1941, 1942,

8    1943, 1944, 1945, 1946, 1947, 1957, and 1958.

9    *BY MS. SWEENEY:*

10   *Q.*  Have you reviewed those documents?

11   *A.*  Yes.

12   *Q.*  Do you recognize them?

13   *A.*  Yes.

14   *Q.*  Who wrote them?

15   *A.*  I did.

16   *Q.*  Generally, what type of documents are they?

17   *A.*  It was an e-mail for a calendar invite.

18   *Q.*  What's the general subject matter of the calendar invite?

19   *A.*  We were requesting that each supplier come in to present

20   their round one bids to us.

21   *Q.*  And do these documents relate to the formal RFP process you

22   described earlier?

23   *A.*  Yes.

24   *Q.*  In what way?

25   *A.*  They are after the kickoff e-mail, this was the next step

 1    for the suppliers to come in and walk us through their bids.

 2            MS. SWEENEY:  At this time, the government moves to

 3    admit Government Exhibits 1941 through -47 and then 1957 and

 4    -58.

 5            THE COURT:  Any objection to those e-mails?

 6            MR. QUINN:  No objection subject to redaction of the

 7    stamp at the top of the documents.

 8            THE COURT:  Ms. Sweeney, is that a litigation-added

 9    indication?

10            MS. SWEENEY:  Yes, Your Honor.

11            THE COURT:  I will overrule that objection.  I will

12    admit Exhibit 1941 through -47 and 1957 and 1958.

13    BY MS. SWEENEY:

14    Q.  So, Ms. Fisher, did these meetings we just looked at, did

15    they occur at or around the time reflected in these calendar

16    entries?

17    A.  Yes.

18    Q.  Were they conducted one-on-one between RSCS and each

19    supplier?

20    A.  Yes.

21            MS. SWEENEY:  Your Honor, I see the time.  I am happy

22    to continue, but this would be a convenient breaking point.

23            THE COURT:  Perfect time.

24            Ladies and Gentlemen, we will break for the day,

25    5:00 o'clock.  So keep those admonitions in mind.  Once again,

1    make sure that you are vigilant about publicity and don't let

2    people try to talk to you as well, okay?  Hope you have a good

3    evening.  We will reconvene tomorrow at 8:30.

4          The jury is excused.

5          (Jury excused.)

6          THE COURT:  Ms. Fisher, you are excused until

7    tomorrow.  Thank you.

8          THE WITNESS:  Thank you.

9          Anything to take up before we recess?

10         Mr. Koenig?

11         MR. KOENIG:  Yes, Your Honor.  If we could get a

12   status update on the revised witness list.

13         THE COURT:  Any update on the revised witness list?

14         Mr. Beller?

15         MR. BELLER:  Your Honor, I think I am going to be the

16   spokesperson, Your Honor.  And I understand and appreciate the

17   government's request.  The defendants are going to be, I think,

18   culling down our list and providing a more updated list to the

19   government.  That's a little bit difficult for us to do right

20   now, Your Honor, simply because we are not exactly certain

21   what's coming up next.

22         For example, it was a bit of a surprise that

23   reduced-weight chicken was not a part of this particular trial.

24   We have had some discussions regarding NAE or no antibiotics

25   ever, so it's a little tough for us because, of course, we are

1   preparing to rebut evidence that is ultimately not coming in.

2        So I think the government is asking a very reasonable

3   request of us, and we certainly have no problems culling down

4   that list understanding we are having a hard time anticipating

5   what is coming next.  So if the Court would give us until end

6   of day on Wednesday or close of business or, rather, I guess we

7   may have to do it after court, we can give them a very

8   culled-down list, I believe.

9        And once we have an understanding of what the

10  government is continuing to present, we also recognize our

11  ongoing obligations to further cull that list and make it as

12  good faith as we can possibly make it.  Under no circumstances

13  will the government not have a complete list for the eight

14  hours prior to testimony, so we are not in any way playing

15  games.  We are simply trying to be responsive to both them, as

16  well as the evidence that's coming in.

17       THE COURT:  The government isn't worrying about having

18  a complete list.  It's more concerned about having a pared-down

19  or, as you used the appropriate chicken term, culled list.

20       Mr. Koenig?

21       MR. KOENIG:  Sure.  Thank you.  You know, as far as

22  the scope of the case goes, it's not as though the evidence of

23  reduced weight or antibiotic-free is somehow gone from the

24  case; it's just not the focus of the witness' testimony.  So I

25  don't see that there is any real meaningful difference between

1    scope of the last one, scope of this one, trials I mean.

2         I do think Wednesday is a little late.  You know, I

3    obviously don't know how long Mr. Bryant will be crossed for,

4    and then we have, what, two witnesses after that, but they

5    should be fairly short.  And they were ones that were in the

6    last trial.  So, you know, if Mr. Bryant is a day and those

7    witnesses are a day each, we could be resting on Wednesday.

8    Maybe I am being hopefully optimistic.  That would really be a

9    crunch, then, if they started with witnesses on Wednesday.

10        *THE COURT:*  What I would like is if you could have --

11   is it possible that the defendants could have a day -- the

12   first day's worth of witnesses by the end of the day tomorrow

13   and then the rest of the list by the end of the day on

14   Wednesday or 5:00 o'clock on Wednesday?

15        *MR. BELLER:*  Certainly, Your Honor.  We will do what

16   we need to, although that does bring us to another issue,

17   because our last communication with the government, they

18   indicated that they may not be calling additional witnesses,

19   and they can close as early as tomorrow or they may not

20   close -- may not rest their case until Thursday.  And so at

21   this point the defendants don't know who is being called and

22   who isn't being called.  So I can talk a little bit more about

23   the first day once we have a better understanding of the

24   government's timing.

25        So in other words, pun intended here, it's a

1    chicken-and-an-egg argument.  We don't know what's coming in

2    front of us, so we are having a difficult time coming up with

3    witnesses to be available to potentially put on.

4         THE COURT:  I will let both sides talk about that, but

5    obviously if there is uncertainty about when the government

6    will rest, that could affect availability, so -- but maybe if

7    the government has a little bit better sense of when that

8    timing is, then there would be a better ability to produce the

9    first day's or at least a day's worth of witnesses, the first

10   day's worth.  So we can take this up again tomorrow, but

11   hopefully by talking between the two sides, progress can be

12   made about that.

13        MR. BELLER:  Your Honor, my request, then, would be

14   for purposes of being able to give the government what they are

15   seeking, if we can plan on calling defense witnesses on Monday

16   if the government continues to anticipate that they are going

17   to finish this week.  It allows us to really be able to line up

18   witnesses starting on Monday.  And I would remind the Court

19   that we still have an opening that is still scheduled to be

20   given to the jury as well.

21        THE COURT:  That is true.  Thanks for reminding me.  I

22   don't want to run the risk like, for instance, not using

23   Thursday.  I don't want to declare Thursday a holiday.  So you

24   need to coordinate so that we avoid something of that nature.

25   If there -- I just don't want to have a gap if we can avoid it.

1        MR. KOENIG:  I think we can get defendants a more

2   concrete idea as to the sort of final -- the end of the

3   witnesses and all that.  I think we can probably do that this

4   evening so they can get us the first couple days or day of

5   witnesses by tomorrow.

6        THE COURT:  Right.  You have to do that because

7   otherwise they -- it may be difficult for them to be able to

8   predict the schedule.  So -- but other than the wild card of

9   simply the Koppenhaver, the other witnesses, I can't remember

10  about Mr. Scholer, but the other witnesses should have some

11  predictability.  And I know the government has already provided

12  estimates, but if you have some better estimates or better

13  predictions, that would be helpful I am sure.

14        Thank you, Mr. Beller.

15        Anything further, Mr. Beller?

16        MR. BELLER:  Nothing further.

17        MR. KOENIG:  Oh, so, yeah, Mr. Scholer, I think it was

18  yesterday we informed them Mr. Scholer would not be called.

19        THE COURT:  Okay.

20        MR. BELLER:  If we have one or two more witnesses, I

21  am assuming that means it's Mr. Brink and potentially

22  Agent Koppenhaver if there are two left.

23        MR. KOENIG:  It would be, I am sorry, Mr. Bryant,

24  Mr. Lewis, Mr. Brink.  If we call Agent Koppenhaver, it will be

25  in rebuttal.

1          *MR. BELLER:* Understood.  Obviously if

2     Agent Koppenhaver is going to testify, we have much more to

3     talk about regarding the scope of his testimony, but -- and

4     whether it's even appropriate for rebuttal, of course,

5     depending upon what the defense's case is, but we can discuss

6     that further off the record.

7          *THE COURT:*  Okay.

8          Ms. Call?

9          *MS. CALL:*  Very briefly, Your Honor.  Whenever it is

10    convenient, the parties and the Court, there are still six

11    exhibits that the government offered last month that I believe

12    the defendants wanted the opportunity to discuss outside the

13    presence of the jury.  It was six documents we sought admission

14    for under 801(d)(2)(A) which were listed in the government's

15    filing.  I can pull the ECF number.  ECF-1086, Section 4 had

16    listed each of those documents.  I can list the exhibit numbers

17    if that would be helpful.

18         *THE COURT:*  Yes, please do.

19         *MS. CALL:*  Government Exhibit 247, 1256, 1258, 1700,

20    1713, and 9991.  To be clear, 9991 had been listed as 8098 in

21    the previous filing and when it was ruled on in the

22    supplemental *James* log; however, it was a large spreadsheet of

23    text messages, and there was only one text message the

24    government was seeking to admit, so 9991 is the excerpt

25    containing that.

1    THE COURT:  Okay.  I haven't looked at those in so

2  long, I think it might be more efficient for us -- why don't we

3  plan on talking about that maybe lunch tomorrow.  Why don't we

4  plan on doing that right after we're done at noon, why don't we

5  tackle those, unless you want to do it at 1:00, but why don't

6  we do that, then.  But you are right, I did forget about those.

7        Ms. Henry?

8        MS. HENRY:  I just wondered for timing purposes does

9  the government anticipate using considerable time in front of

10  the jury to put in documents at this point?  Just again timing.

11        MS. CALL:  Is the question what I am offering or

12  publishing?

13        MS. HENRY:  Timing.

14        THE COURT:  Well, I think Ms. Henry is just asking,

15  along with the witness testimony that we just talked about,

16  will there be stretches of time when documents will be

17  published?

18        MR. KOENIG:  I realized I forgot to say that when I

19  was talking about my estimated time.

20        THE COURT:  But you will include that in your

21  estimations, so ...

22        MS. CALL:  Yes, Your Honor.

23        THE COURT:  All right.  Mr. Fagg -- do you have

24  anything else, Ms. Call?

25        MS. CALL:  I don't believe so.  Thank you.

1         THE COURT:  Mr. Fagg, go ahead.

2         MR. FAGG:  Thank you.  I was just seeking one point of

3    clarification from Ms. Call.  So am I correct that the

4    government is withdrawing 9991 and instead seeking to offer

5    8098 which is an excerpt from 9991?

6         MS. CALL:  It is the reverse.  9991 is an excerpt of

7    8098.

8         THE COURT:  And the government is going to be offering

9    9991, right?

10        MS. CALL:  Yes, Your Honor.

11        MR. FAGG:  Thank you.

12        THE COURT:  Thank you, Mr. Fagg.

13        MS. CALL:  One thing I should have noted following our

14   discussions this morning on the summary exhibits, the

15   government has sent the revised versions taking into account

16   the Court's orders over the past week or so to defendants to

17   give them an opportunity to review.  I think we are hoping to

18   offer them again tomorrow.

19        THE COURT:  Just so I am clear, that one objection

20   that had to do with the substitution of the SMS entry, that

21   objection was overruled, so the government can revise in that

22   manner.

23        MS. CALL:  Thank you, Your Honor.  Understood.

24        MR. KOENIG:  We told this to defense as well, but just

25   so the Court knows, Mr. Scholer, like Agent Koppenhaver, could

1   be a rebuttal witness.  I didn't mean to suggest that he is off

2   the charts completely.

3           THE COURT:  Yeah, I don't think you did.

4           Mr. Beller or Ms. Johnson?

5           MR. BELLER:  No, thank you.  Sorry.

6           THE COURT:  No, that's all right.  I just want to

7   double-check.  We will be in recess until tomorrow at 8:30.

8   Thank you.

9       (Recess at 5:14 p.m.)

10                              INDEX

11  WITNESSES

12    Carl Pepper

13          Cross-examination By Ms. Prewitt            1571

14          Cross-examination By Mr. Feldberg           1678

15          Cross-examination By Ms. Johnson            1683

16          Cross-examination By Mr. Byrne              1718

17          Cross-examination By Mr. Tubach             1747

18          Cross-examination By Ms. Henry              1748

19          Cross-examination By Mr. Lavine             1749

20          Redirect Examination By Ms. Sweeney         1774

21          Recross-examination By Ms. Johnson          1811

22          Recross-examination By Mr. Kornfeld         1813

23          Recross-examination By Mr. Gillen           1820

24    Sara Fisher

25          Direct Examination By Ms. Sweeney           1824

|  | INDEX (Continued) |  |  |  |  |  |
|---|---|---|---|---|---|---|
|  | | | EXHIBITS | | | |
| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |  |
| G-356 |  | 1602 |  |  |  |  |
| G-422 |  | 1720 |  |  |  |  |
| G-423 |  | 1721 |  |  |  |  |
| G-444 |  | 1626 |  |  |  |  |
| G-446 |  | 1628 |  |  |  |  |
| G-748 |  | 1655 |  |  |  |  |
| G-749 |  | 1655 |  |  |  |  |
| I-805 |  | 1703 |  |  |  |  |
| I-807 |  | 1641 |  |  |  |  |
| I-815 |  | 1724 |  |  |  |  |
| I-821 |  | 1642 |  |  |  |  |
| I-822 |  | 1642 |  |  |  |  |
| I-872 |  | 1712 |  |  |  |  |
| I-919 |  | 1766 |  |  |  |  |
| I-932 |  | 1680 |  |  |  |  |
| I-953 |  | 1758 |  |  |  |  |
| I-954 |  | 1756 |  |  |  |  |
| I-958 |  | 1764 |  |  |  |  |
| I-993 |  | 1681 |  |  |  |  |
| 1921 |  | 1837 |  |  |  |  |
| 1922 |  | 1837 |  |  |  |  |
| 1924 |  | 1837 |  |  |  |  |

1       INDEX (Continued)

2          EXHIBITS

3   Exhibit       Offered   Received   Refused   Reserved   Withdrawn

4   1926                    1837

5   1927                    1837

6   1928                    1837

7   1929                    1837

8   1941                    1838

9   1942                    1838

10  1943                    1838

11  1944                    1838

12  1945                    1838

13  1946                    1838

14  1947                    1838

15  1957                    1838

16  1958                    1838

17  I-7772                  1580

18  9876                    1762

19  9977                    1799

20          REPORTER'S CERTIFICATE

21      I certify that the foregoing is a correct transcript from

22  the record of proceedings in the above-entitled matter.  Dated

23  at Denver, Colorado, this 20th day of May, 2022.

24

25                          S/Janet M. Coppock