```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLORADO
 2
     Criminal Action No. 20-CR-00152-PAB
 3   In Re: Penn II
     UNITED STATES OF AMERICA,
 4
         Plaintiff,
 5
     vs.
 6
     JAYSON JEFFREY PENN,
 7   MIKELL REEVE FRIES,
     SCOTT JAMES BRADY,
 8   ROGER BORN AUSTIN,
     TIMOTHY R. MULRENIN,
 9   WILLIAM VINCENT KANTOLA,
     JIMMIE LEE LITTLE,
10   WILLIAM WADE LOVETTE,
     GARY BRIAN ROBERTS,
11   RICKIE PATTERSON BLAKE,

12       Defendants
     _____
13
                         REPORTER'S TRANSCRIPT
14                       Trial to Jury, Vol. 15
     _____
15

16            Proceedings before the HONORABLE PHILIP A. BRIMMER,

17   Chief Judge, United States District Court for the District of

18   Colorado, commencing at 8:36 a.m., on the 17th day of March,

19   2022, in Courtroom A201, United States Courthouse, Denver,

20   Colorado.

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
       Produced via Computer by Janet M. Coppock, 901 19th Street,
25         Room A257, Denver, Colorado, 80294, (303) 335-2106
```

```
1                          APPEARANCES
2           Michael Koenig, Carolyn Sweeney, Heather Call and Paul
3    Torzilli,, U.S. Department of Justice, 450 Fifth Street N.W.,
4    Washington, DC 20530, appearing for Plaintiff.
5           Anna Tryon Pletcher and Michael Tubach of
6    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
7    San Francisco, CA 94111-3823;
8           Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
9    N.W., Washington, DC 20006, appearing for Defendant Penn.
10          David Beller, Richard Kornfeld and Kelly Page of
11   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
12   CO 80202, appearing for Defendant Fries.
13          Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
14   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
15           Laura Kuykendall and Megan Rahman of Troutman Pepper
16   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
17   appearing for Defendant Brady.
18          Michael Felberg of Reichman, Jorgensen, Lehman,
19   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
20   10017;
21
22
23
24
25
```

1              APPEARANCES (Continued)

2              Laura F. Carwile of Reichman, Jorgensen, Lehman,

3      Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4      CA 94065; appearing for Defendant Austin.

5              Elizabeth B. Prewitt of Latham & Watkins, LLP,

6      555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7              Marci Gilligan LaBranche of Stimson, Stancil,

8      LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9      80218, appearing for Defendant Mulrenin.

10              James A. Backstrom, Counselor at Law, 1515 Market

11     Street, Suite 1200, Philadelphia, PA 19102-1932;

12              Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13     Bethesda, MD 20814, appearing for Defendant Kantola.

14              Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15     Street, Suite 1100, Los Angeles, CA 90017;

16              Dennis J. Canty, Canty Law Corporation,

17     1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18     appearing for Defendant Little.

19              John Anderson Fagg, Jr. and James McLoughlin of

20     Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21     Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

1                    APPEARANCES (Continued)

2              Craig Allen Gillen and Anthony Charles Lake of

3     Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4     Atlanta, GA 30339;

5              Richard L. Tegtmeier of Sherman & Howard, LLC,

6     633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7     for Defendant Roberts.

8              Barry J. Pollack of Robbins, Russell, Englert, Orseck

9     & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10    DC 20006;

11             Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12    5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13    for the Defendant Blake.

14

15                        PROCEEDINGS

16         *THE COURT:*  Are we ready, Mr. Koenig?

17         *MR. KOENIG:*  Your Honor, if I may, yesterday's

18    testimony by Mr. Finch, after reviewing it and looking at it in

19    conjunction with the documents that the defendants have

20    disclosed that they may use with him, which the number's

21    roughly around 50 documents, it's really apparent that there is

22    sort of three issues going on with his testimony, sort of a

23    combination of foundational issues, hearsay, and narrative.

24             And if you look at the documents that -- I realize you

25    don't have the binder of documents, but by my count, he is on

Gregory Finch - Direct

1   zero of the documents that they plan to use with him, none.

2   And so it really, really begs the question as to what is the

3   basis for his knowledge?  Is it based on hearsay?  And to

4   channel the defendants' objections when we had our witnesses

5   up, I think there needs to be a lot more of the who, what,

6   where, why, when type foundational questions.

7          For instance, he talks about, Well, this is what

8   customers would tell us to do.  When did they tell you?  Where

9   did they tell you?  You know, were you there?  Did you hear it?

10  That sort of thing.

11         So, you know, I think there needs to be a lot more of

12  that and a lot less of, you know, one line question and then 15

13  lines of transcript with a big, huge narrative that really goes

14  beyond what the question was in the first place.

15         THE COURT:  Well, we'll see how it plays out.

16         MR. KOENIG:  Thank you.

17         THE COURT:  Ready for the witness?

18         (Jury present.)

19         THE COURT:  Great job getting in today, Ladies and

20  Gentlemen.  Really terrific job.  And quite a bit of green

21  showing there, so I tried to do my part.

22         All right.  We are ready to continue.

23         Mr. Beller, go ahead.

24         MR. BELLER:  Thank you.

25                    **DIRECT EXAMINATION CONTINUED**

Gregory Finch - Direct

1    *BY MR. BELLER:*

2    *Q.*  Good morning again, Mr. Finch, and Happy St. Patrick's Day,

3    sir.

4    *A.*  Good morning.  Same to you.

5    *Q.*  Mr. Finch, yesterday we were talking a little bit about

6    Claxton's internal process for contracts and for bids.  And so

7    this morning, I want to switch gears and speak a little bit

8    more about period pricing, okay?

9    *A.*  Okay.

10   *Q.*  Once Claxton Poultry inputs all of its costs and comes to

11   an agreement with the customer on price, does that price stay

12   the same throughout the year?  And, again, I am talking about

13   the QSRs with the cost-plus models.

14   *A.*  No.

15   *Q.*  Why not?

16   *A.*  Well, we have a mechanism called period pricing, so as I

17   described yesterday, through the bid process the QSR dictates

18   what the corn and soybean prices are to establish the contract

19   price.  And then from that point forward, we put the actual

20   ingredient cost into the matrix and then whatever that

21   recalculates to becomes what we call the period price.

22   *Q.*  So to put it simply, is it accurate to say that when

23   Claxton's cost of feed changes, so does the price?

24   *A.*  It does.

25   *Q.*  Do customers ever ask Claxton to lower a price in the

Gregory Finch - Direct

 1   middle of a contract term?

 2           MR. KOENIG:  Objection, hearsay.

 3           THE COURT:  He can answer if he knows.

 4   A.  Yes, all the time.

 5   BY MR. BELLER:

 6   Q.  We'll talk about that more in just a moment.

 7           How are you involved with the period pricing?

 8   A.  So either myself or someone in my office -- let me back up

 9   for just a second.  The QSR has dictated when to buy corn and

10   soy, how much to buy, and at what price.  So when they have

11   given us that information, we place those orders.  So when the

12   period pricing comes around -- they have also given us a

13   calendar, a period pricing calendar, that tells us when pricing

14   is due and for what period that price will cover, you know,

15   November 1st to November 30th, for instance.

16           So when it comes time to turn that bid in or that

17   period price in, rather, either myself or someone in my office

18   will update the model with the new pricing for the feed, and

19   then we send that to Scott and sometimes Mikell for their

20   review to put another set of eyes on it, make sure we didn't

21   make a mistake.  After Scott has said, Yeah, it looks good to

22   me, then myself or that person in my office will forward that

23   pricing to the QSR.

24   Q.  And when you say "QSR," again, with the cost-plus model, we

25   are talking about KFC and Popeye's; is that right?

Gregory Finch - Direct

1    *A.*   Correct.

2    *Q.*   So for those two QSRs, how many different times during the

3    year does the price change under the cost-plus model?

4    *A.*   Well, it could change 12 or 13 times.  It could stay the

5    same, because if they bought ingredients out far enough, then

6    the corn and soybean price may not change from period to

7    period, right?  But if that corn and soy number changes 13

8    times because they have 13 pricing periods, then it's going to

9    change 13 times.

10   *Q.*   And every time it changes, it changes based on the

11   contract -- or does it change based on the contract that was

12   negotiated at the beginning of the contract term?

13   *A.*   It does.  For the most part, the only thing that changes

14   from period to period is that ingredient.  From time to time,

15   they have allowed us to adjust what's called freight and basis,

16   which is also part of the feed cost of the matrix, but once we

17   establish those 40 or 60 items I described yesterday of the

18   line items, labor and depreciation and all that, those do not

19   change until the next contract period.

20   *Q.*   So does that also mean, Mr. Finch, that period pricing is

21   current pricing?

22   *A.*   It does.

23   *Q.*   Now, Mr. Finch, I am going to ask you about covers and

24   shorts in just a moment, but I want to ask you this.  When

25   Claxton sells chicken to another poultry supplier, is the

Gregory Finch - Direct

1    period price used to price that chicken?

2    A.   Yes.  If we're selling to someone else, it's our period

3    price.  If we are buying, it's their period price.

4            MR. KOENIG:  Objection, foundation to the latter

5    answer.

6            THE COURT:  Overruled.

7    BY MR. BELLER:

8    Q.   Will you repeat the answer?

9    A.   Sure.  So if we're selling, then it's at our price, our

10   period price.  If we're buying, then it's at the other

11   producer's period price.

12   Q.   Mr. Finch, in the binder in front of you --

13           MR. KOENIG:  Your Honor, may we have a side bar?

14           THE COURT:  Yes.

15      (At the bench:)

16           THE COURT:  Go ahead, Mr. Koenig.

17           MR. KOENIG:  Just yesterday Ms. Warble testified that

18   even within George's she doesn't know whether the contract

19   price is what she is selling for shortages.  This witness

20   has -- there is no foundation for him to say he knows that it

21   is the competitor's contract price when he buys it, buys the

22   covers for shortage.  I think there needs to be foundation for

23   that.  It's pure speculation otherwise.

24           THE COURT:  Well, once again, the objection was late.

25   That's why I denied it.  The objection came after he answered.

Gregory Finch - Direct

1    So you can object, and we'll take it up, but that objection was

2    late.  All right.

3              MR. KOENIG:  Thank you.

4         (In open court:)

BY MR. BELLER:

6    Q.  Back to where we were.  So, Mr. Finch, there is a binder in

7    front of you, sir.  Could you please turn to Government's

8    Exhibit 1427.

9              MR. BELLER:  Your Honor, I believe that this is

10   already admitted into evidence.  And if so, I am asking the

11   Court to allow me to also publish.

12             THE COURT:  It has been admitted, and you may publish

13   it.

14   BY MR. BELLER:

15   Q.  Mr. Finch, if you will take a moment and review 1427.

16   A.  Okay.

17   Q.  Mr. Finch, is this an example of what you mean by period

18   pricing?

19   A.  Yes.

20             MR. KOENIG:  Objection.  This is a long text string.

21   The question needs to be more specific than that.

22             MR. BELLER:  I am happy to be more specific.

23             THE COURT:  I will sustain the objection.  Go ahead.

24             MR. BELLER:  Thank you.

25             Mr. Brian, if we can please highlight instant message

Gregory Finch - Direct

 1    No. 61.

 2    *BY MR. BELLER:*

 3    *Q.*  Mr. Finch, can you please take a moment and read that

 4    particular line silently to yourself.  Have you done so, sir?

 5    *A.*  Yes.

 6    *Q.*  Is that an example of what you mean by period pricing?

 7          *MR. KOENIG:*  Objection, foundation.  You know, the

 8    government has not been allowed to have people interpret other

 9    people's documents.  I don't know that there is a foundation

10    for him to know what this is talking about.

11          *THE COURT:*  Sustained.  If you can lay foundation.

12    *BY MR. BELLER:*

13    *Q.*  Mr. Finch, if you, you as CFO, were to be speaking with

14    anybody else in the poultry industry, how would you

15    characterize or what words would you use to describe period

16    pricing versus contract pricing?

17    *A.*  Sure.  So period pricing, for the most part it follows the

18    calendar month, KFC being the kind of outlier, because they

19    like to do -- they break the calendar months up into 13 periods

20    instead of 12.

21    *Q.*  And so if you were talking about period pricing, would you

22    say, for example, this month and then list the price?

23    *A.*  Yes.

24    *Q.*  And does this month mean period pricing?

25    *A.*  Yes.

3348

Gregory Finch - Direct

1    Q.  And period pricing means current pricing?  Is that what you

2    testified to?

3    A.  Yes.

4    Q.  Mr. Finch, if you will take a moment to look at Defense

5    Exhibits A-552 and A-553 in your binder.

6         MR. BELLER:  And these are not admitted.  So if we can

7    please show them to counsel only.

8    BY MR. BELLER:

9    Q.  You can take a moment and look at those and let me know

10   when you have had a chance to look at those.

11   A.  Okay.

12   Q.  What is Defense Exhibit A -- well, let me back up.

13        Did you recognize Defense Exhibit A-552 and Defense

14   Exhibit A-553?

15   A.  Yes.

16   Q.  What are those, sir?

17   A.  A-552 is an e-mail from someone that works with me named

18   Ken Hutchinson where he is sending this as a cover to

19   Mike Ledford at KFC for our period price for the next period,

20   which this is October, so this would be November, Novemberish

21   time frame.

22   Q.  What is A-553?

23   A.  This looks to be the attachment to the e-mail that went

24   with it, which is our period pricing for November the 4th of

25   2012 to December the 1st of 2012.

3349

Gregory Finch - Direct

1   Q.  And, Mr. Finch, are these two records, A-552 and A-553, to

2   the best of your knowledge, were they created and sent at or

3   near the time in which these are dated on those documents?

4   A.  Yes.

5   Q.  Are these the types of documents, Mr. Finch, that are kept

6   in the course of a regularly conducted activity of

7   Claxton Poultry?

8   A.  Yes.

9   Q.  And is creating and maintaining these records part of a

10  regular practice of Claxton Poultry?

11  A.  Yes.

12       MR. BELLER:  Your Honor, at this time, I would move

13  for the admission of Defense Exhibits A-552 and A-553.

14       THE COURT:  Any objection to the admission of A-552

15  and A-553?

16       MR. KOENIG:  As to A-552, I believe it's hearsay.  And

17  A-553 -- well, A-552, I believe it's hearsay.

18       THE COURT:  All right.  I will overrule that

19  objection.  That's simply a transmittal message indicating what

20  is contained in the attachment, so I do find that that is not

21  hearsay, and that will be admitted.

22       How about A-553?

23       MR. KOENIG:  No objection.

24       THE COURT:  All right.  And A-553 will be admitted.

25       You may display those, Mr. Beller.

Gregory Finch - Direct

1            MR. BELLER:  Thank you.  If we could display A-552,

2     please, Mr. Brian.

3     BY MR. BELLER:

4     Q.  Mr. Finch, what is the date of A-552?

5     A.  October the 29th, 2012, at 6:30 p.m.

6            MR. BELLER:  If we can please display A-553.

7            THE COURT:  You may.

8     BY MR. BELLER:

9     Q.  Mr. Finch, what is the eight-piece price for period pricing

10    for Claxton for this November period?

11    A.  Can we go to the eight-piece pricing tab, please.  Looks to

12    be .9716.

13    Q.  Thank you.

14           Mr. Finch, in your binder is Exhibit I-296 and I-297.

15    If you can take a moment and review I-296 and I-297.  Let me

16    know when you have had the opportunity to do so.

17    A.  Okay.

18    Q.  Mr. Finch, what is I-296 and I-297, if you know?

19    A.  I-296 appears to be a cover e-mail from Roger Austin to

20    Mike Ledford at UFPC, which is KFC, for their Period 12

21    pricing.

22    Q.  And I-297?

23    A.  This appears to be their Period 12 pricing for November 4th

24    through December 1st of 2012.

25    Q.  So Period 12 pricing, does that mean that it's the same

Gregory Finch - Direct

1    period pricing for Pilgrim's as the two documents for Claxton

2    that the jury just saw?

3    A.  Yes.

4           MR. BELLER:  Your Honor, pursuant to agreement of the

5    parties, I now move into evidence I-296 and I-297, and I ask to

6    publish both.

7           THE COURT:  Any objection to the admission of I-296

8    and I-297?

9           MR. KOENIG:  No, Your Honor.

10          THE COURT:  Both may be admitted, and you may publish.

11   BY MR. BELLER:

12   Q.  What's the dates on these two exhibits?

13   A.  The date on this exhibit is October 29, 2012.

14   Q.  October 29 of 2012.  Is that the same date as Exhibit

15   A-552, the Claxton Period 12 pricing transmission?

16   A.  Yes.

17   Q.  If you could please turn to Government's Exhibit 1427.

18          MR. BELLER:  Again, already admitted into evidence.

19   And if we can publish?

20          THE COURT:  Yes, you may.

21   BY MR. BELLER:

22   Q.  Mr. Finch, what is the date shown on Government's Exhibit

23   1427?

24   A.  It looks to be November the 13th of 2012.

25   Q.  Is that two weeks after October 29 of 2012?

3352

Gregory Finch - Direct

1    A.  Yes, approximately.

2    Q.  Mr. Finch, do you recall, and we can turn back to I-297 if

3    we need to, what was Pilgrim's Purple eight-piece price for

4    this period?  And we can scroll down if we need to.

5    A.  Oh, was this it?  It's -- it looks like it is $1.0046.

6    Q.  And Claxton's price was at .9716?

7    A.  It was.

8    Q.  Now, I am going to ask you as a CFO with a bachelor's

9    degree in accounting, sir, what is 1.0046 minus .9716, roughly?

10          THE COURT:  There is a calculator up there.

11   A.  It's approximately 3 cents.

12   BY MR. BELLER:

13   Q.  Thank you.

14          Approximately 3 cents.  So Pilgrim's price was 3 cents

15   higher than Claxton's for this particular period?

16   A.  It was.

17   Q.  And is this current pricing?

18   A.  It is.

19   Q.  Is it future pricing?

20   A.  No.

21   Q.  Is it future price bidding?

22   A.  No.

23   Q.  So if Claxton Poultry was to purchase product from

24   Pilgrim's Pride during this period, November of 2017 -- excuse

25   me, November of 2012, what price would Claxton have paid for

Gregory Finch - Direct

1    that product?

2            MR. KOENIG:  Objection, foundation, hypothetical.

3            THE COURT:  Overruled.

4    A.  We would pay 1.0046 to Pilgrim's for their chicken.

5    BY MR. BELLER:

6    Q.  So 3 cents higher than what Claxton's price was?

7    A.  Correct.

8    Q.  Mr. Finch, I am going to show you Government Exhibit 15.

9            MR. BELLER:  This is already admitted into evidence.

10           THE COURT:  You may display it.

11   BY MR. BELLER:

12   Q.  If you could take a moment and review Government's

13   Exhibit 15, Mr. Finch.

14           MR. BELLER:  If we can go to the next page, please.

15   Go back to the first page.

16   BY MR. BELLER:

17   Q.  Have you had the opportunity to review Government's

18   Exhibit 15?

19   A.  Yes.

20   Q.  Does Government's Exhibit 15 state the eight-piece price

21   for Pilgrim's?

22   A.  No.

23   Q.  Does Government's Exhibit 15 show the eight-piece price for

24   Claxton?

25   A.  No.

Gregory Finch - Direct

1   *Q.*   Does Government's Exhibit 15 show the pricing at all?

2   *A.*   No.

3   *Q.*   Does Government's Exhibit 15 reference current period

4   pricing difference?

5   *A.*   It does.

6          *MR. BELLER:*   Thank you.   We can take that document

7   down.

8   *BY MR. BELLER:*

9   *Q.*   Mr. Finch, if you can close your binder, sir.   Thank you.

10          Mr. Finch, are you familiar with the term "covers" and

11   "shorts"?

12   *A.*   Yes.

13   *Q.*   What does "covers" and "shorts" mean?

14   *A.*   Covers and shorts is when someone in the supply chain is

15   short of product for a particular day, week, month, whatever

16   the time period, and a cover is someone else within the

17   approved supply chain covers that shortage for them.

18   *Q.*   Why to the best of your knowledge does a shortage happen?

19   *A.*   Well, there is a myriad of reasons.   You know, we're

20   dealing with live animals here, not widgets.   So the animals

21   grow faster or slower at times, so the birds may not be the

22   correct size.   USDA may have slowed the line speed down.   Labor

23   may not have shown up.   You can have an electrical issue where

24   the plant can't run.   It could be a storm in a certain part of

25   the country that shuts plants down.   There is a myriad of

3355

Gregory Finch - Direct

1   reasons why there could be a short.

2   Q.  And I am going to do our court reporter a favor on

3   St. Patrick's Day and ask you to just slow down just a little

4   bit, okay?

5   A.  Okay.

6   Q.  So with a cover and short, how often does that happen?

7   A.  It happens all the time.

8   Q.  When you say "all the time," does that mean daily?

9   A.  It can be daily.  I am not going to say it happens every

10  day, but it happens a lot.

11  Q.  And does it happen only at Claxton, or, to the best of your

12  knowledge, does it happen across all poultry suppliers?

13  A.  Oh, it happens in the entire supply chain.

14  Q.  And when we say "cover" and "short" and "across the whole

15  supply chain," are there more suppliers than, say, Tyson's,

16  Claxton, Pilgrim's, Koch, and George's?

17  A.  In the approved supply chain, yes.

18  Q.  So if it happens every day, can you tell us what happens

19  inside Claxton every day or as often as it happens when there

20  is either a cover or a short?  What happens?

21  A.  So Scott is an hour behind us in Alabama, so our plant

22  starts somewhere between 5:00 and 6:00 in the morning Eastern

23  time.  So when he gets up, he would typically check his phone

24  to see if he has any e-mails from the plant about any issues

25  with any of his orders for that day.  And then he'll check in

Gregory Finch - Direct

1    with typically Stan Brantley, who is our product coordinator at

2    the plant.

3            MR. KOENIG:  Objection, foundation.  The witness

4    knows --

5            THE COURT:  Sustained.

6    BY MR. BELLER:

7    Q.  Well, let's back up just a little bit.  And tell me,

8    Mr. Finch, in terms of Claxton's plant, where is your office

9    located?

10   A.  We call that down the hill.  We have an administrative

11   building down the hill, and the plant is up the hill.

12   Q.  On the same campus?

13   A.  Yes.

14   Q.  In the same sort of facility?

15   A.  Yes.

16   Q.  And where is Mr. Brady's office in comparison to yours?

17   A.  Well, when he is on campus, he would be in the front

18   administrative office in sales.

19   Q.  And is that close to your office?

20   A.  Relatively.

21   Q.  Where is Mr. Fries' office?

22   A.  Would be in the same location that I described for Scott.

23   He is up the hill in the front administrative offices.

24   Q.  And part of your role as CFO, do you have to be aware of

25   covers and shorts?

Gregory Finch - Direct

1    A.   Yes.

2    Q.   Why?

3    A.   Well, because if we're issuing a PO to somebody or they are

4    issuing a PO to us, then if I'm buying from someone, therefore

5    I am issuing a purchase order to them, I have to treat that

6    differently in my records of accounting for production for that

7    day, and I also have to have that record in order to pay that

8    vendor.

9         And the same happens in reverse.  So if we're buying

10   from somebody, they issue us a purchase order, and we take that

11   and we -- I am sorry, if we are selling to them, we issue the

12   purchase order, and then they are going to pay us.  So I am

13   involved in all that process.  And because of that, many times

14   Scott will call me and say, Hey, we are covering this such and

15   such load or we're buying --

16        MR. KOENIG:  Objection, hearsay.

17        THE COURT:  Sustained.

18   BY MR. BELLER:

19   Q.   So without getting into what somebody says to you, okay, do

20   you -- are you involved and working closely with Mr. Brady or

21   any salesperson anytime there is a cover or a short?

22   A.   Yes.

23   Q.   And does that also mean that you know who Mr. Brady is

24   speaking to regarding a cover or a short?

25   A.   Sometimes.

Gregory Finch - Direct

1   Q.  Does it mean that you also overhear conversations between

2   Mr. Brady and the customer regarding a cover and a short?

3   A.  Yes.  Oftentimes Mr. Brady works out of my office at a

4   conference table.

5   Q.  I don't want you to talk about what somebody says to

6   somebody else, but I am wondering if you have knowledge as to

7   how Mr. Brady goes about either finding the customer for an

8   overage or finding somebody to purchase the short from.  How

9   does that happen and when does that happen?

10  A.  Well --

11          MR. KOENIG:  Objection, foundation.  He asked a

12  yes-or-no question and then jumped right to the actual answer.

13          THE COURT:  Sustained.  If he could answer the first

14  question as to whether he knows; and if so, he can explain.

15          MR. BELLER:  Sure.

16  BY MR. BELLER:

17  Q.  Mr. Finch, do you know what Mr. Brady does in order to get

18  a cover or short taken care of?

19  A.  Yes.

20  Q.  If you could explain what you know Mr. Brady to do without

21  talking about what somebody says to somebody else.

22  A.  Okay.  Mr. Brady would typically make calls to others in

23  the approved supply chain at Pilgrim's, for instance, or Tyson

24  to see if they have product.  If we were trying to cover our

25  shortage, do they have product for us to buy?  And/or we would

Gregory Finch - Direct

1    be asking them were they short because we may have product to

2    sell.

3    Q.  And does that mean that the other suppliers, the other

4    poultry suppliers, not just the ones in this room, but all

5    poultry suppliers are also customers of Claxton Poultry?

6    A.  Yes.

7    Q.  How many customers does Claxton Poultry have?

8    A.  A bunch, hundreds.  I don't know the exact number off the

9    top of my head.

10   Q.  In terms of dollars, Mr. Finch, if you know as the CFO, how

11   much of Claxton's business is done through covers and shorts?

12   A.  I don't really track that as a particular number, but it

13   could be in the millions.

14   Q.  Millions per supplier?

15   A.  Yes.

16   Q.  So do you know, for example, last year -- I am going to ask

17   you something that you may have at the front of your mind --

18   how much business or how much product was sold to, say,

19   Tyson Foods?

20   A.  It was north of $6 million in 2021.

21   Q.  So not only is Tyson a customer, Tyson is a significant

22   customer.

23   A.  Yes.

24   Q.  How about in 2014, do you happen to know how many pounds of

25   chicken Claxton sold to Tyson in that year alone?

Gregory Finch - Direct

1    A.   I believe it was 550,000.

2              MR. KOENIG:  I object to this.  He says he doesn't

3    track this stuff, and all of the sudden he is coming up with

4    numbers.  Is there some foundation that can be laid?

5              THE COURT:  Overruled.  He says he knows.

6    BY MR. BELLER:

7    Q.   How many pounds of chicken did Claxton Poultry sell to

8    Tyson's poultry in 2014?

9    A.   550,000 pounds.

10   Q.   And do you know that number because you were asked to look

11   that up?

12   A.   I was asked to look that up.

13   Q.   In your own records?

14   A.   In my records.

15   Q.   That you keep as the chief financial officer of a poultry

16   company?

17   A.   Correct.

18   Q.   Do you have knowledge about who Mr. Brady would have been

19   speaking to at Tyson's regarding selling chicken?

20   A.   Well, it depends on whether -- which QSR.

21   Q.   And so let me ask again.  Do you have knowledge, regardless

22   of the QSR, do you have knowledge about who Mr. Brady would

23   have been speaking to at Tyson's?

24   A.   Yes.

25   Q.   In terms of KFC and -- well, let me back up.  How do you

3361

Gregory Finch - Direct

1  know who Mr. Brady is speaking to at Tyson regarding covering

2  loads?

3  A.  Because I am involved in the cover/short process.  I am

4  often involved in e-mails either as part of the e-mail or as a

5  forward of an e-mail to let me know we are doing a cover or

6  short from somebody or someone else is covering for our short.

7  Q.  Because of that, let's talk about Popeye's and KFC.  Do you

8  know on those two accounts who Mr. Brady would be speaking to

9  at Tyson?

10  A.  Carl Pepper.

11  Q.  What about Tim Mulrenin?

12  A.  That would be Chick-fil-A.

13  Q.  Thank you.

14       Mr. Finch, I am showing you Government's Exhibit 17.

15       MR. BELLER:  Your Honor, this is admitted, and I would

16  ask to publish.

17       THE COURT:  What was the number again?

18       MR. BELLER:  17, Your Honor.

19       THE COURT:  Yes, you may publish it.

20  BY MR. BELLER:

21  Q.  Mr. Finch, if you could take a moment and let me know once

22  you have had a chance to review.

23  A.  Okay.

24  Q.  Mr. Finch, have you seen this document?

25  A.  Yes.

3362

Gregory Finch - Direct

1    Q.  After having seen this document, did you go back through

2    your records at Claxton to determine if there was a cover or

3    short for this particular period?

4    A.  Yes.

5    Q.  So I am directing your attention, Mr. Finch, to the

6    afternoon of October 31st, 2013.  Do you know if Claxton was

7    trying to buy product from another supplier on that day?

8    A.  Yes.

9    Q.  And being short, whose job is it to call around and find

10   someone to buy product from?

11   A.  For Chick-fil-A, it would be Scott Brady.

12   Q.  And who did that on this occasion?

13   A.  It appears from this record that Scott made a call to

14   Mr. Mulrenin.

15           MR. KOENIG:  Objection, speculation.

16           MR. BELLER:  I am happy to lay a better foundation.

17           THE COURT:  That's fine.  Go ahead.

18           MR. BELLER:  Thank you.

19           If you can close that, and I am not going to ask you

20   about that document at least for right now.

21   BY MR. BELLER:

22   Q.  Not from that document but in going back and looking at

23   your records that you keep as CFO, do you know who tried

24   finding -- who in Claxton tried finding product to purchase?

25   A.  Scott Brady.

3363

Gregory Finch - Direct

1    *Q.* Do you know if Mr. Brady was able to find another load?

2    *A.* Yes.

3    *Q.* And what was Mr. Brady trying to buy?

4    *A.* Trying to buy a load of tenders.

5    *Q.* And who was he trying to buy a load of tenders from?

6    *A.* Initially from Tim Mulrenin at Tyson.

7    *Q.* How do you know this?

8    *A.* Because there is an e-mail chain that memorializes the

9    conversation between him and Mr. Mulrenin.

10            *MR. KOENIG:* Objection, hearsay.

11            *THE COURT:* Overruled.

12   *BY MR. BELLER:*

13   *Q.* And, Mr. Finch, are you the custodian of records for

14   Claxton Poultry?

15   *A.* Yes.

16   *Q.* And as the custodian of records for Claxton Poultry, are

17   you able to refer to both e-mails and invoices for purposes of

18   refreshing your recollection?

19   *A.* Yes.

20   *Q.* And when there is a cover and a short, do those e-mails and

21   PO's also get sent to you?

22   *A.* Yes.

23   *Q.* And those e-mails and invoices that get sent to you, is

24   that for the purpose of you processing the PO for purposes of

25   payment?

Gregory Finch - Direct

1    A.   Yes.

2    Q.   Prior to you going back and looking at these records from

3    2013, did you specifically remember the incident?

4    A.   I did not.

5    Q.   But once you reviewed the records, did that refresh your

6    recollection and provide you knowledge that you were, in fact,

7    involved in that incident?

8    A.   It did.

9    Q.   So, Mr. Finch, you had told the jury what a PO is.  Very

10   simply, will you remind the jury what that is?

11   A.   Sure.  PO is short for purchase order, and that's a

12   document that's issued when a transaction is consummated.

13   Q.   And when are PO's drafted and sent?

14   A.   They are typically drafted and sent once an agreement is

15   made on how much volume and what price that volume is going to

16   be for that particular transaction.

17   Q.   And do you have a PO for a transaction with Tyson for the

18   purchase of tenders on this day?

19   A.   Yes.

20   Q.   Are there also e-mails that are kept as business records to

21   support that purchase order?

22   A.   Yes.

23   Q.   Why?

24   A.   Why are there business records?

25   Q.   Why are there e-mails that go along with the purchase

Gregory Finch - Direct

1   orders?

2   A.   I am sorry, e-mails are part of the process.  So the

3   e-mails kind of help memorialize the transaction, and they

4   typically tell things such as what the price is, how many

5   pounds, what the delivery destination is, so we know how to

6   fill the PO out.

7   Q.   So is that, is the e-mail kept in the ordinary course of

8   Claxton's business to accompany the PO when there is a cover or

9   a short?

10   A.   Yes.

11   Q.   If I can show you Defense Exhibit J-42.

12            MR. BELLER:  This is not admitted, so if we can

13   display simply to counsel and the witness.

14   BY MR. BELLER:

15   Q.   If you will review J-042 and let me know when you have had

16   a moment to review it.

17   A.   Okay.

18   Q.   Have you had a chance to review J-042?

19   A.   I have.

20   Q.   And is J-042 a record that was made or in this case an

21   e-mail that was made at or near the time from when the

22   information was transmitted regarding the purchase of tenders?

23   A.   Yes.

24   Q.   Do the individuals that are listed in this particular

25   document have knowledge regarding the purchase of those

Gregory Finch - Direct

 1   tenders?

 2   *A.*  Yes.

 3   *Q.*  Is the record kept, meaning this e-mail, kept in the course

 4   of a regularly conducted activity of Claxton Poultry?

 5   *A.*  Yes.

 6   *Q.*  And is making the record, in this case this e-mail activity

 7   regarding the purchase of tenders, a regular practice of that

 8   activity?

 9   *A.*  Yes.

10        *MR. BELLER:*  Your Honor, at this time, I would move

11   for the introduction of Exhibit J-042.

12        *THE COURT:*  Any objection to the admission of J-042?

13        *MR. KOENIG:*  Yes, Your Honor.  If you look, it's a

14   pretty lengthy e-mail exchange, so there is quite a bit of

15   hearsay embedded in it.  And the other thing is that he is

16   asking if this is a business record of Claxton, but it's a

17   Tyson document clearly.

18        *THE COURT:*  Response?

19        *MR. BELLER:*  Your Honor, in this case, it is a

20   Claxton -- excuse me, a Tyson document.  However, if the Court

21   will notice, Claxton is also involved.  If the Court will see,

22   this is, in fact, a business activity and a business record in

23   the sense that it does have to do with the transfer and sale of

24   chicken that ultimately did not happen for reasons that are

25   detailed in there.  But nonetheless, it is being offered to

Gregory Finch - Direct

1    show what Mr. Finch did next and what Mr. Brady did next, and

2    therefore it is not being offered for the truth, but rather to

3    show what each of the two different entities did following this

4    exchange.

5            THE COURT:  The objection is sustained in terms of

6    it's a business record.  The business record exception

7    requires -- it has a presumption of accuracy.  Each step in the

8    chain has to be by someone who is trained in the habits of

9    precision and who -- and that type of record has to be

10   customarily checked for accuracy.  There is a Tyson part of

11   this, and as a result, it's not a business record.

12           Mr. Koenig, as to the offer of it, which I think

13   Mr. Beller is also doing as part of it, in terms of its effect

14   on the listener?

15           MR. KOENIG:  Well, two things I would say:  First, he

16   said the effect on Mr. Finch, and it's very small font, but I

17   don't see Mr. Finch on here, so I don't see how it could have

18   an effect on him.  Second, if it's effect on listener, I think

19   we're going to have to go through each e-mail to figure out

20   which one had the effect on the listener.

21           THE COURT:  Objection will be sustained.  There may be

22   an effect.  We haven't heard it yet.  It can't be admitted for

23   effect on the listener at least at this point.

24           Go ahead, Mr. Beller.

25           MR. BELLER:  Thank you, Your Honor.

Gregory Finch - Direct

1   *BY MR. BELLER:*

2   *Q.*  Mr. Finch, was the transaction with Tyson for the purchase

3   of tenders ultimately -- did that occur on this day?

4   *A.*  It did not.

5   *Q.*  And do you have knowledge as to why it did not occur?

6   *A.*  The price was too high.

7   *Q.*  Did Tyson's also try to sell nuggets instead of tenders?

8   *A.*  They may have.  Yes, I think they did actually send some

9   information about nuggets, and Scott was trying to buy tenders.

10  *Q.*  So in this particular situation, to your knowledge was

11  there communication between Mr. Brady and Mr. Mulrenin

12  regarding the purchase of chicken on this day?

13  *A.*  Yes.

14  *Q.*  And that, to your knowledge, ultimately was not successful

15  despite this effort.

16        *MR. KOENIG:*  Objection, leading and foundation.

17        *THE COURT:*  Sustained.

18  *BY MR. BELLER:*

19  *Q.*  Was it successful?  Do you know?

20  *A.*  This transaction was not.

21  *Q.*  Do you have knowledge of whether Mr. Scott Brady bought CFA

22  tenders from Pilgrim's Pride on this day?

23  *A.*  Yes.

24  *Q.*  And what date was it that Mr. Brady purchased tenders from

25  Pilgrim's Pride?

3369

Gregory Finch - Direct

1          MR. KOENIG:  Objection.  Can we get some foundation

2     here?

3          THE COURT:  Sustained.

4     BY MR. BELLER:

5     Q.  Do you have knowledge of whether or not that happened?

6     A.  Yes.

7     Q.  And how do you have your knowledge?

8     A.  Because I was involved in the process with the cover as I

9     normally do.

10    Q.  And prior to your testimony today, after having seen

11    Government's Exhibit 17, did you go back to Claxton's records

12    and review Claxton's records?

13    A.  Yes.

14    Q.  And did that remind you or refresh your recollection of how

15    you were involved in the transaction between Claxton Poultry

16    and Pilgrim's Pride?

17    A.  Yes.

18    Q.  Did you have the opportunity to review the records that

19    reminded you of what happened and when it happened?

20    A.  Yes.

21    Q.  And did that also remind you that you yourself, Mr. Finch,

22    were involved in that transaction as the CFO of Claxton?

23    A.  Yes.

24    Q.  Mr. Finch, on what day to the best of your knowledge did

25    Scott Brady purchase tenders from Pilgrim's Pride?

Gregory Finch - Direct

1    A.   November the 1st.

2    Q.   Of what year, sir?

3    A.   2013.

4    Q.   And who at Pilgrim's Pride sold tenders to Scott Brady in

5    Claxton Poultry?

6    A.   Justin Gay.

7    Q.   Was there a purchase order sent between Pilgrim's and

8    Claxton?

9    A.   Yes.

10   Q.   And is a purchase order sent or received kept in the

11   ordinary course of business?

12   A.   Yes.

13   Q.   Even if that purchase order was sent or received via

14   e-mail?

15   A.   Yes.

16   Q.   And is the failure or inability to purchase from Tyson's

17   that same day, did that cause you to then complete and satisfy

18   this purchase order with Pilgrim's Pride?

19   A.   Yes.

20   Q.   If you could take a moment and look at Defense Exhibit

21   J-046.

22        MR. BELLER:  And this is not admitted.

23   BY MR. BELLER:

24   Q.   Mr. Finch, have you had the opportunity to look at J-046?

25   A.   Yes.

Gregory Finch - Direct

1   *Q.*   Is J-046 a business record kept in the ordinary course of

2   business for Claxton Poultry?

3   *A.*   Yes.

4            *MR. KOENIG:*   Objection.  Can we have a quick side bar?

5            *THE COURT:*   Yes.

6        (At the bench:)

7            *THE COURT:*   Mr. Koenig, go ahead.

8            *MR. KOENIG:*   Thank you, Your Honor.

9            There is a couple points, and now this is the second

10   time this has happened.  The whole basis for the business

11   record is it is kept in the ordinary course, and this is a

12   Pilgrim's document which belies what the witness said, that it

13   was kept in the ordinary course.  It clearly was not.  It may

14   have been kept by Pilgrim's as a business record, but

15   definitely not by Claxton.

16            The other one is I don't think he was actually

17   asked -- this is a more fundamental thing, he wasn't actually

18   asked if he recognized this document either.

19            *THE COURT:*   Well, he has testified already that he

20   pays purchase orders when he has to, so in that regard, it

21   could very well be a business record.  The question itself is

22   perfectly appropriate.  And throughout this whole trial,

23   purchase orders are typically things that are kept in the

24   ordinary course of business because, once again, companies need

25   to make sure that they pay them.  So the question does not seem

Gregory Finch - Direct

1    to be problematic, and the witness -- we will see what the

2    witness' answer is.

3            Anything from you, Mr. Beller?

4        MR. BELLER:  No, thank you.

5        THE COURT:  Mr. Koenig, anything else?

6        MR. KOENIG:  Well, may I ask if the Court could

7    inquire as to why they aren't pulling this out of their own

8    files if it's something that's kept in the ordinary course of

9    business, because if they don't have it, then it clearly is not

10   one of their business records.

11       THE COURT:  That very well could be.  Once again,

12   we'll see what the witness' answers are, but those could be

13   good questions on cross-examination.  But if the witness is

14   able to testify and lay the foundation for the business records

15   exception despite that fact, we'll see, then it would seem to

16   be potentially admissible.

17       MR. KOENIG:  So he would have to say that he found

18   this in the files, and that's why he is familiar with it or --

19       THE COURT:  I don't know.  We will see what he says.

20   He hasn't answered yet.

21       (In open court:)

22   BY MR. BELLER:

23   Q.  I think my question, Mr. Finch, is, do you recognize

24   Defense Exhibit J-046?

25   A.  Yes.

Gregory Finch - Direct

1    Q.   What do you recognize J-046 to be?

2    A.   This is a Claxton Poultry issued purchase order to

3    Pilgrim's Pride for 1120 cases of Chick-fil-A tenders.

4    Q.   Now, in this particular document, do you know if this was

5    produced to the Department of Justice by Claxton or by, in this

6    case, Pilgrim's Pride?

7            MR. KOENIG:   Objection, foundation.

8            THE COURT:   He is being asked that question.

9    Overruled.

10   A.   I am sorry, what was the question?

11   BY MR. BELLER:

12   Q.   Do you know if this document was produced by Pilgrim's or

13   by Claxton to the Department of Justice?

14   A.   It should have been in our records, but I don't know.

15   Q.   Do you know if you have such a document in your records?

16   A.   I would be shocked if we didn't.

17   Q.   And so this is a document, regardless of its origin, that

18   you recognize.  Am I saying that right?

19   A.   Yes.   This is a Claxton Poultry purchase order.

20   Q.   And is a Claxton Poultry purchase order kept in the

21   ordinary course of Claxton's business?

22   A.   Yes.

23   Q.   In looking at this document, does it appear to be correct

24   and accurate to the best of your knowledge?

25   A.   Yes.

3374

Gregory Finch - Direct

1          MR. BELLER:  Your Honor, at this time, I would move

2    for the admission of Defendants' Exhibit J-046.

3          THE COURT:  Any objection to the admission of J-046?

4          MR. KOENIG:  Objection.  He has not established that

5    this was actually kept in Claxton's records.  And it's a

6    Pilgrim's document.

7          THE COURT:  The objection is authenticity or what?

8          MR. KOENIG:  Well, no, it's not authenticity so much

9    as it is -- it doesn't meet 803(6) because he said he doesn't

10   know if it's in Claxton's records.  He didn't check.  He is

11   just looking at this document and assuming some familiarity

12   with it.  You know, to say that this is the type of thing we

13   would have kept is different than saying, yes, this is

14   something we kept.

15         THE COURT:  Objection is overruled.  J-046 will be

16   admitted.

17         MR. BELLER:  If we may publish to the jury, Your

18   Honor.

19         THE COURT:  You may.

20   BY MR. BELLER:

21   Q.   Mr. Finch, when was the date of the transport?

22   A.   11/7 of '13.

23   Q.   And I think we had established this, sir, but I want to

24   make sure.  In keeping purchase orders as a business record,

25   were the purchase orders also accompanied by an e-mail?

Gregory Finch - Direct

1   A.   Sometimes, yes.

2   Q.   And when -- you say "sometimes."  If the e-mail is relied

3   on to explain the circumstances or detail of the PO, does that

4   also get kept in the -- preserved and then kept as a business

5   record?

6   A.   Yes.

7   Q.   And do you know if that happened on this occasion?

8   A.   Yes.

9   Q.   Mr. Finch, if you would please turn in your binder and look

10  at Defense Exhibits 44 and -- Defense Exhibits J-044 and J-045.

11  Let me know when you have had an opportunity to review those.

12  A.   Which numbers again?  I am sorry.

13  Q.   J-044 and J-045.  And I will note they may be behind -- no,

14  excuse me.  J-044 and J-045.  And you should have two different

15  binders or two different tabs in your binder for those two

16  documents.

17  A.   Okay.

18  Q.   Let me know when you have had an opportunity to review

19  those.

20  A.   I have.

21  Q.   Are those e-mails that became part of the business record

22  in this case to accompany the purchase order?

23  A.   Yes.

24  Q.   And do they appear to be correct and accurate?

25  A.   Yes.

Gregory Finch - Direct

1    *Q.* And were these particular correspondences made at or near

2    the time or with using information that was transmitted by

3    someone with knowledge of the actual transaction?

4    *A.* Yes.

5    *Q.* Was it kept in the course of regularly conducted activity

6    of Claxton Poultry?

7    *A.* Yes.

8    *Q.* Was making this record, these e-mails, a practice of a

9    cover and short at Claxton Poultry?

10   *A.* Yes.

11   *Q.* And then further on a separate issue, in this case, did

12   this transaction and did these e-mails cause you to then

13   generate and/or approve the purchase order?

14   *A.* Yes.

15          *MR. BELLER:* Your Honor, at this time, I would move

16   for the admission of Defense Exhibit J-044 and J-045.

17          *THE COURT:* Any objection to the admission of J-044,

18   first of all?

19          *MR. KOENIG:* J-044, yes.  Again, there has not been a

20   foundation laid that the purchase order we looked at previously

21   is in any way associated with this e-mail.  And moreover, even

22   if it is, it hasn't been sufficiently explained how he knows

23   it's associated.  He just said, Yeah, it's associated.

24          *THE COURT:* And as to J045?

25          *MR. KOENIG:* J-045 also, again, I don't see where the

Gregory Finch - Direct

1    connection is between the purchase order and J-045, and J-045

2    also contains this e-mail chain that contains hearsay.  I think

3    a lot more has to be established before these e-mail chains

4    become business records.

5              THE COURT:  Response, Mr. Beller?

6              MR. BELLER:  No, Your Honor.  I think a proper

7    foundation has been laid.

8              THE COURT:  Sustained as to both.  I agree with

9    Mr. Koenig that there has been no foundation laid to the

10   connection of these particular e-mails to the purchase orders,

11   and J-045 is not a business record as it contains numerous

12   chains of hearsay that are not done by people with a duty to

13   provide reliability because they are outside of Claxton.

14   BY MR. BELLER:

15   Q.  Mr. Finch, was there a sale to Tyson's October 31st or

16   November 1st?

17   A.  To Tyson?

18   Q.  Correct.

19   A.  No.

20   Q.  Was there negotiation for a sale to Tyson on October 31st

21   or November 1st?

22   A.  No.

23   Q.  What about e-mail negotiations?  Were there calls?

24             MR. KOENIG:  Objection, e-mail negotiation, were there

25   calls.  It's compound or confusing.

Gregory Finch - Direct

1          *MR. BELLER:*  I am happy to break that up into two.

2          *THE COURT:*  That's fine, go ahead.

3     BY MR. BELLER:

4     Q.  Mr. Finch, I am focusing on Tyson's between Scott Brady and

5     Tim Mulrenin.

6     A.  Okay.

7     Q.  Was there, to the best of your knowledge, was there

8     negotiation between Mr. Brady and Mr. Mulrenin on either

9     October 31st and/or November 1st?

10    A.  Yes.

11    Q.  And ultimately, did that transaction not work out?

12         *MR. KOENIG:*  Objection.  Can we get some foundation

13    how he knows that?

14         *THE COURT:*  Overruled.

15    BY MR. BELLER:

16    Q.  Did the transaction work out between the two of them?

17    A.  No.  Canceled the PO.

18    Q.  Was there negotiation to the best of your knowledge between

19    Scott Brady and Justin Gay of Pilgrim's on those same dates?

20    A.  Yes.

21    Q.  And was that particular transaction successful?

22    A.  Yes.

23    Q.  Did Claxton purchase product from Justin Gay at Pilgrim's

24    on November the 1st of 2013?

25    A.  Yes.

3379

Gregory Finch - Direct

1   Q.  Was that product delivered to Claxton on November the 7th

2   of 2013?

3   A.  It was delivered to Pilgrim's.

4          MR. KOENIG:  Objection, foundation.

5          THE COURT:  Overruled.

6   BY MR. BELLER:

7   Q.  You can answer.

8   A.  Yes, it was delivered, yes.

9   Q.  So I am showing you Government's Exhibit 17 again.  And if

10  we can zoom in on October 31st and November 1st, please.

11         MR. BELLER:  Your Honor, if we may also publish this,

12  please.

13         THE COURT:  Yes, you may.

14  BY MR. BELLER:

15  Q.  On Government's Exhibit 17, do you see calls between

16  Scott Brady and Tim Mulrenin on November the 1st of 2013?

17  A.  Yes.

18  Q.  Do you see calls between Scott Brady and Justin Gay on

19  November the 1st of 2013?

20         MR. KOENIG:  Objection, going through the summary

21  exhibit.  I would only ask if they are going to be allowed to

22  do this, we can do it too.

23         THE COURT:  Well, that's premature.  Overruled.

24  BY MR. BELLER:

25  Q.  Do you see calls between Scott Brady and Justin Gay on

Gregory Finch - Direct

 1   November the 1st of 2013?

 2   A.   Yes.

 3   Q.   Does Bill Kantola to the best of your knowledge also sell

 4   Chick-fil-A tenders?

 5   A.   I don't know -- I don't know.

 6   Q.   You don't know.  Do you know if Koch sells to Chick-fil-A?

 7   A.   They have been a supplier at times, yes.

 8   Q.   Mr. Finch, do you see calls on Government's Exhibit 17 that

 9   coincide with the purchase orders for the purchase of

10   Chick-fil-A tenders that you just explained to this jury?

11   A.   Yes.

12   Q.   Same dates?

13   A.   Same dates.

14   Q.   Thank you.

15           Let's talk about --

16           MR. BELLER:  We can take that down, please.

17   BY MR. BELLER:

18   Q.   We can talk about another cover and short.  Mr. Finch, if

19   you would look to Government's Exhibit 7, please.  On

20   Government's Exhibit 7, do you see calls between Justin Gay and

21   Scott Brady?

22   A.   Yes.

23   Q.   In looking at Government's Exhibit 7, did you then go back

24   and check your records regarding this particular date -- or the

25   date of these calls?

Gregory Finch - Direct

1    A.   Yes.

2    Q.   Do you know, Mr. Finch, if there was a cover or short on or

3    near this date?

4    A.   Yes.

5    Q.   And were you involved in that cover and short?

6    A.   Yes.

7         MR. KOENIG:   Objection, again, does he know if there

8    is a cover or short.   I think we should have an explanation of

9    how he knows that.

10        THE COURT:   He testified that he checked his records.

11   Overruled.

12   BY MR. BELLER:

13   Q.   Sir, if you would please turn to Defense Exhibit J-041.

14        MR. BELLER:   This has not yet been admitted.

15   BY MR. BELLER:

16   Q.   If you would please take a moment and review that exhibit.

17   Let me know when you have had a chance to review that, please.

18   A.   Okay.

19   Q.   Do you recognize J-041?

20   A.   Yes.

21   Q.   And is J-041 an e-mail or the type of e-mail transaction

22   that accompanies a purchase order?

23   A.   Yes.

24   Q.   Frequently are terms and conditions of a sale memorialized

25   in e-mail?

Gregory Finch - Direct

1    *A.*  Yes.

2    *Q.*  Does this document appear to have been kept in the ordinary

3    course of business?

4    *A.*  Yes.

5    *Q.*  Does this e-mail show a transaction between Mr. Gay and

6    Mr. Brady, and does that transaction record get kept in the

7    ordinary course of business?

8         *MR. KOENIG:*  Objection, compound.  I don't know which

9    question he is going to be answering.

10        *THE COURT:*  Overruled.

11   *A.*  Yes.

12        *MR. BELLER:*  At this time, I would move for the

13   admission of J-041.

14        *THE COURT:*  Any objection to the admission of J-041?

15        *MR. KOENIG:*  Yes, hearsay.  I would add, again, the

16   question posed, one of the questions posed was does this appear

17   to be something that would be stored.  There is no evidence

18   that this was actually stored at Claxton.  It's a Pilgrim's

19   document.

20        *THE COURT:*  Response to that last point, Mr. Beller?

21        *MR. BELLER:*  Your Honor, there is 16 million

22   documents.  What the original source of the document is and how

23   it arrived to the government sounds to me like a

24   chain-of-custody argument, and I do not believe that a

25   chain-of-custody argument is actually something that has been

Gregory Finch - Direct

1    argued before.  And, in fact, I believe that the government has

2    already stipulated and authenticated that every single document

3    produced by the Department of Justice is, in fact, authentic.

4         I would note the latter part of 803(6), which is that

5    the only time it would not be a regular business activity is if

6    the opponent, in this case the Department of Justice, shows

7    that the source of the information indicates a lack of

8    trustworthiness.  Since the source of this information is from

9    the Department of Justice to me, I would hope that they are not

10   arguing that their documents are untrustworthy.

11        *MR. KOENIG:*  If I may.

12        *THE COURT:*  Yes, go ahead.

13        *MR. KOENIG:*  Mr. Finch testified he is the custodian

14   of records.  And it seems reasonable that he would have gone

15   back and looked for this document rather than just being shown

16   a Pilgrim's document that was produced.  It's not that we are

17   saying our documents are untrustworthy.  I am just saying he

18   didn't go back and look.  Somebody just put this document in

19   front of him.

20        *THE COURT:*  Sustained as to whether or not this

21   document was kept as a business record.  If you could lay that

22   foundation.

23        *MR. BELLER:*  Sure.

24   *BY MR. BELLER:*

25   *Q.*  Mr. Finch, the records and the e-mails of Scott Brady, is

Gregory Finch - Direct

1    that something that you keep as custodian of Claxton?

2    A.   Yes.

3    Q.   And is that something that you have access to for purposes

4    of gathering and responding to subpoenas in the event they are

5    necessary?

6    A.   Yes.

7    Q.   Do you know if documents maintained -- kept and maintained

8    by Claxton are also kept and maintained by Pilgrim's if, in

9    fact, there are interactions between the two different

10   companies?

11            MR. KOENIG:   Objection, foundation.

12            MR. BELLER:   I asked if he knew.

13            THE COURT:   He asked him if he knew.  Overruled.

14   BY MR. BELLER:

15   Q.   Do you know?

16   A.   I don't know if Pilgrim's keeps the same records.

17   Q.   No problem.

18            Do you know if Claxton also has a copy of this

19   exchange on Claxton's servers since this e-mail was sent and

20   received by Mr. Scott Brady?

21   A.   We keep all sent and received e-mails on our e-mail, and

22   it's in the cloud.

23   Q.   Do you have any reason to believe or any concern that this

24   particular document is anything other than complete and

25   accurate?

Gregory Finch - Direct

1    A.   I do not.

2    Q.   Is this the type of e-mail that Claxton would hold onto and

3    keep specifically when it includes information regarding the

4    purchase or sale of poultry products?

5    A.   Yes.

6    Q.   To the best of your knowledge, is this a business record

7    that is, in fact, housed and contained at Pilgrim's -- excuse

8    me, at Claxton even if this particular document originated at

9    Pilgrim's?

10   A.   Yes.

11        MR. BELLER:   Again, actually, if I may back up for

12   just a moment.

13        THE COURT:   Sure.

14   BY MR. BELLER:

15   Q.   A couple more foundational questions.  The purchase and

16   sale of chicken that happens via e-mail, is that a business

17   transaction?

18   A.   It's a record of the transaction.

19   Q.   And so in other words, are frequently offers to contract

20   relayed via e-mail?

21   A.   Yes.

22   Q.   That's a lawyerly way of saying, do you ever have sales

23   transactions or agreements that happen over e-mail?

24   A.   Sure.

25   Q.   Also via e-mail is there ever an acceptance of that offer

3386
Gregory Finch - Direct

 1  also transmitted electronically?

 2  A.  Yes.

 3  Q.  And is that for the actual transmission of both poultry to

 4  one supplier and dollar back to the other supplier?

 5  A.  Yes.

 6  Q.  And so it has some legal significance?

 7  A.  Yes.

 8  Q.  And is having legal significance, is that also a reliable

 9  way to keep track of and monitor the transactions between the

10  parties?

11  A.  Yes.

12      MR. BELLER:  Your Honor, I would again move for the

13  introduction of J-041.

14      THE COURT:  Any objection to the admission of J-041?

15      MR. KOENIG:  Yes.  He basically testified that he

16  didn't look for this document, and he is assuming it would

17  exist on the cloud.  And, you know, the fact that he didn't

18  look for it means was it really maintained in the ordinary

19  course.  I mean, the fact that Pilgrim's produced it, maybe

20  it's their business record, but he hasn't shown that it's his.

21      THE COURT:  Objection will be overruled.  This

22  particular document does not have the type of hearsay that has

23  been problematic in some of the other ones.  It does indicate

24  in the document, it references a purchase order, does contain

25  the numbers.  Based on Mr. Finch's testimony about it having

Gregory Finch - Direct

1    documents of this type being kept in the ordinary course

2    because they memorialize the agreement, J-041 will be admitted.

3            MR. BELLER:  Your Honor, may I publish that to the

4    jury, please?

5            THE COURT:  You may.

6            MR. BELLER:  If we can start from the bottom and zoom

7    in to allow the jury to review that for just a moment.  And if

8    we can go to the next e-mail, please.  And finally the top.

9    BY MR. BELLER:

10   Q.  What transaction occurred between Mr. Brady and Mr. Gay?

11   A.  We were covering a short for them on Popeye's tenders or

12   strips.

13   Q.  How many cases of Popeye's strips was sold?

14   A.  1,000 cases.

15   Q.  And what was the date of that transaction?

16   A.  September the 6th of 2017.

17   Q.  I think we covered this, but who coordinated the sale of

18   this?

19   A.  For Claxton Poultry, it would have been Scott Brady.  And

20   for Pilgrim's, it would have been Justin Gay.

21   Q.  Excuse me for my interruption, sir.

22           MR. BELLER:  If we can again go back to Government's

23   Exhibit 7.  And if we can zoom in on the September 5th portion

24   of that exhibit.

25

Gregory Finch - Direct

1    *BY MR. BELLER:*

2    *Q.*   Sir, here do you see calls between Justin Gay and

3    Scott Brady on this particular date?

4    *A.*   Yes.

5    *Q.*   And do these calls coincide with the short for product that

6    happens the next day?

7    *A.*   Yes.

8    *Q.*   All right.  Let's switch gears just a little bit, okay?

9    Mr. Finch, let's talk about KFC and a KFC contract.  How often

10   and when does a KFC contract get renewed with Claxton Poultry?

11   *A.*   Well, up through 2014, it would have been annually.   In

12   2014, they came to the supply chain and asked for multi-year

13   contracts, so since 2014, they have been three-year contracts.

14   *Q.*   And does Claxton bid to be a supplier to KFC each time the

15   contract is renewed?

16   *A.*   No.  Claxton is an approved supplier.  We have been

17   supplying KFC for over 40 years.

18   *Q.*   So is it a question of volume and price, not whether or not

19   you are going to be a supplier from year to year?  Is that

20   accurate?

21   *A.*   Correct.  We are talking about volume and price, and now we

22   are talking about length of contract, because prior to the 2015

23   contract, we knew the contract was annual.  Now we're talking

24   about length of contract in addition to price and volume.

25   *Q.*   How does the customer's feedback play into the negotiation

Gregory Finch - Direct

1   over volume and price with KFC?

2   A.   QSR customer feedback is what we go off of.  We follow

3   their directional guidance as to where we need to be on price

4   in order to keep the volume that we currently have and also to

5   pick up additional volume.

6   Q.   And KFC, I believe you testified, uses this cost-plus

7   spreadsheet?

8   A.   Correct.

9   Q.   Would you recognize KFC's cost-plus spreadsheet if I showed

10  it to you?

11  A.   Yes.

12  Q.   Sir, if you would open your binder to Government's

13  Exhibit --

14       MR. BELLER:  Your Honor, I believe this has two

15  exhibit numbers.  It's 1506, 9692.  And I believe that this is

16  already in evidence.

17       THE COURT:  It has been admitted under 9692, not 1506

18  as far as I can tell.  Well, it could be a duplicate, however,

19  but you may publish that.

20       MR. BELLER:  If we may publish 9692, and if we could

21  go to page 3, please.  It's very small, but if we could look at

22  that for just a moment.

23  BY MR. BELLER:

24  Q.   Mr. Finch, let me know when you've gotten there, and it's

25  also on your screen, sir.

3390

Gregory Finch - Direct

1    A.   Okay.

2    Q.   Were you involved in calculating the cost categories that

3    went into this?

4    A.   Yes.

5    Q.   And are those Claxton's actual costs?

6    A.   To the best of my memory, they are, along with any known

7    increases we felt were coming in 2013.

8    Q.   Now, this is the actual document that you said in its full

9    form is 40 to 60 different categories?

10   A.   Well, it would be this page and then the next page, which

11   is the feed portion, that feeds to the front page.

12   Q.   Mr. Finch, do you or anyone with your knowledge consult

13   with competitors to determine what costs you put in there?

14   A.   Absolutely not.

15   Q.   Do you consult with Mikell Fries or Scott Brady to

16   determine what costs you put in there?

17   A.   No.

18   Q.   Does Mikell Fries or Scott Brady have input on what the

19   period pricing is?

20   A.   Period pricing?

21   Q.   Yes.

22   A.   No.

23   Q.   And to be fair, that's because period pricing -- or is it

24   fair that period pricing is simply the variation based on feed?

25   A.   That's fair.

Gregory Finch - Direct

1    Q.  How does knowing competitors' period pricing factor into

2    how you calculate these costs?

3    A.  It doesn't.  Claxton makes its own independent pricing

4    decisions.  It has nothing to do with our actual costs knowing

5    what somebody else's price is.

6    Q.  I want to switch gears and talk about one of our favorite

7    subjects and that is dark-meat negotiations.

8    A.  Okay.

9    Q.  Specifically 2014 dark-meat negotiations.  What does it

10   mean to be back on dark meat?

11   A.  Back means back -- a reduction from the COB price, the

12   eight-piece price.

13   Q.  And in order to know a competitor's dark-meat price, do you

14   also need to know their COB or eight-piece price?

15   A.  Yes.

16   Q.  So I want to go to Government's Exhibit 1427 again, if you

17   could take a moment and look at that.

18        MR. BELLER:  And if we can highlight the first two

19   rows of 1427.

20   BY MR. BELLER:

21   Q.  Let me know if you have had a chance to review those two

22   rows, Mr. Finch.

23   A.  Okay.

24   Q.  What is your knowledge of what it means that George's is

25   .30 back?

Gregory Finch - Direct

1          MR. KOENIG:  Objection.  This is argumentative.

2          THE COURT:  Overruled.

3   A.  This would mean that George's dark-meat price is 30 cents

4   less than their COB price.

5   BY MR. BELLER:

6   Q.  Is 30, in this case .30 back, is that a formula from that

7   cost-plus model?

8   A.  Yes.

9   Q.  And how about Pilgrim's is .30 back, what does that mean to

10  you?

11  A.  That Pilgrim's dark-meat price is also .30 back from their

12  COB price.

13  Q.  What about Tyson's, what does it mean that Tyson's is .31

14  back?

15  A.  Their dark-meat price --

16          MR. KOENIG:  Objection, again.  He is interpreting a

17  document.  He has just reviewed it for litigation purposes.

18          THE COURT:  I am going to sustain it on it calls for

19  speculation.

20          MR. BELLER:  If we may publish this, Your Honor.

21          THE COURT:  Yes, you may.

22  BY MR. BELLER:

23  Q.  If, Mr. Finch, a supplier is .30 back, tell me their

24  dark-meat price.

25  A.  From this document?  Any document?

3393
Gregory Finch - Direct

1    Q.  From your knowledge.  If I say somebody is .30 back, what

2    is their price?

3    A.  I have no clue without their eight-piece price.

4    Q.  And if I say that somebody is .31 back, Mr. Finch, if you

5    could tell the jury what their price is.

6    A.  Without the eight-piece price, I can't.

7    Q.  So if I were to tell you .30 back and .31 back, does that

8    tell you the formula?

9    A.  It tells me what their dark-meat formula is back of the

10   COB, but it doesn't tell me what the price is.

11   Q.  So I want to talk to you specifically about Claxton's

12   2014 --

13          MR. BELLER:  We can take this down, please.

14   BY MR. BELLER:

15   Q.  -- 2014 dark-meat bid submission, okay?  From the three

16   rounds of bidding, did Claxton Poultry ever reduce its

17   dark-meat formula?

18   A.  No.

19          MR. BELLER:  So I am showing you what is, I believe,

20   admitted, Your Honor, under 1734.

21          THE COURT:  Yes, that has been admitted.

22          MR. BELLER:  And if we may publish.

23          THE COURT:  You may.

24   BY MR. BELLER:

25   Q.  Mr. Finch, if Claxton's dark-meat formula stayed at 30-1/2

Gregory Finch - Direct

1  back, did the price change?

2  *A.*  Yes.

3  *Q.*  How so?

4  *A.*  Because since it's back of the eight-piece price, every

5  time the eight-piece price changes, then the dark-meat price

6  changes with it.  So if the eight-piece price goes down a

7  penny, the dark-meat price goes down a penny.  If it goes down

8  four pennies, the dark-meat price goes down four pennies.

9  *Q.*  So I want to focus on your knowledge of the negotiations in

10  this particular year.  Claxton's dark-meat price stayed at

11  30-1/2 back throughout all rounds, but the eight-piece price

12  consistently came down.  Did I just interpret that properly?

13  *A.*  Yes.

14  *Q.*  Okay.  What about wing prices for that year?  How did

15  Claxton price wings?

16  *A.*  This is 2014?

17  *Q.*  That's correct.

18  *A.*  Well, we had some confusion on the 2014 bid because we

19  misread the instructions, I am embarrassed to say.  And we

20  submitted our bid at market, and the QSR wasn't real happy with

21  us.  But we wanted to move our wings to market anyway.  I mean,

22  economic conditions in the protein industry had changed

23  dramatically, and being back of the eight-piece price, which we

24  had historically been, was a substantially better price for the

25  QSR.  We had been trying to move our wings to market for a

Gregory Finch - Direct

1    couple of different years, and Mr. Ledford kept beating us down

2    and saying, No, you can't do it.

3    Q.   When you said you "misread the instructions," is that

4    because the instructions actually say input the market price?

5    A.   That's how we interpreted the instructions for 2014.

6    Q.   And did Claxton ever submit a bid for wings to be at market

7    price?

8    A.   We did.  That's how we understood the instruction in the

9    RFP.

10   Q.   As you being the CFO, did you believe that a market price

11   for wings to be a rational place to start negotiations?

12   A.   Absolutely.  I mean, like I said, the wing market had

13   changed so dramatically because of the change in competing

14   meats in the protein sector during this time, that the market

15   for wings had gone up dramatically.  And so we were at a severe

16   price disadvantage to where the market was at the time on

17   wings.  And, you know, we felt like we should have been paid a

18   better price for our wings.  And so we wanted market for our

19   wings.  We wanted market for our wings in 2013, and Ledford

20   said no.  And once again, he said no in 2014.

21   Q.   Did the buyer ever give you feedback to lower your wing bid

22   from market?

23            MR. KOENIG:  Objection, foundation.

24            THE COURT:  Overruled.  He was asked if he knew.

25   A.   Yes.

Gregory Finch - Direct

1    *BY MR. BELLER:*

2    *Q.*  And did Claxton do that?

3    *A.*  Absolutely, we did.  We were afraid we would lose volume if

4    we didn't do what he told us to do.

5    *Q.*  During every single negotiation with KFC in 2013, did

6    Claxton Poultry ever raise its price?

7    *A.*  No.

8    *Q.*  Was Claxton trying to raise its prices based on direction

9    from Mr. Austin at Pilgrim's Pride?

10            *MR. KOENIG:*  Objection, foundation, speculation.

11            *THE COURT:*  He asked if he knows.  He can answer.

12   *A.*  No.

13   *BY MR. BELLER:*

14   *Q.*  I am showing you Government's Exhibit 17.  It's the same

15   one you just looked at a few moments ago.  If you can take a

16   moment and review this.

17            *MR. BELLER:*  And if we can publish, Your Honor?

18            *THE COURT:*  Yes, you may.

19   *BY MR. BELLER:*

20   *Q.*  Does Government's Exhibit 17 show that Claxton by reducing

21   its COB eight-piece price 4 cents also decreased its dark-meat

22   price by the same 4 cents?

23            *MR. KOENIG:*  Objection, leading.

24            *THE COURT:*  Overruled.

25   *A.*  No.

Gregory Finch - Direct

1          MR. BELLER:  Thank you.  We can take that down.

2    BY MR. BELLER:

3    Q.  I want to talk now about the 2015 contract negotiation with

4    KFC.  Were you involved in that negotiation?

5    A.  Yeah, I took my typical role in that one.  This was way

6    different for us, the whole supply chain, because the QSR came

7    to us way early this year.  It was actually, I want to say, the

8    summer of 2014 they came to us.

9          So I took my normal role, although it was weird to be

10   doing pricing at that time of year, but what we knew the cost

11   to be that early.  We had no idea what was coming to us as far

12   as additional cost to add.  But I played my normal role of

13   actual cost as best we could and then conversations internally

14   with Mikell and Steve about what our volumes might be.

15   Q.  We are going to get into that a little bit, okay?

16         Was 2015 a good year for Claxton Poultry and chicken

17   suppliers?

18         MR. KOENIG:  Objection, foundation, suppliers.

19         THE COURT:  He can answer if he knows.

20         MR. KOENIG:  Can we get foundation for how he knows?

21         THE COURT:  Overruled.

22   BY MR. BELLER:

23   Q.  Was it a good year?

24   A.  2015 was a good year for chickens.

25   Q.  What is that opinion based on?

Gregory Finch - Direct

1    *A.*  Well, part of my job is to look at macroeconomic issues

2    within the entire protein space.  And so because of what

3    happened in 2011 and 2012, we had the worst drought since some

4    say 1934, some say 1950, but regardless, worst drought in a

5    long time in '11 to '12, and so the cow herd in the

6    United States had to be culled.  So beef is a competing meat

7    with chicken.

8         So in that time frame, the cattle producers could not

9    afford to pay for 7 or $8 corn, which is where the board went

10   and --

11        *MR. KOENIG:*  Objection, foundation as to where -- this

12   is all hearsay or speculation without foundation.

13        *THE COURT:*  Overruled.

14   *BY MR. BELLER:*

15   *Q.*  Let me try to narrow that down, okay, just a little bit.

16   In terms of it being a good year for chicken suppliers, was

17   that based on what was happening with feed?

18   *A.*  What was happening with feed?

19   *Q.*  Yeah.

20   *A.*  Well, feed had started to come down to historical norms for

21   sure, but it was because of the dynamic of the cow herd being

22   culled, and then pigs got PEDV which was a virus that was

23   killing the moms and the babies with --

24        *MR. KOENIG:*  He is going into details about beef and

25   pork without any foundation for how he would know that.  He

Gregory Finch - Direct

1    works in chickens.

2            THE COURT:  Overruled.

3    BY MR. BELLER:

4    Q.  I need to narrow your questions, okay?  Was feed a factor,

5    yes or no?

6    A.  Feed was coming back to normal, more normal pricing because

7    the cows were gone and the pigs were gone due to the PED virus.

8    Q.  Was fuel a factor, yes or no, Mr. Finch?

9    A.  Yes.

10   Q.  And other proteins as you were explaining were also a

11   factor, right?

12   A.  Yes.

13   Q.  How was KFC's business?

14   A.  Not good.

15   Q.  Was it growing or was it going down, to the best of your

16   knowledge?

17   A.  They had announced publicly that they were closing a lot of

18   stores annually.  They were struggling operationally.  And due

19   to the dynamics I was describing about cows and pigs and market

20   prices being better for chickens, some chicken suppliers had

21   switched over to a big bird, so they got a drying up of supply

22   of chickens around this same time.  And so they've got a

23   multitude of other things happening within the protein sector

24   that's impacting their business.

25            In addition to that, what we call the other red and

Gregory Finch - Direct

1   white, Chick-fil-A's business was going crazy, as was Popeye's,

2   one of their competitors, so operational issues they were

3   having --

4          MR. KOENIG:  Objection.  This is becoming a narrative.

5   BY MR. BELLER:

6   Q.  So, Mr. Finch, I need you to just focus your answers to my

7   questions, okay.  Did you think that big bird or large birds

8   were a fad in 2014?

9   A.  Yeah, we thought they were the new shiny object.

10  Q.  Meaning did Claxton Poultry ever stop producing small

11  birds?

12  A.  No.

13  Q.  Why not briefly?  Why not?

14  A.  We couldn't -- the capital expenditures and the ripple

15  effect in our supply chain to try to convert our plant to big

16  bird was just -- is a nonstarter.  We would have to get a whole

17  bunch of new customers and spend 30, $40 million to convert our

18  plant.  It just wasn't feasible for us.

19  Q.  But did Claxton get the benefit of this small-bird short

20  supply in 2015?

21  A.  Did we get a benefit?

22  Q.  Yeah, was there a big-bird profitability or a big-bird

23  adjustment that was given to Claxton?

24  A.  Yeah.  Part of what KFC came to us for the '15 contract

25  year was they were going to offer a big-bird adjustment because

Gregory Finch - Direct

1   they needed to incent the supply chain to stay in small birds

2   and not go to --

3          MR. KOENIG:  Objection.

4          THE COURT:  Overruled.

5   A.  And not go to big birds.

6   BY MR. BELLER:

7   Q.  Did Claxton demand that premium?

8   A.  We did not.  We were asked by the QSR.

9   Q.  Was there a particular term that was used?

10  A.  Big-bird adjustment.

11  Q.  In 2014, was it more profitable to sell to Chick-fil-A, for

12  example, than what it was to KFC?

13  A.  Yes.

14  Q.  Was KFC competing with Chick-fil-A in 2014, 2015 for this

15  limited volume of small birds?

16  A.  Yes.

17  Q.  So how did you, Mr. Finch, calculate the premium or this

18  big-bird adjustment and the margin when you were filling out

19  the cost-plus model?

20  A.  I used the opportunity -- so we weren't going to switch to

21  big birds for the reasons I just explained, but we could

22  shift -- because we do a two-bird program, we could shift more

23  into our bigger bird program and debone them for Chick-fil-A.

24          So what I did was opportunity cost calculation; in

25  other words, what were we giving up if I transferred those

3402
Gregory Finch - Direct

1   birds and didn't sell them to KFC, and deboned them instead for

2   Chick-fil-A, what was our opportunity cost in doing that.

3   Q.   And what were the numbers that you came up with?

4   A.   My number was 12-1/2 cents.

5   Q.   12-1/2 is the big-bird adjustment number?

6   A.   12-1/2 was what Claxton Poultry's opportunity cost was by

7   continuing to sell to KFC and not switch to Chick-fil-A.

8   Q.   And what was the margin that you calculated in that first

9   round?

10  A.   Well, for that first round, we wanted to reset our margin

11  back to what our historical norm had been which is 10 cents.

12  Q.   Now, we have been talking about big birds or bigger birds.

13  Are bigger birds still small birds in terms of Claxton's

14  production?

15  A.   Can you ask that again?

16  Q.   Let me ask a better question.  Does Claxton actually have a

17  two-bird program?

18  A.   Yes.

19  Q.   And one is a small bird.  The second one is just a little

20  bit larger, but it's still considered to be a small bird in the

21  poultry industry; is that right?

22  A.   Correct.

23  Q.   So in terms of the first-round bid that you offered to KFC,

24  was that the 12-cent big-bird adjustment plus the 10-cent

25  margin?

Gregory Finch - Direct

1    A.   Yes.

2    Q.   And what date was that decision or on what date did Claxton

3    determine -- did you determine those two numbers?

4    A.   I determined that, what the number was going to be,

5    sometime around the end of July.

6    Q.   And was that transmitted then, if you recall, to

7    Mikell Fries on August the 1st of 2014?

8    A.   Yes.

9    Q.   That sounded a little hesitated.  Do you want me to refresh

10   your recollection?  Would that be helpful?

11   A.   Yes.

12        MR. KOENIG:  Objection.  He didn't say he didn't

13   remember.  In fact, he answered the question.

14        MR. BELLER:  I am happy with a yes answer if that's

15   the concern.

16        THE COURT:  Sounds like he is happy with a yes answer.

17   BY MR. BELLER:

18   Q.   So April 1st is the date that that decision was made by you

19   and then transmitted to -- I said April.  August the 1st is the

20   date that that decision was transmitted to Mr. Fries and

21   Mr. Brady; is that right?

22   A.   As I recall, yes.

23   Q.   And do you recall the date that those numbers were sent to

24   Kentucky Fried Chicken or KFC?

25   A.   I don't remember the exact date we sent the bid in,

Gregory Finch - Direct

1   because, as I recall, Ken Hutchinson, who works for me, had put

2   this together at my direction.  When he first sent that to us,

3   he had the two -- the 10-cent margin and the 12-cent big-bird

4   adjustment fused into one line.  And so when I saw that, I

5   called Mikell, and I said, Listen, man, you know who we're

6   dealing with?

7   Q.  Mr. Finch, I am going to stop you for a moment.  Do you

8   recall the date that this was transmitted by Chick-fil-A?

9   A.  I do not recall the date.

10  Q.  Would it help your recollection if I showed you a document?

11  A.  Yes.

12  Q.  In your binder, if you could turn to Exhibits 1132 and

13  1133.  Take a few moments and review that and let me know if

14  that refreshes your recollection as to what date the price was

15  transmitted to KFC.

16  A.  I am sorry, 11 what?

17  Q.  1132 and 1133.

18  A.  Okay.  August the 19th.

19  Q.  Does that refresh your recollection as to what date it was

20  transmitted?

21  A.  Yes.

22  Q.  And what was transmitted is the same numbers that were

23  decided on August the 1st.

24          MR. KOENIG:  Objection, leading.

25          THE COURT:  Sustained.

Gregory Finch - Direct

1            MR. KOENIG:  Sustained?

2            MR. BELLER:  There has not been a question.

3            THE COURT:  Go ahead.

4   BY MR. BELLER:

5   Q.  What numbers were transmitted to Claxton on August --

6   excuse me, to Chick-fil-A on August the 19th of 2014?

7            MR. KOENIG:  Objection.  He is reading from the

8   document to give his answer.

9            THE COURT:  For purposes of the comparison, he may do

10  so.  Overruled.

11           MR. BELLER:  Excuse me, Judge?

12           THE COURT:  For purposes of the comparison, the

13  objection is overruled.

14           MR. BELLER:  Thank you.

15  BY MR. BELLER:

16  Q.  What numbers -- were the same numbers transmitted?

17  A.  Our August 1 numbers were the numbers that were transmitted

18  to KFC, not Chick-fil-A, KFC.

19  Q.  Excuse me, I think I said that incorrectly.

20           Now, was your margin .1940?

21  A.  No.

22  Q.  Why?

23  A.  Well, that .1940 was our 10-cent margin, and then the

24  big-bird premium or big-bird adjustment we had submitted at

25  12 cents got reduced down by KFC to 9.4.

Gregory Finch - Direct

1  *Q.*  And are those two different numbers and different factors?

2  *A.*  Yes.

3  *Q.*  Were those increases that Claxton gained in 2015 reduced

4  over the term of the contract?

5  *A.*  Yes.

6  *Q.*  Thank you.  I am done with this document.  Thank you.

7          Mr. Finch, were you involved in the 2017 negotiation

8  for KFC's contract the following years?

9  *A.*  Yes.  I played my normal role there.

10  *Q.*  How many years was that contract?

11  *A.*  That was going to be another three-year contract for '18,

12  '19, and '20.

13  *Q.*  And over the period of time of '18, '19, and '20, did

14  Claxton raise their price or reduce their price?

15  *A.*  Reduce.

16  *Q.*  Do you recall how much Claxton reduced its price?

17  *A.*  I don't recall.

18  *Q.*  Does 10 cents sound familiar?  And I am happy to show you a

19  document if it does not.

20  *A.*  10 cents sounds about right.

21  *Q.*  Mr. Finch, I want to switch gears now and talk to you about

22  what I will call a reduced weight bird, okay?

23  *A.*  Okay.

24  *Q.*  Does that term sound familiar to you?

25  *A.*  Yes.

Gregory Finch - Direct

1    Q.  Mr. Finch, I want to show you Government's Exhibit 1615.

2           MR. BELLER:  And, Your Honor, I believe this has been

3    admitted.

4    BY MR. BELLER:

5    Q.  Have you had the opportunity to review Government's

6    Exhibit 1615?

7    A.  Yes.

8    Q.  So I now want to ask you --

9           MR. BELLER:  If we can publish that, please?

10          THE COURT:  You may.

11          MR. BELLER:  If we could take that down.

12   BY MR. BELLER:

13   Q.  Mr. Finch, I want to ask you about your personal knowledge,

14   okay?  Was there a time in 2013 that Claxton was asked about

15   the possibility of supplying a smaller bird to KFC?

16   A.  Yes.

17   Q.  Will you please explain that to the jury?

18   A.  Sure.  KFC came to the supply chain --

19          MR. KOENIG:  Objection, hearsay.

20          THE COURT:  Overruled.

21          MR. KOENIG:  Objection, foundation, came to the supply

22   chain.  He worked at Claxton.

23          THE COURT:  I will sustain it on foundation.  If he

24   can be asked about his foundation.

25          MR. BELLER:  I am happy to.

3408
Gregory Finch - Direct

1    *BY MR. BELLER:*

2    *Q.*  Mr. Finch, as the CFO of Claxton Poultry, are you familiar

3    with large expenditures that Claxton Poultry may be asked to

4    make from time to time?

5    *A.*  Yes.

6    *Q.*  Are some of those including the building of, say, a

7    deboning plant for Chick-fil-A at their request?

8    *A.*  Yes.

9    *Q.*  How about if a QSR has to change their specs or their

10   specifications and that requires Claxton to modify equipment,

11   is that something that you were involved in?

12   *A.*  Yes.

13   *Q.*  How about if a QSR changes their specifications and needs a

14   different type of cut requiring the hiring of more labor, is

15   that something that you're involved in?

16          *MR. KOENIG:*  These have all been leading questions.

17          *THE COURT:*  Sustained.

18   *BY MR. BELLER:*

19   *Q.*  What are some of the types of things that you're involved

20   in?

21   *A.*  As far as?

22   *Q.*  As far as any expenditure that Claxton has to make.

23   *A.*  Any major expenditure I am -- certainly brought into and

24   part of the conversation, part of the negotiations many times

25   on whatever it could be.

Gregory Finch - Direct

1   *Q.* If Claxton is asked to reduce the size of its birds to grow

2   a smaller bird, is that something that you were involved in?

3   *A.* Yes.

4   *Q.* Why?

5   *A.* Because it would require a monumental shift in our meat

6   block, and it would also require capital expenditures of

7   equipment inside the plant to run a smaller bird.

8   *Q.* Based on your knowledge and your role as CFO, was there a

9   time in 2013 in which you were asked or you were aware of a QSR

10  wanting to make such an expenditure?

11  *A.* Yes.

12  *Q.* Do you have personal and specific knowledge of that?

13  *A.* Yes.

14  *Q.* What happened in 2013 in KFC's request for you to grow a

15  smaller bird?

16  *A.* Mr. Ledford sent an e-mail to us and asked us if we could

17  possibly produce a --

18          *MR. KOENIG:* Objection, hearsay.

19          *THE COURT:* Overruled.

20  *A.* If we could possibly produce a bird in the 2.4-pound range.

21  *BY MR. BELLER:*

22  *Q.* Does that in effect mean reducing the size of a bird?

23  *A.* Yes.

24  *Q.* Was that even possible, Mr. Finch?

25  *A.* Not for us.

3410

Gregory Finch - Direct

1   Q.  Do you have knowledge of whether other suppliers were able

2   to figure out a way to grow a smaller bird?

3   A.  Yes.

4   Q.  And what is your knowledge?  Were other suppliers able to

5   figure out how to grow a smaller bird?

6           MR. KOENIG:  Objection, foundation.

7           THE COURT:  Sustained.

8   BY MR. BELLER:

9   Q.  What's the basis of your knowledge as to whether suppliers

10  were able to grow a smaller bird?

11  A.  If it wasn't plausible for us, it was likely not plausible

12  for anyone else.  And as I recall, the request --

13          MR. KOENIG:  Objection.  This is not the basis.  This

14  is going beyond.

15          THE COURT:  Sustained.

16  BY MR. BELLER:

17  Q.  Did KFC abandon their efforts?

18  A.  Yes.

19  Q.  Do you have knowledge of KFC abandoning their efforts?

20  A.  Yes.

21  Q.  And do you know why KFC abandoned their efforts?

22  A.  Because the answer came back --

23          MR. KOENIG:  Objection, non-responsive.

24          THE COURT:  Overruled.

25  BY MR. BELLER:

3411
Gregory Finch - Direct

1   *Q.* Do you know why KFC abandoned their efforts?

2   *A.* It wasn't possible to produce the size birds they wanted in

3 the quantities they wanted it.

4   *Q.* Do you know if Claxton transmitted or said that to

5 Mr. Ledford, that this was an impossible task?

6   *A.* Yes.

7   *Q.* Do you know if other suppliers were in agreement with

8 Claxton's position that this was an impossible task?

9   *A.* Yes.

10      *MR. BELLER:* A couple more questions and we can break,

11 Your Honor, if that's okay.

12      *THE COURT:* That's fine.

13 *BY MR. BELLER:*

14   *Q.* What was the date of the exchange between, if you know,

15 Claxton Poultry and Mr. Ledford saying a smaller bird is an

16 impossible task?

17      *MR. KOENIG:* Objection, foundation.

18      *THE COURT:* Overruled.

19   *A.* I don't recall.

20 *BY MR. BELLER:*

21   *Q.* Can I show you Government's Exhibit 1615? Would that

22 potentially remind you of what that date was?

23   *A.* Sure.

24   *Q.* If you can please take a moment and review 1615. Does that

25 refresh your recollection on the date that Claxton told

Gregory Finch - Direct

1   Mr. Ledford that it was an impossible task?

2   A.  Yes.

3   Q.  And what was the date now that --

4           MR. BELLER:  We can take that down.

5   BY MR. BELLER:

6   Q.  Now that your memory is refreshed, what was the date that

7   Claxton Poultry told Mr. Ledford that it was an impossible

8   task?

9   A.  March 8th of 2013.

10  Q.  Is that the same date as Government's Exhibit 1615?

11          MR. BELLER:  And if we can please publish that to the

12  jury.

13          THE COURT:  You may.

14  A.  Yes.

15  BY MR. BELLER:

16  Q.  Was Mr. Ledford's request to grow a smaller bird part of a

17  contract negotiation?

18  A.  No.

19  Q.  Was Mr. Ledford's request to grow a smaller bird related to

20  a contract requirement or term?

21  A.  No.

22  Q.  And was it simply related to whether it was biologically

23  possible to shrink the sizes of the birds being given to

24  Popeye's?

25          MR. KOENIG:  Objection, leading.

Gregory Finch - Direct

1        THE COURT:  Sustained.

2    BY MR. BELLER:

3    Q.  What was it related to, Mr. Ledford -- Mr. Finch?  Excuse

4    me.

5    A.  Mr. Ledford's request?

6    Q.  Which was?

7    A.  The smaller birds.  I am sorry, I forget what your question

8    was.

9    Q.  And was growing a smaller bird impossible?

10   A.  It was.

11        MR. BELLER:  Thank you, Your Honor.  This is a good

12   time to break.

13        THE COURT:  Ladies and Gentlemen, let's go ahead and

14   take the mid-morning break.  We will reconvene at 10:35 since

15   we are going a little bit later.  The jury is excused.

16        (Jury excused.)

17        THE COURT:  Mr. Finch, you are excused for the break.

18   Thank you very much.

19        So I am not sure what the timing of Mr. Finch's

20   testimony is.  We do need to at some point discuss Docket

21   No. 1187, the government's motion to exclude testimony and

22   exhibits.  When would be the best time based upon predictions

23   to do that?  Do you think we will get to the lunch hour to be

24   able to talk about that before Professor Snyder is called?

25        MR. BELLER:  Your Honor, Mr. Finch, I am guessing, is

Gregory Finch - Direct

1    another 45 minutes to an hour.  I realize that he is sometimes

2    a bit winded.  I try to direct him when that happens, but I get

3    leading objections, which is absolutely appropriate under the

4    rules.  And so that just causes me to be a bit uncertain as to

5    how long it's going to take.

6         THE COURT:  Ms. Pletcher may not know.  Ms. Pletcher

7    may be the one asking questions of Professor Snyder.

8         MS. PLETCHER:  I am wondering the same thing.

9    Professor Snyder is present in the courtroom, and he is ready

10   to testify as soon as Mr. Finch wraps up.

11        THE COURT:  Okay.  Are you prepared, Ms. Pletcher, to

12   address the issue now?

13        MS. PLETCHER:  Yes, I am.

14        THE COURT:  I think Professor Snyder should be

15   excluded from the courtroom, then.

16        Ms. Pletcher, go ahead.

17        MS. PLETCHER:  Thank you, Your Honor.

18        We filed a brief this morning.  I am not sure if the

19   Court --

20        THE COURT:  I have not seen that, no.

21        MS. PLETCHER:  So this is the government's fifth

22   motion to exclude Professor Snyder's testimony.  The Court has

23   rejected every single one previously, and there is no reason to

24   rule differently in this case.  In fact, the grounds in this

25   case are even weaker, I would say, than any of the grounds that

Gregory Finch - Direct

1    the government has previously raised.

2            They are essentially asking for --

3            THE COURT:  Well, we don't have much time.  So let's

4    get to the nub of it.  Namely, No. 1, is Professor Snyder going

5    to testify that lack of uniformity is a sign of a lack of an

6    agreement or conspiracy?

7            MS. PLETCHER:  Yes, he is, Your Honor.

8            THE COURT:  Is he going to -- and how is he going to

9    back that particular opinion up?

10           MS. PLETCHER:  So Professor Snyder's opinion --

11           THE COURT:  Mr. Tegtmeier, do you have a mask?

12           Go ahead, Ms. Pletcher.

13           MS. PLETCHER:  Professor Snyder's opinion is grounded

14   first in the DOJ's own primer on indicators of price-fixing.

15           THE COURT:  Which doesn't say that uniformity

16   establishes -- it doesn't say that it's necessary.

17           MS. PLETCHER:  Well, that's right.  And so he is going

18   to show that the fact that the prices are not uniform indicates

19   a lack of agreement.  And there is abundant case law to show

20   that that is a legitimate and rational conclusion to be made.

21           In fact, the real issue here, Your Honor, is that the

22   government is presenting a circumstantial case where -- based

23   on the fact that there was some unquantifiable, substantial,

24   and, quote, historic even price increase.  And so they are

25   asking the jury to infer from the prices that there was some

3416
Gregory Finch - Direct

1    sort of illegal agreement.

2          So Professor Snyder's economic opinion based on

3    analysis of those prices looking at patterns that may exist or

4    not exist in those prices is perfectly reasonable grounds to

5    present an economic opinion and also for the jury to infer that

6    there was no price-fixing.

7          The government also makes an argument as to relevance

8    with respect to the fact that there are no identical prices,

9    and, frankly, Your Honor, that's belied by the great weight of

10   the case law which we have gone through in the filing that we

11   submitted this morning showing that case after case shows that

12   the lack of uniformity in pricing is an indicator that no

13   anomalous conduct took place and that an agreement that's

14   illegal cannot be inferred.

15         THE COURT:  Anything else?

16         MS. PLETCHER:  I do refer the Court to the document we

17   filed this morning for the extensive case law on this point.

18         THE COURT:  Mr. Torzilli?

19         MR. TORZILLI:  It was going to be one point, but I

20   just have to, Your Honor, put into the record to respond to the

21   mountain of case law point that Ms. Pletcher made, just if you

22   will indulge me.  This is a passage from *United States v.*

23   *Socony-Vacuum*, Supreme Court case, 1940, that says, Nor does --

24   is a quote from page 222 of the opinion, "Nor is it important

25   that the prices paid by the combination were not fixed in the

Gregory Finch - Direct

1    sense that they were uniform and inflexible.

2    Price-fixing-fixing as used in the *Trenton Potteries* case,"

3    which was a 1927 Supreme Court case, "has no such limited

4    meaning.  An agreement to pay or charge rigid, uniform prices

5    would an illegal agreement under the Sherman Act.  But so would

6    agreements to raise or lower prices whatever machinery for

7    price-fixing was used.  That price-fixing includes more than

8    mere establishment of uniform prices is clearly evident from

9    *Trenton Potteries* case itself, where the court noted with

10   approval," and it goes on.

11        So the idea that uniform prices are necessary or even

12   important is -- has been rejected, and that's been Supreme

13   Court case law for 80-plus years.

14        But I think the key point here is the cloak of

15   expertise that's been brought to bear on something that's of

16   minimal relevance and, I would say, logically specious, and

17   that's where the cumulative aspect of this comes in.  We've had

18   mountains of evidence about changes in prices that have been

19   discussed with all or nearly all the fact witnesses, customer

20   witnesses.  And then second is putting the, I think, unfairly

21   prejudicial gloss of an expertise on top of that.

22        And it's for all those reasons that -- and the reasons

23   we stated in the brief that we think this portion of

24   Professor Snyder's testimony and exhibits should be excluded.

25        *THE COURT:*  The motion is going to be denied.

Gregory Finch - Direct

1    Professor Snyder, obviously, can testify about factors.  He may

2    have a particular opinion about price uniformity, but the

3    bottom line is the Court will instruct the jury on the law.

4    And if the law -- and I haven't had the benefit of reviewing

5    the case law that Ms. Pletcher has cited presumably in either

6    the defendants' response or Mr. Penn's response, but the jury

7    will instruct the -- the Court will instruct the jury on the

8    law.  And if the law contradicts Professor Snyder, it sounds

9    like a fairly devastating limitation on whatever opinions he

10   may have.

11          Ultimately, once again, the Court instructs the jury

12   on the law, not Professor Snyder, so I am not worried about a

13   danger of there being some undue influence from his particular

14   opinion.

15          Ms. Pletcher, anything else real quick?

16          *MS. PLETCHER:*  There was one more motion that we filed

17   this morning with respect to Professor Snyder's testimony.

18          *THE COURT:*  I haven't seen that at all.

19          *MS. PLETCHER:*  And I can hand up both motions to the

20   Court, but I will just tell you the general nature of it is the

21   defendants are moving to exclude any interpretation -- or any

22   questions asking Professor Snyder to interpret communications

23   or e-mails or texts.  And we believe this is fully in line with

24   a motion the government filed earlier to the same point, but we

25   just wanted to be clear and resolve that before

Gregory Finch - Direct

1    Professor Snyder gets on the stand.

2         THE COURT:  I don't know exactly what you are talking

3    about.  I could imagine cross-examination on that, but once

4    again, it depends on what Professor Snyder is basing his

5    opinions on.  And it also depends on whether or not his

6    opinions could be contradicted by communications, evidence of

7    communications.  So I really don't know.  I will take a look at

8    it over what short amount of time we have on the break, but

9    can't resolve that issue now.

10        MS. PLETCHER:  Thank you, Your Honor.

11        THE COURT:  We will be in recess.  We will take at

12   least 10 minutes, but I don't want to go much longer.  The

13   Court will be in recess.

14     (Recess at 10:30 a.m. until 10:41 a.m.)

15        THE COURT:  Let me ask Mr. Torzilli real quick,

16   Mr. Torzilli, did you have a chance to look at the defendants'

17   joint motion, Docket 1191?

18        MR. TORZILLI:  Very briefly at the break, yes, Your

19   Honor.

20        THE COURT:  Do you anticipate an issue there?

21        MR. TORZILLI:  Not an issue in terms of offering

22   rebuttal testimony, of course, depending on what happens with

23   Professor Snyder, but we certainly are prepared to contradict

24   opinions that Professor Snyder makes with ordinary course

25   evidence, including communications.

Gregory Finch - Direct

1          THE COURT:  Okay.  Well, we'll have to take that up

2     later, then.

3          Why don't we go ahead and bring Mr. Finch back.

4          MS. PLETCHER:  Excuse me, Your Honor.  Just to let you

5     know that Professor Snyder is back in the courtroom now for

6     this witness.

7          THE COURT:  Okay.  And no objection by the government

8     to him being in the courtroom?

9          MR. TORZILLI:  No objection.

10         THE COURT:  Okay.

11         MS. PLETCHER:  Thank you.

12         (Jury present.)

13         THE COURT:  Mr. Beller, go ahead.

14         MR. BELLER:  Thank you, Your Honor.

15    BY MR. BELLER:

16    Q.  Mr. Finch, I want to talk to you about the 2015 Popeye's

17    bone-in promotional discount, okay?

18    A.  Okay.

19    Q.  Are you aware of a promotional discount for Popeye's in

20    2015?

21    A.  Yes.

22    Q.  Who requested that discount of Claxton Poultry?

23    A.  Kent Kronauge.

24    Q.  Tell me who Kent Kronauge is.

25    A.  The buyer for Popeye's.

Gregory Finch - Direct

1    Q.  Also known as a company called SMS?

2    A.  Correct.

3    Q.  Did the contract with Popeye's in 2015 require Claxton to

4    agree to promotional discounts from time to time?

5    A.  No.

6    Q.  How did the request -- do you have knowledge as to how the

7    request was made to Claxton?

8    A.  Yes.

9    Q.  And how did that happen?

10   A.  Kent sent an e-mail to Scott Brady and asked him if we

11   would participate in the discount.

12   Q.  And did he ask if Claxton would agree to reduce its price

13   for a short period of time?

14          MR. KOENIG:  Objection, leading.

15          THE COURT:  Sustained.

16   BY MR. BELLER:

17   Q.  Do you know if Claxton ever gave the discount to Popeye's?

18   A.  Yes.

19   Q.  And do you know for what period of time?

20   A.  I don't remember the period of time.  It seems like it was

21   one month.

22   Q.  Okay.  And what was the amount of that discount?

23   A.  2 cents.

24   Q.  Do you know how 2 cents came to be the number?

25   A.  That was the number Kent asked for.

Gregory Finch - Direct

1    *Q.*  Do you know if, Mr. Finch, did you or anyone else from

2    Claxton to the best of your knowledge come up with that 2-cent

3    figure?

4    *A.*  No.  That was Kent's number.

5    *Q.*  I am sorry?

6    *A.*  That was Mr. Kronauge's number.  That's what he asked for.

7    *Q.*  Do you know, Mr. Finch, whether you or anyone else at

8    Claxton Poultry agreed with anyone other than Mr. Kronauge to

9    come up with that 2-cent discount?

10   *A.*  We did not.

11   *Q.*  So let's talk now about Chick-fil-A and what I am going to

12   call CFA's NAE conversion, okay?  We discussed Chick-fil-A a

13   few times today.  To be clear, does Claxton do business with

14   Chick-fil-A?

15   *A.*  Yes.

16   *Q.*  For how long has Claxton sold chicken to Chick-fil-A or

17   CFA?

18   *A.*  Approximately 53 years.

19   *Q.*  In 2014, are you aware of whether Chick-fil-A changed their

20   product specification related to antibiotics?

21   *A.*  Yes.

22   *Q.*  And what was that change?

23   *A.*  They made a big splash announcement publicly in

24   February '14 that they were going to transition all of their

25   poultry to antibiotic-free.

3423

Gregory Finch - Direct

1   *Q.*  What was the time frame, if you know, for all the different

2   suppliers to make this conversion?

3          *MR. KOENIG:*  Objection, foundation, all the suppliers.

4   *BY MR. BELLER:*

5   *Q.*  Do you know if Chick-fil-A issued a press release

6   announcing being antibiotic-free?

7   *A.*  Yes.

8   *Q.*  Do you know if that press release announcing

9   antibiotic-free was sent to the media?

10  *A.*  Yes.

11  *Q.*  Do you know if that press statement from Chick-fil-A was a

12  public statement that went to all suppliers?

13  *A.*  Yes.

14  *Q.*  Do you know if Chick-fil-A announced a time conversion or a

15  time frame for this conversion to be going antibiotic-free?

16  *A.*  Yes.

17  *Q.*  And what was that time frame?

18  *A.*  2020.

19  *Q.*  And so if the announcement was made in 2014, what period of

20  time did all suppliers have in order to make this conversion?

21  *A.*  Until 2020.

22  *Q.*  For a total of how many years?

23  *A.*  Approximately six.

24  *Q.*  Did Claxton Poultry have experience with what it meant to

25  grow antibiotic-free chickens?

3424

Gregory Finch - Direct

1    *A.*   No.

2    *Q.*   What, Mr. Finch, what are some of the different factors

3    that Claxton had to take into consideration in order to convert

4    all of its products to be antibiotic-free?

5    *A.*   Well, segregation of feed at the feed mill because

6    medicated feed can't be mixed with unmedicated feed.  There was

7    ramifications on the live production side because density

8    settings are different for ABF production than from

9    conventional production and capital expenditures inside the

10   plant to segregate any conventional birds from ABF birds.

11   *Q.*   When you say "density," is that like social distancing but

12   for chickens?

13   *A.*   Correct.  It's how many chickens are placed per square

14   foot.

15   *Q.*   What would be the reason for changing the density?

16   *A.*   Well, because you're not going to medicate these chickens,

17   so chickens are just like us when they get sick, they get

18   medication, and because you are not going to medicate the

19   birds, you put fewer birds in the house, so it requires further

20   spacing out.

21   *Q.*   And when did Claxton learn of CFA's plan to convert to

22   antibiotic-free?

23   *A.*   Best I recall, when that press release came out.

24   *Q.*   And did Chick-fil-A provide Claxton guidance at the time

25   that press release came out on what the density requirements

Gregory Finch - Direct

1   would be?

2   *A.*   No.

3   *Q.*   Did Chick-fil-A provide any sort of direction to

4   Claxton Poultry regarding whether, like, the laying hens had to

5   be antibiotic-free?

6   *A.*   No.

7   *Q.*   Or whether the feed had to be antibiotic-free?

8   *A.*   No.

9   *Q.*   So what detail was Claxton operating off of in

10  February 2014 as to what Claxton needed to do to be

11  antibiotic-free?

12  *A.*   Well, quite frankly, not a lot.  I don't know that

13  Chick-fil-A fully knew at that time what they were going to do.

14  There was three or four definitions that USDA had of various

15  types of antibiotic-free production.  And when they first made

16  the announcement, I don't know that Chick-fil-A knew exactly

17  what they were doing.

18  *Q.*   So I think you said the announcement was in February of

19  2014?

20  *A.*   Uh-huh.

21  *Q.*   Do you know when Chick-fil-A decided on or at least

22  announced to you as a supplier what -- which program, which

23  USDA program Chick-fil-A was going to participate in?

24  *A.*   The best I recall it was the summer of '14, somewhere in

25  the August time frame.

Gregory Finch - Direct

1  Q.  Is that about six or seven months later after the

2  announcement?

3  A.  Correct, it would be.

4  Q.  Now, this conversion, does that require Claxton to spend

5  money to grow an antibiotic-free bird?

6  A.  Yes.

7  Q.  Who was going to pay for that?

8  A.  Well, Claxton Poultry was going to pay for all of the R&D

9  cost until our date to go live with the antibiotic-free

10  production.

11  Q.  And you say "R&D."  Does that stand for research and

12  development?

13  A.  Yes.

14  Q.  Does that mean that Claxton was going to front the money?

15  A.  Yes.

16  Q.  And then ultimately who would actually pay for that?

17  A.  Well, when our selected date came for us to provide what

18  ended up being NAE production, which was January '17,

19  Chick-fil-A was then going to reimburse us for the additional

20  cost of production.

21  Q.  You say that happened or Claxton converted in January of

22  2017.  Does Chick-fil-A pay for this expense?

23  A.  Yes.

24  Q.  Is there any profit to Claxton for this additional cost to

25  grow this antibiotic-free bird?

Gregory Finch - Direct

1    *A.*   No.  It was strictly a pass-through of the cost of

2    production.

3    *Q.*   And do you have knowledge, Mr. Finch, over whether this was

4    a pass-through cost to Chick-fil-A not just for Claxton, but

5    for all suppliers?

6    *A.*   That's my understanding.

7    *Q.*   Now, you said that Claxton Poultry did not have experience

8    being antibiotic-free.  Do you know if any of the suppliers had

9    experience being antibiotic-free?

10            *MR. KOENIG:*  Objection, foundation.

11            *THE COURT:*  He was asked if he knows.  Overruled.

12   *BY MR. BELLER:*

13   *Q.*   Do you know?

14   *A.*   Yes.

15   *Q.*   And how do you know?

16   *A.*   Well, one of the companies was public, which was Tyson, so

17   it was clear in any of their public conference -- or earnings

18   calls or their financials that they would provide.

19            *THE COURT:*  Hold on.  One moment, Mr. Finch.

20            Yes?

21            *MR. KOENIG:*  Hearsay.

22            *THE COURT:*  Sustained.

23   *BY MR. BELLER:*

24   *Q.*   Did Claxton reach out to any other suppliers for

25   instruction or direction on how to grow an antibiotic-free

3428

Gregory Finch - Direct

1    bird?

2    *A.*  Yes.

3    *Q.*  Did Claxton reach out to any other suppliers for direction

4    on the cost of growing an antibiotic-free bird?

5    *A.*  Yes.

6    *Q.*  Why?

7    *A.*  Chick-fil-A directed us to.

8    *Q.*  Chick-fil-A directed you to do what?

9    *A.*  So the two that had antibiotic experience which Chick-fil-A

10   told us was Tyson and Perdue.  And Perdue agreed to offer up to

11   Chick-fil-A and the supply network their veterinarian to help

12   with the other suppliers who didn't have experience.

13   *Q.*  And so when Claxton Poultry is reaching out to Perdue and

14   to Tyson's for direction on how to grow an antibiotic-free bird

15   and what the cost would be that would be passed on to

16   Chick-fil-A, was that done at Chick-fil-A's direction and

17   invitation?

18   *A.*  Yes.

19   *Q.*  What is -- is antibiotic-free also known as an acronym or

20   by an acronym?

21   *A.*  Yes.

22   *Q.*  What is the acronym or what are some of the acronyms for

23   having a antibiotic-free bird?

24   *A.*  ABF is for antibiotic-free.  NAE is for no antibiotics

25   ever.

Gregory Finch - Direct

1    Q.   Is ABF and NAE different?

2    A.   Yes.

3    Q.   How so briefly?

4    A.   Well, the ABF production allows for use of some drugs and

5    medications that the NAE production doesn't allow.  So as a

6    result of that, the mortality is usually greater within NAE

7    than ABF, which drives up the cost.

8    Q.   In April of 2014, had Chick-fil-A informed Claxton which of

9    the two programs or any others that it was going to do?

10   A.   No.

11   Q.   Did Claxton hire a consultant for purposes of being able to

12   assist in this antibiotic-free conversion?

13   A.   Yes.

14   Q.   Who did Claxton hire?

15   A.   Dr. Paul Twining.

16   Q.   And what does Dr. Paul Twining do for a living?

17   A.   He is a consultant on the lab operations side.

18   Q.   When we say "doctor," do you know what his doctorate is in?

19   A.   I am not a hundred percent sure, but I think he is a vet.

20   Q.   Veterinarian?

21   A.   Veterinarian.

22   Q.   And did Claxton also consult with another doctor at Perdue?

23   A.   Yes.

24   Q.   And who was that doctor or who was that veterinarian at

25   Perdue?

3430

Gregory Finch - Direct

1    A.   I believe his name was Dr. Stewart-Brown.

2    Q.   And what was the purpose in hiring Dr. Paul Twining and

3    consulting with Dr. Stewart-Brown at Perdue?

4    A.   Since we had no experience in ABF production or NAE, we

5    wanted to try to come up with what it was going to cost us to

6    produce our chickens and so we could then in turn tell

7    Chick-fil-A how much that was going to be.

8    Q.   And do you have knowledge of whether Dr. Twining and/or

9    Dr. Stewart-Brown also consulted with other suppliers?

10   A.   It's my understanding they did, yes.

11   Q.   Are there a whole lot of vets or nutritionists in the

12   commercial broiler poultry industry?

13   A.   It's a pretty shallow pool.

14   Q.   What cost was ultimately calculated for Claxton to convert

15   to grow an antibiotic-free bird?

16   A.   So our cost on the live pound was between 2 and 2-1/2

17   cents.

18   Q.   And who paid that cost again?

19   A.   Chick-fil-A once we got to January '17.  Claxton paid the

20   cost to get us to 2017.

21   Q.   So Claxton fronted the money, and now that is passed

22   through and recouped through this additional fee to

23   Chick-fil-A?

24   A.   On a go-forward basis.

25   Q.   Is this a transparent process for Chick-fil-A?

*A.* Yes. They were learning right along with the rest of us.
*Q.* And does this additional fee for growing an ABF bird, is that apparent to Chick-fil-A in the pricing or in the pricing negotiations?
*A.* Yes. It's an adder to whatever the agreed-upon price is.
*Q.* Is there any profit that Claxton receives for this adder?
*A.* No. It's strictly a pass-through of cost.
*Q.* So the announcement comes -- and for purposes of my next question, let me understand. The announcement comes in February of 2014. Chick-fil-A decides on which USDA program in August of 2014. When does Claxton Poultry make its conversion to grow an NAE bird?
*A.* January of 2017.
*Q.* How about prior to January of 2017, did Claxton include this adder to Chick-fil-A at all?
*A.* No. We absorbed 100 percent of the cost.
*Q.* Mr. Finch, I would like to show you Government's Exhibit 355.

*MR. BELLER:* Which is already admitted into evidence. And if I may publish it, Your Honor.

*THE COURT:* You may.

*BY MR. BELLER:*

*Q.* Mr. Finch, let me know once you have had an opportunity to review Government's Exhibit 355.
*A.* Okay.

Gregory Finch - Direct

1        MR. BELLER:  Thank you, Mr. Brian.  We can take that

2   down.

3   BY MR. BELLER:

4   Q.   What is the date of the exchange on Government's

5   Exhibit 355?

6   A.   April the 18 of 2014.

7   Q.   Is April 18th of 2014 before Chick-fil-A decided which

8   program it would use?

9   A.   Yes.

10  Q.   How much before?

11  A.   Approximately four months.

12  Q.   And when you converted your plant, which USDA program did

13  you use?

14  A.   We used no antibiotics ever at Chick-fil-A's direction.

15  Q.   So is that NAE?

16  A.   NAE.

17  Q.   How about ABF, did you use ABF?

18  A.   Never.

19  Q.   Antibiotic-free?

20  A.   We did not.

21  Q.   Is NAE more expensive than ABF?

22  A.   Yes.

23  Q.   Mr. Finch, I am now going to ask you to take a look at

24  Government's Exhibit 3.

25        MR. BELLER:  If we may publish for the jury, please?

Gregory Finch - Direct

1          THE COURT:  You may.

2     BY MR. BELLER:

3     Q.  If you can look at the bottom of Government's Exhibit 3,

4     are you able to review that?  Is that the same exchange that we

5     had just looked at in Government's Exhibit 355?

6     A.  Yes.

7     Q.  Is there any mention whatsoever on Government's Exhibit 3

8     of NAE?

9     A.  No.

10    Q.  Is there any mention whatsoever on Government's Exhibit 3

11    that Claxton did not convert to NAE until 2017?

12    A.  No.

13    Q.  Is there any mention at all on Government's Exhibit 3 about

14    Chick-fil-A asking suppliers to consult with Tyson's and

15    Perdue?

16    A.  No.

17    Q.  Is there anything on Government's Exhibit 3 about

18    Chick-fil-A taking this as a pass-through cost and not a profit

19    for the supplier?

20    A.  No.

21    Q.  Thank you.

22          Mr. Finch, I want to ask you a little bit about

23    Pollo Tropical.  Is Pollo Tropical a customer or was

24    Pollo Tropical a customer of Chick-fil-A -- excuse me, of

25    Claxton Poultry?

Gregory Finch - Direct

1    A.   Yes.

2    Q.   Do you know a gentleman by the name of Joe Brink?

3    A.   Yes.

4    Q.   Who is he?

5    A.   He is the buyer for Pollo Tropical.

6    Q.   And in 2015, did Claxton Poultry sell chicken to

7    Pollo Tropical?

8    A.   Yes.

9    Q.   Inside Claxton, who owned the Pollo Tropical account in

10   2015?

11   A.   Walter Cooper was responsible.

12   Q.   I am sorry?

13   A.   Walter Cooper was responsible for Pollo.

14   Q.   Is Pollo Tropical also on a cost-plus contract the same way

15   that KFC and Popeye's is?

16   A.   No.

17   Q.   What type of contract is Pollo Tropical on?

18   A.   Fixed.

19   Q.   And tell the jury, if you can, what a fixed-price contract

20   is.

21   A.   Sure.  It's a contract in which we decide at the beginning

22   of the contract period what the contract price will be for the

23   entire length of the contract.

24   Q.   Is a fixed-price contract riskier for Claxton?

25   A.   Yes.

Gregory Finch - Direct

1   Q.   How so?

2   A.   Well, we're deciding in the fall of the year for the next

3   year what our price needs to be.  We can't predict what grain

4   is going to be.  We can't predict what fuel is going to be.

5   There is a lot of unknowns to us at the time that we're setting

6   that price.

7   Q.   So on a fixed-price contract, if there is a drought that

8   summer and corn prices go through the roof, is that still an

9   expense that's incurred by Claxton?

10  A.   We eat that unless we are able to go back and ask, hey, for

11  some relief, but short of relief granted by the customer, that

12  comes out of Claxton's pocket.

13  Q.   So is negotiation on the supplier side, on Claxton's side,

14  is it different than the type of negotiation that would happen

15  on a cost-plus price?

16  A.   Yes.

17  Q.   How so?

18  A.   Well, I mean, like I said, we are trying to predict where

19  corn is going to be and try to set a price that we think is

20  fair to the customer, Pollo Tropical in this case, and fair to

21  us.  So based on what information we have at that moment,

22  planning intentions and those kinds of things, we try to

23  predict what that's going to be and then set a price based on

24  that.

25  Q.   Was negotiation with Mr. Brink different than negotiation

Gregory Finch - Direct

1    with, say, Mr. Ledford or Mr. Kronauge or Mr. Eddington?

2    A.   Oh, yeah.

3    Q.   How so?

4    A.   Well, Joe would always pick the market variable --

5              MR. KOENIG:  Objection, hearsay.

6              THE COURT:  Overruled.

7    A.   Joe would always pick the market variable that favored him

8    the best.  He picked the worst UB price at the time.  When you

9    talked to him about corn, he didn't want to take into account

10   freight and basis as part of the overall cost of that, so he

11   picked and choosed the things that he felt were in his best

12   interest.  And he was typically a take-it-or-leave-it kind of

13   guy, here is the price, you know, which is difficult.

14   BY MR. BELLER:

15   Q.   So I don't want to go too far down this road, but when you

16   say "freight and basis," freight is the amount to transport.

17   Is it fair to say that basis is a dollar amount that the farmer

18   charges for the release of his or her grain?

19   A.   That would be fair.

20   Q.   Did Mr. Brink push back on pricing negotiation?

21   A.   Yes.

22   Q.   Was that typical?

23   A.   Yes.

24   Q.   So was it typical or do you have knowledge of Mr. Brink,

25   for example, once a price is negotiated then asking for a

Gregory Finch - Direct

1   stair-step price?

2   *A.*  In 2015, he asked us for stair-step, yes.

3   *Q.*  To the best of your knowledge, Mr. Finch, as the CFO of

4   Claxton Poultry, did the price of Pollo Tropical in 2015, was

5   it dependent at all with the price given by any other

6   suppliers?

7   *A.*  Was it dependent on any other supplier?  Was that your

8   question?

9   *Q.*  Yeah, let me ask it again in a way that's perhaps a little

10  easier to understand.  To the best of your knowledge, did the

11  prices of any other supplier influence the pricing, Claxton's

12  pricing with Pollo Tropical in 2015?

13  *A.*  No.

14  *Q.*  Do you have knowledge of any other supplier's price when

15  setting the price for Pollo Tropical in 2015?

16  *A.*  No.

17  *Q.*  Did your price, Claxton's price, depend at all on any other

18  supplier offering a particular price?

19  *A.*  No.

20  *Q.*  Mr. Finch, I am going to show you Government's Exhibit 5.

21          *MR. BELLER:*  Your Honor, I believe that this is

22  admitted, and I would ask to publish.

23          *THE COURT:*  Was it Exhibit 5?

24          *MR. BELLER:*  Exhibit 5, please, Your Honor.

25          *THE COURT:*  Yes, you may.

Gregory Finch - Direct

1   *BY MR. BELLER:*

2   Q.   Let me know once you have had an opportunity to review

3   Government's Exhibit 5.

4   A.   Okay.

5   Q.   Mr. Finch, does Government's Exhibit 5 reflect that

6   Claxton Poultry reduced their price over a six-month period of

7   time?

8   A.   No.

9   Q.   And what was Claxton's average price in 2015 for

10  Pollo Tropical?

11  A.   Best I recall, it was $1.03 delivered to Miami.

12  Q.   Does Government's Exhibit 5 reflect that it was $1.03

13  average for the year with delivery to Miami?

14  A.   No.

15  Q.   Does Government's Exhibit 5 reflect the Urner-Barry price

16  for chicken?

17  A.   No.

18       *MR. KOENIG:*  Your Honor, I object again.  This is

19  going through a document, summary exhibit that the government

20  hasn't been allowed to do with witnesses, so I think out of

21  fairness he shouldn't be able to do this.

22       *THE COURT:*  Overruled.

23  *BY MR. BELLER:*

24  Q.   Mr. Finch, do you have recollection, sir, as to what the

25  WOG price was, Urner-Barry, in September of 2015?

3439

Gregory Finch - Direct

1    *A.*  The WOG price was $1.07.

2    *Q.*  What was the eight-piece price, Urner-Barry price in

3    September of 2015?

4    *A.*  1.17.

5    *Q.*  The $1.07 and $1.17 Urner-Barry market price, does that

6    include freight?

7    *A.*  No.

8    *Q.*  And what was Claxton's price for Pollo Tropical?  And I

9    said 2015 and I meant '14, okay?  What was Claxton's price for

10   Pollo Tropical for that year?

11   *A.*  For which year, then?

12   *Q.*  For 2014.

13   *A.*  Our average price was $1.03.

14   *Q.*  And did that include freight?

15   *A.*  Yes.

16   *Q.*  How much is freight generally for Pollo Tropical?

17   *A.*  At that time to Miami, it was a nickel.

18   *Q.*  Does that mean that Claxton's average price for the year

19   was 98 cents?

20   *A.*  Yes.

21   *Q.*  Is 98 cents substantially lower than the WOG market price

22   of $1.07?

23          *MR. KOENIG:*  Objection, vague.

24          *THE COURT:*  Overruled.

25   *A.*  Yes.

Gregory Finch - Direct

1    *BY MR. BELLER:*

2    *Q.*  Is Claxton's 98-cent price substantially lower than the

3    eight-piece market price of $1.17?

4    *A.*  Yes.

5    *Q.*  Is any of that, Mr. Finch, reflected on Government's

6    Exhibit 5?

7    *A.*  No.

8    *Q.*  Mr. Finch, we started the day yesterday and you had spoken

9    just a little bit about Chick-fil-A's different models and

10   specifically the models that Claxton used or that Claxton was

11   on.  So I want to talk with you a little bit about that, okay?

12   *A.*  Okay.

13   *Q.*  Prior to being on a cost-plus model, was there a different

14   model that Claxton used with Chick-fil-A?

15   *A.*  Well, I call it a grain model, a quasi cost-plus.  I don't

16   want anyone to get confused with what we have been talking

17   about on the eight-piece side.  But prior to switching to the

18   grain model, which is more of a quasi cost-plus, we were on a

19   market-based model that some people called the breast model.

20   *Q.*  So what is the breast model or market-based model?  And I

21   am going to use those terms interchangeably because it sounds

22   like they are the same thing for our purposes; is that fair?

23   *A.*  Yes.

24   *Q.*  Can you explain to the jury what the market-based model or

25   what the breast model is?

Gregory Finch - Direct

1    *A.*   Sure.   That is the model that used the Urner-Barry select

2    boneless price with an adder agreed upon by Chick-fil-A and the

3    customer.

4    *Q.*   And how is that breast model different than the grain-based

5    model?

6    *A.*   It's dramatically different.   The grain-based model -- let

7    me start, the breast model is going to go up and down as the

8    market prices go up and down, so it had less predictability for

9    Chick-fil-A as far as what that was.   The grain model gave

10   Chick-fil-A more input into what their cost was, because now

11   corn and soy is involved in that model and they can dictate

12   when to buy, how much to buy, and at what price to buy of the

13   grain, and so they had more control over the pricing mechanism

14   with the grain model.

15   *Q.*   So I want to stick with this breast model for just a moment

16   because you say the market or a market model.   Was that market

17   the Urner-Barry?

18   *A.*   It was.

19   *Q.*   And so very simply put, does that mean that Claxton's price

20   was tied to that Urner-Barry number plus an additional

21   contracted number?

22   *A.*   Yes.

23   *Q.*   And so as the Urner-Barry market went up and down,

24   Claxton's price also went up and down?

25              *MR. KOENIG:*   Objection, leading.

Gregory Finch - Direct

1        THE COURT:  Sustained.

2    BY MR. BELLER:

3    Q.  Can you explain that in a way that's a bit simpler?

4    A.  Yeah, sure.  So if the price for Urner-Barry is $2.35 and

5    our adder is 20 cents, that means it's $2.55 for, say, the

6    month of, what are we in, March.  If next month that breast

7    meat goes to 2.40 with the adder of 20, then we are up to $2.60

8    instead of $2.55.  Conversely, if it goes to $2.30, then we

9    would be at $2.50 instead of $2.55.

10   Q.  And in 2014, which model was Claxton on for Chick-fil-A?

11   A.  We were on the breast model still.  We were the last one on

12   the breast model.

13   Q.  How long had Claxton been on the breast model with

14   Chick-fil-A?

15   A.  For as long as they originally dictated we use it.  I don't

16   know exact number of years.

17   Q.  Do you know, Mr. Finch, what model other suppliers were

18   using?

19   A.  Yes.

20   Q.  How do you know that?

21   A.  Because Chick-fil-A told us.

22   Q.  And what model were all the other suppliers using?

23        MR. KOENIG:  Objection, hearsay.

24        THE COURT:  Sustained.

25   BY MR. BELLER:

Gregory Finch - Direct

1   Q.  Was there a time when Chick-fil-A wanted Claxton to change

2   models?

3   A.  Yes.

4   Q.  Did Claxton eventually do that?

5   A.  Yes.

6   Q.  Why?

7   A.  Because Chick-fil-A made us.

8   Q.  And to the best of your knowledge, why did Chick-fil-A make

9   you?

10  A.  They wanted everyone to be on the same model.  It gave them

11  more control.

12  Q.  And so in 2014, do you know if there were any other

13  suppliers also on the breast model?

14  A.  No.  We were the last ones.

15  Q.  So if you were the last ones, does that also mean that

16  Perdue and Tyson's were not on the breast model?

17  A.  It does.

18  Q.  How does someone on a grain-based model impact the prices

19  of someone on the breast model?

20  A.  It's impossible.

21  Q.  How so?

22  A.  They are just so de-linked.  One succumbs to market

23  conditions of the breast market, supply and demand of that

24  particular product; whereas, the grain-based model is tied to

25  what the grain's doing.  But the QSR, in this case Chick-fil-A,

Gregory Finch - Direct

1  is controlling that mechanism.  They are telling us when to

2  buy, how much to buy, and at what price to buy, so there is

3  really no way to mesh the two.

4  *Q.*  Mr. Finch, do know if there were communications between

5  anyone at Claxton and other suppliers regarding the different

6  models that were being used with Chick-fil-A?

7  *A.*  Yes.

8  *Q.*  Is it even possible for someone on a breast model and

9  someone on a grain model to align on prices?

10  *A.*  Not in my opinion.

11       *MR. KOENIG:*  Objection, foundation.

12       *THE COURT:*  Overruled.

13  *BY MR. BELLER:*

14  *Q.*  I am sorry?

15  *A.*  Not in my opinion.

16  *Q.*  So I am showing you Government's Exhibit 9, if you can take

17  a moment and review Government's Exhibit 9.

18       *MR. BELLER:*  Your Honor, I believe that this is

19  admitted, and I would ask to publish.

20       *THE COURT:*  You may publish it.

21  *A.*  Okay.

22  *BY MR. BELLER:*

23  *Q.*  Is the market-based model we have been talking about

24  reflected on Government's Exhibit 9?

25  *A.*  No.

3445
Gregory Finch - Direct

1   *Q.* Do you know who Justin to be? We can stop looking at that

2   document. Do you know who Justin is?

3   *A.* Justin Gay at Pilgrim's.

4   *Q.* Does a company on a grain-based model holding have any

5   effect whatsoever on a different company's model if they are on

6   the market-based model?

7   *A.* No.

8   *Q.* And is that basic premise reflected on Government's

9   Exhibit 9?

10  *A.* I don't understand the question.

11  *Q.* Does Government's Exhibit 9 explain that it's impossible?

12  *A.* No.

13  *Q.* Sir, I am now asking you to look at Government's Exhibit 3.

14       *MR. BELLER:* Your Honor, I am asking to publish,

15  please.

16       *THE COURT:* You may.

17  *BY MR. BELLER:*

18  *Q.* Mr. Finch, if you can review the top part of Government's

19  Exhibit 3 and let me know when you've done so.

20  *A.* Okay.

21  *Q.* And if you can then look at the bottom part of Government's

22  Exhibit 3 on the same page.

23  *A.* Okay.

24  *Q.* Does Government's Exhibit 3 indicate that Claxton Poultry

25  was on the breast market?

Gregory Finch - Direct

1    A.   Yes.

2    Q.   Does Claxton Poultry being on the breast market have

3    anything whatsoever to do with Claxton's NAE conversion cost?

4    A.   Nothing at all.

5    Q.   So fair to say these are two completely different things,

6    completely different subjects being discussed on Government's

7    Exhibit 3?

8    A.   Correct.

9    Q.   Last set of questions, Mr. Finch.  We are almost done, and

10   I am done with that exhibit.  Thank you, sir.

11        Mr. Finch, is Claxton Poultry, Mr. Brady or Mr. Fries

12   or anyone else at Claxton Poultry, involved at all with the

13   freezing charge to Church's Chicken?

14   A.   No.

15   Q.   How about credit terms to Sysco?

16   A.   No.

17   Q.   Claxton Poultry, Mr. Fries or Mr. Brady, involved at all

18   with Boston Market?

19   A.   Boston Market, no.

20   Q.   Golden Corral?

21   A.   No.

22   Q.   Sir, I am showing you Government's Exhibit 1238.

23        MR. BELLER:  Your Honor, I believe this is admitted,

24   and I would ask to publish.

25        If you can take a moment and review this.

Gregory Finch - Direct

1        THE COURT:  You may.

2   BY MR. BELLER:

3   Q.  Let me know when you have had a chance to review that,

4   Mr. Finch.

5   A.  Okay, I'm good.

6   Q.  If you could now turn away from that for just a moment.  In

7   August of 2014, are you aware of whether Kentucky Fried Chicken

8   or KFC had meetings with all of the different suppliers to

9   discuss contracts?

10  A.  Yes.

11  Q.  Do you know if 11:00 o'clock or 11 refers to a price or

12  refers to a time of a meeting?

13         MR. KOENIG:  Objection, foundation.

14         THE COURT:  He asked if he knows.  He can answer.

15  BY MR. BELLER:

16  Q.  Do you know?

17  A.  I do.

18         MR. KOENIG:  Foundation.

19         THE COURT:  Let's wait for the question.  Go ahead.

20  BY MR. BELLER:

21  Q.  I want to back out of this for just a moment, and I want to

22  ask you about your knowledge of pricing, okay?  If I were to

23  say something is at 11, knowing pricing information, does that

24  relate to pricing at all?

25  A.  No.

Gregory Finch - Direct

1    *Q.*  Is it more likely that that refers to a time of a meeting?

2    *A.*  Yes.

3    *Q.*  What approach did Claxton take on September the 3rd, 2014

4    regarding KFC pricing?

5    *A.*  We reduced our price 2 cents.

6    *Q.*  Why did Claxton reduce its price 2 cents on September the

7    3rd of 2014?

8    *A.*  Because Bob Lewis at KFC gave us directional guidance to

9    move our price down 2 cents.

10   *Q.*  Later did Claxton Poultry reduce its price over 2 cents

11   more on that particular contract?

12   *A.*  Yes.

13   *Q.*  Sir, I am going to ask you to turn to Government's

14   Exhibit 12.

15          *MR. BELLER:*  Your Honor, I believe this is admitted,

16   and I would ask to publish.

17          *THE COURT:*  You may.

18   *BY MR. BELLER:*

19   *Q.*  If you could take a look at this exhibit and let me know if

20   you have had an opportunity to review it.

21   *A.*  Okay.

22   *Q.*  The 2-cent price reduction that happens on September the

23   3rd of 2014, is that reflected in Government's Exhibit 12?

24   *A.*  Yes.

25   *Q.*  How about the additional 2-cent price reduction that

Gregory Finch - Direct

1  happens later, is that reflected in Government's Exhibit 12?

2  A.  No.

3        MR. BELLER:  Thank you.  I'm done with that.

4  BY MR. BELLER:

5  Q.  Mr. Finch, did you ever ask as CFO of Claxton Poultry

6  Mr. Fries or Mr. Brady to contact competitors to align prices?

7  A.  Absolutely not.

8  Q.  Do you have knowledge, Mr. Finch, of that happening?

9  A.  Absolutely not.

10  Q.  Were all of Claxton Poultry's prices calculated,

11  considered, and set independently?

12  A.  Yes, always.

13  Q.  Now, using period pricing and other market intelligence,

14  did Claxton ever consider other competitors' prices?

15  A.  Not really, just a data point.  Other than that, it wasn't

16  really part of the process.

17  Q.  A data point to be considered.

18  A.  Because everybody bluffs during the negotiation time, I

19  don't know that it was meaningful, I mean, because we didn't

20  know if the QSRs were telling the truth or anybody else was for

21  that matter.

22  Q.  Did Claxton Poultry ever obtain, rely on, or act on pricing

23  and other information learned from competitors?

24  A.  No.

25  Q.  Did you, Mr. Finch, ever agree to change the models or not

Gregory Finch - Cross

1   change the models or change figures in the models so as to

2   reduce or limit prices with a competitor, with a competitor?

3   A.   No.

4   Q.   Do you have personal knowledge of whether Mr. Brady ever

5   agreed with any other supplier on the prices that you were

6   calculating and putting into those models?

7   A.   No.  And he had no authority to do that anyway, no.

8   Q.   Do you have personal knowledge of whether Mr. Fries ever

9   agreed with any other supplier on the prices of broiler chicken

10  products you are calculating and putting into those models?

11  A.   Absolutely not, never did it.

12          MR. BELLER:  Thank you, Your Honor.

13          THE COURT:  Thank you, Mr. Beller.

14          Additional examination?  Ms. Page?  You are just

15  standing up.

16          Additional questions?

17          All right.  Cross-examination.

18          MR. KOENIG:  Can I have one moment, please?

19          THE COURT:  Sure.

20                      **CROSS-EXAMINATION**

21  BY MR. KOENIG:

22  Q.   Good afternoon, Mr. Finch.

23  A.   Afternoon.

24  Q.   Now, you worked for Defendant Fries and the Fries family

25  for a number of years now, right?

Gregory Finch - Cross

1   *A.*   Yes.

2   *Q.*   Safe to say you have become friends or friendly with

3   Defendant Fries and his family?

4   *A.*   Yes.

5   *Q.*   And so you wouldn't -- and nobody would want a friend to be

6   convicted of a crime, would they?

7   *A.*   Wouldn't be much of a friend.

8   *Q.*   And you certainly wouldn't want Defendant Fries to be

9   convicted of a crime, would you?

10  *A.*   No.

11  *Q.*   And same for Defendant Brady?

12  *A.*   No.

13  *Q.*   And it goes deeper than that, right, because you work for

14  Claxton.   And if those men were convicted, that could affect

15  your livelihood in some way.

16  *A.*   Possible.

17  *Q.*   I would like to go back to something you were asked about

18  yesterday.   Do you recall being asked by Mr. Beller whether --

19  to your knowledge, whether the Department of Justice ever

20  sought to interview anybody at Claxton during its

21  investigation?   Do you remember that?

22  *A.*   Yes.

23  *Q.*   And your answer to that was no, not to your knowledge,

24  correct?

25  *A.*   Correct.

Gregory Finch - Cross

1   *Q.* But you -- that's not right, is it?  You do recall

2   Defendant Fries saying that the Department of Justice tried to

3   interview Claxton employee Phil Campbell, right?

4   *A.* I don't recall that.

5   *Q.* Okay.  Well, maybe I can give you something to refresh your

6   recollection.  Yeah?

7   *A.* Sure.

8        *MR. KOENIG:* Can we pull up Government's Exhibit 3055.

9   Your Honor, I apologize, this is a very large document, so we

10  didn't make -- have opportunity to make a whole bunch of

11  copies, but this will be short.

12  *BY MR. KOENIG:*

13  *Q.* Could you look at page 1 and just read it to yourself.  Now

14  let's turn to page 6, if you could.  I will direct your

15  attention to line 15 and below.  You have had a chance to read

16  that?

17  *A.* Yes.

18  *Q.* Now let's go to page 19.  If you could, please.  Just read

19  that to yourself.

20  *A.* Okay.

21       *MR. KOENIG:* All right.  We can take that down.

22  *BY MR. KOENIG:*

23  *Q.* Now, Mr. Finch, does that refresh your recollection as to

24  whether you heard Mr. Fries say that the Department of Justice

25  had tried to interview Claxton employee Phil Campbell?

Gregory Finch - Cross

1          MR. BELLER:  Your Honor, I am going to object under

2    double hearsay.

3          THE COURT:  Overruled.

4    A.  Okay.  What was the question?

5    BY MR. KOENIG:

6    Q.  Does that refresh your recollection as to whether you heard

7    Mr. Fries say that the DOJ had tried to interview Claxton

8    employee Phil Campbell?

9    A.  That was Mikell's opinion, yes.  I heard him say that.

10   Q.  Okay.  So your answer yesterday -- maybe you just forgot,

11   but your answer yesterday should have been different if you had

12   remembered that, right?

13         MR. BELLER:  Objection, argumentative.

14         THE COURT:  Overruled.

15   A.  Well, I don't characterize a card left in a mailbox as a

16   request for an interview.

17   BY MR. KOENIG:

18   Q.  Mr. Finch, Mr. Finch, you have been on the stand for a long

19   time, and for the sake of time, I am going to --

20         MR. BELLER:  Your Honor, I am going to object to this

21   narrative.  A question was asked.  He started to answer it, and

22   I am asking that government counsel allow him to give an answer

23   to the question on the table.

24         THE COURT:  I think that was a -- hold on.

25         Why don't you rephrase the question, Mr. Koenig.

Gregory Finch - Cross

1   *BY MR. KOENIG:*

2   *Q.*  Yes or no, had you recalled what I just showed you to

3   refresh your recollection, had you recalled that yesterday when

4   you were asked by Mr. Beller whether you had any awareness of

5   the Department of Justice trying to interview anybody from

6   Claxton and you said no, whether your answer would have been

7   different, yes or no?

8   *A.*  You know --

9   *Q.*  Again, yes or no, please.

10         MR. BELLER:  Your Honor, it may not call for a

11  yes-or-no answer, so I object to counsel trying to limit the

12  truthful answer.

13         THE COURT:  Mr. Finch can indicate if it can't be

14  answered yes or no.

15  *A.*  Yes, but this was Mikell Fries' interpretation of the

16  government's outreach.  As I recall, Agent Koppenhaver left a

17  card in a door or in a mailbox, and I don't characterize that

18  as a serious attempt by the government to try to have an

19  interview with Mr. Campbell.

20  *BY MR. KOENIG:*

21  *Q.*  All right.  When you do have further explanation, your

22  counsel will or Mr. Beller will have a chance to ask you more,

23  but I just -- for the sake of time, let's just stick with yes

24  or nos to the extent possible, okay?

25         MR. BELLER:  And I am objecting to the fact that

Gregory Finch - Cross

1   that's not a question.

2            MR. KOENIG:  I said okay at the end.

3            THE COURT:  Go ahead.  Ask another question.

4   BY MR. KOENIG:

5   Q.  Now, are you aware that in August of 2019 the government

6   spoke to counsel for Defendant Brady to ask to speak with him?

7   A.  I am not.

8            MR. LAVINE:  Your Honor, can we go on side bar,

9   please?

10           THE COURT:  Sustained.

11           MR. LAVINE:  Thank you, Your Honor.

12  BY MR. KOENIG:

13  Q.  Let's move on a little bit.

14           Isn't it true that you yourself were involved with an

15  effort with Claxton's lawyers to convince the Department of

16  Justice not to charge --

17           THE COURT:  Let's have a side bar.

18       (At the bench:)

19           THE COURT:  Either Mr. Lavine or Mr. Beller, go ahead.

20           MR. LAVINE:  I want to address the first question as

21  far as reaching out to Mr. Brady's counsel for him to be

22  interviewed is an absolute misrepresentation of the record.  I

23  am that lawyer, and I can guarantee you that request was never

24  made.  I know exactly.  And if I have to go back to my office

25  and get my notes of that conversation with Mr. Koenig and

Gregory Finch - Cross

1    Mr. Justin Murphy, I am happy to do so, Your Honor, but that is

2    an absolute, bald-faced misrepresentation.

3            THE COURT:  Mr. Beller, do you have anything else?

4            MR. BELLER:  Yes, Your Honor.  Where the government is

5    going is twofold:  No. 1, the day that Mr. Kornfeld and myself

6    were retained, Mr. Kornfeld contacted the Department of

7    Justice, and the Department of Justice's response to

8    Mr. Kornfeld was, If your client wants to come in today and

9    confess to everything and plead guilty, we are happy to talk to

10   him.

11           Other than that representation, there has never been

12   any effort whatsoever on the part of the Department of Justice

13   to speak to Mr. Fries, to my knowledge, Mr. Brady or anyone

14   else at Claxton Poultry.  And so this is commenting not

15   necessarily on a defendant's right to remain silent, because

16   certainly they would be able to address that issue had I opened

17   the door.  The question was, has there ever been an attempt to

18   interview?  And the answer to that is no, because, of course,

19   an introductory telephone call and a request to come in and

20   plead guilty is certainly not an interview.  That's No. 1.

21           No. 2, Your Honor, while Mister -- the company's

22   counsel sat down with the Department of Justice for the purpose

23   of trying to convince the Department of Justice to not indict

24   the company, that by no means was an interview of Mr. Finch on

25   a factual issue.  And so to imply otherwise is completely and

Gregory Finch - Cross

1    wholly misleading, and it's arguably perpetrating a fraud upon

2    the Court by suggesting otherwise.

3            THE COURT:  Mr. Koenig?

4            MR. KOENIG:  Sure, Your Honor.  I will take up

5    Mr. Lavine's -- actually, the first two are basically the same.

6    The defendants have asked questions of this witness --

7            THE COURT:  If you don't mind, Mr. Koenig, make sure

8    to speak softly because you are very close to the jury.  Go

9    ahead.

10           MR. KOENIG:  The defendants have asked this witness

11   and several other witnesses, and they've said in their opening

12   arguments that the Department of Justice did "ready, fire,

13   aim."  And as specific to this witness, they have said -- they

14   asked, Did you interview anybody, make any attempt to interview

15   anybody at Claxton.  And we -- the fact of the matter is we did

16   try to talk to them.

17           Now, maybe we were suggesting to come in and

18   cooperate, but it was -- you know, right now the state of the

19   record is we never bothered to even reach out, and that's just

20   plain not true.  And it doesn't imply any sort of Fifth

21   Amendment problem, but, you know, they opened the door by

22   making this argument.  So right now the jury thinks, wow, the

23   Department of Justice never bothered to get their side of the

24   story, and that's just not true.

25           The other piece about Mr. Finch being part of an

Gregory Finch - Cross

1  effort to convince -- with the Claxton lawyers trying to

2  convince the Department of Justice not to bring charges, A,

3  shows bias; B, he submitted a written declaration sworn under

4  the penalty of perjury about factual matters.  So I think it's

5  only fair to say, you know, you've reached out, and you gave us

6  a declaration with hundreds of pages of attachments,

7  presentations, written submissions, you called on the phone --

8  the lawyers called on the phone I think is all just totally

9  fair game and just doesn't -- it's just not out of bounds.  I

10  mean, he was involved.  He signed a declaration.

11       THE COURT:  All right.  Mr. Lavine, anything from you

12  more, more from you?

13       MR. LAVINE:  I want to make sure the record is very

14  clear, because I think what he is doing, he is infringing upon

15  my client's right to remain silent and assert his Fifth

16  Amendment rights.  What Mr. Koenig says is not even close to

17  accurate.  What they said to me, Your Honor, and it was

18  Mr. Murphy who is no longer here, Mr. Murphy and Mr. Koenig

19  said, Well, if you want to bring your guy in and cooperate and

20  plead guilty, we're glad to listen to what he has to say.  That

21  is a far cry from trying to interview, Your Honor.

22       And I will tell you I tried to meet and discuss this

23  matter with the government, and I was flat refused.  So I think

24  that the government is doing nothing but trying to inflame this

25  jury on misrepresentations.

Gregory Finch - Cross

1              Thank you, Your Honor.

2              THE COURT:  Mr. Beller, anything more from you?

3              MR. BELLER:  No, Your Honor.

4              THE COURT:  All right.  Did someone else?

5              MR. FAGG:  John Fagg on behalf of Mr. Lovette.

6              On the grounds based on what Mr. Lavine articulated

7    and Mr. Beller articulated and in particular with the last line

8    of questioning by Mr. Koenig which remains on the record which

9    is that Mr. Finch did something to try and convince the

10   Department of Justice not to charge someone, I believe that

11   question is entirely inappropriate and would move for a

12   mistrial on that grounds.

13             MR. BELLER:  Your Honor, the last point, I would

14   simply note to Mr. Fagg's points that had to do with the

15   Claxton indictment, the company's indictment, that had nothing

16   to do with the indictment of the individuals in this courtroom.

17   As to my client and the "ready, fire, aim," which was a

18   statement made by a co-defendant, the very first time the

19   government and the only time the government requested my client

20   to come in and plead guilty was the day that the Indictment was

21   announced.  To the best of my knowledge, there has never been

22   any attempt by anyone at the Department of Justice to interview

23   any of the 2,000 Claxton employees up to and including my

24   client and Mr. Brady and Mr. Finch with the exception

25   apparently of a business card having been left at a low-level

Gregory Finch - Cross

1    employee's door, No. 1.

2            And No. 2, the custodian -- custodial witness

3    interview that was done of Mr. Finch, to the extent the

4    government requested an interview outside of that, I would love

5    to know when and how that happened, because I will attest that

6    not only has the Department of Justice refused to speak to any

7    of us regarding this case, but so have the individuals above

8    the trial department and the trial team here.

9            THE COURT:  Mr. Koenig, last word.

10           MR. KOENIG:  I just -- I guess I don't have anything

11   further.

12           THE COURT:  Then as far as the questions concerning

13   whether or not there was an attempt or an offer to interview

14   either Mr. Brady or Mr. Fries, the Court will sustain the

15   objection as to that.  It does not sound like that there was

16   any investigation-type interview being offered as to either

17   one, and the fact that they may -- the Department of Justice

18   may have invited them in to cooperate or to confess or

19   something of that nature is highly -- would I think tend to

20   mislead the jury, because obviously that's something that would

21   essentially be an invitation for them to come in and admit

22   their guilt, so I will prohibit any questions about that

23   subject.

24           In terms of Mr. Finch and an effort by Mr. Finch to

25   persuade the Department of Justice not to indict Claxton, that

Gregory Finch - Cross

1    is -- involves substantial 403 prejudice that overwhelms any

2    probative value.  We have been trying in this case not to get

3    into any type of corporate responsibility, not to try to get

4    any evidence in front of the jury about whether a given company

5    may have pled guilty or even denied something, so that is also

6    completely out of bounds.

7            So the question or the -- that question will be --

8    sorry, the objection to that question will be sustained.

9            MR. TUBACH:  Will the Court -- would the Court be

10   willing to strike the question and instruct the jury it was an

11   improper question?

12           THE COURT:  I have scrolled way past that question.  I

13   don't recall what it was.

14           MS. JOHNSON:  Your Honor, it's at 113, 5-7.  The

15   question was:  Isn't it true that you yourself were involved

16   with an effort with Claxton's lawyers to convince the

17   Department of Justice not to charge?

18           THE COURT:  I am not going to do that.  It wasn't

19   answered, and what I am worried about is if I -- well,

20   actually, I will strike the question to the extent that they

21   remember it, but obviously won't repeat the question in any

22   way.

23           Thank you.

24      (In open court:)

25           THE COURT:  Ladies and Gentlemen, the last question

Gregory Finch - Cross

1    that was asked you should disregard.  You should disregard the

2    last question.

3              Go ahead.  Mr. Koenig, go ahead.

4    *BY MR. KOENIG:*

5    *Q.*  All right, Mr. Finch.  I would like to ask you about some

6    of your testimony that you gave on direct, okay?  You used the

7    term, and I believe this was yesterday, I didn't hear it

8    repeated today, but maybe I missed it, you used the term "joint

9    supply network."  Do you recall that?

10   *A.*  Yes.

11   *Q.*  And you explained that the QSRs like your Chick-fil-A, KFC,

12   Popeye's, they require a joint supply network so that Claxton

13   and its competitors can sell chicken to each other, is that

14   right, to cover shortages?

15   *A.*  That's a mischaracterization of my testimony.

16   *Q.*  Okay.  But you did use the joint supply network?

17   *A.*  100 percent, because it's --

18   *Q.*  And how -- tell me, how is it a mischaracterization?

19   *A.*  Well, the joint supply group is not established just to let

20   everybody sell to each other.  The joint supply network is so

21   that Chick-fil-A has a stable supply to be able -- so when you

22   pull up to get your chicken sandwich at your restaurant, you

23   are able to get it.  So the joint supply network certainly

24   provides a road for sustainable and continuous supply of

25   chicken for them.

Gregory Finch - Cross

1          As I said, this is a live animal we are dealing with,

2    and so things happen inside the supply chain, and the supply

3    chain has to keep moving.  And so the joint supplier network is

4    a benefit to the QSR.  It's not there simply for other broiler

5    producers to sell chicken to each other.  Certainly that is

6    part of that process, because if one supplier is having an

7    issue with supply, then somebody has to pick up the slack so

8    that when you go to the restaurant, there is a chicken sandwich

9    waiting for you.

10   Q.  I apologize if my question was unclear.  I meant that was

11   one reason, selling to cover shortages, one reason for this

12   joint supply network.

13   A.  I disagree.  I don't think that's a reason why Chick-fil-A

14   would go, oh, let's have this supply network so everybody can

15   sell to each other.  It's an offshoot.  It's a natural offshoot

16   of the way Chick-fil-A and the other QSRs run their business.

17   Q.  Okay.  Well, let me ask you this.  You did testify

18   yesterday, and this -- I am not trying to mislead.  I am just

19   trying to understand that in this so-called joint supply

20   network, that Defendant Brady bought and sold Chick-fil-A or

21   whatever the restaurant customer name is, bought and sold

22   product from competitors; is that correct?

23   A.  Sure, within the joint supply network, the competitor you

24   are calling it is a customer.  So Scott's job is to sell

25   chicken.  His customers happen to be named Tyson, Pilgrim's,

Gregory Finch - Cross

1   Perdue, so that's just a natural offshoot of the way the

2   process works.

3   Q.  Again, yes-or-no questions.  You said yesterday that he

4   interacted with them just as he would with any other customer;

5   is that right?

6   A.  I don't know that I put it in exactly that terms.  I would

7   have to see the transcript to see exactly how I testified.

8   Q.  I think you just said it now.

9   A.  Said what?

10  Q.  You said it's a customer supplier relationship, did you

11  not?

12  A.  It turns into a customer supply relationship, sure.  It's

13  no different than if I was selling to Sysco.  We are going to

14  issue a PO to whoever it is we are buying chicken from or they

15  are going to issue a PO for us, and we are going to pay the

16  bill or they are going to pay the bill.  It's extremely similar

17  to any other customer relationship.

18  Q.  So in other words, when -- you would agree with this,

19  right, that when Mr. Brady contacted competitors or this hybrid

20  customer competitor that you're talking about in the joint

21  supply network, you would agree that -- or it would be your

22  position that that couldn't be any evidence of price-fixing or

23  bid-rigging.  It would just be normal supplier customer

24  relations?

25             MR. BELLER:  We object as compound and vague.

Gregory Finch - Cross

1          THE COURT:  Overruled.

2     A.  Would you repeat the question.  I did not understand that.

3     BY MR. KOENIG:

4     Q.  Okay.  Would you agree with the following or do you agree

5     with the following:  That when we see communications between

6     Defendant Brady and these customer competitors in the joint

7     supply network, that's not evidence of price-fixing or

8     bid-rigging.  That is just normal supplier customer relations.

9     A.  There is absolutely no evidence --

10          MR. BELLER:  Objection, calls for a legal conclusion,

11    speculative.

12          THE COURT:  Sustained.

13    BY MR. KOENIG:

14    Q.  Sir, let me ask you this.  The joint supplier network that

15    you mentioned, that wasn't a term that you used at the time

16    that we're talking about for this alleged conspiracy, is it?

17          MR. LAVINE:  Object, Your Honor, vague.

18          THE COURT:  Overruled.

19    A.  I've always called it a joint supplier network the whole

20    time that I have been involved at Claxton Poultry, so going

21    on -- what am I -- 11 years.  It's always been a joint supplier

22    network as far as I am concerned.

23    BY MR. KOENIG:

24    Q.  Sir, didn't you testify that you were the custodian of

25    records in this case?

Gregory Finch - Cross

1   A.  I am.

2   Q.  And isn't it the case that Claxton Poultry produced

3   somewhere north of 200,000 documents in this case?

4   A.  Could be more than that.  I don't know the exact number.

5   It was a bunch.

6   Q.  And you oversaw that production, didn't you, and

7   collection, right?

8   A.  I did.

9   Q.  Okay.  So you know that the phrase "joint supply network"

10  is really hard to come by in the documents you produced, don't

11  you?

12  A.  Without the documents in front of me, it's hard to say.

13  Joint supplier network is Greg's term.

14  Q.  Excuse me?

15  A.  Joint supply network is how I think of it.  That's my

16  phrase.  It doesn't necessarily mean that anybody else calls it

17  that.  That's how I view it.  It's a joint supplier network,

18  right?  So the QSR has seven, eight, nine, 10, 11 different

19  suppliers in that, and they are all jointly trying to make sure

20  that the supply stays consistent 24/7, 365.  That's a joint

21  supplier network.

22  Q.  Sir, you have produced and collected your own e-mails for

23  this, didn't you?

24  A.  Sure.

25  Q.  And so one would think -- and that covered the period 2012

3467

Gregory Finch - Cross

1    through, what, 2019, something along those lines, right?

2    A.  Whatever the period was the government asked for.

3    Q.  And you would think, then, that the term "joint supplier

4    network" would show up somewhere in your e-mails, wouldn't you?

5    A.  Not necessarily.

6    Q.  A phrase that you said you always thought of you never,

7    ever put down in an e-mail that you produced to the Department

8    of Justice in this case?

9           MR. LAVINE:  Objection, Your Honor.  Counsel is

10   testifying.

11          THE COURT:  Overruled.

12   A.  It's quite possible I never did.

13   BY MR. KOENIG:

14   Q.  Well, sir, it wasn't just the case that you didn't use that

15   term in any documents.  That wasn't the case -- it wasn't used

16   in the industry documents generally, was it?

17          MR. BELLER:  Your Honor, I think there is a lack of

18   foundation there, and I also think that it assumes a fact

19   that's not in evidence.

20          THE COURT:  Sustained as to vagueness as to industry

21   documents and foundation.

22   BY MR. KOENIG:

23   Q.  Sir, if you think it's -- you testified that you think it's

24   perfectly plausible that this term that you have been using or

25   at least thinking of for a decade isn't in your e-mails, then

Gregory Finch - Cross

1   you wouldn't be surprised, fair to say, that that term is

2   really tough to come across in the 14 million documents the

3   government has collected in this case, right?  You wouldn't be

4   surprised by that?

5           MR. BELLER:  Objection, vague.

6           THE COURT:  Sustained.  It calls for speculation.

7   BY MR. KOENIG:

8   Q.  All right.  Let me ask you a few more questions about what

9   you testified to, okay?  You used the term "directional

10  guidance" in your testimony both yesterday and today, I

11  believe, right?

12  A.  Yes.

13  Q.  And, again, as the custodian of records who oversaw the

14  collection of Claxton's documents, you would agree that that

15  term is very difficult to come across in Claxton's productions;

16  isn't that right?

17          MR. BELLER:  Objection, vague, speculation.

18          THE COURT:  Sustained.

19  BY MR. KOENIG:

20  Q.  Sir, when you collected documents, you didn't review them,

21  did you?

22  A.  Well, you just said there is at least 200,000.  It would be

23  impossible for me to review all 200,000.  I oversaw the

24  collection of the documents to make sure that we were providing

25  and producing the types of documents that were requested by the

Gregory Finch - Cross

1    government.

2    Q.  In your e-mails -- did you bother to review your e-mails?

3    A.  I reviewed some of them.  There is no way I reviewed them

4    all.

5    Q.  And isn't it true that the term "directional guidance"

6    doesn't show up much, if at all, in your e-mails?

7            MR. BELLER:  Objection, vague, speculation.

8            THE COURT:  Overruled.  He can answer as to his

9    e-mails.

10   A.  I wouldn't know without having the e-mails in front of me.

11   BY MR. KOENIG:

12   Q.  Well, you reviewed documents in preparation for your

13   testimony today, right?

14   A.  Some.

15   Q.  Yeah.  And those documents were chosen by lawyers, weren't

16   they?

17   A.  Yes.

18   Q.  Okay.  And did you see -- you didn't see the phrase

19   "directional guidance" in those e-mails in documents reviewed,

20   did you?

21   A.  I don't recall.

22   Q.  And you didn't see the term "joint supplier network" in

23   those documents, did you?

24   A.  I don't recall.

25   Q.  But yet you're testifying how important this joint supplier

3470
Gregory Finch - Cross

1    network is and directional guidance is, and they are not in any

2    of the documents that were put before you; isn't that right?

3            MR. BELLER:  Objection, Your Honor.  There is not a

4    question there.

5            THE COURT:  Overruled.

6    BY MR. KOENIG:

7    Q.  Isn't that right?

8    A.  I am sorry, was there a question?

9    Q.  Your testimony to the jury was how important this joint

10   supply network is and the concept of this directional guidance.

11   And yet of all the documents you reviewed leading up to your

12   testimony that were put in front of you, those phrases don't

13   appear, do they?

14   A.  The ones I looked at for this?

15   Q.  Yes.

16   A.  I don't recall seeing them in there.

17   Q.  But yet that was a pretty big part of your testimony,

18   right?

19   A.  Well, it's in my nomenclature.  It's part of who and what I

20   am and what I do, yes.  Joint supplier network is a Greg term.

21   Directional guidance is a Greg term.  Just because I don't put

22   it down in an e-mail doesn't mean it.  There may not be an

23   opportunity or a reason why I would put it down in an e-mail.

24   That's more of a term that we might use internally.  You know,

25   Mikell, what directional guidance did KFC give us on this?

Gregory Finch - Cross

1    Just because it's not in an e-mail doesn't mean I never use it.

2    Q.  Don't you think if you were going to testify about those

3    concepts, joint supply agreement and directional guidance, if

4    it was in an e-mail, you might have showed the jury to

5    corroborate?

6    A.  I don't know.  I don't know why -- I don't know why I would

7    need to.

8         MR. KOENIG:  All right.  I would like to take you to

9    Government's Exhibit 1734, which I believe has been admitted

10   and was used on direct, so if it could be published, please.

11        THE COURT:  Yes, you may.

12   BY MR. KOENIG:

13   Q.  Sir, do you remember looking at this document on direct

14   examination?

15   A.  Yes.

16   Q.  And if I recall correctly, you said something along the

17   lines of, these prices, really, you can't tell what somebody's

18   dark-meat price is by saying .30 back, .31 back, unless you

19   know their eight-piece price, correct?

20   A.  Correct.  It's back of an eight-piece price.  I need the

21   eight-piece price to do that.

22   Q.  Sure.  And you also said that Defendant Fries had no input

23   on the cost model prices that lead to the current pricing; is

24   that right?

25   A.  He had no input on the individual lines of cost, labor,

Gregory Finch - Cross

1    depreciation, all those kinds of things.  He had the pricing

2    authority to make whatever changes he needed to make on margin

3    or the amount we were back on wings or back on -- that's not a

4    cost.  That's a formula.  So he certainly had the authority to

5    change the formula from .30 back to .40 back or .22 back or

6    whatever he wanted to change it to in order to get the QSR's

7    price to where the QSR wanted it to be.  That's just part of

8    the formula to get to the bottom-line price.

9              So, sure, he had the authority to do that.  That's not

10   a cost.  That's a formula.

11             MR. KOENIG:  Can I have a moment to confer, please?

12             THE COURT:  Yes.

13             MR. KOENIG:  Your Honor, I think this is a good time

14   to --

15             THE COURT:  That's fine.

16             Ladies and Gentlemen, we will go ahead and take the

17   lunch break.  We will plan on reconvening at 1:30.  Keep the

18   admonitions in mind, Ladies and Gentlemen, and see you back at

19   1:30.  The jury is excused.

20             (Jury excused.)

21             THE COURT:  Mr. Finch, you are excused for lunch.

22   Thank you.

23             What time would you like to take up the issues related

24   to Professor Snyder?  Do you want to do it now or, say, at

25   1:00?  It doesn't matter to me.

Gregory Finch - Cross

1           Mr. Beller?

2           MR. BELLER:  Your Honor, if I may inquire of the

3   government how much time do they think they may have on

4   cross-examination of Mr. Finch and that may help facilitate our

5   answer.

6           THE COURT:  Do you know, Mr. Koenig?

7           MR. KOENIG:  I don't want to overpromise and

8   underdeliver.

9           THE COURT:  Mr. Beller qualified his estimates too, so

10  you are free to do so as well.

11          MR. KOENIG:  I would say less than a half hour.

12          THE COURT:  Mr. Lavine?

13          MR. LAVINE:  An issue I would like to raise with you,

14  let me know when I can raise it, Your Honor, unrelated to

15  Mr. Snyder.

16          THE COURT:  We are focusing on Snyder now.  Any

17  preference by people?  Why don't we go into it now.

18          Mr. Lavine, though, what was your issue?  Why don't

19  you identify that.

20          MR. LAVINE:  If I may, just a moment, please, Your

21  Honor.  With the questions that government counsel elicited,

22  which the objections were sustained, as far as asking whether

23  or not -- the question I believe was:  Now are you aware that

24  in August of 2019 the government spoke to counsel for Defendant

25  Brady to ask to speak with him, which was an incorrect

Gregory Finch - Cross

1    statement, Your Honor.  But, unfortunately, I think the answer

2    was:  I'm not.

3         So he has already put that in front of the jury and

4    leaving the inference that Department of Justice reached out to

5    Mr. Brady through counsel, which was me, Your Honor, and as a

6    result we didn't do anything.

7         I think I am forced in the position of moving for a

8    mistrial based on prosecutorial misconduct.  That question was

9    so far out of bounds, and it goes to my client's ability to

10   assert his Fifth Amendment and not to have to talk.  So I defer

11   to Your Honor how to handle this or at least an instruction to

12   the Court -- I mean, not to the Court, Your Honor, I apologize,

13   to the jury that that was a highly inappropriate question and

14   that they should disregard that question.

15        THE COURT:  Mr. Koenig?

16        MR. KOENIG:  Your Honor, their whole defense in this

17   trial and the one before has been we didn't bother to look into

18   anything.  We didn't bother to get their side of the story.  I

19   don't see how it's out of bounds for us to say in 2019 we

20   contacted Mr. Brady's lawyer to talk to him and that just does

21   not seem out of bounds at all.  It was well before the

22   Indictment, and it doesn't implicate --

23        THE COURT:  Well, that's not really the issue.  We

24   talked about that when I sustained the objection.  But I guess

25   there would be two things:  One is, do you think that the

Gregory Finch - Cross

1    question answered as it was is prejudicial?  Second, what

2    curative instruction or directive to the jury should be given,

3    if any?

4         MR. KOENIG:  I don't think the answer was prejudicial.

5    He was asked --

6         THE COURT:  Well, the answer wouldn't be.  It's really

7    focused on the question.  But given the answer being no, it

8    could factor in.

9         MR. KOENIG:  I think it would be more prejudicial if

10   he would have said yes, but he is not aware of it.  I don't

11   know how else to, you know, test his knowledge when he says,

12   You're not aware of any Claxton employee in an attempt to

13   interview by the government.  So I think it was a perfectly

14   legitimate question.  And I think the Court's instruction to

15   the jury to disregard the last question strikes the right

16   balance.  If we revisit it, it just highlights it again and

17   would make matters just -- you know, it would just highlight

18   the issue, I guess, inappropriately.

19        THE COURT:  Mr. Lavine?

20        MR. LAVINE:  Your Honor, I think it is highly

21   prejudicial.  And part of the problem I have is it is a factual

22   misrepresentation to the jury and to this Court.  The

23   government did not reach out to me.  I called them as I

24   normally would do when I find out that a client is under

25   investigation.  I asked to meet with them to find out what this

Gregory Finch - Cross

1   case was all about.

2          And I think what they basically told to me was, You

3   need to talk to your client and come in and plead, and, by the

4   way, the train is leaving the station.  That was pretty much

5   the context of that conversation.  I followed up with an e-mail

6   to both Mr. Murphy and to Mr. Koenig that was never responded

7   to.

8          So now I am sitting here with this question out here

9   before the jury, and I am asking -- I am moving for mistrial at

10  this point, Your Honor, because I think it is highly

11  prejudicial to my client.  In the alternative, Your Honor, I am

12  asking for an instruction to the jury that that was a highly

13  inappropriate question.

14       THE COURT:  How would we tell the jury that?  How

15  would I instruct the jury that without reiterating the question

16  and thereby causing the very prejudice that you're worried

17  about?

18       MR. LAVINE:  I appreciate the Court's question.  I

19  would like to think about that.  I don't know.  I am just

20  trying to figure out how to deal with this issue at this point

21  because I think what the government did was misconduct.

22       THE COURT:  Mr. Fagg?

23       MR. FAGG:  Your Honor, just very briefly.  At the last

24  side bar, we had moved for a mistrial on behalf of Mr. Lovette

25  in response to the question that was regarding the corporate

Gregory Finch - Cross

1    pleas -- or the corporate charges that may be coming down,

2    rather, and we think that was an inappropriate question.  The

3    Court did give an instruction to the jury, but I don't believe

4    the Court ever ruled on our mistrial.

5         *THE COURT:*  Yeah, I deny it.  There is no -- and I

6    deny the motion for mistrial that Mr. Lavine just made too.

7    The jury has been instructed already and will be instructed at

8    the end of the case that questions are not evidence.  It's true

9    that on occasion questions could be prejudicial.  Here I have

10   instructed the jury to disregard that last question.

11        At this point in time, it would be impossible to tell

12   the jury to disregard a question because they wouldn't remember

13   what it was.  They might remember that last question, but they

14   were instructed to disregard that.  Without repeating or

15   invoking what the question was, which would then be prejudicial

16   or at least cause the prejudice the two defendants are

17   complaining about, I don't see a basis for prejudice.

18        I have already ruled on the question, sustained the

19   objection to it, but the mistrials, the mistrial motions, I

20   don't find any basis for prejudice to either defendant.  And as

21   a result, I will deny that.

22        Mr. Beller?

23        *MR. BELLER:*  Your Honor, a very brief note, and that

24   is I have been referred to in the cross-examination at least

25   twice as Mr. Finch's counsel.  I am not Mr. Finch's counsel.

Gregory Finch - Cross

1    And I hope that that was simply a slip of the tongue, but I

2    want to make sure that that does not continue because that is,

3    in fact, incredibly prejudicial to my client.

4          THE COURT:  Didn't notice that, but to the extent it

5    occurred, obviously it shouldn't.

6          MR. KOENIG:  I noticed it once.  If I did it -- and I

7    think I corrected myself.  It was just inadvertent, and I think

8    we have seen a lot of messing up with names throughout this

9    examination, so it was not intentional.

10          THE COURT:  Okay.  Let's take up the issue regarding

11    Professor Snyder.  If he is in the courtroom, he should leave.

12          MS. PLETCHER:  He is not here, Your Honor.

13          THE COURT:  All right.  Then why don't we have a

14    response from Mr. Torzilli to the motion to lead off.

15          MR. TORZILLI:  Just two points -- maybe three points,

16    but two main points.  One is just to clarify, we don't intend

17    to ask, and we assume now that the defendants won't be asking,

18    the witness to interpret communications, to interpret

19    documents, to interpret testimony that's being listened to.

20    We're not going to do that.

21          But we're going to need to have on cross-examination

22    the ability to confront him with information that contradicts

23    either his opinion or the basis for his opinion, and that may

24    include documents that have been received into evidence and

25    testimony that witnesses have said not only today but earlier

3479
Gregory Finch - Cross

 1  in trial.

 2          THE COURT:  Well, you prepared your cross, so give me

 3  an example of one.

 4          MR. TORZILLI:  An example is information exchanges.  I

 5  would predict that the information exchanges that

 6  Professor Snyder is going to focus on are not the information

 7  exchanges that are really at issue in this case, and we are

 8  going to want to confront him with the information exchanges

 9  that are really at issue in this case, including the exchange

10  of information by competitors at or near the time when bids are

11  submitted about bids as opposed to information exchanges about

12  covering shorts and relational contracting, which I have also

13  seen in slides and so forth.

14          THE COURT:  Well, so be more specific.  What exactly

15  would you confront him with?

16          MR. TORZILLI:  Show him a document that's been for the

17  most part received into evidence, ask him whether he has seen

18  this, whether he is aware of it, whether he has included it in

19  his analysis, and whether if it wasn't, if he had perhaps --

20          THE COURT:  What type of document?  What would it say?

21  I mean, what would be the nature of the document?

22          MR. TORZILLI:  Either communications that either are

23  among competitors or that report on communications amongst

24  competitors talking about negotiation strategy or where their

25  bids are and so forth.

Gregory Finch - Cross

1        THE COURT:  Okay.  And then why wouldn't that then

2    require Professor Snyder to interpret what that document means?

3        MR. TORZILLI:  It would merely be the who is

4    communicating to whom and what are the words in the

5    communications and what are the dates of the communications

6    relative to when bids are due.

7        THE COURT:  Right, but in terms of the words, why

8    wouldn't that require the professor to then interpret what this

9    means?  Because, of course, as we know, there is lots of

10   contention in the trial about whether words being exchanged

11   between competitors were really reflective of some agreement to

12   fix prices or rig bids.

13       MR. TORZILLI:  I think there are communications that

14   are on their face so explicit that interpretation is not

15   required, particularly relative to what it seems like he is

16   going to testify to.  So, for example, one of the factors it

17   seems like he is going to lean on heavily is the idea of

18   holding prices firm.

19            As Your Honor is well aware, I am sure everyone in the

20   courtroom who's been here is well aware, there are numerous

21   communications where one competitor is either saying to the

22   other or there is communications about intercompetitor

23   communications talking about, We are going to hold or so and so

24   is holding.  And I don't think there needs to be much

25   interpretation to be able to say, yeah, that's a document where

Gregory Finch - Cross

1    someone's talking about holding, and it's at a time relative to

2    when either bids are due or when negotiations are happening.

3         THE COURT:  Okay.  Why couldn't you ask that same

4    question even in the form of a hypothetical or just simply

5    characterize it even in the government's own view and ask him

6    that type of questions like, for instance, Professor, if you

7    had two competitors exchanging information and talking about

8    holding prices firm, would that be consistent with your view?

9         MR. TORZILLI:  The power of the cross-examination is

10   neutered dramatically when a hypothetical question is posed as

11   opposed to confronting a witness with the actual evidence that

12   the jury is going to be deliberating on.  So, I mean, if the

13   question is could that be posed, of course, it could, but the

14   cross-examination value is diminished considerably.

15        THE COURT:  Okay.  Now let's switch topics and go to

16   the point that's made in the motion that the government -- the

17   argument that the government took a diametrically opposed

18   position on this very issue before the first trial, that the

19   defendants indicated that they weren't going to do anything of

20   the sort in terms of, you know, wouldn't ask an expert to

21   interpret documents, and there is a claim that there has been

22   reliance on that, so why would it be appropriate now for the

23   government to do the same thing on cross-examination?

24        MR. TORZILLI:  I would say three things:  One is this

25   is cross-examination, not direct examination, and there should

Gregory Finch - Cross

1    be liberty afforded to the cross-examiner to go after someone

2    whose, in this case, expert opinions or bases are not well

3    formed or well supported based on the evidence that's been

4    received into the case.

5          Secondly, as I said, I think the cross-examination can

6    be accomplished without interpretation of evidence, either

7    testimony or documents.

8          And then third is we've relied on the ruling that our

9    motion was denied.  And so we prepared based on the Court

10   rulings that have been set in place.

11         *THE COURT:*  All right.  Anything else, Mr. Torzilli?

12         *MR. TORZILLI:*  No, sir.

13         *THE COURT:*  Thank you.

14         Ms. Pletcher?

15         *MS. PLETCHER:*  Your Honor, I think Your Honor really

16   hits the nail on the head here with the point that confronting

17   Professor Snyder with specific texts and e-mails that have been

18   highly contested in this trial is not appropriate for

19   cross-examination or, frankly, for direct examination as we

20   conceded.  And we did concede in our papers that we would not

21   ask Professor Snyder about specific communications for this

22   reason.  It's not his -- it's not his province to determine

23   whether what one supplier said to each other actually

24   constituted an agreement or not.  His expertise is in the facts

25   and in the data.  So we have designed our presentation today

Gregory Finch - Cross

1    and Professor Snyder has focused his analysis on the data.

2         And to ask him --

3         THE COURT:  Let me ask you this, Ms. Pletcher.  Has he

4    been prepared or exposed to those e-mails so that he would be

5    familiar with them?

6         MS. PLETCHER:  He has, yes.  We were concerned about

7    the scope of the cross-examination, and he has seen them, but

8    he has been very clear that his analysis is not based on that

9    interpretation and that he is focused on the data.

10        I'm also very concerned that if he is asked about

11   this, it would invade the province of a jury for him as a

12   professor to come up here and say one way or another whether a

13   particular communication is actually an agreement or not.

14        THE COURT:  All right.  Anything else, Ms. Pletcher?

15        MS. PLETCHER:  That's it, Your Honor.  We will rest on

16   our papers on this point.

17        THE COURT:  Thank you.

18        Mr. McLoughlin.

19        MR. McLOUGHLIN:  Thank you, Your Honor.

20        A couple of points responding to Mr. Torzilli.  First,

21   as a result of the government's motion, we represented to the

22   Court that Professor Snyder was not going to use those texts

23   and interpret them.  So we are in a place where the government

24   says, Well, our motion was denied, and so, therefore, there

25   shouldn't be a reliance interest.  But the fact is, as part of

Gregory Finch - Cross

1    that motion, the defendants represented to the Court and to the

2    government that it wouldn't be doing that.  So it, in fact, got

3    what it wanted even though the motions were moot.  And so there

4    is, in fact, a reliance position here.

5           The second thing is the government's argument that,

6    well, the messages are so clear it doesn't require

7    interpretation is nothing more than saying, well, we're right,

8    we're always right, and it's so clear that no one could ever

9    disagree with us.  And that, of course, is a fallacy.  We

10   disagree with them with respect to the interpretation of

11   virtually every communication.  And merely saying we should be

12   entitled to cross-examine him about the texts we think are

13   clear simply avoids the issue.

14          The third point here is what the government's cross I

15   think looks like is they are going to throw a bunch of

16   documents one after another in front of Professor Snyder who is

17   then going to say, But I didn't incorporate texts in my

18   analysis.  And, of course, one of the reasons he didn't is

19   because of the motions, and it invades the province of the

20   jury.

21          And then the government spins around having made that

22   argument that he is not entitled to and he is not authorized to

23   and says to the jury, Aha, see, he didn't include all of that.

24   That is argument that they can make.  And, moreover, once

25   Professor Snyder says, I didn't incorporate the text, going to

Gregory Finch - Cross

 1   the text is actually outside the scope of the direct.

 2         Within the scope of the direct, they are perfectly

 3   free to challenge the integrity of his math, of his analysis of

 4   his economic theory, whether it's on information sharing and

 5   something else and be perfectly within the scope, but this way

 6   they are going beyond the scope of the direct, and they are

 7   going -- they are accusing him of failing as an expert because

 8   he didn't do something he wasn't allowed to do under the cases

 9   in their motion.

10         Thank you.

11         THE COURT:  Ms. Henry, did you have a point?

12         MS. HENRY:  I just wanted to respond very briefly to

13   the notion of that it was all very obvious that holding prices

14   meant that it could come from a competitor.  Obviously that is

15   one of the things that has been very much contested where

16   something of that nature has been said, and we would certainly

17   have a big problem if in the questioning there was this sort of

18   assumption of, here, this information came from a competitor,

19   so what would you think about that.  That's going to raise huge

20   problems during the exam.

21         THE COURT:  All right.  Mr. Torzilli.

22         MR. TORZILLI:  I don't anticipate asking "what do you

23   think of that" type of questions.  All we are looking for, Your

24   Honor, is to point to words on documents, point to people on

25   documents and ask him whether he knows, whether he has

Gregory Finch - Cross

1    considered, whether he has relied on, and I realize -- and

2    whether he has seen.  And I think that's perfectly appropriate,

3    because it looks like what occurred here is that this is a

4    very, very, very thinly supported set of expert opinions that

5    we're about to hear from Professor Snyder, and we need to have

6    an opportunity to go after him on that.

7         THE COURT:  Okay.  The motion will be granted in part

8    and denied in part.  The government did take a completely

9    inconsistent position on this issue, and I am not going to

10   allow the government to ask him about any specific documents.

11   For one thing, the documents are -- the whole trial is

12   interpreting -- or much of the trial is about interpreting

13   those documents, and the interpretation of them is highly

14   contested.

15        This is true even if Professor Snyder has been

16   prepared with those documents.  He has been prepared with the

17   documents, but he hasn't -- he was instructed not to take them

18   into account in formulating his analysis.  So it would -- and

19   that was in keeping with the representation that the defendants

20   made early on in response to a government motion which said it

21   would be inappropriate for an expert to interpret documents.

22   So for that reason, the government will not be allowed to try

23   to impeach him or ask him about specific documents.

24        The government may ask him some very -- some questions

25   with a high level of generality about types of communications

Gregory Finch - Cross

1    that may exist, but once again, those questions cannot

2    incorporate the phrasing of some of the critical documents in

3    this case because that would just be an end run around what I

4    just ordered.

5         But it wouldn't be inappropriate to ask him -- you

6    know, it's hard for me to phrase it, but once again, to try to

7    characterize a type of communication going on or a price -- or

8    a -- type of information exchanges or things of that nature,

9    that is permissible depending upon the professor's testimony,

10   but it cannot attempt to get specific as to particular

11   documents or incorporate phrases.

12        *MR. TORZILLI:*  One follow-up question on that, Your

13   Honor.

14        *THE COURT:*  Yes.

15        *MR. TORZILLI:*  So part of the problem is that that

16   part of what Professor Snyder is going to testify to is

17   precisely in the documents, and I will just give you one

18   example that I think illustrates it.  And I realize Your Honor

19   may want to take this up as the testimony unfolds, but I will

20   just refer you to Exhibit J-214.  And J-214 has what purports

21   to be and I think is some DOJ indicators of bid-rigging and

22   price-fixing.  And item No. 2, there is holding prices firm as

23   an indication of price-fixing and bid-rigging.  And that in

24   similar terminology is, as Your Honor is well aware, all over

25   the documents for lack of a better word.

Gregory Finch - Cross

1          So I think even a generally and high-level set of

2     questions is going to pick up on terminology that's in

3     documents, so it's both going to be permissible and

4     objectionable based on, I think, Your Honor's guidance.

5          THE COURT:  Right.  I mean, but the fact of the matter

6     is that that particular exhibit quotes the DOJ guidance which

7     uses the phrase "hold prices firm," so he is not -- there is no

8     implication that he is getting it from the document.  He is

9     getting it from the DOJ antitrust primer.

10          MR. TORZILLI:  Understood.  But when we ask questions

11     to him on cross-examination about those words, those also

12     happen to be words that are in the documents.

13          THE COURT:  Yeah, you can ask him about things that

14     are in the DOJ primer because it appears he is taking those

15     bullet points from the primer.

16          MR. TORZILLI:  Understood.  So the primer in its

17     entirety is fair game for cross-examination.

18          THE COURT:  Once again, I haven't heard him testify,

19     but it appears that he is doing so.  That was the

20     representation that was made to the Court and that I made an

21     assumption when I had a previous order.  So once again, to the

22     extent that he is relying upon it, of course, you can ask him

23     about the primer.

24          MR. TORZILLI:  Thank you.

25          THE COURT:  Anything else on that subject?  All right.

Gregory Finch - Cross

 1              Anything else upon any subject assuming it's only

 2      about two minutes long?

 3              We will be in recess until 1:30.

 4          (Recess at 12:25 p.m. until 1:30 p.m.)

 5          THE COURT:  Why don't we go ahead and get the jury.

 6      Why don't we get Mr. Finch.

 7              Mr. Koenig, go ahead.

 8          MR. KOENIG:  Thank you, Your Honor.

 9      BY MR. KOENIG:

10      Q.  All right, Mr. Finch.  I think when we broke for lunch, we

11      were talking about current pricing, correct?

12      A.  I don't recall.

13      Q.  Okay.  Well, let's talk about current pricing, then, shall

14      we?  Current pricing and period pricing, that's kind of the

15      same thing, right?

16      A.  Period pricing is current.

17      Q.  Sure.  And I believe you testified on direct that your

18      current pricing at Claxton was determined totally

19      independently.

20      A.  All of our pricing was determined independently.

21      Q.  Okay.

22          MR. KOENIG:  Your Honor, I would like to pull up

23      Government's Exhibit 6046 and offer it into evidence.

24          MR. BELLER:  May I have a paper copy, please?

25          THE COURT:  Yes.

Gregory Finch - Cross

1      MR. KOENIG:  This was subject to a favorable ruling in

2   ECF-559.

3      MR. BELLER:  Your Honor, the government is looking for

4   a copy.  I can now see it on my screen, so if it's going to be

5   a holdup, I don't need it.

6      MR. KOENIG:  That's the entirety of the exhibit what's

7   displayed.

8      THE COURT:  Any objection to the admission of 6046?

9      MR. BELLER:  No, Your Honor.

10     THE COURT:  6046 will be admitted.

11  BY MR. KOENIG:

12  Q.  All right, Mr. Finch.  You see the subject line is KFC

13  Period 7 pricing?

14  A.  Yes.

15  Q.  And you just told the jury that period pricing is current

16  pricing, right?

17     MR. KOENIG:  May we publish?

18     THE COURT:  Yes, you may.

19  BY MR. KOENIG:

20  Q.  So it says KFC Period 7 pricing, which is current pricing,

21  right?

22  A.  KFC Period 7 pricing.

23  Q.  If you look at Defendant Brady's e-mail, he says, I talked

24  to Bill, and Koch is .9884, and for Period 6 he was .9809.  Do

25  you see that?

Gregory Finch - Cross

1    A.   I do.

2    Q.   And you know of somebody named Bill at Koch, right?

3    A.   I do.

4    Q.   Bill Kantola?

5    A.   That would be Bill Kantola.

6    Q.   And then you see where it says George's is .9784, and for

7    Period 6 they were at .9817.  Do you see that?

8    A.   I do.

9    Q.   And those are the Koch and George's current pricing,

10   correct?

11   A.   Appear to be.

12   Q.   Okay.  And then down here in the second row, it says, I

13   will call Ric Blake in the morning and see why they went down.

14        Do you see that?

15   A.   Yeah.

16   Q.   And you know that Ric Blake works at George's, right?

17   A.   I do.

18   Q.   And then it says, Bill thinks we could increase by .005 to

19   .0075.  He will have everyone's prices by Friday.

20        Do you see that?

21   A.   I do.

22   Q.   Now, in response Defendant Fries, do you see where he says,

23   Yeah, I agree, but we need to do it in smaller increments,

24   .0025 to .0040 at a time.

25        Do you see that?

Gregory Finch - Cross

1   *A.*   I do.

2   *Q.*   And you would not consider that to be determining your

3   period pricing or current pricing independently, would you?

4   *A.*   I don't see this as trying to come with our price at all.

5   I don't even see our price on here.

6   *Q.*   Sir, we're talking about period pricing here.

7   *A.*   Yeah.  I don't see Claxton's period price on here anywhere.

8   *Q.*   Do you see it says he agrees that we could raise the price?

9   *A.*   Yeah, okay, that is Mikell's opinion.  The QSR has to

10  approve it.  That's not just arbitrarily done.  So in Mikell's

11  opinion, he thought they may be able to, but the QSR ultimately

12  held the power as to whether it could be changed or not.

13  *Q.*   I see.  So your testimony to the jury is that talking to

14  Defendant Kantola and Defendant Blake in order to figure out

15  how much to move the period pricing is still determining the

16  price independently?

17  *A.*   Well, we can't move the period price.  The freight -- or

18  the grain determines -- the grain change, corn and soybean

19  price moves the period price, so we can't change the period

20  price.  We can't change any price without the approval of the

21  QSR.  So as far as I am concerned, this is just banter.

22  *Q.*   I see.  Okay.  Banter.

23         You talked about Urner-Barry on direct.  Do you recall

24  that?

25  *A.*   Urner-Barry, yes.

Gregory Finch - Cross

1    Q.  And I believe due to an error you were asked about your

2    recollection whether you recalled Urner-Barry in September of

3    2015.  You were asked that twice, right?

4    A.  I was.

5    Q.  And you gave two different answers.  First you said 1.17,

6    and then you said 1.07; is that right?

7    A.  Yes, but there is two different quotes on Urner-Barry.

8          MR. BELLER:  Your Honor, I am going to object to the

9    interruption of the answer and ask that the witness be allowed

10   to answer the question that's been asked.

11         MR. KOENIG:  On redirect, he can clarify.

12         THE COURT:  He wasn't asked a question.  Go ahead,

13   Mr. Koenig.

14   BY MR. KOENIG:

15   Q.  Now, even though you were asked September 2015 twice, you

16   understood that to mean you were being asked about

17   September 2014 and September 2015; isn't that right?

18   A.  Well, we were -- as I recall, the questions were

19   surrounding the 2015 stair-stepped contract with

20   Pollo Tropical, so we would have been talking about the 2015

21   contract in the fall of 2014.  In the fall of 2014, the

22   whole-bird quote on -- or the WOG quote on Urner-Barry was

23   $1.07.  Eight-piece quote, which was a different quote on

24   Urner-Barry, was $1.17.

25   Q.  Sir, you understood, even though you were asked the same

Gregory Finch - Cross

1    question twice, you understood it as two separate questions

2    asking about two different time periods, right?

3    A.  We were talking about the 2015 contract, so Mr. Beller must

4    have -- I don't even know if I heard 2014, if I am being honest

5    with you, so I, you know, I knew he was talking about the 2015

6    contract.  So the only Urner-Barry quote would have been the

7    September before, which is when we were negotiating with

8    Joe Brink.

9    Q.  And you knew that question was coming because you prepped

10   for this testimony, right?

11   A.  I didn't prep for this testimony, no.

12   Q.  You did not prepare at all for this testimony.

13   A.  I reviewed documents.  I met with my corporate attorney.

14   Q.  You said --

15   A.  And I was interviewed by Mr. Fries' and Mr. Brady's

16   attorneys.

17   Q.  You said you recalled the September '14 or '15 Urner-Barry

18   Index, right?

19   A.  I did because I did.

20   Q.  What is -- what was the Urner-Barry in September of 2013?

21   A.  I don't -- I don't recall.

22   Q.  What about September of 2016?

23   A.  Don't recall.

24   Q.  So you didn't actually recall.  What you did was you looked

25   up the numbers, and you recalled looking them up.  You don't

3495

Gregory Finch - Cross

1    recall it from the time, do you?

2    *A.*  I absolutely do, because that was the year Joe Brink would

3    not execute our 2015 contract after he agreed to a multi-year

4    deal.  It was also the year of the big-bird premium or big-bird

5    adjustment, which was basically the same bird as

6    Pollo Tropical.  And so we were selling to KFC at $1.06.

7           So I absolutely remember that.  That contract for the

8    rest of my life will be indelibly marked on my mind, because

9    Joe Brink was very, very difficult to deal with that year.  I

10   will never forget that as long as I live.

11   *Q.*  Let's go on, then, to Government's Exhibit 17.  Do you

12   recall seeing Government's Exhibit 17?

13          *MR. KOENIG:*  If you can pull it up and publish.

14          *THE COURT:*  You may.

15   *A.*  I recall seeing this.

16          *MR. KOENIG:*  If you could pull up side by side

17   Government's Exhibit 1700.

18   *BY MR. KOENIG:*

19   *Q.*  I believe in response to some questions from Mr. Beller

20   about Government's Exhibit 17 you were asked about these phone

21   calls here between Defendants Brady and Mulrenin and so forth,

22   right?

23          *MR. KOENIG:*  Can we publish, please?

24          *THE COURT:*  Publish 1700 alongside?

25          *MR. BELLER:*  Your Honor, if I may, 1700 has a limiting

Gregory Finch - Cross

1    instruction.

2          THE COURT:  Yes, I don't typically review the limiting

3    instruction every single time it's been displayed, but it does

4    have a limiting instruction, consider top e-mail only against

5    Mr. Brady.

6    BY MR. KOENIG:

7    Q.  So you said that these phone calls here, you went through

8    some purchase orders, and basically your point was that those

9    calls were about shortages, right?

10   A.  Those were covers.  Those were calls related to covers of a

11   specific order.

12   Q.  Now, let's look at Government's Exhibit 17, the bottom

13   e-mail.  Got feedback from RSCS or UFPC at the time, right?

14   A.  I am sorry, sir.  Where are you?

15   Q.  1700 on the left, the bottom e-mail.  See attached feedback

16   from the round one.

17   A.  Okay.

18   Q.  You see that?  That's reflected on Government's Exhibit 17

19   on the right, isn't it?

20   A.  Let me see.  Okay.  So 1700 is a Claxton Poultry e-mail and

21   an e-mail from KFC.  17 looks like something between

22   Mike Ledford and Roger Austin who works for Pilgrim's.

23   Q.  No, up at the top.

24   A.  Oh, up at the top, I'm sorry.  I see that.

25   Q.  Okay.  And then your testimony is that the ensuing calls

Gregory Finch - Cross

1    were about covering a shortage, right?

2    A.   They were.

3    Q.   But in Government's Exhibit 17, there is not the top part

4    of Government's Exhibit 1700, is there?

5    A.   Excuse me?

6    Q.   The top e-mail on the left is not reflected in Government's

7    Exhibit 17, is it?

8            MR. BELLER:   Objection, Your Honor, foundation.

9            THE COURT:   Overruled.

10   A.   So are you talking about -- I just want to be clear, are

11   you talking about "FYI I will make some calls"?

12   BY MR. KOENIG:

13   Q.   Yes.

14   A.   Is that here on the government's exhibit?   It doesn't

15   appear to be.   The government's exhibit appears to be only

16   partial.

17   Q.   Okay.   So Defendant Brady gets feedback on the left now,

18   gets feedback from UFPC, and then says, I will make some calls.

19   Do you see that?

20   A.   I do.

21   Q.   And then on the right, what do you see the very next day?

22   You see calls, right?

23   A.   The calls for the covers which we had documentary support

24   in what we produced.

25   Q.   So the way you look at it is he gets feedback on an RFP.

Gregory Finch - Cross

1    He says, I will make some calls, and he was referring to making

2    calls about shortages.

3    A.  Well, I know he was making calls about the shortages

4    because we had the documentary evidence that we showed that

5    backed up the calls at that time.

6    Q.  Do you agree that --

7           MR. BELLER:  Your Honor, again, I am going to ask that

8    the witness be given the opportunity to answer the question

9    that was asked.

10          THE COURT:  I think he finished his answer.

11   Overruled.

12   BY MR. KOENIG:

13   Q.  Now I have forgotten my question.

14          (The record was read by the court reporter.)

15   BY MR. KOENIG:

16   Q.  Sir, you would agree that a phone conversation can have

17   more than one topic, right?

18   A.  That's possible.

19   Q.  And so when you testified about the purpose of those calls,

20   you weren't considering Defendant Brady's e-mail there on the

21   left, were you?

22          MR. BELLER:  Objection, foundation and speculation,

23   Your Honor.

24          THE COURT:  Overruled.

25   A.  I am sorry, what was the question again?

Gregory Finch - Cross

1    *BY MR. KOENIG:*

2    Q.  When you testified about the purpose of the calls in

3    Exhibit 17, you weren't considering Defendant Brady's e-mail on

4    the left where he said, "I'll make some calls after getting

5    feedback from KFC"?

6    A.  Well, the supply shortages don't stop just because we

7    happen to be in the negotiating period of the year.  I mean,

8    the supply disruptions can happen year round.  So, you know, I

9    will make some calls, okay, so what?  About what?  I don't

10   know.  But these conversations here are about the supply

11   shortages.  And like I said, the supply chain issue is 24/7,

12   365.  So it doesn't take a break just because it happens to

13   coincide with the same time that the bid process is taking

14   place.

15          *MR. KOENIG:*  Let's pull up Government Exhibit 15.  And

16   may we publish?

17          *THE COURT:*  You may.

18   *BY MR. KOENIG:*

19   Q.  Do you recall testifying about Government's Exhibit 15?

20   A.  Give me a second.  Yes.

21   Q.  And you were asked about the text messages such as George's

22   is .30 back on dark meat.  Do you remember that?

23   A.  Yes.

24   Q.  And your testimony was that -- on direct was that in order

25   to know what that formula means, you need to know the

Gregory Finch - Cross

1    competition's eight-piece price, right?

2    A.  I will need to know the eight-piece price to know what .30

3    back meant.

4            MR. KOENIG:  All right.  If we could, please, pull up

5    Government's Exhibit 10651.  And this has not yet been offered,

6    but the government would seek to offer it.

7            THE COURT:  All right.  And this is 1065-1?

8            MR. KOENIG:  No, 10651.  May we approach and provide

9    you a copy?

10           THE COURT:  Yes.

11           Any objection to the admission of 10651?

12           MR. BELLER:  If we may have just one moment.

13           THE COURT:  You may.

14           MR. BELLER:  Your Honor, if we may have a side bar,

15   please.

16           THE COURT:  Yes.

17      (At the bench:)

18           THE COURT:  Mr. Beller, go ahead.

19           MR. BELLER:  Thank you, Your Honor.

20           Your Honor, it appears that the difference between

21   this exhibit and the one that the government has introduced

22   previously is the addition of the top line or I believe the top

23   couple of lines.

24           Your Honor, first I would note that we have what

25   appears to be at least double hearsay, No. 1.

Gregory Finch - Cross

1            No. 2, Your Honor, I would note that this was not on

2   the *James* log.  This has never been proposed as being in

3   furtherance of the conspiracy nor has it been considered by the

4   Court, so I do believe that this is not an exception to hearsay

5   under 801(d)(2)(A) or 801(d)(2)(E).

6            THE COURT:  Mr. Koenig, response?

7            MR. KOENIG:  Yes, Your Honor.  We are offering this --

8   we are offering this in response to what the witness said on

9   direct.  And so I don't think this is a situation where we need

10  to be bound by what we put on the *James* log.  We couldn't

11  anticipate what this witness was going to say way back in

12  September or August.  And so I think it should be allowed in as

13  801(d)(2)(E).

14           MR. BELLER:  Your Honor, I would note that simply

15  because they are offering it for a different purpose, they are

16  still offering it for the truth of the matter asserted and that

17  is that Mike Ledford told Roger Austin what the price would be.

18  Roger Austin or somebody told that to Mr. Brady, and Mr. Brady

19  then told that to Mr. Fries.  So we have multiple layers of

20  hearsay.  In order for this to be admissible, there has to be

21  an exception to the hearsay rule to each one of those

22  particular steps.  The government has not established that.

23           THE COURT:  Anything else, Mr. Koenig?

24           MR. KOENIG:  Yes.  Mr. Ledford's statement is effect

25  on Roger Austin as the listener, so that takes care of that.

Gregory Finch - Cross

1    And then the communication of the whole statement is

2    801(d)(2)(E) in furtherance.  And there is certainly no risk of

3    connecting up which is what the main concern of the *James*

4    hearing is.

5            *THE COURT:*  Mr. Beller, anything else?

6            *MR. BELLER:*  Only, Your Honor, we certainly don't know

7    that this information was from Mr. Ledford to Roger Austin.  It

8    may very well have been from Mr. Ledford to Scott Brady, so

9    there is unreliability in the underlying statement itself, and

10   I continue to maintain that the government is offering it for

11   the truth of the matter asserted, in which case it is hearsay.

12           *THE COURT:*  Objections will be overruled.  The fact

13   that it wasn't part of the *James* log is not relevant here

14   because this is being used on cross-examination to essentially

15   be able to cross-examine this particular witness.  The

16   government couldn't have necessarily anticipated this.

17           The statement on the very top will only be admitted

18   with a limiting instruction that any statement by Mr. Ledford

19   can only be considered for the effect on the listener, not for

20   the truth of any matter asserted.  These are statements of two

21   of the defendants, so they are 801(d)(2)(E) statements.

22           *MR. BELLER:*  Your Honor, the one additional note that

23   I would establish not to the admissibility of this document,

24   but rather the questions to the witness, and that is a

25   foundation has not at this point been laid for this witness to

Gregory Finch - Cross

1   be testifying regarding these particular statements.  And such

2   an objection is premature, but nonetheless, I want the Court to

3   be on notice of that at this time.

4             THE COURT:  Understood.

5             Anything on that, Mr. Koenig?

6             MR. KOENIG:  Yes.  The other exhibit, the one that

7   doesn't contain the top line, was inquired about, and so the

8   conversation as a whole, I think he has a foundation already to

9   talk about this particular document.

10            THE COURT:  And, Mr. Koenig, is this document, does it

11  differ from -- I am not sure what exhibit, but is it just the

12  additional top line?

13            MR. KOENIG:  I believe that's correct, yes.

14            THE COURT:  All right.

15            MR. TUBACH:  I believe it's the top two lines, Your

16  Honor.

17            THE COURT:  Right.  That probably makes sense given

18  the fact that 1700 -- these are excerpted from 1700; is that

19  right?

20            MR. KOENIG:  Yes, Your Honor.

21            THE COURT:  Got it.  Understood.  Thank you.

22       (In open court:)

23  BY MR. KOENIG:

24  Q.  All right, Mr. Finch.  Just to reset --

25            THE COURT:  Let me rule on --

3504
Gregory Finch - Cross

1          *MR. KOENIG:*  My apologies.

2          *THE COURT:*  -- the exhibit.

3          So Exhibit 10651 will be admitted.

4          The very top entry, we can display that to the jury,

5    the very top entry, Ladies and Gentlemen, where it says --

6    talks about Mr. Ledford, any statement by Mr. Ledford can be

7    considered only as to -- not for the truth of the matter

8    asserted, but only for the effect on the listener, all right?

9          Go ahead, Mr. Koenig.

10         *MR. KOENIG:*  Thank you.

11   BY MR. KOENIG:

12   Q.  All right.  So you testified on direct about the bottom

13   four entries, I believe, on government -- that are shown here

14   on this exhibit.  And you basically said that because there was

15   no eight-piece price referenced, the .30 back was kind of

16   meaningless.  Do you remember that?

17   A.  You can't calculate what the actual dark-meat price is

18   without the COB price.

19   Q.  You will agree with me that the two e-mails that were at

20   the top that weren't on the previous exhibit, Ledford told

21   Roger to be at .9250, that's an eight-piece price, isn't it?

22   A.  It's a number.  I don't know if it's actually Roger's

23   number or not, but it is a number.

24   Q.  You agree that that is consistent with how eight-piece

25   prices are reported usually.

Gregory Finch - Cross

1    *A.* Well, most all the prices on the COB or the cost-plus

2    contract go to four decimal places.

3    *Q.* And if that is an eight-piece price, then what

4    Defendant Austin is .30 back, that is relevant -- I mean, not

5    relevant, that is calculable?

6    *A.* If .9250 were an eight-piece price, then if whoever gave

7    that information was telling the truth, then you could

8    conceivably take 30 cents off of that, if Roger is really at

9    .30 back. We don't know if Roger is really at .30 back or not.

10   We don't know who is bluffing and who's not.

11   *Q.* Thank you very much.

12        *MR. KOENIG:* If we could now pull up Government's

13   Exhibit 9 and permission to publish.

14        *THE COURT:* You may.

15   *BY MR. KOENIG:*

16   *Q.* All right. Do you recall on direct you were asked about

17   what model Claxton was using in 2014 for Chick-fil-A?

18   *A.* I remember it, yes.

19   *Q.* And you testified it was the breast model, I believe,

20   right?

21   *A.* 2014 we were on the market model, breast model.

22   *Q.* And not the grain model that the competitors were using.

23   *A.* Correct.

24   *Q.* And you were asked, is it even possible for someone on a

25   breast model and someone on a grain model to align prices, and

Gregory Finch - Cross

1    you said no, right?

2    A.   Yes.

3    Q.   Now, what you were not asked was whether Claxton was at

4    this exact same time in 2014 transitioning to the grain model,

5    were you?

6    A.   I don't recall every question.

7    Q.   And you did not tell the jury on direct that Claxton was

8    transitioning to the grain model at this time, did you?

9    A.   I don't recall.

10   Q.   But it is true you would agree with me that Claxton was

11   transitioning to the grain model at that time?

12   A.   Yes.  As I testified, we were the last ones on it in 2014,

13   and we were going to it in 2015.

14   Q.   So in 2014, then, when Claxton was switching over to the

15   grain model, Defendant Brady reached out to competitors to

16   figure out where to price your product.

17          MR. BELLER:  Objection, foundation, speculation.

18          THE COURT:  Sustained.

19   BY MR. KOENIG:

20   Q.   In 2014 when Claxton was in the process of doing the

21   transition, you agree, looking at Government's Exhibit 9, that

22   Defendant Brady reached out to his competitors?

23          MR. BELLER:  Same question, same objections.

24          THE COURT:  Sustained.

25   BY MR. KOENIG:

Gregory Finch - Cross

1    *Q.* Sir, do you see these calls between Scott Brady,

2    Justin Gay, Searcy Wildes?

3    *A.* Yes.

4    *Q.* And those calls occurred in the time frame that Claxton was

5    switching to the grain model, correct?

6         *MR. BELLER:* Objection, foundation, Your Honor.  There

7    is a lack of personal knowledge for this witness.

8         *MR. KOENIG:* He already testified that they were

9    switching.  I am just connecting the two.

10        *THE COURT:* Overruled.  That he was already switching,

11   you mean the pricing model?  Sustained.

12        *MR. KOENIG:* I am sorry, I didn't understand the --

13        *THE COURT:* Well, the objection was foundation, and I

14   think what you said back was that he was testifying about the

15   pricing model, but the objection will be sustained.

16   BY MR. KOENIG:

17   *Q.* All right.  Let me just confirm, do you see the 11:55 a.m.

18   entry of July 2nd?

19   *A.* Yes.

20   *Q.* And you see where it says, Justin said they are reviewing

21   their CFA grain-based model now for 2015.  I will check with

22   Perdue and Tyson.

23        *MR. BELLER:* Your Honor, again, there is a lack of

24   foundation.  This summary chart is only as valid as the

25   underlying documents used to create this, so the witness has to

Gregory Finch - Cross

1    have knowledge in order to be able to testify as to its

2    contents.

3              THE COURT:  Let's hear the question first.  Go ahead.

4    BY MR. KOENIG:

5    Q.  Well, I just asked, does he see those words?

6              THE COURT:  He can answer that question.

7    A.  Yes.

8              MR. KOENIG:  All right.  You can take that down.

9    BY MR. KOENIG:

10   Q.  Sir, you testified on direct about the inner workings of

11   the negotiations with the QSR customers, right?

12   A.  I spoke about my portion.

13   Q.  Well, you also spoke about Defendant Fries and

14   Defendant Brady too, right?

15   A.  I may have.  I don't recall.

16   Q.  Sir, isn't it true you did not attend many or any QSR

17   negotiations with customers?  Did you?

18   A.  My role in the pricing was not to talk to customers or the

19   QSR.  Mine was to come up with the actual cost, deliver that to

20   Mr. Fries, and then Mr. Fries and Mr. Brady took over

21   conversations.  I stood by for guidance back from the QSRs when

22   they gave it to Mr. Fries and Mr. Brady.

23   Q.  So the stuff you testified about yesterday about what

24   happened with what was said in negotiations and so forth,

25   that's just stuff you learned from Defendants Brady and Fries.

Gregory Finch - Cross

 1    You don't have any firsthand knowledge of that, do you?

 2    A.  I don't know which part of my testimony you're referring

 3    to.

 4    Q.  Yesterday you testified quite a bit about negotiations with

 5    QSRs, right?

 6    A.  Yes.

 7    Q.  But since you weren't in the negotiations, that's all stuff

 8    that you've learned from Defendants Brady and Fries, right?

 9           MR. BELLER:  Your Honor, I am going to object as to

10    "they."

11           THE COURT:  Overruled.

12    A.  What was the question?

13    BY MR. KOENIG:

14    Q.  The question was, all the stuff you testified to yesterday

15    about negotiations with QSRs, that is all information you

16    learned from Defendant Brady and Fries.

17    A.  Well, no.  I have been doing pricing since I got to

18    Claxton, so the way the process -- I just don't have a

19    front-line role in the process where I interact with the

20    customer, the QSR.  But when that information comes back, we

21    circle back up internally and go, Hey, what feedback did we

22    get?  And then we decide based on whatever the feedback is, go

23    down on this price or that price, then we collectively decide,

24    you know, Mikell, get some input from me.  This is what they

25    are saying.  Does this make sense?

3510

Gregory Finch - Cross

1   Q.  Let me ask you this.  Do you recall talking about Claxton's

2   negotiation strategy yesterday?

3   A.  Yes.

4   Q.  And I believe you used the word "weird" to describe that

5   strategy, correct?

6   A.  Yes.

7   Q.  And the strategy is that Claxton would tell the customer,

8   say RSCS and KFC, Just put us in the middle somewhere, right?

9   That was your testimony?

10  A.  They knew that we wanted to be in the middle somewhere and

11  not too high or too low, yeah.  We would tell them that, look,

12  we want to keep our volume and we want to add to it.  Tell us

13  where we need to be on price.  And they would give us feedback.

14  Q.  But that negotiation strategy doesn't make sense unless you

15  know what your competitors are bidding, does it?

16  A.  Well, what our competitors are bidding is of no consequence

17  to us.  We've decided internally what our price was going to

18  be, and we reported that separate from anybody else to the QSR.

19  And then part of that delivery of that pricing is, hey,

20  remember, we want to be in the middle.  We're trying to not be

21  too high, too low, because we want to grow our volume with you,

22  so tell us where we need to be.

23  Q.  Sir, your testimony to the jury is you want to be in the

24  middle of your competitors' bids, but what your competitors'

25  bids are is irrelevant.  Is that your testimony?

Gregory Finch - Cross

1    A.  To us it is because we make our own independent decision on

2    what our price is going to be, and we can't control what

3    everybody else does.  So only the QSR has the visibility of

4    everybody's suggested contract price to be able to give us the

5    feedback that we're in the middle.  I mean, they are the only

6    ones that can tell us that.  No one else can.

7    Q.  So, sir, you would never go to a car dealer and say, Don't

8    give me your most expensive car.  Don't give me your cheapest

9    car.  Just pick one in the middle and call me in the morning.

10   You would not do that, would you?

11   A.  Well, buying a car is a little different than negotiating a

12   contract for chicken.

13   Q.  Do you have an answer?

14   A.  Yeah, I gave it.

15   Q.  It's a yes-or-no question.

16        MR. BELLER:  Your Honor, I am going to object as to

17   the relevance of how he purchases vehicles.

18        THE COURT:  Overruled.  He can answer.

19   A.  Would I personally buy a car that way, no.

20   BY MR. KOENIG:

21   Q.  Similarly in the QSR negotiations, in order to get an

22   acceptable price for your chicken, you would need to know the

23   range before you knew if you could accept somewhere right in

24   the middle, wouldn't you?

25   A.  No, absolutely not.  Our pricing that we submit to them is

Gregory Finch - Cross

1    off our actual cost plus any and all adjustment.  Internally we

2    have discussions before we even submit the bid as to where we

3    think we want to be if we can get there with the QSR.  I mean,

4    you know, it's -- there is no way for us -- the only people

5    that can tell us -- and we are putting a tremendous amount of

6    trust in the QSR here, is the only people that can tell us if

7    we are in the middle or not is the people who has everybody's

8    pricing in front of them.

9    Q.  Let me ask you this.  In order to make this bidding

10   strategy plausible, you explained yesterday that you learned

11   your competitors' current prices from shortage purchases,

12   right?

13   A.  Yes.

14   Q.  And you learned competitors' current pricing from

15   distributors, correct?

16   A.  Yes.

17   Q.  But you didn't learn from distributors or from shortages,

18   you didn't learn your competitors' price increases, their bids,

19   did you?

20   A.  Their bids?

21   Q.  Yeah.

22   A.  We didn't learn anybody's bid.  We had no access to

23   anybody's bid except for Claxton's.

24   Q.  All right.  In 2014, though -- let me back up.  Those two

25   sources of information, plus your trust in the QSR, the

Gregory Finch - Cross

1    customer, those are the two sources of information that you

2    said let you know whether you were in the middle and what the

3    range was, right?

4    A.   Well, we certainly know where our current price is in

5    relation to anybody else's current price.  The current pricing

6    is largely irrelevant when you are doing the next year's

7    contract, because, as I also testified, those cost components

8    that make up the cost, they don't change from year to year.

9    The only opportunity we have to change that is when we

10   renegotiate.  So it's a data point that we use, but it has no

11   bearing upon our independent decision.

12   Q.   Sir, then when you explained where you get current pricing

13   from in the context of explaining the weird negotiation

14   strategy, you are saying now that those things are largely

15   irrelevant.

16   A.   No.  I am saying they are a data point.

17   Q.   So there is one option I noticed you didn't mention, and

18   that's getting bids straight from the competition, right?

19   A.   As a method of what?

20   Q.   Of figuring out where you would be in the middle.

21   A.   No.  We don't get competitors' bids.

22   Q.   Sir, you have reviewed the evidence in this case, haven't

23   you?

24   A.   Some.

25   Q.   And you are aware of a lot of the communications that have

Gregory Finch - Cross

1    occurred?

2    A.   I am aware that communications happen within the supply

3    chain, sure.  You have got to have communications in order to

4    move chicken.

5    Q.   And you know about the 15- to 20-cent price hike in 2015?

6    A.   The what?

7              MS. HENRY:  Objection, lack of foundation.

8              THE COURT:  Overruled.  He can answer.

9    BY MR. KOENIG:

10   Q.   Do you know about the 15- to 20-cent price hike in 2015?

11             MS. JOHNSON:  Objection, Your Honor.  That misstates

12   the evidence that's been before this jury.  Not all suppliers

13   had a 15- to 20-percent price increase.

14             THE COURT:  He is being asked -- he can answer if he

15   knows.

16   A.   So what was the question?  I am sorry.

17   BY MR. KOENIG:

18   Q.   The question is, you know about there being a 15- to

19   20-percent -- or cent price increase in 2015 to QSR customers,

20   right?

21   A.   I don't know what the exact amount of increase was, but the

22   QSR came to us and asked us what it would take to incentivize

23   us to stay in small birds, and they offered a big-bird

24   adjustment.  But what everybody's adjustment ended up being, I

25   couldn't quantify it as 15 to 20 percent or 15 to 20 cents.

Gregory Finch - Cross

1    Q.  Sir, what we have determined from your testimony is that --

2    or what your testimony is is that you used terms like

3    "directional guidance."  You've used terms like this "joint

4    supplier network," terms that are not found in any of your

5    e-mails, correct?

6         MR. BELLER:  I am going to object as being compound

7    and asked and answered, Your Honor, and sustained last time.

8         THE COURT:  I don't recall that.  Overruled.

9    BY MR. KOENIG:

10   Q.  Correct?  That's what you testified to.

11   A.  I testified to?

12   Q.  That your use of directional guidance and joint supply

13   network, those are words you used on the stand here but aren't

14   found anywhere in your e-mails; is that right?

15   A.  I didn't look at all of my e-mails.  It's possible they are

16   in there.  I mean, joint supply network is another word for

17   supply chain.  I mean, you know, I don't know if they are in

18   there or not.  I didn't review all my e-mails.

19   Q.  And you said you reviewed evidence in this case.  You know

20   about the communications?

21        MR. TUBACH:  Objection, vague and ambiguous about

22   communications, Your Honor.

23        MR. KOENIG:  I will rephrase.

24   BY MR. KOENIG:

25   Q.  You know about the communications we looked at in the

Gregory Finch - Redirect

1    summary exhibits today, right?

2    A.  Well, I have no personal knowledge of them, but I know that

3    they are here on these charts.

4    Q.  You have reviewed them.

5    A.  I have reviewed these charts that say they were.  I haven't

6    actually seen the underlying phone records that support them.

7    Q.  And we have also heard you testify that you don't want

8    Defendant Fries or Defendant Brady to be convicted, do you?

9    A.  No.  They didn't do it.

10   Q.  Sir, your role here today is to just explain away the

11   evidence, isn't it?

12   A.  No.  I swore an oath to this Court to tell the truth, and I

13   have done my best to tell the truth over the last two days, and

14   I will continue to do that until I am dismissed.

15           MR. KOENIG:  One moment, please.

16           THE COURT:  Yes.

17           MR. KOENIG:  No further questions.

18           THE COURT:  Thank you.

19           Redirect?

20                       **REDIRECT EXAMINATION**

21   BY MR. BELLER:

22   Q.  Good afternoon again, Mr. Finch.

23   A.  Good afternoon.

24   Q.  Mr. Finch, does Mikell Fries, as president of Claxton

25   Poultry, report to a board of directors?

Gregory Finch - Redirect

1    *A.*  Yes.

2    *Q.*  You were asked if you work for Defendant Fries.  Do you

3    recall that question?

4    *A.*  Yes.

5    *Q.*  Now, let's call him Mr. Fries, okay?  If Mr. Fries is

6    overseen by a board of directors, do you serve on that board of

7    directors?

8    *A.*  Yes.

9    *Q.*  Do you serve on that board of directors with Doris Fries,

10   his grandmother?

11   *A.*  Yes.  She is chairman of the board.

12   *Q.*  And how about his aunt?

13   *A.*  Yes.

14   *Q.*  Is she also on the board of directors?

15   *A.*  Yes.

16   *Q.*  And this is the board of directors that oversees Mr. Fries.

17   *A.*  Yes.

18   *Q.*  Government counsel asked you quite a bit about what words

19   you looked for in different documents that were produced.  Were

20   you called by the government in a hearing as a custodian of

21   records?

22   *A.*  Yes.

23   *Q.*  As their witness, did they have you go through documents

24   looking for certain words?

25   *A.*  No.

Gregory Finch - Redirect

1   *Q.*  Are you aware of the 200,000 documents that you produced

2   any words regarding these gentlemen having an agreement to fix

3   bids or raise prices of broiler chicken products?

4   *A.*  No.

5   *Q.*  Are you aware of any words in the documents that you've

6   reviewed of these gentlemen having a price-fixing agreement?

7   *A.*  No.

8   *Q.*  Are you aware of any words in these documents of these

9   gentlemen having a quid pro quo, if one raises the price, the

10  other one will raise the price or vice versa?

11  *A.*  No, not there.

12  *Q.*  You had indicated that supply chain is the same as network;

13  is that right?

14  *A.*  Well, supply chain is another way to rephrase joint

15  supplier network.

16  *Q.*  And Mr. Koenig had asked you about the lack of inclusion of

17  the words "supplier network" in the government's database; is

18  that right?

19  *A.*  Yes.

20  *Q.*  Do you recall that?

21  *A.*  Yes.

22  *Q.*  Do you recall that --

23          *MR. KOENIG:*  Objection, misstates his testimony.

24          *THE COURT:*  Overruled.

25  *BY MR. BELLER:*

Gregory Finch - Redirect

1    Q.  Do you recall that Mr. Koenig also asked you about

2    directional guidance in all of the government's documents?

3    A.  Yes.

4    Q.  Do you -- did the government ever ask you to do a word

5    search and discover the 289 times in the government's documents

6    in which the "directional guidance" appears?

7    A.  Did they ask me to?

8    Q.  Yeah.

9    A.  No.

10   Q.  Did the government ever ask you about the 539 times that

11   the phrase "supplier network" appears in the government's

12   database of documents?

13   A.  No.

14        MR. BELLER:  Your Honor, may we have 6046.

15        Before we get there, Judge, excuse me, may I step back

16   a moment?

17        THE COURT:  Yes.

18   BY MR. BELLER:

19   Q.  Is it your job to produce correspondence regarding what the

20   government -- what words the government is looking for?

21   A.  No.  They tell us.

22   Q.  Is it your job to present in court certain documents that

23   the government is looking for or certain words that the

24   government is looking for --

25   A.  No.

3520

Gregory Finch - Redirect

1    Q.   -- to prove the government's case?  Is that your job?

2    A.   No.

3    Q.   Whose job is that, Mr. Finch?

4    A.   That would belong to the government.

5         MR. BELLER:  Your Honor, may I please have 6046.

6         THE COURT:  You may.

7         MR. BELLER:  May we publish that to the jury, please?

8         THE COURT:  You may.

9    BY MR. BELLER:

10   Q.   Mr. Finch, in front of you is Government's Exhibit 6046.

11   Mr. Koenig had asked you about this document.  Do you recall

12   that series of questions?

13   A.   Yes.

14   Q.   And do you also recall on direct examination that you were

15   given a very brief opportunity to explain freight and basis to

16   the jury?

17   A.   Yes.

18   Q.   If you can please review this document and tell me whether

19   or not this is about freight and basis to the best of your

20   knowledge.

21        MR. KOENIG:  Objection, foundation.

22        THE COURT:  Overruled.

23   A.   To the best of my recollection, that's what started this

24   conversation was freight and basis.

25   BY MR. BELLER:

Gregory Finch - Redirect

1   *Q.* So let's talk about that for just a little bit, because you

2   had said to the jury that during period pricing a contract

3   changes or can change based upon grain; is that right?

4   *A.* Yes.

5   *Q.* It can also change depending on the type of contract on

6   freight and basis?

7   *A.* Yes.

8   *Q.* Was there a time in 2013 in which the period pricing was

9   changing for the competitors but the price was not changing for

10  Claxton?

11  *A.* Yes.

12  *Q.* And what did you as CFO or as a representative of Claxton

13  do to investigate that and find out why competitors' prices

14  were changing but Claxton's price was not changing?

15  *A.* We had an internal conversation because we didn't

16  understand what was going on.  Since the QSRs dictate the price

17  point of buying the underlying grain itself, then, you know,

18  everybody's pricing on the period pricing, if they locked in

19  those prices, should change about the same.  But it was obvious

20  to us they weren't.  So through those conversations and some

21  conversations with the QSRs themselves, we discovered that some

22  contracts with some of the suppliers allowed for a monthly or

23  quarterly adjustment for freight and basis, and that was

24  something that Claxton did not have.

25  *Q.* And so do you recall if Claxton went to the QSR and asked

Gregory Finch - Redirect

1   for an incremental increase in freight and basis?

2   A.   Yes.

3   Q.   And does this document represent that?

4   A.   This is part of that time frame and that conversation.

5   Q.   And would that have been a discussion that somebody at

6   Claxton would have also had with Bill Kantola at Koch to

7   discover why his price was increasing but Claxton's was not?

8   A.   Quite possibly, yes.

9   Q.   For period pricing?

10  A.   Period pricing.

11  Q.   When the government met with you, did the government ever

12  ask you to explain freight and basis?

13  A.   No.

14  Q.   Sir, I am showing you Government's Exhibit 17.  Mr. Koenig

15  asked about this particular document.  Mr. Koenig asked you

16  specifically about the call between Scott Brady and

17  Tim Mulrenin at 9:42 on November the 1st.  Do you see that?

18  A.   I do.

19  Q.   And Mr. Koenig asked you in your experience, Mr. Finch, is

20  it possible that people can talk about multiple different

21  topics at once, do you recall that, or in a single

22  conversation?

23  A.   Yes.

24  Q.   How long was the telephone call between Mr. Brady and

25  Mr. Mulrenin on November the 1st of 2013?

Gregory Finch - Redirect

1    *A.* It appears to be zero minutes and zero seconds.

2    *Q.* Can you have multiple discussions or discuss multiple

3    factors or multiple different topics in a telephone call that

4    lasts zero minutes and zero seconds?

5    *A.* No.

6    *Q.* Is that misleading?

7    *A.* Very much.

8    *Q.* I want to ask you about --

9         *MR. KOENIG:* Your Honor, can we publish this, please?

10        *MR. BELLER:* Oh, yes, if we can publish that.

11        *THE COURT:* You may.

12   *BY MR. BELLER:*

13   *Q.* Highlighted, Mr. Finch, on the screen, do you see the

14   telephone call between Mr. Brady and Mr. Mulrenin in which the

15   government has noted a time of zero minutes and zero seconds?

16   *A.* Yes.

17   *Q.* Did you put that in there?

18   *A.* No.  Did I put that zero, that thing in there?

19   *Q.* Yes.

20   *A.* This is not my document.  No.

21   *Q.* And was that the telephone call that Mr. Koenig was asking

22   you about in which it's possible to discuss multiple things in

23   a single conversation?

24        *MR. KOENIG:* Objection, misstates the testimony.

25        *THE COURT:* Overruled.

Gregory Finch - Redirect

 1   A.  That was the call he asked me about specifically, yes.

 2        MR. BELLER:  Thank you.  If we can remove that.

 3   BY MR. BELLER:

 4   Q.  Mr. Finch, if we can show you Government's Exhibit 10651.

 5   If you could take a moment and review that.

 6   A.  Okay.

 7   Q.  So we were talking, Mr. Finch, about the dark-meat

 8   formulas, right?

 9   A.  Yes.

10   Q.  And you were asked on one of the government's summary

11   charts about how to calculate the dark-meat price; is that

12   right?

13   A.  Yes.

14   Q.  And so the government has then shown you this particular

15   document.  Are you a party to this conversation, Mr. Finch?

16   A.  No.

17   Q.  So do you know personally if Mr. Ledford, Mr. Fries, and

18   Mr. Brady discuss or talk on the phone?

19   A.  Do I know if they do?

20   Q.  Yes.

21   A.  Yes.

22   Q.  Frequently?

23   A.  Frequently.

24   Q.  You had mentioned that sometimes suppliers will share

25   information.  Do buyers also share information?

Gregory Finch - Redirect

1   A.   Yes.

2   Q.   Do you know if suppliers share truthful information?

3   A.   We trust they do, but not a hundred percent sure, no.

4   Q.   Do they also sometimes bluff?

5   A.   They do bluff.

6   Q.   Now, Ledford told Roger to be at 9250.  Where did that

7   information come from, Mr. Finch, if you know?

8   A.   I have no personal knowledge of where that came from.

9   Q.   Do know if that is Mr. Ledford speaking directly to

10  Mr. Brady?

11  A.   I do not.

12  Q.   Do you know if that is Roger Austin speaking to Mr. Brady?

13  A.   I do not.

14  Q.   It would be speculative to even know where this came from.

15  A.   Correct.

16  Q.   If you can look at this document and point me to the part

17  where it says that Claxton Poultry has agreed with anyone to

18  maintain or fix a price.

19  A.   It's simply not there.

20  Q.   How many millions of pounds of cars do you buy every year,

21  Mr. Finch?

22  A.   Me personally?

23  Q.   Yes, sir.

24  A.   Not very many.

25  Q.   So does someone with a rudimentary understanding of

Gregory Finch - Redirect

1    negotiating and purchasing an automobile have an understanding

2    of what it means to purchase and negotiate millions of pounds

3    of poultry chicken?

4    A.   No way.

5    Q.   Did the government at any point go to Claxton Poultry and

6    ask for an education in how to go about understanding this case

7    or this industry?

8         MR. KOENIG:  Objection, Your Honor.

9         THE COURT:  Sustained.

10   BY MR. BELLER:

11   Q.   Did defense counsel?  Have I ever been to Claxton Poultry?

12   A.   Yes.

13   Q.   Have I -- did you or somebody at Claxton Poultry give me

14   and these attorneys --

15        MR. KOENIG:  Objection, relevance.

16        THE COURT:  Let's hear the question.

17   BY MR. BELLER:

18   Q.   -- an education as part of interviewing you for your

19   testimony?

20   A.   Yes.

21        MR. KOENIG:  Objection, relevance.

22        THE COURT:  Overruled.

23   A.   Yes.

24   BY MR. BELLER:

25   Q.   You were asked if I prepped you for your testimony.  Have I

Gregory Finch - Redirect

1   interviewed you?

2   A.   Yes.

3   Q.   Have I asked you to teach me this poultry industry?

4   A.   Yes.

5   Q.   Have I asked you for details so as for us to understand how

6   this industry works?

7   A.   Yes.

8   Q.   Is that anything that has ever happened by DOJ to you?

9   A.   No.

10   Q.   Now, you were asked at length about Claxton's strategy of

11   being in the middle of the pricing structure, right?

12   A.   Yes.

13   Q.   The pricing matrix.  And how do you end up in the middle

14   unless you know your competitors' price?  Do you recall that

15   line of question?

16   A.   Yes.

17   Q.   Do you tell your customers that you want to be in the

18   middle?

19   A.   We tell the QSR customer.

20   Q.   The QSR, right?

21   A.   Yeah.

22   Q.   Is that part of just negotiation to say that out front to

23   the customer, to the QSR customer?

24   A.   No.

25   Q.   Do you --

Gregory Finch - Redirect

1          MR. KOENIG:  Objection, foundation.

2          THE COURT:  Overruled.

3   BY MR. BELLER:

4   Q.  Do you rely on the QSR to assist you in offering that

5   directional guidance in telling you where to be?

6   A.  Yes.

7   Q.  Do you follow their direction?

8   A.  Always.

9   Q.  Mr. Finch, you were asked if -- why you would not want

10  Mr. Fries and Mr. Brady to be convicted.  And you were asked if

11  it's because you could potentially -- it could potentially

12  affect your livelihood.  Do you recall that question?

13  A.  Yes.

14  Q.  Is there any other reason why you, Mr. Finch, do not want

15  to see Mr. Fries and Mr. Brady be convicted of a Sherman Act

16  violation of price-fixing?

17  A.  Yeah, because they didn't do it.

18          MR. KOENIG:  Objection, foundation, calls for a

19  conclusion that's up to the jury.

20          THE COURT:  The door was opened.  Overruled.

21  BY MR. BELLER:

22  Q.  I am sorry, if you could answer that question.

23  A.  Sure.  They simply did not do it.

24          MR. BELLER:  Thank you.

25          MR. KOENIG:  Your Honor, may I have one question on

Edward Snyder - Direct

1    recross on the joint network?

2          THE COURT:  No, no.  Mr. Finch, you are excused.

3    Thank you.

4          Next witness.

5          MS. PLETCHER:  Thank you, Your Honor.  We call

6    Professor Edward Snyder.

7          Your Honor, may I approach with binders?

8          THE COURT:  Yes, you may.

9      (**Edward Snyder** was sworn.)

10         THE WITNESS:  I do swear.

11         COURT DEPUTY CLERK:  Please state your name and spell

12   your first and last name for the record.

13         THE WITNESS:  My name is Edward, E-D-W-A-R-D, A.,

14   Snyder, S-N-Y-D-E-R.

15                      **DIRECT EXAMINATION**

16   BY MS. PLETCHER:

17   Q.  Good afternoon, Professor Snyder.

18   A.  Good afternoon.

19   Q.  My name is Anna Pletcher, and I represent Jayson Penn.  We

20   have met before, haven't we?

21   A.  Yes.

22   Q.  It's good to see you today.

23         We are going to start off talking a bit about your

24   background, and we will get into your assignment in this case,

25   your economic analysis, and your conclusions.

3530

Edward Snyder - Direct

1          First, Professor Snyder, would you introduce yourself

2    to the jury.

3    *A.*  Yes.  I am Edward A. Snyder.  I am a professor of economics

4    and management at Yale University where I teach and do

5    research.

6    *Q.*  Thank you, Professor Snyder.  That takes me right into my

7    next question for you.  So you just described where you work;

8    is that right?

9    *A.*  Yes.

10   *Q.*  Have you served in other academic roles?

11   *A.*  Yes.  Until about two and a half years ago I was Dean of

12   the Yale School of Management.  That's the business school at

13   Yale.  Prior to that, I was Dean and professor at the

14   University of Chicago's business school.  And before that, I

15   held the same pair of positions at University of Virginia's

16   Darden School.

17   *Q.*  Professor Snyder, please tell the jury about your

18   educational background.

19   *A.*  Yes.  I grew up going to public schools in Pennsylvania and

20   Massachusetts and Maine.  I went to college in Maine at

21   Colby College.  Then I did my graduate work in public policy

22   and economics at the University of Chicago where I earned my

23   Ph.D. in economics.

24   *Q.*  To earn your Ph.D. in economics, did you write a

25   dissertation?

3531

Edward Snyder - Direct

1    A.   I did.

2    Q.   What was that dissertation about?

3    A.   I studied over 200 criminal antitrust cases brought by the

4    U.S. Department of Justice, the antitrust division, over a

5    14-year period.  And these cases involved consumer products,

6    agricultural products, industrial products, all different parts

7    of the economy.

8    Q.   Do those cases involve bid-rigging and price-fixing?

9    A.   Yes.

10   Q.   Now, where did you start your professional career?

11   A.   I started my professional career at the antitrust division

12   of the U.S. Department of Justice.

13   Q.   And how long did you work there?

14   A.   For over five years.

15   Q.   What did you do?

16   A.   I mainly worked on antitrust cases and antitrust

17   investigations.

18   Q.   What was your title?

19   A.   Staff economist.

20   Q.   Did the investigations that you worked on in the Department

21   of Justice include bid-rigging and price-fixing cases?

22   A.   Yes.  I recall working, for example, with attorneys on

23   potential bid-rigging in highway contracting.

24   Q.   Do you have a specialty within the field of economics?

25   A.   I do.  My specialty is industrial organization.  That's IO

Edward Snyder - Direct

 1   for short.

 2   Q.   What does that mean?

 3   A.   That is the subfield of economics that deals most directly

 4   with antitrust.  IO economists study obviously how industries

 5   are organized, but products, product differentiation, the

 6   interaction between buyers and sellers, distribution, supply

 7   chains, pricing, competitive interactions and the overall

 8   competitive landscape within industries.

 9   Q.   Separate from your work at the Department of Justice -- I

10   am sorry, separate from your work in academics, do you also do

11   consulting on academic matters?

12   A.   Yes.

13   Q.   I am sorry, on antitrust matters.

14   A.   Yes, I do.  I have done antitrust consulting for over three

15   decades, and during that time I've worked on over 30 separate

16   antitrust litigations.

17   Q.   And in those matters, you have been retained as an expert?

18   A.   Yes, I have.

19   Q.   Have you offered expert testimony in court before?

20   A.   Yes, about 12 times.

21   Q.   What kinds of cases have you testified in?

22   A.   In antitrust cases, in cases that draw on my skill as an IO

23   economist.

24   Q.   How many times have you given testimony to a jury?

25   A.   To a jury, three times.

3533

Edward Snyder - Direct

1   *Q.*  Have you ever testified in court in a criminal matter

2   before?

3   *A.*  No.  This is the first.

4   *Q.*  Now, did anyone assist you in conducting your analysis

5   today that you'll be presenting to the jury?

6   *A.*  Yes.  I had a team of people at Analysis Group support me

7   in my work.

8   *Q.*  And what is Analysis Group?

9   *A.*  That's a economics and consulting firm headquartered in

10  Boston but offices around the country and beyond, including an

11  office here in Denver.

12  *Q.*  Professor Snyder, would you please open your binder to

13  what's been marked as H-317.  It should be the first tab.

14  *A.*  Yes.

15  *Q.*  Do you recognize this document?

16  *A.*  This is a recent CV.

17  *Q.*  A CV.  Your curriculum vitae?

18  *A.*  Yes.

19  *Q.*  Does this summarize your professional background that you

20  just told the jury about?

21  *A.*  Yes, it does.

22          *MS. PLETCHER:*  Your Honor, I offer H-317 into

23  evidence.

24          *THE COURT:*  Any objection to the admission of H-317?

25          *MR. TORZILLI:*  It's hearsay.

Edward Snyder - Direct

1          THE COURT:  The objection will be overruled.  H-317 is

2     admitted.

3     BY MS. PLETCHER:

4     Q.  Professor Snyder, at this point we are going to shift gears

5     and talk about your assignment in this case and the approach

6     that you took to it.  So first, Professor Snyder, what were you

7     asked to do in this case?

8     A.  I was asked to conduct economic analyses to try to reach

9     conclusions about whether price-fixing occurred.

10    Q.  Did you reach conclusions?

11    A.  I did.

12    Q.  What was your bottom-line conclusion?

13    A.  Based on objective economic evidence, things that

14    economists analyze, things that I can observe, the evidence

15    contradicts the government's alleged price-fixing.

16         MR. TORZILLI:  I object to this line of questioning.

17    Can we have a side bar?

18         THE COURT:  Yes.

19      (At the bench:)

20         THE COURT:  Mr. Torzilli, go ahead.

21         MR. TORZILLI:  Your Honor, he was just asked whether

22    price-fixing occurred, and he is going to say the evidence says

23    no.  And that not only calls for a legal conclusion, but it is

24    what the jury is here to do, not an expert witness.  And it's

25    also contrary to the disclosures we were provided, including in

Edward Snyder - Direct

 1    Defense Exhibit J-207 which purports to be a summary of the

 2    opinions he is supposed to be testifying to today.

 3         THE COURT:  Ms. Pletcher?

 4         MS. PLETCHER:  Your Honor, we were very clear as to

 5    what Professor Snyder would be testifying to with respect to

 6    his conclusions, and we went over it multiple times.  And the

 7    purpose of his testimony is to explain what he concluded after

 8    his analysis.  He is not testifying to the ultimate result.  He

 9    is testifying to the objective data and what his conclusion

10    shows as to whether there was an illegal agreement or not.

11         THE COURT:  Mr. Torzilli, so part of your objection is

12    that this is an undisclosed opinion?

13         MR. TORZILLI:  Not only that, but he was asked in his

14    opinion basically whether price-fixing occurred.  That's what

15    the jury is supposed to be doing.  And it also calls for a

16    legal conclusion.  I mean, putting aside the question of the

17    disclosure, I mean, had the disclosure been an explicit

18    bottom-line opinion, I am sure we would have filed a motion to

19    exclude that, which seems completely improper for an expert to

20    be providing an expert opinion on.

21         MS. PLETCHER:  Your Honor, if we go back to

22    document 809, which is the Court's order from one of the

23    earlier motions the government filed to exclude

24    Professor Snyder's testimony, the Court explicitly said that

25    Professor Snyder may testify about whether or not his analyses

3536

Edward Snyder - Direct

1       show the existence of a conspiracy.

2               *MR. TORZILLI:*  Your Honor, may I respond to that?

3               *THE COURT:*  Yes.

4               *MR. TORZILLI:*  Yeah.  I think what Your Honor said

5       there was that his testimony was relevant to that element of

6       the offense, not that he could provide an opinion on that

7       element of the offense directly and explicitly.

8               *THE COURT:*  Well, I think it's a foregone conclusion

9       that Professor Snyder was going to be testifying about whether

10      he believed, based upon the evidence that he looks at, whether

11      there has been price-fixing, so I don't find there has been any

12      violation of an ultimate opinion or anything of that nature.

13              Moreover, I do believe that the subject matter and

14      that conclusion of Professor Snyder has been disclosed, so I

15      will overrule the objection.

16          (In open court:)

17      *BY MS. PLETCHER:*

18      *Q.*  Professor Snyder, how did you go about reaching your

19      conclusion in this case?

20      *A.*  My understanding is that the government alleges a

21      price-fixing conspiracy starting in 2012 through 2019 and is

22      focused on particular events during that time period.  And the

23      government, therefore, has a hypothesis that price-fixing

24      occurred.  My approach is then to test that hypothesis.

25      *Q.*  And what did you do to test the hypothesis?

Edward Snyder - Direct

1   *A.*  Testing involves three things:  No. 1, I studied the

2   industry; secondly, I identified questions that I wanted to

3   answer to evaluate the hypothesis; and third, I conducted

4   economic analyses to help me answer those questions.

5   *Q.*  Let's start with that first point you made,

6   Professor Snyder.  What did you do to study the industry?

7           *MR. TORZILLI:*  Your Honor, I am going to object to

8   this question.  May we have a side bar?  I think this violates

9   the order from earlier today.

10          *THE COURT:*  All right.  We can have a side bar.

11      (At the bench:)

12          *THE COURT:*  Mr. Torzilli?

13          *MR. TORZILLI:*  Your Honor, I thought we just went

14  through that they were asking about communications, but now he

15  said he studied the industry, which means that he doesn't, as

16  far as I know, slaughter chickens or buy chickens or sell

17  chickens, so he learned this from somewhere, including

18  potentially through communications that were barred from

19  cross-examining him on.  So this seems extraordinarily unfair

20  that he is able to testify to information on direct but we're

21  not able to confront him with potentially contrary information

22  on cross-examination.

23          *THE COURT:*  Well, he is not, you know, a professor of

24  chickens, so obviously he had to do homework in order to

25  understand the industry just like anyone would.  There is

Edward Snyder - Direct

 1   absolutely no implication that his studying the industry meant

 2   that he has specifically delved into the ins and outs of the

 3   documents.  In fact, Ms. Pletcher said the only reason he

 4   looked at those was he needed to be prepared for possible

 5   cross-examination, so the objection will be overruled.

 6        (In open court:)

 7   BY MS. PLETCHER:

 8   Q.   Professor Snyder, I will ask you that question again.  What

 9   did you do to study the industry?

10   A.   Well, at a broad level, I studied the products, product

11   differentiation, who were the buyers, who were the suppliers,

12   what kind of interactions did the buyers and suppliers have,

13   what were the relevant demand and supply factors in this

14   industry.  And then after that broad study, I focused on

15   outcomes.

16   Q.   What do you mean by the term "outcomes"?

17   A.   I mean the outcomes of the bidding and negotiation

18   processes that I can observe, what were the bids, what were the

19   final prices.  It also involves who sold to what at what

20   volumes, but these are objective economic data that I would put

21   under the category of outcomes.

22   Q.   After studying the industry, Professor Snyder, you

23   mentioned that there were specific questions you honed in on

24   that you wanted to answer.  What were those questions?

25   A.   I had three questions, and I prepared a slide for that

Edward Snyder - Direct

1   purpose.

2   *Q.*  Professor Snyder, I am going to show you what has been

3   marked for identification as J-206.  It should be in your

4   binder in front of you.

5   *A.*  Yes.

6   *Q.*  Do you recognize this document?

7   *A.*  Yes.  This is the slide that I prepared.

8   *Q.*  Will this slide assist you in explaining to the jury how it

9   is that you approached your assignment in this case?

10  *A.*  Yes.

11          *MS. PLETCHER:*  Your Honor, may I display J-206 for

12  demonstrative purposes only?

13          *THE COURT:*  Any objection to the admission of or

14  displaying of J-206 for demonstrative purposes?

15          *MR. TORZILLI:*  No objection to its display.

16          *THE COURT:*  J-206 may be displayed for demonstrative

17  purposes only.

18          *MS. PLETCHER:*  May it be published, please?

19          *THE COURT:*  Yes.

20  *BY MS. PLETCHER:*

21  *Q.*  Professor Snyder, what is the first question that you

22  wanted to answer in your analysis?

23  *A.*  The first question is -- given the government's hypothesis

24  and the outcomes that they highlighted, the first question is,

25  are there alternative explanations for those outcomes.

Edward Snyder - Direct

1    Q.  What do you mean by the term "alternative explanations"?

2    A.  I mean very simply that if you see, for example, a price

3    increase, that could be due to price-fixing, but it also could

4    be due to increased demand, limitations on supply, related

5    problems in supply chain, general inflation and so forth.

6    Those other factors represent alternative explanations for the

7    price increase.

8    Q.  Is examining alternative explanations as you did in this

9    case, is that the type of analysis that economists customarily

10   engage in?

11   A.  That is pretty much the bread and butter of what IO

12   economists do.  They observe something in the marketplace,

13   consider what possible explanations there are for that

14   observation.

15   Q.  Now, let's turn to the second question that you examined,

16   Professor Snyder.  What is that second question?

17   A.  Second is do information exchanges indicate bid-rigging or

18   price-fixing.

19   Q.  What do you mean by the term "information exchange"?

20   A.  Information exchange means to me, as an economist, exchange

21   of information between and among industry participants.  It can

22   go in different directions concerning things like prices,

23   market conditions, expected changes in demand and supply, and

24   you can also get information sharing or information exchange in

25   the context of negotiations and contract negotiations.

Edward Snyder - Direct

1    Q.  When you use the term "industry participants," does that

2    include both buyers and suppliers?

3    A.  Yes.

4    Q.  Now, are information exchanges a topic that economists

5    customarily study?

6    A.  Yes.  And information itself is something that economists

7    have studied for a long time.  One of my former professors,

8    George Stigler, won the Nobel Prize, wrote -- 61 years ago

9    wrote a very famous article called The Economics of

10   Information.  And since then economists have been studying the

11   role of information in lots of different market settings.

12          Earlier this week I checked, that article has been

13   cited nearly 12,000 times by economists, which is an indication

14   of how much effort economists put into studying the role of

15   information.

16   Q.  Shifting to your third question that's on this slide,

17   Professor Snyder, what was the third question that you focused

18   on?

19   A.  The third question is, do economic analyses indicate

20   bid-rigging or price-fixing, and here the economic analyses

21   deal with objective data.

22   Q.  Was one of those analyses that you studied analysis of bids

23   and prices specifically related to KFC 2015 and 2013 contracts

24   in this case?

25   A.  Yes.

Edward Snyder - Direct

1    *Q.*  Did you also conduct a benchmarking analysis?

2    *A.*  I did conduct a benchmarking analysis.  That's a standard

3    tool used by economists.

4    *Q.*  Did you reach a conclusion on these three questions that

5    you studied?

6    *A.*  Yes.  And I believe I prepared another chart with those

7    conclusions.

8    *Q.*  If you can turn, Professor Snyder, to J-207 in your binder.

9    Do you recognize this document?

10   *A.*  Yes.  That's the summary of conclusions that I prepared.

11   *Q.*  Would this slide assist you in explaining to the jury the

12   conclusions you reached with respect to these specific

13   analyses?

14   *A.*  Yes.

15        *MS. PLETCHER:*  Your Honor, I would ask to publish

16   Exhibit J-207 for demonstrative purposes only.

17        *THE COURT:*  Any objection to the publication of J-207

18   for demonstrative purposes?

19        *MR. TORZILLI:*  No, Your Honor.

20        *THE COURT:*  That may take place.

21        *MS. PLETCHER:*  Thank you.

22   *BY MS. PLETCHER:*

23   *Q.*  Professor Snyder, would you summarize for the jury the

24   conclusions that you reached with respect to each of these

25   three questions.

Edward Snyder - Direct

1   *A.*   Yes.  First, there are simple and reasonable explanations

2   supported by the economics for various observed outcomes, and

3   these alternative explanations are unrelated to the alleged

4   bid-rigging or price-fixing.

5   *Q.*   And with respect to the second question, what was your

6   conclusion?

7   *A.*   Information exchange is expected in the broiler chicken

8   industry, and, therefore, it's not an indicator of bid-rigging

9   or price-fixing.

10  *Q.*   And the conclusion you reached with respect to the third

11  question?

12  *A.*   My economic analyses yield economic evidence that -- where

13  that evidence does not line up with the government's theory

14  about alleged price-fixing.

15  *Q.*   Professor Snyder, now we've heard the summary of your

16  conclusions.  At this point, we would like to shift gears and

17  get into the details of your analysis.  Let's start by looking

18  at the very first question that you examined.  Can you remind

19  the jury what that first question is that you looked at?

20  *A.*   The first question, again, is, are there alternative

21  explanations for observed outcomes that the government has

22  highlighted.

23  *Q.*   Specifically, what observed outcomes did you analyze in

24  this case?

25  *A.*   Well, for example, the observed outcomes in the context of

Edward Snyder - Direct

1    the 2015 KFC contract negotiations.

2    *Q.*  What analysis did you conduct related to that KFC 2015 COB

3    contract?

4    *A.*  Well, the first analysis I did was historical.

5    *Q.*  What do you mean by "historical" analysis?

6    *A.*  Well, I wanted to understand price movements, price

7    fluctuations over a long period of time, so I studied those for

8    a 15-year period that began back in 2005 and runs through 2019.

9    And that time period includes changes in prices before the

10   period of alleged price-fixing, as well as the years during the

11   period.

12   *Q.*  Why did you start with a historical analysis?

13   *A.*  A historical analysis helps me assess whether a particular

14   price change is an anomaly or whether it fits into the pattern

15   of what you see in other periods where you would expect those

16   price changes are caused by changes in demand and supply.

17   *Q.*  And what did you find when you conducted the historical

18   price analysis in this case?

19   *A.*  Well, I found that the 2015 price increase substantial, it

20   looks pretty similar to price increases in the before period in

21   2008 and 2010.  I also saw patterns where prices fell during

22   both the during period and the previous period.

23   *Q.*  Professor Snyder, do you have a chart that depicts your

24   analysis and your findings?

25   *A.*  I do.

Edward Snyder - Direct

1    *Q.*  I am going to ask you to turn to Exhibit J-208 in your

2    binder.

3    *A.*  Yes.

4    *Q.*  Is this the chart that we just referred to?

5    *A.*  Yes.

6    *Q.*  Who prepared this chart?

7    *A.*  The team at Analysis Group prepared the chart at my

8    direction.

9    *Q.*  What data was used for this chart?

10   *A.*  The data are as follows, and there are a couple basic steps

11   to this methodology.  One is to -- once I got the monthly data

12   that showed the prices charged by KFC -- excuse me, charged to

13   KFC by Pilgrim's Pride, I checked the underlying transaction

14   data for Pilgrim's Pride to make sure that those monthly

15   average data were accurate.  Then I aggregated the monthly data

16   up to annual data, and I made sure those were accurate.  Then I

17   took -- now then having an average annual price, I took the

18   price change from year to year.  And that's what's displayed in

19   this particular chart, annual price changes based on average

20   prices from year to year.

21        *MS. PLETCHER:*  Your Honor, at this point, I would move

22   to admit Exhibit J-208 into evidence.

23        *THE COURT:*  Any objection to the admission of J-208?

24        *MR. TORZILLI:*  No objection.

25        *THE COURT:*  No objection?

Edward Snyder - Direct

1          MR. TORZILLI:  No objection.

2          THE COURT:  Exhibit J-208 will be admitted.

3          MS. PLETCHER:  Thank you, Your Honor.  May we publish?

4          THE COURT:  You may.

5     BY MS. PLETCHER:

6     Q.  Now, at the outset, Professor Snyder, you mentioned that

7     this chart reflects Pilgrim's Pride data.  Why did you use

8     Pilgrim's Pride data for this chart?

9     A.  Because Pilgrim's is a substantial supplier.  No. 2, I had

10    very detailed data for Pilgrim's, and my team and I deemed that

11    those data were reliable.

12    Q.  Now, Professor Snyder, this chart is up in front of the

13    jury at this point.  Could you please describe to the jury what

14    it is that this chart shows.

15    A.  So this chart shows annual price changes where the prices

16    in question are the prices that Pilgrim's charged KFC, and the

17    product in question is small-bird, eight-piece COB.  And the

18    chart starts with 2005, runs through 2019.  And the bars show,

19    if they are above the zero line, that indicates that the prices

20    went up in that particular year compared to the previous year;

21    and if the bars are below the line, that indicates that prices

22    in that given year went down relative to the previous year.

23    Q.  Okay.  So let me make sure I understand what's happening

24    here.  Are these price increases from one year to the next?

25    A.  That is correct.  So, for example, in 2014, you see the

Edward Snyder - Direct

1    minus 6 percent, that indicates that prices in 2014 fell

2    6 percent from the previous year 2013.

3    Q.  Professor Snyder, can you explain what this chart shows in

4    terms of your overall analysis in this case?

5    A.  Well, I can't tell you what it shows in terms of my overall

6    analysis yet, but what it does is as follows:  It suggests to

7    me that the 2015 price increase may not be an anomaly.  It's

8    not that different from what you see in 2008.  It's not that

9    different from what you see in 2010.  So it suggests to me that

10   I should do an analysis to see if factors other than the

11   alleged price-fixing caused that 2015 price increase.  And

12   those factors for an economist start with demand and supply.

13   Q.  Professor Snyder, I want to be clear, I think you mentioned

14   there was an increase in 2010.  Did you mean there was an

15   increase in 2011?

16   A.  Correct.  I meant 2008 and 2011.

17   Q.  Now, there are also price decreases on this chart as well;

18   is that right?

19   A.  Yes.  Prices are moving around a lot.

20   Q.  So why do we see these types of price fluctuations over a

21   period of time in this case?

22   A.  Well, one thing that economists have learned is that

23   agricultural prices in particular shift around a lot.  In

24   general, prices will shift when demand and supply factors

25   change.  But in agricultural markets, you have a specific

Edward Snyder - Direct

1  factor that contributes to price fluctuations, and that factor

2  is that the investment decisions are made well before the

3  supply of the agricultural products is actually made.  And that

4  difference between when the investment decisions are made and

5  when they are supplied actually generates the potential that

6  the expectations were off.  Suppliers could undershoot or they

7  could overshoot generating actual price changes.

8  Q.  Is there literature, economic literature on this point?

9  A.  Yes.  I mean, having observed these big price swings in

10  agricultural markets for decades, if not centuries, economists

11  and others wondered why this was happening.  And back in 1934,

12  economists developed something called the cobweb model that

13  says prices move around, and the driver for this particular

14  model is exactly the factor I just mentioned.  There is a

15  difference between when the investment decisions are made and

16  when supplies come to market.  The expectations behind those

17  investment decisions can be correct, but they can also be off,

18  undershooting, overshooting.

19  Q.  How do factors like weather factor into price, if at all?

20  A.  That's another factor that's, of course, important to

21  agriculture.  You get shocks.  So even if you planned correctly

22  and invested correctly, if there is a weather shock, a drought,

23  you may not have the supplies that come out -- that would have

24  been expected to come out of those investments.

25  Q.  So given what you have just explained, Professor Snyder,

Edward Snyder - Direct

1    what, if anything, does this chart tell you about the

2    hypothesis that you set out to test here?

3    A.  Well, it suggests to me an alternative hypothesis.  It

4    doesn't tell me that that alternative explanation is right, but

5    it suggests where to look, and that's at the changes in demand

6    and changes in supply.

7    Q.  Let's talk about your analysis of demand and supply in this

8    particular market.  Did you conduct such an analysis?

9    A.  I did, and I believe I have a chart that I prepared to

10   summarize the change in demand that you saw leading up to 2015

11   and two supply factors that are also relevant leading up to

12   2015.

13   Q.  Professor Snyder, would you look at Exhibit J-209 in the

14   binder.

15   A.  Yes.

16   Q.  What is this slide?

17   A.  This is a slide that I prepared to summarize what I found

18   on the demand side and what I found on the supply side.

19   Q.  Would this slide assist you in explaining your findings to

20   the jury?

21   A.  I hope so, yes.

22        MS. PLETCHER:  Your Honor, I ask to publish J-209 for

23   demonstrative purposes only.

24        THE COURT:  Any objection by the government?

25        MR. TORZILLI:  No, sir.

Edward Snyder - Direct

1        THE COURT:  Then J-209 may be displayed for

2    demonstrative purposes only.

3    BY MS. PLETCHER:

4    Q.  Professor Snyder, what does this slide explain?

5    A.  No. 1, demand.  Demand for chickens, including small birds,

6    increased leading up to 2015.

7    Q.  And what does it explain with respect to your findings on

8    supply?

9    A.  On the supply side, among other factors, I investigated

10   two.  One is that there was a lower stock of so-called breeder

11   birds going into that time period, and there were lower

12   margins, profit margins on small birds compared to big birds.

13   Put differently, big birds were more profitable than small

14   birds.

15   Q.  So let's focus in on your first bullet point here, demand.

16   Could you please explain to the jury what you mean when you

17   said that demand for chickens was increasing leading up to

18   2015.

19   A.  Well, here is the underlying economics.  The demand for a

20   given product will depend in part on close substitutes.  And

21   for chicken, the closest substitutes are beef and pork.  And my

22   analysis shows that the wholesale prices for beef and pork were

23   rising relative to chicken.  That means that some consumers at

24   least are encouraged to shift from beef and pork to chicken.

25   That means greater demand for chicken.  When demand goes up,

                                                                                    3551
Edward Snyder - Direct

1    prices are expected to follow.

2    Q.   Professor Snyder, do you have a chart that shows your

3    analysis?

4    A.   Yes, I do.

5    Q.   I am going to ask you to look at Exhibit J-210 in your

6    binder.

7    A.   Yes.

8    Q.   What is this?

9    A.   This is a chart that my team at Analysis Group prepared at

10   my direction.  It shows how the prices of three meats changed

11   relative to each other over time starting in 2010 through 2016.

12   Q.   And what data was used for this chart?

13   A.   For the wholesale prices of beef and pork, those data came

14   from the U.S. Department of Agriculture.  And then for chicken,

15   I used the Pilgrim's Pride data that I referred to earlier.

16   Q.   And how did you and your team verify that this chart is

17   accurate?

18   A.   Well, for the USDA data, it was really making sure that we

19   read the reports correctly and depicted the data accurately.

20   And then for the Pilgrim's COB pricing to KFC, I used the

21   underlying transaction data and verified that by checking, for

22   example, monthly prices versus contracts to make sure that they

23   were consistent.

24          MS. PLETCHER:  Your Honor, at this point, we move to

25   admit Exhibit J-210 into evidence.

Edward Snyder - Direct

1              THE COURT:  Any objection to the admission of J-210?

2              MR. TORZILLI:  The title is argumentative.  If the

3    titles were redacted, we would have no objection to its

4    admission.

5              THE COURT:  Ms. Pletcher, any comment on that?

6              MS. PLETCHER:  Your Honor, the title is just a neutral

7    description of what's in the chart.  I don't see it as

8    argumentative.

9              THE COURT:  Anything more, Mr. Torzilli?

10             MR. TORZILLI:  Yes.  May I be heard on side bar?

11             THE COURT:  Yes.

12        (At the bench:)

13             THE COURT:  Mr. Torzilli, go ahead.

14             MR. TORZILLI:  So the title here or at least the last

15   two words of the title are "increasing demand," which is the

16   argument that the witness wants to make from the information

17   reflected.  As you can see, the information reflected has

18   nothing to do with demand on its face.  It's a listing of

19   prices for three different industries over time.  So although

20   the argument is that demand is increasing, the information

21   below is all about a price trend.

22             His argument, his hypothesis is this shows increasing

23   demand, so that's the argument content of the slide.  So I

24   would maintain that if the title or the words "increasing

25   demand" were redacted, we would have no problem with its

3553

Edward Snyder - Direct

1    admission into evidence.

2         THE COURT: Anything else, Ms. Pletcher?

3         MS. PLETCHER: I still think it's a neutral

4    explanation, but if Your Honor is inclined to disallow the

5    slide for that reason, then I would just redact the word

6    "increasing" if that satisfies Mr. Torzilli's issue.

7         MR. TORZILLI: The other issue is "demand." I mean,

8    this is a slide about prices. His argument that that is a --

9    you know, an inferential leak from prices is this says

10   something about demand, but the actual what is reflected, the

11   data that's reflected, the underlying information reflected is

12   prices, not demand.

13        MR. McLOUGHLIN: Your Honor, this is Jim McLoughlin.

14   As Professor Snyder testified, it is economics 101 that when

15   the price of a substitute good goes up, then other substitutes,

16   the demand increases. So the government is here arguing about

17   angels on the head of a pin in terms of Professor Snyder's

18   testimony versus a label on a chart.

19        THE COURT: All right. The government's objection to

20   the title is sustained. There is a factual basis for the

21   chart, but the jury doesn't need to know about his slide deck

22   and his explanation, No. 1, or that type of thing. That is

23   part of his presentation. It's not relevant. It can be shown

24   obviously for demonstrative purposes.

25        But so given that Ms. Pletcher has offered to redact

Edward Snyder - Direct

 1   the title of the slide, the rest of J-210 will be admitted for

 2   all purposes.

 3       *MS. PLETCHER:*  Thank you, Your Honor.  May we display

 4   it as redacted?

 5      (In open court:)

 6       *THE COURT:*  J-210, other than the top title, will be

 7   admitted.

 8       *MS. PLETCHER:*  Thank you, Your Honor.  May it be

 9   published as redacted?

10       *THE COURT:*  Yes, it may.

11   BY *MS. PLETCHER:*

12   *Q.*  Professor Snyder, the jury is now able to view your chart.

13   Can you explain to the jury what it shows?

14   *A.*  Yes.  This chart uses a tool called price index, and it

15   shows how the prices for beef and pork were changing relative

16   to prices paid by KFC for eight-piece COB from Pilgrim's Pride.

17   It starts out in year 2010 and continues through 2016.

18   *Q.*  What do you mean when you say a "price index"?

19   *A.*  These are not actual prices for the three meats.  Instead,

20   the way a price index works is it starts all the products out

21   at a dollar here in 2010, two years before the beginning of the

22   alleged conspiracy, and you can think of that as what's a

23   dollar's worth of beef get you in 2010.  Same thing for pork.

24   Same thing for chicken supplied to KFC.  And then it asks the

25   question, to get that same amount of the protein, what do you

Edward Snyder - Direct

1   have to pay relative to that dollar.  So it tracks how those

2   relative prices change over time.

3   Q.  And why is it relevant to your analysis to look at this

4   historical price sequence?

5   A.  Well, it lays the groundwork for understanding why the

6   demand for chicken was rising.  It also -- and I mean by that

7   in the period of time leading up to the 2015 contract

8   negotiations.  But it also just gives you a sense of what's

9   happening to this price paid by KFC over time.  And one

10  observation I have is it's not actually keeping up very well

11  with the prices of beef and pork.

12  Q.  And what do you mean by that, the price of chicken is not

13  keeping up?

14  A.  Well, they start out in 2010, as I said, at the same level,

15  a dollar, and they track somewhat closely, but you see around

16  2012 a gap opening up between the red, which is the price of

17  chicken paid by KFC, and especially beef.  So that chicken

18  price paid by KFC is not keeping up with beef.  And then around

19  2013, you start to see the same kind of gap opening up with

20  pork.

21  Q.  And how do you explain the timing of the price increase

22  here?  There is a jump in the red line at 2015.  How do you

23  explain the timing of that price increase?

24  A.  Well, the big gaps between beef and pork versus chicken

25  would increase based on standard economics.  That would

1   increase the demand for chicken which would be expected to

2   increase the price of chicken.

3          Now, as to the timing, why does it happen then?  Well,

4   I am not -- I can't give a complete answer.  It could have come

5   earlier, but what's happening with that sharp increase in the

6   red line beginning in January 2015, that reflects the contract

7   negotiations in the period of time shaded in gray, so those

8   contract negotiations are happening in 2014 based on the

9   documents I reviewed.

10         And then the higher prices for chicken go into effect

11   the following January.

12  *Q.*  Professor Snyder, at this point I am going to shift to

13   talking about supply.

14         *MS. PLETCHER:*  I am mindful of the time, though, Your

15   Honor, and this would be a good time for a break if it works.

16         *THE COURT:*  This would be before we shift to supply.

17   Ladies and Gentlemen, we will go ahead and take the

18   mid-afternoon break.  We will reconvene at 3:30.  Thank you.

19         (Jury excused.)

20         *THE COURT:*  We will be in recess.  Thank you.

21      (Recess at 3:15 p.m. until 3:47 p.m.)

22         *THE COURT:*  Mr. Torzilli?

23         *MR. TORZILLI:*  May I raise one issue before the jury

24   comes in outside the presence of the witness?

25         *THE COURT:*  You will have that opportunity in just a

1    minute, but a more pertinent matter is that one of the jurors

2    is ill.  Ms. Caroll is not feeling well, but she thinks she

3    will get better by Monday, but she is not capable of continuing

4    today.  Ms. Grimm took her outside to let her get some fresh

5    air, but she just is not feeling well enough to continue, so we

6    are going to have to adjourn for the day.

7              So what I am going to do is I am going to bring the

8    rest of the jury in.  Ms. Grimm has reminded Ms. Carroll to

9    follow the admonitions over the weekend.  I am going to bring

10   the rest of the jurors in and give them the same admonition

11   that I have in the past and to be careful on the weekend, and

12   then I'll excuse them.  And then we'll take up whatever other

13   issues that we have.

14             So let me go ahead and -- Professor Snyder, you can

15   stay or leave, to tell you the truth, whatever you prefer, but

16   you won't be testifying any more today, unfortunately, but we

17   will go ahead and bring the jury in at this time.

18             *THE WITNESS:*  Thank you, Your Honor.

19             (Jury present.)

20             *THE COURT:*  So, Ladies and Gentlemen, as some of you

21   may know, maybe all of you know, Ms. Carroll is not feeling

22   well.  And what we're going to do, because I anticipate,

23   Ms. Carroll anticipates that she'll be better, and as you know,

24   we don't have trial tomorrow, we are going to be resuming on

25   Monday, so I am going to let you go for the day.

1            Keep -- just as I mentioned to you last Thursday, be

2    especially vigilant over the weekend because you may come in

3    contact with more people tomorrow if you go back to work or

4    over the weekend.  And don't let them, you know, talk to you

5    about, like, you're still in that trial?  What's going on?  Or

6    any of those types of things that they might naturally ask

7    about, but which you have to, you know, keep up the defenses.

8    Don't start talking to those people.  Don't listen to them.

9    Just tell them you can't hear what they have to say, can't talk

10   about it whatsoever, and do all those other things that I told

11   you about too.

12           Don't start looking up stuff.  Don't start doing your

13   own economic analysis, any of those types of things, all right,

14   because you just, you know, listen to the end.  When you get to

15   the deliberation phase, you will be able to talk among

16   yourselves about those things, okay?

17           Of course, we've got another snowstorm brewing up for

18   Monday as you would have it, but anyway, I don't know exactly

19   what the weather will be like, but hopefully it will allow you

20   all to get in here on time.  If for some reason -- I haven't

21   looked at the weather at all.  But if for some reason it's a

22   bad one, you will all be contacted by phone.  So if the

23   forecast looks bad, make sure that you have your phones on even

24   if you might not otherwise have them on overnight just in case,

25   okay?

1           Hope you have a good Friday and the rest of the

2   weekend.   The jury is excused.

3           (Jury excused.)

4           THE COURT:  Let me mention one thing before I hear

5   from Mr. Torzilli, and that was on J-210, so J-210 was offered

6   for all purposes, and I sustained an objection to the title.  I

7   want to be clear, with this type of a slide, Professor Snyder

8   can certainly -- we can display the title for demonstrative

9   purposes while he is testifying.  It's just that the title part

10  of it, assuming there is another objection sustained as to it,

11  wouldn't go back to the jury.

12          But, obviously, the -- you know, his -- following his

13  outline of his analysis, the fact that it says explanation

14  No. 1 would be relevant to that.  So in the future if we have

15  something like that, the title can be displayed.  It just

16  wouldn't be admitted.

17          Mr. Torzilli, your issue?

18          MR. TORZILLI:  Very briefly, and this comes from the

19  wing of I am doing my best to follow Your Honor's guidance on

20  what is or isn't permissible in the cross-examination of this

21  witness.  So I had until probably about 3:10 p.m. this

22  afternoon been planning to just confirm with the witness on

23  cross-examination that he, in essence, didn't rely on any

24  evidence in the case because of the discussion that we had had

25  about, you know, not getting into documents and so forth.  But

1    the witness testified that he has indeed reviewed documents

2    that he has relied on as part of the analysis that leads to his

3    opinions in this case.

4         So I would appreciate Your Honor's guidance on what is

5    or isn't permissible.  But my plan would be then to inquire of

6    him to confirm what he did review as evidence in this case,

7    including documents, versus what he didn't review and who

8    provided him the information in terms of the information that

9    was presented to him for his review.

10        THE COURT:  Well, you know, in a civil case, there

11   would be probably a robust disclosure of all that information.

12   Obviously, I don't know, but I would anticipate he would have

13   looked at pricing information because he needs to know --

14   perhaps he looked at final contract prices, or we know that one

15   of his slides has, I think, maybe even bid prices, I am not

16   sure, but that, of course, would be natural to someone who is

17   looking at price information.

18        However, it wouldn't have been necessary or probably

19   expected that he would look at e-mail exchanges between people

20   to be able to derive that information.

21        MR. TORZILLI:  It arose in the context of the price

22   slide with the demand title, because it now appears that that

23   gray shading that he testified relates to when the negotiations

24   occurred.  He said that he was able to derive that based on

25   documents he reviewed.  So you don't get that information from

3561

1    contracts.  You are getting that from presumably e-mail

2    communications about when the negotiations began and what was

3    happening during the course of the negotiations.  So it seems

4    to go beyond price data and finalized contracts, which

5    obviously come at the end of the bidding and negotiation

6    process.

7         THE COURT:  All right.  Perhaps Ms. Pletcher knows

8    where he derived the information to put in the gray bar on

9    J-210.

10        MS. PLETCHER:  I do.  Thank you, Your Honor.

11        I noted the ambiguity in Professor Snyder's answer and

12   was going to clear that up first thing to make clear that he

13   looked at contracts and bids, and some bids are communications

14   that contained the bidding numbers in it, and he was focused in

15   on the bids, so that is what he was looking at.

16        To the extent that a bid period opened on a particular

17   time, that was the time that he would use for this negotiation

18   process.  So business transaction-type stuff, nothing related

19   to e-mails, texts that were communications that are otherwise

20   substantive.

21        THE COURT:  Ms. Pletcher, in terms of bid documents

22   that he looked at, what do those consist of specifically, do

23   you know?  Would it be like what we have seen before, cover

24   memo, here is --

25        MS. PLETCHER:  That is exactly right, a cover memo

1    transmitting a cost model, for example, that has bids in it.

2         THE COURT:  Did he look at other categories of

3    documents to derive that information?

4         MS. PLETCHER:  To my knowledge, not to derive that

5    type of information.  As I was very -- explained to Your Honor,

6    we did prepare him for potential cross-examination on certain

7    communications that we thought might come up, but that was not

8    what -- where he derived the data for these analyses that you

9    are seeing here.

10        THE COURT:  Mr. Torzilli, anything else?  Does that

11   help?

12        MR. TORZILLI:  Nothing further.  I do want liberty to

13   inquire about the specifics of what he reviewed and didn't

14   review in connection with the analysis he conducted.

15        THE COURT:  Well, what I would say is you can

16   obviously ask him what he reviewed.  That's fine.  Remember,

17   though, that Ms. Pletcher has prepared him on certain

18   categories of documents that are really not fair game.

19        MR. TORZILLI:  To be clear, Your Honor, I want to ask

20   him about what he reviewed or didn't review for purposes of

21   relying on information that led up to the opinions that are

22   embodied in his testimony, not about preparation for, you know,

23   hypothetical cross-examination questions.

24        THE COURT:  Right.  But then you would have to be

25   careful about asking him what he didn't review if what you plan

1    on asking him are all those categories of e-mails that are --

2    we have already talked about as being inappropriate topics of

3    cross-examination.

4         Mr. McLoughlin?

5         *MR. McLOUGHLIN:*  Your Honor, I just wanted to state

6    for the record, because this has the possibility of spinning

7    out into a lengthy inquiry about everything an expert may have

8    looked at, I think the relevant circumstance or the relevant

9    question is what you relied upon in coming to your conclusions,

10   the preparation of your opinion and the preparation of your

11   slides and the rest of it.  That is a very, very clean,

12   noncontroversial distinction that allows everybody to know

13   where the lines are and gives the government, I think, all the

14   cross-examination they want because they can cross-examine on

15   anything that's the basis of his opinion.

16        When we start getting into, did you look at this and

17   did you look at that, then there are no lines.  So I would make

18   that observation for the record, Your Honor.

19        *THE COURT:*  Yeah, it could be, but there may be

20   categories of information that don't have anything to do with

21   those controversial e-mails that are perfectly fair game for

22   the government to inquire about, because if he didn't take them

23   into account, it may undermine the opinion.  But once again, we

24   are not getting into those specific documents.

25        Ms. Pletcher, anything else?

3564

1          *MS. PLETCHER:*  Yes, Your Honor.  On a slightly

2    different topic, I wonder if the Court would consider

3    continuing Professor Snyder's testimony via VTC on Monday.  The

4    reason we had to move up his testimony today had to do with

5    some challenging family issues that came up unexpectedly.

6          *THE COURT:*  Right.

7          *MS. PLETCHER:*  It would be very difficult for him to

8    make it back on Monday.  We were hoping we could finish today,

9    but obviously the timing didn't work out.

10         *THE COURT:*  Are those difficult issues that present

11   for him on Tuesday?

12         *MS. PLETCHER:*  They arise more later in the week, Your

13   Honor.  I would have to go back and check on the specific days

14   that are the most difficult for him.  He did inquire if I could

15   ask you if it was possible just to continue on Monday, would

16   significantly relieve the issues that he is experiencing.

17         *THE COURT:*  I am sorry?

18         *MS. PLETCHER:*  For him to continue on VTC on Monday

19   would significantly relieve the challenges that he would face

20   if he had to come back.

21         *THE COURT:*  Mr. Torzilli?

22         *MR. TORZILLI:*  Obviously, we are a little in the dark

23   as far as the nature of the issues and so forth, but just given

24   the information that we know now, we would ask that he be here

25   on Monday to continue with his examination.

3565

1          THE COURT:  Well, let's see if we can work this out.

2     I have no doubt that Professor Snyder has got some issues,

3     because, otherwise, you know, he would magically be available

4     for direct, but not cross, but that doesn't seem to be the case

5     at all.  So let's see if we can't work it out.

6          For instance, I have got to look back at my witness

7     list.  Yes, Ms. Becker, Ms. Becker's cross-examination, it

8     worked out just fine.  It really did.  And the direct too.  As

9     long as you solve the technical problems, the video quality,

10    the audio quality is really good, and for that reason I really

11    believe that the effectiveness of both the direct and the cross

12    by VTC would not cause any issues, certainly for the jury.

13         I know that the government, you would always prefer to

14    have someone live, but in light of what seems to be some type

15    of a personal issue, and it's been one that's been flagged for

16    some time, I would hope that the parties can try to work that

17    out.  And maybe if it's possible for the government to know a

18    little bit more about the issue, it might help to weigh their

19    decision.

20         Let's see if you can work that out, because, really,

21    things have come a long way in terms of video technology.

22         MS. PLETCHER:  Thank you, Your Honor.  We will confer

23    with the government.

24         THE COURT:  Is that all right with you, Mr. Torzilli?

25         MR. TORZILLI:  I am happy to confer with Ms. Pletcher.

3566

1          *THE COURT:*  Anything else to take up?

2          All right.  We will be in recess then until Monday at

3     8:30.  And then on the video VTC issue, let's try to -- if I

4     need to make a decision about that, let's try to have it so

5     that I can do that before Friday at 5:00, decision before

6     Friday at 5:00, not filing it Friday at 5:00, so we don't have

7     to have witnesses worrying about this over the weekend.

8          We will be in recess, then.  Thank you.

9        (Recess at 4:05 p.m.)

10                              INDEX

11   WITNESSES

12      Gregory Finch

13          Direct Examination Continued By Mr. Beller      3342

14          Cross-examination By Mr. Koenig                 3450

15          Redirect Examination By Mr. Beller              3516

16      Edward Snyder

17          Direct Examination By Ms. Pletcher              3529

18

19

20

21

22

23

24

25

| 1 | INDEX (Continued) |
| 2 | EXHIBITS |

| 3 | Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---|---------|---------|----------|---------|----------|-----------|
| 4 | J-041 | | 3387 | | | |
| 5 | J-046 | | 3374 | | | |
| 6 | J-208 | | 3546 | | | |
| 7 | J-210 | | 3554 | | | |
| 8 | I-296 | | 3351 | | | |
| 9 | I-297 | | 3351 | | | |
| 10 | H-317 | | 3534 | | | |
| 11 | A-552 | | 3349 | | | |
| 12 | A-553 | | 3349 | | | |
| 13 | 6046 | | 3490 | | | |
| 14 | 10651 | | 3504 | | | |

| 15 | REPORTER'S CERTIFICATE |

16    I certify that the foregoing is a correct transcript from

17  the record of proceedings in the above-entitled matter.  Dated

18  at Denver, Colorado, this 1st day of June, 2022.

19

20                              S/Janet M. Coppock

21

22

23

24

25