1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
2
   Criminal Action No. 20-CR-00152-PAB
3  In Re: Penn III

4  UNITED STATES OF AMERICA,

5       Plaintiff,

6  vs.

7  JAYSON JEFFREY PENN,
   MIKELL REEVE FRIES,
8  SCOTT JAMES BRADY,
   ROGER BORN AUSTIN,
9  WILLIAM WADE LOVETTE,

10      Defendants
   _____

11                  REPORTER'S TRANSCRIPT
12                   Trial to Jury, Vol. 3
   _____

13

14         Proceedings before the HONORABLE PHILIP A. BRIMMER,

15  Chief Judge, United States District Court for the District of

16  Colorado, commencing at 8:25 a.m., on the 8th day of June,

17  2022, in Courtroom A201, United States Courthouse, Denver,

18  Colorado.

19

20

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
    Produced via Computer by Janet M. Coppock, 901 19th Street,
25     Room A257, Denver, Colorado, 80294, (303) 335-2106

1                          APPEARANCES

2              Kevin Hart, Leslie Wulff, Paul Torzilli and Daniel

3     Loveland, U.S. Department of Justice, 450 Fifth Street N.W.,

4     Washington, DC 20530, appearing for Plaintiff.

5              Anna Tryon Pletcher and Michael Tubach of

6     O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

7     San Francisco, CA 94111-3823;

8              Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

9     N.W., Washington, DC 20006, appearing for Defendant Penn.

10             David Beller, Richard Kornfeld and Kelly Page of

11    Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

12    CO 80202, appearing for Defendant Fries.

13             Bryan B. Lavine and Laura Anne Kuykendall of Troutman

14    Pepper Hamilton Sanders, LLP, 600 Peachtree Street NE,  Suite

15    3000, Atlanta, GA 30308;

16             Megan Rahman of Troutman Pepper Hamilton Sanders, LLP,

17    1001 Haxall Point, Richmond VA 23219, appearing for Defendant

18    Brady.

19             Michael Felberg of Reichman, Jorgensen, Lehman,

20    Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21    10017;

22             Laura F. Carwile of Reichman, Jorgensen, Lehman,

23    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

24    CA 94065; appearing for Defendant Austin.

25

1            APPEARANCES (Continued)

2        Dru Nielsen of Eytan Nielsen, 3200 Cherry Creek Drive

3    South, Suite 720, Denver, CO 80209;

4        John Anderson Fagg, Jr. and Frank Schall of

5    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

6    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

7                    *   *   *   *   *

8                    PROCEEDINGS

9        *THE COURT:*  We are on the record in 20-CR-152.  The

10   jury is not present.  We are going to talk about an issue that

11   Mr. Feldberg brought up at the end of the day yesterday

12   concerning a new exhibit which is Government's Exhibit 63.

13       Mr. Feldberg, go ahead.

14       *MR. FELDBERG:*  Your Honor, this morning at 7:28 the

15   prosecution sent us an e-mail that they no longer intend to use

16   Exhibit 63 as a demonstrative.

17       *THE COURT:*  Okay.

18       *MR. FELDBERG:*  But there are two howevers.  The first

19   is that they attached a new spreadsheet that we have not

20   previously seen, and I am told it is dense and full of

21   voluminous information.  And they advised that it was prepared

22   by tactical specialist Rebecca Nelson of the FBI.  The

23   government intends to inform the Court that we will be seeking

24   testimony of Ms. Nelson as it relates to this project during

25   our case in chief.

1         Of course, Ms. Nelson was not on the government's

2    witness list, and we will object to that if the government does

3    actually intend to call her as a witness.

4         The material on the spreadsheet after a very, very

5    preliminary review looks quite dense, and it's all new to us.

6         The second thing, the second however is the

7    prosecution also advised that they may ask Ms. Evans to testify

8    generally to the patterns she saw in her analysis.  That sounds

9    suspiciously like opinion testimony that Ms. Evans is probably

10   not qualified to present, so I wanted to alert the Court that

11   obviously if that comes up, we are going to object to it.

12        THE COURT:  Was there any description of what these

13   patterns consisted of?

14        MR. FELDBERG:  None.

15        THE COURT:  Thank you, Mr. Feldberg.

16        Why don't we hear from Ms. Pletcher first, then we

17   will hear from the government.

18        MS. PLETCHER:  Thank you, Your Honor.

19        On this point of the disclosure, this new analysis

20   with respect to Ms. Nelson, there was no disclosure of

21   Ms. Nelson as an expert, and this appears to be an expert-type

22   analysis.  The expert disclosure the government presented

23   before trial No. 1 listed a number of experts, and she was not

24   on that list, so we are concerned that we just don't have the

25   proper disclosure to be able to rebut whatever analysis this

1   is.

2          THE COURT:  And what opinion testimony does it appear

3   to be from what you could discern?

4          MS. PLETCHER:  So, Your Honor, it's a graph where

5   there appears to be an extensive analysis of different phone

6   records that were pulled together into some historical chart

7   analyzing different phone records over a time period.

8          THE COURT:  And what type of analysis would that be?

9   I mean, phone records wouldn't typically necessarily lend

10  themselves to too much analysis other than it would be --

11  quantitative-type thing.

12         MS. PLETCHER:  It is to my understanding, of course,

13  we don't appear to have full disclosure, I don't know, maybe

14  there is more behind it, but there is a series of spreadsheets,

15  multiple different data points with phone records, and,

16  honestly, Your Honor, I don't even know what's in it, we just

17  saw it this morning, but this is a concern I have.

18         THE COURT:  You don't need an expert to add numbers

19  together.  You know, someone with get up on the witness stand

20  and add numbers together.  That's not a witness that needs to

21  be disclosed.  But we'll see.  You don't know exactly what's

22  going on yet.

23         MS. PLETCHER:  Right.  This chart seems to be pretty

24  sophisticated, but, again, I just saw it briefly.

25         THE COURT:  Thank you.

1          Ms. Wulff, go ahead.

2          MS. WULFF:  Thank you.  Good morning, Your Honor.

3          Let me address a number of points.  First -- all

4     right.  Let me start.

5          Your Honor, Mr. Feldberg is correct, in light of the

6     concerns raised by the defense as to Exhibit 63, the government

7     no longer intends to use Exhibit 63 as a demonstrative.

8          Our plan had been to have Ms. Evans testify to a

9     call-frequency analysis.  However, in light of defense's

10    concerns, we would like to have tactical specialist Rebecca

11    Nelson testify during our case in chief.  Ms. Nelson can

12    testify to the analysis she performed on the underlying

13    spreadsheets and, therefore, that does not require the use --

14          THE COURT:  What underlying spreadsheets are you

15    talking about?

16          MS. WULFF:  I am sorry, Your Honor, the underlying

17    phone records.  I used an incorrect word.  And, therefore, it

18    does not require the use of a computer program which was partly

19    the concerns raised by Mr. Feldberg with regard to Ms. Evans'

20    testimony in connection with Exhibit 63.  I would say that

21    while the government produced Ms. Nelson's -- some of

22    Ms. Nelson's analysis this morning, the rest of Ms. Nelson's

23    analysis in terms of call-frequency data has actually been

24    produced to the defendants I believe as the summer of 2021, so

25    over a year ago.  I believe it was May or June of 2021.

1        And that analysis is the duplicated records, so to

2   speak, so when Ms. Nelson pulled data from the underlying

3   Verizon and AT&T records, she compared calls between a number

4   of individuals in the conspiracy, former defendants, current

5   defendants, other individuals, that was all produced to these

6   defendants last year, last summer.  Those results contain

7   duplicates, because, for example, a call between Mr. Brady and

8   Mr. Austin would appear on both Mr. Brady and Mr. Austin's

9   records and that what I will call the duplicated analysis is

10   what was produced to the defendants a year ago.

11        Ms. Nelson has now gone through and deduplicated that,

12   and that is what we produced to the defendants this morning.

13   So the defense has had the actual -- the records and her work

14   product for over a year, I believe, or thereabouts.  And this

15   is, again, in response to defendants' concerns that the work

16   that Ms. Evans did which involved a computer program that they

17   could not duplicate and that it was new, this is, in fact,

18   information that they've had now for a year.  And Ms. Nelson

19   was noticed on the government's very first witness list in this

20   case before the first trial.  That's at Docket No. 590.

21        So they have been aware of the subject matter of her

22   testimony and had *Jencks* produced to them, which was these

23   underlying spreadsheets, again, over a year ago, so this is

24   just further refinement to deduplicate what was the duplicated

25   spreadsheets.

1          THE COURT:  Here is what we are going to do.  The

2     reason that we are meeting right now is because we anticipated

3     that an issue concerning Exhibit 63 would come up in the

4     connection -- in connection with Ms. Evans' testimony.  That is

5     no longer the case, so we are not going to spend time now

6     because I do not want to condition the jury that we start late

7     every day.  I want to condition the jury that we start on time

8     every day.  So we are going to wait on this one.

9          The issues really are, No. 1, Ms. Nelson -- I don't

10     care whether she was disclosed.  There was a deadline by which

11     the government needed to, you know, put witnesses on a list,

12     so, you know, it's not a situation that the government is just

13     helping the defense out by addressing one of their concerns,

14     this issue of the government not having put Ms. Nelson on a

15     list.  And then there would be an issue of potential prejudice

16     which is some of the things that you were talking about.  But I

17     also would need an understanding of exactly what type of

18     analysis is being done.  You know, is it just a quantification

19     of calls; or is it, Oh, we've noticed this pattern, you know,

20     the length of the call corresponds to the -- when bids are due

21     or something of that nature, which, you know, could be a little

22     bit different and could shade more into a type of expert

23     analysis, although, once again, I am not quite sure.

24          But anyway, those are some of the issues we will talk

25     about.  We can talk about that perhaps at the noon hour, but we

1    are not going to talk about that now.

2          *MS. WULFF:*  Understood.  May I just correct, I said

3    they were produced last June I thought.  But counsel has

4    informed me they were produced last August.  I just want to be

5    very clear so I hadn't misstated the record.

6          *THE COURT:*  Anything else we should take up before we

7    bring the jury in?

8          *MS. CARWILE:*  This actually is time sensitive.

9    Yesterday during a side bar, counsel informed us that there

10   would be forthcoming 302s for Ms. Fisher's --

11         *THE COURT:*  Not during a side bar because I would have

12   known about that, but during a side conversation outside of --

13         *MS. CARWILE:*  During a side bar, counsel informed us

14   that Ms. Fisher had been interviewed at lunch yesterday for a

15   last minute prep session.  And my understanding was counsel

16   also indicated they would provide us a report of that, I

17   believe they said when it was available or when it was ready.

18   And I just want to note that I understand it's not required

19   until cross under rule, but I wanted to alert the Court I will

20   be asking for it if I don't have it before cross begins of

21   Ms. Fisher.

22         *THE COURT:*  This is of Ms. Fisher?

23         *MS. CARWILE:*  Yes.  That's why I am bringing it up

24   now.  I am sorry.  I don't want to make us late, but that's why

25   I am bringing us up.

175

Sara Fisher - Direct

1          THE COURT:  Okay.  Well, we'll see.

2          All right.  Let's bring the jury back in and

Ms. Fisher first.

4          (Jury present.)

5          THE COURT:  Good morning, ladies and gentlemen.  As

you will recall, we had just gotten started really with the

direct examination of Ms. Fisher, so we will continue with that

right now.

9          Mr. Loveland, go ahead.

10         MR. LOVELAND:  Thank you, Your Honor.

11                    **DIRECT EXAMINATION CONTINUED**

12  BY MR. LOVELAND:

13  Q.  Ms. Fisher, they remember you, but would you please

14  reintroduce yourself to the members of the jury.

15  A.  Hi, my name is Sara Fisher.

16  Q.  Now, Ms. Fisher, yesterday you testified about the bidding

17  process and some of the companies that KFC bought chicken from.

18  Of the eight chicken suppliers you mentioned, including

19  Pilgrim's Pride and Claxton, was it KFC's goal to buy chicken

20  from all eight or just some number less than eight?

21  A.  All eight.

22  Q.  And given that KFC needed 450 million pounds of chicken per

23  year, was it practical to not buy chicken from any of the

24  eight?

25  A.  No.

Sara Fisher - Direct

1    *Q.* And why is that?

2    *A.* We needed all of the volume, and we needed the different

3    plant locations as well.

4    *Q.* Now, Ms. Fisher, if you could remind the jury, did you

5    review some documents in preparation for your testimony today?

6    *A.* Yes.

7    *Q.* Would you please review the documents located in tabs 19 to

8    25 of the binder in front of you?

9         *MR. LOVELAND:* For the Court's record, these are

10   Exhibits F-852, F-853, 1825, 1826, 1930, 1920, and C465.

11        *THE COURT:* Some of those are -- actually the ones

12   with an F prefix are actually defense exhibits, not that it

13   matters.  Either side can introduce each other's exhibits from

14   each other's lists.

15        *MR. LOVELAND:* Excuse me, Your Honor.  To clarify for

16   the jury, C465, F852, and F853 are defense exhibits.

17        *THE COURT:* Right.  Go ahead.

18   *BY MR. LOVELAND:*

19   *Q.* Ms. Fisher, have you had a chance do review those?

20   *A.* Yes.

21   *Q.* Do you recognize them?

22   *A.* Yes.

23   *Q.* What are they?

24   *A.* They are bid submissions from suppliers.

25   *Q.* Did you receive those bid submissions from chicken

177

Sara Fisher - Direct

1  suppliers?

2  A.  Yes.

3       MR. LOVELAND:  Your Honor, at this point, I would move

4  for admission of F-852, F-853, Government's Exhibit 1825, 1826,

5  1930, 1920, and C-465.

6       THE COURT:  Any objection to the admission of those

7  exhibits?

8       Each of those exhibits then will be admitted.

9       MR. LOVELAND:  Your Honor, may I please have the

10  Court's permission to publish Defense Exhibit F-852?

11       THE COURT:  You may.

12       MR. LOVELAND:  Can we focus on the bottom half,

13  Ms. Golshanara.

14  BY MR. LOVELAND:

15  Q.  Ms. Fisher, what are we looking at here?

16  A.  An e-mail.

17  Q.  Okay.  And who sent this e-mail?

18  A.  I sent it.

19  Q.  Who did you send this e-mail to?

20  A.  To Scott Brady and Mikell Fries.

21  Q.  And please remind the jury, what was Scott Brady's role at

22  Claxton?

23  A.  He was our direct account representative for KFC.

24  Q.  What was the nature of the reporting relationship, if any,

25  between Scott Brady and Mikell Fries?

Sara Fisher - Direct

1   A.   Scott reported to Mikell, I believe.

2   Q.   Now, would you please summarize the substance of what

3   you're conveying to Claxton Poultry, Scott Brady, and Mikell

4   Fries in this e-mail.

5   A.   Yes.  I was just asking them to submit a firm bid by the

6   end of the following week, which was February 3rd.

7   Q.   Excuse me, Ms. Fisher.

8        Okay.  When you say "firm offer," what are you

9   referring to here?

10  A.   As part of the bidding process, we were looking for

11  pricing, volume, and product.

12  Q.   And you mentioned by the end of the following week.  What's

13  the -- what was the due date or week due date of this bid that

14  you were requesting?

15  A.   February 3rd.

16       MR. LOVELAND:  Now, Ms. Golshanara, will you please

17  focus on the top half of this exhibit.

18  BY MR. LOVELAND:

19  Q.   Ms. Fisher, are you able to see what's on the screen there?

20  A.   Yes.

21  Q.   Would you please summarize for the jury, what are we

22  looking at here?

23  A.   An e-mail from Scott Brady providing a -- some bid

24  information.

25  Q.   And would you walk the jury through -- well, first, when

Sara Fisher - Direct

1    did Mr. Brady send this e-mail?

2    A.   February 3rd, 2017.

3    Q.   Would you walk the jury through the substance of what

4    Mr. Brady is saying here?

5    A.   Yes.  He was basically saying that they were looking for

6    additional volume and that some of their prices or their costs

7    have increased, but they were not going to pass it on, and they

8    were going to hold their pricing flat from where it was

9    currently at that time.

10   Q.   Is there anyone on this e-mail chain that isn't from

11   Restaurant Supply Chain Solutions or Claxton?

12   A.   No.

13   Q.   Did this e-mail have an attachment to it?

14   A.   Yes, it did.

15        MR. LOVELAND:  Your Honor, at this point, I would ask

16   the Court's permission to please publish F853, which is a

17   defense exhibit.

18        THE COURT:  You may.

19        MR. LOVELAND:  Thank you.

20        Now, Ms. Golshanara, maybe you could zoom in a little

21   there on the text for us, please.

22   BY MR. LOVELAND:

23   Q.   First, Ms. Fisher, what kind of document are we looking at

24   here?

25   A.   It's an Excel file.

Sara Fisher - Direct

1   Q.  And is there just one tab in this Excel file, or are there

2   more than one tab in the Excel file?

3   A.  There is three.

4   Q.  Could you explain to the jury, what type of document is

5   this in terms of the bidding process?

6   A.  This is the cost model document, so it basically has a

7   breakdown of all of the cost components that go into the final

8   FOB price that the suppliers offer to us.

9       MR. LOVELAND:  Ms. Golshanara may be scrolling as I

10  talk about things.

11  BY MR. LOVELAND:

12  Q.  Could you walk us through at a high level what is happening

13  in this chart here?

14  A.  Sure.  So it's just taking all the different cost

15  components and either adding or subtracting if there is credits

16  involved, and then you get down to the bottom which is the

17  total FOB plant cost, which is the price per pound for the

18  eight-piece.

19  Q.  Okay.  And you mentioned "bottom."  What's the bottom line

20  price here?

21  A.  For the total FOB plant cost, it's .9939.

22  Q.  And what KFC product does this bottom line price refer to?

23  A.  The eight-piece.

24  Q.  And are there other bottom-line prices for different KFC

25  products here?

Sara Fisher - Direct

1    A.   Yes, for the supplemental items.

2    Q.   Could you walk the jury through what those items are?

3    A.   Yes, the supplemental dark meat, and that was .6939; the

4    supplemental white meat, which is the supplemental split

5    breasts that we discussed earlier is 1.2939; and the

6    supplemental wings is 1.4439.

7    Q.   Okay.

8         MR. LOVELAND:  Ms. Golshanara, could you scroll back

9    up to the top for a moment, please.  Thank you.

10   BY MR. LOVELAND:

11   Q.   Could you walk us through some of the line items on the

12   left-hand side to give the jury a sense of what's going on in

13   this chart?

14   A.   Sure.  So just a couple of examples, feed expense, that

15   very top line item is basically what it costs to feed the

16   chicks as they grow before they go to the facility for -- to

17   the production facility.  The chick cost is actually the cost

18   that, you know -- they work with the farmers.  Those are just a

19   couple of examples.  Those are adding to get to your, you know,

20   live delivered cost, and then it continues down further.

21   Q.   See the initial WOG or I guess it's WOG, what does that

22   refer to for the jury?

23   A.   It stands for without giblets, so it's basically just the

24   bird after the inside and the neck have been removed.

25   Q.   What does labor there refer to?

Sara Fisher - Direct

1    A.   Labor, that would be the cost of labor at the production

2    facility to produce this product.

3    Q.   And how about depreciation?

4    A.   I mean, that's just something that's related to their

5    building and their equipment.  It's a cost of doing business.

6           MR. LOVELAND:  Your Honor, at this time, I would ask

7    the Court's permission to please publish Government's Exhibit

8    1825.

9           THE COURT:  You may.

10          MR. LOVELAND:  Thank you.

11   BY MR. LOVELAND:

12   Q.   Now, Ms. Fisher, what are we looking at here?

13   A.   This is an e-mail from Roger Austin providing initial bid

14   information back to us.

15          MR. LOVELAND:  If Ms. Golshanara can zoom all the way

16   out for us, please.

17   BY MR. LOVELAND:

18   Q.   Who sent this e-mail?

19   A.   Roger Austin.

20   Q.   And what was Roger Austin's role at Pilgrim's Pride at this

21   point in time?

22   A.   He was our direct account representative for KFC product.

23   Q.   Excuse me, Ms. Fisher.

24          And do you know what Roger Austin's title was at

25   Pilgrim's?

Sara Fisher - Direct

1   A.  Yes.  He was VP.

2          MR. LOVELAND:  And if we could scroll up at just the

3   text again, thank you, Ms. Golshanara.

4   BY MR. LOVELAND:

5   Q.  When does Roger Austin send this e-mail?

6   A.  February 3rd, 2017.

7   Q.  Okay.  And who is receiving this?

8   A.  Me and Rich Eddington.

9   Q.  Could you walk the jury through the substance of this

10  e-mail.

11         MS. CARWILE:  Your Honor, I am going to object and ask

12  that this e-mail just speak for itself.  The jury has it.

13         MR. LOVELAND:  Your Honor, I am happy to have a side

14  bar.

15         THE COURT:  Sure.

16     (At the bench:)

17         THE COURT:  Go ahead, Mr. Loveland.

18         MR. LOVELAND:  And, Your Honor, I want to apologize

19  for cutting off Ms. Carwile.  I just didn't want to get into a

20  speaking objection in front of the jury, and I thought maybe

21  side bar was the best place to approach this.

22          I am not asking Ms. Fisher to read the document or say

23  what a certain word is or any of those things.  I am asking her

24  to explain the substance of it, how she understood it.  And,

25  you know, words on a page speak for themselves, but the jury

Sara Fisher - Direct

1   benefits from the context that someone who worked in this

2   industry is able to provide and the ability to say what's

3   actually happening here.  You know, things like WOG or FOB,

4   they do not speak for themselves and neither do bid

5   submissions.  I think it's relevant evidence that has been --

6   has come in in previous trials, the ability for a witness to

7   say the substance of what's happening, not just reading the

8   document, Your Honor.

9          THE COURT:  Ms. Carwile?

10         MS. CARWILE:  I disagree.  I think this document is

11  easy to understand except for if he wants to ask things about

12  things like .30 back, but I don't think he should be asking

13  this witness to communicate what Mr. Austin meant or the

14  substance of what this e-mail means.  The jury has it.  They

15  can read it.

16         THE COURT:  Well, the question was, you know, can you

17  summarize -- or walk the jury through the substance of the

18  e-mail, and that would be just asking a witness to explain what

19  someone said, and I agree that the e-mail probably speaks for

20  itself in that regard.  Having the witness kind of going

21  through the e-mail and explain everything that's going on in it

22  is probably unnecessary.

23         On the other hand, if it's broken down, various terms

24  that the jury may not yet understand or asked about, if, you

25  know, the witness is asked to describe the purpose of this

Sara Fisher - Direct

1    e-mail or is this similar -- is this what you would expect

2    back, that type of thing, that's all perfectly appropriate.  So

3    I will sustain the objection just in terms of trying to

4    characterize a general question about characterizing this

5    particular e-mail.

6          But on the other hand, the government can ask

7    questions about it.  Certainly the government isn't prohibited

8    from asking about this because it speaks for itself.  Thank

9    you.

10         (In open court:)

11   BY MR. LOVELAND:

12   Q.  Okay, Ms. Fisher.  I am going to ask you some specific

13   questions about this e-mail.

14         Mr. Austin is saying our goal is to keep 50 loads

15   intact.  That's a term within the industry.  Could you break

16   down what that means within the chicken industry, that first

17   part of the e-mail?

18   A.  He was basically just saying that they currently had about

19   50 loads a week, and they wanted to keep that going forward

20   with the next contract.

21   Q.  Okay.  And it says, The model is based on period 2 pricing

22   model.  What is a pricing model?

23   A.  Pricing model is the different cost components that get

24   down to the final FOB cost per pound.

25   Q.  Excuse me, I am sorry, Ms. Fisher.

Sara Fisher - Direct

1        What does period 2 refer to in this context?

2   *A.*   The price -- the product cost was priced every period based

3   on feed prices and changes in the feed prices, so he is

4   basically saying they built the model based on where that P2

5   price was at that time.

6   *Q.*   And it says, We've adjusted our model to reflect

7   improvements or increases in our processing costs.  What does

8   that mean in this context?

9   *A.*   He basically is saying that they have called out the -- any

10   increases in prices or decreases in prices of the cost

11   components.

12   *Q.*   And the next section of the e-mail is asking about 29, .30

13   back, eight-piece and various weights.  Can you explain to the

14   jury what's going on in the substance of that portion of the

15   e-mail?

16   *A.*   Yes.  So the supplemental dark meat is typically based on a

17   cents back from the eight-piece FOB, so they are basically

18   saying they were -- in the current contract they were 29

19   cents -- a reduction from the eight-piece was 29 cents to get

20   to the dark meat, and they were going to take that to 30 cents.

21        And then the case weights, there is -- it's a live

22   animal, so the case weight is not always going to be the same.

23   And there was a target case weight, but you have to multiply

24   the cost per pound times the case weight to get to the actual

25   costs.  They were willing to reduce their case weight down a

Sara Fisher - Direct

1    pound.

2    Q.  Was reducing the case weight down a pound something that

3    was good for KFC, good for the supplier, or how did that shake

4    out?

5    A.  It was good for KFC.

6    Q.  And could you explain to the jury why it was good for KFC?

7    A.  So to get to the total case cost, you take the per-pound

8    FOB from the cost model and multiply it out by the case weight

9    to get to that case cost, so the lower the case weight, the

10   lower your case cost will be.

11   Q.  Does the case weight have anything to do with the

12   specification of small bird that KFC was focused on buying?

13   A.  Yes.

14   Q.  And how does that work?

15   A.  Well, the specification is -- part of the specification,

16   KFC also specifies what the target case weight should be,

17   because we can't have the cases too heavy from a labor

18   standpoint in the restaurants and deliveries.

19   Q.  The next portion of the e-mail talks about something

20   specific to do with supplemental white and wing pricing.

21   What's the substance of that portion of the e-mail mean?

22   A.  Basically, they provided a bid price but said they are

23   willing to reevaluate what that price would be at a later time

24   to see if they are willing to come down on that price.

25   Q.  Is there anyone from a different chicken supplier on this

Sara Fisher - Direct

1   e-mail?

2   *A.*   No.

3   *Q.*   Have you ever seen a bid submission from a chicken supplier

4   that included a competitive -- a competitor company at any

5   point in your career?

6   *A.*   No.

7   *Q.*   Ms. Fisher, at this point, I would ask you to please review

8   tabs 26 to 32 of the binder in front of you.

9           *MR. LOVELAND:*   For the Court's record, these are all

10  Defense Exhibits C-207, F-789, F-796, G-474, B-963, F-747, and

11  F-783.

12          *THE COURT:*   Got it.  By the way, Mr. Loveland, you

13  don't have to mention that they are defense exhibits, but you

14  had said that some things which really were defense exhibits

15  were government's exhibits, and I just wanted to -- I just

16  wanted to clarify that, but otherwise, if it's a letter prefix,

17  it's technically a defense exhibit, but as I said before, any

18  party can introduce exhibits.  It doesn't matter whether they

19  are the government's exhibits or defense exhibit.  But you

20  don't need to have to mention that.

21          *MR. LOVELAND:*   Certainly, Your Honor, thank you.

22  *BY MR. LOVELAND:*

23  *Q.*   Ms. Fisher, have you had a chance to look at those?

24  *A.*   Yes.

25  *Q.*   Do you recognize them?

Sara Fisher - Direct

1   *A.*   Yes, I do.

2   *Q.*   And what are they?

3   *A.*   They are the exhibits to basically the contracts that were

4   awarded as part of this bidding process.

5   *Q.*   And when you say "exhibits," what does that mean?

6   *A.*   Basically, it just specifically speaks to the time period,

7   the price, volume, all of the contract details for this

8   particular time period for these items.

9          *MR. LOVELAND:*   Your Honor, at this point, I would ask

10  the Court's permission to please publish F-796.

11         *THE COURT:*   It hasn't been admitted yet.

12         *MR. LOVELAND:*   Excuse me, Your Honor.   At this point,

13  I would move to admit all of the documents that we discussed

14  earlier.

15         *THE COURT:*   Any objection to the admission of C-207,

16  F-789, F-796, G-474, B-963, F-747, and F-783?   Each of those

17  exhibits will be admitted.   And you may publish, Mr. Loveland,

18  F-796.

19         *MR. LOVELAND:*   Thank you, Your Honor.

20  *BY MR. LOVELAND:*

21  *Q.*   Ms. Fisher, what are we looking at here?

22  *A.*   The exhibit for Pilgrim's Pride.

23  *Q.*   And I want to get into a little bit more specifics of

24  what's meant by exhibit --

25         *MR. LOVELAND:*   Ms. Golshanara, can you zoom in on just

Sara Fisher - Direct

1    the top half of this, please?

2    *BY MR. LOVELAND:*

3    Q.  It says Exhibit 1 at the top.  What does that mean in this

4    context?

5    A.  So we have an overarching contract with -- between RSCS and

6    suppliers.  It's the supplier business relationship agreement,

7    and it's just kind of overarching terms of how we work

8    together.  And then the exhibits are used as a way to call out

9    the specifics for specific time periods and products and

10   pricing, volume.

11   Q.  The supplier business relationship agreement, is that

12   sometimes referred to as an SBRA?

13   A.  Yes.

14   Q.  And does the SBRA, does an SBRA change often, or does it

15   stay in place for a long period of time?

16   A.  No, it stays in place.

17   Q.  About how long do SBRAs stay in place?

18   A.  I mean, once they are signed, they're signed.  If there is

19   any changes that need to be made, an amendment would be made,

20   but once it's executed, it doesn't change.

21   Q.  Is there a supplier business relationship agreement for

22   each individual chicken supplier, or is it something that all

23   suppliers sign onto at once?

24   A.  Each individual supplier.

25   Q.  Okay.  For this exhibit specifically, what's the time

Sara Fisher - Direct

1   period that's relevant here?

2   A.  May 21st, 2017 through December 31st, 2017.

3   Q.  Now, at the time, was there already a contract agreement in

4   place for KFC for this time period?

5   A.  Yes.

6   Q.  And so could you explain to the jury why it is that this

7   time period of a portion of 2017 is covered by this new

8   contract?

9   A.  Yes.  So after the negotiations were complete for the 2018

10  through '20 contract period, there was savings that was going

11  to be delivered in that time period, and so we asked -- went

12  back to the suppliers and asked them to basically pull some of

13  that savings forward to provide relief to our restaurants

14  earlier than January 1 of 2018.

15          MR. LOVELAND:  Ms. Golshanara, can we focus on the

16  bottom half with maybe putting RSCS Margin-Over-Feed Pricing

17  Model at the top.  Thank you.

18  BY MR. LOVELAND:

19  Q.  Now, this particular contract, Exhibit 1, what company

20  entered into it?

21  A.  Pilgrim's Pride.

22  Q.  And who is the representative from Pilgrim's Pride who

23  entered into this contract?

24  A.  Roger Austin.

25  Q.  What date was that?

Sara Fisher - Direct

1   A.   September 18th, 2017.

2   Q.   Now, September 18th, 2017 is after the period that this

3   applied for; is that correct?

4   A.   Yes.

5   Q.   Can you explain the way that that worked for the jury?

6   A.   So basically the details were worked out and agreed upon

7   and put into place, and then it just took a little bit longer

8   to get the actual signatures completed.

9   Q.   Here we've got a chart -- well, first I will ask, who

10  signed off on this for Restaurant Supply Chain Solutions?

11  A.   Steve McCormick.

12  Q.   Who is Steve McCormick?

13  A.   He was the CEO at the time.

14  Q.   What date did he sign off on it?

15  A.   September 19, 2017.

16  Q.   Ms. Fisher, there is a chart above with some line items and

17  numbers.  What's going on here for the jury?

18  A.   This is the cost model that we discussed a few minutes ago.

19  Q.   Just for an example, what is fat and tail yield?

20  A.   There is a calculation and everything that comes off of the

21  bird and credits and yields, and that's just one of piece of it

22  to get down to the bottom line FOB.

23  Q.   Okay.

24       MR. LOVELAND:  Ms. Golshanara, could we flip to

25  page 2.  And we'll focus on the top here, please.

Sara Fisher - Direct

1    *BY MR. LOVELAND:*

2    Q.  What are we looking at here, Ms. Fisher?

3    A.  This is the bottom half of the cost model.

4    Q.  What's the bottom-line cost here?

5    A.  .9998.

6    Q.  And what product is this referring to?

7    A.  The eight-piece.

8    Q.  So are there any products discussed here other than the

9    eight-piece?

10   A.  No, not on this page.

11   Q.  Could you just explain to the jury what FOB means?

12   A.  It stands for freight onboard, so it's basically the

13   product cost before -- at the supplier's facility before any

14   cost is added to ship the product.

15   Q.  Ms. Fisher, did RSCS end up entering into contracts with

16   all eight of the chicken suppliers that you mentioned?

17   A.  Yes.

18   Q.  Would that include Claxton?

19   A.  Yes.

20   Q.  That would include Pilgrim's?

21   A.  Yes.

22   Q.  Would that include Tyson?

23   A.  Yes.

24   Q.  Did the contracts for each of the chicken suppliers all

25   start at the same time, or were there different time periods?

Sara Fisher - Direct

1    *A.*   There were different time periods.

2         *MR. LOVELAND:*  Ms. Golshanara, would you please flip

3    forward to page 4, and if we could focus just on the top half

4    for a moment.

5    *BY MR. LOVELAND:*

6    *Q.*   What's the time period where this contract is in effect for

7    this exhibit?

8    *A.*   January 1, 2018 through December 31st, 2018.

9    *Q.*   And what product are we dealing with here?

10   *A.*   Eight-piece.

11   *Q.*   Why is this a different time frame than the last

12   eight-piece exhibit that we just looked at?

13   *A.*   This is related to what we discussed as far as pulling some

14   of the savings forward, so we started the contract earlier in

15   May as opposed to January 1, so then it turned into a -- kind

16   of a stair step for the rest of the contract.

17   *Q.*   Let's walk the jury through what you mean by stair step and

18   how that played out in terms of payment.

19   *A.*   So we for Pilgrim's, for an example, there was a negotiated

20   price for the three years that equaled a certain amount of

21   savings over that three-year period.  So with them pulling some

22   of that forward, we -- the savings, that total savings from the

23   three years was still the same, but we pulled it forward so it

24   was for a longer period, so three and a half years versus three

25   years.  So we stair stepped it to make sure that the savings

Sara Fisher - Direct

1  that was negotiated originally was the same in the longer time

2  period.

3  Q.  So at a simple level, did this allow Pilgrim's Pride to

4  take some of the price off up front rather than wait for the

5  contract to kick in later?

6  A.  Yes.

7  Q.  Okay.

8          MR. LOVELAND:  If we can scroll down to the top -- or

9  the bottom part of this, excuse me.  Thank you.

10 BY MR. LOVELAND:

11 Q.  Now, there is a cost model here, Ms. Fisher.  Is this the

12 same or different cost model from the previous period that we

13 looked at?

14 A.  The line items are the same, but the pricing is a little

15 bit different.

16 Q.  Okay.

17         MR. LOVELAND:  Could we look at the next page, please.

18 And if we could zoom in on just the part with the numbers and

19 words.

20 BY MR. LOVELAND:

21 Q.  What's the bottom-line cost here, Ms. Fisher?

22 A.  .9621.

23 Q.  And, again, is that what's referred to as total FOB cost?

24 A.  Yes.

25         MR. LOVELAND:  Ms. Golshanara, could we please flip

Sara Fisher - Direct

1   forward to December 31st, 2020?  Excuse me.  Could we please

2   flip forward to page 7?  Once we are there, if we could zoom in

3   on just the top half.

4   *BY MR. LOVELAND:*

5   Q.  I got ahead of myself.  I apologize for that.

6          What are we looking at here?

7   A.  This is the time period from January 1, 2019 to

8   December 31st, 2020.

9          MR. LAVINE:  Can we have a side bar?

10         THE COURT:  Yes, we may.

11     (At the bench:)

12         THE COURT:  Go ahead, Mr. Lavine.

13         MR. LAVINE:  Your Honor, this has nothing to do with

14  Mr. Loveland's questioning of this witness.  It's the fact we

15  have a juror in the second row who is falling asleep, and I am

16  wondering whether we need to take a little stretch break.

17         THE COURT:  Yeah, are you talking about Mr. Mares?

18         MR. LAVINE:  Yeah.

19         THE COURT:  I can't -- because he seems awake now, but

20  did you see his eyes closed?

21         MR. LAVINE:  Yes.

22         THE COURT:  Let's go ahead and do that.  I think it's

23  a great idea.

24         (In open court:)

25         THE COURT:  Ladies and gentlemen, why don't we take a

Sara Fisher - Direct

1   little bit of a stretch break.  We do this occasionally just to

2   make sure that everyone is staying awake.  So you can just stay

3   in your seat there, but give people an opportunity to stand up,

4   if they wish, stretch a little bit, get the blood flowing.

5           Why don't we take a 10-minute recess, okay, 10-minute

6   recess, so the jury is excused.

7           We will reconvene at 20 after, all right?  Thank you.

8       (Recess at 9:11 a.m. until 9:35 a.m.)

9       THE COURT:  Let us talk about the juror in question.

10  We'll refer to him as Juror No. 10.  As you may have noticed, I

11  am not sure if you did yesterday, but he was -- his body

12  language was just very slumped.  He this morning indicated to

13  Ms. Buchanan before we started that he had transportation

14  problems and that he lives -- he lives in Morrison, so he lives

15  a long ways away and that he didn't have a way to get into

16  court.  He doesn't have, like, a smart phone, he said an

17  iPhone, and that his father had to bring him in, but his father

18  would not be a means of transportation into court every day.

19          Ms. Buchanan, you know, asked him politely why he had

20  not brought that issue up during jury selection, at which point

21  he started to cry.  So anyway, Ms. Buchanan reported that to

22  me.  I instructed her to let him know that he would need to,

23  you know, look into public transportation, you know, some means

24  other than his father of being able to come in.  At that point,

25  he fell to the floor and was crying.

Sara Fisher - Direct

1    Then, of course, Mr. Lavine appropriately brought to

2  our attention today that he had his eyes closed. I am not sure

3  he was sleeping, but in any event, and then when we called for

4  the stretch break, normally you would expect that someone,

5  especially if someone who had nodded off would take advantage

6  of the stretch break and stretch, make sure to wake up, but

7  instead he just kind of put his head back, and then as he went

8  out -- I don't know if you observed him going out of the

9  courtroom, but, once again, he was incredibly slumped.

10    So Ms. Buchanan during the break asked him if he was

11  feeling all right, whether there were issues or whether

12  anything was weighing on his mind other than the transportation

13  issue. He disclaimed that -- No. 1, he said he was not sick.

14  He said that there wasn't any issue with that but, once again,

15  you know, fell to the floor crying.

16    So I -- I don't know exactly what's going on. The

17  questioning, as you may recall yesterday, was very brief with

18  him. I don't think the attorneys asked him any questions, I am

19  not sure, but my questioning of him was just real

20  straightforward. It only consisted really the bare minimum

21  number of questions. He has had the same job for four years,

22  but it's been a fairly -- it seems like, I am not sure what the

23  job consisted of, a fairly low-level job. But in any event, I

24  am kind of throwing it open to you to see what you want to do

25  at this point. We can, of course, continue through and see how

Sara Fisher - Direct

1    things go, but for some reason there does seem to be some

2    issues.  And, of course, we do want to make sure that whatever

3    is going on, that he is able to pay attention.

4         Mr. Beller?

5         MR. BELLER:  Thank you, Your Honor.

6         Two questions.  First, will the Court allow us just a

7    minute to step outside --

8         THE COURT:  No problem.

9         MR. BELLER:  -- and confer?  I want to make sure I

10   state a position that is consistent with everyone, No. 1.

11        No. 2, Your Honor, Morrison is not particularly far,

12   of course, but if there was an option to put him up in a hotel

13   in Denver, is that something that is available?

14        THE COURT:  Ms. Buchanan mentioned that to him and

15   that did not seem to strike him as a solution.  He did say, and

16   I should mention this, that he just doesn't have any money.

17   And he does not fall within the court rules in terms of being

18   able to put him up in a hotel.  She had mentioned to him, Well,

19   could you take an Uber, that type of thing.  Once again, the

20   Court doesn't pay for people, especially only at that distance,

21   to do that.  You couldn't have all your jurors, you know,

22   taking Ubers in in the morning and back home.

23        But in any event, none of those things struck him as

24   solutions.  They didn't make him happier or make him think

25   that, you know, oh, okay, well, maybe I can work on that.

1          So I -- once again, I don't know exactly what's going

2     on, but I did want to report that.

3          MR. BELLER:  Thank you, Your Honor.  If I may have

4     just a very brief moment to discuss with Ms. Wulff, and then if

5     the defendants can step outside, we can report right back.

6          THE COURT:  Sure, yeah.

7          (Brief recess.)

8          THE COURT:  Go ahead, Mr. Beller.

9          MR. BELLER:  Thank you, Your Honor.

10         The parties have had an opportunity to confer.  I have

11    also had an opportunity to confer with the other defendants.

12    It sounds like we are all recommending the same course of

13    action to the Court, and that is to excuse that particular

14    juror.

15         Your Honor, the analysis is not simply limited to what

16    has been articulated, but rather the next piece of this, which

17    is the trial is likely to last for a while.  Based on the

18    behavior that's been observed, we also have some concerns about

19    his ability to deliberate and deliberate competently.  So in

20    addition to everything that has already been articulated, we

21    are also looking forward to the coming weeks, and for all the

22    reasons that are described, I believe that we agree that he

23    should be excused, and the first alternate should be put in his

24    seat.

25         THE COURT:  Let me add the following just as a

Sara Fisher - Direct

1    follow-up to what Mr. Beller had mentioned about a concern

2    concerning his ability to deliberate.  When Ms. Buchanan went

3    back and asked him to come out of the jury room so she could

4    check on him, make sure that he wasn't feeling sick, he was

5    apart from the other jurors with his back turned to them.  Now,

6    it's early on and if he -- there could be other explanations,

7    but it does suggest that there could be some basis for that

8    concern.

9            Of course, the Court would not countenance actions by

10   a juror simply who realizing he was stuck on a long trial is

11   trying to pull something over on the Court just to get out of

12   jury selection, but I think that that is unlikely here.  It

13   would take someone who, you know, has the ability to do

14   essentially quite elaborate acting job and to cry at will, you

15   know, to do something that was just really an act, so I don't

16   think that that's really the situation here.  For whatever

17   reason, Juror No. 10 I think is, you know, just unable to

18   really emotionally deal with some of the issues he has like

19   with the transportation to the trial.

20           So I think it is appropriate to go ahead and excuse

21   him at this time, and we will then substitute in the first

22   alternate, which is Juror No. 4.

23           All right.  Why don't we do this.  Why don't we -- I

24   don't want to embarrass him, but let's, Ms. Buchanan, let's go

25   ahead and bring Juror No. 10 in, and I will mention real

Sara Fisher - Direct

1   quickly to him that we are going to go ahead and excuse him at

2   this time, okay?

3           COURT DEPUTY CLERK:  Yes, Your Honor.

4           (Juror present.)

5           THE COURT:  So, Mr. Mares, I have been informed by

6   Ms. Buchanan that you have got some transportation issues, and

7   it seems like those issues are weighing heavily on you.  Of

8   course, it's so important that every juror in this case be able

9   to pay close attention to the trial in this case, and from what

10  Ms. Buchanan has indicated, it seems like you may be a bit

11  distracted by some of the worries that you have over the

12  transportation issue.

13          So at this time, I am going to go ahead and excuse

14  you, all right?  So if you have anything in the jury room that

15  you need to collect, you can go collect that.  And once you

16  have done that, you are free to leave, all right?

17          PROSPECTIVE JUROR:  Thank you, Your Honor.

18          THE COURT:  Thank you very much.  You are excused at

19  this time.

20          Why don't we go ahead and have Ms. Fisher come in,

21  then.

22          (Jury present.)

23          THE COURT:  Ladies and gentlemen, as I think you

24  figured out, we excused Mr. Mares.  He was having some

25  difficulties.  So, Ms. Ortega and Ms. Clyde, if you want, you

Sara Fisher - Direct

1   could singly or collectively shift down one, but if you are

2   happy in the seats you are in, you can stay put, whatever you

3   want to do.

4           Let us continue, and, Mr. Loveland, go ahead.

5           MR. LOVELAND:  Thank you, Your Honor.  And for the

6   Court's record, Exhibit F-796 is still being published, and we

7   are at page 7.

8   BY MR. LOVELAND:

9   Q.  Ms. Fisher, are you able to see that?

10  A.  Yes.

11          MR. LOVELAND:  If we could zoom in on the top portion.

12  Thank you.

13  BY MR. LOVELAND:

14  Q.  What is the time frame for this contract here?

15  A.  January 1st, 2019 through December 31st, 2020.

16  Q.  And so what product is this for KFC?

17  A.  Eight-piece.

18  Q.  Same product that we saw on the last two examples?

19  A.  Yes.

20  Q.  And why is it that this contract has a period over two

21  years rather than just one year or a portion of the year?

22  A.  That was just part of the stair step that we worked out

23  with Pilgrim's with them pulling some of the savings forward in

24  2017.

25  Q.  Does that mean that it will be -- the same prices are from

Sara Fisher - Direct

 1   January 1st, 2019 through the end of 2020?

 2   A.  The cost model will be the same, yes.

 3       MR. LOVELAND:  And if we could scroll down to the

 4   bottom part, please.

 5   BY MR. LOVELAND:

 6   Q.  What are we looking at here?

 7   A.  This is the -- just the top portion of the cost model.

 8   Q.  Is the bottom-line price on this page or this screen?

 9   A.  No.

10       MR. LOVELAND:  Ms. Golshanara, could we flip to

11   page 8, please, just focus on the top, please.

12   BY MR. LOVELAND:

13   Q.  What is the bottom-line price, if you are able to see it?

14   A.  .9494.

15   Q.  So overall were the exhibits and contracts that we just

16   looked at, the three of them, were they reached as part of the

17   same negotiation process?

18   A.  Yes.

19   Q.  And is that the bidding cycle you have been discussing

20   throughout your testimony?

21   A.  Yes.

22   Q.  Is that the entirety of the date range for the agreements

23   that were reached with Pilgrim's Pride?

24   A.  Yes.

25   Q.  Was there anything else notable about this bidding cycle

Sara Fisher - Direct

1   that you have been describing to the jury?

2   A.  Really just we did the stair-step approach after we had

3   negotiated the three years.

4   Q.  So by "stair step," you mean the financial arrangement by

5   which you spread out some of the savings that had been

6   negotiated to earlier points in time?

7   A.  Yes.

8   Q.  In your experience, was it typical for contracts to be

9   meted out for such a long period here, it was three and a half

10  years?

11  A.  Yes.  I believe the previous contract was three to four

12  years, and we were wanting to do a longer-term contract to make

13  sure that we ensured supply in the future.

14  Q.  Ms. Fisher, throughout your testimony, you have described

15  various ways that the bidding process was set up and the

16  reasons for why.  Why did you take those steps to keep chicken

17  suppliers separate during the bidding cycle?

18      MS. NIELSEN:  Objection, Your Honor.  May we go on

19  side bar?

20      THE COURT:  Sure.

21    (At the bench:)

22      THE COURT:  I am not sure who made the objection.  Is

23  it Ms. Carwile?  Ms. Nielsen?  Go ahead, Ms. Nielsen.

24      MS. NIELSEN:  Your Honor, we would object to relevance

25  as to the question of why.  As the Court has ruled in previous

Sara Fisher - Direct

1   trials, this type of opinion as to why has been ruled

2   irrelevant, reason being that this is a per se case and the

3   only issue here is whether there is an agreement to fix bids

4   and prices or whether there is not.  And if there was, it's

5   irrelevant whether that agreement had pro competitive effects

6   and whether it -- irrelevant whether it had anticompetitive

7   effects.

8          *THE COURT:*  Mr. Loveland, response?

9          *MR. LOVELAND:*  Yes, Your Honor.  So first, I would say

10  that I think this is the same objection from yesterday, just

11  with a different argument, but at the outset this is not

12  opinion testimony.  The government is asking a witness, a fact

13  witness, what did you do and why did you do it?  That is not

14  the same thing as asking what were your expectations or

15  anything nebulous like that.  We have gone through details of

16  how Ms. Fisher structured this process, and we have been

17  careful to describe those details every step of the way for the

18  jury, and so I think it is relevant for the jury to understand

19  how is this process set up, what was done during the process,

20  and why was the process set up this way.

21          Looking at these contracts and these e-mails and these

22  invitations without a witness to give that framework and to

23  explain what you did and why I think is confusing for the jury.

24  This isn't opinion testimony.  This does not fly in the face of

25  any of the Court's previous rulings.  This is something that

Sara Fisher - Direct

1   we've done throughout Ms. Fisher's testimony, and it's the same

2   objection I would respectfully submit that the Court overruled

3   yesterday.

4           THE COURT:  Yeah, I don't think that Ms. Nielsen's

5   objection was it was opinion testimony.  Her objection was that

6   it was irrelevant because this is a per se case.  So what would

7   be the relevance of this testimony?

8           MR. LOVELAND:  Well, Your Honor, I think for the jury

9   to understand the bidding process, how it was set up, how it

10  was run, and why it was set up this way is the relevant factual

11  framework for the jury to consider.  And it is highly relevant

12  because the process here was designed a specific way with

13  competition in mind.  Now, we are not asking -- we are not

14  asking Ms. Fisher to expound on theoretical reasons or

15  expectations or things that weren't written down.  We are just

16  merely asking Ms. Fisher, What did you do and why did you do

17  it.  I think it's relevant for the jury to understand the

18  context of how it worked in this market, because markets can

19  work in very, very, very different ways.

20          If the jury didn't understand that this was a

21  blind-bidding process, for example, they may think it's

22  something more like an auction.  So that's the factual

23  framework that I think the jury needs to understand in order to

24  understand this case, and I think it's highly relevant

25  testimony, and there is no unfair prejudice at all from having

Sara Fisher - Direct

1    a witness explain what she did and why she did it.

2         THE COURT:  Right.  But given the fact that you asked

3    her about that yesterday, what new information do you

4    anticipate that she would provide in answer to your question?

5         MR. LOVELAND:  I don't think I asked this exact

6    question, Your Honor.  I did have the good fortune of being

7    able to review the transcript last night.  I may be mistaken,

8    but I am fairly certain the questions were more targeted to

9    specific things; whereas, here Ms. Fisher is going to explain

10   overall why the process was set up the way it is.

11        It's a little bit more of an open-ended question, but

12   it is very much a different question.  I anticipate the witness

13   will talk about the various steps in the process, give the jury

14   some detail as between the things that happened in between the

15   steps, and also to just explain the reasoning for why she did

16   what she did every step of the way.

17        THE COURT:  Ms. Nielsen?

18        MS. NIELSEN:  Your Honor, this witness has already

19   described the blind-bidding process in detail.  The why remains

20   irrelevant in a per se case, and I would also add an objection

21   of 403 as this is cumulative testimony.

22        THE COURT:  Mr. Loveland, I will give you the last

23   word.

24        MR. LOVELAND:  Yes, Your Honor.  And I don't know that

25   I have the most to add here, but I think it's completely

Sara Fisher - Direct

1    appropriate to have the witness after going through the

2    contracts at each step to explain to the jury why each thing

3    was done.  It's not cumulative.  It's something that they have

4    now digested a great deal of information, and the witness is

5    able to explain to the jury why things were done that way.

6    It's a different question in a different context.

7              Thank you, Your Honor.

8              THE COURT:  I am going to sustain the objection.  The

9    witness has already explained the blind-bidding process, and

10   the government has every right to bring that type of

11   information out, but the question that she is being asked now

12   and also the description from Mr. Loveland of what he

13   anticipates her answer would be or at least the line of

14   questioning would be to explain the blind-bidding process at

15   each and every step of the way, which would have a tendency to

16   greatly emphasize the, you know, the blindness of the process.

17   And that, then, shades over I think in a prejudicial way to

18   what we -- what I have already ruled in the previous trials is

19   improper, which is to overemphasize a rule breaking by the

20   defendants because of a failure to follow or at least the

21   allegation that they failed to follow the rules of the

22   blind-bidding game.

23             So going into that much more detail with her in some

24   every step of the way process I think would focus on an

25   irrelevant topic for a per se case, and for that reason I think

Sara Fisher - Cross

1   that -- and also I do agree that it is cumulative as well based

2   upon the questions that were already elicited and the testimony

3   already elicited yesterday.  So I will sustain the objection.

4           (In open court:)

5           MR. LOVELAND:  Thank you, Your Honor.

6   BY MR. LOVELAND:

7   Q.  Ms. Fisher, at any point during the bidding cycle that you

8   have testified about, did any chicken suppliers tell you that

9   they were sharing prices?

10  A.  No.

11  Q.  At any point during this bidding cycle, did you ever hear

12  about any chicken suppliers sharing prices?

13  A.  No.

14  Q.  At any point in your career at RSCS, did you ever tell a

15  chicken supplier to share its prices with another chicken

16  supplier?

17  A.  No.

18          MR. LOVELAND:  Your Honor, I have no further questions

19  on direct.

20          THE COURT:  Thank you.

21          Cross-examination?  Ms. Carwile, go ahead.

22                          **CROSS-EXAMINATION**

23  BY MS. CARWILE:

24  Q.  Good morning, Ms. Fisher.

25  A.  Good morning.

Sara Fisher - Cross

1    *Q.*  Can you hear me?

2    *A.*  Yes.

3    *Q.*  All right.  My name is Laura Carwile, and I represent Roger

4    Austin.

5         Ms. Fisher, other than in prior in-court proceedings

6    in this case, you and I have never met, correct?

7    *A.*  Correct.

8    *Q.*  And, in fact, you have never met with any defense attorney

9    involved in this case; is that correct?

10   *A.*  Correct.

11   *Q.*  And outside of court, you have met with the prosecutors or

12   government agents at least 13 separate times prior to today; is

13   that correct?

14   *A.*  I don't know the exact amount, but, yes, I have met with

15   them.

16   *Q.*  Would it refresh your recollection as to the exact amount

17   if I gave you the dates of the meetings you've had with the

18   prosecutors?

19   *A.*  Yes.

20   *Q.*  All right.  So in 2021 --

21        *MR. LOVELAND:*  Objection, Your Honor.  I can take this

22   at side bar, but I don't know that this is a proper way to

23   refresh a witness' recollection.

24        *THE COURT:*  Yeah, I agree.  She can be shown, like, a

25   list of dates or something to refresh her recollection, and

Sara Fisher - Cross

1   then she can take a look at that, and then you could ask her if

2   it refreshes her recollection.

3           MS. CARWILE:  All right.

4           May I approach?

5           THE COURT:  Yes.  Ms. Buchanan will hand it to the

6   witness.

7   BY MS. CARWILE:

8   Q.  And, Ms. Fisher, take your time and let me know when you

9   have looked at the dates of the meetings you have had with the

10  prosecutors.

11          MR. LOVELAND:  Objection, Your Honor, to the

12  characterization of what's before the witness.

13          THE COURT:  Well, she can take a look at it, and if

14  she thinks that that refreshes her recollection about a

15  meeting, then she can so indicate.

16  A.  Yes.  I mean, I know I have met with them several times.  I

17  can't confirm the dates, but I know I have met with them

18  several times.

19  BY MS. CARWILE:

20  Q.  Fair to say you have met with them at least a dozen times?

21  A.  I don't know.  I mean, I have met with them quite a few

22  times, but I can't confirm.

23  Q.  Okay, that's fine.

24          THE COURT:  Ms. Buchanan, can you hand that back to

25  Ms. Carwile.

Sara Fisher - Cross

1    *BY MS. CARWILE:*

2    Q.  All right.  And, Ms. Fisher, you were interviewed by

3    prosecutors, at least one prosecutor sitting at this table, as

4    late as yesterday at lunch right before you started your

5    testimony yesterday afternoon; is that correct?

6    A.  Yes.

7    Q.  And in some of those sessions, you were being prepared for

8    your in-court testimony today?

9    A.  Yes.

10   Q.  And so the prosecutors were preparing you for the questions

11   they would ask you on direct.

12   A.  Yes.

13   Q.  And they were preparing you for some of what you may be

14   asked on cross-examination?

15   A.  Yes.

16   Q.  And that happened in more than one session when you met

17   with the prosecutors.

18   A.  Correct.

19   Q.  Now, despite the fact that this -- the prosecution indicted

20   this case in the year 2020, you were not interviewed by anyone

21   from the prosecution until March of 2021, correct?

22   A.  I don't recall the date.  I'm sorry.

23   Q.  That's okay.  Was it in the year 2021?

24   A.  That sounds right, yes.

25   Q.  So at some point in the year 2021 was your very first

214

Sara Fisher - Cross

1  interview with the prosecutors?

2  A.  I believe so.

3  Q.  Now, before we get started, I just want to orient about

4  language I am going to use so that we are on the same page.  Is

5  that okay?

6  A.  Yes.

7  Q.  So I am going to be using the phrase "2018 contracts," and

8  when I say that, I am going to be referring to those three or

9  four -- three or three-and-a-half-year contracts you testified

10  about on direct between RSCS and chicken suppliers.

11  A.  Okay.

12  Q.  Does that work?

13  A.  Yes.

14  Q.  And when I say "2018 contract negotiations," I am going to

15  be discussing the time period during which those exact

16  contracts were negotiated, okay?

17  A.  Okay.

18  Q.  All right.  So I am going to start by asking you for a

19  little bit of an overview about the 2018 contract negotiations.

20  A.  Okay.

21  Q.  So you testified there were eight suppliers who entered

22  bids for the 2018 contracts?

23  A.  Yes.

24  Q.  And all eight of those suppliers ultimately received some

25  of RSCS's business.

Sara Fisher - Cross

1   A.   Yes.

2   Q.   And before I move on from that, Ms. Fisher, I want to ask

3   you something about these eight suppliers.  I may have

4   misunderstood what you said yesterday, but is it your testimony

5   that these suppliers did not know who was bidding for RSCS's

6   business in 2018 because they weren't cc'd on the same e-mail?

7   A.   Yes.

8   Q.   So your testimony is that suppliers who had previously bid

9   in other years for RSCS didn't have any information as to who

10  was bidding in the year 2018?

11  A.   Nothing that I shared that I am aware of.

12  Q.   So that's -- that's a separate question.  I am not asking

13  you about necessarily anything you did, but my question is, is

14  your testimony that suppliers who had provided chicken to RSCS

15  for years in the past prior to this 2018 contract negotiations

16  had no idea which other suppliers were bidding for RSCS's

17  business in 2018?

18       MR. LOVELAND:  Objection, Your Honor, foundation, and

19  she is asking the witness to extrapolate on what others knew.

20       MS. CARWILE:  Well, it was asked that way on direct as

21  well.

22       THE COURT:  I don't recall that, sustained, but you

23  can lay some foundation.

24  BY MS. CARWILE:

25  Q.   I believe -- well, I will move on from that.

Sara Fisher - Cross

1         But it is fair to say that the suppliers who bid for

2    the 2018 contracts with one exception had provided eight-piece

3    COB chicken to RSCS in previous contract cycles?

4    A.   Yes.

5    Q.   All right.  And basically your testimony on direct was that

6    you e-mailed suppliers separately?

7    A.   Correct.

8    Q.   So that you did not inform them of who was bidding for that

9    contract negotiation, correct?

10   A.   Correct.

11   Q.   Nothing -- you don't know what anyone else knew or anyone

12   else said.

13   A.   Correct.

14   Q.   Thank you for clearing that up, Ms. Fisher.  I appreciate

15   that.

16         All right.  So moving on, you said RSCS gave each of

17   those eight suppliers a contract in 2018.

18   A.   Yes.

19   Q.   And is it accurate to say that these suppliers were

20   competing with each other over the volume of chicken they would

21   get to sell to RSCS?

22   A.   Yes.

23   Q.   And so basically for each contract period, RSCS, as you

24   testified on direct, needs to buy a certain amount of chicken,

25   right?

Sara Fisher - Cross

1   A.   Yes, that's correct.

2   Q.   Another shorthand way to say amount of chicken or pounds of

3   chicken is volume of chicken, right?

4   A.   Yes.

5   Q.   And you could even just say volume and you would know what

6   I am talking about.

7   A.   Yes.

8   Q.   And so each of these eight suppliers are competing for

9   volume in sales to RSCS during these contract negotiations.

10  A.   Yes.

11  Q.   And that's basically them competing to sell a certain

12  amount or set of pounds of chicken to you and then make money

13  on that sale.

14  A.   Yes.

15  Q.   So volume is an extremely important part of these

16  contracts.  Do you agree?

17  A.   Yes.  It's one of the important parts, yes.

18  Q.   Yeah, it's one of the most important parts of the

19  contracts?

20  A.   Well, pricing, volume, plant location are all very

21  important.

22  Q.   Okay.  And volume is one of those three very important

23  considerations?

24  A.   Yes.

25  Q.   And so suppliers were competing against each other to sell

218

Sara Fisher - Cross

1  more chicken than their competitors to RSCS essentially is the

2  way the contract negotiation works.

3  A.  Yes.

4  Q.  And RSCS would actually take away volume from one supplier

5  and give it to another supplier or other suppliers if it was in

6  RSCS's interest to do that, right?

7  A.  If it was in the best interests of the system to the

8  franchisees, then, yes, we would move volume.

9  Q.  And by "move volume" -- I am just trying to get the

10  language right so we are on the same page.  By "move volume,"

11  you mean RSCS would take away sales, the sale opportunity of

12  amount of chicken from one supplier and give those sales to

13  another supplier if RSCS felt like that would help RSCS,

14  correct?

15  A.  Yes, during the bidding process.

16  Q.  Right, of course.  And I am -- sorry, I should have made

17  that clear.  I am only talking about the negotiation part of

18  the process?

19  A.  Yes.

20  Q.  Thank you for clarifying that.

21       And that actually did happen for the 2018 contracts,

22  didn't it?

23  A.  Yes.

24  Q.  Some suppliers ended up getting to sell less chicken than

25  they had in the previous 2015 contract.

Sara Fisher - Cross

1    A.   Correct.

2    Q.   Which means that those suppliers sold less chicken than

3    they had in previous contracts to RSCS.

4    A.   Yes, that's correct.

5    Q.   Yeah, meaning they lost some of RSCS's business

6    essentially.

7    A.   Yes.

8    Q.   All right.  And Pilgrim's Pride was one of the suppliers

9    that lost volume from its previous 2015 contract to this 2018

10   contract; isn't that correct?

11   A.   Yes, that's correct.

12   Q.   All right.  We are going to come back to the actual numbers

13   of that later, but I just wanted to set the stage.  Thank you

14   for going through that with me, and I will come back to that in

15   a little bit.

16          I want to talk to you now, back up a little bit and

17   talk more about what RSCS is and its role in this process,

18   okay?

19   A.   Okay.

20   Q.   So you testified that RSCS is the sole supply chain arm for

21   Yum Brands; is that correct?

22   A.   We provide the supply chain function for Yum Brands, yes.

23   Q.   And you are the only company that does that, right?

24   A.   From a -- from our -- what we do, yes.

25   Q.   Okay.  And Yum, taking another step back, Yum Brands is

Sara Fisher - Cross

1    essentially for -- it's an umbrella company that includes four

2    other companies that run restaurants, so that's KFC, Pizza Hut,

3    Taco Bell, and Habit Burger Grill; is that right?

4    A.   Yes.

5    Q.   And Yum Brands doesn't include any other restaurant or

6    company than those four.

7    A.   Not that I'm aware of.

8    Q.   And besides Yum Brands, RSCS has an agreement to service

9    A&W restaurants because of a previous -- because A&W was

10   previously a part of Yum Brands but is no longer; is that

11   right?

12   A.   That's correct.

13   Q.   So other than the four restaurants included in the umbrella

14   company of Yum Brands and A&W, RSCS does not serve in any

15   capacity for any other company, correct?

16   A.   Correct.

17   Q.   RSCS's purpose is to service the Yum Brands and A&W.

18   A.   Yes.

19   Q.   Okay, thank you.  And that includes negotiating contracts

20   on behalf of Yum Brands.

21   A.   Yes.

22   Q.   That would include negotiating contracts for KFC and its

23   franchisees?

24   A.   Yes.

25   Q.   Okay.  And so ultimately RSCS works on behalf of KFC and

Sara Fisher - Cross

1    its franchisees; is that right?

2    A.   Correct.

3    Q.   And you actually said on direct I think that franchisees

4    own RSCS because it's a cooperative, correct?

5    A.   Correct.

6    Q.   So it's fair to say that RSCS answers to KFC and its

7    franchisees?

8    A.   Correct.

9    Q.   And so if KFC franchisees were upset about something, RSCS

10   would -- it would be brought to the attention of RSCS.

11   A.   Yes.

12   Q.   All right.  Now, let's talk about your personal role in

13   these 2018 contract negotiations, okay?

14   A.   Uh-huh.

15   Q.   So you were new to the chicken procurement team at RSCS at

16   the time that the negotiations for the 2018 contracts began; is

17   that right?

18   A.   Yes, that's correct.

19   Q.   And you said on direct you had been in that role since

20   2016.  This may be my error.  I may have written it down wrong.

21   Did you say you started in March or June of 2016?

22   A.   I believe it was March or April, I believe.

23   Q.   I had June, but maybe it was on me.  And you left in March

24   of 2019; is that right?

25   A.   Yes.

Sara Fisher - Cross

1   Q.  So before that time, you had never been involved in

2   negotiating KFC contracts for chicken; is that right?

3   A.  Correct.

4   Q.  And so at no time prior to sometime in the middle of 2016

5   had you ever worked on contracts involving KFC before.

6   A.  Correct.

7   Q.  And then you left this role in March of 2019.

8   A.  Yes.

9   Q.  And that was before the contract negotiation began in

10  earnest for the 2021 cycle.

11  A.  Yes.

12  Q.  Okay.  So it is -- from what I'm hearing you say, it's fair

13  to say that the only contract negotiation cycle you have

14  participated in for KFC is the 2018 contracts; is that correct?

15  A.  Yes, that's correct.

16  Q.  Okay.  Thank you.

17       And in that 2018 contract negotiations, I think you

18  said on direct you played a behind-the-scenes role; is that

19  right?

20  A.  Yes.  I did the communications and just kind of analysis

21  behind the scenes.

22  Q.  So when you say you did the "communications," you mean that

23  you communicated on behalf of RSCS with separate suppliers to

24  inform them of dates or the process or feedback or things of

25  that nature; is that right?

Sara Fisher - Cross

1   *A.*   Correct.

2   *Q.*   And you were -- you did that at the direction of your boss,

3   Rich Eddington.

4   *A.*   Yes.

5   *Q.*   And the other thing that you did besides communicate with

6   the suppliers as the sort of front-line communicator for

7   certain dates and bidding deadlines is you did some analysis of

8   the bids behind the scenes; is that right?

9   *A.*   Yes.

10   *Q.*   Okay.  And did I accurately represent your role in the 2018

11   contract negotiations?

12   *A.*   Yes, you did.

13   *Q.*   Okay, thank you.

14          Is it fair, Ms. Fisher, to say you didn't play a

15   leading role in these negotiations?

16   *A.*   Yes.

17   *Q.*   And I think I just asked you this, so I am sorry to repeat

18   myself, but your boss for the 2018 negotiations was Rich

19   Eddington?

20   *A.*   Yes, that's correct.

21   *Q.*   And he was the team leader responsible for the poultry

22   department at that time?

23   *A.*   Yes.

24   *Q.*   Okay.  And his more formal title was senior director of

25   procurement at RSCS during that time; is that right?

Sara Fisher - Cross

1    A.   Yes.

2    Q.   And so he was the leader or the boss of these 2018 contract

3    negotiations for KFC?

4    A.   Yes, he was.

5    Q.   And you understood that Mr. Eddington had -- or has

6    extensive experience in the chicken industry, is that correct,

7    from working with him?

8    A.   Yes, that's correct.

9    Q.   Thank you.

10        So now I'm going to do what I promised and come back

11   to talking about the actual numbers of the volume that was

12   provided as sales awards to the different suppliers, okay?

13   A.   Okay.

14        MS. CARWILE:   So, Your Honor, if I may grab some

15   binders and approach the Court, and I will provide it to

16   counsel as well.

17        THE COURT:   Yes, of course.

18        MS. CARWILE:   Thank you.   Thank you for letting me get

19   a little settled here.

20        Your Honor, at this time, I would like to move into

21   evidence a series of contracts that are the subject of a

22   previous agreement between the parties, and I can list those

23   for the Court.

24        THE COURT:   Yes, go right ahead.

25        MS. CARWILE:   Thank you.   I am going to not publish

Sara Fisher - Cross

1    them unless it becomes unfortunately necessary.

2         Okay.  So the list is Exhibit 1119, 1121, 1123, 1125,

3    1126, 1127, F-744, F-756, F-765, and F-774.

4         And for the record, the binder I have provided has

5    five other exhibits that have been moved into evidence on

6    direct.

7         THE COURT:  Okay.

8         MS. CARWILE:  So those are the ones I am moving now

9    for the admission of, Your Honor.

10         THE COURT:  Any objection to the admission of the

11   exhibits that Ms. Carwile just mentioned?

12         MR. LOVELAND:  No objection, Your Honor.

13         THE COURT:  Each of those exhibits will be admitted.

14         MS. CARWILE:  Thank you.

15   BY MS. CARWILE:

16   Q.  Ms. Fisher, I am going to show you now a one-page document,

17   not a binder, and ask you if you recognize it, okay?

18   A.  Okay.

19         MS. CARWILE:  I am going to provide copies to counsel.

20   And may I approach Ms. Buchanan, Your Honor?

21         THE COURT:  Yes, you may.

22         MS. CARWILE:  Thank you.

23   BY MS. CARWILE:

24   Q.  So, Ms. Fisher, without talking about the contents of the

25   defense Exhibit I-979 which I have provided you, do you

Sara Fisher - Cross

1   recognize this chart?

2   A.  Yes.

3   Q.  Okay.  And is it accurate to say that this chart compares

4   the volume of chicken that each supplier sold to RSCS during

5   the 2015 contracts compared with the number that they sold to

6   RSCS in the 2018 contracts?

7   A.  Yes.

8   Q.  Okay.  And these numbers in this chart come directly -- and

9   I can give you time to look at this if you would like certainly

10  because I gave you the binder -- but if you know, the numbers

11  in the chart come from, directly from the contracts from the

12  2015 and 2018 RSCS contracts; is that right?

13  A.  Yes, they should.

14  Q.  Okay.

15          MS. CARWILE:  Your Honor, I would ask to move I-979

16  into evidence under 611(a) and 1006, and if the Court would

17  like me to provide additional information, I can do that on

18  side bar.

19          THE COURT:  Let's find out if there is an objection.

20          Any objection to the admission of I-979?

21          MR. LOVELAND:  Your Honor, if we could have a side

22  bar, please.

23          THE COURT:  We may.

24      (At the bench:)

25          THE COURT:  Go ahead, Mr. Loveland.

Sara Fisher - Cross

1          *MR. LOVELAND:*  So my concern here -- and we do not

2     have an objection to this being shown to the jury as a

3     demonstrative.  My concern here is whether this material

4     included in this chart is overly voluminous to meet the

5     requirement of the federal rules.

6          I think it's just comparing two documents essentially

7     for each of the chicken suppliers.

8          *THE COURT:*  Okay.  Ms. Carwile?

9          *MS. CARWILE:*  Thank you, Your Honor.  I would note

10    that in trial two Ms. Johnson went through this chart

11    extensively with this witness.  I believe it took over the

12    course of maybe an hour, I don't want to misrepresent the

13    amount of time it took, and she went through with this witness

14    each number in this chart, and the witness agreed to each

15    number.  And if the Court and counsel would like to note the

16    Court's ultimate ruling that this would be assistive to the

17    jury, I can point everyone to transcript page 1945 at line 20

18    through page 1946 at line 20 in the certified transcript.

19         And the Court overruled the government's same

20    objection to and found that this chart summarizes a number of

21    different contracts and admitted this chart in evidence.  I

22    would ask the same ruling be made here.

23         *THE COURT:*  Mr. Loveland, whenever you are ready.

24         *MR. LOVELAND:*  If I could have the Court's indulgence

25    for just a brief moment.

Sara Fisher - Cross

1          *THE COURT:*  Sure.

2          *MR. LOVELAND:*  Your Honor, it was admitted at the last

3    trial.   The government withdraws its objection.

4          *THE COURT:*  Yeah, only in a retrial would you have a

5    demonstration of the fact that it cannot be conveniently

6    discussed in court and the summary would provide a material

7    benefit to the jury, so, yes, the objection has been withdrawn.

8    Thank you.

9          (In open court:)

10         *MS. CARWILE:*  Your Honor, at this time, I would move

11   for Defense Exhibit I-979 into evidence.

12         *THE COURT:*  Any objection?

13         *MR. LOVELAND:*  No, Your Honor.

14         *THE COURT:*  I-979 will be admitted.

15         *MS. CARWILE:*  I would like to publish it but only the

16   top title at this time, please.   Thank you.

17         May I do so, Your Honor?

18         *THE COURT:*  Yes, you may.

19         *MS. CARWILE:*  Thank you.

20   *BY MS. CARWILE:*

21   *Q.*  All right.   Ms. Fisher, can you see that on your screen?

22   *A.*  Yes.

23   *Q.*  So the chart as we just said is going to compare the volume

24   of sales that each supplier essentially was allowed to make to

25   RSCS under both the 2015 contract and the 2018 contract; is

1    that right?

2    *A.*  Yes.

3    *Q.*  And, Ms. Fisher, before I go further, the reason we're

4    comparing the 2015 contract and the 2018 contract is because

5    both of these contracts are three-year contracts; is that

6    right?

7    *A.*  Yes.  I didn't recall if it was three or four years, but if

8    it started in 2015, it would have been three years.

9    *Q.*  That's okay, right.  So essentially the 2015 contract,

10   though, my point is it goes to the end of either mid 2017 or

11   early 2018, the 2018 contracts?

12   *A.*  Yes.

13   *Q.*  And that's why these are the two being compared, right?

14   *A.*  Yes.

15   *Q.*  Okay.

16        *MS. CARWILE:*  So if we can just show the first line

17   without any of the suppliers, the title of the chart.  Thank

18   you so much.

19   *BY MS. CARWILE:*

20   *Q.*  So, Ms. Fisher, you talked a little bit about truckloads on

21   direct.  I would like to just get a little more clarification

22   on that if I can.

23   *A.*  Okay.

24   *Q.*  So we have already determined that volume of chicken is a

25   shorthand way to say or a different way, I should say, to say

Sara Fisher - Cross

1    amount or pounds of chicken; is that right?

2    A.   Yes.

3    Q.   But there are other -- there are other types -- there are

4    other ways that chicken suppliers and chicken buyers use the

5    phrase "volume"; is that right?

6    A.   Yes.

7    Q.   Other than just pounds of chicken?

8    A.   Yes.

9    Q.   One of the ways that they indicate volume of chicken is to

10   use the phrase "truckloads," right?

11   A.   Yes, that's correct.

12   Q.   And that just means -- is it fair to say that that sort of

13   means in a layperson's term the amount of pounds of chicken

14   that's been on a truck?

15   A.   Yes, that's correct.

16   Q.   And to be really precise because I don't want to suggest

17   that the chicken is just thrown into a truck, it's actually put

18   into cases and then put on the truck, right?

19   A.   Yes, that's correct.

20   Q.   And we'll get back to this, but even another way to talk

21   about volume of chicken is to talk about how much chicken is in

22   a case, right?

23   A.   Yes.

24   Q.   But for now we are going to talk about truckloads meaning

25   how much chicken can fit on a truck, right?

Sara Fisher - Cross

1    A.   Yes.

2    Q.   And that is one of the ways that these contracts explain

3    how much volume each supplier is going to be allowed to sell to

4    RSCS.

5    A.   Yes, that's correct.

6    Q.   All right.  And would you agree with me that while it can

7    vary, I understand that, a truckload of chicken is

8    approximately 33,500 pounds of chicken?

9    A.   Yes, that's correct.

10   Q.   And one last thing before we start looking at the actual

11   numbers.  The numbers we're about to look at are the number of

12   truckloads per week that each supplier sold to RSCS, correct?

13   A.   Yes, that's correct.

14   Q.   Thank you.

15           So let's start with the top line, Case Farms.

16           MS. CARWILE:  If that can be displayed, thank you.

17   BY MS. CARWILE:

18   Q.   So, Ms. Fisher, looking at this line, it's fair to say that

19   Case Farms sold eight truckloads of chicken to RSCS per week in

20   2015 and 14 truckloads in 2018; is that right?

21   A.   Yes.

22   Q.   So Case Farms gained six truckloads per week in volume of

23   sales to RSCS during the 2018 contract.

24   A.   Yes.

25   Q.   All right.  Let's look at the second line, please, Claxton.

Sara Fisher - Cross

1    So under the 2015 contract, Claxton was selling RSCS

2    16 truckloads of chicken per week; is that correct?

3    A.   Yes.

4    Q.   And under the 2018 contract, they were selling the exact

5    same amount of truckloads, correct?

6    A.   Correct.

7    Q.   So there was no change in how much volume Claxton was able

8    to sell to RSCS.

9    A.   Correct.

10   Q.   All right.  I am going to give you a little bit of break

11   and go through the next three lines together.  If we could look

12   at George's, Koch, and Mar-Jac, please.

13          MR. LOVELAND:  Objection, Your Honor.  I think the

14   document speaks for itself, and at this point, we are just

15   reading it into the record.

16          THE COURT:  Overruled.

17   BY MS. CARWILE:

18   Q.   So taking a look at those three chicken supplier companies,

19   is it fair to say that each of those suppliers lost between

20   four and seven truckloads in sales to RSCS per week of chicken?

21   A.   Yes.

22   Q.   All right.  Now, let's look at OK Foods, please, the next

23   line in the chart.

24          MS. CARWILE:  I think the bottom part, the surprise is

25   gone, that's okay, I can live with that.

Sara Fisher - Cross

1    *BY MS. CARWILE:*

2    *Q.*  So OK Foods, the reason why I want to focus on it is

3    because there is no number in the 2015 contract box; is that

4    right?

5    *A.*  Yes.

6    *Q.*  And that's because OK Foods did not have a contract to

7    supply small-bird COB to RSCS in 2015; is that right?

8    *A.*  That's correct.

9    *Q.*  So they were a new supplier as of the 2018 contract.

10   *A.*  Well, they were brought on before the contracts went into

11   place, but, yes, they were not a part of the 2015 contracts.

12   *Q.*  So the first time OK Foods ever signed a contract to

13   sell -- a three-year contract to sell chicken to RSCS was in

14   the 2018 contract?

15   *A.*  Yes.

16   *Q.*  And it looks like RSCS gave OK Foods eight truckloads of

17   chicken per week in new sales.

18   *A.*  Correct.

19   *Q.*  All right.  And finally -- no, not finally, almost finally,

20   let's look at the Pilgrim's line, please.  Now, I want to stick

21   with this line for a little bit, Ms. Fisher.  This line shows

22   us just like the lines above it that under the 2015 contract

23   Pilgrim's sold 63 truckloads of chicken per week to RSCS; is

24   that right?

25   *A.*  Yes.

234

Sara Fisher - Cross

1  Q.  And that under the 2018 contract, Pilgrim's was only

2  contracted to sell 40 truckloads of chicken a week to RSCS; is

3  that right?

4  A.  Yes.

5  Q.  So that's a net loss of 23 truckloads per week of chicken

6  sales to RSCS, correct?

7  A.  Yes, that's correct.

8  Q.  And I had asked you previously about the number of pounds

9  estimated approximately that are in each truckload.  You

10  said -- you agreed with me that it was about 33,500.

11  A.  Yes.

12  Q.  And that's pounds of chicken per truckload.

13  A.  Correct.

14  Q.  So if we multiply that number by the number of truckloads

15  that Pilgrim's Pride lost in volume of sales, we can calculate

16  how many pounds of sales they lost.  Is that fair to say?

17  A.  Yes.

18  Q.  Okay.  I did this calculation before court, Ms. Fisher, and

19  I think there is a calculator.  If you want to check my math, I

20  would not be offended.  But I have that 33,500 times 23 is

21  770,500 pounds of chicken.  Does that sound right?

22  A.  Yes.

23  Q.  So what this chart is showing that between the 2015

24  contract and the 2018 contract, Pilgrim's Pride lost 770,000 --

25  over 770,000 pounds of chicken sales to RSCS per week; is that

Sara Fisher - Cross

1    right?

2    A.   Yes.

3    Q.   Let's look at the final line of this chart, please, which

4    is Tyson.  And we're old pros at this by now, but I am just

5    going to make sure I see the numbers correctly.  Is it fair to

6    say that Tyson actually gained nine truckloads of chicken in

7    sales to RSCS per week between 2015 and 2018?

8    A.   Yes.

9    Q.   So they went from 25 truckloads per week to 34 truckloads

10   per week?

11   A.   Yes.

12   Q.   All right.  So this chart --

13            MS. CARWILE:  And if we could also show the last line.

14   BY MS. CARWILE:

15   Q.   This line basically shows that in 2015 RSCS bought

16   214 truckloads per week of chicken.  And in 2018, RSCS bought

17   17 less or 197 truckloads; is that correct?

18   A.   That's correct.

19   Q.   So the number of truckloads that RSCS didn't buy was 17

20   overall total.

21   A.   Correct.  The total went down 17 loads, yes.

22   Q.   But Pilgrim's lost more than 17 truckloads of chicken per

23   week in volume of sales.

24   A.   Yes.

25   Q.   So is it fair to say that some of the sales of chicken that

Sara Fisher - Cross

1    Pilgrim's lost were given to other companies, other suppliers?

2    A.  Yes.

3    Q.  All right.  Thank you.  And now we are done with that

4    chart.  Thank you, Ms. Fisher.  I appreciate your patience with

5    me.

6           Let's turn to a different topic.  I would like to talk

7    with you now about what period pricing is, okay?

8    A.  Okay.

9    Q.  So on direct, you testified about the supply chain for

10   chicken sort of at a higher level.  And I believe you said that

11   chicken would basically go from suppliers, for the most part it

12   would go to a distributor, and then from that distributor the

13   chicken would be delivered to the various restaurants.  Is that

14   an overarchingly fair way to say what the supply chain looked

15   like?

16   A.  Yes.

17   Q.  So the distributor was sort of a middleman in this process.

18   A.  Correct.

19   Q.  And for the most part with very rare exception, a

20   distributor company is a separate company than a supplier,

21   right?

22   A.  Yes.

23   Q.  So it's not as if for the most part -- I understand there

24   are a few exceptions to this, but for the most part it's not as

25   if suppliers own the distributors and then that is how that

Sara Fisher - Cross

1    worked.

2    *A.*   Correct.

3    *Q.*   Distributors are separate companies?

4    *A.*   Yes, for the most part.

5    *Q.*   Thank you so much.

6          So and it's fair to say that because they had to work

7    directly together in the supply chain, distributors and

8    suppliers often spoke to each other.

9    *A.*   Yes.

10   *Q.*   Okay.  Now, RSCS negotiated the price of chicken from each

11   supplier during those contract negotiations we've talked about,

12   correct?

13   *A.*   Yes.

14   *Q.*   And I think you said this on direct, but please correct me

15   if I'm wrong, you said once the SBRA is signed, it's signed,

16   it's set; is that right?

17   *A.*   Not -- the SBRA, yes.  The exhibits are what's -- what is

18   for the contracted periods.

19   *Q.*   Okay.  So let me make it even simpler.  Once the contract

20   that you're negotiating has been set, it's set, right?  And

21   unless someone negotiates a different set of terms, those are

22   the terms that RSCS is going to buy chicken from the suppliers.

23   *A.*   That's correct.

24   *Q.*   Okay.  So that's true that once the cost model is set for a

25   certain contract period, it's set, correct?

Sara Fisher - Cross

1   A.   Yes.  I mean, there is items in the cost model that are

2   variable, but, yes.  Other than that, the fixed components are

3   fixed, yes.

4   Q.   And I think you might have anticipated where I was going

5   with that, I appreciate that, which is that there are items in

6   the cost model that are variable, correct?

7   A.   Correct.

8   Q.   What are some of those items?

9   A.   Mostly feed-related items.

10  Q.   That's because the cost to feed the chickens changes from

11  period to period, correct?

12  A.   Correct.

13  Q.   So it's not true that the exact price of chicken stays the

14  same to the fourth decimal place in every period even under the

15  same contract.

16  A.   Correct.

17  Q.   And that's because, as you said, the cost model includes

18  variables, the main one of which is the grain prices.

19  A.   Correct.

20  Q.   And the way RSCS deals with the variation in the grain

21  prices each period is that they provide distributors with the

22  exact price for that period of the chicken from each supplier;

23  is that right?

24  A.   Yes.

25  Q.   So you basically calculate how much it costs to feed these

Sara Fisher - Cross

1   chickens over a four-week-period and then you calculate what

2   the cost is for that month based on your contract and you give

3   that to the distributors.

4   A.  Well, it's a little bit more complicated than that because

5   we have got commodity risk management in there directing grain

6   prices and whatnot.

7   Q.  I believe you that it's more complicated.  I am not trying

8   to pretend it's not.  But I guess what I am trying to say is

9   with the feed cost variable, would you agree with me that that

10  variable changes the period price over each period for each

11  supplier?

12  A.  Yes.

13  Q.  Even though the contract has already been set and is

14  negotiated.

15  A.  Correct.

16  Q.  Okay, thank you.

17        And a period is every four weeks for KFC; is that

18  right?

19  A.  Yes, it is.

20  Q.  It doesn't necessarily correlate to a calendar month?

21  A.  Correct.

22  Q.  Because, for instance, January is more than four weeks?

23  A.  Yes.  There is 13 periods.

24  Q.  Perfect.  So there is 13 periods in a year.  The first

25  period, period 1 is the first four weeks of January?

Sara Fisher - Cross

1   A.   Not necessarily.  I think -- I mean, I guess there could

2   be, like, the remaining days of the last year in there.

3   Q.   Fair enough.  So it's either the first four weeks of

4   January or a few less than the first four weeks of January.

5   A.   Yes.

6   Q.   Period 2 would be the remaining weeks in January and

7   whatever the next four weeks to calculate are into February; is

8   that right?

9   A.   It flows in a four-week process.

10  Q.   Thank you.  I think I am making it more complicated than I

11  need to, but I am essentially just asking you that periods do

12  not correlate to months in the calendar year.

13  A.   Correct.

14  Q.   And for each of these periods, RSCS gives the distributors

15  the price that it has calculated for that period for each

16  supplier in some form of a list or something like that.

17  A.   It's a blended price because we have suppliers going

18  into -- multiple suppliers going into DCs, so RSCS communicated

19  blended pricing to the distributor so they knew what to charge

20  the restaurants.

21  Q.   But I am asking about the amount of money that the

22  supplier -- the distributors pay for the suppliers, that's what

23  I am asking about.

24  A.   Yes, sorry.

25  Q.   So the prices that the distributors paid to the suppliers,

Sara Fisher - Cross

1    the period prices for those -- all eight of those suppliers

2    were provided to the distributors each period, correct?

3    A.  Yes, I believe so.

4    Q.  Okay.  Thank you.

5         And we've been using this phrase "period pricing,"

6    "period pricing."  The more -- a lay way to explain period

7    pricing is to just say current pricing, right, the current

8    price of chicken from the distributor or from the supplier to

9    the distributor for that period.

10   A.  Correct.

11        MS. CARWILE:  And if I can approach the witness with

12   what has been previously marked as Defense Exhibit I-045.  I

13   have a copy for counsel, and if I may approach the Court to

14   provide copies as well?

15        THE COURT:  You may.

16        MR. LOVELAND:  Your Honor, can we do a very, very

17   brief side bar?

18        THE COURT:  Yes.

19     (At the bench:)

20        THE COURT:  Mr. Loveland, go ahead.

21        MR. LOVELAND:  Thank you, Your Honor.

22        I just want to note, I know that there was a lot said

23   about government's exhibits that had confidential exempt

24   notations on the document and here that's on there.  So if we

25   are about to show this to the jury, it's something that the

Sara Fisher - Cross

1    defense has consistently objected to since the last trial, and

2    so I don't know if that would be appropriate.

3           MS. CARWILE:  I can explain.  The exhibit that's being

4    shown or that will be shown to the jury is redacted.  I

5    provided counsel and the witness copies that aren't redacted.

6    I am happy to take them back and redact it, but I think the

7    prejudice problem involves the jury, so it's the same exhibit

8    just with it unredacted.  I will not show that to the jury.

9           THE COURT:  Any problem in that case, Mr. Loveland?

10          MR. LOVELAND:  No, Your Honor.  I just wasn't able to

11   see that at the time I raised the issue, so there is no problem

12   with that.

13          THE COURT:  Sure.  And we will just want to make sure

14   that this exhibit is redacted by the time it makes it into an

15   exhibit notebook that goes back to the jury.

16          MS. CARWILE:  We will bring it to the Court today.

17          THE COURT:  That's great.  Thank you.

18          (In open court:)

19          MS. CARWILE:  Your Honor, at this time, I would move

20   for the admission of Defense Exhibit I-054 into evidence.

21          THE COURT:  Any objection?

22          MR. LOVELAND:  No, Your Honor.

23          THE COURT:  I-054 will be admitted.

24   BY MS. CARWILE:

25   Q.  So before I publish to the jury, Ms. Fisher, you have a

Sara Fisher - Cross

1  document in front of you that's two pages, but it's

2  double-sided.  Do you see that?

3  *A.*  Yes.

4  *Q.*  And I would ask you to turn and have published to the jury

5  just the side that has on the upper left corner Period 2, 2017

6  Margin Over Feed Price.

7          *MS. CARWILE:*  If we could do that, Your Honor?

8          *THE COURT:*  Yes.

9          *MS. CARWILE:*  Thank you.

10  *BY MS. CARWILE:*

11  *Q.*  And if I can direct your attention and have highlighted the

12  gray line that says Eight-piece Purple (Fresh.)  Thank you so

13  much.

14          So, Ms. Fisher, do you see that line of prices?

15  *A.*  Yes.

16  *Q.*  Okay.  And above each of those prices, there is a chicken

17  supplier company name; is that right?

18  *A.*  Yes.

19  *Q.*  And these are the eight chicken suppliers who were bidding

20  for the 2018 contracts.

21  *A.*  Correct.

22  *Q.*  And this is the price that these chicken suppliers are

23  selling to the distributors in the period 2 of 2017; is that

24  right?

25  *A.*  Yes.

Sara Fisher - Cross

1   Q.  Okay.  And these prices go out to a fourth decimal place.

2   Yeah, I think that's correct as to all of them; is that right,

3   Ms. Fisher?

4   A.  Yes.

5   Q.  And that's a specific price that RSCS calculated based on

6   the contract it has with each supplier and that variable cost

7   you were talking about.

8   A.  Correct.

9   Q.  And this price, this set of prices is only valid for the

10  period that -- in this case period 2 of 2017?

11  A.  Yes.

12  Q.  Those prices, because of the variation in the feed costs we

13  talked about, would be different for period 3 of 2017.

14  A.  Yes.

15  Q.  And you had said that the cost model RSCS has people use

16  for its bid cycles is the same.  You have the same line items

17  and things of that nature, correct?

18  A.  Yes, whatever is used in the bidding process for a

19  particular supplier would be the same that they provide on a

20  period basis, yes.

21  Q.  Right, right.  So however, that -- the price that is set

22  for period 2 of this year is, like I said, just applicable for

23  period 2 of 2017.

24  A.  Yes.

25  Q.  Okay.  And because these prices are so specific, they are

Sara Fisher - Cross

1    out to four decimal places, they change even if it's a few

2    decimal places each period, correct?

3    A.  Yes.

4    Q.  I would like to turn now to what happened --

5           MS. CARWILE:  Your Honor, I don't know if we are

6    taking another break.

7           THE COURT:  We are, and you predicted exactly when I

8    thought it would be an appropriate time.

9           Ladies and gentlemen, because we had a break about an

10   hour early, why don't we take 10 minutes right now.  So why

11   don't we plan on reconvening at 11:00, all right?

12           The jury is excused for the break.

13           (Jury excused.)

14           THE COURT:  We will be in recess until 11:00.  Thank

15   you.

16       (Recess at 10:50 a.m. until 11:04 a.m.)

17           THE COURT:  Let's go ahead and bring the jury back in.

18           (Jury present.)

19           THE COURT:  Go ahead, Ms. Carwile.

20           MS. CARWILE:  Thank you, Your Honor.

21   BY MS. CARWILE:

22   Q.  Ms. Fisher, I have moved the microphone since our break.

23   Can you still hear me?

24   A.  Yes.

25   Q.  So I said I was going to change topics, but I do have a few

Sara Fisher - Cross

 1   more questions for you about Defense Exhibit I-054 before we

 2   leave that topic, okay?

 3   A.  Okay.

 4       MS. CARWILE:  So if we could have that pulled up, the

 5   same side and zoomed in on the chart part of it if you don't

 6   mind.  Thank you.

 7   BY MS. CARWILE:

 8   Q.  So, Ms. Fisher, could you explain to me and the jury what

 9   eight-piece purple means?

10   A.  Purple is just the eight-piece chicken.  There is a color

11   label associated with it that KFC put in place.

12   Q.  Okay.  Thank you.

13       So when we see the word "purple" in regard to KFC

14   chicken, that's that eight-piece COB or chicken-on-the-bone

15   product that you have been discussing; is that right?

16   A.  Yes.

17   Q.  Thank you.

18       And, Ms. Fisher, last question about this document,

19   this is a document that was created by your company, RSCS; is

20   that right?

21   A.  Yes.

22   Q.  Thank you.

23       MS. CARWILE:  We can take that down.

24   BY MS. CARWILE:

25   Q.  So now I want to turn to a new topic, Ms. Fisher.  I want

Sara Fisher - Cross

1    to talk about what happened after RSCS received the first round

2    of bids from the suppliers in the 2018 negotiations, okay?

3    A.   Okay.

4    Q.   So once each supplier gave you their initial or first-round

5    bids, RSCS would compile all of these suppliers' bids in order

6    to essentially compare them; is that fair to say?

7    A.   Yes.

8    Q.   Now, Ms. Fisher, as a side note, on direct you used the

9    phrase "blind bid" or "blind bidding."  Do you remember that?

10   A.   Yes.

11   Q.   When you were preparing for your testimony with the

12   prosecutors, did they ask you to use that phrase?

13   A.   No, I don't think so.

14   Q.   Okay.  Well, Ms. Fisher, you have testified previously

15   twice in two prior proceedings about the same subject matter;

16   isn't that right?

17   A.   Yes, that's correct.

18   Q.   And that testimony was under oath; isn't that right?

19   A.   Yes, it was.

20   Q.   And it was about the exact same subject matter that we've

21   been talking about today, correct?

22   A.   Correct.

23   Q.   And will you accept my representation that at no point in

24   either of those prior proceedings did you yourself use the

25   phrase "blind bid"?

Sara Fisher - Cross

1    *A.*   Yes.

2    *Q.*   Okay.  Thank you.

3          Let's talk about the bids.  So you testified on direct

4    that -- I think you said something like, and please correct me

5    if I'm wrong about this, I think you said something, If

6    suppliers are in the dark about others' prices, it is, quote,

7    more advantageous, unquote, to RSCS.  Is that a fair statement?

8    *A.*   Yes.

9    *Q.*   Thank you.

10         So RSCS would gather the bids that they received in

11   the first round of bidding and they would analyze these bids

12   with -- internal to RSCS, meaning you would analyze them with

13   your co-workers?

14   *A.*   Correct.

15   *Q.*   And you said that part of your job was to do some of that

16   analysis; is that right?

17   *A.*   Yes.

18   *Q.*   But you weren't the only person at RSCS doing the analysis?

19   *A.*   No, no, I don't think so.

20   *Q.*   You work with other people to do the analysis, right?

21   *A.*   Yes.

22   *Q.*   So after RSCS analyzed these first-round bids from each

23   supplier, someone from RSCS would provide each supplier

24   feedback on those first-round bids; is that right?

25   *A.*   Yes, that's correct.

Sara Fisher - Cross

1  Q.  Now I believe you said previously that RSCS would sometimes

2  or often give this feedback in ranges or percentages.

3  A.  Yes.

4  Q.  And basically what I mean by that is RSCS would provide

5  each supplier with a range of prices or a percentage of how far

6  off the supplier was from the price that RSCS wanted.

7  A.  Yes.

8  Q.  And you would only provide that feedback to these suppliers

9  after you and your company knew what the first-round bids were

10  for all eight suppliers?

11  A.  Yes.

12  Q.  And the purpose of that feedback was -- one of the

13  purposes, I should say, of that feedback was for RSCS to

14  essentially give its suppliers more information about the price

15  RSCS wanted; is that right?

16  A.  Yes.  We were trying to drive the prices down.

17  Q.  Exactly.  You were trying to drive a price down to a price

18  that RSCS wants.

19  A.  Correct.

20  Q.  And in order to do that, you might tell a supplier, Your

21  bid is 10 percent too high.  I am making that number up.  I am

22  not suggesting you said 10 percent.  But is that a good example

23  of what you might say?

24  A.  Typically, it would be a range, some type of range, or it

25  could be specific line items.  It just really depended on the

Sara Fisher - Cross

1    situation.

2    Q.   Thank you for clarifying that.

3         So let's talk about what you mean when you say it was

4    typically a "range."  Would that be a range of prices?

5    A.   Typically, I think it would be a percent.  We may say

6    you're -- you know, take a look at it.  We want you -- you may

7    be off 2 to 4 percent from where we want to be or something

8    like that.

9    Q.   So the percentages could be typically in ranges or they

10   could be by themselves, or you may even give a range of some

11   other type than percentages?

12   A.   That's typically what we would do.  I can't speak to what

13   anybody did outside of what I did, but that's typically how

14   RSCS does it, yes.

15   Q.   I appreciate that clarification, and I should have said --

16   maybe I didn't make this clear, but I appreciate that because I

17   am only asking about what you did, so thank you for clarifying.

18        So the feedback was provided to each supplier as to

19   how much lower RSCS might want the price, right?

20   A.   Yes.

21   Q.   And it was up to each of those suppliers to decide what to

22   do with that feedback.

23   A.   Correct.

24   Q.   Right.  Because this is two sides of the contract

25   negotiation, so the suppliers give you their bids.  RSCS gives

Sara Fisher - Cross

1    feedback.  And then the suppliers can basically either take

2    that feedback and respond as RSCS wants or they could ignore it

3    if they wanted to.  To their own peril, they may lose sales to

4    RSCS.  Is that fair to say?

5    A.  Yes.

6    Q.  And that -- the ranges of feedback that you provided to

7    each supplier related at least in some way to the other bids

8    you were receiving from other suppliers; is that fair?

9    A.  I would say that's a portion of it, yes.

10   Q.  Okay.  So a portion of your feedback involved information

11   you had about other suppliers' bids for that round only.

12   A.  Yes.

13   Q.  Okay.  Another purpose -- well, another way to explain this

14   purpose of getting the suppliers to lower their prices is to

15   say that you were trying to get suppliers to be more aggressive

16   with their pricing; is that right?

17   A.  Yes.  We were trying to get aggressive pricing from

18   suppliers, that's accurate.

19   Q.  And for the 2018 contract, every single supplier who

20   provided you -- who you signed a contract with lowered their

21   bid from the first round to the contract price; isn't that

22   right?

23   A.  Yes, I believe so.

24   Q.  Let's talk about another goal of RSCS's feedback which I

25   believe you've said previously was to get suppliers' prices in

Sara Fisher - Cross

 1   as close of a range as possible.  Is that fair to say?

 2   *A.*  Yes.

 3   *Q.*  And can you -- so you would consider getting the suppliers'

 4   prices within a closer range, one of RSCS's goals?

 5   *A.*  Yes, that was a goal of that negotiation.

 6   *Q.*  That negotiation.  And like you said, you weren't involved

 7   in previous negotiations so you can't testify to them, but

 8   you're saying from what you remember, the negotiation you were

 9   involved in, that was one of the goals.

10   *A.*  Correct.

11   *Q.*  Can you explain what it means to have a range of supplier

12   prices?  That may be a little bit of a simple question, but I

13   would love to hear your answer on it.

14   *A.*  So each supplier has -- obviously we land on a different

15   price with each supplier from an FOB standpoint per pound, and

16   so we want that range to be as close as possible, because we're

17   selling to our franchisees and we don't want some franchisees

18   having to pay a lot more for their product than another.

19   *Q.*  Great.  Thank you.  I really appreciate that explanation.

20          And when we're saying "ranges," would you agree with

21   me that we mean the difference between the highest price

22   supplier's price and the lowest price supplier's price?

23   *A.*  Yes.

24   *Q.*  Is that right?

25   *A.*  Yes.

Sara Fisher - Cross

1  Q.  Okay.  Thank you so much.

2         So now that we have that sort of background that you

3  have provided us, which I appreciate, the point -- the goal was

4  to try to get the number of the highest supplier and the number

5  of the lowest supplier, the price to be closer.

6  A.  Correct.

7  Q.  And the way you did that in the negotiation you were a part

8  of was by giving the suppliers feedback on their bids.

9  A.  Correct.

10  Q.  And you have already answered my next set of four

11  questions, so I am going to move on.  I appreciate that.

12         Part of the reason that RSCS was negotiating a

13  three-year contract rather than a one-year contract as it had

14  done previously was that RSCS believed it could reduce the

15  range of the cost of a case of chicken between the suppliers;

16  is that right?

17  A.  Really the main goal that we were looking for in that

18  three-year contract is because going into that process we were

19  concerned about the amount of small bird that was out there,

20  and we didn't want to get into an annual contract and then lose

21  plants and not have enough volume going forward.

22  Q.  Thank you.  I am going to ask you more questions about that

23  in a little bit.  I appreciate your answer there.

24         My question, though, is for the 2018 contracts, is it

25  correct to say that the range of -- that RSCS was able to

Sara Fisher - Cross

1    tighten the range of supplier pricing from the 2015 contract

2    where the price range between the highest and lowest priced

3    supplier was $4.24 a case to a range of only 70 cents per case

4    for the 2018 contract?

5    A.  Yes, but that didn't necessarily correlate to how long we

6    put in the contract bid years.

7    Q.  Understood.  So unrelated to the length of the contract.

8    A.  Correct.

9    Q.  That was the tightening of price ranges of case prices was

10   a goal of RSCS that was achieved between the 2015 contract

11   where the difference between the highest-priced supplier and

12   the lowest-priced supplier was over $4 a case to the 2018

13   contract where the difference in price between the

14   highest-priced supplier and the lowest-priced supplier was 70

15   cents a case.

16   A.  Yes.

17   Q.  All right.  Let's talk about the issue you just raised

18   which is that supply shortage issue of small birds, okay?

19   A.  Okay.

20   Q.  So you testified that RSCS began this contract negotiation

21   cycle in December of 2016.

22   A.  Yes.

23   Q.  And that's when you sent those kickoff e-mails that we

24   read.

25   A.  Yes.

255

Sara Fisher - Cross

1  *Q.*  And then a few weeks later you sent out calendar

2  invitations to each supplier inviting them to come to a meeting

3  with RSCS to talk about their initial bids.

4  *A.*  Yes.

5  *Q.*  And you're the person who sent the calendar invitations out

6  to the suppliers, correct?

7  *A.*  Yes.

8  *Q.*  You're not the person who decided which dates would be

9  given to which supplier to meet with RSCS.

10  *A.*  I think we worked through calendars to see when people were

11  available.

12  *Q.*  That's your recollection of why --

13  *A.*  I believe so.

14  *Q.*  -- dates were chosen?

15  *A.*  Yes.

16  *Q.*  And each meeting was scheduled on a different date?

17  *A.*  I think there were some that may have overlapped on days.

18  *Q.*  The order, though, was decided by RSCS, for instance, one

19  supplier went first and then -- even if there were some

20  meetings on the same days, RSCS decided one might go before the

21  other on that day.

22  *A.*  I don't recall that.  I'm sorry.

23  *Q.*  That's okay.  Don't worry about it.  It's been a little bit

24  of time.

25          Would you agree with me that starting contract

Sara Fisher - Cross

1    negotiations over a year in advance was a bit unusual for RSCS?

2    A.   Yes, it was.

3    Q.   And I think you already said this, but please correct me if

4    I'm wrong, part of the reason that RSCS wanted to begin

5    contract negotiations that early was RSCS had a concern that

6    there wouldn't be enough small birds available.

7    A.   Yes, that's correct.

8    Q.   And you talked about this on direct, and I just have a few

9    questions about small birds versus big birds because we haven't

10   heard much about that yet.

11   A.   Okay.

12   Q.   Is it fair to say that there are different sizes of chicken

13   that are sold to different restaurants or other places that

14   sell chicken.

15   A.   Yes.

16   Q.   And each restaurant or other place that sells chicken needs

17   a certain size of chicken in order to sell its product for the

18   most part.

19   A.   Yes.

20   Q.   And that range is between something called a small bird,

21   which I think you said on direct was about 2.8 pounds.

22   A.   I believe that's what KFC's target was, yes.

23   Q.   Thank you.

24          To something called a big bird which is a different

25   kind of bird that's sold to different restaurants and

Sara Fisher - Cross

1    companies?

2    A.   Yes.

3    Q.   And the size of the bird that KFC needed for all of its

4    fresh chicken products was small bird.

5    A.   Yes.

6    Q.   It could not purchase big bird -- it could not purchase

7    big-bird chicken to replace small-bird chicken?

8    A.   Not for the chicken-on-the-bone products.

9    Q.   Right, sorry.  From now on when I am asking you about this,

10   I will only be referring to the chicken-on-the-bone fresh

11   chicken products, okay?

12   A.   Okay.

13   Q.   So they couldn't say, Well, we don't have enough small

14   chickens or small birds; let's buy a few big birds on the

15   market and replace it, right?

16   A.   That's correct.

17   Q.   And you made this pretty clear on direct.  Part of the

18   reason is because KFC has a particular specification of chicken

19   the way they cook it, the way they store it, the way they serve

20   it, and it has to be within this tight range of size so that

21   there is no food safety issues, for instance, right?

22   A.   Yes.

23   Q.   And so the product is consistent across each KFC across the

24   country and across the world.

25   A.   That's correct.

Sara Fisher - Cross

1    Q.   So having the correct small bird available for KFC in the

2    market was almost the most important thing to RSCS; is that

3    fair to say?

4    A.   I mean, it was very important, yes.

5    Q.   Having enough chicken for Kentucky Fried Chicken to sell

6    their products is one of the biggest considerations RSCS has in

7    these negotiations.

8    A.   Yes, it's one of them.

9    Q.   Okay.  And you said that when you started negotiations for

10   the 2018 contract, RSCS was concerned there wouldn't be enough

11   small birds available to purchase.

12   A.   Yes.  We wanted to start early and lock up our contracts

13   before -- we didn't want to wait too long if there wasn't

14   enough available.

15   Q.   Okay.  And I think you've -- would it be correct to say

16   that from a long-term perspective, the small-bird segment was

17   shrinking so the possibility existed there could be a long-term

18   shortage of small birds.

19   A.   That was a concern, yes.

20   Q.   And that's something you knew -- you thought could possibly

21   be true.

22   A.   Yes.

23   Q.   And so you have been made aware there was a small-bird

24   supply problem in 2014.  You know that to be true.

25   A.   Yes.

1   *Q.*  And you know that part of the reason that's true is because

2   the small-bird segment was shrinking compared to other types of

3   birds like the big-bird segment.

4   *A.*  Yes.

5   *Q.*  Of the market.

6   *A.*  Yes, that's how I understand.

7   *Q.*  So basically the concern was there weren't going to be

8   enough small birds for KFC to buy.

9   *A.*  Yes.

10  *Q.*  And you have previously said that the price of chicken sold

11  to RSCS was higher in the 2015 contract because the supply of

12  small birds was tight in the year that contract was negotiated,

13  correct?

14  *A.*  That's how I understand it, yes.

15  *Q.*  Okay.  And at the risk of repeating myself too much, by

16  supply being tight that year, that meant there weren't enough

17  small birds to open its restaurants and sell products.

18  *A.*  That could have been, yes.  I wasn't involved at that

19  point.

20  *Q.*  No, I know.  I understand that.  I am saying you have been

21  made aware that that was the issue in 2014 for the 2015

22  contracts, there weren't enough small birds.

23          *MR. LOVELAND:*  Objection, Your Honor.  I think the

24  witness just said that she was not a part of that.

25          *THE COURT:*  Overruled.  She can testify as to what her

Sara Fisher - Cross

1    understanding was since it was material to the negotiations.

2    A.   That was my understanding, yes.

3    BY MS. CARWILE:

4    Q.   And so RSCS is basically worried that just like for the

5    2015 contract where small-bird supply was of a huge concern,

6    that concern could be the same in 2018, right?

7    A.   I don't think the concern was as great, but we wanted to

8    start our negotiations early so that we got what we needed

9    before others, the suppliers locked up with other customers.

10   Q.   Okay.  And that worry that you had was actually a

11   legitimate worry, because in addition to the small-bird

12   shortage, which you were aware of from 2014, some small-bird

13   plants by certain suppliers were being converted into big-bird

14   plants, right?

15   A.   Yes, but I would say we were pleasantly surprised at the

16   volume that was offered at the beginning of the bid.

17   Q.   Absolutely.  And you anticipated my question.  I promise I

18   will get there, but I have a few questions about the conversion

19   of plants, okay?

20   A.   Okay.

21   Q.   You understood that certain suppliers were converting some

22   of what their -- previously had been small-bird plants into

23   big-bird plants, correct?

24   A.   Yes, that's correct.

25   Q.   And one of the reasons for that conversion of these plants

Sara Fisher - Cross

1    is that big birds are more profitable than small birds to the

2    chicken suppliers, correct?

3              *MR. LOVELAND:*  Objection, Your Honor, foundation.

4              *THE COURT:*  Sustained.  If you could lay foundation.

5    *BY MS. CARWILE:*

6    Q.  Do you know one of the reasons -- do you know the

7    reasons -- as part of your role in the contract negotiations

8    and your understanding of the market in 2018, are you aware of

9    the reasons for why certain suppliers were converting

10   small-bird plants into big-bird plants?

11   A.  Yes.

12   Q.  And was one of those reasons that big birds were more

13   profitable to the suppliers who sold them than small birds

14   were?

15   A.  Yes.

16   Q.  And basically what that means is that in a plant where a

17   supplier was previously processing small birds, they could

18   convert that plant to a big-bird plant and make more money per

19   bird in the same -- in that plant; is that right?  That's what

20   I mean by more profitable.

21   A.  Yes.

22   Q.  And you said you have a background in finance on direct; is

23   that right?

24   A.  Yes.

25   Q.  So you would agree with me that in general it is a rational

Sara Fisher - Cross

1    economic decision for a company to sell more of a product that

2    makes more money and less of a product that makes less money?

3    A.   Yes.  I can't speak for the companies, but ...

4    Q.   No, no, I just mean general rational economic decision in

5    the marketplace, you would agree with me it makes more sense to

6    sell product that makes you more money.  Fair to say?

7              MR. LOVELAND:  Objection, asked and answered.

8              THE COURT:  Overruled.

9    A.   Yes.

10   BY MS. CARWILE:

11   Q.   And because big birds made the suppliers more money and

12   because of that there were less small-bird plants, there were

13   less small birds available because they weren't being processed

14   anymore in the same numbers.

15   A.   Yes.

16   Q.   And, again, referencing your background in finance, you

17   would agree with me that it is also a standard economic

18   principle that lower supply in a market tends to lead to higher

19   prices of that same item in the same market.

20   A.   Yes.

21   Q.   Now, you've already testified that small birds were

22   essential to Kentucky Fried Chicken's business, right?

23   A.   Yes.

24   Q.   And you've said on direct that's because all of Kentucky

25   Fried Chicken's fresh chicken products are made with only small

Sara Fisher - Cross

1   birds.

2   A.   Correct.

3   Q.   And so because KFC needs these birds to keep its

4   restaurants open, RSCS started its contract negotiations to

5   make sure that in 2018, unlike in 2015, there was enough small

6   birds for KFC to keep its restaurants open.

7   A.   Correct.

8   Q.   And I think you might have said this on direct, but you

9   basically used the phrase "lock in volume," right?

10   A.   Yes.

11   Q.   You were trying to sign a contract with these suppliers to

12   say, You will sell us this many truckloads, and we have that

13   before other people come in and take those truckloads.

14   A.   Yes.

15   Q.   And, again, that was partially because of what you

16   understood had happened in the previous 2015 contract.

17   A.   Yes.

18   Q.   All right.  So let's talk now about how the 2018 contract

19   actually turned out, and you previewed my question when you

20   said RSCS was happy with the amount of volume, but I am going

21   to ask you a few questions about that, okay?

22   A.   Okay.

23   Q.   So despite those concerns, RSCS was actually surprised that

24   there was a higher supply of small birds available for the 2018

25   contract.

Sara Fisher - Cross

1   A.   Yes, we were surprised that several suppliers came to us

2   and offered more than what they were doing for us at the time.

3   Q.   And that was a pleasant surprise to RSCS.  You were happy

4   to be surprised in that way.

5   A.   Yes.

6   Q.   And that meant that RSCS was ultimately happy with how much

7   volume it was able to lock in for the 2018 contract.

8   A.   Yes.  We locked in the volume we needed.

9   Q.   So, again, last question on these basic economic

10  principles, Ms. Fisher, but in 2018, the 2018 negotiations,

11  there are more small birds available than RSCS had originally

12  thought.  And it would go to reason that RSCS would then pay

13  less for the small birds than it purchased under the 2018

14  contract than it purchased under the 2015 contract.

15  A.   Yes.

16  Q.   So in that way, RSCS had more leverage in the 2018 contract

17  than it did in the 2015 contract.

18  A.   Yes.

19  Q.   So RSCS was able to get a reduction in price from all the

20  suppliers for its 2018 contract, correct?

21  A.   Yes, I believe so.

22  Q.   And that's compared to the previous 2015 contract.

23  A.   Yes.

24  Q.   So every single supplier reduced its price in 2018

25  according to RSCS's wishes.

Sara Fisher - Cross

1   A.   Yes.

2   Q.   And the price that RSCS ultimately paid in 2018 for each of

3   those suppliers for chicken was around the target price RSCS

4   had wanted for that contract cycle.

5   A.   Yes, I believe so.

6   Q.   And you talked a little bit about this on direct, so I want

7   to go a little bit into the savings that RSCS was able to

8   provide to its system, and by "its system" I am meaning the

9   restaurants and RSCS and the people in RSCS who do the contract

10  negotiations, okay?

11  A.   Okay.

12  Q.   So is it fair to say that the savings to RSCS over the life

13  of the 2018 contract was approximately $60 million?

14  A.   Yes.

15  Q.   And because these contracts are three years, it's basically

16  $20 million a year in savings, correct?

17  A.   Correct.

18       MS. CARWILE:   Now, if we could pull up what was

19  introduced on direct, I believe it's 1825.  And if we could

20  highlight and zoom in on the paragraph that starts "in addition

21  to the changes," please.

22  BY MS. CARWILE:

23  Q.   And, Ms. Fisher, I promise I am almost done, okay?  I have

24  about 10 minutes left, and then I will stop asking you

25  questions.

Sara Fisher - Cross

1          *MS. CARWILE:*  This is great, thank you.

2          And, Your Honor, if I could publish this to the jury?

3          *THE COURT:*  You may.

4          *MS. CARWILE:*  Thank you very much.

5   *BY MS. CARWILE:*

6   *Q.*  So, Ms. Fisher, you testified that Mr. Austin sent you this

7   e-mail, and in this e-mail, he wrote about various reductions

8   in price or savings that Pilgrim's was planning to provide to

9   RSCS for the 2018 contracts.

10  *A.*  Yes.

11  *Q.*  One of those savings was to reduce the case weight from

12  52.5 pounds to 51.5 pounds, right?

13  *A.*  Yes.

14  *Q.*  And you testified on direct that that was a savings to

15  RSCS, right?

16  *A.*  To the franchisees, to the restaurants.

17  *Q.*  But -- fine, but to RSCS as part of that system, correct?

18  *A.*  Well, we don't purchase it.  I mean, it was a savings as

19  part of the negotiation, yes.

20  *Q.*  Thank you.  I appreciate that clarification, thank you.

21         *MS. CARWILE:*  So we can bring this part of -- we can

22  put this exhibit away.

23  *BY MS. CARWILE:*

24  *Q.*  I am going to ask you one more time to do a little bit of

25  math with me, okay, Ms. Fisher?  So we have previously talked

Sara Fisher - Cross

 1    about how chicken is sold in truckloads, and we sort of talked

 2    about how chicken is sold in cases which go on the trucks; is

 3    that fair to say?

 4    A.  Yes.

 5    Q.  And each of those cases has the same number of pieces of

 6    eight-piece chicken in it.

 7    A.  Yes.

 8    Q.  So regardless of the amount -- the weight of those pieces

 9    of chicken, the same number of pieces is sold to RSCS.

10    A.  Yes.

11    Q.  And because the price of chicken that RSCS negotiated with

12    Pilgrim's was around a dollar per pound that year and because

13    RSCS was -- excuse me, because Pilgrim's reduced its case

14    weight by a pound, is it fair to say that RSCS received a

15    savings of a dollar per case, about a dollar per case?

16    A.  Yeah, based on case-weight reduction, yes.

17    Q.  Perfect.  So based on the case-weight reduction that

18    Pilgrim's was offering to RSCS in the 2018 contract

19    negotiation, RSCS saved a dollar per case, correct?

20    A.  Yes.

21            MR. LOVELAND:  Objection, asked and answered.

22            THE COURT:  Overruled.

23    BY MS. CARWILE:

24    Q.  And will you agree with me that there are approximately 640

25    cases on a truckload?

Sara Fisher - Cross

1    *A.*   Yes.

2    *Q.*   So would you also then agree with me that that's about $640

3    in savings per truckload.

4    *A.*   Yes.

5    *Q.*   Going to -- I think the prosecutor showed you the first

6    part of the Pilgrim's contract from the 2018 contract where

7    Pilgrim's was selling 50 truckloads a week to RSCS; is that

8    right?

9    *A.*   Yes.

10   *Q.*   So $640 in savings per truckload.  Pilgrim's is at that

11   point selling RSCS 50 truckloads.  That is -- and I will let

12   you check my math again, but that's about $32,000 in savings to

13   RSCS per week from Pilgrim's.

14   *A.*   Yes.

15   *Q.*   And 52 weeks in a year, that's about -- that's over

16   $1.6 million in savings based on the math I just did, right?

17   *A.*   Yes.

18   *Q.*   So Mr. Austin's offer from -- Pilgrim's Pride's offer that

19   Mr. Austin was communicating to you to reduce the case weight

20   from 52.5 to 51.5 saved RSCS approximately $1.6 million a year.

21   *A.*   Yes.

22   *Q.*   And basically that just means that RSCS was paying less

23   money for the same number of pieces of chicken.

24   *A.*   Yes.  But the actual weight of every case is different, and

25   so the original agreed-upon case weight was 52.50.  But if

Sara Fisher - Cross

1    their actual weights were coming in lower than that 52.50, then

2    we would negotiate with them to charge closer to it, so --

3    Q.  Right, I understand, and thank you so much for that

4    clarification.  I understand that there can be renegotiations

5    based on the poundage that's coming in, so I am not trying to

6    lock you in to saying, you know, that's always the case, that

7    number is always the case, but in general the contract

8    negotiations involve a negotiated case weight.

9    A.  Yes.

10   Q.  And the negotiated case weight that Pilgrim's was offering

11   was a pound less, meaning $1.6 million a week in savings to

12   RSCS.

13   A.  Yes.

14   Q.  All right.  And RSCS went into these contract negotiations

15   in 2018 with a price in mind that it would consider fair.  Is

16   that fair to say?

17   A.  Yes, I believe so.

18   Q.  And RSCS's focus is on the total chicken-on-the-bone cost

19   that's being provided in a bid for the most part; is that fair

20   to say?

21   A.  Can you rephrase the question?

22   Q.  Of course, no problem.

23       I understand that RSCS looks at and focuses in some

24   way on line items within a bid that a supplier would provide;

25   is that fair?

Sara Fisher - Cross

1  A.  Yes.

2  Q.  But ultimately, RSCS is looking at that bottom-line number

3  price of eight-piece purple COB.

4  A.  Yes, that's correct.

5  Q.  And while I understand that, you know, RSCS does care about

6  the line items, ultimately RSCS -- the most important price on

7  that sheet is the bottom-line price that RSCS is paying for

8  chicken.

9  A.  Yes.  We want to negotiate whether it's line item or FOB to

10  get to the lowest landed cost to customers.

11  Q.  And the price you are mostly focused on is that bottom-line

12  price?

13  A.  I mean, that's ultimately what we are looking at, yes, but

14  we consider the cost components while we are negotiating.

15  Q.  That's why I asked it the way I did.  I understand you are

16  looking at the line items, the cost components, but what you

17  are focused on ultimately is the cost of chicken that RSCS

18  pays.

19  A.  Yes.

20  Q.  All right.  And you have previously said that if the

21  competitive bidding process got the final price lower than what

22  RSCS wanted, RSCS was okay with that, right?

23  A.  If they got it lower than -- I mean, RSCS had a range in

24  mind, and if we achieved that, we would be satisfied with that,

25  yes.

Sara Fisher - Cross

1   Q.  Exactly.  Because RSCS is looking at what -- RSCS is

2   working on behalf of a for-profit company trying to reduce its

3   costs, right?

4   A.  Yes.  Our goal is to get the lowest-landed cost to our

5   restaurants.

6   Q.  Exactly.  And they are negotiating with -- and RSCS is fine

7   if its chicken suppliers who it's negotiating with make less

8   money; that was not relevant to RSCS?

9   A.  Actually, we wanted it to be a win-win, our partnerships,

10  yes.

11  Q.  So you wanted to make sure the suppliers were able to

12  supply chicken, right?

13  A.  Our goal is not to put suppliers out of business.

14  Q.  Of course not.  And I am not in any way suggesting that.

15  But what I am asking is this is a two-way negotiation.  RSCS is

16  worried about its side of the negotiation.

17  A.  Yes.

18  Q.  For lack of a better phrase.

19  A.  Yes.

20  Q.  And you -- RSCS, we have already said, received a

21  significant price decrease from the contracts from all of the

22  suppliers?

23  A.  Yes.

24  Q.  And RSCS ended up getting close to the target price that

25  you wanted from all of your suppliers?

Sara Fisher - Cross

1    A.   Yes.

2    Q.   So RSCS was happy with the results of the 2018

3    negotiations.

4    A.   We were satisfied with the results, yes.

5    Q.   All right.  This is my last question to you, Ms. Fisher.  I

6    promised I would be done.  Sitting here today, you do not have

7    any personal knowledge that anyone in this courtroom entered

8    into any agreement to fix prices, rig volume awards, or rig

9    bids during the time frame that you have testified here today,

10   do you?

11   A.   No.

12           MS. CARWILE:  Thank you.

13           Nothing further, Your Honor.

14           THE COURT:  Thank you, Ms. Carwile.

15           Additional cross-examination?

16                        **CROSS-EXAMINATION**

17   BY MS. KUYKENDALL:

18   Q.   Good morning, Ms. Fisher.

19   A.   Good morning.

20   Q.   My name is Laura Anne Kuykendall, and I represent Scott

21   Brady.  I am going to ask you some more questions about

22   Claxton's negotiations with RSCS for the 2018 contract.

23   A.   Okay.

24   Q.   You first reach out to the suppliers December of 2016,

25   right?

Sara Fisher - Cross

1    *A.*  Yes.

2    *Q.*  And that was to let them know that RSCS was ready to begin

3    negotiations for the 2018 contract?

4    *A.*  Yes.

5    *Q.*  And you had meetings with the suppliers in January of 2017

6    to discuss that contract?

7    *A.*  Yes.

8          *MS. KUYKENDALL:*  Could you please pull up Government's

9    Exhibit 1947.

10         Your Honor, I believe this was admitted this morning,

11   and I would ask it be published for the jury.

12         *THE COURT:*  You may.

13   *BY MS. KUYKENDALL:*

14   *Q.*  Ms. Fisher, do you see Government's Exhibit 1947?

15   *A.*  Yes.

16   *Q.*  It's either on the screen in front of you or in your

17   binder.  Ms. Fisher, this is an e-mail from you to Mr. Brady,

18   Mr. Fries, and Mr. Martin?

19   *A.*  Yes.

20   *Q.*  And it also includes Mr. Suerken from RSCS?

21   *A.*  Yes, it does.

22   *Q.*  And Mr. Rich Eddington?

23   *A.*  Yes.

24   *Q.*  And it was for the meeting that was in January of 2017?

25   *A.*  Yes.

Sara Fisher - Cross

1   *Q.*  To start the negotiations for the 2018 contract?

2   *A.*  Yes, that's correct.

3   *Q.*  And RSCS intended for that contract to include 2018, 2019,

4   and 2020?

5   *A.*  Yes.

6   *Q.*  And based on the calendar invitation, Claxton's meeting

7   with RSCS was to take place on January 19th?

8   *A.*  Yes.

9   *Q.*  And I believe you testified yesterday that Mr. Brady and

10  Mr. Fries attended that meeting on behalf of Claxton?

11  *A.*  Yes.

12  *Q.*  And you attended that meeting?

13  *A.*  I did.

14  *Q.*  And Mr. Suerken was there?

15  *A.*  Yes, I believe so.

16  *Q.*  And Mr. Eddington was there?

17  *A.*  Yes.

18  *Q.*  Now, Ms. Fisher, Mr. Eddington was the team leader for this

19  negotiation?

20  *A.*  Yes, he was.

21  *Q.*  And you reported to Mr. Eddington?

22  *A.*  Yes.

23  *Q.*  And Mr. Campisano also reported to Mr. Eddington?

24  *A.*  Yes.

25  *Q.*  And Mr. Brady was your day-to-day contact at Claxton?

Sara Fisher - Cross

1    *A.*  Correct.

2    *Q.*  So you were pretty familiar with Mr. Brady.

3    *A.*  Yes.

4    *Q.*  But this meeting was your first time ever meeting

5    Mr. Fries, right?

6    *A.*  Yes, it was.

7    *Q.*  And at these initial meetings, RSCS was asking suppliers to

8    make initial presentations?

9    *A.*  Yes.

10   *Q.*  And then in turn RSCS was discussing with the suppliers its

11   goals and expectations for the negotiations?

12   *A.*  Yes, that's correct.

13   *Q.*  And then after the meetings had taken place, the suppliers

14   were submitting their bids to RSCS?

15   *A.*  Yes.

16   *Q.*  So now let's talk about the first-round bids that were

17   submitted in February of 2017.

18        *MS. KUYKENDALL:*  Could we please bring up Defense

19   Exhibit F-852.

20        Your Honor, I believe this was admitted this morning,

21   and may it be published for the jury?

22        *THE COURT:*  Yes, it may.

23   *BY MS. KUYKENDALL:*

24   *Q.*  Ms. Fisher, do you see Exhibit F-852?

25   *A.*  Yes.

276

Sara Fisher - Cross

1    Q.  And let's look at the top e-mail.  This is an e-mail from

2    Mr. Brady to you?

3    A.  Yes.

4    Q.  It's dated February 3rd, 2017?

5    A.  Correct.

6    Q.  And it also copies Mr. Eddington?

7    A.  Yes.

8    Q.  In this e-mail, Mr. Brady is sending you Claxton's initial

9    bid submission?

10   A.  Yes.

11   Q.  And he is also asking for additional volume, right?

12   A.  Yes.

13   Q.  And this would have been over and above Claxton's current

14   allocation of volume.

15   A.  Yes.

16   Q.  And Claxton was specifically asking for four additional

17   loads of eight-piece and one additional load of dark meat,

18   right?

19   A.  Yes.

20   Q.  And that would have been per week for 2018, 2019, and 2020?

21   A.  Correct.

22        MS. KUYKENDALL:  Can we please call up Exhibit F-853.

23        And, Your Honor, I believe this was also admitted this

24   morning, and may it be published for the jury?

25        THE COURT:  Yes, it may.

Sara Fisher - Cross

1    *BY MS. KUYKENDALL:*

2    *Q.* Ms. Fisher, do you see Exhibit F-853 on your screen?

3    *A.* Yes.

4         *MS. KUYKENDALL:* Can we scroll towards the bottom,

5    please? Yes, thank you.

6    *BY MS. KUYKENDALL:*

7    *Q.* This was the bid submission that was attached to the e-mail

8    that we just looked at?

9    *A.* Yes, I believe so.

10   *Q.* And this was the cost model that was Claxton's first-round

11   proposal, right?

12   *A.* Yes.

13   *Q.* And Claxton offered its eight-piece COB at a price of

14   .9939, right?

15   *A.* Yes.

16   *Q.* Now, there were further rounds of negotiation after this

17   first round, correct?

18   *A.* Yes, that's correct.

19   *Q.* So let's talk about those rounds.

20        Now, Mr. Brady sent you some revised pricing after the

21   February 3rd submission, correct?

22   *A.* I believe so, yes.

23        *MS. KUYKENDALL:* Can we please look at Exhibit F-915?

24        Your Honor, F-915 as redacted is subject to the

25   parties' agreement at Docket No. 1351 and 1338-3, and I would

Sara Fisher - Cross

1   move to admit it.

2             *THE COURT:*  Any objection to the admission of F-915?

3             *MR. LOVELAND:*  No, Your Honor.

4             *THE COURT:*  F-915 will be admitted, and it may be

5   published.

6   *BY MS. KUYKENDALL:*

7   *Q.*  Ms. Fisher, do you see F-915?

8   *A.*  Yes.

9   *Q.*  This is an e-mail from Mr. Brady to you and Mr. Eddington,

10  right?

11  *A.*  Yes.

12  *Q.*  It's dated March 2nd?

13  *A.*  Yes.

14  *Q.*  It's about a month after the February 3rd submission we

15  just looked at?

16  *A.*  Correct.

17  *Q.*  Mr. Brady is saying to you he is sending you revised

18  pricing for 2018?

19  *A.*  Yes.

20  *Q.*  So he is transmitting to you another bid submission?

21  *A.*  Yes.

22  *Q.*  So if Mr. Brady is providing revised pricing, you and

23  Mr. Eddington provided feedback to Claxton, right?

24  *A.*  Yes.

25  *Q.*  And then Claxton had reacted to that feedback and provided

Sara Fisher - Cross

1    some sort of revised submission, correct?

2    A.  Correct.

3    Q.  And like the prior submission, there is an e-mail

4    attachment, correct?

5    A.  Yes, there is an attachment.

6    Q.  And the attachment is the cost model.

7    A.  Yes.

8    Q.  I am sorry, didn't hear you.

9    A.  Yes.

10   Q.  Thank you.  So let's look at F-916.

11          MS. KUYKENDALL:  Can we call that up?

12          And, Your Honor, F-916 is also subject to the parties'

13   agreement at Docket 1351 and 1338-3, and I would move to admit

14   it.

15          THE COURT:  Any objection?

16          MR. LOVELAND:  No, Your Honor, thank you.

17          THE COURT:  So F-916 will be admitted.

18          MS. KUYKENDALL:  Thank you.  May it be published for

19   the jury?

20          THE COURT:  It may be.

21   BY MS. KUYKENDALL:

22   Q.  So this is the revised pricing that Mr. Brady sent to you,

23   correct?

24   A.  Yes.

25          MS. KUYKENDALL:  And if we scroll to the bottom.

Sara Fisher - Cross

1    *BY MS. KUYKENDALL:*

2    Q.  Do you see that Claxton offered revised pricing of .9334?

3    A.  Yes.

4    Q.  Which means that Claxton had reduced its pricing by more

5    than 6 cents, right?

6    A.  Correct.

7    Q.  And so Claxton did not push back in its revised pricing

8    that it sent to you in March?

9    A.  No, not that I'm aware of.

10   Q.  Didn't say no when you asked it to reduce its price?

11   A.  Not that I'm aware of.

12   Q.  And it did what RSCS had asked?

13   A.  I don't know exactly what feedback was provided, so I can't

14   answer that in particular, but they lowered their cost, yes.

15   Q.  Thank you.

16          So now let's look at the third-round submission.

17   After Claxton submitted its March 2nd proposal reducing its bid

18   by 6 cents, RSCS sought additional price reductions, right?

19   A.  I -- I don't recall how many rounds we went with Claxton.

20   Q.  Let's look at F-868.  Do you recognize this document?

21   A.  Yes.

22   Q.  And this is an e-mail from you to Scott Brady copying

23   Mr. Eddington?

24   A.  Yes.

25   Q.  And you sent it on May 11, 2017?

Sara Fisher - Cross

1   A.  Correct.

2   Q.  So about two months after the submission we just looked at

3   in F-915 and 916.

4   A.  Yes.

5   Q.  Does this e-mail accurately reflect the information that

6   you sent to Mr. Brady in May of 2017?

7   A.  Yes, I believe so.

8   Q.  And was it your regular practice to send and receive bids

9   and bid-related communications like this one from suppliers via

10  e-mail during this time?

11  A.  Yes.

12        MS. KUYKENDALL:  At this time, Your Honor, I move to

13  admit F-868.

14        THE COURT:  Any objection to the admission of F-868?

15        MR. LOVELAND:  No, Your Honor, thank you.

16        THE COURT:  F-868 will be admitted and may be

17  published.

18        MS. KUYKENDALL:  Thank you, Your Honor.

19  BY MS. KUYKENDALL:

20  Q.  So in this e-mail, Ms. Fisher, you are proposing a

21  stair-step decrease for Claxton?

22  A.  Yes.

23  Q.  And the stair-step decrease would have begun in period 6 of

24  2017?

25  A.  That's correct.

Sara Fisher - Cross

1   Q.   At a reduction of one penny per pound?

2   A.   Correct.

3   Q.   And period 6 is roughly in the middle of 2017, right?

4   A.   Yes, that's correct.

5   Q.   And when you began the negotiations for the 2018 contract,

6   you were only looking at 2018, 2019, and 2020, right?

7   A.   Yes, that's correct.

8   Q.   You were not looking to renegotiate the existing 2017

9   contract.

10  A.   No, not at the start.

11  Q.   But what you're proposing in this e-mail is that Claxton

12  reduce its price beginning in period 6 of 2017 even though you

13  already have a contract in place for Claxton for that period.

14  A.   Yes.  We negotiated the -- we finalized the negotiation for

15  the '18, '19, '20, and then we asked them to start some of that

16  savings early in 2017.

17  Q.   So I just want to make sure my question is clear.  So you

18  are asking Claxton in 2017 to renegotiate part of its existing

19  2017 contract.

20  A.   Correct.

21  Q.   And Claxton did not have to do that.

22  A.   No.

23  Q.   But they did that at the request of RSCS.

24  A.   Yes, they did.

25  Q.   So let's look at that stair-step decrease for the rest of

283

Sara Fisher - Cross

1   the years 2018, 2019, and 2020.  For 2018, RSCS proposed that

2   Claxton would drop its price by 5-1/2 cents for the eight-piece

3   and almost 5 cents for the dark meat, right?

4   A.  Yes.

5   Q.  And then for 2019 and 2020, another decrease was going to

6   be applied, right?

7   A.  Correct.

8   Q.  So under the proposal, Claxton's price would come down for

9   the second half of 2017, and then every year after that for all

10  three years of the 2018, 2019, and 2020 contract, right?

11  A.  Yes.  It was equivalent to what we had negotiated

12  originally for the '18, '19, and '20 savings.

13  Q.  Right.  Thank you.

14        We looked at Claxton's first-round bid, their

15  second-round bid, and then this May 2017 proposal.  As you

16  mentioned, the process started in December of 2016 with the

17  initial meetings -- excuse me, with the initial e-mail to set

18  up those January 2017 meetings, right?

19  A.  Yes.

20  Q.  And then the final contracts were executed generally in the

21  fall of 2017, right?

22  A.  That's correct .

23        MS. KUYKENDALL:  Can we please bring up F-756 which

24  was admitted this morning, I believe.

25        THE COURT:  Yes.  It has been admitted, and it may be

Sara Fisher - Cross

1    published.

2              *MS. KUYKENDALL:*  Thank you.

3    *BY MS. KUYKENDALL:*

4    *Q.*  So, Ms. Fisher, this is Claxton's -- or, excuse me, this is

5    an exhibit, Claxton's Supplier Business Relationship Agreement

6    with RSCS or the SBRA, right?

7    *A.*  Yes.

8    *Q.*  I believe you explained this morning the SBRA is the main

9    agreement between RSCS and the suppliers and in this case

10   Claxton.

11   *A.*  Yes.

12   *Q.*  And then the specific pricing and volume agreements between

13   RSCS and the suppliers are contained in the exhibits like this

14   one.

15   *A.*  Yes, that's correct.

16   *Q.*  And in this example, Steve McCormick executed this exhibit

17   on behalf of RSCS, right?

18   *A.*  Correct.

19   *Q.*  And he was the president of RSCS?

20   *A.*  Yes.

21   *Q.*  And Mr. Mikell Fries executed this SBRA exhibit on behalf

22   of Claxton?

23   *A.*  Yes.

24   *Q.*  And both were executed in September of 2017?

25   *A.*  That's correct.

Sara Fisher - Cross

1    *Q.* And if we scroll back up, these exhibits -- or this page of

2    this exhibit, the applicable period is May 21st, 2017 through

3    December 31st, 2017?

4    *A.* Yes.

5    *Q.* So consistent with what we just discussed, this final

6    contract reflects that Claxton agreed to renegotiate some of

7    its 2017 pricing for RSCS in 2017.

8    *A.* Yes.

9    *Q.* And, Ms. Fisher, not all of the suppliers agreed to do

10   this, right?

11   *A.* That's correct.

12   *Q.* And some of the suppliers did not start their new pricing

13   until 2018.

14   *A.* That's correct.

15   *Q.* But Claxton agreed to renegotiate its price for 2017 before

16   the expiration of its 2017 contract.

17   *A.* Yes.

18   *Q.* And that was at the direction of RSCS as we've discussed.

19   *A.* Yes.

20   *Q.* So let's turn to page 2 if we can.

21       MS. KUYKENDALL:  And if we scroll to the bottom where

22   we see the total FOB plant cost.

23   BY MS. KUYKENDALL:

24   *Q.* For the remainder of 2017, Claxton's FOB plant cost was

25   .9809.  That may be a little hard to read, but do you see where

Sara Fisher - Cross

 1   Claxton's total FOB plant cost was .9809?

 2   A.  Yes.

 3   Q.  Now, Ms. Fisher, do you recall what Claxton's price was in

 4   2017 prior to this renegotiation?

 5   A.  No, I do not.

 6        MS. KUYKENDALL:  Can we please bring up F-754.  And

 7   this will be just for the witness at this time, Your Honor.  It

 8   has not been admitted yet.

 9        THE COURT:  Right.

10   BY MS. KUYKENDALL:

11   Q.  Ms. Fisher, this is another exhibit to the SBRA for

12   Claxton, correct?

13   A.  Yes, it is.

14   Q.  And the applicable period for this exhibit is January 1,

15   2016 through December 31, 2017?

16   A.  Yes.

17   Q.  So this contract -- so this is the contract for the period

18   immediately preceding the negotiation that you were involved?

19   A.  Yes.

20   Q.  This is the type of document that RSCS would have relied

21   upon and maintain in the course of its usual business?

22   A.  Yes.

23   Q.  This reflects the contract in place for Claxton that was

24   supposed to run through December 31st, 2017?

25   A.  Yes.

Sara Fisher - Cross

1        *MS. KUYKENDALL:*  Your Honor, F-754 is subject to the

2   parties' agreement at Docket No. 1351 and 1338- 3, and I move

3   the admission of it at this time.

4        *THE COURT:*  Any objection to F-754?

5        *MR. LOVELAND:*  None, Your Honor, thank you.

6        *THE COURT:*  That exhibit may be admitted, and it may

7   be published.

8        *MS. KUYKENDALL:*  Thank you, Your Honor.

9        Can we turn to page 2, please?

10  BY MS. KUYKENDALL:

11  *Q.*  So if we scroll to the bottom, we see this reflects

12  Claxton's COB price in 2017 prior to the renegotiation that we

13  just reviewed?

14  *A.*  Yes.

15  *Q.*  And that price is 1.0369?

16  *A.*  Yes, but I don't know what the variable cost, if they were

17  held constant between this contract and the contract, so it's

18  not an apples-to-apples.  You can't just subtract the 1.0369

19  with what's in the new contract.

20  *Q.*  I understand, but we can at least look at the FOB contract

21  price, right?

22  *A.*  If the feed was held and the variable costs were held

23  constant.

24  *Q.*  I understand.  But this price was at least set to run

25  through the end of 2017, right?

Sara Fisher - Cross

1    *A.* Yes, that cost model was.

2    *Q.* Right.  Thank you.

3            As we just saw in F-756, the new contract was to start

4    in the middle of 2017, right?

5    *A.* Yes.

6    *Q.* And that price was .9809?

7    *A.* Yes.

8    *Q.* So based on the numbers -- and if we need to flip back and

9    forth if we can -- Claxton had reduced its price by about 5-1/2

10   cents?

11   *A.* That's what I was referring to.  I know they came down, but

12   I don't know if the variable costs were held constant, so it

13   may not be as straight.  You may not be able to say you can

14   just take the 1.0369 minus the other FOB.

15            *MS. KUYKENDALL:* I understand.

16            *THE COURT:* Ms. Kuykendall, it is almost noon, so if

17   you can look for a convenient spot in your questions.

18            *MS. KUYKENDALL:* This is a convenient breaking time.

19            *THE COURT:* Ladies and gentlemen, we will go ahead and

20   take the lunch break.  If you go out over the lunch break and

21   even if you are walking around in the courthouse itself, if you

22   could keep those yellow juror buttons visible to everyone and

23   especially to the witnesses.  Otherwise, please keep the

24   admonitions in mind, and we will reconvene at 1:30.

25            The jury is excused.

Sara Fisher - Cross

1          (Jury excused.)

2          THE COURT:  Ms. Fisher, you are excused until 1:30.

3    Thank you very much.

4          THE WITNESS:  Thank you.

5          THE COURT:  A couple of things or several things.

6    First of all, we do have a calculator now, so just in case you

7    want a witness to do a little simple math.

8          Also there was a reference by Ms. Carwile to -- in

9    asking questions about or of Ms. Fisher about previous

10   testimony, and the term used was "proceedings."  We talked

11   about that before the second trial, and the better term is

12   "hearings," so if we could try to do that.  Hearings I think

13   would be less likely to make a juror infer that perhaps there

14   was --

15         MS. CARWILE:  And I am sorry about that.  I will use

16   hearings --

17         THE COURT:  No problem.  It wasn't a big deal, but I

18   just thought I would mention that at the outset.

19         Another thing is that this trial the Court had some

20   COVID test kits, and we have given each of the jurors one of

21   those boxes that has two test kits, and we have told them that

22   in the event they are not feeling well, to take a test, so I

23   just wanted to let you know about that.  I may mention that to

24   them just so they understand what they should do.

25         Next issue is that issue that we were talking about in

Sara Fisher - Cross

1    regard to testimony from the new witness.  And I understand the

2    government has supplied or filed a new witness list.  I would

3    prefer -- we can either talk about that issue at 1:15 or we

4    could talk about it at 5:00 o'clock.  It doesn't matter to me.

5              Any preference by the government or by defendants?

6              *MS. WULFF:*  Thank you, Your Honor.

7              The only thing that the government would like to raise

8    before the testimony of Ms. Evans is whether absent the

9    testimony of Rebecca Nelson whether we may be able to ask

10   Ms. Evans some questions about what she observed from her

11   call-frequency analysis.  And I know that Mr. Feldberg had

12   raised that this morning what -- I believe he said concerns

13   about what the scope of that would be.  And the government

14   would plan to ask Ms. Evans whether there were years, for

15   example, that she observed having more calls or years she

16   observed having fewer calls.  And the government thinks that

17   this would be appropriate.  It doesn't call for any sort of

18   opinion.  It's just an observation from the data without

19   getting into specific numbers.

20             *THE COURT:*  And I inferred from some things that

21   Mr. Feldberg mentioned and from what you mentioned this morning

22   is that rather than Ms. Evans having gone through each of the

23   telephone records, that she relied upon perhaps some type of an

24   electronic means or some electronic summary to derive those

25   calls, but I'm not sure.

Sara Fisher - Cross

1          MS. WULFF:  She relied on a computer program, Your

2    Honor.

3          THE COURT:  What did the computer program do, search

4    for a number?

5          MS. WULFF:  Yes.  My understanding is the computer

6    program or the phone records themselves get ingested into the

7    computer program, and then you can run a query on the computer

8    program to say, Look for calls between these numbers going

9    either direction, and then it generates the result in an Excel

10    format, I believe.

11          THE COURT:  Okay.  Mr. Feldberg?

12          MR. FELDBERG:  First of all, Your Honor, I would like

13    an opportunity to discuss this with my colleagues.

14          THE COURT:  And that's perfectly appropriate.  Why

15    don't we do this.  Why don't we, because this may be relevant

16    to questions that are asked of Ms. Evans, why don't we plan on

17    meeting at 1:15.  Do you think that that would be sufficient

18    amount of time, Mr. Feldberg?

19          MR. FELDBERG:  I think so, Your Honor.  But if I may

20    just ask for a point of clarification.  Did I understand

21    Ms. Wulff correctly to say that if the prosecution is permitted

22    to inquire of Ms. Evans of did you observe more phone calls in

23    year one than year two or words to that effect, that would

24    eliminate the argument over Rebecca Nelson as a potential

25    witness and all of the things that that entails?

Sara Fisher - Cross

1          THE COURT:  I think that maybe what she was suggesting

2     is that if the Court rules adversely to the government as to

3     Ms. Nelson, then she would like to ask questions of Ms. Evans.

4          MR. FELDBERG:  Is that right?

5          MS. WULFF:  That is correct.  That is -- the Court

6     understood me correctly.

7          THE COURT:  So we will need to resolve the issue as to

8     Ms. Nelson at 1:15, and then depending on that ruling, we'll

9     take up the issue as to Ms. Evans.

10          MR. FELDBERG:  Thank you, Your Honor.

11          THE COURT:  Anything else that we should take up at

12     this time?  We will be in recess until 1:15.  Thank you.

13          (Recess at 12:07 p.m. until 1:18 p.m.)

14          THE COURT:  So we are going to take up the issue that

15     has come up in regard to Exhibit 63, I believe it is, but also

16     in regard to the government's request to add an additional

17     witness.  So pardon the expression, but it's a little bit of a

18     chicken and egg problem because it sounds like the issue came

19     up because there were concerns about Ms. Evans testifying about

20     I think it was Exhibit 63, but then to meet that the proposal

21     is to substitute in a new witness.  But apparently we are going

22     to talk about adding in a new witness first, and that's fine

23     with me, so go right ahead.  We have to keep this fairly brief.

24     Ms. Wulff has mentioned some of the issues before but did not

25     have a chance to make a full record on it, so go ahead.

Sara Fisher - Cross

1          *MS. WULFF:*  Thank you, Your Honor.

2          The Court is exactly right.  What the government

3  proposes to do is substitute in Rebecca Nelson at the FBI for a

4  portion of Ms. Evans' testimony.  And in the government's

5  witness list, it has always footnoted next to Ms. Evans that

6  the government could elicit the same or similar testimony from

7  another witness, and that's what we are doing here.  So we are

8  dividing the proposed testimony into two witnesses, one being

9  Ms. Evans to testify about the summary charts 50 to 62, and

10 then instead of having Ms. Evans testify as to the summary --

11 excuse me, this new topic or this other topic, I should say,

12 being the call frequency, we would like to substitute in

13 Rebecca Nelson from the FBI as we believe that Ms. Nelson would

14 be better able to testify to this particular subject matter in

15 light of the work that she has already done.

16         *THE COURT:*  And what work would she be testifying to

17 because it seems to me that all Ms. Evans would do is -- would

18 testify about the fact that she relied upon some computer

19 program to do a search of a given number and from that number

20 she was able to determine, you know, how many calls were made

21 in a given period of time.

22         But it sounds like Ms. Nelson would be testifying to

23 something different than that.

24         *MS. WULFF:*  I believe it's the same, although I want

25 to make sure I am understanding what the Court is describing

Sara Fisher - Cross

1   what the testimony is.  So Ms. Nelson did a call-frequency

2   analysis or she ran or she looked at the phone records of

3   Defendants Austin and Defendant Brady, looked at the total

4   number of calls between the two gentlemen.  The charts of that

5   were produced to the defendants last October in preparation for

6   Ms. Nelson's testimony, anticipated testimony during the first

7   trial.  Ms. Nelson was on the government's witness list until

8   day 14 of the first trial, so defendants would have been

9   expecting her testimony.

10          And then the new information that we produced to them

11  this morning is the fact that she has now gone through and

12  deduplicated the issue we talked about this morning, the fact

13  that a call might appear on both Mr. Austin's records and

14  Mr. Brady's records, and now there is only one version of every

15  call.

16          So her chart is the data that we produced to

17  defendants this morning, and it's the same testimony that

18  Ms. Evans would have testified to with regard to Exhibit 63,

19  but Ms. Evans and Ms. Nelson undertook slightly different

20  methodologies, and the government would like to use

21  Ms. Nelson's methodology instead of Ms. Evans because it's more

22  easily explainable and more easily verifiable.  It's also based

23  on data or, excuse me, charts that were produced to the

24  defendants, you know, 10 months ago.

25              THE COURT:  And but there is a chart that the

Sara Fisher - Cross

1    government would intend to introduce through Ms. Nelson.

2         MS. WULFF:  Not introduce, Your Honor, because we

3    understand that the deadline to submit summary charts that we

4    would introduce as evidence was in April, so we are seeking --

5    we would prepare some sort of chart or graph from the

6    information we produced to defendants this morning and make

7    that a demonstrative that we would not submit to go back with

8    the jury.

9         THE COURT:  Okay.  And then so the factors that cases

10   in the 10th Circuit talk about are threefold when we are

11   talking about a new witness:  Reasons for delay in disclosing

12   the witness; whether the delay prejudices the other side; and

13   third, the feasibility of curing the prejudice with a

14   continuance.  Any of those factors you want to address?

15        MS. WULFF:  Of course, Your Honor.  Again, the

16   government would argue that this is not so much a delay as it

17   is a substitution of part of Ms. Evans' testimony which has

18   always been contemplated by the government's witness list.  It

19   says that Ms. Evans or another individual may testify as to the

20   summary charts or the information that she will testify to.

21   She is in that way sort of similar to a records custodian in

22   that if one custodian isn't available, the government can

23   substitute in another, so that's what we are proposing to do

24   here with Ms. Nelson.  In other words, the government doesn't

25   actually view this as a delay.  We are just telling the parties

Sara Fisher - Cross

1    and the Court today that Ms. Evans' testimony will be

2    bifurcated across two witnesses now as opposed to one.

3           In terms of prejudice, I believe I have covered that

4    in that the materials were produced -- well, the underlying

5    records were produced to defendants two years ago.  The

6    first-layer chart that Ms. Nelson did was produced to

7    defendants 10 months ago.  And at that time, defendants were

8    likely anticipating Ms. Nelson's testimony as she was on the

9    government's witness list for the first 14 days of the first

10   trial, so it's not so much that this is entirely new

11   information or new testimony.

12          And we don't believe that there is a need to cure it

13   with any sort of continuance as the government would not put

14   Ms. Nelson on the stand until the end of its case in chief,

15   which is currently likely set for Tuesday depending on, of

16   course, how the rest of the trial unfolds.

17          *THE COURT:*  Okay.  Thank you.

18          Mr. Feldberg or Ms. Pletcher, either one?

19   Ms. Pletcher, go ahead.

20          *MS. PLETCHER:*  Thank you, Your Honor.

21          Defendants request that the Court exclude any

22   testimony from Ms. Nelson and any testimony from Ms. Evans with

23   respect to these new phone record chart for a number of

24   reasons.  First is this was untimely disclosed not only based

25   on the Court's deadlines for disclosing witnesses but under

Sara Fisher - Cross

1    Rule 16(g) for expert witness disclosure.

2          Now, the government says that Ms. Nelson was

3    originally put on their witness list for the first trial, which

4    is true, but then the defendants wrote to the government and

5    told them that we believed that Ms. Nelson was an expert, and

6    she had not been disclosed properly at the time.  And after we

7    sent that notice to the government, they withdrew Ms. Nelson

8    from the witness list.  So we never had the opportunity to have

9    that discussion.

10         We still believe she is an expert witness.  And the

11   charts that we saw this morning confirm that she is.  It's not

12   a matter of simply looking at a PDF Verizon phone bill and

13   picking out the number of calls that were made.  What

14   Ms. Nelson did is they created a structured dataset, which

15   means that she took the PDF phone records and had to make some

16   judgments about how to interpret that data and put it into a

17   dataset that could actually be usable into an Excel

18   spreadsheet.

19         So, for example, she had to look at the time zones and

20   decide which time zones were going to be normalized so they

21   could all be compared against each other.  She had to look at

22   the duration of the calls.  And because they are identified

23   differently with different carriers had to normalize those and

24   make some decisions about what constitutes a call.

25              THE COURT:  And was she doing that just for calls from

Sara Fisher - Cross

1    a particular number?  I mean, she wouldn't be doing that for

2    all the different phone calls because there would be a million

3    of them.

4         MS. PLETCHER:  Which is certainly possible.  We don't

5    know the full extent of what she had to do.  Just looking at

6    this database, we understand that these things had to be done

7    in order to create the database.  The deduplication piece is

8    actually quite technical.  It requires making these types of

9    decisions and creating a computer program that can then go

10   through and apply the criteria to all the underlying data.

11        So it is a type of skill set that an expert would need

12   to have, certainly more than a layperson and certainly more

13   than Ms. Evans would have.

14        THE COURT:  I guess the question would be in terms of

15   some that deduplication or some of those other things, I mean,

16   like, do I know how my car radio works?  No.  Can I use it?

17   Yes.  So even if, you know --

18        MS. PLETCHER:  I understand that.

19        THE COURT:  That's the thing.  Like, so what?  What is

20   it about her testimony that would be expert like or even

21   prejudicial?  Because the defendants simply haven't had an

22   opportunity to assimilate what she has done?

23        MS. PLETCHER:  Right.  So the basis of her testimony

24   comes from creating this structured database, and there are so

25   many different variables and different ways to interpret the

Sara Fisher - Cross

1    phone records when you put it into a database like this that

2    just pulling up a number of calls between defendant one and

3    defendant two, that's easy.  That will just give you a number.

4    But the data it's pulling from is actually very complex, and it

5    had to be created.  It wasn't just looking at the phone

6    records.

7         The phone records are really when you look at all of

8    the different types of carriers, they are pretty challenging to

9    decipher and then to put that into an algorithm is a very

10   challenging piece, and the algorithm has to have criteria and

11   variables, and that's the part that we would want to be able to

12   explore that with whoever created the database.  And if that's

13   Ms. Nelson, we would want to be able to do the legwork needed

14   to be able to cross-examine her effectively.

15        By the same token, for Ms. Evans to use the data from

16   that dataset but just to say that she typed in a couple

17   numbers --

18        THE COURT:  Well, I didn't get the impression that she

19   was using Ms. Nelson's dataset.  I thought that she was just

20   using some program that would enable one to enter in a

21   particular telephone number and then get a printout of where

22   those numbers -- the list or the entries for those numbers.

23        MS. PLETCHER:  Right, right.  And that's exactly it.

24   It's that program that needs to be created and the data that

25   goes into that program that is actually the source of the --

Sara Fisher - Cross

1          *THE COURT:*  And what's your understanding, if any, as

2    to who created that program?

3          *MS. PLETCHER:*  I would assume that this would be

4    Ms. Nelson who created it.  I don't know, but it really is a

5    complex undertaking.

6          *THE COURT:*  Okay.  And, Ms. Pletcher, if as part of

7    what you mentioned to me, if you can address those three

8    factors too, reason for the delay, whether the delay prejudiced

9    the other party, and the feasibility of carrying the prejudice

10   with a continuance.  We are not going to continue the trial, so

11   we don't have to worry about that one too much but ...

12         *MS. PLETCHER:*  As to point No. 1, the reason for the

13   delay, the government has not provided a sufficient reason that

14   would justify such an extreme delay and having -- that is

15   announcing this witness after trial has already started.  And

16   that goes to the next point which is prejudice with the delay.

17         We are into trial already.  The openings have already

18   happened.  Defendants have not had a chance to incorporate the

19   anticipated testimony into our opening, for example.  We were

20   never able to do that.  This isn't information that has all the

21   sudden become known to the government.  It's been known to the

22   government for many years.  And there is no way to cure it at

23   this point because the prejudice to the defendants has already

24   happened.

25         Again, openings have happened.  We don't have enough

Sara Fisher - Cross

1   time at this point to digest this dataset, to really pick it

2   apart, to be able to cross-examine effectively.  I understand

3   the government's case is going to end as soon as Tuesday which

4   does not give us enough time to really fully be able to

5   meaningfully contest that new evidence.

6       THE COURT:  And were you provided -- you referred to a

7   dataset.  Were you given a dataset today or --

8       MS. PLETCHER:  So we received a spreadsheet today

9   that -- it's my understanding the spreadsheet is the underlying

10  data for the pivot chart that is potentially going to be used

11  by Ms. Evans or maybe Ms. Nelson.  And it's the -- it is this

12  new data in its new form.  The raw data, the hundreds of

13  thousands of phone records, yes, we have had that for a long

14  time.  This is different.

15      THE COURT:  But you weren't given, for instance, a

16  copy of the computer program that was used to search the

17  database.

18      MS. PLETCHER:  No.

19      THE COURT:  Thank you, Ms. Pletcher.

20      Mr. Feldberg, did you have anything else?

21      MR. FELDBERG:  I would just add, Your Honor, we got

22  started on this Sunday afternoon when we got proposed

23  Exhibit 63, and since that time a couple of our colleagues have

24  been struggling to get through and try to verify bits and

25  pieces of the data, and they found a reasonable number of

Sara Fisher - Cross

1    errors, which probably goes to the question of interpreting the

2    data.  So it's not cut and dried.

3         Ms. Nelson, if she were permitted to testify, would

4    clearly be expressing some level of expertise which makes her

5    an expert witness in how the decisions are made, and that's an

6    additional reason that we're prejudiced.  She would be

7    testifying essentially as an expert without disclosure.

8         THE COURT:  Because -- and, Mr. Feldberg, can you

9    mention just a little bit more about the attempts to try to

10   re-create the numbers found in Exhibit 63?  Was that -- what

11   type of effort was made?  Obviously it wasn't done with the

12   same computer program that perhaps Ms. Nelson used, but was

13   there some other methodology that was used to try to do that?

14        MR. FELDBERG:  Your Honor, we, of course, don't have

15   the government's computer program.  My understanding, and I

16   will be corrected if I'm wrong, is that people were going

17   through phone records by hand on PDFs and counting.  And it was

18   at a minimum some undercounting of calls in non-bidding months.

19   But we have only looked at a limited sample.  There is only so

20   much time.

21        THE COURT:  Yeah, understood.

22        Mr. Fagg, quickly?

23        MR. FAGG:  Yes.  Thank you, Your Honor.

24        Mr. Feldberg hit on one of the key points there at the

25   end, which is that people have been going through these phone

Sara Fisher - Cross

1    records by hand because they were produced as PDFs.  So the

2    data obviously that has been used by Ms. Nelson or Ms. Evans

3    has been converted into some sort of electronic, sortable,

4    searchable data, right, so it's not the information that --

5    that is one step in the process here that I just want to make

6    sure that the Court understands.  It's not as if --

7        THE COURT:  These are phone records that the

8    government would have obtained in PDF too, do you know?  I

9    mean, are both sides working with the same information but the

10   government decided to take an extra step?

11       MR. FAGG:  But I think that extra step is the expert

12   analysis we were talking about.

13       THE COURT:  It didn't sound like it.  It sounded like

14   the government made a conversion and then from there to make

15   the data more usable for a person like Ms. Nelson perhaps to do

16   an analysis.

17       MR. FAGG:  I don't believe that that is the case.  I

18   believe that what occurred was much more complicated than that.

19       THE COURT:  I think it is, once that happened, but I

20   am just saying maybe the defendants could have had the data

21   converted into a usable format as well.

22       MR. FAGG:  Just a couple of other points.  When

23   Ms. Wulff talks about the disclosure that was made to the

24   defendants last year, I am happy to be corrected on this, but I

25   believe this was a file of 99 different spreadsheets with

Sara Fisher - Cross

1    countless tabs on each spreadsheet, and so it's not as if the

2    defendants have had some sort of well-defined list of

3    information that Ms. Nelson is likely to testify to.  And

4    obviously there are deadlines in the case for a reason.

5          THE COURT:  Well, it's also, as Ms. Pletcher said,

6    once Ms. Nelson was withdrawn, why would anyone spend time

7    doing that?

8          MR. FAGG:  Exactly.

9          THE COURT:  Thank you, Mr. Fagg.

10         Ms. Wulff?

11         MS. WULFF:  Thank you, Your Honor.

12         There is three things I want to respond to.  First,

13   the Court is correct, it seems correct in indicating Ms. Nelson

14   would not be offering any expert testimony.  She is not

15   offering any opinion as to what these calls mean.  She is just

16   testifying as to what the call --

17         THE COURT:  That's not the issue.

18         MS. WULFF:  Okay.

19         THE COURT:  The issue is whether it's beyond the ken

20   of an ordinary juror.  That's really the test.  And if she --

21   in order to be able to explain why she got the numbers that she

22   did or why she used some type of a program, why she created a

23   program that she did or even the process of deduplicating would

24   need to provide some type of explanation that is not as simple

25   as, say, adding numbers together, but would require a certain

Sara Fisher - Cross

1   type of explanation that would go beyond what an ordinary juror

2   would -- could be able to do, then that is expert testimony,

3   and it really sounds like she would need to do that in order to

4   explain how she did what she did.  I don't even know what she

5   did because I haven't seen these charts.

6          Common sense tells me that's true, not only because

7   the government withdrew her once upon a time, but also because

8   it sounds like the information that was produced once upon a

9   time, you know, was quite complicated in and of itself and, you

10  know, wasn't just, Here is my addition sheet.  So it sounds

11  like she was bringing to bear some expertise.

12        *MS. WULFF:*  Let me address those points, Your Honor,

13  because I do think there has been some confusion in terms of

14  what defense counsel has said.

15        Ms. Nelson did not use some sort of computer

16  algorithm, there is no dataset, that those words are not

17  appropriate to Ms. Nelson's testimony, the AT&T records for

18  which there is four numbers at issue, two for Mr. Brady and two

19  for Mr. Austin.  Two phone numbers are AT&T and two of the

20  numbers are Verizon.  So for the two AT&T phone numbers,

21  those -- the information that the government received from AT&T

22  is a text file, a .TXT file, which is -- which translates into

23  an Excel file, and that's the format that they were also

24  produced to the defendants in.

25        The Verizon records, as the Court may recall from

Sara Fisher - Cross

1    prior testimony, are produced as a PDF.  Ms. Nelson then did --

2    I am sure it's not just literally scanning them, but you can

3    take a PDF and convert it into an Excel and that is what she

4    did.  So the data was all in Excel format which she could

5    compare.  And the part of the reason -- and this goes to the

6    second layer of confusion, I believe, part of the reason for,

7    as Mr. Fagg said, that there were so many spreadsheets with so

8    many tabs is that the government has produced, my understanding

9    of the way Ms. Nelson has organized her work product is that

10   the tabs actually show her doing her work product, so to speak,

11   because you can see the steps that she applies to dedupe calls.

12              THE COURT:  To what?  To deduplicate calls?

13              MS. WULFF:  Yes.  Again, I have not looked at every

14   single spreadsheet, but from my understanding from Ms. Nelson,

15   there is -- part of the reason for the tabs is to show her

16   work, and we have produced the tabs to -- in a sense they would

17   help the defendants re-create her work.

18              THE COURT:  And those electronic files I assume with

19   the tabs are the ones that were produced last summer?

20              MS. WULFF:  That's correct, and then we produced

21   further ones this morning.  And I attempted to produce even the

22   most up-to-date work product over the lunch hour.  Apparently

23   some of them got bounced back because of file size, but I will

24   obviously correct that as soon as possible.

25              But, yes, again, it builds off of the same charts that

Sara Fisher - Cross

1    she produced or she made, the government produced to the

2    defense last October.  So it's not a dataset, and there is no

3    algorithm, and I want to be clear about that.  It's looking at

4    Excel rows and comparing them.

5         THE COURT:  And through Excel one could search that

6    database by number.

7         MS. WULFF:  Yes.  You can sort and filter, and I

8    believe that is essentially what Ms. Nelson did.  She did not

9    run some sort of sophisticated government software.

10        THE COURT:  Then what did Ms. Evans do to figure out

11   the numbers in 63?

12        MS. WULFF:  So Ms. Evans did use a computer program

13   that ingested the phone records in their native format and is a

14   computer program that then generates the total number of hits

15   of calls between the individuals, so that is the computer

16   program issue.  And that's why again the government would pivot

17   to Ms. Nelson to provide the same testimony for again which we

18   have indicated that we could provide that testimony through any

19   government employee -- well, not any government employee, but

20   through another government employee.  It's essentially the same

21   testimony coming in through a different witness.  So there is

22   no prejudice, we believe, because Ms. Evans could have

23   testified to this same topic on her direct examination.

24        THE COURT:  And how would Ms. Evans, assuming she did,

25   control for duplicates?

Sara Fisher - Cross

1          *MS. WULFF:*  Yes.  She did a similar work that

2     Ms. Nelson did which is similar to work that has been talked

3     about before which is comparing when, you know, calls look like

4     they might be duplicates because, for example, they both take

5     place at the same minute of the same hour for a similar length

6     of time or within -- you know, it might show that, for example,

7     I called you at 11:23 and you called me at 11:24 but those seem

8     close enough that they were likely the same call.  And then

9     both Ms. Nelson and Ms. Evans would testify that, for example,

10    due to time zones there is one call at, say, 11:24 and then

11    another call at 8:24, but both are for the same length of time

12    or a very similar length of time, that those would likely be

13    the same calls because of the 3-hour apart time zone

14    difference, and they would consolidate that into one.

15         *THE COURT:*  All right.  Thank you.  We have got to

16    rule on this one.  So I am going to exclude Ms. Nelson.  No. 1,

17    she just was not -- this is a late endorsement of her past of

18    the time that she was -- witnesses were to be disclosed.  I

19    don't know, I still can't quite figure out whether she really

20    would be an expert if what she did was simply -- there is

21    nothing wrong with the government converting a PDF into -- you

22    know, using something to convert it into a Excel-readable

23    format.

24         But there wasn't -- you know, there wasn't any reason

25    for the defendants to focus on Ms. Nelson after she was

Sara Fisher - Cross

1   withdrawn in a previous trial as an expert.  The fact that she

2   was withdrawn suggests that the government thought she was an

3   expert.  And for the defendants to get the word this morning or

4   last night or whenever it was just at the last minute that she

5   might testify I think causes the defendants considerable

6   prejudice, because all of the sudden they have to just in terms

7   of that work, the tabs that you would have to go back and try

8   to figure out what her work product or her reasoning was on it

9   is -- you know, that causes a distinct prejudice even if she

10  wouldn't be called until Tuesday.  Tuesday is not that far

11  away.

12        And just the fact that she would come at the end of

13  the government's case would mean that she was coming close to

14  the beginning of the defendants' case, so I consider there to

15  be quite a bit of prejudice there.

16        And because the time frame is close together in terms

17  of it's just next Tuesday, there wouldn't be an opportunity to

18  further delay her testimony nor has there been any request by

19  either side to do that.  So I will exclude the testimony of

20  Ms. Nelson.

21        That then gets us back to whether or not I should

22  allow Ms. Evans to testify about 63.  63 is not complicated.

23  And what it sounds like is Ms. Evans used some other program, I

24  don't know what type of program that is, but once again, it

25  doesn't sound like anything that's especially complicated.  It

Sara Fisher - Cross

1   just searches for similar -- you know, a given number, and it

2   produces results.  It also sounds like what Ms. Evans did is to

3   so-call deduplicate is simply to do a comparison.  A comparison

4   doesn't require any expert testimony.

5        It is true that this is being produced, you know,

6   really kind of the last minute -- since Sunday, I guess, and

7   for that reason I am going to allow Ms. Evans to testify as the

8   next witness, but I am also going to require the government to

9   make her available at some point if the defendants want to

10  cross-examine her further on this particular subject at the end

11  of the government's case so that -- so if you could -- what I

12  would suggest is the parties talk and have her available by VTC

13  if there is a request for some additional cross-examination of

14  her before the government rests.

15       You know, once again, whether something comes in under

16  1006, perfection is not required.  Some discrepancies that may

17  come in, you know, would not -- or some discrepancies in the

18  data, the inaccuracies, as long as they are not major, would

19  not prevent an exhibit such as 63 from coming in.  But at this

20  point in time, I am not sure that the defendants have had the

21  full opportunity to be able to test outside of

22  cross-examination at trial of the accuracy of that, but once

23  again, I haven't heard anything that would suggest that the

24  process that Ms. Evans used to come up with 63 is something

25  that would necessarily result in gross disparities that would

Sara Fisher - Cross

1    keep it from coming in.  So I will allow her to testify about

2    63, but once again, I will -- I won't admit it until the

3    defendants have an opportunity sometime before the close of the

4    government's case if they want to recall Ms. Evans and

5    cross-examine her further about that.

6            Ms. Pletcher.

7            MS. PLETCHER:  Thank you, Your Honor.

8            So I think that the government intends to use it only

9    as a demonstrative.

10           THE COURT:  Right.  I think that's right.  So I guess

11   what I would rule is this.  Because I think it's important that

12   the defendants have an opportunity to have a more fully

13   informed cross of it, we won't have it displayed until such

14   time as they do, but if we can agree on her appearing by VTC,

15   it could then be displayed at that time next week, all right?

16           Anything else before we bring the jury back in?

17           Let's bring the jury back in.

18           (Jury present.)

19           THE COURT:  Sorry for the delay, ladies and gentlemen.

20   We had an issue that we had to take up.  I really appreciate

21   the fact that you were all ready to go.

22           All right.  Ms. Kuykendall, go ahead.

23           MS. KUYKENDALL:  Thank you.

24   BY MS. KUYKENDALL:

25   Q.  Good afternoon, Ms. Fisher.

312

Sara Fisher - Cross

1    *A.*  Good afternoon.

2    *Q.*  So before the lunch break, we were talking about Claxton's

3    2018 contract, and we were looking at the renegotiated 2017

4    contract.

5         *MS. KUYKENDALL:*  Can we please bring up F-756?  Can we

6    have that published, please?

7         *THE COURT:*  Yes, you may.

8    *BY MS. KUYKENDALL:*

9    *Q.*  So comparing, again, the renegotiated 2017 price and the

10   former 2017 price, that difference was about 5-1/2 cents; is

11   that right?

12   *A.*  Yes, depending on what the variable costs were.

13   *Q.*  Thank you.  I understand.

14        So now I want to turn to the 2018 price.  And if we

15   can look at page 4, please, of F-756.  And the applicable

16   period is January 1, 2018 to December 31, 2018; is that right?

17   *A.*  Yes.

18   *Q.*  So this is the next portion of that contract that you were

19   negotiating?

20   *A.*  Correct.

21        *MS. KUYKENDALL:*  If we turn to page 4 and scroll to

22   the bottom.

23   *BY MS. KUYKENDALL:*

24   *Q.*  Claxton's COB price was reduced again; is that right?

25   *A.*  Yes.

Sara Fisher - Cross

1    Q.   And the price was .9371?

2    A.   Correct.

3    Q.   So this is, again, another reduction?

4    A.   Yes.

5    Q.   Of more than 4 cents?

6    A.   Yes.

7    Q.   And, again, Claxton did not push back?

8    A.   No.

9    Q.   Did not say no?

10   A.   No.

11   Q.   Did what RSCS wanted?

12   A.   Yes.

13   Q.   And this was part of that stair-step decrease that RSCS had

14   proposed?

15   A.   Yes.

16        MS. KUYKENDALL:   If we can turn to page 7, please.

17   BY MS. KUYKENDALL:

18   Q.   The applicable period of this portion of the contract is

19   January 1, 2019 to December 31, 2020; is that right?

20   A.   Yes.

21   Q.   So this is the last two years of the three-year contract

22   that you were negotiating?

23   A.   Yes.

24        MS. KUYKENDALL:   Can we turn to page 8, please, and if

25   we scroll to the bottom.

314

Sara Fisher - Cross

1  *BY MS. KUYKENDALL:*

2  *Q.*  And Claxton's FOB plant costs for the eight-piece COB is

3  reduced again?

4  *A.*  Yes.

5  *Q.*  And the contract price is .9314.  Do you see that?

6  *A.*  Yes.

7  *Q.*  So, Ms. Fisher, from P6 2017 to the end of 2020, Claxton

8  came down over 10-1/2 cents; is that right?

9  *A.*  Again, from this 2017 contract to what was put in place in

10  May, I can't speak to without looking at it to see if the

11  variable price was -- the variable components were apples to

12  apples, but they did come down once for May 2017 to the end of

13  2020.

14  *Q.*  I understand if we take away the grain fluctuations.  But

15  if we just looked at all the contract prices, you would agree

16  that we looked at about a 5-1/2-cent reduction and over a

17  4-cent reduction and then this about less than the -- I think

18  less than 5 -- less than half a penny, right?  That's over

19  10-1/2 cents?

20  *A.*  It is, but it's not -- I can't tell you unless you look at

21  the 2017 initial contract to the May 2017 contract if the

22  variable costs were held constant to give you what that number

23  is.

24  *Q.*  Thank you.

25          Now, as we saw through the bid submissions, Claxton

315
Sara Fisher - Cross

1    responded to RSCS's directional guidance and reduced its bid

2    submissions in each subsequent round, right?

3    A.   Correct.

4    Q.   Didn't push back when RSCS asked it to submit its bid

5    submissions, right?

6    A.   No, not that I'm aware of.

7    Q.   Didn't say no?

8    A.   No.

9    Q.   And did what RSCS wanted, right?

10   A.   That's correct.

11   Q.   And Claxton responded to RSCS's directional guidance when

12   it implemented the stair-step decrease that RSCS had requested

13   in May of 2017, right?

14   A.   Yes.

15   Q.   And during this process, Claxton had requested more volume,

16   right?

17   A.   Yes, they did.

18   Q.   So had Claxton had wanted to increase its volume of sales

19   to KFC in this three-year contract period, right?

20   A.   Yes, they did.

21          MS. KUYKENDALL:  Can I have a moment to confer, Your

22   Honor?

23          THE COURT:  Yes, you may.

24          MS. KUYKENDALL:  No further questions.

25          THE COURT:  Thank you.

Sara Fisher - Cross

1          Ms. Pletcher, go ahead.

2          *MS. PLETCHER:*  Thank you, Your Honor.

3                     **CROSS-EXAMINATION**

4   *BY MS. PLETCHER:*

5   *Q.*  Good afternoon, Ms. Fisher.

6   *A.*  Good afternoon.

7   *Q.*  My name is Anna Pletcher, and I represent Jayson Penn.  You

8   don't know Jayson Penn, do you?

9   *A.*  No.

10  *Q.*  You have never met him?

11  *A.*  No.

12  *Q.*  Never talked to him?

13  *A.*  No.

14          *MS. PLETCHER:*  I have no more questions.

15          *THE COURT:*  Thank you.

16          Ms. Page.

17                     **CROSS-EXAMINATION**

18  *BY MS. PAGE:*

19  *Q.*  Good afternoon, Ms. Fisher.  How are you?

20  *A.*  Doing well.  How are you?

21  *Q.*  Good.  My name is Kelly Page, and I represent Mikell Fries.

22  I have some very good news for you.  I believe I am the last

23  one, and I don't have any binders for you to look through, but

24  I do have some questions about Claxton's first-round bid

25  submission in 2017.

Sara Fisher - Cross

1   A.   Okay.

2          MS. PAGE:   Mr. Brian, if we could go ahead and pull up

3   Defense Exhibit F-853, please.

4          Your Honor, this was admitted this morning, so I would

5   ask permission to publish to the jury and the witness.

6          THE COURT:   What was the exhibit number again?

7          MS. PAGE:   F-853.

8          THE COURT:   You may.

9          MS. PAGE:   And, Mr. Brian, if we can go to that

10  pricing sheet tab, that first tab.

11  BY MS. PAGE:

12  Q.   Ms. Fisher, just to remind the jury, this is Claxton's

13  cost-plus model that was submitted to RSCS in February of 2017?

14  A.   Correct.

15  Q.   And looking at that top line, you see a line that says

16  injected eight-piece.

17  A.   Yes.

18  Q.   And that is the bid that Claxton submitted to you for that

19  eight-piece COB that we have been talking a lot about today.

20  A.   Yes, that's correct.

21  Q.   And that bid price is .9939; is that right?

22  A.   Yes.

23  Q.   And to be more specific, this was not just the bid that was

24  submitted to you by Claxton; this was the bid that was

25  submitted to you by Scott Brady on behalf of Claxton?

Sara Fisher - Redirect

1   A.  Yes.

2           MS. PAGE:  I have no further questions.

3           THE COURT:  Thank you.

4           Ladies and gentlemen, just for your information, you

5   heard Ms. Page just refer to Mr. Brian.  There really isn't a

6   Mr. Brian.  There is Mr. Brian Fronzaglia, and he is right

7   there.  He will wave.  And he is doing a lot of the pulling

8   exhibits up and focusing in on them, so just so you know who he

9   is.

10          All right.  Any additional cross-examination?  I don't

11  think so.

12          Redirect?

13                    **REDIRECT EXAMINATION**

14  BY MR. LOVELAND:

15  Q.  Good afternoon, Ms. Fisher.

16  A.  Good afternoon.

17  Q.  Ms. Fisher, do you recall being asked about the various

18  interviews that you had with the United States?

19  A.  Yes.

20  Q.  Okay.  And do you recall being asked about your description

21  of the process as blind bidding?

22  A.  Yes.

23  Q.  During your interviews and trial preparation sessions, were

24  you instructed to tell the truth?

25  A.  Yes.

Sara Fisher - Redirect

1   *Q.*  Were you asked to explain things in your own words?

2   *A.*  Yes.

3   *Q.*  Were you ever told by anyone from the United States in this

4   case to say anything but the truth?

5   *A.*  No.

6   *Q.*  Okay.  I want to pivot now and talk a little bit about

7   RSCS.  You recall being asked about RSCS and its relationship

8   with the various Yum Brands?

9   *A.*  Yes.

10  *Q.*  To clarify, who owns RSCS?

11  *A.*  The franchisees and Yum.

12  *Q.*  And who does RSCS serve?

13  *A.*  We serve the restaurants.

14  *Q.*  And by the restaurants, which restaurants do you mean?

15          *MS. CARWILE:*  Objection.  Can we be heard at side bar?

16          *THE COURT:*  Yes.

17     (At the bench:)

18          *THE COURT:*  Go ahead, Ms. Carwile.

19          *MS. CARWILE:*  So on the direct examination of this

20  witness, the question was asked about savings that were

21  delivered to the system or what she called the system, and she

22  used the phrase "we provided relief to our restaurants."  My

23  concern about this question or potential, I believe, line of

24  questioning and I let it go because I didn't want to draw

25  attention to it when it happened on direct, but there has been

Sara Fisher - Redirect

1    a very clear ruling of this Court, I believe, from trial one at

2    least but certainly at trial two that there was to be no

3    testimony about any effect on the downstream customer, in this

4    case the KFC restaurants and the consumer.  And she can talk,

5    of course, at a high level about the restaurants.

6            I understand I did the same on cross, but the second

7    she starts talking about relief or something of that nature to

8    the downstream customer of RSCS, I think there is a clear

9    violation of motions that have been made and ruled upon.  And

10   that's my, essentially, objection here.  I don't know what the

11   answer is going to be, but I wanted to raise it before it gets

12   said and the bell gets rung.

13           THE COURT:  Mr. Loveland, response?

14           MR. LOVELAND:  Two points.  I was, I think, using very

15   similar phrasing to what Ms. Carwile had, so that was the

16   intention.  I would also say to the extent that the defense

17   explores this concept of savings and explored the ownership

18   structure of RSCS at length bringing in A&W and using the term

19   "umbrella corporation" or "umbrella structure" or something to

20   that effect, I wanted to clarify for the jury who owns RSCS and

21   who RSCS served, and that was the intention behind this line of

22   questions.

23           THE COURT:  Yeah, I don't see wrong with any of the

24   questions that Mr. Loveland asked, but I do think that we

25   should steer clear of any discussion, not that Mr. Loveland has

Sara Fisher - Redirect

1   indicated that there is going to be any, that would indicate,

2   you know, who stands to benefit from price savings or things of

3   that nature.  But certainly clarifying the ownership structure

4   of RSCS is appropriate.  I think the jury has already heard

5   that it's owned by the franchisees, but as long as those are

6   the focus of the questions, that seems fine, so I will overrule

7   that objection.

8           And, Mr. Loveland, were you going to go into how the

9   franchisees or the stores or the restaurants stood to benefit

10  from cost savings?

11          *MR. LOVELAND:*  No, Your Honor.  I was trying to

12  clarify the RSCS ownership structure and that it was owned by

13  the franchisees.  I can lead through these two or three

14  questions and move on.

15          *THE COURT:*  Okay.  Thank you.

16          (In open court:)

17  *BY MR. LOVELAND:*

18  *Q.*  Okay, Ms. Fisher.  Just to make sure anything didn't get

19  lost in the shuffle, I believe you just testified that RSCS is

20  owned by the franchisees or the stores; is that right?

21  *A.*  Yes.  We're a cooperative, and each member produces a share

22  and then controls -- we report to the boards who are the

23  franchisee and Yum, yes.

24  *Q.*  So in the negotiation process, RSCS seeks to serve the

25  interest of those restaurants; is that right?

Sara Fisher - Redirect

1    *A.*   Yes.

2    *Q.*   I want to talk to you for a moment about Mr. Eddington who

3    came up briefly on cross.  Was this negotiation about what you

4    have testified began in the very late stages of 2016, was this

5    the first negotiation that Mr. Eddington had ran for a

6    customer?

7          *MS. CARWILE:*  Objection to foundation.  She testified

8    she hasn't been involved in this team before that.

9          *MR. LOVELAND:*  Your Honor, similar foundation

10   objections were overruled in this context.  She worked for

11   Mr. Eddington and had been employed at the company for, I don't

12   know, about a decade before this.

13         *THE COURT:*  Overruled.  She can answer if she knows.

14   *BY MR. LOVELAND:*

15   *Q.*   Would you like me to restate the question?

16   *A.*   No, that's okay.  I believe Rich started after the 2015

17   contract was done, so this would have been his first contract

18   from a COB -- from a chicken-on-the-bone standpoint.

19   *Q.*   Okay.  And when he came to RSCS, where did he come from?

20   *A.*   I believe he came from Mar-Jac.

21   *Q.*   Do you have any reason to believe that Mr. Eddington

22   understood the purpose of the bidding process different from --

23         *MS. CARWILE:*  Objection, foundation, speculation.  She

24   can't testify to that.

25         *THE COURT:*  We didn't hear the whole question, but I

Sara Fisher - Redirect

1    will sustain the objection.  It sounds like -- I think I

2    understand where it was going.

     *BY MR. LOVELAND:*

3

4    Q.  Briefly, Ms. Fisher, what's Mar-Jac for the jury?

5    A.  A poultry supplier.

6    Q.  Now, you were asked several questions on cross-examination

7    about volume, and I believe your answers talked about the

8    importance of volume.  Is volume the most important factor that

9    you look for in the bidding process, or are there others that

10   are equally important?

11   A.  I would say price, volume, and plant location are all very

12   important.

13   Q.  And can you extrapolate for the jury how those three

14   factors can affect each other during your review of bids?

15   A.  Well, I mean, from a plant location standpoint and then if

16   you are -- our job is to get the lowest-landed cost to the

17   restaurants, so if we are not purchasing from the correct plant

18   locations and just looking at price or just looking at volume

19   out of particular locations, then we would not be delivering

20   the lowest-landed cost to the restaurants because restaurants

21   are across the country.

22   Q.  Okay.  In the context of volume, you were shown a chart and

23   asked about various volume increases and decreases amongst the

24   various chicken suppliers.  What I want to ask you is, is

25   profit based solely on volume; or are there other factors that

Sara Fisher - Redirect

1   go into whether a company makes profit?

2          MS. CARWILE:  Objection as to vagueness, what company

3   he is talking about.

4          THE COURT:  Overruled.

5   A.  I mean, I can't speak for the companies, but I would think

6   that more things go into it than just volume.

7          MS. PAGE:  Objection, speculation, Your Honor.  She

8   says she thinks.  She does not have foundation for the answer.

9          THE COURT:  Overruled.

10  BY MR. LOVELAND:

11  Q.  Sorry, Ms. Fisher, if there was more to say, you can answer

12  the question.  The question was regarding profit, does it

13  depend solely on volume; or are there other factors that

14  determine whether a company makes a profit?

15  A.  Volume is a piece of it, but it depends on what they're

16  charging and their cost to run their facilities.  There is

17  multiple things, I would think, that would go into it.

18  Q.  So there may be instances where higher prices and lower

19  volume could result in more profit, for example?

20          MS. NIELSEN:  Objection, leading.

21          THE COURT:  Sustained.

22  BY MR. LOVELAND:

23  Q.  Ms. Fisher, could you discuss for the jury how volume and

24  price would affect each other in terms of profits?

25          MR. LAVINE:  Objection, Your Honor, which company are

Sara Fisher - Redirect

1  we talking about, vague.

2         THE COURT:  Yeah.  I am going to sustain the

3  objection.  I assume it related to the suppliers.

4         MR. LOVELAND:  I will clean it up, Your Honor.  Thank

5  you.

6  BY MR. LOVELAND:

7  Q.  Ms. Fisher, you were asked a lot of questions about market

8  forces, supply and demand.  You were shown charts about volume

9  for various chicken companies.  My question to you is, for a

10 chicken supplier, could you explain to the jury how volume and

11 price could affect things like profit?

12        MS. CARWILE:  Objection to foundation.  She hasn't

13 testified to that.

14        THE COURT:  Sustained.

15        MR. LOVELAND:  Your Honor, could we have a brief side

16 bar?

17        THE COURT:  Yes.

18     (At the bench:)

19        THE COURT:  Go ahead, Mr. Loveland.

20        MR. LOVELAND:  Okay.  So before the break, Ms. Carwile

21 asked about this last question on these basic economic

22 principles, Ms. Fisher, but in 2018, the 2018 negotiations,

23 there are more small birds available than RSCS had originally

24 thought.  And it goes on to talk about supply and demand and

25 how it could affect both chicken suppliers and RSCS and KFC.  I

Sara Fisher - Redirect

1    am merely trying to ask a very basic question about the effects

2    that volume and price could have on each other in terms of

3    profit, and I think Ms. Carwile went much further into detail

4    than I am planning on going in this line of questions.

5            THE COURT:  Yeah, however, Ms. Carwile's questions

6    were all focused on RSCS's bottom line, and it's true that she

7    was -- that Ms. Fisher was asked about some of those

8    fundamental laws of supply-and-demand factors, but your

9    questions were more based upon how price and volume could

10   affect the profitability of a supplier, a topic that she has

11   not demonstrated any foundation to know.  That's why the

12   objection was sustained.

13           MR. LOVELAND:  Thank you for the clarification, Your

14   Honor.

15           THE COURT:  Thank you.

16           (In open court:)

17   BY MR. LOVELAND:

18   Q.  Ms. Fisher, in the context of cross-examination, do you

19   recall being asked about supply and demand and market forces in

20   the context of small-bird products?

21   A.  Yes.

22   Q.  I want to ask you the question, did OK Foods sell chicken

23   to KFC before the 2018 bidding process that you have been

24   testifying about?

25   A.  Yes.

Sara Fisher - Redirect

1   *Q.*  OK Foods sold chicken, eight-piece chicken on the bone

2   before the 2018 --

3   *A.*  It wasn't a part of the 2015 contract, but they were

4   brought onboard before that contract -- the 2018 contract went

5   in place.

6   *Q.*  Okay.  And thank you for the clarification.  I will

7   rephrase.

8          To be precise, did OK Foods participate in the

9   2015-to-2017 contract cycle?

10  *A.*  They weren't awarded business, but I wasn't a part of that,

11  so I can't answer whether they participated.

12  *Q.*  So they were not awarded business in the 2015-to-2017

13  contract cycle.

14         *MR. LAVINE:*  Objection, Your Honor.  I think the

15  witness testified she doesn't know.

16         *MR. LOVELAND:*  No, she said they were not awarded.

17         *THE COURT:*  Mr. Loveland, you have to address

18  everything to me, not have a side conversation with counsel.

19         *MR. LOVELAND:*  She testified they were not awarded any

20  business from 2015 to 2017 as part of the --

21         *THE COURT:*  The last thing that was said was not in

22  the form of a question, that was just a statement, so I don't

23  think there is a pending question right now.

24         Go ahead, Mr. Loveland.

25         *MR. LOVELAND:*  Thank you, Your Honor.

Sara Fisher - Redirect

1    *BY MR. LOVELAND:*

2    Q.  If an additional supplier is added from the 2015 - 2017

3    bidding process and then into the 2018 - 2020 bidding process,

4    OK Foods is added as an additional chicken supplier, does that

5    affect the supply of chicken that KFC is able to purchase?

6    A.  I mean, it would open up more volume potentially, yes.

7    Q.  Do you recall being asked about the feedback process that

8    occurred during the rounds of bidding in the negotiation

9    process?

10   A.  Yes.

11   Q.  Okay.  I believe you testified that you got information

12   from other suppliers and used that as part of the feedback

13   process; is that right?

14   A.  Yes.

15   Q.  When you were giving feedback to a chicken supplier such as

16   Pilgrim's in the feedback process, do you ever disclose where

17   the information came from?

18   A.  No.

19   Q.  Why?

20   A.  Because that's part of the blind-bidding process where we

21   want everything to stay confidential to negotiate.

22        *MS. CARWILE:*  I object, Your Honor, this statement.

23        *THE COURT:*  Overruled.

24   A.  We want everything to remain confidential so that it

25   creates competition and we can deliver the lowest-landed cost

Sara Fisher - Redirect

1    to our restaurants.

2    *BY MR. LOVELAND:*

3    *Q.* Do you recall being asked in terms of the market factors,

4    supply and demand, I want to go back to small birds, were you

5    asked about how the supply and demand of small-bird products

6    could affect price?

7    *A.* Yes.

8    *Q.* I want to ask you about other market factors.

9            In the bidding process, is your goal to get merely a

10   better price than you had before or the best possible price?

11   *A.* The best possible price.

12   *Q.* And what steps do you take to ensure that you get the best

13   possible price rather than just a better price than you got

14   before?

15   *A.* That's part of how -- why we set up the bidding process as

16   we do, so it's confidential, so that --

17           *MS. CARWILE:* Your Honor, I am going to object again

18   to her testifying about what the process is and this type of

19   testimony. If you would like me to say more outside the

20   presence of the jury, I can do that.

21           *THE COURT:* I will sustain the objection.

22   *BY MR. LOVELAND:*

23   *Q.* Ms. Fisher, regardless of any market factors, including

24   supply and demand, if suppliers coordinate their prices, are

25   you able to ensure that you are able to get the best price?

Sara Fisher - Redirect

1          *MS. CARWILE:*  Objection.

2          *THE COURT:*  I am going to sustain the objection.  I am

3     not quite sure, it seems like the question is --

4          *MS. CARWILE:*  It assumes facts not in evidence.

5          *THE COURT:*  I agree.  Sustained.

6     BY MR. LOVELAND:

7     Q.  Regardless of any market conditions, did you ever hear of

8     anyone from RSCS or KFC at any point in your career ask a

9     chicken supplier to share prices?

10         *MS. CARWILE:*  Objection, hearsay.

11         *THE COURT:*  Overruled.

12    A.  No, I did not.

13         *MR. LOVELAND:*  Thank you, Ms. Fisher.

14         No further questions from the government, Your Honor.

15         *THE COURT:*  May Ms. Fisher be excused?

16         *MR. LOVELAND:*  Yes, Your Honor.  I wanted to say that

17    we do not plan to recall this witness.

18         *THE COURT:*  Yeah, I was asking if there is any

19    objection from any of the defendants to her being excused.

20         All right.  Thank you very much, Ms. Fisher.  You are

21    excused.

22         *THE WITNESS:*  Thank you.

23         *THE COURT:*  The United States may call its next

24    witness.

25         *MS. WULFF:*  Thank you.

Sara Fisher - Redirect

1          Before the government calls Rachel Evans, may the

2     government ask a clarification on side bar?

3          THE COURT:  Yes, you may.

4        (At the bench:)

5          MS. CARWILE:  Before we get the clarification, I also

6     want to note I would like to put something on the record after

7     she speaks just so we don't take the headsets off.

8          THE COURT:  Okay.  Ms. Wulff, go ahead.

9          MS. WULFF:  Thank you, Your Honor.  Apologize I didn't

10    get a chance to ask this before the jury came in.

11          But the government wanted to inquire about whether it

12    could keep the testimony of Ms. Evans as to call volumes

13    between Defendant Brady and Defendant Austin at a sufficiently

14    high level so as to avoid further recross-examination by the

15    witness -- excuse me, witness by the defense later in the

16    government's case, for example, if we were to ask her was there

17    a year that had more calls than any other years or the year

18    with the second highest number of calls or the years that had

19    the lowest number of calls and approximate volume comparison

20    such as 10 times in one year versus the other.  Would that be

21    sufficiently high level that we could avoid further

22    cross-examination?

23          THE COURT:  Well, it sounds like you don't want to

24    have her be subject to recall sometime next week?

25          MS. WULFF:  That's correct.

Sara Fisher - Redirect

1          THE COURT:  And when you are mentioning the so-called

2     high-level testimony, would she be testifying in reference to

3     Exhibit 63?

4          MS. WULFF:  She would be testifying in reference to

5     the Excel that was used -- or the -- yeah, the work product

6     that was used to generate Exhibit 63.

7          THE COURT:  Right.  But would her testimony still be

8     in connection with using Exhibit 63 as a demonstrative?

9          MS. WULFF:  I see.  I misunderstood.  Then we would

10    not offer Exhibit 63 as a demonstrative.

11         THE COURT:  Okay.  But what you are talking about in

12    terms of the high level would still be information that she

13    derived from the use of the program that you had referred to

14    right before the afternoon session?

15         MS. WULFF:  Yes, yes, Your Honor.

16         THE COURT:  Response from anyone on that issue?

17         MS. PLETCHER:  I will take that up, Your Honor, Anna

18    Pletcher.  We still object for the same reasons that this

19    late-disclosed Exhibit 63, even though that itself is not going

20    to be shown, it's the underlying data that is the issue for us

21    in terms of being prepared to make an effective

22    cross-examination.  And if Ms. Evans is going to be relying on

23    the same data, then the problem still exists, so we still think

24    that we would need to be able to have that time to examine that

25    data and then ultimately cross-examine Ms. Evans next week as

333
Sara Fisher - Redirect

1    the Court suggested.

2         THE COURT: Anything more on that, Ms. Wulff?  I can

3    understand where Ms. Pletcher is coming from because,

4    otherwise, instead of having there be a demonstrative, she

5    would simply kind of summarize the highlights of 63, and given

6    that's derived from the same process that she used to generate

7    63, the defendants would still be deprived of more time to be

8    able to double-check those figures.

9         MS. WULFF: Yes, Your Honor.  The response to that

10   would be the government is not required to disclose the

11   testimony of Ms. Evans, so had we not sought the demonstrative

12   in the first place, the government could have asked Ms. Evans

13   these high-level questions on direct examination and the

14   defendants would have cross-examined her on the spot.  And we

15   believe -- because again it's based on the same underlying

16   phone records that have been produced years ago, so in some

17   sense we did give them some notice of this area of testimony by

18   making the demonstrative notice that we needn't have given in

19   the first instance.

20        THE COURT: Response, Ms. Pletcher?

21        MS. PLETCHER: Your Honor, Ms. Evans was never

22   disclosed as a phone-records analyst of any sort.  We have done

23   this now for the third time.  Ms. Evans' testimony has been

24   based on the summary charts.  That was what we understood it to

25   be.  That's what we are prepared to cross-examine her on.  So

Sara Fisher - Redirect

1    this is new material that Ms. Evans would be covering.  It's

2    based on a database that we have not had a sufficient time to

3    analyze, and that's prejudicial to the defendants.  So we still

4    believe that we need more time in order to make a meaningful

5    cross-examination.

6         THE COURT:  Yeah, I think, Ms. Pletcher, the issue

7    would be, if it's not expert testimony, it doesn't really sound

8    like it is, and if it's based on a dataset that you've got,

9    then as Ms. Wulff said, why would it be subject to -- you know,

10   why couldn't Ms. Evans just have been called without the

11   demonstrative, and she would be able to testify about those

12   big-picture numbers that Ms. Wulff mentioned?

13        MS. PLETCHER:  Your Honor, we have not had the benefit

14   of understanding what it is that Ms. Evans is basing her --

15   would be basing her testimony on.  If she -- she still is

16   testifying to underlying phone records, that is the bottom line

17   here, and these are -- this is testimony that if she is going

18   to be giving about patterns that she saw, about patterns in the

19   data, and that is evidence that defendants have not had an

20   opportunity to fully vet, so that's the problem.

21        THE COURT:  Well, here is what we're going to do, and

22   that is Ms. Evans can testify, and we'll see -- once again, I

23   think we talked about this before, but I will make up my mind

24   after I hear what her testimony is about this program that she

25   used.  If all it is is simply something that takes a phone

Sara Fisher - Redirect

1   number, you plug in the numbers, and out spits the number of

2   times that it appears in a database and, you know, essentially

3   what the entry for that line is, then that may not be expert

4   testimony, but I will hear that.  And then we can have a side

5   bar before she would get to the bottom-line conclusion about,

6   you know, testifying about the big picture, as Ms. Wulff

7   mentioned.

8          But I think Ms. Wulff essentially may have a good

9   point.  If it's not expert but it's just simply looking at

10  those easily compiled numbers, then it may not be expert

11  testimony.  It may not really be subject to disclosure, as long

12  as the government isn't trying to introduce a new exhibit or

13  even use a new demonstrative.

14         *MS. PAGE:*  Before we leave this topic, Kelly Page on

15  behalf of Mikell Fries, my bigger concern here is that

16  Ms. Evans has never been a fact witness.  She has simply been

17  here to check the accuracy of the documents provided to her by

18  the government, so by asking her to opine about the patterns in

19  phone records, they are now making her a fact witness.

20         So Ms. Evans' belief of a pattern and the pattern

21  which is subjective to Ms. Evans is frankly irrelevant, so I

22  think the testimony should be barred under 402 and 403.

23         *THE COURT:*  Response on that, Ms. Wulff?

24         *MS. WULFF:*  Yes, Your Honor.  I did not indicate that

25  I would ask Ms. Evans about any patterns.  I believe I said I

Sara Fisher - Redirect

1    would ask her questions like, was there a year that had more

2    calls than any other year?  If so, what year was that?  And she

3    is not a fact witness.  She was -- she did not participate in

4    the calls.  She is looking at the underlying records and

5    testifying to the total number of calls that she has seen.  I

6    don't believe that makes her a fact witness or an expert

7    witness.

8          THE COURT:  Anything else on that, Ms. Page?

9          MS. PAGE:  No, Your Honor.

10         THE COURT:  Yeah, I will overrule both of those

11   objections.  I don't think she is a fact witness in that sense,

12   but nonetheless, once again, her testimony before was, you

13   know, just double-checking things, and that's not dissimilar to

14   what she would be testifying to about this particular

15   compilation of data.  All right.  Thank you.

16         Ms. Carwile, you had an additional issue?

17         MS. CARWILE:  Thank you, Your Honor.  I will wait

18   until the white noise machine is on.

19         I just wanted to put something on the record in regard

20   to an agreement that Ms. Wulff and I came to last night so that

21   it's -- I make sure that it's on the record.  We have agreed

22   regarding the publication of certain charts and exhibits prior

23   to their formal admission into evidence during the testimony of

24   just Ms. Evans.  And I can inform the Court more about that

25   agreement or if the Court just wants us to work it out between

Sara Fisher - Redirect

1  ourselves, we know what the agreement is, but what I wanted to

2  make sure I put on the record was that the agreement does not

3  waive any or all defendants' objections to the admissibility of

4  any chart or exhibit that's published.

5      THE COURT:  Okay.  So it basically doesn't change

6  anything.  Any previous objections would stand, but there may

7  be some agreed-upon or some agreements related to how -- or

8  that -- the timing at which something is displayed; is that

9  right?

10      MS. CARWILE:  That's exactly right, Your Honor.  Some

11 of the things that both of us would like to display to the jury

12 have not yet been formally introduced, but they will be by the

13 government, so it's exactly as you said, the timing is the

14 issue.  It changes nothing about any other objection is the

15 point.

16      THE COURT:  Any disagreement with that summary,

17 Ms. Wulff?

18      MS. WULFF:  Ms. Carwile and I are in agreement, Your

19 Honor.

20      THE COURT:  I may not necessarily know, but as long as

21 you clue me to what's been agreed in terms of publication,

22 that's fine.

23      MS. WULFF:  Thank you, Your Honor.

24      (In open court:)

25      THE COURT:  The United States may call its next

Rachel Evans - Direct

1    witness.

2            MS. WULFF:  Thank you, Your Honor.  The government

3    calls Rachel Evans.

4            Your Honor, may I while Ms. Evans is coming in pass

5    binders up to the Court -- to the witness and the Court through

6    Ms. Buchanan.

7            THE COURT:  Yes, you may.

8         (**Rachel Evans** was sworn.)

9            THE WITNESS:  I do.

10           COURT DEPUTY CLERK:  Please state your name and spell

11   your first and last name for the record.

12           THE WITNESS:  Rachel Evans, R-A-C-H-E-L, E-V-A-N-S.

13                        **DIRECT EXAMINATION**

14   BY MS. WULFF:

15   Q.  Good afternoon, Ms. Evans.

16   A.  Good afternoon.

17   Q.  Could you please tell the jury where you work?

18   A.  I work for the United States Department of Justice

19   antitrust division.

20   Q.  What's your position at the DOJ, Ms. Evans?

21   A.  I am a paralegal specialist.

22   Q.  How long have you been a paralegal specialist with the DOJ?

23   A.  For almost two years.

24   Q.  What kinds of cases do you work on?

25   A.  I work on civil and criminal cases.

Rachel Evans - Direct

1   *Q.*  Is there a particular subject matter of those cases?

2   *A.*  Generally antitrust.

3   *Q.*  As a paralegal specialist, Ms. Evans, what do your

4   responsibilities typically include?

5   *A.*  My responsibilities include taking notes, reviewing

6   documents, summarizing information, and reviewing it for

7   accuracy.

8   *Q.*  Is your work on this case different from your work from the

9   other investigations and cases you are assigned to?

10  *A.*  Yes.

11  *Q.*  How so?

12  *A.*  I was not part of the investigation for this case.

13  *Q.*  So what was your assignment for this case?

14  *A.*  It was to review the summary charts for accuracy and also

15  to review the frequency of certain set of phone calls.

16  *Q.*  And were you involved in any decisions about how to charge

17  this case?

18  *A.*  No.

19  *Q.*  Were you involved in any decisions about how to try this

20  case?

21  *A.*  No.

22  *Q.*  So has your involvement in this case been more or less

23  limited than your involvement in other investigations and

24  cases?

25  *A.*  More limited.

Rachel Evans - Direct

1    Q.  Ms. Evans, about how many hours have you spent verifying

2    summary charts and performing call-frequency analyses in this

3    case?

4    A.  Over 200 hours.

5    Q.  So, Ms. Evans, let's look at some of the summary charts you

6    helped to verify.  If you could flip in your document to

7    Exhibit 90-10, or your binder.

8         MS. WULFF:  And, Mr. Dunn, with Ms. Buchanan's

9    permission, will pull that up for the Court and the witness and

10   the attorneys only.

11   BY MS. WULFF:

12   Q.  Ms. Evans, do you recognize this document?

13   A.  Yes, I do.

14   Q.  What is it?

15   A.  It's a chart that lists people's names, their associated

16   phone numbers, and associated companies of employment along

17   with an employment period where applicable.

18        MS. WULFF:  At this point, the government would move

19   to publish Exhibit 90-10 for the jury.  It's a demonstrative.

20        THE COURT:  Any objection to 90-10 as a demonstrative?

21        MS. CARWILE:  No, Your Honor.

22        THE COURT:  90-10 will be displayed.

23        Ladies and gentlemen, when you hear the term

24   "demonstrative," that varies from an exhibit that's otherwise

25   admitted in the following way.  A demonstrative will be -- can

Rachel Evans - Direct

1    be viewed and shown to you, for instance, now, but it won't go

2    back to the jury room with you for purposes of deliberations,

3    okay?  An exhibit that is otherwise admitted will go back to

4    you so that you can review it if you wish to do so during your

5    deliberation, but something published just as a demonstrative

6    you just see in court.

7            Go ahead, Ms. Wulff.

8            *MS. WULFF:*  Thank you, Your Honor.

9            Mr. Dunn, if you could call out the first row above

10   the text and the column header for Ms. Evans.

11   *BY MS. WULFF:*

12   *Q.*  Ms. Evans, does the row of text above the chart reference

13   another exhibit number?

14   *A.*  It does.

15   *Q.*  What number is that?

16   *A.*  9748.

17   *Q.*  And if you could look at the first two column headers, what

18   information is contained in those two columns?

19   *A.*  The first column lists names of people, and the second

20   column list says their associated phone numbers.

21   *Q.*  Did you verify the accuracy of the information in these two

22   columns?

23   *A.*  I did.

24           *MS. WULFF:*  Mr. Dunn, if you could call out the row

25   for Defendant Scott Brady, please.

Rachel Evans - Direct

1    *BY MS. WULFF:*

2    *Q.*  Ms. Evans, if you could look at the column there for

3    company and employment period for Defendant Brady.  What does

4    the information in this cell mean?

5    *A.*  It lists the companies at which Mr. Brady was employed.

6    *Q.*  Did you verify the accuracy of this information?

7    *A.*  I did.

8    *Q.*  How did you do that?

9    *A.*  I looked at Mr. Brady's e-mail signatures.

10   *Q.*  Did you verify the accuracy of the rest of the information

11   in this column?

12   *A.*  Yes.

13   *Q.*  How did you do that?

14   *A.*  I looked at the e-mail signatures for the corresponding

15   people.

16   *Q.*  And does Exhibit 90-10 fairly and accurately summarize the

17   information contained in the underlying documents?

18   *A.*  It does.

19        *MS. WULFF:*  The government moves to admit

20   Exhibit 90-10 into evidence.

21        *THE COURT:*  Any objection to Exhibit 90-10 other than

22   any previously made objections?

23        All right.  Then, ladies and gentlemen, at this time,

24   then, so this was shown to you as a demonstrative, but now the

25   government has moved its admission, and I will admit it at this

343

Rachel Evans - Direct

1   time.  So now this particular exhibit, because it's been

2   admitted will go back to the jury and could be viewed if you

3   choose to during deliberations.

4        *MS. WULFF:*  Now you can take down this exhibit.

5   *BY MS. WULFF:*

6   *Q.*  Ms. Evans, in addition to the verification work you did for

7   this case, you mentioned also doing call-frequency work; is

8   that correct?

9   *A.*  Yes.

10  *Q.*  What individuals did you do call-frequency analysis for?

11  *A.*  For Mr. Austin and Mr. Brady.

12  *Q.*  And what phone numbers did you use for Defendant Brady?

13  *A.*  The numbers that are listed for him in Exhibit 90-10.

14  *Q.*  What phone numbers did you use for Defendant Austin?

15  *A.*  The numbers that are listed for Mr. Austin in

16  Exhibit 90-10.

17  *Q.*  What time period did you look at?

18  *A.*  The time period of 2011 to 2018.

19  *Q.*  And what kind of report did you look at?

20  *A.*  I looked at an Excel report that was generated from

21  DocuGenie, which is a phone records database.

22  *Q.*  And what is your understanding of the Excel report

23  generated by DocuGenie?

24  *A.*  It's a generation of phone records for Mr. Austin and

25  Mr. Brady.

344

Rachel Evans - Direct

1   Q.   Specifically what types of phone records?

2   A.   There are Verizon and AT&T records.

3   Q.   And I am sorry, Ms. Evans, what kind of phone calls were

4   you looking for?

5   A.   Oh, for phone calls that are between Mr. Austin and

6   Mr. Brady.

7   Q.   Now, when you looked at the results generated by DocuGenie,

8   did you do anything to those results?

9   A.   Yes, I had to deduplicate the data.

10  Q.   What is deduplication?

11  A.   It's removing duplicates.

12  Q.   Why were there duplicates?  What is your understanding of

13  why there were duplicates in the data?

14  A.   Because the DocuGenie database had phone records for both

15  Mr. Austin and Mr. Brady, and the same phone call would be

16  reflected on both of those sources.

17  Q.   So how did you go about removing the duplicates?

18  A.   For each day, I compared the time, duration, and direction

19  of the phone call to determine if it was likely that the two

20  entries were duplicates.

21  Q.   Did the time zone of calls factor into your work,

22  Ms. Evans?

23  A.   In a way, yes.

24  Q.   How so?

25  A.   If there were two entries that were of the same duration,

Rachel Evans - Direct

1   direction, same minute but off by a couple hours, it was likely

2   that they were duplicate entries.

3   Q.  And why would they -- why did those indicia mean to you

4   that they were likely duplicate entries?

5   A.  Because the difference in hours could have been due to time

6   zones.

7   Q.  So what did you do when you identified duplicate calls?

8   A.  I removed one of the entries.

9   Q.  Did you ever remove both entries in that instance?

10  A.  No.

11  Q.  And at the end of your analysis, did you look at the total

12  number of calls between Defendants Austin and Defendants Brady?

13  A.  I did.

14  Q.  When you looked at the total number of calls, did you

15  observe that there was one year that had more calls than any of

16  the other years?

17          MS. CARWILE:  Your Honor, objection to the discussion

18  we had at side bar, and if we can voir dire if she is going to

19  get into this now.

20          MS. WULFF:  If Your Honor would like a response, I am

21  happy to give one.

22          THE COURT:  Yes, response.

23          MS. WULFF:  The government's understanding is the

24  government is permitted to ask these high-level questions, and

25  the defendants can cross her on them.

346

Rachel Evans - Direct

1          *THE COURT:*  I will -- yeah, I am going to sustain the

2     objection and allow voir dire at this time.  So if Ms. Carwile

3     wishes to ask some foundational questions at this time, she

4     can.

5               So, ladies and gentlemen, when you hear in the course

6     of an examination of a witness and the other side, an opposing

7     party, asks for the opportunity to voir dire, which is a bold,

8     out-of-date French term, what it means is the opportunity to

9     ask for the opposing counsel to ask some questions of the

10    witness to determine whether or not there is some foundation

11    for a particular topic, so that's what Ms. Carwile is doing

12    now.

13         *MS. CARWILE:*  Thank you.

14                    VOIR DIRE EXAMINATION

15    *BY MS. CARWILE:*

16    *Q.*  Good afternoon, Ms. Evans.

17    *A.*  Good afternoon.

18    *Q.*  You said you used a program called DocuGenie; is that

19    right?

20    *A.*  Yes, that's right.

21    *Q.*  And you didn't create the program DocuGenie, of course.

22    *A.*  No.

23    *Q.*  You aren't the person who uploaded the call PDFs and call

24    logs into DocuGenie, are you?

25    *A.*  I was not.

Rachel Evans - Direct

1   Q.  And you did not go look at the underlying PDF or -- well,

2   PDF documents that were the actual call records, did you?

3   A.  In checking the frequency of these phone calls, I did not.

4   Q.  Thank you.  And I really appreciate your clarification.  I

5   am only going to ask you now about the checking the frequency

6   of the calls, okay?

7   A.  Okay.

8   Q.  So any question I ask you, it's just about that topic,

9   okay?

10  A.  Okay.

11  Q.  All right.  So you used this program, but you weren't the

12  person who input the calls, you said, from the PDFs into the

13  program.

14  A.  Yes.

15  Q.  You don't know the process through which the calls were

16  input into the DocuGenie program.

17  A.  I don't know the specific process.

18  Q.  Okay.  And you weren't involved in that process you said.

19  A.  Right, I was not involved.

20  Q.  When you looked at the frequency of the call data from this

21  program, you didn't go back and confirm the accuracy of your

22  numbers using the actual documents that were put into

23  DocuGenie, correct?

24  A.  Right.  I did not do that.

25  Q.  And you don't have a background in how the program works.

Rachel Evans - Direct

1  Is that fair to say?

2  *A.*  Other than reviewing the general manual of it, but, yeah.

3  *Q.*  Right.  You know maybe how to use it like a user would, but

4  you don't know how the computer program works, right?

5  *A.*  Right.

6  *Q.*  And you said that when you looked at certain calls, you

7  made choices regarding which calls to keep in your analysis and

8  which to get rid of based on duping or duplicated calls, I

9  should say, right?

10  *A.*  Yes, if it was likely that they were duplicates.

11  *Q.*  Okay.  And I heard you say that a few times, so I want to

12  kind of focus on that phrase because I appreciate you bringing

13  it up.  You said they were likely duplicates, right?

14  *A.*  Uh-huh.

15  *Q.*  So you can't be sure that the calls you removed were

16  actually duplicated calls?

17  *A.*  I can't be sure.

18  *Q.*  Right.  And so just so I understand, the extent of what you

19  did in order to, I guess, review the frequency of a certain

20  subset of calls is that you used a program that you had nothing

21  to do with the creation or the download of and you clicked

22  something and then you got some sort of output that you looked

23  at; is that right?

24  *A.*  Yes, that's right, it generated an Excel report.

25  *Q.*  All right.  It generated an Excel report, thank you.

Rachel Evans - Direct

1          Then you made decisions based on what you thought --

2     calls that looked like possible duplicates would be based on

3     numerous factors; is that right?

4     A.  Yes.

5     Q.  And that's the totality of what you did when you looked at

6     these calls.  And no one from the government and you didn't

7     ever look at the underlying evidence that was -- that analysis

8     was based on, right, the PDFs, the actual evidence?

9          MS. WULFF:  Objection, compound.

10    A.  I did not look at the underlying records.

11         MS. CARWILE:  If I can have a minute, Your Honor.

12         THE COURT:  Sure.

13    BY MS. CARWILE:

14    Q.  And, Ms. Evans, you are not here at this point to testify

15    about how long a certain number of these calls are; is that

16    right?

17    A.  That's correct.  I only looked at the frequency.

18    Q.  So you only looked at the frequency.  So you can't testify

19    today how many of those calls that you looked at or reviewed

20    were under a minute or less, can you?

21    A.  No.

22    Q.  You can't testify to how many Verizon calls were listed at

23    a minute, right?

24    A.  That's right.  I would have to look.

25    Q.  Right.  And you weren't asked to do that for this case at

Rachel Evans - Direct

1   this moment, right?

2   A.  Yes.

3   Q.  And you also couldn't testify as to how many AT&T calls are

4   less than a minute or a few seconds long, even possibly as

5   short as three seconds, right?  You can't testify to that

6   today.

7   A.  I cannot.

8           THE COURT:  Ms. Carwile, just so we are clear, we need

9   to make a distinction between voir dire and cross-examination.

10          MS. CARWILE:  I am sorry, thank you, Your Honor.

11          THE COURT:  I think we are into cross-examination.

12          MS. CARWILE:  If I may just ask a few questions of the

13   program, and then I will be done, Your Honor.

14          THE COURT:  Go ahead.

15   BY MS. CARWILE:

16   Q.  So this DocuGenie --

17   A.  DocuGenie.

18   Q.  -- thank you -- is a specialized program that takes data

19   and puts it into an Excel; is that right?

20   A.  Yes, that's one of the ways that --

21          THE COURT:  Was there an objection?

22          MS. WULFF:  Misstates testimony.

23          THE COURT:  That wasn't an attempt to characterize

24   testimony.  I think it was just a question.  Overruled.

25   A.  Excel is one of the ways you can generate the report.  I

Rachel Evans - Direct

1   think you can also do PDF, but Excel is easier to work in.

2   *BY MS. CARWILE:*

3   Q.  But that's essentially how the program works, but it's a

4   specialized program that does that?

5   A.  Yes, it aggregates phone records.

6   Q.  And it sounds like you actually had to read some sort of

7   manual or do some kind of training to use the DocuGenie

8   program; that true?

9   A.  Just to familiarize myself with all the tools, because

10  there is options that you have to choose, so you select which

11  phone numbers you want to run a report for.

12  Q.  Right.  Are there other options you can choose?

13  A.  There is other settings that you can apply, and so I

14  applied the proper ones, like, there are certain settings that

15  you choose.

16          *MS. CARWILE:*  Thank you, Your Honor.

17          *THE COURT:*  The purpose of the voir dire was then to

18  base an objection on it, and is there an objection?

19          *MS. CARWILE:*  Yes, Your Honor.  I would object to this

20  line of testimony as lack of foundation and other comments that

21  were made outside the presence of the jury.

22          *THE COURT:*  All right.  Response to the objection?

23          *MS. WULFF:*  Yes, Your Honor, I believe that Ms. Evans

24  has testified as to what she -- how she used the program and

25  the results that she got from it and, therefore, can testify

352

Rachel Evans - Direct

 1  to -- at a high level, to her results.

 2       *THE COURT:*  Objection will be sustained.  You can lay

 3  additional foundation regarding the program.

 4       *MS. WULFF:*  Thank you, Your Honor.

 5                 **DIRECT EXAMINATION CONTINUED**

 6  *BY MS. WULFF:*

 7  *Q.*  Ms. Evans, could you look at Exhibits 50 to 62 in your

 8  binder?  Thank you, Ms. Evans.  Do you recognize those

 9  documents?

10  *A.*  I do.

11  *Q.*  Are these the charts that you verified?

12  *A.*  Yes, they are.

13  *Q.*  And are all 13 of these charts similar in nature?

14  *A.*  They are.

15  *Q.*  Can you describe these charts at a high level?

16  *A.*  They are charts of communications and documents for

17  specific time periods.

18  *Q.*  What kinds of communications and documents do they

19  summarize?

20  *A.*  There are e-mails, phone records, text messages, calendar

21  invites, and electronic documents.

22  *Q.*  For each of these 13 charts, did you take the same steps to

23  confirm the accuracy of the summarized information?

24  *A.*  Yes.

25  *Q.*  What steps did you take to verify the accuracy of the

Rachel Evans - Direct

1   information?

2   *A.*  For each row in the summary charts, I compared the

3   information listed in the summary charts with the underlying

4   exhibits to make sure that the information in the summary

5   charts was accurately reflected.

6   *Q.*  As you were verifying the accuracy, did you ever discover

7   any errors?

8   *A.*  Yes, I did.

9   *Q.*  What did you do when you discovered an error?

10   *A.*  I fixed them.

11          *MS. WULFF:*  And if we could go into the information in

12   the charts in a bit more detail, the government requests

13   permission to publish Exhibit 56 as a demonstrative and the

14   first page at this time.

15          *THE COURT:*  Any objection to her doing so?

16          *MS. CARWILE:*  Could I have just a minute, Your Honor?

17          *THE COURT:*  Yes, you may.

18          *MS. CARWILE:*  Thank you.

19          If I could inquire from Ms. Wulff something?

20          *THE COURT:*  Yes, you may.

21          *MS. CARWILE:*  No objection.

22          *THE COURT:*  Then the first page of Exhibit 56 may be

23   displayed for demonstrative purposes.

24   *BY MS. WULFF:*

25   *Q.*  Ms. Evans, what's at the very top of the chart?

Rachel Evans - Direct

1   A.  There is a date range.

2        MS. WULFF:  And if we could call out the top -- the

3   title and the first two days of records, please.

4   BY MS. WULFF:

5   Q.  And what does that date range signify, Ms. Evans?

6   A.  It represents the date range for the communications and

7   documents in this particular summary exhibit.

8   Q.  If we can look at the headers starting on the left, what is

9   the Date column used for?

10  A.  It lists the specific date of the communication in the

11  corresponding row.

12  Q.  The next column is the Time column.  What information is in

13  the Time column?

14  A.  Where applicable, it lists a time for the corresponding

15  row, communication in the row.

16  Q.  And what kind of information is in the Type column?

17  A.  There is an image that represents what type of

18  communication that is.

19  Q.  And if you look at the first row, what image is there?

20  A.  The pile of papers.

21  Q.  And what does that particular image mean?

22  A.  It represents electronic documents.

23  Q.  What are electronic documents?

24  A.  PDFs are a type of electronic document.

25  Q.  And what does the image in the next two rows mean?

Rachel Evans - Direct

1    A.   That represents phone calls.

2    Q.   And the two rows after that?

3    A.   That's for e-mails.

4         MS. WULFF:   And if we were now to look at the second

5    page and call out the first several rows.  I can give

6    Ms. Carwile a moment.

7         MS. CARWILE:   No objection, Your Honor.

8         THE COURT:   Is there a request then to display the

9    second page for demonstrative purposes?

10        MS. WULFF:   Our request is to display the --

11        MR. TUBACH:   We have no objection to display the

12   second page, which I think is admissible for that.

13        THE COURT:   Which portion of the second page did you

14   request?

15        MS. WULFF:   I requested the top three -- four rows,

16   Your Honor.

17        THE COURT:   Any objection to that?

18        MR. TUBACH:   No objection, Your Honor.

19        THE COURT:   Then the top three or four rows can be

20   displayed for demonstrative purposes only.

21   BY MS. WULFF:

22   Q.   Ms. Evans, what does the image in these rows indicate?

23   A.   The image represents text messages.

24   Q.   Do you recall if there are any other symbols used in these

25   charts?

356

Rachel Evans - Direct

1   A.  Yes, there is one.

2   Q.  What is it?

3         MS. CARWILE:  So I am going to object to this.

4         THE COURT:  Let's see if we can display only the first

5   three or four rows as opposed to just have it pop out.  Was

6   that your objection?

7         MS. CARWILE:  It wasn't, Your Honor.

8         MS. WULFF:  I now understand Ms. Carwile's objection.

9   It relates to what we discussed at side bar, and I will

10  withdraw the question.

11        THE COURT:  Okay.

12        MS. CARWILE:  Thank you.

13  BY MS. WULFF:

14  Q.  Is this being -- there it is, thank you.

15        MS. WULFF:  Sorry, Your Honor, it wasn't being

16  displayed on all the screens.  Sorry, I didn't see it.

17  BY MS. WULFF:

18  Q.  Now, actually, thank you, Ms. Evans.  I can continue with

19  the second page.

20        MS. WULFF:  If we could go back to the first page with

21  the same call-out as before, the title and the first two days.

22  BY MS. WULFF:

23  Q.  Ms. Evans, moving along to the next column, what does the

24  From column include?

25  A.  It lists the name of the individual who sent the

357

Rachel Evans - Direct

1    communication, and also it lists their associated company.

2    Q.   How did you determine the name of the individual who sent

3    the communication?

4    A.   I looked at the underlying exhibit for the particular row,

5    and sometimes I would reference the associated metadata with

6    that underlying exhibit.

7    Q.   Did you ever refer to any other charts or exhibits to

8    determine the name of the individual making the communication?

9    A.   Sometimes I would reference Exhibit 90-10.

10   Q.   And in what instances would you reference Exhibit 90-10?

11   A.   To confirm other names that are used for the individual.

12   Q.   Did you use Exhibit 90-10 particularly in connection with

13   phone records to associate the phone number with the name of an

14   individual?

15   A.   Yes.

16   Q.   And how did you determine which company to list below each

17   individual's name?

18   A.   I looked at Exhibit 90-10 as well.

19   Q.   Did you ever have to look to other sources of information

20   in addition to 90-10?

21   A.   There were times I had to look at other exhibits.

22   Q.   And what kinds of exhibits?

23   A.   Other e-mails are an example.

24   Q.   And once you did that, did you list that exhibit in the

25   Exhibit Number column in the chart?

358

Rachel Evans - Direct

1   A.  Yes, I did.

2   Q.  Did you take any steps to verify that the company logos

3   used in the From column were accurate?

4   A.  Yes.

5   Q.  What steps did you take?

6   A.  I visited the company websites for each of the companies to

7   confirm the logo was accurate.

8   Q.  Now, did you take the same steps we just described to

9   verify the accuracy of the information in the From column to

10  also verify the accuracy of the information in the To column?

11  A.  Yes.

12  Q.  Now, moving on to the next column, the Excerpt column, what

13  does the Excerpt column include?

14  A.  For e-mails and electronic documents and text messages, it

15  includes an excerpt of the communication, and for phone records

16  it includes -- it lists the duration of the phone call.

17  Q.  Now, does the Excerpt column include the entire contents of

18  the e-mails or documents that are being summarized?

19  A.  Not always.

20  Q.  Why not?

21  A.  Because it's an excerpt.

22  Q.  And for phone calls, you said that the Excerpt column

23  includes the duration of the phone call.

24  A.  Yes.

25  Q.  Can you actually tell what was said on the phone call?

359

Rachel Evans - Direct

1    A.   No.

2    Q.   Why not?

3    A.   The phone calls happened before I was assigned to the case.

4    Q.   And what kind of information were you looking at to

5    summarize the phone calls?

6    A.   The underlying phone records.

7    Q.   And is there another word for phone records you might have

8    used here?

9    A.   The underlying exhibit, the underlying exhibit is the phone

10   record.

11   Q.   Are the phone records phone bills?

12   A.   Phone bills, yeah.

13   Q.   Finally, what does the Exhibit Number column include?

14   A.   It includes the underlying exhibit for the corresponding

15   row and any other exhibits I needed to reference when verifying

16   the accuracy of the chart.

17   Q.   Now, what order are the rows in, Ms. Evans?

18   A.   They are in chronological order.

19   Q.   I want to talk about the steps that you took to verify that

20   the rows are in chronological order, okay?

21        MS. WULFF:  At this time, I would request permission

22   to use as a demonstrative the entries for Friday, October 17th,

23   which are at the bottom of the first page.

24        THE COURT:  You've already been given permission to

25   display the first page, so that's -- no additional permission

Rachel Evans - Direct

1    is necessary.

2              *MS. WULFF:*  Thank you.

3    *BY MS. WULFF:*

4    *Q.*  Now, Ms. Evans, what does the ET stand for in the bottom

5    two rows on October 17th?

6    *A.*  It stands for Eastern time zone.

7    *Q.*  Do all the rows on Exhibits 50 to 62 have ET in the time

8    field?

9    *A.*  No, they don't.

10   *Q.*  Can you explain what it means if a row does have ET listed

11   in the time field?

12   *A.*  It means that I was able to verify the time zone of the

13   communication.

14   *Q.*  What do you mean by "verify the time zone of the

15   communication"?

16   *A.*  It means that there was either a time zone listed on the

17   face of the document and I converted it to Eastern time or

18   other sources of the metadata I was able to verify what time

19   zone it was in.

20   *Q.*  Can you explain what metadata is?

21   *A.*  Yes.  Metadata, it's data that summarizes other data such

22   as file name, who last authored the file, who created it, who

23   received it, and it can also include time zone information.

24   *Q.*  So when you were able to verify the time zone of the

25   original communication, what did you do?

Rachel Evans - Direct

1    A.  I standardized it to Eastern time zone if it wasn't already

2    in Eastern time -- if it wasn't already clear that it was in

3    Eastern time zone.

4    Q.  And how did you do that?

5    A.  I used a time conversion website.

6    Q.  So what does it mean if an entry has a time but does not

7    have ET next to it, like, for example, the entry at 10:12 a.m.

8    here?

9    A.  It means that I was not able to verify the time zone of the

10   communication.

11   Q.  And so in those instances, what time did you list in the

12   time field?

13   A.  I listed the time as it appears in the face of the

14   underlying exhibit.

15   Q.  Now, do you know the precise time of those communications?

16   A.  I do not know the precise time zone, but I do know the time

17   as it appears on the face of the underlying exhibit.

18   Q.  And is that the time that you put on Exhibit 50 to 62?

19   A.  Yes, the time as it appears.

20   Q.  As it appears where?

21   A.  In the face of the underlying exhibit.

22   Q.  Now, how did you determine what order to list the

23   communications in, Ms. Evans?

24   A.  I arranged them in chronological order according to the

25   time as they appear in the chart.

Rachel Evans - Direct

1    *Q.*  Now, looking again at this entry at 10:12 a.m., what kind

2    of communication is that entry?

3    *A.*  This is a Verizon phone record.

4    *Q.*  How do you know that it's a Verizon phone record?

5    *A.*  Because the way that Verizon lists their call duration,

6    they list it using Min, M-I-N.

7    *Q.*  Can you compare that to, for example, the call at

8    11:02 a.m. ET?

9    *A.*  That -- yeah, the call at 11:02 a.m. ET is a AT&T record.

10   *Q.*  And how do you know that, Ms. Evans?

11   *A.*  Based on the way that the call duration is listed there.

12   *Q.*  Now, going back to the call at 10:12 a.m., which is on a

13   Verizon record, were you able to determine the time zone of

14   this call?

15   *A.*  With the information I had available to me, I could not

16   determine the precise time zone of the call.

17   *Q.*  Why not?

18   *A.*  The information that I had available to me, it was

19   uncertain if it was reliable, so I did not apply a methodology

20   to the time zones.

21   *Q.*  Is that true for all Verizon calls?

22   *A.*  Yes.

23   *Q.*  So what did you do for Verizon calls?

24   *A.*  I listed the time as it appears in the face of the

25   underlying exhibit.

                                                                                   363
                           Rachel Evans - Direct

 1   Q.  Now, for other phone calls, were you able to determine the

 2   time zone of the phone communication?

 3   A.  Yes.  Those were the AT&T records.

 4   Q.  And what time zone are AT&T records listed in?

 5   A.  They are in UTC, Universal Time Coordinated.

 6   Q.  What is UTC?

 7   A.  It's a standard -- another time zone.

 8   Q.  What did you do to the AT&T records?

 9   A.  I standardized -- I converted from UTC to Eastern time zone

10   for the AT&T records.

11   Q.  Now, in addition to the Verizon records that we discussed

12   and the AT&T records that we discussed, are there any other

13   phone carriers whose records are summarized in these charts?

14   A.  No.

15   Q.  Now, even though you can't determine the precise time zone

16   of the Verizon calls, do you still think the way these entries

17   are summarized is a fair and accurate representation?

18        MS. CARWILE:  I am going to object to that as outside

19   the scope of this witness' testimony.

20        THE COURT:  Overruled.

21   A.  I do.

22   BY MS. WULFF:

23   Q.  Why is that?

24   A.  Because they are arranged in chronological order according

25   to how the times appear in the summary charts.

Rachel Evans - Direct

1  Q.  And were you consistent in the way you applied the ET

2  notation in these summary charts?

3  A.  Yes.  That methodology was consistent.

4       MS. WULFF:  Now, if we could look at the entries for

5  Wednesday, October 8th, which are also on the first page, so I

6  will call those out as a demonstrative.  If we could call these

7  out as a demonstrative.

8       THE COURT:  Once again, that entire first page was

9  already displayed to the jury as a demonstrative, and a part of

10 it can be too.

11      MS. WULFF:  I am sorry, I was in part narrating so my

12 paralegal could know what to do, but thank you, Your Honor.

13      THE COURT:  No problem.

14 BY MS. WULFF:

15 Q.  All right.  Now, Ms. Evans, I want to talk about some of

16 the other issues we see in the Time column.  Do all the rows on

17 this date have information in the Time column?

18 A.  No.

19 Q.  Do they also summarize information from the same exhibit?

20 A.  The four e-mails are sourced from the same exhibit.

21 Q.  Thank you for that clarification.  You are right,

22 Ms. Evans.

23      Now, what exhibit is that?

24 A.  It's Exhibit 498.

25 Q.  Would looking at Exhibit 498 help explain what you did

Rachel Evans - Direct

1    here?

2    *A.*  Yes.

3         *MS. WULFF:*  The government would request permission to

4    publish Exhibit 498 as a demonstrative.

5         *MS. CARWILE:*  No objection.

6         *THE COURT:*  All right.  Exhibit 498 may be displayed

7    as a demonstrative.

8         *MS. WULFF:*  Thank you, Your Honor.

9         Mr. Dunn, if we could call out the bottom four e-mails

10   to zoom in so we can read them.

11   *BY MS. WULFF:*

12   *Q.*  Ms. Evans, are the bottom four rows on Exhibit 498 the

13   e-mails that are summarized in Exhibit 56?

14   *A.*  Yes, they are.

15   *Q.*  Can you use these four e-mails to explain why not all the

16   e-mails on Exhibit 56 had information in the Time column?

17   *A.*  Yes.  The first e-mail in the chain appears at the bottom,

18   and it's the e-mail listed at 4:28 p.m.  And then the next

19   e-mail in the chain appears above it.  It's listed at 2:29 p.m.

20   So I did not list the e-mail time 2:29 p.m. on the summary

21   exhibit because it would appear confusing and as if the e-mails

22   are out of order.  But looking at the e-mail chain here, we can

23   see that the 2:29 p.m. e-mail came after the 4:28 p.m. e-mail.

24   *Q.*  And how do you know that's the order in which these e-mails

25   were written, Ms. Evans?

Rachel Evans - Direct

1    *A.* Because I have experience reading e-mail chains in work and

2    in my everyday life.

3    *Q.* Now, do you know why the time appears this way on the

4    e-mail?

5    *A.* Yes.

6    *Q.* Why is that?

7    *A.* Because the e-mail recipients were in different time zones.

8          *MS. WULFF:* Now, if we could go back to 56 and again

9    on the first page, and, Mr. Dunn, if we can call out the header

10   in the first row.

11   *BY MS. WULFF:*

12   *Q.* Ms. Evans, were there any documents where you could not

13   determine any time for the summarized document?

14   *A.* Yes, there were.

15   *Q.* What did you do in those instances?

16   *A.* I did not list a time.

17   *Q.* Is Exhibit 413 one of those examples?

18   *A.* It is.

19          *MS. WULFF:* Mr. Dunn, if we could take the call out

20   and look at the first page of 56 as a whole again.

21   *BY MS. WULFF:*

22   *Q.* So, Ms. Evans, zooming out and looking at this first page

23   as a whole, can you explain what the color red signifies in

24   this chart?

25   *A.* Yes.  Red signifies communications between two individuals

Rachel Evans - Direct

1   who worked for two different chicken suppliers.

2   Q.  What is the color orange used for?

3   A.  Orange represents communications between two individuals

4   who worked for the same chicken supplier.

5   Q.  What about the rows that do not have any color

6   highlighting?

7   A.  That represents communications involving a chicken supplier

8   customer.

9   Q.  Is this color coding consistent across Exhibits 50 to 62?

10  A.  It is.

11  Q.  Did you take any steps to verify the accuracy of this color

12  coding, Ms. Evans?

13  A.  Yes.

14  Q.  What did you do?

15  A.  I compared the information in the From and the To columns

16  to ensure that the accurate color coding was applied.

17  Q.  How do you know what kind of companies these companies are?

18  A.  Because I looked up the companies on Google.

19  Q.  Ms. Evans, do you believe that the charts contained in

20  Exhibits 50 to 62 fairly and accurately summarize the

21  information from those underlying exhibits?

22  A.  I do.

23  Q.  Do they also put the excerpted records in context with each

24  other in terms of dates and times?

25  A.  Yes, they do.

Rachel Evans - Cross

 1    Q.  And approximately how many documents are excerpted between

 2    the summary charts, Ms. Evans?

 3    A.  There is approximately 200.

 4            MS. WULFF:  A moment to confer, Your Honor.

 5            THE COURT:  You may.

 6            MS. WULFF:  Thank you, Your Honor.  No further

 7    questions on direct.

 8            THE COURT:  Thank you.

 9            Cross-examination?

10            MS. CARWILE:  Just for scheduling purposes, Your

11    Honor, would you like me to go for about five minutes or should

12    we take a break?

13            THE COURT:  Let's go ahead and try to stick to the

14    schedule, if you don't mind.

15            MS. CARWILE:  No problem.  I just wanted to check in

16    on that.

17            THE COURT:  Sure.

18            MS. CARWILE:  Thank you.

19                        **CROSS-EXAMINATION**

20    BY MS. CARWILE:

21    Q.  Good afternoon again, Ms. Evans.  Are you able to hear me?

22    A.  Yes, I can.

23    Q.  Great.

24            So, Ms. Evans, you said you were a paralegal in the

25    Department of Justice's San Francisco office?  Did you say

Rachel Evans - Cross

1   that?

2   A.   I am in the San Francisco office.

3   Q.   And you have worked as a paralegal there for a little under

4   two years you said?

5   A.   Yes, almost two years.

6   Q.   And you are not a supervising paralegal; is that right?

7   A.   I am not.

8   Q.   So you testified on direct that you had no participation in

9   the investigation of this case, right?

10  A.   Right.

11  Q.   So, for instance, you didn't sit in any interviews that

12  were conducted in this case.

13  A.   I did not.

14  Q.   And so essentially what I heard you say is your limited

15  role in this case was to review the government charts based on

16  the parameters they gave you to review them; is that right?

17  A.   Yes, in terms of the summary charts, that's correct.

18  Q.   Yes, thank you.  And I appreciate that clarification.  My

19  questions going forward will only be about Charts 50 through

20  62, okay?

21  A.   Okay.

22  Q.   Does that work?

23  A.   Yes.

24  Q.   And I may also ask you about 90-10, which we have also

25  seen, but I will only be asking about those charts and any

Rachel Evans - Cross

1  underlying exhibits.

2  *A.* Okay.

3  *Q.* So your role was to review those summary charts or those

4  government charts and confirm that what was placed in the

5  charts was typed in the charts correctly from the exhibit that

6  was referenced.  Is that a fair summary of what your role was?

7  *A.* Including any metadata, so that's not always listed, like,

8  on the underlying exhibits, so I would have to go look at that,

9  but generally, yes.

10  *Q.* Okay.  Including the metadata, that was essentially your

11  whole role in this case?

12  *A.* Yes, to verify the accuracy, yes.

13  *Q.* So you were not told by the prosecutors to review all of

14  the documents in this case, right?

15  *A.* It did not -- I didn't need to look at all the documents.

16  *Q.* Right.  That was not part of your role, to look at all of

17  the documents involved in this case.

18  *A.* Right.

19  *Q.* Your only role was to look at the documents that the

20  prosecutors used to make these summary charts, no other

21  documents, correct?

22  *A.* Yes.

23  *Q.* All right.  And you -- that includes the fact that you

24  didn't review all potentially relevant e-mails involved in this

25  case, correct?

Rachel Evans - Cross

1          MS. WULFF:  Objection, calls for a legal conclusion.

2          MS. CARWILE:  I can -- well, if the Court wants a

3     response, I am happy to provide one.

4          THE COURT:  Overruled.

5          MS. CARWILE:  Go ahead.

6     A.  Sorry, could you repeat that?

7     BY MS. CARWILE:

8     Q.  Of course.  Absolutely.  I am happy to repeat it.

9          I said you were not asked by the prosecutors to review

10    all of the potentially relevant e-mails in this case, correct?

11    A.  I was not asked to.

12    Q.  And that's true of any -- all the potentially relevant

13    phone calls as well, right?  You weren't asked to review those

14    either.

15    A.  Right.

16    Q.  So your job was to look at the government's charts and the

17    information that they put in those charts and nothing else,

18    correct?

19    A.  Yes.

20    Q.  All right.  Now, with respect to your role, Ms. Evans, you

21    didn't have any discretion about what to put in these charts,

22    correct?

23    A.  I did not.

24    Q.  Right.  You had no decision-making authority or even role

25    in what went into these charts.

Rachel Evans - Cross

1   *A.*  No, unless it was fixing an error that I found.  And I

2   might not be understanding your question.

3   *Q.*  No, you are understanding it.  I appreciate the way you

4   answered that, and I will get back to fixing errors in a little

5   bit.  But in terms of which documents, for instance, to put in

6   these charts, that was not your decision?

7   *A.*  That's correct.

8   *Q.*  And you didn't play any role, in fact, in that decision; is

9   that correct?

10  *A.*  Right.

11  *Q.*  And that's true of anything that's in the summary charts,

12  none of that was up to you, correct?

13  *A.*  Correct.

14  *Q.*  All right.  That was up to the prosecutors from the

15  Department of Justice who had you come in and review these

16  charts, right?

17  *A.*  Yes.  It was up to the attorneys and --

18  *Q.*  To the attorneys, right, some of whom are sitting at this

19  table, others of who may not be, but regardless, the people

20  whose job it was to decide what went in these charts was the

21  prosecutors, correct?

22  *A.*  Yes.

23          *THE COURT:*  Ms. Carwile, so now if you would look for

24  a convenient breaking spot.

25          *MS. CARWILE:*  No problem.  This is a fine breaking

Rachel Evans - Cross

1    spot.

2            THE COURT:  Thanks.  We will go ahead and take the

3    mid-afternoon break at this time, and we will reconvene at

4    3:30.  The jury is excused.

5            (Jury excused.)

6            THE COURT:  Anything to take up during the break?

7            MS. WULFF:  Can we let Ms. Evans go before we discuss

8    that?

9            THE COURT:  Let's just find out.  It sounds like no.

10   We will be in recess until 3:30.

11        (Recess at 3:15 p.m. until 3:36 p.m.)

12           THE COURT:  Ready for the jury?  Let's bring the jury

13   back in.

14           (Jury present.)

15           THE COURT:  Go ahead, Ms. Carwile, whenever you are

16   ready.

17   BY MS. CARWILE:

18   Q.  Ms. Evans, don't worry, I just have a few more questions to

19   ask you.  Before we took the break, we were discussing the fact

20   that it wasn't you, it was the prosecutors who created the

21   charts.  And, in fact, when you became involved in this case,

22   these charts had already been created by them; is that correct?

23   A.  Yes.

24   Q.  All right.  On direct, Ms. Evans, you testified that these

25   government charts often do not include the entire contents of

Rachel Evans - Cross                                                                    374

1    an e-mail; is that correct?

2    A.  Yeah, not always.

3    Q.  Not always, thank you.  And so where there is an e-mail

4    listed in one of these charts, it may be only snippets or small

5    portions of the e-mail that are actually included in these

6    government charts, correct?

7    A.  It could be.

8    Q.  So let's look at one example of that, all right?

9    A.  Okay.

10         MS. CARWILE:  So I would like to pull up Government

11   Chart 59, just the first entry, and I would ask that this be

12   published to the jury.

13         THE COURT:  Any objection to the displaying of page 1

14   of Exhibit 594, demonstrative purposes only?

15         MS. CARWILE:  Actually, I could even just publish the

16   first line, Your Honor, of page 1.

17         THE COURT:  Of Exhibit 59?

18         MS. CARWILE:  Yes.

19         THE COURT:  Any objection to that?

20         MS. WULFF:  No objection, Your Honor.

21         THE COURT:  That may be.

22   BY MS. CARWILE:

23   Q.  All right.  So, Ms. Evans, this is one of the examples in

24   which only a small, small portion of an e-mail is included in

25   this government chart, correct?

Rachel Evans - Cross

1    A.  I can tell that by it says it reads in part.

2    Q.  Right.  It reads in part, right?

3    A.  Yes.

4    Q.  Do you know how many sentences of Government's Exhibit 1051

5    were left out of this chart?

6    A.  I do not.

7          MS. CARWILE:  I am going to ask to pull up

8    Government's Exhibit 1051, which is the underlying exhibit for

9    this chart entry.

10   BY MS. CARWILE:

11   Q.  That right, Ms. Evans?

12   A.  Yes.

13         MS. CARWILE:  I ask that it be published to the jury,

14   both pages, Your Honor, side by side.

15         THE COURT:  Are you moving for its admission?

16         MS. CARWILE:  I am not.  I am simply asking for

17   publication pursuant to the discussion we had earlier.

18         THE COURT:  For demonstrative purposes only?

19         MS. CARWILE:  Yes, for demonstrative purposes, thank

20   you.

21         THE COURT:  Page 1.

22         MS. CARWILE:  Both pages.

23         THE COURT:  Any objection to displaying Exhibit 1059

24   for demonstrative purposes only?

25         MS. WULFF:  I believe it is 1051, and there is no

Rachel Evans - Cross

1    objection.

2         MS. CARWILE:  I may have been too close to the

3    microphone, Your Honor.  It is 1051.

4         THE COURT:  Then 1051 may be displayed to the jury for

5    demonstrative purposes only.

6         MS. CARWILE:  Thank you.

7    BY MS. CARWILE:

8    Q.  Ms. Evans, do you have Government Chart 59 in page form in

9    front of you?  Are you able to get it quickly?

10   A.  Yes.

11   Q.  Thank you.

12        Can you just look at that first line we looked at

13   earlier?

14   A.  Yes.

15   Q.  Great.

16        Can you also see what's on your screen, which is

17   Exhibit 1051?

18   A.  Yes.

19        MS. CARWILE:  I am going to ask if Mr. Brian,

20   Mr. Fronzaglia, if he can highlight what is included in

21   Government's Exhibit Chart 1051.

22   BY MS. CARWILE:

23   Q.  I am going to ask you if you can compare the chart to what

24   he has highlighted if that is correct.  Those are the lines

25   that are included in the chart, okay?

Rachel Evans - Cross

1   A.   Okay.

2   Q.   Let me know when you are ready.  Take your time.

3   A.   I am ready.

4   Q.   And so before I ask you to verify what's on your screen,

5   this is an e-mail from Mr. Roger Austin to his boss, Mr. Jayson

6   Penn; is that correct?

7   A.   Yes.

8   Q.   And is it correct to say that the highlighted portions of

9   1051 on your screen are the only parts of that e-mail that the

10  prosecutors included in their chart?

11         MS. WULFF:  Objection as to scope.  Goes beyond her

12  scope of the direct exam which was -- which was the accuracy of

13  the summarized information.

14         THE COURT:  Overruled.

15  BY MS. CARWILE:

16  Q.   Go ahead.

17  A.   The highlighted portion is the portion that appears in the

18  summary exhibit.

19  Q.   So anything on your screen that was not highlighted was not

20  included in the prosecutor's chart in this entry, correct?

21  A.   Yes, it's not in the chart.

22  Q.   Thank you.

23         MS. CARWILE:  We can take that down.

24  BY MS. CARWILE:

25  Q.   And, Ms. Evans, before we look at the second of the charts

Rachel Evans - Cross

1    that I want to pay attention to, let me ask you this.  You've

2    testified that your job was to verify the accuracy of these

3    charts, but I want to be clear about what that means, okay?

4    You were never asked to confirm whether information in the

5    exhibits themselves was accurate, correct?

6            MS. WULFF:  Objection, calls for hearsay.

7            THE COURT:  Overruled.

8    A.  Yes, my role was to make sure that the information was from

9    the underlying exhibits was accurately typed.

10   BY MS. CARWILE:

11   Q.  Right.

12   A.  Reflected in the summary charts.

13   Q.  That's exactly what I meant.  Thank you for answering like

14   that.  What I mean is, for instance, if there was a price in

15   one of these e-mails that you were asked to review that was

16   correctly typed into the chart, you weren't asked to review

17   whether that price was the accurate price of some supplier or

18   something like that, correct?

19   A.  Correct.

20   Q.  Thank you very much for that clarification.

21           I just want to look at one more chart, if that's all

22   right with you, Ms. Evans.

23           MS. CARWILE:  If we can pull up Government Chart 52,

24   the entry from November 29th, the one that's listed at

25   2:31 p.m.  And I would ask for that to be published to the

Rachel Evans - Cross

1    jury.  I will give Ms. Wulff a minute.

2            MS. WULFF:  No objection.

3            THE COURT:  And once again, you are asking that that

4    line be displayed for demonstrative purposes only?

5            MS. CARWILE:  I am, Your Honor.  I am sorry to keep

6    misspeaking.

7            THE COURT:  That's all right.  That may be displayed

8    for demonstrative purposes only.

9            MS. CARWILE:  Thank you.

10   BY MS. CARWILE:

11   Q.  So, Ms. Evans, based on my earlier question, for instance,

12   in this e-mail, Mr. Tucker is sending potential pricing

13   information to Mr. Austin, you were not asked to verify whether

14   any of those prices were the accurate bid numbers for these

15   suppliers?

16   A.  That's correct.

17   Q.  So this is an e-mail from Mr. Tucker to Mr. Austin.

18           MS. CARWILE:  If we can display for demonstrative

19   purposes the chart entry just below this one, and I will give

20   Ms. Wulff a minute to look at that.

21           And I would ask the Court's permission to do that.

22           MS. WULFF:  No objection to displaying the next entry

23   for demonstrative purposes.

24           THE COURT:  And that may be displayed, then, once

25   again, for demonstrative purposes only.

Rachel Evans - Cross

1    *BY MS. CARWILE:*

2    *Q.*  All right.  So, Ms. Evans, here you have -- or here, excuse

3    me, the prosecutors have included an e-mail from Mr. Tucker to

4    Mr. Austin at 2:31 p.m., and then the next e-mail they've

5    included is an e-mail from Mr. Austin and Mr. Tucker at

6    4:33 p.m. -- I am sorry, 4:53 p.m.; is that right?

7    *A.*  Yes, I see them.

8    *Q.*  But you were not asked to review the actual response from

9    Mr. Austin to Mr. Tucker in response to the 2:31 p.m. e-mail;

10   is that correct?

11   *A.*  I am not sure.  Yeah, if it's not in the chart, then I did

12   not review it.

13   *Q.*  Thank you for that answer.

14          And my question is the e-mail at 4:53 p.m. is not

15   actually Mr. Austin's response to Mr. Tucker to the e-mail from

16   2:31, but the e-mail that Mr. Austin wrote to respond to

17   Mr. Tucker is not included in this chart, and you weren't asked

18   to review it, correct?

19   *A.*  Yes.

20   *Q.*  Okay, thank you.

21          And would you agree with me that the way this chart is

22   displayed, it's intended to look as if this is the response

23   from Mr. Austin to Mr. Tucker's earlier e-mail?

24          *MS. WULFF:*  Objection, argumentative.

25          *THE COURT:*  Sustained.

Rachel Evans - Cross

| | |
|---|---|
| 1 | *BY MS. CARWILE:* |
| 2 | *Q.* Ms. Evans, you testified on direct that you made some edits |
| 3 | to these charts when you found -- |
| 4 | *MS. CARWILE:* We can take this down, I am sorry. I |
| 5 | should have said that. |
| 6 | *BY MS. CARWILE:* |
| 7 | *Q.* Ms. Evans, you testified that you made some edits to errors |
| 8 | you found in the charts; is that right? |
| 9 | *A.* I did. |
| 10 | *Q.* And when you found edits you needed to make or errors in |
| 11 | the charts, you ultimately ran those by the prosecutors to make |
| 12 | sure that making those changes was okay to do; is that right? |
| 13 | *A.* Yes, and I communicated that there was an error, yes. |
| 14 | *Q.* So you told them there was an error, and you told them that |
| 15 | you had fixed it, but you made sure to let them know no matter |
| 16 | what the error was; is that right? |
| 17 | *A.* Yes. I kept them informed of the errors. |
| 18 | *Q.* I am almost done, Ms. Evans, I promise. |
| 19 | So we've discussed a bit about the date ranges that |
| 20 | are at the top of the charts, right? And they basically have a |
| 21 | beginning date and an end date at the top of each chart, right? |
| 22 | *A.* Yes. |
| 23 | *Q.* And between the years of 2012 and 2019, the charts don't |
| 24 | include every single date from January 1st, 2012 to |
| 25 | December 31st, 2019, right? |

Rachel Evans - Cross

1    A.  They don't include every date.

2    Q.  Right.  The ranges of the charts are within those two

3    years, but they don't -- the charts themselves are only

4    referencing documents and phone calls that are within a limited

5    set of date ranges in that seven-year period, right?

6    A.  Yes, they are summaries of specific time periods.

7    Q.  Well, let me ask you about that.  They are charts that are

8    limited to certain time periods, correct?

9    A.  Yes, based on the communications that are contained in the

10   summaries.

11   Q.  Right.  But just because something is not in one of these

12   charts, that doesn't mean that it didn't happen during this

13   time period, right?

14   A.  Yes, that's right.

15   Q.  Because we talked about it.  Not all relevant e-mails or

16   documents are included in these government charts, right?

17            MS. WULFF:  Objection, calls for a legal conclusion.

18            THE COURT:  I will sustain the objection.

19   BY MS. CARWILE:

20   Q.  Okay.  Ms. Evans, these charts do not include everything of

21   potential relevance that happened during these limited date

22   ranges; is that correct?

23            MS. WULFF:  Objection to foundation as well.  She

24   already looked at them, and Ms. Evans didn't review all of the

25   documents.

383

Rachel Evans - Redirect

1          *THE COURT:*  Sustained.

2     *BY MS. CARWILE:*

3     *Q.*  So basically these charts represent e-mail excerpts, calls,

4     and some other documents that the prosecutors decided to

5     include in these charts; is that correct?

6     *A.*  Yes.  It's a selection of documents.

7     *Q.*  Right, that the prosecutors made, right?

8     *A.*  Yes.

9          *MS. CARWILE:*  Okay, nothing further.  Thank you, Your

10    Honor.

11         Additional cross?

12         Redirect?

13                    **REDIRECT EXAMINATION**

14    *BY MS. WULFF:*

15    *Q.*  Hi, Ms. Evans.

16    *A.*  Hello.

17    *Q.*  You testified on direct that summary Exhibits 50 to 62

18    summarize approximately 200 documents; is that right?

19    *A.*  Approximately, yes.

20    *Q.*  And just now you were asked some questions on

21    cross-examination about the fact that they summarize only

22    communications for only certain time periods between 2012 and

23    2019; is that correct?

24    *A.*  For certain time periods, yes.

25    *Q.*  Do you know how long these summary charts would be if they

384

Rachel Evans - Redirect

1    summarized all the documents and communications between 2012

2    and 2019?

3              MS. CARWILE:  Objection to foundation.

4              THE COURT:  She can answer yes or no.  Overruled.

5    A.  I don't know precisely how long they would be.

6    BY MS. WULFF:

7    Q.  Have you -- are you aware of the approximate size of the

8    document database in this case?

9    A.  It's more than the documents I reviewed.

10   Q.  So would the summary charts be much larger were you to

11   include all the documents and communications in this case?

12   A.  Yes.

13             MS. WULFF:  No further questions, Your Honor.

14             THE COURT:  Then subject to recall, may Ms. Evans be

15   excused?

16             All right.  Thank you, Ms. Evans.

17             THE WITNESS:  Thank you.

18             THE COURT:  You are excused.

19             The United States may call its next witness.

20             MR. TORZILLI:  Thank you, Your Honor.

21             The United States calls Robert Bryant.

22        (**Robert Bryant** was sworn.)

23             THE WITNESS:  I do.

24             COURT DEPUTY CLERK:  Please state your name and spell

25   your first and last name for the record.

Robert Bryant - Direct

1          *THE WITNESS:*  Robert Bryant, R-O-B-E-R-T, B-R-Y-A-N-T.

2                          **DIRECT EXAMINATION**

3     *BY MR. TORZILLI:*

4     *Q.*   Good afternoon, Mr. Bryant.

5     *A.*   Good afternoon.

6     *Q.*   Where were you employed?

7     *A.*   Pilgrim's.

8     *Q.*   Is that Pilgrim's Pride?

9     *A.*   That's correct.

10    *Q.*   What products does Pilgrim's Pride sell?

11    *A.*   Chicken products.

12    *Q.*   Anything else?

13    *A.*   They have a pork business in Europe.

14    *Q.*   What type of -- can you just generally describe the types

15    of chicken products that Pilgrim's produces in the United

16    States, please?

17    *A.*   All types, fast-food chains, retail delis, broad-line

18    distributors.  They have a prepared food division and even a

19    pet food division.

20    *Q.*   Where is Pilgrim's Pride headquartered?

21    *A.*   Greeley, Colorado.

22    *Q.*   How long have you worked for Pilgrim's Pride?

23    *A.*   Since the middle 2000s.  It was through an acquisition.

24    *Q.*   How long have you been in the chicken industry?

25    *A.*   Pretty much since I graduated high school.

Robert Bryant - Direct

1    Q.   When was that, approximately?

2    A.   30 years ago.

3    Q.   The early 1990?

4    A.   That's right.

5    Q.   What was your first job in the chicken industry?

6    A.   I actually started cleaning up the place, the front offices

7    and then out into the processing plant.

8    Q.   And you said "cleaning up the place," what place were you

9    cleaning up?

10   A.   At the time, I worked at the Mayfield, Kentucky, plant.

11   Q.   What kind of plant was the Mayfield, Kentucky, plant?

12   A.   It's a chicken slaughter plant.

13   Q.   Who owns the plant around the time that you started working

14   there?

15   A.   At that time, it was called Seaboard Farms.

16   Q.   Is that the only job you've held in the chicken industry?

17   A.   No.

18   Q.   Could you briefly describe your career in the chicken

19   industry from the early '90s until you started working for

20   Pilgrim's?

21   A.   Yes.  So I started as an hourly employee, sanitation,

22   cleaning of front offices in the processing plant.  After

23   approximately two years, I was promoted to supervisor and held

24   various supervisory positions and working my way through

25   management, various manager roles, then regional management

Robert Bryant - Direct

1    roles and ultimately a general manager over a couple different

2    divisions for Pilgrim's.

3    Q.  What specific type of chicken products does the Mayfield

4    plant or has the Mayfield plant produced?

5    A.  For most of the time it was considered a fast-food plant.

6    Q.  What does it mean to be a fast-food plant?

7    A.  Those chicken plants are tailored to specific customer

8    needs, and that one was primarily tailored towards production

9    of fast-food products.

10   Q.  What are the types of things that a plant has in order to

11   be tailored to be a fast-food chicken processing facility?

12   A.  First thing is it has to have the bird size, a small-bird

13   size for the fast-food bone-in products.  It has to have the

14   machines and capability on the back end to produce and package

15   those products for the fast-food customers.

16   Q.  To your knowledge, does the Mayfield facility or has the

17   Mayfield facility produced products that crossed -- were

18   shipped across state lines?

19   A.  Yes, most all of them do.

20   Q.  Now, during your time working at Pilgrim's, have you had

21   any involvement in sales to customers?

22   A.  I have.

23   Q.  Approximately when did you first have involvement in sales

24   to customers?

25   A.  Sometime in the middle to late 2000s.  I was a sales

Robert Bryant - Direct

1   coordinator at the Mayfield, Kentucky, plant.

2   Q.  At that time, did you have direct involvement in sales to

3   customers?

4   A.  I was not customer facing in that time, no.

5   Q.  So could you describe what your responsibilities were at

6   that time when you were not customer facing?

7   A.  Scheduling the plant, more or less the liaison between

8   sales and production, you know, working out any issues between

9   sales and production, you know, reviewing sales reports and

10  disseminating those reports to managers above me.

11  Q.  Did there come a time, Mr. Bryant, where you did have a

12  direct contact with customers as part of your job

13  responsibilities?

14  A.  Yes.

15  Q.  Approximately when did that occur?

16  A.  After I was promoted to the regional planner for fresh-food

17  service, I started to call on a few customers, but I wasn't

18  customer facing on national accounts until 2014.

19  Q.  You mentioned in your previous answer fresh-food service.

20  Can you explain to the jury what fresh-food service is?

21  A.  Fresh-food service is a division inside Pilgrim's.  It's

22  one of the business units.  Inside of fresh-food service, the

23  plants were tailored to three primary customers, fast-food or

24  QSR restaurants, retail delis like the deli WOGs and

25  eight-piece that you would buy at a supermarket, and broad-line

Robert Bryant - Direct

1   distributors like Sysco or US Foods.

2   Q.  So you mentioned business unit.  Can you explain what a

3   business unit within Pilgrim's is?

4   A.  Yes.  Pilgrim's is divided by bird size and customer into

5   different business units, and fresh-food service is one of

6   those business units, so it's like an economic channel that

7   separates the different -- different business units inside

8   Pilgrim's.

9   Q.  And you mentioned, I think you said QSR or fast-food.  What

10  do the letters QSR stand for?

11  A.  Quick service restaurant.  The terms are used

12  interchangeably.  Sometimes we call them quick-service

13  restaurants to talk about KFC, Popeye's, those type of

14  restaurants.  Sometimes we call them fast-food, but QSR is just

15  a common term we use.

16  Q.  Is Church's another example of a QSR or fast-food

17  restaurant customer of Pilgrim's?

18  A.  That's correct.

19  Q.  You mentioned retail.  Can you say a little bit more about

20  what the retail part of the fresh-food service division in

21  Pilgrim's is?

22  A.  The retail part was really limited to the retail deli, so

23  the rotisserie bird that you would buy at your supermarket or

24  the eight-piece that you would buy that was prepared at your

25  local supermarket in the deli area, so those were the two

Robert Bryant - Direct

1    primary items that fresh-food service would supply to the

2    retail segment.

3    Q.  And you mentioned broad line.  Can you explain what the

4    broad line part of the fresh-food service division of Pilgrim's

5    is, please?

6    A.  Yes.  So the broad lines were like Sysco, US Foods,

7    Reinhart.  They carried multiple products and pretty much were

8    like a one-stop shop to restaurants where they would not only

9    deliver meat, poultry, fish products, but also paper goods,

10   pretty much everything a restaurant may need to operate.

11   Q.  During your career, Mr. Bryant, at Pilgrim's, have you had

12   experience in a sales role selling to each of those three

13   segments, to restaurants, fast-food segment, broad line, and

14   retail?

15   A.  I have.

16   Q.  In the year 2014, Mr. Bryant, did you have increased

17   responsibility with sales to Pilgrim's customers?

18   A.  I have.  I did, yes.

19   Q.  Can you explain what those increased responsibilities were?

20   A.  We were -- I was asked to be part of the team to negotiate

21   our contracts with our national accounts, particularly in the

22   QSR or fast-food accounts.

23   Q.  In what way was that an increase in your responsibilities?

24   A.  Although I dealt with those accounts and had conversations

25   with the various salespeople prior to that, I didn't call on

1    those accounts directly.  There may have been a few meetings,

2    but not in that capacity before that I can recall.

3    Q.  You mentioned national accounts.  Can you explain to the

4    jury what national accounts are and provide some examples?

5    A.  We called them national accounts because they were

6    broad-based accounts that generally covered more than just a

7    regional area, but a huge national or more than just a regional

8    area of the country, and they were large accounts that needed

9    an account owner, a specific account owner that would call on

10   that particular account.

11   Q.  Okay.  Now, Mr. Bryant, you said a few moments ago you

12   started working in the industry around age 18.  Can you explain

13   to the jury where you were born and raised up to the point

14   where you started working at the Mayfield facility at age 18?

15           MR. BELLER:  Your Honor, objection, relevance.

16           THE COURT:  Overruled.

17   A.  I was actually born in West Berlin, Germany.  My dad was in

18   the service and was at a few Air Force bases before spending

19   half my childhood in Collinsville, Illinois, which is a suburb

20   of St. Louis, then moved to Kentucky, Lawrenceburg, Kentucky,

21   then finally into western Kentucky where I spent most of my

22   life.

23   BY MR. TORZILLI:

24   Q.  Now, jumping back to your career at Pilgrim's, have you

25   become familiar with bids?

Robert Bryant - Direct

1    A.  I did, yes.

2    Q.  Can you explain to the jury what bids are relative to your

3    career at Pilgrim's?

4    A.  A bid is when a customer asks you to solicit a proposal or

5    submit pricing, both pricing and volume proposal for their

6    products.

7    Q.  Mr. Bryant, during your career, have you had any

8    involvement in bidding for customers' business?

9    A.  Probably thousands of different bids, yes.

10   Q.  Is that across all different types of customers, fast-food,

11   retail, broad line?

12   A.  That would be correct, yes.

13   Q.  Now, focusing specifically on fast-food customers,

14   approximately how many bids have you personally been involved

15   in, approximately?

16   A.  I would say in the hundreds.

17   Q.  Hundreds of bids?

18   A.  That's correct, yes.

19   Q.  Now, on those hundreds of bids that you were personally

20   involved in, did you work directly on any of those bids with

21   anyone you see in the courtroom here today?

22   A.  I did.

23   Q.  Who?

24   A.  Roger Austin.

25   Q.  Defendant Roger Austin?

393

Robert Bryant - Direct

1    *A.*   That's correct.

2    *Q.*   How long have you known Defendant Roger Austin?

3    *A.*   I would say probably since the middle 2000s, so at least

4    probably 15 years.

5    *Q.*   How long did you work with Defendant Roger Austin on

6    fast-food customer bids, approximately?

7    *A.*   For bids, it would probably be at least from 2014 until he

8    retired.  We probably had discussions prior to that, but I

9    don't recall.

10   *Q.*   Can you identify Defendant Roger Austin by where he is

11   located or what he is wearing?

12         *MR. FELDBERG:*  Your Honor, we concede the

13   identification.  There is no question this is Mr. Austin.

14         *THE COURT:*  Do you accept the stipulation?

15         *MR. TORZILLI:*  Provided the record reflects that the

16   witness can identify the defendant.

17         *THE COURT:*  Yeah, I think that there is no --

18   Mr. Feldberg has indicated that that's not an issue.

19         *MR. FELDBERG:*  We are not litigating identification,

20   Your Honor.

21         *MR. TORZILLI:*  That's acceptable to the government,

22   Your Honor.

23   *BY MR. TORZILLI:*

24   *Q.*   On the same topic of bids to fast-food customers,

25   Mr. Bryant, do you have an understanding of the relationship

Robert Bryant - Direct

1   between Defendant Austin and Pilgrim's competitors relative to

2   those bids?

3         MR. FELDBERG:  Objection to the form of the question,

4   Your Honor.  It's vague.

5         THE COURT:  Overruled.

6   A.  Yes.

7   BY MR. TORZILLI:

8   Q.  Mr. Bryant, what is the basis for your understanding of a

9   relationship between Defendant Roger Austin and Pilgrim's

10  competitors related to fast-food restaurant bids?

11        MR. TUBACH:  I am going to object, and can we have a

12  side bar?

13     (At the bench:)

14        THE COURT:  Go ahead, Mr. Tubach.

15        MR. TUBACH:  Your Honor, I believe what we are going

16  to get now is a reprise of what we had in the second trial,

17  which is Mr. Bryant characterizing suddenly what it means the

18  relationship between one of the defendants is and the

19  competitors.  There is no foundation for this, and I believe

20  rather than having a characterization of what something might

21  be, until there is a foundation laid for what actually happened

22  that then forms the basis for his description or the words or

23  labels wants to put on them, there is no foundation for this

24  testimony.  And I believe we won't be able to unring this bell

25  once he says this was, for example, something like happened in

Robert Bryant - Direct

1    the second trial, he was there to coordinate bids with

2    competitors.

3         THE COURT:  Mr. Torzilli, what is the -- what's

4    your -- what answer do you anticipate Mr. Bryant will give to

5    your question?

6         MR. TORZILLI:  Your Honor, I think that the witness

7    will have probably about four parts to the answer, and I will

8    say, of course, Your Honor, you have already identified and

9    ruled that Mr. Bryant is a co-conspirator, of course, as part

10   of the James process and Defendant Austin and others at

11   Pilgrim's that he is going to identify in his answer are as

12   well, particularly at the points in time that he will be

13   identifying the events that form his basis, but one is he will

14   have -- he will rely on e-mails that he received, e-mails that

15   were written by Defendant Austin, e-mails that were written by

16   Jayson McGuire, a co-conspirator, an exchange of e-mails

17   between them, phone calls that Mr. Bryant overheard, calls

18   between Defendant Austin and Defendant Brady, and a phone call

19   between Defendant Austin and Bill Kantola who, of course, is

20   another co-conspirator, as well as a meeting where Mr. McGuire

21   instructed Defendant Austin to put this out to the industry,

22   which was information about Pilgrim's Pride bid strategy ahead

23   of submitting bids to fast-food restaurant customers.

24        And he may have others, but I think that at a minimum

25   those will be the co-conspirator moments that he will be

396

Robert Bryant - Direct

1    identifying.

2              THE COURT:  Mr. Tubach, anything else?

3              MR. TUBACH:  I am not objecting to that actual

4    testimony, but what I think we are going to get from this

5    witness first is some sort of summary of what he thinks that

6    all adds up to, and that's what I am objecting to, and that's

7    what happened in the second trial, and that's improper.

8              THE COURT:  Yeah, I think the question is broad.  I

9    think what is going to happen, it sounds like, is that or at

10   least Mr. Torzilli anticipates that very broad and somewhat

11   innocuous question will then cause Mr. Bryant to launch into a

12   rather detailed description of what he believes support the

13   existence of a conspiracy.  So I think, Mr. Torzilli, the

14   questions need to be broken up, because it sounds like that

15   broad question will just cause Mr. Bryant to launch into a

16   narrative.  But if you can ask more specific questions, I think

17   that would be a more directed means of, you know, asking him

18   about the knowledge that you referred to.

19             MR. TORZILLI:  Understood.  If I may inquire, Your

20   Honor, in terms of guidance for structuring the remainder of

21   the examination, would it be acceptable to go through the what

22   I will call the constituent events, some of which I just

23   identified here on the side bar, but there are others, but go

24   through the constituent events and then towards the conclusion

25   of the direct examination rely on the exposition in through the

Robert Bryant - Direct

1  witness' testimony of those as essentially forming the basis to

2  proceed with this particular line of questioning?

3       THE COURT:  Well, I think we'll see what happens, but

4  that may be fine, but I guess we would probably need to hear

5  what the testimony is first.

6       MR. TORZILLI:  That's certainly understood, Your

7  Honor.  The reason I raise it is at the prior hearing --

8       THE COURT:  You don't have to use the term "hearing"

9  necessarily when we are at side bar, unless you think you are

10  being overheard by the jury.

11       MR. TORZILLI:  I am doing that only for muscle memory.

12       THE COURT:  Well, that's fine.

13       MR. TORZILLI:  But at the prior -- at the prior trial

14  for the direct examination of this witness, we did go through

15  the constituent events and then got to not these particular

16  questions but a variant of them, and the witness was trying to

17  explain that those events that he had testified to were indeed

18  the basis for his belief or his understanding, I should say,

19  that there was.  And I think the way the question was posed by

20  Ms. Call was whether there was an agreement, so I am just

21  concerned we will go through the constituent events, and then

22  he is going to try to, you know, refer back to what he has been

23  explaining for the past day, day and a half, and that's, you

24  know, not going to be connecting as far as an adequate

25  foundation which, frankly, on the merits is more than an

Robert Bryant - Direct

1   adequate foundation for him to be testifying to the types of

2   questions that I intend to pose to him.

3        MR. TUBACH:  Your Honor, the Court sustained the

4   objection to the testimony, whether he could testify that was

5   an agreement, and that's precisely why he shouldn't be allowed

6   to do this on the front end.  Chances are we may get to the end

7   and he still may not have a foundation to testify this was a

8   part of any agreement because it's simply the label that the

9   DOJ has asked him to slap on this conduct now.  That's why we

10  are asking he not be allowed to give this testimony now.

11       THE COURT:  Of course, the question itself didn't use

12  the term "agreement" or anything of that nature, but once

13  again, I think we are going to have to wait and see because I

14  think that -- I can't remember exactly what objection I

15  sustained or what the predicate testimony was right before the

16  objection was made, but I think we'll have to play it by ear,

17  but I do think generally the fact that asking a broad,

18  open-ended question at the front is not a good approach and --

19  but rather as you suggest, Mr. Torzilli, going into some of

20  those constituent parts first seems like a more appropriate

21  question for a fact witness.

22       MR. TORZILLI:  Understood, Your Honor.  Just two

23  further points of clarification that I do think require a

24  response, one just to augment the point Your Honor just made is

25  Mr. Tubach misrepresented what the pending question was, of

1    course.  The question was not about agreement; the question was

2    about relationship.  And I realize Your Honor picked up on that

3    and corrected it.  And also second is the other difference is

4    the question that related to agreement in the previous trial

5    was not limited to any particular person.  I have limited my

6    question here to Defendant Austin at least for the moment, so

7    the pending question, I realize I will move on from it, but

8    just to be clear for future evaluation is different in some,

9    what I think, very material respects from what occurred

10   previously.

11          THE COURT:  Okay.  Then I think we can go ahead with

12   the examination.  I will sustain the objection.

13          (In open court:)

14          MR. TORZILLI:  Thank you very much, Your Honor.

15   BY MR. TORZILLI:

16   Q.  Sir, did there -- you said in 2014 there came a time when

17   you got involved in national accounts?

18   A.  That's correct.

19   Q.  When approximately within 2014 did you become involved in

20   national accounts?

21   A.  The summer of 2014.

22   Q.  And what is the summertime or is the summer season in 2014,

23   were there any bids that were either occurring or going to

24   occur?

25   A.  KFC started in August of 2014, I believe, among others,

Robert Bryant - Direct

1   among others.

2   Q.  So there were other fast-food restaurants that were also up

3   for bid in 2014?

4   A.  I believe most were, yes.

5   Q.  And what was your particular role in fast-food restaurant

6   bids in 2014?

7   A.  I was customer facing.  I began either late June or early

8   July helping to prepare a PowerPoint presentation to be used in

9   prebid meetings with various customers.

10  Q.  Now, how did you get involved in the PowerPoint

11  presentation that was going to be used for various customers?

12  A.  I received a phone call from my manager, Jason McGuire,

13  asked me to help him develop a PowerPoint presentation for

14  those customer meetings.

15  Q.  You said Mr. Jason McGuire was your manager?

16  A.  At the time, yes.

17  Q.  Do you remember what his job title was?

18  A.  He was the director of sales for fresh-food service.

19  Q.  And can you generally describe what his job

20  responsibilities were at that time?

21  A.  Yeah.  He was responsible for the sales, strategy, pricing

22  for the fresh-food service business unit.

23  Q.  Did that include fast-food restaurants?

24  A.  Yes.

25  Q.  Did that include any other types of customers other than

Robert Bryant - Direct

1   fast-food restaurants?

2   *A.*  It included them all inside that particular division.

3   *Q.*  How did Mr. McGuire get in contact with you about the slide

4   presentation you were going to get involved in?

5   *A.*  He called me.

6   *Q.*  Do you recall what he said to you?

7   *A.*  Yes.  He said that we were going to go after price

8   increases with our QSR customers, and he asked if I could

9   develop a slide that pertained to supply and demand as a basis,

10  as one of our bases for seeking those price increases.  And

11  once we got the PowerPoint done, we were going to blitz the

12  customers with relatively similar information.

13  *Q.*  Mr. McGuire said "blitz the customers."  What does that

14  mean?

15  *A.*  He wanted to get this information put together and then set

16  up meetings with most, if not all, of our QSR customers to set

17  the tone for the negotiations that fall.

18  *Q.*  And you used the term "QSR."  That stands for quick-service

19  restaurant?

20  *A.*  That's correct.

21  *Q.*  That's another name for a fast-food restaurant?

22  *A.*  That's correct.

23  *Q.*  Can you give us some examples of the fast-food restaurants

24  that were part of the blitz that Mr. McGuire was talking to you

25  about?

Robert Bryant - Direct

1   A.   KFC, Popeye's, Church's, to name a few.

2   Q.   Now, you said that you were involved in the presentation, a

3   slide deck or PowerPoint presentation?

4   A.   That's correct.

5   Q.   Did you prepare specific slides for that presentation?

6   A.   I did.

7   Q.   Could you describe the slides you prepared for the

8   presentation?

9   A.   It was bird availability.  KFC, among other core

10  restaurants, buy a particular size bird, and it showed the

11  decrease in supply over a period of time in that particular

12  size.

13  Q.   Did the blitz of the customers the way that Mr. McGuire

14  described it to you on the phone call, did it, in fact, occur?

15  A.   It did.

16  Q.   Did you, in fact, participate?

17  A.   I did.

18  Q.   Who else participated?

19  A.   Jason McGuire, Mr. Austin, Justin Gay, Scott Tucker, I

20  believe Tommy Lane attended some of those meetings.

21  Q.   You just mentioned a number of people.  You mentioned

22  Mr. Gay.  Can you tell us a little bit about who Mr. Gay was

23  and what his role was at the time?

24  A.   He was national accounts salesperson that worked for Roger

25  Austin.

Robert Bryant - Direct

1   Q.  You mentioned Mr. Tucker.  Who was Mr. Tucker?

2   A.  A national sales account person that worked for Mr. Austin.

3   Q.  You mentioned Mr. Lane.  Who is Mr. Lane?

4   A.  Mr. Lane was a business analytics maybe, I am not sure what

5   his title was, but he helped with the models, the cost models

6   for the QSR customers.

7   Q.  Now, Mr. Bryant, you mentioned some of the customers that

8   you visited as part of the customer blitz in the summer of

9   2014.  You mentioned Church's and Popeye's.  Did you attend

10  meetings at Church's and Popeye's?

11  A.  I did.

12  Q.  When approximately did those meetings happen?

13  A.  Late July, somewhere in the 20-something of July.  I don't

14  remember the exact date.

15  Q.  Of 2014?

16  A.  That's correct.

17  Q.  Were the meetings close in time to each other?

18  A.  What I recall is we met with one one day, and then the next

19  day we met with the other, but I don't recall the order.

20  Q.  And did those meetings occur close in location to each

21  other?

22  A.  Yes.  Their corporate offices are within a few miles apart

23  in the same general area of north Atlanta.

24  Q.  Atlanta, Georgia?

25  A.  That's correct.

Robert Bryant - Direct

1   Q.  At one of those meetings, was there an incident that

2   occurred that sticks out in your mind?

3   A.  Yes.

4   Q.  Could you explain what happened?

5   A.  We had finished -- what I recall is that we were finishing

6   our presentation or finished our presentation, and the

7   customers had stepped out of the room for some reason, I don't

8   recall which, and it was just some Pilgrim's people in the

9   room.  I don't recall who all was there at the time.  But what

10  I do recall is Mr. McGuire and Mr. Austin were at the front of

11  the room.  The projector was still on, and the slide in our

12  presentation had a table in it that showed the profitability

13  and the different segments of the poultry industry which was

14  another basis for our price increases was still being

15  displayed.  And they were having a conversation, and

16  Mr. McGuire told Roger Austin that he needed him to put this

17  out to the industry.

18          And I remember that as Jason McGuire said that he

19  gestured toward the screen that was on the wall.

20  Q.  Let's unpack that a little bit.  So first, what customer

21  support meeting where Mr. McGuire said put this out to the

22  industry?  What customer were you visiting?

23  A.  I am not sure.  I am just -- I remember it was during the

24  trip to Popeye's and Church's that happened back to back days,

25  but I am not sure which one.  I can remember the room, but I

Robert Bryant - Direct                                    405

 1   don't remember whose room we were in.  I just remember the

 2   meeting and those two at the front of the room when that

 3   exchange occurred.

 4   Q.  So you remember it was one customer or the other, but you

 5   don't remember which one?

 6   A.  No.

 7   Q.  You say you remember the room.  Can you tell us what --

 8   describe the room for us.

 9   A.  It was, like, a typical meeting room or boardroom.  There

10   was a long table in there, longer than the tables that the

11   defendants are sitting at, maybe -- maybe twice that long with

12   chairs around it.  What I remember, like I said, is that we

13   were -- we gave the presentation, and the projector was still

14   going, and the table that was in that presentation was still

15   being displayed when they had that conversation.  And I just

16   remember that it was just us in there.  And I remember being

17   seated.

18          MR. BELLER:  I am going to object as non-responsive.

19   The question has been asked and answered.

20          THE COURT:  Overruled.

21   A.  I remember being seated and observing the conversation.

22   BY MR. TORZILLI:

23   Q.  How many people, Mr. Bryant, were in the room at the time

24   Mr. McGuire gave his instruction to Defendant Austin?

25   A.  I don't remember.

Robert Bryant - Direct

1   Q.   Now, you do remember where the customer was at the time.

2   Is that fair to say?

3   A.   Yes.

4   Q.   Where was the customer?

5   A.   They had stepped out of the room, and I don't recall why

6   they stepped out.  We had a natural break in the meeting

7   because we had finished a presentation, but I don't think we

8   finished our discussions, and I don't remember why they stepped

9   out.

10  Q.   Was the door to the conference room open or was it closed?

11  A.   It was closed.

12  Q.   And you said you were -- where were you?

13  A.   I remember being seated at the table and just observing the

14  conversation.

15  Q.   And where was Mr. McGuire?

16  A.   He was on one side of the screen.

17  Q.   Was he seated or standing?

18  A.   He was standing.

19  Q.   And where was Defendant Austin?

20  A.   He was on the other side of the screen.

21  Q.   Was he seated or standing?

22  A.   He was standing.

23  Q.   Now, what was the slide being projected on?  Was it the

24  wall or a screen or what?

25  A.   It was a screen.  It was a screen.  And like I said, I can

Robert Bryant - Direct

1  just remember that slide being up and the projector still

2  going.

3  Q.  What slide?

4  A.  It was a table, and it showed the opportunity cost of

5  participating in small birds compared to other segments of the

6  chicken industry that were more profitable at the time.

7  Q.  You used the term "opportunity cost."  Can you explain what

8  that means to the jury?

9  A.  So what I mean is that by selling small birds at that time

10  in 2014, the return of selling a different size chicken, the

11  profitability would have been greater, so there was a cost to

12  participating in that particular segment, and that was part of

13  the basis for the price increases, that they needed to narrow

14  that profitability gap between small birds and these other

15  segments.

16  Q.  When Mr. McGuire instructed Defendant Austin to put this

17  out to the industry, you said he was gesturing.  Where was he

18  gesturing and with what parts of his body, part or parts of his

19  body was he gesturing?

20  A.  He was gesturing towards the screen and the table that was

21  being displayed with his hand.

22  Q.  Was his voice loud or soft, do you remember anything about

23  that?

24  A.  The only thing -- they were having a conversation.  I don't

25  remember them being loud or anything of that nature.  They were

Robert Bryant - Direct

1    having a conversation, and it was -- what I recall, it was

2    about our discussions with the customer or customers.

3    Q.  Were you in a position to observe Defendant Austin's

4    reaction to the instruction that Mr. McGuire was giving him?

5    A.  I was.

6    Q.  What did you observe about Defendant Austin's reaction?

7    A.  I just remembered him nodding his head like he understood

8    or an agreement or I'll take care of it.

9            MR. FELDBERG:  Objection, move to strike, the

10   characterization, everything after he nodded.

11           THE COURT:  Overruled.

12   BY MR. TORZILLI:

13   Q.  Have you completed your answer, sir?

14   A.  I have, yes.

15   Q.  Now, what was your reaction to hearing what Mr. McGuire had

16   instructed Defendant Austin to do?

17   A.  I was surprised.

18   Q.  Would you explain to the jury why you were surprised about

19   what you heard from Mr. McGuire.

20   A.  So this was early on in meeting with national accounts, and

21   I was surprised that Mr. McGuire was instructing Mr. Austin to

22   share our basis for price increase with our competitors.  Not

23   only that, but having that conversation in a customer's meeting

24   room.  And I remember when he said that, and I remember

25   thinking this was how it's done.  I couldn't believe this is

Robert Bryant - Direct

1   how it's done.

2   Q.  What do you mean you couldn't believe this is how it's

3   done?

4   A.  That you shared or you got -- you tried -- you shared your

5   basis or coordinated with your competitors --

6           MR. TUBACH:  Objection, Your Honor.  This is the

7   characterization we have been objecting to the whole time.

8           THE COURT:  I am going to sustain that last bit as

9   non-responsive.

10  BY MR. TORZILLI:

11  Q.  Mr. Bryant, how, if at all, did what you heard from

12  Mr. McGuire instructing Defendant Austin to put this out to the

13  industry affect your future work in sales and bidding to

14  fast-food restaurant customers as a Pilgrim's employee?

15          MR. FELDBERG:  Objection, Your Honor.  Can we have a

16  side bar?

17          THE COURT:  Yes.

18      (At the bench:)

19          MR. TORZILLI:  If I may, I am being informed by the

20  team this may be a good moment to invite the jury to have a

21  stretch break.

22          THE COURT:  Everyone looks okay at the moment given

23  the fact that we are taking a -- having a side bar, but I will

24  keep an eye on them.

25          Go ahead, Mr. Feldberg.

1           MR. FELDBERG:  Thank you, Your Honor.

2           Your Honor, I think where this is heading is an effort

3    to inquire of Mr. Bryant to interpret his understanding of

4    something that Mr. McGuire said or perhaps something that

5    Mr. Austin gestured.  After the jury was excused yesterday,

6    Your Honor gave some guidance on what could and could not be

7    permitted in Mr. Bryant's testimony.

8           At 7:00 o'clock last night, the prosecution

9    interviewed Mr. Bryant for either the 36th or 37th time.

10          THE COURT:  Who's counting?

11          MR. FELDBERG:  Exactly.  And essentially the report

12   indicates that he said -- I don't have the exact words in front

13   of me at the moment, but something like:  As a result of

14   hearing that, I did something.  I prepared for a meeting

15   shortly thereafter.  And it looks to us like this is -- he has

16   never said that before in prior testimony or prior interviews.

17   And it looks like it's simply a manufactured attempt to

18   essentially put words into his mouth so that he can then

19   attempt to interpret Mr. McGuire's statement and, I guess,

20   Mr. Austin's gesture.

21          THE COURT:  Mr. Torzilli?

22          MR. TORZILLI:  A few points that need to be responded

23   to here.  So speaking of the manufacturing, I think there is

24   some manufactured facts in the previous comments from counsel.

25   What was actually occurring there was Mr. Bryant was talking

411

Robert Bryant - Direct

1    about a document that was sent to him by his boss the day

2    before on August -- I believe it was 22nd, either 21st or 22nd,

3    meeting with KFC.  Of course, this line of questioning doesn't

4    have anything to do with KFC.  This has to do with a meeting

5    that occurred at either Pilgrim's or -- I am sorry, at either

6    Popeye's or Church's in late July as part of a customer blitz,

7    not an August meeting with KFC, so that's the first thing I

8    wanted to clarify.

9         The second thing is that this questioning is very much

10   in line with the guidance that Your Honor provided yesterday

11   afternoon.  The question that's pending says, Mr. Bryant, how,

12   if at all, did what you heard from Mr. McGuire instructing

13   Defendant Austin to put this out to the industry affect your

14   future work in sales and bidding to fast-food restaurant

15   customers as a Pilgrim's employee?

16        This is, I think, very much in line with what Your

17   Honor was talking about, which is testimony about what the

18   person did with information they read or heard is perfectly

19   acceptable testimony from someone, especially someone who is a

20   co-conspirator receiving information from another

21   co-conspirator.

22        *THE COURT:*  Yeah, I think that was part of

23   Mr. Feldberg's objection is that getting the memo last night

24   seemed to be trying to tailor testimony to the Court's

25   comments.  And I think -- I don't want to put words in

Robert Bryant - Direct

1    Mr. Feldberg's mouth, but given the fact that that had not

2    appeared in a previous memo and he was expressing some

3    skepticism about it.  Any comment on that front, Mr. Torzilli?

4         *MR. TORZILLI:*  Your Honor, to be clear, what we asked

5    him about last night was not this.  It was something else.

6         *THE COURT:*  That's right.  You said it was something

7    else.  Okay.  Understood, sorry.

8         Mr. Tubach?

9         *MR. TUBACH:*  Your Honor, I think what we have here is

10   the government trying to elicit again broad testimony about

11   this caused me to coordinate with other competitors when the

12   only testimony he's going to give about himself coordinating

13   anything from his prior testimony is three years later, that

14   the government is trying to draw this link is just trying to

15   get him to give the same broad sort of, I coordinated because I

16   saw this.  There is no immediate effect on the listener

17   whatsoever unless Mr. Bryant is going to come up with something

18   brand new.  So I think that's the risk we are running into

19   here, and that's why I object.

20        *THE COURT:*  Mr. Feldberg?

21        *MR. FELDBERG:*  Thank you, Your Honor.

22        That's exactly the point, Your Honor.  There has been

23   no prior testimony or interview report that Mr. McGuire's

24   comment, if in fact it happened, had any impact whatsoever on

25   Mr. Bryant's conduct.  And after Your Honor gave guidance

Robert Bryant - Direct

1    yesterday afternoon, suddenly we get a 302 interview report

2    from last night saying now admittedly the report was about the

3    KFC meeting.  This is -- he says either Popeye's or Church's,

4    but it's the same issue.  It's trying to manufacture an effect

5    on the listener when none has existed in six days of prior

6    testimony and 36 interview reports.

7              THE COURT:  Okay.

8              MR. TORZILLI:  May I respond?

9              THE COURT:  Yeah, go ahead.

10             MR. TORZILLI:  Sorry, the transceiver was

11   malfunctioning there for a second.  Thank you, Your Honor.

12             So just to be clear, his -- the statement, which is a

13   co-conspirator statement that's been on, I think, multiple

14   James logs and has been ruled to have been uttered during the

15   course and in furtherance of the conspiracy and something that

16   Mr. Bryant heard at the time it was uttered, was "Put this out

17   to the industry."  And Mr. Bryant has said, I think testified

18   twice now, three times that he was like, Wow, this is how it's

19   done.  So I think the natural follow-up question is, Okay, if

20   this is how it's done, what did that mean to you in your future

21   work as a sales employee at Pilgrim's Pride working on

22   fast-food restaurant bids, which is, of course, the core of the

23   charged conspiracy and what we are here to try.

24             THE COURT:  Although, isn't Mr. Tubach correct that at

25   least based on Mr. Bryant's previous testimony that he really

Robert Bryant - Direct

1    didn't act on anything for about three years?

2         MR. TORZILLI:  He was involved in the negotiations

3    with KFC.  He attended a future meeting with KFC.  And, no,

4    Mr. Tubach is absolutely wrong.  He overheard the two

5    conversations, the one that Defendant Austin had with Defendant

6    Brady, the one that Defendant Austin had with former defendant

7    and co-conspirator Bill Kantola on either the day before or the

8    day of the KFC meeting at which he was present, and those

9    overheard phone calls and the related e-mail string, which is,

10   I believe, Government Exhibit 1066, informed him hugely about

11   what was going on with the conspiracy that he personally

12   witnessed and observed during the time and by his presence at

13   the meeting participated in.

14        MR. FELDBERG:  Those are passive -- assuming the truth

15   of the testimony, all he did is hear something.  He didn't do

16   anything.  He does not from -- based on prior testimony and all

17   of the summary reports do anything until three years later in

18   2017.

19        THE COURT:  Mr. Tubach?

20        MR. TUBACH:  That is fact.

21        THE COURT:  Mr. Tubach, anything else?

22        MR. TUBACH:  Sorry, I was just going to agree that is

23   exactly.  He attended meetings with KFC.  He didn't do

24   anything.  There was no testimony he actually did anything in

25   response to what Mr. McGuire said.  What they are trying to

Robert Bryant - Direct

1   do -- the only coordination Mr. Bryant is going to talk about

2   at all that he participated in was in 2017, and it's just --

3   they are just trying to characterize other testimony.  Why

4   don't we have the testimony of what they actually did and

5   observed rather than their characterization.  For that reason,

6   I object.

7          THE COURT:  I am going to overrule the objection.  I

8   think that, you know, we'll see what his testimony is.  Perhaps

9   it's later.  I think to some extent that this may not be wholly

10  material because there was a basis and it happened in the last

11  trial to allow him to express his understanding of what the

12  terms meant, but we'll see if that transpires.  But the

13  objection that was made will be overruled.  If he testifies

14  about some effect, of course, there can be cross-examination

15  about the delay or whatever that may be part of the answer, but

16  we'll see about that.

17         MR. TORZILLI:  Your Honor, if I may.  One other thing,

18  I do want to correct the record because it is a

19  misrepresentation of the facts that I think is particularly

20  gross.  The top e-mail, Government Exhibit 1066, Mr. McGuire

21  says to Mr. Bryant, I believe it's August 21st, I don't have it

22  in front of me, but it's either the day of or day before the

23  meeting, he says to him in a one-on-one e-mail with no one else

24  on it, something to the effect of, This ought to help you all

25  out some.  So it's his boss saying here is some information,

Robert Bryant - Direct

1    and all of the constituent e-mails in that exhibit are all

2    co-conspirator statements that Your Honor has ruled were made

3    during the course and in furtherance of the conspiracy.

4           So the fact that he is telling Mr. Bryant, This ought

5    to help you all out some, and these are co-conspirator

6    statements being supplied to him I think is very strong

7    indication that this is not just someone who's, you know, some

8    third or fourth order bystander to what's going on, but rather

9    has a firsthand account and is a participant in the

10   conspiratorial actions that are going on here.

11          THE COURT:  Okay.  Thank you.

12          (In open court:)

13          THE COURT:  Ladies and gentlemen, let me mention to

14   you that during these long side bars, you are perfectly free to

15   stand up and stretch or move around.  I never quite know how

16   long they will last, but feel free to do that if you like.  It

17   may be a good opportunity just to get the blood flowing.

18          Even if it's not at the break time, if you really need

19   to take a break, please feel free to raise your hand because we

20   can take one, you know, in the event that it's necessary.  And

21   is it necessary, Mr. Rolle?

22          JUROR:  I have one kidney, so, yes.

23          THE COURT:  No problem.  Why don't we break for the

24   day, then, because otherwise we would probably be quite close

25   to the time that we're going -- but, yeah, let me know,

Robert Bryant - Direct

1    Mr. Rolle, because of that fact you need to take more frequent

2    breaks.

3              All right.  So, ladies and gentlemen, we'll break for

4    the day.  Why don't we start at the same time, 8:30.  Keep the

5    admonitions in mind, ladies and gentlemen.  Once again, stand

6    firm, if anyone tries to get a rise out of you, if they ask you

7    about the case or anything of that nature, don't look up any

8    information, and I will see you tomorrow at 8:30.  The jury is

9    excused.

10             (Jury excused.)

11             THE COURT:  Mr. Bryant, then you will be excused until

12   8:30.  Thank you.  Everyone else may be seated.

13             Anything that we should talk about before we recess?

14   Yes, Mr. Fagg.

15             MR. FAGG:  Thank you, Your Honor.

16             You had asked me to update the Court by Thursday at

17   lunch about the Touhy request that we had sent to the

18   government, and I neglected to do that.  I want to give you

19   that update now.

20             THE COURT:  Sure.

21             MR. FAGG:  We have been in discussions with the

22   government, have made it clear we are not seeking any documents

23   in connection with the testimony.  The government has accepted

24   service of the subpoenas, and we are having continuing

25   discussions with Mr. Hart and his -- and the Touhy officer at

Robert Bryant - Direct

1   the department about the scope and nature of the testimony we

2   anticipate, and I believe we are very close to a resolution on

3   this.

4           THE COURT:  That sounds great.  Anything to add to

5   that, Mr. Hart?

6           MR. HART:  Nothing, not at this time.

7           THE COURT:  Thank you, Mr. Fagg.

8           Anything else that we should bring up before we

9   recess?  We will be in recess then until 8:30 tomorrow.

10      (Recess at 4:47 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Robert Bryant - Direct

1                              INDEX

2    WITNESSES

3       Sara Fisher

4          Direct Examination Continued By Mr. Loveland    175

5          Cross-examination By Ms. Carwile               210

6          Cross-examination By Ms. Kuykendall            272

7          Cross-examination By Ms. Pletcher              316

8          Cross-examination By Ms. Page                  316

9          Redirect Examination By Mr. Loveland           318

10      Rachel Evans

11         Direct Examination By Ms. Wulff                338

12         Direct Examination Continued By Ms. Wulff      352

13         Cross-examination By Ms. Carwile               368

14         Redirect Examination By Ms. Wulff              383

15      Robert Bryant

16         Direct Examination By Mr. Torzilli             385

17                            EXHIBITS

18   Exhibit       Offered  Received  Refused  Reserved  Withdrawn

19   I-054                   242

20   90-10                   343

21   C-207                   189

22   C-465                   177

23   G-474                   189

24   F-744                   225

25   F-747                   189

Robert Bryant - Direct

1                          INDEX (Continued)

2                             EXHIBITS

3    Exhibit        Offered   Received   Refused   Reserved   Withdrawn

4    F-754                      287

5    F-756                      225

6    F-765                      225

7    F-774                      225

8    F-783                      189

9    F-789                      189

10   F-796                      189

11   F-852 - F-853              177

12   F-868                      281

13   F-915                      278

14   F-916                      279

15   B-963                      189

16   I-979                      228

17   1119                       225

18   1121                       225

19   1123                       225

20   1125-1127                  225

21   1825-1826                  177

22   1920                       177

23   1930                       177

24

25

Robert Bryant - Direct

1              REPORTER'S CERTIFICATE

2      I certify that the foregoing is a correct transcript from

3   the record of proceedings in the above-entitled matter.  Dated

4   at Denver, Colorado, this 8th day of June, 2022.

5

6                      S/Janet M. Coppock

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25