1  IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

2

Criminal Action No. 20-CR-00152-PAB
3  In Re: Penn III

4  UNITED STATES OF AMERICA,

5  Plaintiff,

6  vs.

7  JAYSON JEFFREY PENN,
MIKELL REEVE FRIES,
8  SCOTT JAMES BRADY,
ROGER BORN AUSTIN,
9  WILLIAM WADE LOVETTE,

10  Defendants

11  _____

REPORTER'S TRANSCRIPT
12  Trial to Jury, Vol. 7

13  _____

14  Proceedings before the HONORABLE PHILIP A. BRIMMER,

15  Chief Judge, United States District Court for the District of

16  Colorado, commencing at 8:33a.m., on the 15th day of June,

17  2022, in Courtroom A201, United States Courthouse, Denver,

18  Colorado.

19

20

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
Produced via Computer by Janet M. Coppock, 901 19th Street,
25  Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                        APPEARANCES

 2            Kevin Hart, Leslie Wulff, Paul Torzilli and Daniel

 3   Loveland, U.S. Department of Justice, 450 Fifth Street N.W.,

 4   Washington, DC 20530, appearing for Plaintiff.

 5            Anna Tryon Pletcher and Michael Tubach of

 6   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

 7   San Francisco, CA 94111-3823;

 8            Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

 9   N.W., Washington, DC 20006, appearing for Defendant Penn.

10            David Beller, Richard Kornfeld and Kelly Page of

11   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

12   CO 80202, appearing for Defendant Fries.

13            Bryan B. Lavine and Laura Anne Kuykendall of Troutman

14   Pepper Hamilton Sanders, LLP, 600 Peachtree Street NE,  Suite

15   3000, Atlanta, GA 30308;

16            Megan Rahman of Troutman Pepper Hamilton Sanders, LLP,

17   1001 Haxall Point, Richmond VA 23219, appearing for Defendant

18   Brady.

19            Michael Felberg of Reichman, Jorgensen, Lehman,

20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21   10017;

22            Laura F. Carwile of Reichman, Jorgensen, Lehman,

23   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

24   CA 94065; appearing for Defendant Austin.

25
```

Robert Lewis - Cross

1        APPEARANCES (Continued)

2            Dru Nielsen of Eytan Nielsen, 3200 Cherry Creek Drive

3    South, Suite 720, Denver, CO 80209;

4            John Anderson Fagg, Jr. and Frank Schall of

5    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

6    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

7                    *    *    *    *    *

8                    PROCEEDINGS

9            THE COURT:  Back on the record in 20CR152.  Are we

10   ready for the jury?  Why don't we go ahead and get Mr. Lewis.

11   And, Ms. Buchanan, why don't you get the jury.

12           (Jury present.)

13           THE COURT:  Ladies and gentlemen, as you will recall,

14   Mr. Lavine was cross-examining Mr. Lewis, so we will continue

15   with that now.

16           Mr. Lavine, go ahead.

17           MR. LAVINE:  Thank you, Your Honor.

18                  **CROSS-EXAMINATION CONTINUED**

19   BY MR. LAVINE:

20   Q.  Mr. Lewis, good morning.

21   A.  Good morning.

22   Q.  How are you doing this morning?

23   A.  Better today, thank you.

24   Q.  Good to hear.

25           So when we broke, I was about to start to get into

Robert Lewis - Cross

1    the -- I just wanted to address a little bit about the 2014

2    contracts with RSCS.  Now, on direct, government counsel took

3    you through several of the contracts and admitted them into

4    evidence, but there are two that I just want to add to it that

5    weren't admitted, all right?

6    A.  Sir, could I ask you to put the mic --

7    Q.  Is that better?

8    A.  Better.

9    Q.  Great.

10        When you came to RSCS in May of 2014, you looked at

11   the suppliers who bid who had contracts from 2014; is that

12   correct?

13   A.  That's correct.

14   Q.  And one of the companies that was a supplier was Case

15   Foods; is that correct?

16   A.  Case Farms.

17   Q.  I am sorry, Case Farms.

18        If you could turn to tab 14 in your notebook.

19        MR. LAVINE:  And if we could bring up Defense Exhibit

20   F-743.

21        And, Your Honor, this is subject to a prior agreement

22   with the parties under Docket 1351 and 1338-3.

23        THE COURT:  And, Mr. Lavine, are you moving its

24   admission at this time?

25        MR. LAVINE:  Yes, Your Honor, I will be.

Robert Lewis - Cross

1        *THE COURT:*  Any objection to the admission of F-743?

2        *MR. HART:*  No objection, Your Honor.

3        *THE COURT:*  F-743 will be admitted and may be

4   published.

5        *MR. LAVINE:*  Thank you, Your Honor.

6   *BY MR. LAVINE:*

7   *Q.*  Now, Mr. Lewis, I just want you to look at -- this would be

8   the 2014 contract for Case Farms; is that correct?

9   *A.*  That's correct.

10  *Q.*  Thank you.  You can put that away.

11       Now, another company that also was a supplier in 2014

12  was Marshall Durbin; is that correct?

13  *A.*  That's correct.

14  *Q.*  And if you could turn to tab 15 in your book.  And this

15  would be Defense Exhibit F-788.

16       *MR. LAVINE:*  Your Honor, this is also subject to a

17  prior agreement of the parties, and I would move for its

18  admission and ask that it be published.

19       *THE COURT:*  Any objection to the admission of F-788?

20       *MR. HART:*  No objection, Your Honor.

21       *THE COURT:*  F-788 will be admitted and may be

22  published.

23       *MR. LAVINE:*  Thank you, Your Honor.

24  *BY MR. LAVINE:*

25  *Q.*  Now, Mr. Lewis, this what is shown here of F-788 would be

1220

Robert Lewis - Cross

1  the contract, 2014 contract for Marshall Durbin; is that

2  correct?

3  A.  That's correct.

4  Q.  All right.  You can put that away.

5       MR. LAVINE:  Brian, you can bring that down.

6  BY MR. LAVINE:

7  Q.  So of the contracts that government counsel went through

8  with you, pretty much looked at all the contracts for 2014 when

9  you came onboard in May of 2014; is that correct?

10  A.  That's correct.

11  Q.  And you did this to see who the existing suppliers were?

12  A.  Yes.

13  Q.  And how much they had committed to supplying to RSCS.

14  A.  Yes.

15  Q.  And for the 2015 contract negotiations, one of your primary

16  considerations aside from price was supply.

17  A.  Correct.

18  Q.  Now, we went through yesterday how you reached out to them,

19  how you reached out to suppliers on phone calls, and then you

20  had e-mails, and then you had various meetings with the

21  suppliers in negotiating the 2015 contract, correct?

22  A.  Correct.

23  Q.  And we talked about how during this process, this is when

24  RSCS had to go out and buy those incremental loads at a higher

25  price.

Robert Lewis - Cross

1  A.  Correct.

2  Q.  Now, during the initial calls, do you recall, sir, that you

3  discussed RSCS would be looking at the margin needed to compare

4  to the big-bird profitability?

5  A.  I was looking for some perspective on what the margin

6  differences were.

7  Q.  Correct.  And because you were aware that there was a large

8  margin or a large difference between the big birds and the

9  small birds when it came to margin.

10  A.  I was aware that there was a difference in the margins, but

11  I had no idea how to determine that other than what the

12  suppliers were telling me.

13  Q.  Right.  And so is it fair to say, sir, that you really

14  didn't do any other further review or research into the

15  big-bird margin issue?

16  A.  Correct.

17  Q.  Would it be fair to say, sir, that the big birds were more

18  profitable than the small birds?

19  A.  It makes sense that that's the case for a number of

20  reasons, yes.

21  Q.  Okay.  Now, I believe you testified yesterday, and correct

22  me if I'm wrong, that were you aware that suppliers were moving

23  away from the small birds to the more profitable big birds?

24  A.  Yes, I was aware of that, but that is a dynamic that

25  started many years prior to 2014.

Robert Lewis - Cross

1    *Q.*  All right.  But it existed in 2014.

2    *A.*  It did.

3    *Q.*  And would you agree with me, sir, that one of the reasons

4    for the shift from the big bird to the -- from the small bird

5    to the big bird was the margin?

6    *A.*  I believe the primary shift from small birds to big birds

7    was shifting consumer demand.

8    *Q.*  Okay.  But there was also a difference in the margin from

9    the small bird to the big bird.

10   *A.*  So I understood.

11   *Q.*  Right.  And if the suppliers were moving away from the

12   small birds to the more profitable big birds, RSCS would have

13   to deal with that because RSCS only buys small birds.

14   *A.*  That's incorrect.  RSCS buys products that require small

15   birds, as well as big birds.

16   *Q.*  But there was a concern with the small-bird supply, and one

17   of the concerns was the fact that the big birds was commanding

18   a better margin.

19   *A.*  So the suppliers were telling us.

20   *Q.*  All right.  And was it a concern of RSCS?

21   *A.*  Yes.

22   *Q.*  And so you would have had to discuss the margin discrepancy

23   with all the suppliers, then.

24   *A.*  Yes.

25   *Q.*  And even suppliers who only produced a small bird.

Robert Lewis - Cross

1    A.   Yes.

2    Q.   And the reason for that is if you didn't address the margin

3    discrepancy with all the suppliers including the small-bird

4    suppliers, then the small-bird suppliers in a sense would be

5    out of sync with those who produced the big birds because of

6    the larger margin.

7    A.   That's correct.   We needed the suppliers to be competitive

8    with one another.

9    Q.   Right.   And that has to do with some of the supply chain

10   issues that we discussed yesterday.

11   A.   Yes.

12   Q.   So after the initial phone calls in July, you sent e-mails

13   out to the suppliers in July of 2014.

14   A.   I do not recall sending e-mails in July.   I believe the

15   contacts at that point were all by telephone.

16   Q.   Okay.   Do you recall, for example, sending an e-mail to --

17   now, let me back up a second.

18          On direct, I believe you testified that you had set up

19   through e-mails meetings with the suppliers in the first part

20   of August of 2014; is that correct?

21   A.   I set up suppliers I believe via telephone.   The meetings

22   with suppliers were set up by telephone.

23   Q.   And you did meet with the suppliers in the first part of

24   August of 2014.

25   A.   That's correct.

1224

Robert Lewis - Cross

1  Q.  All right.  If you could turn to tab 16 of your book,

2  please.

3           MR. LAVINE:  And if we could pull up Defense Exhibit

4  A-644.

5  BY MR. LAVINE:

6  Q.  And, Mr. Lewis, if you could take a look at this, please.

7  A.  Okay.

8  Q.  Now, this is an e-mail from you to Mr. Scott Brady at

9  Claxton; is that correct?

10  A.  Correct.

11  Q.  And this is dated July 10, 2014?

12  A.  Correct.

13  Q.  And you would have sent this e-mail to Mr. Brady on

14  July 10, 2014.

15  A.  Correct.

16           MR. LAVINE:  Your Honor, I would move for the

17  admission of Defense Exhibit A-644.

18           THE COURT:  Any objection to the admission of A-644?

19           MR. HART:  No objection provided it includes the

20  redactions, Your Honor.

21           THE COURT:  Yeah, I think it's being offered --

22           MR. LAVINE:  It is being offered with the redactions.

23           THE COURT:  A-644 will be admitted.

24           MR. LAVINE:  May I publish, Your Honor?

25           THE COURT:  Yeah, let me just provide the jury with

Robert Lewis - Cross

1    one -- you may publish it.

2           And, ladies and gentlemen, when you hear the term

3    "redaction," I am not sure you are familiar with that, but that

4    obviously means that part of the exhibit was -- is somehow,

5    like in this case, blacked out, or it could be words are

6    deleted or something like that.  That's a redaction.

7           *MR. LAVINE:*  May I proceed, Your Honor?

8           *THE COURT:*  Yes, you may.  Go ahead.

9           *MR. LAVINE:*  Thank you.

10   *BY MR. LAVINE:*

11   *Q.*  Now, Mr. Lewis, this e-mail was sent on July 10, 2014 to

12   Mr. Brady.

13   *A.*  Yes.

14   *Q.*  And this confirms the telephone conversation, the initial

15   conversation you would have had with him around the first part

16   of July in 2014.

17   *A.*  Yes.

18   *Q.*  And that phone call would have been the start of the

19   negotiation process for the 2015 contract.

20   *A.*  Yes.

21   *Q.*  All right.  So if we can just kind of go through some of

22   the bullet points on this e-mail.  First you asked for the

23   number of loads that Claxton can supply to RSCS starting

24   January 2015.

25   *A.*  Correct.

Robert Lewis - Cross

1   Q.  And this is -- the reason for this is you are trying to now

2   start to get a feel for what the suppliers can actually supply

3   to RSCS over that three-year contract.

4   A.  Correct.

5   Q.  You also then have, if we go down to the third bullet

6   point, What are your top four or five concerns about your

7   dealings with RSCS/KFC?  Do you see that, sir?

8   A.  Yes.

9   Q.  Would it be fair to say that that is your request to

10  address some of the issues that we talked about yesterday

11  between the suppliers and KFC, for example, quality assurance

12  issues, specification issues?  Would that be correct, sir?

13  A.  Yes, that's correct.

14  Q.  And that's part of your new approach to try and have more

15  communication, more transparency.

16  A.  Yes.

17  Q.  All right.  Now, the next bullet point --

18          MR. LAVINE:  If you could highlight that, please.

19  BY MR. LAVINE:

20  Q.  -- you want to update your margin over feed model to

21  reflect current cost.  And that would be filling out the cost

22  model for you, correct?

23  A.  Yes, that's correct, to reflect the suppliers' true cost.

24  Q.  Correct.

25          MR. LAVINE:  If we could go down to the next bullet

Robert Lewis - Cross

1  point, please.

2  *BY MR. LAVINE:*

3  *Q.* And on the next one, it is the profit margin needed and how

4  that compares to the big-bird profitability.

5  *A.* Yes.

6  *Q.* And the reason for this is you're now trying to get some

7  feedback from the suppliers of what they think they need to try

8  and equalize the difference between the big-bird margin and the

9  small-bird.

10  *A.* Yes. This was included because they had begun to tell us

11  that there was a difference in the margin, so we wanted to try

12  to understand what that was.

13  *Q.* And so as a result, that issue about the big-bird margin

14  entered into the conversations between RSCS and the suppliers.

15  *A.* Yes.

16  *Q.* All right. And at the same time I think in that e-mail,

17  you want their feedback on a three-year contract.

18  *A.* Yes, we did.

19  *Q.* And this was the first time this was proposed, and it was

20  proposed by RSCS.

21  *A.* Yes.

22  *Q.* Now, you sent similar e-mails to the one that is in tab 16,

23  which is Defense Exhibit A-644, to the other suppliers, did you

24  not, sir?

25  *A.* Yes.

1228

Robert Lewis - Cross

1   Q.  If you would look at -- let's start with tab 17, Defense

2   Exhibit G-504.  Did you find it, sir?

3   A.  Yes.

4   Q.  Okay.  Now, this is an e-mail from you to Brian Roberts?

5   A.  Correct.

6   Q.  And Brian Roberts is with Tyson Foods; is that correct?

7   A.  That's correct.

8   Q.  And this was sent on July 10, 2014?

9   A.  Yes.

10  Q.  The same date that you sent the prior e-mail to Mr. Scott

11  Brady.

12  A.  Yes.

13          MR. LAVINE:  Your Honor, I would move for the

14  admission of Defense Exhibit G-504.

15          THE COURT:  Any objection to the admission of G-504?

16          MR. HART:  No objection, Your Honor.

17          THE COURT:  G-504 will be admitted.

18  BY MR. LAVINE:

19  Q.  Now, I would like you to turn your attention to tab 18.

20          MR. LAVINE:  Brian, I don't want it published yet.

21  BY MR. LAVINE:

22  Q.  And that is Defense Exhibit C-541.  Do you see that, sir?

23  A.  Yes.

24  Q.  This is an e-mail from you to Bill Kantola.

25  A.  Correct.

Robert Lewis - Cross

1    *Q.*  And Bill Kantola is at Koch Foods?

2    *A.*  Yes.

3    *Q.*  And this is dated July 10, 2014.

4    *A.*  Yes.

5    *Q.*  And you would have sent this e-mail.

6    *A.*  Yes.

7         *MR. LAVINE:*  Your Honor, I would move for the

8    admission of Exhibit C-451.

9         *THE COURT:*  Any objection to the admission of C-451?

10        *MR. HART:*  No objection, Your Honor.

11        *THE COURT:*  That exhibit will be admitted.

12   *BY MR. LAVINE:*

13   *Q.*  If you would now turn to tab 19.  And that would be Exhibit

14   C-872.  Do you see it, sir?

15   *A.*  Yes.

16   *Q.*  Okay.  And this is an e-mail from you to Greg Tench.

17   *A.*  Yes.

18   *Q.*  And Greg Tench is with what supplier?

19   *A.*  He is with Mar-Jac Poultry.

20   *Q.*  And it's dated July 9th?

21   *A.*  Yes.

22   *Q.*  And do you recall sending this e-mail, sir?

23   *A.*  I do not recall sending this e-mail, but it's obvious that

24   I did.

25        *MR. LAVINE:*  Your Honor, I move for the admission of

Robert Lewis - Cross

1    C-872.

2              THE COURT:  Any objection to the admission of C-872?

3              MR. HART:  No objection, Your Honor.

4              THE COURT:  That exhibit will be admitted as well.

5    BY MR. LAVINE:

6    Q.  Now, if you could turn your attention, sir, to tab 20, and

7    that will be Defense Exhibit F-384, please.  Do you see it,

8    sir?

9    A.  Yes.

10   Q.  Now, this is an e-mail from you to Roger Austin, correct?

11   A.  Yes.

12   Q.  And Roger Austin is with Pilgrim's Pride.

13   A.  Correct.

14   Q.  And this is dated July 10, 2014.

15   A.  Correct.

16   Q.  And you would have sent this e-mail to him; is that

17   correct?

18   A.  Yes, sir.

19             MR. LAVINE:  Your Honor, I move for the admission of

20   Defense Exhibit F-384.

21             THE COURT:  Any objection to the admission of F-384?

22             MR. HART:  No objection, Your Honor.

23             THE COURT:  That exhibit will be admitted.

24             MR. LAVINE:  Your Honor, may I publish Defense Exhibit

25   F-384?

1231

Robert Lewis - Cross

1        THE COURT:  You may.

2    BY MR. LAVINE:

3    Q.  Now, these four e-mails that we just went through, which

4    would be one to Mr. Brian Roberts at Tyson, Mr. Kantola at

5    Koch, Mr. Tench at Mar-Jac, and Mr. Austin at Pilgrim, those

6    are all similar to the e-mail you sent to Scott Brady on

7    July 10 of 2014; is that correct, sir?

8    A.  That's correct.

9    Q.  And in each one of these e-mails, RSCS raised the issue of

10   the profit margin and the big-bird profitability.

11   A.  That's correct.

12   Q.  And you are aware, sir, that people at RSCS was focused on

13   this big-bird profitability issue.

14   A.  If certainly would have been a consideration through the

15   2015 negotiations.

16   Q.  Thank you.

17        And so following I think it's the August 7 e-mail that

18   you sent out to the suppliers for the meetings, you did have

19   meetings with the suppliers in early August of 2014.

20   A.  Yes.

21   Q.  For example, you met with Claxton on August the 5th.

22   A.  I recall it was the first week of August.  I don't remember

23   that date, but I don't doubt that that isn't true.

24   Q.  Is there something to refresh your memory just to make

25   sure, sir?

Robert Lewis - Cross

1    *A.*  I sent out a confirming e-mail.

2    *Q.*  Take a look at tab 7 and just look at that and see if that

3    confirms that you met with Scott Brady at Claxton on August the

4    5th, 2014.

5    *A.*  Yes, sir, it confirms it.

6    *Q.*  You can put that the away, sir.

7         Now, during those meetings with the suppliers, you

8    discussed what you were looking for from the suppliers, true?

9    *A.*  Yes.

10   *Q.*  And as we said, you followed up each meeting with an e-mail

11   confirmation to each one of the suppliers.

12   *A.*  Each supplier individually, yes.

13   *Q.*  Individually.  Now, let's go back to tab 7.  It's

14   Government's Exhibit 1137.

15        *MR. LAVINE:*  I believe, Your Honor, this was admitted

16   on June 14, 2022.  May I publish, Your Honor?

17        I am sorry, I believe this was admitted, 1137, on

18   June 14, and if so, I would like to publish, Your Honor.

19        *THE COURT:*  Of course.  Yes, it has been admitted.  It

20   may be published.

21        *MR. LAVINE:*  Thank you, Your Honor.

22   *BY MR. LAVINE:*

23   *Q.*  Now, Mr. Lewis, if you can just look at this exhibit,

24   please.  Now, this is the e-mail we talked about from you to

25   Mr. Brady, to Mr. Brady and Mr. Fries at Claxton.

1233

Robert Lewis - Cross

1    A.   Yes.

2    Q.   And the date of the e-mail is August the 7th.

3    A.   Yes.

4    Q.   And it references the fact that you met with Claxton on

5    August the 5th, 2014.

6    A.   That's correct.

7    Q.   And this is the time that you asked in this communication,

8    you asked for the supplier, that is Claxton, to submit a

9    realistic cost model.

10   A.   Yes.

11   Q.   And you posed various questions that you wanted the

12   suppliers to answer during this period of time.

13   A.   Yes.   The answer as part of the 2015 negotiations.

14   Q.   Right.   And Claxton submitted a cost model and answered

15   your questions on August 19 as requested; is that correct, sir?

16   A.   My recollection, yes, that's correct.

17   Q.   So if we could turn to tab 21, Government's Exhibit 1132;

18   and tab 22, Government's Exhibit 1133.

19          MR. LAVINE:   And, Your Honor, I believe both of

20   Exhibits 1132 and 1133 were admitted on June 14.

21          THE COURT:   Yes, both were.

22          MR. LAVINE:   Thank you.

23          THE COURT:   And they may be published.

24          MR. LAVINE:   Thank you, Your Honor.   If we could

25   publish -- perfect.   Thank you.

Robert Lewis - Cross

1    *BY MR. LAVINE:*

2    *Q.*   Now, the e-mail from Scott Brady is transmitting to you the

3    2015 pricing model for COB, correct?

4    *A.*   That's correct.

5    *Q.*   And at the bottom part of the e-mail, he inserts answers to

6    your questions that you pose to him in your initial e-mail of

7    August the 7th, 2014.

8    *A.*   Correct.

9    *Q.*   And so they were being responsive to what you had asked

10   them to do.

11   *A.*   Yes.

12   *Q.*   All right.   Now, if we can look at the first page of 1133.

13   Now, sir, the first page shows the FOB price at $1.1099; is

14   that correct?

15   *A.*   That's correct.

16          *MR. LAVINE:*   Mr. Brian, if you can go to the second

17   page, please.

18   *BY MR. LAVINE:*

19   *Q.*   And in that model, Claxton specifically broke out the

20   supplier margin and the big-bird profitability line items.   If

21   you could go down to the bottom.

22   *A.*   Yes.

23   *Q.*   And they showed you exactly what the supplier margin and

24   the big-bird profitability margin was?

25   *A.*   Yes, sir.

Robert Lewis - Cross

1   Q.  It shows -- in this submission, it shows a supplier margin

2   of 10 cents.

3   A.  Yes.

4   Q.  And that would be -- the supplier margin is the normal

5   margin, not the number, but the supplier margin is just the

6   normal margin that the supplier would put into the cost model;

7   is that correct?

8   A.  That's the way they would normally describe the margin,

9   yes.

10  Q.  Correct.  And in this, Claxton lists the big-bird

11  profitability at 12 cents?

12  A.  Yes.

13  Q.  All right.  Now, Claxton had a follow-up meeting on

14  August 28th between yourself -- do you recall, sir, having a

15  follow-up meeting on August 28th between yourself,

16  Mr. Eddington, Mary Hester, Todd Imhoff, Mr. Fries, and

17  Mr. Brady to discuss the proposal?

18  A.  I don't remember specifically that occurring on that date,

19  but I don't deny that it happened.

20  Q.  Well, how about if we look at tab 25.

21       MR. LAVINE:  Mr. Brian, you can take down that

22  exhibit, please.

23  BY MR. LAVINE:

24  Q.  If you look at tab 25, and just take a look and look at it

25  and see if that refreshes your recollection.  And once you have

Robert Lewis - Cross

1    looked at it, you can close that tab.

2    A.  Yes.

3    Q.  Does that refresh your recollection that there was a

4    meeting on August 28th?

5    A.  Yes.

6    Q.  All right.  Now, during these negotiations, Claxton was

7    willing to negotiate, were they not?

8    A.  Yes.

9    Q.  And they didn't threaten to take their business elsewhere?

10   A.  No, I don't recall that they said that.

11   Q.  And Claxton's approach was not take it or leave it?

12   A.  No.

13   Q.  And fair to say that Mr. Fries and Mr. Brady responded to

14   your pricing guidance during the negotiations?

15   A.  Yes.

16   Q.  Now, after the meeting, you placed a call to Mr. Brady and

17   tried to get him to come down off of Claxton's COB price.  Do

18   you recall that, sir?

19   A.  I don't recall it specifically, but I don't deny that it

20   happened.

21   Q.  How about you look at tab 23, please.  And just take a look

22   at that and see if that refreshes your recollection.  And once

23   you have looked at it, you can close that tab.

24   A.  Am I looking at Exhibit 1005?

25   Q.  Yes, you are, sir.

Robert Lewis - Cross

1  A.  Okay.

2  Q.  Does that refresh your recollection?

3  A.  Yes.

4  Q.  All right.  And, in fact, Claxton came down 2 cents after

5  you had a discussion with Mr. Brady.

6  A.  Yes, I believe they adjusted their margin by 2 cents.

7  Q.  All right.  So I would now like to look at the final

8  contract for Claxton, so if you could look at tab 26, please.

9  And this would be Government's Exhibit 1119.

10        MR. LAVINE:  Your Honor, I believe it was admitted on

11  June 8th.

12        THE COURT:  Yes, it has been admitted.  You may

13  publish it.

14        MR. LAVINE:  Thank you, Your Honor.

15  BY MR. LAVINE:

16  Q.  Mr. Lewis, I want to go back one second.  When we were

17  talking about the fact that Claxton never threatened to take

18  its business someplace else, it wasn't a take it or leave it

19  with Claxton, they never said to you, The price is the price,

20  did they, sir?

21  A.  I don't recall them saying that.

22  Q.  Okay.  Thank you, sir.

23        So I believe we are talking about -- we are at tab 26.

24  You have got the contract up.  Now, what is the final COB price

25  that Claxton submits?

1238

Robert Lewis - Cross

1    A.   $1.0669.

2    Q.   And the bid proposal that we looked at before at

3    Exhibit 1133 was a price of $1.1099.  Do you recall that, sir?

4    A.   Yes.

5    Q.   So Claxton came down over 4 cents during the negotiation

6    process.

7    A.   Yes.

8    Q.   And if we can go back to the final contract, sir, to the

9    page that is already up, if you could go up to the supplier

10   margin and the big-bird adjustment, please.  Now, the supplier

11   margin, looking at this, stated 10?

12   A.   Yes.

13   Q.   And the big-bird adjustment was decreased to .0940.

14   A.   Correct.

15   Q.   And this was a reduction since the first proposal.

16   A.   Yes.

17   Q.   And if I do my math correctly, I believe that Claxton came

18   down .0430 to be exact.

19   A.   That sounds familiar, yes.

20   Q.   All right.  Thank you.

21        MR. LAVINE:  Mr. Brian, you can take that down.

22   BY MR. LAVINE:

23   Q.   Now, Mr. Lewis, you would agree that suppliers had the

24   right to use the best information available to them to make

25   well-informed, independent decisions about what prices they

1239

Robert Lewis - Cross

 1  were going to offer RSCS.

 2  A.  Yes.

 3  Q.  Now, as you've already testified to, you looked at all of

 4  the 2015 contracts because you were involved in the

 5  negotiations of the contracts; is that correct?

 6  A.  The 2015?

 7  Q.  2015, yes, sir.

 8  A.  Yes.

 9  Q.  And during the negotiations, some of these suppliers came

10  down in price from the initial bid to the final bid.

11  A.  Yes.

12  Q.  The final contract, I am sorry, sir.

13  A.  Yes.

14  Q.  Now, we've already looked at Claxton's and saw that Claxton

15  came down .0430, but I want to look at a couple other examples

16  of bids and the contracts of the some of the other suppliers,

17  if that's all right with you, sir?

18  A.  Sure.

19  Q.  Let's start with Case Farms.  Now, as I said, government

20  counsel didn't cover Case Farms, but Case Farms did bid in

21  2015.  We looked at the contract this morning.

22  A.  May I look at it again?

23  Q.  Oh, absolutely, sir.  Let me see what tab it's at.  Look at

24  tab 27, please.

25  A.  Okay.

Robert Lewis - Cross

1  *Q.*  So you do recall Case Farms bidding and signed the contract

2  in 2015?

3  *A.*  To be honest, I did not recall Case Farms bidding.  We've

4  been talking primarily about six suppliers, and I had

5  actually -- it's been eight years.

6  *Q.*  I understand, sir.

7  *A.*  I had forgotten that Case Farms actually bid on the

8  eight-piece COB product.

9  *Q.*  All right.  So I want to start with Case Farms.  So if we

10  could -- if you would look at tab 27, and it's Defense Exhibit

11  F-882.

12  *A.*  Yes.

13       *MR. LAVINE:*  Your Honor, I would move for admission of

14  Exhibit F-882.  It is subject to a prior agreement between the

15  parties at Docket No. 1351 and 1338-4.

16       *THE COURT:*  Any objection to the admission of F-882?

17       *MR. HART:*  No objection, Your Honor.

18       *THE COURT:*  F-882 will be admitted.

19       *MR. LAVINE:*  May we publish, Your Honor?

20       *THE COURT:*  You may.

21       *MR. LAVINE:*  Thank you.

22  *BY MR. LAVINE:*

23  *Q.*  Now, Mr. Lewis, looking at this, Case Farms' bid was

24  $1.0680.  Do you see that?

25  *A.*  Yes.

Robert Lewis - Cross

1    *Q.*  Now, if you could look at tab 28, it's Defense Exhibit

2    F-744.

3           *MR. LAVINE:*  And, Your Honor, this has been admitted

4    on June 8, 2022.

5           *THE COURT:*  Which exhibit was it again?

6           *MR. LAVINE:*  Defense Exhibit F-744.

7           *THE COURT:*  Yes.  It was admitted, and it may be

8    displayed.

9           *MR. LAVINE:*  Thank you, Your Honor.

10   *BY MR. LAVINE:*

11   *Q.*  No, Mr. Lewis, if you would take a look at this, can you

12   confirm that the Case's final eight-piece contract price was

13   $1.0310?

14   *A.*  Yes.

15   *Q.*  All right.  Now, I would like to look at J-266.

16          *MR. LAVINE:*  Your Honor, I would like to publish this

17   for demonstrative purposes and only the title and the first two

18   rows.

19          *THE COURT:*  One moment.

20          *MR. LAVINE:*  If I may publish the demonstrative, Your

21   Honor, J-266.  It would be at tab 39.

22          *THE COURT:*  And I am sorry, Mr. Lavine.  Which rows

23   did you wish to --

24          *MR. LAVINE:*  The first two rows, Your Honor, including

25   Case Farms which we just had Mr. Lewis testify to.

Robert Lewis - Cross

1     THE COURT:  Any objection to the display of the first

2   two rows of J-266 for demonstrative purposes only?

3          MR. HART:  No objection, Your Honor.

4          THE COURT:  All right.  Those two rows may be

5   displayed.

6   BY MR. LAVINE:

7   Q.  Now, Mr. Lewis, this --

8          MR. LAVINE:  If I can have one moment, Your Honor.

9          THE COURT:  Sure.

10   BY MR. LAVINE:

11   Q.  All right.  This shows Case Farms, and it's the first-round

12   bid that we just talked about at $1.0680.  Do you see that,

13   sir?

14   A.  Yes.

15   Q.  And then we have the final contract price at $1.0310.

16   A.  Yes.

17   Q.  Now, you can trust my math, and sometimes it's right,

18   sometimes it's wrong, or you can do it on the calculator, but I

19   come up with a change from the first round to the second round

20   that Case Farms dropped their price .0370.

21   A.  Correct.

22   Q.  All right.  I appreciate you accepting my math calculations

23   here.

24          Now, we had just looked at Claxton's initial bid and

25   their final contract price.  And if you recall, their initial

Robert Lewis - Cross

1  bid was $1.1099.

2  A.  Yes.

3  Q.  And their final contract price was 1.0669.

4  A.  Yes.

5  Q.  And we had calculated that Claxton came down over 4 cents.

6  A.  Yes.

7  Q.  Now, if we can look back at Exhibit J-266.

8       MR. LAVINE:  And if we can add the second line to

9  that, which would be Claxton's.

10      THE COURT:  To display that, are you asking for

11  permission to display that?

12      MR. LAVINE:  Yes, Your Honor, I am asking for

13  permission to display the second line of this demonstrative.

14      THE COURT:  Any objection to the display of the next

15  row of J-266 for demonstrative purposes?

16      MR. HART:  No objection, Your Honor.

17      THE COURT:  Thank you.  That may be displayed.

18      MR. LAVINE:  May we publish, Your Honor?

19      THE COURT:  You may.

20  BY MR. LAVINE:

21  Q.  Now, Mr. Lewis, this shows Claxton's first-round bid at

22  $1.1099 which you testified to earlier, correct?

23  A.  Correct.

24  Q.  And it shows its final contract price at $1.0669 --

25  A.  Yes.

Robert Lewis - Cross

1     *Q.*  -- correct?

2          And so that shows that Claxton came down in its

3     bidding at .0430, a little bit more than 4 cents.

4     *A.*  Yes.

5     *Q.*  All right.  Now, let's look at another example.  Let's look

6     at George's.  I am not going to ask you off the top of your

7     head what George's initial bid was, sir, so why don't we look

8     at tab 29.  And that would be Government's Exhibit 1008.

9          *MR. LAVINE:*  Your Honor, Government's Exhibit 1008 has

10    been admitted on June 14.

11         *THE COURT:*  Yes, it has.

12         *MR. LAVINE:*  May we publish, Your Honor?

13         *THE COURT:*  You may.

14    *BY MR. LAVINE:*

15    *Q.*  Now, if you would take a look at this and confirm that

16    George's initial bid was $1.0913.

17    *A.*  This is a multi-page exhibit.  I am not sure what page

18    you're looking at, sir.

19    *Q.*  Right.  Hold on.

20         *MR. LAVINE:*  If I may have just one moment, please,

21    Your Honor.

22         *THE COURT:*  Yes, of course.

23         *MR. LAVINE:*  If I may have a second, Your Honor.

24         *THE COURT:*  You may.

25    *BY MR. LAVINE:*

Robert Lewis - Cross

1   Q.  All right.  Mr. Lewis, if you would turn to --

2          MR. LAVINE:  I apologize for this, Your Honor.

3   BY MR. LAVINE:

4   Q.  At the bottom, if you would look at the numbers at the

5   bottom of this exhibit and look at the page that ends in 11628.

6   If you look at the middle column under Proposed at the bottom,

7   it is 1.0913.  Do you see that, sir?

8   A.  Yes.

9   Q.  And that would be George's first-round bid?

10  A.  Got it.

11  Q.  All right.  Now, sir -- and I apologize for the delay on

12  that.  Now, if we could look at tab 30 and Government's Exhibit

13  1121.

14          MR. LAVINE:  Your Honor, I believe this was admitted

15  on June 8th.

16          THE COURT:  It has been admitted.  It may be

17  displayed.

18          MR. LAVINE:  May we publish, Your Honor?

19          THE COURT:  You may.

20          MR. LAVINE:  Thank you.

21  BY MR. LAVINE:

22  Q.  Do you see, sir, that George's 2015 contract price came

23  down to $1.0307?

24  A.  Yes.

25  Q.  So if I look at the first-round bid to the final contract,

Robert Lewis - Cross

1   George's came down about 6 cents from its initial bid; is that

2   correct, sir?

3   A.   That's correct.

4   Q.   If we could go back to J-266.

5         MR. LAVINE:   And if we could look at the next row,

6   please.

7         THE COURT:   Any objection to displaying to the jury

8   for demonstrative purposes the next row of J-266?

9         MR. HART:   No objection, Your Honor.

10        THE COURT:   And that may be displayed.

11   BY MR. LAVINE:

12   Q.   Thank you.

13        Mr. Lewis, the third row we are looking at George's

14   showing the first-round bid was $1.093, and the contract price

15   was 1.037 which resulted in a decrease of over 6 cents; is that

16   correct, sir?

17   A.   That's correct.

18   Q.   Let's look at another example.  Let's talk about Koch

19   Foods.  If you would turn to tab 31.  And this would be

20   Government's Exhibit 1026.

21        MR. LAVINE:   Your Honor, I do believe this was

22   admitted on June 14.

23        THE COURT:   It has been admitted.

24   BY MR. LAVINE:

25   Q.   Do you see, sir, where Koch's initial bid was $1.0549?

Robert Lewis - Cross

1    *A.*  Yes.

2    *Q.*  If we can pull up --

3            *mr. lave:*  Would you publish that, please?

4            *THE COURT:*  Yes, you may.

5            *MR. LAVINE:*  I am sorry, 1026.

6    *BY MR. LAVINE:*

7    *Q.*  Now, this shows that Koch's initial bid was $1.0549,

8    correct?

9    *A.*  Correct.

10   *Q.*  All right.

11           *MR. LAVINE:*  You can take that down, please.

12   *BY MR. LAVINE:*

13   *Q.*  If you would look at tab 32, which is Government's Exhibit

14   1123.

15           *MR. LAVINE:*  This has also been admitted on June the

16   8th, Your Honor.

17           *THE COURT:*  Yes, it has been admitted and may be

18   published.

19           *MR. LAVINE:*  Thank you, Your Honor.

20   *BY MR. LAVINE:*

21   *Q.*  Mr. Lewis, if you would take a look at this, Koch's 2015

22   contract price for eight-piece was $1.0369; is that correct,

23   sir?

24   *A.*  That's correct.

25   *Q.*  And if I do the math, it appears that Koch decreased by

1248

Robert Lewis - Cross

1    about almost 2 cents, it's .018.

2    A.  Correct.

3         MR. LAVINE:  If we can go back to J-266, please.  And

4    if we can add that line.

5         THE COURT:  Any objection to displaying the next line

6    of J-266 for demonstrative purposes?

7         MR. HART:  No objection, Your Honor.

8         THE COURT:  All right.  You may do so.

9    BY MR. LAVINE:

10   Q.  Now, Mr. Lewis, on this next line, this is Koch, and we

11   have gone through the first-round bid, the contract price, and

12   it shows it came down .018, about 2 cents; is that correct,

13   sir?

14   A.  That's correct.

15   Q.  The next supplier I want to talk to you about is Mar-Jac.

16   Now, yesterday when government counsel discussed with you

17   Mar-Jac, they used Government's Exhibit 1028 and 1029 to show

18   the first-round bid and the final contract.  And I believe that

19   you said that you recognized 1028 as the first-round bid.

20        MR. LAVINE:  Your Honor, this is admitted, if we could

21   publish.

22        THE COURT:  Yes, 1028 was admitted and may be

23   published.

24   BY MR. LAVINE:

25   Q.  Now, the date on 1028 is August the 25th, 2014; is that

Robert Lewis - Cross

 1   correct?

 2   A.   That's correct.

 3   Q.   And the attachment is listed as KFC Cost - Email.XLS,

 4   right?

 5   A.   Right.

 6   Q.   Now, if we could pull up Government's Exhibit 1029.

 7        MR. LAVINE:   That has also been admitted, Your Honor.

 8        THE COURT:   Yes, and it may be published as well.

 9   BY MR. LAVINE:

10   Q.   And that is the first round -- that is -- which is

11   first-round bid of $1.10615.  Do you see that, sir?

12   A.   Yes.

13   Q.   Now, I would like you to look at Government's Exhibit 1027,

14   which is at tab 33.  Do you see that?  It's Government's

15   Exhibit 1027?

16   A.   Yes.

17   Q.   All right.

18        MR. LAVINE:   Your Honor, I believe this is subject to

19   prior agreement of the parties at Docket No. 1351 and 1338-4.

20        THE COURT:   Are you moving its admission at this time?

21        MR. LAVINE:   I will be, yes, Your Honor.

22        THE COURT:   You said you will be.

23        MR. LAVINE:   Yes, I move for its admission.  I am

24   sorry, Your Honor.

25        THE COURT:   Any objection to the admission of 1027?

Robert Lewis - Cross

1    MR. HART:  No objection, Your Honor.

2    THE COURT:  1027 will be admitted and may be

3    published.

4    BY MR. LAVINE:

5    Q.  Now, if you look at this submission, this is to Rich

6    Eddington at RSCS; is that correct?

7    A.  Yes.

8    Q.  And it's from Greg Tench?

9    A.  Yes.

10   Q.  And it's dated August the 19th, 2014.

11   A.  Yes.

12   Q.  Would you please look, sir, at what the FOB price is in

13   this submission.

14   A.  For purple label is $1.1161.

15   Q.  Correct.  Now, sir --

16   MR. LAVINE:  Can we publish that, please?

17   BY MR. LAVINE:

18   Q.  Now, this submission in Government's Exhibit 1027 is more

19   than what was listed on Government's Exhibit 1028 by about

20   1/10th of a penny.  Will you take my word for that, sir?

21   A.  I will take your word for that.

22   Q.  And based on the dates, this is dated August the 19th,

23   versus the other bid that government counsel showed you was

24   dated August the 25th, which would be the first-round bid, sir,

25   if you know?

Robert Lewis - Cross

1    A.   The August 19th would be the first-round bid.

2    Q.   Correct, sir.  So Mar-Jac's first-round bid is actually

3    $1.1161; is that correct, sir?

4    A.   Yes.

5    Q.   All right.  I would like to now turn to tab 34,

6    Government's Exhibit 1125.

7         MR. LAVINE:  Your Honor, I believe this was admitted

8    on June the 8th.

9         THE COURT:  It has been admitted and may be published.

10        MR. LAVINE:  Thank you, Your Honor.

11        Mr. Brian, if you can publish the second page, please.

12   BY MR. LAVINE:

13   Q.   So Mar-Jac's price for 2015 for eight-piece was $1.0775; is

14   that correct, sir?

15   A.   That's correct.

16   Q.   And so Mar-Jac came down about 3 cents.

17   A.   Yes.

18   Q.   All right.

19        MR. LAVINE:  If we could go back to demonstrative

20   J-266, please.  I would like to add the other column, the other

21   row of Mar-Jac.

22        THE COURT:  Any objection to adding the next row of

23   J-266 for demonstrative purposes?

24        MR. HART:  No objection, Your Honor.

25        THE COURT:  All right.  That may be done.

Robert Lewis - Cross

1        MR. LAVINE:  Thank you, Your Honor.

2    BY MR. LAVINE:

3    Q.  So in this row, we show Mar-Jac whose first-round bid was

4    $1.1161 and a contract price of 1.0775 which resulted in a

5    decrease of .0386, which is 3 cents plus 86; is that correct?

6    A.  That's correct.

7    Q.  So next I want to talk about Pilgrim's.

8        If you could look at tab 35, Government's Exhibit

9    1105.

10       MR. LAVINE:  Your Honor, this was admitted on

11   June 14th.

12       THE COURT:  Yes.  You may display it.

13       MR. LAVINE:  Thank you.

14   BY MR. LAVINE:

15   Q.  If you would look at this, Pilgrim's bid price was $1.1026;

16   is that correct, sir?

17   A.  That's correct.

18   Q.  All right.

19       MR. LAVINE:  You can take that down.

20   BY MR. LAVINE:

21   Q.  Now, if you would turn to tab 36, which is Government's

22   Exhibit 1126.

23       MR. LAVINE:  Your Honor, this was also admitted on

24   June the 8th.

25       THE COURT:  Yes, you may publish that as well.

Robert Lewis - Cross

1          MR. LAVINE:  Thank you, Your Honor.

2    BY MR. LAVINE:

3    Q.  Now, do you see, sir, where Pilgrim's final price was

4    $1.0856?

5    A.  Yes.

6    Q.  So Pilgrim's came down from the first bid to the final

7    contract; is that correct?

8    A.  That's correct.

9          MR. LAVINE:  If we can now go back to J-266, and I

10   would like to add the row, Your Honor, of Pilgrim's.

11         THE COURT:  Any objection to the displaying the next

12   row of J-266 for demonstrative purposes?

13         MR. HART:  No objection, Your Honor.

14         THE COURT:  That may be done.

15   BY MR. LAVINE:

16   Q.  Now, Mr. Lewis, this last row of Pilgrim's, this shows what

17   we just talked about as far as the first-round bid and the

18   final contract showing that Pilgrim's came down .0170; is that

19   correct?

20   A.  That's correct.

21   Q.  All right.  Now, I would like to go to the last, which

22   would be Tyson's.  If you would turn to tab 37, please, for

23   Government's Exhibit 1146.

24         MR. LAVINE:  Your Honor, I believe this was admitted

25   on June 14.

1254

Robert Lewis - Cross

1     *THE COURT:*  It has been admitted and may be published.

2     *MR. LAVINE:*  Thank you, Your Honor.

3    *BY MR. LAVINE:*

4    *Q.*  If you would look at this, Mr. Lewis, do you agree that

5    Tyson's initial bid was $1.0919?

6    *A.*  Yes.

7     *MR. LAVINE:*  You can take that down.

8    *BY MR. LAVINE:*

9    *Q.*  If you would now turn to tab 38, Government's Exhibit 1127.

10     *MR. LAVINE:*  Your Honor, this was admitted on June the

11   8th.

12     *THE COURT:*  Yes, it has and may be published.

13     *MR. LAVINE:*  Thank you, Your Honor.

14   *BY MR. LAVINE:*

15   *Q.*  If you look at this, Mr. Lewis, is it true that Tyson's

16   final bid price was $1.0762?

17   *A.*  Yes.

18   *Q.*  A difference of about 1.5 cents?

19   *A.*  Yes.

20   *Q.*  All right.

21     *MR. LAVINE:*  You can take that down.

22     If you would bring back up demonstrative J-266,

23   please.

24     Your Honor, I would like to add the last row of

25   Tyson's, please.

Robert Lewis - Cross

1    THE COURT:  Any objection to adding the final row for

2   demonstrative purposes of J-266?

3    MR. HART:  No objection, Your Honor, but can I have a

4   brief side bar?

5    THE COURT:  Yes, you may.

6    (At the bench:)

7    THE COURT:  Go ahead, Mr. Hart.

8    MR. HART:  Yes, Your Honor.  In looking at J-266,

9   line -- or row 3 for George's, it appears as if there is a math

10  error, the third row, the third column.  It says .606, and the

11  correct math should be .0606.  I believe we had identified this

12  too.  I think they may be just using the wrong version.

13    THE COURT:  Okay.

14    MR. LAVINE:  Your Honor, Mr. Hart is absolutely

15  correct.  It was a typo, and we will correct that, Your Honor.

16    THE COURT:  The question is when because Mr. Hart may

17  object, but do you intend to do that through the witness,

18  Mr. Lavine?

19    MR. LAVINE:  Yes, I do.  And I have just been informed

20  the typo has been corrected on the demonstrative.

21    THE COURT:  Okay.  Well, since it's been displayed to

22  the jury, you know, you can do what you want to do in terms of

23  making that record, but we'll see what happens with this

24  particular demonstrative.  But obviously at least as to

25  cross-examination or voir dire on the exhibit, the government

Robert Lewis - Cross

1  could, of course, point that out if it hasn't been corrected

2  already, whatever.  Okay?

3          MR. LAVINE:  Thank you, Your Honor.

4          (In open court:)

5  BY MR. LAVINE:

6  Q.  Now, Mr. Lewis, if you would look at demonstrative J-266.

7  And if we can go back to the line with George's.  The

8  first-round bid was $1.0913, the contract price was 1.0307.

9  Previously when we showed you the decrease, it was listed as

10 .606.  This is corrected.  And do you agree that the difference

11 was .0606, still 6 cents coming down?

12 A.  I agree.

13 Q.  All right.  Do you agree that this is an accurate

14 representation of George's and the difference, please?

15 A.  Yes.

16 Q.  Thank you.

17         Now, Mr. Lewis, we've just reviewed the bids and the

18 final contracts for Case Farms, Claxton, George's, Koch,

19 Mar-Jac, Pilgrim's, and Tyson for the 2015 contract.  Do you

20 agree, sir?

21 A.  Yes.

22         MR. LAVINE:  Your Honor, at this time, I would move

23 for the admission of Exhibit J-266.

24         THE COURT:  Any objection to the admission of J-266?

25         MR. HART:  No objection, Your Honor.

1    *THE COURT:*  J-266 will be admitted.

2        So, ladies and gentlemen, once again, I talked about

3    this earlier, but at first it was being shown to you as a

4    demonstrative.  Now it's being moved into evidence, so I have

5    admitted it, J-266.  So that means you'll have it for purposes

6    of deliberation in the jury room.

7        *MR. LAVINE:*  Thank you, Your Honor.

8    *BY MR. LAVINE:*

9    *Q.*  So, Mr. Lewis, we look at all these suppliers, Case,

10   Claxton, George's, Koch, Mar-Jac, and Tyson that we have just

11   gone through, they all came down from their first-round bid to

12   the final contract price in 2015.

13   *A.*  Correct.

14   *Q.*  And no supplier held their price, did they, sir?

15   *A.*  That's correct.

16   *Q.*  Now, when you look at the 2015 contracts, each supplier had

17   a different final contract price, did they not, sir?

18   *A.*  Yes.

19   *Q.*  And the 2015 contract prices between the suppliers were not

20   close.  Let me put it this way.  There was a wide disparity

21   between the pricing between the suppliers.

22   *A.*  There was a range I believe of about 5-1/2 cents.

23   *Q.*  Right.

24   *A.*  Per pound.

25   *Q.*  Thank you, sir.  Now, just bear with me.  I am almost done.

1258

Robert Lewis - Cross

1      On direct, sir, government counsel --

2           *MR. LAVINE:*  You can take that down now.

3      *BY MR. LAVINE:*

4      *Q.*  -- had you do some calculations as far as the increase in

5      the price for Claxton from its 2014 to its 2015 price.  Do you

6      remember that, sir?

7      *A.*  Yes.

8      *Q.*  And I believe you identified that the proximate increase

9      was 13.94 cents.

10     *A.*  Yes, I think we rounded it off to 14.

11     *Q.*  And you also identified the volume for Claxton on a weekly

12     basis at 536,000 pounds?

13     *A.*  Yes.

14     *Q.*  Now, that calculation and the number that you came up with,

15     you have no actual -- you have no idea whether Claxton was

16     actually paid that amount of money, do you, sir?

17     *A.*  They were paid an approximate amount of money, close to

18     that.

19     *Q.*  Well, you don't know, sir, because you left in December of

20     2014?

21     *A.*  Well, a contract is a contract whether I'm there or not.

22     *Q.*  Right.  But you don't really know how much money was

23     actually paid to Claxton, do you, sir?

24     *A.*  No, I don't.

25     *Q.*  And Claxton has a right to make money, do they not, sir?

Robert Lewis - Cross

1  A.  Sure.

2  Q.  Right.  And you would agree that Claxton is not running a

3  non-profit corporation?

4  A.  Correct.

5  Q.  Now, I just want to go through a couple points before we do

6  a little calculation here.  When you came in, KFC was running

7  out of chicken in 2014.

8  A.  Yes.

9  Q.  They had difficulty finding chicken.

10  A.  Yes.

11  Q.  And RSCS wanted to get a three-year contract to try and

12  guarantee supply.

13  A.  Yes.

14  Q.  And I believe you agreed with me that you would expect a

15  price premium to guarantee a supply for three years considering

16  the market and the big-bird issue.

17  A.  No, that's not correct.

18  Q.  It's not?

19  A.  Even though there was a three-year contract, the pricing

20  and other terms and conditions were subject to renegotiation at

21  the end of each calendar year.

22  Q.  Right.  But I believe you said you would expect some type

23  of premium for suppliers to lock up their supply for three

24  years.  I don't question what you just said.

25  A.  No, I wouldn't necessarily expect there would be a premium

Robert Lewis - Cross

1    for that.

2    Q.  Okay.  But you wanted to keep suppliers in that small-bird

3    market.

4    A.  Yes.

5    Q.  And you were aware that the industry was shifting to a

6    bigger bird size.

7    A.  Yes.

8    Q.  And as a result, the small-bird size that KFC used was

9    becoming less available, readily available at that time.

10   A.  Yes.

11   Q.  And RSCS was willing to pay a little bit more or pay more

12   to maintain that supply.

13   A.  Yes.

14   Q.  All right.  So let's just do a little math here.  So

15   Claxton as we saw on --

16        MR. LAVINE:  Mr. Brian, if you would bring up the

17   demonstrative again, J-266.

18        Your Honor, may I publish?

19        THE COURT:  You may.

20   BY MR. LAVINE:

21   Q.  Now, we determined that Claxton came down .0430, over

22   4 cents; is that correct, sir?

23   A.  Yes.

24   Q.  Now, I want to use that number and multiply that by the

25   weekly volume that you discussed with government counsel on

1261

Robert Lewis - Cross

1    direct of 536,000 pounds on a weekly basis.  And if I take .043

2    times 536,000 times 52, I come up with $1,198,496.  And please

3    feel free to use the calculator.

4    A.   I think you are correct.

5    Q.   Thank you.

6            And you agree with me, sir, that during the

7    negotiations, that you allocate -- RSCS reallocated volume and

8    took volume away from some of the higher-priced suppliers to

9    some of the lower-priced suppliers; is that correct?

10   A.   Correct.

11   Q.   And so with Claxton coming down on their bid $1,198,496 and

12   as a result, RSCS shifted volume from the highest-priced

13   suppliers and gave more volume to Claxton; is that correct,

14   sir?

15   A.   Even though Claxton and other suppliers reduced their

16   prices slightly, there is still a great difference between the

17   92 cents that was in effect at the time --

18   Q.   No question, sir.

19   A.   And the new price they were proposing in 2015, so --

20   Q.   I understand that, sir.

21   A.   So, yes, I would say we avoided the increase amounting to

22   4.3 cents from Claxton because it never really went into

23   effect.  It was part of a proposed number.

24   Q.   Part of a proposed that they came down $1.2 million.  And

25   by coming down, RSCS gave them more volume; is that correct,

1262

Robert Lewis - Cross

1  sir?

2  A.  I think Claxton's volume stayed relatively the same as

3  2014.  I don't recall specifically.

4  Q.  All right.  Let's go back and see if we can't do a little

5  math.

6       MR. LAVINE:  You can take that down, Mr. Brian.

7       If we could bring up -- Your Honor, if I may have just

8  one moment.

9       THE COURT:  Sure.

10      MR. LAVINE:  If we could bring up Government's Exhibit

11  1728.

12  BY MR. LAVINE:

13  Q.  And that would be in tab 9 of your book, sir.

14      MR. LAVINE:  May we publish?  This has already been

15  admitted.

16      THE COURT:  Yes, you may.

17  BY MR. LAVINE:

18  Q.  Mr. Lewis, would you please take a look at this and tell me

19  what the volume is for Claxton for the year 2014?

20  A.  459,040 pounds per week.

21  Q.  Correct.  Now, if we can turn to -- what was that number

22  again, please, sir?

23  A.  459,040.

24  Q.  Now, if you can look at Government's Exhibit 1119.

25      MR. LAVINE:  If we can publish that, Your Honor.

Robert Lewis - Cross

1          *THE COURT:*  You may.

2   *BY MR. LAVINE:*

3   *Q.*  And that is the final contract price?

4   *A.*  Yes.

5   *Q.*  Now, if you would look at that, please, sir, and let's see

6   if we can't figure out the volume that was allocated to

7   Claxton.

8          And, in fact, sir, isn't it 536,000?

9   *A.*  Yes.

10  *Q.*  So if I take 536,000 -- you have the calculator, don't you?

11  *A.*  I do.

12  *Q.*  Thank you, sir.

13  *A.*  It's 16 loads in 2015 as opposed to about 14.

14  *Q.*  Right.  So they increased two loads per week?

15  *A.*  In '15.

16  *Q.*  So it was an increase in volume for Claxton, was it not,

17  sir?

18  *A.*  Yes.

19         *MR. LAVINE:*  Thank you, sir.

20         If I may have just one moment, please, Your Honor.

21         *THE COURT:*  You may.

22         *MR. LAVINE:*  Your Honor, I have concluded my exam.

23         Mr. Lewis, thank you very much.

24         *THE COURT:*  Thank you, Mr. Lavine.

25         Additional cross, Ms. Pletcher?

Robert Lewis - Cross

1    **CROSS-EXAMINATION**

2    *BY MS. PLETCHER:*

3    *Q.*  Good morning, Mr. Lewis.

4    *A.*  Good morning.

5    *Q.*  My name is Anna Pletcher, and I represent Jayson Penn.

6         Now, is that better?

7    *A.*  Yes.  Would you repeat what you said?

8    *Q.*  Yes.  Good morning, Mr. Lewis.  My name is Anna Pletcher,

9    and I represent Jayson Penn.  You have only met Jayson Penn

10   maybe two or three times, is that right, if that?

11   *A.*  Yes.

12   *Q.*  And that would have been before 2009 before you retired the

13   first time.

14   *A.*  Yes.

15   *Q.*  After you came back in 2014, you had no contact with Jayson

16   Penn; isn't that right?

17   *A.*  That's correct.

18   *Q.*  No e-mails?

19   *A.*  No.

20   *Q.*  No phone calls?

21   *A.*  No.

22   *Q.*  No meetings?

23   *A.*  No.

24        *MS. PLETCHER:*  Those are all my questions.

25        *THE COURT:*  Thank you, Ms. Pletcher.

Robert Lewis - Cross

1           Additional cross, Ms. Nielsen?

2                *MS. NIELSEN:*  Thank you.

3                         **CROSS-EXAMINATION**

4    *BY MS. NIELSEN:*

5    *Q.*  Good morning, Mr. Lewis.

6    *A.*  Good morning.

7    *Q.*  My name is Dru Nielsen, and I represent Bill Lovette.

8           Mr. Lewis, you worked with -- in the same industry

9    with Mr. Lovette for a long time, correct?

10   *A.*  Yes.

11   *Q.*  In fact, you worked in the same industry as Mr. Lovette for

12   decades?

13   *A.*  Yes.

14   *Q.*  In working in the same industry as Mr. Lovette for decades,

15   you personally developed great respect for him.

16   *A.*  Yes.

17                *MS. NIELSEN:*  Thank you.  Those are my questions.

18                *THE COURT:*  Thank you, Ms. Nielsen.

19                Additional cross?

20                *MS. CARWILE:*  Your Honor, Mr. Feldberg does have

21   cross, but he had to step out briefly.

22                *THE COURT:*  No problem.  We will wait for just one

23   minute.

24                *MS. CARWILE:*  Thank you very much.

25                *MR. FELDBERG:*  Apologies, Your Honor.

Robert Lewis - Cross

1        *THE COURT:*  No problem.

2                    **CROSS-EXAMINATION**

3    *BY MR. FELDBERG:*

4    *Q.*  Mr. Lewis, good morning.

5    *A.*  Good morning.

6    *Q.*  I am Michael Feldberg.  I am Roger Austin's lawyer.

7             *MR. FELDBERG:*  Could we call up, please, Exhibit F-660

8    which I think was discussed during an earlier examination.

9             Your Honor, I believe this has been admitted, and I

10   would like to publish it to the jury.

11            *THE COURT:*  Yes, you may.

12   *BY MR. FELDBERG:*

13   *Q.*  Mr. Lewis, F-660 consists of two e-mails that you wrote to

14   Mr. Austin, the bottom one on June 25th, 2014, the top one on

15   June 27th, 2014, correct?

16   *A.*  Correct.

17   *Q.*  Now, in the top e-mail, the June 27 e-mail, you refer to a

18   $315,000 investment at Enterprise.  Do you see that?

19   *A.*  Yes.

20   *Q.*  Enterprise was a Pilgrim's plant, correct?

21   *A.*  That's correct.

22   *Q.*  And would it be fair to say that what you're referring to

23   with respect to the $315,000 investment at Enterprise was an

24   investment by RSCS so that Pilgrim's could add an additional

25   line to produce birds for KFC at the Enterprise plant?

Robert Lewis - Cross

1    *A.*  I do not remember this transaction.

2    *Q.*  You don't remember that in June of 2014, you and Mr. Austin

3    agreed that Pilgrim's would build an additional line at its

4    Enterprise plant in Alabama to produce more chicken for KFC?

5    *A.*  I remember the $315,000 investment, but I do not recall

6    what it was for.

7    *Q.*  If I -- withdrawn.

8         Do you recall that it was a shared investment so that

9    RSCS would put up some of the money and Pilgrim's would put up

10   some of the money so that both sides could benefit from

11   additional production for KFC?

12   *A.*  I do not recall that, sir.  It's been eight years.

13   *Q.*  I appreciate that.

14   *A.*  I don't recall.

15   *Q.*  Memories fade over eight years.  Fair enough.  Let's move

16   on to another subject.

17        RSCS is owned by the KFC franchisees; is that correct?

18   *A.*  That's correct.

19   *Q.*  So RSCS in effect works for the KFC franchisees.

20   *A.*  Yes.

21   *Q.*  And reports to the KFC franchisees, correct?

22   *A.*  Correct.

23   *Q.*  Do you recall, sir, when you came back to RSCS in 2014 that

24   RSCS had retained a consulting firm called McKinsey?

25   *A.*  Yes, I'm aware of that.

Robert Lewis - Cross

1   Q.  And are you aware of the fact that McKinsey was retained by

2   RSCS to address let's call it the small-bird shortage problem?

3   A.  I do not recall much about the McKinsey consultants or why

4   they were there.

5   Q.  Do you recall that they were paid over a million dollars by

6   RSCS?

7           MR. HART:  Objection, Your Honor, foundation.

8           THE COURT:  Sustained.

9   BY MR. FELDBERG:

10  Q.  Do you recall what they were paid?

11  A.  I do not.

12  Q.  Do you recall that the purpose of their retention was to

13  address the supply chain issues that you've discussed with

14  other counsel?

15          MR. HART:  Objection, foundation.

16          THE COURT:  Overruled.  He can answer if he knows.

17  A.  When I signed a two-year initial contract with RSCS, I had

18  a specific goal in mind, and that was to address the severe

19  supply situation for KFC.  I was not hired to work with or

20  interact with McKinsey.

21  BY MR. FELDBERG:

22  Q.  So you don't recall what they were doing?

23  A.  I do not recall what they were doing.

24  Q.  Fair enough.  Let's move on.

25          You discussed with -- during other examinations the

Robert Lewis - Cross

1    suppliers' round 1 bids and then their final contract prices,

2    correct?

3    *A.* Correct.

4    *Q.* Between the first-round bids that the suppliers submitted

5    and the final contract prices, did RSCS give feedback to the

6    suppliers?

7    *A.* Could you be more specific?

8    *Q.* Did you comment to the suppliers on their first-round bids

9    and give them directional guidance?

10   *A.* Yes.

11   *Q.* And did some of that directional guidance consist of, for

12   example, saying to one supplier, You're X percent off where you

13   should be or where another supplier is?

14   *A.* I might give a range, but I would never give specifics, no,

15   sir.

16   *Q.* But you might give a range, You're 2 to 4-percent off,

17   correct, or just for example.

18   *A.* Yes.

19   *Q.* So that would give the supplier to whom you said You're

20   2 percent -- 2 to 4-percent off an idea of where others are,

21   correct?

22   *A.* For a particular cost component, yes, sir.

23   *Q.* Now, you told us on direct examination, sir, that you were

24   brought back to RSCS because Mr. Ledford who had been the head

25   of poultry procurement left abruptly in May of 2014, correct?

Robert Lewis - Cross

1     A.  Correct.

2     Q.  Do you know Mr. Ledford?

3     A.  I do.

4     Q.  Is he knowledgeable about the poultry industry?

5     A.  Yes.

6     Q.  He spent a lot of years working in the industry?

7     A.  Yes.  He worked both sides of the business for many years.

8     Q.  You have respect for his ability and knowledge?

9     A.  Very much so.

10         MR. FELDBERG:  Could we call up, please, Government's

11    Exhibit 1126, which I believe is the Pilgrim's contract for the

12    2015 year?

13         Your Honor, I believe this is in evidence.  Could we

14    publish it, please?

15         THE COURT:  Yes.

16         MR. FELDBERG:  And in particular, could we turn to

17    Exhibit 2 which is on the page that has the No. 3 at the

18    bottom.

19    BY MR. FELDBERG:

20    Q.  Now, Mr. Lewis, on Exhibit 2, the volume commitment is

21    63 truckloads, correct?

22    A.  Correct.

23    Q.  And that's for the 2015 contract.

24    A.  Correct.

25    Q.  Now, let's say -- and that's per week, correct?

Robert Lewis - Cross

1  A.  Yes.

2  Q.  Now, let's say in a given week RSCS wants 63 truckloads,

3  but Pilgrim's can't produce 63 truckloads.  It can only produce

4  61.  Under the contract, Pilgrim's has to go out and buy the

5  additional two truckloads, correct?

6  A.  If KFC's demand equaled 63 loads for that particular week,

7  yes.

8  Q.  If KFC's demand did not equal 63 truckloads, let's say it

9  was only 61, what remedy did Pilgrim's have?

10  A.  We haven't talked a lot about frozen chicken on the bone,

11  but the supplier had the option to produce those two loads of

12  product and freeze it for use at a later time as an option.

13  Q.  As an option.

14  A.  Yes, sir.

15  Q.  But would you agree with me, sir, that under the

16  circumstances that we've just described, KFC decides in one

17  week it only wants 61 truckloads, not 63, Pilgrim's is not

18  going to get paid for 63.

19  A.  Pilgrim's would get paid for exactly what they shipped.

20  Q.  61 in the case of the hypothetical we are discussing?

21  A.  Yes.

22       MR. FELDBERG:  Could we please call up F-384, which I

23  believe was admitted into evidence during Mr. Lavine's

24  examination.

25       THE COURT:  Yes, that has been admitted.

1272

Robert Lewis - Cross

1      *MR. FELDBERG:*  And may we publish, Your Honor?

2      *THE COURT:*  You may.

3  *BY MR. FELDBERG:*

4  *Q.*  Mr. Lewis, this is an e-mail you wrote to Roger Austin on

5  July 10th, 2014, correct?

6  *A.*  Correct.

7  *Q.*  And would it be fair to say that one of the things you

8  asked Mr. Austin in this e-mail is the profit margin needed and

9  how that compares to big-bird profitability.

10  *A.*  Yes.

11  *Q.*  So you essentially asked him what Pilgrim's needed by way

12  of profit margin, correct?

13  *A.*  Yes.  I wanted to know what he needed, but that doesn't

14  mean I would necessarily grant that request.

15  *Q.*  Understood.  It's a negotiation, correct?

16  *A.*  Correct, yes.

17  *Q.*  But you wanted to know what Pilgrim's needed to stay in the

18  business, correct?

19  *A.*  Well, I think there is also a difference between needed and

20  wanted.

21  *Q.*  Fair enough.  But -- and the question you asked is needed,

22  right?

23  *A.*  I asked needed, yes.

24  *Q.*  Now, we've talked a little bit about FOB cost.  Does the

25  term "lowest landed cost" ring a bell to you?

Robert Lewis - Cross

1  *A.*  Yes.

2  *Q.*  Could you use -- I'm sorry.  Does the term "lowest landed

3  cost" ring a bell to you?

4  *A.*  Yes.

5  *Q.*  What does it mean?

6  *A.*  It means that the lowest possible price landed or delivered

7  to a restaurant.

8  *Q.*  And is that something that RSCS cared about?

9  *A.*  Yes.

10  *Q.*  Wanted the lowest landed costs, correct?

11  *A.*  Yes.

12  *Q.*  And is one component of lowest landed cost the cost of

13  delivering product to the restaurants?

14  *A.*  Well, yes.  There are actually components.  One would be

15  the freight to get it to a distribution point and then the

16  distribution fee to get the product from the distribution point

17  to the restaurant, so there is really three components.

18  *Q.*  All of which involve the cost of moving the product,

19  correct?

20  *A.*  Yes.

21  *Q.*  So would it be fair to say that all other things being

22  equal, if the plant is closer to the restaurant, the freight

23  costs are going to be lower.

24  *A.*  Yes.

25  *Q.*  Because freight costs increase with distance, correct?

Robert Lewis - Cross

1    A.   Correct.

2    Q.   And Pilgrim's -- and Pilgrim's had plants located

3    throughout the southeast, correct?

4    A.   Yes.

5              MR. FELDBERG:  Could we call up J-266?

6              And I believe this has been admitted, Your Honor.

7              THE COURT:  Yes.

8              MR. FELDBERG:  And may it be displayed?

9              THE COURT:  It may be.

10   BY MR. FELDBERG:

11   Q.   Now, during Mr. Lavine's examination, you discussed the

12   various components of J-266.  Do you recall that, Mr. Lewis?

13   A.   Yes.

14   Q.   And would it be fair to say that some of the suppliers came

15   down substantially from their first-round bid to their contract

16   price and others came down by a much smaller amount?

17   A.   That's fair to say, yes.

18   Q.   Ending with different contract prices in a range of about

19   5-1/2 cents?

20   A.   Yes.

21   Q.   And you told us that you looked at the 2014 contracts when

22   you first rejoined the company in 2014, and do you recall that

23   the range of prices among the suppliers in the 2014 contract

24   was less than a penny?

25   A.   I want to say it was less than 2 cents.  I don't know if it

Robert Lewis - Cross

1  was less than a penny.

2  Q.  We can look at the contracts, but we don't have to do that

3  now.  But in any event, the range for the 2015 contract was

4  substantially greater than it had been in the prior year,

5  correct?

6  A.  Yes.

7  Q.  And would you agree, sir, that because some of the

8  companies came down a lot and others came down a little, and

9  the final prices were all different, that the companies had

10  different strategies?

11          MR. HART:  Objection, Your Honor, foundation.

12          THE COURT:  Overruled.  He can answer if he knows or

13  understands.

14  A.  Would you ask it again, please, sir?

15  BY MR. FELDBERG:

16  Q.  Let me ask it another way.

17  A.  Okay.

18  Q.  You told us during Mr. Lavine's examination that Claxton

19  was willing to negotiate, didn't say the price is the price, et

20  cetera.  Do you recall that?

21  A.  Yes.

22  Q.  And do you recall, sir, that in the negotiations with

23  Pilgrim's, Pilgrim's did not want to negotiate and did not want

24  to reduce its price?

25  A.  I don't recall saying that.

Robert Lewis - Cross

1    *Q.* But do you recall in the negotiations with Pilgrim's,

2    Pilgrim's did not wish to reduce its price from its first-round

3    bid to the contract?

4    *A.* Pilgrim's did reduce its bid from the first round.

5    *Q.* By a small amount, correct?

6    *A.* Yes.

7    *Q.* And that had to do with a function in one of the cost

8    models, correct?

9    *A.* I don't remember the cause of change, but, yeah, it was

10   small.

11   *Q.* But would you agree with me, sir, that Claxton and

12   Pilgrim's had different strategies for the 2015 contract?

13   *A.* Sir, I have no idea what their strategies were.

14   *Q.* But the results reflect differences in approach, do they

15   not?

16        *MR. HART:* Objection, foundation.

17        *THE COURT:* Overruled.  He can answer if he knows.

18   *A.* I would like to think that the lower costs were the result

19   of good negotiations.

20   *BY MR. FELDBERG:*

21   *Q.* I am sure they were, sir, and I am sure you are an

22   excellent negotiator, but Claxton came down 4.3 cents, and

23   Pilgrim's came down 1.7 cents, correct?

24   *A.* That's correct.

25   *Q.* Those are different numbers, correct?

Robert Lewis - Redirect

1  A.  Yes.

2  Q.  Reflecting different approaches, correct?

3  A.  Again, sir, I don't know what the motives were behind the

4  reductions.  We were glad to receive the reductions.

5  Q.  And the reductions were different.

6  A.  I am sorry?

7  Q.  The reductions were different.

8  A.  The reductions were different.

9       MR. FELDBERG:  One moment, Your Honor.

10      THE COURT:  Certainly.

11      MR. FELDBERG:  Nothing further for Mr. Lewis, Your

12  Honor.

13      And thank you, Mr. Lewis, and I apologize again for

14  the delay.

15      THE COURT:  No problem.

16      Additional cross-examination?

17      MR. KORNFELD:  No, thank you, Your Honor.

18      THE COURT:  Redirect?

19                    **REDIRECT EXAMINATION**

20  BY MR. HART:

21  Q.  Good morning, Mr. Lewis.

22  A.  Good morning.

23  Q.  Do you remember being asked questions on cross-examination

24  about big-bird margin?  Do you remember that?

25  A.  About bid --

1278

Robert Lewis - Redirect

1    *Q.*  Big-bird margin.

2    *A.*  Big-bird margin, yes, I am sorry.

3    *Q.*  What was the source of the information regarding the

4    big-bird margin?

5    *A.*  That information came from suppliers.

6    *Q.*  And would you explain why the source came from the

7    suppliers?

8           *MR. KORNFELD:*  Objection, Your Honor, foundation and

9    vague.

10          *THE COURT:*  Overruled.  He can answer if he

11   understands.

12   *A.*  I guess the source was the suppliers because they are the

13   suppliers of the big birds and the small birds that we used as

14   well.

15   *BY MR. HART:*

16   *Q.*  And on cross you testified suppliers were telling you -- us

17   when you ask about your concerns about big birds that there

18   were higher margins rather than the smaller margins.  Do you

19   remember testifying to that?

20   *A.*  Yes.

21   *Q.*  Did RSCS have the right to audit the suppliers' books?

22   *A.*  No.

23   *Q.*  Did RSCS have the ability to have an accountant review

24   suppliers' books to see what big-birds margins were?

25          *MR. KORNFELD:*  Objection, Your Honor, asked and

Robert Lewis - Redirect

 1   answered.

 2           THE COURT:  Overruled.

 3   A.  No.

 4   BY MR. HART:

 5   Q.  Or the margins for small birds too?

 6   A.  I am sorry, what was that?

 7   Q.  Sure.  Did you have the ability -- did they have an

 8   open-book policy where you could find out where the margins

 9   were on the small birds?

10   A.  No.

11   Q.  On cross-examination, do you remember being asked questions

12   about a series of e-mails that you sent in July of 2014 to the

13   suppliers?

14   A.  Yes.

15   Q.  Did you send those e-mails individually to the suppliers,

16   or did you send them collectively to each -- to the suppliers?

17   A.  They were sent individually.

18   Q.  Why did you send them individually?

19   A.  The bidding process at RSCS is highly confidential, and we

20   always dealt with suppliers one on one.

21           MS. NIELSEN:  Judge, I am going to object.  May we go

22   on side bar?

23           THE COURT:  Yes.

24      (At the bench:)

25           THE COURT:  Go ahead, Ms. Nielsen.

Robert Lewis - Redirect

1          MS. NIELSEN:  Thank you, Your Honor.

2          I am going to object under 403 and 401 to the

3  government continues to elicit the word "confidential."  This

4  is confusing to the jury because the question is not what

5  Mr. Lewis perceived to be a confidential process.  The law says

6  that the sharing of pricing information is legal so as long as

7  there is not an illegal agreement in place.  And I think this

8  witness continuing to describe the bidding process as a

9  confidential process is confusing the issue before the jury.

10          THE COURT:  Mr. Hart, response.

11          MR. HART:  Yes, Your Honor.  Mr. Lewis was just

12  describing what he did and why he did it.  There was no

13  question with respect to whether it was a confidential process.

14  The questions were what did he do in terms of sending e-mails

15  and why did he do it that way.

16          THE COURT:  All right.  Ms. Nielsen, anything else?

17          MS. NIELSEN:  Nothing further from me, Your Honor.

18          THE COURT:  Thank you.

19          MR. KORNFELD:  Your Honor, if I may.

20          THE COURT:  Go ahead.

21          MR. KORNFELD:  Your Honor, in addition to the bases

22  that Ms. Nielsen raised, the Court has already ruled that the

23  wants, desires of the various customers around a number, the

24  issue is not relevant.  I mean, I am amplifying the relevance

25  objection but just am mindful of the Court's prior rulings on

1281

Robert Lewis - Redirect

1    this issue.

2        THE COURT:  Right.  As Mr. Kornfeld has suggested, the

3    issue here is whether by repeating the -- what Mr. Lewis is

4    describing as the confidential nature of the bidding process

5    and also because of that nature his individual e-mails to

6    suppliers, at least at some times, that would cause prejudice

7    to the defendants because the jury may be confused between the

8    difference of a confidential bidding process and a -- some type

9    of a violation of that confidentiality shading into a violation

10   of the Sherman Act.

11       I don't find that the question asked of Mr. Lewis just

12   now would tip that balance in favor of some type of Rule 403

13   prejudice.  On the other hand, this is kind of well-trod

14   ground, and as a result, there doesn't seem to be too much

15   reason to go back over that since there weren't many questions

16   on cross-examination that tended to raise that particular

17   issue, so we'll see what the rest of the examination is like.

18   But as to that question of Mr. Hart, the objection will be

19   overruled.

20           (In open court:)

21       THE COURT:  Overruled.  Go ahead, Mr. Hart.

22       MR. HART:  Thank you, Your Honor.

23   BY MR. HART:

24   Q.  Mr. Lewis, do you remember being asked questions on

25   cross-examination about Claxton reducing its price for the 2015

Robert Lewis - Redirect

1   contract compared to its first-round proposal?

2   A.  Yes.

3   Q.  And you testified that you thought it was avoiding

4   additional cost.

5   A.  Yes.

6   Q.  Could you share with the jury what exactly you meant in

7   viewing that they avoided additional cost?

8   A.  Well, we received the initial proposal which was X dollars

9   and cents per pound.  That price never went into effect.  It

10  was actually renegotiated.  And that's where the reduction of

11  4.3 cents took place.  So the price that really went into

12  effect was the 1.0669 price, and that's the price at which we

13  signed the 2015 contract.

14  Q.  Sir, based on your experience in the industry, do suppliers

15  usually come in with their best price right away?

16  A.  No.

17  Q.  Can you share with the jury what usually happens when a

18  supplier submits its first-round proposal?

19  A.  There is always negotiation.  If the first price that they

20  submitted was accepted, then there is no such thing as

21  negotiation.

22  Q.  Are you familiar with the term "cushion"?

23  A.  Cushion?  Yes.

24  Q.  Cushion.  How are you familiar with the term "cushion"?

25  A.  From experience.

Robert Lewis - Redirect

1   Q.  What is the term "cushion" as it relates to the bidding for

2   supply contracts?

3   A.  The supplier would add a little extra, if you will, knowing

4   that there was going to be a negotiation around the price they

5   submitted.

6   Q.  And based on your experience, sir, for the 2015 contracts,

7   did the suppliers build in a cushion?

8           MR. FELDBERG:  Objection, Your Honor.

9           MR. LAVINE:  Objection, Your Honor.

10          THE COURT:  Overruled.  He can answer, if he knows.

11  A.  Yes.  That was obvious because all six suppliers reduced

12  their price.

13  BY MR. HART:

14  Q.  You mentioned that other suppliers also reduced their price

15  compared to the first-round submission; is that correct?

16  A.  Correct.

17  Q.  Including Pilgrim's?

18  A.  Yes.

19  Q.  Based on your experience, do you believe that Pilgrim's

20  included a cushion on its first-round proposal?

21  A.  Yes.

22  Q.  Why do you think that?

23  A.  Because the price was reduced before we signed the final

24  contract.

25          THE COURT:  Mr. Hart, can you look for a convenient

Robert Lewis - Redirect

1  breaking spot?

2        MR. HART:  There is no time like the present, Your

3  Honor.

4        THE COURT:  Ladies and gentlemen, we will go ahead and

5  take our mid-morning break at this time.  We will plan on

6  reconvening at 10:30.  The jury is excused for the mid-morning

7  break.

8        (Jury excused.)

9        THE COURT:  Any issues over the break?

10        MR. HART:  Nothing from the government, Your Honor.

11        THE COURT:  We will be in recess until 10:30.  Thank

12  you.

13     (Recess at 10:16 a.m. until 10:35 a.m.)

14        THE COURT:  Why don't we get Mr. Lewis.  And why don't

15  we also get the jury.

16        (Jury present.)

17        THE COURT:  Mr. Hart, go ahead.

18        MR. HART:  Thank you, Your Honor.

19  BY MR. HART:

20  Q.  Mr. Lewis, do you remember being asked questions on

21  cross-examination about suppliers having the right to use best

22  information in determining their bid price?

23  A.  I am sorry, I didn't understand what you said.

24  Q.  Sure.  Do you remember being asked questions on

25  cross-examination about suppliers having the right to use the

Robert Lewis - Redirect

1   best information to inform their bid price?

2   A.   Yes.

3   Q.   Now, sir, when you say best information, does that include

4   other bidders' prices before submitting the final bid?

5   A.   No.

6          MR. KORNFELD:   Objection, Your Honor, foundation.

7          THE COURT:   Sustained.

8          MR. KORNFELD:   Also 701.

9          THE COURT:   Sustained.

10  BY MR. HART:

11  Q.   Mr. Lewis, you were asked questions on cross-examination

12  about suppliers lowering their bid price from the initial

13  round.   Do you remember that?

14  A.   Yes.

15  Q.   And did Claxton increase its 2015 FOB price by

16  approximately 13.94 cents?

17  A.   Yes.

18  Q.   Is that nearly 14-cent increase triple the amount of

19  decrease by which Claxton lowered its bid?

20         MR. KORNFELD:   Objection, Your Honor, argumentative,

21  and the numbers are the numbers.

22         THE COURT:   Overruled.

23  A.   Yes.

24  BY MR. HART:

25  Q.   Did Pilgrim's increase its 2015 FOB price by approximately

Robert Lewis - Redirect

1  16 cents compared to the 2014 price?

2  *A.*  Yes.

3  *Q.*  Is that 16-cent price increase 10 times greater than the

4  1.7 percent decrease that Pilgrim's dropped their bid price?

5      *MS. PLETCHER:*  Objection, Your Honor, to the gestures.

6      *THE COURT:*  Overruled.

7      *MR. HART:*  No further questions.

8      *THE COURT:*  Is Mr. Lewis subject to recall?  Thank you

9  very much, Mr. Lewis.  You are excused.

10      The United States may call its next witness.

11      *MR. LOVELAND:*  Your Honor, at this point, the United

12  States would seek to admit and publish a series of exhibits.

13      *THE COURT:*  Go ahead.

14      *MR. LOVELAND:*  Your Honor, first the United States

15  would seek to both admit and publish together Defense Exhibit

16  E-570 and Government's Exhibit 1547.  Your Honor, these

17  exhibits are required to be published together, and they each

18  have a limiting instruction as well.

19      *THE COURT:*  Okay.  So I am aware of the limiting

20  instruction on 1547, but not E-570.

21      *MR. LOVELAND:*  Your Honor, maybe this is best

22  addressed at side bar.

23      *THE COURT:*  Sure.

24    (At the bench:)

25      *THE COURT:*  Mr. Loveland, what do you believe is the

Robert Lewis - Redirect

1   limiting instruction on E-570?

2        *MR. LOVELAND:*  Your Honor, what I have here is that

3   E-570 can only be used against Defendants Penn and Austin.

4   Exhibit 1547 I had a limiting instruction as against only

5   Mr. Penn.

6        *THE COURT:*  Right.  I agree as to 1547.

7        Let me ask Mr. Tubach, do you agree that there is a

8   limiting instruction as to E-570?  And, Mr. Feldberg, you can

9   jump in too.

10       *MR. TUBACH:*  Your Honor, we do not have a limiting

11  instruction on E-570.  We do have one on 1547.

12       *THE COURT:*  Right.  Mr. Feldberg, you don't have to

13  stand up if you don't want to.

14       *MR. FELDBERG:*  I don't have independent information

15  beyond exhibit -- Docket No. 1378-2 on Exhibit B which says

16  that the exhibit can only be considered against Mr. Penn and

17  Mr. Austin.  Now, that is a filing that I believe the

18  government filed.  It's notice of government's plan to

19  introduce exhibits.  I don't have anything independent of that.

20       *THE COURT:*  Well, as long as the government doesn't

21  object to a limiting instruction in regard to E-570 to that

22  effect, then I think the best thing to do is to go ahead and

23  provide that limiting instruction as to that exhibit.  Any

24  disagreement with that, Mr. Loveland?

25       *MR. LOVELAND:*  No, Your Honor.  And just for the

Robert Lewis - Redirect

1    Court's record, I had Docket 1363-1 which is the Court's table

2    of rulings that I am relying on a column that -- for this

3    limiting instruction, Your Honor.

4         THE COURT:  Any disagreement with the Court providing

5    that limiting instruction, Mr. Tubach?

6         MR. TUBACH:  No, Your Honor.

7         THE COURT:  Mr. Feldberg?

8         MR. FELDBERG:  No, Your Honor.

9         THE COURT:  Okay.  I will do so.  Thank you.  I will

10   ask in open court whether there is any objection to the

11   admission of those exhibits.

12        Thank you.

13        (In open court:)

14        THE COURT:  Let's take them one at a time.  First of

15   all, any objection to E-570 subject to the limiting instruction

16   that we just discussed?

17        MR. FELDBERG:  No objection, Your Honor.

18        THE COURT:  Then E-570 will be admitted.  And it may

19   be published at this time.

20        Ladies and gentlemen, the limiting instruction as to

21   this exhibit is that it may only be considered as against

22   Mr. Austin and Mr. Penn and Mr. Austin and Mr. Penn only.

23        Did you want to allow the jury an opportunity to look

24   at that now, Mr. Loveland, or do you want to go to the next

25   one?

Robert Lewis - Redirect

1          MR. LOVELAND:  I think an opportunity to read this now

2    and then Government's Exhibit 1574 would be the government's

3    preference, Your Honor.

4          THE COURT:  That's fine.  We will take that up next,

5    then.  I will give the jury an opportunity to review this.

6          All right.  Any objection to the admission of

7    Exhibit 1547 with the limiting instruction?

8          Exhibit 1547 will be admitted.

9          And, ladies and gentlemen, that has a limiting

10   instruction as well; namely, that this particular exhibit may

11   only be considered against Mr. Penn, against Mr. Penn only.

12   All right.

13         MR. LOVELAND:  Your Honor, the government would now

14   seek to admit and publish three exhibits which should be

15   published together.  Those exhibits are E-873, E-874, and

16   Government's Exhibit 1056.  And we would seek to publish in

17   that order, Your Honor.

18         THE COURT:  All right.

19         MR. LOVELAND:  And we are moving for admission for

20   these three at this time, Your Honor.

21         THE COURT:  Understood.  Let me just look them up.

22         Any objection to the admission of E-873 and E-874?

23   All right.  And any objection to the admission of Exhibit 1056?

24         Each of those will be admitted and may be published in

25   whatever order you wish, Mr. Loveland.

Robert Lewis - Redirect

1          MR. LOVELAND:  Thank you, Your Honor.

2          For the Court's record, we are beginning with E-873.

3          THE COURT:  All right.

4          MR. LOVELAND:  Thank you, Your Honor.

5          And we would now seek to publish E-874.

6          THE COURT:  You may.  All right.

7          MR. LOVELAND:  Your Honor, the government would seek

8    permission to publish Government's Exhibit 1615.

9          THE COURT:  1615?

10          MR. LOVELAND:  Yes, Your Honor.

11          THE COURT:  A previously admitted exhibit?

12          MR. LOVELAND:  Yes, Your Honor.  It should have been

13   moved in as part of the Notice 1378, Attachment A.

14          THE COURT:  Has this been previously reviewed by the

15   jury?  I'm not sure.

16          MR. LOVELAND:  Your Honor, I don't believe it has.

17          THE COURT:  All right.  Exhibit 1615 may be displayed.

18          MR. LOVELAND:  Thank you, Your Honor.

19          THE COURT:  All right.

20          MR. LOVELAND:  Thank you, Your Honor.

21          I think I may have gotten out of order.  Can we have

22   permission to publish 1056?

23          THE COURT:  You may.

24          MR. LOVELAND:  Thank you.

25          THE COURT:  All right.

Robert Lewis - Redirect

1          MR. LOVELAND:  Thank you, Your Honor.

2          The government would both seek to admit and publish

3    Government's Exhibit 559.  And, Your Honor, this exhibit has a

4    limiting instruction.

5          THE COURT:  Any objection to the admission of

6    Exhibit 559 with the limiting instruction?

7          All right.  Exhibit 559 will be admitted.  It may be

8    displayed.

9          And, ladies and gentlemen, the limiting instruction

10   for this particular exhibit is that you will see that there is

11   an e-mail from a Matthew Boarman.  Mr. Boarman's statements can

12   be considered not for the truth of the matters that they may

13   assert, but only for their effect on the listener.

14         All right.  All right.

15         MR. LOVELAND:  Mr. Dunn, if you could scroll all the

16   way to the top for the jury.

17         THE COURT:  All right.

18         MR. LOVELAND:  Your Honor, the government would seek

19   permission to publish Government's Exhibit 9744.

20         THE COURT:  You may.

21         MR. LOVELAND:  Thank you, Your Honor.

22         And, Mr. Dunn, if you could focus on just the text,

23   thank you.

24         THE COURT:  All right.

25         MR. LOVELAND:  The government would seek the Court's

Robert Lewis - Redirect

1  permission to publish Government's Exhibit 1069.

2          THE COURT:  You may.

3          MR. LOVELAND:  Thank you, Your Honor.

4          THE COURT:  All right.

5          MR. LOVELAND:  The government would seek to publish

6  Government's Exhibit 1074, Your Honor.

7          THE COURT:  You may.

8          MR. LOVELAND:  Thank you.

9          THE COURT:  All right.

10          MR. LOVELAND:  The government would seek the Court's

11  permission to publish Government's Exhibit 1238.

12          THE COURT:  You may.

13          MR. LOVELAND:  Thank you, Your Honor.

14          THE COURT:  All right.

15          MR. LOVELAND:  The government would seek to both admit

16  and publish Government's Exhibit 953 which is subject to a

17  limiting instruction.

18          THE COURT:  Any objection to the admission of

19  Exhibit 953 with the limiting instruction?

20          Exhibit 953 will be admitted and may be published.

21          Ladies and gentlemen, you will see in this e-mail

22  chain that there are e-mails from a Mr. Jason Slider, so

23  Mr. Slider's statements cannot be considered for the truth of

24  the matters associated, but only for the effect on the

25  listener.

Robert Lewis - Redirect

1        MR. LOVELAND:  If we could start at the bottom.  Thank

2   you, Mr. Dunn.

3        THE COURT:  All right.  All right.  All right.  All

4   right.

5        MR. LOVELAND:  The government would seek to admit and

6   then publish Government's Exhibit 955 which is also subject to

7   a limiting instruction.

8        THE COURT:  Any objection to the admission of

9   Exhibit 955 with the limiting instruction?

10       Exhibit 955 will be admitted and may be published.

11       Ladies and gentlemen, on this particular e-mail, there

12   are statements of a Mr. Lonnie Justice.  His statements can be

13   considered only for their effect on the listener, not on the

14   truth of any matters that Mr. Justice asserts.

15       MR. LOVELAND:  Thank you, Your Honor.

16       THE COURT:  All right.  All right.

17       MR. LOVELAND:  Your Honor, at this time, the

18   government would seek to publish Government's Exhibit 8084.

19   And for this one, Your Honor, we would ask to just focus on the

20   first page.

21       THE COURT:  You may.

22       MR. LOVELAND:  Thank you, Your Honor.

23       Mr. Dunn, if you could focus the jury's attention on

24   the top half of page 1 of Government's Exhibit 8084.

25       And, Your Honor, this is a Verizon Wireless phone

Robert Lewis - Redirect

1    record.  The representation from the government is similar to

2    last time.

3            THE COURT:  That's fine.

4            MR. LOVELAND:  The government would seek to publish

5    Government's Exhibit 1846.  And, Your Honor, for efficiency,

6    the government is seeking to publish 1846, 1847, 1848, and 1849

7    which are sequential and short exhibits.

8            THE COURT:  You may.

9            Sorry, Mr. Quinn, go ahead.

10           MR. QUINN:  We have a note that 1846 through 1848 have

11   already been published yesterday, Your Honor.

12           MR. LOVELAND:  That does not match with my notes, Your

13   Honor.  We are happy to take a look at that.  What I would say

14   is if we do so, I would seek permission to republish 8084 in

15   the event that 1846 through 1849 were not published already.

16           THE COURT:  Why don't we do this, Mr. Loveland.  Do

17   you have other exhibits that you wanted to display to the jury

18   as well?  We can try to double-check on 1846 through 1849,

19   whether they were published yesterday, I am not sure.

20           MR. LOVELAND:  Per co-counsel, I am not seeing this in

21   the transcript, and these are the last exhibits we were seeking

22   to publish before calling Mr. Suerken as a witness.

23           THE COURT:  Okay.  You may publish those.  To the

24   extent that Mr. Quinn articulated an objection, it will be

25   overruled.  I think that you're probably right about them not

Robert Lewis - Redirect

1   having been published before, so go ahead.

2        *MR. LOVELAND:*  Thank you, Your Honor.

3        For the Court's record, we are starting with 1846, and

4   Mr. Dunn is zooming us into the top where the text is.

5        *THE COURT:*  All right.

6        *MR. LOVELAND:*  For the Court's record, we are now

7   publishing 1847.  And Mr. Dunn will focus us in on the top

8   where the text is.  Thank you.

9        *THE COURT:*  All right.

10        *MR. LOVELAND:*  The government is now publishing 1848

11   for the Court's record and focusing on the top where the text

12   is, Your Honor.

13        *THE COURT:*  All right.

14        *MR. LOVELAND:*  Finally, Your Honor, Government's

15   Exhibit 1849.

16        *THE COURT:*  All right.

17        *MR. LOVELAND:*  Your Honor, at this time, the

18   government would seek the Court's permission to call

19   Mr. Suerken as a witness.

20        *THE COURT:*  You may.

21     (**Peter Suerken** was sworn.)

22        *THE WITNESS:*  I do.

23        *COURT DEPUTY CLERK:*  Please state your name and spell

24   your first and last name for the record.

25        *THE WITNESS:*  Pete Suerken, P-E-T-E, S-U-E-R-K-E-N.

Peter Suerken - Direct

1        **DIRECT EXAMINATION**

2   *BY MS. WULFF:*

3   *Q.*  Good morning, Mr. Suerken.

4   *A.*  Good morning, ma'am.

5   *Q.*  Have you ever had responsibility for buying bone-in chicken

6   at a company called RSCS?

7   *A.*  Yes, ma'am.

8   *Q.*  And what years was that?

9   *A.*  2014 through 2017.

10  *Q.*  Approximately what month did you start in 2014?

11  *A.*  Sometime the spring of 2014, around -- shortly after

12  Mother's Day weekend.

13  *Q.*  And approximately what month did you stop having

14  responsibility in 2017?

15  *A.*  February of 2017.

16  *Q.*  Mr. Suerken, what does RSCS stand for?

17  *A.*  Restaurant Supply Chain Solutions.

18  *Q.*  Did RSCS ever go by a different name?

19  *A.*  It did.

20  *Q.*  What name was that?

21  *A.*  UFPC or Unified Foodservice Purchasing Cooperative.

22  *Q.*  Can you please explain RSCS's business model to the jury?

23  *A.*  RSCS is the supply chain provider to Yum Brands.  It is a

24  cooperative that is owned by all of the franchisees.

25  *Q.*  And you've used a number of terms there.  Can you explain

Peter Suerken - Direct

1   what a purchasing cooperative is?

2   A.   A purchasing cooperative groups all of the procurement

3   needs for goods or services for a group of restaurant chains,

4   so Taco Bell, Pizza Hut, KFC, all get together as a co-op and

5   buy all their goods and services together.

6   Q.   Is the fact that RSCS is the purchasing co-op relevant to

7   the contracts that it negotiates?

8   A.   Yes, ma'am.

9   Q.   How so?

10   A.   Because RSCS never takes title or ownership to those goods

11   or services that they buy.  They merely set the contracts up so

12   that the distribution centers can buy off of those contracts

13   and then resell those items to the stores.

14   Q.   And who is RSCS's largest customer for bone-in chicken?

15   A.   Kentucky Fried Chicken or KFC.

16   Q.   Now, Mr. Suerken, how did you come to have responsibility

17   for bone-in chicken in May -- or spring of 2014?

18   A.   I was the executive vice-president of food and packaging

19   procurement.  And at the time, our lead poultry buyer left the

20   company suddenly.

21   Q.   What was that individual's name?

22   A.   Mike Ledford.

23   Q.   And do you know why you in particular were picked to have

24   that role?

25   A.   Because ultimately all of the feed procurement fell to me.

Peter Suerken - Direct

1  Q.  All of the food procurement had fallen to you?  That was

2  your prior role?

3  A.  No, that was my current role.  So anytime there was a hole

4  to fill, I will backfill into that hole.

5  Q.  Did you have prior experience running bidding processes?

6  A.  Yes.

7  Q.  What was your experience?

8  A.  I have run bidding processes since the mid '90s with

9  various companies.

10 Q.  Can you explain your background for the jury?

11 A.  I'm an ag econ and business major.  Went to work for a

12 large grain company in commodities, came to Yum Brands as

13 commodity risk management, VP of commodity risk management

14 where I moved into procurement and supply chain management.

15 Q.  What does procurement and supply chain management mean?

16 A.  Buying goods and then shipping those goods all to wherever

17 they are needed.

18 Q.  And how much of that experience that you just testified to

19 was at RSCS, Mr. Suerken?

20 A.  A little more than half.

21 Q.  So how many years?

22 A.  13 years.

23 Q.  Now, you testified that you stopped having responsibility

24 for bone-in chicken at KFC in about February of 2017.  Why did

25 you stop?

Peter Suerken - Direct

 1   *A.*  My job was eliminated.

 2   *Q.*  So for the rest of my questions today, unless I

 3   specifically say otherwise, I am going to focus on that time

 4   period, so from the spring of 2014 until February of 2017,

 5   okay?

 6   *A.*  Yes, ma'am.

 7   *Q.*  Let's introduce the jury to some of the people you worked

 8   with at RSCS.  Did you work with someone named Bob Lewis?

 9   *A.*  I did.

10   *Q.*  What was his role in the bidding process?

11   *A.*  Mr. Lewis was our poultry expert at the time.

12   *Q.*  And what was your relative seniority with Mr. Lewis?

13   *A.*  Mr. Lewis reported directly to me.

14   *Q.*  Did you work with someone named Rich Eddington?

15   *A.*  I did.

16   *Q.*  Do you recall when Mr. Eddington started working with your

17   team?

18   *A.*  It would have been the first part of August, either the

19   first or second week of August.

20   *Q.*  Of what year?

21   *A.*  2014.

22   *Q.*  What was Mr. Eddington's role?

23   *A.*  He was our poultry expert.

24   *Q.*  Do you know whether Mr. Eddington had prior experience

25   buying chicken on behalf of fast-food restaurants?

1300

Peter Suerken - Direct

1    A.   I do.

2    Q.   Did he?

3    A.   He had not.

4    Q.   He had -- I am sorry?

5    A.   He did not have prior experience buying chicken for

6    fast-food restaurants.

7    Q.   Do you know where Mr. Eddington worked before coming to

8    RSCS?

9    A.   Yes.

10   Q.   Where?

11   A.   Koch Foods.

12   Q.   And what was the relative seniority between you and

13   Mr. Eddington?

14   A.   Mr. Eddington reported directly to me.

15   Q.   Did you also work with someone named Sara Fisher?

16   A.   I did.

17   Q.   What was her role?

18   A.   She did logistics, supply chain logistics, moved truckloads

19   of chicken around the system.

20   Q.   And what was your relative seniority with Ms. Fisher?

21   A.   She reported in through someone to me.

22   Q.   Who was that person?

23   A.   Steve Campisano.

24   Q.   Now, before we go into the bidding process in more detail,

25   Mr. Suerken, is there a chicken item that is particularly

Peter Suerken - Direct

1   important to KFC?

2   *A.*   Eight-piece chicken on the bone is very important to KFC.

3   *Q.*   Why is that product so important?

4   *A.*   Because it's 40 to 50 percent of their total costs.

5   *Q.*   Of whose total costs?

6   *A.*   Kentucky Fried Chicken's.

7   *Q.*   Are there other common products that KFC buys?

8   *A.*   Yes.

9   *Q.*   Can you identify some of them?

10  *A.*   They buy wings, filets, nuggets, popcorn chicken, things

11  like that.

12  *Q.*   Are you familiar with chicken legs or thighs?

13  *A.*   Yes, ma'am, dark meat.

14  *Q.*   So are thighs and dark meat the same thing?

15  *A.*   Yes.

16  *Q.*   Now, is there a spread between the eight-piece

17  chicken-on-the-bone pricing and the pricing for dark meat?

18  *A.*   Yes.

19  *Q.*   What is that?

20  *A.*   Typically, it runs between 28 and 32 cents.

21  *Q.*   Have you ever -- and how are those 28 or 32 cents measured?

22  *A.*   Typically, dark meat trades at a lower price; therefore,

23  it's 28 cents lower price per pound than eight-piece chicken on

24  the bone.

25  *Q.*   Have you ever heard of the term in this instance ".28

Peter Suerken - Direct

1   back"?

2   *A.*   Yes.

3   *Q.*   And in that phrase, what does "back" mean?

4   *A.*   28 cents below the price of eight-piece chicken on the

5   bone.

6   *Q.*   So assuming that the supplier holds its eight-piece

7   chicken-on-the-bone price constant, if it changes its dark-meat

8   price from .28 back to .30 back, what does that do to the

9   actual costs of the dark-meat chicken?

10   *A.*   Lowers the price 2 cents a pound.

11   *Q.*   Because the back is a discount?

12   *A.*   Yes.

13   *Q.*   Now, is there a particular size chicken that KFC bought

14   during the time period we're talking about?

15   *A.*   Yes, ma'am.

16   *Q.*   What size?

17   *A.*   Small bird.

18   *Q.*   Do you know why KFC buys this size chicken?

19   *A.*   Yes.

20   *Q.*   Why?

21   *A.*   There is three main reasons.  The first is food safety.

22   You can -- it cooks better in the fryers.  You don't have raw

23   pieces.  The second is quality.  It's a better product.  And

24   the third is, probably the most important, is profitability.

25   At KFC you are buying by the pound and selling by the piece, so

Peter Suerken - Direct

1  the smaller the bird, the more meat you get, the less you have

2  to pay for the piece, and you're still selling it for the piece

3  so it's more profitable.

4  Q.  Because does the price that KFC charges per piece vary

5  based on the price that KFC bought it per pound?

6  A.  No, ma'am.

7  Q.  And, again, sticking with our time period of spring 2014 to

8  February 2017, do you have a sense of approximately how much

9  chicken KFC bought per week?

10  A.  Yes.

11  Q.  What is it?

12  A.  Approximately 200 truckloads a week.

13  Q.  Do you have a sense of how many pounds of chicken that is?

14  A.  I would have to do the math, 32, 33,000 pounds a truck

15  times 200.

16  Q.  I think there may be a calculator, but we can also use the

17  round numbers.

18  A.  Approximately 6.4 to 6.7 million pounds a week.

19  Q.  And what is the approximate dollar value of that chicken?

20  A.  It could be anywhere from $6 million to $8 million a week

21  depending upon pricing.

22  Q.  Now, Mr. Suerken, is that for all chicken that KFC buys or

23  just a single product?

24  A.  Just the single product.

25  Q.  Which product?

Peter Suerken - Direct

1    A.  Eight-piece chicken on the bone.

2    Q.  Okay.  We're going to talk about bidding processes a little

3    bit.  Mr. Suerken, what kind of bidding process does KFC use?

4    A.  KFC uses an RFP, which is request for proposal, request for

5    pricing, also known as a blind bid.

6    Q.  Can you explain to the jury how an RFP works?

7    A.  It is a document that is sent out by the buyer to the

8    seller that asks the seller for various information about the

9    item that they're offering to the buyer.  It also gives the

10   seller parameters around what they're asking for and how many

11   loads, where it is, where you want it, all those type things.

12   So it's information that the buyer would give to a seller.

13   Q.  And you said that it's a blind-bidding process.  What is a

14   blind-bidding process?

15   A.  It is a offer -- it is -- it's an offer that only -- it's

16   only shared between the buyer and a single supplier.

17   Q.  Do you know why KFC used a blind-bidding process?

18   A.  Yes.

19   Q.  Why?

20   A.  Because you wouldn't want all the suppliers to coordinate

21   their answers back and forth to an RFP with one another.

22        MS. PLETCHER:  Objection to foundation, Your Honor.

23        THE COURT:  Overruled.

24   BY MS. WULFF:

25   Q.  Are you aware of whether KFC used a blind-bidding process

Peter Suerken - Direct

1   for chicken before 2014?

2   *A.*   Yes.

3   *Q.*   How do you know?

4   *A.*   Because I was vice-president of food and packaging

5   procurement for a period of time as well as vice-president of

6   commodity risk management, and I had access to those

7   negotiation sessions, as well as documents.

8   *Q.*   Did they use a blind-bidding process before spring of 2014?

9   *A.*   They did.

10   *Q.*   So now that you've explained what a blind-bidding process

11   is, let's talk about some of the steps of that process.   What's

12   the first step?

13   *A.*   The first step is that you would send out a document.   You

14   would create the document and then send out the document to the

15   individual suppliers telling them about what you were looking

16   for, when you wanted it, all the kinds of parameters in

17   which -- so they could give you an offer, but it also would

18   have questions in it about their process, cost, things of that

19   nature.   So you would create that document, and then you would

20   send this out to the sellers of the items.

21   *Q.*   Did you tell the suppliers who you were sending those

22   requests to?

23   *A.*   No, ma'am.

24   *Q.*   Why not?

25   *A.*   To ensure that there was competition.

1306

Peter Suerken - Direct

1  Q.  And what happened next after you sent out the requests for

2  prices?

3  A.  They would send -- they would fill the RFP document back in

4  and send it back in to us.

5  Q.  And once KFC received the bids, was that the end of the

6  bidding process?

7  A.  No, ma'am.

8  Q.  Why not?

9  A.  Because those were the first-round pricing.  You would

10  never accept a first-round price.  You would negotiate.

11  Q.  Why would you never accept the first-round pricing?

12  A.  Because typically that's not the best price available.

13  Q.  How do you know?

14  A.  I've never actually bought the first price offer to me.  I

15  have always negotiated them and seemed to always get them a

16  little bit lower.

17  Q.  Excuse me, you what?

18  A.  I always seemed to get them a little bit lower.

19  Q.  So during these negotiations, what was KFC's goal for the

20  negotiation process?

21  A.  Ultimately to assure supply at the best possible price.

22  Q.  Do you understand what it means to negotiate suppliers off

23  of one another?

24  A.  I do.

25  Q.  What do you understand that term to mean?

Peter Suerken - Direct

1   *A.*  It's basically placing suppliers in competition with one

2   another relative to their price and costs of a certain item.

3   *Q.*  How do you do that?

4   *A.*  You would look at the offers, and you would basically go

5   back and take pieces of the cost structure and negotiate them

6   back with each individual supplier, so you would say, A piece

7   of your offer is not slightly -- is not as good as somebody

8   else or your price is not as good as somebody else, and you

9   would work back and forth on those.

10  *Q.*  When you were doing that, did you tell one supplier the

11  cost or the bid price that another supplier had submitted?

12  *A.*  We would tell them what was the price, but we wouldn't tell

13  them the supplier.

14  *Q.*  So you might give them the information, but not who had

15  submitted that bid.

16  *A.*  Yes, ma'am.

17  *Q.*  Why not?

18      *MS. NIELSEN:*  Objection.  May we go on side bar?

19      *THE COURT:*  Yes.

20     (At the bench:)

21      *THE COURT:*  Go ahead, Ms. Nielsen.

22      *MS. NIELSEN:*  Your Honor, my objection is to relevance

23  and 403 and the Court's prior ruling.  I don't know that I need

24  to articulate the arguments made by myself and Mr. Kornfeld

25  made in the last side bar, but I would object to this witness

Peter Suerken - Direct

1    describing why he wanted the bids to go a certain way.  It's

2    not relevant to the charge in this case.

3              THE COURT:  Ms. Wulff, response?

4              MS. WULFF:  Yes, Your Honor, this is a new witness,

5    and so the government is asking him to explain how he conducted

6    negotiations and why he did them that way.  I believe it's

7    relevant, and this particular witness has not explained his

8    negotiation strategy.

9              THE COURT:  Ms. Nielsen, anything else?

10             MS. NIELSEN:  No, thank you, Your Honor.

11             THE COURT:  All right.  So even though this is a new

12   witness, we've heard lots of testimony about the process, so

13   while -- since this is going to be a new round of negotiations,

14   I will allow some questions, but, once again, because the jury

15   has heard about the process in quite a bit of detail, we'll

16   see.  I don't want to suggest that there is going to be future

17   objections to cumulative.

18             MS. WULFF:  Your Honor, this is actually my last

19   question on this particular negotiation, and then what he did

20   as part of the 2017 negotiations, so I may ask him a question

21   or two about that, but this is my last question about this

22   particular --

23             THE COURT:  I understand, right.  Because this is

24   about 2014 and then you may ask him a question about 2017?

25             MS. WULFF:  Yes, that's correct.

Peter Suerken - Direct

1    THE COURT:  Okay.  We'll see, then.  Thank you.

2         (In open court:)

3    THE COURT:  The objection is overruled.

4         Go ahead, Ms. Wulff.

5    MS. WULFF:  Thank you, Your Honor.

6    BY MS. WULFF:

7    Q.  So, Mr. Suerken, do you remember the question that was

8    posed or would you like me to repeat it?

9    A.  Let's repeat the question, please.

10   Q.  I had asked -- we were talking about the negotiations that

11   you would do with suppliers, and I asked why you might tell

12   them the price that another supplier had submitted but not who

13   had submitted that price.

14   A.  Yes.

15   Q.  And I asked you why?

16   A.  Because it would break the confidentiality of the RFP.

17        MR. FELDBERG:  Objection, Your Honor, 401, 403.  We

18   have been through the confidentiality issue.

19        THE COURT:  Overruled.

20   BY MS. WULFF:

21   Q.  Now, Mr. Suerken, what happens at the end of a negotiation?

22   A.  Typically, the business is awarded to one of the suppliers

23   or a portion is awarded to all of the suppliers.

24   Q.  And would you sign a contract?

25   A.  Yes.

Peter Suerken - Direct

1   *Q.*  In your experience, did KFC ever buy all of its chicken

2   from a single supplier?

3   *A.*  No.

4   *Q.*  Why not?

5   *A.*  Because you wouldn't want to put all your eggs in one

6   basket.

7   *Q.*  What do you mean by "putting all of your eggs in one

8   basket," Mr. Suerken?

9   *A.*  You wouldn't want to have -- that would place too much risk

10  with one individual supplier.

11  *Q.*  What do you mean by "risk"?

12  *A.*  When 40 to 50 percent of the cost of running your

13  restaurant is chicken on the bone, you would never allow one

14  individual company to dictate price and/or supply.  They could

15  raise price to the point where it doesn't make any sense to

16  operate the restaurant, or they could run you out arbitrarily.

17  *Q.*  What do you mean by "run you out arbitrarily"?

18  *A.*  They could just not ship chicken, and you could not open

19  your restaurants, and you would have no warning.

20  *Q.*  Do you know whether KFC ever bought all of its chicken from

21  a single supplier from 2012 to 2014?

22  *A.*  I do.

23  *Q.*  How do you know that?

24  *A.*  Once again, I was the vice-president of food and packaging

25  procurement.  I would have access to all of those records and

1311

Peter Suerken - Direct

1  documents and contracts.

2  *Q.*  And did they?

3  *A.*  They did not.

4  *Q.*  So if at the end of this whole bidding process KFC signed

5  contracts with multiple suppliers, what was the purpose of the

6  bidding process from KFC's perspective?

7        *MR. KORNFELD:*  I am going to object as cumulative from

8  the last witness, same negotiation period, same company, it's

9  cumulative.

10        *THE COURT:*  Yes, you may respond.

11        *MS. WULFF:*  I am going to the fact that even though

12  there are multiple suppliers, it's not a winner-take-all bid,

13  and there is still a purpose behind the bidding process.

14        *THE COURT:*  I will allow some questions.  Mr. Kornfeld

15  is right, this has been asked of other witnesses as to the same

16  negotiation.

17  *BY MS. WULFF:*

18  *Q.*  Mr. Suerken, did you -- do you remember the question?

19  *A.*  Please repeat the question.

20  *Q.*  So if at the end of this bidding process KFC signed

21  contracts -- how about this.  Are you familiar with the term

22  "winner-take-all bid"?

23  *A.*  Yes.

24  *Q.*  Was this a winner-take-all bid?

25        *MR. KORNFELD:*  Your Honor, same objection.

Peter Suerken - Direct

1    *THE COURT:*  Overruled.

2    *A.*  Absolutely not.

3    *BY MS. WULFF:*

4    *Q.*  So if it was not a winner-take-all bid, what was the

5    purpose of the bidding process from KFC's perspective?

6    *A.*  To establish prices with multiple vendors and secure supply

7    and mitigate as much risk as possible, supply risk, I should

8    say.

9    *Q.*  As the person running the bidding process, what parts of

10   the suppliers' bids were most important to you?

11   *A.*  All of them, ultimately, that added up to the price.

12   *Q.*  Did you look at, for example, quality?

13   *A.*  Yes, food safety, quality or table stakes.

14   *Q.*  What do you mean by "table stakes"?

15   *A.*  If you don't have either one of those, you can't

16   participate in the bid.

17   *Q.*  Can we explain just what quality means and food safety in

18   this context?

19   *A.*  Food safety is food safe products.  Nobody gets sick when

20   eating it.  There is no problems there.  Quality is, is there

21   miscuts?  Is it missized?  Is there issues with it, so is it a

22   quality product that the consumer can identify and see as

23   quality?

24   *Q.*  And I believe you mentioned that at the end of the day you

25   are looking at the price?

Peter Suerken - Direct

1    A.  Yes.

2    Q.  What does KFC look for in terms of price?

3    A.  Ultimately, the lowest landed price across the system, the

4    least cost that they could pay for their total needs.

5    Q.  What is a landed price?

6    A.  Landed is delivered to the store, so what a case of chicken

7    would cost delivered to the store is the landed cost.

8    Q.  Because who pays for freight?

9    A.  Ultimately, the KFC operator.

10   Q.  Do all of KFC's suppliers sell the exact same size bird?

11   A.  No, ma'am.

12   Q.  So as the buyer, would you expect to see some differences

13   between the prices for different suppliers?

14   A.  Yes.

15   Q.  Now, I want to circle back to the contracts that get signed

16   at the end of this bidding process.  Do those contracts set the

17   exact price that KFC will pay?

18   A.  They do not.

19   Q.  Why not?

20   A.  Because the contracts are formula-based prices meaning that

21   there is different inputs that can change over time that go

22   into those formulas that essentially calculate the price.

23   Q.  What are some of those inputs?

24   A.  The cost of corn and soybean meal to feed the chicken, the

25   feed gain ratio, natural gas cost to heat the houses, cost to

Peter Suerken - Direct                    1314

1    run the plant, to harvest the animals, all of those things.

2    Q.  Have you heard of the term "period pricing"?

3    A.  I have.

4    Q.  Can you explain period pricing to the jury?

5    A.  KFC has 13 periods in a year.  They are marketing windows,

6    and you would establish a set price for each one of those 13

7    periods.

8    Q.  Do the period prices relate to the bid prices that the

9    companies submit?

10   A.  Yes.

11   Q.  How?

12   A.  Because the formula that is submitted is what is used

13   ultimately to calculate each one of those period prices.

14   Q.  Let's drill down into 2014 in more detail.  Did anything

15   noteworthy happen in the chicken industry in the spring and

16   summer of 2014?

17   A.  KFC that spring was shorted truckloads of chicken and had

18   trouble running its stores.

19   Q.  Are you aware of there ever being this kind of supply

20   shortage in the past?

21   A.  No, ma'am, I'm not aware of one.

22   Q.  Did RSCS have to take any action as a result of that supply

23   shortage?

24   A.  We did.

25   Q.  What action did KFC have to take?

Peter Suerken - Direct

1    *A.*  We had to buy incremental loads above and beyond the

2    contracted loads that we had bought.

3    *Q.*  What does it mean to buy incremental loads?

4    *A.*  It means you step out into the marketplace and buy

5    truckloads of chicken in the spot market, meaning you're buying

6    them that day.  There is no contract.  You're just looking to

7    find whoever has them and paying whatever it takes to get them.

8    *Q.*  And do you recall how the prices for the incremental loads

9    compared to the contract prices that were in place at that time

10   in 2014?

11   *A.*  I do.

12   *Q.*  How did they compare?

13   *A.*  20 to 35 percent higher.

14   *Q.*  Was KFC willing to enter into long-term supply contracts at

15   those prices?

16   *A.*  No, ma'am.

17   *Q.*  Why not?

18   *A.*  Because those weren't long-term prices; they were

19   short-term prices.  They were for what was available at that

20   moment in time, not for the next two, three, four years.

21   *Q.*  So why was KFC willing to pay those high prices in the

22   spring of 2014?

23        *MR. KORNFELD:*  I am going to object again as to

24   cumulative from Mr. Lewis' testimony.  The jury has heard all

25   this.

Peter Suerken - Direct

1    THE COURT:  Overruled, as long as this is not an

2  extensive discussion.  Go ahead.

3    MS. WULFF:  Thank you, Your Honor.

4  BY MS. WULFF:

5  Q.  Why was KFC willing to pay those prices in the spring of

6  2014?

7  A.  For two reasons.  The first is to assure supply to make

8  sure that the stores could operate, because shutting down

9  stores is not a good idea to stay profitable.  The second is

10  that if you took those incremental loads and spread those

11  loads' costs out across the other 185 to 200 that you had, the

12  net impact to the total system was negligent I believe if you

13  just look at it on a total basis, not on a load-by-load basis.

14  So you cost average them out over everything that you had.

15  Q.  Now, in your experience running bidding processes, do you

16  consider buying chicken on the spot market to be a substitute

17  to conducting a blind-bidding process?

18  A.  Absolutely not.

19  Q.  Why not?

20  A.  Because it's not reflective of the market or the market

21  conditions, and it's not reflective of the time frame that

22  you're buying chicken for.

23  Q.  Did you run a bidding process for KFC in the summer of

24  2014?

25  A.  Yes, ma'am.

Peter Suerken - Direct

1    Q.   When did that bidding process start?

2    A.   We started having conversations about it in June or July of

3    that year.

4    Q.   And approximately when did you sign the contracts with the

5    suppliers?

6    A.   It would have been sometime late that fall.

7    Q.   When did those contracts go into effect?

8    A.   January 1st, 2015.

9    Q.   And what was their end date?

10   A.   December 31st, 2017.

11   Q.   So how long was the contract?

12   A.   A three-year contract.

13   Q.   Did the supply shortages that happened in the spring of

14   2014 influence the strategy for this particular bidding

15   process?

16   A.   Yes, ma'am.

17   Q.   How so?

18   A.   We moved from a one-year contract to a three-year contract.

19   Q.   Do you know why the decision was made to move to a

20   three-year contract?

21   A.   I do.

22   Q.   Why was it made?

23   A.   To assure supply over a longer period of time.

24   Q.   Are you aware of whether KFC had ever negotiated a

25   three-year chicken contract before 2014?

Peter Suerken - Direct

1    A.   I am.

2    Q.   How are you aware?

3    A.   Once again, I was the executive vice-president of

4    procurement, as well as vice-president of commodity risk

5    management.  I had access to all the contracts and documents.

6    Q.   And had KFC ever negotiated a three-year contract before

7    2014?

8    A.   No, ma'am.

9    Q.   Which suppliers were involved in the bidding process for

10   the 2015 contract?

11   A.   George's, Case Farms, Koch Foods, Tyson, Claxton Poultry,

12   Pilgrim's -- is that seven?  George's, Case Farms, Claxton

13   Poultry, Mar-Jac, Pilgrim's, Tyson, Koch Foods.

14   Q.   Okay.  And you sort of muttered to yourself, but how many

15   suppliers was that?

16   A.   There is seven of them.  I apologize.

17   Q.   No problem.

18        Mr. Suerken, do you understand what it means to place

19   suppliers into competition with one another?

20   A.   I do.

21   Q.   What does that term mean to you?

22   A.   In this instance, it meant that the suppliers were all

23   competing with one another to sell KFC truckloads of chicken,

24   trying to earn the right to sell KFC those truckloads.

25   Q.   And did you place Pilgrim's and Claxton into competition

Peter Suerken - Direct

 1   with one another for the 2015 contract?

 2   A.   We did.

 3   Q.   How so?

 4   A.   They were competing with one another to sell KFC truckloads

 5   of chicken.

 6   Q.   And at the end of this process, did you sign a contract

 7   with each of the seven suppliers you just mentioned?

 8   A.   We did.

 9   Q.   During the bidding process, did you interact with anyone at

10   Claxton?

11   A.   I did.

12   Q.   Who?

13   A.   Mikell Fries and Scott Brady.

14   Q.   Did you interact with anyone at Pilgrim's?

15   A.   I did.

16   Q.   Who?

17   A.   Roger Austin and Bill Lovette.

18   Q.   Did you interact with anyone at Koch Foods?

19   A.   I did.

20   Q.   Who?

21   A.   Bill Kantola.

22   Q.   Are you familiar with someone named Joe Grendys?

23   A.   Yes.

24   Q.   Do you know where Mr. Grendys worked at this time?

25   A.   President and CEO of Koch.  I believe he is the owner as

Peter Suerken - Direct

1    well.

2    Q.  Of Koch Foods?

3    A.  Yes.

4    Q.  Did you interact with anyone at Mar-Jac?

5    A.  Yes.

6    Q.  Who?

7    A.  Pete Martin and Greg Tench.

8    Q.  Did you know Mr. Martin's role at Mar-Jac?

9    A.  President and CEO.

10   Q.  What is Mr. Tench's role at Mar-Jac?

11   A.  I believe vice-president of sales.

12   Q.  Did you interact with anyone at Tyson?

13   A.  Yes.

14   Q.  Who?

15   A.  Brian Roberts.

16   Q.  What was Mr. Roberts' role at Tyson?

17   A.  Vice-president of national accounts.

18   Q.  Did you interact with anyone at George's?

19   A.  Yes.

20   Q.  Who?

21   A.  Charles George.

22   Q.  What was Mr. George's role at George's?

23   A.  Co-CEO.

24   Q.  Did you interact with anyone at Case Farms?

25   A.  Yes.

Peter Suerken - Direct

1   *Q.*   Who?

2   *A.*   Kevin Phillips and Mitch Mitchell.

3   *Q.*   All right.  For this particular bidding process, did you

4   meet with any of the suppliers before you actually sent out the

5   requests for bids?

6   *A.*   We did.

7   *Q.*   When did those meetings take place?

8   *A.*   First week, second week of August, right in there.

9   *Q.*   And what was the purpose of these meetings?

10  *A.*   It was to set up the RFP to basically have a discussion

11  around we were going to market.  We were moving from a one-year

12  to three-year, answer any questions that people might have.

13  This was also the first time that I was heavily involved in the

14  process; therefore, it was kind of a meet-and-greet for me as

15  well.

16  *Q.*   What do you mean by "meet-and-greet"?

17  *A.*   It was the first time that I had spoken to some of the

18  participants within the RFP or gotten to know their companies.

19  *Q.*   And what was the purpose of getting to know them?

20  *A.*   Because chicken on the bone is incredibly important of

21  KFC's business.  You want to kind of know who you are doing

22  business with.

23  *Q.*   Did you meet with all seven of the suppliers?

24  *A.*   We did.

25  *Q.*   So I want to talk about a couple of those meetings in

Peter Suerken - Direct

1    particular.  Do you remember the meeting with Pilgrim's Pride?

2    *A.*  I do.

3    *Q.*  Who did you meet with?

4    *A.*  The first meeting was with Mr. Austin and maybe a couple

5    other people, but I can't remember who they were.

6    *Q.*  Do you know Mr. Austin?

7    *A.*  Yes.

8    *Q.*  Have you ever met face to face?

9    *A.*  Yes.

10   *Q.*  Would you be able to identify him if you saw him in the

11   courtroom today?

12        *MR. FELDBERG:*  We stipulate to identification, Your

13   Honor.

14        *THE COURT:*  Do you accept the stipulation, Ms. Wulff?

15        *MS. WULFF:*  Yes.

16   *BY MS. WULFF:*

17   *Q.*  Before this meeting, had you ever met Defendant Austin

18   before?

19   *A.*  Yes, ma'am.

20   *Q.*  What do you remember or do you remember anything about this

21   meeting?

22   *A.*  I do.

23   *Q.*  What do you remember about the meeting?

24   *A.*  That -- Mr. Austin's stance on prices.

25   *Q.*  What was Defendant Austin's stance on prices?

Peter Suerken - Direct

1   *A.*   That we were going to pay more and there was nothing we

2   could do about it.

3   *Q.*   That who was going to pay more?

4   *A.*   KFC.

5   *Q.*   Did he give you a reason for why KFC was going to pay more?

6   *A.*   Small birds were in decline, the market was going their

7   way, that they could charge what they wanted.  That was

8   basically the entire thought process.

9   *Q.*   What did you perceive Defendant Austin's confidence level

10  to be that prices were going to increase?

11          *MR. FELDBERG:*   Objection, calls for speculation.

12          *THE COURT:*   Sustained.  If you can lay foundation for

13  his perception.

14  *BY MS. WULFF:*

15  *Q.*   Sure.  Mr. Suerken, did Defendant Austin say anything to

16  you that indicated his confidence that Pilgrim's would be able

17  to achieve a price increase?

18  *A.*   Yes.

19  *Q.*   What did he say?

20  *A.*   The price was going to be what the price was going to be,

21  and it was going to be higher, period.  It was dictatorial.

22  There was not going to be any negotiation.

23  *Q.*   And how did he communicate that?

24  *A.*   That's what he said.

25  *Q.*   Do you recall how you responded to the presentation at the

Peter Suerken - Direct

1   time?

2   *A.*   I don't, ma'am.

3   *Q.*   Did you observe anything about the way Defendant Austin

4   communicated that message to you?

5   *A.*   I don't particularly remember anything about it other than

6   the message.

7   *Q.*   Do you recall anything about his tone of voice?

8   *A.*   It was just matter of fact.

9   *Q.*   Did you have a reaction to Defendant Austin and Pilgrim's

10   presentation?

11   *A.*   I remembered I was a bit stunned.  That was one of the

12   first times in my career I had ever had a supplier kind of tell

13   me what I was going to pay for a price and there was nothing I

14   could do about it.

15   *Q.*   Do you remember the meeting you had with Claxton before you

16   sent out the request for prices?

17   *A.*   I do.

18   *Q.*   Who did you meet with on behalf of Claxton?

19   *A.*   Mikell Fries and Scott Brady.

20   *Q.*   Had you ever met either of these men before?

21   *A.*   I don't believe so.

22   *Q.*   Do you know Defendant Fries?

23   *A.*   I do.

24   *Q.*   Have you met him face to face?

25   *A.*   Yes.

Peter Suerken - Direct

1    Q.  Would you be able to identify him if you saw him in the

2    courtroom?

3            MR. KORNFELD:  Your Honor, we will stipulate to the

4    ID.

5            MS. WULFF:  That's acceptable to the government.

6            THE COURT:  Go ahead.

7    BY MS. WULFF:

8    Q.  And perhaps -- well, same questions for Defendant Brady.

9    Do you know Defendant Brady?

10   A.  I do.

11           MR. LAVINE:  Your Honor, for the record, we will

12   stipulate that Mr. Suerken can identify Mr. Brady.

13           THE COURT:  Is that acceptable?

14           MS. WULFF:  That's acceptable.  Thank you, Mr. Lavine.

15           THE COURT:  Go ahead.

16   BY MS. WULFF:

17   Q.  Now, Mr. Suerken, do you recall anything about the meeting

18   with Claxton?

19   A.  Yes.

20   Q.  What do you recall?

21   A.  How they positioned their pricing.

22   Q.  How did they position their pricing?

23   A.  They essentially told us they didn't want to be the

24   highest, they didn't want to be the lowest.  They just wanted

25   to be up toward the top end of the pricing, above the middle.

Peter Suerken - Direct

1   *Q.* Did you have a reaction to that comment?

2   *A.* At the time, no, but in my head, yes.

3        *MR. KORNFELD:* Objection, Your Honor.  Objection to

4   the relevance of his reaction beyond at the time.

5        *MS. WULFF:* I believe he said he didn't have a

6   reaction but in his head he did, so maybe it's a question of

7   whether he reacted out loud or whether he thought he had a

8   reaction, Your Honor.

9        *THE COURT:* I am going to sustain the objection.  If

10  you can just clarify with the witness.

11  *BY MS. WULFF:*

12  *Q.* Mr. Suerken, what do you mean by the fact that you had a

13  reaction in your head?

14  *A.* I thought to myself that I had never had a supplier

15  basically base their price on somebody else's price not knowing

16  what the other price was.  That was an odd negotiation

17  strategy.

18  *Q.* What is your understanding that is an odd negotiation

19  strategy based on?

20  *A.* Because you would never set your price based off of a price

21  you didn't know.  Somebody could be doing something silly and

22  the price --

23        *MR. KORNFELD:* Objection, Your Honor.

24        *THE COURT:* Overruled.  Sorry, Mr. Kornfeld, I cut you

25  off.  Go ahead.

Peter Suerken - Direct

1          MR. KORNFELD:  It's non-responsive to the question

2    that was asked.

3          THE COURT:  Overruled.

4    BY MS. WULFF:

5    Q.  So Mr. Suerken, what is your understanding that is an odd

6    negotiation strategy based on?

7    A.  Because I have done this for many years, and I've never had

8    a supplier come in and tell me that they just wanted to be

9    towards the top, not the bottom.  They normally would quote a

10   price.

11   Q.  And why did that seem odd to you?

12   A.  Because I have never had that happen.

13   Q.  Do you have an understanding as to whether or not there is

14   a risk to this approach?

15   A.  It would be inherently very risky for the supplier.

16   Q.  How do you have that understanding?

17   A.  Because you're basing your price off of an unknown --

18          MR. KORNFELD:  Your Honor, I am sorry.  I am going to

19   object.  Now the witness is speculating from the perspective of

20   the supplier, and there is nothing in the record that he has

21   any experience on the supply side or that he knows Claxton's

22   internal strategies.

23          MS. PLETCHER:  I further object to anything prior to

24   2014.  The witness said that it was his first negotiations on

25   chicken.

Peter Suerken - Direct

1          *THE COURT:*  Ms. Pletcher's objections will be

2    overruled.  Mr. Kornfeld's objection will be sustained.

3          *MS. WULFF:*  A brief moment, Your Honor.

4          *THE COURT:*  Sure.

5          *MS. WULFF:*  Thank you, Your Honor.

6    *BY MS. WULFF:*

7    *Q.*  Mr. Suerken, what happened after the meetings with the

8    suppliers?

9    *A.*  We then sent out our RFP.

10   *Q.*  And do you recall anything about the first-round prices

11   that KFC got for the January 2015 contract?

12   *A.*  We as a group were stunned at how high they were.

13   *Q.*  Who do you mean by --

14   *A.*  RSCS.

15   *Q.*  -- the group?

16   *A.*  RSCS in general, our entire staff was taken aback by how

17   high the prices came back.

18   *Q.*  How did the prices compare to the prices that you were

19   expecting to see?

20   *A.*  Anywhere from 13 to 17 percent higher than what we were

21   expecting to see.

22   *Q.*  And were you expecting a price increase?

23   *A.*  Yes.

24   *Q.*  What kind of price increase were you expecting?

25   *A.*  2, 3, 4 percent.

1329

Peter Suerken - Direct

1    *Q.*  So why were you stunned?

2    *A.*  Because they came in anywhere from 14, 15, to 18, 19,

3    20 percent higher.

4    *Q.*  Higher than what you were expecting or percent higher --

5    *A.*  Percent higher bases the bid, bases the prior pricing.  We

6    thought that they would come in 2 to 3 to 4 percent.

7            *MR. KORNFELD:*  Objection, Your Honor.  There is not a

8    question pending.

9            *THE COURT:*  That's true.

10            Next question, Ms. Wulff.

11   *BY MS. WULFF:*

12   *Q.*  Based on your prior job at RSCS, did you have an awareness

13   of how this particular price increase compared to other price

14   increases for eight-piece chicken on the bone?

15            *MR. KORNFELD:*  Objection, Your Honor, foundation.  His

16   prior job at RSCS was not buying eight-piece COB.

17            *THE COURT:*  He can answer if he has awareness of that

18   before.

19   *BY MS. WULFF:*

20   *Q.*  Did you have an awareness of that, Mr. Suerken?

21   *A.*  Yes, ma'am.

22   *Q.*  And how do you have that awareness?

23   *A.*  I was the executive vice-president of food and packaging

24   procurement.  All of those eight-piece contracts crossed my

25   desk.

Peter Suerken - Direct

1    *Q.* So how did this price increase that you saw for the

2    January 2015 contract compare to other price increases that KFC

3    had seen in the past?

4    *A.* They had never seen one that high.

5    *Q.* Do you recall whether there was anyone at RSCS at the time

6    who had a different reaction to you to the first-round bid

7    prices?

8    *A.* I don't recall anyone having a different reaction.

9    *Q.* And you said the group was stunned?

10   *A.* Yes.

11   *Q.* Do you recall whether there was a specific line item on the

12   bids that was driving the suppliers' price increase?

13   *A.* I do.

14   *Q.* Which one?

15   *A.* Margin.

16   *Q.* What is margin, Mr. Suerken?

17   *A.* Profitability.

18        *MS. WULFF:* Your Honor, I can keep going, or if the

19   Court would like, this is a very convenient breaking point.

20        *THE COURT:* It's fine that we break at this time.

21        Ladies and gentlemen, we will go ahead and break for

22   lunch at this time. Let's plan on reconvening same time, 1:30.

23   Keep the admonitions in mind. Keep the yellow juror buttons

24   visible, if you would. The jury is excused for the lunch

25   break. Thank you.

 1        (Jury excused.)

 2            THE COURT:  We will be in recess until 1:30.

 3        (Recess at 12:00 p.m. until 1:33 p.m.)

 4            MR. LAVINE:  Can I take one minute of the Court's

 5    time?

 6            THE COURT:  Yes.

 7            MR. LAVINE:  Your Honor, I have run the numbers about

 8    four times over the lunch break, and I just don't see how I get

 9    Mr. Eddington on with any significant time, maybe 10 minutes if

10    I'm lucky.  And so I have talked to the government --

11            THE COURT:  Today.

12            MR. LAVINE:  Yeah, today, not later but today.  And I

13    would like the Court to consider us releasing him so he can get

14    an earlier flight instead of getting up at 3:00 o'clock in the

15    morning tomorrow morning to catch a flight.  I just don't think

16    it's --

17            THE COURT:  Obviously you can do whatever you want

18    because you are calling the witnesses, but I think what you're

19    suggesting, would you have another witness today?

20            MR. LAVINE:  No, I don't, but I ran the numbers when I

21    consider government counsel's continued direct and estimate on

22    cross-examinations and then redirect and then the documents

23    that they are going to publish, which takes time, and we have

24    a -- got a rule time, which isn't going to take that long, and

25    I still have 20 minutes at an opening.  I think I am right

Peter Suerken - Direct

1    about 5:00 o'clock.

2         THE COURT:  Ms. Wulff, any disagreement with some of

3    those projections?

4         MS. WULFF:  Sure, Your Honor.  The government was in

5    communication with Mr. Lavine over the lunch about the

6    estimates.  I think government counsel understands the

7    difficulties faced in scheduling witnesses, obviously, but we

8    are a bit frustrated at the prospect of potentially rest or

9    ending the day early today, especially when compounded with the

10   fact that defendants I believe do not have a full day of

11   witnesses tomorrow either.  They've been on notice now for, I

12   believe, over a month that the government will be resting by

13   today.  And they have, you know, somewhere between 30 to 40

14   people left on their witness list.  So we are sympathetic to

15   the problems of scheduling witnesses, but, of course, we are a

16   bit frustrated and concerned about efficient use of jury time

17   and the Court's time.

18        THE COURT:  Mr. Lavine, go ahead.

19        MR. LAVINE:  I just want to respond to one thing the

20   government said.  I don't think there is 30 to 40 people on

21   that witness list.  We cut down that witness list, and we

22   asterisk -- and we plan on filing another witness list

23   hopefully at the end of today after they rest, so I don't think

24   it's a matter that there is to be a laundry list of witnesses

25   they have to worry about.  It's a specific, finite number, I

Peter Suerken - Direct

1    think from the 27th to about the 30th, Your Honor, and then we

2    should be at the end.

3            THE COURT:  Okay.  Here is what I think we'll do.  I

4    think that -- my intuition is that Mr. Lavine is right and

5    Ms. Wulff did not disagree with his estimates.  I think to have

6    Mr. Eddington to come in for 20 minutes of testimony probably

7    does not make just a lot of sense given the fact that he is

8    trying to get out of town.  We'll find out at the end of the

9    day.  I do want to talk outside the presence of the jury about

10   what we anticipate will be the schedule tomorrow.  But it

11   sounds like my guess is we will probably have a half day, so

12   we'll see.

13           As we were talking about, and we can talk about this

14   more tomorrow, but in terms of letting the jury go early, you

15   know, I think that they will be concerned because they think by

16   virtue of being released early tomorrow, they have to add --

17   tack on another half day to the end, so because they have an

18   interest in being efficient too so they can finish their jury

19   duty, so that's why I wanted to talk tomorrow about what the

20   revised estimate will be, not that we have to give them a new

21   estimate, but I would like to be able to assure them that even

22   though we may not fill up tomorrow, that that is not going to

23   result in them having to be here longer than I told them about

24   the first day.

25           So I think that they are going to -- they won't be

Peter Suerken - Direct

1   worried as long as I can assure them that the trial is on track

2   to get wrapped up as scheduled at least.

3           Mr. Feldberg?

4           MR. FELDBERG:  Just one scheduling note, Your Honor.

5   If at some point it is possible to predict when the court day

6   will end tomorrow, I know we may do some nonjury things like

7   work on jury instructions, it would be helpful to people who

8   are trying to make plane reservations for tomorrow if we just

9   had an idea of when Your Honor anticipates ending the court

10  day.

11          THE COURT:  Well, I think that that ball is largely in

12  the defense court, so you would probably know best, okay?

13          MR. LAVINE:  Your Honor, I think I can represent on

14  behalf of all the defense, we are not coming close to the 14th.

15  I don't know how long the government is going to have for

16  rebuttal, but --

17          THE COURT:  My intuition is we are in great shape, and

18  we can tell the jury that don't worry, but I would like to talk

19  to you tomorrow, because, as you said, Mr. Lavine, I think you

20  had indicated to me that in terms of those witnesses on the

21  list who had asterisks, that by -- once the government rested,

22  you will then be able to take a look at the list and reassess

23  and have a -- perhaps a shortened witness list.

24          MR. LAVINE:  Yes, Your Honor, we plan on doing that

25  today.

Peter Suerken - Direct

1          THE COURT:  So we will know a little more, at least I

2     will and the government will, when we talk.  So I think we are

3     okay, and I am not going to require that you call Eddington

4     today.

5          MR. LAVINE:  Thank you, Your Honor.

6          THE COURT:  Then let's go ahead and bring Mr. Suerken

7     in, and let us get the jury.

8          (Jury present.)

9          THE COURT:  Ms. Wulff, go ahead when you are ready.

10          MS. WULFF:  Thank you, Your Honor.

11    BY MS. WULFF:

12    Q.  Good afternoon, Mr. Suerken.  Now, before the break, we

13    were talking about the first-round prices that KFC received for

14    the 2015 contracts.  Do you remember that?

15    A.  Yes, ma'am.

16    Q.  Did you all sign contracts at those first-round prices?

17    A.  We did not.

18    Q.  Why not?

19    A.  Because the first prices we saw, they were prenegotiated.

20    Q.  What do you mean by "prenegotiated"?

21    A.  We hadn't negotiated any of the prices yet.

22    Q.  So did you negotiate the prices?

23    A.  We did.

24    Q.  How did you do that?

25    A.  We placed the suppliers in competition with one another by

1336

Peter Suerken - Direct

1  comparing their costs and analyzing their RFPs and basically

2  gave them feedback of where they needed to improve in the hopes

3  of getting their prices lower.

4  Q.  Now, at this stage in the process, were there certain

5  suppliers who were more attractive to KFC than other?

6  A.  Yes.

7  Q.  Which ones?

8  A.  George's, for instance, was very attractive.

9  Q.  Were there any other suppliers who were particularly

10  attractive?

11  A.  Case Farms was attractive.  There was some -- the Tyson

12  offer was attractive because where it was located from a

13  geography standpoint.  But outside of that, not a lot else was

14  very attractive.

15  Q.  I am sorry, what was the last part?

16  A.  But after that, not a lot else was very attractive in the

17  first-round offers.

18  Q.  Did the difference between suppliers cause you to shift the

19  volume from some to others?

20  A.  Yes.

21  Q.  Who did you move volume away from?

22  A.  Pilgrim's Pride.

23  Q.  And who did you move it towards?

24  A.  George's, Case Farms, Tyson, and Koch Foods.

25  Q.  Why did you move volume in this particular direction?

1337

Peter Suerken - Direct

1    *A.*  Because it was an effort to lower our total costs.

2    *Q.*  Did the overall cost of the bids or the price of the bids

3    you received impact the way you allocated volume between the

4    suppliers?

5    *A.*  Yes.

6    *Q.*  How so?

7    *A.*  Because as we looked across and analyzed all the RFP

8    results and analyzed all the answers to our questions, some

9    offers were better than others and, therefore, were the offers

10   better via whether price, geography, or case weights, we

11   awarded them more business.

12   *Q.*  And did the size of the increase of these offers as

13   compared to the increase RSCS had been expecting factor into

14   the way you allocated volume between the suppliers?

15   *A.*  Yes.

16   *Q.*  How so?

17   *A.*  We were far more aggressive to save anywhere we could.

18   *Q.*  Why is that?

19   *A.*  Because we were taking such a huge increase, we were doing

20   anything we could to save a penny.

21   *Q.*  Now, do you have an awareness of whether your approach to

22   awarding volume between the suppliers was the same or different

23   to that of your predecessor, Mr. Ledford?

24   *A.*  Slightly different.

25   *Q.*  And how do you know what his approach was?

Peter Suerken - Direct

1    *A.*  He was more concerned with pricing uniformity, and I was

2    more concerned with getting to the lowest total price.

3    *Q.*  Do you know why you used a different approach than he did?

4    *A.*  Yes.

5    *Q.*  And how do you know that?

6    *A.*  Because we were taking a massive hit, and the way my team

7    would look at things would have been slightly different.

8           *MS. PLETCHER:*  Speculation, Your Honor.

9           *THE COURT:*  Overruled.

10   *A.*  The way my team would look at things would be different

11   than the poultry had previously.

12   *BY MS. WULFF:*

13   *Q.*  Did your background influence the way you looked at the

14   allocation of volume between suppliers?

15   *A.*  Yes, ma'am.

16   *Q.*  How so?

17   *A.*  We utilized complicated software to look at the allocation

18   methodology to take into account multiple variables so that we

19   didn't pay -- so we awarded the business at the most optimal

20   points in time, and that was one of the first times -- it was

21   the first time that the company ever used software on that

22   specific category.

23   *Q.*  I believe you said you had a background in supply chain.

24   *A.*  Yes, ma'am.

25   *Q.*  Are you aware of whether this was -- whether Mr. Ledford

Peter Suerken - Direct

1  had that type of background?

2  A.  Yes.

3  Q.  Did he?

4  A.  He did not.

5  Q.  Who was the biggest supplier by volume to KFC?  Excuse me,

6  who was the biggest supplier by volume to KFC before the 2015

7  contract?

8  A.  Pilgrim's Pride.

9  Q.  And who was the biggest supplier by volume during the 2015

10  contract?

11  A.  Pilgrim's Pride.

12  Q.  Mr. Suerken, how does -- what does it mean to have a

13  background in supply chain?  Can you describe how your

14  background impacted your analysis of the bids?

15  A.  I looked at the --

16        MR. KORNFELD:  Objection, Your Honor, calls for 701,

17  702-type evidence.

18        THE COURT:  Overruled.

19  A.  I would have looked at far more factors, including the

20  freight lanes, the logistics, and tried to put as many

21  variables in as I could outside of the -- just the actual price

22  of the chicken.  I would have looked at freight rates between

23  DCs, freights rates to get to the mills.  I would have looked

24  at all those things at one point in time.

25  BY MS. WULFF:

Peter Suerken - Direct

1   Q.  What are freight rates between DCs?

2   A.  What it costs to ship chicken to the distribution center

3   and what it would cost to have chicken shipped out of that

4   distribution center to the stores.

5   Q.  And why is that relevant to the determination of how much

6   volume to award to each supplier?

7   A.  Because ultimately it allows you to get to the -- get the

8   store the lowest landed cost possible and, therefore, lowering

9   the total cost that the system would have to pay for chicken.

10  Q.  Again, what is landed cost?

11  A.  Chicken delivered to the store.

12  Q.  Now, after the company submitted their initial bids, did

13  you have any meetings either in person or on the phone with

14  people from Pilgrim's?

15  A.  Yes, ma'am.

16  Q.  How many meetings did you have?

17  A.  Three.

18  Q.  Let's start with the first one.

19       MS. WULFF:  So, Mr. Dunn, if you could pull up for the

20  Court, the parties, and the witness Exhibit 1060.  And we can

21  zoom in on the top.

22       With the Court's permission, may I approach with

23  binders?

24       THE COURT:  You may.

25  BY MS. WULFF:

Peter Suerken - Direct

1  Q.  Mr. Suerken, you can look at either the screen in front of

2  you or the hard-copy binder.  Do you recognize this document?

3  A.  I do.

4  Q.  What is it?

5  A.  It is a meeting request or notification that went out from

6  my e-mail box -- e-mail inbox to the RSCS staff as well as the

7  Pilgrim's Pride -- several people at Pilgrim's Pride.

8          MS. WULFF:  The government moves to admit and publish

9  Exhibit 1060.

10         THE COURT:  Any objection to the admission of

11  Exhibit 1060?

12         Exhibit 1060 will be admitted and may be published.

13         MS. WULFF:  Thank you, Your Honor.

14  BY MS. WULFF:

15  Q.  So, Mr. Suerken, who sent out this calendar invite?

16  A.  It would have either been me or my administrative assistant

17  coming out of my Outlook inbox.

18  Q.  And who were the people that were invited to the meeting?

19  A.  It looks like the RSCS staff, as well as multiple people

20  from Pilgrim's Pride.

21  Q.  Was Defendant Austin invited to the meeting?

22  A.  Yes, ma'am.

23  Q.  Was Robbie Bryant invited to the meeting?

24  A.  Yes, ma'am.

25  Q.  What day was the meeting scheduled for?

1342

Peter Suerken - Direct

1    *A.*  August 22nd.

2    *Q.*  We are talking about the year 2014?

3    *A.*  Yes.

4    *Q.*  And what was the purpose of setting this meeting?

5    *A.*  To discuss their RFP, their offer.

6    *Q.*  Do you recall anything about this meeting in particular?

7    *A.*  How many people that they brought.

8    *Q.*  How many people did Pilgrim's bring?

9    *A.*  It was quite a few.  I don't remember the exact number.  It

10  was just a large contingent.

11    *Q.*  How did that compare to other meetings like this?

12    *A.*  No one else brought that many people.

13    *Q.*  And what meaning did you attribute to the fact that

14  Pilgrim's brought so many people?

15        *MR. FELDBERG:*  Objection, calls for speculation.

16        *THE COURT:*  Overruled.

17    *A.*  It's typically a negotiation tactic.

18  *BY MS. WULFF:*

19    *Q.*  Can you explain what kind of negotiation tactic that is?

20    *A.*  The more people you bring, the more leverage you have in

21  the room.  You control the conversation the more people you

22  have.

23    *Q.*  What message did Pilgrim's deliver to RSCS at this meeting?

24    *A.*  That their offer was what it was in the RFP and that they

25  wouldn't be changing price.

Peter Suerken - Direct

1          MS. WULFF:  Mr. Dunn, you can take down this exhibit.

2    BY MS. WULFF:

3    Q.  So, Mr. Suerken, I want to talk about the second

4    conversation you had with someone from Pilgrim's during the

5    bidding process.  What was that?

6    A.  That was a meeting that took place with Roger Austin,

7    myself, and Todd Imhoff.

8    Q.  Was that meeting the final meeting you had with Pilgrim's?

9    A.  No, ma'am.  There was a second meeting -- I apologize.

10   There was a second meeting, a phone conversation that took

11   place.

12   Q.  Who was that phone conversation with?

13   A.  Bill Lovette and Steve McCormick and myself.

14   Q.  Who was Bill Lovette?

15   A.  President and CEO of Pilgrim's Pride at the time.

16   Q.  Do you know Defendant Lovette?

17   A.  I do.

18   Q.  Have you ever met face to face?

19   A.  Yes.

20   Q.  Would you be able to identify him if you saw him in the

21   courtroom?

22   A.  I would.

23        MS. NIELSEN:  Your Honor, we would stipulate to the

24   identification of Mr. Lovette.

25        THE COURT:  Do you accept the stipulation?

Peter Suerken - Direct

1          *MS. WULFF:*  That's acceptable, Your Honor.

2          *THE COURT:*  Go ahead.

3     *BY MS. WULFF:*

4     *Q.*  And I believe you said that the telephone call also

5     involved someone named Steve McCormick?

6     *A.*  Yes, ma'am.

7     *Q.*  Who is Mr. McCormick?

8     *A.*  President of RSCS.

9     *Q.*  And do you know approximately how close in time this call

10    was to the meeting we just looked at in Exhibit 1060?

11    *A.*  I don't recall, ma'am.

12    *Q.*  Now, how did this call come about?

13    *A.*  Mr. McCormick was frustrated and upset with the pricing

14    that Pilgrim's had turned in and wanted to have a conversation

15    with Mr. Lovette regarding the price.

16    *Q.*  Now, what was the reporting relationship between you and

17    Mr. McCormick?

18    *A.*  He was two levels above me.

19    *Q.*  And in your experience, how common was it for Mr. McCormick

20    to be involved in the actual bidding process for the supply of

21    any product?

22    *A.*  It had never happened.

23    *Q.*  Do you know why he wanted to participate in this particular

24    call?

25    *A.*  Because of what the price that Pilgrim's was asking and

                                                                          1345
                         Peter Suerken - Direct

 1  what he believed would be the effect on the KFC restaurants.

 2  Q.  And do you know why Mr. McCormick wanted to talk to

 3  Defendant Lovette in particular as to someone else at

 4  Pilgrim's?

 5  A.  Mr. Lovette was the decision-maker.

 6  Q.  How do you know that?

 7  A.  Roger Austin stated that.

 8  Q.  And what happened on the phone call?

 9  A.  Mr. McCormick told Mr. Lovette about our situation and what

10  he thought prices would ultimately do to our stores.

11  Mr. Lovette told him about the small-bird/big-bird margin,

12  margins, and then reiterated that they wouldn't be changing

13  price.

14  Q.  Okay.  There is a couple things you said there.  You said

15  Defendant Lovette -- or, excuse me, Mr. McCormick told you

16  about what that price increase would do to our stores.  What do

17  you mean by that?

18  A.  Given that chicken on the bone was 40 to 50 percent of the

19  cost of running a KFC, a huge increase of 15 to 20 percent, in

20  their case 18 to 19 percent, would possibly put stores -- could

21  and did or would put stores out of business.

22  Q.  And you mentioned that Defendant Lovette talked about the

23  small-bird/big-bird -- I don't remember your exact word, but

24  the small-bird/big-bird --

25  A.  Dilemma.

Peter Suerken - Direct

1   Q.   What does that mean?

2   A.   To that point in time, larger birds had better margins and,

3   therefore -- and small birds didn't have the margins of large

4   birds, so, therefore, they lost the production across the

5   industry of small birds.  He indicated in order for him to

6   continue to grow small birds, he would have to have an increase

7   in margin structure.

8   Q.   Were you aware of that small-bird/big-bird dilemma?

9   A.   Yes, ma'am.

10  Q.   How were you aware of it?

11  A.   It was common knowledge throughout the industry.

12  Q.   Do you have a basis to know whether the margin increase

13  that the suppliers proposed for the 2015 contracts was

14  proportionate to the small-bird/big-bird dilemma or the size of

15  the small-bird/big-bird dilemma?

16       MS. NIELSEN:  Objection, Your Honor, calls for expert

17  testimony.

18       MR. KORNFELD:  Also foundation, Your Honor.

19       THE COURT:  I am going to sustain the objection.  If

20  you can lay foundation.

21       MS. WULFF:  I believe I asked if he had a basis to

22  know, Your Honor.  I think that was the question pending.

23       THE COURT:  Why don't you pose that question again,

24  then.

25  BY MS. WULFF:

Peter Suerken - Direct

1    Q.  Mr. Suerken, do you have a basis to know whether the margin

2    increase that the suppliers proposed for the 2015 contracts was

3    proportionate to the small-bird/big-bird dilemma or the size, I

4    should say, of the small-bird/big-bird dilemma?

5           MS. NIELSEN:  Your Honor, I would renew my objection.

6           THE COURT:  Overruled.

7    A.  I didn't think it was proportionate.

8    BY MS. WULFF:

9    Q.  What is that based on?

10          MR. KORNFELD:  Objection, Your Honor.  He still hasn't

11   foundation.  He hasn't said what the basis of that knowledge

12   is.  He just jumped to the conclusion.

13          THE COURT:  Ms. Wulff just asked him that question.

14   Overruled.

15   BY MS. WULFF:

16   Q.  What was that based on, Mr. Suerken?

17   A.  What we were being told was that large birds had X margin,

18   and I can't remember exactly what it was, and that smaller

19   birds had Y margin, and if you just looked at the two and the

20   relative risk of growing a large bird to a small bird and

21   compared all of it, that increase wasn't justified.

22   Q.  Now, before the break, you talked about the fact that RSCS

23   was expecting a price increase for this 2015 contract.  Do you

24   recall that?

25   A.  Yes, ma'am.

Peter Suerken - Direct

1    *Q.*  And had RSCS taken into account the small-bird/big-bird

2    dilemma in projecting the size of the increase it was expecting

3    for the 2015 contract?

4    *A.*  We did.

5    *Q.*  I believe you also said that Defendant Lovette said that

6    Pilgrim's would not be changing its bid price?

7    *A.*  That's correct.

8    *Q.*  And do you recall what he said about that?

9    *A.*  He just said that they weren't going to negotiate their

10   price.

11   *Q.*  Do you recall how Mr. McCormick responded to this

12   conversation?

13          *MS. NIELSEN:*  Objection, hearsay.

14          *THE COURT:*  Sustained.

15   *BY MS. WULFF:*

16   *Q.*  Mr. Suerken, what was your reaction to Defendant Lovette's

17   comments?

18   *A.*  I knew that was coming.

19   *Q.*  I'm sorry?

20   *A.*  I didn't expect him to change his price.  I knew it was

21   coming.

22   *Q.*  I see.  And why didn't you expect him to change his price?

23   *A.*  We had already made all of those arguments and negotiated

24   all those points.  No additional conversation was going to

25   change.

Peter Suerken - Direct

1   Q.   Who is the "we" -- you said we had already made all

2   those --

3   A.   Myself and the RSCS staff with Roger and the Pilgrim's

4   group.

5   Q.   And so you weren't expecting that your boss could make any

6   incremental difference?

7   A.   No.

8   Q.   Based on your conversation with Defendant Lovette and

9   Mr. McCormick, did you understand that Defendant Lovette was

10  informed about Pilgrim's bidding process for KFC?

11  A.   Yes, he was.

12  Q.   How do you know that?

13  A.   He knew all the details of the RFP.

14  Q.   Okay.  And I believe you were about to go into it, but

15  let's talk about the third meeting you had with people from

16  Pilgrim's during the bidding process.  Who was that meeting

17  with?

18  A.   Todd Imhoff and Roger Austin.

19  Q.   Who is Mr. Imhoff?

20  A.   The chief procurement officer at the time at RSCS and my

21  boss.

22  Q.   So Mr. McCormick is two levels above you, and Mr. Imhoff

23  was one level above you?

24  A.   Yes, ma'am.

25  Q.   And what was this meeting with Mr. Austin, you, and

Peter Suerken - Direct

1    Mr. Imhoff?

2    A.   It was a meeting to discuss their offer.

3    Q.   Who is "their" in that sentence?

4    A.   Pilgrim's Pride's offer.

5    Q.   Where did the meeting take place?

6    A.   Mama's Barbecue in Louisville, Kentucky.

7    Q.   Why did you pick Mama's Barbecue?

8    A.   Because I like barbecue and they have good barbecue.

9    Q.   Whose idea was it to meet over lunch?

10   A.   It probably would have been mine.

11   Q.   Why did you bring Mr. Imhoff with you to the meeting?

12   A.   He was responsible for the category, as well as I.

13   Q.   And what did you three discuss over lunch?

14   A.   We discussed the Pilgrim's Pride pricing offer, and if they

15   weren't going to move, what our actions would be.

16   Q.   And was Pilgrim's Pride going to move their offer?

17   A.   They had no intention of.

18   Q.   What do you mean by "move their offer"?

19   A.   Change their price.

20   Q.   In what direction?

21   A.   Lower their price.

22   Q.   And you said if Pilgrim's Pride wasn't going to move their

23   offer, you were going to discuss what RSCS's reaction was?

24   A.   Yes, ma'am.

25   Q.   And what was RSCS's reaction?

Peter Suerken - Direct

1    A.   We were going to pull 20 truckloads of chicken meaning

2    lower their allocation from 100 truckloads a week to

3    80 truckloads a week.

4    Q.   And why did you make the decision to pull 20 truckloads of

5    chicken from Pilgrim's Pride?

6    A.   Twofold.  It was going to save the system money, and the

7    thought process was if we could take 20 loads away, maybe they

8    would lower their price on the rest.

9    Q.   Was the decision to take 20 truckloads of chicken away from

10   Pilgrim's Pride related to the analysis you discussed a moment

11   ago?

12   A.   Yes, ma'am.

13   Q.   How did Defendant Austin react to this conversation?

14   A.   He was upset.

15   Q.   How do you know he was upset?

16   A.   His voice changed.  He became agitated.  He raised his

17   voice.  He was obviously aggravated with that.

18   Q.   Did he say anything in response?

19   A.   He did.

20   Q.   What did he say?

21   A.   He told us that we were going to run KFC out of chicken,

22   that we didn't know what we were doing, that he knew where all

23   the loads were, and that there was no possible way that we

24   could have backfilled those 20 loads.

25   Q.   Okay.  There is a couple things there I want to have you

Peter Suerken - Direct

1   explain.  What did you understand Defendant Austin to mean when

2   he said you were going to run KFC out of chicken?

3   A.  That by removing 20 truckloads of chicken from Pilgrim's

4   Pride, we would not be able to buy 20 truckloads of chicken

5   somewhere else in the marketplace per week.

6   Q.  What does that mean?

7   A.  It means that we needed 200 truckloads of chicken, and if

8   we took 20 from him, we would only have 180, and we would have

9   to shut down stores because we would be less 20 truckloads of

10  chicken that week every week for the next three years.

11  Q.  And then I believe you said that Defendant Austin said he

12  knew where all the loads were.  What did you understand that

13  comment to mean?

14  A.  That somehow, some way, he knew what my other offers were,

15  the volume from other suppliers and their offers.

16  Q.  And did Defendant Austin tell you how he knew that?

17  A.  No, ma'am.

18  Q.  What effect -- excuse me.

19      MS. WULFF:  I am sorry, Your Honor.

20  BY MS. WULFF:

21  Q.  If RSCS didn't buy those 20 truckloads of chicken from

22  Pilgrim's, do you know what that meant for Pilgrim's?

23      MS. PLETCHER:  Objection, calls for speculation.

24      THE COURT:  He can answer it yes or no.  Overruled.

25  A.  They would have had to have found another customer for --

Peter Suerken - Direct

 1          MS. NIELSEN:  Your Honor, objection.

 2          THE COURT:  Sustained.

 3   A.  Please repeat the question, ma'am.

 4   BY MS. WULFF:

 5   Q.  Do you know what it would mean for Pilgrim's or how --

 6   excuse me.  Let me ask a better question.

 7          Do you know how it would impact Pilgrim's if KFC

 8   reduced the amount of truckloads it bought from Pilgrim's by

 9   20 truckloads a week?

10          MS. NIELSEN:  Objection, foundation.

11          THE COURT:  Sustained.

12   A.  Yes.

13          THE COURT:  Mr. Suerken, if an objection is sustained,

14   you can't answer it, so, ladies and gentlemen, you should

15   disregard the last answer.

16          New question, Ms. Wulff.

17   BY MS. WULFF:

18   Q.  What effect did you expect that taking loads away from

19   Pilgrim's would have on their price?

20          MS. NIELSEN:  Objection, foundation.

21          THE COURT:  Overruled.

22   A.  I thought that they would lower their price.

23   BY MS. WULFF:

24   Q.  And did it have that effect?

25   A.  No, ma'am.

Peter Suerken - Direct

1  *Q.*  Mr. Suerken, what was your reaction to this conversation

2  with Defendant Austin?

3  *A.*  I was shocked, stunned.

4  *Q.*  Can you explain what you mean by that?

5  *A.*  I had never had a supplier tell me that they knew where all

6  our offers were, all our volumes were.  Basically I never had a

7  supplier sit in front of me and say that.

8  *Q.*  All right.  Moving on to meetings with other suppliers, did

9  you also meet with anyone from Mar-Jac at this stage of the

10  bidding process?

11  *A.*  Yes, ma'am.

12  *Q.*  And I'm going to show you a document at this time for the

13  Court, the counsel, and the witness, Exhibit 9992.

14       *MS. WULFF:*  Mr. Dunn, if you could zoom in on the top

15  so we can actually read it.

16  BY MS. WULFF:

17  *Q.*  Mr. Suerken, do you recognize this document?

18  *A.*  I do.

19  *Q.*  What is it?

20  *A.*  It's a calendar invite coming from me going out to -- for a

21  meeting with Mar-Jac at RSCS on the 27th of August, 2014.

22       *MS. WULFF:*  At this time, the government moves to

23  admit and publish Government's Exhibit 9992.

24       *THE COURT:*  Any objection to the admission of

25  Exhibit 9992?

Peter Suerken - Direct

1        Exhibit 9992 will be admitted.

2   *BY MS. WULFF:*

3   *Q.*  Mr. Suerken, what was the purpose of this meeting?

4   *A.*  To discuss their offer.

5   *Q.*  Whose offer?

6   *A.*  Mar-Jac's chicken-on-the-bone offer to KFC.

7   *Q.*  Who attended the meeting -- do you recall who attended the

8   meeting on behalf of Mar-Jac?

9   *A.*  Pete Martin and Greg Tench.

10  *Q.*  And what is Mr. Martin's role?

11  *A.*  President and CEO.

12  *Q.*  What was Greg Tench's role?

13  *A.*  Sales.

14  *Q.*  What did you discuss at the meeting?

15  *A.*  Their offer and price to KFC.

16  *Q.*  What was KFC willing to -- hoping to achieve -- oh, and I

17  am sorry.  It doesn't look like --

18          *MS. WULFF:*  Did I ask to publish it, Your Honor?

19          *THE COURT:*  You did not.

20          *MS. WULFF:*  I am sorry.  The government requests to

21  admit and publish Exhibit 9992.

22          *THE COURT:*  You may.

23  *BY MS. WULFF:*

24  *Q.*  What was RSCS hoping to achieve at this meeting?

25  *A.*  The hope was to get a lower price from them.

Peter Suerken - Direct

1    Q.  Did you achieve that goal?

2    A.  I don't believe so, ma'am.

3    Q.  I am so sorry.  I didn't hear.

4    A.  I do not believe so.

5    Q.  Thank you.

6          MS. WULFF:  We can take down Exhibit 9992.

7    BY MS. WULFF:

8    Q.  Did you have any meetings with Tyson as part of the ongoing

9    bidding process?

10   A.  Yes, ma'am.

11   Q.  Who did you meet with?

12   A.  Brian Roberts.

13   Q.  What was Mr. Roberts' role at Tyson?

14   A.  Vice-president of national accounts.

15   Q.  Do you recall Tyson's position with regard to their bid

16   during this process?

17   A.  To the first part of the process, they weren't willing to

18   give on price.

19   Q.  Did they eventually give on price?

20   A.  A little bit in exchange for some more volume.

21   Q.  Did you consider the reduction that Tyson offered to be

22   significant to KFC?

23   A.  No, no, ma'am.

24   Q.  Why not?

25   A.  It was nominal.

Peter Suerken - Direct

1  Q.  Now, after all these meetings we just discussed, were you

2  able to achieve any significant reduction in prices for the

3  2015 contract for KFC?

4  A.  No, ma'am.

5  Q.  And how did the price for the contract that began

6  January 20, 2015 compare to the prices that had been in place

7  under the prior contract?

8  A.  Anywhere from 11 to 17, 18 percent higher, I believe.

9  Q.  Was that true for all the suppliers?

10 A.  They would have all fallen in that range.

11 Q.  And are you aware of how this price increase for the

12 January 2015 contract compared to other price changes in

13 year-over-year contracts to KFC for chicken on the bone?

14 A.  Yes.

15 Q.  How are you aware?

16 A.  KFC operators who had been operating stores for 20, 30, 40

17 years insured us that we knew exactly what that price was.

18 Q.  And how did that price increase compare?

19 A.  It was the highest they had ever seen.

20 Q.  At that time, what was your reaction to the contract prices

21 starting 2015?

22 A.  It was the worst RFP I had ever run.

23 Q.  What makes you say that?

24 A.  I had never had an RFP with that type of an increase in the

25 history of my career.  I was disappointed.

Peter Suerken - Direct

1   Q.  We've spent a lot of time talking about the contracts that

2   started in January 2015.  When did those contracts end?

3   A.  December 31st, 2017.

4   Q.  And so when did the next contract start?

5   A.  It would have been January 1st, 2018.

6   Q.  Did you have any role in the bidding process for the

7   contracts starting January 2018?

8   A.  Very limited.

9   Q.  Can you remind the jury why not?

10  A.  I was relieved of my duties in February of 2017.

11  Q.  Did you start the bidding process for the January 2018

12  contract before you left KFC?

13  A.  We had started the process, yes, ma'am.

14  Q.  And did you start the process for the January 2018 contract

15  earlier than you started the bidding process for the

16  January 2015 contract?

17  A.  Yes.

18  Q.  Why?

19  A.  Because we felt like that the marketplace had changed.

20  There was no truckloads available.  There was additional

21  participants within the marketplace.  There were things going

22  on that the market felt looser meaning that there was more

23  loads, meaning that you would have more competition, more

24  leverage and could possibly get lower prices.

25  Q.  Do you know what were the things that contributed to the

1359

Peter Suerken - Direct

1   additional loads available for the January 2018 contract?

2   A.  My belief was that we restored profitability to the

3   eight-piece chicken-on-the-bone marketplace.

4   Q.  Do you know whether there were additional suppliers in

5   place?

6   A.  I don't recall.

7   Q.  What was your goal for the bidding process for the

8   contracts starting -- or what was KFC's goal for the bidding

9   process for the contract that would start January 2018?

10  A.  Get a lower price.

11  Q.  As compared to what?

12  A.  Than we were paying.

13  Q.  Did KFC communicate that goal to its suppliers?

14  A.  I don't remember a lot from that year.  I was let go in

15  February and didn't see the process through, ma'am.

16       MS. WULFF:  And at this time if we could pull up

17  Exhibit 1801 for the Court, counsel, and the parties.

18  BY MS. WULFF:

19  Q.  Mr. Suerken, do you recognize this document?

20  A.  Yes, ma'am.

21  Q.  What is it?

22  A.  It is an e-mail that I sent out to the chicken-on-the-bone

23  suppliers the 17th of February, 2017.

24       MS. WULFF:  The government moves to admit and publish

25  Exhibit 1801.

Peter Suerken - Direct

1      THE COURT:  Any objection to the admission of Exhibit

2  1801?

3           1801 will be admitted.

4      MS. WULFF:  Thank you.

5           May it also be published, Your Honor?

6      THE COURT:  Yes, you may.

7      MS. WULFF:  Mr. Dunn, could we call out the header in

8  the first paragraph?  Thank you.

9  BY MS. WULFF:

10  Q.  Mr. Suerken, what is the date of this e-mail?

11  A.  February 17, 2017.

12  Q.  Who is copied on the e-mail?

13  A.  Looks like the RSCS staff and a couple people from Yum

14  Brands/KFC.

15  Q.  Who is in the salutation line for this e-mail?

16  A.  Chicken-on-the-bone suppliers.

17  Q.  Are any of the chicken-on-the-bone suppliers in the cc

18  line?

19  A.  No, ma'am.

20  Q.  Do you know how they received this e-mail?

21  A.  Yes.

22  Q.  How?

23  A.  I would have put them on the BCC.  They would have blind

24  carbon copy.

25  Q.  Why did you blind carbon copy the suppliers?

Peter Suerken - Direct

1   A.  Because we were placing the suppliers in competition with

2   one another.

3   Q.  Now, the second -- can you read the second-to-the-last

4   sentence of the first paragraph?  It starts with "so that

5   everyone."

6   A.  So that everyone is aware we have bought some loads in our

7   initial meetings.  The offers we bought were fair and

8   reasonable and were consistent with our goals of building on

9   our partnership together via quality and reinvestment back in

10  small-bird production.

11  Q.  What did you mean by that sentence?

12  A.  It means that we had bought some truckloads of chicken from

13  incumbent suppliers because we thought the price was fair.

14  Q.  Why did you tell the suppliers that you had already bought

15  some initial loads?

16  A.  Because we were serious that we were going to market early,

17  and I wanted them to know that we were indeed buying and that

18  they needed to get their prices as good as they possibly could.

19  Q.  I am sorry, you wanted them to know you were what, in deep

20  buying?

21  A.  That we were already in the marketplace buying, and they

22  needed to get their prices as good as possible as quickly as

23  possible because we were already tieing up loads.

24  Q.  And did you hope that this would -- or what was your goal

25  of communicating that information to the suppliers?

Peter Suerken - Direct

1    A.   To be fair and honest so they knew what we were doing.

2    Q.   Did you hope that it would have an effect on the prices

3    they submitted for the 2018 contracts?

4    A.   I had hoped that they were going to bring us better prices,

5    yes.

6         MS. WULFF:   We can take down this document.

7    BY MS. WULFF:

8    Q.   Mr. Suerken, just a few more questions before I close.  At

9    this time again between 2014 and 2017, did KFC have restaurants

10   in all 50 states?

11   A.   Yes, ma'am.

12   Q.   And where did chicken sold at a KFC in Colorado come from?

13   A.   It could have come from multiple states.

14   Q.   Did it come from anywhere outside the State of Colorado?

15   A.   It would have had to come from outside the State of

16   Colorado.

17   Q.   Why do you say that?

18   A.   There was no production facilities in Colorado.

19   Q.   At any point in your career at RSCS, did you ever tell a

20   chicken supplier to share its bids with another chicken

21   supplier?

22   A.   No, ma'am.

23   Q.   At either point -- at any point during either of the

24   bidding processes for the 2015 or the 2018 contract, did any

25   chicken supplier tell you that it was sharing its bids with

Peter Suerken - Direct

1    another chicken supplier?

2            *MR. KORNFELD:*  Objection, Your Honor, relevance, and

3    this issue has been addressed in the Court's prior ruling.

4            *THE COURT:*  Overruled.

5    *A.*  Could you repeat the question, ma'am?

6    *BY MS. WULFF:*

7    *Q.*  Mr. Suerken, at any point during the bidding processes for

8    either of the 2015 or 2018 contracts, did any chicken supplier

9    tell you that it was sharing its bids with another chicken

10   supplier?

11   *A.*  No, ma'am.

12   *Q.*  At any point during the bidding process for either the 2015

13   or 2018 contract, did any chicken supplier tell you it was

14   coordinating bid strategies with another chicken supplier

15   before submitting its final bid?

16   *A.*  No, ma'am.

17           *MS. WULFF:*  One moment, Your Honor.

18           *THE COURT:*  Sure.

19   *BY MS. WULFF:*

20   *Q.*  Mr. Suerken, at any point in your career at RSCS, did any

21   chicken supplier ever tell you it was sharing its bids with

22   another chicken supplier?

23   *A.*  No, ma'am.

24           *MS. WULFF:*  No further questions, Your Honor.

25           *THE COURT:*  Thank you.

Peter Suerken - Cross

1        Cross-examination?  Ms. Nielsen?

2            MS. NIELSEN:  Thank you, Your Honor.

3                         **CROSS-EXAMINATION**

4    BY MS. NIELSEN:

5    Q.  Good afternoon, Mr. Suerken.  My name is Dru Nielsen.  I

6    represent Bill Lovette.

7            Let's talk about the timing of when the government

8    first contacted you about this case.  The first time that

9    federal agents spoke with you was in March of 2021, correct?

10   A.  Yes, ma'am.

11   Q.  And when you talked to federal agents that first time, you

12   were already aware that an Indictment had been filed, correct?

13           MS. WULFF:  Objection, Your Honor, relevance.

14           MS. NIELSEN:  Your Honor, it goes to the timing of the

15   investigation and whether he was interviewed prior.

16           THE COURT:  Overruled.  He can answer.

17   A.  Could you repeat the question, ma'am?

18   BY MS. NIELSEN:

19   Q.  Sure.  That first time that you were contacted by anyone at

20   the government, you were already aware that an Indictment had

21   been filed, correct?

22   A.  Yes, ma'am.

23   Q.  Now, when the federal agents interviewed you that very

24   first time in March of 2021, the agents wanted to talk to you

25   about the price increases in the 2014 time frame, correct?

Peter Suerken - Cross

1  A.  Yes, ma'am.

2  Q.  Okay.  And to set some parameters for my questions, all of

3  my questions are what you knew at the time in the 2014, 2015

4  time frame, okay?

5  A.  Yes, ma'am.

6  Q.  Now, let's talk about what was going in the market back in

7  2014, okay?

8  A.  Yes, ma'am.

9  Q.  Great.  First let's talk about the economics of small bird

10  versus big bird, okay?

11  A.  Yes, ma'am.

12  Q.  In 2014, there was a shortage of small bird, correct?

13  A.  We ran out of small bird, yes.

14  Q.  Okay.  So putting yourself back in the 2014 time period, if

15  you were a chicken supplier, you wouldn't have been in the

16  small-bird business at that time.

17  A.  Probably wouldn't have been.

18       MS. WULFF:  Objection, Your Honor, speculation,

19  foundation, calls for 701, calls for speculation.

20       THE COURT:  Overruled.  He can answer.

21  BY MS. NIELSEN:

22  Q.  Do you want me to repeat that question?

23  A.  Please.

24  Q.  So putting you back into the 2014 time period, if you were

25  a chicken supplier, you wouldn't have been in the small-bird

Peter Suerken - Cross

1    business at that time.

2    A.  No, ma'am, I would not have.

3    Q.  You wouldn't have been in the small-bird business because

4    of the economics of big bird versus small bird, correct?

5    A.  Yes, ma'am.

6    Q.  If you were a chicken supplier producing small bird back in

7    2014, you would have converted your plant to big bird.

8    A.  Yes, ma'am.

9    Q.  Now, one of the reasons why you would have converted to big

10   bird is that the margin, the profit for big bird was much

11   higher than on small bird.

12   A.  Yes, ma'am.

13   Q.  And during this 2014 time period, small-bird plants were,

14   in fact, being converted to big-bird plants, correct?

15   A.  There had been a few, yes.

16   Q.  And your belief at the time was that big birds would

17   continue to become more profitable for suppliers.

18   A.  Yes, ma'am.

19   Q.  And your belief at the time was that the small-bird supply

20   would continue to become tighter.

21   A.  Yes.

22   Q.  Okay.  So in 2014, you understood that a change needed to

23   happen in small-bird pricing just to remain competitive with

24   big bird, correct?

25   A.  Yes, ma'am.

1367
Peter Suerken - Cross

1    Q.  So in 2014 for the reasons we just discussed, you expected

2    an increase in price for small-bird chicken.

3    A.  I did.

4    Q.  In fact, you went into the negotiations in 2014 for those

5    2015 contracts knowing that RSCS was going to take a beating on

6    the price of small bird.

7    A.  Yes, ma'am.

8    Q.  And the low supply of small-bird chicken became very

9    apparent on Mother's Day of 2014, correct?

10   A.  KFC ran out of chicken.

11   Q.  Okay.  And Mother's Day has historically been a huge day

12   for KFC, correct?

13   A.  Yes.

14   Q.  In fact, historically Mother's Day is the day that KFC

15   sells the most chicken of any other day, correct?

16   A.  Yes.

17   Q.  And as you said, on that day, Mother's Day 2014, KFC ran

18   out of chicken.

19   A.  Yes, ma'am.

20   Q.  And at the time that KFC ran out of chicken, KFC had

21   contracts in place to buy chicken on the bone from seven

22   different chicken suppliers, correct?

23   A.  Yes.

24   Q.  And still with seven suppliers, in May of 2014, KFC didn't

25   have enough chicken from any of its approved suppliers,

Peter Suerken - Cross

1    correct?

2    A.   Yes, ma'am.

3    Q.   So RSCS, as the purchasing agent for KFC, had to try to buy

4    what's called incremental loads of chicken, correct?

5    A.   Yes, ma'am.

6    Q.   And that means additional truckloads of chicken on top of

7    the chicken that KFC had contracted to buy from its seven

8    suppliers, correct?

9    A.   Yes, ma'am.

10   Q.   And just so the jury is clear, when we're talking about

11   truckloads of chicken, we're talking about 18-wheeler semi

12   trucks, right?

13   A.   Yes.

14   Q.   KFC was so desperate to buy chicken in May of 2014 that KFC

15   was willing to pay a third more than the contract price for

16   those incremental loads, correct?

17   A.   Yes, ma'am.

18   Q.   Now, for these additional loads that you needed in the

19   Mother's Day 2014 time period, RSCS was offering to pay in the

20   neighborhood of $1.30 per pound, correct?

21   A.   Yes, ma'am.

22   Q.   And that was approximately 40 cents more per pound than the

23   contract prices, correct?

24   A.   Yes, ma'am.

25   Q.   Now, even though KFC was willing to pay this increased

1369

Peter Suerken - Cross

 1   price, this 40 cents more per pound, KFC was still unable to

 2   buy the chicken that it wanted in spring and summer of 2014,

 3   correct?

 4   A.   I don't recall that.  I don't know if we -- or not.

 5   Q.   Do you recall that on behalf of KFC you were out there in

 6   the market begging for chicken, correct?

 7   A.   That would be fair, yes.

 8   Q.   And at the time that you're out begging for chicken for

 9   KFC, you knew that KFC was competing with other large

10   restaurant chains for that same small bird, correct?

11   A.   It never really crossed my mind, ma'am.

12   Q.   So KFC wasn't competing with other restaurant chains?

13   A.   It was irrelevant to where I was.  I had stores closed.  I

14   didn't care who I was buying it away from.

15   Q.   Okay.  But you were in the same marketplace with other

16   large chains trying to buy the same chicken, correct?

17   A.   I was trying to buy chicken, yes, ma'am.

18   Q.   And Popeye's was also trying to buy chicken at the same

19   time, correct?

20   A.   I can't attest to what Popeye's was or wasn't doing.

21   Q.   Do you recall testifying at a prior hearing in this matter?

22   A.   Yes, ma'am.

23   Q.   Judge Brimmer was here, correct?

24   A.   Correct.

25   Q.   And you swore to tell the truth, correct?

Peter Suerken - Cross

1    A.  Yes, ma'am.

2         MS. NIELSEN:  Mr. Brian, could you please pull up the

3    transcript of March 2nd, 2022, page 097, lines 15 through 17.

4    BY MS. NIELSEN:

5    Q.  Sir, do you recall being asked:  You knew that KFC -- you

6    knew at the time that RSCS was competing with other big

7    purchasers like Popeye's, correct?

8    A.  I don't recall being asked that question.

9    Q.  Okay.  Does that refresh your recollection?

10   A.  Not really, but if it's there, I evidently was.

11   Q.  Now, let's talk about your experience negotiating

12   chicken-on-the-bone contracts, okay?

13   A.  Yes, ma'am.

14   Q.  Prior to 2014, you were not specifically involved in

15   purchasing chicken on the bone for KFC, correct?

16   A.  No.

17   Q.  Prior to 2014, you were not responsible for a broader set

18   of protein and products, correct?

19   A.  Yes, ma'am.

20   Q.  You were more of a generalist.

21   A.  Yes, ma'am.

22   Q.  So 2014 was the first year that you were involved in the

23   supply of bone-in chicken for KFC.

24   A.  I had been involved, but not the lead negotiator.

25   Q.  Not in the negotiations, correct?

Peter Suerken - Cross

1   A.  Yes, ma'am.

2   Q.  And the reason you were kind of thrust into this new role

3   was because the chief negotiator for RSCS left, correct?

4   A.  Yes, ma'am.

5   Q.  And as you said, you had to backfill the hole left by

6   Mr. Ledford.

7   A.  Yes, ma'am.

8   Q.  And that's because Mr. Ledford left RSCS and moved to

9   Chick-fil-A, correct?

10  A.  Yes, ma'am.

11  Q.  And Mr. Ledford had been RSCS kind of resident chicken

12  specialist, correct?

13  A.  Yes, ma'am.

14  Q.  And Mr. Ledford left RSCS right after Mother's Day of 2014.

15  A.  It would have been around that time frame.  I don't recall

16  the exact date.

17  Q.  All right.  And then you were bought in kind of to fill

18  that hole when Mr. Ledford left.

19  A.  Yes.

20  Q.  Okay.  So Mr. Ledford left, and you were kind of thrust

21  into this role to try to figure out how to fix the chicken

22  supply crisis that was going on at that time.

23  A.  Yes, ma'am.

24  Q.  Okay.  And in the summer of 2014, you hired Rich Eddington

25  to help with the KFC contracts, correct?

Peter Suerken - Cross

1    A.  Yes, ma'am.

2    Q.  And the reason you hired Rich Eddington was to be the

3    hand-on guy on the specifics, correct?

4    A.  He was a technical poultry expert.

5    Q.  Right.  He had a background specializing in chicken,

6    correct?

7    A.  Yes, ma'am.

8    Q.  Now, in the summer of 2014, you also -- well, RSCS also

9    hired a consulting company called McKinsey & Company to help

10   come up with ideas to address the small-bird supply issue,

11   correct?

12          MS. WULFF:  Objection, foundation.

13          THE COURT:  Sustained.  If you could lay a foundation.

14   BY MS. NIELSEN:

15   Q.  Do you know whether RSCS hired a consulting company in

16   summer of 2014?

17   A.  Yes.

18   Q.  And was that McKinsey & Company?

19   A.  I believe so.

20   Q.  Okay.  And was McKinsey & Company brought in to help come

21   up with ideas to address small-bird supply issue?

22          MS. WULFF:  Objection, foundation.

23          THE COURT:  Overruled.  He can answer.

24   A.  Yes.

25   BY MS. NIELSEN:

Peter Suerken - Cross

1    Q.  Now, you know that McKinsey & Company is one of the premier

2    consulting firms in the country, correct?

3    A.  Yes, ma'am.

4    Q.  And starting in June 2014 and for the next six weeks, you

5    worked with the McKinsey consultants to assess the small-bird

6    supply issue, correct?

7    A.  I was part of the team, yes, ma'am.

8    Q.  And working with the McKinsey consultants, you and your

9    colleagues at RSCS asked Pilgrim's employees to discuss the

10   conditions of the small-bird market with you, correct?

11   A.  I don't remember -- you got me there.  We could have, might

12   have.  I don't remember.

13   Q.  Okay.

14        MS. NIELSEN:  Mr. Brian, could we pull up I-829.

15   BY MS. NIELSEN:

16   Q.  Would looking at a document perhaps refresh your

17   recollection?

18   A.  Sure.

19   Q.  Does that document refresh your recollection?

20   A.  I don't remember the meeting, ma'am.  I apologize.

21   Q.  Okay.  So you don't remember having a meeting with

22   Pilgrim's employees and McKinsey to discuss the small-bird

23   market?

24        MS. WULFF:  Objection.  He said he didn't remember.

25   A.  I don't remember that, ma'am.

Peter Suerken - Cross

1    *BY MS. NIELSEN:*

2    Q.   Okay.  You recall, though, that you had a meeting where

3    Pilgrim's brought their economist to a meeting to discuss the

4    conditions of the small-bird market.

5    A.   There was an economist at some point that discussed the

6    small-bird market, yes.

7    Q.   Okay.  And the Pilgrim's economist walked you and the

8    McKinsey consultants through a lot of information, correct?

9    A.   I don't remember that.

10   Q.   Okay.  And do you recall thinking that the Pilgrim's

11   economist knew what he was talking about?

12   A.   I honestly don't remember that.

13   Q.   Okay.  Again, you remember testifying under oath at a

14   previous hearing, correct?

15   A.   Yes, I do.

16        *MS. NIELSEN:*  Mr. Brian, could you please pull up the

17   March 2nd, 2022 transcript, page 1101?  And pull up lines 9

18   through 25 -- that whole page.

19   *BY MS. NIELSEN:*

20   Q.   Can you take a moment and review that page of the

21   transcript and see if that refreshes your recollection?

22   A.   What lines did you want me to read, ma'am?

23   Q.   9 through 25.

24   A.   Okay, what's your question?

25        *MS. WULFF:*  Objection, Your Honor.  For refreshment,

Peter Suerken - Cross

1    the document should be taken down before the witness is asked.

2            THE COURT:  It's been taken down now.

3    BY MS. NIELSEN:

4    Q.  You recall the economist, correct?

5    A.  Yes.

6    Q.  And that was Pilgrim's economist, correct?

7    A.  Yes, I believe so.

8    Q.  And you recall that the Pilgrim's economist walked you and

9    the McKinsey consultants through a lot of information, correct?

10   A.  There was a lot of information, yes.

11   Q.  Okay.  And you recall thinking at the time that the

12   Pilgrim's economist knew what he was talking about.

13   A.  Made sense.

14   Q.  That's what you testified to previously, correct?

15   A.  I don't exactly remember what I testified to.

16   Q.  Now, during the summer of 2014, you were providing McKinsey

17   & Company with your input and feedback as they were studying

18   the small-bird supply issue, correct?

19   A.  I provided them feedback.

20   Q.  Okay.  And the purpose of the McKinsey study and report and

21   you helping them with that study was to develop a strategy of

22   how KFC was going to deal with the increased price of chicken,

23   correct?

24           MS. WULFF:  Objection, foundation.

25           THE COURT:  Overruled.  He can answer.

Peter Suerken - Cross

1    A.  Could you repeat the question?

2    BY MS. NIELSEN:

3    Q.  Sure.  The purpose of the McKinsey report and you helping

4    with the McKinsey report was to develop a strategy of how KFC

5    was going to deal with the increased price of chicken, correct?

6    A.  Help is a generous term, but, yes, that was the idea.

7    Q.  Okay.  And it was to try to ensure supply to KFC in

8    upcoming years, correct?

9    A.  Yes.

10   Q.  You know that RSCS had historically focused on procuring

11   chicken on the bone at the lowest cost, correct?

12   A.  I believe so, yes.

13   Q.  And you became aware that RSCS was paying a lower cost for

14   chicken compared to its competitors, correct?

15   A.  I don't remember that, ma'am.

16   Q.  Okay.  Again, you testified previously in this matter,

17   correct?

18   A.  Yes.

19        MS. NIELSEN:  Mr. Brian, if we could please pull up

20   page 1105.

21        MS. WULFF:  Your Honor, may we have a brief side bar?

22        THE COURT:  Yes.

23     (At the bench:)

24        THE COURT:  Ms. Wulff, go ahead.

25        MS. WULFF:  Yes, Your Honor.  I think we are just a

Peter Suerken - Cross

1   little bit concerned that Ms. Nielsen is getting awfully close

2   to the line in terms of accidentally alerting the jury to a

3   prior trial.  She mentioned this matter, and I know that the

4   Court has previously been concerned about the jurors seeing the

5   number of pages in the transcript, that it might indicate the

6   length of the hearing or the proceeding, and so I just, with

7   apologies to Ms. Nielsen, wanted to be careful, the matter

8   going forward.

9        THE COURT:  Ms. Nielsen, anything?

10        MS. NIELSEN:  Your Honor, I am certainly open to any

11   suggestions.  I could tell Mr. Brian the number privately, but

12   then -- and I could whisper it also to the government.  As I

13   said, I am open to suggestions.

14        THE COURT:  It's logistically a little bit

15   complicated.  It wouldn't be hard for Ms. Nielsen to whisper it

16   to Mr. Fronzaglia, but then the government wouldn't know.

17        MS. WULFF:  There is a couple things.  One, it's more

18   that she said "this matter," and she has mentioned the Court --

19   Your Honor being present.  I also believe that if we're showing

20   portions of the witness' transcript to him even for refreshment

21   they should be marked for identification as exhibits, so that

22   would be also one way to handle the pagination issue.

23        THE COURT:  Well, Ms. Nielsen doesn't have any idea

24   until a witness is testifying what she may need to impeach him

25   with, so for her to be able to put those things together

Peter Suerken - Cross

1  magically without extended delay would be impossible.

2          Moreover, once again, by virtue of her identifying on

3  the record the pages and lines, she is making the record that

4  you're talking about, so this -- it just goes back to the fact

5  that Ms. Nielsen was open to suggestion.  But for the reasons,

6  Ms. Wulff, that you just mentioned, there is rhyme and reason

7  to the way she is doing it.

8          MS. WULFF:  Yes, thank you, Your Honor.  Again, my

9  primary concern is just saying "this matter," so if that's --

10 if that's what Ms. Nielsen is talking about, a prior hearing

11 and not necessarily this matter.  That's really what I am most

12 concerned about.

13         THE COURT:  Yeah, I think it's appropriate to -- once

14 again, we have used the term "hearing" before.  That's probably

15 the best term to use.  Also, just -- this isn't necessarily a

16 big deal, I didn't think it was such a big deal when

17 Ms. Nielsen mentioned it, but just as it's not appropriate to

18 refer to the jury and kind of use the jury as a prop, it's also

19 not a good idea to refer to the judge as -- because it's using

20 the judge as a prop too, so there doesn't seem to be a

21 particular good purpose for that, but I didn't think it was

22 that big of a problem.

23         MS. NIELSEN:  I apologize, Your Honor.  I was just

24 trying to emphasize that he was under oath, and he should have

25 been telling the truth.

Peter Suerken - Cross

1    *THE COURT:*  Yeah, and the fact that I am here wouldn't

2  necessarily be material as compared to him taking an oath, so

3  it's more direct to ask him that.

4         Thank you.

5         (In open court:)

6         *THE COURT:*  Go ahead, Ms. Nielsen.

7         *MS. NIELSEN:*  Mr. Brian, if we could please pull up

8  page 1107, lines 16 through 18.  Actually, can we pull up -- I

9  am sorry, that was the question before.  Can we pull up

10  page 1111, lines 11 through 14.

11  *BY MS. NIELSEN:*

12  *Q.*  Mr. Suerken, my question was, you became aware that RSCS

13  was paying a lower cost for chicken compared to its

14  competitors, correct?

15  *A.*  Yes.

16  *Q.*  And you testified to that previously, correct?

17  *A.*  Yes.

18  *Q.*  Which meant that if a chicken supplier --

19         *MS. NIELSEN:*  You can pull that down, thank you.

20  *BY MS. NIELSEN:*

21  *Q.*  Which meant if a chicken supplier could sell their chicken

22  elsewhere, the chicken supplier -- elsewhere meaning someone

23  other than RSCS, the chicken supplier might be better off doing

24  that, correct?

25  *A.*  As long as everything is held constant, yes.

Peter Suerken - Cross

1   Q.  Because RSCS was paying a lower price compared to

2   competitors, correct?

3   A.  Yes, as long as load counts are similar and things like

4   that.

5   Q.  Okay.  You also knew in 2014 that chicken producers did not

6   feel like RSCS was a good partner with them, correct?

7   A.  Yes, ma'am.

8   Q.  You knew that the chicken producers didn't feel like RSCS

9   was a good partner because RSCS had been hard on the chicken

10  producers in the past, correct?

11  A.  Yes, ma'am.

12  Q.  RSCS had been hard on the chicken producers about their

13  price, correct?

14  A.  Define "hard."

15  Q.  Well, you became aware in 2014 that RSCS was perceived as

16  being difficult to work with, correct?

17  A.  KFC and RSCS, yes, ma'am.

18  Q.  That you were perceived by the suppliers as being difficult

19  to work with.

20  A.  Yes, ma'am.

21  Q.  Okay.  So fair to say before you started the negotiations

22  with Pilgrim's in August of 2014, you had learned and you had

23  knowledge that the chicken suppliers had had past issues

24  dealing with RSCS, correct?

25  A.  Yes, ma'am.

Peter Suerken - Cross

1    Q.  Now, historically you knew that RSCS had managed

2    chicken-on-the-bone procurement focused on a low cost, correct?

3    A.  Yes.

4    Q.  But going into the 2015 negotiations -- I am sorry, the

5    2014 negotiations for the 2015 contracts, RSCS needed to kind

6    of change its focus to assure supply, correct?

7    A.  Yes.

8    Q.  So part of your plan was to seek a three-year-long

9    contract, correct?

10   A.  Yes.

11   Q.  And the reason you wanted a three-year-long contract is

12   because RSCS had only done one-year contracts in the past,

13   correct?

14   A.  There was more to it than that, but, yes.

15   Q.  And they had run out of chicken, correct?

16   A.  Yes.

17   Q.  So you wanted to have a three-year contract in place to

18   ensure supply for those three years, correct?

19   A.  Yes.

20   Q.  Now, let's talk about the first pricing meeting with

21   Pilgrim's in 2014, okay?

22   A.  Okay.

23         MS. NIELSEN:  Mr. Brian, can you please pull up and

24   show the witness, the Court, and the parties what's marked for

25   identification as Defense Exhibit E-158.

Peter Suerken - Cross

1    BY MS. NIELSEN:

2    Q.  Do you recognize this exhibit as a calendar invite?

3    A.  Yes, it would have been.

4    Q.  A calendar invite sent from your e-mail address, correct?

5    A.  Yes.

6    Q.  And does this exhibit show the date of your meeting with

7    Pilgrim's employees?

8    A.  August 1st, yes, ma'am.

9            MS. NIELSEN:  Your Honor, I would move for admission

10   of E-158.

11           THE COURT:  Any objection to the admission of E-158?

12           MS. WULFF:  No objection, Your Honor.

13           THE COURT:  E-158 will be admitted.

14           MS. NIELSEN:  And I ask that be published to the jury

15   briefly.

16           THE COURT:  It may.

17   BY MS. NIELSEN:

18   Q.  Mr. Suerken, the date of the first pricing meeting with

19   Pilgrim's was August 1st, 2014, correct?

20   A.  Yes.

21   Q.  Okay.  And that meeting was held at RSCS, correct?

22   A.  Yes.

23   Q.  RSCS set the date of the meeting, correct?

24   A.  I sent out the meeting request, but --

25   Q.  So you set the date of the meeting, correct?

Peter Suerken - Cross

1    *A.*  We would have probably agreed to it with Roger, but, yes.

2    *Q.*  And the purpose of the August 1st meeting was to discuss

3    the 2015 contract negotiations before the first-round bids were

4    due, correct?

5    *A.*  Yes.

6    *Q.*  Bill Lovette wasn't at that meeting on August 1st, 2014,

7    correct?

8    *A.*  No, ma'am, he wasn't.

9    *Q.*  Now, on direct you testified that Mr. Austin told you that

10   Bill Lovette was the decision-maker, correct?

11   *A.*  Yes.

12   *Q.*  Now, you don't have any firsthand knowledge about Pilgrim's

13   internal decision-making processes, right?

14   *A.*  I do not.

15   *Q.*  You never worked at Pilgrim's, correct?

16   *A.*  No, ma'am.

17   *Q.*  And you don't have any firsthand knowledge regarding

18   whether Mr. Lovette was involved in the process of deciding the

19   bid that Pilgrim's submitted to RSCS, correct?

20   *A.*  Could you repeat the question?

21   *Q.*  Sure.  That was a mouthful.

22   *A.*  Yeah, I didn't quite catch you.

23   *Q.*  You, sir, you never worked at Pilgrim's, right?

24   *A.*  I agree to that one.

25   *Q.*  And you don't know their internal decision-making

Peter Suerken - Cross

 1   processes, correct?

 2   *A.*   I have no idea.

 3   *Q.*   And you don't have any firsthand knowledge whether

 4   Mr. Lovette was involved in the process of deciding the bid

 5   that Pilgrim's submitted to KFC.

 6   *A.*   No, ma'am.

 7   *Q.*   You also have no firsthand knowledge regarding what

 8   Mr. Lovette reviewed related to the KFC contract negotiations.

 9   *A.*   Absolutely not.

10   *Q.*   Do you know how many employees Pilgrim's had in the summer

11   of 2014?

12   *A.*   It would have been in the thousands.

13   *Q.*   Does 50,000 sound right?

14           *MS. WULFF:*   Objection, foundation.

15           *THE COURT:*   Sustained.

16   *BY MS. NIELSEN:*

17   *Q.*   You don't know, right?

18   *A.*   No, ma'am.

19   *Q.*   Okay.  You do know that at RSCS it was very uncommon for

20   RSCS's CEO to be involved in any negotiations, correct?

21   *A.*   Yes.

22   *Q.*   In fact, you said prior to 2014, it had never happened that

23   the CEO was involved in negotiations.

24   *A.*   I said Steve McCormick had never been.

25   *Q.*   He had never been involved, correct?

Peter Suerken - Cross

1    *A.*  Not that I was aware of.

2    *Q.*  And he was the CEO of RSCS.

3    *A.*  At that time.

4    *Q.*  Now, after Pilgrim's submitted their bid to you, you had a

5    conversation with Roger Austin requesting that Pilgrim's lower

6    their price, correct?

7    *A.*  When?

8    *Q.*  After the bid was submitted, correct?

9    *A.*  When was the bid submitted, ma'am?

10   *Q.*  Was the bid submitted around August 20th of 2014?

11   *A.*  Okay, yes, we had a meeting post then.

12   *Q.*  And you talked to Mr. Austin about -- you tried to convince

13   him to lower the price, correct?

14   *A.*  Yes, ma'am.

15   *Q.*  And Mr. Austin wouldn't, correct?

16   *A.*  Yes.

17   *Q.*  And when Mr. Austin indicated that Pilgrim's wouldn't lower

18   the price, you informed the CEO of RSCS, correct?

19   *A.*  Yes.

20   *Q.*  And the CEO was Mr. McCormick, correct?

21   *A.*  Yes.

22   *Q.*  And as you just testified, it was not common for

23   Mr. McCormick to be involved in contract negotiations, correct?

24   *A.*  Yes, ma'am.

25   *Q.*  This was the very first time that Mr. McCormick, the CEO at

Peter Suerken - Cross

1    the time, had ever been involved in contract negotiations.

2           MS. WULFF:  Objection, asked and answered.

3           THE COURT:  Overruled.  He can answer.

4    A.  Yes.

5    BY MS. NIELSEN:

6    Q.  But in 2014, Mr. McCormick wanted to have a conversation

7    with Pilgrim's CEO, Bill Lovette, correct?

8    A.  Yes.

9    Q.  And as you testified, it was Mr. McCormick who wanted to

10   have that call, correct?

11   A.  Yes.

12   Q.  And so a call was set up for your CEO, Mr. McCormick, to

13   talk with Pilgrim's CEO, Bill Lovette, correct?

14   A.  Yes.

15   Q.  And Roger Austin coordinated that call with Mr. Lovette,

16   correct?

17   A.  I believe so.

18   Q.  And now, on direct you testified that you had one

19   interaction with Bill Lovette in 2014, correct?

20   A.  Yes, I believe so.

21   Q.  And what you call an interaction with Mr. Lovette was this

22   call that Mr. McCormick had with Mr. Lovette, correct?

23   A.  It was a singular phone call, yes.

24   Q.  And that was the interaction that you were describing,

25   correct?

Peter Suerken - Cross

1    A.   Yes.

2    Q.   A telephone call that you listened in on, correct?

3    A.   No.  It was a conference call that I participated in.

4    Q.   Okay.  Mr. Lovette is in Colorado, correct?

5    A.   Yes.

6    Q.   And you are at RSCS headquarters, correct?

7    A.   Yes.

8    Q.   In Mr. McCormick's office.

9    A.   Yes, on a speaker phone.

10   Q.   On a speaker phone?

11   A.   Yes.

12   Q.   You weren't huddled up on one phone?

13   A.   No.

14   Q.   Now, you do recall that the call between you and

15   Mr. McCormick and Mr. Lovette, that occurred around August or

16   September of 2014, correct?

17   A.   It would have been after August.  It would have been after

18   the meeting on the 27th.

19   Q.   Okay.  So around August, September time frame?

20   A.   You got me there.

21   Q.   And to be clear, this is the only telephone call you had

22   with Mr. Lovette in 2014.

23   A.   I believe so, yes, ma'am.

24   Q.   Only call you ever had with Mr. Lovette?

25   A.   It's the only one I ever recall.

1388

Peter Suerken - Cross

1  Q.  During this call that you participated in with you, RSCS's

2  CEO, Mr. McCormick, and Mr. Lovette, Mr. Lovette explained the

3  reasons for Pilgrim's pricing, correct?

4  A.  He did.

5  Q.  Okay.  And during that call, you heard Mr. Lovette give a

6  very methodical economic case --

7          MS. WULFF:  Objection, Your Honor, hearsay.

8          MS. NIELSEN:  Your Honor, he has talked about what was

9  said on the call, the purpose of the call.  I am not giving a

10  precise statement.  I am asking him to see if he agrees with

11  what was discussed on the call.

12          MS. WULFF:  801(d)(2)(E) statements can only be

13  elicited by the government.

14          THE COURT:  Objection sustained.

15  BY MS. NIELSEN:

16  Q.  Without telling me what Mr. Lovette said, you agree that

17  his explanation about Pilgrim's pricing was tough to argue

18  with, correct?

19  A.  Could you repeat the question?

20  Q.  Sure.  Without telling me what Mr. Lovette said, his

21  explanation of Pilgrim's pricing was tough for you to argue

22  with.

23  A.  On that phone call?

24  Q.  Yes.

25  A.  It wasn't my place to argue on that phone call.

Peter Suerken - Cross

1    *Q.* Well, let me ask you this.  Your impression during that

2    call was that what Mr. Lovette was saying made sense, correct?

3    *A.* Absolutely, yes, ma'am.

4    *Q.* In 2014, Pilgrim's was supplying approximately 100 loads of

5    chicken to KFC, correct?

6    *A.* I don't exactly remember how many that they were supplying

7    in 2014, ma'am.

8    *Q.* Okay, sure.

9          *MS. NIELSEN:*  Mr. Brian, could you pull up page 1046,

10   line 11 through 13, and see if that refreshes your

11   recollection.

12   *BY MS. NIELSEN:*

13   *Q.* Does that refresh your recollection?

14   *A.* Yeah, I believe my answer was about a hundred, not a

15   hundred.

16   *Q.* So about a hundred loads, correct?

17   *A.* Yes.

18   *Q.* And Pilgrim's a hundred loads that it was supplying to KFC

19   constituted about 50 percent of KFC's eight-piece

20   chicken-on-the-bone supply, correct?

21   *A.* Yes.

22   *Q.* And based on Pilgrim's price position in 2014 and what was

23   presented to you, you put together a plan on how to respond to

24   Pilgrim's, correct?

25   *A.* Are you talking about the 2014 pricing or the 2014

Peter Suerken - Cross

1  proposal?  What are you talking about?

2  Q.  That's a good question.  I'm talking about when you got the

3  bid from Pilgrim's in 2014, you put together a plan on how to

4  respond to them, correct?

5  A.  Ultimately, yes, ma'am.

6  Q.  And your plan involved trying to get chicken suppliers

7  other than Pilgrim's to increase their volume to RSCS, correct?

8  A.  Anybody that had a lower price, can we buy more from them.

9  Q.  And to achieve that goal, you went out and talked to other

10  suppliers, correct?

11  A.  Yes.

12  Q.  And you went out and talked to other suppliers about

13  providing more chicken, more volume to KFC, correct?

14  A.  Yes.

15  Q.  And you were able to get some additional loads from other

16  suppliers, correct?

17  A.  Yes, ma'am.

18  Q.  And this meant you took away significant volume from

19  Pilgrim's, correct?

20  A.  Yes.

21  Q.  You took away 20 of Pilgrim's approximately 100 loads,

22  correct?

23  A.  Yes.

24  Q.  So you took 20 percent of Pilgrim's volume.

25  A.  Yes.

Peter Suerken - Cross

1  *Q.*  And that's over 670 pounds of chicken per week that

   Pilgrim's lost in business to KFC.

3  *A.*  Better put a couple more zeros behind that.

4  *Q.*  I am sorry, you are right.  670,000 pounds that Pilgrim's

5  lost, correct?

6  *A.*  Yes, ma'am.

7  *Q.*  Thanks for clarifying.

8        So Pilgrim's lost volume to its competitors, correct?

9  *A.*  Yes, ma'am.

10  *Q.*  And those loads that you took away from Pilgrim's, those

11  loads went to Pilgrim's competitors, correct?

12        *MS. WULFF:*  Objection, Your Honor, asked and answered.

13        *THE COURT:*  Overruled.

14  *A.*  Yes, ma'am.

15  *BY MS. NIELSEN:*

16  *Q.*  Now, let's talk about your interactions with Mr. Lovette,

17  okay?  You just testified about the one phone conversation you

18  had involving Mr. Lovette, yourself, and your CEO, correct?

19  *A.*  Yes, ma'am.

20  *Q.*  You also had one in-person meeting with Mr. Lovette,

21  correct?

22  *A.*  Yes.

23  *Q.*  And you know that that meeting was not in 2014, correct?

24  *A.*  Yes.

25  *Q.*  And that one meeting you had with Mr. Lovette, your boss,

Peter Suerken - Cross                                    1392

 1  Mr. Imhoff, was with you, correct?

 2           *MS. WULFF:*  Objection, Your Honor, outside the scope

 3  of direct examination.

 4           *THE COURT:*  Response?

 5           *MS. NIELSEN:*  May I respond on side bar, Your Honor?

 6           *THE COURT:*  Yes.

 7     (At the bench:)

 8           *THE COURT:*  Ms. Wulff, go ahead.

 9           *MS. WULFF:*  I objected that it's outside the scope of

10  direct examination, Your Honor.

11           *THE COURT:*  That's right.  Ms. Nielsen requested the

12  side bar.

13           Ms. Nielsen, go ahead.

14           *MS. NIELSEN:*  Yes, Your Honor.  So there was another

15  conversation about the same topics that Mr. Suerken has

16  discussed at length in terms of effects that the pricing and

17  volume had on KFC, had on Pilgrim's.  This conversation that

18  occurred with Mr. Lovette in 2015 was during the term of this

19  contract when the contract could be renegotiated, so I think it

20  is within the scope, and I would request permission to inquire.

21           *THE COURT:*  Ms. Wulff, response?

22           *MS. WULFF:*  Your Honor, Mr. Suerken's testimony was

23  limited to the contract negotiation process for the 2015

24  contract and then the start, the very, very start of the

25  contract negotiation process for the 2018 contract.  We didn't

Peter Suerken - Cross

1    go into communications or any potential renegotiations of the

2    2015 contract.

3              THE COURT:  Ms. Nielsen, anything more from you?

4              MS. NIELSEN:  No, Your Honor.

5              THE COURT:  Other than the fact that I think that

6    Mr. Suerken said he only met with Mr. Lovette once, so, you

7    know, if this was now twice, that can be asked, although it

8    seems to have been established already.  But other than that, I

9    will sustain the government's objection as being beyond the

10   scope.

11             MS. NIELSEN:  May I have just a moment to confer,

12   please?

13             THE COURT:  Sure.

14             (In open court:)

15   BY MS. NIELSEN:

16   Q.  Mr. Suerken, I just want to be clear.  You only had one

17   phone call about chicken prices in 2014 with Mr. Lovette,

18   correct?

19   A.  Yes, ma'am.

20   Q.  That's the only time that you ever had a phone call with

21   Mr. Lovette in 2014.

22   A.  Yes, ma'am.

23             MS. NIELSEN:  No further questions.

24             THE COURT:  All right.  Thank you.

25             Additional cross-examination?

Peter Suerken - Cross

1        **CROSS-EXAMINATION**

2    *BY MR. FELDBERG:*

3    *Q.*  Mr. Suerken, I am Roger Austin's lawyer.

4    *A.*  Yes, sir.

5    *Q.*  I want to draw your attention back to the meeting you had

6    with Mr. Austin and Mr. Imhoff at Mama's Barbecue.

7    *A.*  Yes.

8    *Q.*  You recall that meeting, correct?

9    *A.*  Yes, sir.

10   *Q.*  You recall the lunch?

11   *A.*  Yes.

12   *Q.*  You testified on direct examination that Mr. Austin told

13   you you wouldn't be able to find additional loads, correct?

14   *A.*  Yes, sir.

15   *Q.*  But you did find additional loads, correct?

16   *A.*  Yes, sir.

17   *Q.*  So Mr. Austin was wrong, wasn't he?

18   *A.*  Dead wrong.

19   *Q.*  And you were right, correct?

20   *A.*  Yes, sir.

21   *Q.*  And, in fact, in the 2015 contract, you reduced Pilgrim's

22   from the hundred loads in the prior year to 63 loads, correct?

23   *A.*  In what year?

24   *Q.*  For the 2015 -- the contract beginning January 1, 2015.

25   *A.*  I don't remember that, sir.

Peter Suerken - Cross

1    MR. FELDBERG:  Could we call up Exhibit 1126, please,

2    and Exhibit 2, page 3.

3    This is in evidence, Your Honor.  May I display it?

4    THE COURT:  Yes, you may.

5    BY MR. FELDBERG:

6    Q.  Sir, do you see page 3, Exhibit 2 of the Pilgrim's RSCS

7    contract for the period beginning January 1, 2015?

8    A.  Yes.

9    Q.  And what is the weekly volume commitment for KFC

10   eight-piece chicken on the bone?

11   A.  63 truckloads.

12   Q.  Does that refresh your recollection, sir?

13   A.  No.

14   Q.  You just don't remember?

15   A.  I just don't remember.

16   Q.  Do you have any reason to doubt that this is the contract,

17   and it actually states the weekly commitment?

18   A.  It looks like an RSCS contract, yes.

19   Q.  Do you want to look at the front page?

20   A.  No, I don't think I need to.

21   MR. FELDBERG:  Thank you, sir.  No further questions.

22   THE COURT:  Additional cross-examination?

23   Mr. Kornfeld?

24                    **CROSS-EXAMINATION**

25   BY MR. KORNFELD:

Peter Suerken - Cross

1   *Q.*  Good afternoon, Mr. Suerken.  I wanted to ask you some

2   questions.  We talked a lot about Pilgrim's.  I want to focus

3   on Claxton for a few minutes.

4          Now, you're aware -- or going into the 2015 contract

5   negotiations, you're aware of the fact that Claxton was a

6   regional supplier, correct?

7   *A.*  Describe "regional."

8   *Q.*  Supply chicken to a region of the country?

9   *A.*  All suppliers are regional suppliers, sir, depending upon

10  their plant.

11  *Q.*  Exactly.  But are you aware of the fact that Claxton only

12  had one plant?

13  *A.*  Yes, sir.

14  *Q.*  Are you aware of the fact that that was in Claxton,

15  Georgia?

16  *A.*  Yes, sir.

17  *Q.*  Southeastern Georgia, correct?

18  *A.*  Yes, primarily set up to go into the Florida market.

19  *Q.*  Exactly.  And were you aware of the fact that in that time

20  frame Claxton had about 1 percent of the market share in this

21  country for chicken?

22  *A.*  I couldn't -- I can't testify to that, sir.  I don't know.

23  *Q.*  But you knew obviously much smaller as a one-plant

24  operation?

25  *A.*  Absolutely.

Peter Suerken - Cross

1   Q.  Much smaller than Tyson, Pilgrim's?

2   A.  Absolutely, yes, sir.

3   Q.  And with respect to going into the negotiations, before you

4   took this job where you were negotiating eight-piece COB, the

5   first time you did that was for the 2014 contract, correct?

6   A.  Yes, sir.

7   Q.  And that was the first -- in connection with those

8   negotiations, that's the first time you dealt with Mikell

9   Fries, correct?

10  A.  Yes.

11  Q.  You never met him before you started engaging in these

12  negotiations?

13  A.  I had not.

14  Q.  And you only talked to him a very few times, correct?

15  A.  Absolutely, yes, sir.

16  Q.  And in any event, putting aside Mr. Fries, this was your

17  first time negotiating with Claxton Chicken, correct?

18  A.  Yes, sir.

19  Q.  And when you did that, you didn't have an understanding of

20  Claxton's internal business strategies, did you?

21  A.  No, sir.

22  Q.  You didn't have an understanding of their internal process

23  at arriving at a bid price, correct?

24  A.  No, sir.

25  Q.  You didn't have an understanding of who was all involved at

Peter Suerken - Cross

1    Claxton in the bidding process, correct?

2    *A.*   No, sir.

3    *Q.*   And certainly you weren't privy to their strategic

4    discussions about how they wanted to interact with RSCS,

5    correct?

6    *A.*   No, sir.

7    *Q.*   And Mr. Ledford was your predecessor in negotiating with

8    Claxton and with Mr. Fries, correct?

9    *A.*   Yes, sir.

10   *Q.*   Do you know approximately how many years Mr. Ledford

11   negotiated with Claxton?

12   *A.*   I don't offhand, sir.   I apologize.

13   *Q.*   Do you know how many different contracts he negotiated, he

14   being Mr. Ledford, negotiated with Mr. Fries?

15   *A.*   I don't know -- I don't recall the exact year Mr. Ledford

16   came to the co-op, sir.

17   *Q.*   But in any event, you didn't ask Mr. Ledford about

18   Mr. Ledford's understanding of Claxton's negotiation

19   strategies, did you?

20   *A.*   No.

21   *Q.*   You didn't ask Mr. Ledford about Mr. Fries' negotiation

22   style, did you?

23   *A.*   No.

24   *Q.*   So for lack of a better phrase, you didn't really get the

25   scouting report on Claxton or on Mr. Fries.

Peter Suerken - Cross

1          *MS. WULFF:*  Objection, Your Honor, argumentative.

2          *THE COURT:*  Overruled.

3    *BY MR. KORNFELD:*

4    *Q.*  You didn't get the scouting report from Mr. Ledford on how

5    to negotiate with Claxton, did you?

6    *A.*  No, sir.

7    *Q.*  Now, in your testimony, you were asked on direct about

8    certain producers -- excuse me, certain suppliers got more

9    volume as a result of the 2015 contract as compared to the '14

10   contract.  Do you remember generally that line of questioning?

11   *A.*  Yes, sir.

12   *Q.*  And you listed a bunch of suppliers that got more volume,

13   but you neglected to include Claxton in that list.  And it's

14   true, is it not, that Claxton also got additional volume in

15   '15?

16   *A.*  I don't remember that, sir.

17   *Q.*  Well, you would agree with me that the contracts that

18   Claxton executed with RSCS would reflect the weekly volume they

19   received, correct?

20   *A.*  Yes, sir.

21         *MR. KORNFELD:*  If we could please show the witness --

22   let's start with the 2014 contract, which is Government's

23   Exhibit 1728.

24         Your Honor, it's in evidence, and I would ask that

25   page 9 be published, please.

Peter Suerken - Cross

1    THE COURT:  You may.

2   BY MR. KORNFELD:

3   Q.  And that, sir, do you have that in front of you?

4   A.  I do.

5   Q.  And that reflects -- it's 2014 volume, does it not,

6   estimated volume per week at the top in the right-hand column?

7   A.  Yeah, 460,000 pounds.

8        MR. KORNFELD:  And then if we could please put up the

9   2015 contract, which is Government's Exhibit 1119 at page 4.

10       Your Honor, that's also in evidence.  May I please

11  publish that?

12       THE COURT:  You may.

13  BY MR. KORNFELD:

14  Q.  And that reflects in the weekly volume commitment

15  536,000 pounds per week, correct?

16  A.  Yes, sir.

17  Q.  So Claxton, in fact, gained approximately 77,000 pounds of

18  additional weekly volume in the 2015 contract as compared to

19  the 2014 contract, correct?

20  A.  Yes, when you're buying six of million pounds of chicken a

21  week, 75,000 pounds is pretty easy to lose.

22  Q.  Yeah, easy to lose maybe for you, but for a Claxton, a

23  smaller producer, that's 77,000 additional weekly pounds it's

24  selling to KFC, correct?

25  A.  Yes, sir.

Peter Suerken - Cross

1  Q.  And by the way, I didn't expect you to remember that.  I

2  was just trying to clarify that.  That's all.

3          Also, sir, you talked about in direct your expectation

4  that the price increase in the 2015 contract would be somewhere

5  between 2 and 4 cents.  Do you generally recall that testimony?

6  A.  I don't remember if I called cents or percent, sir.

7  Q.  That was my first question.  I don't recall because I was

8  confused.

9  A.  I believe 2 to 3 or 4 percent, which ironically if you look

10  at it would be 2, 3, 4 cents.

11  Q.  That might be the source of my confusion.

12  A.  It's about the same.

13  Q.  You would agree, would you not, that chicken prices are

14  affected by a multitude of factors?

15  A.  Yes, sir.

16  Q.  They are affected by outside market factors like consumer

17  preference and consumer demand, correct?

18  A.  Yes.

19  Q.  They are also affected by a multitude of what I would call

20  industry factors like cost of labor, cost of diesel, cost of --

21  chick cost, et cetera, et cetera, correct?

22  A.  Yes, sir.

23  Q.  And you would agree with me, would you not, that you have

24  to take into account current market conditions when you're

25  negotiating a contract, do you not?

Peter Suerken - Cross

1    A.  Yes, sir.

2    Q.  And with respect to the 2014 negotiations for the 2015

3    contract, I think you told Ms. Nielsen that if you were a

4    producer or a supplier, you wouldn't have even been in the

5    small-bird business during that time frame, correct?

6           MS. WULFF:  Objection, asked and answered.

7           THE COURT:  He was just asked if he recalls that.

8    Overruled.

9    BY MR. KORNFELD:

10   Q.  Do you recall that testimony?

11   A.  From 10 minutes ago?

12   Q.  Yes, exactly.

13   A.  Yes, I do.

14   Q.  And the reality is that was one of the significant market

15   conditions was that the small bird -- the small-bird

16   profitability that you talked about at length today, correct?

17   A.  Yes.

18   Q.  And put simply, big birds were a heck of a lot more

19   profitable than small birds, right?

20   A.  Historically they had made more money, yes, sir.

21   Q.  And at that time when you were negotiating the 2015, at

22   that time that was a present reality in the marketplace as

23   well, right?

24   A.  I believe so, yes, sir.

25   Q.  Well, you know so because you testified about it.

Peter Suerken - Cross

1    A.   Yes, sir.

2    Q.   And you knew that as a result, the small-bird suppliers

3    were suffering financially as compared to their big-bird

4    brethren, right?  They weren't making as much money.

5    A.   I can't attest to somebody else's P and L, sir.

6    Q.   Well, you knew they were approximately a dollar a bird less

7    profitable, did you not?

8    A.   I can't attest to the exact numbers, sir.

9    Q.   Well, you knew they were significantly less profitable,

10   were you not?

11   A.   I knew that they made less money, yes, sir.

12   Q.   Significantly less money, correct?

13   A.   You would have to help me understand what -- exactly what

14   "significantly" means.

15   Q.   What does significant -- you have talked about numbers and

16   percentages.  What is significant in the context of chicken

17   profitability?  What does that mean to you?

18   A.   I don't run a poultry plant.  I don't know.

19   Q.   All right.  Well, let me ask you this.  Would you agree

20   based on your understanding and knowledge of the chicken

21   industry and your experience in negotiating contracts that if

22   there were a delta of around a dollar between small and big

23   birds, that would be significant?

24   A.   That would be --

25            MS. WULFF:  Objection, Your Honor, foundation, calls

Peter Suerken - Cross

1    for speculation.

2         *THE COURT:*  Overruled.

3    *A.*  I can answer that one.  Yes, sir, that would be

4    significant.

5    *BY MR. KORNFELD:*

6    *Q.*  And you were aware at the time you were negotiating this

7    contract that there had been some -- a contraction of

8    small-bird plants; in other words, there weren't as many of

9    them as there had been in the past, correct?

10   *A.*  Yes.

11   *Q.*  You were aware that some small-bird suppliers had gone

12   bankrupt in that general time frame, 2011 to 2014.  You were

13   aware of that, right?

14   *A.*  I don't recall that, sir, but you are talking 10 years ago.

15   I don't remember.

16   *Q.*  Well, you testified a lot today about things that happened

17   10 years ago.

18   *A.*  You are asking me specifically about bankruptcy cases in

19   2011 to 2014.  I am telling you I don't know.

20   *Q.*  I am not asking you about bankruptcy cases.  I am simply

21   asking you, were you aware that there were small-bird suppliers

22   that had gone bankrupt in that general time frame?

23   *A.*  I can't testify to that, sir.  I don't remember.

24   *Q.*  Okay.  You certainly were aware that KFC was paying up to

25   approximately 50 percent more for the incremental loads in 2014

Peter Suerken - Cross

1   as you testified about I think both certainly on direct and I

2   think in cross as well, right?

3   A.  I never testified to 50 percent, sir.

4   Q.  Well, how much more was KFC paying?

5   A.  20 to 35, I believe.

6   Q.  Up to about $1.45?

7   A.  I don't remember the exact amounts.  I remember $1.30

8   something.  I don't know that I remember $1.45.

9   Q.  25, 30 percent, is that significant from your perspective

10  as a buyer for KFC?

11  A.  On a per one truckload basis, yes.  Spread out over

12  200 truckloads, if you spread the cost out, it's not a lot.

13  Q.  I am not talking about amortizing.  I am talking about if

14  you are paying $1.30 for something that you otherwise were

15  paying $1 for.  We are not really quibbling, are we, that $1.30

16  is significantly more money than a dollar?

17  A.  It's more money, yes, sir.

18  Q.  And yet you thought based on all your understanding of the

19  market conditions, you assumed that a 2 to 4 percent increase

20  or a 2 to 4-cent increase, whichever it was, would be a

21  reasonable increase in going into the 2015 contract based on

22  all of the things you testified about with respect to market

23  conditions.

24  A.  It's what I testified to.  I didn't testify to market

25  conditions, sir.

Peter Suerken - Cross

1    Q.  I understand that.  But that wasn't my question.  We went

2    through --

3    A.  You keep asking me about things that you are adding on to

4    it.  I testified to 2 to 4 percent.  That's what I testified

5    to.

6    Q.  Here is what I am asking you.  We went through five minutes

7    of your understanding or sometimes lack thereof of market

8    conditions.  Do you remember that?  Do you remember my

9    questions in the last five minutes?

10   A.  Lack of -- I didn't -- I don't remember you asking me about

11   my lack of understanding of market conditions.

12   Q.  Well, for instance, sir, I asked you if you knew that there

13   were chicken suppliers that had gone bankrupt, and you

14   professed not to be aware of that.

15   A.  Don't know that.

16   Q.  Okay.  So you talked about both what your understanding was

17   and what your lack of understanding is, correct?

18   A.  If you want to assume that, yes, sir.

19   Q.  Well, that's my question.  What you assumed, sir, back in

20   2015 or 2014 was that an increase of 2 to 4 percent would sort

21   of make up for all of the changes in market conditions in the

22   small-bird market during that time frame.  That was your

23   assumption.

24   A.  Yes, sir.

25          MR. KORNFELD:  Thank you, sir.

Peter Suerken - Cross                          1407

1           THE COURT:  Thank you, Mr. Kornfeld.

2           Additional cross-examination?

3           All right.  Why don't we go ahead and take our

4     mid-afternoon break because we are just about at that time.  We

5     will plan on reconvening at our normal time, 3:30.  The jury is

6     excused for the afternoon break.

7           (Jury excused.)

8           THE COURT:  Mr. Suerken, if you will come back at

9     3:30.

10          THE WITNESS:  Yes, sir.

11          THE COURT:  You are excused now, though.

12          THE WITNESS:  Okay, thank you.

13          THE COURT:  Great.  Thanks.

14          So assuming after redirect Mr. Suerken is excused and

15    assuming at that time the government rests, I will explain to

16    the jury just briefly what that means.  What we've done in the

17    past is done a side bar Rule 29 which essentially allows each

18    defendant to make a record of his Rule 29, but not really

19    elaborating on it.  We can talk later about when those might be

20    due.  But I wanted to check with the defendants to see whether

21    they wished for me to, for instance, excuse the jury in order

22    to do it in court and have it take longer.

23          MR. TUBACH:  Your Honor, from Mr. Penn's point of

24    view, no reason to make the jury wait.  We will make a

25    placeholder Rule 29 motion and make a supplemental.

Peter Suerken - Redirect

1    THE COURT:  That's what we will do.  Then after that,

2    we'll see whether there is an opening that Mr. Lavine had

3    mentioned given the fact that it was reserved.  And then at

4    that time, my understanding is that there will not be any

5    witnesses, and I would then go ahead and let the jury go for

6    the day; is that correct?

7    MR. LAVINE:  That is correct, Your Honor.

8    THE COURT:  Mr. Hart?

9    MR. HART:  One thing to remind the Court, we intend on

10   putting in some documents after the witness.

11   THE COURT:  Oh, after the witness, okay.  I am glad

12   you reminded me of that.  That will take some time.  But once

13   that process is complete, okay, so we will play that by ear.

14   We will see what time it is.  But then once the government does

15   rest, I'll proceed in the way that I just outlined, all right?

16   We will be in recess, then, until 3:30.  Thank you.

17   (Recess at 3:15 p.m. until 3:46 p.m.)

18   THE COURT:  Why don't we get Mr. Suerken back and

19   bring the jury back in.

20   (Jury present.)

21   THE COURT:  Redirect.

22   **REDIRECT EXAMINATION**

23   BY MS. WULFF:

24   Q.  Mr. Suerken, you were asked some questions on

25   cross-examination about this 2015 contract being the first time

Peter Suerken - Redirect

1   you ran a bidding process for chicken.  Do you recall that?

2   A.  Yes, ma'am.

3   Q.  Did you prepare in preparation to run this bidding process?

4   A.  Yes, ma'am.

5   Q.  How did you prepare?

6   A.  Right before Mr. Ledford was leaving the company, I asked

7   him for everything he could remember to tell me going into the

8   process.  We then started negotiation training sessions in June

9   of that year trying to come back with how we were going to

10  think about the category, what we were going to do, how we were

11  going to approach the category, all of our negotiation tactics.

12  We figured out our MDOs, most desirable outcomes, LDOs, least

13  desirable outcomes, did all those things you do in prep for a

14  negotiation as well as run a Porter's five forces analysis to

15  figure all the things we could or couldn't do.

16  Q.  What was that word you used, a what analysis?

17  A.  Dr. Michael Porter is a Harvard Business School supply

18  chain expert.

19          MS. NIELSEN:  Objection, outside the scope.

20          THE COURT:  Mr. Suerken, if you can slow down just a

21  little bit.  Ms. Coppock is really super good, but you may be,

22  you know, at the limit there.

23          THE WITNESS:  Okay.

24  A.  Please ask the question again.  What do you want?

25  BY MS. WULFF:

Peter Suerken - Redirect

1   Q.  You were describing how you prepared to run this bidding

2   process, and I think where we left off you talked about MDOs,

3   which are most desirable outcomes, and LDOs, which are least

4   desirable outcomes.  And then you said you ran some kind of

5   analysis, and I didn't hear.

6   A.  It's a Porter's five forces analysis.  He is a professor at

7   the Harvard Business School that teaches supply chain and

8   negotiation tactics.

9   Q.  And did you bring this preparation into your work for the

10  2015 bidding process?

11  A.  Yes, ma'am.

12  Q.  You were also asked some questions about Defendant Austin's

13  comments at the barbecue lunch at Mama's?

14  A.  Yes, ma'am.

15  Q.  And the fact that you did have the loads lined up.  Do you

16  recall that?

17  A.  Yes.

18  Q.  If you had the loads lined up, why do you still remember

19  Defendant Austin's comment eight years later?

20  A.  Because I took his comments to mean that he believed that

21  he knew what all the other suppliers were doing.

22  Q.  And had you had a supplier tell you something like this

23  before?

24  A.  No, ma'am.

25  Q.  How did you react to it at the time?

Peter Suerken - Redirect

1   A.   I was stunned.  I couldn't believe he was telling me that.

2   Q.   Now, Mr. Suerken, talking about the first-round bids that

3   the suppliers submitted to KFC, do you recall how the bids from

4   the different chicken suppliers compared to each other?

5   A.   A bit of it, yes, ma'am.

6   Q.   What do you recall?

7   A.   Pilgrim's was the most expensive and George's was the least

8   expensive.

9   Q.   Do you recall how similar in price they were or I should

10  say whether they were similar in price?

11  A.   Yes.  I was surprised at how eerily similar several of the

12  offers were.

13  Q.   Do you recall how bids from all seven of the suppliers

14  compared to RSCS's expectations?

15  A.   Yes.

16  Q.   How did they compare?

17  A.   They were all much, much higher.

18  Q.   Can you give any sort of context to how much higher they

19  were?

20  A.   12 to 17 percent, 12 to 18 percent higher, something like

21  that.

22  Q.   And is it possible to answer that question not in

23  percentages, Mr. Suerken, but in terms of if you were expecting

24  an increase of a certain size, was this increase double that

25  size, triple that size?

Peter Suerken - Redirect

1    A.  Three to four times.

2    Q.  The size of the increase that you were expecting.

3    A.  Yeah, three to four to four and a half times what we were

4    expecting.

5    Q.  And did your expectations take into account the challenges

6    in the small-bird market at the time?

7    A.  Yes.

8    Q.  Mr. Suerken, do you recall approximately how much market

9    share Claxton had at KFC?

10   A.  Yes.

11   Q.  How much?

12   A.  15 -- 13, 14, 15 percent, something like that.

13   Q.  More than 1 percent?

14   A.  Yes, ma'am.

15   Q.  You testified on cross-examination about volume shifting --

16   or shifting volume away from Pilgrim's for the 2015 contract?

17   A.  Ask the question again?  I believe I misspoke on the

18   previous question.  Could you ask that question again, the last

19   one?

20   Q.  Sure.  Do you recall -- the question was, approximately how

21   much market share did Claxton have at KFC?

22   A.  It would have been -- I misspoke there.  It would have been

23   7 -- 6, 7, 8 percent, something like that.

24   Q.  But either way, that's still larger than 1 percent?

25   A.  Yeah.  So I just want to make sure I was correct.

1413

Peter Suerken - Redirect

1   *Q.* I appreciate that. You are welcome to correct your

2   answers.

3          So you testified on cross-examination about shifting

4   volume away from Pilgrim's for the 2015 contract?

5   *A.* Yes.

6   *Q.* Was your decision to shift volume impacted by freight

7   costs?

8   *A.* Yes.

9   *Q.* How so?

10  *A.* Because we took into account the -- we awarded business --

11  freight is ultimately a part of the price, and the lower the

12  freights you pay, the lower the price you pay. So, therefore,

13  there were facilities that had -- that geographically were

14  closer to where we needed the chicken, and less freight meant a

15  lower price.

16  *Q.* And who pays for the freight?

17  *A.* The KFC store operator ultimately.

18  *Q.* Can a chicken supplier move its location in order to be

19  better cost advantaged to KFC?

20  *A.* No, ma'am.

21  *Q.* You also testified that this was the worst RFP you ever ran

22  in your career. Was that true even though you were able to

23  move volume away from Pilgrim's?

24       *MR. KORNFELD:* Your Honor, objection. This is beyond

25  the scope of the cross-examination.

1    *THE COURT:*  Response?

2    *MS. WULFF:*  Your Honor, he was asked a number of

3    questions about the fact that the price -- how the prices

4    compared to the expectations, what he should have been

5    expecting in the market given the market conditions at the

6    time, and I believe this question goes to all the factors that

7    he was taking into consideration.  He also was asked about the

8    fact that he moved volume away from Pilgrim's and why he did

9    so.

10   *THE COURT:*  Overruled.

11   *BY MS. WULFF:*

12   *Q.*  Mr. Suerken, you testified that this was the worst RFP you

13   ever ran in your career.  Was this true even though you were

14   able to move volume away from Pilgrim's for the 2015 contract?

15   *A.*  Yes, ma'am.

16   *MS. WULFF:*  No further questions, Your Honor.

17   *THE COURT:*  All right.  And may Mr. Suerken be excused

18   without being subject to recall?

19   *MS. NIELSEN:*  Your Honor, we would ask he remain

20   subject to recall.

21   *THE COURT:*  Then, Mr. Suerken, I will let someone from

22   the government explain exactly what that means, but at this

23   time, you are excused.  Thank you.

24   The United States may call its next witness.

25   *MR. LOVELAND:*  Your Honor, at this point, the United

1    States would seek to publish a series of exhibits for the

2    jury's consideration.

3            THE COURT:  Go ahead.

4            MR. LOVELAND:  Your Honor, I would first seek the

5    Court's permission to publish Government's Exhibit 1522.

6            THE COURT:  You may.

7            MR. LOVELAND:  Thank you, Your Honor.

8            THE COURT:  Okay.

9            MR. LOVELAND:  Next we would seek the Court's

10   permission to publish 1523.

11           THE COURT:  You may.

12           MR. LOVELAND:  Thank you, Your Honor.

13           THE COURT:  All right.

14           MR. LOVELAND:  We would seek the Court's permission to

15   publish 1035, Your Honor.

16           THE COURT:  You may.

17           MR. LOVELAND:  Thank you, Your Honor.

18           THE COURT:  All right.

19           MR. LOVELAND:  Court's permission to please publish

20   1036 for the jury.

21           THE COURT:  You may.

22           MR. LOVELAND:  Thank you.

23           THE COURT:  Mr. Loveland, it looks like you are

24   publishing one page, and this is the second page.

25           MR. LOVELAND:  If we can start at the first page,

1   Mr. Dunn, and zoom out so that the jury can see the sticker and

2   the Court can as well.  And now, Mr. Dunn, if you could just

3   focus on the text of page 1.

4           Your Honor, this is a two-page exhibit.

5           THE COURT:  All right.  All right.

6           MR. LOVELAND:  The Court's permission to please

7   publish Government's Exhibit 803.

8           THE COURT:  You may.

9           MR. LOVELAND:  Thank you, Your Honor.

10          THE COURT:  All right.

11          MR. LOVELAND:  Your Honor, I would ask the Court's

12  permission to admit and publish Government's Exhibit 58 which

13  is a summary chart, Your Honor.

14          THE COURT:  Any objection to the admission of

15  Government's Exhibit 58?

16          Exhibit 58 will be admitted and may be displayed to

17  the jury.

18          Ladies and gentlemen, once again, this is one of the

19  summary exhibits, and you should follow the same admonition as

20  I have given to you as far as the other summary exhibits.

21          MR. LOVELAND:  Your Honor, we are going to adjust the

22  screen a little bit so the jury can see the date displayed on

23  the left-hand side.

24          THE COURT:  That's fine.

25          All right.  All right.  All right.  All right.  All

1    right.  All right.  All right.  Mr. Loveland, that's the same

2    page, right?  It got readjusted, but I think that's the same

3    view as before except a little expanded.

4            MR. LOVELAND:  Yes, Your Honor.  I think Mr. Dunn

5    shifted things a little bit, so we are on page 4 of this

6    exhibit.

7            And, Mr. Dunn, if you can focus on the bottom half

8    with the Court's permission.

9            THE COURT:  All right.

10           MR. LOVELAND:  Turning to page 5 of 6 of this exhibit,

11   Your Honor.

12           THE COURT:  All right.  All right.

13           MR. LOVELAND:  This is the last page, 6, of this

14   Government's Exhibit 58, Your Honor.

15           THE COURT:  All right.

16           MR. LOVELAND:  Your Honor, the government would seek

17   to admit and publish Government's Exhibit 59 which is another

18   summary chart.

19           THE COURT:  You may.

20           And, ladies and gentlemen, let me just refresh your

21   memory as to that admonition.  So once again, each of the

22   exhibits that the exhibit purports to summarize is listed on

23   the right, and those summaries are being admitted because they

24   may assist you in understanding the evidence that has been

25   presented, but keep in mind that a summary is not evidence of

1418

1    the material it summarizes, and it is only as valid and

2    reliable as of the underlying material that it seeks to

3    summarize.  You may give a summary exhibit entire weight, some

4    weight, or no weight at all depending on your assessment of the

5    underlying material and the accuracy of the summary.

6              All right.  59 will be admitted and may be displayed.

7              *MR. LOVELAND:*  Thank you, Your Honor.

8              For the Court's record, this is a two-page document.

9    Mr. Dunn is going to focus us on the top portion of page 1.

10             *THE COURT:*  All right.  All right.

11             *MR. LOVELAND:*  Mr. Dunn will now take us to page 2,

12   Your Honor.

13             *THE COURT:*  All right.

14             *MR. LOVELAND:*  Your Honor, the government would seek

15   to admit and publish Government's Exhibit 60, which is a

16   summary chart.

17             *THE COURT:*  Any objection to the admission of 60?

18             Ladies and gentlemen, the same admonitions as to

19   Exhibit 60, which is a summary chart.

20             Exhibit 60 will be admitted and may be published.

21             *MR. LOVELAND:*  Thank you, Your Honor.

22             Again, this is a two-page summary chart.

23             *THE COURT:*  Okay.  Okay.

24             *MR. LOVELAND:*  On the second page, Your Honor,

25   Mr. Dunn will focus us in on the content.

1        *THE COURT:*  All right.

2        *MR. LOVELAND:*  Your Honor, the government would seek

3   to admit and publish Government's Exhibit 61, which is another

4   summary chart.

5        *THE COURT:*  Any objection to the admission of 61?

6        Exhibit 61 will be admitted.  It may be published.

7   And, once again, ladies and gentlemen, same admonition.  This

8   is a summary exhibit.

9        *MR. LOVELAND:*  This is three pages, Your Honor.

10       *THE COURT:*  All right.  All right.

11       *MR. LOVELAND:*  On to page 2 now, Your Honor.

12       *THE COURT:*  All right.  All right.

13       *MR. LOVELAND:*  And this is the last page, Your Honor.

14       *THE COURT:*  All right.

15       *MR. LOVELAND:*  Your Honor, the government would seek

16   to admit and publish Government's Exhibit 62, which is another

17   summary chart.

18       *THE COURT:*  Any objection to the admission of

19   Exhibit 62?

20       Exhibit 62 will be admitted.  It may be published.

21       And, ladies and gentlemen, once again, same

22   admonitions.  This is another summary exhibit.

23       All right.  All right.

24       *MR. LOVELAND:*  This is the second and last page, Your

25   Honor.

1    *THE COURT:*  All right.

2    *MR. LOVELAND:*  Your Honor, the government would seek

to publish Government's Exhibit 1856.

3

4    *THE COURT:*  You may.  All right.

5    *MR. LOVELAND:*  The government would next seek to

6    publish Exhibit 1858.

7    *THE COURT:*  You may.  All right.

8    *MR. LOVELAND:*  Your Honor, the government would seek

9    permission to publish 1862.

10    *THE COURT:*  You may.

11    *MR. LOVELAND:*  Thank you.

12    *THE COURT:*  All right.

13    *MR. LOVELAND:*  Your Honor, at this time, the

14    government would ask for a moment to confer.

15    *THE COURT:*  You may.

16    *MR. LOVELAND:*  Your Honor, permission to step outside

17    the well for a moment?

18    *THE COURT:*  You may.

19    *MR. LOVELAND:*  Your Honor, the government rests its

20    case.

21    *THE COURT:*  Thank you.

22    Ladies and gentlemen, when the government rests its

23    case, it means that the government has concluded the evidence

24    for its case in chief.  At this time, then, I need to have a

25    side bar with the attorneys, so let's do that at this time.

1        (At the bench:)

2            THE COURT:  Any motions for judgment of acquittal at

3   this stage on behalf of defendants?  Why don't I go one by one.

4   On behalf of Mr. Penn?

5            MR. TUBACH:  Yes, Your Honor, on behalf of Mr. Penn, I

6   move for judgment of acquittal under Rule 29 because the

7   evidence is insufficient to sustain a conviction.  Pursuant to

8   the Court's direction, we will supplement this oral motion with

9   a written submission on a date as directed by the Court.

10           THE COURT:  Thank you, Mr. Tubach.

11           Any motion for judgment of acquittal on behalf of

12  Mr. Fries?

13           MR. KORNFELD:  Yes, thank you, Your Honor.

14           On behalf of Mr. Fries, we also would make a motion

15  for judgment of acquittal pursuant to Rule 29 based on the

16  insufficiency of the evidence, and we too will supplement in

17  writing on a day at the direction of the Court.

18           THE COURT:  Any motion for acquittal on behalf of

19  Mr. Brady?

20           MR. LAVINE:  Yes, Your Honor.  On behalf of Mr. Brady,

21  we also have a motion for judgment of acquittal under Rule 29

22  based on the fact the evidence is insufficient to sustain a

23  conviction, and we will also supplement according to the

24  Court's order.

25           THE COURT:  Thank you, Mr. Lavine.

1        On behalf of Mr. Austin, any motion for judgment of

2   acquittal?

3        *MR. FELDBERG:*  Yes, Your Honor.  On behalf of

4   Mr. Austin, we move for judgment of acquittal on the ground

5   that the evidence is insufficient to sustain a conviction.  We

6   will supplement our oral motion with a written filing at a time

7   directed by the Court.

8        *THE COURT:*  Thank you, Mr. Feldberg.

9        On behalf of Mr. Lovette, any motion for judgment of

10  acquittal?

11       *MR. FAGG:*  Yes, Your Honor.  On behalf of Mr. Lovette,

12  we move for judgment of acquittal pursuant to Rule 29 because

13  the evidence even taken in the light most favorable to the

14  government is insufficient to sustain a conviction.  And

15  pursuant to the Court's directive, we will submit a written

16  supplement to this oral motion.

17       *THE COURT:*  Thank you, Mr. Fagg.

18       Mr. Lavine, we are -- we would have time to fit your

19  opening in, assuming that you are ready to do that.  Would that

20  be your preference?  It probably would take us close to

21  5:00 o'clock.

22       *MR. LAVINE:*  Your Honor, I can do it now, or I can do

23  it first thing in the morning, whatever is the Court's

24  position.

25       *THE COURT:*  Why don't we do it now.  I think it might

1    be -- as long as you are ready to go on it.

2         MR. LAVINE:  I am fine, Your Honor.

3         THE COURT:  Okay.  Thank you very much.

4         (In open court:)

5         THE COURT:  Ladies and gentlemen, so once the

6    government has rested, as you will recall, the defendants don't

7    have any obligation whatsoever to introduce evidence, but they

8    certainly may if they choose to do.  You will also recall that

9    Mr. Brady reserved his opening.  So at this time, I will ask,

10   and it looks like he is, ready to proceed with an opening

11   statement.

12        Mr. Lavine, go ahead.

13        MR. LAVINE:  Your Honor, if I could ask the Court, two

14   minutes?

15        THE COURT:  Yes, I will give you a two-minute warning.

16        MR. LAVINE:  Could you, please, sir?  Thank you.

17                          **OPENING STATEMENT**

18        MR. LAVINE:  When we don't know all the facts, we jump

19   to conclusions.  We make assumptions.  We draw inferences.  We

20   fill in the gaps and tell ourselves a story to help us figure

21   out what exactly is going on.  But these stories that we tell

22   ourselves are often wrong because we don't have all the facts,

23   and that is exactly what is happening in this courtroom today.

24        The prosecution's story is light on actual facts.

25   It's a story full of plot holes and missing details.  We all

1    know that it's the plot that makes the story so compelling, but

2    the prosecution's story is short on plot, light on facts, and

3    long on speculation, assumption, and inferences, and there is

4    no place for that in a federal courtroom.

5         This case is about whether these men had an agreement

6    to fix prices and rig bids for the sale of chicken.  But

7    because an agreement never happened, the government spends a

8    tremendous amount of time talking to you about things that have

9    absolutely nothing to do with the existence of an agreement to

10   fix prices and rig bids.

11        There is no "I will if you will" in the prosecution's

12   case.  By distracting you with a story about the conduct the

13   prosecution doesn't like or fully understand, like suppliers

14   sharing pricing information during negotiations, the government

15   wants you to assume these men had an agreement to fix prices

16   and rig bids.  They want you to infer an agreement from the

17   fact that these men communicated about prices, and they want

18   you to fill in the details they aren't able to provide in the

19   hope that you'll find that there was an illegal agreement.

20        By discussing pricing with each other during the

21   prosecution -- what the prosecution argues is a blind-bidding

22   process is not a violation of the Sherman Act.  It is not a

23   conspiracy.  It is not an agreement.  And most importantly, it

24   is not illegal.

25        The prosecution must prove beyond a reasonable doubt

 1    that there was a conspiracy in the chicken industry and that

 2    each one of these men knowingly joined that conspiracy, that

 3    these men entered into an agreement to break the law.  The

 4    conspiracy is the agreement to fix prices.  It is not an

 5    agreement to talk to each other or agreement to share pricing

 6    information or an agreement to discuss strategy during the

 7    bidding process.  And I am not standing here today trying to

 8    convince you that you have to like the fact that these

 9    individual suppliers talk to each other.  That's not what you

10    are being asked to decide.  It is your job to determine whether

11    or not these men agreed to break the law.

12            But the prosecution cannot prove to you beyond a

13    reasonable doubt that there was a conspiracy that existed.  At

14    best, the prosecution is asking you to infer or assume that

15    there was a price-fixing agreement.  Not one credible witness

16    says there is a conspiracy.  They dump hundreds of texts and

17    e-mails on you without any witness to explain them.  They don't

18    even show you the details of the claims or the prices they say

19    are fixed.

20            They don't show you all the bids and the contracts.

21    They don't take the time to either explain any of these

22    documents to you.  And without any of these facts, they ask you

23    to fill in the missing details and somehow find an agreement

24    existed, but that is not your job.  So let's talk about some of

25    these missing details, those missing facts, those plot holes.

1426

1      We all know that Claxton doesn't give away its chicken

2    for free.  Selling chicken is a process.  It requires

3    negotiation between the customer and the supplier.  You've

4    heard a little bit about this process, and you're going to hear

5    more about it.  You've heard it referred to as a blind bid, but

6    it's an actual negotiation, a back and forth between supplier

7    and the customer.  It's not as if the suppliers put their

8    chicken price in a sealed envelope, and the customer picks up

9    the best bid, and a winner take all.  There is plenty of

10   business to go around, and the big fast-food customers need

11   more than supplier, especially in the small-bird market.

12      Now, after the suppliers put out their RFP, the

13   customers and the suppliers sit down and they negotiate price.

14   And just as important, they negotiate volume.  Claxton is

15   trying to sell chicken at a price that is right for them, and

16   the customer is trying to buy chicken at a price that is right

17   for them.  And the customer uses volume as a negotiating tool

18   to obtain a lower price from the supplier.

19      This is a back-and-forth process that takes months,

20   phone calls, e-mails, in-person meetings.  The customer

21   provides feedback to the suppliers on the suppliers' bids.

22   Sometimes the customers are honest about their feedback, and

23   sometimes they bluff to get a lower price.  Multiple rounds of

24   back and forth on prices until a final contract is reached.

25      So how did the bids at Claxton get done where Mikell

1    and Scott worked?  Well, Greg Finch, Claxton's CFO, is going to

2    tell you.  Now, Mr. Finch was directly involved in the pricing

3    process at Claxton, will tell you the pricing at Claxton is

4    done independently each and every time.  He and the pricing

5    team come up with Claxton's initial bids without reliance on

6    any future pricing from any competitor and without an agreement

7    with anyone to fix prices and rig bids.  Claxton's pricing is

8    the result of independent business decisions.  It is not the

9    result of any understanding or agreement with competitors.

10        Claxton's bids are not manipulated by competitor

11   agreement.  And Mr. Finch will tell you that Scott Brady is not

12   involved in determining the initial bid and that Scott Brady

13   does not have pricing authority.  Scott is a salesman for

14   Claxton.  He sells chicken.  He doesn't price it.  Scott talks

15   on the phone with competitors a lot.  You will see charts the

16   government has with Scott's phone calls.  He is on the phone

17   all the time with competitors, customers, distributors.  He is

18   a salesman doing his job.

19        Scott also exchanged pricing information with

20   competitors a handful of times over nine years.  Scott Brady

21   does not have pricing authority.  And Scott Brady cannot and

22   did not affect an agreement to fix prices and rig bids.

23        And you will hear how Mikell and Scott and Claxton

24   respond to the directional guidance of Claxton's customers like

25   KFC each and every time during that negotiation process.  All

1    that means is that Claxton lowers its price when a customer

2    asked it to.  The evidence will show that Claxton does so every

3    single time it is asked.

4         Following the directional guidance of their customers

5    like KFC, Claxton lowered pricing during the negotiations and

6    always competed for more volume.  Claxton did not raise prices

7    to match any of its competitors.  Claxton lowered prices and,

8    in lowering prices, Claxton undercut its competitors and took

9    their volume so Claxton would have more loads of chicken to

10   sell.  That is how Claxton makes money and that, members of the

11   jury, is competition.

12        That's the evidence in this case, and it is completely

13   inconsistent with an agreement to fix or raise prices.

14        Now, Mr. Bryant, the government's supposed insider, he

15   didn't testify that he had an agreement with Scott Brady,

16   Mikell Fries, or anyone at Claxton to fix prices, and he didn't

17   testify that anyone ever told him that they had an agreement

18   with Mikell Fries, Scott Brady, or anyone at Claxton to fix

19   prices, and whether that was to increase prices in 2014 or to

20   limit a decrease in price in 2017.  Mr. Bryant offers no

21   evidence that Mikell or Scott entered into an agreement to do

22   anything.

23        And Mr. Bryant has not spoken to Scott Brady since

24   Scott started working at Claxton in 2012, 10 years ago, no

25   phone calls, no e-mails, no text messages, nothing.

1        Now, Mr. Bryant said he heard that everyone was

2   raising prices in 2014, and he says Pilgrim's got pricing

3   information and used that pricing information to formulate its

4   own bid in 2017.  But Mr. Bryant's entire testimony is based on

5   three things:  Speculation, assumption, and inferences.

6        So let's talk about what you are going to hear from

7   the defense about the 2015 bid for KFC.  You will hear about

8   the market conditions in 2014.  Mr. Eddington, who was brought

9   in as the poultry expert for RSCS in 2014 to work with

10  Mr. Suerken and Mr. Lewis, will tell you that the market

11  conditions were not favorable to RSCS.  KFC was running out of

12  chicken.  RSCS was paying a premium to secure supply of

13  chicken.  And large birds were $1 per bird more profitable than

14  small birds, which are the birds that KFC was buying.

15       Mr. Lewis and Mr. Suerken will tell you the same

16  thing.  It was the perfect storm.  Now, this is not some

17  made-up story by the suppliers trying to scare the customers

18  into paying more for chicken.  It was the reality of the market

19  conditions at the time of the negotiations whether the

20  prosecution recognizes that or not.

21       Now, because of the market conditions, RSCS had to pay

22  a premium to suppliers to address the price difference between

23  the big-bird margin and the small-bird.  And you will hear from

24  Mr. Finch how Claxton in late July of 2014 independently came

25  up with their big-bird premium number that was used in initial

1    bids submitted to KFC and how it was that same price that

2    Claxton submitted to KFC on August the 19th, 2014, the exact

3    same price that he forwarded to Mikell and Scott on August the

4    1st, 2014, 19 days before Claxton submitted its initial bid.

5    The price never changed from Mr. Finch's initial calculation in

6    late July 2014 to when the bid was actually submitted to KFC on

7    August the 19th, 2014.  No changes, despite those telephone

8    calls between suppliers on the prosecutor's charts.  Mr. Finch

9    calculated that price independently.  And once it was

10   calculated, it was the price that was submitted as Claxton's

11   initial bid proposal.

12          Now, there will be no dispute that the initial bids

13   from the suppliers in 2014 were high, and RSCS was not happy.

14   But Mr. Eddington will tell you, and Mr. Suerken already has

15   acknowledged, that the market conditions justified an increase

16   in pricing.  And at the end of the negotiations, Mr. Eddington,

17   the poultry expert for RSCS, will tell you that the pricing for

18   2015 ended up at the high end of the range that he expected.

19          Now, Ms. Fisher and Mr. Eddington will also tell you

20   about the 2017 negotiations.  First, Scott Brady on behalf of

21   Claxton asked for more volume.  He asked for 25 percent more

22   volume.

23          Two, Mr. Eddington will tell you how RSCS set up the

24   initial meetings with the suppliers to help with messaging

25   because RSCS knew that the suppliers talked and he wanted to

1    take advantage of it.  He expected the suppliers to talk among

2    themselves during those initial meetings.

3            Three, Claxton renegotiated its contract at the

4    request of RSCS before its current contract was even up and

5    once again decreased its price.

6            Four, Claxton dropped its price over 10 cents.

7            And five, Pilgrim's lost volume once again.

8            But Mr. Bryant, well, he also believed that there was

9    an understanding in 2017 to limit the price decrease, and his

10   handwritten notes reflected competitor bid information he was

11   provided by Mr. Austin.  And because he had this information,

12   he again wrongly and without any factual -- any actual facts

13   assumed that there was some agreement.  But Mr. Bryant was not

14   acting pursuant to any agreement.  He received pricing

15   information, and he came up with Pilgrim's price based on what

16   was best for Pilgrim's.  He did not know what anybody did or

17   what anybody intended to do.  And he tried to undercut Claxton.

18           Now, I've talked to you about 2015 and 2018 contracts

19   for KFC, but the government alleges a conspiracy from 2012.

20   And, of course, that's another missing chapter from the

21   government's story as the prosecution is not going to present

22   any evidence about any other negotiations as in 2012 and 2013

23   and instead ask you to assume what happened based on a bunch of

24   documents produced to you without any witness testimony

25   whatsoever.

1               But assumptions don't cut it in federal criminal case.

2      Facts do.  And you will hear from Mr. Ledford who was the

3      respected poultry expert for RSCS prior to leaving for

4      Chick-fil-A in 2014 who will tell you what happened during

5      those negotiations.  He will provide actual facts, not

6      assumptions.  The defense will provide you the missing details.

7               The evidence will show that the consistency and

8      history of Claxton's course of conduct as it relates to

9      developing its pricing and negotiating with customers, and you

10     will see that that evidence is entirely inconsistent with an

11     agreement to fix prices and rig bids in every single year.

12     Numbers do not lie.  The evidence of the initial bid

13     submissions, the movement in the subsequent rounds of

14     negotiations, the final contracts, the volume allocations all

15     will show there was no agreement.  These details are important.

16              And you don't have to take my word for it.  We are

17     also going to show you the objective economic data, and we will

18     call an economist, Ted Snyder, to talk to you about it.  He is

19     a professor of economics and used to work as a economist for

20     the antitrust division of the Department of Justice where these

21     prosecutors work.  Professor Snyder spent decades studying the

22     economics of price-fixing.  We asked Professor Snyder to study

23     the objective data, the prices and the bids in this case, and

24     he did.  And he will tell you that the objective data does not

25     support the prosecution's story.

1        THE COURT:  Two minutes, Mr. Lavine.

2        MR. LAVINE:  Thank you, Your Honor.

3        Professor Snyder will explain to you how he reached

4   that conclusion, but I want to preview two things for you.

5   First, you will hear a lot of about chicken suppliers

6   exchanging pricing information as if there is something wrong

7   with that.  Professor Snyder will explain to you the economics

8   of information exchange.  He will tell you why information

9   exchanges occur in many industries for perfectly valid reasons

10  having nothing to do with price-fixing.  And he will explain

11  why economists would expect to see information exchanged in the

12  broiler chicken industry too.

13        Second, Professor Snyder will put the price increases

14  you will hear about in context.  You will hear testimony about

15  historic price increases.  Professor Snyder will show you that

16  the spike in prices in 2015 was not abnormal.  Price spikes and

17  dips happen year after year in the chicken industry just like

18  any other industry and that is because supply and demand, not

19  price-fixing.

20        The facts are important.  The details matter.

21        The agreement the government has the burden to prove

22  is an agreement to fix prices and rig bids, not an agreement to

23  exchange pricing, not an agreement to confer during the

24  blind-bid process.  You will not see any evidence that there

25  was an agreement to fix prices and rig bids or that Scott Brady

1   or Mikell Fries entered into an agreement to fix prices and rig

2   bids.

3          Scott did not enter into an agreement to fix prices

4   and rig bids.  Mikell did not enter into an agreement to fix

5   prices and rig bids.  None of these men because no such

6   conspiracy existed.

7          When the Department of Justice indicts five men and

8   turns their lives upside down and accuses them of serious

9   federal crimes, you would think the prosecution would have the

10  facts to back up the allegations.  In this case, the

11  prosecutors not only don't have the facts to back up or support

12  their story, but they also don't see fit to show you the whole

13  story.  The defense isn't afraid of the whole story because

14  it's the truth.

15         The truth of this case is that there was no

16  conspiracy.  The truth of this case is that Scott Brady is not

17  guilty.  And the truth of this case is that all five of these

18  men are innocent.  At the end of this trial, we will stand up

19  in front of you again and ask that you return and render the

20  only verdict that can be with regard to the facts and evidence

21  in this case, and that is a verdict of not guilty for Scott

22  Brady.

23         Thank you.

24         *THE COURT:*  Thank you, Mr. Lavine.

25         Ladies and gentlemen, then tomorrow we will resume at

1    the same time, and at that time, the defendants will have an

2    opportunity to call witnesses.  Keep the admonitions in mind.

3    Make sure that you don't get lured into any of those

4    conversations that we had talked about on previous occasions.

5    Hope you have a good evening, and we will see you back tomorrow

6    at 8:30.  The jury is excused.

7              (Jury excused.)

8              THE COURT:  I guess I anticipate that we'll have time

9    tomorrow to talk about some different issues.  I would propose

10   that we not stay late tonight.  I would also propose that the

11   defense can think about when it may be a reasonable deadline

12   for them to submit their Rule 29 motions, so we'll talk about

13   that tomorrow too.

14             Anything that you think that we should discuss

15   tonight?  Anything on behalf of the United States, Mr. Hart?

16             MR. HART:  The only thing is the government would look

17   forward to receiving the revised witness list.

18             THE COURT:  Yes.  We talked about that, and we

19   anticipate that that's going to be discussed tonight amongst

20   the defendants, so look for that tomorrow morning.

21             Anything else, Mr. Hart?

22             MR. HART:  One other topic, the Court suggested that

23   we might cover jury instructions tomorrow.  If you could

24   provide some guidance, we just want to be prepared.

25             THE COURT:  Maybe, maybe not.  We might do that, but

1  it certainly wouldn't be anything like a final jury instruction

2  conference.  There were some different proposals going back and

3  forth.  I was thinking of that as something that we could do,

4  but we'll see.  We'll play that by ear.

5            Anything on behalf of the defendants?

6            All right.  We will reconvene then tomorrow at 8:30.

7  The Court will be in recess.  Thank you.

8       (Recess at 4:58 p.m.)

9                              **INDEX**

10  **WITNESSES**

11     **Robert Lewis**

12          **Cross-Examination Continued By Mr. Lavine      1217**

13          **Cross-examination By Ms. Pletcher            1264**

14          **Cross-examination By Ms. Nielsen            1265**

15          **Cross-examination By Mr. Feldberg           1266**

16          **Redirect Examination By Mr. Hart           1277**

17

18

19

20

21

22

23

24

25

1                              INDEX Continued

2    WITNESSES

3        Peter Suerken

4            Direct Examination By Ms. Wulff              1296

5            Cross-examination By Ms. Nielsen            1364

6            Cross-examination By Mr. Feldberg          1394

7            Cross-examination By Mr. Kornfeld          1395

8            Redirect Examination By Ms. Wulff          1408

9    OPENING STATEMENT

10       By Mr. Lavine                                    1423

11                              EXHIBITS

12   Exhibit         Offered   Received  Refused  Reserved  Withdrawn

13   58                        1416

14   59                        1418

15   60                        1418

16   61                        1419

17   62                        1419

18   E-158                     1382

19   J-266                     1257

20   F-384                     1230

21   C-451                     1229

22   G-504                     1228

23   559                       1291

24   E-570                     1288

25

1

INDEX (Continued)

2

EXHIBITS

3

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---------|---------|----------|---------|----------|-----------|
| A-644 | | 1224 | | | |
| F-743 | | 1219 | | | |
| F-788 | | 1219 | | | |
| C-872 | | 1230 | | | |
| E-873, E-874 | | 1290 | | | |
| F-882 | | 1240 | | | |
| 953 | | 1292 | | | |
| 955 | | 1293 | | | |
| 1027 | | 1250 | | | |
| 1056 | | 1290 | | | |
| 1060 | | 1341 | | | |
| 1547 | | 1289 | | | |
| 1801 | | 1360 | | | |
| 9992 | | 1355 | | | |

18

REPORTER'S CERTIFICATE

19

    I certify that the foregoing is a correct transcript from

20

the record of proceedings in the above-entitled matter.  Dated

21

at Denver, Colorado, this 15th day of June, 2022.

22

23

                              S/Janet M. Coppock
                              _____

24

25