1       IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
2

Criminal Action No. 20-CR-00152-PAB
3   In Re: Penn III

4   UNITED STATES OF AMERICA,

5       Plaintiff,

6   vs.

7   JAYSON JEFFREY PENN,
    MIKELL REEVE FRIES,
8   SCOTT JAMES BRADY,
    ROGER BORN AUSTIN,
9   WILLIAM WADE LOVETTE,

10      Defendants

11  _____

                    REPORTER'S TRANSCRIPT
12                   Trial to Jury, Vol. 13

13  _____

14          Proceedings before the HONORABLE PHILIP A. BRIMMER,

15  Chief Judge, United States District Court for the District of

16  Colorado, commencing at 8:30 a.m., on the 5th day of July,

17  2022, in Courtroom A201, United States Courthouse, Denver,

18  Colorado.

19

20

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
      Produced via Computer by Janet M. Coppock, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 335-2106

1                              APPEARANCES

2          Kevin Hart, Leslie Wulff, Paul Torzilli and Daniel

3    Loveland, U.S. Department of Justice, 450 Fifth Street N.W.,

4    Washington, DC 20530, appearing for Plaintiff.

5          Anna Tryon Pletcher and Michael Tubach of

6    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

7    San Francisco, CA 94111-3823;

8          Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

9    N.W., Washington, DC 20006, appearing for Defendant Penn.

10          David Beller, Richard Kornfeld and Kelly Page of

11   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

12   CO 80202, appearing for Defendant Fries.

13          Bryan B. Lavine and Laura Anne Kuykendall of Troutman

14   Pepper Hamilton Sanders, LLP, 600 Peachtree Street NE,  Suite

15   3000, Atlanta, GA 30308;

16          Megan Rahman of Troutman Pepper Hamilton Sanders, LLP,

17   1001 Haxall Point, Richmond VA 23219, appearing for Defendant

18   Brady.

19          Michael Felberg of Reichman, Jorgensen, Lehman,

20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21   10017;

22          Laura F. Carwile of Reichman, Jorgensen, Lehman,

23   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

24   CA 94065; appearing for Defendant Austin.

25

1              APPEARANCES (Continued)

2          Dru Nielsen of Eytan Nielsen, 3200 Cherry Creek Drive

3    South, Suite 720, Denver, CO 80209;

4          John Anderson Fagg, Jr. and Frank Schall of

5    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

6    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

7                    *    *    *    *    *

8                      PROCEEDINGS

9          *THE COURT:*  We are back the record in 20-CR-152.

10         So it looks like after Mr. Bryant is done, then we

11   will rest the rebuttal case, so we will go into our final jury

12   instruction conference at that point.

13         Other than the revised theories of the case

14   instruction, I didn't receive any other comments or proposed

15   instructions, so I am assuming that there aren't any and that

16   would mean that the jury instructions conference should go

17   fairly quickly.

18         One thing on the theories of the case, Mr. Penn took

19   out most of the "Mr. Penn contends," and I am going to require

20   that people put more of those back in.  So, otherwise, the

21   changes are fine, but other than Mr. Lovette's which is fine,

22   Mr. Lovette doesn't have to make any changes, other than

23   Mr. Lovette's theory of the case instructions and Mr. Penn's,

24   other than him taking out all of the "contends," which I am not

25   going to allow him to take out, but otherwise the changes are

 1    all fine, not that the government -- I will give the government

 2    a chance to argue if they think that any of the wordsmithing is

 3    inappropriate, obviously, at the final jury instruction

 4    conference.  It seemed -- those other changes are fine to me,

 5    but if you need a paper copy and just want to interlineate and

 6    add some "contends" in there for the other defendants, let me

 7    know.  We can hand out a paper copy, and we will just look at

 8    those changes real quickly.

 9         Mr. Tubach?

10         MR. TUBACH:  No, Your Honor.  We can get a clean

11    version with the "contends" back in.

12         THE COURT:  You are good at that, but I just didn't

13    want to -- just in case someone didn't have the technical

14    facility.  And it's perfectly fine to interlineate too because

15    we can make the changes real quickly because we have to make

16    them anyway, okay?

17         Anything else we should talk about, Mr. Beller?

18         MR. BELLER:  Thank you, Your Honor.  Very quickly, and

19    that is over the weekend I did realize we actually don't have a

20    presumption of innocence in any of the jury instructions.

21         THE COURT:  That's a problem.

22         MR. BELLER:  That's a problem.  Your Honor, my

23    apologies for having not filed this last night, but I did

24    incorporate some language from a recent 10th Circuit decision,

25    so I mention it now only because the Court mentioned not having

1    any new instruction, and I actually do have one that I would

2    like to tender.

3            THE COURT:  Yeah.  Why don't you go ahead and tender

4    that at this time.

5            MR. BELLER:  Your Honor, I did so in Instruction No.

6    3, which is the reasonable doubt instruction.  I simply

7    tendered it using language out of the 10th Circuit case that

8    was decided last month, and that is *United States v. Starks*, 34

9    F.4th 1142.  For purposes of the parties, Your Honor, it is --

10   what is interlineated is the second sentence that starts with

11   the word "you" and then that particular phrase ends with the

12   superscript of 1 or the footnote of 1, so that is the language

13   that I took out of the *Starks* case and added to Instruction 3.

14           THE COURT:  Okay.  Yeah, I will take a look at that.

15   Of course, the preliminary jury instructions where we did

16   mention the presumption of innocence would be considered as a

17   jury instruction as a whole, not that this is inappropriate,

18   but I haven't had a chance to look at it, but I appreciate your

19   tendering that instruction.

20           MR. BELLER:  Thank you, Your Honor.

21           THE COURT:  All right.  So we will talk about that as

22   well.

23           Any other issues to take up before we bring the jury

24   in?  Why don't we get Mr. Bryant as well.  Did you have

25   something from the government, Mr. Hart?

Robert Bryant - Direct

1      MR. HART:  No, I just wanted to inform the Court

2  nothing from the government, Your Honor.

3      THE COURT:  Good morning, ladies and gentlemen.  Hope

4  you had a good Fourth of July weekend.  As you recall, we ended

5  on Thursday and the direct of Mr. Bryant on the rebuttal case,

6  and we will continue with that now.

7      Mr. Torzilli, go ahead.

8      MR. TORZILLI:  Thank you, Your Honor.

9      Good morning, Mr. Bryant.

10     (**Robert Bryant** was previously sworn.)

11     THE WITNESS:  Good morning.

12                    **DIRECT EXAMINATION CONTINUED**

13  BY MR. TORZILLI:

14  Q.  We were talking when we left off last week about the year

15  2014 and I want to pick up there, okay?

16     Did Defendant Roger Austin give Pilgrim's bid

17  information to Pilgrim's competitors as part of the agreement

18  among competitors to raise price that you talked about?

19     MR. BELLER:  Objection, foundation.

20     THE COURT:  Overruled.

21  A.  I don't know.

22  BY MR. TORZILLI:

23  Q.  Did Defendant Roger Austin receive bid information from

24  Pilgrim's competitors during the KFC bidding in 2014?

25     MR. BELLER:  Objection.  Foundation.

Robert Bryant - Direct

1          THE COURT:  He can answer if he knows.  Overruled.

2    A.   I don't know.

3    BY MR. TORZILLI:

4    Q.   Did you receive a set of e-mails from your boss in August

5    of 2014?

6    A.   I did.

7    Q.   Was that -- did that receipt of e-mails occur right before

8    the meeting that you were going to participate in with KFC?

9          MR. TUBACH:  Your Honor, this is asked and answered.

10   We went over this on Thursday afternoon.

11         THE COURT:  Sustained.

12   BY MR. TORZILLI:

13   Q.   Sir, were there e-mails that you received that indicated to

14   you that Defendant Roger Austin obtained bid information from

15   Pilgrim's competitors?

16         MR. FELDBERG:  Objection.  Leading and no foundation

17   in light of the witness' answers to the prior questions.

18         MR. TUBACH:  And also asked and answered from Thursday

19   afternoon.

20         THE COURT:  Sustained.

21   BY MR. TORZILLI:

22   Q.   Mr. Bryant, did Defendant Roger Austin communicate with

23   anyone at Claxton Poultry relating to Defendant Austin's

24   participation in the agreement among competitors to raise

25   prices to KFC in 2014?

Robert Bryant - Direct

1              MR. BELLER:  Objection.  Foundation, 602.

2              THE COURT:  Sustained on foundation.

3      BY MR. TORZILLI:

4      Q.  Do you know, just yes or no, whether Defendant Roger Austin

5      communicated with anyone at Claxton relating to Defendant

6      Austin's participation in the agreement among competitors to

7      raise the price of KFC chicken in 2014?

8              MR. FELDBERG:  Same objection.  Foundation, Your

9      Honor.

10             THE COURT:  Overruled.  He can answer that question.

11     BY MR. TORZILLI:

12     Q.  A yes-or-no question, Mr. Bryant.

13     A.  Yes.

14     Q.  How do you know?

15     A.  I overheard a phone call between Mr. Austin and Mr. Brady.

16     Q.  In that call, did Defendant Austin give Pilgrim's bid

17     strategy to Defendant Brady?

18             MR. FELDBERG:  Your Honor, didn't we go over this on

19     Thursday in redirect?  Asked and answered, objection.

20             THE COURT:  Response?  I cannot remember that.

21             MR. TORZILLI:  It was not asked.

22             MR. BELLER:  I join in that objection and respectfully

23     disagree with that.  I would also object to the

24     characterization that is stated in the question.

25             THE COURT:  Overruled, both objections.

Robert Bryant - Direct

1   *BY MR. TORZILLI:*

2   *Q.*  You can answer, Mr. Bryant.

3   *A.*  Yes.

4   *Q.*  I am sorry, could you say that again?

5   *A.*  Yes.

6   *Q.*  During that call that you overheard between Defendant

7   Austin and Defendant Brady, did you hear any discussion of

8   covering shortages?

9   *A.*  No, not that I recall, no.

10  *Q.*  For the 2014 KFC bids, the first-round bid, Mr. Bryant, to

11  your knowledge, did every competitor submit a first-round bid

12  to KFC that reflected a historically high price increase?

13       *MR. TUBACH:*  Lacks foundation, Your Honor.

14       *THE COURT:*  Sustained.  If you can lay foundation.

15  *BY MR. TORZILLI:*

16  *Q.*  Sure.  Do you, sir, have knowledge about the extent to

17  which Pilgrim's competitors submitted first-round bids to KFC

18  in 2014?

19  *A.*  Yes.

20  *Q.*  Do you know the relative magnitude of the first-round bids

21  that those competitors submitted to KFC?

22  *A.*  Similar to our own bids, yes.

23  *Q.*  By "our own bids," who do you mean?

24  *A.*  Pilgrim's.

25  *Q.*  And what was the magnitude of Pilgrim's bid submission to

Robert Bryant - Direct

1    KFC?

2         MR. TUBACH:  This is about the same e-mail that we

3    have now been over and went over on Thursday.  It's just a

4    repeat.

5         THE COURT:  Overruled.

6         MR. BELLER:  Your Honor, I am also going to object as

7    to vague, and I still think there is a lack of foundation.

8         THE COURT:  Both objections overruled.

9    BY MR. TORZILLI:

10   Q.  You can answer, Mr. Bryant.

11   A.  I am sorry, can you repeat the question?

12   Q.  Yeah, just a moment.

13        Mr. Bryant, the question was:  And what was the

14   magnitude of Pilgrim's bid submission to KFC in the first round

15   of the 2014 bidding?

16   A.  It was almost 20 cents a pound.

17   Q.  Above what?

18   A.  Excuse me?

19   Q.  Above what?

20   A.  Over the current prices or the previous contract.

21   Q.  Mr. Bryant, in the conversation you overheard between

22   Defendant Austin and Defendant Brady, did you understand

23   Defendant Austin to be providing Pilgrim's bid strategy to a

24   competitor?

25        MR. BELLER:  Objection.  Relevance.

Robert Bryant - Direct

1          MR. FELDBERG:  Foundation.  And it's, once again, the

2     understanding question, Your Honor.

3          MR. FAGG:  And leading, Your Honor.

4          THE COURT:  I will sustain it on vagueness as to the

5     understanding.  If you could clarify that aspect of it,

6     Mr. Torzilli.  Otherwise, overruled.

7          MR. TORZILLI:  Thank you, Your Honor.

8     BY MR. TORZILLI:

9     Q.  Sir, do you know in the conversation you overheard between

10    Defendant Austin and Defendant Brady whether Defendant Austin

11    was providing Pilgrim's bid strategy to a competitor for the

12    KFC bid?

13    A.  Yes.

14    Q.  How do you know?

15    A.  Well, I overheard the conversation where Mr. Austin relayed

16    to a couple competitors that the price is the price; I just

17    need to know how many loads you want at that price, and we also

18    delivered that same message to KFC.

19    Q.  Now, Mr. Bryant, I would like to talk to you about the KFC

20    bids for the year 2017, okay?  So, Mr. Bryant, did you

21    personally participate in an agreement among competitors

22    relating to the bids to KFC in 2017?

23    A.  By personally, I didn't have any discussions with any

24    competitors personally, no.

25    Q.  But you participated -- did you participate in those bids?

Robert Bryant - Direct

1   A.   Yes.

2   Q.   Did you ask Defendant Roger Austin to obtain bid

3   information from Pilgrim's competitors?

4   A.   Yes.

5   Q.   For what purpose did you make that request?

6   A.   To help us, Pilgrim's, formulate their bid submission.

7   Q.   When was the contract between KFC and Pilgrim's supposed to

8   start after the completion of the bids in 2017?

9   A.   Beginning of January -- or beginning of 2018.

10  Q.   What was -- was there an agreement among competitors with

11  respect to the KFC bids in 2017?

12          MR. FELDBERG:  Foundation, Your Honor.

13          THE COURT:  Sustained.

14  BY MR. TORZILLI:

15  Q.   Do you know, yes or no, whether there was an agreement

16  among competitors with respect to the KFC bids in 2017?

17          THE COURT:  Yes or no.

18  A.   I am not -- I guess yes.

19  BY MR. TORZILLI:

20  Q.   How do you know?

21          MR. FELDBERG:  Your Honor, objection.  "I guess yes"

22  doesn't lay a foundation.  We would have to know the basis.

23          THE COURT:  I think that's what Mr. Torzilli just

24  asked.

25          MR. TORZILLI:  That's the intent of the pending

Robert Bryant - Direct

1   question.

2   BY MR. TORZILLI:

3   Q.  How do you know, Mr. Bryant?

4   A.  Because it followed a similar pattern to 2014 where when we

5   started negotiations with KFC, we shared the strategy, the

6   one-on-one meetings with each other leading into the bids and

7   then during the bids received the pricing information from the

8   various competitors to help formulate the bid.  And then during

9   the next round bids, Roger was asked to tell the industry that

10  we were going to hold in our response to the second-round bid.

11  Q.  You said that Pilgrim's received pricing information.  Who

12  did Pilgrim's receive pricing information from?

13          MR. BELLER:  Objection, Your Honor.  Foundation.

14          THE COURT:  Sustained, if you could lay foundation.

15  BY MR. TORZILLI:

16  Q.  Who obtained the pricing information that you referred to

17  in your earlier answer?

18  A.  Mr. Austin.

19  Q.  Do you know where Defendant Roger Austin got the pricing

20  information that he received?

21          MR. LAVINE:  Objection, asked and answered.  He

22  already said he doesn't know where Mr. Austin got the

23  information.

24          THE COURT:  Overruled.

25  A.  I don't recall ever asking him directly who he spoke to to

2608

Robert Bryant - Direct

1   receive that information.

2   BY MR. TORZILLI:

3   Q.  Did he get competitor bid information?

4   A.  Yes.

5   Q.  How do you know?

6   A.  He shared it with me.

7   Q.  Did the competitor information Defendant Austin received,

8   did he -- did that include Claxton's information?

9   A.  Yes.

10  Q.  Did you, Mr. Bryant, ask Defendant Austin to get competitor

11  bid information?

12  A.  Yes.

13  Q.  Did you ask Defendant Austin to get that information from

14  competitors in order to cover shortages?

15          MR. LAVINE:  Objection.  Leading, Your Honor.

16          THE COURT:  Overruled.

17  A.  No.

18  BY MR. TORZILLI:

19  Q.  Do you know whether Defendant Austin got the information

20  directly from competitors?

21          MR. FAGG:  Objection, Your Honor.  He already said he

22  doesn't know where he got it.

23          THE COURT:  Sustained.

24  BY MR. TORZILLI:

25  Q.  Mr. Bryant, you mentioned a moment ago information being

Robert Bryant - Direct

1   put out to the industry.  Do you remember saying that a moment

2   ago?

3   A.  Yes.

4   Q.  Can you explain what you meant by that?

5   A.  Our competitors.

6   Q.  So did Defendant Roger Austin give Pilgrim's bid strategy

7   to Pilgrim's competitors in 2017?

8             MR. BELLER:  Objection.  Foundation.

9             THE COURT:  Sustained.

10  BY MR. TORZILLI:

11  Q.  Was Defendant Austin instructed by your boss, Mr. Stiller,

12  to give Pilgrim's bid strategy information to Pilgrim's

13  competitors in 2017?

14  A.  Yes.

15  Q.  To your knowledge at that time in 2017, what was the

16  purpose of your boss, Mr. Stiller, instructing Defendant Austin

17  to give bid strategy to Pilgrim's competitors?

18            MR. FELDBERG:  Objection.  Foundation.

19            MR. BELLER:  And also speculation, Your Honor.

20            THE COURT:  Sustained.

21  BY MR. TORZILLI:

22  Q.  Just yes or no, do you have an understanding, Mr. Bryant,

23  what the purpose of Mr. Stiller giving that instruction to

24  Defendant Austin was?

25            MR. FELDBERG:  Same objection, Your Honor.  It's a

Robert Bryant - Direct

 1  foundation issue.

 2          *MR. BELLER:*  And relevance, Your Honor.

 3          *THE COURT:*  Sustained as to foundation.  Overruled as

 4  to relevance.

 5  *BY MR. TORZILLI:*

 6  *Q.*  Yes-or-no question, Mr. Bryant.  Do you, yes or no, have an

 7  understanding as to the purpose of your boss, Mr. Stiller,

 8  instructing Defendant Austin to provide bid strategy

 9  information to Pilgrim's competitors?

10          *MR. FELDBERG:*  Objection, same question Your Honor

11  just sustained an objection to.

12          *THE COURT:*  Overruled.  I am sorry, sustained on that

13  one.

14          *MR. TORZILLI:*  That was a yes-or-no question, Your

15  Honor?

16          *THE COURT:*  Right.

17          *MR. TORZILLI:*  Ms. Pearce, if we could call up

18  Government's Exhibit 1882.

19          And, Your Honor, this is in evidence and permission to

20  publish it?

21          *THE COURT:*  Yes, you may.

22  *BY MR. TORZILLI:*

23  *Q.*  Mr. Bryant, if we could look at the middle of the e-mail.

24  It should be on your screen now.  Do you see it?

25  *A.*  Yes.

Robert Bryant - Direct

1  *Q.*  Who wrote that e-mail?

2  *A.*  Mr. Austin.

3  *Q.*  Who did he send it to?

4  *A.*  Me and Scott Tucker.

5  *Q.*  I want to direct your attention to the second to the last

6  line that begins with the words "Claxton meets"?

7  *A.*  Yes.

8  *Q.*  To your knowledge -- also, Mr. Bryant, what is the date of

9  the e-mail that Defendant Austin sent to you here?

10  *A.*  January 17, 2017.

11  *Q.*  When was the -- what month and year was the first -- the

12  KFC bidding starting in 2017?

13  *A.*  It was due I believe the first week of February.

14  *Q.*  So is this e-mail being written a couple of weeks before

15  the first-round bid is due?

16  *A.*  Correct.

17  *Q.*  To your knowledge, Mr. Bryant, how many Claxton employees

18  did Defendant Roger Austin communicate with during this period

19  of time?

20       *MR. BELLER:*  Objection.  Foundation.

21       *THE COURT:*  Overruled.  It was prefaced as to your

22  knowledge.

23  *A.*  The only one I was aware of was Scott Brady.

24  *BY MR. TORZILLI:*

25  *Q.*  Defendant Scott Brady?

Robert Bryant - Direct

1    A.   Correct.

2    Q.   When you received this e-mail, did you read the sentence

     that begins with "Claxton meets"?

4    A.   I did.

5            MR. LAVINE:   I object to this.   This is not relevant

6    as far as rebuttal.   This was never even discussed in the

7    defense case, so there is nothing to rebut here, Your Honor.

8            THE COURT:   Overruled.

9    BY MR. TORZILLI:

10   Q.   Mr. Bryant, does this sentence have anything to do with the

11   covering shortages?

12   A.   No.

13   Q.   What does it have to do with?

14   A.   It has to do with the pre-meeting between Claxton and KFC.

15   Q.   Regarding what?

16   A.   The KFC bid in 2017.

17   Q.   Does anything in this e-mail relate to covering shortages?

18   A.   No.   Down below I believe in my e-mail I think I did say

19   something about covering shortages, yes.

20   Q.   In the e-mail below the one we were looking at?

21   A.   That's correct.

22   Q.   But not in the one that Defendant Austin wrote to you?

23   A.   That's correct.

24           MR. TORZILLI:   We can take that down.   Thank you,

25   Ms. Pearce.

Robert Bryant - Direct

1   *BY MR. TORZILLI:*

2   *Q.*  I want to talk about the agreement you testified to a

3   little bit more, okay?  Did the agreement among competitors you

4   testified about get written into a formal contract?

5           *MR. TUBACH:*  Objection.  Vague and ambiguous.

6           *THE COURT:*  Overruled.

7   *A.*  Not that I am aware of, no.

8   *BY MR. TORZILLI:*

9   *Q.*  Did it get written down at all?

10  *A.*  Not that I am aware of, no.

11  *Q.*  Can you explain how you know there was an agreement among

12  competitors in 2014 to raise price even though it wasn't

13  written down?

14          *MR. FAGG:*  Objection.  Asked and answered.

15          *THE COURT:*  Overruled.

16  *A.*  The instruction to put the strategy out to the industry

17  about the plan to increase prices, the confirmation e-mail that

18  our competitors, in fact, did raise prices along with us and

19  then the sharing of Pilgrim's stance in the next round not to

20  concede any price concessions and ultimately resulted in a

21  higher price for everyone.

22  *BY MR. TORZILLI:*

23  *Q.*  Mr. Bryant, did the competitors need to trust each other in

24  order for the agreement to work?

25          *MR. FELDBERG:*  Objection.  Foundation.

Robert Bryant - Direct

1    *THE COURT:*  Overruled.

2    *A.*  Yes.

3    *BY MR. TORZILLI:*

4    *Q.*  How so?

5    *A.*  Well, if there wasn't a level of trust, then sharing that

6    information could be used against one another in an effort to

7    undercut or be detrimental to someone.

8    *Q.*  What do you mean by "detrimental to someone"?

9    *A.*  They could lose business, all their business, undercut on

10   price, you know, use it to -- against them with the customer to

11   tell the customer that they are receiving that information.

12   There are lots of ways it could be used against someone to the

13   detriment of the people sharing it.

14   *Q.*  If there wasn't trust?

15   *A.*  Correct.

16   *Q.*  Now I want to ask you about whether Pilgrim's bids and bid

17   strategy were independent of competitors or not, okay?

18   *A.*  Okay.

19   *Q.*  So for the KFC 2014 bid, did Pilgrim's prepare a KFC cost

20   model?

21   *A.*  Yes.

22   *Q.*  Did Pilgrim's eventually submit its KFC cost model to KFC?

23   *A.*  Correct, yes.

24   *Q.*  And based on your personal knowledge, sir, in 2014, did

25   Pilgrim's coordinate its bids and bid strategies with Pilgrim's

Robert Bryant - Direct

1   competitors?

2           *MR. BELLER:*  Objection.  Foundation.

3           *THE COURT:*  Overruled.

4           *MR. FAGG:*  Objection also on leading, Your Honor, and

5   vague.

6           *THE COURT:*  Overruled.

7   *A.*  Yes.

8   *BY MR. TORZILLI:*

9   *Q.*  What does the word "independent" mean to you in the context

10  of bid submissions and bid strategy?

11  *A.*  I mean, ultimately --

12          *MR. TUBACH:*  That's irrelevant.

13          *THE COURT:*  Overruled.

14  *A.*  Independent would be without any -- just market

15  intelligence, you know, publicly available data and things like

16  that but made in a vacuum without competitor information.

17  *BY MR. TORZILLI:*

18  *Q.*  Using that definition of independent that you just laid

19  out, did Pilgrim's pursue its bids and bid strategies in 2014

20  for KFC independent of Pilgrim's competitors?

21  *A.*  No.

22  *Q.*  And I want to now ask you some questions about the

23  first-round bids to KFC in 2017, okay?

24  *A.*  Okay.

25  *Q.*  Did Pilgrim's prepare a KFC cost model?

Robert Bryant - Direct

1    *A.*   Yes.

2    *Q.*   Did you personally have a role in preparing it?

3    *A.*   Yes.

4    *Q.*   Did Pilgrim's eventually submit its cost model to KFC as

5    part of the first-round bid?

6    *A.*   Yes.

7    *Q.*   Based on your personal knowledge, sir, in 2017 for that

8    first-round bid, did Pilgrim's coordinate its bid with

9    Pilgrim's competitors?

10   *A.*   We used the bid information that Roger supplied to

11   formulate our bid.

12   *Q.*   And based on the definition of independent you provided a

13   couple minutes ago, did Pilgrim's first-round bid submission,

14   was that wholly independent of Pilgrim's competitors?

15          *MR. TUBACH:*  Objection.  Irrelevant.

16          *THE COURT:*  Overruled.

17   *A.*   No.

18   *BY MR. TORZILLI:*

19   *Q.*   Just a couple more questions, Mr. Bryant.  I want to ask

20   you about Pilgrim's sales to KFC in calendar year 2015, okay?

21   *A.*   Okay.

22   *Q.*   So did Pilgrim's sell eight-piece chicken on the bone to

23   KFC in calendar year 2015?

24   *A.*   Yes.

25   *Q.*   Did those sales occur under a contract between Pilgrim's

Robert Bryant - Direct

1   and KFC or its purchasing cooperative, RSCS?

2   A.   Yes.

3   Q.   Did the bidding and negotiations for that contract take

4   place in 2014?

5   A.   Correct.

6   Q.   Now I would like to show you an exhibit.

7         MR. TORZILLI:   Your Honor, if I may publish J-256 to

8   the jury.  I believe it has been received in evidence.

9         THE COURT:   Yes, you may.

10        MR. TORZILLI:   Thank you, Your Honor.

11  BY MR. TORZILLI:

12  Q.   Do you see J-256 on your screen, Mr. Bryant?

13  A.   I do.

14  Q.   In the title of the page that's being displayed, do you see

15  a year stated?

16  A.   I do.

17  Q.   What year?

18  A.   2015.

19  Q.   In the title, do you see the name of a bone-in chicken

20  product specified?

21  A.   Yes.

22  Q.   What product?

23  A.   It says eight-piece COB prices to benchmark suppliers, so

24  chicken on the bone.

25  Q.   I am sorry, I cut you off.

1    A.   That stands for chicken on the bone.

2    Q.   And now, do you see the bar all the way on the left?

3    A.   Yes.

4    Q.   Do you see the title under the bar all the way on the left?

5    A.   Yes.

6    Q.   What does it say?

7    A.   Pilgrim's sales to KFC.

8         MS. PLETCHER:   Objection, Your Honor.   He is just

9    reading from this document, and I object on foundation, 601,

10   602, 701, 702.

11        THE COURT:   He was just asked to look at the left-most

12   bar.   Overruled.

13   BY MR. TORZILLI:

14   Q.   What does the title say on the left-most bottom bar,

15   Mr. Bryant?

16   A.   Pilgrim's sales to KFC.

17   Q.   Okay.

18        MR. TORZILLI:   We can take J-256 down.   Thank you.

19   BY MR. TORZILLI:

20   Q.   Did Pilgrim's sales to KFC of eight-piece chicken on the

21   bone in 2015 result from Pilgrim's bids and negotiations with

22   KFC back in 2014?

23   A.   Yes.

24   Q.   So did the sales for the bar on the left result from the

25   bids that Pilgrim's submitted to KFC in 2014?

Robert Bryant - Cross

1          MS. PLETCHER:  Objection.  Foundation, 602, 701, 702.

2          THE COURT:  Overruled.

3     A.  It should be, yes, without seeing the data.

4     BY MR. TORZILLI:

5     Q.  And did Pilgrim's participate in an agreement with its

6     competitors to increase the price that was going to be charged

7     to KFC for eight-piece chicken on the bone in calendar year

8     2015?

9     A.  Correct.

10         MR. TORZILLI:  Your Honor, one moment to confer.

11         THE COURT:  Of course.

12         MR. TORZILLI:  Nothing further.  Thank you, Your

13    Honor.

14         Thank you, Mr. Bryant.

15         THE COURT:  Thank you.

16         Cross-examination?

17         MS. PLETCHER:  May we have one moment, Your Honor?

18         THE COURT:  Sure.

19         Mr. Beller, go ahead.

20         MR. BELLER:  Thank you, Your Honor.  If I may have

21    just a brief moment to set up, please.

22         THE COURT:  Absolutely.

23                         **CROSS-EXAMINATION**

24    BY MR. BELLER:

25    Q.  Mr. Bryant, it's been three weeks since you testified to

Robert Bryant - Cross

1   the jury the first time, right?

2   A.   I assume so, yes.

3   Q.   June 13th is when you got off the stand until today, so we

4   are going to call it about three weeks.  Is that all right?

5   A.   Okay.

6   Q.   None of your knowledge about the underlying facts of the

7   case have changed in that three-week period of time, fair?

8   A.   Correct.

9   Q.   So when you testified in June, the middle of June, when you

10  told the jury about things that you made assumptions about,

11  those today are still assumptions.

12  A.   That's not correct.

13  Q.   So have you made different assumptions today than what you

14  made back in -- on June 13th when you testified?

15  A.   I believe what I testified to was my understanding, not

16  assumptions.

17  Q.   Fair enough.  So we are going to draw a distinction between

18  understanding and assumptions.  So when you testified to the

19  jury that your understandings were based on assumptions, those

20  same understandings were still based on those same assumptions

21  despite the passage of three weeks?

22  A.   Once again, it's my understanding.

23  Q.   When you told the jury about things that you made

24  inferences about, three weeks later those same things are still

25  inferences, right?

2621

Robert Bryant - Cross

1   A.   Still my understanding.

2   Q.   When you told the jury when you had firsthand personal

3   knowledge and that it was limited to two phone calls in which

4   price was discussed, put this out to the industry -- excuse me,

5   two phone calls in which price was not discussed, put this out

6   to the industry in which price was not discussed, and e-mails,

7   your knowledge is still limited to those three things; is that

8   right?

9   A.   Yes, like I said, what was -- the instructions given to put

10   it out to the industry, the phone calls, the e-mails, and the

11   conversations.

12   Q.   And that is the extent of your knowledge; is that fair?

13   A.   That's fair.

14   Q.   All right.  So let's talk about the only parts of your

15   knowledge or your understanding, if you prefer, that has

16   changed in the prior three weeks, okay?

17   A.   Okay.

18   Q.   You've met with the prosecution.

19   A.   Correct.

20   Q.   So you got off the stand on June the 13th, and you met with

21   the prosecutors, right?

22   A.   Last week, yes.

23   Q.   Okay.  Well, actually twice, at least twice you have met

24   with them, correct?

25   A.   Yeah, the other time was about a different proceeding.

Robert Bryant - Cross

1   Q.   So you met with them on -- the federal prosecutors on June

2   the 14th, and you met with prosecutors last week prior to

3   taking the stand last week and today, right?

4   A.   That's correct, yes.

5   Q.   How many times total have you met with federal prosecutors

6   between June 13th and today?

7   A.   Twice, I believe.

8   Q.   How many other times aside from those two meetings did you

9   or your attorney have any contact with the prosecutors in the

10  last three weeks?

11          MR. TORZILLI:   Objection.   Foundation.

12          THE COURT:   Overruled.

13  A.   I don't know how many times my attorneys have spoken to the

14  prosecutors.   I just know the two times that I have.

15  BY MR. BELLER:

16  Q.   So you've spoken with them twice.   Is it fair to say based

17  on your knowledge or assumptions or we can use your word

18  "understanding" that your lawyer has spoken to the prosecutors

19  in the last three weeks?

20  A.   That's correct, yes.

21  Q.   And in the meeting -- so let's talk about the meeting that

22  you had last week with the prosecutors.   In that meeting, they

23  asked you about certain details stated by other witnesses.

24  A.   Yes, they did, yes.

25  Q.   Information that other witnesses testified about.

Robert Bryant - Cross

1    A.   Correct, yes.

2    Q.   They asked you about pieces of evidence used by other

3    witnesses.

4    A.   Correct.

5    Q.   They asked you to comment on those other witnesses'

6    statements and testimony.

7    A.   That's correct, yes.

8    Q.   So, Mr. Bryant, instead of 31 meetings with the

9    prosecutors, now you've had a total of 33 meetings with them.

10   A.   That's correct.

11   Q.   And those meetings with them has shaped the information

12   that you are testifying about today.

13   A.   No.

14   Q.   Well, let's be clear.  You just testified that they shared

15   evidence and testimony of other witnesses between you getting

16   off the stand on June 13th and you getting on the stand on

17   Thursday, right?

18   A.   That's correct, yes.

19   Q.   So to the extent your knowledge has changed, your knowledge

20   has changed only insofar as the government has provided you

21   more information to prepare you to testify today.

22   A.   Not exactly, no.

23   Q.   The only knowledge you have gained in the last three weeks,

24   Mr. Bryant, was provided to you by prosecuting attorneys.

25   A.   No.  I don't follow your question there.  They did show me

Robert Bryant - Cross

1    that bar graph, but other than that, I don't really recall

2    anything else coming up.

3    Q.   So let me be clear on my question.   In the three weeks

4    since you testified last, you have gained more information

5    about this case.

6    A.   Like I said, that bar graph they showed me.

7    Q.   Is that a yes, Mr. Bryant?

8    A.   Yes.

9    Q.   You have gained more information about the case?

10   A.   Yes, they showed me the bar graph.

11   Q.   And the information that you have gained about the case

12   came from federal prosecutors.

13   A.   Correct.

14   Q.   And it came from federal prosecutors based on evidence and

15   testimony that came from inside this courtroom.

16   A.   That's correct.

17   Q.   Mr. Bryant, let's go back to this understanding versus

18   assumption distinction that you and I are making.   During the

19   year that you've been meeting with federal prosecutors, when

20   they asked you questions and you answered those questions, you

21   sometimes made assumptions.

22   A.   No.   I mean, I gave my understanding.

23   Q.   Great.   Mr. Bryant, you testified before this jury on

24   June 9th, right?

25   A.   I believe so, yes.

Robert Bryant - Cross

1  *Q.*  Do you remember that when you testified, you testified to

2  the truth?

3  *A.*  Yes.

4  *Q.*  You testified to the best of your ability based on the

5  knowledge that you had.

6  *A.*  That's correct.

7  *Q.*  You listened to the questions.

8  *A.*  Yes.

9  *Q.*  You listened to the questions carefully.

10  *A.*  Tried to, yes.

11  *Q.*  You answered those questions.

12  *A.*  Yes.

13  *Q.*  Since that time, you have spoken to the prosecutors.

14  *A.*  Correct.

15  *Q.*  Let's go back to the testimony that you gave on June 9th

16  just a little less than a month ago.

17       *MR. BELLER:*  If we can have page 650 shown to the

18  witness and to the parties, please.

19  *BY MR. BELLER:*

20  *Q.*  So, Mr. Bryant, are you able to see this transcript that's

21  in front of you?

22  *A.*  Yes.

23  *Q.*  So here is what's going to happen.  I am going to read line

24  25, everything after the letter Q.  You're going to read line

25  2 -- I will read lines 25 through 1 after the Q.  You are going

Robert Bryant - Cross

1    to read line 2 which was your answer, okay?

2    A.  Okay.

3    Q.  Okay.  When they asked you your questions and you answered

4    those questions, you sometimes made assumptions.

5           Mr. Bryant, what was your answer?

6           MR. TORZILLI:  Objection, Your Honor.  There is no

7    prior inconsistency.

8           THE COURT:  Overruled.

9           MR. BELLER:  May I ask my question again?

10          THE COURT:  Yes.

11   BY MR. BELLER:

12   Q.  Mr. Bryant, you were asked on June 9th, 2022:  Okay.  When

13   they asked you questions and you answered those questions, you

14   sometimes made assumptions.

15          What was your testimony on June the 9th, sir?

16   A.  Probably, yes.

17          MR. BELLER:  Thank you.  I am done with that,

18   Mr. Brian.

19   BY MR. BELLER:

20   Q.  And when you answered their questions, you sometimes made

21   inferences, right?

22   A.  Once again, I gave my understanding.

23   Q.  You're saying understanding; I'm saying inferences.  Do you

24   agree with me that you sometimes made inferences when you were

25   asking -- answering their questions?

2627

Robert Bryant - Cross

1    A.  In what context?  When you're asking -- in our -- outside
2    the courtroom or inside the courtroom?
3    Q.  When you are answering questions, you sometimes made
4    inferences.
5    A.  Not in the courtroom.
6    Q.  Okay.  Only outside the courtroom that you made inferences?
7    A.  When they were asking for my understanding, yes.
8    Q.  Okay.  So let me go back.  When the prosecutors -- when you
9    were answering the prosecutors' questions outside the
10   courtroom, you also sometimes made inferences.
11   A.  Correct.
12   Q.  Mr. Bryant, I want to talk about market conditions in 2014
13   and the 2014 KFC negotiations, okay?
14   A.  Okay.
15   Q.  Three weeks ago you did not remember that KFC restaurants
16   ran out of chicken on Mother's Day 2014, right?
17   A.  That's correct, yeah.
18   Q.  And three weeks ago and two more meetings with the
19   prosecution and your memory or your knowledge has not changed
20   about that fact.
21   A.  That's correct.
22   Q.  Three weeks ago, you did not remember that KFC was buying
23   supplemental loads of chicken for a 50 percent premium.
24        MR. TORZILLI:  Objection.  Outside the scope.
25        THE COURT:  Overruled.

2628

Robert Bryant - Cross

1  A.  Correct.

2  BY MR. BELLER:

3  Q.  And three weeks and two more meetings with the prosecution

4  has not changed your memory about that fact.

5  A.  Correct.

6  Q.  Sales decisions at Pilgrim's Pride in 2014 had to be fact

7  based and they had to be profitable.

8  A.  Correct.

9  Q.  Sales decisions at Pilgrim's in 2014 required benchmarking

10  and current market conditions taken into consideration.

11  A.  Correct.

12  Q.  You, Mr. Bryant, in talking about this agreement don't

13  remember that from 2014 to 2015 Pilgrim's lost 560,000 pounds

14  of chicken per week for KFC alone.

15  A.  Correct.

16  Q.  Even though the purpose of the plan insofar as you're aware

17  was to keep volume the same and is just deal with price.

18  A.  Correct.

19  Q.  Pilgrim's lost volume going into 2015; Claxton Poultry

20  gained volume going into 2015.

21       MR. TORZILLI:  Objection.  Lacks foundation.

22       THE COURT:  Overruled.  He can answer if he knows.

23  A.  I mean, I have been shown that on the Claxton piece, but I

24  didn't know that.

25  BY MR. BELLER:

Robert Bryant - Cross

1   Q.  Mr. Bryant, you were asked this exact same question on June

2   the 13th.  Do you recall that?

3   A.  Yes.

4          MR. BELLER:  If we can please show page 765, lines 11

5   through 14.

6   BY MR. BELLER:

7   Q.  Mr. Bryant, again, I am going to ask everything after the

8   Q, and I want you to answer everything after the A, okay?

9   A.  Yes.

10  Q.  So, Mr. Bryant, what we have is that Pilgrim's lost volume

11  going into 2015; Claxton gained volume going into 2015; is that

12  right?

13         MR. TORZILLI:  Objection.  This mischaracterizes that

14  prior testimony.

15         THE COURT:  Overruled.

16  BY MR. BELLER:

17  Q.  And what was your answer, Mr. Bryant?

18  A.  That's correct.

19  Q.  Three weeks, three weeks and two more meetings with federal

20  prosecutors and that hasn't changed, right?

21  A.  That's correct.

22  Q.  Now, I want to talk about these phone calls you say you

23  overheard, okay?

24  A.  Okay.

25  Q.  Mr. Bryant, three weeks ago you stated that in these phone

Robert Bryant - Cross

1    calls you don't know what was stated by the person on the other

2    end of the line.

3    A.   That's correct.

4    Q.   Three weeks and two more meetings with the prosecution has

5    not changed that lack of knowledge.

6    A.   Correct.

7    Q.   Mr. Austin did not convey a price.

8    A.   Not that I remember or recall, no.

9    Q.   Mr. Austin did not try to get the person on the other end

10   of the line to agree to anything during those phone calls.

11   A.   Not that I recall, no.

12   Q.   Mr. Austin never said, We'll hold firm on our price if you

13   will too.

14   A.   Not that I remember, no.

15   Q.   He never said, We're going to raise our price if you will

16   too.

17   A.   Not that I remember, no.

18   Q.   You didn't hear him say, We'll do it if you do it.

19   A.   That's correct.

20   Q.   And you never heard a quid pro quo.

21   A.   That's correct.

22   Q.   Three weeks, two more meetings with the prosecutors has not

23   changed any of that knowledge.

24   A.   That's correct.

25   Q.   Three weeks, Mr. Bryant, and two more meetings with these

Robert Bryant - Cross

1   prosecutors has not changed that you have no personal knowledge

2   of the substance of any other calls between any of the men in

3   this courtroom.

4   A.   That's correct.

5   Q.   I am sorry?

6   A.   I said that's correct.

7   Q.   You, sir, never participated in a single one.

8   A.   That's correct.

9   Q.   You never overheard a single telephone call other than

10  these two calls that you testified about.

11  A.   Not that I can remember, no.

12  Q.   These two calls that you say form the basis of your

13  understanding that there was an agreement.

14  A.   Correct.

15  Q.   Nothing about the passage of three weeks or two more

16  meetings has changed any of that.

17  A.   That's correct.

18  Q.   You have no direct knowledge or information where you

19  offered to set Pilgrim's price on the condition that any

20  competitor do the same.

21  A.   Correct.

22  Q.   No direct information where another competitor offered to

23  set a price on the condition that you do the same.

24  A.   That's correct.

25  Q.   Mr. Bryant, you were asked about Exhibit 1066 on your

Robert Bryant - Cross

1    rebuttal direct examination.

2           MR. BELLER:  Your Honor, if I may please pull that up

3    for reference?

4           THE COURT:  You may.

5    BY MR. BELLER:

6    Q.  Mr. Bryant, if you can take a moment and refresh your

7    recollection of this particular communication so I can ask you

8    questions about it, please.

9    A.  Okay.

10          MR. BELLER:  Your Honor, may we publish for the jury

11   as well?

12          THE COURT:  Yes, you may.

13          MR. BELLER:  Thank you.

14   BY MR. BELLER:

15   Q.  Mr. Bryant, do you recall this e-mail communication string?

16   A.  Yes.

17          MR. BELLER:  Thank you, Your Honor.  We can take this

18   document down now, please.

19   BY MR. BELLER:

20   Q.  Mr. Bryant, as to this e-mail, Mr. Austin had a

21   conversation with an unknown competitor at an unknown time with

22   an unknown company, and then after Mr. Austin had that

23   conversation, Mr. Austin told Mr. McGuire, Mr. McGuire told

24   you, eight years later you told the government, the government

25   then formulated questions to ask you for you to now be able to

Robert Bryant - Cross

1    testify about that as fact not once but twice in this trial.

2         MR. TORZILLI:  Argumentative, compound and lacks

3    foundation as to part of the question that's compound.

4         THE COURT:  Overruled.

5    BY MR. BELLER:

6    Q.  Is that right?

7    A.  Can you go through that again?

8    Q.  Absolutely.  I am happy to.

9         So as to this e-mail, Mr. Bryant, at an unknown time,

10   Mr. Austin had a conversation with an unknown competitor at an

11   unknown company, and then after Mr. Austin had that

12   conversation, Mr. Austin told Mr. McGuire, Mr. McGuire told

13   you, eight years later you told the government, the government

14   then formulated their questions to ask you for you to now be

15   able to testify to this jury as to that fact not once but

16   twice.

17   A.  Most of that is correct, but what I recall is he had

18   conversations with more than one competitor.

19   Q.  Great.  If we can please show you the June 13, '22

20   transcript, lines -- page 758, line 8 through 13.  Mr. Bryant,

21   I will read everything after the Q.  I want you to tell the

22   jury everything after the A.

23        All right.  So at an unknown time, according to you,

24   your testimony is that Mr. Austin had a conversation with an

25   unknown competitor at an unknown time with an unknown company,

Robert Bryant - Cross

1  and then after Mr. Austin had that conversation, Mr. Austin

2  told Mr. McGuire, Mr. McGuire told you, eight years later you

3  told the government, the government then formulated questions

4  to ask you for you to now be able to testify about as fact; is

5  that right?

6  A.  Yes.

7  Q.  Thank you.

8      MR. BELLER:  You can take this down.

9  BY MR. BELLER:

10  Q.  Three weeks and two more meetings with the prosecution has

11  not given you any more basis or memory about your knowledge as

12  to that communication, right?

13  A.  That's correct.

14  Q.  Who the different suppliers are on that e-mail, that

15  quotation, "different suppliers," that was an assumption on

16  your part.

17  A.  No.

18      MR. BELLER:  If we can have page 740, June 13, 2022.

19  BY MR. BELLER:

20  Q.  Mr. Bryant, I am going to ask everything after the Q:  And

21  so when you were testifying on direct examination and you

22  listed all of the different suppliers as meaning everyone, that

23  was an assumption that you were making on your part.

24      Your answer?

25  A.  That was my understanding, yes.

Robert Bryant - Cross

1    Q.   Understanding.   There is no quid pro quo in that e-mail,

2    right?

3    A.   That's correct.

4    Q.   There is nothing in that e-mail about pricing.

5    A.   Not an exact price, no, but there is about price, yeah, not

6    exact price, but bids.

7    Q.   Well --

8    A.   Increase in bids, increase in bids, I am sorry.

9    Q.   Excuse me, I spoke over you, Mr. Bryant.   You said?

10   A.   Increase in bids, but not a price.

11   Q.   The discussion is about pricing models, not prices.

12   A.   Correct, I believe.

13   Q.   There is no quid pro quo?

14   A.   Correct.

15   Q.   You wanted the information so that you could formulate your

16   own strategy for KFC.

17   A.   Correct.

18   Q.   You wanted to know competitors' bid prices so that you

19   could decide where to place Pilgrim's price.

20   A.   We, we.   It was more than just me, yes.

21   Q.   Well, more than just you.   When I say "we," I am talking

22   about you and your co-workers could know where to place

23   Pilgrim's price.

24   A.   That's correct, yes.

25   Q.   You wanted to undercut the highest bidder so as to be No. 2

Robert Bryant - Cross

1    in the pricing.

2    A.  I wouldn't call it undercut, no.

3    Q.  Mr. Bryant, let's look at page 771 of your testimony on

4    June 13th, 2022, okay?

5    A.  Okay.

6         MR. BELLER:  This is lines 11 through 13, please,

7    Mr. Brian.

8    BY MR. BELLER:

9    Q.  Question:  And you wanted to undercut the highest bidder to

10   be No. 2 in price.

11        Mr. Bryant, what was your answer to that question,

12   sir?

13   A.  Correct.

14        MR. BELLER:  Thank you, Mr. Brian.

15   BY MR. BELLER:

16   Q.  Undercutting the No. 1 competitor would maximize

17   profitability for Pilgrim's Pride.

18   A.  Correct.

19   Q.  So when you testified on direct examination that the,

20   quote/unquote, plan did not include undercutting competitors,

21   you would agree with me that this is an exception to that

22   testimony.

23   A.  No.

24   Q.  You just testified to the jury, Mr. Bryant, did you not,

25   that you wanted this bid information so as to undercut the

Robert Bryant - Cross

1    No. 1 highest competitor?

2            *MR. TORZILLI:*  Objection.  Argumentative.

3            *THE COURT:*  Overruled.

4    *BY MR. BELLER:*

5    *Q.*  That's a yes-or-no question, Mr. Bryant.

6    *A.*  I can't answer it yes or no.

7    *Q.*  You just testified to the jury that the purpose in

8    obtaining the price was to undercut the No. 1 bidder.

9    *A.*  Undercut used in the context that you're trying to use it

10   would mean to take a significantly cheaper price in order to

11   gain market share.  In the context that we're talking about, it

12   was to place No. 2 in price to maximize profitability.  Once

13   again, it wasn't about gaining a market share.

14   *Q.*  So let me be very clear, and that is your understanding or

15   your impression of this plan would be in order to undercut you

16   would also have to take market share.

17   *A.*  That would be part of the plan, to -- it would be part of

18   the plan, yes, to agree to take a cheaper price with a customer

19   in an effort to gain market share, yes.

20   *Q.*  And that is your understanding.

21   *A.*  Correct.

22   *Q.*  That is your assumption.

23   *A.*  I mean, that's the way I understand it, yes.

24   *Q.*  Yeah.  That was your assumption.  So when we're talking

25   about this particular incident, you wanted to know the prices

Robert Bryant - Cross

1  of your competitor so that you could purposefully submit a

2  price that was less than your competitor.

3  A.  Correct.

4  Q.  So let's talk about that a little bit more.  You do not

5  know where or how Mr. Austin obtained the prices that you wrote

6  down in your notebook.

7  A.  I don't recall asking him, no.

8  Q.  I didn't ask you if you recalled asking him; I asked you

9  about your knowledge.  You do not know where or how Mr. Austin

10  obtained the prices you wrote down in your notebook.

11  A.  That's correct.

12  Q.  You assumed that Mr. Austin spoke to someone to obtain

13  these prices.

14  A.  Well, he told me he was going to make some calls and find

15  out, and then he returned with the information, so, yes.

16  Q.  Let me ask my question again, okay?  You assumed that

17  Mr. Austin spoke to someone to obtain these prices.

18  A.  Correct.

19  Q.  You made assumptions about their source.

20  A.  Correct.

21  Q.  You made assumptions that this was future bid pricing.

22  A.  That's the way they were represented, yes.

23  Q.  You did not have a discussion with Mr. Austin where he

24  explicitly told you what these numbers represent or where he

25  got these numbers.

Robert Bryant - Cross

1   A.   I don't believe so.

2   Q.   But for the exception of Koch, the pricing in 1919 and the

3   period current pricing in I-054 are identical.

4   A.   I don't know what that zero whatever.

5          MR. BELLER:   If we can please show the witness, Your

6   Honor, and the jury I-054.

7          THE COURT:   You may.

8   BY MR. BELLER:

9   Q.   Would that refresh your recollection as to what that

10  exhibit represents, Mr. Bryant?

11  A.   Yes.

12  Q.   If you can take just a brief moment and review this.   Let

13  me know once you have had the opportunity to do so.

14  A.   Okay.   Yes.

15  Q.   So let me ask my question again.   But for the exception of

16  Koch, the pricing in your notes 1919 and the prices in the

17  current period pricing of I-054 are identical.

18  A.   I believe that's correct, yes.

19          MR. BELLER:   Thank you.   I am done with this, Your

20  Honor.

21  BY MR. BELLER:

22  Q.   Let's talk about your knowledge or lack of knowledge about

23  Claxton Poultry, Mr. Bryant.   You have never spoken to

24  Mr. Mikell Fries about Claxton Poultry's prices.

25  A.   Correct.

Robert Bryant - Cross

1   *Q.*  You have never spoken with Mr. Fries about any other

2   suppliers' pricing.

3   *A.*  Correct.

4   *Q.*  You have never agreed with Mr. Fries to raise the price or

5   reduce a decrease in price of chicken to your customers.

6   *A.*  That's correct.

7   *Q.*  Likewise, you've never directly received Claxton's pricing

8   information from Mr. Brady.

9   *A.*  That's correct.

10  *Q.*  You have also never received any other suppliers'

11  information from Mr. Brady.

12  *A.*  That's correct.

13  *Q.*  You have never spoken to Mr. Brady about how Claxton goes

14  about determining its pricing.

15  *A.*  That's correct.

16  *Q.*  You have never agreed with Mr. Brady to raise the price of

17  chicken or reduce a reduction in price of chicken to their

18  customers.

19  *A.*  That's correct.

20  *Q.*  On June 13th, 2022, you did not know Greg Finch, the CFO of

21  Claxton Poultry?

22  *A.*  That's correct.

23  *Q.*  Three weeks later you still do not know Greg Finch, the CFO

24  of Claxton Poultry?

25  *A.*  That's correct.

Robert Bryant - Cross

1   Q.   You have never once in your entire career had a discussion

2   with Greg Finch about how Claxton Poultry prices its chicken.

3   A.   That's correct.

4   Q.   Three weeks later and two more meetings with the prosecutor

5   and none of these answers have changed, right?

6   A.   That's correct.

7   Q.   Mr. Bryant, you do not know how any of Claxton's

8   competitors -- Pilgrim's competitors, excuse me.  Let me try

9   this again.  You do not know how any of Pilgrim's competitors,

10  including Claxton, go about formulating their pricing during

11  bid submissions.

12  A.   That's correct.

13  Q.   Any testimony that you have given on this, Mr. Bryant, is

14  an assumption.

15  A.   Yeah, I don't know about how they do their bids.

16  Q.   So sticking with Claxton Poultry, let's narrow the lens and

17  talk a little bit about 2014.  In 2014, Mr. Bryant, you never

18  learned any of Claxton's three bid prices for the 2015

19  contract.

20  A.   That's correct.

21  Q.   So when you testified just a few minutes ago that every

22  competitor raised their prices and raised their prices to a

23  monumental level, that was an assumption on your part?

24  A.   No.  We had the e-mail confirmation.

25  Q.   Well, the e-mail confirmation that we just got done going

Robert Bryant - Cross

1   through, right?

2   A.   Correct.

3   Q.   So bear with me for just a moment.  Mr. Bryant, you have

4   never ever had any of Claxton's bid prices.

5   A.   Only we had those in 2017 in my handwritten notes, yes.

6   Q.   Right.  So the handwritten notes that we were just talking

7   about that's identical to current pricing.  I am asking you

8   about 2014.

9   A.   In 2014, no, I did not.

10  Q.   You never had them?

11  A.   That's correct.

12  Q.   So when you testify and characterize them as being large or

13  monumental, that is an assumption on your part because you

14  yourself have never yourself once laid eyes on those?

15  A.   No, just the information I received from Roger and Jason

16  McGuire, Roger Austin and Jason McGuire.

17  Q.   Right.  That you already told the jury all about, right?

18  A.   Correct.

19  Q.   That don't have prices in them?

20  A.   That's correct, yes.

21  Q.   There are no prices.  So when you say that you got

22  information from Mr. McGuire and Mr. Austin, that did not

23  include pricing information?

24  A.   Not an exact price, no.

25  Q.   So let me go back to my question.  You have never seen or

Robert Bryant - Cross

1    received Claxton Poultry's bid prices for the 2014 negotiation

2    for the 2015 contract.

3    *A.*   That's correct.

4    *Q.*   Never once.

5    *A.*   Correct.

6    *Q.*   You did not know any of the bid prices submitted by any of

7    the suppliers.

8    *A.*   Not that I can remember, no.

9    *Q.*   So you were asked on direct examination, did all the

10   suppliers have gigantic increases, right?

11   *A.*   That's correct, yes.

12   *Q.*   I think monumental increases.

13   *A.*   I think that was the word he used.

14   *Q.*   And you answered yes, correct?

15   *A.*   That's correct.

16   *Q.*   You said, Absolutely, everybody did.  You answered that

17   without knowing a single price.

18   *A.*   That's correct.

19   *Q.*   Not knowing a single price for a single competitor.

20   *A.*   Correct.

21   *Q.*   That, sir, is an assumption on your part, right?

22   *A.*   No.

23   *Q.*   Not only did you not know the bid prices; you never

24   received bid prices or contract prices from anyone, any of the

25   suppliers?

Robert Bryant - Cross

1    A.   That's correct.

2    Q.   Three weeks and two more meetings with prosecutors has not

3    changed that lack of knowledge.

4    A.   Correct.

5    Q.   When you were asked about sharing bid information prior to

6    bid submissions, that was an assumption on your part.

7    A.   No.

8    Q.   Do you want to use your understanding, would that make you

9    happier?  That was an understanding on your part?

10   A.   I mean, prior to bid submission when you asked that

11   question, I mean, we gave the basis for the price increases to

12   our competitors and, you know, got the confirmation back that

13   our competitors did, in fact, raise prices.

14   Q.   Okay.  Let's break that down.  So sharing bidding

15   information -- or, excuse me, sharing the basis, sharing the

16   strategy of raising bids, you're talking about that PowerPoint

17   presentation that you gave to the customer.

18   A.   Correct.

19   Q.   You are talking about the PowerPoint presentation that you

20   gave to the customer that pulls its numbers out of AgriStats?

21   A.   Correct.

22   Q.   AgriStats, which is an industry subscription service that

23   publishes information about chicken prices.

24        MR. TORZILLI:  Objection.  Outside the scope.

25        THE COURT:  Overruled.

2645

Robert Bryant - Cross

 1   *A.*  Correct.

 2   *BY MR. BELLER:*

 3   *Q.*  Information about chicken prices that anyone who pays the

 4   monthly fee and is involved in the chicken industry has access

 5   to.

 6   *A.*  That's correct.

 7   *Q.*  And if a producer, if a chicken producer, a chicken

 8   supplier did not know chicken was going up in 2015, they had no

 9   place in the business.

10   *A.*  Correct.

11   *Q.*  Because the AgriStats number supported an increase.

12   *A.*  You have to pull that information out in order to say that.

13   The numbers themselves won't say you need to go for a price

14   increase.  You have to pull that information out of there and

15   make that strategy call.

16   *Q.*  Sure.  So when you say "pull that information out of

17   there," AgriStats classifies and groups pricing, right?

18   *A.*  That's correct, yes.

19   *Q.*  And it puts it in tables, right?

20   *A.*  Correct.

21   *Q.*  And it allows you to do some really basic math, correct?

22   *A.*  Correct.

23   *Q.*  And so you can take a big-bird price, big-bird

24   profitability?

25   *A.*  Correct.

Robert Bryant - Cross

1  Q.  You can take small-bird profitability?

2  A.  Correct.

3  Q.  You can subtract one from the other.

4  A.  Correct.

5  Q.  And you can get the delta, in other words, the difference

6  between profitability for big bird or for small bird.

7  A.  That's correct.

8  Q.  All of this is on that PowerPoint table that you presented

9  to the customers.

10  A.  That's correct, yes.

11  Q.  So let me go back.  That is the information that you say

12  Mr. McGuire said put this out on the industry, right?

13  A.  Correct.

14  Q.  So let me go back to my question.  When you were asked

15  about sharing bid information prior to bid submissions, that

16  was an assumption on your part.

17  A.  I wouldn't characterize it as an assumption when he was

18  told to share.

19  Q.  You have no personal knowledge of that happening.

20  A.  Correct.

21  Q.  You don't know if that ever occurred.

22  A.  That's correct.

23  Q.  Mr. Torzilli asked you about independent decisions for

24  Pilgrim's, and I want to focus on that, and that's where we are

25  going to start the wrap-up process here, okay, Mr. Bryant?

1   *A.*   Okay.

2   *Q.*   You used competitor information to make the best economical

3   decision for Pilgrim's.

4   *A.*   Correct.

5   *Q.*   Not a quid pro quo.

6   *A.*   That's correct.

7   *Q.*   So when Mr. Torzilli was asking you about your definition

8   of independent, your definition of independent is blind, right?

9   *A.*   Correct.

10  *Q.*   Your definition of independent means that you don't know

11  anything having to do with any other competitors' pricing.

12  *A.*   Not their bid prices.

13  *Q.*   Not their bid prices, absolutely.  That your definition of

14  independent is that it doesn't consider any bid price or bid

15  strategy that may have been learned from the industry.

16  *A.*   Not learned from a competitor.

17  *Q.*   Great.

18  *A.*   Correct.

19  *Q.*   And so to be clear, in your mind, independent is not

20  related to whether or not there was an agreement; in your mind,

21  independent simply means, and I don't mean this pejoratively,

22  independent means ignorant, ignorant of anything everyone is

23  doing on bids?

24  *A.*   Not directly talking to competitors would I say that, yes.

25  *Q.*   Right.

Robert Bryant - Cross

1    A.   I mean, if you gleaned information from publicly available

2    data, AgriStat, whatever sources, then that's all market intel,

3    but not directly talking to your competitor.

4    Q.   And I appreciate that distinction.

5              So all of your testimony, your perspective,

6    Mr. Bryant, is driven by this idea in your mind that you should

7    not have, compare, or obtain competitor pricing.

8    A.   Correct.

9    Q.   Okay.

10   A.   In part.

11   Q.   And so that is sort of the foundation for your belief that

12   the bid pricing or rather the pricing for Pilgrim's was or was

13   not independent, right?

14   A.   Correct.

15   Q.   Great.  There was no quid pro quo.

16   A.   Not that I'm aware of, no.

17   Q.   No, Hey, we'll do it if you'll do it?

18   A.   Not that I am aware of, no.

19   Q.   You have no personal knowledge of anyone at Pilgrim's

20   telling anyone else, any other competitor, what price to submit

21   their bids at?

22   A.   That's correct.

23   Q.   You didn't get on the phone with a competitor and decide

24   what each competitor's price was going to be.

25   A.   That's correct.

1   Q.  No discussion of, Hey, we're going to bid high, but only if

2   you bid low.

3   A.  That's correct.

4   Q.  Or, Hey, you guys take the volume this month; we're good.

5   A.  That's correct.

6   Q.  No discussion of, We're going to be the ones who make the

7   most money this month; you all agree to make less money.

8   A.  That's correct.

9   Q.  None of those discussions ever occurred.

10  A.  Not that I'm aware of, no.

11  Q.  They didn't occur by telephone?

12  A.  Correct.

13  Q.  They didn't occur by e-mail.

14  A.  Not that I'm aware of, no.

15  Q.  They didn't occur by text?

16  A.  That's correct.

17  Q.  So as far as you know, they never occurred in person.

18  A.  That's correct.

19  Q.  You made, you and your team made an independent decision,

20  independent meaning what was in Pilgrim's best interest, not as

21  part of an agreement but based on competitor information for

22  the best interest of Pilgrim's Pride?

23          MR. TORZILLI:  Objection.  Compound, vague, ambiguous.

24          THE COURT:  Overruled.

25  A.  I mean, ultimately, like, in 2017, we made the decision

Robert Bryant - Cross

1   based off the pricing that we received, but it was not in

2   consultation with any competitor.

3   BY MR. BELLER:

4   Q.   It wasn't together with another competitor.

5   A.   Ultimately, no.

6   Q.   Wasn't a, Hey, we're all going to raise our prices; we'll

7   raise our prices, but only if you raise your prices.

8   A.   Correct.

9   Q.   So while you may have had certain bid information, you made

10   an independent pricing decision based on what was in Pilgrim's

11   best interest.

12   A.   Ultimately, yes.

13   Q.   You are without any personal knowledge to say whether or

14   not Claxton Poultry did the exact same thing.

15   A.   Correct.

16   Q.   Three more weeks and 33 meetings with prosecutors and

17   you're still without that knowledge.

18   A.   Correct.

19          MR. BELLER:   If I may have just a brief moment, Your

20   Honor.

21          THE COURT:   Yes, you may.

22          MR. BELLER:   Thank you, Your Honor.

23          THE COURT:   Thank you, Mr. Beller.

24          Additional cross-examination, Mr. Feldberg?

25          MR. FELDBERG:   Thank you, Your Honor.

Robert Bryant - Cross

1          **CROSS-EXAMINATION**

2    *BY MR. FELDBERG:*

3    *Q.*  Mr. Bryant, do you recall testifying a few minutes ago in

4    response to a question from Mr. Torzilli that in 2014 the

5    first-round bids of the other suppliers were similar to

6    Pilgrim's bid?

7    *A.*  Correct, yes.

8          *MR. FELDBERG:*  Could we call up, please, from

9    Mr. Bryant's testimony on June 13th at this trial before this

10   jury page 758 lines 19 through 22.

11   *BY MR. FELDBERG:*

12   *Q.*  Mr. Bryant, just as Mr. Beller did, I am going to read the

13   question, and I am going to ask you to read the answer that you

14   gave to this jury on June 13th.

15         Question:  This lack of knowledge about the bids

16   submitted in 2014 does not just apply to Claxton, but you don't

17   know any of the bids submitted by any of the other competitors

18   either, do you?

19         What was your answer, sir?

20   *A.*  That's correct.

21   *Q.*  And that was the truth, wasn't it?

22   *A.*  That's correct.

23   *Q.*  And you've testified at prior hearings also under oath that

24   you did not know the bids submitted by any of the other

25   suppliers in 2014, correct?

Robert Bryant - Cross

1   A.   That's correct.

2   Q.   And that's true, correct?

3   A.   That's correct.

4   Q.   So when you testified earlier this morning in response to a

5   question by Mr. Torzilli that the first-round bids of the other

6   suppliers were similar to the Pilgrim's bid in 2014, you didn't

7   actually know that, correct?

8   A.   I didn't know their exact price, just the e-mail that --

9   Q.   So your testimony that the bids were similar was not

10  correct, not truthful.

11  A.   No, no.

12       MR. TORZILLI:   Objection.   That misstates the

13  testimony.

14       THE COURT:   Overruled.   He can answer.

15  A.   No.

16  BY MR. FELDBERG:

17  Q.   The fact of the matter is, Mr. Bryant, you don't know what

18  any of the other suppliers' bids were in connection with the

19  bidding rounds in 2014, correct?

20  A.   That's correct.

21  Q.   Okay.   Now, let's talk about the things you say you heard

22  that form the basis of what you call your understanding, okay?

23  A.   Okay.

24  Q.   Let's talk about 2014.   You claim that on the day of a

25  meeting between Pilgrim's and RSCS on August 22nd, 2014, you

Robert Bryant - Cross

1    walked in and out of Roger Austin's office twice, correct?

2    A.  It was more than twice, but, yes.  I was pacing, yes.

3    Q.  But on two occasions, you say you heard him say on the

4    phone, I told them the price is the price; the only question is

5    how many loads, correct?

6    A.  That's correct.

7    Q.  I told them, past tense, correct?

8    A.  That's the way I recall it, yes.

9    Q.  And you say that you told -- that at the end of one of

10   those conversations, Mr. Austin said to you, that was Brady;

11   and at the end of the other, Mr. Austin told you that was

12   Kantola, correct?

13   A.  That's correct, yes.

14   Q.  You didn't hear anything that the person on the other end

15   of the phone said.

16   A.  That's correct.

17   Q.  You don't -- you didn't hear Mr. Austin ask anyone to agree

18   to anything.

19   A.  That's correct.

20   Q.  You didn't hear Mr. Austin tell anyone what Pilgrim's price

21   was.

22   A.  That's correct.

23   Q.  You didn't hear Mr. Austin ask anyone what someone else's

24   price was, correct?

25   A.  That's correct.

Robert Bryant - Cross

1    Q.  All you heard was, I told them -- all you say you heard is,

2    I told them the price is the price; the only question is how

3    many loads.

4    A.  That's correct.

5    Q.  Now, let's take a look at some of the phone records from

6    August 22nd, 2014.

7         MR. FELDBERG:  I am going to ask to call up, please,

8    Exhibit 1237.

9         Your Honor, this is in evidence, and may I display it

10   to the jury?

11        THE COURT:  Yes, you may.

12        MR. FELDBERG:  Mr. Fronzaglia, could you please

13   highlight the call from Mr. Austin's Verizon phone records on

14   August 22nd at 7:56 a.m.

15   BY MR. FELDBERG:

16   Q.  Do you see the highlighted call, Mr. Bryant?

17   A.  I do.

18   Q.  And we have talked about this before.  Does that indicate

19   to you that there was a call from Mr. Kantola to Mr. Austin at

20   7:56 a.m. on August 22nd?

21   A.  I don't recognize the numbers.

22   Q.  Would you accept my representation that it's Mr. Kantola

23   calling Mr. Austin?

24   A.  Yeah, I guess, yes.  I don't know.

25   Q.  I misspoke.  It's Mr. Austin calling Mr. Kantola?

Robert Bryant - Cross

 1   *A.*  I guess.  I don't know the numbers.

 2   *Q.*  And when we were here three weeks ago, I showed you the

 3   telephone number, the exhibit with the telephone numbers.  Do

 4   you need to see it again, or would you accept my

 5   representation?

 6   *A.*  I mean, I accept your representation.  I just don't know.

 7   *Q.*  All right.  Now, Verizon, that call at 7:56 is listed in

 8   the Verizon records at 1 minute.  Do you see that?

 9   *A.*  Yes.

10   *Q.*  Do you know that Verizon rounds up calls that are a minute

11   or less to 1 minute?

12            *MR. TORZILLI:*  Objection.  No foundation.

13            *MR. FELDBERG:*  I asked if he knows.

14            *THE COURT:*  Overruled.  He can answer if he knows.

15   *A.*  No, I don't.

16   *BY MR. FELDBERG:*

17   *Q.*  And do you know whether AT&T in their records break down

18   calls to the second?

19            *MR. TORZILLI:*  Same objection.

20   *A.*  I don't.

21   *BY MR. FELDBERG:*

22   *Q.*  Let's take a look at Mr. Kantola's AT&T records.

23            *MR. FELDBERG:*  Can we call up, please, Exhibit I-994?

24   Your Honor, I think this has not yet been admitted, but I think

25   it's on a stipulated list.

Robert Bryant - Cross

1             THE COURT:  Mr. Feldberg, are you moving its admission

2    at this time?

3             MR. FELDBERG:  I am, Your Honor.

4             THE COURT:  Any objection to the admission of I-994?

5             MR. TORZILLI:  No objection.

6             THE COURT:  I-994 will be admitted.

7             MR. FELDBERG:  May we publish I-994?

8             THE COURT:  You may.

9    BY MR. FELDBERG:

10   Q.  Mr. Bryant, I am representing this is an entry from

11   Mr. Kantola's AT&T phone records.

12            MR. FELDBERG:  And, Mr. Fronzaglia, could you please

13   highlight the third call from the bottom, August 22nd, 2014?

14   It says 11:56, and it's in UTC time.

15   BY MR. FELDBERG:

16   Q.  Do you see that?

17   A.  I do.

18   Q.  And what's the length of that call, sir?

19   A.  I don't know.

20   Q.  Does it say 24 seconds?

21   A.  I see a 24, yes.

22            MR. TORZILLI:  Objection.  Foundation.

23            THE COURT:  Overruled.

24            MR. FELDBERG:  I am sorry.

25            THE COURT:  Go ahead, Mr. Feldberg.

Robert Bryant - Cross

1          *MR. FELDBERG:*  May I proceed?

2          *THE COURT:*  Yes, go ahead.

*BY MR. FELDBERG:*

3

4    *Q.*  Does it say 0:24?

5    *A.*  Yes.

6    *Q.*  Does that indicate 24 seconds to you, sir?

7    *A.*  I don't know if that's 24 seconds or 24 minutes.  I don't

8    know.

9    *Q.*  Does the zero in front of the colon give you some

10   indication that it's a 24-second call and not a 24-minute call?

11   *A.*  No.  Normally you would put the minutes after the colon,

12   right?  So if it's 1:24, it would be 1:24.

13   *Q.*  Sir, if you look at the first entry on the page, it's

14   listed as 6:55, correct?

15   *A.*  Yes.

16   *Q.*  Are you suggesting that that call was 6 hours and 55

17   minutes long?

18   *A.*  I am not suggesting anything.  I really don't know.

19   *Q.*  You know, sir, that Mr. Kantola's call was listed in the

20   Verizon records as 1 minute, correct?

21   *A.*  Yes.

22   *Q.*  And here in Mr. Kantola's AT&T records, it's listed as 24

23   seconds, isn't it?

24   *A.*  I don't know.

25   *Q.*  Let's go back to Exhibit 1237.

Robert Bryant - Cross

1   A.  I just -- I am not a phone records expert.  I haven't

2   looked at my own phone records in years.

3   Q.  Sir, there is no pending question.  We are going back to

4   Exhibit 1237.

5          Do you see a call listed at 8:18 a.m.?

6   A.  Yes.

7   Q.  And that call is also listed as 1 minute.  Do you see that?

8   A.  I do.

9   Q.  And would you accept my representation, that's a call from

10  Mr. Brady to Mr. Austin?

11  A.  Yes.

12  Q.  And it's listed as 1 minute at 8:18 a.m., correct?

13  A.  Yes.

14  Q.  Now, we also have Mr. Brady's AT&T records, and that is

15  Exhibit 1239.

16         MR. FELDBERG:  And I believe it is in evidence, Your

17  Honor.

18         THE COURT:  It is and may be displayed.

19         MR. FELDBERG:  Thank you, Your Honor.

20         And, Mr. Fronzaglia, could we please turn to the page

21  that's listed as No. 427 and the fifth entry down from the top.

22  BY MR. FELDBERG:

23  Q.  And do you see, sir, that in Mr. Brady's AT&T records, that

24  same call from 8:18 in the morning is listed again here in UTC

25  time as 19 seconds?

2659
Robert Bryant - Cross

1          MR. TORZILLI:  Your Honor, objection.  He is being

2    asked to interpret a record that he has never seen before.

3          THE COURT:  He can answer.  Overruled.  He can answer

4    if he understands.

5    A.  Like I said before, I don't know if that's seconds, minutes

6    or what that is.

7    BY MR. FELDBERG:

8    Q.  Do you see -- withdrawn.

9          You say you don't know whether that 0:19 is 19 seconds

10   or something else?

11         MR. TORZILLI:  Objection.  Asked and answered.

12         THE COURT:  Overruled.

13   A.  I don't know.  It's the first time I have ever seen this.

14   I don't know.

15   BY MR. FELDBERG:

16   Q.  Sir, let's go back to 1237.  There is one more call

17   incoming from Mr. Austin, incoming from Mr. Brady to Mr. Austin

18   at 8:55 a.m.  Do you see that?

19   A.  I do, yes.

20   Q.  And that's listed as 5 minutes, correct?

21   A.  That's correct, yes.

22   Q.  And there is no other call in any of these telephone

23   records between Mr. Austin and either Mr. Brady or Mr. Kantola

24   on August 22nd, correct?

25   A.  I don't know that.

Robert Bryant - Cross

1    *Q.*  Well, do you recall testifying --

2    *A.*  I think I accepted your representation before, yes.

3    *Q.*  Do you see any other calls?

4    *A.*  Well, I haven't reviewed this document like that.  I don't

5    know their numbers by heart, so I couldn't do that.

6    *Q.*  Would you accept my representation, sir, that there are no

7    other calls between Mr. Austin and either Mr. Brady or

8    Mr. Kantola on August 22nd?

9         *MR. TORZILLI:*  Objection.  Lacks foundation, calls for

10   speculation.

11        *THE COURT:*  Overruled.  He can answer.

12   *A.*  I'll accept your representation.  I just don't know.

13   *BY MR. FELDBERG:*

14   *Q.*  Now, the meeting between RSCS and Pilgrim's on August 22nd

15   began at 11:00 o'clock, correct?

16   *A.*  I don't remember.

17        *MR. FELDBERG:*  Let's call up J-081, which, Your Honor,

18   I believe is in evidence.

19        *THE COURT:*  Yes, it is.  It may be published.

20   *BY MR. FELDBERG:*

21   *Q.*  And looking at the bottom of the e-mail, sir, from

22   Mr. Suerken to a number of people about the subject Pilgrim's

23   Pride meeting, what time is listed?

24   *A.*  It says 11:00 to 1:00.

25   *Q.*  So all of the calls for which we have objective data

Robert Bryant - Cross

1  between Mr. Austin and either Mr. Brady or Mr. Kantola on

2  August 22nd occurred more than two hours before the start of

3  the KFC/Pilgrim's meeting, correct?

4  A.  I don't know that.  I mean, on the top, it says 3:00 to

5  5:00.  I don't remember what time this meeting actually took

6  place.

7  Q.  But we established during your earlier testimony three

8  weeks or so ago, sir, that UTC time, which is what Pilgrim's

9  uses, is most times of the year four hours ahead of East Coast

10  time.  Do you recall that?

11         MR. TORZILLI:  Objection.  Lacks foundation.

12         THE COURT:  Overruled.

13  A.  No, I don't.

14  BY MR. FELDBERG:

15  Q.  You know, sir, that Pilgrim's servers report times in UTC

16  time, correct?

17         MR. TORZILLI:  Objection.  That mischaracterizes the

18  facts and the witness lacks foundation.

19         THE COURT:  He asked if he knows.  Overruled.

20  A.  No.  What I am used to seeing is whenever I get a calendar

21  invite, it would correct whatever time zone I was in, like, on

22  my phone or my computer, whatever --

23  BY MR. FELDBERG:

24  Q.  Well, even if the meeting started at 3:00 o'clock in the

25  afternoon as opposed to 11:00 a.m., the phone calls, the only

Robert Bryant - Cross

1    phone calls between Mr. Austin and either Mr. Brady or

2    Mr. Kantola on that day occurred several hours before the

3    meeting, correct?

4    A.   Correct.

5    Q.   So what you claim happened, Mr. Bryant, can't possibly be

6    true, can it?

7    A.   It happened.

8    Q.   Mr. Bryant, your testimony to this jury is that Mr. Austin

9    said twice, I told them the price is the price, past tense,

10   even though the phone records establish that the only calls

11   were before the meeting.

12   A.   That's what you've shown, yes.   I remember the phone calls

13   very clearly.

14   Q.   But, sir, the objective data shows that the only time that

15   Mr. Austin spoke with either Mr. Brady or Mr. Kantola on

16   August 22nd, the only times were several hours before the

17   meeting, correct?

18   A.   What you've shown, yes.

19   Q.   Now, the other thing you claim to have observed in 2014 is

20   a statement by Mr. McGuire to Mr. Austin to put something out

21   to the industry, correct?

22   A.   Correct.

23   Q.   And the "put something out to the industry" was a page from

24   a PowerPoint that contained AgriStats data, correct?

25   A.   That's what he was gesturing towards, yes.

Robert Bryant - Cross

1    *Q.* And that is --

2          *MR. FELDBERG:* Let's call that up. It is

3    Exhibit 1055, page 8. And, Your Honor, I believe this is in

4    evidence. Could we publish it, Your Honor?

5          *THE COURT:* It is in evidence, and it may be

6    published.

7    *BY MR. FELDBERG:*

8    *Q.* Now, this is information from AgriStats, correct?

9    *A.* Correct, yes.

10   *Q.* And it shows, does it not, that big birds were a whole lot

11   more profitable than small birds, correct?

12   *A.* Correct.

13   *Q.* And you've told us, Mr. Bryant, that AgriStats data was

14   available to anyone in the industry who chose to purchase it,

15   correct?

16   *A.* That's correct, yes.

17   *Q.* And you've also told us that everybody in the industry

18   either knew or should have known that big birds were way more

19   profitable than small birds in the spring of 2014, correct?

20   *A.* Correct.

21   *Q.* So the information in this slide that you say Mr. McGuire

22   told Mr. Austin to put out to the industry was information the

23   industry already knew, correct?

24   *A.* They should have.

25   *Q.* And what you say is, Mr. McGuire had this slide up on the

Robert Bryant - Cross

1    screen, said to Mr. Austin, Put this out to the industry, and

2    depending on which version you are giving, Mr. Austin either

3    shook his head or nodded, correct?

4    *A.*   Correct.

5    *Q.*   And you don't remember Mr. Austin saying a single word in

6    response.

7    *A.*   I don't remember him saying anything, no.

8    *Q.*   And you don't know whether Mr. Austin actually did anything

9    with this information that was already well known to the

10   industry.

11   *A.*   That's correct.

12   *Q.*   Now, the first time you talked this slide in a prior

13   hearing you told us under oath that that meeting occurred at

14   SMS, the buying cooperative for Popeye's, correct?

15           *MR. TORZILLI:*  Objection.  Improper impeachment.

16           *THE COURT:*  Overruled.

17   *A.*   I believe at first I said it was Church's, and then I said

18   I couldn't remember --

19   *BY MR. FELDBERG:*

20   *Q.*   Do you recall testifying at a prior hearing, sir, that this

21   occurred at a meeting at Popeye's, SMS?

22   *A.*   Once again, I believe at first I thought it was Church's,

23   and then I said it could have been Popeye's, but I was unsure.

24   *Q.*   Well, we know it was not at Popeye's, don't we?

25   *A.*   I don't know that, no.

Robert Bryant - Cross

1          MR. FELDBERG:  Well, let's call up E-174, which I

2    believe is in evidence, Your Honor.

3          THE COURT:  Yes, and it may be published.

4          MR. FELDBERG:  Thank you.  Is it okay if I look at the

5    screen?

6          THE COURT:  Yes, of course.

7          MR. FELDBERG:  Easier to see.

8          THE COURT:  Sure.

9    BY MR. FELDBERG:

10   Q.  Mr. Bryant, this is a calendar invite for the Popeye's

11   meeting, correct?

12   A.  Correct.

13   Q.  You were one of the addressees?

14   A.  Correct.

15   Q.  Mr. Austin on the invite?

16   A.  He is not on there, no.

17         MR. FELDBERG:  Could we call up, please, H-911, which

18   I do not believe is yet in evidence.

19   BY MR. FELDBERG:

20   Q.  Do you recognize H --

21         MR. FELDBERG:  Thank you.

22   BY MR. FELDBERG:

23   Q.  Do you recognize H-911, sir?

24   A.  No, not really.

25   Q.  Are you one of the recipients?

Robert Bryant - Cross

1    A.   I was, yes.

2    Q.   It's an e-mail from Mr. Higdem to Mr. McGuire copying you

3    and Mr. Gay, correct?

4    A.   Correct, yes.

5            MR. TORZILLI:   Objection.   He is being asked about a

6    document that is not in evidence.

7            THE COURT:   Sustained.

8            MR. FELDBERG:   You can take it down, please.

9    BY MR. FELDBERG:

10   Q.   Is this document that we just looked at part of the

11   preparation for the Pilgrim's meeting?

12   A.   I don't remember it, to be honest with you.   I just don't.

13   Q.   Is Mr. Austin copied on that e-mail?

14   A.   I didn't see him on there, no.

15   Q.   Now, you testified that in your meetings with the

16   prosecutors since you were last here three weeks ago they told

17   you about some of the evidence in the case, correct?

18   A.   That chart that he displayed earlier, yes.

19   Q.   Did they tell you that Mr. Kronauge of SMS said that

20   Mr. Austin was not at any meeting at SMS in 2014?

21           MR. TORZILLI:   Objection.   Lacks foundation.

22           THE COURT:   I am going to sustain the objection as to

23   the form.

24   BY MR. FELDBERG:

25   Q.   Do you know whether Mr. Kronauge testified in this

Robert Bryant - Cross

1    courtroom at this trial that Mr. Austin was not at a meeting at

2    SMS in 2014?

3    A.   No.

4    Q.   You don't know that?

5    A.   I don't.

6    Q.   Now, you have also testified that maybe the meeting was at

7    Church's, correct?

8    A.   Possibly, yes.

9    Q.   Have you ever seen a calendar invite for a meeting between

10   Pilgrim's and Church's in July of 2014?

11   A.   No.

12   Q.   Have you ever seen any e-mails about a meeting between

13   Pilgrim's and Church's in July of 2014?

14   A.   No.

15   Q.   Have you ever seen any PowerPoint presentations for a

16   meeting between Pilgrim's and Church's in July of 2014?

17   A.   No.

18   Q.   In your 33 meetings with the prosecutors and agents, have

19   they ever shown you any calendar invite, e-mail, PowerPoint

20   presentation, or any other document reflecting a meeting

21   between Pilgrim's and Church's in July of 2014?

22   A.   No.

23   Q.   And from the two conversations that you claim you overheard

24   Mr. Austin say, I told them the price is the price on

25   August 22nd, and the slide with the AgriStats data that you say

Robert Bryant - Cross

1  Mr. McGuire said to Roger, Put it out to the industry, from

2  that you conclude that there was some kind of conspiracy,

3  correct?

4  A.  No.  It was more than that.

5  Q.  There are no other conversations, are there, sir?

6  A.  Yes.

7  Q.  You have not identified in all of your testimony a single

8  other conversation with Roger Austin that supports your

9  assumption of a conspiracy.

10  A.  Like I testified earlier, you know, the instruction to put

11  it out to the industry, the confirmation e-mail from Mr. Austin

12  that everyone else was equally as high, and then, you know, the

13  conversations about the price is the price; I just need to know

14  how many loads you want at that price, and delivering that

15  message to KFC in person.

16  Q.  That's the sum total supporting your assumptions.

17  A.  That's my understanding.

18  Q.  And when you say "understanding," that's an understanding

19  based on the assumptions that you're making, correct?

20  A.  That's my understanding based on being there.

21  Q.  Well, let's talk about what you just described as the

22  confirmation e-mail.  I believe that's Exhibit 1066.

23          MR. FELDBERG:  Your Honor, I believe that's in

24  evidence.  Could we call it up and publish it to the jury,

25  please?

Robert Bryant - Cross

1           *THE COURT:*  Yes, you may.

2     *BY MR. FELDBERG:*

3     *Q.*  Is 1066 what you were referring to as the confirmation

4     e-mail, sir?

5     *A.*  Yes.

6     *Q.*  Now, let's --

7           *MR. FELDBERG:*  Could we scroll down so that we see the

8     first e-mail in this thread.

9     *BY MR. FELDBERG:*

10    *Q.*  From Mr. McGuire, correct?

11    *A.*  Correct.

12    *Q.*  I heard they made a couple of calls and were surprised.  Do

13    you see that?

14    *A.*  Yes.

15    *Q.*  The "they" is KFC, correct?

16    *A.*  That's correct.

17          *MR. FELDBERG:*  So we scroll up, please.

18    *BY MR. FELDBERG:*

19    *Q.*  And then Mr. McGuire says, Surprised like how much higher

20    everyone else was?  Correct?

21    *A.*  Correct.

22    *Q.*  And then a little later, Mr. McGuire makes kind of an

23    off-color reference.  Do you see that?

24    *A.*  Yes.

25    *Q.*  From this, you conclude that KFC thought the suppliers came

Robert Bryant - Cross

1   in higher than they had expected, correct?

2   A.   No, from this I concluded that KFC was surprised that other

3   suppliers came in high.

4   Q.   Fair enough.

5        MR. FELDBERG:   So we can take 1066 down now, please.

6   BY MR. FELDBERG:

7   Q.   So to get the sum total of the information you say you had

8   in 2014, the two conversations you claim you overheard in which

9   Roger said, The price is the price, correct?

10  A.   Correct.

11  Q.   Mr. McGuire saying to Mr. Austin, Put the AgriStats data

12  out on the industry, correct?

13  A.   Correct.

14  Q.   And an e-mail in which it's reported that KFC expresses

15  surprise at high bids.

16  A.   And actually delivering the exact same message to KFC in

17  person.

18  Q.   And Pilgrim's took a negotiating position with KFC in which

19  they asked for, insisted on a price increase, correct?

20  A.   Correct.

21  Q.   That's the sum total of the information you have about

22  2014.

23  A.   Correct.

24       MR. FELDBERG:   Your Honor, I can keep going, or we can

25  take a break here as the Court prefers.

Robert Bryant - Cross

1          THE COURT:  We can take a break now.  Why don't we go

2     ahead, ladies and gentlemen, and plan on reconvening.

3     10:30 will be a usual time.  Keep the admonitions in mind.  The

4     jury is excused for the mid-morning break.

5          (Jury excused.)

6          THE COURT:  Mr. Bryant, you are excused until 10:30.

7     Thank you.

8          So if over the break you could please give your

9     revised theories, those of you who were revising them, to

10    Ms. Butler, that would be helpful.

11         MR. TUBACH:  Your Honor, we have done exactly that,

12    the portions that the Court wanted.

13         THE COURT:  I appreciate that.  But if the other

14    defendants who need to, not Mr. Lovette, but if others could.

15         MR. FELDBERG:  If I could have five minutes to do

16    that.

17         THE COURT:  Yes, at some point during the break.

18         MR. FELDBERG:  And supply those to Ms. Grimm.

19         THE COURT:  Yes, or Ms. Butler if she happens to be in

20    here, but either one is fine.  We will be in recess.  Thank

21    you.

22         (Recess at 10:15 a.m. until 10:37 a.m.)

23         THE COURT:  Ms. Butler will now pass out some revised

24    instructions.  They have the updated theory of the case

25    instructions.  They do not -- we haven't tackled the issue of

Robert Bryant - Cross

1   Instruction No. 3 that Mr. Beller proposed, so it doesn't

2   reflect that.  That doesn't mean that we won't revise No. 3 as

3   Mr. Beller proposed, just we haven't taken that up yet.

4         Why don't we get Mr. Bryant back in.

5         MR. BELLER:  Your Honor, before we do that, may I

6   raise an issue, please?

7         THE COURT:  Go ahead.

8         MR. BELLER:  I believe Mr. Bryant on cross-examination

9   disclosed in response to my questions answers that make it

10  appear that there may have been a Rule 615 sequestration

11  violation.  Based on that, Your Honor, obviously there is not a

12  lot of research that has been done on that, but I do believe

13  that there is at least enough of a concern based upon his

14  answers that I don't believe that it is appropriate for the

15  government to be able to do a redirect examination of

16  Mr. Bryant.  It is clear that his answers are in response to a

17  violation of 615.

18        I am asking the Court to not necessarily -- or,

19  rather, the Court give us additional opportunity to be able to

20  see if there are other sanctions that have to be requested as a

21  result; but nonetheless, I do not believe that a redirect is

22  appropriate given his answers in response to those questions.

23        THE COURT:  So first of all, in terms of whether other

24  sanctions may be available, obviously, the defendants have an

25  opportunity to look into that matter and figure out what

Robert Bryant - Cross

1    sanctions may be appropriate assuming there is a factual basis

2    for them.  In terms of the limitation on any redirect,

3    Mr. Torzilli, do you want to respond to that?

4           MR. TORZILLI:  Yeah, I don't see any reasons to

5    curtail redirect based on what's been --

6           THE COURT:  Well, here is the story.  It sounds like

7    he was shown one exhibit.  He indicated which one.  It was

8    somewhat ambiguous as to whether or not he had been informed by

9    the government of the testimony of other witnesses in this

10   trial, so that would potentially be a basis, but we don't know

11   who.  Would that inform any limitation?

12          MR. TORZILLI:  I don't think so.  And when we spoke to

13   Mr. Bryant last week, other than showing him that exhibit, we

14   did not discuss the trial proceedings and, in fact, even with

15   the exhibit, just showed him the exhibit and asked him factual

16   information that was drawn off of information.

17          THE COURT:  So the government's representation is when

18   it met with him last week, the government did not share with

19   him or made representations to him or paraphrase to him the

20   testimony of other witnesses.

21          MR. TORZILLI:  Absolutely.  I believe the only

22   information at least from any party in this case that he knows

23   about in terms of testimony is defense counsel raising

24   Mr. Kronauge's testimony with him on cross-examination.

25          THE COURT:  Okay.  And then the one trial exhibit that

Robert Bryant - Cross

1    was shown to him was the Snyder exhibit which is the one bar

2    graph.  I can't remember the number of it.

3          MR. TORZILLI:  J-256, yes.

4          THE COURT:  Mr. Beller, anything else from you real

5    quick?

6          MR. BELLER:  Thank you, Your Honor.  I will be brief

7    and just note that the written notice of the meeting does

8    indicate that it was almost two hours long when the government

9    did, in fact, meet with Mr. Bryant.  We, of course, don't have

10   notes of all of that, but nonetheless, it was a two-hour long

11   meeting with the government.

12         Mr. Bryant testified that the government shared

13   certain details stated by other witnesses, information that

14   other witnesses testified about.  They asked you about pieces

15   of evidence used by other witnesses, asked you to comment on

16   those witnesses' statements and testimony.  All of those

17   questions he answered affirmatively to.

18         Your Honor, I would also note the government's brief

19   in which the government says that he is able to rebut Mr. Finch

20   and how Claxton goes about forming pricing and he is also able

21   to rebut Mr. Kronauge testifying about Mr. Kronauge's ability

22   to be able to call suppliers and get otherwise accurate

23   information.  That, of course, I don't know the basis for the

24   government having said that in their filing, but nonetheless, I

25   do have enough concern that I do believe a redirect is

Robert Bryant - Cross

1    inappropriate.

2          THE COURT:  All right.  As to the request for

3    redirect, based upon Mr. Torzilli's representations, I am going

4    to deny any limitation on the government's redirect.  That

5    doesn't mean that we won't, you know, potentially at least

6    explore the issues of whether there has been a violation of the

7    sequestration order in the preparation of Mr. Bryant somewhere

8    down the road, but it doesn't have to take place during the --

9    up until the point that we give this to the jury.

10         Anything else from you, Mr. Torzilli?

11         MR. TORZILLI:  Just one point about the duration of

12   the meeting based on the agent notes, there was a lunch period

13   where the witness and his counsel I think got lunch, so we

14   weren't talking to him -- by "we" I mean the government, not me

15   necessarily personally, for a two-hour time frame.  It was less

16   than that because there was time he was with his attorney

17   getting lunch and so forth.

18         THE COURT:  All right.  Let's bring Mr. Bryant in, and

19   let's get the jury.

20         (Jury present.)

21         THE COURT:  Mr. Feldberg, whenever you are ready.

22         MR. FELDBERG:  Your Honor, I think it was Mark Twain

23   who said, If I had more time, I could make it shorter.

24         THE COURT:  He did say that in regard to a letter.

25         MR. FELDBERG:  I have no further questions for this

1    witness.

2              THE COURT:  Thank you, Mr. Feldberg.

3              Additional cross-examination?  Well, then we will have

4    redirect.

5                        **REDIRECT EXAMINATION**

6    BY MR. TORZILLI:

7    Q.  Mr. Bryant, The price is the price; I just need to know how

8    many loads you want, how long did it take me to just say that?

9    A.  A couple seconds.

10   Q.  Not minutes, right?

11   A.  Correct.

12   Q.  So a telephone conversation where that's the centerpiece of

13   the conversation doesn't need to take long, correct?

14             MR. BELLER:  Objection.  Leading.

15             THE COURT:  Sustained.

16   BY MR. TORZILLI:

17   Q.  Was the -- as you recall it, the conversations that you

18   overheard between Defendant Austin and Defendant Brady and

19   Defendant Austin and Mr. Kantola, did you recall them as being

20   long conversations or short?

21             MR. FELDBERG:  Objection.  He just testified that he

22   only heard one thing.

23             THE COURT:  Overruled.

24   A.  I don't recall either way.  I just remember those comments.

25   BY MR. TORZILLI:

Robert Bryant - Redirect

1   Q.  Now, Mr. Bryant, you were asked on cross-examination about

2   your knowledge of how Claxton prices its chicken products.  Do

3   you remember that?

4   A.  Yes.

5   Q.  Did you ever work for Claxton?

6   A.  No.

7   Q.  Did Defendant Scott Brady work for Claxton?

8   A.  Yes.

9   Q.  Did he work for Claxton in August of 2014 when the KFC

10  bidding was going on?

11  A.  Yes.

12  Q.  Did Defendant Austin discuss or provide Pilgrim's bid

13  strategy on a phone call with Defendant Scott Brady?

14  A.  Yes.

15  Q.  Sir, you were asked on cross-examination about what you did

16  or did not know about the first-round bids that Pilgrim's

17  competitors submitted to KFC in 2014.  Do you recall that?

18  A.  Yes.

19  Q.  And you referred to an e-mail confirmation during your

20  cross-examination.  Do you remember saying that?

21  A.  Yes.

22  Q.  Could you explain what e-mail confirmation you're talking

23  about?

24  A.  The one from Mr. McGuire and Mr. Austin discussing the KFC

25  bid.

2678

Robert Bryant - Redirect

1   *Q.* Did you trust the information that Mr. McGuire provided to

2   you?

3   *A.* Yes.

4   *Q.* Did you trust the information that Defendant Austin

5   provided?

6   *A.* Yes.

7        *MR. TORZILLI:* Ms. Pearce, if we could call up

8   Government's Exhibit 9744.

9        And, Your Honor, this is in evidence. Permission to

10  publish?

11       *THE COURT:* You may.

12  *BY MR. TORZILLI:*

13  *Q.* Sir, on the screen in front of you is Government's Exhibit

14  9744.

15       *MR. TUBACH:* I am going to object that this be

16  published at this time. There is no foundation for this

17  witness to testify to this.

18       *THE COURT:* Response?

19       *MR. TORZILLI:* I want to ask some questions that do

20  not involve interpretation of information contained in this

21  document, but he has testified about trusting information from

22  some of the participants in this e-mail.

23       *THE COURT:* I will overrule the objection to it being

24  displayed. It may be displayed.

25       *MR. TORZILLI:* Thank you, Your Honor.

Robert Bryant - Redirect

1    *BY MR. TORZILLI:*

2    Q.  Mr. Bryant, are you on the e-mail that's being displayed?

3    A.  No.

4    Q.  Who wrote it?

5    A.  Jason McGuire.

6    Q.  What was the date of the e-mail that Mr. McGuire wrote?

7    A.  August 18, 2014.

8    Q.  How does that date compare relative to when the first-round

9    bids were submitted by competitors to KFC?

10   A.  It was around the same time.

11   Q.  I want to draw your attention to in the first big paragraph

12   the one that starts with "it's the same," and in the second to

13   the last line, there is a sentence that starts with "Roger did

14   some checking around."  Do you see that?

15   A.  Yes, I do.

16   Q.  What is Defendant Austin's first name?

17           *MR. TUBACH:*  Your Honor, this is plainly -- asking

18   about this document, what his first name is, I object to lack

19   of foundation asking about this document.

20           *MR. FAGG:*  And relevance and beyond the scope, Your

21   Honor.

22           *THE COURT:*  Overruled.

23   *BY MR. TORZILLI:*

24   Q.  You can answer, sir.

25   A.  Roger.

Robert Bryant - Redirect

1    *Q.*  Now, I want you to look at in the middle of the e-mail from

2    Mr. McGuire.  There is a series of names on the left-hand side

3    and then numbers next to them.  And if you could just look at

4    them for a moment and let me know when you're done reviewing

5    that.

6    *A.*  Okay.

7    *Q.*  Okay.  Are you generally familiar with the information

8    contained there?

9        *MR. TUBACH:*  Objection, Your Honor.  Lacks foundation.

10       *MR. BELLER:*  And relevance.

11       *THE COURT:*  Sustained.

12       *MR. TORZILLI:*  We can take the exhibit down.

13   *BY MR. TORZILLI:*

14   *Q.*  So, sir, in the e-mail confirmation that you talked about,

15   did you understand that the e-mail confirmation was telling you

16   that all the chicken suppliers had submitted substantially

17   higher price increases to KFC?

18       *MR. BELLER:*  Objection.  Relevance.

19       *MR. FELDBERG:*  And leading, Your Honor.

20       *THE COURT:*  Sustained as to leading.

21   *BY MR. TORZILLI:*

22   *Q.*  Who did you understand in the e-mail confirmation the

23   authors to be referring to when they were confirming the higher

24   prices?

25       *MR. BELLER:*  Objection.  Foundation and relevance.

1          *THE COURT:*  Overruled.

2     *A.*  Our competitors.

3     *BY MR. TORZILLI:*

4     *Q.*  Did that include Koch Foods?

5     *A.*  Yes.

6     *Q.*  Case Farms?

7     *A.*  Yes.

8     *Q.*  Claxton Poultry?

9     *A.*  Yes.

10          *MR. FAGG:*  Objection.  Leading.

11          *THE COURT:*  Sustained.

12    *BY MR. TORZILLI:*

13    *Q.*  Who did it include?

14    *A.*  All of our competitors in the KFC bid.

15    *Q.*  Can you just off the top of your head name the ones that

16    come to mind?

17    *A.*  Tyson, Koch, Claxton, George's, Mar-Jac.

18    *Q.*  Sir, when you testified to an agreement among competitors

19    both today and last week and in your earlier testimony in this

20    case, did you base that on your personal knowledge?

21          *MR. TUBACH:*  Objection, Your Honor.  Misstates the

22    testimony, prior testimony.  Other than Thursday, there has

23    been no testimony about an agreement.

24          *THE COURT:*  Overruled.

25    *BY MR. TORZILLI:*

Robert Bryant - Redirect

1   Q.  You can answer.  When you testified in this case about an

2   agreement among competitors, did you base that testimony on

3   your personal knowledge?

4   A.  Yes.

5   Q.  Things you saw with your eyes?

6   A.  Yes.

7   Q.  Things you read in your e-mails?

8   A.  Correct.

9   Q.  Including e-mails written by your boss?

10  A.  Correct.

11  Q.  And by Defendant Roger Austin.

12          MR. BELLER:  Objection.  Leading.

13          THE COURT:  Sustained.

14  BY MR. TORZILLI:

15  Q.  What are the things that you saw that contributed to your

16  knowledge of the agreement that you testified to?

17  A.  Instructions to share information with competitors,

18  e-mails, phone calls, prices shared with me by Mr. Austin and

19  use those in formulation of bids.

20  Q.  Did it also include things that you heard with your own

21  ears?

22  A.  That's correct, yes.

23  Q.  Was the purpose of that agreement to manipulate the outcome

24  of the KFC bids?

25          MR. FELDBERG:  Leading.

1           *THE COURT:*  Sustained.

2     *BY MR. TORZILLI:*

3     *Q.*  What was the purpose of that agreement?

4     *A.*  It was to influence the outcome of the bid.

5     *Q.*  In what way?

6     *A.*  It was to help us either limit a decrease or maximize an

7     increase in price during the bidding process.

8     *Q.*  Pilgrim's by itself or with others?

9     *A.*  With others.

10    *Q.*  Who?

11    *A.*  Like I have testified before, the ones that I was most

12    keenly aware of were Tyson, Koch, and Claxton, but also had

13    information from others like Mar-Jac and George's.

14           *MR. TORZILLI:*  Moment to confer, Your Honor?

15           *THE COURT:*  You may.

16           *MR. TORZILLI:*  No further questions, Your Honor.

17    Thank you.

18           And thank you, Mr. Bryant.

19           *THE COURT:*  Mr. Bryant, you may be excused.   Thank

20    you.

21           Let's have a side bar at this time, please.

22        (At the bench:)

23           *THE COURT:*  So are you going to -- is the government

24    going to rest at this time, Mr. Torzilli?

25           *MR. TORZILLI:*  Yes, Your Honor.

1        THE COURT:  Okay.  So we are kind of at a little bit

2   of an awkward time.  It's almost 11:00 o'clock.  My guess is

3   that our jury instruction conference and the manufacturing of

4   the final instructions will probably take 40 minutes from

5   whenever we start.  And I don't know how long the government's

6   opening close is, but, you know, that would then take us fairly

7   deep into the lunch hour.

8        If we excuse the jury and still give them an hour and

9   a half lunch break, then we could resume at -- we could tell

10   them to come back at 12:30.  I could start reading the

11   instructions, and we could proceed with our -- with the

12   closings.  Does that sound like an acceptable way for us to

13   proceed?  Anyone have an objection to doing that?

14        MR. TUBACH:  No objection, Your Honor.  I think it

15   might be, depending on how long we have to do the jury

16   instruction conference, we might want a little extra time just

17   so we can go eat and make sure we can come back.

18        THE COURT:  Well, maybe we should do that because it

19   would be a long afternoon anyway.  How about if we told them to

20   come back at 12:45, do you think that that would sufficiently

21   enable everyone to grab a bite?  I don't want people to sit

22   there, you know, starving while the long afternoon wears on.

23        MR. TUBACH:  People are putting one finger in the air,

24   which means would the Court be amenable on 1:00 o'clock.

25        THE COURT:  That's fine.  We won't finish with the

1   closings anyway, so there is no use in trying to cram too much

2   in, so why don't we tell them to come back at 1:00, then.

3   That's all I wanted to talk about.  Thank you.

4        (In open court:)

5            THE COURT:  The United States may call its next

6   witness, or do you have additional rebuttal evidence?

7            MR. TORZILLI:  Thank you, Your Honor.  At this time,

8   the government rest its rebuttal case.

9            THE COURT:  Thank you.

10           So, ladies and gentlemen, that means that the evidence

11  in the case has concluded.  And given that fact, we now, "we"

12  meaning myself and the attorneys, need to finalize the jury

13  instructions.  We are right at that point where by the time we

14  got that done we really wouldn't have time for me to read the

15  instructions to you and then have much of an opportunity for

16  anyone to argue anything.  So here is what I am going to do.

17           I am going to let you go at this time and come back at

18  1:00 p.m., by 1:00 p.m.  And when you come back at 1:00 p.m.,

19  we will start off by my reading the instructions to you, and

20  then after that, we will start off with the closing arguments,

21  okay?  We will not, ladies and gentlemen, finish the closing

22  arguments today assuming that people use the amount of time

23  that I have allotted to them, so -- but we'll get through

24  whatever we get through, and then we will finish up with

25  whatever we have left tomorrow morning, okay?

1          So, ladies and gentlemen, we are getting close, but

2     that doesn't mean we are there, so you have to still keep those

3     admonitions in mind.  Don't discuss -- don't start talking

4     about the case at all amongst yourselves.  Keep the yellow

5     juror buttons visible, and we'll see you back at 1:00 o'clock,

6     all right?

7               The jury is excused.

8               (Jury excused.)

9          *THE COURT:*  First of all, any renewed Rule 29 motions

10    at the close of the government's rebuttal case?  Mr. Fagg?

11         *MR. FAGG:*  Yes, Your Honor.  On behalf of Mr. Lovette,

12    we would renew our Rule 29 motion.  I am happy to elaborate

13    more.

14         *THE COURT:*  No, I was assuming that defendants wish to

15    do so, we can adopt pretty much the same rule as we did in

16    regard to the Rule 29 motion at the close of the defendants'

17    case, namely that I will go around and ask each individual

18    defendant, and then those objections can be preserved and

19    incorporated in the briefing pursuant to the schedule that we

20    have already set up.  In the event that defendants believe that

21    we should extend the deadline based upon the fact that the

22    rebuttal case just ended today, we can talk about that too, but

23    why don't we as an initial matter at least just go through each

24    defendant and have them if they want to do an abbreviated

25    placeholder type of renewal of the motion, then that's

 1   perfectly fine.  So I will assume that that has now taken place

 2   in regard to Mr. Lovette.

 3            MR. FAGG:  Thank you, Your Honor.

 4            THE COURT:  On behalf of Mr. Penn?

 5            MR. TUBACH:  On behalf of Mr. Penn, we move for

 6   judgment of acquittal under Rule 29 with grounds that the

 7   evidence is insufficient to sustain a conviction.

 8            THE COURT:  Thank you.

 9            On behalf of Mr. Fries?

10            MR. KORNFELD:  Your Honor, we too renew our motion

11   under Rule 29 for the same reasons articulated by Mr. Tubach

12   and Mr. Fagg.

13            THE COURT:  Thank you.

14            On behalf of Mr. Brady?

15            MR. LAVINE:  Your Honor, we also renew our motion for

16   Rule 29 based on the comments of Mr. Tubach and Mr. Fagg.

17            THE COURT:  Thank you.

18            And on behalf of Mr. Austin?

19            MR. FELDBERG:  Your Honor, we renew our motion for

20   Rule 29 judgment of acquittal based on the fact that the

21   evidence is insufficient to sustain a conviction.

22            THE COURT:  Thank you.

23            And we don't have to talk about the deadline if you

24   want to think about it, but remind me, that once we -- at least

25   at that point perhaps when we let the jury go to begin their

2688

1    deliberations, we can take the scheduling issue up, all right?

2          Now let us go ahead and conduct the final jury

3    instruction conference.  So we'll go through the instructions,

4    and we'll take up the proposed revisions to Instruction No. 3

5    as part of that and also the revisions to the theories of

6    defense instructions in regard to that.  And we'll also talk

7    about any tendered instructions other than what -- well, in

8    addition to Instruction No. 3 which Mr. Beller tendered, we

9    will also talk about what Ms. Carwile tendered which is

10   Instruction No. 21 and any additional ones that may come up.

11         So, first of all, let me ask if the government and

12   each of the defendants have received a copy of the revised jury

13   instruction packet which is -- on the front of it says Draft

14   July 5th.  Everyone get that?  Okay.

15         Then let me start off with the government.  Up

16   until -- in regard to the stock instructions, and why don't I

17   define the stock instructions as through Instruction No. 16,

18   but let's make an exception right at the moment for Instruction

19   No. 3.  Any objections to the instructions in the Court's

20   July 5th packet?

21         MS. CHENG:  No objections from the government, Your

22   Honor.

23         THE COURT:  Let me ask the government, then, in terms

24   of the remainder of the packet, but not including the theories

25   of defense, any objections by the United States?

1              *MS. CHENG:*  No, Your Honor.

2              *THE COURT:*  Okay.  Now let me ask the defendants the

3       same question.  First of all, up and through Instruction No. 16

4       but excepting for the moment Instruction No. 3, any objections

5       by the defendants to the first 16 instructions?  All right.

6              *MR. FAGG:*  Just for purposes of clarification, I

7       assume no further objections.

8              *THE COURT:*  Why don't we make this the rule, that

9       further objections -- no further objections would incorporate

10      objections from the two previous trials, but why don't we

11      articulate any objections that were first made in this trial,

12      okay?

13             *MR. FAGG:*  Sure.

14             *THE COURT:*  We can perhaps use a shorthand, but I just

15      want to make sure we make a good record on whatever objections

16      may be made during this trial, okay?  You might be able to do

17      that in a shorthand fashion, but I just want to articulate

18      those so we make a good record.  Okay.

19             And then for the remainder of the instructions but not

20      including the theories of defense instructions, namely

21      Instructions 17 through 31, any objections on behalf of the

22      defendants?

23             Ms. Carwile?

24             *MS. CARWILE:*  Yes, Your Honor.  Should I tender that

25      objection now, Your Honor?

1          THE COURT:  Yes.  I am not sure that we had a copy,

2     but why don't you tender that to Ms. Grimm.  She will mark it.

3     Why don't we call that Defense Tendered No. 1.

4          MS. CARWILE:  Thank you, Your Honor.  And I will

5     provide Ms. Grimm a copy.

6          THE COURT:  Actually, why don't we say it's

7     Mr. Austin's Tendered No. 1.

8          And, Ms. Carwile, do you want to incorporate the

9     objections -- or, sorry, the argument that you made in favor of

10    Mr. Austin's Tendered No. 1?

11         MS. CARWILE:  I would like to incorporate that, Your

12    Honor.

13         THE COURT:  That's fine.

14         MS. CARWILE:  And I would just note that an additional

15    request that I understand I have already made before the Court

16    but I would like to be explicit about it, which is that if the

17    Court would consider providing only the second of the two

18    proposed sentences.  The Court has concerns about the word

19    "relevant" in the first sentence I had proposed, so my

20    additional request would simply be for the Court to provide

21    only the second sentence.  And other than that, I have no

22    additional argument.

23         THE COURT:  Okay.  And I will deny that request.  Once

24    again, the same reason as the paragraph as a whole, namely, I

25    believe that that information is already included in the

 1    paragraph immediately before the proposed new language has been

 2    added, and for that reason I don't think that the jury needs

 3    that additional information.  And I will mark Mr. Austin's

 4    Tendered No. 1 as refused.

 5          Mr. Lavine, go ahead.

 6          MR. LAVINE:  On behalf of Mr. Brady, we would adopt

 7    Ms. Carwile's recommended.

 8          THE COURT:  And for the same reason, I will reject

 9    that request.

10          MS. PLETCHER:  Your Honor, Mr. Penn joins as well.

11          THE COURT:  Okay.  Anyone else?

12          MR. FAGG:  Yes, Your Honor, Mr. Lovette.

13          MR. KORNFELD:  And Mr. Fries, Your Honor.  Thank you.

14          THE COURT:  For the same reason, I will reject each of

15    those requests.

16          All right.  Then why don't we switch back -- and while

17    I think of it, any objection to the verdict form by the United

18    States?

19          MS. CHENG:  No, Your Honor.

20          MR. FAGG:  Your Honor, I had something I want to make

21    sure is clear on the record as related to the instructions.

22          THE COURT:  We are going to come back to them.  We are

23    not done yet.  I just thought that the verdict form was fairly

24    easy so we would go to that, but we are coming back to the

25    instructions.

1        MR. FAGG:  Thank you.

2        THE COURT:  Any objection other than Mr. Beller's

3   request for separate verdict form -- separate verdict form for

4   each defendant?  Any objection to the verdict form as the Court

5   has tendered it?  All right.  And as to Mr. Beller's request, I

6   will reject that for the same reasons that I rejected it during

7   the previous jury instruction conference.

8        Mr. Fagg?

9        MR. FAGG:  Simply to say we join in Mr. Beller's

10  request for separate verdict forms.

11       THE COURT:  And I will reject that for the same

12  reason.

13       MR. FELDBERG:  We join as well.

14       MR. TUBACH:  As do we on behalf of Mr. Penn, Your

15  Honor.

16       MR. LAVINE:  On behalf of Mr. Brady also.

17       THE COURT:  As to each defendant, then, I will reject

18  that request.

19       Now let us go back to Mr. Beller's proposed change to

20  Instruction No. 3.  Adding some language regarding presumption

21  of innocence, in part this is taken from a recent 10th Circuit

22  case.

23       Government's position as to Mr. Beller's on behalf of

24  Mr. Fries' proposed amendment to Instruction No. 3?  Ms. Cheng?

25       MS. CHENG:  Your Honor, we would object to the

1    addition.  There is no need to deviate here from what is in the

2    10th Circuit pattern, and it's superfluous, because as Your

3    Honor mentioned, you had already mentioned the presumption

4    twice in the opening preliminary instructions, and it was

5    also -- this presumption of innocence was also featured

6    throughout the record during voir dire.

7         The *Starks* case that Mr. Beller is citing here

8    actually illustrates why the reasons and facts needed to

9    deviate from the 10th Circuit pattern don't exist here.  *Starks*

10   contemplated a situation where the prosecutor misstated the

11   presumption during the closing argument and effectively said it

12   is no longer true that the defendant was presumed guilty once

13   the evidence closed.  And the 10th Circuit reasoning was

14   basically that the district court could have better, quote,

15   preserved that presumption in light of the prosecutor's

16   specific statement that it, the presumption, had been

17   extinguished from this case, unquote.

18        These circumstances are not present here, and the

19   government does not intend to argue that the burden should be

20   shifted or that the defendants are not presumed guilty, and so

21   there is no reason to make a change from what is in the 10th

22   Circuit pattern.

23        One more point I will make on that, which is that this

24   10th Circuit case, *Starks*, is based on *Mahorney*, which is a

25   prior 10th Circuit case at which it cites for its reasoning --

1    this is at 917 F.2d 469.  This is a case that was decided in

2    1990, well before the latest revision to the 10th Circuit

3    pattern.  So this particular circumstance has already been

4    contemplated by the 10th Circuit, and the Court decided, the

5    10th Circuit decided not to include it in its pattern

6    instruction because it is simply unnecessary in most cases

7    where the prosecutor is not attempting to shift the burden;

8    whereas, here we are not going to argue in any way that the

9    defendants should not be presumed guilty or that the

10   presumption has somehow changed throughout the course of trial.

11           So the facts we have a -- factually we are very, very

12   distinguishable as to what happened in both *Starks* and

13   *Mahorney*.  And the defendants in this case should not be -- are

14   not really entitled to any additional instruction beyond what

15   any other criminal defendant would be facing with the pattern,

16   so for those reasons we object.

17           *THE COURT:*  Thank you.

18           Mr. Beller?

19           *MR. BELLER:*  Thank you, Your Honor.

20           And I know the Court is quite familiar with the

21   committee on the pattern instructions.  Your Honor, I would

22   note that in *Starks*, while I agree very much with the

23   government, and that is the prosecuting attorney in the *Starks*

24   case did make mention that now that all of the evidence is in,

25   that the presumption of innocence no longer exists.

 1          That was not objected to, and the Court did not

 2    provide any sort of curative instruction.  And so factually as

 3    stated by the government, I agree with them in their analysis

 4    on *Starks*.  I respectfully disagree with them on their analysis

 5    of the law.  While I do note and consider the Court's earlier

 6    statements that the presumption of innocence was mentioned at

 7    the beginning of trial, it was also mentioned in the *Starks*

 8    case, Your Honor.

 9          And the 10th Circuit in *Starks* took issue with the

10    fact that two days had passed since the jury had initially

11    heard the presumption of innocence and in that two-day period

12    of time very likely may not have remembered necessarily the

13    instruction from the Court.  I agree that in the Court's

14    preliminary instruction to the jury the presumption of

15    innocence was stated verbally to them.  It is not contained in

16    the jury instruction packet.  And as importantly, I don't

17    believe that it is clear to the jury that the presumption of

18    innocence stays with the defendants throughout deliberations.

19    Certainly that was not stated in the Court's initial

20    instructions, rather, the defendants are to be presumed

21    innocent.

22          I did look at the transcript.  I don't believe, Your

23    Honor, that it was expanded beyond that.  Therefore, I do

24    believe that this is a correct recitation of the law.  I do

25    believe it is consistent with *Starks*.  I think it can be a

1    stand-alone instruction.  But given the fact that the word

2    "innocent" is used in Instruction 3, I also equally believe

3    that it's an appropriate place in order to put that particular

4    provision.

5            I would note that that is verbatim taken out of the

6    case, although there are some ellipses, Your Honor, that

7    frankly I didn't know what the Court had skipped over, and I've

8    removed them in my recitation that I've tendered.

9            THE COURT:  Thank you, Mr. Beller.

10           Ms. Cheng, anything else?

11           MS. CHENG:  Really briefly, Your Honor.  I think

12   Mr. Beller agrees that this was effectively -- what they were

13   talking about in Starks was effectively a curative instruction.

14   There is no reason to give anything like that here, because

15   unlike the situation in Starks where the 10th Circuit found

16   that the prosecutor had "undermined" the presumption, in this

17   case we do not intend to undermine this presumption at all.

18   And even though the Court had given it in the Starks case in

19   the preliminary instruction, the only reason that the Court

20   felt that it was necessary to give a curative instruction in

21   that case was because of the prosecutor's plainly erroneous

22   statement on the presumption.

23           THE COURT:  All right.  I am going to reject the

24   language, not because it doesn't come from Starks.  Mr. Beller

25   faithfully reproduced it.  But as both sides acknowledged, the

2697

1    *Starks* situation was different because the prosecutor in

2    closing made a misstatement regarding the presumption of

3    innocence, and, therefore, it was necessary to clarify for the

4    jury what the presumption of innocence meant.  It wasn't

5    extinguished at some point.  But that's not the case here.

6         Moreover, the government in this case is not going to

7    argue anything to that effect.  And I already instructed the

8    jury in my opening preliminary instruction what -- the fact

9    that the presumption of innocence exists and that each of the

10   defendants is presumed innocent.  So I am not going to change

11   or make alterations in light of *Starks* to the 10th Circuit

12   stock instruction.  Rather, I am going to keep Instruction No.

13   3 as is and will mark Mr. Beller's instruction as Mr. Fries'

14   Instruction No. 2.  It's not, of course, his second one, but

15   just tendered No. 2.

16        *MR. TUBACH:*  Your Honor, Mr. Penn would join in that

17   request.

18        *THE COURT:*  Anyone not join?  So each of the

19   defendants also joins Mr. Fries' tendered instruction, and for

20   the same reasons, I will reject each of those tendered

21   instructions.

22        All right.  Then let us move on to the theories of

23   defense instructions.  Has the United States had an opportunity

24   to review the revisions to the theory of defense instructions,

25   namely the instructions beginning with Instruction No. 32 and

1    carrying over through Instruction No. 36?

2            MS. CHENG:  Your Honor, we understand that the defense

3    simply added statements to the effect of Mr. Brady contends or

4    this particular defendant asserts, and if that's the only

5    change, then the government has no objection to those changes

6    relative to what it saw over the weekend.

7            THE COURT:  That's not the only changes.  The

8    defendants submitted over the weekend some additional changes.

9    Have you seen those?

10           MS. CHENG:  We have seen a version that they submitted

11   over the weekend.  So my understanding is there was a change

12   from what they submitted in the second trial and that was

13   submitted over the weekend, and the only changes made today was

14   to add those starting phrases; is that correct?

15           THE COURT:  Well, these are in effect cumulative

16   changes.  So these include the changes that the defendants

17   submitted over the weekend, and then additional changes were

18   made to some of them because of the "contends" language.  For

19   instance, Mr. Penn, some of his proposed changes weren't made

20   because it had to do with the "contends," but Mr. Penn had some

21   other changes to his as well.  Mr. Lovette I think -- yeah,

22   Mr. Lovette had some changes to his but didn't have anything to

23   do with the "contends" language.

24           So what we are talking about now is as the theories of

25   defense instructions appear in the court packet of July 5th,

1    any objection by the United States?

2         *MS. CHENG:*  Understood, Your Honor.  We would simply

3    renew our prior objections on the defense theories of the case

4    going back to the jury in the first place.  Just for the

5    record, I will just quickly repeat some of our prior objections

6    which is that --

7         *THE COURT:*  If you want to incorporate your objections

8    from the previous jury instruction conference that we had in

9    this case, you can do so.

10        *MS. CHENG:*  Thank you, Your Honor.  I would like to do

11   so, our prior colloquies.  And I would make one additional

12   point which I don't think at least we have discussed in this

13   round on the defense theories which is that Your Honor had

14   requested from the very first trial that these instructions

15   should not be too detailed and should be of an average-sized

16   paragraph with about approximately four or so sentences.  Some

17   of these are -- some of these span almost a full page, and it's

18   our position that these are simply too detailed and represents

19   summaries of evidence in the light most favorable to the

20   defendants and amount effectively to testimony or closing

21   statements.

22        *THE COURT:*  Okay.  So I will for the same reason that

23   I denied the defendants' -- sorry, the government's objections

24   to the theories of defense instructions in our previous jury

25   instruction conference in this case, I will reject the

 1    government's objections right now.  And in addition, I will

 2    also reject Ms. Cheng's last point.  I am not aware of there

 3    being some -- like a four-sentence limitation or a reasonable

 4    paragraph limitation.  I would assume it would depend on the

 5    case.  This case is more complicated, more detailed, and,

 6    therefore, I believe that that justifies a somewhat longer

 7    theory of defense language than you might have in a more

 8    straightforward, less complicated case.

 9          Any of the defendants want to make any additional

10    record on that?

11          All right.  And let me just as -- and anything from

12    the defendants on the theories of defense instructions like

13    objecting to one another's theories of defense?  I just want to

14    make sure we cover that base.

15          Now let me ask the United States just to make sure

16    that I didn't miss anything, other than what you have already

17    mentioned during this final jury instruction conference, any

18    other objections to the jury instructions or any tendered jury

19    instructions?

20          *MS. CHENG:*  No, Your Honor.  We would just like to

21    renew our prior objections on the statute of limitations

22    instructions and any other objections made in prior trials.

23          *THE COURT:*  And you may do so, and they will be denied

24    for the same reasons that I denied them in those trials.

25          On behalf of the defendants, any additional objections

1    or any additional tendered instructions other than what we have

2    talked about today or which were discussed in the previous

3    trials?

4         *MR. BELLER:*  Your Honor, I am going to be tendering to

5    Ms. Grimm a proposed instruction based on the events that have

6    happened this morning regarding Rule 615.  The instruction that

7    I have drafted, and I have just provided a copy to the

8    government, states:  Prior to trial, the Court ordered

9    witnesses to be sequestered.  There is sufficient evidence to

10   believe the government violated this order in meeting with

11   Mr. Bryant before his rebuttal testimony.  You may consider

12   this violation in considering Mr. Bryant's credibility and

13   whether the government proved their case beyond a reasonable

14   doubt.

15        Your Honor, in a moment of candor, I must tell the

16   Court that this is not deeply researched on my part.  I do

17   believe that it's appropriate.  I would -- if I can use the

18   word "assume" without irony, I would assume that there is law

19   to support it, but I also don't want to misrepresent that I

20   have been able to do deep research for the giving of such an

21   instruction, but I do ask the Court to give it, and I do

22   believe that it is appropriate.  And if I may approach

23   Ms. Grimm.

24        *THE COURT:*  Yes, you may.

25        Ms. Cheng, did you get a copy of it too?

1          *MS. CHENG:*  I did.

2          *THE COURT:*  Okay.

3          So, Ms. Cheng, whenever you are ready to respond.

4     Ms. Wulff.

5          *MS. WULFF:*  Yes, thank you, Your Honor.  The

6     government does not believe there is any basis for this

7     instruction.  The Court conducted a colloquy with Mr. Torzilli

8     at the break, and there is no reason to believe that the

9     government has violated the sequestration order, let alone

10    sufficient reason to give such an instruction.

11         *THE COURT:*  Mr. Beller or any other defendant?

12    Mr. Tubach, go ahead.

13         *MR. TUBACH:*  Your Honor, we do believe the instruction

14    is appropriate.  Mr. Torzilli made the representations he made,

15    but what we have is the sworn testimony of a witness that he

16    was -- discussed with the government lawyers not just exhibits

17    in evidence but also witness testimony.  And Mr. Beller -- I

18    won't repeat, Mr. Beller read the rough transcript where

19    Mr. Bryant made those statements and gave that testimony.

20         There is a case out of the Sixth Circuit, *U.S. v.*

21    *Solorio*, 337 F.3d 580, pin cite 592.  It a Sixth Circuit case

22    2003 that approved an instruction that the jury can consider

23    sequestration -- a sequestration violation in evaluating the

24    credibility of witnesses.  So, again, as Mr. Beller indicated,

25    our research is real-time here, but we do believe it's an

1    appropriate instruction.  And at some later point, we may need

2    to make a record about whatever motions we want to make before

3    this goes much further because obviously we have only had the

4    testimony of Mr. Bryant at this point.

5         THE COURT:  Thank you, Mr. Tubach.

6         Anyone else?

7         Ms. Wulff, did you want to mention anything in

8    response to Mr. Tubach?  I think she is looking up that case

9    that he cited, which you certainly can.

10        MS. WULFF:  I certainly have not had a chance to read

11   that case yet.  I was looking at the question posed to

12   Mr. Bryant that I believe is the genesis of this.  It was a

13   compound question asking about whether he considered evidence

14   and testimony, and I believe there is certainly no basis --

15   again, there was no violation of the sequestration order.

16   Mr. Bryant was asked questions about an exhibit which would be

17   evidence, and so his answer is that he did review evidence with

18   the prosecutors, but, again, the government maintains that

19   there is no violation of the sequestration order, and there is

20   certainly not sufficient evidence on the record nor is there a

21   basis to instruct the jury.

22        THE COURT:  All right.  Mr. Beller, did you have

23   anything else?

24        MR. BELLER:  Only very briefly, and that is I am not

25   sure that showing that graph and asking questions was not, in

1    fact, a violation of 615, No. 1.  No. 2, certainly I take

2    Mr. Torzilli at his word.  I have no reason to doubt what

3    Mr. Torzilli is saying.  I do want to point out, however, that

4    Mr. Torzilli was not, in fact, present for the vast majority of

5    this meeting based on the notes that we have been provided.

6    And so based on all of this and ultimately based on

7    Mr. Bryant's answers, it certainly is appropriate.

8         THE COURT:  All right.  I am going to reject -- I am

9    going to call this Mr. Fries' Tendered Instruction No. 3.  I

10   will go ahead and reject that.  Here is why.  First of all,

11   while it's true that we don't know exactly how the meeting

12   between Mr. Bryant and the government in between his testimony

13   in the government's case in chief and his rebuttal testimony

14   actually unfolded.  Based upon Mr. Torzilli's representation, I

15   am going to assume that he was not -- he meaning Mr. Bryant was

16   not made aware of witness testimony.

17        Now, I realize that there may be some FBI witness

18   statement or something that would suggest otherwise, but those

19   as we know are typically prepared by FBI agents and perhaps

20   that's not accurate, not precluding the defendants from filing

21   whatever they want to on that issue after today.  However, I

22   don't believe that -- but we do know that Mr. Bryant was shown

23   an exhibit which was 259 --

24        MR. TORZILLI:  J-256, Your Honor.

25        THE COURT:  Sorry, J-256.  Now, as Mr. Beller said,

2705

1  that may be a violation of sequestration.  I am not sure.  We

2  would have to look into that.  I am not sure.  It depends on

3  what was said.  I mean, just showing someone an exhibit is not

4  a violation of the sequestration order, but if it came with

5  testimony of the witness about that, then maybe it would.  I'm

6  not sure.  But in any event, Mr. Bryant's very limited

7  testimony about J-256 would not justify giving Mr. Fries'

8  Tendered Instruction No. 3.

9        Moreover, the questions that were asked of Mr. Bryant

10  by Mr. Beller were all along the lines of you didn't learn

11  anything more between the time that you testified and your

12  testimony today, and Mr. Bryant said no.  The only thing that

13  he admitted to is he was shown this one exhibit.  So there is

14  nothing that would support and the jury has heard nothing that

15  would suggest that Mr. Bryant gained any information whatsoever

16  that changed his testimony.  And as a result, giving the

17  instruction as tendered by Mr. Fries, Fries Tendered

18  Instruction No. 3 is not justified based upon the testimony of

19  Mr. Bryant, so I will reject that at this time.

20        MR. FELDBERG:  For the record, Your Honor, Mr. Austin

21  joins in the giving of Instruction No. 3.

22        THE COURT:  Any other defendant not join that?  I

23  don't mean to put you on the spot but just to save some time.

24  For the same reason, each of those tendered instructions, the

25  same one will be rejected.

2706

1        I can't remember if I asked, do defendants have any

2   other objections to the packet that haven't already been

3   articulated or any additional tendered instructions?  Mr. Fagg?

4        MR. FAGG:  No additional tendered instructions, Your

5   Honor, but we would renew our objection to Instructions No. 18

6   and 22 as they are given based on the filings that we made and

7   the arguments from last week.  We would also on behalf of

8   Mr. Lovette object to Instruction No. 26 as it is given for the

9   reasons that we articulated at the hearing last week.

10        THE COURT:  All right.  And I will consider those

11  arguments to be incorporated, and I will deny those for the

12  same reasons that I articulated during the jury instruction

13  conference in this case.

14        Any additional?  And one objection will stand for all

15  too so you don't each have to join in on that.

16        Any additional comments, objections, tendered

17  instructions?

18        All right.  Mr. Tubach.

19        MR. TUBACH:  Sorry, Your Honor.  And I do this purely

20  for the record at this point because I haven't researched the

21  law on the timing of this.  With respect to the Rule 16

22  potential violation, I think to make sure I preserved

23  Mr. Penn's rights, I think I need to move to have Mr. Bryant's

24  direct testimony stricken, as well as his rebuttal testimony

25  stricken, and then also move for a mistrial at this point.

1    But, again, for the record, we know very little at this point.

2    I just want to make sure I am not waiving any rights.

3              THE COURT:  Anyone want to join Mr. Tubach's motion?

4              MR. FAGG:  Yes, Your Honor.  We do on behalf of

5    Mr. Lovette.

6              THE COURT:  So each of the defendants, I am watching

7    each of the defendants' counsel stand up, so I assume that each

8    other defendant has joined those requests.  I will deny each of

9    those requests and -- sorry, I misspoke and didn't say

10   Mr. Penn.

11             MR. TUBACH:  I was going to say we haven't had an

12   opportunity to brief that yet.  So I would ask the Court to

13   hold off on ruling until we have had an opportunity to brief

14   it.

15             THE COURT:  For purposes of, like, there being a

16   mistrial, I will, and we will proceed on with closing

17   arguments, but the defendants have not had an opportunity to

18   brief that.  They don't necessarily even know the facts, and as

19   a result, I will certainly give them an opportunity to be able

20   to do that and make any appropriate motion even if it involves

21   a motion I just denied.

22             MR. TUBACH:  I just want to make sure we are not in a

23   motion for reconsideration rather than --

24             THE COURT:  I see what you mean.  Yes, that's an

25   excellent point.  I will not hold you to a motion for

1    reconsideration standard given the fact you haven't had an

2    opportunity to look into it.

3              MR. TUBACH:  Thank you, Your Honor.

4              THE COURT:  Anything else that we should talk about

5    before we reconvene at 1:00 p.m.?

6              MR. KORNFELD:  Perhaps, and I don't know that we need

7    to resolve that now, but perhaps revisiting the deadline for

8    the Rule 29s.

9              THE COURT:  We can talk about that now.

10             MR. KORNFELD:  I believe we had agreed that ours would

11   be due on the 11th, Monday, and the government would have the

12   same relevant amount of time.  It would be our assertion to

13   push that deadline to at least the 18th, and, obviously, no

14   objection for the government to get the concurrent amount of

15   time to respond.

16             THE COURT:  Any objection on behalf of the United

17   States to revising the deadline for Rule 29 motions to July 18,

18   and then I forget how much the corresponding amount of time is

19   and when that would be --

20             MR. HART:  No objection, and the government would ask

21   until August 5th.

22             THE COURT:  Any objection to the government responding

23   on August 5th?

24             MR. KORNFELD:  No, Your Honor.

25             THE COURT:  So we will set the new date for the

 1    submission of Rule 29 motions to be July 18th and the

 2    government to respond on or before August 5th.

 3         MR. HART:  Thank you, Your Honor.

 4         THE COURT:  Mr. Beller?

 5         MR. BELLER:  Your Honor, just an issue of

 6    housekeeping, and that is deliberations on Friday.  Is the jury

 7    going to be given the option or the choice?

 8         THE COURT:  Yes.

 9         MR. BELLER:  Very good.  So I remind the Court to ask

10    about that, please.

11         THE COURT:  That is a good idea.  I think that I

12    mentioned that to them at the very beginning of the case, but

13    it's a good idea to remind them of that fact so their schedule

14    is kept in mind.  Okay.

15         And then why don't we -- does the United States know

16    at this point in time how much time they would like the

17    heads-up to be, assuming that you want me to mention something?

18         MR. HART:  Yes, Your Honor.  For closing purposes, an

19    hour and 20 minutes with a two-minute warning.

20         THE COURT:  Okay.  So the initial -- the government's

21    initial close will go an hour and 20 minutes, and I will give

22    you a two-minute heads-up.

23         MR. HART:  Thank you, Your Honor.

24         THE COURT:  And any request by the defendants at this

25    point?  You don't have to -- I am not sure how -- I forgot what

1  term we even used for the common argument.

2          MR. BELLER:  The best one, Your Honor.

3          THE COURT:  What's it called?

4          MR. BELLER:  The best one.

5          Your Honor, if we could have 20 minutes for that

6  initial table-setting closing.

7          THE COURT:  Yes.

8          MR. BELLER:  I will be giving that closing, Your

9  Honor.  The rest of defense counsel are going to be going in

10 order of the Indictment, and I believe each is asking for 42

11 minutes -- excuse me, 43.

12         THE COURT:  So in other words -- oh, so 43 total or

13 get the warning at 43.

14         MR. TUBACH:  If the Court is willing to give us 45, we

15 will take the warning at 43.  But having done the math, I think

16 we are each ceding two minutes to Mr. Beller, and he gets two

17 minutes extra that was allotted for the first opening, so that

18 puts him at 20 and puts us all at 43.

19         THE COURT:  Now, Mr. Beller, for the table-setting

20 closing, would you like a warning from the Court at a given

21 time?

22         MR. BELLER:  Yes, Your Honor, two minutes is

23 appropriate.

24         THE COURT:  Anyone not want two minutes?  It looks

25 like everyone else will go two minutes too.

1           Anything else we should talk about before we recess?

2               MR. HART:  Nothing from the government, Your Honor.

3               THE COURT:  Then we will get the final jury

4   instruction packet out to you.  It will be essentially the

5   same.  But other than that, we'll reconvene at 1:00.

6   Mr. Kornfeld?

7               MR. KORNFELD:  I am sorry, Your Honor, and there is an

8   element of self-interest in this question to the Court.  So

9   given we are going in order of Indictment, I am likely to

10  close, depending on how long it takes the Court to read the

11  instructions, at a time period where if I were to go today, it

12  would probably put us 5:15, 5:20ish.  So I don't know what the

13  Court's thoughts are about doing that, but I would prefer not

14  to get a tired jury that -- if that's how the waves break

15  timewise, and I am just wondering if the Court has thoughts

16  about that now.

17              THE COURT:  Well, someone has got to be last, but we

18  are not going to go -- I have always told the jury, and I think

19  the Rockies are in Los Angeles so that's not a problem, but I

20  have always told the jury that they should expect to be done at

21  5:00.  So I haven't broken it down yet that way, but why don't

22  we -- when we reconvene at 1:00, I will have done that, and

23  then I will give you a better sense.  But we are not going to

24  go substantially past 5:00 o'clock, so instead if we need to

25  recess a little bit early because we will have arguments

1    tomorrow regardless, so ...

2         MR. KORNFELD:  Great.  Thank you, Your Honor.

3         MR. TUBACH:  I would ask after the government's,

4    depending on where the breaks come, that perhaps the Court have

5    two-minute breaks or something between at least some of the

6    arguments so the jury can stand up and stretch.  It's a long

7    time to just --

8         THE COURT:  Yeah.  I think we might even do something

9    more like five minutes or something, because, by virtue of them

10   having lunch a little bit earlier, it makes for a longer

11   stretch of time, and we all learned in the second trial that,

12   you know, even for us to start outside of the presence of the

13   jury at 8:00 a.m. kind of seemed like a long day.  So it would

14   be a long day to the jury.

15        We will be in recess, then, until 1:00 o'clock.  Thank

16   you.

17      (Recess at 11:40 a.m until 1:05 p.m.)

18        THE COURT:  Let me ask this question, and that is, do

19   the parties waive Ms. Coppock's recording of my reading of the

20   instructions.  You don't have to, but, Mr. Torzilli?

21        MR. TORZILLI:  Yes on behalf of the government.

22        MR. TUBACH:  Yes on behalf of Mr. Penn.

23        MR. KORNFELD:  Yes on behalf of Mr. Fries, Your Honor.

24        MR. LAVINE:  Yes.

25        MR. FELDBERG:  Yes on behalf of Mr. Austin.

1          *MR. FAGG:*  Yes on behalf of Mr. Lovette.

2          *THE COURT:*  Thank you.

3          *MR. TORZILLI:*  For the government's closing, Ms. Wulff

4    would like to use the poster boards, and we have the easel

5    here, so between the end of the jury conference and the

6    beginning of openings, we will put these up right about here if

7    that's acceptable.

8          *THE COURT:*  Yes.  That shouldn't block anyone's view,

9    and that is acceptable.

10         *MS. WULFF:*  Your Honor, at this time, may I also

11   request permission to approach the easel during my closing, or

12   do I need to --

13         *THE COURT:*  No, you don't need to.  And if someone

14   wants to help you set it up, that's always a good idea, and

15   that person doesn't need separate permission either.

16         All right.  Anything else?

17         Let's bring the jury back in.

18         (Jury present.)

19         *THE COURT:*  Ladies and gentlemen, you can see that I

20   have given you a set of the jury instructions, so those jury

21   instructions you can take back to the jury room during the

22   course of your deliberations.  I am about to read those

23   instructions to you, and while I read those to you, despite the

24   fact that I have got numerous barriers here, I would like you

25   to do one of two things.  Either follow along with your own set

1   while I read the instructions or simply listen to my reading of

2   the jury instructions.

3           What I don't want you to do is to read ahead while I'm

4   reading the jury instructions because then by definition you

5   wouldn't be paying attention to my reading of the instructions,

6   all right?

7           So with that, let me now start off with Instruction

8   No. 1.

9           (Jury instructions were read to the jury.)

10          *THE COURT:*  Now, ladies and gentlemen, we are ready to

11  begin the closing arguments in this case.  The government,

12  because it has the burden of proof, will go first.  After that,

13  the defendants may give a closing argument, and then finally if

14  the government wishes to, it may give a rebuttal argument.

15          At this time, then, we will hear the closing argument

16  of the United States.

17          *THE COURT:*  Go ahead, Ms. Wulff.

18                          **CLOSING ARGUMENT**

19          *MS. WULFF:*  We got 'em.  We got 'em.  The plan was

20  working.  KFC was boxed in, and we had all submitted higher

21  prices to KFC.  Members of the jury, those are the words of

22  Robbie Bryant, the defendants' conspirator, describing his

23  reaction to learning that the plan, the conspiracy, had worked,

24  that the defendants and their conspirators had worked together

25  as a team against their customers.  They had worked together to

1      decide in advance how the bidding process should play out.

2              They changed the rules of the game, and instead of

3      playing by the fair rules, they played by their rules.  They

4      stacked the deck in their favor, and they did it to keep prices

5      as high as possible, to make more money for their companies at

6      the expense of their customers.

7              And the evidence against the defendants is not just

8      Mr. Bryant's testimony, you saw the defendants' words too, in

9      texts and e-mails written while they were committing the crime.

10     The defendants' own words show you how they ripped off their

11     customers and how they cheated the system.  At each turn, these

12     supposed-to-be competitors, these conspirators, they made a

13     plan.  They picked up the phones and called each other.  They

14     got on the same page.  The bosses signed off, and they

15     committed a crime.

16             The government has proven that Defendants Roger

17     Austin, Bill Lovette, Jayson Penn, Mikell Fries, and Scott

18     Brady are guilty beyond a reasonable doubt of participating in

19     a bid-rigging and price-fixing conspiracy.

20             Members of the jury, you have seen and heard a lot of

21     evidence, and at the end of the day, you have to ask yourselves

22     two fundamental questions:  One, why did the defendants and

23     their should-be competitors call each other and exchange their

24     bids and bidding strategy during the bidding process?  And,

25     two, were each of these five men involved?  Were they part of

1   the conspiracy?

2            So let's start with the purpose, the why, why they

3   called each other, why they gave each other their bids and

4   their bidding strategies.  Defendants talked to each other a

5   lot.  That's not really in dispute here.  And they talked about

6   their bids.  The question is why, and the answer is because

7   they were conspiring to rig bids and fix prices, meaning they

8   collaborated with each other instead of competing against each

9   other, and they got on the same page against the customers.

10  And that answer is all you need because that's the crime.

11           Members of the jury, look at what information they had

12  and when they had it because that tells you why they had it, to

13  rig bids and fix prices.

14           Now, you heard a lot about bids from several chicken

15  supply contracts, and for each one, the defendants' illegal rig

16  had two phases, getting on the same page and staying on the

17  same page.  And no matter which phase, look at what information

18  did they have and when did they have it because that tells you

19  everything you need to know.

20           All right.  Let's talk about defendants getting on the

21  same page.  Customers asked the chicken suppliers to send their

22  first-round bids.  They asked for competitive bids.  And the

23  rig was defendants giving each other their bids, the bids they

24  were about to submit and getting on the same page.  What

25  information do they have?  Each other's bids.  And when do they

 1  have it?  Before they're due.

 2       Now let's discuss defendants staying on the same page.

 3  Customers gave feedback, tried to negotiate bids down, and the

 4  rig was defendants giving each other what they needed to push

 5  back, bids, bidding strategy, coordinating whether to hold or

 6  to lower.  That's staying on the same page.

 7       They made the customers' feedback meaningless, because

 8  once the defendants had their should-be competitors' bidding

 9  strategy, they didn't have to compete against each other.  They

10  didn't have to submit their best price.  Again, ask the

11  questions:  What information did they have and when did they

12  have it?

13       They have each other's bidding plans, don't concede on

14  price, and they have it while the customer was trying to

15  negotiate bids down.  You saw this in the evidence, and you

16  heard it from the witnesses.  So let's use the 2015 KFC

17  contract that you heard so much about as a really quick

18  example.  Okay.

19       Exhibit 1074.  What information did Defendant Austin

20  get?  He called around and got his supposed-to-be competitors'

21  bids, his conspirators' bids, including Claxton's.  And when

22  did he get it?  The day before the bids were due.  The customer

23  wanted competitive bids, but Defendant Austin got his

24  conspirators' bids in advance, and that's phase 1 of the rig,

25  getting on the same page.

1          Now, the exhibit numbers I call out to you today have

2     all been admitted into evidence, meaning that they will be with

3     you in the jury room while you deliberate, so you may want to

4     consider jotting down the numbers I mention so that you can

5     refer to them later.

6          Of course, there is also staying on the same page.

7     KFC tried to negotiate down from the record high first-round

8     bids for that 2015 contract.  And look at the Exhibit 1238.

9     What did Defendant Brady get?  Pilgrim's strategy, his

10    supposed-to-be competitor's strategy.  Greeley told him not to

11    come down on price, Greeley, that's Pilgrim's headquarters

12    where Defendants Penn and Lovette worked.  Told Austin not to

13    lower his price.  And when did Defendant Brady get it?  Exactly

14    when he needed it, when KFC was shopping around to find a lower

15    price.  And that's how you know the bid was rigged.

16         Members of the jury, this quick example we just went

17    through involved a small piece of the bidding process for the

18    2015 KFC contract, and it involved all five of these

19    defendants.  You can look at the pattern of the communications

20    and map it out onto this structure that we showed you during

21    opening statements.  Defendant Austin and Brady get calling

22    each other, getting on the same page, and reporting up to their

23    bosses, Defendants Penn, Lovette, and Fries.

24         *THE COURT:*  Sorry, Ms. Wulff.  If any of the attorneys

25    want to reposition so they can see the board, feel perfectly

1    free to do that.

2            Go ahead, Ms. Wulff.  Sorry.

3            *MS. WULFF:*  There it is.  That's this case.  And this

4    pattern, it goes on for bid after bid after bid.  And while the

5    specific details of the rig might change, the conspiracy's

6    pattern remains the same.

7            And now that you have an example of how the conspiracy

8    operated, let's talk about the law.  As Chief Judge Brimmer

9    instructed you, the government has the burden of proof, and we

10   have to prove these elements:  The existence of a conspiracy,

11   that each defendant joined the conspiracy, and that the

12   conspiracy affected interstate commerce.  Chief Judge Brimmer

13   instructed you about the law, and he told you about

14   conspiracies, specifically that the conspiracy between the

15   defendants doesn't need to be formal or official.  It can be

16   entirely unspoken.  And that's because a conspiracy is a

17   partnership in crime, an agreement or mutual understanding

18   between two or more people.  It doesn't even matter the

19   defendants' conspiracy is successful, because at the end of the

20   day, the agreement to act together, that's the crime.

21           And Chief Judge Brimmer told you that price-fixing can

22   take many forms.  Price-fixing can be agreeing to increase

23   prices like that three-year 2015 KFC contract.  It can be

24   agreeing to lower prices or agreeing to stabilize prices

25   meaning to keep prices from going down even further like that

1    2018 KFC contract.

2           He also told you that bid-rigging can take many forms.

3    Bid-rigging can mean setting the prices to be bid, who should

4    be high, who should be low, like Claxton wanting to be in the

5    middle, or Pilgrim's wanting to be No. 1 for the 2015 bid or

6    No. 2 in 2018, as long as the agreement or mutual understanding

7    affects competition for something that is to be awarded on the

8    basis of bids.

9           So how did the conspiracy insider, Robbie Bryant,

10   describe it?  He used words like manipulating the bids, having

11   an understanding, agreeing on price, make a plan, boxing in the

12   customer.  That's price-fixing.  That's bid-rigging.  Those are

13   words of a criminal conspiracy.

14          Now, for the second element of the crime, you have to

15   ask yourselves, did each of these five men join that

16   conspiracy?  Did they know about it, and did they voluntarily

17   participate, meaning did the actions that they took calling

18   competitors, directing their subordinates to call competitors,

19   signing off on rigged bids advance the conspiracy's objectives.

20   And if you find that they did, then you know that each

21   defendant participated in the conspiracy.

22          Knowing the purpose, the why, that tells you whether

23   there was a conspiracy, so that's where I am going to focus,

24   that and the evidence connecting each of these five defendants

25   to the crime.  We'll turn to interstate commerce at the very

1       end because it's not seriously in dispute.

2              Let's start with Robbie Bryant because he made things

3       simple.  He told you that the overall purpose was to increase

4       prices together with our competitors.  There you have it.

5       That's it.  Game over.  Defendants did it to increase prices

6       together with their competitors.  That was the purpose of their

7       conversations.  That was their conspiracy.  And he explained

8       that purpose by telling you about what he heard, what he saw,

9       and what he himself did.

10             As I go through my remarks today, I will be showing

11      portions of testimony.  And as Chief Judge Brimmer has

12      instructed you, your memory controls.  And a copy of that

13      testimony will not be available to you in deliberations, so you

14      may want to consider taking special note of any testimony you

15      want to remember.

16             Mr. Bryant told you that chicken suppliers were in

17      competition against the common customer, meaning they were

18      collaborating, not competing against each other.  So the

19      members of the conspiracy were collaborating with each other

20      instead of competing against each other, meaning that they had

21      flipped the bidding process on its head to compete against

22      their customers.  And it's not just that.  He told you he had

23      personal knowledge of an agreement between people at Pilgrim's

24      and their competitors that affected the bidding for fast-food

25      restaurant customers and that Defendant Austin, he was in on

1    it.  It doesn't get much clearer than that.

2           His testimony is how you know that this case is not

3    about what defendants told you during their opening statements.

4    It's not like looking at the prices the gas stations are

5    charging.  It's not like calling around to other hotels to see

6    what their rates are.  And it certainly wasn't about finding

7    out about what a competitor's current prices were while

8    covering shorts.  The defense's arguments are meant to distract

9    you and distract you from the actual evidence because that

10   evidence shows the defendants and their conspirators gave each

11   other their bids for a purpose, for the exact purpose that

12   Chief Judge Brimmer told you is illegal, to rig bids and fix

13   prices.

14          They gave each other their bids to manipulate the

15   outcome of the bidding process.  And how do you know?  Again,

16   look at what information Robbie Bryant had and when did he have

17   it.  Okay, the 2018 contract, you remember his handwritten

18   notes, Exhibit 1919.  He asked Defendant Austin to get the

19   should-be competitors' bids, the conspirators' bids.  That is

20   getting on the same page.  And Mr. Bryant didn't know it at the

21   time, but it was the exact same thing Defendant Austin had done

22   three years before, Exhibit 1074.  Defendant Austin, he was the

23   go-to guy for getting his conspirators' bids and getting his

24   conspirators on the same page.

25          So Mr. Bryant's testimony from this morning about 2014

1   and 2017 was spot on.  And back to the 2015 contract,

2   Exhibit 1066, what did Mr. Bryant know and when did he know it?

3   Pilgrim's knew everyone had submitted record-high first-round

4   bids before they went to the meeting with KFC.  They knew they

5   could insist that the price was the price.  That was staying on

6   the same page.

7        Now, let's get two things straight about Mr. Bryant.

8   Yes, he didn't tell the government about something that was

9   completely unrelated to the crime we are here to talk about,

10  but he did the right thing.  He asked for a meeting with the

11  government and he disclosed the information.  And, yes, the

12  government gave him immunity.  And Chief Judge Brimmer has

13  instructed you to scrutinize his testimony with, quote, greater

14  care and caution.  And when you do, you'll see that what

15  Mr. Bryant said is supported by the evidence, the phone calls,

16  the e-mails, the text messages, and the defendants' own words.

17       Take just one example from the bidding process for the

18  2014 KFC contract.  Mr. Bryant told you he was in Defendant

19  Austin's office in Louisville for the meeting with KFC.  They

20  were telling KFC that Pilgrim's wasn't going to lower its bid.

21  And he overheard Defendant Austin having two calls with

22  competitors.  One was with Defendant Brady, and the other was

23  with Bill Kantola, the person leading the bidding process at

24  Koch Foods, a conspirator.  On both calls Mr. Bryant heard

25  Defendant Austin bragging to the should-be competitors, the

1    conspirators, including Defendant Brady, about the KFC

2    negotiations.  Defendant Austin said, The price is the price; I

3    just need to know how many loads.  Hold firm.  No need to lower

4    your bids.  That is the message.

5              Now, Mr. Bryant heard these two conversations himself,

6    his own ears, and his testimony is supported by the phone

7    records, records in black and white.  And you can look for the

8    evidence of those calls on Exhibit 58.  Mr. Bryant told you the

9    purpose of those calls, to increase prices together with their

10   competitors.  But you can also figure out why they gave each

11   other their bids and bidding strategies by looking for the

12   pattern in the communications because the pattern is the

13   purpose.  It's one and the same.  The pattern is in the

14   evidence, and you can pay attention to three things to help you

15   make sense of the pattern, to help you understand the

16   conspiracy and defendants' knowing participation.

17             You have the timing, the people, and the number.

18   Okay, the timing.  When did the conversations take place?

19   When -- while the so-called -- that competitors, the

20   conspirators were supposed to be coming up with independent

21   bids and responding to customer feedback.  Instead, they were

22   getting on the same page and staying on the same page.

23             And two, the people.  Who called who?  Defendants and

24   their conspirators at chicken supply companies in charge of the

25   bidding process, people who were supposed to be competing

1    against each other for business.

2          And three, the number, how many times?  This wasn't a

3    one-time thing.  Defendants and their conspirators called each

4    other dozens and dozens and dozens of times for seven years.

5          And you can use these three things, the timing, the

6    number, and the people, use them as tools.  These three tools

7    will help you explain the pattern in the summary charts you

8    have seen on your screen, and together these three tools will

9    show you defendants getting on the same page and staying on the

10   same page, rigging bids and fixing prices.

11         So how do the defendants' communications fit into this

12   pattern?  Consider this chart here.  In mapping the summary

13   charts onto this chart will help you understand the defendants'

14   role in the crime.  Defendants Austin and Brady were the foot

15   soldiers calling each other on the phone to get on the same

16   page.  And then they reported up to their bosses, Defendants

17   Penn, Lovette, and Fries.

18         And why does that matter?  Because there are different

19   types of evidence showing you that they knowingly participated

20   in the conspiracy, that they worked to advance the conspiracy's

21   objectives.

22         So let's start with the foot soldiers, Defendants

23   Austin and Brady.  They worked for the phones.  You saw call

24   after call after call on bid after bid getting their

25   conspirators on the same page and keeping them on the same

1   page.  And for these types of communications look to the phone

2   records, because the communications between companies, between

3   the should-be competitors were on the phone to avoid leading a

4   paper trail.

5        And Defendants Brady and Austin then reported up to

6   their supervisors in crime, Defendants Penn, Lovette, and

7   Fries.  And you see those communications in the texts and

8   e-mails that the defendants wrote each other, e-mails and texts

9   they wrote while they were committing the crime, evidence in

10  black and white showing you what happened on the phone calls,

11  what kind of information they had and when they had it.

12  Getting on the same page and staying on the same page.

13       And the bosses, Defendants Penn, Lovette, and Fries,

14  they oversaw the conspiracy making sure everyone did their

15  part.  They also stepped in from on high and worked the phones

16  when they needed to.  You heard there were others at Pilgrim's

17  who were in on it too, Mr. Bryant told you people like Jason

18  McGuire and Tim Stiller.  You have seen some of their e-mails

19  and text messages during this trial.  So remember this dynamic

20  here.  Foot soldiers working the phones between the companies

21  and then reporting up to their bosses who signed off on the

22  plan.

23       Now, you've heard a lot about the intricacies of the

24  chicken supply industry and the fast-food restaurants during

25  this trial, but at the end of the day defendants' conspiracy

1    was simple.  And as you go through the government's summary

2    charts, Exhibits 50 to 53 and 56 to 62, use the three tools

3    that we talked about, the timing, the number, and the people.

4    Look at what information they had and when they had it because

5    that tells you why they had it, to rig bids and fix prices, the

6    first element.

7           And then you can chart out how the information flows

8    through the conspiracy using this framework here.  Literally

9    you can draw this information out, and that's the evidence in

10   the summary chart, onto this diagram as you go through it in

11   the jury room because this flow of information will show you

12   that each of the five defendants participated in the

13   conspiracy, the second element.  You have evidence about five

14   different rigged contracts with you in the jury room, and we

15   won't go through all of them today, but I will go through

16   several to show you how to use the tools in your tool kit.

17   What information did they have and when did they have it and

18   how did the information flow through the conspiracy, because

19   that answers the two fundamental questions:  Why did they give

20   each other their bids and bidding strategies during the bidding

21   process, and was each defendant part of the scheme.

22          So let's start at the beginning, the bidding process

23   for the 2013 KFC contract.  Mike Ledford from KFC told you

24   about this bid, and this round of bidding starts with

25   Exhibit 50.  First-round bids were due to KFC on October 10th,

1    so how did the defendants get on the same page?  Use the tool

2    kit.  Look at the timing and the people involved in the calls

3    and the days leading up to the bid, and that will show you why

4    they were calling each other, to get on the same page and rig

5    the bids.  And how do you know?  Because Pilgrim's, Claxton,

6    and Koch Foods all had the bids for dark meat at .30 back, but

7    three companies who had five different calls between them in

8    the two days leading up to when the bids were due on the same

9    page.

10        Exhibit 51 is the next round of the rig, staying on

11   the same page.  KFC gave the companies feedback and wanted the

12   companies to lower their bids by 1 cent to be .31 back instead

13   of .30 back by November 14th.  You can see that in Exhibits

14   1526 and 1528.  Remember, dark meat is priced at the difference

15   from the eight-piece chicken on the bone.

16        So the defendants have to decide, are they going to

17   hold firm, or are they going to lower their prices?  Defendants

18   need to know their conspirators' strategy so they could all

19   negotiate against the customer together.  The final number

20   wasn't important; it was about the change.  And they got on the

21   same page on Tuesday, November 13th, the day before they had to

22   get back to KFC, again the timing and the people running the

23   bidding process at each of their companies.

24        All right.  Defendant Brady starts by calling his

25   conspirator at George's.  And the moment he hangs up the phone,

1    he reassures his boss, Defendant Fries, George's is .30 back.

2    In other words, don't worry, boss.  George's isn't caving.

3    George's is staying to the same page and keeping its bids high.

4    Then Defendant Brady gets a call from Defendant Austin, and

5    they talk for 13 minutes.  And the same thing happens only this

6    time while he is on the phone with Defendant Austin, Defendant

7    Brady is texting his boss about their agreement.  And Defendant

8    Brady texts, Pilgrim's is .30 back and Tyson is .31 back, same

9    message as the last text.  Don't worry, Pilgrim's isn't caving.

10         Defendants Brady and Fries are texting each other a

11   blow by blow of the conspiracy in their own words, Exhibit

12   1427.  Ask yourselves, what information did defendants have and

13   when did they have it?  Defendant Brady got George's strategy

14   and he got Pilgrim's strategy from Defendant Austin.  The

15   companies were going to hold.  And when did Defendant Brady

16   have it?  The day before his conspirators had to respond to

17   KFC's feedback.  That tells you why they had it, to stay on the

18   same page.

19         The conspirators only talk about how much back they

20   were and whether they were lowering their prices.  Stay firm

21   but lower, stay .30 back or .31 back, because that was the

22   phase of the rig, staying on the same page.

23         But the rigging continues.  Defendant Brady texts

24   Defendant Fries.  "He" meaning Defendant Austin said to raise

25   our prices.  And Defendant Fries texts him, Tell him we are

 1    trying.  And Defendant Brady, Will do.  So let's get this

 2    straight.  Defendant Austin told Defendant Brady to raise

 3    Claxton's prices.  He told a competitor to increase its prices.

 4    Is that how competition is supposed to work?  Remember Mike

 5    Ledford, the defendants' witness, the guy who was running this

 6    bidding process, because he sure didn't think so.  He didn't

 7    want competitors talking to each other about their bids.

 8           And there is more, because Defendant Fries says, Tell

 9    him we are trying.  Tell the competitor we are trying to raise

10    our prices.  Tell him we are good with rigging the bids.

11    Defendant Fries directing Defendant Brady to reassure the

12    competitor, his conspirator, that Claxton is keeping its bids

13    up, that's not independent pricing.  That's the opposite of

14    independent pricing.  It's a quid pro quo.  It's conspirators

15    saying, Tell him we'll do it if he does it.

16           This isn't market intelligence.  This is rigging bids.

17    Market intelligence would mean using that information to

18    compete.  Defendant Fries would tell Defendant Brady to lower

19    Claxton's bids, to stab Pilgrim's in the back, but he didn't.

20    They got together to stab the customer in the back by agreeing

21    to hold firm, and their actions matched their words.  They

22    stayed on the same page at .30 back.  And the reassurances that

23    Defendant Brady and Austin gave each other worked.  You can see

24    it right here in the bids the companies submit immediately

25    after the text we just looked at.  Pilgrim's stayed .30 back on

1    dark meat, and so did Claxton.

2         So let's look at the flow of information through this

3    round of bidding.  Defendant Brady and Austin call each other.

4    They stay on the same page.  Defendant Brady reports up to

5    Defendant Fries.  And Defendant Fries signs off and tells

6    Defendant Brady, Good job.

7         The bidding process for the 2013 KFC contract had a

8    third round, and you can see that in Exhibit 52.  Exhibit 1544

9    you can see KFC's feedback.  They wanted lower bids for the

10   eight-piece chicken on the bone and for dark meat.  And the

11   conspiracy stayed on the same page by deciding whether to lower

12   their bids and, if so, by how much.  Defendant Austin got to

13   work.  Get everyone on the same page.  And he told his boss,

14   Defendant Penn, he would.  Defendant Austin said he would do it

15   by having some discussions to get the pulse, get the pulse.

16   What does that mean?  It's code.  Of course, they are not going

17   to spell it out.  Defendant Austin isn't about to write an

18   e-mail that says, I am going to go out and rig bids.  Criminals

19   don't write e-mails like that because they don't want to get

20   caught.  It was the one thing Professor Snyder, defendants'

21   $850,000 witness, got right.  You remember him, the

22   $11,000-a-day guy?  Even he said that criminals hide the

23   evidence of their crimes.  They don't want to get caught.  They

24   write in code, and they try to cover their tracks.  That's how

25   it works.

1          And Defendant Austin, he got the pulse by talking on

2     the phone with conspirators at four different companies.  Count

3     them, one, two, three, four.  And you can see the evidence of

4     what they talked about yourself, because the day after

5     Defendant Austin calls conspirators at four different

6     companies, he has each company's plans, the blueprint of the

7     conspiracy.  It's right there in the spreadsheet.  The match is

8     perfect.  The timing, the day after he decides he is going to

9     get the pulse, and the people he talked to matches the bids.

10          Defendant Austin loops in his boss, Defendant Penn, to

11     get approval for the conspiracy, Exhibits 1522 and 1523.  And

12     those bids are evidence of the conspiracy, proof that the

13     defendants weren't just gathering market intelligence.  They

14     were rigging bids.  And Defendant Penn knew.  How do you know

15     that?  Look at what Defendant Penn did when he got his

16     conspirators' plan.

17          He doesn't ask Defendant Austin, Hey, is this good

18     information, or what am I supposed to do here?  No.  Defendant

19     Penn wanted Defendant Austin to go out and get more

20     information.  Do we have TSN price idea?  TSN is Tyson, another

21     conspirator.  Now, you can only consider this particular

22     statement as to Defendant Penn, and it's not on a summary

23     chart.  It's Exhibit 1547.  And it shows that Defendant Penn

24     knew exactly what Defendant Austin was doing because he

25     directed him to keep doing it.  He knew of the crime, and he

1    told him to go out and do more crime.

2         Defendant Penn sees his conspirators' bids, his

3    conspirators' plans for the bids, and he sends Defendant Austin

4    out there to try to get more people onboard, on the same page.

5    And what comes next you can consider as to all defendants, and

6    that's because Defendant Penn sends the plan right there in

7    that spreadsheet, the blueprint for the conspiracy, straight to

8    his own boss, Defendant Lovette, the person ultimately

9    responsible for Pilgrim's bids.

10        That's also in Exhibits 1522 and 1523.  Look at the

11   timing and the people.  It was Friday, and the bids were due to

12   KFC on Monday.  And Defendant Penn is looping in the CEO of

13   Pilgrim's, getting his sign-off on the conspiracy.  And happens

14   next?  The companies follow the blueprint.  Their actions

15   matched their words.  Claxton submits the exact bid they told

16   Pilgrim's they would, and Pilgrim's keeps their bids the

17   highest in the bunch.  That's how you know this was information

18   sharing for the purpose of rigging bids because they trusted

19   each other and they knew not to undercut each other.

20        And even more than that, they knew that their bosses

21   had their backs.  Remember what Robbie Bryant said?  He talked

22   about how conspirators didn't use each other's bids and bid

23   strategies to undercut each other, because you can only do that

24   once, and then the whole conspiracy would fall apart.  And even

25   worse, you could get fired for giving away your company's bids

1    if the other guy undercut you.  So they rigged these bids like

2    it was their job, because it was.

3          Now, gambling with your job is a pretty big risk to

4    take, but it's not gambling with your job if you have a

5    conspiracy, if you understand why the conspirators were giving

6    their bids to each other.  So why are they giving their bids to

7    each other before they sent them to KFC?  To cheat rather than

8    compete.  Defendant Brady and Austin knew that they were

9    sharing bids to manipulate the outcome of the bidding process,

10   and they trusted each other with their bids and bid strategy

11   because they knew that the point was to get on the same page

12   and then stay on the same page to rig the bids.  And the

13   bosses, Defendants Penn, Lovette, and Fries, they knew that

14   too, because when they got the reports, they didn't use those

15   bids to compete.

16         This evidence is exactly what the jury instruction

17   that Chief Judge Brimmer just read to you.  Defendants will try

18   to get you to look at the jury instructions in bits and pieces

19   just like they will try to get you to look at the facts in bits

20   and pieces.  So let's read this sentence together in its

21   entirety.  Mere exchanges of information, even regarding price,

22   are not necessarily illegal, in the absence of additional

23   evidence that an agreement to engage in unlawful conduct

24   resulted from, or was a part of, the information exchange.

25         That second part of the sentence, that's the part of

1    the law that the defendants want you to forget about, but that

2    is the whole point of this case.  It's true that sharing prices

3    with a competitor is not always illegal, but these

4    competitors -- excuse me, these conspirators did more than just

5    give each other their prices.  They trusted each other with

6    their bids, and they gave each other their bids, and that gave

7    them confidence that they wouldn't be competing against each

8    other, which means that they could go up together and that they

9    wouldn't undercut each other.

10          So they gave each other their bids to get on the same

11   page and their strategy to stay on the same page and to

12   manipulate the outcome.  They did it for a reason, because they

13   were part of a conspiracy, because they had an agreement, and

14   that's how you know that this price sharing was 100 percent

15   illegal.  Again, members of the jury, it all goes back to the

16   purpose, why did they call each other and give each other their

17   bids?  Because they were part of a conspiracy.  They had each

18   other's bids to cheat instead of compete because they had an

19   agreement.

20          So turning back to that -- the final phase of that

21   2013 KFC contract, this round of the bidding process shows

22   Defendants Austin and Brady getting on the phone and Defendant

23   Austin reporting up to his boss, Defendant Penn, and Defendant

24   Penn reporting up to his boss, Defendant Lovette, and signing

25   off.

 1              Defendants and their conspirators kept it up the next

 2     year for the 2014 contract, and you can look at Exhibit 53.

 3     Not all the conspiratorial communications for this particular

 4     round are on Exhibit 53, but we will show you what they are and

 5     how they fit in.  So the rig starts when KFC tells its

 6     suppliers that it isn't satisfied with the bids and decides it

 7     will be sending out questions for information the next day.  It

 8     jumps right to defendants staying on the same page.  Defendant

 9     Brady's first response is to tell his boss, I will make some

10     calls.  Now, this is Exhibit 1700, and it's not on a summary

11     chart, and that's because this particular statement of

12     Defendant Brady's is only admissible against him.

13              Now, how do you know what Defendant Brady meant?  Look

14     at the whole e-mail because it tells you right there.  The

15     calls were about KFC's feedback.  And who does Defendant Brady

16     call to discuss the customer feedback?  He gets on the phone

17     with his conspirators.  He talks to three different should-be

18     competitors, conspirators.  And KFC goes on to ask the

19     conspirators to lower their bids again.  KFC is disappointed

20     with Pilgrim's bid.  And, again, the conspirators get on the

21     phone to stay on the same page to decide whether they are

22     holding firm or lowering their prices on both the eight-piece

23     chicken on the bone and the dark meat.

24              Defendant Austin tells conspirators at Pilgrim's that

25     he will do some scouting.  Do some scouting, get the pulse,

1    it's the same, staying on the same page with his conspirators.

2    And this statement is only admissible against him.  You can see

3    it on Exhibit 1713, and it's not on Exhibit 53.  But you know

4    what it means because you have seen it before.  You know what

5    it means because the paper trail shows you what happened next,

6    and that paper trail is admissible against all defendants.

7         First, Defendants Brady and Austin talk, and Defendant

8    Brady texted their conversation to their boss, Defendant Fries.

9    Ledford told Roger to be at 9250.  Mike Ledford told Defendant

10   Austin that he wanted Pilgrim's bids to be at .9250, and

11   Defendant Austin told his should-be competitor, his

12   conspirator, what the customer wanted.  Defendant Austin and

13   Defendant Brady were comparing notes on where the customer

14   wanted them to be so they could figure out which companies were

15   going to lower their bids and by how much.  Pilgrim's was going

16   to lower its bid at the customer's request, and so they wanted

17   Claxton to know.  They were comparing notes to stay on the same

18   page.

19        They talked some more, and Defendant Brady knows that

20   this is good stuff because he texts his boss, Call me, and

21   Defendant Fries does.  Then Defendant Brady gets right back on

22   the phone with Defendant Austin, and look at the timing here

23   because the timing isn't a coincidence.  It's a conspiracy.

24        But that's not all because Defendants Brady and Fries

25   aren't done.  Defendant Brady texts Defendant Fries, Just an

1    FYI, last year we were .32 back on dark meat, and this year we

2    are .3050 back.  In other words, last year we had a lower

3    price.  He says, this year Roger is at .30 back and not moving.

4    Again, that's Roger, Defendant Austin, competitor, conspirator.

5    And the texts are flying really rapid fire here.  They are all

6    on the same minute in the records, 1:31 p.m.  Look at

7    Exhibit 10651.

8         And Defendant Fries' first response is, K.  Can do .31

9    back if you want.  His first reaction when he thinks about the

10   fact that Claxton is raising its bid significantly from the

11   year before is, all right, lower the price a little bit.  Give

12   the customer a little something in the negotiations.

13        Then after Defendant Austin tells Defendant Brady that

14   Pilgrim's is staying firm, Defendant Fries changes course.

15   Stay 305 then.  In other words, never mind.  Hold firm at the

16   higher price to the customer and stay on the same page with the

17   conspirators.

18        So what information do they have and when do they have

19   it?  Defendant Brady had Pilgrim's response to the customer

20   feedback, and he had it hours before Claxton submitted its

21   final bid to the customer.  That shows you why the defendants

22   gave each other their bids and bidding strategy.  It shows you

23   the purpose of the calls was to stay on the same page.  There

24   are no assumptions or inferences here.  You have the

25   defendants' own words in black and white, the words they wrote

1    while they were committing the crime.

2          And what happens?  Their actions match their words.

3    Pilgrim's bid is at 9250 right where Defendant Austin told

4    Defendant Brady it would be.  And both companies submit bids

5    that are 3050 back from their eight-piece bids.  They stay on

6    the same page.  So this round of bidding shows Defendant Austin

7    and Brady getting on the phones together, staying on the same

8    page, Defendant Brady reporting up to his boss, Defendant

9    Fries, and Defendant Fries signing off.

10         And that brings us to the 2015 KFC contract.  You

11   heard a lot about that contract during this trial.  It was the

12   big rig.  And the market for small birds, the birds that the

13   defendant sold to KFC was changing.  Sure, supply and demand

14   meant that prices were going to go up, but it was also the

15   motive here for the conspirators to push through even a bigger

16   price increase than KFC had been expecting.

17         The first part of the bidding process is on

18   Exhibit 58.  KFC starts everything off by asking for the

19   companies to submit their bids on August 19th.  And you see

20   Defendants Austin, Brady and their conspirators picking up the

21   phones, comparing their bids, and deciding just how high they

22   were going to go, getting on the same page.

23         Now, Defendant Penn knows it's important to get

24   everyone on the same page, so he calls Brian Roberts, the guy

25   running the bidding process at Tyson.  And you can use the

1    tools in your tool kit to tell you what was said on the call,

2    the timing and the people.  These are Pilgrim's pricing

3    worksheets.  Look at Pilgrim's margin before Defendant Penn

4    called Mr. Roberts and compared to Pilgrim's margin after

5    Defendant Penn called Mr. Roberts.  Defendant Penn didn't use

6    that information to compete.  He put Pilgrim's right at the

7    same level of Tyson within 24 hours on a Saturday, and he does

8    it by increasing the margin to Pilgrim's, the profit.

9           Now, don't worry because Defendant Austin does his job

10   too, and he works the phone calling conspirators to get

11   everyone on the same page.  And proof of what he talked about

12   is in the paper trail.  Look at Exhibits 1035 and 1036.  The

13   report that Defendant Austin and Jason McGuire sent up to the

14   boss, Defendant Penn.  What information does Defendant Austin

15   and Mr. McGuire have and when do they have it?  Bids for five

16   of their should-be competitors, their conspirators, including

17   Claxton right there in a spreadsheet.  And they have it the day

18   before the first-round bids were due to KFC.

19          Now, why does Defendant Austin have this information?

20   To get everyone on the same page.  And why does he send it to

21   his boss, Defendant Penn?  To get his sign-off.  And Defendant

22   Austin and Mr. McGuire have even more information in

23   Exhibit 1074.  What do they have and when do they have it?

24   Information on how much each of their conspirators is

25   increasing costs and margin, the costs that folks are going in

2741

1    with.  When do they have it?  They have it the day before the

2    first-round bids were due.

3           Again, Defendant Austin and Mr. McGuire sent all this

4    information to Defendant Penn to show him what they have done,

5    that they got the industry on the same page.  And Defendant

6    Penn, he knows the rules.  He doesn't use the bids to compete

7    or steal business from the conspirators, because his response

8    is three simple words, three words that tell you everything you

9    need to know about what Defendant Penn was thinking.  I am

10   good.

11          This isn't someone with his foot on the throat of his

12   competitors.  And how do you know?  Because full throttles

13   competition is using information against your competitors, not

14   against the customers, but that's what he does because he

15   proves that -- the plan that the conspirators put together and

16   says he will report up to his own boss, Defendant Lovette, in

17   the morning.

18          Again, there is no, Hey, what's this, or what do you

19   want me to do here?  No.  Defendant Penn knew exactly what to

20   do.  He knew he used his conspirators' bid to cheat instead of

21   compete.  And Defendant Penn knew to get his boss, Bill

22   Lovette's approval.  Look at the parallel between this exhibit

23   and Exhibit 1522 and 1523.  This is just a replay from what

24   happened during the bidding for the 2013 KFC contract.  Rinse

25   and repeat.  Rig the bids and repeat.

1          And sure enough, all the suppliers took their bids up.

2     Mr. Lewis recalled that the bids were shockingly high.  And

3     remember, Mr. Lewis had been pricing KFC bids since the 1970s.

4     And Mr. Suerken told you that everyone at KFC was stunned.

5     Both men had extensive experience with KFC chicken supply

6     contracts, and Mr. Lewis said there was nothing in the market

7     to account for such a high price, including the forces of

8     supply and demand.  And Mr. Suerken, he said this was the worst

9     bidding process of his entire career.  Even the defense's

10    witness, Mr. Eddington, said it was beyond what KFC was

11    expecting.  They were surprised.

12         But you know who wasn't surprised?  The defendants and

13    their conspirators.  Why?  Because it was their plan.  Look at

14    Exhibit 1066.  Mr. McGuire asks what KFC thought of the

15    proposal.  Defendant Austin says:  I heard that they, that's

16    the KFC team, made a couple of calls and were surprised.  And

17    Mr. McGuire says:  Surprised like how much higher everyone else

18    was?  And Defendant Austin says:  Yes.

19         Members of the jury, of course Defendants Austin and

20    Mr. McGuire weren't surprised about where their competitors'

21    bids were because they had gotten their conspirators on the

22    same page, and they make fun of the customer.  Mr. McGuire

23    asks:  Can you smell their dirty drawers from where they

24    crapped their pants?  Ha.

25         And Defendant Austin says:  Definitely.

1          Now, KFC crapping their pants, that was the exact

2    customer feedback that Pilgrim's had planned for, historic

3    highs, we have got them.  Everyone was on the same page.  There

4    was nowhere for KFC to go.  Mr. McGuire forwarded Exhibit 1066

5    to Mr. Bryant.  That's proof that everyone was on the same

6    page, proof that the meeting the next day with KFC the next day

7    was just a formality.  Pilgrim's had tomorrow's news today.

8          So what's next?  Staying on the same page and keeping

9    the bids as high as possible when KFC tried to push back.  You

10   remember Mr. Bryant overheard Defendant Austin confirming to

11   Defendant Brady and Mr. Kantola that the price was the price.

12   The plan was to hold firm.  Defendant Austin didn't need to say

13   much at this point because the historic high price was the

14   price.  All they needed to do was stay on the same page.

15         So for the first part of this KFC contract, you have

16   Defendant Austin and Brady again getting on the phone, getting

17   on the same page, Defendant Austin reporting up to his boss,

18   Defendant Penn, reporting up to his boss, Defendant Lovette,

19   both of them signed off, and Defendant Austin updated Defendant

20   Brady on the plan.  And you can see the continuation of this

21   bidding process at Exhibit 59.

22         KFC wants lower bids, and the conspirators get

23   together to stay on the same page to keep their bids as high as

24   possible.  Defendant Austin tells Defendant Penn that the plan

25   is to hold firm.  Defendant Penn agrees.  And make sure that

1    Defendant Lovette is looped in.  I told Roger to proceed.  Now,

2    Defendant Austin does what he was instructed, and he has a call

3    with KFC and keeps Pilgrim's bids high.  And then he calls

4    Defendant Penn, and he reports up.

5            Now, the big rig was so important that Defendant

6    Lovette intervened and calls Defendant Austin himself, and they

7    talk for 15 minutes.  Defendant Lovette, the CEO of tens of

8    thousands of people, calls Defendant Austin skipping down the

9    chain of command.  Now, Defendant Lovette's attorneys don't

10   know what to do about this phone call so they offer you two

11   different arguments that don't go together.  Now, members of

12   the jury, which one is it?  Defendant Lovette, such a busy guy

13   and totally clueless about the bidding process for his

14   company's No. 1 fast-food customer; or is he the kind of CEO

15   who is turning the company around as it comes out of

16   bankruptcy, attending monthly sales meetings, worrying about

17   the bidding strategy, being looped into documents showing the

18   blueprint of the conspiracy, the kind of guy that Mr. Suerken

19   described as the decision-maker who knew all the details about

20   Pilgrim's bid, and then reaches out to Defendant Austin when

21   the conspiracy is at a key point when his company is asking to

22   push through a historic profit increase?  That second

23   explanation is the only one that makes sense.

24           Now, look at what happens after the call from

25   Defendant Lovette to Defendant Austin.  Defendant Austin gets

1    off the phone with the CEO and gets the go-ahead to keep the

2    conspiracy on track.  And Defendant Austin immediately calls

3    Defendant Brady to give him Pilgrim's strategy.  Defendant

4    Brady texts Defendant Fries.  I talked to Roger about KFC and

5    Greeley told him not to come down on price.  Defendant Austin's

6    bosses had told him to hold prices high.  And it goes on.

7    Defendant Brady writes, He called Bob today and told him.

8    Defendant Austin had already called Bob Lewis and told him that

9    Pilgrim's was holding firm on its price.  Defendant Fries

10    responds:  Wow, exclamation point.

11        So what information did Defendant Brady have that

12    Pilgrim's was keeping its prices up?  The Defendant Austin's

13    bosses, Defendants Penn and Lovette at Greeley, had signed off

14    on the plan and that Defendant Austin had already delivered

15    that message to the customer.  And when did he have it?  When

16    KFC was shopping around trying to get the suppliers to lower

17    their price so that Defendant Brady didn't have to lower his,

18    and that's how you know the bids were rigged.

19        So in this day in a matter of hours, you have all five

20    defendants involved in the plan, Defendant Lovette and Penn

21    giving instructions to Defendant Austin, Defendant Austin

22    executing on the plan, updating Defendant Brady who reports up

23    to his boss, Defendant Fries.

24        Now, this wasn't the only time that Defendant Lovette

25    stepped in from on high for this particular contract.

1    Mr. Suerken told you about the call with the CEO of RSCS and

2    Mr. Lovette.  KFC really wanted Pilgrim's to lower its bid and

3    was threatening to take away loads of chicken.  Defendant

4    Lovette had any easy choice, lower the bids and keep the

5    volume, but he didn't take that easy route because he knew that

6    lowering the bid went against the conspiracy.

7           And Exhibit 60 shows the continuation of the bidding

8    process as the conspirators stay on the same page.  And once

9    again, there are some exhibits that aren't on the summary

10   charts.

11          Let's look at what happened on Friday, August 29th.

12   Focus on the timing and the people.  Defendants Penn and Fries

13   had separate phone calls with Pete Martin, the person in charge

14   of the bidding process at Mar-Jac, a competitor, a conspirator.

15   And those calls are at Exhibit 9622 and 10026, and not all of

16   them are on the summary chart.  And Pete Martin took

17   handwritten notes of what was discussed on those calls.

18          His handwritten notes are at Exhibit 1030.

19   Exhibit 1030 is also not on a summary chart, but it's

20   important.  When you get to the jury room, take it out, look at

21   Pete Martin's handwriting and look at the notes that he wrote

22   as he was committing the crime.  What information did

23   Defendants Penn and Fries give Pete Martin?  Defendant Penn

24   gave him Pilgrim's bid, and Defendant Fries gave him Claxton's

25   bid.  And when did they do it?  August 29th, the very same day

1    that Mr. Lewis sent out Exhibit 1160, a final push to get the

2    suppliers to lower their bid.

3         Now, the fact that Defendants Penn and Fries gave

4    their bidding strategy to a should-be competitor, to a

5    conspirator, means that they knew exactly what it meant when

6    Defendants Brady and Austin had their should-be competitors'

7    information, their conspirators' information.  Again, what

8    information they had and when they had it, and that tells you

9    that they gave each other their bid and bidding strategies as

10   part of the price-fixing and bid-rigging conspiracy.  The

11   purpose is important.  It makes it criminal.

12        And you already know what happens next.  KFC was

13   forced to take a price hike to eat industry record prices for

14   up to three years, and those price increases were a big deal to

15   KFC because KFC buys so much chicken.  Mr. Lewis told you that

16   every penny per pound cost KFC $4 million for a single year.

17   The conspirators raised the contract prices by way more than

18   just a single penny.  The price increases the conspiracy

19   imposed cost KFC tens of millions of dollars more for just one

20   year.  And this three-year 2015 KFC contract was a big deal.

21   You heard a lot about it during trial.  So before you move on,

22   I want to pause on a couple of things.

23        First, defendants like to talk about how some of the

24   conspirators lowered their bid as the process kept going or how

25   some of them submitted their bids earlier than others, but none

1    of that changes the fact that there was a conspiracy.  The plan

2    was to take the bids to historic highs, and it doesn't matter

3    if they negotiated away a little bit during the process or if

4    some of them submitted bids earlier or later than others.  The

5    whole point was to get the conspirators up to the next level,

6    plus the agreement is the crime.  It doesn't matter if some of

7    the conspirators negotiated away a little bit more than others.

8    It's like a bank robber slipping the teller a $20 bill on their

9    way out.

10        Second, defendants like to talk about how Pilgrim's

11   lost volume for the 2015 contract, that that somehow proves

12   that they didn't agree to take prices up to historic highs in

13   the first place, but that's not right either.  In fact,

14   Mr. Eddington, the defense's own witness, told you KFC was

15   always planning on taking volume away from Pilgrim's.  It

16   didn't like having so many eggs in one basket.  And Pilgrim's,

17   they didn't lose volume due to competition.  They lost volume

18   as part of the plan, plus that volume loss was good business

19   for Pilgrim's.  It seems counterintuitive at first, and that's

20   because the defendants only tell you part of the story, that

21   Pilgrim's lost volume.

22        They ignored the fact that Pilgrim's padded its profit

23   so much that even with less volume Pilgrim's made more profit,

24   over $7-1/2 million more profit in just one year, more profit

25   for less chicken because of a massive price hike.  That's like

1    more money for less work.

2          And after the conspirators got the price hike to KFC,

3    they took their plan to other customers, just like Mr. Bryant

4    said they would.  One of the other customers was Golden Corral.

5    And we are not going to talk about this episode as much,

6    Exhibit 56, but it has the exact same pattern of communication,

7    and you can use the tools in the tool kit, the timing, the

8    people, and the number, to look at it in the jury room, what

9    information did they have and when did they have it and look at

10   how the bidding strategy and the bid information flowed through

11   this diagram here.

12         Now, one thing I do want to highlight about this round

13   is Defendant Penn's own words because they show you that he

14   knew what he was doing was wrong and that he wanted to cover

15   his tracks, Exhibits 439 to 441.  Tim Stiller, one of the

16   conspirators, one of Defendant Penn's conspirators at

17   Pilgrim's, is texting about the plan to rig the bids.  And he

18   texts:  They are listening to my direction.

19         And Defendant Penn asks:  Who is they?

20         But before Mr. Stiller can respond, Defendant Penn

21   regrets asking and says:  If they is illegal, don't tell me,

22   not don't do anything illegal; don't put the illegal stuff in

23   writing.  Mr. Stiller knew exactly what Defendant Penn meant

24   and changed the subject.  Defendant Penn's own words show you

25   he knew what he was doing was wrong, and he didn't want to get

2750

1    caught.  And to quote Defendant Penn himself, he knew it wasn't

2    exactly a legal conversation.

3           In 2016, Sysco wanted to change a payment term.  They

4    wanted suppliers like Pilgrim's and Koch Foods to give them

5    more time to pay.  And multiple witnesses explained that credit

6    terms is a part of price.  It's like the amount of time that

7    someone has to pay their credit card bill.  And companies like

8    Pilgrim's want to get paid faster because they have already

9    sold the chicken, and they want to get paid for it sooner

10   rather than later.

11          Now, Joe Grendys, he is the CEO of Koch Foods, he

12   reached out to Bill Lovette about Sysco's request.  This is

13   Exhibit 803.  Have you heard that Sysco is going to 65-day

14   terms with their suppliers?  Defendant Lovette wrote back

15   reassuring his conspirator that Koch could tell Sysco no, that

16   the companies agreed to make Sysco pay sooner as a way to get

17   prices up.  He said, Yes, we told them no, all caps,

18   exclamation point.

19          The two CEOs even promised that they would keep in

20   touch and let each other know if they changed their mind.  Now,

21   in the context of all the other conversations happening about

22   price, this was two CEOs coming together and agreeing with each

23   other, relying on the familiarity and trust they had because of

24   their conspiracy to push back on other parts of their business.

25          The success of the defendants' conspiracy eventually

1    caught up with them.  And when it came time for KFC to

2    negotiate the next contract for 2018, 2019, and 2020, KFC

3    needed a pricing reset.  They were going to beat prices down,

4    but KFC didn't know that the defendants had teamed up to hold

5    onto the high profits.  We start with Exhibit 61.  Again, pay

6    attention to the phase of the rig, what information defendants

7    have and when they have it.

8         Ms. Fisher says that KFC will be meeting with the

9    suppliers in mid to late January.  And then sure enough, as the

10   suppliers start meeting with Ms. Fisher and Mr. Suerken to talk

11   about what KFC wants, look at what information defendants have

12   and when they have it.  Defendant Austin says he will get a

13   blow by blow after Claxton and Koch Foods meet with KFC.  Get

14   everyone on the same page to have Pilgrim's in the No. 2 spot.

15        Then the week the bids were due to KFC, Mr. Stiller

16   came to Mr. Bryant looking for information on where Pilgrim's

17   needed to be in its bid, meaning what was the plan between the

18   conspirators, only Mr. Bryant didn't have updated information.

19   And you heard that didn't go over well.  Mr. Stiller told

20   Mr. Bryant that he, and I quote, didn't know shit.  Think about

21   that for a second, manipulating the bids with their should-be

22   competitors, their conspirators, was so fundamental to

23   Pilgrim's business that when Mr. Bryant fell down on the job

24   and hadn't taken that step, he got told off by his boss.  And

25   Mr. Bryant fixed that right quick and put Defendant Austin to

 1    work.

 2            Look at the information Defendant Austin got and when

 3    he got it.  Defendant Austin reached out one by one to get all

 4    of his conspirators on the same page, Koch Foods, Defendant

 5    Brady at Claxton, George's, Mar-Jac.  He works his way through

 6    his phone book through the membership list of the conspiracy.

 7    And then he reports back to Robbie Bryant lickety split.  He

 8    called up Mr. Bryant and said, Are you ready?  I got it.  What

 9    did Defendant Austin have?  The bid numbers for his

10    competitors, his conspirators.  And when did Defendant Austin

11    have their bid numbers?  The day before the bids were due.

12            Mr. Bryant took notes, and he took the notes because

13    he had already been in trouble once before with his boss,

14    Mr. Stiller.  He wanted to be able to prove to his boss that he

15    knew how to get the job done.  Those handwritten notes are

16    Exhibit 1919, and they aren't on a summary chart.

17            Yes, Exhibit 1919 matches up with the suppliers'

18    current prices, but that makes sense here.  Why?  Because the

19    agreement at this point was to keep the prices where they were,

20    to keep the record-setting prices in place.  And if you're

21    resisting a price decrease, then, of course, the point is to

22    keep your bids at the same level as they were.  You can't go

23    higher.  And that's what happens.

24            The companies keep their bids at the same level as

25    their current prices.  Their actions match their words.  You

1    see Defendant Austin and Brady getting on the same page over

2    the phone and Defendant Austin reporting up to others at

3    Pilgrim's.  And by now you know what happened next because the

4    pattern is the same.

5            The final phase is Exhibit 62.  KFC wasn't satisfied,

6    they wanted lower prices, so they asked the conspirators to

7    adjust their bids.  And then what happens?  The same thing, the

8    conspirators stay on the same page to push back against KFC.

9            Now, this was the last contract you saw evidence

10   about.  And why is that?  Because Mr. Bryant told you that

11   there was outside interest in the communications between the

12   conspirators.  The secret was out, and the defendants'

13   conspiracy had to come to an end.  Now, the fact that the

14   conspiracy ended when there was outside interest, that also

15   shows you that they gave each other their bids and bidding

16   strategy as part of the conspiracy and that they knew what they

17   were doing was wrong and, most importantly, that they didn't

18   want to get caught.

19           So remember the questions we started with, members of

20   the jury.  Why did the defendants give each other their bids

21   and bidding strategies during the bidding process?  And were

22   each of these five men involved?  Did they participate in the

23   conspiracy?  These two questions get right to the issues you

24   have to decide.  No fancy economic expert can answer them for

25   you.  You heard his testimony.  He missed the whole point of

1    the government's allegation.  It's not just that the

2    conspirators gave each other their bids and bidding strategy.

3    It's why they did it, a question you can only answer by looking

4    at the texts, the e-mails, the phone calls, and listening to

5    the witness testimony.  None of that was information that the

6    $850,000 witness relied on.

7              You have the actual facts that matter.  You know the

8    why.  You know the why was the conspiracy.  And you saw the

9    evidence connecting each of the five defendants to the

10   conspiracy.  You saw how they each participated in their own

11   way consistent with their roles.  Defendants Brady and Austin

12   worked the phones, got the should-be competitors, the

13   conspirators on the same page and kept them on the same page,

14   and they reported up to their bosses, Defendants Penn, Lovette,

15   and Fries.  And those men participated just like bosses do.

16   They got the conspiracy updates, they signed off, and they

17   stepped in when they needed to.

18             So when you go back to the jury room and answer the

19   two questions, why did the conspirators give each other their

20   bids and bidding strategies during the bidding process and did

21   each of these five men participate, when you look at the

22   information they had and when they had it, when you follow the

23   flow of the bidding information through the conspiracy, you

24   will find that the government has proven the first two elements

25   beyond a reasonable doubt, the existence of a price-fixing and

1   bid-rigging conspiracy and the knowing participation of each of

2   the five defendants.

3   So we have two quick things to cover before I wrap up.

4   First, interstate commerce.  Did chicken affected by the

5   conspiracy travel across state lines?  Absolutely.  Take just

6   one simple example.  Mr. Suerken told you that chicken sold to

7   the KFC in Colorado traveled to here from outside the state.

8   So that is done.

9   Members of the jury, after you have found that the

10  government has found all three elements beyond a reasonable

11  doubt, the government has to show that the conspiracy existed

12  at some point within the statute of limitations.  Now, there

13  are different dates for the different defendants, but all you

14  have to ask yourself is, did the conspiracy exist at the end of

15  2015?  And the answer is yes, as long as you find that one

16  co-conspirator acted in furtherance of the conspiracy after

17  October 6th, 2015, that's all you need.

18  And remember that bidding process for that three-year

19  2018 KFC contract when Defendant Austin got the blow by blow

20  from the conspirators after they met with Ms. Fisher or when he

21  gave Robbie Bryant the information that was in his handwritten

22  notes and all the other acts the conspirators took to get on

23  the same page for that contract?  All those acts took place in

24  2017.

25  Members of the jury, that brings us to the end.  The

2756

1   facts speak loudly and clearly here.  Together these five men

2   from two different companies and their conspirators rigged bids

3   and fixed prices.  They participated in a conspiracy that

4   affected the cost of hundreds of millions of dollars of

5   chicken, chicken sold to fast-food restaurants across this

6   country, restaurants like Kentucky Fried Chicken.  And each and

7   every one of these five defendants knew that when they gave

8   each other their bids and their bidding strategy, they were

9   doing so to get on the same page and to stay on the same page,

10   that they were doing so because they had an agreement, a mutual

11   understanding, to cooperate together against their customers to

12   rig the game.

13          Members of the jury, when you look at all the

14   evidence, look at what information they have and when they have

15   it, and you will understand why the defendants gave each other

16   their bids and bidding strategies.  And the answer is because

17   they were conspiring to rig bids and fix prices.  And the

18   government has proven that each of these five defendants, Roger

19   Austin, Bill Lovette, Jayson Penn, Mikell Fries, and Scott

20   Brady is guilty beyond a reasonable doubt.

21          Thank you.

22          *THE COURT:*  Thank you, Ms. Wulff.

23          Ladies and gentlemen, let's go ahead and take our

24   mid-afternoon break and plan on reconvening same time at 3:30.

25   Once again, keep the admonitions in mind.  The jury is excused

1    for the mid-afternoon break.  Thank you.

2            (Jury excused.)

3            THE COURT:  Just for timing purposes, Ms. Wulff's

4    closing ended seven minutes early, so the government has seven

5    minutes.  The original estimate was an hour 20 minutes.  We

6    will be in recess.  Thank you.

7       (Recess at 3:15 p.m. until 3:30 p.m.)

8            THE COURT:  Why don't we go ahead, if you are ready,

9    Mr. Beller, we will bring the jury in.

10           MR. BELLER:  I am ready.  Thank you, Your Honor.

11           THE COURT:  Okay.

12           Mr. Kornfeld, you will go first thing tomorrow, then.

13           MR. KORNFELD:  Thank you, Your Honor.

14           (Jury present.)

15           THE COURT:  So, members of the jury, we are now going

16   to start with the closing arguments on behalf of the

17   defendants.  And as you will anticipate, we are starting off

18   with Mr. Beller.

19           Go ahead, Mr. Beller.

20                          **CLOSING ARGUMENT**

21           MR. BELLER:  Thank you, Your Honor.

22           Just because the Federal Government emphatically

23   insists on the truth of a theory, it does not mean it's true

24   when it's not supported by the evidence.  Even when they cut

25   and paste the evidence from pieces back together like a cliché

1    ransom note, it doesn't mean their theory is true.  The five

2    men charged in this courtroom, each and every one of them, is

3    not guilty.

4         The government is trying to prove that suppliers

5    spoke, that the chicken growers called each other and spoke,

6    and the buyers didn't want them to do that.  The buyers didn't

7    like that they did that.  The buyers wanted this to be a

8    confidential process.  But that is not the issue that you are

9    here to decide.  Why?  Because it is legal for them to have

10   done so.

11        Whether it's because some of the people here are

12   executives and had little to no contact with other suppliers or

13   whether it's because they are salespeople and part of their job

14   required them to speak all the time or certainly allowed them

15   to speak at all different times, one thing they all have in

16   common and that is they are not guilty of the charge that has

17   been brought against them.

18        Let's set something very clear from the beginning.

19   Suppliers, these defendants, depending on their roles, they

20   talked.  They covered for each other.  And sometimes they

21   bluffed each other so as to gain market share and volume.

22   Sometimes they shared real pricing information, future pricing

23   information, bid information.  Sharing information no matter

24   that the Federal Government doesn't like it, sharing

25   information is not illegal.  It is not a conspiracy.  Sharing

1    pricing formulas is not illegal.  It's not a conspiracy.

2    Learning pricing information is not illegal.  It's not a

3    conspiracy even if they act on that information.  It's not

4    illegal.  It's not a conspiracy.  It's not an agreement.  An

5    agreement is what is illegal, not the sharing of pricing

6    information.

7            Pilgrim's Pride, Pilgrim's Pride has a strategy,

8    premium pricing.  It prices its chicken high.  And if they lose

9    a customer, if they lose volume, there is thousands of other

10   customers that are willing to swoop in and buy that same

11   chicken for a higher price.  Claxton Poultry undercuts its

12   competitors.  It reduces its price.  It follows the guidance of

13   the customer.  And as an award, they are awarded additional

14   volume, additional business.  The government's so-called

15   evidence is half the story.  Their covering of the jury

16   instructions, of the law, is a third of the instructions of the

17   law.  Which of the government's calls has a quid pro quo?

18   That's what the government has to prove, not that conversations

19   happened, not that they shared information, but an agreement.

20   I'll do it if you do it.

21           Now, when I'm speaking about the five individuals that

22   are in this courtroom that are charged, I am going to refer to

23   them all by their names, the dignity of calling them Mr. Fries

24   or Mikell or Mr. Austin or Roger or Jayson or Mr. Brady.  I am

25   not going to resort to labeling tactics by giving them a title

1    like innocent Mr. Fries, not guilty Mr. Fries, wrongly accused

2    Mr. Austin as the government does by labeling them Defendant

3    Penn, Conspirator Brady in the hopes that it will

4    subconsciously substitute for actual evidence.

5           Attorneys for each of the men accused are going to

6    tell you exactly why the facts of the case do not support a

7    finding of guilt, why the facts show that each is not guilty.

8    I represent only Mr. Fries, but I am speaking on behalf of all

9    five only for this portion, because the law is the same for all

10   of us in this courtroom.  The same law applies.  While they are

11   going to talk to you about why the facts show they are not

12   guilty, I want to go through and point out the jury

13   instructions, the jury instructions that the government did not

14   go through.  I want to go through the instructions with you so

15   that you have the whole story, the whole story.

16          Let's start where we started when we were doing jury

17   selection, and that is the presumption of innocence.  The five

18   individuals charged in this courtroom are presumed not guilty.

19   That is where your brain has to start when you're going through

20   this process.  The presumption of innocence is with them

21   throughout the entire trial including your jury deliberations,

22   including your jury deliberations.  It is like a seesaw.  The

23   only way, the only way you ever tilt to the government's side

24   is when the evidence gets piled on.  The only time you can get

25   to guilt beyond a reasonable doubt is when it tilts all the

1    way.  It is your duty, it's your duty, Jury Instructions 2 and

2    5, to base your verdicts solely on the evidence.  What do I

3    mean by that?  I mean that the arguments of counsel aren't

4    evidence.  What I am saying to you right now is not evidence.

5    What Ms. Wulff said to you a few moments ago, not evidence.

6          And so after weeks and weeks of hearing evidence and

7    seeing evidence, if you walked in this morning uncertain what

8    the government proved, if at the time the government rested, if

9    after Mr. Bryant got off the stand, if you didn't understand

10   what the evidence was or how it connected, you already know

11   your decision.  That's not guilty.  That's not guilty because

12   anything that came after that is arguments of counsel which is

13   not evidence.

14         The government, the government has the burden of

15   proving each and every one of the men charged in this courtroom

16   beyond a reasonable doubt, and if it fails to do so, you must

17   find each not guilty.  Importantly, you are the deciders of

18   fact.  Your role is to consider the facts, apply them to the

19   law as Judge Brimmer has given them to you, and decide whether

20   or not the government proved the case.  Your role is relatively

21   straightforward.  The government proved it or the government

22   did not prove it.

23         Now, you were told on closing several times, Use your

24   tool kit.  Put this back together.  Figure it out.  That's not

25   your role.  Your role as a jury is to ask, Did the government

1    prove it.  The government has the resources and the ability to

2    present the evidence to you and to try to convince you.  Your

3    role is not to go in the back as though this is a puzzle and

4    you're being given a thousand-piece jigsaw, a thousand pieces

5    of evidence without witnesses testifying about them and then

6    simply putting them together.  Not your role.

7         The government has to prove guilt beyond a reasonable

8    doubt.  What does that mean?  Well, the Jury Instruction 3

9    explains it to you.

10        *MR. LOVELAND:*  Your Honor, I am sorry, we need to be

11   heard on side bar.  The government objects to this graphic.

12       (At the bench:)

13        *THE COURT:*  Mr. Loveland, go ahead.

14        *MR. LOVELAND:*  Your Honor, precedent prohibits

15   illustrations of reasonable doubt that try to define the terms

16   outside of the jury instructions that Your Honor has carefully

17   laid forth to the jury.  In the 10th Circuit case of *United*

18   *States v. Pepe*, 501 F.2d 1142, it's made clear that the concept

19   of reasonable doubt is not susceptible to description by terms

20   with sharply defined, concrete meanings.  It has to be defined

21   by wording or language.

22        By having this graphic which shows multiple, multiple

23   levels and color descriptions, the defense has usurped the

24   Court's role in properly laying before the jury the pattern

25   instruction on what reasonable doubt entails.  The defendants'

1   graphic also quantifies reasonable doubt mathematically, which

2   is something that's also inconsistent with 10th Circuit

3   precedent and federal precedent from around the country.

4          I would cite the Court as well to a Third Circuit

5   case, *United States v. Pungitore*, 910 F.2d 1084.  There the

6   Third Circuit held that the use of a scale was a blatant

7   attempt to quantify a reasonable doubt, a practice which has

8   been met with strong disapproval in federal courts.  That's a

9   quote, Your Honor.

10          We did not object to the balancing scale graphic.

11  While I think that was inappropriate too, that was not

12  something the government was inclined to object to, but this

13  sliding scale, this heat map that attempts to quantify

14  reasonable doubt is not something that's appropriate, and it

15  does usurp the Court's role.

16          Also, the graphic poses a grave danger under 403 of

17  misleading the jury.  The Supreme Court itself has held that

18  attempts to explain the term 'reasonable doubt' do not usually

19  result in making it any clearer to the minds of the jury.  That

20  is *Holland v. United States* case of 348 U.S. 121.

21          I would also cite the Court to a D.C. Circuit case

22  that also says attempts to clarify the meaning of the phrase

23  "reasonable doubt" by explanation, elaboration or illustration,

24  more often than not tend to confuse or mislead.  *United States*

25  *v. Pinkney*, 551 F.2d 1241, and that's a D.C. Circuit case.

1          Your Honor, we are not inclined to object to this

2    scale, although I think the seesaw was one thing, but this heat

3    map quantification there, the government would ask for a

4    curative instruction and that the Court tell the jury to merely

5    rely upon the law as it's been given in Jury Instruction 3.

6    Thank you.

7          THE COURT:  Mr. Beller, response?

8          MR. BELLER:  Thank you, Your Honor.

9          Judge, first and foremost, it's certainly something

10   that the government was prepared for this particular argument

11   and I would say they waived it by not raising it in a trial

12   brief.  That's No. 1.

13         No. 2, Pepe, of course, is the one case that I do know

14   a little bit about, that had nothing to do with a graphic.  It

15   pertained to a jury instruction.

16         No. 3, Your Honor, this is simply arguments of

17   counsel.  I did refer the jury to the specific jury instruction

18   for an explanation.  This is an argument.

19         No. 4, Your Honor, the reason I imagine that the

20   government has such a record prepared is this is the exact same

21   identical graphic that was used in the Jindal case, an

22   antitrust case that the antitrust division recently litigated.

23   And in that particular matter, the graphic was, in fact,

24   permitted in court.  And so excuse me for being taken a bit

25   offguard by this, but nonetheless, I do believe it is

2765

1   appropriate under the circumstances, and while subject to

2   interpretation, it's absolutely a correct statement of law.

3            THE COURT:  Mr. Beller, do you mind displaying that

4   just for me?  I didn't have a chance to really study it before

5   the objection.

6            MR. BELLER:  Yes, Your Honor.  Just one moment,

7   please.

8            MR. LOVELAND:  Your Honor, while you are looking at

9   it, I would just note that the guilty beyond a reasonable doubt

10  is displayed even outside of the literal box on the chart here.

11           THE COURT:  Okay.  I have had a chance to look at it.

12  Anything else, Mr. Beller?

13           MR. BELLER:  No.  Thank you, Your Honor.

14           THE COURT:  Anything else, Mr. Loveland?

15           MR. LOVELAND:  Your Honor, I would rest on my

16  arguments and just say Mr. Beller is correct, a similar graphic

17  was used in the *Jindal* case.  The government did not object

18  there.  The government's objection is made here.  Thank you.

19           THE COURT:  I am going to sustain the objection.  The

20  problem with this particular exhibit is by virtue of exclusion,

21  it really -- it does provide a definition because it defines by

22  virtue of saying what it isn't and then it lists a lot of

23  different things that -- different terms that allegedly do not

24  constitute proof beyond a reasonable doubt.  The Court has got

25  an instruction on that.  I do believe that this crosses the

2766

1     line, so I will sustain the objection as to this, but I won't

2     provide a curative instruction other than to sustain the

3     objection.

4          MR. BELLER:  Your Honor, if I may, please, I don't

5     know how much time that took, and I want to make sure that I am

6     not running afoul of what -- the time limits of the Court.

7          THE COURT:  Yeah, I am excluding that time.  So the

8     objection started at -- let me check my notes again.  Hold on.

9     Yeah, the objection started at 3:43, so I will deduct -- add

10    back on, in essence, six minutes, all right?  Thank you.

11         (In open court:)

12         THE COURT:  The objection will be sustained.

13         MR. BELLER:  Thank you, Your Honor.

14         Proof beyond a reasonable doubt is the highest burden

15    that we have in law.  If we were talking about money, a civil

16    action, one company suing another would be a much lower

17    standard.  Proof beyond a reasonable doubt is the highest.  And

18    when you start with the presumption of innocence and you

19    balance that against the government's responsibility and

20    obligation and burden, heavy burden to prove a case beyond a

21    reasonable doubt, that presumption of innocence is difficult to

22    overcome and the law requires it that way.

23         This is not a balancing test.  You don't get to decide

24    which side do you believe more.  The defendants did not have to

25    put on a case.  The defense put on a case because there were

1    witnesses who could complete the story that the government

2    didn't want to tell you.  You don't get to balance.  It's a

3    question of they are innocent.  Is the weight, the magnificent

4    weight of the government's evidence so gigantic that it can

5    overcome that innocence?  Not maybe, not perhaps, but beyond a

6    reasonable doubt.

7            Jury Instruction No. 6 talks to you about how to go

8    about viewing the evidence, how to go about considering some of

9    the different facts.  You are permitted to draw reasonable

10   inferences.  Well, that begs the question, what is a reasonable

11   inference?  And the law tells you what a reasonable inference

12   is.  It is proven facts, No. 1, proven facts plus reason plus

13   common sense.  That is a reasonable inference.

14           Let's talk about what a reasonable inference is not.

15   It is not an assumption.  It is not a guess.  It is not an

16   understanding, somebody's understanding.  So what's an example

17   of a reasonable inference in this case?  Tell them we're

18   trying.  Tell them we're trying.  And what happens hours after

19   that?  No. 1, I will tell you there wasn't a telephone call

20   back saying, Hey, they're trying, we're trying.  What is a

21   reasonable inference?  That hours later Claxton Poultry

22   undercut Pilgrim's Pride and took volume, hours later.  That is

23   a reasonable inference that no agreement existed.

24           Now, you're also asked to talk about witness

25   credibility.  Witness credibility is Instruction 7 and 10.  So

1    let's spend a little bit of time talking about witness

2    credibility.  What this instruction says to you, did the

3    witness clearly see or hear the things about which he or she

4    testified, not the telephone game, not somebody might have told

5    somebody who might have told somebody, but witness credibility,

6    did the witness clearly see or hear the things.

7           And Mr. Bryant, Mr. Bryant gets his very own

8    instruction.  You should consider the testimony of Robbie

9    Bryant with greater care and caution than the testimony of an

10   ordinary witness.  Why is that?  As Judge Brimmer told you, the

11   government has exclusive authority to grant immunity to a

12   witness, the exclusive authority to do so.  What does that

13   mean?  That means the Federal Government, the prosecutors and

14   the prosecutors alone can compel the attendance, they can force

15   through legal process anyone they want to take that stand and

16   testify.  That's not something that any one of us get to do.

17   The government alone does that.

18          Who didn't they call to testify in their case in chief

19   when they have the burden?  These are just some of the names of

20   the witnesses that appear in the prosecution's charts, some of

21   the names of the witnesses that you heard spoken about on the

22   witness stand, some of the names of witnesses who appear in

23   some of the documents, and every single one of these

24   individuals were not called.  And that is something that you

25   can consider in determining whether or not the government has

1    proven this case beyond a reasonable doubt.

2           One of the names that's on there, Special Agent

3    Taylor, FBI, the very agent who investigated this case who has

4    sat at the government's table since day one they did not call

5    to the stand.  It's not a long walk to get to that stand unless

6    you get lost along the way.  Ladies and gentlemen, the

7    government has lost their way on this case.

8           They could have called anyone from Claxton Poultry.

9    Do you think that if they interviewed a single person, just one

10   from Claxton Poultry, 1700 employees, you would have heard

11   about it?  If they would have interviewed one person from

12   Pilgrim's Pride other than Robbie Bryant -- the government

13   formed their theory two years ago and then spent a year trying

14   to find witnesses who would support the theory that Ms. Wulff

15   just gave to you.  Do you think if they interviewed just one

16   person from Pilgrim's Pride other than Robbie Bryant you would

17   know about it?  All of that is something that you can take into

18   consideration.

19          What did the government do?  The government put all

20   their eggs in one basket.  Ms. Wulff's theories, Ms. Wulff

21   saying, hold on.  The telephone calls said, hold on, no need to

22   lower your bids.  Did you hear that from the evidence?  Did you

23   hear that?  Ms. Wulff said that Mr. Fries and Mr. Penn and

24   Mr. Lovette were responsible for making sure that the

25   conspiracy was working the way it was supposed to.  Did any of

2770

1    the evidence say that?  They relied only on Robbie Bryant,

2    because Robbie Bryant, Mr. Bryant, the admitted liar,

3    Mr. Bryant, Ms. Wulff says, well, he just didn't share

4    information.  You heard him testify.  He affirmatively denied

5    to them -- he affirmatively lied to them.  That's who they

6    decided on.  Who did they decide on?  The man of the telephone

7    game who has little to no knowledge about any underlying fact

8    of what happened.

9            THE COURT:  Two minutes left.

10           MR. BELLER:  Thank you.  Two minutes?

11           THE COURT:  Yes.

12           MR. BELLER:  A conversation on a conversation on a

13   conversation.

14           THE COURT:  Because you had 20 minutes, right,

15   Mr. Beller?

16           MR. BELLER:  20 minutes, Your Honor.

17           THE COURT:  Yeah.

18           MR. BELLER:  Mr. Bryant, the telephone game, let's

19   talk about the elements of the offense.

20           MR. LOVELAND:  Objection, Your Honor.  Excuse me.

21   It's been taken down.

22           MR. BELLER:  Let's talk about the elements of the

23   offense for a moment.  You have two decisions to make.

24   Decision No. 1, not why, we will get into the why, Decision

25   No. 1, did the government prove a conspiracy beyond a

1    reasonable doubt, period.  Did they prove that there was a

2    conspiracy?  If the answer is yes, you will go on to Question

3    2.  If the answer is no, they didn't, then we're done at that

4    point.

5           If we can advance, Mr. Brian.  Thank you.

6           A conspiracy is an agreement to act together.  In

7    determining whether a conspiracy was proved, you can view the

8    evidence as a whole and not piecemeal.  The government uses

9    summary charts.  The government uses summary charts, but the

10   summary charts themselves are not evidence.  Why are the

11   summary charts not evidence?  Because Mr. Ledford told you.

12   Question:  Is that chart a complete and accurate summation of

13   the negotiation that happened between RSCS and the chicken

14   producers?  Answer:  No.

15          So as the government puts these summary charts up in

16   front of you, think about it.  Why didn't the government call

17   Mr. Ledford?  Why didn't the government call Mr. Eddington?

18   Why didn't the government call Mr. Kronauge?  And why is

19   Mr. Ledford telling the government and telling you as the jury

20   that they are incorrect?  Exchange of information even

21   regarding price is not illegal.  If actions were taken

22   independently on behalf of a company, there would be no

23   agreement.

24          Jury Instruction No. 21:  A business may lawfully copy

25   its competitor's price list, follow and conform exactly to its

1    competitors' price, follow policy and price changes and adopt

2    the same.  All of that is perfectly legal to do.

3          Robbie Bryant, Robbie Bryant testified about

4    independent pricing, and he testified that independent pricing

5    to him meant ignorance, but that's not what Jury Instruction 21

6    means.  When you consider that Robbie Bryant according to him

7    received bid information, he testifies that he made an

8    independent decision.  It is that independent decision on

9    behalf of Pilgrim's, the independent decision on behalf of

10    Claxton that makes this case not a conspiracy.  If and only if

11    you find that there is a conspiracy, you then go to knowingly.

12          Knowingly must be proven by the government beyond a

13    reasonable doubt, and it must be unanimous.  Voluntary,

14    intentionally, knowing of its goal and intending to help

15    accomplish it.

16          Jury Instructions 20 and 23 say that mere knowing or

17    knowledge of a conspiracy is insufficient to make a person a

18    member of a conspiracy and a corporation's employees cannot be

19    found guilty of conspiring together.

20          Here is what that means, a conspiracy cannot equal

21    Mr. Fries conspiring alone with Mr. Brady.  It cannot mean

22    Mr. Lovette conspiring or agreeing, it's the agreement, that

23    quid pro quo, with Mr. Penn, Mr. Bryant, Mr. McGuire, et

24    cetera.

25          If I may have a brief moment.

1          THE COURT:  Sure.

2          MR. BELLER:  When you take this law, the law that says

3  that sharing pricing information is legal, sharing bidding

4  information is legal, meeting with and discussing pricing and

5  future bid information with your competitors is legal as long

6  as you act independently, the government's case fails.  When

7  you take this law and when you consider that the government

8  relies on Robbie Bryant and his little to no actual personal

9  knowledge, when you consider that the government didn't even

10  interview their witnesses prior to making their allegation and

11  then setting out to prove it, when they don't call witnesses

12  who are responsible for the negotiation, who they include on

13  their summary charts, they are clearly only telling you parts

14  of the story that they want you to hear and parts of the jury

15  instructions that they want you to read.

16          Suppliers talked.  They covered for each other.  They

17  shared pricing information.  It's not an agreement.  There was

18  no if you do it, I'll do it too.  Ms. Wulff asks why call?  Why

19  the calls?  Because they can, because they can.  That's why,

20  because sharing pricing, sharing bidding, obtaining pricing,

21  obtaining bidding, and then using that to set your own price as

22  Mr. Bryant says independently for Pilgrim's, not together, and

23  as Mr. Finch said independently for Claxton, not together,

24  because they can and the law says so.

25          When you apply that law, you'll land on a single

2774

 1   verdict as to all five of these men, and that verdict is not

 2   guilty.

 3           MR. BELLER:  Thank you, Mr. Beller.

 4           THE COURT:  Mr. Tubach.

 5           MR. LOVELAND:  If we can have a brief side bar.

 6           THE COURT:  Yes.  Thank you.

 7       (At the bench:)

 8           THE COURT:  Mr. Loveland, go ahead.

 9           MR. LOVELAND:  This is for primarily, I guess,

10   Mr. Beller.  I want to be careful here.  I am sure that this

11   was not intentional, but twice after Your Honor sustained on

12   the objection to the graphic it was displayed before the jury.

13   It was briefer the second time than the first, but there is no

14   mistaking that that graphic was up twice after Your Honor

15   sustained the objection.  I know that Your Honor was

16   disinclined to give a curative instruction at the time.

17           I think now it's very important that we do so.  And I

18   do think that Mr. Beller actually noticed it and took steps

19   during his remarks to make sure that it didn't happen a third

20   time.  But I think at this point it's very important that we

21   have a curative instruction that would just essentially tell

22   the jury that they are only to rely on the law as Your Honor

23   has outlined it for them, and with respect to reasonable doubt

24   they are not to rely on any graphics that were displayed and

25   only the words and definitions laid forth by Jury Instruction

1    3.

2         *THE COURT:*  I didn't see either one.  I think the

3    first one, though, it seemed like it just happened to be the

4    next slide in the deck, and it was accidentally flashed up for

5    a bit.  And, of course, Mr. Loveland objected, and it was taken

6    down quickly.  I didn't see the third instance.  I certainly

7    don't think there was any intentionality to any of that.  It

8    was just a mistake.  But given the fact that the government

9    strongly objected to it being displayed and I sustained that

10   objection, I don't see the need for any further ringing of the

11   bell on this one, so I will deny that.

12         Let me mention something on time.  Because I thought

13   that the bench conference lasted for six minutes and because I

14   added, then, six minutes to the time that Mr. Beller otherwise

15   would have had, his argument would have ended at 3:53.  With

16   the six minutes, he was due to be done at 3:59.  He went until

17   4:05.  So I think appropriately the -- I think what should

18   happen is the defendants can swap around some time just to even

19   that out, but I just wanted to mention that before Mr. Tubach

20   gave his, because his may be right on time.  But in any event,

21   I wanted to mention that.  Otherwise, are we ready to go?

22         *MR. TUBACH:*  I certainly am.

23         (In open court:)

24         *THE COURT:*  Mr. Tubach, when you're ready.

25                        **CLOSING ARGUMENT**

1          *MR. TUBACH:*  Thank you, Your Honor.

2          Not a man in this courtroom is guilty of a conspiracy

3    to fix prices, not one single man.  That's because there was no

4    conspiracy.  It's a made-up conspiracy theory by these

5    prosecutors, a theory they landed on before they had

6    investigated to know whether it was true and a theory they

7    stuck with when they learned it was wrong.

8          We are in a court of law, and in a court of law the

9    prosecution has to bring you evidence, not theories, not

10   assumptions, not speculation, evidence that proves beyond a

11   reasonable doubt that these men are guilty of the crime with

12   which they've been charged.

13         Now, I am going to take you through the evidence as it

14   relates to Jayson Penn so you can see for yourselves just how

15   wrong the government got this.

16         We have all been sitting in this courtroom for the

17   better part of a month now, and in that time, you may have

18   noticed an obviously and enormous flaw in the government's case

19   against Jayson.  Where are the witnesses?  This is supposed to

20   be a price-fixing case, so where are the witnesses who say that

21   Jayson Penn fixed prices with anyone?  The government didn't

22   call any because there aren't any.  Instead, the government's

23   strategy has been to take a handful of e-mails and texts, pull

24   out some cherry-picked sound bites and not give you the whole

25   story.

1            How do we end up in this position, a case against

2    Jayson Penn with no witnesses against Jayson?  You see, you

3    heard it in the government's closing argument.  Jayson was at

4    the top of the company.  When he was charged in this case, he

5    had just become the CEO of Pilgrim's Pride.  He had worked

6    incredibly hard for decades to get there, and he had finally

7    made it to the top, and that made him an irresistible target

8    for the prosecutors.

9            The problem is they didn't do their homework.  They

10   didn't do the basic investigation necessary to understand

11   whether he actually had done anything wrong.  In my opening

12   statement, I told you that they had not interviewed a single

13   person on any e-mail or text that Jayson Penn wrote before

14   charging him and that they hadn't interviewed a single person

15   at Pilgrim's Pride where Jayson worked for the entire time this

16   supposed conspiracy was going on.  Now, if that was wrong, you

17   can be quite sure the prosecution would have shown that to you.

18   They didn't because it's true.

19           And this basic failure to do the work, to do their job

20   is why Jayson Penn stands accused of fixing prices and rigging

21   bids when there is not one person on this earth who said that

22   he did so.  I am going to go through all the evidence now so

23   you can see that as to Jayson Penn the government does not come

24   close to proving beyond a reasonable doubt that he committed

25   the crime with which he has been charged, because the truth is,

1    Jayson Penn never fixed prices or rigged bids with anyone,

2    period.

3         Let's get into the evidence.  The government charged

4    an eight-year conspiracy to fix prices and rig bids for broiler

5    chicken products.  But let's be clear.  Even the people at this

6    table don't believe that allegation, so they told you this case

7    would focus just on KFC, but then they still dumped hundreds of

8    exhibits into evidence that have nothing to do with KFC and

9    relate to all kinds of random topics, and they didn't call any

10   witnesses to testify about them.

11        In fact, most of the exhibits that relate to Jayson

12   Penn have nothing to do with KFC at all.  It's just not

13   relevant to what the government is saying this conspiracy

14   supposedly is, but I will address them.

15        Now, here is a road map of what I am going to cover in

16   my closing argument today.  First, I am going to talk about the

17   witnesses and what they have to say about Jayson.  Then I am

18   going to go through and talk about each of the instances of bid

19   rigging that the government alleges Jayson was involved in.

20   Then I am going to talk about five stray e-mails, maybe fewer,

21   that the government has thrown into evidence but without any

22   context.

23        All right.  Let's talk about the witnesses first.  If

24   the prosecution's alleged conspiracy had really existed, there

25   would have had to have been dozens and dozens of people

 1    involved in this conspiracy from all over the chicken business,

 2    all those suppliers, Tyson, Claxton, Koch, Mar-Jac, George's,

 3    Case Farms, Holmes, OK Foods and more.  And even the

 4    allegations just relating to KFC would have involved virtually

 5    all the suppliers.  And the prosecution did not call one

 6    witness from any of those companies.  Instead, out of all of

 7    the people, the entire chicken industry on the suppliers' side,

 8    who did the government bring to you not once but twice?  Robbie

 9    Bryant.

10         It is shocking that the prosecution would rest its

11    case on a witness like that.  But rather than thinking about

12    when it is fair and just to seek to convict these good men

13    based on the testimony of an admitted liar, these prosecutors

14    practiced how to minimize his dishonesty to you when he got on

15    that witness stand.  That's just wrong.

16         I expect you are going to hear a lot more about

17    Mr. Bryant, but as it relates to Jayson Penn, here is all you

18    need to know.  Although Mr. Bryant worked at Pilgrim's Pride

19    where Jayson Penn worked during the entire time this supposed

20    conspiracy was going on, here is what he had to say about

21    Jayson Penn.  He has no personal knowledge that Jayson Penn

22    agreed with any competitor to fix prices or rig bids.  He has

23    no personal knowledge that Jayson Penn instructed anyone to

24    coordinate prices or bids with competitors.  And he has no

25    personal knowledge that Jayson Penn knew of anyone rigging bids

1   or fixing prices.

2          That's the government's star insider witness, and he

3   had nothing to say about Jayson.

4          Now, what about the other witnesses?  They either

5   didn't mention him at all or didn't really know him.  Sara

6   Fisher doesn't know Jayson Penn.  Ted Sangalis doesn't know

7   Jayson Penn.  Rachel Evans didn't mention him.  Flo Becker, the

8   one who testified about video conference, doesn't know Jayson.

9   Bob Lewis, he did actually know Jayson Penn because he met him

10  two or three times before he retired in 2009 when Jayson worked

11  at a different company.  Pete Suerken didn't even mention

12  Jayson Penn once in his testimony.

13         The government has had years to find someone, anyone

14  who would say that Jayson Penn was fixing prices.  The fact

15  that there is no such witness is all you need to conclude that

16  the government has failed to prove its case against Jayson

17  beyond a reasonable doubt.

18         So what's the government's response to this obvious

19  failure?  In its opening statement if you remember back to

20  that, the government said you wouldn't hear from a lot of

21  witnesses because the conspiracy was a secret.  That is

22  straight-up nonsense.  The prosecution has the power to force

23  people to talk.  They and they alone have the power to give

24  people immunity, force them up on that stand and force them to

25  tell you what happened under penalty of perjury.

 1          And it's not like they don't know who these people

 2    are.  This is not some kind of conspiracy in the movies where

 3    you push a bookshelf and it opens and you go down some secret

 4    staircase in some secret meeting room.  This is the chicken

 5    business.  These people are in company org charts.  They are in

 6    LinkedIn.  They are in all the e-mails and texts that are in

 7    evidence.  So the idea that the government did its darndest but

 8    they just couldn't crack this conspiracy is a terrible excuse

 9    for not bringing you a real case.

10          But it's even worse than that.  The government

11    actually went out of its way not to call witnesses who could

12    have explained the facts to you.  You will see this over and

13    over again as we go through the evidence, and you will see that

14    the government didn't just cherry-pick the snippets of

15    documents to show you; they cherry-picked the witnesses to

16    bring on that witness stand.  So that's it for the witnesses.

17          What's left?  As to Jayson Penn, not much.  As I

18    mentioned in my opening statement, a handful of documents and

19    two phone calls.  That's the government's whole case against

20    Jayson.  Let me go through that evidence now.

21          Let me talk briefly about the 2013 contract with KFC.

22    The government alleges that Jayson was part of an effort to fix

23    prices during those negotiations.  These allegations make no

24    sense whatsoever.  And apparently even the prosecutors don't

25    believe it because they didn't call a single witness to talk

1     about those negotiations.

2          So what's the government's theory about how Jayson was

3     involved?  One document.  In the final round of negotiations

4     after Pilgrim's had already reduced its price, Roger Austin was

5     trying to get -- was trying to convince Jayson to drop the

6     price again.

7          Jayson asked Mr. Austin to put together a spreadsheet,

8     and he said, Roger, what will we be giving up in dollars on

9     eight-piece and dark year over year if we do lower the pricing

10    to your recommended number?  Can you do a spreadsheet similar

11    to last year?

12         So Mr. Austin put together the spreadsheet, and they

13    sent it to Jayson.  It included the pricing analysis he had

14    requested and also included some market intelligence about what

15    other suppliers might have bid, and here is the spreadsheet.

16    The spreadsheet was titled Price Reduction Impact and analyzed

17    the total revenue hit to Pilgrim's if the company went along

18    with Mr. Austin's recommendation to lower the price further.

19         The market intelligence about the other companies that

20    you see on the upper right there, eight-piece quotes, was

21    included to show Mr. Penn that Pilgrim's, the good guys on the

22    spreadsheet, of course, were the highest of anyone else, to

23    convince him to go along with Mr. Austin's recommendation to

24    lower the price.  There is absolutely nothing on this

25    spreadsheet that hints about any agreement or deal with any

2783

1    competitors.  It was just market intelligence, and Jayson was

2    perfectly entitled to use that intelligence to make his own

3    decision.

4              Now, the government showed you in its closing argument

5    as part of the supposed evidence that Jayson was involved in

6    price-fixing that he got this spreadsheet and asked Mr. Austin,

7    Do we have Tyson price idea?  And this supposedly shows that

8    Mr. Penn is part of a conspiracy, but they didn't show you

9    Mr. Austin's response.  Mr. Austin's response was:  I can give

10   you an educated guess.  They are currently this and that below

11   George's.  I would guess they are around .96 flat.  Why didn't

12   the prosecution show you this response?  Because they don't

13   want you to know the whole truth.  They want you to know their

14   truth.  And the fact of the matter is Roger Austin was just

15   dead wrong.  We can now look back at the bids, and Tyson was

16   actually 3 cents higher than 96 flat.  And so when Mr. Penn

17   said, Do we have Tyson price idea, he wasn't asking Mr. Austin

18   to go out and fix a price with someone or get an agreement with

19   Tyson, and that's exactly how Mr. Austin understood him.  Do

20   you have any idea where Tyson might be?  He said, I think they

21   might be 96 flat.

22             So at the end of the day, this spreadsheet is a big

23   zero.  Pilgrim's, here are the three bids that Pilgrim's put

24   together, and that is when Mr. Austin sent Jayson the price

25   reduction impact spreadsheet.  And you can see the price went

1    down each time, and that was the precise point of that

2    spreadsheet.  There is nothing even remotely in this evidence

3    that shows that Jayson Penn was fixing prices with anyone,

4    nothing.  So much for 2013.

5            The next bid that the government alleges Jayson Penn

6    was involved in fixing price was the 2015 KFC contract, and the

7    government spent a lot of time on that, so I want to address it

8    here.  It's just more of the same, information sharing followed

9    by companies making their own decision.  Now, the government

10   seems to concede that prices were going to go up a lot in 2015.

11   Their complaint was that it went up too much and that must have

12   been because there was a price-fixing agreement.  But you have

13   now heard a mountain of evidence that it was the law of supply

14   and demand, the market forces that drove those prices up.

15           Let me summarize it briefly for you.  2015 was a

16   historic year in the small-bird chicken market, a historic

17   imbalance between supply and demand.  You heard this from

18   pretty much every witness who testified.  On the supply side,

19   the supply of small birds that KFC buys had been drying up for

20   years.  Big birds are more profitable, so suppliers were moving

21   over to big birds and they wouldn't make as many small birds.

22   And even within the small-bird category, Chick-fil-A was

23   gobbling up lots of the chickens because they are growing like

24   crazy, so suppliers were shifting their weight up out of the

25   KFC range to the Chick-fil-A range, and that took more supply

1     away from KFC.

2             At the same time, demand for those small birds was

3     going up.  The rotisserie chickens we all love from the

4     supermarkets, they were getting very popular and Chick-fil-A

5     and Popeye's were growing.  So this all came to a head in 2015.

6     The difference between big-bird and small-bird profitability

7     had reached historic proportions.  Rich Eddington, an

8     undisputed expert in the small-bird chicken business, he has

9     been selling it for decades and buying it for decades, said the

10    difference between big-bird and small-bird profits was 34 cents

11    a pound that year.  That's huge when you are buying and selling

12    a product for about a dollar.

13            Then came Mother's Day, the day when KFC ran out of

14    chicken.  This is the first time anyone could remember KFC

15    literally running out of chicken and closing stores.  So RSCS,

16    the buyer for KFC, they panicked.  They demanded daily updates

17    from the suppliers.  They went out literally, in their words,

18    begging for more chicken, and they had to pay a huge premium

19    just to get it.

20            So a response to this historic shortage of small

21    birds, RSCS decided to do three things they had never done

22    before.  The first was to negotiate earlier in the year than

23    they usually did.  The second was to try to negotiate a

24    three-year contract when all the prior contracts had been one

25    year.  And then the most important, RSCS told its suppliers to

1   add a big-bird premium to their chicken prices.  That was their

2   idea, not the suppliers' idea.  And they knew they needed to do

3   that because they were desperate to keep these suppliers in the

4   market.  They needed those profit margins to go up or they were

5   going to run out of chicken.

6          And you can see this in Bob Lewis' first e-mail.  He

7   was the rented buyer that RSCS brought out of retirement.  He

8   told here Roger Austin, but they sent this to everyone, What's

9   the profit margin you need and how that compares to big-bird

10  profitability?  Now, in response, RSCS to this request, some

11  Pilgrim's folks went down and met with RSCS and told them the

12  difference in profitability was about $1 per bird between big

13  bird and small bird, exactly in line with what Mr. Eddington

14  said, 34 cents a pound.

15         Even the government witness, Mr. Suerken, remember

16  Mr. Suerken, he told you that if he had been a chicken

17  supplier, he wouldn't have even been in the small-bird business

18  in 2014.  He would have converted his birds to big birds.

19  There is no evidence that anything I have just told you,

20  anything, was the result of any agreement or conspiracy among

21  any of the suppliers.  It was just the market reality that KFC

22  faced going into these negotiations.

23         All right.  Let's talk about the -- that's enough

24  about the background.  Let's talk about the bids.  So in early

25  August 2014, RSCS asked the suppliers to submit their bids for

1    2015 pricing.  And at Pilgrim's, the financial professionals

2    put together the bid, and in addition to updating their costs

3    which RSCS had asked them to do, they also included the

4    proposed big-bird premium because that's what RSCS had told

5    them to do.  And for Pilgrim's it was 10 cents a pound.

6            Now, Jayson for his part, he reviewed the draft bid.

7    He spoke to those who put it together.  He spoke with the

8    person who was responsible in that business unit for that

9    business, made them redo the bids, and then he discussed it

10   with Mr. Lovette.  Mr. Lovette and Mr. Penn approved with the

11   recommendation that Mr. McGuire made, the man in charge of this

12   business, to increase the margin by 10 cents.  That was an

13   independent decision based on Pilgrim's own evaluation of what

14   their chicken was worth in that market.

15           You can see that here.  This is what they sent over

16   to -- their bid to RSCS it.  The supply margin was .2175, and

17   that difference, the increase, the increase that RSCS had asked

18   them to put in, 10 cents per pound.  Why 10 cents?  Pilgrim's

19   whole strategy was to try to get small birds up to big-bird

20   profitability.  They are a huge company.  They already sold big

21   birds.  They could just move everything over to big birds and

22   then KFC would be in big trouble, right?  So the idea was to

23   start getting small birds up to big-bird profits.  They didn't

24   increase it by 34 cents; they increased it by 10 cents.

25           Now, why?  Because that's exactly what they had been

1    telling RSCS they were going to do.  This is the e-mail from

2    Mr. McGuire to Jayson Penn.  McGuire again owned this business.

3    I believe we should do the 10 cents per pound because we have

4    been prepping them for that for the last few meetings.

5         Now, the government keeps saying the fix was in.  This

6    was all a big conspiracy.  But that's not what the evidence

7    shows.  Here is a chart showing how many times Pilgrim's

8    revised its bid before they sent it on to RSCS.  The first

9    draft was created way back on August 13th, and then there is

10   one draft after another, one draft after another.  They

11   submitted -- they created internally no less than 12 different

12   bids before they finally submitted it to RSCS a day late.

13        If the fix was in, why was Pilgrim's, why were all

14   these employees wasting their time doing all these bids?  They

15   would have just submitted the number everyone agreed on and

16   moved on to something else.  The fact that they were doing all

17   this work shows you, tells you that there was no agreement on

18   what to bid.

19        Now, you don't just have to look at what Pilgrim's

20   did.  You have two independent sources that tell you that the

21   bid Pilgrim's submitted was a market-based price, not anything

22   related to any agreement or conspiracy among competitors.

23        The first is Rich Eddington.  Mr. Eddington worked in

24   the chicken business virtually all of his life, and he knew the

25   chicken business cold.  And he testified that the worst-case

1    scenario he can expect was 34 cents per pound increase.  That

2    would have been Armageddon, right?

3         He also said he didn't actually believe that the

4    suppliers would increase their prices by 10 cents.  He said he

5    thought the margin increase would be 8 to 10 cents.  That's

6    what he expected.  And so Pilgrim's increase of 10 cents was

7    exactly in line with what Mr. Eddington expected.

8    Mr. Eddington never worked at Pilgrim's.  He has got no loyalty

9    to Pilgrim's.  He worked at RSCS, and that's what he expected.

10        Now, the second independent source is Kent Kronauge.

11   He was the buyer for Popeye's and also a fast-food customer

12   buying small birds, right?  So Mr. Kronauge had also been

13   buying small-bird chickens for decades, and he had lots of

14   friends all over the industry.  And he checked around, he did

15   his due diligence, and he concluded that a reasonable increase

16   was 14 cents a pound.  That was his independent judgment about

17   a proper increase that was fair based on the market conditions.

18        And then he went to all of his suppliers, the Popeye

19   suppliers who are all the same suppliers supplying to KFC, and

20   he said he wanted them all to agree on a 14-cent increase, no

21   secrets, not trying to hide one from the other.  He told them

22   all, I want 14 cents, and they all agreed.

23        How did Mr. Kronauge's independent judgment about

24   where the market was going at Popeye's, where he was at

25   Popeye's compare with what the suppliers ended up doing at KFC?

 1    Let's take a look.  As Mr. Kronauge said, I went to the field

 2    and I said, Look, I need everybody to be at 14 cents on the

 3    cost-plus, right?  That was his testimony.  That's the 14

 4    cents.  So now this is what Popeye's, the buyer, thinks is a

 5    reasonable market increase.  Let's look at how the other

 6    suppliers to KFC ended up for these same small birds.  Some

 7    were a little higher; some were a little lower.  But this is

 8    right in line with what Mr. Kronauge decided based on his own

 9    independent judgment and his own evaluation of the market was a

10    reasonable price increase.

11          Now, did Pilgrim's look at what other companies were

12    doing to help them understand where the market was?

13    Absolutely, they did.  It's not just legal as Mr. Beller

14    pointed out; it's smart business.  And that's exactly what

15    Mr. Kronauge did because he called around to look at where the

16    market was going, and then he came up with this 14 cents.

17          So where did all these suppliers end up at the end of

18    the day to KFC?  The undisputed evidence is that the initial

19    bids were different.  The final prices were different, and the

20    suppliers took volume away from each other.

21          Let me focus on the volume part.  You have seen this

22    chart before.  It's now in evidence.  Pilgrim's in the 2015

23    contract lost over 560,000 pounds of chicken every single week.

24    That is a huge loss.  Now, the government says, Oh, but they

25    charged so much more, they still made more money, but I thought

1    the whole idea was that this conspiracy was about not losing

2    volume, because if you are going to increase the price lot, you

3    would want to sell the same amount of chicken at that price.

4    But look at this.  Koch Foods and Tyson and Claxton and

5    George's, they are stealing away product from Pilgrim's.  Who

6    in their right mind would enter into a conspiracy where the

7    deal is you take my business and make the money?  It's okay.

8    You have it.  Common sense tells you that doesn't happen.

9         So what evidence did the government introduce to

10   suggest that Jayson agreed with anyone to fix prices?  I have

11   been talking about companies.  Let's talk about Jayson Penn.

12   What's the evidence that he agreed with anyone to fix a bid to

13   KFC?  Virtually nothing.  As Robbie Bryant told you, the

14   government's only supposed conspiracy insider, Jayson Penn just

15   wasn't involved in any of those things he talked about, whether

16   they occurred or not.  And you are going to hear a lot about

17   that from other counsel, those phone calls, the price is the

18   price, all that other stuff.  No evidence that Jayson Penn was

19   involved in that as well.  In fact, Robbie Bryant said it

20   affirmatively, he was not involved.

21        So instead the government points to one e-mail and two

22   phone calls.  None of this comes close to showing beyond a

23   reasonable doubt that Jayson Penn entered into any conspiracy

24   to fix prices.  Let's look at the facts.  First, the government

25   points to an e-mail and a spreadsheet that Jason McGuire sent

2792

1    to Jayson Penn that contained the market intelligence, and you

2    have heard this from the government.  And it says Roger did

3    some checking around and based on that here is what he thinks,

4    folks, may be going with.

5         Now, there is nothing remotely conspiratorial about

6    this e-mail no matter how many times the government wants you

7    to think so.  First off, notice that all of the suppliers

8    perhaps going in with bids are expressing exactly 2-cent

9    ranges.  That suggests the information came from someone who

10   maybe didn't want Roger to have the actual information.  Maybe

11   that's a customer.  We know that the customers talked to Roger

12   every day.  But honestly, it doesn't matter where it came from

13   because it was market intelligence.  And as you will hear from

14   others, some of this information was just flat wrong.

15        The government also points to a spreadsheet, and they

16   showed that to you in their closing, but it's just another way

17   of showing the same information.  It's nothing new.

18        Now, the prosecution pointed out that Mr. McGuire said

19   in this e-mail that we want to be the leader, the price leader,

20   right?  But that's not a crime; that's a strategy.  You heard

21   from witness after witness that Pilgrim's strategy was to be

22   the leader on price.  Mike Ledford told you that.  Rich

23   Eddington told you that.  Brenda Ray told you about price

24   courage.  That's what that meant.  And that's what Mr. McGuire

25   meant when he said that Pilgrim's would be the price leader.

1    That has nothing to do with price-fixing; it had to do with

2    Pilgrim's own pricing strategy.  That's the one document they

3    point to showing that Jayson Penn was supposedly involved in

4    this conspiracy.

5         Now let's look at the two phone calls.  First, the

6    government points to a call that Jayson had with a man named

7    Brian Roberts at Tyson.  The government wants you to guess that

8    this phone call was about KFC bids just based on the timing of

9    the calls, but it's pure speculation.  First, the government

10   put three phone calls on its prosecution charts there.  They

11   are trying to show they talked a lot, but, in fact, there is

12   only one phone call, right?  The first is zero seconds, then

13   there is a 38-second connection, and then they spoke for about

14   15 minutes, almost 16 minutes.  And that's either sloppy work

15   or they are trying to mislead you, but either way, these show

16   you these charts are not reliable.

17        Here is something else the government didn't tell you

18   about that phone call on August 15, 2014.  That phone call was

19   the first time that Brian Roberts and Jayson Penn had ever

20   spoken on the phone before.  The government has all the phone

21   records.  They know this full well.

22        Do you really think that Jayson Penn and Brian Roberts

23   agreed to fix prices and rig bids the very first time they

24   spoke on the phone?  Use your common sense.  If someone you've

25   never spoken with on the phone calls you up and said, Hey, you

1    want to commit a crime?  What's your likely response to that

2    going to be?  I don't think so.  Common sense tells you that's

3    not what the conversation was about, and it's absurd for them

4    to suggest otherwise.

5            Now, they put up some chart where they said that

6    because of this phone call, they got to the same level as

7    Tyson.  And then they showed you something about a 12-cent

8    margin increase at Pilgrim's.  That wasn't the increase that

9    anyone submitted from Pilgrim's to RSCS.  We know that because

10   it's in an e-mail right here.  This is the e-mail that was sent

11   to Jayson Penn saying, Here is the model I'm sending you.  It's

12   the same one we reviewed a couple days ago.  We are going up on

13   cost 6 cents except this time we inserted the margin into this

14   model 10-cent per pound increase.  Why is the government

15   showing you this chart about the 12-cent price increase?  Who

16   knows.  It's just part of the story they made up in their head.

17   Total speculation.

18           Now, of course, there is an easy way for the

19   prosecution to have actually shown you or proven to you what it

20   is that Jayson Penn and Brian Roberts talked about.  And what

21   is that?  Put Brian Roberts on the stand, no speculation, no

22   guesswork, but they chose not to do that, so they shouldn't be

23   asking you to speculate about what a phone call was about if

24   they don't even have the wherewithal to put the relevant

25   witnesses on the stand.  That's the first phone call.

1           The second call relates to a man named Pete Martin.

2      Now, the government points to one page of handwritten notes,

3      and, remember, they called Pete Martin's former executive

4      assistant, Flo Becker, who told you it might have been his

5      handwriting.  Maybe it was somebody else's.  But, again, why

6      didn't the government call Pete Martin as a witness?  He could

7      have told you whether those notes were his and, if so, what

8      they meant.  Mrs. Becker told you that he still works at

9      Mar-Jac.  In fact, he is probably sitting at his desk working

10     right now.  Why didn't they call him?  They chose not to do so.

11          So what do we know about these handwritten notes?  Not

12     much, honestly.  At the top of the notes, there are a couple of

13     names.  Mark McEwen, he was a grain broker.  Steve Campisano

14     was an RSCS employee.  The government chose not to call either

15     of them either of then either.

16          Now, the government points out that there on the

17     bottom it says, Talked to Jayson Penn.  Right underneath that,

18     it says $433 or better to get out.  And we know that that

19     refers to soybean meal futures contracts because that was the

20     exact price of soybean meal futures on August 28th, the day

21     before these notes were written.  Now, the government points

22     out it says plus 8 cost and plus 11 margin to the right of

23     Jayson's name.  But what they didn't tell you is that was never

24     Pilgrim's bid.  Pilgrim's bid was plus 6 cost and plus 10

25     margin.  So maybe these numbers refer to the number above 19,

1    because 8 and 11 equals 19, or maybe it refers to something

2    else, but this is all speculation.  And the only reason we are

3    here speculating is because the government didn't put Pete

4    Martin on the stand to ask him about these notes.

5          And whatever these notes mean, they are a total red

6    herring, because by August 29th, Pilgrim's had already

7    submitted its bid 10 days earlier, and they had already told

8    RSCS before these notes were even written that they weren't

9    going to move on price.  So that's the entirety of the

10   government's case against Jayson Penn relating to these 2015

11   negotiations, one e-mail, two phone calls, and a whole lot of

12   speculation and missing witnesses.

13         All right.  Let's talk quickly about the 2017 KFC

14   negotiations for 2018 pricing.  I will mention this briefly

15   because, honestly, this one is baffling.  This, what you are

16   seeing right here is the sum total of why they think Jayson

17   Penn was involved in price-fixing in 2018.  There is nothing

18   remotely suspicious about this.  This is the kind of text that

19   gets sent every day.  This is not evidence of a conspiracy.

20   It's just ordinary business communications.  If the government

21   had any real evidence that Jayson Penn was fixing prices in

22   these negotiations, they would have shown it to you.  This is a

23   zero.

24         Let's talk about Golden Corral.  They said we wouldn't

25   hear a lot about that, and they were right, they didn't tell

1    you a lot about that.  They didn't introduce one single bid or

2    contract relating to Golden Corral.  The only reason they

3    showed this to you is because they could show you a couple of

4    texts to try and make Jayson look bad.  They don't have

5    anything to do with price-fixing.  They just showed them to you

6    for a cheap sound bite, and here they are.

7         Tim Stiller and Jayson Penn were texting back and

8    forth, and as happens sometimes when people are texting, things

9    get confused.  At one point Mr. Stiller said, They are

10   listening to my direction.  And then Mr. Penn says, Well, who

11   is "they" because he had previously been talking about

12   Pilgrim's employees and also about Mar-Jac.  And then

13   Mr. Stiller didn't answer.

14        And he says, If they is illegal, don't tell me.  And

15   that's what the prosecution showed you.  But then they didn't

16   show you the response.  What she said is, Oh, he then quickly

17   changed the subject.  He didn't change the subject.  He

18   answered the question.  He says, Was referring to Roger

19   listening.  Sorry, thought you were referring to Roger caving.

20   Why didn't they show you that?  Because they are not wanting

21   you to see the actual evidence and the truth.  There is

22   absolutely nothing nefarious going on here.  It's just a

23   miscommunication.

24        Now, there is some market intelligence in here, but

25   it's totally wrong.  Mr. Stiller said, We know Mar-Jac.  Their

1    biggest supplier is 2 cents higher than us, and they are not

2    moving, all right?  Wrong on both counts.  The bids before

3    this, Mar-Jac was actually lower than Pilgrim's.  And

4    afterwards, Mar-Jac did move.  So it's just more market

5    intelligence that wasn't accurate.

6          Now, the government also put on its chart there that

7    at one point Jayson referred to Mar-Jac as a solid competitor.

8    So what?  In the same text string he referred to Tyson as

9    morons.  It is not a crime to have an opinion about your

10   competitors.  That's all about Golden Corral.

11         Now, the government also dumped into evidence a bunch

12   of stray e-mails that's got nothing to do with any of these

13   bids.  I thought that we may see some of these in our rebuttal

14   closing, so I can't go without addressing them.  The first one

15   that they referenced is Brenda Ray's e-mail, right?  She told

16   you what this was all about.  It was a friendly competitor.

17   She was telling him that it was all over the market that

18   Pilgrim's had taken up contract pricing.  If related to halal

19   meat, nine-piece chicken in northeast U.S.

20         It has nothing to do with this case.  Fast-food

21   restaurants don't even buy nine-piece chicken.  We called

22   Ms. Ray to tell you the whole story.  She testified that Jayson

23   had nothing to do with increasing those prices.  The prices had

24   already been taken up when this guy called from George's.  It

25   was not part of any price-fixing or bid-rigging with

1    competitors.  She had just gotten some market intelligence and

2    passed it on.

3          Now, here is the part the government likes.  Jayson

4    forwarded Ms. Ray's e-mail to someone else and said:  Not

5    exactly a legal conversation.  But as we all know, apologies of

6    Mr. Penn, he was just dead wrong.  And you, ladies and

7    gentlemen, know more about that phone call that Ms. Ray was

8    writing about than he did.  You heard the testimony from

9    Ms. Ray.

10         And you know what's so disturbing about this is the

11   government knows this.  They know all of this.  They

12   interviewed Ms. Ray a year ago.  She told them exactly what she

13   told you.  And the government, instead of just admitting this

14   e-mail didn't amount to anything, dumped this into evidence,

15   didn't call any witnesses and just hoped nobody would show up

16   to actually explain it, so we had to bring Ms. Ray into court

17   and explain this e-mail to you.  This is the government

18   affirmatively trying to deceive you, and it's shameful.

19         Here is another e-mail which they may or may not talk

20   about, but it's in evidence.  I need to raise it.  The next

21   stray e-mail is one that relates to H-E-B, another company you

22   have heard absolutely nothing about.  And the government didn't

23   call any witnesses about this, but it's clear it doesn't have

24   anything to do with price-fixing.  Jayson said at one point I

25   had a few owners of small-bird companies thanked us for getting

1    via me for getting our act together.  I guess it will happen

2    again.  Good work.  Forward.  This was all about trying to

3    convince H-E-B to increase its bird weight so they could sell

4    larger chickens to H-E-B.  That would be good for Pilgrim's and

5    good for the competitors.  It has absolutely nothing to do with

6    a bid or fixing a price or anything.

7         The next one I want to show you is one the government

8    also dumped into evidence, and this is from Jayson Penn to Bill

9    Lovette.  And he says, Apparently your boy was not listening to

10   your illegal spiel on forward pricing at the NCC.  The

11   government likes this e-mail because it has the words "illegal

12   spiel" in it.  But what did the government tell you about this

13   document?  Literally nothing.

14        They know the NCC stands for the National Chicken

15   Council, and they know it's located just a few blocks away in

16   Washington, D.C. from the Federal Bureau of Investigation.  Why

17   not send Agent Taylor here over to the NCC to say, Hey, was

18   there some illegal spiel going on?  They apparently didn't want

19   to know.  So we brought in Mike Brown from the NCC ourselves,

20   another witness the prosecution chose not to call.  And he

21   explained that there is absolutely nothing improper going on at

22   all.

23        Jayson wasn't even at the NCC meeting.  In this

24   e-mail, he was just making a joke.  He was ribbing his boss for

25   giving a rah-rah speech at the NCC in front of a large crowd

1    about the sunny days ahead in the chicken business when Tyson

2    was wildly underpricing Pilgrim's out in the market.  This

3    e-mail is just another example of the government introducing

4    into evidence a sound bite and trying to keep the truth from

5    you.

6         The fourth e-mail writes that Jayson's refusal to

7    cover for Tyson's shorts.  This is without a doubt one of the

8    strangest parts of the government's conspiracy theory.  Here is

9    what happened.  In 2014, Tyson's took a lot of business away

10   from Pilgrim's, particularly Wal-Mart business.  Nothing wrong

11   with that.  That's competition, right?  The problem was Tyson

12   had promised more chicken to its customers than it could

13   deliver.  So what did it do?  It made sure to fulfill its

14   promise to its big new customer, Wal-Mart, and it asks

15   Pilgrim's to cover for them, for the other customers.

16        Jayson refused.  And he used an analogy to Otis

17   Campbell, the town drunk on an old TV show.  And he said, If

18   that's -- we are enabling the town drunk by giving him beer for

19   Thanksgiving instead of walking him into an AA meeting.  In

20   other words, if we just follow along behind Tyson and let them

21   keep promising more chicken than they can deliver and we just

22   get their scraps, the customers will never come to us.  And

23   Jayson made absolutely clear what his purpose was in doing

24   this.  What was the goal?  The goal was to add this Denver

25   distribution center to our business.  How?  We will prove that

1    we are committed to being a valuable supplier to Kroger and

2    enable them to grow their business.

3           THE COURT:   Two minutes.

4           MR. TUBACH:   Thank you, Your Honor.

5           So this is wildly off base.   Why did the government

6    put this in evidence?   Why didn't they put that in evidence?

7           I want to end with a very simple point.   At the bottom

8    the prosecution says that Jayson was not a competitor, that he

9    didn't compete, but he was a tough competitor.   He is a

10   competitor by nature, and you heard that from Brenda Ray.   And

11   I can't explain this any better than the way Jayson explained

12   it in his own words.   Here are his words in the middle of the

13   conspiracy that these people say existed:   I hate Tyson but I

14   hate Sanderson more, his two biggest competitors.   And then

15   another e-mail, Personal mission to send Sanderson Farms into a

16   tailspin.   Foot on the throat.   Both of these boys will be

17   going down.

18          These are not the words of a price fixer.   They are

19   the words of a tough competitor, and that's exactly who Jayson

20   Penn was.   The government bears the burden to prove beyond a

21   reasonable doubt that Jayson Penn committed the crime with

22   which he has been charged.   From what you have heard in this

23   case, there are many reasons to doubt.

24          The government called no witness to testify about

25   Jayson at all.   The prosecution cherry-picked these e-mails and

 1    sound bites to mislead you.  It was market forces that drove

 2    these prices up and down to KFC, not any agreement among

 3    competitors.  And Pilgrim's lost business year after year after

 4    year to KFC for the entire time of this supposed conspiracy to

 5    KFC.  In fact, the government's whole case against Jayson is

 6    made up of assumptions and speculation, cherry-picked sound

 7    bites and trying to keep you from learning the truth.  Time and

 8    again in this case the prosecution looked for a sound bite,

 9    threw it up against the wall and hoped that no one would

10    realize it didn't actually relate to price-fixing.  They should

11    not be doing that.

12          The government is supposed to be doing justice.

13    That's why they are called the Department of Justice.  But they

14    are not seeking justice here.  They are just seeking

15    convictions.  It's honestly anyone's worst nightmare.  There

16    you are working hard at your job, doing your best to make your

17    company successful, and the government swoops in one day with

18    no warning and destroys it all in a day.

19          This long nightmare needs to end for Jayson Penn and

20    for his family sitting right there.  A verdict of not guilty

21    will never give Jayson Penn back the reputation he worked for

22    30 years to earn, but a not guilty verdict will at least show

23    that our system of justice ultimately works, because in our

24    country the government can't just label someone a criminal.

25    They have to prove it in court with evidence to a jury.  Give

1    Jayson Penn back his life.  Return a verdict that speaks the

2    truth, a verdict of not guilty.  Thank you.

3             THE COURT:  Thank you, Mr. Tubach.

4             Ladies and gentlemen, we will go ahead and recess for

5    the day.  A couple of things to mention to you.  As you will

6    recall way back when at the beginning of the trial, I mentioned

7    to you that once the jury has the case and begins its

8    deliberations, then you will be deliberating on Friday, so

9    Friday you will be deliberating because we will finish up the

10   closings tomorrow.  In fact, tomorrow, ladies and gentlemen, I

11   anticipate that we should be finished with closing arguments

12   right about lunchtime, maybe just a few minutes after 12:00,

13   but it will be around that time.

14            And in that regard, by court's tradition, we will be

15   providing lunch to you tomorrow and each successive day of

16   deliberations thereafter.  So what does that mean?  Ms. Grimm

17   can tell you what that lunch will consist of.  We actually vary

18   it each day if you keep going, but that does not mean that you

19   have to have that lunch.  You don't have to have that lunch.

20   You can decide to bring your own lunch or you can decide to go

21   out to lunch.  You can decide to deliberate during lunch or you

22   can decide not to deliberate during lunch, whatever you as a

23   jury choose to do, okay?  But I did want to let you know for

24   planning purposes that we will plan lunch tomorrow for you,

25   okay?

1          Otherwise, ladies and gentlemen, keep all those

2     admonitions in mind, because I still have not released you to

3     commence your deliberations.  If people start talking to you

4     about the case, once again, turn a deaf ear to anything that

5     they may be saying to you.  And we will resume tomorrow same

6     time, 8:30, all right?  The jury is excused.

7          (Jury excused.)

8          THE COURT:  Let me mention two things.  One is just so

9     everyone is on the same page, once we finish the arguments, I

10    will be dismissing the two alternates, so just so we are on the

11    same page, the first alternate is Mr. Barcelona.  The second

12    alternate is Mr. Collins.  So I want to make sure everyone is

13    on the same page in that regard.

14          The other thing is, this doesn't have to be done

15    tomorrow, but last trial the Court was given a flash drive from

16    the government that had all the admitted exhibits on it, not

17    just the electronic ones, but all the admitted exhibits.  And

18    similarly, the defendants provided a flash drive with all the

19    defendants' admitted exhibits.  And I think that Mr. Torzilli

20    and Mr. Quinn are kind of the point people on that, but if you

21    could do the same, once again, it doesn't have to be done

22    tomorrow, but if you could aim to do that, that would be good.

23    And then we'll file that with the Clerk of the Court not for

24    public use, but just for the record.

25          And then at the end -- once the jury is told to go and

1    commence their deliberations, then we will go over exhibits,

2    and I think that Ms. Grimm has given a copy of the spreadsheet

3    to you, so like last trial, you can check that over.  That's

4    one of the things that we'll do tomorrow as well.

5           Anything else that we should talk about at this time?

6    Mr. Hart?

7           MR. HART:  Nothing from the government, Your Honor.

8           THE COURT:  Thank you.

9           Anything else on behalf of defendants?

10          All right.  We will be in recess then until

11    8:30 tomorrow.  Thank you.

12       (Recess at 4:58 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                 **INDEX**

2      **WITNESSES**

3         Robert Bryant

4             Direct Examination Continued By Mr. Torzilli    2600

5             Cross-examination By Mr. Beller                 2619

6             Cross-examination By Mr. Feldberg               2651

7             Redirect Examination By Mr. Torzilli            2676

8      **CLOSING ARGUMENT**

9         By Ms. Wulff                                        2714

10        By Mr. Beller                                       2757

11        By Mr. Tubach                                       2776

12                              **EXHIBITS**

13     **Exhibit       Offered  Received  Refused  Reserved  Withdrawn**

14     I-994                   2656

15                      **REPORTER'S CERTIFICATE**

16        I certify that the foregoing is a correct transcript from

17     the record of proceedings in the above-entitled matter.  Dated

18     at Denver, Colorado, this 5th day of June, 2022.

19

20                                  S/Janet M. Coppock

21

22

23

24

25