1     IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLORADO
2
Criminal Action No. 20-CR-00152-PAB
3    In Re: Penn III

4    UNITED STATES OF AMERICA,

5         Plaintiff,

6    vs.

7    JAYSON JEFFREY PENN,
     MIKELL REEVE FRIES,
8    SCOTT JAMES BRADY,
     ROGER BORN AUSTIN,
9    WILLIAM WADE LOVETTE,

10        Defendants
     _____

11
                    REPORTER'S TRANSCRIPT
12                  Trial to Jury, Vol. 11
     _____

13

14         Proceedings before the HONORABLE PHILIP A. BRIMMER,

15   Chief Judge, United States District Court for the District of

16   Colorado, commencing at 8:30 a.m., on the 29th day of June,

17   2022, in Courtroom A201, United States Courthouse, Denver,

18   Colorado.

19

20

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Therese Lindblom, 901 19th Street,
25       Room A257, Denver, Colorado, 80294, (303) 335-2105

1                                    APPEARANCES

2        Kevin Hart, Leslie Wulff, Paul Torzilli and Daniel

3  Loveland, U.S. Department of Justice, 450 Fifth Street N.W.,

4  Washington, DC 20530, appearing for Plaintiff.

5        Anna Tryon Pletcher and Michael Tubach of

6  O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

7  San Francisco, CA 94111-3823;

8        Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

9  N.W., Washington, DC 20006, appearing for Defendant Penn.

10        David Beller, Richard Kornfeld and Kelly Page of

11  Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

12  CO 80202, appearing for Defendant Fries.

13        Bryan B. Lavine and Laura Anne Kuykendall of Troutman

14  Pepper Hamilton Sanders, LLP, 600 Peachtree Street NE,  Suite

15  3000, Atlanta, GA 30308;

16        Megan Rahman of Troutman Pepper Hamilton Sanders, LLP,

17  1001 Haxall Point, Richmond VA 23219, appearing for Defendant

18  Brady.

19        Michael Felberg of Reichman, Jorgensen, Lehman,

20  Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21  10017;

22        Laura F. Carwile of Reichman, Jorgensen, Lehman,

23  Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

24  CA 94065; appearing for Defendant Austin.

25

1           APPEARANCES (Continued)

2           Dru Nielsen of Eytan Nielsen, 3200 Cherry Creek Drive

3    South, Suite 720, Denver, CO 80209;

4           John Anderson Fagg, Jr. and Frank Schall of

5    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

6    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

7                    *    *    *    *    *

8                         PROCEEDINGS

9           (In open court at 8:30 a.m.)

10          THE COURT:  All right.  Anything to tie up before we

11   begin?

12          MR. HART:  Two issues, Your Honor.  First, with

13   respect to this evening's festivities with the charging

14   conference, the Government would request --

15          THE COURT:  By the way, I want to make it clear

16   exactly -- we're going to talk through the issues that were

17   raised in the various proposals to amend them.  It's not

18   necessarily the final jury instruction conference.  Instead,

19   we'll just talk about whether we think that some of the

20   instructions should be modified.  But we'll have what I hope to

21   be a brief final jury instruction conference towards the very

22   end of the case, which, admittedly, is coming up soon,

23   regardless, but we'll do that as a matter of formality once the

24   evidence is either finished or almost finished.

25          MR. HART:  That's a good segue.  Yesterday, we

1  received an updated or revised witness list.  Should the

2  Government put on a rebuttal case, we just wanted to talk to

3  the Court in terms of scheduling, given the timetables, for

4  witness travel and so forth, would a Tuesday, the 5th -- again,

5  to the extent that we put on a rebuttal case, having our

6  witnesses here on Tuesday would be amenable to the Court and to

7  the parties?  We wanted to tee that up to the Court to see --

8          THE COURT:  Of course, it's a holiday weekend, and it

9  makes things a little more complicated.  What do -- what do we

10  anticipate -- do we think that the -- I didn't work out the

11  math on the schedule.  It looks like we may have -- I suppose

12  it's a chance that defense could rest tomorrow, a little bit

13  before 5 p.m.

14          Mr. Beller, do you have --

15          MR. BELLER:  I will advise the Court the defense case

16  is moving much faster than we had originally anticipated it was

17  going to.  I also imagine that Mr. Finch's testimony is going

18  to be much faster than what it was last time, the same for

19  Mr. Eddington.  I believe that our best estimate puts us done

20  and resting, absent, obviously, any clients making a decision

21  to testify, sometime midday tomorrow.

22          THE COURT:  Okay.

23          MR. BELLER:  We certainly believe there is going to be

24  sufficient time for the Government to begin the rebuttal case

25  tomorrow.

1       THE COURT:  Yeah.  Given that we may have that much

2   time, I think that it would be a good idea to have some

3   witnesses.  I'm not sure how long the Government's rebuttal

4   case may last, but if it's possible to get at least some of the

5   witnesses here, that would be a good idea.

6       MR. HART:  Mr. Loveland will address part of that.

7   We'll try our best.  But, again, as you mentioned, holiday

8   weekend and there are travel concerns.  I understand that

9   flights to Denver are few and far between, we hear the Court,

10  and we'll do our best efforts.

11      MR. LOVELAND:  That point, Your Honor, looking at the

12  transcript from yesterday afternoon, in terms of timing of the

13  argument for TS Nelson, we could let her to know to get on a

14  plane as soon as that issue is resolved.  But at this point, I

15  think she's sort of in a standby position.

16      THE COURT:  So to speak.  Let's resolve that issue

17  now.

18      The Government has -- I'm not going to hear any

19  additional argument on it.  The Government filed a notice of

20  non-expert rebuttal testimony from FBI Tactical Specialist

21  Rebecca Nelson, Docket No. 1397.  And the argument is that the

22  reserved opening statement of Mr. Brady, which was given last

23  week on Wednesday at the end of the day, opened the door to

24  having Tactical Specialist Nelson testify in the Government's

25  rebuttal case.  The defendants filed a response to that last

1    night at some point in time late, which is Docket No. 1404.

2         Do you have an update on something, Mr. Loveland?

3         MR. LOVELAND:  Your Honor, I would not want to spend

4    any of the Court's time on the briefing.  I do think that each

5    and every of the defense witnesses that has been called in this

6    case, fact witnesses, has further opened the door, and so I'm

7    prepared to give very brief remarks on that, if it would be

8    helpful to Your Honor.

9         THE COURT:  Okay.  This would be, like, in the nature

10   of a reply, go ahead, real quick.

11        MR. LOVELAND:  Yes, Your Honor.  I think the notice

12   was trying to give as much attention to the issue as possible

13   and as much of advance notice.  But, obviously, the

14   Government's ability to call a rebuttal witness hinges on --

15   not only on the opening but each defense witness that has been

16   called, and, the Government would submit, each defense witness

17   called in the case has offered an argument that would be

18   properly rebutted by TS Nelson's testimony.

19        First, Mr. Ledford in his direct examination broached

20   a topic that he hadn't broached before, and I would direct the

21   Court's attention to pages 1579 and forward in the certified

22   transcript.  Now, Mr. Ledford, of course, was examined by

23   Mr. Beller on behalf of Mr. Fries.  I mention that because

24   there was an argument of spillover prejudice to other

25   defendants.  I'll also bring this up in the context of

1    Professor Snyder, who, of course, was noticed by all of the

2    defendants.  Any concerns about spillover I think are addressed

3    there.

4        Mr. Ledford testified that there was, quote, an

5    unwritten policy that chicken suppliers could call each other

6    to cover shortages rather than go through official channels.

7    That testimony was elicited as part of the defense theme and

8    its pronounced theme through each witness to explain away the

9    calls in this case, the calls being calls between defendants

10   and their competitors.  And at issue primarily for TS Nelson is

11   the call between Scott Brady and Roger Austin.  This testimony

12   was new to this trial.  It's not something the Government could

13   have anticipated.

14       You mentioned you didn't want to know if there was a

15   problem, why is that, that was a question posed.

16       Again, if it was, like, the first example I went

17   through, the weather-related event, sort of one-off, that

18   wasn't going to be happening every week, and they were

19   shipping, I think it was, around 300 truckloads a week of

20   eight-piece, I didn't have the time in my day or did my staff

21   to worry about every single load that every single supplier was

22   producing and have to babysit the loads.

23       Mr. Ledford went on to testify that he encouraged

24   chicken suppliers to call each other.  This is a direct

25   response that the Government should be able to make through

1    TS Nelson's testimony.  That was the first witness.

2         Mr. Kronauge, who was also called by Defendant Fries,

3    picked up on this theme and gave testimony on this point as

4    well.  He said, and I quote -- this is from page 1766 of the

5    certified transcript.  I highly encourage them if they're short

6    on their mix to get it covered within the supply -- you know,

7    our supplier base.

8         Moving on, he says:  But usually I highly encourage

9    them to talk and get it covered and get it transported over to

10   a DC.  Again, this is testimony that came after the Government

11   filed its notice.  The purpose of the notice was to give the

12   defense as much time as possible.  It wasn't to suggest that

13   further evidence they offered in their case wouldn't be proper

14   for our rebuttal case as well.

15        Professor Snyder was disclosed, noticed, and

16   presumably paid for by all of the defendants, so, here the

17   spillover argument is nonexistent.  I think it's fair to call

18   Professor Snyder, a defense expert.  Professor Snyder, when he

19   was mentioning his second Nobel laureate, tried to explain away

20   communications between suppliers.  I would direct the Court's

21   attention to certified transcript page 1830 and going forward.

22   When Professor Snyder was questioned on behalf of Defendant

23   Penn, he had an answer that involved a four-step process with a

24   slide he made sure to direct the defense counsel to.

25        He talked about information exchange and argued that

1    the broiler chicken industry was one where there was a special

2    need for proper information exchange between competitor

3    companies.  He then went through four specific reasons for

4    this.  One was, of course, shortages, the flexibility of

5    supply, sourcing from multiple suppliers, which was, as he

6    acknowledged, related closely to the second, and then what he

7    described as relational contracting, the notion being because

8    chicken suppliers have ongoing relationships with their

9    customers and each other, it creates an opportunity for proper

10   exchange of information.  That's another example of this

11   defense theme.

12          Now, Your Honor, this has been raised by each and

13   every defense witness.  I don't want to rehash what was set

14   forth in the Government's brief.  I do believe Mr. Lavine's

15   argument opened the door, I think each and every witness since

16   has hit the point consistent with this testimony.  I anticipate

17   Mr. Finch will address a similar point, as well, in terms of

18   covering shortages.  I believe the door is squarely open for

19   rebuttal witness.

20          I'd also be happy to address why TS Nelson is not an

21   expert briefly, although if she were --

22          *THE COURT:*  I don't think she is.

23          *MR. LOVELAND:*  I think the Government's --

24          *THE COURT:*  I don't think she is an expert.

25          *MR. LOVELAND:*  I'm happy to answer any specific

1  questions.  I didn't want to rehash what is in the brief, but I

2  do think it's important that each and every defense witness has

3  further opened that door.

4      *THE COURT:*  First of all, on the expert point, I don't

5  find that she is an expert.  I -- reading the briefing, I get a

6  better sense of exactly what she would testify to, and she's

7  using software programs that aren't that complicated.  Is she

8  making decisions?  Yes, but everyone makes decisions, and

9  certainly law enforcement officers -- or anyone sorting data

10  may make various decisions, but the fact that he or she does so

11  does not -- the question is whether that's an exercise of

12  expertise.  And I don't find that she's exercising any

13  expertise.

14      Were she to testify about opinions regarding the

15  evidence, that could be expert testimony.  But, on the other

16  hand, it could be, yeah, within this date range, you have more

17  calls or something.  That's not a big deal.  The real issue is

18  whether there was an opening of the door.

19      All of the things that Mr. Loveland just mentioned I

20  don't find open the door.  Those aren't anything that is

21  specific at all.  As a matter of fact, those are all just

22  things that have come up in the previous trials, clearly

23  anticipated, nothing specific there.

24      Really boils down to whether the opening by Mr. Brady,

25  which was reserved and which took place last week, opened the

1    door.  I read over a transcript -- the official transcript of

2    Mr. Brady's opening, and I don't find that the door was opened.

3    There is just really one statement that says that Mr. Brady is

4    on the phone all the time with competitors, customers,

5    distributors.  He is a salesman doing his job.

6         But the fact that he may have used the phrase "all the

7    time" doesn't imply that his pattern of phone calls didn't

8    involve, you know, more phone calls during particular points in

9    time.  The phrase "all the time" just implies that he uses the

10   telephone a lot for his job.  In fact, Mr. Brady in the opening

11   doesn't suggest that there weren't phone calls during periods

12   of time when the contracts were being negotiated, so there is

13   no specific denial on that point too.

14        But -- so even though an opening can -- and we talked

15   about this I think in the last trial -- the Tenth Circuit in

16   United States v. Chavez reported at 229 F.3d 946, from 2000, an

17   opening statement can open the door, so defendants' opening can

18   open the door, although that case I think implied by opening

19   the door, it didn't mean that the Government could wait until

20   the rebuttal -- its rebuttal case to put on any evidence;

21   instead, maybe that would open the door to putting on evidence

22   in its case in chief.  But by reserving opening, that, you

23   know, could, since the Government had already finished its case

24   in chief, open the door to having something take place in the

25   rebuttal -- in its rebuttal case.  But, you know, even if the

1    reserved opening opened the door, I would still find that the

2    Government had to put it on in its case in chief, because

3    Mr. Fries' opening statement was essentially the same thing.

4    Essentially, there is no material difference in terms of that

5    particular type of statement.

6            So the Government had the opportunity, it had the

7    opportunity to do it in the case in chief, but that was already

8    precluded.

9            Moreover, these are arguments that were -- that could

10   have been anticipated in any event.  So the Court does not find

11   that Mr. Brady's opening opened the door, that any of the other

12   testimony that the defendants have put on so far have opened

13   the door.  Of course, we'll see whether another witness could

14   open the door, such as Mr. Finch.  But the defendants have

15   disclaimed any testimony to that effect.

16           So we'll see, but at least at this point in time, I am

17   going to rule that Tactical Specialist Nelson's testimony is

18   not proper rebuttal testimony and will forbid her from

19   testifying about the subjects that are mentioned in Docket

20   No. 1397.

21           All right.  Let's bring the jury in.

22           *MR. BELLER:*  Your Honor, may I also bring in

23   Mr. Finch?

24           *THE COURT:*  Yes.  Thank you.

25           (Jury in at 8:47 a.m.)

Gregory Finch – Direct

1        THE COURT:  Thank you.  Please be seated.

2            Mr. Beller, whenever you're ready, go ahead.

3          (**GREGORY FINCH, GOVERNMENT'S WITNESS, SWORN**)

4              **DIRECT EXAMINATION CONTINUED**

5    *BY MR. BELLER:*

6    *Q.*  Good morning, Mr. Finch.  Mr. Finch, to orient the jury as

7    to where we were yesterday, we spent a few minutes talking

8    about Mrs. Doris Fries.  Do you recall that?

9    *A.*  Yes.

10   *Q.*  Does Mrs. Doris Fries still have a role within the

11   operation of Claxton Poultry?

12   *A.*  Oh, very much so.  She's very active in the business and

13   serves as our chairman and as our CEO.

14   *Q.*  So we also spoke just a little bit about Mr. Mikell Fries'

15   promotion to the role of president.  During the 2012

16   negotiations for the 2013 KFC contract, who was president of

17   Claxton Poultry?

18   *A.*  Jerry Lane.

19   *Q.*  And who was the director of sales during that period of

20   time?

21   *A.*  Tom Scarborough.

22   *Q.*  In the 2013 negotiation for the 2014 KFC contract, who was

23   president of Claxton Poultry?

24   *A.*  Jerry Lane.

25   *Q.*  Who was the director of sales?

Gregory Finch - Direct

1   *A.*   Tom Scarborough.

2   *Q.*   How about the 2014 negotiation for the 2015 KFC contract,

3   same two questions?

4   *A.*   Same answer, Jerry Lane and Tom Scarborough.

5   *Q.*   And so yesterday you testified that Mikell Fries became

6   president in 2015; is that correct?

7   *A.*   I did say that.

8   *Q.*   And have you had the opportunity to give it more thought

9   after hearing these questions?

10  *A.*   Yes.

11  *Q.*   Do you have knowledge or do you recall when Mikell Fries

12  became the president of Claxton Poultry?

13  *A.*   Internally, February of '16, and we announced it externally

14  March of '16.

15  *Q.*   Okay.  Thank you.  Thank you, Mr. Finch.

16         So we were also talking about the customer providing

17  Claxton Poultry feedback on its prices.  And so I want to pick

18  up on that same line of questioning.  Okay?

19  *A.*   Okay.

20  *Q.*   To the best of your knowledge, Mr. Finch, has Claxton

21  Poultry ever refused to reduce its price when the customer

22  gives feedback on what it takes to be priced in the middle?

23         *MR. LOVELAND:*  Objection, Your Honor.  Foundation.

24         *THE COURT:*  Sustained.

25

Gregory Finch - Direct

1    *BY MR. BELLER:*

2    *Q.*  Mr. Finch, are you familiar with feedback given to Claxton

3    Poultry by the customers?

4    *A.*  Yes.

5    *Q.*  How so?  How are you aware of that feedback?

6    *A.*  Well, part of the process, once we've submitted a bid, is

7    for the customer to give us feedback on where we are on the

8    bid, changes they would like to make and so forth.  Once we

9    receive that feedback back, typically through Scott, then

10   Mikell and I will have an internal conversation about what the

11   QSRs say --

12   *Q.*  And so --

13   *A.*  -- what they're telling us we need to do.

14   *Q.*  Excuse me for interrupting you, Mr. Finch.

15        Let's speak a little more specifically about KFC.  To

16   the best of your knowledge, with your role in determining

17   pricing and bidding, does RSCS or KFC provide feedback after

18   every round of bid?

19   *A.*  Most every round, yes.

20   *Q.*  And when the customer gives feedback, what is that

21   feedback -- what form does that feedback take?

22   *A.*  Various forms.  Could be an email, could be a phone call,

23   could be an in-person meeting.

24   *Q.*  Does the feedback ever include raising prices?

25   *A.*  Not to my recollection.

Gregory Finch – Direct

1    Q.  Does the feedback include direction on what it will take to

2    reach a certain volume?

3    A.  Absolutely.

4    Q.  Does the feedback ever take a form of, here is where you

5    need to be in order to be in the middle?

6    A.  Yes.

7    Q.  And do you receive that feedback, or you do hear -- are you

8    a participant in receiving that feedback?

9    A.  Yes.

10        MR. LOVELAND:  Objection, Your Honor.  I don't think

11   the witness has testified to any client-facing interaction.  I

12   think there is a foundational issue here.

13        THE COURT:  Overruled.  He just answered the question.

14   Go ahead.

15   BY MR. BELLER:

16   Q.  And based on that feedback, Mr. Finch, are you a

17   participant in determining what Claxton Poultry's response is

18   going to be back to the customer regarding the next round bid?

19   A.  On occasion.  Mikell has the ultimate pricing authority, so

20   he doesn't need me to make that decision, but he will consult

21   me from time to time saying, Hey, KFC is saying this, what do

22   you think?  At the end of the day, we have to follow their

23   guidance because they're the only ones that can put us in the

24   middle.

25   Q.  And are you personally aware in your role as CFO of Claxton

Gregory Finch - Direct

1   Poultry ever, ever taking a position of refusing to follow the

2   QSRs' feedback?

3   A.   No.

4   Q.   Mr. Finch, do you see the contracts that come out of QSR

5   negotiations?

6   A.   Yes.

7   Q.   And in -- do you see every contract that comes out of QSR

8   negotiations?

9   A.   Most every contract.  Some don't make it down to me.

10  Q.   And every contract that you have seen for QSR business, do

11  the contracts reflect a reduction in price at the direction of

12  the customer?

13  A.   Yes.

14  Q.   Mr. Finch, how large is Claxton Poultry in relation to the

15  rest of the poultry market?

16  A.   Approximately 1 percent.

17  Q.   Do you -- by being 1 percent of the poultry market, do you

18  have knowledge of whether other QSR producers can handle

19  Claxton's share of, say, KFC?

20  A.   Yes.

21  Q.   And what is that knowledge?

22  A.   It would be fairly easy for them to absorb our production.

23          MR. LOVELAND:  Objection, again, Your Honor.

24  Foundation.

25          THE COURT:  Overruled.

Gregory Finch - Direct

1   *BY MR. BELLER:*

2   *Q.*   Do you, Mr. Finch, have knowledge of how important Claxton

3   is to the larger QSR supply chain?

4   *A.*   Yes.

5   *Q.*   What is Claxton's role?

6   *A.*   Well, being a small player in the industry, our geographic

7   location is very advantageous for the QSRs, because we can

8   service Georgia, Florida, South Carolina, Alabama, North

9   Carolina.   So the pricing that you might hear me talk about is

10  a Claxton plant price.   In other words, there is no freight in

11  that number.   So when we're shipping that product to the

12  various distribution centers or to the actual stores, freight

13  has to be added to that.   So our geographic location allows us

14  to service those restaurants for them efficiently.

15         In addition to that, I mean, we've been in business

16  for 73 years, so we've been a very consistent partner for the

17  QSRs.   We've been in the supply chain with them for 20, 40, 50

18  years, so, clearly, we've done a good job to be allowed to stay

19  in the joint supply network for that long, because even in the

20  time period I've been at Claxton, I've seen some fall out of

21  some -- some producers fall out of various QSR supply chains.

22  *Q.*   Are --

23  *A.*   Clearly we have a role.

24  *Q.*   Thank you, Mr. Finch.

25         So a follow-up question, to break that down just a

Gregory Finch - Direct

1    little bit.  Is it cheaper or less expensive to transport

2    chicken from Claxton, Georgia, to a Chick-fil-A in Orlando than

3    what it would be a Pilgrim's plant in Mayfield, Kentucky?

4    A.   Yes.

5    Q.   Why?

6    A.   Well, freight is largely based on distance and, you know,

7    fuel pricing.  And so the distance from Mayfield, Kentucky, to

8    Orlando is further than Claxton, Georgia, to Orlando.  So the

9    freight component of that is going to be more expensive.

10   Q.   And is Claxton Poultry one of the southern --

11   southeasternmost chicken plants -- the most southeastern

12   chicken plant in the entire country?

13   A.   We are.

14   Q.   And the closest to Florida?

15   A.   Maybe.  I'm not -- I'm not 100 percent sure on that.

16   Q.   Okay.  Let me ask a cleaner question.  One of the closest

17   plants to Florida?

18   A.   Certainly.

19   Q.   That means one of the closest plants to Disney World, for

20   example?

21   A.   Correct.

22   Q.   I want to switch gears, Mr. Finch, and talk a little bit

23   about the cost-plus contract.  Are the line items in a

24   cost-plus contract given to the QSR customer?

25   A.   Yes.  They dictate to us what they want to know in their

Gregory Finch - Direct

1    form, and then we give them that information.

2    Q.  And what are the types of things that they want included in

3    the cost-plus formula?

4    A.  It would be feed cost, grower pay, utilities, labor,

5    depreciation, overhead, marination costs, yields, feed

6    conversions, just to name a few.

7    Q.  What -- you mentioned feed conversion.  Can you explain to

8    the jury what feed conversion is.

9    A.  Sure, feed conversion is how many pounds of feed it takes

10   to convert to 1 pound of meat.  If it takes 2 pounds -- if I

11   have a feed conversion of 2.0, that means 2 pounds of feed

12   converts to 1 pound of finished product.

13   Q.  Is that how much corn and soybean meal a chicken is going

14   to eat before it's actually processed?

15   A.  Yes.

16   Q.  Is that different depending on the size of the chicken?

17   A.  Yes.

18   Q.  So if a grower is wanting to grow, say, a 4-pound chicken,

19   lightweight, is that going to take a different amount of feed

20   than a grower who is trying to grow, say, an 8 or a 9-pound

21   chicken?

22   A.  Yes.

23   Q.  So when you say these cost line items, does that mean that

24   it's a cost to Claxton Poultry?

25   A.  Yes.  It's our actual labor cost, depreciation cost, you

Gregory Finch - Direct

1    know, whatever those variables are.  There is between 40 and 60

2    of them, I think, on that three- or four-page Excel

3    spreadsheet.  So it's whatever our actual costs are, any known

4    costs -- increases we know are coming to us in the next year.

5    If we're going to do a labor increase, utility bills are going

6    up, packaging is going up, we put those costs into our actual

7    cost in to projecting what our actual cost is going to be for

8    that next period.

9    Q.  So when these are being transmitted to the customer, does

10   the customer simply get a bid that shows, here is how much

11   we're going to charge you?

12   A.  Well, they get the bid in the format that they ask us to

13   submit it in, so it's a multipage Excel spreadsheet that they

14   get back.  It has all of those cost components on there that

15   add together with another line item -- when you hear the term

16   "plus," the plus in this model is what is called margin.  So

17   the cost is the cost, and then the plus is the margin.  So the

18   adding of the cost plus the margin gets me to the bottom-line

19   price that we're going to charge the QSR.

20   Q.  And so, Mr. Finch, to break this down just a little bit

21   further, does that also mean that RSCS buying chicken from

22   Claxton Poultry knows how much you're paying your employees,

23   for example?

24   A.  They don't know the actual wage rate, but they know how

25   much labor it's costing for us to produce their chicken to

Gregory Finch - Direct

1  their size and their specification, yes.

2  Q.  And so that labor, you know, while they may not know the

3  dollar an hour that a line worker is making, they know how much

4  labor was spent to produce that one chicken?

5  A.  Correct.  All the way up to the fourth decimal place.

6  Q.  Okay.  So does that mean, Mr. Finch, that from your

7  perspective the pricing of RSCS chicken is a transparent one,

8  transparent towards the customer?

9  A.  I'm not a fan of transparent.  I think it's a little

10  ambiguous.  I like to call it open, because we're laying for

11  bare what our actual costs are to make the chicken that they've

12  asked us to make for them.  I think it's a very open process.

13  Q.  So, you know, if Claxton Poultry, for example, needs to put

14  before a whole bunch of expenditures to repair equipment or

15  outfit the plant with COVID protocols, is that something that

16  the customer can see from one year to the next?

17  A.  They wouldn't see the granularity of those exact costs, but

18  they would certainly see that our plant costs had gone up,

19  labor costs had gone up from 2019, non-pandemic, to 2020,

20  pandemic.

21  Q.  Does that mean where they can see increases, whether it's

22  labor, feed conversion, plant cost, how it changes from one

23  year to the next?

24  A.  Sure.  They have the information too.  Yes.

25  Q.  Mr. Finch, to your knowledge, as the CFO, do customers ever

Gregory Finch - Direct

1  tell you to change certain cost data entries in these models?

2  A.  Yes.

3  Q.  So what does that look like?  Give us an example of what

4  that may sound like or look like.

5  A.  Sure.  So we'll present the model to KFC, let's say, and

6  then we'll get feedback from Mike Ledford, Mary Hester, whoever

7  the buyer happens to be for that contract period, and they'll

8  say, Your labor is a penny too high or your depreciation seems

9  high or your box and packaging number seems high compared to

10  where you were last year and to compared to where we're seeing

11  the other broiler producer prices come in, because we're all

12  doing the RFP at the same time.  So they not only are able to

13  look at my cost year over year, but they're also able to lay my

14  cost next to those other eight or nine or ten suppliers in the

15  supply chain to kind of see where everybody is.

16  Q.  So the customer, however, doesn't actually know what your

17  payroll system is cutting out or pushing out or how much -- how

18  big that check is, but they're telling you that your labor

19  costs are too high and to pull it down in the model.  Is that a

20  summary of what you said?

21  A.  Yes.  So if -- I think of those 40 or 50 variables I talked

22  about as levers for the QSR to move.  But at the end of the

23  day, they want to get to whatever that bottom-line price is.

24  So they might pull a labor lever, not knowing what the actual

25  number is -- they just know that we're higher than everybody

Gregory Finch - Direct

1   else -- to try to get us to the number they're trying to get us

2   to.  Does that make sense?

3            So if our cost-plus model came in at a dollar 1, let's

4   say, and they wanted us to get to a dollar, they may pick out

5   the labor as the thing that gets us to the dollar and say we're

6   a penny too high.  Does that make sense?

7            So that's -- that's how that process would work or the

8   feedback from them would work.

9   Q.  So they'll ask you to pull down a cost in this model

10  without actually knowing what your actual real costs are?

11  A.  Correct.

12  Q.  What QSR customers, Mr. Finch, actually used a cost-plus

13  model?

14  A.  Well, that traditional cost-plus model I just described

15  would be used by KFC and Popeyes.

16  Q.  Did Chick-fil-A use a similar model with some different

17  factors and call it something different?

18  A.  Yes.

19  Q.  What is that?

20  A.  It -- they call it the grain model, which I call a quasi

21  cost-plus, because unlike the 40-variable one I just described,

22  the main variables in the grain model is corn and soybean, with

23  an escalator and de-escalator for wings and dark meat.  They're

24  not looking at our cost of production like the eight-piece

25  customers do.

Gregory Finch - Direct

1  Q.  Who develops this cost-plus model, and by that what I mean

2  is, the spreadsheet itself and the different categories?

3  A.  The QSR dictates the spreadsheet to us.  They send us the

4  template to use.

5  Q.  How do you -- well, let me back up.  Do you as the CFO

6  determine the individual costs to fill in that spreadsheet?

7  A.  Yes.

8  Q.  How do you do that?

9  A.  Well, I take my general ledger that has my actual cost in

10  it through the month, let's say, for instance, that we're doing

11  an RFP in October of the year, so I would use my actual cost in

12  my general ledger through September as those costs, and then as

13  I said, I'll add anything that I know is coming to me for the

14  next year, and then that forms the basis for my actual cost to

15  go into that model for submission to the QSR.

16  Q.  And one of the costs that you had mentioned, Mr. Finch, is

17  feed; is that right?

18  A.  It is, yes.

19  Q.  The feed meaning, primarily, corn and soybean meal?

20  A.  They're the largest components, but there are certainly

21  many components that go into the calculation.

22  Q.  Who determines the cost of the corn and soybean meal that

23  you put into that model?

24  A.  The bid model?

25  Q.  Yes.

Gregory Finch - Direct

1    A.   The QSR does.  What they typically do is kind of levelize

2    everybody at the beginning of the process, and they'll say in

3    your RFP, you use $4 for corn and $400 for soybean meal.  So we

4    just -- we plug that into that number so that way it kind of

5    levelizes the cost component of the bid for all of the

6    producers.  And so now the variation is, you know, Pilgrim's

7    labor rates that might be different than Claxton's or Tyson or

8    whatever the case may be, you know, you're looking at the

9    variables of production for that particular producer because

10   they've kind of taken the feed cost component out.

11   Q.   So is the price of corn and the price of soybean meal the

12   same price year-round?

13   A.   No.

14   Q.   How does it vary?

15   A.   Well, it's priced off the Chicago Board of Trade.  And so

16   based on whatever variables are impacting that market, you

17   know, usage, those types of things, planting intentions, yields

18   on the crops, all of those kind of things would impact what the

19   Chicago Board of Trade quote would be for the corn or the

20   soybean meal.

21   Q.   And so how does the model reflect this variation in corn

22   and soybean over a period of time?

23   A.   Well, so I was just describing to you the bid process.

24   There is another thing called period pricing.  And the QSR not

25   only tells us what price to use for the bid, they also tell us

Gregory Finch - Direct

1    how much, when, and at what price to buy corn and soybean

2    throughout the year.  Okay.  And then we do that.  And whatever

3    those numbers are -- let's say for January, we would use

4    October, November, and December's numbers.  The average of

5    those three months, where they've dictated us to buy, becomes

6    the price of the feed for the January period pricing.

7    Q.  Okay.  Thank you.  I appreciate that.

8         There is another number in that cost-plus model, and

9    the other number I want to ask about is margin.  For Claxton

10   Poultry, is margin the same thing as profit?

11   A.  No.

12   Q.  What is it?

13   A.  Well, as I said a little bit earlier, the margin is the

14   plus of the cost-plus component.  Our approach is that each one

15   of those individual line items remain our cost regardless of

16   what the QSR says.  If they say, You're a penny high on labor,

17   you need to take that out, we make that adjustment in the

18   margin line, because at the end of the day, we're trying to get

19   to the price of the QSRs moving us to, but -- but we want our

20   cost to be our cost.  When I look at my general ledger next

21   year, I can look at it and say, Okay, there is that number.  If

22   I start moving numbers around on the cost line, that gets

23   confused.

24        So for us, that margin number kind of becomes the

25   lever that Mikell pulls.  Not only is it not a profit, it's not

Gregory Finch - Direct

1   a cost, but that's one of the levers that Mikell will pull when

2   the QSR is giving us guidance to move down.  He'll reduce the

3   amount in the margin line in order to get us to the price

4   they're trying to get us to.

5   Q.  To sum that up in a simple way, does that mean that that

6   margin line for Claxton Poultry is a bit of a cushion so that

7   you can pull out of it in order to make sure that your other

8   cost line items remain accurate?

9   A.  Yeah.  For us, it's like a plug-to-balance to get where the

10  QSR wants us to.

11  Q.  Does the customer also weigh in and dictate or provide

12  feedback what margin goes into that category?

13  A.  Yes.

14  Q.  So with this understanding of the cost-plus model,

15  Mr. Finch, how does a cost-plus model protect the buyer or the

16  customer?

17  A.  The QSR?

18  Q.  The QSR.

19  A.  So as I said earlier, it's a very open process.  So we're

20  giving them what the cost is for them -- for us to produce the

21  product they're asking us to produce.  And for them, they have

22  all of these levers now that they can pull to move the

23  suppliers to the price they're trying to get the bottom-line

24  price to.  So, you know, that open -- you know, process -- and

25  those levers they're allowed to pull, allows -- ultimately

2012

Gregory Finch - Direct

1    allows them to dictate what the price is going to be.

2    Q.  When you say open process, open process, you're talking

3    about open between Claxton Poultry, as the supplier, and KFC,

4    for example, as the buyer?

5    A.  Correct.

6    Q.  That's the open relationship?

7    A.  Correct.

8    Q.  You mentioned period pricing, and I want to ask you a

9    little bit more about period pricing.  So once Claxton Poultry

10   inputs all of its costs, including that cushion of margin, and

11   comes to an agreement with the customer on price, does that

12   price stay the same all year long?

13   A.  No.

14   Q.  Will you explain why not?  I think you started to, I

15   stopped you.  Would you explain why it doesn't stay the same

16   all year long?

17   A.  Sure.  So once we agreed on a price and a volume with the

18   QSR customer, they give us what is called a pricing calendar,

19   and that pricing calendar breaks down the year in the pricing

20   periods that they would like us to send those prices to them.

21   Typically, there is a due date on that calendar that says

22   January 1 pricing is due December 20.  They give us when to

23   give it to them and then what date the calendar is covering.

24   So as a general rule, the QSRs file a regular calendar, January

25   to December.

Gregory Finch - Direct

1              Chick-fil-A, in particular, likes to do a two-month

2     pricing model, so their pricing -- they may have six pricing

3     periods in a year.  KFC is a little bit of an outlier.  For

4     some reason, they like 13 periods.  They kind of slice a

5     regular calendar up into 13 periods.

6     Q.  To put it simply, for Claxton, when you have a contract,

7     when the cost of feed changes, either goes up or goes down, the

8     price that is given to the customer also changes by going up or

9     going down?

10    A.  Correct.

11    Q.  Okay.  Do customers -- to your knowledge, Mr. Finch, ever

12    ask Claxton -- QSR customers -- to lower a price in the middle

13    of a contract period?

14    A.  Yes.

15    Q.  When and how does that happen?  Perhaps a better question

16    is, why and how does that happen?

17    A.  Well, the why is because they can.  The how it happens is,

18    they call us or they email us or whatever the case may be and

19    say, We want you to come down.

20    Q.  Okay.  How are you, Mr. Finch, involved in the period

21    pricing?

22    A.  With the period pricing, as I described, we have a period

23    pricing schedule, which is given to me and to my controllers,

24    as well as my executive assistant.  We load that into our

25    regular Outlook calendar to give us a call-up of when the

Gregory Finch - Direct

1    pricing is due.  And then either myself or one of my

2    controllers will update the feed component a day or so before

3    the model is due to the QSR, and that will -- when we update

4    that, it will update the price.  It will go up or it will go

5    down or it will stay the same if feed costs didn't change.

6            And then we typically send that to Scott and sometimes

7    Mikell just to kind of get another set of eyes on that model,

8    make sure we haven't missed anything, made any mistakes.  On

9    occasion, Scott will contact the QSR, just, you know, to

10   double-check a feed cost or make sure we haven't missed a

11   marketing accrual or one of their -- their fees that they add

12   to the model so we don't get embarrassed by sending the model

13   and they are going, Hey, you forgot this, then we have to fix

14   it and resend it.

15           After that process, then Scott will kind of give us

16   the high sign and say, Hey, I'm good with this.  And then

17   myself or one of my controllers will sent it to the QSR.

18   Q.  So how often is that period pricing model sent to the QSR

19   customer?

20   A.  Well, depends on their calendar, as I was describing

21   earlier.  So for KFC, for instance, it would be 13; for

22   Popeyes, it would be 12; for Chick-fil-A, it would be 6.

23   Q.  Times a year?

24   A.  Correct, times per year.

25   Q.  So every time there is a new period, the prior period's

Gregory Finch - Direct

1  model gets sent to the QSR?

2  A.  Correct.

3  Q.  Okay.  So having explained period pricing, Mr. Finch, does

4  that mean that period pricing is the same thing as current

5  pricing?

6  A.  Yes.

7  Q.  So we'll talk about covers and shorts in just a moment, but

8  when Claxton sells chicken to another supplier, another chicken

9  grower, is the period price the price that is -- the cover and

10  short is actually determined at?

11  A.  Yes.

12        MR. LOVELAND:  Objection.  Foundation and speculation,

13  Your Honor.

14        THE COURT:  I'm going to sustain the objection.  I

15  can't remember if he just testified about his knowledge on

16  covers and shorts as to that issue, so I'll sustain the

17  objection.  If you could lay a foundation.

18        MR. BELLER:  I'm happy to.

19  BY MR. BELLER:

20  Q.  Mr. Finch, are chicken suppliers also customers of Claxton

21  Poultry?

22  A.  Yes.

23  Q.  How so?

24  A.  Well, each QSR has a group of approved producers, and they

25  vary by QSR.  So within that supply chain, let's say KFC, for

Gregory Finch - Direct

1   instance, the eight or nine of us that are producing for KFC

2   are producing, essentially, the same size bird to exactly the

3   same specification.  So within that network, even though their

4   sign outside says Tyson, for instance, they're a customer of

5   Claxton because we have to make sure that the supply chain

6   stays moving.  If one of the producers inside of that approved

7   network has an operational issue, has a bird health issue,

8   labor doesn't show up, whatever the case may be that creates a

9   short, then the others in that approved supply chain need to

10  try to cover that short so that the overall supply chain

11  doesn't drop and you show up to the restaurant to get your

12  chicken sandwich and you can't because they don't have meat in

13  the store.

14  Q.   So are competitors chicken competitors, and are they also

15  chicken customers?

16  A.   Yes.

17  Q.   And vice versa?

18  A.   Yes.

19  Q.   And, Mr. Finch, putting it simply, does that mean that

20  Claxton chicken sells to Pilgrim's Pride?

21  A.   Yes.

22  Q.   Does Claxton chicken sell to Tyson?

23  A.   Yes.

24  Q.   To Perdue?

25  A.   Yes.

2017

Gregory Finch - Direct

1   *Q.*  To any of the other chicken suppliers for that QSR

2   customer, does Claxton chicken sell that producer chicken?

3   *A.*  Yes, anyone in that supply chain, regardless of what their

4   name is on the outside of their building, is subject to be a

5   customer, even though they're also a competitor.

6   *Q.*  And so when you say customer -- excuse me -- QSR, in this

7   case, we're talking about KFC, CFA, Chick-fil-A, Popeyes,

8   right?

9   *A.*  Correct.

10  *Q.*  How about, does Claxton also buy and sell chicken from

11  other producers for other non-QSR customers?

12  *A.*  On occasion we have, yes.

13  *Q.*  How about -- so I asked you about selling chicken.  How

14  about buying chicken?  Does Claxton Poultry from time to time

15  have a need to purchase chicken from another producer for

16  purposes of fulfilling an order?

17  *A.*  Yes.

18  *Q.*  When that happens, do you see the invoices?

19  *A.*  Yes.

20  *Q.*  When that happens, does Claxton Poultry charge the other

21  producers a dollar amount for having supplied them chicken?

22  *A.*  Yes.

23  *Q.*  When Claxton Poultry needs to purchase chicken, does

24  Claxton Poultry purchase chicken for free?

25  *A.*  No.

Gregory Finch - Direct

1    *Q.*  Is there a dollar amount that is put on that product?

2    *A.*  Yes.

3    *Q.*  And do you have knowledge of the dollar amounts -- maybe

4    not the dollars and cents -- but at least an understanding as

5    to what price the chicken is both bought and sold for?

6         *MR. LOVELAND:*  Objection.  Speculation and foundation.

7    He can't know how other chicken suppliers set their prices,

8    Your Honor.

9         *THE COURT:*  Overruled.

10   *BY MR. BELLER:*

11   *Q.*  Do you have a knowledge, Mr. Finch, as CFO of Claxton

12   Poultry, how much money Claxton Poultry is paying and/or

13   charging for the sale and purchase of chicken from other

14   suppliers?

15   *A.*  Yes.  I mean, once a buy or sell is agreed to, then POs

16   have to be exchanged.  We just don't do this on handshake.  So

17   a purchase order is issued by us or by the other company,

18   depending on who is buying or selling, and that purchase order

19   memorializes the terms, how many pounds, how many cases, what

20   the dollar per pound, delivery instructions, if there is a

21   requirement for a kill certificate.  All of those kind of

22   things, you know, form the whole basis of that transaction.

23   *Q.*  And are -- is that price -- is the price that you charge

24   the same thing as your current price for that QSR customer, in

25   other words, the period price?

Gregory Finch – Direct

1    A.  Yes.  When we do covers and shorts, we buy and sell at the

2    then-current period price.

3    Q.  So does that also mean, Mr. Finch, that when you buy and

4    sell from another producer that you learn the other producer's

5    current period price under that contract?

6            MR. LOVELAND:  Objection, Your Honor.  He can't know

7    how other chicken suppliers set price.  Foundation.

8            THE COURT:  Overruled.  He can answer if he knows.

9            THE WITNESS:  Yes, we buy -- they tell us what price

10   to put on the purchase order.

11   BY MR. BELLER:

12   Q.  And how about in reverse, when you're selling chicken, do

13   you know, Mr. Finch, what price you sell that chicken for?

14   A.  Yes.

15   Q.  And is it your current period price?

16   A.  It is, yes.

17   Q.  And so, same question, does that mean that if you're

18   putting your current period price on an invoice and sending the

19   invoice to Pilgrim's, does Pilgrim's Pride read the invoice and

20   see the price that they're paying you for chicken?

21   A.  Yes.

22   Q.  And is that the current period price?

23   A.  Yes.

24   Q.  All of that, you have knowledge of?

25   A.  Yes.

Gregory Finch - Direct

1    *Q.*  Is it pretty common knowledge?

2    *A.*  Yes.  Happens on almost a daily basis.

3    *Q.*  Is it pretty common knowledge for an entire industry?

4    *A.*  Yes.

5    *Q.*  Okay.  Mr. Finch, I want to show you Government's -- excuse

6    me, it's Exhibit 1427.

7         *MR. BELLER:*  Your Honor, if I may also distribute some

8    binders, please?

9         *THE COURT:*  You may.

10   *BY MR. BELLER:*

11   *Q.*  Let me know when you're ready, Mr. Finch.

12   *A.*  Okay.  Sorry.

13   *Q.*  Mr. Finch, on your screen is 1427.

14        *MR. BELLER:*  Your Honor, I do believe that this is

15   already admitted, and I'm asking that it be published.

16        *THE COURT:*  It has been admitted and may be published.

17   *BY MR. BELLER:*

18   *Q.*  Mr. Finch, I want to draw your attention to line 61.  I'm

19   going to ask you to take a moment to review that particular

20   line.  Let me know once you've had the opportunity to do so.

21   *A.*  Okay.

22   *Q.*  Okay.  Mr. Finch, you were not a participant in this

23   conversation; is that right?

24   *A.*  Correct.  I am not.

25   *Q.*  So I'm not going to ask you to interpret what may have been

Gregory Finch - Direct

1    in one person's head versus another.  Okay?

2    A.   Okay.

3    Q.   Mr. Finch, the use of the term "this month," in your

4    knowledge, is that consistent with terminology used to describe

5    period pricing?

6    A.   Yes.

7    Q.   How do you -- how do you know?  Why do you have that

8    belief?

9    A.   Well, the pricing schedule I mentioned earlier largely

10   follows the lunar calendar, so it's following a

11   January-to-December month, so it would not be uncommon for a

12   QSR producer to say period pricing or monthly pricing.  They're

13   kind of interchangeable.

14   Q.   And so "this month" would refer to the price for that

15   month -- that time period, in your knowledge?

16   A.   Correct.

17   Q.   Okay.  So, Mr. Finch, I want to show you -- well, in that

18   case -- so we have this month, he is 3 cents higher.  Would

19   another producer being 3 cents higher to you mean that the

20   period price or the current price was 3 cents higher than

21   Claxton's current price?

22   A.   Yes.

23   Q.   Mr. Finch -- I'm done with this exhibit.  Thank you.

24            If I can, I can show you -- this is just for counsel

25   and the witness -- A-552.

Gregory Finch – Direct

1          Mr. Finch, if you can take a moment and review A–552.

2    Once you've had an opportunity to review that, let me know.

3    *A.*  Okay.

4          *MR. BELLER:*  If I may show to the witness, please, and

5    parties, A–553.

6    *BY MR. BELLER:*

7    *Q.*  Let me know when you've had the opportunity to review

8    A–553.

9    *A.*  Okay.

10         *MR. BELLER:*  And, Mr. Brian, if we can have those side

11   by side for the witness and the parties, please.

12   *BY MR. BELLER:*

13   *Q.*  Mr. Finch, are you familiar with A–552 and A–553?

14   *A.*  Yes.

15   *Q.*  In your role as CFO, do you have from time to time the

16   opportunity to review documents similar to A–552 and A–553?

17   *A.*  Yes.

18   *Q.*  And are these things that you rely on in the performance of

19   your duties and responsibilities as chief financial officer of

20   Claxton Poultry?

21   *A.*  Yes.

22   *Q.*  And do these documents have legal significance or legal

23   consequence for Claxton Poultry?

24   *A.*  Yes.

25   *Q.*  Are these documents and these types of documents kept in

2023

Gregory Finch - Direct

1  the ordinary course of business for Claxton Poultry?

2  *A.*  Yes.

3      *MR. BELLER:*  Your Honor, at this time, I would move

4  for the introduction of A-552 and A-553.

5      *THE COURT:*  And which is the cover email?

6      *MR. BELLER:*  Excuse me for not being more clear.  Your

7  Honor, the cover email is A-552.

8      *THE COURT:*  Okay.

9      *MR. BELLER:*  And the attachment is A-553.

10     *THE COURT:*  Any objection, first of all, to the

11  admission of A-552?

12     *MR. LOVELAND:*  No objection to A-552 or A-553, Your

13  Honor.

14     *THE COURT:*  Okay.  Then both will be admitted.

15     *MR. BELLER:*  Thank you.

16     *THE COURT:*  And may be displayed.

17     (Exhibit A-552 admitted.)

18     (Exhibit A-553 admitted.)

19     *MR. BELLER:*  If we can have these in the current form

20  on the screen published, Mr. Brian.  Thank you.

21  *BY MR. BELLER:*

22  *Q.*  Mr. Finch, what is the date on A-552?

23  *A.*  October the 29th of 2012.

24  *Q.*  And can you very briefly explain to the jury what A-552 and

25  A-553 is?

Gregory Finch – Direct

1    *A.*  Sure.  A-552 is an email that was sent by Ken Hutcheson, my

2    controller, to Mike Ledford, a copy to Carol Knight, Scott

3    Brady, and myself, in order to introduce the attachment to

4    that email, which is 553, which is Claxton Poultry's period

5    price for November.

6    *Q.*  Thank you.

7          Mr. Finch, if you can take a moment -- this is just

8    for the witness and the parties -- and look at I-296 and I-297.

9    *A.*  Okay.

10   *Q.*  Mr. Finch, are you generally familiar with what these two

11   documents are?

12   *A.*  Yes.

13         *MR. BELLER:*  Your Honor, pursuant to agreement of the

14   parties, I now move for the introduction of I-296 and I-297.

15         *THE COURT:*  Any objection to the admission of I-296

16   and I-297?

17         *MR. LOVELAND:*  None, thank you, Your Honor.

18         *THE COURT:*  Both will be admitted.

19         (Exhibit I-296 admitted.)

20         (Exhibit I-297 admitted.)

21         *MR. BELLER:*  And if I may please publish, Your Honor.

22         *THE COURT:*  You may.

23   *BY MR. BELLER:*

24   *Q.*  Mr. Finch, what is I-296 and I-297?

25   *A.*  I-296 appears to be a cover email from Roger Austin to

Gregory Finch - Direct

1   Mike Ledford, Carol Knight, copying several Pilgrim's

2   employees, introducing the attachment to that, which is their

3   period pricing for November.

4   Q.  And so period pricing -- and this is for which customer?

5   A.  This would be for Pilgrim's, this particular document.

6   Q.  I'm sorry, for which QSR customer?

7   A.  I'm sorry.  KFC.

8   Q.  So is Claxton's period pricing also for KFC for the same

9   period of time?

10  A.  Yes.

11  Q.  Is the date on this exhibit, the Pilgrim's period price,

12  also October 29?

13  A.  Yes.

14  Q.  Mr. Finch, I want to show Government Exhibit 1427 just a

15  moment again.

16          What is the date shown on Government Exhibit 1427?

17          MR. BELLER:  And if I may publish, please?

18          THE COURT:  You may.

19          THE WITNESS:  November the 13th of 2012.

20  BY MR. BELLER:

21  Q.  So November 13 of 2012.  Does that mean it's about two

22  weeks after this period pricing?

23  A.  Approximately, yes.

24  Q.  Okay.  So let's go back to Pilgrim's I-297, please, and

25  publish.

Gregory Finch – Direct

1          Mr. Finch, what was Pilgrim's purple eight-piece price

2     for this period as shown on I-297?

3     A.  Can we go to the Pricing tab, please, CP Pricing.  Scroll

4     to the top first, okay.  Now towards the bottom.  1.0046.

5     Q.  And if we can -- so when I say purple label, what does that

6     mean, Mr. Finch?

7     A.  KFC has different types of cuts that have different

8     marinations in them.  So they segregate them in their stores'

9     coolers by the label color on the box.  Purple label means it's

10    made to a purple specification, so the label on the outside end

11    of the box is going to be purple.

12    Q.  Fancy way of saying, this is the eight-piece bucket price?

13    A.  Correct.

14    Q.  So the eight-piece bucket price for Pilgrim's Pride for

15    this period is 1.0046?

16    A.  Correct.

17    Q.  Okay.  Now, let's switch over to A-553, please, and

18    publish.

19         Mr. Finch, what is Claxton's purple eight-piece price

20    for this exact same period of time, two weeks prior to the

21    message?

22    A.  .9716.

23    Q.  Mr. Finch, I'm going to test your accounting degree.  What

24    is 1.0046 minus .9716?

25    A.  It's a shade over 3 cents.  Approximately 3 cents.

Gregory Finch - Direct

1   *Q.* So does that mean Pilgrim's' price was 3 cents higher than

    Claxton for that month?

3   *A.* Correct.

4   *Q.* And was that their current pricing in November of 2012 in

5   that text exchange that you saw?

6   *A.* Yes.

7   *Q.* If Claxton Poultry were to purchase product from Pilgrim's

8   Pride during this period of time, the same period of time as

9   Exhibit 1427, what price would Claxton have paid for that

10  product?

11          *MR. LOVELAND:* Objection. Speculation. It's been

12  asked in a hypothetical context but no foundation as to this

13  price at this time, Your Honor.

14          *THE COURT:* Sustained. If you will lay a foundation.

15          *MR. BELLER:* I'm happy to.

16  *BY MR. BELLER:*

17  *Q.* Mr. Finch, during this period of time, if Claxton had

18  purchased product -- if Claxton wanted to purchase product, do

19  you know, based on all of those questions that I asked you a

20  few moments ago, what price Claxton would have paid to

21  Pilgrim's?

22  *A.* Yes.

23  *Q.* And what price would Claxton have paid to Pilgrim's?

24          *MR. LOVELAND:* Same objection, Your Honor.

25          *THE COURT:* Overruled.

Gregory Finch - Direct

1              *THE WITNESS:*  1.0046.

2    *BY MR. BELLER:*

3    Q.  Does that mean it would have been 3 cents higher than us or

4    3 cents higher than Claxton during that period of time?

5    A.  Yes.

6              *MR. BELLER:*  Thank you.  I'm done with this exhibit.

7    *BY MR. BELLER:*

8    Q.  Mr. Finch, speaking of covers and shorts, we discussed this

9    just a little bit, I want to dive into it a little bit more.

10   How often do covers and shorts happen?

11   A.  All the time.  I won't say daily, but it can be daily.

12   There is often disruptions in the supply chain.  We're dealing

13   with a live bird here, so there is a myriad of things that

14   could happen inside the supply chain that would cause a

15   disruption.

16   Q.  Is there an individual at Claxton Poultry who is a sales

17   coordinator?

18   A.  Sales coordinator?

19   Q.  Yeah.

20   A.  Yes, Stan Brantley.

21   Q.  What is Mr. Brantley's job?

22   A.  Mr. Brantley's job is to look at our orders for the day and

23   compare that to the kill schedule for the day and try to

24   project whether we're going to be long on chicken or short on

25   chicken.

Gregory Finch - Direct

1    *Q.*  Long on chicken meaning what?

2    *A.*  We have more chicken than we have orders for.

3    *Q.*  Does Mr. Brantley coordinate with the salespeople to try to

4    figure out what to do with chicken when either you're going to

5    be long or short on chicken?

6    *A.*  Yes.

7    *Q.*  And does that happen every day, Mr. Finch?

8    *A.*  Yes, multiple times during the day.

9    *Q.*  So what happens if you have, say, 500 extra chickens that

10   you don't have customers for, generally speaking, what happens

11   at Claxton Poultry?

12   *A.*  Stan's going to communicate that out to the sales team

13   either directly by phone or send out an email to the sales team

14   and say, Hey, we have, you know, 500 pounds of chicken or 500

15   cases of chicken or whatever that is that we need to move.

16   He'll tell them what it is, leg quarters or wings or fast-food,

17   whatever the case may be.

18   *Q.*  In terms of dollars, Mr. Finch, how much of Claxton's

19   business, generally speaking -- how much of Claxton's business

20   is done in covers and shorts?

21   *A.*  It depends on the year, but it could be millions.

22   *Q.*  Millions of dollars of chicken that you are selling to

23   other chicken producers?

24   *A.*  Correct, yes.

25   *Q.*  And is that a number that you actually keep track of?

Gregory Finch - Direct

1   A.   We -- I don't have it off the top of my head, necessarily.

2   Q.   That's okay.

3   A.   It's in my general ledger.  When I'm buying chicken or

4   selling chicken, I have to record that as a sale in my book of

5   record, and I have to collect the money for it.  And then if

6   I'm buying it, I have to record that as a purchase.  If I

7   don't, I overstate my production numbers by the amount of

8   pounds that I'm buying from the other producer.

9   Q.   So when you say millions of dollars, it can be millions of

10  dollars a year of chicken that you are selling to other

11  producers, does that include Pilgrim's Pride?

12  A.   Yes.  Tyson, Mar-Jac, a bunch of them.

13  Q.   Does -- switching gears.  Let's talk more specifically

14  about KFC.  Okay?  And for our purposes, I may call it KFC,

15  RSCS, or Yum Brands.  Are you comfortable with that

16  interchange?

17  A.   Sure, I'll ask if that's okay.

18  Q.   Perfect.  That may also include UFPC.

19  A.   Okay.

20  Q.   Does Claxton have a contract with KFC?

21  A.   Yes.

22  Q.   How does customer feedback specific to KFC feed into or

23  play into the negotiation process based on your history and

24  knowledge with KFC?

25  A.   For Claxton Poultry, it's our road map.  You know, we've

Gregory Finch - Direct

1  told them that we want to be in the middle of pricing, and so

2  they're giving us guidance throughout the multiple rounds of

3  the bid process to put us in the middle, and we're making those

4  adjustments, typically, downward to the price where they want

5  us to be.  So their directional guidance becomes our road map

6  for us through that bid process.

7  Q.  Mr. Finch, would you recognize KFC's cost-plus spreadsheet

8  if I showed it to you?

9  A.  Yes.

10      MR. BELLER:  Your Honor, I believe this is admitted.

11  I'm asking to publish 9692, please.

12      THE COURT:  Yes, you may.

13      MR. BELLER:  Thank you.

14  BY MR. BELLER:

15  Q.  Mr. Finch, it's in your binder; it's also on your screen.

16  Do you recognize 9692?

17  A.  Yes.

18  Q.  What is this?

19  A.  This is our initial bid to KFC for contract year 2013.

20  Q.  And 9692, were you involved in calculating the different

21  cost categories?

22  A.  Yes.

23  Q.  So you spoke to the jury just a little bit ago about how

24  those cost categories can sometimes change.  So in the case of

25  the time that you have been CFO of Claxton Poultry, have your

Gregory Finch – Direct

1  cost categories been actual costs?

2  A.  Yes.

3  Q.  Do you consult with Mikell Fries or with Scott Brady to

4  determine what Claxton Poultry's actual costs are?

5        MR. LOVELAND:  Objection.  Hearsay, Your Honor.

6        THE COURT:  The question is whether he did that.

7  Objection is overruled.  He can answer yes or no.

8        THE WITNESS:  No, I do not.

9  BY MR. BELLER:

10  Q.  Does a salesperson determine operational costs for Claxton

11  Poultry?

12  A.  He would have no frame of reference.

13  Q.  Okay.  Does a CFO determine actual costs for the operation

14  of a poultry plant?

15  A.  Yes, typically.

16  Q.  Is it usual for Claxton Poultry to also send its period

17  pricing for the prior year to KFC?

18  A.  It's not unusual.  They'll -- our QSRs will oftentimes ask

19  us to send the most current pricing with the bid package.

20  Q.  Does Mikell Fries or Scott Brady have any input on what the

21  actual period pricing number is that gets transmitted?

22  A.  No.  The period pricing is changed by the feed cost

23  component of that price.  So the -- there is nothing for Mikell

24  or Scott to have input on.

25  Q.  Mr. Finch, does Claxton Poultry make independent pricing

Gregory Finch - Direct

1    decisions?

2    A.  Yes.

3         MR. LOVELAND:  Objection, Your Honor.  701, ultimate

4    issue in this case.

5         THE COURT:  Overruled.

6         THE WITNESS:  Yes, we always make an independent

7    pricing decision.

8    BY MR. BELLER:

9    Q.  What does independent pricing decision mean?

10   A.  It means it's just us; we don't discuss it with anyone

11   outside of Claxton --

12   Q.  Even if --

13   A.  -- other than the QSR.

14   Q.  Even if you are able to learn from time to time other

15   competitors' pricing, is Claxton's decision independent?

16        MR. LOVELAND:  Objection.  Misstates the testimony the

17   witness just offered, Your Honor.

18        THE COURT:  Overruled.

19        THE WITNESS:  So a competitor's pricing has no bearing

20   on what our costs are or what our bid is going to be to the

21   QSR.  If we do happen to learn it, you know, we have no way to

22   independently verify that information, so we don't know if

23   they're giving us a period price, if they're giving us their

24   future price, if they're giving us some price that they're

25   bluffing with, right.  So bluffing is a part of the whole

Gregory Finch - Direct

1   negotiation process.

2          The QSRs, we've found, will bluff with us, as well as

3   the other producers.  So because we can't really independently

4   verify that information, we use it kind of as a data point

5   because we have current pricing for the other producers, if we

6   get a wild crazy number that we hear through chatter during

7   this process from another producer, you know, we're going to

8   go, huh, you know, but short of that, it's really just a data

9   point -- one of the many data points we use in coming up with

10  our ultimate price.

11  BY MR. BELLER:

12  Q.  So my question is not, do you make an independent pricing

13  decision with ignorance.  My question is, if you happen to

14  learn other pricing, does Claxton still make its pricing

15  decision based on what is in Claxton's best interests?

16  A.  Absolutely.  Following the guidance of the QSR.

17  Q.  If you have the opportunity to undercut a competitor

18  because you've learned their price, do you do that?

19  A.  Dang right.

20  Q.  If you have the opportunity to steal volume, to steal

21  business from a competitor because you learned some inside

22  information, do you use that too?

23  A.  Yes.

24  Q.  Do you as CFO ever -- ever compromise Claxton's best

25  interests in order to benefit a competitor?

Gregory Finch - Direct

1   A.   No.

2   Q.   I want to switch gears.

3          MR. BELLER:   Thank you, Brian.

4   BY MR. BELLER:

5   Q.   I want to talk a little bit about dark-meat negotiations,

6   okay.

7   A.   Okay.

8   Q.   Let's turn back to Government Exhibit 1427, if we may.

9          THE COURT:   That may be published.

10         MR. BELLER:   Thank you.

11  BY MR. BELLER:

12  Q.   Do you see on 1427 -- and I recognize that this is a little

13  bit small -- George's is 30 back, Pilgrim's is 30 back, and

14  Tyson's is 31 back?

15  A.   Yes, I see that.

16  Q.   That's 59 -- lines 58 and 59.  So, again, I'm not asking

17  you to interpret what somebody may have meant or understood

18  here; I'm asking about your knowledge.  Okay?

19         Do you recognize numbers like that?  In other words,

20  what does it mean to be 30 back?

21  A.   Yes, I recognize that.

22  Q.   Okay.  And what does that mean?

23  A.   It's a part of the pricing model with the QSRs, is dark

24  meat and wings are oftentimes what I call part and parcel to

25  the eight-piece price.  So back means that dark meat is priced

Gregory Finch - Direct

1   some amount back of the eight-piece price.  Same thing on

2   wings, if wings are priced back of the eight-piece price, then

3   it's the eight-piece price minus whatever that back is to get

4   to what the dark-meat price is.

5   *Q.*  So is that a formula?

6   *A.*  Formula, yes.

7   *Q.*  Mr. Finch, tell the jury how much George's price was for

8   dark meat?

9           *MR. LOVELAND:*  Objection, Your Honor.  He can't know

10  that based on the information displayed on the screen.

11          *THE COURT:*  Overruled.  He can answer.

12          *THE WITNESS:*  I can't answer that with the information

13  on the screen.

14  *BY MR. BELLER:*

15  *Q.*  Why not?

16  *A.*  Because I don't have their eight-piece price.

17  *Q.*  What about Pilgrim's?

18  *A.*  Same answer, I don't have enough information.  I need their

19  eight-piece price to determine -- with this little bit of

20  information, I would need the eight-piece in order to determine

21  what the actual dark-meat price is.

22  *Q.*  What about Tyson's?

23  *A.*  Same thing, can't do it with the information I have.

24  *Q.*  So is this just a formula?

25  *A.*  Yes, it's a formula back of the eight-piece.

Gregory Finch - Direct

1   Q.  Mr. Finch, if I were to tell you Pilgrim's is 28 back, am I

2   talking about period pricing?

3   A.  Yes, more than likely.

4   Q.  Could I be talking about bid pricing?

5   A.  You could.

6   Q.  Could I be talking about next month's pricing?

7   A.  Could.

8   Q.  Do you know?

9   A.  No.

10  Q.  And do you not know because that's a formula?

11  A.  It's a formula.

12  Q.  Okay.  I want to talk to you specifically about Claxton's

13  2014 dark-meat bid submission.  Okay.

14  A.  Okay.

15  Q.  From three rounds of bidding, did Claxton Poultry ever

16  reduce its dark meat formula?

17  A.  No, started at 30 1/2 and ended at 30 1/2.

18  Q.  But even though the dark-meat formula never changed, did

19  the price change?

20  A.  Yes.

21  Q.  How so?

22  A.  Well, because that number is part and parcel to the

23  eight-piece price, every time the eight-piece price went down,

24  the dark-meat price went down in conjunction with it.  If the

25  eight-piece price moved down a penny, the dark meat moved down

Gregory Finch - Direct

1    a penny.  If it moved down 4 pennies, the dark meat moved down

2    4 pennies.

3    Q.  For Claxton's eight-piece COB price, did it, in fact, go

4    down?

5    A.  For 2014?

6    Q.  That's right.

7    A.  Yes.

8    Q.  And so if the eight-piece price went down, even though the

9    30 1/2 back never changed, does that also mean that the

10   dark-meat price went down?

11   A.  Yes.

12   Q.  Claxton Poultry ever submit a bid for wings to be at the

13   market price?

14   A.  Yes.

15   Q.  What does market mean?

16   A.  Market in this particular case is a price discovery

17   mechanism called Urner-Barry.

18   Q.  And can anyone access Urner-Barry if they pay a fee?

19   A.  Yes, it's a subscription-based service.

20   Q.  Is that sort of like having a paywall?

21   A.  Yeah, just like that.

22   Q.  Okay.  So why did Claxton Poultry choose market or choose

23   to make a bid to price wings at market?

24   A.  Well, I mean, the short answer is, it was a good place to

25   start.  The longer answer is, we've been trying to move our

Gregory Finch - Direct

1    wing prices up for years and Mr. Ledford kept beating over the

2    head and saying no.  We decided to start our negotiations and

3    market it for 2014 to see if he would allow us to make that

4    move this year.

5    Q.  Is pricing wings or a supplemental product, here wings, is

6    pricing wings at market pretty common in the industry?

7    A.  Certainly there is others in the supply chain we knew were

8    priced at market for covers and shorts, so we knew that KFC was

9    treating us differently on the wing piece of the cost-plus

10   matrix, so --

11   Q.  Mr. Finch, do you also think based on your knowledge and

12   your 25 years in the industry that negotiating based off market

13   is a fair way to do it?

14   A.  Absolutely.

15   Q.  When you submitted the pricing -- when Claxton Poultry

16   submitted the pricing of wings at Urner-Barry market price, do

17   you know if the buyer gave you feedback to lower that price?

18   A.  Yes.

19   Q.  Did Claxton lower its price from market?

20   A.  Oh, yeah, he was very adamant.  We moved in a hurry,

21   because we were afraid he was going to take our tonnage if we

22   didn't listen to him.

23   Q.  During every negotiation with KFC in 2013, did Claxton ever

24   raise its eight-piece price?

25   A.  2013?

Gregory Finch - Direct

1    Q.   Yes.

2    A.   No.

3    Q.   Well, you say 2013, no.  So what about 2014, did Claxton

4    ever raise its prices --

5    A.   No.

6    Q.   -- from one bid to the next?

7    A.   We did not.

8    Q.   Did Claxton reduce its case weight price?

9    A.   Well, we reduced our case weight, so everything is priced

10   on a price per pound.  So -- but -- so reducing the case weight

11   reduced the total price of that case.  It didn't reduce the

12   price per pound.  You follow me?  So if the price was a dollar,

13   and the case weighed 51, then the case price is $51.  If we

14   went to 50 1/2 pounds and it was a dollar, then that case price

15   would be $50.50.

16   Q.   And so for every round of bidding, if Claxton's price is

17   9620 during every round, but the case weight came down, did the

18   price ultimately come down?

19   A.   The case price came down, yes.

20   Q.   While on a chart it may only show 9620, the check that the

21   customer is writing is actually smaller?

22   A.   Correct.

23   Q.   Did Claxton ever to your knowledge try to raise its prices

24   based on direction from Mr. Austin at Pilgrim's?

25             MR. LOVELAND:  Objection.  Foundation.

Gregory Finch – Direct

1        *THE WITNESS:*  No, quite the opposite.

2        *THE COURT:*  Sustained.

3   *BY MR. BELLER:*

4   *Q.*  Do you have knowledge over whether or not Claxton ever

5   tried to raise its prices?

6   *A.*  Yes.

7   *Q.*  Do you have knowledge in your role and in your

8   participation of setting prices what the motivation was behind

9   raising or setting prices?

10  *A.*  Behind raising and setting prices?

11  *Q.*  Yeah, from one year to the next.

12  *A.*  Sure.  We want to sell our chicken for as much as the

13  customer will allow us to sell it for.

14  *Q.*  What are some of the different things you considered,

15  Mr. Finch, in deciding whether or not you were going to raise

16  your prices?

17  *A.*  Well, the main thing we considered on the QSR side is

18  whatever the QSR customer told us.

19  *Q.*  How about market conditions, was that a consideration?

20  *A.*  Certainly, it can be a consideration, but with the

21  cost-plus model, the price is ultimately driven off of the cost

22  to make that product and not so much off of the market.

23  *Q.*  How about if corn and soy goes up, does that help determine

24  what your bid or what your price is going to be?

25  *A.*  Sure, the feed cost component goes up.

2042

Gregory Finch – Direct

1    *Q.*  How about if labor goes up, does that change what your

2    price is going to be?

3    *A.*  Yes.

4    *Q.*  How about what your competitors are charging on period

5    pricing, does that help inform your decision on what your

6    future bid price is going to be?

7    *A.*  You know, competitor period pricing is a data point, but

8    our costing -- our pricing is based on Claxton Poultry's

9    pricing, not what somebody else says or does, other than the

10   direction from the QSR.

11   *Q.*  How about if you have to put in new equipment, does that

12   determine what a future price is going to be?

13   *A.*  Sure, that will impact depreciation.

14   *Q.*  How about if there is a drought and the price of other

15   proteins skyrockets, is that going to help determine how

16   Claxton prices its chicken for coming years?

17   *A.*  Sure.

18   *Q.*  So all of these are simple supply and demand issues.  Does

19   that factor into how you price your chicken?

20   *A.*  It's one of the factors, yes.

21   *Q.*  And do salespeople at other companies talking to other

22   salespeople at your company impact the pricing decisions that

23   you are making regarding your chicken?

24        *MR. LOVELAND:*  Same objection regarding foundation,

25   Your Honor.

1          THE COURT:  Sustained.

2   *BY MR. BELLER:*

3   Q.  Have I missed anything that you consider in making a

4   pricing decision?

5          MR. LOVELAND:  Objection, Your Honor.  I think the

6   implication there is to get to the question that was just

7   sustained.

8          THE COURT:  The question is whether it was leading.

9   Overruled.

10         THE WITNESS:  You haven't missed anything.  We take

11  our direction on pricing from the QSR, not from the competitor.

12  *BY MR. BELLER:*

13  Q.  When did Mr. Scott Brady join Claxton Poultry?

14  A.  August of 2012.

15  Q.  When was the negotiation for the 2013 contract for KFC?

16  A.  Would have been the fall of that year.

17  Q.  So within a few weeks of Mr. Brady joining Claxton Poultry?

18  A.  Fair.

19  Q.  When you set your pricing of chicken, do you consider an

20  employee's opinion who has been there for a few weeks?

21  A.  No.

22  Q.  Does it matter to you at all?

23  A.  Not when I'm setting up my costing, no.

24  Q.  Mr. Finch, I want to switch gears for just a moment, and I

25  want to talk a little bit about this notion of large bird or

Gregory Finch - Direct

1    big bird versus small bird, okay.

2    *A.*   Okay.

3    *Q.*   Were you involved in the 2015 contract negotiations with

4    KFC?

5    *A.*   Yes.

6    *Q.*   What was your involvement?

7    *A.*   My involvement was with my typical role, coming up with

8    cost matrix to submit to the QSR.  Now, this was a different

9    contracting year than we had ever seen before, though, in that

10   up to this point, our contracts with KFC had been annual

11   contracts.  And this time, they came and asked for a

12   multi-year, three-year contract, and they did it earlier than

13   they had ever done it before.

14   *Q.*   Were you a part of the pricing team?

15   *A.*   Yes.

16   *Q.*   Were you aware of and monitoring what was happening in the

17   market?

18   *A.*   Yes, part of my job.

19   *Q.*   Did you determine actual cost to Claxton?

20   *A.*   To the best I could at that time of year, yes.  I mean, you

21   know, normally this is happening in October or November, so we

22   had to use the cost that we knew at the time, because there was

23   no way to, you know, project what those costs were going to be

24   later in the year.

25   *Q.*   Mr. Finch, was 2015 a good year for chicken suppliers?

Gregory Finch - Direct

1    *A.*   Yes.

2    *Q.*   How so?

3    *A.*   Well, as I described yesterday, you know, part of my role

4    is market intelligence, so because of some things that were

5    going on in the overall protein sector, drought conditions that

6    had an impact on beef, disease conditions that had an impact on

7    hogs, as well as avian influenza that had raised its head at

8    the end of '14, into '15, a lot of the competing meats were no

9    longer there, so chicken was kind of the last protein standing.

10   So because of that, and supply and demand, chicken prices were

11   high, right.

12          So the other dynamic there is the inputs had begun to

13   recede from historical highs in '13 and '14 because of drought

14   conditions and other conditions back to what I would call

15   historical norms.  So we had kind of an anomaly there where

16   chicken was the last man standing, which meant there was better

17   price support because there wasn't as much competition from

18   other proteins, and then we had a receding input cost because

19   grain was coming off the historical highs back to historical

20   norms.

21   *Q.*   Mr. Finch, are you an agricultural economist?

22   *A.*   I am not.

23   *Q.*   Have you ever spoken to an individual by the name of

24   Theodore Snyder?

25   *A.*   I have not.

Gregory Finch – Direct

1   *Q.*  Do you know who I'm talking about when I say Theodore

2   Snyder?

3   *A.*  Not really.

4   *Q.*  Have you learned through me or anybody else in this

5   courtroom anything having to do with the knowledge of or

6   opinions of somebody named Theodore Snyder?

7   *A.*  No.  As I told you yesterday, I'm weird.  I read a lot.  I

8   have to keep up with this, because we're a small shop, so we

9   don't have people that keep up with market intelligence.  It's

10  part of my role I have to do.

11  *Q.*  So, Mr. Finch, having somebody who is doing business with

12  KFC and selling supply to KFC, how in 2015 was their business

13  from your perspective?

14  *A.*  It was not good.

15  *Q.*  What do you mean by that?

16  *A.*  They has announced publicly they were closing hundreds of

17  stores a year due to operational challenges.  This market

18  condition I just described had some of the broiler producers in

19  the small-bird arena considering and actually converting their

20  small-bird plants into big-bird plants, because the pricing was

21  so high that the big-bird guys were just making a killing, so

22  they had that going on.  This created a shortage for them in

23  some markets in '14, around Mother's Day, which precipitated

24  them coming to us early to try to lock their supply down.

25          In addition to that, some of their other QSR

Gregory Finch - Direct

1   competitors, for instance, what we call the other red and

2   white, which was Chick-fil-A, their business was booming.

3   They're growing in double digits.

4        *MR. LOVELAND:*  Objection, Your Honor.

5        *THE COURT:*  Sustained.

6   *BY MR. BELLER:*

7   *Q.*  How is Chick-fil-A's business, briefly?

8   *A.*  In 2015, it was going gangbusters.

9   *Q.*  Does Chick-fil-A grow a larger bird or demand a slightly

10  larger bird than KFC?

11  *A.*  Yes.

12  *Q.*  So -- and does Claxton grow that slightly larger bird for

13  CFA -- for Chick-fil-A?

14  *A.*  Yes.

15  *Q.*  So does Claxton Poultry have sort of a two-bird program?

16  *A.*  Yes.

17  *Q.*  What is a big bird?

18  *A.*  Industry standard big bird is going to be 7-plus pounds.

19  *Q.*  Does Claxton Poultry and did Claxton Poultry in 2015 grow a

20  big bird?

21  *A.*  No.

22  *Q.*  What was happening, if you have knowledge, what was

23  happening with big-bird profitability compared to small-bird

24  profitability in 2015?

25  *A.*  Big-bird guys were making money hand over fist.

Gregory Finch – Direct

1    *Q.*  What would it take, Mr. Finch, for Claxton Poultry to

2    choose to start producing big birds instead of small birds?

3    *A.*  Well, certainly because of what we saw going on in the

4    industry, we had to consider it.  And so we did.  But for us,

5    it would require an entirely new customer base from the

6    small-bird customers that we currently have.  We would likely

7    have to spend somewhere in the neighborhood of 30 to

8    $40 million inside of the plant to retool the equipment in the

9    plant to be able to handle the bigger bird.

10          And then the live bird supply side, there is ripple

11    effects into that, because how many birds you can place in a

12    house is different on a big-bird program than it is on our

13    small-bird program.

14          After kind of looking at that and considering those

15    variables, we just determined that for us it didn't make a

16    whole lot of sense to make this dramatic move and really kind

17    of upset a 65-year-old business model that was working.

18    *Q.*  Mr. Finch, do you have knowledge of whether in, say, 2014,

19    if Jerry Lane and/or Tom Scarborough were at least considering

20    what it would take to make the move?  In other words, is that

21    something that Claxton Poultry considered doing?

22    *A.*  Yes, we had internal conversations about that.

23    *Q.*  And how about Mr. Fries, do you have knowledge over whether

24    Mr. Fries had opinion about sort of the market and what was

25    happening with big birds?

Gregory Finch - Direct

1    A.   Yes, he had an opinion.

2    Q.   Did you think, Mr. Finch, in August of 2014 this huge

3    big-bird profitability was going to end up being a fad?

4    A.   Yes, I thought it was the shiny new object in the industry.

5    Q.   I'm sorry?

6    A.   I thought it was the shiny new object in the industry that

7    everybody was going to chase.

8    Q.   Ultimately, did Claxton Poultry ever stop producing small

9    birds?

10   A.   No.

11   Q.   Why not?

12   A.   Well, for the reasons I just described.  The capital

13   expenditure, redesigning our business model that had been

14   working for 65 years, you know, and having to find a whole new

15   customer base, having to build new houses in order to be able

16   to process the same number of chickens we were processing.  It

17   just wasn't economically feasible for a single-plant operation.

18   Most of the companies that were making the switch were

19   multi-plant operations, so they were able to switch one complex

20   out of their 20 or 25 over to do this.  It was a much simpler

21   process for them.  But us being a single plant, it just wasn't

22   feasible.

23   Q.   Mr. Finch, was the negotiation in 2014 for 2015

24   particularly unique?

25   A.   Yes.

Gregory Finch - Direct

1   *Q.*  And unique as it relates to this big-bird sort of

2   profitability?

3            *MR. LOVELAND:*  Objection.  Leading, Your Honor.

4            *THE COURT:*  Overruled.

5            *THE WITNESS:*  Yes.

6   *BY MR. BELLER:*

7   *Q.*  How so?

8   *A.*  Well, as I said, KFC came to us way earlier in the process

9   than they ever had.  It was because they ran out of chicken

10  since the markets -- around Mother's Day, so they needed to

11  lock their supply down.  So they saw the same thing we saw of

12  this potential shift out of small birds into big birds because

13  the profit was so large.  So they needed to do something to

14  lock down their supply for multiple years, and so they came up

15  with this idea of giving everyone in the supply chain a

16  big-bird premium to -- big-bird adjustment in order to --

17           *MR. LOVELAND:*  I'm going to object on foundational

18  grounds.  He's now speaking to what KFC did and why.  I think

19  that's outside the scope of the question, and he doesn't have

20  foundation for it.

21           *THE COURT:*  Sustained.

22  *BY MR. BELLER:*

23  *Q.*  Let's narrow that.

24  *A.*  Sure.

25  *Q.*  Okay.  Did Claxton Poultry get the benefit of a big-bird

Gregory Finch - Direct

1    adjustment?

2    A.   Yes.

3    Q.   What is a big-bird adjustment?

4    A.   That was an idea, concept floated by KFC in order to incent

5    small-bird producers to stay in small birds and not convert to

6    big birds.

7    Q.   So it was paying more money in order to secure suppliers,

8    is that a proper summation?

9    A.   Yes.

10   Q.   Did Claxton demand that premium from KFC?

11   A.   We did not.

12   Q.   What was the term that KFC used regarding this -- a

13   premium?

14   A.   Big-bird adjustment.

15   Q.   And what is that?

16   A.   That was a number that they were willing to give the supply

17   chain above the normal margin that we talked about earlier in

18   order to get the supply chain to stay in small birds and

19   produce their chicken.

20   Q.   In 2014, Mr. Finch, was it more profitable to you to sell

21   to Chick-fil-A than it was to sell to KFC?

22   A.   Yes.

23   Q.   Was KFC competing with Chick-fil-A for the 2015 limited

24   volume of birds?

25   A.   Yes.

Gregory Finch - Direct

1   Q.  Was KFC competing with Popeyes for the same limited volume

2   of birds?

3   A.  Yes.

4   Q.  Was KFC competing with Bojangles for the same limited

5   supply of birds?

6   A.  Yes.

7   Q.  So how, Mr. Finch, did you calculate that year the big-bird

8   adjustment and the margin for the cost-plus model?

9   A.  So on the big bird, as I described earlier, it wasn't

10  feasible for us to convert to big birds, but because we run a

11  two-bird program, what we could potentially do is shift more

12  birds from KFC over to Chick-fil-A, and cut those birds for

13  Chick-fil-A instead.  So I did what I call an opportunity-cost

14  calculation.  So what I mean by that is, if I take this many

15  birds and move them out of KFC over to Chick-fil-A, what would

16  my profit be on those birds versus keeping them in the KFC

17  bucket?

18  Q.  And what was that calculation?

19  A.  The calculation at that time was 12 1/2 cents.

20  Q.  Does -- is there a standard margin that you usually start

21  with in negotiation, or an aspirational margin you set with?

22  A.  Yes, we like to set our margin at 10 cents with every

23  contract if we can, not always allowed to, but that is our goal

24  to at least start at 10.

25  Q.  In this case, in this year, how did margin and big-bird

Gregory Finch – Direct

1  adjustments work?

2  *A.*  So --

3  *Q.*  How did it factor in?  I should ask a better question.

4  *A.*  Sure, the margin was the same margin we discussed earlier

5  on a traditional cost-plus model, so we reset that to 10, and

6  then we submitted our big-bird premium on top of that.

7  *Q.*  Mr. Finch, when is it, if you remember, in time -- when is

8  it that you did sort of this rough calculation?

9  *A.*  It would have been sometime in late July.

10  *Q.*  Of 2014?

11  *A.*  Correct.

12  *Q.*  For the 2015 contract?

13  *A.*  Correct.

14  *Q.*  Do you recall or do you know if you sent that calculation

15  to Mr. Fries or Mr. Brady?

16  *A.*  I did not send it directly.  After I had my conversation

17  with Mikell about this, I had Ken Hutcheson, one of my

18  controllers, send it to Mikell and Scott and copy me.

19  *Q.*  And, you know, Mikell makes sense.  He was the president.

20  Why send it also to Scott Brady?

21  *A.*  Because Scott Brady is the national account sales manager

22  for that account.

23        *MR. LOVELAND:*  Objection, Your Honor.  I think it

24  misstates prior testimony.  I don't think Mr. Fries was

25  president at this time.

Gregory Finch - Direct

1        THE COURT:  Overruled.  He may answer.

2    BY MR. BELLER:

3    Q.  That may have been my bad question.  Why did you send it to

4    Mikell Fries?

5    A.  He was the sales manager, and Scott reported to Mikell.

6    Q.  I said president, excuse me.  Let's do this again and clean

7    it up.

8        Why did you send it to Mikell Fries, and why did you

9    send it to Scott Brady?

10   A.  I sent it to Mikell because he's the sales manager at the

11   time, and I sent it to Scott because he's the account manager

12   for KFC.

13   Q.  What was offered as the first bid in the summer of 2014?

14   A.  Big-bird adjustment?

15   Q.  Big-bird adjustment and margin.

16   A.  I'm sorry.  So the margin was 10 cents, and Mikell, being

17   conservative as he is, had me reduce my 12 1/2 opportunity cost

18   down to 12.  So we went in our first bid 10 cent margin and

19   12 cent big-bird adjustment.

20   Q.  Were those broken up in that bid?

21   A.  Yes.

22   Q.  Is it accurate or inaccurate to say Claxton submitted a

23   margin of 22 cents?

24   A.  That would be inaccurate.  Our margin was 10 and big-bird

25   adjustment was 12.

Gregory Finch - Direct

1   *Q.*  Was that broken down to the point that the customer could

2   see the distinction in the breakdown?

3   *A.*  Yes.

4   *Q.*  Do you know, Mr. Finch, what date that first-round bid was

5   sent to KFC?

6   *A.*  August the 19th, 2014.

7   *Q.*  Were the numbers sent to KFC on August 19 of 2014 the exact

8   same numbers that you calculated in late July of 2014?

9   *A.*  Yes.

10  *Q.*  Were they also the exact same numbers sent to KFC on

11  August 19, 2014, the same that you asked Mr. Hutcheson to send

12  to Mr. Fries and Mr. Brady?

13  *A.*  Yes.

14  *Q.*  What date did you ask Mr. Hutcheson and Mr. Fries to send

15  those numbers -- excuse me, bad question.  What date did you

16  ask Mr. Hutcheson to send the numbers to Mr. Fries and

17  Mr. Brady?

18  *A.*  August 1.

19  *Q.*  So the late July calculation, the August 1st transmittal

20  email, and the August 19 transmittal to KFC, did the 10 cents

21  and the 12 cents ever change between those three dates?

22  *A.*  No.

23          *THE COURT:*  Can you look for a convenient breaking

24  spot?

25          *MR. BELLER:*  This is a great breaking spot.  Thank

Gregory Finch - Direct

1    you, Your Honor.

2            THE COURT:  Okay.  We'll go ahead and take a

3    mid-morning break.  We'll plan on reconvening at 12:30.  The

4    jury is excused -- 10:30.  I'm not sure what I said.  12:30.

5            MR. BELLER:  We'll take it.

6            THE COURT:  10:30.

7            (Jury out at 10:14 a.m.)

8            THE COURT:  Thank you, Mr. Finch.  You are excused

9    until 10:30.  Everyone else can be seated.

10           I want to talk to you about something that happened

11   during the direct exam of Mr. Finch.  Mr. Beller asked

12   Mr. Finch in regard to Exhibit 1427 whether he could tell what

13   the price for -- I think he said dark meat was in regard -- as

14   mentioned in lines 58 and 59.

15           Mr. Loveland then interposed an objection.  At that

16   point, there were murmurs that I heard, not from the jury, not

17   from staff, not from the gallery, and then I heard a comment,

18   "that's the point."  If I can hear that, the witness can hear

19   that, and it's likely that the jury could hear that.  It's a

20   fundamental of trial practice that you do not do anything that

21   would cue the witness what an answer would be, and you don't do

22   anything that would possibly, you know, whisper an answer, what

23   the answer should be to the jury.

24           Judge Blackburn -- I mentioned this before on this

25   trial -- not in this trial -- Judge Blackburn had a case where

Gregory Finch - Direct

1    a paralegal was -- appeared to be signaling to a witness

2    through eye movements and maybe head nodding, and he cited her

3    for contempt.  He found her in contempt, even though she said

4    it was kind of inadvertent spontaneous reaction to what the

5    testimony was taking place.  She promptly was fired from her

6    law firm.  She appealed it up to the Tenth Circuit, and the

7    Tenth Circuit affirmed her citation for contempt.

8           So I want to make sure that everyone takes this really

9    seriously.  You know, in the heat of battle, whatever, you need

10   to be very, very careful about some types of extraneous

11   comments you may make in reaction to what is going on in the

12   courtroom so there is no perception whatsoever that the witness

13   is being, you know, cued or that the jury can overhear, you

14   know, what the answer should be or some reaction.  All right.

15          We'll be in recess until 10:30.

16          (Recess at 10:18 a.m.)

17          (In open court at 10:32 a.m.)

18          THE COURT:  Let's go ahead and bring the jury in.

19          (Jury in at 10:34 a.m.)

20          THE COURT:  Thank you.  Please be seated.

21          Mr. Beller, go ahead.

22          MR. BELLER:  Thank you, Your Honor.

23   BY MR. BELLER:

24   Q.  Mr. Finch, when we broke, we were talking about the

25   big-bird adjustment and margin that was calculated in July.  Do

Gregory Finch - Direct

1   you recall that?

2   A.  Yes.

3   Q.  Okay.  Mr. Finch, I want to show you two documents, only

4   for the witness and the parties at this point, A-645 and A-646.

5        Mr. Finch, do you recognize A-645 and A-646?

6   A.  Yes.

7   Q.  What do these two documents depict, Mr. Finch?

8   A.  What are the two documents?

9   Q.  Yes.

10  A.  Okay.  Sorry.  The first document, 645, is an email from

11  Ken Hutcheson copying -- to Mikell and Scott, with a copy to

12  me, that says that --

13  Q.  Don't tell me what it says at this point.

14  A.  Sorry.

15  Q.  That's okay.

16  A.  Okay.

17  Q.  What about A-646, Mr. Finch.

18  A.  It's the attachment that goes with the email.

19  Q.  And is this the email and the attachment that you were

20  referencing regarding transmitting the initial price

21  calculation to Mr. Fries and Mr. Brady?

22  A.  Yes.

23        MR. BELLER:  Your Honor, at this time, I would move

24  for A-645 and A-646, and I believe this is by agreement.

25        THE COURT:  Any objection to the admission of those

Gregory Finch – Direct

1    two exhibits?

2           MR. LOVELAND:  Mr. Beller is correct, no objection,

3    Your Honor.

4           THE COURT:  A-645 and A-646 will be admitted and may

5    be published.

6           (Exhibit A-645 admitted.)

7           (Exhibit A-646 admitted.)

8           MR. BELLER:  Thank you.  If we may publish those as

9    they are.

10   BY MR. BELLER:

11   Q.  Mr. Finch, what is the date on the email on A-645?

12   A.  August 1, 2014.

13   Q.  And what is the initial margin and big-bird adjustment

14   calculated and reflected in August -- on August the 1st of

15   2014?

16   A.  On this particular pass, Ken fused them together, so it's

17   the 22 line, which I later had him break out.

18   Q.  And so when you say you later had him break out, does that

19   mean that when it was transmitted to the customer they were

20   broken into the two different categories?

21   A.  Correct.

22   Q.  Okay.  Thank you.

23          MR. BELLER:  Thank you, Mr. Brian.

24   BY MR. BELLER:

25   Q.  Mr. Finch, during that negotiation and after this

Gregory Finch - Direct

1   first-round bid was submitted to RSCS, did Claxton ever lower
2   their margin number?
3   *A.*   No.
4   *Q.*   Did Claxton ever lower their big-bird premium -- big-bird
5   adjustment?
6   *A.*   Yes.
7   *Q.*   Why?
8   *A.*   Because KFC made us.
9   *Q.*   Did Claxton as a result of lowering its big-bird margin
10  ultimately end up being awarded more volume?
11  *A.*   Yes.
12  *Q.*   How much more volume was Claxton awarded for the 2015 to
13  2018 contract?
14  *A.*   Approximately 80,000 pounds a week.
15  *Q.*   80,000 pounds of chicken a week.  Is that a number that is
16  significant to Claxton Poultry?
17  *A.*   Yes.
18  *Q.*   How so?
19  *A.*   Well, it's close to 4 million pounds a year, so over our --
20  all of our production, it's 1 percent, but then within just
21  this QSR customer we've gotten the additional tonnage from,
22  it's 14 to 15 percent increase year over year.
23  *Q.*   And, Mr. Finch, was this a multi-year contract?
24  *A.*   Yes.  This was the first time that KFC had come to us and
25  asked for us to give them a three-year contract versus the

Gregory Finch - Direct

1    annual contracts we've been operating under.

2    Q.  So despite this being a three-year contract, did the price

3    that Claxton charged RSCS for chicken change every year?

4    A.  Yes.

5    Q.  Did it go up or did it go down?

6    A.  Down.

7    Q.  And why is it, despite a three-year contract, that -- did

8    the prices go down every year?

9    A.  Well, because the QSR made us move them down.

10   Q.  Well, you say made.  Would it be fair to say that they gave

11   you feedback and asked you to bring them down?

12   A.  Their guidance was, You need to reduce your price.

13   Q.  And did Claxton do so?

14   A.  Yes.

15   Q.  So, Mr. Finch, I have just a few more cleanup questions

16   before we're finished.

17          Mr. Brady or Mr. Fries -- I should say is Claxton

18   Poultry, Mr. Brady, or Mr. Fries involved at all with selling

19   to Golden Corral?

20   A.  No.

21   Q.  Did Claxton even have a contract selling to Golden Corral

22   in 2014?

23   A.  No.

24   Q.  Has Claxton ever sold boneless breasts to US Foods?

25   A.  Not to my knowledge.

Gregory Finch - Direct

1   *Q.* How about credit terms for Sysco, is that something that

2   Claxton was ever involved in negotiating?

3   *A.* No.

4   *Q.* How about selling to Boston Market?

5   *A.* No.

6   *Q.* Mr. Finch, I want to show you Government Exhibit 1238.

7        *MR. BELLER:* Your Honor, I believe this is admitted.

8        *THE COURT:* Yes, it has been.  It may be published.

9        *MR. BELLER:* Thank you.  If we may publish this.

10  *BY MR. BELLER:*

11  *Q.* Mr. Finch, if you can take a moment and just review the

12  very last text exchange on the bottom of 1238.

13  *A.* Okay.

14  *Q.* What is the date of that particular text message?

15  *A.* September the 3rd, 2014.

16  *Q.* Okay.  Thank you.  And I'm done with that.

17        Mr. Finch, on September the 3rd of 2014, what approach

18  did Claxton Poultry take regarding KFC pricing?

19  *A.* We reduced our price 2 cents.

20  *Q.* Why?

21  *A.* Because Bob Lewis told us we were too high and we needed to

22  come down 2 cents.

23  *Q.* Did Claxton follow Mr. Lewis' feedback?

24  *A.* We did, yes.

25  *Q.* Later, over the course of this particular negotiation, did

Gregory Finch - Direct

1    Claxton reduce its price even 2 cents more?

2    A.   Yes.

3    Q.   So what was the total amount of the price reduction over

4    the course of that negotiation?

5    A.   Approximately 4 cents.

6    Q.   Mr. Finch, did you as CFO involved in the negotiation of

7    pricing chicken ever direct Mr. Fries or Mr. Brady to contact

8    competitors to align future bid pricing?

9    A.   Never.

10   Q.   Do you have any knowledge of that occurring?

11   A.   I do not.

12   Q.   Did you, Mr. Finch, ever agree to change the models or not

13   change the models so as to reduce or limit prices in

14   conjunction with a competitor?

15   A.   No.

16         MR. LOVELAND:  Objection.  Foundation, Your Honor.

17         THE COURT:  Overruled.

18   BY MR. BELLER:

19   Q.   You may answer, Mr. Finch.

20   A.   No.

21   Q.   Do you, Mr. Finch, have personal knowledge of whether

22   Mr. Brady ever agreed with any other supplier on the prices

23   that you were calculating?

24   A.   He did not.

25   Q.   How about Mr. Fries?

Gregory Finch – Direct

1    A.  He did not.

2              MR. LOVELAND:  Objection, Your Honor.  No knowledge or

3    foundation to answer these questions.

4              THE COURT:  The answer was unresponsive to the

5    question.  Sustained.

6    BY MR. BELLER:

7    Q.  Do you, Mr. Finch, have personal knowledge of whether

8    Mr. Fries ever agreed with any other supplier on the prices

9    that you were calculating?

10   A.  Yes.

11   Q.  To the best of your knowledge, Mr. Finch, were all of

12   Claxton's prices set independently?

13   A.  Yes.

14   Q.  Did you, Mr. Finch, ever agree to change the models or not

15   change the models so as to reduce or limit prices with a

16   competitor?

17             MR. LOVELAND:  Objection.  Same objection, Your Honor.

18   Lack of foundation as to the inputs that he received.

19             THE COURT:  Overruled.

20             THE WITNESS:  No.

21   BY MR. BELLER:

22   Q.  Do you, Mr. Finch, have personal knowledge over whether

23   Mr. Brady ever agreed with any other supplier on the prices

24   that you were calculating?

25   A.  Yes.

Gregory Finch - Direct

1   Q.  Can you explain.

2   A.  Yes.  You asked if I had knowledge.  I had knowledge; he

3   did not.

4   Q.  Do you have personal knowledge of whether Mr. Fries ever

5   agreed with any other suppliers on the prices of broiler

6   chicken products that you were calculating?

7           MR. LOVELAND:  Objection, Your Honor.  I want to flag

8   that the witness answered a question not before him.

9           THE COURT:  Overruled.

10          THE WITNESS:  Yes, I have knowledge.

11  BY MR. BELLER:

12  Q.  What's your knowledge?

13  A.  Mr. Fries did not fix a bid or rig a price with anybody.

14  Q.  Do you have personal knowledge of whether Mr. Fries or

15  Mr. Brady ever agreed with any other supplier to manipulate

16  prices of broiler chicken products that you were calculating?

17          MR. LOVELAND:  Objection, Your Honor.  Foundation,

18  701, and ultimate issue.

19          THE COURT:  Overruled.

20          THE WITNESS:  Yes --

21  BY MR. BELLER:

22  Q.  Do you want me to ask it again?

23  A.  Yes, I have knowledge.

24  Q.  What is your knowledge of whether Mr. Fries or Mr. Brady

25  ever agreed with any other supplier to manipulate bids of

Gregory Finch – Cross

1   broiler chicken products that you were calculating?

2   A.  They never did.

3           MR. BELLER:  Thank you, Your Honor.

4           THE COURT:  Thank you.

5           Cross-examination.

6           Any of the defendants?

7           (No response.)

8           By the Government, Mr. Loveland.

9           MR. LOVELAND:  Thank you, Your Honor.

10                    **CROSS–EXAMINATION**

11  BY MR. LOVELAND:

12  Q.  Good morning, Mr. Finch.

13  A.  Good morning.

14  Q.  Now, Mr. Finch, how long have you worked for the Fries

15  family?

16  A.  Since April of 2011.

17  Q.  Okay.  I think you testified about this primarily

18  yesterday.  Claxton Poultry is a family operation, right?

19  A.  Correct.

20  Q.  Okay.  Originally named after Norman Fries, correct?

21  A.  Senior.

22  Q.  Norman Fries, Sr. was Defendant Mikell Fries' grandfather,

23  right?

24  A.  Correct.

25  Q.  Doris Fries is still with us, right?

Gregory Finch - Cross

1   A.   Yes, she's actively involved in the business.

2   Q.   And she's still running the company, correct?

3   A.   Correct.

4   Q.   In the years you've worked for Claxton Poultry, have you

5   developed a close working relationship with Mikell Fries?

6   A.   Yes.

7   Q.   Have you developed a personal relationship with Mikell

8   Fries?

9   A.   Yes.

10   Q.   He's your friend?

11   A.   Sure.

12   Q.   He's your close friend?

13   A.   He doesn't let too many people close.  He's definitely a

14   friend.

15   Q.   Are you among the closer people that you know to him?

16   A.   No.

17   Q.   Okay.  You wouldn't want to see that friend convicted of a

18   federal crime, correct?

19   A.   Correct.

20   Q.   Scott Brady, you worked with him for how many years?

21   A.   Scott in August of 2012, so ten years, plus or minus.

22   Q.   In that decade that you worked with Scott Brady, have you

23   developed a close working relationship with him?

24   A.   Yes.

25   Q.   Do you consider Scott Brady to be a friend?

Gregory Finch - Cross

1    A.  I do.

2    Q.  You would not want Scott Brady to be convicted of a crime

     either, as he's your friend, correct?

3

4    A.  Correct.

5    Q.  Now, you still work for Claxton Poultry, right?

6    A.  Yes.

7    Q.  And you've been the CFO since you got there?

8    A.  Yes.

9    Q.  Okay.  What about Mikell Fries, does he still work for

10   Claxton Poultry?

11   A.  Yes.

12   Q.  I want to clear up -- there was a little bit of confusion.

13   What is Mikell Fries' title now?

14   A.  Currently he's president of the company.

15   Q.  Okay.  I think there were a few different years floating

16   around as to when he became president, and there was also

17   mention on your direct testimony that he was made president by

18   the board privately before it became public; is that right?

19   A.  Correct.

20   Q.  Okay.  So could you give the jury an understanding of when

21   Mikell Fries became the president at Claxton, even if it was

22   not public?

23   A.  February of 2016.

24   Q.  And before that, he was the manager of sales, correct?

25   A.  Correct.

2069

Gregory Finch – Cross

1   Q.   In that role, he had authority to sign contracts, correct?

2   A.   Correct.

3   Q.   Now that he's the president, he's your boss, right?

4   A.   He is.

5   Q.   And Claxton pays your salary, right?

6   A.   Yes.

7   Q.   Salary and bonus, correct?

8   A.   Yes.

9   Q.   You're on the board of Claxton, in addition to being CFO,

10  right?

11  A.   Yes.

12  Q.   If either of these defendants, Mikell Fries or Scott Brady,

13  were convicted, that would affect Claxton Poultry's business,

14  would it not?

15  A.   Perhaps.

16  Q.   And if they were convicted, that would affect your

17  livelihood and income, wouldn't it?

18  A.   Perhaps.

19  Q.   Do you see Mikell Fries in the courtroom here today?

20  A.   Yes.

21  Q.   Would you please identify Mikell Fries by an item of

22  closing he's wearing?

23         MR. BELLER:  Your Honor, I'm happy to stipulate this

24  is Mr. Fries.

25         THE COURT:  Do you accept the stipulation,

2070

Gregory Finch - Cross

1    Mr. Loveland?

2              MR. LOVELAND:  Certainly, Your Honor.

3              THE COURT:  Thank you.

4              Go ahead.

5    BY MR. LOVELAND:

6    Q.  As a heads-up, I was about to ask, do you see Scott Brady

7    in the courtroom here today?

8              MR. LAVINEj:  We're happy to stipulate, Mr. Brady is

9    right here.

10             THE COURT:  Do you accept that stipulation?

11             MR. LOVELAND:  Certainly, Your Honor.

12             THE COURT:  Go ahead.

13   BY MR. LOVELAND:

14   Q.  Do you know who Roger Austin is?

15   A.  Yes.

16   Q.  How do you know who Roger Austin is?

17   A.  I've come to know Roger Austin for a number of years I've

18   been in the chicken business.

19   Q.  Where does Roger Austin work -- excuse me, where did Roger

20   Austin work around the time period of 2012 through 2019?

21   A.  He worked for Pilgrim's.

22   Q.  Did you have occasion to meet Roger Austin in person?

23   A.  On occasion, we might bump into each other at a trade show

24   or something, yes.

25   Q.  You'd recognize him if you saw him?

Gregory Finch - Cross

1   A.  Yes.

2           MR. LOVELAND:  And, Your Honor, I see movement, but I

3   was about to ask the witness if he would identify Roger Austin.

4           MR. FELDBERG:  We'll stipulate to the identification.

5           THE COURT:  Do you accept that stipulation,

6   Mr. Loveland?

7           MR. LOVELAND:  Absolutely, Your Honor.

8           THE COURT:  Go ahead.

9           MR. LOVELAND:  Your Honor, at this point, I would like

10  to ask the Court's permission to publish Government

11  Exhibit 1119.

12  BY MR. LOVELAND:

13  Q.  Fair warning, at some point, I'm going to ask you to use a

14  calculator.

15  A.  Yes.

16  Q.  Not immediately.

17          THE COURT:  It has been admitted.  You may publish it.

18          MR. LOVELAND:  Thank you, Your Honor.

19  BY MR. LOVELAND:

20  Q.  Are you able to see what is on the screen, Mr. Finch?

21  A.  It's a little small, but I can see it.

22  Q.  We can zoom in.

23          MR. LOVELAND:  Ms. Pearce, if you could zoom in at the

24  top half of this page.

25

Gregory Finch – Cross

1   BY MR. LOVELAND:

2   Q.  This is a contract between Claxton Poultry and Restaurant

3   Supply Chain Solutions, correct?

4   A.  It appears to be, yes.

5   Q.  It appears to be -- this is a contract from 2015 -- running

6   from the year January 1, 2015, through the end of 2017,

7   correct?

8   A.  Correct.

9   Q.  This is a contract that you would have reviewed in your

10  role as CFO, correct?

11  A.  Correct.

12  Q.  You also served as the document custodian for Claxton as

13  part of this case, correct?

14  A.  Correct.

15          MR. LOVELAND:  Okay.  Let's please scroll down to the

16  bottom of this page, Ms. Pearce.

17          And if we could include the dates at the bottom.

18  BY MR. LOVELAND:

19  Q.  Okay.  Are you able to see that, Mr. Finch?

20  A.  Yes.

21  Q.  Okay.  This is a contract that was entered into, correct?

22  A.  Yes.

23  Q.  Okay.  And it ran through December 31, 2017, right?

24  A.  Yes.

25  Q.  Claxton got paid on this contract in 2015, right?

Gregory Finch - Cross

1    A.  Correct.

2    Q.  And I'll back up.  RSCS, Restaurant Supply Chain Solutions,

3    sets up the purchases for KFC, right?

4    A.  Correct.

5    Q.  This is a KFC contract, right?

6    A.  That's their co-op.

7    Q.  This is a KFC contract, correct?

8    A.  Correct.

9    Q.  Claxton got paid on this contract in 2016, right?

10   A.  Well, it wasn't this exact contract, but, yes.  I mean,

11   we -- part -- this was a three-year contract.  Part of our

12   agreement with RSCS is that at the end of each year we would

13   rediscuss prices.

14   Q.  Okay.

15   A.  So I wouldn't want to mislead anybody that this is the

16   exact amount we got paid for all three years, because it's not.

17   Q.  Certainly not.  We'll make sure we use "abouts" or

18   "approximates" when we do numbers.  But this contract was in

19   effect in 2016, correct?

20   A.  Correct.

21   Q.  And it sets forth the parameters under which Claxton got

22   paid in 2016; correct?

23   A.  With the change in cost.

24   Q.  With the change in cost, which is something built into the

25   cost-plus model, correct?

Gregory Finch - Cross

1    *A.*  Correct.

2    *Q.*  I'm going to ask you the same questions.  For 2017, under

3    these terms, including the fact that the cost-plus model could

4    get changed, Claxton got paid under this contract during the

5    year 2017, correct?

6    *A.*  Yes.

7    *Q.*  And each of those years, 2015 through 2017, Mikell Fries

8    was paid a salary from Claxton, correct?

9    *A.*  Correct.

10   *Q.*  And for each of these years, from 2015 through 2017, Scott

11   Brady was paid a salary from Claxton, correct?

12   *A.*  Correct.

13   *Q.*  That's Mikell Fries' signature there, correct?

14   *A.*  It looks to me, yes.

15   *Q.*  Meaning that Mikell Fries had authority to bind Claxton to

16   this contract when he signed it in October of 2014, correct?

17   *A.*  Correct.

18   *Q.*  Ultimately, his grandmother is at the top, but Mikell Fries

19   can sign this too, right?

20   *A.*  Correct.

21   *Q.*  Okay.  This is before he was president, correct?

22   *A.*  Correct.  But as I testified yesterday, an officer can

23   delegate to another individual to sign a contract.

24   *Q.*  Very prescient.

25           My next question is, and you testified on direct that

Gregory Finch - Cross

1   Mikell Fries could delegate his authority, right?

2   A.   Correct.

3   Q.   And that would be including delegating it to Scott Brady,

4   correct?

5   A.   Correct.

6   Q.   Okay.  And now is the calculator's time.  So if we could

7   please look at page 4.

8          Mr. Finch, you can feel free to please use "abouts" or

9   "approximates" as we do this.  As you mentioned, we want to be

10  accurate for the jury.

11         MR. LOVELAND:  I misspoke.  I'm going to ask for page

12  5, I believe.  Ms. Pearce is going to zoom in on the chart for

13  us, please.

14  BY MR. LOVELAND:

15  Q.   Do you see the top where it says KFC eight-piece chicken on

16  the bone?

17  A.   Yes.

18  Q.   Okay.  And that's the flagship KFC product; it's the

19  biggest product, correct?

20  A.   Correct.

21  Q.   Okay.  How many weekly pounds is the volume commitment

22  to -- from Claxton to KFC?

23  A.   536,000.

24  Q.   Okay.  And that's what you refer to as the volume of

25  chicken that Claxton would provide, right?

Gregory Finch - Cross

 1   A.  Correct.

 2   Q.  Okay.  It says in parentheses next to that, 16 TLs.  Do you

 3   see that?

 4   A.  I do.

 5   Q.  That stands for 16 truckloads, right?

 6   A.  Correct.

 7   Q.  Which means that 536 pounds works out to about

 8   16 truckloads, right?

 9   A.  Approximately, yes.

10   Q.  Approximately.  Okay.  So if we want to figure out

11   approximately how much Claxton was getting paid per week only

12   for this top product, the eight-piece chicken on the bone, we

13   would multiply $536,000 by the bottom-line cost, right?

14   A.  Well, it would be the 536 pounds.  But, remember, this is

15   just --

16   Q.  Pounds?

17   A.  -- estimate of what they think the weekly volume is going

18   to be.  It wouldn't be what we actually got paid.  What we

19   actually got paid would be based on how the orders actually

20   came in.

21   Q.  And I appreciate the qualification.  Some weeks it could be

22   more, and some weeks it could be less, right?

23   A.  Correct.

24   Q.  So this is an approximation?

25   A.  Correct.

Gregory Finch - Cross

1    *Q.*  If we take those approximately 536,000 pounds, and we look

2    at page 2, are you able to see the total FOB plant cost on the

3    screen, sir?

4    *A.*  Yes.

5    *Q.*  Okay.  And the total FOB plant cost is the bottom-line

6    plant cost for eight-piece chicken on the bone, right?

7    *A.*  Correct.

8    *Q.*  What is that number for the jury?

9    *A.*  1.0669.

10   *Q.*  Let's do some math, understanding it is an approximation,

11   if you could multiply 536 pounds by $1.0669.

12   *A.*  Okay.

13   *Q.*  What do you have?

14   *A.*  Approximately 572,000.

15   *Q.*  Okay.  And that's per week, right?

16   *A.*  Correct.

17   *Q.*  So if we take that 572,000 per week and multiple $572,000

18   per week by 52 weeks, what number do you get?

19   *A.*  29.7 million.

20   *Q.*  Again -- that means, again, you were careful to state,

21   approximately this contract that Mikell Fries signed just for

22   eight-piece chicken on the bone was worth about $30 million for

23   one year?

24   *A.*  Correct.

25   *Q.*  This is a three-year contract?

Gregory Finch - Cross

1    A.   Correct.

2    Q.   Okay.  Now, you testified on direct about shortages, and

3    you said there are, I think you used the word "myriad reasons"

4    for shortages, correct?

5    A.   Correct.

6    Q.   Okay.  And you also said they would happen -- I believe you

7    used the phrase, quote, all the time, correct?

8    A.   Could be daily.  Yes.

9    Q.   Could be daily.

10   A.   Sure.

11   Q.   You weren't willing to say daily, every day, but you said

12   it happens a lot.

13   A.   It happens a lot.  Sure.

14   Q.   It's going to happen at least weekly, right?

15   A.   Some weeks.  I can't say it's every week or every day.

16   Q.   Okay.

17   A.   But it happens a lot.

18   Q.   It happens a lot?

19   A.   Sure.

20   Q.   Happens multiple times a month?

21   A.   Safe to say.

22   Q.   Safe to say, multiple times a month.

23         Let's go through a few of those myriad reasons for

24   shortages.  Could you just give the jury a high-level list of

25   maybe some of the most common causes.

Gregory Finch - Cross

1   A.   Sure.  Not an exhaustive list by my means.  You could have

2   a plant that breaks down.  USDA could slow your line speeds

3   down.  You could have a live-operations issue where the birds

4   come in too big or too small.  You could have a weather event,

5   flood, hurricane, you know, winter storm, just -- there is a

6   myriad of different reasons why, you know, you could

7   potentially have a shortage in the supply chain.

8   Q.   And those shortages, they happen all year-round, right?

9   A.   Yes, the supply chain works 24/7, 365.

10  Q.   The things that cause shortages, be they winter storms,

11  thunderstorms, hurricanes, truck issues, plant issues, they

12  happen all during the year, correct?

13  A.   Correct.

14  Q.   In your experience, can you ever think of a single instance

15  where Claxton ever went more than a month without dealing with

16  some type of shortage, either its own shortage or the shortage

17  of another competitor?

18  A.   It would be rare that we wouldn't cover for somebody or

19  somebody cover for us.

20  Q.   Rare.  And fair to say, when you say rare, you can't, as

21  you sit here today, think of a single instance of that

22  happening?

23  A.   No.

24  Q.   Okay.  And you testified that when a company such as

25  Claxton experiences a shortage, they may call over to another

Gregory Finch - Cross

1   chicken supplier such as Pilgrim's, right?

2   A.  Correct.

3   Q.  So when a company like Claxton calls over to Pilgrim's

4   about covering a shortage, Claxton may place that call in the

5   summer or it might be in the winter, right?

6   A.  Correct.

7   Q.  Because shortages happen all the time throughout the year?

8   A.  All the time.  They don't take a break.  It's 24/7, 365.

9   Q.  Okay.  Now part of Scott Brady's job to deal with the 24/7,

10  365 shortages was to call over to Pilgrim's or another company

11  to figure out how to cover that shortage, right?

12  A.  Depending on who the customer was, yes.

13  Q.  That customer -- let's talk about one specifically would

14  include Pilgrim's Pride, correct?

15  A.  It depends on who the QSR is.  It certainly could be

16  Pilgrim's Pride, but it depends on what customer and which

17  supply chain is having a shortage.

18  Q.  Okay.  Well, you testified to KFC, correct?  You testified

19  about KFC, sir?

20  A.  Sure.

21  Q.  For KFC, does Pilgrim's Pride provide chicken?

22  A.  Yes, they're in the supply chain.

23  Q.  As does Claxton, correct?

24  A.  Correct.

25  Q.  So Scott Brady, it's part of his duty to cover shortages

Gregory Finch - Cross

1   24/7, 365, could call over to Pilgrim's, specifically Roger

2   Austin, right?

3   *A.*  If it's a KFC shortage, Scott would have dealt with Roger

4   on the shortage.  Yes.

5   *Q.*  If it's a KFC shortage, it's Scott and Roger, right?

6   *A.*  Correct.

7   *Q.*  Okay.  And you would expect those phone calls between Scott

8   and Roger to happen year-round, because shortages happen 24/7,

9   365, right?

10  *A.*  Correct.

11  *Q.*  And --

12  *A.*  And when a shortage happens, it's more than one call.  It

13  could be 12, 15, 16, 18, who knows how many calls.  It's not

14  just a single call to effect the transaction.

15  *Q.*  Right.  And there is no reason why, for example, shortages

16  would happen on bid day more often than they would on any other

17  time of year, is there?

18  *A.*  Well, shortage will happen regardless of what day of the

19  week it is.  So, you know, to say they happen more often at bid

20  day, I have no frame of reference to make that.

21  *Q.*  I'll rephrase.  You wouldn't expect them to happen any more

22  often on bid day than they do at any other time of year, would

23  you?

24          *MR. BELLER:*  Objection.  Asked and answered,

25  foundation.

Gregory Finch - Cross

1          THE COURT:  Overruled.

2     BY MR. LOVELAND:

3     Q.  Do you want me to repeat the question, sir?

4     A.  Well, there is no way for me to tell the supply chain to

5     have a shortage.  I have no way to have an expectation that

6     there is going to be a shortage or not be a shortage, right?

7     So, you know, I -- the supply chain is not sitting around

8     going, We're going to run out of chicken right here, and this

9     is when bids are due.

10    Q.  Yeah.

11    A.  I mean, I would have no need to think of it in those terms.

12    Q.  Absolutely.  And I want to rephrase to make sure that we

13    understand each other.

14         You testified a lot about your extensive experience

15    working in the chicken industry, not just for Claxton, but for

16    Harrison before that, 25 years.  The question I have is simply,

17    based on all of that, you're monitoring the supply chain,

18    you're listening in on Pilgrim's' earnings calls, reading the

19    8-Ks, studying the industry, the market intelligence.  Is there

20    any reason why you could think of why calls for shortages would

21    be more likely to happen on bid day, as compared to any other

22    days of the year?

23         MR. BELLER:  Objection.  Compound, assumes facts not

24    in evidence, foundation, speculation.

25         THE COURT:  Overruled.

Gregory Finch - Cross

1    THE WITNESS:  Sir, you'll have to repeat that.  I

2    don't understand -- I don't think I understand the question.

3    BY MR. LOVELAND:

4    Q.  Happy to.  I'm going to repeat it for you, sir.  Just a

5    moment.  I want to make sure that we understand each other.

6         You testified a lot about your extensive experience

7    working in the chicken industry, not just for Claxton, but for

8    Harrison before that, for a total of around 25 years.  The

9    question I have is simply, based on all of that, you're

10   monitoring the supply chain, you're listening in on Pilgrim's

11   earning calls, you're reading of 8-Ks, you're studying the

12   market intelligence.  Is there any reason why you could think

13   of why shortages would be more likely to happen on bid day as

14   compared to any other day of the year?

15   A.  No, I can think of no reason why.

16   Q.  Okay.  So Scott Brady and Roger Austin going six months

17   without talking to each other and then talking during the time

18   that bids are due doesn't make much sense from a shortages

19   perspective, does it?

20   A.  Sure, it's definitely conceivable.

21   Q.  Let's unpack that.  You said shortages happen 24/7, 365.

22   You said you can't think of -- excuse me, sir, I'm going to

23   need a verbal yes.  You said shortages happen 24/7, 365, right,

24   sir?

25   A.  They can, yes.

Gregory Finch - Cross

1    Q.   Okay.  And you said -- and you said that you can't think of

2    any reason why they would happen more often on bid day than any

3    other day of the year, right?

4    A.   Correct.

5    Q.   And you said that you can't think of a single instance when

6    Claxton has gone a month without covering a shortage one way or

7    the other, right?

8    A.   Correct.

9    Q.   So I'm going to ask you, is going six months, Scott Brady

10   and Roger Austin going six months without calling each other,

11   and then calling each other when bids are due, that can't be

12   explained by shortages, can it, sir?

13   A.   Makes total sense to me.  If the shortages Scott was

14   covering weren't KFC, he wouldn't have necessarily reason to

15   talk to Roger Austin for six months or eight months or whatever

16   the time period is.  The shorts just don't happen to KFC; the

17   shorts happen to all of the various supply chains.  So it's

18   conceivable that we went a six-month period without shorts

19   happening, sure.  I mean, every once in a while we get lucky

20   and the supply chain works the way it's designed to work, and

21   then there aren't interruptions.

22   Q.   Do you remember being asked questions during direct

23   examination that sort of went into the specifics of shortages

24   and covers?

25   A.   Yes.

Gregory Finch - Cross

1    *Q.*   Okay.  I want to talk about that for a bit.  Shorts and

2    coverages have nothing to do with bids or requests for

3    proposals, right?

4    *A.*   They have nothing to do with it?

5    *Q.*   My question is that, yes, sir.

6    *A.*   Correct.  Shorts and covers are shorts and covers.

7    *Q.*   Shorts and covers are shorts and covers, and they have

8    nothing to do with bids and RFPs, and you testified that the

9    price of covering a short is the current price, to your

10   knowledge, right?

11   *A.*   Correct.

12   *Q.*   Okay.  Those prices have already been negotiated, right?

13   *A.*   Yes.

14   *Q.*   Those prices have nothing to do with any bid that is going

15   on, right?

16   *A.*   Correct.

17   *Q.*   And that's because new prices have not been negotiated yet,

18   right?

19   *A.*   Well, I don't know what point in time you're talking about.

20   I don't know that I understand your question.

21   *Q.*   I'm going to strike it, sir.  Thank you.

22           Now, in the context of you buying chicken from a

23   competitor to cover a shortage, you would never tell that

24   competitor, Raise your price on me, would you?

25   *A.*   Raise their price?

Gregory Finch - Cross

1   Q.  Yeah.  Would you ever tell a competitor, Raise your price

2   on me?

3   A.  Not likely.

4   Q.  No, have you ever heard of someone telling a competitor,

5   Please raise your price on me?

6   A.  I can't think of an instance.

7   Q.  Okay.  And you have never thought of an instance where a

8   competitor says, Hey, can you raise your price of chicken for

9   me to buy it from you?

10  A.  Well, I think we all want to sell our chicken for the most

11  we can.  But on the buy side, we want to buy our chicken for

12  the least amount we can.

13  Q.  I'm going to note the polite chuckle.  It was pretty

14  charming, for the record.

15          MR. LOVELAND:  Could I have the Court's permission to

16  please publish Government Exhibit 1427, Your Honor?

17          THE COURT:  You may.

18  BY MR. LOVELAND:

19  Q.  Are you able to see what is on the screen, sir?

20  A.  Yes.

21  Q.  Do you see where Scott Brady texted Mikell Fries, He said

22  to raise our prices?

23  A.  Yes, I see that.

24  Q.  Okay.  Do you see where Mikell Fries says, Tell him we are

25  trying?

Gregory Finch - Cross

1    *A.*  I see that.

2    *Q.*  Do you see where Scott Brady says, Will do?

3    *A.*  Sure.

4    *Q.*  Roger Austin isn't saying, Raise your prices for me so I

5    can buy chicken for you more expensively, is he, sir?

6    *A.*  I don't know that Roger Austin said this.  It says "he."

7    From this document, I can't tell who said what.

8    *Q.*  Okay.  Let's go up.  Pilgrim's is 30 back and Tyson is 31

9    back.  Pilgrim's is Pilgrim's Pride, right?

10   *A.*  Correct.

11   *Q.*  Okay.  Tyson is Tyson chicken, right?

12   *A.*  Correct.

13   *Q.*  Okay.  I talked to Roger and this month he is .03 higher

14   than us on eight-piece and his case weight is 50.5, right?

15   *A.*  Yes.

16   *Q.*  Do you see that?

17   *A.*  Yes.

18   *Q.*  Is there a Roger in the small sales department at Claxton?

19   *A.*  No.

20   *Q.*  Okay.  So when Roger Austin says, He said to raise our

21   prices, that's Scott Brady relaying that to Mikell Fries.

22   Roger Austin, a competitor, isn't saying, Please raise your

23   prices on me so that I can buy chicken to cover the shortage

24   more expensively, is he, sir?

25   *A.*  I don't know what he's saying, but probably not.

Gregory Finch - Cross

1   Q.  Probably not.  Not something you've ever heard of; is that

2   right?  Not something you've ever heard of for a competitor to

3   say, Raise your prices so I can buy more expensive chicken from

4   you, right?

5   A.  I don't recall.

6   Q.  Well, is it that you don't recall, or is your testimony

7   earlier that you said, you've never heard of such a thing, and

8   did you chuckle when you said it?

9   A.  May have.

10  Q.  Okay.  I want to talk a little bit about market share and

11  Claxton's market share and its relation to the larger players

12  in the industry.  You -- do you recall testifying about those

13  topics on direct, right?

14  A.  Yes.

15  Q.  Did you say that Claxton is about 1 percent of the poultry

16  market?

17  A.  Yes.

18  Q.  Okay.  Now, that's just the poultry market at large, right?

19  A.  Correct.  There is 30 or 40 producers that make up the

20  poultry industry.  So in the greater poultry industry, Claxton

21  Poultry is roughly 1 percent.

22  Q.  Okay.  And when you say the greater poultry industry, that

23  includes things broader than the quick-service restaurants,

24  right?

25  A.  That's the entire industry.

Gregory Finch - Cross

1    Q.   Yeah, and quick-service restaurants is a submarket within

2    the industry, right?

3    A.   Correct, it's a submarket of the chicken business, yes.

4    Q.   Okay.  So what percentage of the quick-service industry for

5    chicken does Claxton serve?

6    A.   I don't know the exact number, but I would say we're

7    probably in -- of the QSRs that we supply to -- not the entire

8    QSR channel, but the QSRs that we supply to, my guess would be

9    we're probably 8 to 12 percent of those restaurants.

10   Q.   8 to 12 percent.  And this is your estimate, sir, you were

11   clear on that?

12   A.   That's correct.

13   Q.   All the QSR restaurants that Claxton provides to?

14   A.   Correct.  You throw McDonald's and Burger King and Wendy's

15   and Subway and all of those back in there, we're way under

16   5 percent, approaching the 1 percent.

17   Q.   Understood.

18           In 2015, you had 12 percent of the market for Popeyes

19   chicken, right?

20   A.   Could be.

21   Q.   Now, is it fair to say that location of a processing plant

22   is a critical piece of information for chicken customers?

23   A.   It can be.

24   Q.   Because chicken is a fresh product, right?

25   A.   Most of the time.  It is sold in frozen form as well.

2090

Gregory Finch - Cross

1   Q.   Spoilage is a concern over large distances for the fresh

2   product, which is the majority of it, right?

3   A.   Spoilage can be a concern.

4   Q.   Yeah, and delivery costs can be substantial, even if you

5   increase the distance a few hundred miles, right?

6   A.   Can be, especially in today's fuel market.

7   Q.   Certainly.

8   A.   Yes.

9   Q.   So fair to say that Claxton is more important in some areas

10  of the country than other areas of the country?

11  A.   Sure.

12  Q.   And Claxton's plant is located how far from the

13  Florida/Georgia line?

14  A.   I don't know the exact distance.

15  Q.   Okay.  Could you give the jury an estimate, whether it be

16  time it takes you to drive, how long, about how many miles?

17  A.   We can get to Jacksonville in about two hours from the

18  plant.

19  Q.   Okay.  Jacksonville, Florida, in about two hours from

20  Claxton's plant in Georgia?

21  A.   Jacksonville is inside the Florida line.  I don't want

22  anybody to misunderstand what I'm saying.

23  Q.   Certainly, it's a little further than just to get to the

24  border to get to Jacksonville, right?

25  A.   Yes.

Gregory Finch - Cross

1   *Q.*   Jacksonville is in northern Florida, right?

2   *A.*   Yes.

3   *Q.*   About 20 million people live in Florida, right?

4   *A.*   I don't know.

5   *Q.*   Is it a market that you've studied and looked at closely in

6   your role as CFO of the company for about 11 years?

7   *A.*   Not in particular, no.

8   *Q.*   Florida is not a market that you've particularly focused on

9   at Claxton Poultry?

10  *A.*   Not to know how many people live there, no.

11  *Q.*   Okay.  Is it a market that you focused on in terms of the

12  business that you do there?

13  *A.*   We sell a good amount of chicken into Florida.

14  *Q.*   Okay.  Is it a market you focused on in terms of the number

15  of restaurants that, for example, Chick-fil-A has in Florida?

16  *A.*   No.

17  *Q.*   Is it a market you've focused on in terms of Popeyes'

18  footprint restaurants in Florida?

19  *A.*   No.

20  *Q.*   So you haven't done market intelligence on Florida, the

21  state that is less than two hours from your plant?

22  *A.*   We have not.  But remember, the QSRs dictate to us where to

23  send our product.

24  *Q.*   Okay.

25  *A.*   So what is going on in Florida is not of real consequence

Gregory Finch - Cross

1  to us, because we may be supplying for Popeyes, and they say,

2  Send it to Louisiana, or we -- they may say, Send it to

3  California.  So we don't control where the QSRs tell us to send

4  their product in the supply chain.

5  Q.  Right.  But you testified on direct that part of your job

6  in market intelligence is to pay attention to your customers'

7  needs, right?

8  A.  Well, market intelligence is certainly part of what I do.

9  But I don't drill down to the population statistics.

10  Q.  Okay.  How common is it for you to send a truckload of

11  chicken to Seattle, Washington?

12  A.  At time of the year -- well, Seattle, probably not very

13  often.  But there is times of the year where we're the only

14  supplier for a certain what is called an LTO, limited time

15  offer.  Like Popeyes might do a Rip'n Chicken or Beer Can

16  Chicken or something like that, and Claxton is the only one

17  that produces it for the entire country.  There are times when

18  that is going on where we have to ship product to Portland or

19  we have to ship it to Texas or wherever they tell us to ship

20  it.

21          So it's certainly plausible, depending on what is

22  going on with the market and the supply chain and the QSR's

23  business, that we could potentially go that far.  Not to the

24  state of Washington, I'm not aware that we've ever sold to the

25  state of Washington.

Gregory Finch - Cross

 1   Q.  Okay.

 2   A.  That's a very detailed answer about exceptions.  My

 3   question is the largest market that you are next to, Florida,

 4   does Claxton have significant market power in Florida?

 5          MR. TUBACH:  Objection, Your Honor.  Market power is a

 6   legal definition, calls for speculation.

 7          THE COURT:  Sustained.  If you could define the term.

 8          MR. LOVELAND:  I'll rephrase.  Thank you very much,

 9   Your Honor.

10   BY MR. LOVELAND:

11   Q.  Claxton's chicken is more important to restaurants in

12   Florida based on its location than it is to restaurants in

13   Washington, correct?

14   A.  Not necessarily.  I mean, to the Washington state, that

15   particular example, sure.  But remember, we don't control where

16   the restaurants tell us to send their product.  So do we market

17   in Florida?  Yeah, we do, primarily through distributors and

18   non-QSR business, but we do send QSR products to there, but

19   that's dictated by the customer.  They tell us what

20   distribution centers --

21   Q.  That's something you pay attention to, what the customer

22   tells you, right?  You testified a lot on direct about what the

23   customer tells you, right?

24   A.  We -- correct.

25   Q.  When the customer tells you, I want you to advertise in

Gregory Finch - Cross

 1   Florida, is that something you pay attention to?

 2   *A.*   We don't advertise in Florida.

 3   *Q.*   You just mentioned advertisement, sir.  Could you clarify

 4   for the jury what you meant there?

 5   *A.*   Advertising?

 6   *Q.*   If I misunderstood you, I apologize.

 7   *A.*   Yeah.  I don't remember saying advertising.  We -- you

 8   know --

 9   *Q.*   If Claxton's plant shut down, do you have an understanding

10   based on your reading 8-Ks, listening to earning calls, doing

11   market intelligence, do you have an understanding of how that

12   would affect your quick-service restaurant customers in

13   Florida?

14          *MR. LAVINE:*  Objection.  Foundation, Your Honor, and

15   speculation.

16          *THE COURT:*  Overruled.  He can answer if he knows.

17          *THE WITNESS:*  I don't know specifically.

18   BY MR. LOVELAND:

19   *Q.*   Do you know more about your competitors than your

20   customers, sir?

21   *A.*   Well, some of my competitors are my customers.  But, no,

22   not necessarily.

23   *Q.*   I want to talk a little bit about pricing authority, which

24   is a term that I believe you used on your direct.  Do you

25   recall that?

Gregory Finch - Cross

1    *A.*   I do.

2    *Q.*   Okay.  Now, you testified that Scott Brady does not have

     pricing authority, right?

4    *A.*   He does not.

5    *Q.*   Does Claxton have any written policy that says this?

6    *A.*   No.

7    *Q.*   Okay.  But someone has pricing authority, right?

8    *A.*   Correct.

9    *Q.*   Doris Fries has pricing authority, correct?

10   *A.*   Correct.

11   *Q.*   Her grandson, Mikell Fries, has pricing authority, correct?

12   *A.*   Yes.

13   *Q.*   He had pricing authority even before he was president,

     correct?

15   *A.*   Yes.

16   *Q.*   And pricing authority can be delegated, correct?

17   *A.*   Pricing authority is rarely if ever delegated -- what's

     the -- what was your term?  Delegated.  I'm sorry.

19   *Q.*   Pricing --

20   *A.*   Delegated.  Sorry for the brain freeze.

21   *Q.*   No, sir.  Pricing authority can be delegated, correct?

22   *A.*   No.

23   *Q.*   It cannot?

24   *A.*   No.

25   *Q.*   I think we're going to come back to that in a moment.

Gregory Finch - Cross

1          *MR. LOVELAND:*  What I'd like to do is ask the Court's

2    permission to publish Government Exhibit 1503.

3          *THE COURT:*  You may.

4          *MR. LOVELAND:*  Okay.

5    *BY MR. LOVELAND:*

6    *Q.*  And, Mr. Finch, is this something you can see on your

7    screen?

8    *A.*  It's a little small, but I can make it out.

9    *Q.*  It is.

10         *MR. LOVELAND:*  Let's do the top half, Ms. Pearce.

11   *BY MR. LOVELAND:*

12   *Q.*  UFPC is what, Mr. Finch?

13   *A.*  That is the buying co-op for KFC prior to RSCS.

14   *Q.*  Okay.  And so RSCS is the new name, but it's, essentially,

15   the same entity, UFPC and RSCS, right?

16   *A.*  Correct.

17   *Q.*  This is a contract for KFC chicken between UFPC, KFC, and

18   Claxton, correct?

19   *A.*  Correct.

20   *Q.*  And the period is -- it's for periods 1 through 13, 2013,

21   meaning the calendar year 2013, right?

22   *A.*  Correct.

23   *Q.*  Okay.  And this particular exhibit, which is a part of the

24   contract, right, exhibit is a part of the contract?  Right?

25   *A.*  It is.

2097

Gregory Finch - Cross

1    Q.   This is for eight-piece chicken on the bone, right?

2    A.   Correct.

3    Q.   Okay.

4            MR. LOVELAND:   Can we see the bottom half.

5            Just a moment.   The Court's indulgence, please.

6    BY MR. LOVELAND:

7    Q.   You see CLA, underscore, in the bottom right-hand corner

8    there, right?

9    A.   Yes.

10   Q.   That means this is a document produced to this court by

11   Claxton Poultry, right?

12   A.   That's my understanding.

13   Q.   And that's your understanding as the custodian who is in

14   charge of the process of producing documents to this court in

15   this case, correct?

16   A.   Right.

17   Q.   You were the main person from Claxton in charge of that,

18   right?

19   A.   Correct.

20   Q.   Okay.   So this is the contract that was entered into

21   between Claxton and KFC's buying co-op for 2013 for eight-piece

22   chicken on the bone, right?

23   A.   Yes, it appears to be.

24   Q.   Scott Brady signed this in December of 2012, right?

25   A.   Correct.

Gregory Finch - Cross

1   Q.   You testified on direct you didn't listen to him about

2   pricing for this exact contract because he was new in

3   August 2012, right?

4   A.   Correct.

5   Q.   You then just said, pricing authority is rarely delegated,

6   but that is his signature, four months after joining the

7   company, on this contract, right, sir?

8   A.   Clearly, Scott signed the contract.  But he didn't set the

9   price; Mikell Fries did.

10  Q.   Scott signed the contract through authority delegated to

11  him, right?

12  A.   Correct.  Mikell --

13  Q.   Doesn't seem like a rare occurrence; it happened within

14  four months of walking in the door; is that right?

15  A.   Mikell decided to delegate the signature authority to sign

16  the contract to Scott Brady for this contract.

17  Q.   This contract is binding on Claxton, correct?

18  A.   It is.

19  Q.   Committed Claxton to provide chicken to KFC, correct?

20  A.   Yes.

21  Q.   At the price specified here, which is total FOB plant cost,

22  those two numbers.  Do you see them?

23  A.   Yes.

24  Q.   Could you explain what those two numbers are for the jury?

25  A.   Sure.  We talked about this a little bit earlier, but one

Gregory Finch - Cross

1    is purple price and one is orange price.  So based on the exact

2    specifications of those chickens that we're producing, one is

3    going to have a purple label, and one is going to have an

4    orange label.

5    Q.  I may save you some chicken math, but fair to say this

6    contract was worth millions and millions of dollars?

7    A.  Sure.

8    Q.  Okay.  Now, you used the phrase "joint supply network" or

9    "joint supplier network" during your direct examination, right?

10   A.  Yes.

11   Q.  That was in the context of Claxton and its competitors

12   working together to sell each other chicken, right?

13   A.  For the QSRs, yes.

14   Q.  Okay.  And working with the QSRs, right?

15   A.  Correct.

16   Q.  Okay.  So Scott Brady sold to competitors in this so-called

17   joint supply network, right?

18   A.  Correct, they were his customers.

19   Q.  Okay.  Now, Scott Brady contacted competitors in the joint

20   supplier network, and when he did so, your testimony is that

21   that was proper to do, right?

22   A.  Sure, Scott's job is to sell chicken inside those QSR

23   supply chains, Tyson, Pilgrim's, you know, Perdue, Mar-Jac, you

24   know, fill in the blank of the approved suppliers.  While they

25   are competitors, they are also our customers.

Gregory Finch - Cross

1    *Q.*  Where did the term "joint supply" or "joint supplier

2    network" come from?

3    *A.*  They came from Greg Finch.

4    *Q.*  You called it a Greg term previously; is that right?

5    *A.*  I did.

6    *Q.*  Do you have an idea of how many times joint supply network

7    or joint supplier network, either one, shows up in the more

8    than 200,000 documents you produced to the Court in this case?

9    *A.*  I don't have the exact number, but probably not very many.

10   *Q.*  Would it surprise you to know the answer is zero?

11   *A.*  No.  There is a lot of terms I use conversationally and

12   colloquially that don't make it into the written form.  Not

13   surprising.

14   *Q.*  Okay.  Can you think of a single instance where you read

15   that phrase in something related to this case?

16   *A.*  No.  But it's a Greg term.  It helps me understand the

17   subsets inside the QSR.

18   *Q.*  When you say it's a Greg term, it's not a term that has any

19   meaning at large in the industry, something you use?

20   *A.*  It has meaning to Greg.

21   *Q.*  Let's talk about the phrase "directional guidance."  Do you

22   remember using the phrase "directional guidance"?

23   *A.*  Sure.

24   *Q.*  And the way you described it, directional guidance is when

25   customers tell Claxton or another chicken supplier where to go

Gregory Finch - Cross

1   with their prices, right?

2   A.   The QSR customers, yes.

3   Q.   QSR customers, specifically, such as KFC, right?

4   A.   Correct.

5   Q.   Such as Chick-fil-A, right?

6   A.   Correct.

7   Q.   But does KFC ever say through its directional guidance,

8   Please raise your prices higher?

9   A.   No.

10  Q.   Okay.

11  A.   I can think of one time where they gave us instruction on

12  the last bid, because they were adding a sourcing fee to the

13  overall cost model.  So that's the only time that I can

14  remember in the relevant period.  So their primary direction is

15  down.

16  Q.   So directional guidance is down?

17  A.   Correct.

18  Q.   Okay.  Is directional guidance a Greg term?

19  A.   Directional guidance a Greg term?

20  Q.   Yes.  Is it a term that you would use and you would call a

21  Greg Finch term or a Greg term?

22  A.   Well, I mean, I think we would all agree that down is a

23  direction.  Directional guidance -- I mean, yeah, it's mine.

24  Q.   Okay.  That's a lot of letters for down, sir.  Can you

25  recall a single instance of reading directional guidance in any

Gregory Finch - Cross

1    of the 200,000 documents you produced to the Court in this

2    case?

3    A.   I don't recall.

4    Q.   Would it surprise you to know that it doesn't exist?

5    A.   Not at all.  Once again, there is words I use and phrases I

6    use conversationally that never make it into written form.

7    Q.   Okay.

8    A.   I'm sure that's true of most everybody.

9    Q.   Let's talk about large or big birds.  Do you recall

10   testifying about that on direct?

11   A.   Yes.

12   Q.   In Claxton's history, how many large birds has it sold?

13   A.   How many have we sold?

14   Q.   Yes.

15   A.   By definition of the industry, zero.

16   Q.   Okay.  And you testified on direct that it would not have

17   been feasible for Claxton to convert to producing large birds

18   even during the time period where large birds were commanding a

19   premium in terms of margin, correct?

20   A.   Correct.

21   Q.   Now, as part of the collaborative joint supplier network

22   that you testified about, did Claxton ever tell Pilgrim's that

23   it was never going to convert to producing big birds?

24   A.   Did we tell Pilgrim's?

25   Q.   Yes.

Gregory Finch - Cross

1    *A.*   No.

2    *Q.*   Why not?

3    *A.*   Because our business decisions are of no consequence to

4    Pilgrim's.

5    *Q.*   Because you wouldn't want Pilgrim's to use that information

6    against you, right?

7    *A.*   I mean, we would never discuss a business decision like

8    that with Pilgrim's.  The discussions we were having around

9    this time were with the QSR customers, not other broiler

10   producers.

11   *Q.*   Right, on the same token, you wouldn't want to tell a

12   competitor your future bidding price, right?

13   *A.*   Correct.  To my knowledge, Claxton Poultry never did.

14   *Q.*   Because it's something the customer -- strike that and

15   excuse me -- because it's something your competitor could use

16   against you, your future bid price, right?

17   *A.*   If they knew it, I guess they could.

18   *Q.*   So unless you have an agreement with your competitor,

19   you're not going to tell them your future prices, correct?

20       *MR. TUBACH:*  Objection, Your Honor.  Calls for

21   speculation and lack of foundation.

22       *THE COURT:*  Overruled.

23   *BY MR. LOVELAND:*

24   *Q.*   May I repeat the question, or do you remember it, sir?

25   *A.*   Repeat it, please.

Gregory Finch - Cross

1   Q.   So unless you have an agreement with a competitor, you're

2   not going to tell your competitor your future prices, correct?

3   A.   Well, I'm not going to tell my competitor -- anybody my

4   future price, other than the QSR customer I'm dealing with.

5   Q.   You're not going to tell anybody other than the QSR

6   customer you're dealing with what your future price is, is that

7   your testimony, sir?

8   A.   Correct.

9   Q.   Okay.  Now, I just -- couple brief questions.  As the CFO

10  of Claxton, is it fair to say the buck stops for you with all

11  things financial with the company?  Right?

12  A.   Yes.

13  Q.   Okay.  The cost-plus model that you discussed on your

14  direct testimony, you mentioned it was not affected by market

15  conditions.  Do you recall that?

16  A.   Yes.

17  Q.   Okay.

18  A.   It's cost driven.

19  Q.   Claxton Poultry knew that big birds were a fad, right?

20  A.   Yes.

21  Q.   Okay.  And so Claxton Poultry's cost-plus model was not

22  affected by the large-bird fad, right?

23  A.   It was not affected by us; it was affected by the QSR,

24  because KFC, who also knew about what was going on with big

25  birds, knew they were in big trouble if they didn't get the

Gregory Finch - Cross

1   small-bird guys to stay in small bird; therefore, they

2   approached the supply chain with this concept of a big-bird

3   adjustment to incent the small-bird suppliers to stay in small

4   birds.

5   Q.   And Claxton knowing that large birds were a fad and Claxton

6   knowing that it was infeasible to convert its plant to large

7   birds never considered fully converting to large birds,

8   correct?

9   A.   What do you mean by "fully"?

10  Q.   Converting to large birds was not something that was ever

11  seriously considered by Claxton Poultry, because Claxton

12  Poultry recognized both that it was a fad and that it wasn't

13  feasible in terms of cost, correct?

14  A.   Well, once again, I don't know what you mean by

15  "seriously."  But I'll tell you what we did is we looked at it,

16  because it made sense for us to look at it.  We've got a

17  fiduciary responsibility to the company to take a look at

18  things when these market conditions happen.  So we looked at

19  it.  Did we study on it for months and years?  No.  It didn't

20  take long to study on it because the lack of feasibility

21  surfaced fairly early.  You know, 30 or $40 million CapEx

22  expenditure, all new customers, the ripple effect through the

23  supply chain, it was evident pretty quick into the process that

24  as a single-plant operator, it just wasn't feasible for us to

25  switch to the large birds.

2106

Gregory Finch – Cross

1   Q.  So market conditions are something that could affect your

2   prices, then; is that fair to say?

3   A.  Sure.

4   Q.  Okay.

5   A.  At times.

6          MR. LOVELAND:  Court's indulgence for one moment.

7          THE COURT:  Sure.

8   BY MR. LOVELAND:

9   Q.  Sir, you testified on direct that other competitors'

10  information on costs and prices does not have any effect on

11  Claxton's price because Claxton calculates its costs

12  independently to arrive at cost independently, right?

13  A.  Correct.  If we happen to learn information, it's just a

14  data point in our process.

15  Q.  But you also testified that Claxton's pricing strategy was

16  to end up in the middle of the pack, right?

17  A.  Correct.

18  Q.  Okay.  And you also testified that you took directional

19  guidance, meaning, go down, from your customers, right?

20  A.  The QSR customers, yes.

21  Q.  And that means that Claxton Poultry, by and large, when the

22  customer said, Go down, Claxton Poultry went down, right?

23  A.  Correct.

24  Q.  Okay.  So are the prices that Claxton sets for its

25  customers primarily results of the math problem of the

Gregory Finch - Cross

1    cost-plus model, or is it the goal to end up in the middle

2    where customers tell you to be?

3    A.   Well, our ultimate goal is to sell our chicken for as much

4    as we can sell our chicken for, as much as they'll allow us to

5    sell for.   But as far as being in the middle, we can't put

6    ourselves in the middle.   The QSR customer is the only one that

7    has all six, seven, eight, nine, ten, eleven, twelve companies'

8    bids to be able to put us in the middle.   So we have to put a

9    high degree of trust in that QSR to put us in the middle, and

10   we have to guess that the directional guidance they're giving

11   us is going to result in us being put in the middle by them.

12   Q.   Okay.   So you used the word "trust" in the QSRs'

13   directional guidance, right?

14   A.   Sure, we have to trust them.   They bluff like anybody else.

15   But over time, you know -- after you've dealt with a customer

16   for 20 years or 40 years or 50 years, they know your

17   tendencies.   They know where you're trying to be, what your

18   goals are as their supplier.   So that partnership relationship

19   that is built over a bunch of years allows us to trust that

20   they're going to put us in the middle at the end of the pricing

21   mechanism.   And the reality is until they make their last phone

22   call or their last email to that last supplier, they don't

23   know where the middle is.

24   Q.   So in figuring out where the middle is, it would be helpful

25   for you to know your competitors' prices, right?

Gregory Finch - Cross

1    *A.* Not for us. We trust the QSR to put us in the middle. We

2    don't rely on what they're doing with the other customers.

3    *Q.* Okay. You trust the QSR, but you also just said the QSR

4    often does bluff; is that right?

5    *A.* Sure.

6    *Q.* Mikell Fries knows that the QSR does often bluff, doesn't

7    he?

8    *A.* I don't know about often, but certainly they have been

9    known to bluff.

10   *Q.* Let's talk about your role in negotiations with customers.

11          Now, did you have direct client-facing interactions in

12   your role at -- as CFO?

13   *A.* Well, it depends on the customer.

14   *Q.* For KFC?

15   *A.* For KFC? Typically, my -- so -- typically, on a KFC

16   contract, I am front and center on the front of the process,

17   because Mikell and Scott can't start the bidding process

18   without the cost constructs. I update the pricing model, and

19   then from that point forward, I'm in an advisory role, as we

20   get feedback from the QSRs to -- as to what directional

21   guidance is, and those kinds of things we'll have internal

22   conversations potentially about those. On the back end, once

23   Mikell has decided volumes and pricing, I show up back again

24   front and center for period pricing. That's kind of how my

25   role ebbs and flows within the process of the RFP.

2109

Gregory Finch - Cross

1    Q.  In the context of your role ebbing and flowing, can you

2    describe for the jury what, if any, client contact you have?

3    A.  Who are you calling the client?  Like KFC?

4    Q.  Yes.

5    A.  RSCS --

6    Q.  Let's say the customer, RSCS on behalf of KFC.

7    A.  Yeah, very little.

8    Q.  Okay.  And the client-facing contact was handled by people

9    like Mikell Fries and Scott Brady, right?

10   A.  Correct.

11   Q.  So in your role, you got reports back from Mikell Fries and

12   Scott Brady about what was happening during the negotiations,

13   right?

14   A.  Correct.

15   Q.  Now, a lot of that is happening on the phones, right?

16   A.  It can, sure.

17   Q.  So you may see emails, but you have to rely on Mikell

18   Fries and Scott Brady to convey any information that happened

19   over the telephone, right?

20   A.  Correct.  I mean, sometimes they forward me texts or

21   emails, but usually our conversations are in person or on the

22   phone.

23   Q.  Now, just getting back to Claxton's goal about being

24   somewhere in the middle range of price, you also testified that

25   customers knew Claxton wanted to be in the middle, correct?

Gregory Finch - Cross

1    A.   Yes.

2    Q.   Okay.  What's the basis for your knowledge that customers

3    wanted to be in the middle?

4    A.   The customers know?

5    Q.   Yeah.

6    A.   Because that's our strategy, and we communicated it to

7    them.

8    Q.   That's a strategy you communicated, or is that a strategy

9    primarily communicated by Mikell Fries and Scott Brady?

10   A.   Would have been primarily by Mikell Fries or Scott Brady.

11           MR. LOVELAND:  Court's brief indulgence?

12           THE COURT:  Sure.

13   BY MR. LOVELAND:

14   Q.   I want to unpack the concept of "in the middle."

15           Mr. Finch, is the number three in the middle?

16   A.   What's that?

17   Q.   Is the number three in the middle?

18   A.   I don't have enough information to answer that question.

19   Q.   Right, because you have to know all of the other numbers in

20   order to know whether the number three is in the middle, right?

21   A.   Yeah, if you just want me to randomly put three in the

22   middle, sure.  I need to know, is it 100 numbers we're talking

23   about or what are we talking about, sure.

24   Q.   I wouldn't want you to do that.  If you knew the number set

25   was one, two, three, four, and five, then you would know that

2111

Gregory Finch - Cross

1    three is in the middle?

2    A.   If it's five, two and a half, yeah, round to three.

3    Q.   Okay.  Tell me this, if Claxton's goal is to be in the

4    middle of a group of bids, it would be good for Claxton to know

5    what those other bids are, correct?

6    A.   It's largely immaterial because the only one to put us in

7    the middle is the QSR.

8    Q.   Sir, that wasn't my question.

9    A.   Yes, if I -- it doesn't -- I mean, for me to know

10   Pilgrim's' price, I could put me between me and Pilgrim's, but

11   for our process, we didn't rely on what competitor pricing was,

12   we relied on the QSR to put us in the middle.

13   Q.   Sir, my question was, if Claxton's goal was to be in the

14   middle, especially considering that customers -- QSR customers

15   can and do bluff, would it be good for Claxton to know other

16   companies' bids?

17   A.   Right.  Other company's bids are a data point for Claxton

18   in the process.

19   Q.   Okay.

20   A.   So --

21   Q.   It would be helpful data for Claxton to know?

22   A.   Perhaps, but we don't know how to independently verify

23   those numbers, so we don't know what number they're giving us,

24   is it period price, future price, some number they made up, so

25   there is no way to independently verify it.

2112

Gregory Finch - Cross

1   Q.  Just like you have a course and pattern of dealing with a

2   customer, you grow to trust them over time, couldn't the same

3   thing happen with Pilgrim's as part of the joint supply

4   network?

5   A.  I'm sorry, I missed the first part of your question.

6   Q.  Absolutely not.  I should have been closer to the mike.

7         Just like you have an ongoing relationship that you

8   testified about with customers that leads to trust, couldn't an

9   ongoing relationship between people at Claxton and Pilgrim's

10  lead to trust in the information provided?

11  A.  Possibly.

12  Q.  So if you call your competitors to ask, and you do that on

13  a regular basis, you could figure out whether they're

14  trustworthy or not, couldn't you?

15  A.  I guess if you had enough data points you could, yeah.  You

16  could make a decision.

17  Q.  What if you previously worked at a company and switched

18  over to another company, would that allow you to establish

19  trust?

20  A.  Not necessarily.

21  Q.  Okay.  So you recall and you testified on direct that in

22  late summer and fall of 2014, KFC through RSCS was negotiating

23  a three-year contract to run from 2015 to 2017, right?

24  A.  Yes.

25  Q.  And Claxton bid on that contract?

Gregory Finch - Cross

1   A.  Yes.

2   Q.  And Claxton entered into that contract with KFC, and you

3   saw that contract earlier, right, sir?

4   A.  Yes.

5   Q.  And Claxton knew going into the negotiations with KFC that

6   large birds were a fad, right?

7   A.  That was our opinion.

8   Q.  And that profitability wasn't worth the cost of any

9   conversion, right?

10  A.  That was our business decision.

11          MR. LOVELAND:  Okay.  I'm going to ask the Court's

12  permission to please publish Government Exhibit 900.

13          We'll zoom in on maybe the top portion -- excuse me,

14  Your Honor.

15          THE COURT:  Yes, you may.

16          MR. LOVELAND:  Thank you, Your Honor, and excuse me

17  again.

18  BY MR. LOVELAND:

19  Q.  Sir, are you able to see the top of page 1 of Government

20  Exhibit 900?

21  A.  Yes.

22  Q.  These are board meeting minutes from Claxton, right?

23  A.  Correct.

24  Q.  Produced to the Court by Claxton as part of the process you

25  oversaw, right?

Gregory Finch - Cross

1   A.   Yes.

2   Q.   So these are accurate board meeting minutes, right?

3   A.   Yes.

4   Q.   Now, the most important people at the company are the ones

5   who attend the board meeting, right?

6   A.   I mean, most important people are the people that work in

7   our plant.

8   Q.   Fair, sir.  The most senior people with the highest amount

9   of decision-making authority are the ones who attend the board

10  meetings, correct?

11  A.   Correct.

12  Q.   And that would include you, right?

13  A.   Yes.

14  Q.   And that would include listed here as Mrs. Fries, Doris

15  Fries, which is Mikell Fries' grandmother, right?

16  A.   Yes.

17  Q.   And that would include Mikell Fries, right?

18  A.   Yes.

19  Q.   And this is from August 28, 2014, correct?

20  A.   Correct.

21  Q.   Who is Jerry Lane at this time?

22  A.   August '14, Jerry is president.

23  Q.   So you don't get the most senior people in a room together

24  to discuss trivial things, right?

25  A.   Sometimes we discuss trivial things or light things --

Gregory Finch - Cross

1   lighter things, yeah, sure.

2   Q.  The purpose of the meeting is to talk about the issues that

3   are most important for the company, though; fair to say?

4   A.  Well, the primary purpose of the meeting is to conduct

5   company business, yes.

6   Q.  Yes.  Okay.  So the paragraph halfway down this page, if we

7   could focus on that, please.

8        Jerry, which is Jerry Lane, is giving an update on

9   corn and soy here, right?

10  A.  Yes.

11  Q.  Okay.  And that's an important matter of business to the

12  board, correct?

13  A.  Yes.

14  Q.  Major cost in Claxton's business?

15  A.  Yes.

16       MR. LOVELAND:  Okay.  Let's please, Ms. Pearce, flip

17  to page 3 of Government Exhibit 900.  And if we could focus on

18  the bottom paragraph on this page.

19  BY MR. LOVELAND:

20  Q.  Mikell is Mikell Fries, right?

21  A.  Yes.

22  Q.  He's giving an update on the sales program, right?

23  A.  Correct.

24  Q.  That's his role, so to speak, is to give an update on the

25  most important aspects of Claxton's sales program, right?

Gregory Finch - Cross

1    A.  Correct.

2    Q.  Where it says, He said big birds were a fad, that's Mikell

3    Fries saying that large birds were not here to stay, correct?

4    A.  Correct.

5    Q.  Mikell Fries goes on to say, They are prepared to pay 10,

6    but the industry is saying we want 20.

7            Do you see that?

8    A.  I do.

9    Q.  They is quick-service customers, right?

10   A.  This was a recap of a particular quick-service customer

11   feedback they had given to Mikell as to what that particular

12   QSR buyer was hearing in the marketplace.

13   Q.  Okay.  The QSR buyer was KFC?

14   A.  In this particular case, it was Popeyes.

15   Q.  Okay.  Going on, the next several sentences talk about

16   other customers, including KFC and Chick-fil-A, though,

17   correct?

18   A.  Correct.

19   Q.  So this is a broader statement than just one customer,

20   correct?

21   A.  Well, to my knowledge, he said they are prepared to pay 10,

22   the industry is wanting 20, that particular bit of information

23   came from a conversation Mikell had with Kent Kronauge at

24   Popeyes.

25   Q.  Okay.  That's not listed here, though, right?

Gregory Finch - Cross

1   *A.*  Correct, it's not.

2   *Q.*  That --

3   *A.*  That's the concept for that particular line that is

4   highlighted.

5   *Q.*  KFC and Chick-fil-A are listed here, though, correct?

6   *A.*  They are.

7   *Q.*  Now, the industry is not Claxton, right?

8   *A.*  Correct.  That's what Kent relayed to Mikell.

9   *Q.*  The industry refers to chicken suppliers at large, correct?

10  *A.*  Well, in this particular case, because it's Kent's

11  conversation with Mikell, he's talking about the other broiler

12  producers that are in the Popeyes supply chain.

13  *Q.*  Okay.  But here, Claxton is considering the industry at

14  large and not just Claxton's own math equation in terms of the

15  future pricing, correct?

16  *A.*  Well, I don't think we're really considering anything,

17  because I don't see any kind of actionable item.  Mikell was

18  just relating to the board some information that he had heard

19  from Popeyes related to what was going on in the industry, and

20  then went on to talk about what was happening with our other

21  customers.

22       *MR. LOVELAND:*  We can take that down, please,

23  Ms. Pearce.  Thank you.

24  *BY MR. LOVELAND:*

25  *Q.*  I want to talk briefly about Defendant Scott Brady joining

Gregory Finch - Cross

1    from Pilgrim's to Claxton in the summer of 2012.  Do you recall

2    testifying about that on direct?

3    A.   Yes.

4    Q.   Okay.  Part of Claxton's strategy was to be put in the

5    middle in terms of pricing, right?

6    A.   Correct.

7    Q.   And that, you testified, required trust between Claxton and

8    its customers, right?

9    A.   Us and the QSR, yes.

10   Q.   Okay.  So when Claxton checks in with its competitors to

11   see if suppliers are bluffing, it's important that Claxton be

12   able to trust information from competitors too, right?

13   A.   Not really.  As I said earlier, the competitor information,

14   the chatter that may go on that we may hear about, is largely a

15   data point for us in our decision-making process.  Certainly

16   helps if we, you know, hear the QSR saying one thing and we get

17   some wild chatter from the other producers as to what the QSR

18   may be telling them, it helps to kind of balance -- you know,

19   balance the two off of each other.

20   Q.   When you work for people for years, you develop a

21   relationship with them, right?

22   A.   Sure, friendship, yes.

23   Q.   Trust, right?

24   A.   Sure.

25   Q.   So that trust between competitors could be easier to

Gregory Finch - Cross

1   establish at Claxton if it had just hired Scott Brady over from

2   Pilgrim's, correct?

3   A.   No.

4   Q.   Couldn't be?

5   A.   No.

6   Q.   Scott Brady would have no insight into what Pilgrim's was

7   doing?

8   A.   He may, but it would have no bearing on what Claxton was

9   doing.  I mean, there is no doubt he had friends that he worked

10  with for years at Pilgrim's, and he probably remains friends to

11  them now.  But his employment relationship changed dramatically

12  when he walked in our door.  He no longer works for Pilgrim's.

13  He no longer has insight what Pilgrim's is doing.  He now works

14  for Claxton, is beginning to learn what Claxton does.

15  Q.   He still calls them, though, right?

16  A.   Sure, he has to.  They're his customer.

17  Q.   Does the trust go away the moment he walks out the door?

18  A.   What trust?

19  Q.   The trust that someone can build from working with others

20  over a period of years.

21  A.   I don't think so.  I mean, Scott -- Scott's -- I've got

22  friends that go back years and years and years with people that

23  work at different companies.  I don't think you break a

24  friendship, relationship with somebody just because somebody

25  different signs your check or a different name at the top of

Gregory Finch - Cross

1    your check.

2    Q.  Certainly not.  And not just because you sign a contract

3    worth millions of dollars four months later either, right?

4    A.  Sorry.  I don't understand your question.

5    Q.  And Scott Brady wouldn't lose his trust that he built up

6    with Pilgrim's employees just because he signed a contract on

7    behalf of Claxton Poultry worth millions of dollars in

8    December 2014, correct?

9    A.  December of 2014, Scott works for Claxton.  Whatever trust

10   Pilgrim's has in Scott is of no consequence at that point.

11   He's our employee now.  So I don't understand the premise of

12   your question.

13   Q.  Understood.

14          I want to correct the record.  I think I said

15   December 2014.  I'm sure it doesn't change your answer, sir;

16   but I meant December 2012.

17          All right.  And, sir, just for the record, the fact

18   that I said December 2014 for that contract, I meant

19   December 2012, wouldn't change your answer, right?

20   A.  No.

21   Q.  Okay.  I want to talk a little bit about the open,

22   transparent process that you testified about on direct.  Do you

23   remember testifying on direct about transparency between

24   Claxton and its customers?

25   A.  I remember testifying about it being open.  I --

Gregory Finch - Cross

1    transparent is an ambiguous term.  What does that mean?  It's

2    an open process between us and the QSR, yes.

3    Q.   That's right.  Thank you for correcting me.  The phrase you

4    preferred was "open" in response to the question about

5    transparency, correct?

6    A.   Yes.

7    Q.   Do you recall using the word "open" in your direct, right?

8    A.   Yes.

9    Q.   Now you agree with me that a QSR customer only knows what

10   bidders -- in other words suppliers -- tell them during a

11   bidding process, correct?

12   A.   Correct.

13   Q.   Customers don't have the option to audit a supplier's

14   books, do they?

15   A.   They do.

16   Q.   Okay.  Could you describe that process for the jury?

17   A.   Sure.  Within the -- so the information you showed us on

18   the screen here is attachment to the actually contract.  So the

19   actual contract has a provision in it that allows for the QSR

20   to come audit our books any time they would like to audit our

21   books.

22   Q.   Certainly.  If costs are manipulated by suppliers, the

23   customers, though, would not know the real costs, right?

24   A.   If costs were manipulated?

25   Q.   Yeah.

Gregory Finch - Cross

1   *A.* Well, they would be able to tell. Not the specific

2   manipulation, but as I described earlier, you know, laying my

3   bid next to period price next to Pilgrim's' bid and period

4   price and so forth, they could certainly see if there was an

5   anomaly in that process.

6   *Q.* Let's look at a specific example.

7          *MR. LOVELAND:* If I could please have the Court's

8   permission to publish Government Exhibit 1137?

9          *THE COURT:* You may.

10  *BY MR. LOVELAND:*

11  *Q.* If we could focus in on -- I know it's small on the screen,

12  sir, we're going to focus in just on the text.

13         Are you able to see what is on the screen, sir?

14  *A.* Yes.

15  *Q.* And Bob Lewis is emailing Mikell Fries and Scott Brady,

16  right?

17  *A.* Appears so, yes.

18  *Q.* This is in August of 2014, right?

19  *A.* Yes.

20  *Q.* Okay. And the subject line is meeting follow-up, right?

21  *A.* Correct.

22  *Q.* Just take a moment to just look at this at a high level,

23  and then I'm going to ask you just a couple of quick questions

24  about it.

25         I see you looking at me. Do you generally see what

Gregory Finch - Cross

1   this is about?

2   A.   Yes.

3   Q.   Now, this is an email following up from a meeting in

4   relationship to the bidding process with KFC, correct?

5   A.   Correct.

6   Q.   Okay.  Bob Lewis is the negotiator for KFC, right?

7   A.   Yeah, he's the buyer, yeah.

8   Q.   He's the buyer?

9   A.   Yes.

10  Q.   I want to direct your attention to the third bullet.  Do

11  you see where it says, Realistic cost model in abbreviated form

12  to include the line items of those components most susceptible

13  to change?  Do you see that, sir?

14  A.   I do.

15  Q.   Okay.  What Bob Lewis is saying here is, I want a more

16  realistic cost model, right?

17        MR. TUBACH:  Calls for speculation, lack of

18  foundation.

19        THE COURT:  Sustained.

20        MR. LOVELAND:  Thank you, Your Honor.  I'll rephrase.

21  BY MR. LOVELAND:

22  Q.   Mr. Finch, on direct, you testified that you had a role in

23  determining all of the prices for the cost-plus model that

24  Claxton created for its QSR customers, right?

25  A.   Yes.

Gregory Finch - Cross

1    Q.  And you were kept apprised of bidding processes as they

2    went by Mikell Fries, Scott Brady, and others, right?

3    A.  Yes.

4    Q.  And you were certainly kept apprised of the bidding process

5    in the summer and fall of 2014 for KFC that resulted in a

6    three-year contract worth many millions of dollars for Claxton,

7    correct?

8    A.  Yes.

9    Q.  Okay.  Based on that, when Bob Lewis says here, Realistic

10   cost model is an abbreviated form to include the line items for

11   those components most susceptible to change, what Bob Lewis is

12   saying is, Give me a better cost model, right?

13         MR. TUBACH:  Objection.  Calls for speculation, lack

14   of foundation.

15         MR. LOVELAND:  Your Honor, I believe foundation has

16   been appropriately set here.

17         THE COURT:  Sustained.

18   BY MR. LOVELAND:

19   Q.  I'll ask it this way, sir:  Based on your 11 years of

20   experience, your intimate involvement in the process, all of

21   the information relayed to you by Defendants Mikell Fries and

22   Scott Brady, what do you take that third bullet point to mean?

23         MR. BELLER:  Objection.  Relevance as to what

24   Mr. Finch thought that Mr. Lewis meant.

25         MR. LOVELAND:  Your Honor, Mr. Finch testified that

Gregory Finch - Cross

1    he's ultimately the one that sets the prices in the cost-plus

2    model.  Presumably, things that are directed from the customer

3    to Claxton about the cost-plus model are things that are very

4    important for Mr. Finch to consider.

5            THE COURT:  Sustained.  You can ask him that question.

6            MR. LOVELAND:  Okay.

7    BY MR. LOVELAND:

8    Q.  Mr. Finch, you're ultimately the one that sets prices in

9    the cost-plus model, right?

10   A.  Mikell is the one that actually sets the final price, but I

11   set the original price that we're going to offer based on the

12   costs of the particular chicken that we're producing.

13   Q.  Okay.  And you're involved in creating all of the inputs

14   that go into the cost-plus model, right?

15   A.  The QSR dictates the model to me, and I put in the actual

16   cost in the line item that they've dictated the cost model for.

17   Q.  Okay.  So this -- when you get feedback from a customer

18   like Bob Lewis, is that the sort of thing that makes its way to

19   your desk?

20   A.  Yes.

21   Q.  Okay.  Is this something that you reviewed in the course of

22   your role as the CFO of Claxton?

23   A.  Yes.

24   Q.  Okay.  Having reviewed this, having established your role,

25   what does bullet point 3 mean in your opinion?

Gregory Finch - Cross

1    A.  Well, I'm going to take you for a second up to the -- this

2    first line saying, Going forward, we know that transparency and

3    sincere willingness to give and take will help us form true

4    partnerships.  KFC had beat the living mess out of us for the

5    last two, three, four years relative to what the market

6    conditions were.  Not only us, Claxton, but us, the supply

7    chain.  So all of a sudden, this was a new leaf for them.  They

8    were going to be a kinder, gentler customer for us.  They knew

9    they were getting ready to be hit with substantial increases in

10   cost and in price because they had beat us down so badly.

11        So Bob's -- Bob hasn't changed the cost model.  He's

12   just saying, Hey, we're in the middle of the year.  We don't

13   normally come to you at this time.  Tell us what the cost model

14   would look like if you do it for us at this particular moment

15   and then highlight for us, if you would, besides the feed cost

16   that is part of that, that they already dictate anyway, please

17   tell us what you believe as Claxton Poultry are the areas of

18   most concern in susceptibility of change.  Like utilities, like

19   labor.  You know, so highlight those things to us, and let --

20   let's talk about, you know, under this new kinder, gentler

21   program, you know, how we might go about attacking those

22   things.

23             THE COURT:  Can we break for lunch now?

24             MR. LOVELAND:  Would one more question be acceptable?

25             THE COURT:  One more, go ahead.

Gregory Finch - Cross

1          MR. LOVELAND:  Thank you very much, Your Honor.

2     BY MR. LOVELAND:

3     Q.  And Bob Lewis is focused here on a realistic cost model,

4     meaning an accurate one, correct?

5     A.  No, they dictate the cost model.  He just wants to know the

6     realistic cost at that particular moment in time, which is two

7     months or so ahead of when we normally would have been giving

8     him his cost-plus model.

9     Q.  Bob Lewis wanted you to provide accurate information,

10    correct?

11    A.  Well, you'd have to ask Bob Lewis to be sure, but we always

12    provided accurate information.  From 2012 forward, everything

13    we gave to the QSR was our actual costs.

14         MR. LOVELAND:  Your Honor, this is an excellent place

15    to break.

16         THE COURT:  Ladies and gentlemen, we'll break for

17    lunch.  Why don't we plan on reconvening at 1:35.  Keep the

18    admonitions in mind.  Jury is excused.

19              (Jury out at 12:03 p.m.)

20         THE COURT:  Any issues?

21         MR. LOVELAND:  Not from the Government's perspective.

22         THE COURT:  Mr. Finch, you may be excused.  See you

23    back at 1:35.

24              Everyone else may be seated.

25              Mr. Fagg, go ahead.

Gregory Finch - Cross

1           *MR. FAGG:*  We talked yesterday about Mr. Brown is the

2    next witness and his counsel wanting to dial in.  I spoke to

3    Ms. Grimm about it this morning.

4           *THE COURT:*  She mentioned that, to take a break so we

5    can set up that link.

6           *MR. FAGG:*  Thank you.

7           *THE COURT:*  We will do that.  I think I'll explain it

8    in the sense that we need to -- I don't know -- figure out a

9    way that's -- that's not specifically telling the jury that

10   we're trying to hook in the attorney.

11          *MR. FAGG:*  Thank you, Your Honor.

12          *THE COURT:*  We'll be in recess until 1:35.  Thank you.

13          (Recess at 12:05 p.m.)

14          (In open court at 1:36 p.m.)

15          *THE COURT:*  Thank you.  Please be seated.

16          Why don't we go ahead and get Mr. Finch.

17          And we can go ahead and get the jury, too.

18          (Jury in at 1:38 p.m.)

19          *THE COURT:*  Mr. Loveland, go ahead.

20          *MR. LOVELAND:*  Thank you, Your Honor.

21   *BY MR. LOVELAND:*

22   *Q.*  Mr. Finch, good afternoon.

23   *A.*  Good afternoon.

24   *Q.*  Okay.  Now, I want to talk about independent business

25   decisions.  Do you recall talking about that during your direct

Gregory Finch - Cross

1    testimony?

2    *A.*  Yes.

3    *Q.*  Now, you testified on direct that Claxton makes its own

4    independent pricing decisions, right?

5    *A.*  Correct.

6    *Q.*  It doesn't take input from other people about what is going

7    to be its price, correct?

8    *A.*  Other than the QSR.  Correct.

9    *Q.*  Other than the QSR.  Thank you for that clarification.  But

10   it doesn't take input from competitors on its price, correct?

11   *A.*  Correct.

12   *Q.*  And you said your price, your being Claxton's price, has

13   nothing to do with knowing what somebody else's price is,

14   right?

15   *A.*  Correct.

16   *Q.*  Okay.  You also testified on direct, quote, We would never

17   discuss a business decision like that with Pilgrim's.  Do you

18   recall that?

19   *A.*  That question was about big birds, right.

20   *Q.*  In the context of large birds?

21   *A.*  Yes.

22   *Q.*  You would never discuss a business decision like large

23   birds with Pilgrim's; is that correct?

24   *A.*  Correct.

25   *Q.*  In that same line of questioning, when asked that you were

Gregory Finch - Cross

1    not going to tell anybody -- you being Claxton -- other than a

2    QSR customer what Claxton was doing with its future price, you

3    agreed to that too, correct?

4    A.   I think I stated that, correct.

5    Q.   Okay.  Now, an independent decision means -- I think you

6    had put it this way -- don't discuss it with anyone outside of

7    Claxton, right?

8    A.   We do not discuss our future pricing with anybody outside

9    of Claxton other than the QSR.

10   Q.   Okay.  And those were your words about what it means to

11   make an independent decision, right?

12   A.   Correct.

13   Q.   Okay.  And having somebody else, another company, tell

14   Claxton what to do with Claxton's prices, that's not

15   independent either, right?

16   A.   Well, somebody else's opinion about what we could do with

17   our price is just that, it's an opinion.  Only the QSR can move

18   our price.

19   Q.   Only the QSR can move your price.  So if a competitor tells

20   you what to do with your price, that's not independent, right?

21   A.   Once again, it's the opinion of the competitor what we may

22   be able to do with our price.  Ultimately the QSR is going to

23   decide what we can do with our price, if we can do anything

24   with our price.

25   Q.   Okay.  If Claxton were to listen to that, though, that

Gregory Finch - Cross

1    wouldn't be independent, right?

2    A.  Do what?

3    Q.  If Claxton were to listen to a competitor tell Claxton what

4    to do with Claxton's price, that would not be independent,

5    correct?

6    A.  Well, I mean, it would be a point -- a data point.  I don't

7    know how you're defining independence.

8    Q.  Sir, I'm defining it the way you did, quote, We don't

9    discuss it with anybody outside of Claxton, end quote; is that

10   correct?

11   A.  And the QSRs.

12   Q.  And the QSRs.  So you --

13   A.  Our future pricing, correct, we do not discuss Claxton

14   Poultry future pricing with anyone outside of Claxton other

15   than our QSR customer.

16   Q.  Okay.  So if a chicken company tells another chicken

17   company what to do with its prices, that's price fixing, right?

18        MR. TUBACH:  Objection.  Calls for a legal conclusion.

19        THE COURT:  Sustained.

20   BY MR. LOVELAND:

21   Q.  So in August of 2014, when Roger Austin shared Pilgrim's'

22   pricing strategy with Scott Brady, that was not independent

23   pricing, correct?

24        MR. FELDBERG:  Objection, Your Honor.  Same argument

25   we discussed at sidebar yesterday.

Gregory Finch - Cross

1          THE COURT:  Yeah, I think it is asking him to comment

2    on the evidence.  Sustained.

3          MR. LOVELAND:  Your Honor, can I have the Court's

4    permission, please, to publish Government Exhibit 1238.

5          THE COURT:  What was the number, again?

6          MR. LOVELAND:  Excuse me, Your Honor.  1238.

7          THE COURT:  You may.

8          MR. LOVELAND:  Thank you.

9          I'll ask Ms. Pearce to zoom in on just the text at the

10   top.

11   BY MR. LOVELAND:

12   Q.  Now, Mr. Finch, you were shown text messages between Scott

13   Brady and Mikell Fries on direct examination, correct?

14   A.  Yes.

15   Q.  Okay.  And you testified about what you thought those text

16   messages meant in your mind on direct, correct?

17   A.  Some of them.

18   Q.  And you also testified that you at times received text

19   messages or emails from Mikell Fries or Scott Brady, correct?

20   A.  Correct.

21   Q.  Okay.  I want to focus your attention -- these text

22   messages, do you see they're from August of 2014, sir?

23   A.  Yes.

24   Q.  Okay.  Do you see where Scott Brady texts Mikell Fries, I

25   talked to Roger about KFC and Greeley told him not to come down

Gregory Finch - Cross

1  on price.  He called Bob today and told him.  Do you see that?

2  A.  I do.

3  Q.  Want to ask you a few things.  First, Greeley, Colorado, is

4  where Pilgrim's is headquartered, correct?

5  A.  Correct.

6  Q.  Okay.  Claxton has nothing in Greeley, Colorado, correct?

7  A.  We do not.

8  Q.  Roger Austin works at Pilgrim's, correct?

9  A.  August of '14, I believe that's correct.

10  Q.  Okay.  Bob Lewis, as you testified earlier, was the

11  negotiator for KFC in August of 2014, correct?

12  A.  Correct.  Ledford had left.  Bob was the man in charge.

13  Q.  I want to focus on the bottom text message from Scott Brady

14  to Mikell Fries.  Roger and Bill are not moving.  Do you see

15  that text message?

16  A.  I do.

17  Q.  Do you see that it mentions George's in this text message?

18  A.  Yes.

19  Q.  Did Bill Kantola work for a chicken supplier at this point

20  in time?

21  A.  Yes.

22  Q.  Okay.  What I want to ask you is, is having chicken

23  supplier companies tell you their price strategy during a

24  bidding process independent?

25          MR. TUBACH:  Objection, Your Honor.  Lack of

Gregory Finch - Cross

1    foundation, calls for speculation.

2            THE COURT:  He can answer the question theoretically,

3    but not in reference to this particular entry, if he's being

4    asked to interpret it.

5            MR. LOVELAND:  Thank you, Your Honor.

6    BY MR. LOVELAND:

7    Q.  Would you like me to repeat the question?

8    A.  Please.

9    Q.  Is having chicken supplier companies tell you their price

10   strategy during an ongoing bid independent decision-making?

11           MR. TUBACH:  I object.  Could we have a sidebar,

12   please?

13           THE COURT:  Yes.

14           (Hearing commenced at the bench.)

15           THE COURT:  Mr. Tubach, go ahead.

16           MR. TUBACH:  I believe Mr. Loveland using the word

17   "independent" is taking a word directly out of the jury

18   instructions, and that seems to be not using it in the

19   colloquial sense but trying to get him to use it in the legal

20   sense, which the Court is going to instruct the jury about the

21   law, and it's pretty plain, because the prior question was

22   whether it's -- something he described constituted price

23   fixing.  I don't believe it's a proper line of inquiry.

24           THE COURT:  Response.

25           MR. LOVELAND:  Your Honor, I think I just spent five

Gregory Finch - Cross

1    or six questions going through the exact definition that the

2    witness used when the witness described independent pricing

3    decisions, and I did that intentionally to make sure the jury

4    was aware of the words that the witness was using and how he

5    was using them.  And so I think that's quite clear on the

6    record.  And I do think it's an appropriate question to ask

7    this witness, what he means when he uses words on direct and

8    how they would apply to a given situation.

9         THE COURT:  Mr. Tubach.

10        MR. TUBACH:  Your Honor, I believe -- I could be

11   mistaken, I believe it was Mr. Loveland who injected the word

12   "independent" into the questioning.  If I'm wrong, I could be

13   corrected.  To keep using a term defined in a jury instruction,

14   that essentially asks him to make a legal decision.

15        THE COURT:  Mr. Loveland, do you recall -- I don't

16   recall either exactly what term Mr. Finch was using.

17        MR. LOVELAND:  We can look at the transcript now, Your

18   Honor.  I think my co-counsel are trying to help me out.  But I

19   quoted him directly from language that I pulled over the lunch

20   break as saying, We don't discuss it with anyone outside of

21   Claxton.  That was in response to what independent meant from a

22   question from Mr. Beller.  And I literally quoted the witness's

23   response to direct questions in my questions to the witness.

24        THE COURT:  Mr. Tubach, any comments on that?

25        MR. TUBACH:  No, I can't find it here quickly.

Gregory Finch - Cross

1          THE COURT:  I'm going to overrule the objection.  In

2     any event, based upon Mr. Finch's testimony, the use of the

3     term "independent," even if it does coincide with a term used

4     in the jury instructions, is not an inappropriate

5     characterization of what Mr. Finch's testimony had been on

6     Claxton's decision-making.  So objection will be overruled.

7          MR. FAGG:  Your Honor, these questions of being asked

8     in the theoretical, I would ask that the exhibit be taken down.

9          THE COURT:  Yes, that's appropriate.

10          (Hearing continued in open court.)

11          THE COURT:  Objection is overruled.  Go ahead,

12     Mr. Loveland.

13          MR. LOVELAND:  Thank you, Your Honor.

14     BY MR. LOVELAND:

15     Q.  Okay, sir.  The question that I'd like to ask is, is having

16     a chicken supplier company tell you, Claxton, their price

17     during a bidding process independent?

18     A.  I don't know what you mean by independent.  But regardless

19     of what they're telling us, we have no way to independently

20     verify that Greeley told Roger to hold or Bill Kantola to hold

21     or whatever.  We have no way to independently verify that

22     information.  It's a data point in the process, but we have no

23     way to know whether the truth is being told or not.

24     Q.  Okay.  Sir, I'm going to move on in a second.  Just for the

25     future, when I use the word "independent," I mean it the way

Gregory Finch - Cross

1   you used it in response to Mr. Beller, which is, We don't

2   discuss it with anyone outside of Claxton, okay?  For future

3   questions, that's the definition I'm working off of, okay?

4          MR. BELLER:  Your Honor, I'm going to object to the

5   narrative.  This isn't a question or answer, nor is

6   Mr. Loveland's interpretation of how I meant it or how he meant

7   it on a different question relevant to any future questions.

8          MR. LOVELAND:  Your Honor, I believe numerous times on

9   direct defense counsel has made it a point to make sure they

10  were using the same terms in the same way.  That's what I'm

11  trying to do here.

12         THE COURT:  All right.  I'm going to overrule the

13  objection.  Just -- but if the term is used in the future, it

14  should be defined at that time.

15         MR. LOVELAND:  Okay.  Thank you very much, Your Honor.

16  BY MR. LOVELAND:

17  Q.  Sir, when Roger Austin told Scott Brady to raise Claxton's

18  prices in November 2012, was that an independent business

19  decision?

20         MR. FELDBERG:  Objection, Your Honor.  Assumes a fact

21  not in evidence.

22         MR. LOVELAND:  Your Honor, Government's Exhibit 1427

23  was explored with this witness on direct.

24         MR. FELDBERG:  But Government Exhibit 1427 is not --

25  there is nothing written by Roger Austin on that exhibit,

Gregory Finch - Cross

1    somebody else's rendition of something else.

2           THE COURT:  Objection sustained.  The questions about

3    it were what the terms meant to Mr. Finch.  So they were of a

4    different character than the question asked.

5           MR. LOVELAND:  Your Honor, may I ask the Court's

6    permission to publish Government Exhibit 1427.

7           THE COURT:  Yes.

8           MR. LOVELAND:  Ms. Pearce is going to zoom in on the

9    text -- excellent.  Thank you, Ms. Pearce.

10   BY MR. LOVELAND:

11   Q.  Do you recall being asked on direct examination about this

12   very text message exchange, Mr. Finch?

13   A.  I remember seeing this document.

14   Q.  Okay.

15   A.  Yes.

16   Q.  And do you recall answering questions about some but not

17   all of the text messages in this exchange?

18   A.  Yes.

19   Q.  And you confirmed on direct examination, you're not on

20   these text messages, right?

21   A.  I am not.

22   Q.  Okay.  But you were still able to answer questions about

23   what some of these words meant to you, correct?

24   A.  Yes.

25   Q.  Okay.  Do you see where Scott Brady texts Mikell Fries in

Gregory Finch - Cross

1   November of 2012, I talked to Roger, and this month he is .03

2   higher than us on eight-piece, and his case weight is 50.5?  Do

3   you see that?

4   A.  Yes.

5   Q.  Roger Austin worked for Pilgrim's Pride at this point in

6   time, correct, sir?

7   A.  Yes, to the best of my knowledge.

8   Q.  I believe your testimony on direct was that you believed

9   this had to do with period pricing, correct?

10  A.  Yes.

11  Q.  That it was current pricing, and this conversation did not

12  have to do with future pricing, correct?

13  A.  The highlighted conversation is talking about period

14  pricing.

15  Q.  Okay.  Let's go down past the highlighted conversation.  Do

16  you see how, I guess it's eight minutes later, Scott Brady

17  texts Mikell Fries, He said to raise our prices?

18  A.  Sure, I see that.

19  Q.  Do you see underneath that where Mikell Fries says, Tell

20  him we are trying?

21  A.  Sure.

22  Q.  And what does Scott Brady say to Mikell Fries in response?

23  A.  He says, Will do.

24  Q.  That conversation is not about period pricing, correct?

25  A.  I can't tell from this text message.

Gregory Finch - Cross

1    *Q.* But you've never heard of a competitor asking you to raise

2    prices for them to buy chicken from you, correct?

3    *A.* Well, the period pricing is already set and agreed to by

4    the QSR and the supplier, so I don't need to negotiate a period

5    price with another customer or competitor.

6    *Q.* Exactly, and you can't raise a period price because it's

7    already set, correct?

8    *A.* Correct.

9    *Q.* Okay.

10        *MR. LOVELAND:* Your Honor, I'm going to ask the

11   Court's permission to please publish Government Exhibit 10651.

12        *THE COURT:* You may.

13        *MR. LOVELAND:* Thank you, Your Honor.

14        Ms. Pearce will zoom us in on just the text.

15   *BY MR. LOVELAND:*

16   *Q.* Mr. Finch, are you able to see that okay?

17   *A.* Yes.

18   *Q.* Okay. Can you see that these are a series of text messages

19   between Mikell Fries and Scott Brady in November 2013?

20   *A.* Yes, they appear to be.

21   *Q.* Okay. You're not on this series of text messages, are you,

22   sir?

23   *A.* No.

24   *Q.* Okay.

25   *A.* No.

Gregory Finch - Cross

1    Q.   Now, in November of 2013, did Michael Ledford have a role

2    in negotiations with Claxton during a bidding process for

3    chicken?

4    A.   Yes.  He left in early 2014.

5    Q.   Okay.  Just for the jury's benefit, what was Michael

6    Ledford doing in terms of negotiating chicken with Claxton in

7    November of 2013?

8    A.   I don't know his exact title at the time, but he was a

9    buyer for RSCS -- he may have been the head buyer, I'm not

10   100 percent sure, but he was --

11   Q.   He was intimately involved in negotiating chicken prices

12   with Claxton Poultry, right?

13   A.   Fair.

14   Q.   He was intimately involved in negotiating chicken prices

15   with Pilgrim's Pride, right?

16   A.   He would have been negotiating with all suppliers around

17   the same time.

18   Q.   Okay.  Do you see where Scott Brady texts Mikell Fries,

19   Ledford told Roger to be at .9250?

20   A.   I do.

21   Q.   What does Scott Brady say after that text message?

22   A.   Call me.

23   Q.   After that, Scott Brady texts, Just an FYI, last year we

24   were .32 back on dark meat and this year we are 3050 back.  Do

25   you see that?

Gregory Finch - Cross

 1    *A.*   I do.

 2    *Q.*   That is past pricing, right?

 3    *A.*   Yes.

 4    *Q.*   That's not a future bid?

 5    *A.*   Doesn't appear to be.

 6    *Q.*   Okay.  Scott Brady then says, Roger is .30 back and not

 7    moving.  Do you see that?

 8    *A.*   I do.

 9    *Q.*   You can't move a current price, correct?

10    *A.*   Not without QSR permission.

11    *Q.*   You cannot move period pricing, correct?

12    *A.*   That is a current price.

13    *Q.*   Mikell Fries then says, K.  Can do 31 if want?

14    *A.*   Correct.

15    *Q.*   Now, that's not about period pricing, because that's about

16    changing a price, right?

17         *MR. FAGG:*   Objection, Your Honor.  Speculation and

18    argumentative and lacks foundation.

19         *THE COURT:*   Response.

20         *MR. LOVELAND:*   Your Honor, the witness testified on

21    direct examination in the context of a different series of text

22    messages between these very same defendants.  That .30 back

23    and .31 back related to period pricing.  This is directly

24    within the scope of direct.  I'm asking questions just as

25    defense counsel asked on direct about what these words mean in

Gregory Finch - Cross

1    the context of the time and people on these text messages.

2         THE COURT:  Sustained.

3    BY MR. LOVELAND:

4    Q.  Sir, do you see where Mikell Fries responds to Scott Brady,

5    Stay at .305 then?

6    A.  Yes.

7    Q.  How many minutes after hearing from Scott Brady what Roger

8    was doing did Mikell Fries send that text message?

9         MR. FAGG:  Objection, Your Honor.  Document speaks for

10   itself, and it's outside the scope.

11        THE COURT:  Sustained.

12   BY MR. LOVELAND:

13   Q.  Is hearing your competitors' future price, as you

14   testified, and changing yours in response an independent

15   business decision?

16        MR. FELDBERG:  Objection, Your Honor.  It is tied to

17   this document, I think the Court's prior ruling addresses that.

18        MR. LOVELAND:  Your Honor, I'm happy to take it at

19   sidebar.

20        THE COURT:  I don't think this document should be

21   displayed if your question is a general one, which I think it

22   is.

23        MR. LOVELAND:  I think it may be best to do this

24   outside the presence of the jury.

25        THE COURT:  You want a sidebar?

Gregory Finch - Cross

1          MR. LOVELAND:  Yes.

2          THE COURT:  Yes, you may.

3          (Hearing commenced at the bench.)

4          THE COURT:  Mr. Loveland, go ahead.

5          MR. LOVELAND:  Your Honor, I just -- I just wanted to

6     clarify the Court's ruling, and I would submit that in the

7     context where the defense was able on direct examination to

8     show Government's Exhibit 1427, which is a series of text

9     messages between Scott Brady and Mikell Fries and ask questions

10    about what specific words meant, that the Government should be

11    able to do the same thing.  We're trying to do the same thing

12    here, Your Honor.  And I have up in front of me the transcript.

13         Mr. Beller asked:  George's is 30 back, Pilgrim's is

14    30 back, and Tyson 31 back.  He went on to ask:  What does that

15    mean?  It's part of the pricing model with QSR, it's dark meat

16    and wings.  He went on to explain how it was period pricing.

17         Now, on cross-examination --

18         THE COURT:  Let me ask you this, Mr. Loveland, before

19    we go into cross-examination, are there any -- does the

20    transcript show any objections?

21         MR. LOVELAND:  Yes, Your Honor, I objected.  He can't

22    know that information based on what is displayed on the screen,

23    and you overruled and said he can answer.

24         THE COURT:  Okay.  Keep going.

25         MR. LOVELAND:  So the witness testified on direct what

Gregory Finch - Cross

1    specific items meant in these exact text message exchanges,

2    including 1427, which I showed to the witness.  The witness on

3    cross-examination said and admitted, you can't change period

4    pricing, and you can't change current pricing because it's

5    locked in at the given rate.  The fact that these text messages

6    contemplate moving prices, it cannot be about current or period

7    pricing, which is what the direct examination left the jury

8    with the impression of.  I think it's proper fodder for cross.

9    The examination is in the same scope and using the same style

10   of questions that Mr. Beller did.

11           THE COURT:  Mr. Beller, Mr. Fagg, or anyone else who

12   wants to respond?

13           MR. BELLER:  If I may start.

14           Your Honor, I think it's important for the Court to

15   understand the transcript as read by Mr. Loveland, and that is

16   to read the entire question which is asked, which is an

17   important point for the purpose of understanding the Court's

18   ruling.

19           When Mr. Finch was shown this particular exhibit, the

20   question -- and this is at exactly 9:46 a.m. -- So, again, I am

21   not asking you to interpret what somebody may have meant or

22   understood here.  I'm asking about your knowledge.  Okay?  Do

23   you recognize numbers like that?  In other words, what does it

24   mean to be 30 back?

25           He says:  Yes, I understand that.

Gregory Finch - Cross

1        And I say:  Okay.  What does that mean?

2        And so for the purposes of the question on direct

3   examination, it was very much predicated on terminology and his

4   understanding of terminology.  And a predicate to every

5   question was to please not try to interpret or state what

6   somebody else meant, but, rather, it was being used for the

7   purpose of the terminology itself.

8        And so I think that is an extraordinarily important

9   point for the Court's context and understanding in knowing why

10  the objection was overruled.

11       THE COURT:  All right.  Anyone else of the defendants

12  want to comment?

13       MR. FAGG:  The only other thing I would say briefly is

14  that along the lines of what Mr. Beller said, Mr. Beller asked

15  about a very specific phrase.  Mr. Loveland has gone through it

16  and sought to have the witness interpret -- ask questions about

17  an entire chain of text messages that is clearly on its face

18  about different things.  So I do think that it's very

19  different.  The particular document that Mr. Beller asked about

20  is also from a different time period.

21       THE COURT:  All right.  Mr. Loveland.

22       MR. LOVELAND:  First, Your Honor, I prefaced my

23  cross-examination by going through the sorts of things that he

24  testified on direct about with respect to text messages.  I was

25  dealing with 1427.  I was careful to point out that -- and the

Gregory Finch – Cross

1    witness noticed that he was only asked about some of the text

2    messages, and so I went further down the line and then filled

3    in the rest of the text messages.

4            In terms of there being a timing issue with the

5    particular exhibit that is up now, the witness testified that

6    the text messages were seven minutes apart.  In terms of the

7    witness's understanding, I used similar prefatory questions

8    saying, based on your knowledge in the industry when you see

9    things like this.  I don't have the transcript in front of me.

10   I can certainly use similar prefatory.  But the impression the

11   jury was left with of 1427 in particular, it was period

12   pricing.  The witness admitted period pricing can't move.

13           So from the face of the terms of use, the fact that

14   someone is talking about moving something, the defense

15   represented to the jury that period pricing means we're not

16   talking about period pricing here, and I am mindful of trying

17   to stylize questions in a similar way, and I can preface it by

18   saying, I'm not asking you to interpret what any of the people

19   on this chain thought, but when you see prices move, it can't

20   be period pricing.  I can try to structure the question that

21   way.

22           But I do think we're directly within the scope of

23   direct.  And I think, if anything, the notion that we should

24   leave out half of the text messages that are minutes apart is

25   confusing, misleading, and unfair to the jury.  I think they

Gregory Finch - Cross

1    deserve the full context of what these things mean.

2         THE COURT:  Well, the immediate issue is simple,

3    Mr. Feldberg's request that the exhibit not be displayed when a

4    general question was asked, and that -- so to the extent that

5    the Government's objecting to that request, the objection is

6    overruled.

7         Because the Government has not been -- as Mr. Beller

8    did -- prefacing questions with just the witness's

9    understanding of a general term, without an attempt to try to

10   figure out what the speakers or the text writers meant when

11   they sent a given email, so while it's perfectly appropriate

12   for the Government to explore the topic of period pricing

13   versus, you know, changing a price, inferring that it can't be

14   period pricing, the Government needs to do so in a way that

15   does not ask the jury to interpret text messages which the

16   witness has no foundation whatsoever to interpret.

17        All right?

18        MR. LOVELAND:  Thank you, Your Honor.  I'll have the

19   exhibit taken down, and I will ask a specific question,

20   prefacing, is based on only the witness's knowledge, after

21   putting it back up briefly for one more question.  I will be

22   mindful of the Court's instruction here.

23        THE COURT:  Okay.  Thank you.

24        (Hearing continued in open court.)

25        MR. LOVELAND:  I'll ask that no exhibit be displayed

Gregory Finch - Cross

1     for a moment.  Thank you very much, Your Honor.

2     BY MR. LOVELAND:

3     Q.  Only a few more questions, Mr. Finch.  I just want to

4     clarify your testimony.  Period pricing is locked in based on

5     an existing contract, right?

6     A.  Correct, other than the change in feed ingredients from

7     period to period.

8     Q.  Changing feed ingredients, but the cost-plus model is the

9     cost-plus model, right?

10    A.  Correct.

11    Q.  That's the same thing for current pricing.  Current pricing

12    is locked into an existing contract, correct?

13    A.  Correct.

14    Q.  Unless a QSR reaches out to you, you can't move current or

15    period pricing, correct?

16    A.  Correct.

17          MR. LOVELAND:  Okay.  Your Honor, with the Court's

18    permission, if we could display Government Exhibit 10651.

19          THE COURT:  Yes.

20    BY MR. LOVELAND:

21    Q.  Mr. Finch, I want to have some prefatory things here, as

22    Ms. Pearce is zooming in on just the text.  I would ask, sir,

23    that you not opine on what anyone in this text message chain is

24    thinking, but I want to ask you about the terms that are in

25    use.

Gregory Finch - Cross

1          Do you see where it says, Can do 31 if want?

2     A.   Yes.

3     Q.   31 refers to a price back from eight-piece chicken on the

4     bone, correct?

5     A.   Correct.

6     Q.   Okay.  That's a price, correct?

7     A.   That's a calculation.

8     Q.   That's a calculation of a price, correct?

9     A.   Well, it's part of the calculation for a price.  Without

10    the eight-piece price, I can't give you the price.

11    Q.   Absolutely.

12    A.   It is part of the formula to determine the dark-meat price.

13    Q.   Thank you, sir.

14          When it says, Can do 31 if want, that cannot be

15    referring to current or period pricing because it refers to

16    moving the price, correct?

17          MR. TUBACH:  Same objection.  He's asking him to

18    interpret a document.

19          THE COURT:  Sustained.

20    BY MR. LOVELAND:

21    Q.   Just to clarify, you're not on this text, right?

22    A.   Correct.

23    Q.   Okay.  When someone says the word "stay," that implies

24    something can be moved, correct?

25          MR. TUBACH:  Again, the document is up.  He's clearly

Gregory Finch - Cross

1    asking about the document.  There is no foundation.

2          MR. LOVELAND:  I'm asking about the words of the

3    document with the prefatory questions that he not opine on what

4    any of the speakers thought.

5          THE COURT:  Sustained.

6          MR. LOVELAND:  I'll ask Ms. Pearce to take the

7    document down, please.

8    BY MR. LOVELAND:

9    Q.  Sir, is hearing your competitors' price and adjusting yours

10   upwards independent?

11   A.  Possibly.  I don't -- you know, there is no way for me to

12   verify the authenticity of a competitor's price, but I could

13   hear a competitor's price and decide to take my price up.  But

14   most of the time, we decided to take our price down, not

15   knowing whether it was the real competitor price or not.

16   Q.  And just to be clear, is adjusting your price, Claxton's

17   price, based on a competitor's future bid in your mind an

18   independent business decision?

19   A.  We can't adjust a Claxton price based on what a competitor

20   says; we can only adjust a Claxton price if the QSR allows us.

21   Q.  Is adjusting your bid to a QSR based on what a competitor

22   tells you their bid is an independent business decision?

23   A.  We don't adjust our price based on what a competitor says;

24   we only adjust our price based on what the QSR says.

25   Q.  Okay.  Now, sir, you looked at a number of exhibits that

Gregory Finch - Cross

1    you were not on today, correct?

2    A.  Some, yes.

3    Q.  Yes.  And those included text messages, including the text

4    message originally shown to you by the defense in part,

5    Government Exhibit 1427, correct?

6    A.  I --

7    Q.  You wouldn't remember the number?

8    A.  No.

9         MR. LOVELAND:  Could you please pull up with the

10   Court's permission Government Exhibit 1427?

11        THE COURT:  Yes, you may.

12        MR. LOVELAND:  Thank you.

13   BY MR. LOVELAND:

14   Q.  You're not on this text message chain, correct?

15   A.  Correct.

16        MR. LOVELAND:  With the Court's permission to publish,

17   please, Government Exhibit 10651.

18        THE COURT:  You may.

19        MR. LOVELAND:  Thank you.

20   BY MR. LOVELAND:

21   Q.  You're not on this text message chain, are you, sir?

22   A.  Correct.

23        MR. LOVELAND:  Court's permission to please publish

24   Government Exhibit 1238.

25        THE COURT:  You may.

Gregory Finch - Redirect

1              MR. LOVELAND:  Thank you, Your Honor.

2              We'll zoom in on just the text, sir.

3    BY MR. LOVELAND:

4    Q.  You're not on this text message chain, are you, sir?

5    A.  No.

6    Q.  Okay.  So you don't know what Scott Brady, Mikell Fries,

7    and Roger Austin were doing with respect to pricing during

8    these bids, do you, sir?

9    A.  Do I know what they were doing?

10   Q.  Correct.

11   A.  No, I have no personal knowledge.

12             MR. LOVELAND:  No further questions, Your Honor.

13             THE COURT:  All right.  Thank you.

14             Redirect.

15             MR. BELLER:  If I may have just a brief moment, Your

16   Honor?

17             THE COURT:  You may.

18                     **REDIRECT EXAMINATION**

19   BY MR. BELLER:

20   Q.  Good afternoon, again, Mr. Finch.

21   A.  Good afternoon.

22   Q.  Mr. Finch, I want to just cover a few topics that the

23   Government covered with you, okay.

24   A.  Okay.

25   Q.  Can we start, Mr. Finch, with Exhibit 1119?

Gregory Finch - Redirect

1          MR. BELLER:  If we can have that displayed to the

2    jury, please, Your Honor?

3          THE COURT:  You may.

4    BY MR. BELLER:

5    Q.  Mr. Finch, do you recall being asked about this particular

6    contract, 1119?

7    A.  Yes.

8    Q.  Okay.  And if we can go down to the bottom.  You were asked

9    about Mr. Fries' signature in October of 2014; is that right?

10   A.  Yes.

11   Q.  What was -- in October of 2014, Mr. Finch, do you recall

12   how many years this contract was signed for?  And we can

13   certainly scroll up if you need to look at the document a

14   little bit closer.

15   A.  So this would have been the first of the three-year

16   contracts that RSCS or KFC had with us.

17   Q.  You say the first of a three-year contract, and the

18   Government kept asking you if this was a three-year contract.

19   So let me ask you this:  Is this the first of a three-year

20   contract?

21   A.  Yes.

22   Q.  And was this contract actually renegotiated and redone

23   about a year later?

24   A.  Yes.

25         MR. BELLER:  And if we can show Mr. Finch F-754.  Your

Gregory Finch - Redirect

1    Honor, I believe that this is in evidence.

2           *THE COURT:* Yes, it is.  And you may display it.

3           *MR. BELLER:* Thank you.  If we may publish F-754.

4    *BY MR. BELLER:*

5    Q.  Mr. Finch, if you will look down on the bottom of F-754,

6    please.  What is the date of this contract?

7    A.  Mikell's signature is 12/14 of '15.

8    Q.  Okay.  Is that about one year after that earlier contract?

9    A.  Approximately, yes.

10   Q.  Mr. Finch, that earlier contract that the Government kept

11   asking you was for three years.  Was that contract usurped or

12   otherwise overridden by this new updated contract a year later?

13   A.  Yes.

14   Q.  Thank you.

15          Mr. Finch --

16          *MR. BELLER:* And I'm done with that one.  Thank you,

17   Mr. Brian.

18   *BY MR. BELLER:*

19   Q.  Mr. Finch, you were asked about calls between Mr. Brady and

20   Mr. Austin.  Do you recall that?

21   A.  Yes.

22   Q.  Are there other salespeople in the QSR industry that also

23   buy and sell chicken other than Mr. Brady and Mr. Austin?

24   A.  Yes.

25   Q.  Do you know if Carl Pepper is one of those people?

Gregory Finch - Redirect

1   A.   Yes.

2   Q.   How about Greg Tinch?

3   A.   Yes.

4   Q.   How about Jimmie Little?

5   A.   Yes.

6   Q.   What about Ric Blake?

7   A.   Yes.

8   Q.   What about Searcy Wildes?

9   A.   Yes.

10   Q.   Justin Gay?

11   A.   Yes.

12   Q.   Justin McGuire?

13   A.   Yes.

14   Q.   Jason McGuire, excuse me.

15         Scott Tucker?

16   A.   Yes.

17   Q.   Brian Roberts?

18   A.   Yes.

19   Q.   Bill Kantola?

20   A.   Yes.

21   Q.   Pete Martin?

22   A.   Yes.

23   Q.   Jeremy Martin?

24   A.   Yes.

25   Q.   Are there others, or is that just -- let me ask a better

Gregory Finch - Redirect

1    question.  Is that just a few of the salespeople that are in

2    the QSR industry across many different companies?

3    A.   Yes.

4    Q.   And do you know if, for example, Justin Gay and Scott

5    Tucker are at KFC -- excuse me, are at Pilgrim's?

6    A.   They were Pilgrim's' employees during the relative period

7    of this case, yes.

8    Q.   Did they also buy and sell KFC chicken?

9    A.   Yes.

10   Q.   So do you know, Mr. Finch, if Mr. Brady was wanting to buy

11   and sell -- buy or sell KFC chicken was his only option

12   Mr. Roger Austin of Pilgrim's?

13   A.   No.

14   Q.   Let's turn, if we may --

15         MR. BELLER:  Your Honor, if I may publish 1427 for

16   just a moment, please?

17         THE COURT:  You may.

18   BY MR. BELLER:

19   Q.   Mr. Finch, if you could take a moment and look at 1427.

20   Let me know when you've had a chance to review it.

21   A.   Is this the whole document I'm looking at?

22         MR. BELLER:  Mr. Brian --

23   BY MR. BELLER:

24   Q.   Excuse me, I'm sorry.  We may need to -- can you see it now

25   better on your screen?  If you cannot, I'm happy to reference

Gregory Finch – Redirect

1    it in the binder, sir.  Whatever is easiest for you.

2    A.  Okay.  I got it.

3    Q.  Okay. 1427.  You were asked on direct examination about the

4    line, Tell them we're trying, right?

5    A.  Yes.

6    Q.  What is the date on that particular text message of, Tell

7    them we're trying?

8    A.  November the 13th of 2012.

9    Q.  November --

10        MR. LOVELAND:  Objection, Your Honor.  The document

11   speaks for itself.  He shouldn't be asked to interpret the

12   words, and all of the other sustained objections by the

13   defense.

14        THE COURT:  Mr. Beller, any response?

15        MR. BELLER:  Yes, Your Honor, I'm not about to ask him

16   to interpret any words whatsoever.  And he was asked at length

17   about this document without objection.

18        THE COURT:  Objection sustained.

19   BY MR. BELLER:

20   Q.  Mr. Finch, what does that line say?

21        MR. LOVELAND:  Objection, Your Honor.  The document

22   speaks for itself.  Same objection.

23        THE COURT:  Sustained.

24   BY MR. BELLER:

25   Q.  Mr. Finch, I'm going to ask you about J-406, please.

Gregory Finch - Redirect

1          MR. BELLER:  If we can publish that to the jury.

2     BY MR. BELLER:

3     Q.  Do you see J-406?

4          MR. BELLER:  Excuse me, Your Honor, I believe that

5     this is already admitted, and I'm asking to publish.

6          THE COURT:  Let me just look it up.

7          MR. BELLER:  Yes.

8          MR. LOVELAND:  I don't mean to interrupt Your Honor's

9     train of thought, but this is outside the scope of cross, so I

10    object on that ground.

11         THE COURT:  J-406 has been admitted.  Let me look at

12    it just to determine the objection.

13         I'll overrule the objection for now, and we'll see

14    what the questions are.  J-406 may be displayed to the jury.

15    BY MR. BELLER:

16    Q.  Mr. Finch, on November 13 of 2012, did Claxton raise its

17    price on bulk wings?

18    A.  No, lowered it.

19    Q.  Lowered its price, on November 13 and November 14, lowered

20    its price?

21    A.  Correct.

22    Q.  So when we say lowering its price, this is round 2 bid that

23    Claxton Poultry lowered its price?

24         MR. LOVELAND:  Objection.  Leading.  Object to form.

25         THE COURT:  Overruled.

Gregory Finch - Redirect

1    *BY MR. BELLER:*

2    Q.   You can answer, Mr. Finch.

3    A.   I'm sorry, what was the question?

4    Q.   Yeah.  Claxton's round 2 bid on November 13, November 14,

5    was the price raised or lowered from its earlier bid?

6    A.   It was lowered.

7    Q.   So if you lower a price, is that consistent with trying to

8    raise a price?

9    A.   No.

10   Q.   Is lowering a price consistent with using market

11   intelligence to undercut another buyer?

12   A.   Yes.

13   Q.   We talked about wings bulk.  Did Claxton raise or lower its

14   price on wings precounted?

15          *MR. LOVELAND:*  Objection, Your Honor.  He's asking the

16   witness to read off of this document.  He's not asking the

17   witness's knowledge.

18          *THE COURT:*  Sustained.

19   *BY MR. BELLER:*

20   Q.   Same dates, Mr. Finch?

21          *MR. LOVELAND:*  Objection, Your Honor.  I would then

22   ask this document not be displayed if we're asking what this

23   witness knows.

24          *THE COURT:*  We don't know what he's asking yet.

25   Overruled.

Gregory Finch - Redirect

1    *BY MR. BELLER:*

2    *Q.*  Mr. Finch, do you know, as CFO, when Claxton submitted

3    different bids to different customers?

4    *A.*  Yes.

5    *Q.*  Do you know if Claxton submitted an updated round 2 bid to

6    KFC in 2013, specifically November 13 and November 14?

7            *MR. LOVELAND:*  Again, Your Honor, objection.  I don't

8    think there is any need for this to be displayed if he's asking

9    the witness what he knows.

10           *THE COURT:*  Agreed.

11           *MR. BELLER:*  I'm happy to pull it down.

12   *BY MR. BELLER:*

13   *Q.*  Mr. Finch, do you know if Claxton raised or lowered its

14   price on wings bulk on November 13, November 14 of 2012?

15   *A.*  Yes, I know.

16   *Q.*  What did Claxton do?

17   *A.*  We lowered our price.

18   *Q.*  Is lowering your price on bulk wings consistent or

19   inconsistent with trying to raise prices?

20   *A.*  Inconsistent.

21   *Q.*  Is lowering the price antithetical to manipulating or

22   agreeing to raise prices?

23           *MR. LOVELAND:*  Objection, Your Honor.  Speculation.

24   The witness testified he had no personal knowledge what Roger

25   Austin and Scott Brady and Mikell Fries were doing with respect

Gregory Finch - Redirect

1    to this very same time.

2          *THE COURT:*  Overruled.  That wasn't the question.

3    *BY MR. BELLER:*

4    *Q.*  You may answer, Mr. Finch.

5    *A.*  I'm sorry, you'll have to repeat it.  Sorry about that.

6    *Q.*  That's okay.

7          Is raising -- excuse me, is lowering a price

8    antithetical or inconsistent with an agreement to raise prices?

9    *A.*  Yes.

10   *Q.*  What do I mean or what do you mean by the word

11   "antithetical"?

12   *A.*  It's against, it's completely opposite.

13   *Q.*  How about bluffing.  You had testified on cross-examination

14   that suppliers bluff and buyers bluff; is that right?

15   *A.*  Correct.  Yes.

16   *Q.*  Is bluffing antithetical to an agreement to raise prices?

17   *A.*  Yes.

18   *Q.*  Why?

19   *A.*  I mean, if you're trying to make an agreement, you're going

20   to be honest with what your pricing is and not try to fool

21   somebody to giving them a price that is not a price that has

22   been agreed to.

23   *Q.*  You were asked if you know the population of Florida,

24   right?

25   *A.*  I was.

Gregory Finch - Redirect

1    Q.   Okay.  You were asked how you go about advertising in

2    Florida; is that correct?

3    A.   I was.

4    Q.   So let's try to break that down.  Do you sell to the public

5    directly?

6    A.   Very little.

7    Q.   So can I walk into Claxton Poultry's chicken plant and

8    purchase chicken at wholesale millions of pounds of chicken as

9    David Beller, the lawyer?

10   A.   Certain days of the week and certain cuts of chicken, yes.

11   Q.   Okay.  If I needed to do so, because you had surplus?

12   A.   Yes.

13   Q.   How --

14   A.   On occasion.

15   Q.   How about advertising to consumers in Florida, is that

16   something that Claxton Poultry does?

17   A.   No, Claxton does very little advertising, period.

18   Q.   Do you have billboards along the Florida Turnpike that

19   says, Please buy our chicken?

20   A.   No.

21   Q.   Is there any reason why Claxton would need to advertise

22   to -- to average Joe citizen in Florida?

23   A.   No.

24   Q.   How does Claxton sell its product or how does Claxton's

25   product end up with a consumer in Florida?

Gregory Finch – Redirect

 1   *A.*   In Florida, typically through what is known as a

 2   distributor.

 3   *Q.*   Who decides who the distributors are?

 4   *A.*   The QSR on their products, and then we negotiate

 5   independently on non-QSR products directly with those

 6   distribution centers.

 7   *Q.*   All right.  Let's stick with QSR for just a moment.  Does

 8   the QSR tell you who to give your chicken to?

 9   *A.*   Yes, they dictate what warehouses we use.

10   *Q.*   Okay.  And the warehouses is what you mean by the

11   distributor?

12   *A.*   Correct.

13   *Q.*   Okay.  Would there be any reason, Mr. Finch, for you to

14   know or care what the population of Florida is?

15   *A.*   No, sir.

16   *Q.*   Mr. Finch, you were asked about certain contracts being

17   worth millions and millions of dollars.  Do you recall that?

18   *A.*   Yes.

19   *Q.*   These contracts that are worth millions and millions of

20   dollars to the QSR customer, does that include expenses?

21   *A.*   No.

22   *Q.*   Well, the cost-plus model in the contract that we're

23   looking at are worth millions and millions of dollars, correct?

24   *A.*   Correct.

25   *Q.*   Is that all profit?

Gregory Finch - Redirect

1    *A.*   No.

2    *Q.*   And, in fact, what is 40 percent of that millions and

3    millions?

4    *A.*   That -- income tax to my Uncle Sam.

5    *Q.*   What about -- what about feed, is that included in this

6    contract that is worth millions and millions?

7    *A.*   Feet?

8    *Q.*   Feed.

9    *A.*   Yes, feed is in the number.

10   *Q.*   Right.  In other words, this millions and millions does

11   also include a little bit of profit and most of it is expense;

12   is that right?

13   *A.*   Correct.  Most of it is cost, correct.

14   *Q.*   You were asked a lot about this what you call a Greg term.

15   Are you familiar with that?

16   *A.*   Yes.

17   *Q.*   This joint supply network; is that right?

18   *A.*   Correct.

19   *Q.*   Okay.  Is that a fancy way of saying, all the different

20   producers who produce chicken and sell chicken approved

21   producers to a particular QSR customer?

22   *A.*   Yes.

23   *Q.*   All right.  You're taking that and are you calling that

24   joint supply network?

25   *A.*   Yes.

Gregory Finch – Redirect

1    *Q.*  Perfect.  So you were asked about the, I believe, 200,000

2    documents that Claxton Poultry produced to the Department of

3    Justice, right?

4    *A.*  Yes.

5    *Q.*  You were also asked in that same group of documents about

6    the term directional guidance; is that correct?

7    *A.*  Yes.

8    *Q.*  Is directional guidance just another way of saying feedback

9    from the customer?

10   *A.*  Yes.

11   *Q.*  So let me ask if you know, Mr. Finch, how many documents

12   has the Department of Justice put together or produced in this

13   particular case?

14          *MR. LOVELAND:*  Objection.  Foundation, Your Honor.

15          *THE COURT:*  Sustained.

16          *MR. BELLER:*  Your Honor, may we go on sidebar?

17          *THE COURT:*  Sure.

18          (Hearing commenced at the bench.)

19          *THE COURT:*  Mr. Beller, go ahead.

20          *MR. BELLER:*  Thank you, Your Honor.  I'm very happy to

21   lay a foundation; however, I do want to let the Court know that

22   the foundation I would lay and the way that this particular

23   witness has knowledge is because Mr. Koenig in his questioning

24   of Mr. Finch in trial 1 specifically predicated his questions

25   on the number of documents that had been shown to Mr. Finch.

Gregory Finch – Redirect

1    So Mr. Finch does have knowledge of that.

2          In addition, Mr. Finch also has knowledge because

3    Claxton Poultry is paying the bill for the housing of all of

4    these different documents that the Department of Justice

5    produces.  So certainly, I am very happy to lay a foundation,

6    but I want to make sure that the Government is on notice as to

7    how that information will come out, if they persist in the

8    foundation objection.

9          THE COURT:  Well, I think generally this is really

10   getting far afield.  I just don't know why Mr. Finch's

11   knowledge regarding the number of documents produced by Claxton

12   to the Department of Justice somehow makes the number of --

13   total number of documents relevant.  So I just -- I'm not going

14   to allow him to answer that question.  I just -- I just think

15   it opens a big can of worms, and it's irrelevant.

16         MR. BELLER:  Which I understand, and I offer this not

17   to argue with the Court but simply rather to supplement the

18   record briefly.

19         Your Honor, great issue and pain was taken by the

20   Government to point out the fact that Mr. Finch has apparently

21   made up these terms, supplier network and directional guidance,

22   when in reality they appear many, many times in the production

23   that the Government has, in fact, produced.  And at the last

24   trial, Mr. Finch testified to that very same thing.  So the

25   Government was on notice of Mr. Finch's answers to that through

Gregory Finch - Redirect

1    the transcript in the last trial.

2        THE COURT:  And did -- I can't remember, did Mr. Finch

3    testify about that knowledge because of some independent

4    searches that he conducted?

5        MR. BELLER:  Your Honor, I believe that it was --

6    you're putting me on the spot, let me say, this is my memory, I

7    don't want to say too terribly accurately, I believe the

8    information may have come from Claxton's counsel.  I don't know

9    that Mr. Finch actually is the one who went through the

10   relativity search.  It was a question that I myself asked him;

11   however, on redirect, after Mr. Koenig implied that these were

12   terms that Mr. Finch made up and that the department had never

13   heard of these terms before --

14       THE COURT:  Right.  You know, once again, I think that

15   we're fading into areas where -- you know, when Mr. Loveland

16   asked Mr. Finch, you know, would you be surprised to know that

17   these terms don't appear anywhere within the 200,000, there is

18   no objection to that question.  Now we're getting into, you

19   know, asking Mr. Finch something that he has no personal

20   foundation for, you know, and I'm not sure how the form of the

21   question is going to come.  But I'm worried it's going to,

22   would you be surprised to learn something similar to that,

23   somewhat of a tit for tat.  I don't want to get into that.

24       It's not at all relevant to any type of rebuttal, if

25   you will, to the questions he was asked about the 200,000 or

Gregory Finch - Redirect

1    the so-called Greg terms that weren't mentioned in the 200,000.

2    All right?

3              Anything else?

4              *MR. BELLER:* No.  Thank you.

5              (Hearing continued in open court.)

6    *BY MR. BELLER:*

7    *Q.* Mr. Finch, you were asked a bit about -- actually, let me

8    back up -- joint supplier network, whether it's joint supplier

9    network or approved suppliers, does any of that and whether it

10   appears or doesn't appear in Claxton documents, does it change

11   any of your testimony?

12   *A.* No.

13   *Q.* Does it change whether or not there is a certain limited

14   number of approved suppliers that can supply QSRs certain spec

15   foods?

16   *A.* No.

17   *Q.* How about directional guidance, if we call it directional

18   guidance versus calling it feedback, does it change at all

19   whether or not Claxton received that information from

20   customers?

21   *A.* No.

22   *Q.* Does it change what that terminology is regarding whether

23   or not Claxton would follow it?

24   *A.* No.

25   *Q.* I want to switch gears and talk just a little bit about

Gregory Finch – Redirect

1    your -- the questions to you of Claxton's strategy of being in

2    the middle.  Okay.

3    A.  Okay.

4    Q.  Do you have knowledge, Mr. Finch, as to whether that is a

5    strategy that Claxton has had for quite a while?

6    A.  Yes.

7    Q.  How long, if you know, has Claxton used the pricing

8    strategy of wanting to be placed in the middle?

9    A.  The entire 11 years I've been there.  I'm not certain when

10   it started prior to me being there.

11   Q.  Have you ever known a strategy while you have been there

12   where Claxton's goal, their strategy and negotiation was to be

13   at the top?

14   A.  No.

15   Q.  Are you familiar with the term, like, "tight range amongst

16   suppliers"?

17   A.  Yes.

18   Q.  What is that, Mr. Finch?

19   A.  Well, the QSRs are buying for the entire franchise chain,

20   and so they have to try to keep the suppliers in a very tight

21   range on pricing, meaning that the highest-priced person and

22   the lowest-priced person are in a relatively tight range.  So

23   that those case weights, when they buy the chicken from the

24   distribution center to go to the store, they don't want a wide

25   range of cost of case to the restaurants.  So if someone is

Gregory Finch - Redirect

1    really, really low, the franchisees are only going to want to

2    buy that chicken.  If somebody is really, really high, they're

3    not going to want to buy that chicken.  Does that make sense?

4    So they keep us in a tight range to make sure that that case

5    weight that is going to the stores would -- other than freight

6    is in a relatively -- relatively the same from store to store.

7    Q.  Knowing that the different suppliers want all of their --

8    excuse me -- all of the customers want the suppliers to be in

9    this very tight range, does that limit the risk to Claxton in

10   terms of your strategy of wanting to be in the middle?

11        MR. LOVELAND:  Objection, Your Honor.  I think we're

12   far afield of the scope of cross-examination.

13        THE COURT:  Overruled.

14        THE WITNESS:  I'm sorry, what was the question?

15   BY MR. BELLER:

16   Q.  Does that limit -- does the fact that the customer wants

17   everybody in a tight range, does that limit the risk to Claxton

18   of wanting to go in or wanting to be priced in the middle?

19   A.  I don't know that it limits the risk.  But, you know, in

20   the middle is in the middle, whether it's a penny or three

21   pennies.

22   Q.  If it's a tight range, there is very little delta between

23   the middle and the top, right?

24   A.  Correct.

25   Q.  Is there very little delta between the middle and the

Gregory Finch - Redirect

1    bottom?

2    *A.*  Yes.

3    *Q.*  And is that in part why Claxton trusts the QSR buyer to

4    assist in offering feedback or directional guidance for Claxton

5    to be in the middle?

6    *A.*  The tight range is something that helps to keep them in

7    check, for sure.

8    *Q.*  Mr. Finch, you were asked many questions on

9    cross-examination that began with the word "if."  Do you recall

10   that?

11   *A.*  I'm sorry, somebody coughed, I didn't hear you.

12   *Q.*  Mr. Finch, you were asked many questions on

13   cross-examination that began with the word "if."  Do you recall

14   that?

15   *A.*  I-F?

16   *Q.*  Yes.

17   *A.*  Yes.

18   *Q.*  Like if somebody had relationships, correct?

19   *A.*  Yes, hypotheticals.

20   *Q.*  Or if somebody had trust?

21   *A.*  Correct.

22   *Q.*  If somebody had relationships?

23   *A.*  Yes.

24   *Q.*  Do you recall being asked if costs are manipulated?

25   *A.*  Yes.

Gregory Finch - Redirect

1          MR. LOVELAND:  Objection.  Misstates prior testimony,

2     Your Honor.

3          THE COURT:  Overruled.

4     BY MR. BELLER:

5     Q.  You say hypotheticals, are those also assumptions?

6     A.  Yes.

7     Q.  Is -- did you have difficulty in answering questions that

8     are based on assumptions?

9          MR. LOVELAND:  Objection, Your Honor.  This is outside

10    the scope of cross.

11         THE COURT:  Overruled.

12         THE WITNESS:  Yes.

13    BY MR. BELLER:

14    Q.  Why?

15    A.  Well, answering -- they're not my set of variables.  It's a

16    hypothetical; it's not real.  Most of my decisions are based on

17    real information, not a hypothetical.

18    Q.  And so what happens for you when you're trying to process

19    an assumption on top of an assumption?  Does that change the

20    accuracy of the information?

21    A.  It can, for sure.

22    Q.  Mr. Finch, you were shown Document No. 1137.  And I'm

23    hoping that I can show that to you as well.

24         THE COURT:  You may.

25         MR. BELLER:  Thank you.  And I believe this has been

Gregory Finch - Redirect

1    admitted.  And if I may publish.

2            THE COURT:  You may.

3            MR. BELLER:  Thank you.

4    BY MR. BELLER:

5    Q.  Mr. Finch, you were asked about this particular document on

6    cross-examination; is that right?

7    A.  Yes.

8    Q.  What is the date on this correspondence from Mr. Lewis?

9    A.  August the 7th of 2014.

10   Q.  Is that before or after you had already decided what

11   Claxton's first-round bid was going to be?

12   A.  After.

13   Q.  Is this before or after you had already transmitted your

14   first-round bid to Mr. Fries and Mr. Brady?

15   A.  This is before -- to Mr. Brady and Mr. Fries, I'm sorry,

16   this is after.

17   Q.  How about when that same price was transmitted to RSCS and

18   Mr. Lewis?

19   A.  This is before.

20   Q.  Okay.  So did this meeting happen after Claxton had already

21   determined its price and prior to that being sent to RSCS?

22   A.  Yes.

23   Q.  Okay.  Thank you.

24           MR. BELLER:  We can take this document down.

25

Gregory Finch - Redirect

1   *BY MR. BELLER:*

2   *Q.*  Mr. Finch, you were asked at length about Exhibit 1238.  Do

3   you recall 1238?

4   *A.*  I don't.  I've seen a bunch of them since I've been up

5   here.  Sorry.

6   *Q.*  I understand.  If we can refresh your recollection by

7   showing you 1238.

8        *THE COURT:*  You may.

9   *BY MR. BELLER:*

10  *Q.*  Do you now recall this particular exhibit, Mr. Finch?

11  *A.*  Yes.

12  *Q.*  Okay.  Thank you.

13       Mr. Finch, do you recall on cross-examination --

14       *MR. BELLER:*  We can take this document down --

15  actually, if we can publish it to the jury so that the jury

16  knows what we're referring to, Your Honor.

17       *THE COURT:*  I think it was, but if not, it may be.

18       *MR. BELLER:*  Thank you.

19  *BY MR. BELLER:*

20  *Q.*  Mr. Finch, do you recall a time, any time, either on my

21  direct examination or the prosecution's cross-examination,

22  reading anything or seeing anything that reminded you that

23  Claxton shared their bid price with another company?

24       *MR. LOVELAND:*  Objection, Your Honor.  He testified he

25  had no personal knowledge.

1          *THE COURT:*  Overruled.  He can answer.

2          *THE WITNESS:*  That Claxton shared our bid price with

3    anyone other than the QSR?

4    *BY MR. BELLER:*

5    *Q.*  Yes.

6    *A.*  I have no personal knowledge that we ever did that.

7    *Q.*  Have you seen anything?  Has anything been shown to you in

8    this courtroom that makes you second-guess that?

9          *MR. LOVELAND:*  Objection, Your Honor.  The defense

10   sustained objections regarding his interpretation of these

11   documents, so I think the question is improper on that basis.

12         *THE COURT:*  Overruled.

13         *THE WITNESS:*  I have seen nothing to contradict my

14   personal knowledge.

15   *BY MR. BELLER:*

16   *Q.*  Mr. Finch, have you seen anything in any document that the

17   Government showed you in cross-examination where you saw that

18   there was an agreement between Claxton Poultry and any other

19   producer?

20         *MR. LOVELAND:*  Same objection.  He wasn't allowed to

21   answer that question, Your Honor.

22         *THE COURT:*  I'm going to sustain the objection.  The

23   question that is posed to him can't be seeing anything that he

24   interprets it.  It would have to be, did he see anything that

25   refreshes his recollection, which I think the questions

Gregory Finch - Redirect

1    initially did.  I'm not sure the last one did, but that's how

2    the question should be posed.

3    *BY MR. BELLER:*

4    *Q.*  Mr. Finch --

5                Excuse me for interrupting the Court.

6                *THE COURT:*  Go ahead.

7    *BY MR. BELLER:*

8    *Q.*  Mr. Finch, have you seen anything or has anything been

9    shown to you by either me or the Government refreshed your

10   recollection that there is an agreement between Claxton Poultry

11   and any other producer?

12   *A.*  No.

13   *Q.*  Have you seen anything that refreshes your recollection

14   that shows a *quid pro quo*?

15   *A.*  No.

16   *Q.*  Have you seen anything that refreshes your recollection

17   that there is a communication or that there a design of, If you

18   do this, we'll do that?

19   *A.*  No.

20   *Q.*  Have you seen anything that refreshes your recollection

21   that Claxton agreed to match our future numbers with another

22   producer?

23   *A.*  No.

24   *Q.*  And so when you say that Claxton made an independent

25   pricing decision, did that mean without the -- without an

Gregory Finch - Redirect

1    agreement with any other producer?

2            MR. LOVELAND:  Objection, Your Honor.  He's now

3    defining the term for the witness.  The witness should define

4    his own term.

5            THE COURT:  I'm going to sustain that as to the

6    "independent."  If you could define that for the witness.

7    BY MR. BELLER:

8    Q.  Does independent, Mr. Finch, to you mean without agreement?

9            MR. LOVELAND:  Objection.  Leading, Your Honor.

10           THE COURT:  Sustained.

11   BY MR. BELLER:

12   Q.  What does independent to you mean, Mr. Finch?

13   A.  On my own, no help from anyone.

14   Q.  What about an agreement, does that factor in at all?

15           MR. LOVELAND:  Objection, Your Honor.  Asked and

16   answered.  The witness gave his definition.

17           THE COURT:  Overruled.

18           THE WITNESS:  Does independent include an agreement?

19   BY MR. BELLER:

20   Q.  Exclude an agreement.

21   A.  Yeah.  It excludes an agreement.

22   Q.  Mr. Finch, if you could please take a look at 10651.  You

23   were asked at length about this exhibit, as well.

24           THE COURT:  Do you want that displayed, Mr. Beller?

25           MR. BELLER:  If I could, please, Your Honor.

2179

Gregory Finch - Redirect

1          THE COURT:  You may.

2     BY MR. BELLER:

3     Q.  Mr. Finch, you were asked on cross-examination if this

4     occurred on November the 19th of 2013.  Do you recall that?

5     A.  Yes.

6          MR. BELLER:  Thank you.  If we may display J-407 to

7     the witness.

8     BY MR. BELLER:

9     Q.  Mr. Finch, what is J-407?

10         MR. BELLER:  And if we may publish to the jury,

11    please, Your Honor?

12         MR. LOVELAND:  Your Honor, I'm going to object.  I

13    think if we're asking the witness what he remembers about this,

14    it should be from the witness's recollection.

15         THE COURT:  Let me ask Ms. Grimm, is J-407 --

16         COURTROOM DEPUTY:  Yes.

17         THE COURT:  It may be displayed.  We'll see what the

18    question is.

19         MR. BELLER:  Thank you.

20    BY MR. BELLER:

21    Q.  Mr. Finch, what is J-407?

22    A.  This is a recap of our -- each of our round bid prices for

23    the 2014 KFC contract.

24    Q.  Is this particular document something that you as CFO --

25    are these numbers something that you as CFO have very intimate

Gregory Finch - Redirect

1   knowledge of?

2           *MR. LOVELAND:*  Objection.  Leading, Your Honor.

3           *THE COURT:*  Overruled.

4           *THE WITNESS:*  Yes.

5   *BY MR. BELLER:*

6   *Q.*  Mr. Finch, do you recall what day Claxton submitted its

7   third-round bid?

8           *MR. BELLER:*

9           *MR. LOVELAND:*  Objection, Your Honor.  It's the

10  witness's recollection.  It should not be displayed.

11          *THE COURT:*  I agree.

12          *MR. BELLER:*  I'll take it down.

13  *BY MR. BELLER:*

14  *Q.*  Mr. Finch, what day did Claxton submit its third-round bid?

15  *A.*  I don't recall sitting here.  If you have something that

16  could refresh my memory.

17  *Q.*  I do.  Would it help if you had the opportunity to look at

18  Defense Exhibit J-407?

19          *MR. LOVELAND:*  Your Honor, that's improper

20  refreshment.

21          *THE COURT:*  I disagree.  You can show anything to

22  refresh recollection.  If that refreshes his recollection, he

23  can be shown that.

24  *BY MR. BELLER:*

25  *Q.*  Would that refresh your recollection?

Gregory Finch - Redirect

1    A.  Yes.

2           MR. BELLER:  If I may show J-407, please?

3           THE COURT:  You may.

4    BY MR. BELLER:

5    Q.  Mr. Finch, do you have J-407 in front of you?

6    A.  Yes.

7    Q.  Mr. Finch, does J-407 refresh your recollection as to what

8    date Claxton submitted its third-round bid?

9    A.  Yes.

10   Q.  And what date was that, Mr. Finch?

11          MR. LOVELAND:  Document shouldn't be displayed at this

12   point in time.

13          THE COURT:  Agreed.

14          MR. BELLER:  Your Honor, at this time -- well, that's

15   fine.

16   BY MR. BELLER:

17   Q.  Mr. Finch, what date was that submitted?

18   A.  November the 18th of 2013.

19   Q.  And do you recall, Mr. Finch, what Claxton's eight-piece

20   price was on that date?

21   A.  Not off the top of my head, no.

22   Q.  Would it refresh your recollection if you had the

23   opportunity to look at J-407?

24   A.  Yes.

25          MR. BELLER:  If we can please show the witness J-407.

Gregory Finch - Redirect

1    *BY MR. BELLER:*

2    *Q.*   Let me know if that refreshes your recollection, Mr. Finch.

3    *A.*   Yes.

4           *MR. BELLER:*   If we can please remove J-407.

5    *BY MR. BELLER:*

6    *Q.*   What was Claxton's price on November the 18th?

7    *A.*   9402.

8    *Q.*   Mr. Finch, you were asked about the communication -- I

9    think you've just testified that the text message that you were

10   asked about was on or about November the 19th; is that right?

11   *A.*   Yes.

12   *Q.*   Did Claxton submit a fourth-round bid to RSCS?

13   *A.*   Yes.

14   *Q.*   What date was Claxton's bid to RSCS for its fourth-round

15   bid?

16   *A.*   November the 19th of 2013.

17   *Q.*   The very next day from the third bid; is that right?

18   *A.*   Correct.

19          *MR. LOVELAND:*   Objection.  Leading, Your Honor.

20          *THE COURT:*   Overruled.

21          *THE WITNESS:*   Yes.

22   *BY MR. BELLER:*

23   *Q.*   Thank you.

24          Is November 19 the day after November 18?

25   *A.*   Yes.

Gregory Finch - Redirect

1    *Q.*  Okay.  What date was the text message communication?

2    *A.*  The 19th.

3    *Q.*  So does that mean that the same day there was a text

4    communication Claxton submitted a new bid?

5    *A.*  Yes.

6    *Q.*  What number did Claxton give on November 19?

7    *A.*  The eight-piece number?

8    *Q.*  That's correct.

9    *A.*  It was lower than the third round, but I don't recall the

10   number.

11   *Q.*  Would it refresh your recollection if you had the

12   opportunity to look at J-407?

13   *A.*  Yes.

14        *MR. LOVELAND:*  Objection.  At this point, the document

15   is in evidence, and he's just testifying to it.

16        *THE COURT:*  Well, the proper method for refreshing is

17   being used.  Overruled.

18   *BY MR. BELLER:*

19   *Q.*  Would that refresh your recollection?

20   *A.*  Yes.

21        *MR. BELLER:*  If we can please show the witness J-407.

22   *BY MR. BELLER:*

23   *Q.*  Mr. Finch, what was Claxton's price on November the 19th,

24   2013, for eight-piece?

25   *A.*  9275.

Gregory Finch - Redirect

1    *Q.*   Mr. Finch, is 9275 less than 9402?

2    *A.*   Yes.

3    *Q.*   Does that mean Claxton's price came down 2 cents?

4    *A.*   Approximately, yes.

5    *Q.*   It came down 2 cents, was that the same date as that text

6    message?

7    *A.*   Yes.

8    *Q.*   Mr. Finch, when competitors are trying to undercut each

9    other, do they come down 2 cents?

10         *MR. LOVELAND:*   Objection, Your Honor.   Speculation.

11         *THE COURT:*   Overruled.

12         *THE WITNESS:*   Yes, that's the definition of

13   undercutting, is submitting a lower price.

14   *BY MR. BELLER:*

15   *Q.*   Is it learning other people's potential price and then

16   coming in at a lower price?

17   *A.*   Yes.

18   *Q.*   Is 2 cents significant?

19   *A.*   Yes.

20   *Q.*   So if Claxton's eight-piece price came down 2 cents on

21   November 19, what happened to Claxton's dark-meat price on the

22   exact same day?

23   *A.*   It went down 2 cents also.

24   *Q.*   Is it unusual in your experience, Mr. Finch, for someone to

25   submit a round-3 and a round-4 bid within 24 hours of each

1   other?

2   A.   It certainly happens.  It's a little unique, but it doesn't

3   happen every year certainly.

4   Q.   And is that an indication also of trying to get in the door

5   and undercut somebody?

6   A.   Yes.

7   Q.   Is trying to undercut somebody by coming down 2 cents

8   within 24 hours antithetical to an agreement to fix prices or

9   rig bids?

10         MR. LOVELAND:  Objection.  No personal knowledge, 701.

11         THE COURT:  Sustained.

12   BY MR. BELLER:

13   Q.   You were asked, Mr. Finch, regarding this very exhibit on

14   cross-examination if Claxton went up in price.  Do you recall

15   that?

16   A.   Yes.

17   Q.   That if raising the dark-meat price is going up in price.

18   Do you recall that?

19   A.   Yes.

20   Q.   On November 19, 2013, did Claxton go up in dark-meat price?

21   A.   No.

22   Q.   What direction did Claxton go?

23   A.   We went down.

24   Q.   Two more topics, Mr. Finch, and we're done.  Okay?

25   A.   Okay.

Gregory Finch - Redirect

1    *Q.* Mr. Finch, you were asked about Exhibit 900, the board

2    meeting minutes.  Do you recall that?

3    *A.* Yes.

4           *MR. BELLER:* If we can pull up Exhibit 900, the board

5    meeting minutes, please.

6           Your Honor, if I may publish that to the jury.

7           *THE COURT:* Yes, you may.

8    *BY MR. BELLER:*

9    *Q.* Mr. Finch, do you recall that you were asked about these

10   particular minutes?

11   *A.* Yes.

12   *Q.* Do you recall that you were asked a series of questions

13   regarding big bird versus small bird?

14   *A.* Yes.

15   *Q.* Do you recall that you were asked, He said they are

16   prepared to pay 10 but the industry is saying we want 20?

17   *A.* Yes.

18   *Q.* And were you also asked whether Mikell Fries said that big

19   birds were a fad?

20   *A.* Yes.

21          *MR. BELLER:* If we can highlight -- this is page 3,

22   the final paragraph on page 3 that begins "Mikell."

23   *BY MR. BELLER:*

24   *Q.* Right after that, what did Mr. Fries go on to say to

25   complete that discussion?

Gregory Finch - Redirect

1    *A.*  Right after what?

2    *Q.*  Right after, He said they are prepared to pay 10 but the

3    industry is saying we want 20.  What does the next sentence say

4    in that provision?

5    *A.*  He went on to discuss the KFC struggles that they were

6    having, closing stores, and what was going on in the

7    marketplace with them.

8    *Q.*  And so you were asked quite a bit about the fact that

9    Claxton was not planning on converting to big bird; is that

10   right?

11   *A.*  Yes.

12   *Q.*  So let's go to another section of the same board meeting

13   minutes.  This is the first -- the second full paragraph on

14   page 2, that starts "Jerry's."  Do you see that?

15   *A.*  Yes.

16   *Q.*  Who is Jerry?

17   *A.*  Jerry Lane.

18   *Q.*  And who is Jerry Lane?

19   *A.*  At this time, he was the president of the company.

20   *Q.*  And what did Mr. Lane say regarding hatchery supplies?

21   *A.*  Nowhere near where it had been in the past few years.

22   *Q.*  And does Mr. Lane also talk about the concern with big

23   birds and avian flu?

24   *A.*  Yes.

25   *Q.*  What does he say about avian flu?

Gregory Finch - Redirect

1   *A.*  He's talking about how it's hit Mexico, and it's going to

2   potentially impact the breeder flocks here in the

3   United States.

4   *Q.*  And is there discussion in this exact same board meeting

5   that you were asked about regarding bigger birds?

6   *A.*  Yes.

7   *Q.*  What does it say regarding what was due to bigger birds --

8   or what does that line say?

9   *A.*  It says that the -- the supply -- broiler production was up

10  because there were bigger birds.  Not necessarily more birds,

11  but the birds weighed more.

12  *Q.*  How were the big-bird guys doing?

13  *A.*  They were killing it.  They were making a lot of money.

14  *Q.*  And how much more money -- what was discussed in this board

15  meeting that you were asked about with small birds?

16  *A.*  According to Jerry, it says they're making over a dollar a

17  pound more than we are.

18  *Q.*  How much were some companies making per week?

19  *A.*  Up to $5 per plant.

20       *MR. LOVELAND:*  Objection, Your Honor.  At this point,

21  he has just read a series of sentences into the record.  This

22  document speaks for itself.

23       *THE COURT:*  That is generally true.  Many more

24  questions along these lines, Mr. Beller?

25       *MR. BELLER:*  One more.

Gregory Finch - Redirect

1              THE COURT:  Go ahead.  Overruled.

2    BY MR. BELLER:

3    Q.  What did Mr. Fries say regarding the plant cost for big

4    birds?

5    A.  That it's lower than ours.

6    Q.  Thank you, Mr. Finch.

7              Are all of these reasons, to the best of your

8    knowledge, as to why Claxton Poultry was awarded a big-bird

9    adjustment to stay in the small-bird industry?

10             MR. LOVELAND:  Objection, Your Honor.  Leading.

11             THE COURT:  Sustained.

12   BY MR. BELLER:

13   Q.  Why did Claxton get a big-bird adjustment?

14   A.  Well, because the QSR, as we discussed before, have to keep

15   pricing in a tight range, so if they didn't give the big-bird

16   adjustment to us, then we're going to be an outlier on price

17   by, you know, 9 cents a pound.

18             The other issue is, the QSR knew what our product mix

19   was.  They had been doing business with us for 40-plus years.

20   They knew we did a bigger bird, and we would have an

21   opportunity to shift our production from smaller bird to bigger

22   bird to run Chick-fil-A instead of KFC.

23   Q.  Mr. Finch, you said that the capital expenditure for

24   converting to big birds was going to be 30 to $40 million; is

25   that right?

Gregory Finch - Redirect

1    *A.*  Correct, at that time, yes.

2    *Q.*  At that time.  If Claxton is making $5 million a week by

3    converting, how long would it take to pay off a $30 million

4    capital expenditure?

5    *A.*  Well, tax effective, that's about 3 million, so 10 to

6    12 years.

7    *Q.*  Mr. Finch, you were asked about whether or not you were a

8    custodian of records; is that right?

9    *A.*  Yes.

10   *Q.*  Can you tell the jury what a custodian of records is.

11   *A.*  Yes.  It's a person responsible for making sure that

12   documents are preserved and that they are presented when asked

13   for.

14   *Q.*  By being a custodian of records, did you meet with the

15   Department of Justice?

16   *A.*  Yes.

17   *Q.*  Did you sit down and chat with the Department of Justice?

18   *A.*  Yes.

19   *Q.*  Did the Department of Justice ask you any of the questions

20   when you sat down and met with them that you were asked today

21   on cross-examination?

22   *A.*  No.

23   *Q.*  Mr. Finch, finally --

24        *MR. BELLER:*  If I may have just a brief moment, Your

25   Honor?

1        THE COURT:  Yes, you may.

2    BY MR. BELLER:

3    Q.  Finally, I want to end where Mr. Loveland started with you,

4    okay, and that is, talking about working for the Fries family.

5    I think you were asked if Mr. Fries is your boss.

6    A.  Yes.

7    Q.  Do you recall this?

8    A.  Yes.

9    Q.  Who oversees Mr. Fries' job?

10   A.  The board of directors.

11   Q.  Who is on the board of directors?

12   A.  Mrs. Fries, Mikell's aunt, Pamela Fries 5, Jerry Lane, Hub

13   Daniel, Greg Finch, Mikell Fries.

14   Q.  When you say Greg Finch, you're speaking of yourself in the

15   third person?

16   A.  Correct.

17   Q.  So is it fair to say, Mr. Finch, that you serve on the

18   board that oversees him?

19        MR. LOVELAND:  Objection.  Defendant is on the board

20   too, Your Honor.  It's misleading.

21        THE COURT:  Overruled.

22        THE WITNESS:  Correct.  Being a small company like we

23   are, there is oftentimes crossover.  So Mikell is my boss on

24   day-to-day things as CFO, but Greg is Mikell's boss as a member

25   of the board of directors.

Gregory Finch – Redirect

1   *BY MR. BELLER:*

2   Q.  So you're speaking in the third person, and that can be a

3   little confusing.

4   A.  Sorry.

5   Q.  That's okay.  When you say "Greg," are you talking about

6   yourself?

7   A.  Yes.

8   Q.  Okay.  You were asked a question of if Mr. Fries is

9   convicted as an individual, can that have an impact on you,

10  right?

11  A.  Yes.

12  Q.  And what's the answer?

13  A.  Yes.  Certainly.

14  Q.  Could it have impacts on other people too?

15  A.  Yes.

16  Q.  Is that weighty on you?

17  A.  Sure.

18  Q.  Is that difficult for you to process?

19  A.  Sure.

20  Q.  Does that create stress for you?

21          *MR. LOVELAND:*  Objection.  Relevance, Your Honor.

22          *THE COURT:*  Overruled.

23          *THE WITNESS:*  Yes, certainly will.

24  *BY MR. BELLER:*

25  Q.  Does it cause nerves regarding you testifying?

Gregory Finch - Redirect

1   A.   I don't know about nerves, but it's certainly stressful.

2   Q.   This isn't a fun experience; is that fair?

3   A.   No, it is not.

4   Q.   Does that also mean, Mr. Finch, because this is such a

5   weighty decision that you are being careful in your testimony?

6        MR. LOVELAND:   Objection.   Leading, improper

7   bolstering, and I think relevance, too, Your Honor.

8        THE COURT:   Objection to leading.   That objection

9   would be sustained.

10  BY MR. BELLER:

11  Q.   Are you careful?

12  A.   Am I careful?

13  Q.   Yes.

14  A.   Sure.

15  Q.   Are you careful in your answers?

16  A.   Sure.

17  Q.   Why?

18  A.   Why?

19  Q.   Yes.

20  A.   Because it's a mature and complex industry that we're

21  talking about, and I want to make sure that everyone

22  understands the truth of how it really works.

23  Q.   Are you accurate?

24  A.   Yes.

25       MR. LOVELAND:   Objection, Your Honor.   I do think is

Gregory Finch - Redirect

1    improper bolstering of a witness they have called.  I'm happy

2    to be heard on sidebar, Your Honor, but he's essentially

3    asking, did you tell the truth?

4             THE COURT:  Overruled.

5    BY MR. BELLER:

6    Q.  You can answer.

7    A.  Yes, I'm as accurate as I could possibly be.  I've been

8    telling the whole truth, nothing but the truth to the best of

9    my knowledge and recollection ever since I've stood back here

10   yesterday and took an oath to this court to do so.

11            MR. LOVELAND:  Objection, Your Honor.

12            THE COURT:  Overruled.

13   BY MR. BELLER:

14   Q.  Mr. Finch, you were asked that you -- if you would want to

15   see a friend convicted of a federal crime.  Do you recall that

16   question?

17   A.  Yes.

18   Q.  Is the impact on Mr. Fries or the impact on you or anyone

19   else, does that negatively influence you being careful and

20   accurate?

21            MR. LOVELAND:  Objection, Your Honor.  Asked and

22   answered.  This is outside the scope of cross.

23            THE COURT:  Overruled.

24            THE WITNESS:  Look, I don't want anyone to go to

25   prison that's wrongly accused and hadn't done what they're

Gregory Finch - Redirect

1   accused of.

2          MR. LOVELAND:  Objection, Your Honor.  This is not the

3   question that was posed to the witness.

4          THE COURT:  Sustained.

5   BY MR. BELLER:

6   Q.  Do you have a fiduciary duty to Claxton Poultry?

7   A.  Yes.

8   Q.  Do you in any way compromise your fiduciary duty to your

9   friend?  Do you compromise your duty to Claxton Poultry over

10  Mr. Fries?

11  A.  I don't --

12         MR. LOVELAND:  Objection.  Compound.

13         THE COURT:  Overruled.

14  BY MR. BELLER:

15  Q.  You can answer these questions, Mr. Finch.

16  A.  Okay.  I don't compromise anything I do.  I'm not going to

17  lie for anybody, regardless of who it is.  I'm going to tell

18  the truth.  My first obligation in life is to my Lord and

19  Savior, Jesus Christ.

20         MR. LOVELAND:  Objection.

21         THE WITNESS:  My second at the moment is to this

22  court, who I took an oath yesterday to tell the whole truth and

23  nothing but the truth so help me God, until I'm dismissed from

24  the stand.

25         MR. BELLER:  I have one final question, Your Honor.

Gregory Finch - Redirect

1          THE COURT:  Objection overruled.

2     BY MR. BELLER:

3     Q.  Mr. Finch, you were asked by Mr. Loveland -- you were told

4     by Mr. Loveland that you would not want to see a friend

5     convicted of a federal crime; is that true?

6     A.  He told me that.

7     Q.  And you answered?

8     A.  I do not.

9     Q.  Why?

10    A.  I don't want to see anybody convicted of anything that they

11    didn't do.

12         MR. LOVELAND:  Objection, Your Honor.  This is not the

13    question that was asked.  He's opining on an ultimate issue of

14    the case.  He already said he had no personal knowledge of it.

15         THE COURT:  Yeah.  I'm going to sustain that.

16    BY MR. BELLER:

17    Q.  Mr. Finch, after being subject to Mr. Loveland's

18    cross-examination --

19         MR. LOVELAND:  Objection to characterization, Your

20    Honor.

21         THE COURT:  Overruled.

22    BY MR. BELLER:

23    Q.  Does it change any of the answers that you have given to

24    this jury on what you know and what you believe?

25    A.  No.

Gregory Finch - Redirect

1        MR. BELLER:  Thank you.  I have no further questions.

2        Thank you, Mr. Finch.

3        THE COURT:  Is Mr. Finch subject to recall?

4        MR. LOVELAND:  No, Your Honor.

5        THE COURT:  All right.  Mr. Finch, you are excused.

6   Thank you.

7        THE WITNESS:  All right.

8        THE COURT:  Ladies and gentlemen, why don't we go

9   ahead and take the mid-afternoon break just a little bit early.

10  We've got an IT issue that we're going to deal with.  I think

11  we should be okay -- why don't you plan on being ready at 3:25,

12  but it could -- it's possible it could go to 3:30.  If you

13  could be ready at 3:25.

14       All right.  The jury is excused for the mid-afternoon

15  break.

16       (Jury out at 3:07 p.m.)

17       THE COURT:  Thank you.  Please be seated.

18       Mr. Fagg, the next witness will be Mr. Brown, and then

19  presumably over the break, we should be able to get the

20  connection up for his attorney.

21       MR. FAGG:  Absolutely, Your Honor.

22       THE COURT:  Okay.  So we'll try to reconvene just in

23  15 minutes, at 25 after, and -- but, you know, that should work

24  out.

25       All right.  We'll be in recess, thank you.

Michael Brown - Direct

1           (Recess at 3:08 p.m.)

2           (In open court at 3:26 p.m.)

3           THE COURT:  Go ahead and bring the jury in.  You can

4   bring the witness in if you wish, too.

5           Mr. Brown, if you'll come up here, you can stand up

6   near the witness stand, that would be great.

7           (Jury in at 3:27 p.m.)

8           THE COURT:  Thank you.  Please be seated.

9           Mr. Fagg, you may call the next witness.

10          MR. FAGG:  Thank you, Your Honor.  We call Mike Brown.

11          THE COURT:  Ladies and gentlemen, Mr. Brown is on the

12  witness stand.

13          Mr. Brown, I'm going to have you take an oath at this

14  time that Ms. Grimm will administer to you.

15              (**MICHAEL BROWN, DEFENDANTS' WITNESS, SWORN**)

16          COURTROOM DEPUTY:  Please state your name and spell

17  your first and last name for the record.

18          THE WITNESS:  My name is Michael James Brown; Michael,

19  M-I-C-H-A-E-L, James, J-A-M-E-S, Brown, B-R-O-W-N.

20          THE COURT:  Mr. Fagg, go ahead.

21                      **DIRECT EXAMINATION**

22  BY MR. FAGG:

23  Q.  Good afternoon, Mr. Brown.

24  A.  Good afternoon.

25  Q.  My name is John Fagg, and I represent Bill Lovette.  I just

Michael Brown - Direct

1  have a few brief questions for you today, okay.

2  A.  Yes, sir.

3  Q.  Where do you work, Mr. Brown?

4  A.  I work for the National Chicken Council in Washington, D.C.

5  Q.  What is the National Chicken Council, sir?

6  A.  The National Chicken Council is a trade association.  We

7  were created in 1954 when the Poultry Products Inspection Act

8  was passed, and it's our duty to represent and be the voice of

9  the chicken industry in Washington, D.C. before members of

10  Congress and regulators.

11  Q.  And, Mr. Brown, if you could maybe lift the microphone up

12  just a little bit so we can make sure the jury can hear you.

13  A.  Yes.

14  Q.  Does the National Chicken Council go by an acronym?

15  A.  Yes, we go by NCC.

16  Q.  Is that how you're generally known?

17  A.  Yes, that's how we're known.

18  Q.  And how long have you worked for the NCC, sir?

19  A.  I'm in my 11th year.

20  Q.  What is your title?

21  A.  I'm the president of the association.

22  Q.  Have you held that job the entire time?

23  A.  Yes, sir.

24  Q.  You said you were a trade association.  What sort of

25  companies or organizations are members of your trade

Michael Brown - Direct

1  association?

2  *A.*  Well, our primary members would be chicken companies,

3  integrators or processors, as they're known, many branded folks

4  in the room would know, the chicken that ends up in supermarket

5  or in restaurants.  There is 28 of them.  There is also what we

6  have known as allied members and allied leaders.  These are

7  companies that often either supply the industry with equipment

8  towards manufacturing and also some customers of the processors

9  that would include restaurants, such as, you know, KFC,

10  Popeyes, people of that nature.

11  *Q.*  Sir, does the NCC have anything to do with the pricing of

12  chicken?

13  *A.*  No, sir.

14  *Q.*  I want to switch gears and ask you a little bit about

15  Mr. Lovette, okay?

16  *A.*  Yes.

17  *Q.*  Do you know Bill Lovette?

18  *A.*  I do.

19  *Q.*  Does Mr. Lovette participate in the NCC?

20  *A.*  Yes, he did.  I've known Mr. Lovette since I on-boarded at

21  NCC, so he's been a member of the board, on the executive

22  committee, and he was actually my chairman for a year.

23  *Q.*  And you said he was chairman for a year.  Did you

24  participate in the meeting in which he was elected or selected

25  as chair?

Michael Brown – Direct

1   A.  I would not select him, but I did participate with the

2   nominating committee.

3   Q.  When that decision was made?

4   A.  Yes, sir.

5   Q.  And are you aware of the factors that the nominating

6   committee considered when selecting the chair?

7   A.  Yes, sir.  They -- first and foremost, they are represented

8   leaders in the industry.  They also participate at a high rate

9   with the council so that they can fulfill their duties if

10  selected.

11  Q.  When you say participate with the council at -- I think

12  maybe you said a high level, what do you mean by that?

13  A.  Well, attend meetings, we have board meetings and policy

14  meetings, and also when we are trying to develop policy towards

15  a government action, he would always make himself available.

16  Q.  So you select people that are engaged?

17  A.  Yes, sir.

18  Q.  And as chair of the NCC, what were Mr. Lovette's duties?

19  A.  Mr. Lovette's duties would be to chair the various

20  meetings.  We have a January board meeting in Atlanta.  We have

21  a board meeting in June.  We have a board meeting in November.

22  And then also any conferences or executive committee meetings

23  that might pop up, he would chair those meetings.

24  Q.  Did you have an opportunity to observe him in his role as

25  chair?

2202

Michael Brown - Direct

1   A.   I did.

2   Q.   Did you have an opportunity to interact with him?

3   A.   Very much.

4   Q.   So based on your experience and interacting with him and

5   working with him, was he a good chairman?

6   A.   He was an excellent chairman.

7   Q.   And based on your observations of him and your role as

8   president and your interactions with him, did you have an

9   understanding of whether or not he was represented by the NCC?

10  A.   He was --

11        MS. WULFF:  Objection, Your Honor.  Improper character

12  testimony.

13        THE COURT:  Overruled.

14        THE WITNESS:  If I understand your question correctly,

15  he was well respected by our membership and certainly by our

16  staff, who he was supportive of.

17  BY MR. FAGG:

18  Q.   So I want to witch gears and really focus in, sir, on --

19  specifically on the year 2013, okay.

20  A.   Yes, sir.

21  Q.   Do you recall an NCC event in July of 2013?

22  A.   We've had several events.  Oh, in July, we would have had a

23  marketing conference, yes.

24  Q.   And did Mr. Lovette attend that?

25  A.   Yes, that would have been part of his role as the chairman

Michael Brown – Direct

1    of the NCC, to come give opening comments.

2    *Q.*  Do you recall where that was?

3    *A.*  Yes, it was in Coeur d'Alene, Idaho.

4    *Q.*  Did you attend that meeting?

5    *A.*  I did.

6    *Q.*  And do you recall when it occurred?

7    *A.*  It occurred the third week of July, is when we

8    traditionally hold that meeting.  Yes, I think it was the 21st

9    through 23rd.

10   *Q.*  Did -- and you said Mr. Lovette attended?

11   *A.*  He did.

12   *Q.*  Do you recall when in that time frame, July 21 to 23, when

13   he arrived in Idaho?

14   *A.*  Yes.  I would have arrived a day early to participate in a

15   game that I love more than it loves me, a round of golf.

16        *MS. WULFF:*  Objection, Your Honor.  Not responsive to

17   the question.

18        *THE COURT:*  Overruled.

19        *THE WITNESS:*  And Mr. Lovette would have arrived the

20   next day, and I would -- yes, so I arrived on the 20th, and he

21   arrived on the 21st.

22   *BY MR. FAGG:*

23   *Q.*  And did you meet with Mr. Lovette when he was there?

24   *A.*  I met with him, and I spent I think my entire time with

25   him, except in bed, sleeping.

Michael Brown - Direct

1   Q.  And so you said you spent your entire time with him, so --

2   do you recall he arrived on the 21st?  Did you meet with him

3   that day or that evening?

4   A.  Yes, I would have greeted him upon his arrival once he

5   settled in his room.

6   Q.  What about after that?

7   A.  Yes, after that, I attended a reception for the attendees

8   with Mr. Lovette and shepherded him around the event.

9   Q.  What about after that time, when you were shepherding him

10  around at the reception?

11  A.  Well, we left a bit early because Mr. Lovette had requested

12  to have dinner with me prior to the conference, so we went from

13  the reception to dinner.

14  Q.  Who all attended the dinner?

15  A.  It was just Mr. Lovette and myself.

16  Q.  Do you recall Mr. Lovette saying anything at that dinner

17  that you thought was improper?

18  A.  Absolutely not.

19  Q.  Did -- do you recall him saying anything that you thought

20  was concerning?

21  A.  No, it was a very good dinner, and it was discussing my

22  role at the council.

23  Q.  What did you do after dinner, sir?

24  A.  Well, it was -- dinner went on for a while.  It was a late

25  dinner.  We came back to the resort and went to our rooms.

Michael Brown - Direct

1    There were no other functions to attend.

2    Q.  And so, then, did I understand you correctly earlier that

3    you said that the conference really kicked off in earnest the

4    next day?

5    A.  Yes, that would be when the program would begin.

6    Q.  And so that would have been July 22?

7    A.  Yes, sir.

8    Q.  Did you see Mr. Lovette that morning?

9    A.  I did.

10   Q.  When was that?

11   A.  I -- it would have been very early morning, before the

12   breakfast started, I would guess it was around 7:00 a.m.

13   Q.  What was the context there?

14   A.  The context there was to meet him, make sure he was fully

15   prepared for the day's events.  I attended the continental

16   breakfast with him, and, again, I go around with him -- he's in

17   a position that's very well respected and a lot of the folks

18   would come up --

19            THE COURT:  Hold on just one second, Mr. Brown.

20            MS. WULFF:  Objection, Your Honor.  Not responsive to

21   the question.

22            THE COURT:  Overruled.

23            THE WITNESS:  And so I would take him around.  As you

24   can imagine, somebody in these positions, people come up, they

25   want to get to know them-- introduce themselves to him.  And

Michael Brown - Direct

1   then I would have escorted him directly from the breakfast into

2   the conference room.

3   *BY MR. FAGG:*

4   *Q.*   And so the conference room, can you describe that for the

5   jury a little bit?

6   *A.*   Yeah.  It's a large -- large open area that you might see

7   in a lot of hotels, if you've attended a wedding in such an

8   atmosphere, with the seating set up in rows, classroom

9   structure type, and then with a large podium and normally a

10  large screen where our speakers would go.

11  *Q.*   And was Mr. Lovette one of the speakers at that conference?

12  *A.*   Yes, he was the headliner to kick off the conference.

13  *Q.*   You say he was the headliner.  How long was his speech, do

14  you recall?

15  *A.*   I don't know.  Maybe 15 minutes.

16  *Q.*   And --

17  *A.*   10 minutes, 15.

18  *Q.*   Can you describe for the jury a little bit about the -- how

19  Mr. Lovette came to speak at this event?

20  *A.*   Well, he came to speak at the event because it was part of

21  his responsibility as being the chairman of the chicken

22  council, to attend that meeting and to kick it off.  And those

23  calendars are provided to the chairman roughly a year -- no, in

24  October of each year, so he would have committed to it.

25  *Q.*   And so as part of that kickoff speech, did the NCC play a

Michael Brown – Direct

1   role in preparing remarks for Mr. Lovette?

2   A.  Yes, we typically and -- we always prepare remarks for our

3   chairmen on any of our presentations.

4   Q.  Who prepares those?

5   A.  In 2013, it would have been my chief economist, Bill

6   Roenigk, and my senior vice president for communications, Tom

7   Super.

8   Q.  And then were those remarks sent to Mr. Lovette?

9   A.  No, they come to me first for review, and then I send -- I

10  always send off presentations to my general counsel to review

11  them first, and then I would have sent them to Mr. Lovette.

12  Q.  Do you recall in this instance whether or not your general

13  counsel had any comments to those remarks?

14  A.  No.  No comments.

15  Q.  Do you recall that he did not?

16  A.  Yeah, it passed muster with my counsel.

17  Q.  And did you have any comments to it?

18  A.  I did not.

19  Q.  And then you said it was sent to Mr. Lovette?

20  A.  Yes.

21  Q.  Do you recall whether or not Mr. Lovette provided any

22  feedback to you regarding the draft remarks?

23  A.  No, other than likely thanking me.

24  Q.  And the purpose of those -- that -- those draft remarks

25  were for him to deliver the speech at the NCC that we just

Michael Brown - Direct

1    talked about?

2    A.   Yes, to kick off the conference.

3    Q.   Without telling us exactly what he said, can you describe

4    generally the nature of what it was that he was speaking about?

5    A.   Yeah, it was a challenging time for our industry.  We had

6    new regulations going in place.  We had an RFS for corn ethanol

7    put in place, drove up cost for industry.  I think 12 or 13

8    companies went under as a result of it.  And Bill's discussion

9    was more of a pep talk for the room, for people in the

10   industry, that, you know, there is a bright road ahead type of

11   comments.

12   Q.   So -- and you were present when he gave his remarks?

13   A.   Yes, I'm always present with the chairman, and my general

14   counsel is always present with me.

15   Q.   So I'd like to describe for the jury a little bit -- like

16   for you to describe to the jury a little bit the audience

17   there.  Can you tell us about -- approximately how many people

18   would have been in the room?

19   A.   Yeah.  I'd have to guess, I think we average somewhere

20   between 125 to 150 attendees.  There is a lot of mid-level or

21   lower-level senior management who attend.  You have a lot of

22   people in communications that attend the meeting.

23   Q.   And in terms of the types of companies that the people who

24   were in attendance work for, can you tell us about that?

25   A.   Well, they would be employees from the chicken industry,

Michael Brown - Direct

1    from the processor/integrator community.  We would also have

2    suppliers there that support the industry, and also customers

3    would be there.

4    Q.  Were members of the media there?

5    A.  Oh, yes, in fact, the conference is co-sponsored by a -- a

6    media outlet, WATT.  And since then, I have given them full

7    rein of the marketing conference, and I just lend our name.

8    Q.  When you talk about integrators, you're talking about the

9    chicken producers; is that fair?

10   A.  Yeah, chicken processors, they deliver the chicks to

11   farmers, they pick them up six weeks later, we process them,

12   and they go to market.

13   Q.  Pilgrim's would be an example of one of those?

14   A.  Pilgrim's would be.

15   Q.  Tyson?

16   A.  Tyson.

17   Q.  Mountaire?

18   A.  Mountaire.

19   Q.  And speaking of Pilgrim's, at this July 2013 conference,

20   was Mr. Penn there?

21   A.  No, he was not.

22   Q.  So if we could -- so I'm sorry.  So Mr. Lovette gave his

23   pep talk?

24   A.  Yes.

25   Q.  And then what happened next?

Michael Brown - Direct
                                                                    2210

1    *A.* He left the podium, walked through the conference area,

2    auditorium, whatever we want to describe it as, and, of course,

3    while he walks down, some people come over, they say hello, I'm

4    with him, I guess him out of the room into his car, I breathe

5    easy, and then I leave.

6    *Q.* So, then, you left the conference as well?

7    *A.* Absolutely.

8    *Q.* When he got in his car, do you know where he went?

9    *A.* I assume to the airport and off to do business.

10   *Q.* But he wasn't staying at the conference?

11   *A.* No. Neither one of us stayed.

12   *Q.* And so, sir, I'd like --

13        *MR. FAGG:* If we could display GX-3025. And I would

14   ask that it be published to the jury.

15        *THE COURT:* Yes, you may.

16        *MR. FAGG:* Thank you, Your Honor.

17   *BY MR. FAGG:*

18   *Q.* Sir, do you see on the first sentence there at the end, how

19   does that sentence -- at the -- how does it end? At the what?

20        *MS. WULFF:* Objection, Your Honor. I believe the

21   witness --

22        *MR. FAGG:* I'm asking him about a specific term, Your

23   Honor.

24        *THE COURT:* If you could be more specific in your

25   question, Mr. Fagg.

Michael Brown - Direct

1          *THE WITNESS:*  I'm not sure if I see the same thing.

2      *BY MR. FAGG:*

3      *Q.*  You see at the very end of the first sentence where it says

4      "at the NCC"?

5      *A.*  Yes, I do.

6      *Q.*  And what do you do -- can you tell us again what the NCC

7      is?

8      *A.*  We are a, for all intents and purposes, a lobbying

9      organization of the trade association.

10     *Q.*  That's the acronym for the National Chicken Council?

11     *A.*  Yes.

12          *MR. FAGG:*  We can take that down.  Thank you.

13     *BY MR. FAGG:*

14     *Q.*  Sir, when you listened to Mr. Lovette's speech, was there

15     anything that sounded illegal to you?

16          *MS. WULFF:*  Objection, Your Honor.  701, goes to the

17     ultimate facts in issue.

18          *THE COURT:*  Response.

19          *MR. FAGG:*  I'm just asking for his impression of this

20     speech, Your Honor, what the -- he overheard.  I'm not asking

21     him specifically what Mr. Lovette said.

22          *MS. WULFF:*  I believe that's the exact type of opinion

23     testimony going to the ultimate facts in question.  He's not a

24     lawyer.  That's the exact reason for --

25          *THE COURT:*  Overruled.

Michael Brown – Direct

1              THE WITNESS:  Could you repeat the question?

2    BY MR. FAGG:

3    Q.  Sure.  Did he say anything that in your opinion sounded

4    illegal to you?

5    A.  No, he would have stuck to the script.  Bill is a

6    button-down guy.

7    Q.  Did he say anything close to that line to you?

8    A.  No.

9              MS. WULFF:  Objection, Your Honor.  Foundation.  This

10   is, again, calling for opinion testimony.  The witness is not a

11   lawyer, and this goes to the ultimate conclusions.

12             THE COURT:  Overruled.

13   BY MR. FAGG:

14   Q.  You can answer, sir.

15   A.  No, there would be no -- there would be no such discussion,

16   other than what we presented Mr. Lovette to deliver.

17   Q.  And, sir, last final question for you, during the entire

18   time period when you were with Mr. Lovette, from dinner to

19   breakfast the next morning, to mingling beforehand, to his

20   remarks, to whenever he left to go in his car, did you hear him

21   say anything that was improper?

22   A.  Absolutely not.

23             MR. FAGG:  Thank you, sir.  That's all I have.

24             THE WITNESS:  Thank you.

25             THE COURT:  Thank you.

Michael Brown - Cross

1          Any additional cross -- sorry, cross-examination,

2    Mr. Tubach.

3          *MR. TUBACH:*  Thank you, Your Honor.

4                    **CROSS-EXAMINATION**

5    *BY MR. TUBACH:*

6    *Q.*  Good afternoon, Mr. Brown.  My name is Michael Tubach.  I

7    represent Jayson Penn.  You testified on direct examination in

8    response to Mr. Lovette's counsel's questions about Jayson

9    Penn.  Do you know Jayson?

10   *A.*  I do.

11   *Q.*  How do you know him?

12   *A.*  I know him through the National Chicken Council.  He was a

13   board member and executive committee member.  He was in my

14   elected-officer group.

15   *Q.*  How long have you known him, approximately?

16   *A.*  I've known -- well, I know I've known Bill for the

17   11 years; I would guess Jayson for 10.

18   *Q.*  And you said he served on the board of directors of the

19   NCC?

20   *A.*  Yes, he did.

21   *Q.*  Okay.  And you mentioned something about the executive

22   committee.

23   *A.*  We have a board of directors that -- it's approximately 70

24   members that we have the chicken integrators on there as well

25   as many of our supplier members that I described earlier.

Michael Brown - Cross

1    *Q.*  And then what's the executive committee?

2    *A.*  The executive committee at the time that Jayson would have

3    been in his role with the council would have been a 15-member

4    committee, made up of balance of size and region of chicken

5    integrators or chicken companies.

6    *Q.*  So during your interactions with him as a member of the

7    board of the NCC and on the executive committee, did you have

8    an opportunity to observe and interact with him in those

9    capacities?

10   *A.*  Yes.

11   *Q.*  Based on your work with Mr. Penn, did you believe he was a

12   good board member?

13   *A.*  Well, I thought he was an excellent board member, but so

14   did the board, as he was elected to the executive committee and

15   subsequently chosen by the nominating committee to be in line

16   for chairmanship.

17   *Q.*  Thank you.

18          Did you have an understanding whether members of the

19   NCC and the staff, whether Mr. Penn was respected by the NCC?

20   *A.*  Very well respected.

21   *Q.*  Okay.  And last question, you mentioned this July 2013

22   marketing seminar?

23   *A.*  Yes.

24   *Q.*  You would have known if Mr. Penn was there, right?

25   *A.*  I would have known if he was there.

Michael Brown - Cross

1   *Q.*   And he was not there, right?

2   *A.*   I know where my bosses are, when they're present and not.

3   *Q.*   Mr. Penn was not there?

4   *A.*   He was not there.

5           *MR. TUBACH:*   Thank you very much.   I have no further

6   questions.

7           *THE COURT:*   Thank you.

8           Additional cross-examination by any of the defendants?

9           Cross-examination by the United States.   Go ahead.

10          *MS. WULFF:*   Thank you, Your Honor.

11                          **CROSS-EXAMINATION**

12  *BY MS. WULFF:*

13  *Q.*   Good afternoon, Mr. Brown.

14  *A.*   Good afternoon.

15  *Q.*   The National Chicken Council is financed by dues from the

16  chicken suppliers?

17  *A.*   Yes, ma'am.

18  *Q.*   And Pilgrim's is a dues-paying member of the NCC?

19  *A.*   All of our members are dues-paying, yes.

20  *Q.*   And Pilgrim's is a member?

21  *A.*   Yes.

22  *Q.*   Has been one for the entire time you've been president?

23  *A.*   Yes.

24  *Q.*   And the dues that each member company pays are based at

25  least in part on the amount of chicken produced by each

Michael Brown - Cross

1  supplier, right?

2  *A.*  As far as the processors, yes.  But other member dues are

3  based on the category of their membership.

4  *Q.*  And I believe you used the term processors; I was using the

5  term suppliers.  But Pilgrim's is a processor under the

6  definition you were using, right?

7  *A.*  Yes.

8  *Q.*  For Pilgrim's, the amount of dues it pays -- and companies

9  like Pilgrim's and Claxton, the suppliers, their dues are based

10  at least in part on the amount of chicken that they each

11  produce, right?

12  *A.*  Correct.

13  *Q.*  Pilgrim's is one of the largest chicken suppliers in the

14  country?

15  *A.*  I think second.

16  *Q.*  Its dues are among the very highest?

17  *A.*  It would be.  It is.

18  *Q.*  Am I correct that Pilgrim's pays over $200,000 a year in

19  dues to the National Chicken Council?

20  *A.*  That sounds close.

21  *Q.*  For the past 11 years, while you've been president,

22  Pilgrim's has paid at least $2.2 million to the National

23  Chicken Council?

24  *A.*  At least, yes.

25  *Q.*  And Claxton also pays dues to the National Chicken Council,

Michael Brown - Cross

1  right?

2  A.  Yes.

3  Q.  And has for the past 11 years?

4  A.  Yes.

5  Q.  Being president of the National Chicken Council is your

6  full-time job?

7  A.  Yes, it is.

8  Q.  You get a salary?

9  A.  I do.

10  Q.  That salary is somewhere in the hundreds of thousands of

11  dollars a year, isn't it?

12  A.  It is.

13  Q.  It's your primary source of income?

14  A.  It is my only source of income.

15  Q.  It's paid for out of the NCC's budget?

16  A.  Correct.

17  Q.  Which, of course, comes from the membership dues that are

18  paid by the defendants' employers?

19  A.  Yes.

20  Q.  In fact, just a moment ago you referred -- in response to

21  Mr. Tubach's question, you referred to Defendants Penn and

22  Lovette as your bosses, didn't you?

23  A.  Everybody that pays dues to my organization I consider a

24  boss, and they get equal treatment.

25  Q.  That includes these five defendants, correct?

Michael Brown - Cross

1    A.   Yes.  Well, actually, I only know three of the defendants.

2    Q.   Defendants Penn and Lovette?

3    A.   Yes.

4    Q.   And Defendant Fries?

5    A.   Yes.

6    Q.   So those three men are among your bosses?

7    A.   They would have been, and anybody under their employ in

8    those companies, I consider a boss.  But my job is not to wag

9    to the dollar, I have to --

10   Q.   I --

11   A.   -- get to agreed-upon policies.  If I was driven by the

12   amount of money that one company gave me versus another, I

13   might as well just go work for that company.  I have to --

14   Q.   The --

15   A.   -- bring it together.

16   Q.   Thank you, Mr. Brown.

17          I asked you a question about who your bosses were, and

18   so if you could please try to answer my question.

19   A.   Uh-huh.

20   Q.   Mr. Brown, you're here today as part of your job duties

21   with the National Chicken Council?

22   A.   I don't know that that's the reason I'm here.  I was asking

23   to come.

24   Q.   Sure.  Are you being paid part of your salary to be here

25   today?

Michael Brown - Cross

1    A.   I am not being paid anything to be here.

2    Q.   Are you taking unpaid leave from the National Chicken

3    Council today?

4    A.   Well, I guess I'm on the clock, but I don't consider this

5    to be part of my job criteria.

6    Q.   Okay.  You've known Defendant Lovette for a number of

7    years?

8    A.   Eleven years.

9    Q.   And you said you had a professional relationship with him?

10   A.   I did, indeed.

11   Q.   You also have a personal relationship with him?

12   A.   Well, you get to know people over time, yes.

13   Q.   Would --

14   A.   I mean, we're not friends that go out and meet for golf and

15   go drinking together, but you develop -- like in any

16   relationship, anybody I've ever worked for, I thought at the

17   end of the day it was a -- some type of friendship established.

18   Q.   Thank you, Mr. Brown.

19         Now, turning more directly to the time you spent

20   together in Idaho in 2013 -- is that July?

21   A.   Yes.

22   Q.   I believe you testified that you met up with Defendant

23   Lovette after he settled into his room on the date of his

24   arrival, right?

25   A.   That would be accurate.

Michael Brown - Cross

1    *Q.* So you don't know if he talked to anyone on his way in?

2    *A.* I actually greeted Bill when he arrived.  So I would have

3    met him.  He would go to his room, I'd say, Hey, we've got the

4    reception starting at 5:00, he'd come down -- whatever time the

5    reception started --

6           Let me back up, Your Honor.

7           But I would have met him and taken him to the

8    reception.

9    *Q.* But you didn't follow him up to his room and back?

10   *A.* Yeah, I -- I would have a hard time accounting for all of

11   my time.

12   *Q.* Fair enough, Mr. Brown.

13          So you also can't account for all of Mr. -- Defendant

14   Lovette's time, can you?

15   *A.* I can account for the time that he was to devote to the

16   conference and the time that he spent with me and the time that

17   I performed my duties of escorting him.

18   *Q.* Thank you, Mr. Brown.

19          A few final questions, Mr. Brown.  You haven't been

20   attending trial, correct?

21   *A.* Pardon me?

22   *Q.* You have not been attending this trial, right?

23   *A.* No, ma'am.

24   *Q.* You haven't heard the testimony of any of the Government's

25   witnesses?

Michael Brown – Redirect

1   A.  No, ma'am.

2   Q.  Including Pilgrim's' employee, Robbie Bryant?

3   A.  I don't know Robbie, but I haven't heard his testimony.

4   Q.  You haven't seen any of the emails in this case, including

5   emails between Defendant Lovette and the CEO of Koch Foods --

6           MR. FAGG:  Objection, Your Honor.  Outside the scope

7   of direct.

8           THE COURT:  Overruled.

9   BY MS. WULFF:

10  Q.  Mr. Brown, you haven't seen any of the emails in this

11  case, including emails between Defendant Lovette and the CEO of

12  Koch Foods, Joe Grendys, about credit terms?

13  A.  No, I have not.

14  Q.  You haven't seen any of the text messages in this case?

15  A.  No, I have not.

16  Q.  You haven't seen any of the evidence in this case, have

17  you?

18  A.  No, ma'am, I have not.

19          MS. WULFF:  Thank you.  No further questions.

20          THE COURT:  Thank you.  Redirect.

21                    **REDIRECT EXAMINATION**

22  BY MR. FAGG:

23  Q.  Just a few more questions, Mr. Brown, and then we'll get

24  you on your way.  The prosecutor was asking you some questions

25  about Pilgrim's being a member and paying dues of the NCC.  Do

Michael Brown – Redirect

1    you remember that?

2    A.  Yes.

3    Q.  Does the fact that Pilgrim's is a member of the NCC and has

4    paid dues to your organization influence your testimony that

5    you gave today in any way?

6    A.  Not in any way.

7    Q.  And does your relationship with Mr. Lovette influence your

8    testimony in any way?

9    A.  Not in any way.  I'm sworn in under perjury, and I come

10   from a prison town, and I'm not going back.

11          MS. WULFF:  Objection --

12          THE COURT:  Overruled.

13          MS. WULFF:  -- nonresponsive.

14   BY MR. FAGG:

15   Q.  Sir, last question for you, does your friendship with

16   Mr. Penn in any way influence your testimony today?

17   A.  No, it does not.

18          MR. FAGG:  Thank you very much, Mr. Brown.  That's

19   all.

20          THE COURT:  Thank you.

21          Is Mr. Brown subject to recall by the United States?

22          MS. WULFF:  He is not, Your Honor.

23          THE COURT:  All right.  Mr. Brown, you're excused.

24   Thank you very much.

25          THE WITNESS:  Thank you, Your Honor.

Bruce Bagshaw – Direct

1          MR. FELDBERG:  May I go get the next witness, Your

2     Honor?

3          THE COURT:  Yes, you may.

4          Ms. Withers, you may call the next witness.

5          MS. WITHERS:  Mr Austin calls Bruce Bagshaw.

6          THE COURT:  Mr. Bagshaw, Ms. Grimm will administer the

7     oath.

8          (**BRUCE BAGSHAW, DEFENDANTS' WITNESS, SWORN**)

9          COURTROOM DEPUTY:  Please be seated.

10         Please state your name and spell your first and last

11    name for the record.

12         THE WITNESS:  My name is Bruce Bagshaw, B-R-U-C-E,

13    B-A-G-S-H-A W.

14                        **DIRECT EXAMINATION**

15    BY MS. WITHERS:

16    Q.  Hi, Mr. Bagshaw, my name is Julie Withers.  I represent

17    Roger Austin.  Let me know if you have trouble hearing me.

18         MR. LOVELAND:  Excuse me.  I would like a brief

19    sidebar with the Court.

20         THE COURT:  All right.

21         (Hearing commenced at the bench.)

22         THE COURT:  All right.  Mr. Loveland, go ahead.

23         Mr. Loveland, can't hear you.  Sorry.

24         MR. LOVELAND:  Thank you, Your Honor, I'm sorry.  Does

25    this work now?

2224

Bruce Bagshaw – Direct

1          THE COURT:  Yes.

2          MR. LOVELAND:  I first want to apologize to the Court

3     and Ms. Withers, I was looking for an opportunity before the

4     witness took the stand, so I apologize for that.  I want to

5     raise an issue that we briefed in our trial brief, and this,

6     frankly, Your Honor, pertains to both Mr. Bagshaw and

7     Mr. Shelton.  They are both obviously character witnesses for

8     Roger Austin.  Last trial, there were objections that were

9     sustained related to specific instances of conduct under the

10    character testimony, specifically related to things like awards

11    that Mr. Austin had won in the chicken industry.  And the

12    testimony also focused on specific instances of conduct when

13    Mr. Austin sold chicken to these two men before RSCS or UFPC

14    existed.  But the basis for the character evidence was conduct

15    of selling chicken.

16         The Government would argue that this is not

17    permissible straightforwardedly as a specific instance of

18    conduct under Rule 405, but it's also propensity evidence

19    because it relates to selling of chicken.  There was testimony

20    that he was an honest chicken salesman, he made weights

21    correct, things of that sort, and it was all sustained.

22         Finally, it's unfairly prejudicial because it could

23    lead the jury to confuse the issues regarding the chicken

24    sales.

25         What the Government would propose to do is we would

2225

Bruce Bagshaw – Direct

1    stipulate to a foundation being met for any reputation evidence

2    that the defense seeks to offer, but we would argue that it's

3    straightforward impermissible to get into specific instances of

4    conduct and to specifically go into things about how he used to

5    sell chicken.  That's propensity evidence again.

6          I would just sort of close and say, I would hope we

7    can resolve this so we don't have to have sustained objections

8    in front of the jury like we did last trial.

9          MS. WITHERS:  To start with the easy one, I have no

10    intention of asking him about awards, but on the second count,

11    in terms of laying a foundation --

12          THE COURT:  Ms. Withers, you can speak a little bit

13    softer.

14          MS. WITHERS:  In terms of laying a foundation, we need

15    to lay the foundation in front of the jury so they can evaluate

16    whether they can credit his opinion.

17          THE COURT:  I'm sorry?

18          MS. WITHERS:  We need to lay the foundation in front

19    of the jury and with the jury so they can evaluate whether or

20    not they can credit his opinion.

21          THE COURT:  When you say the foundation, what are you

22    referring to?

23          MS. WITHERS:  I am referring to the basis for the

24    witness's opinion for Mr. Austin's reputation in the community

25    and character for honesty, and that is business dealings

2226

Bruce Bagshaw – Direct

1    underlie that experience.

2         THE COURT:  Okay.  Mr. Loveland.

3         MR. LOVELAND:  Your Honor, I believe objections were

4    ultimately sustained on the business dealings as to foundation.

5    If the defense witnesses, Mr. Bagshaw and Mr. Shelton, want to

6    testify, the proper foundation would be the basis in the

7    community, not Mr. Austin sold me chicken honestly.  That's a

8    specific act related to these two men.  It's not character

9    evidence within the community.

10         And, again, this is a propensity concern because it

11   relates to selling chicken.  The anecdote about making weights

12   correct is exactly what the Government is concerned about.

13   And, again, I think that the objection is broader than just the

14   awards -- Government's are broader than just the awards.

15         THE COURT:  Anything more, Ms. Width.

16         MS. WITHERS:  Some of the objections were sustained,

17   some were overruled, and I would propose we hear the questions.

18   But in terms of a specific instance of selling chicken, that

19   may be the Government's concern, but overall having sold

20   chicken certainly goes to the basis of their business dealings

21   and would underlie the opinions and care evidence that we're

22   about to hear.

23         THE COURT:  All right.  The -- first of all, it's

24   appropriate for the witness to testify about how he knows

25   Mr. Austin.  And Ms. Withers is right, it's necessary and

Bruce Bagshaw - Direct

1    appropriate for the jury to understand how he is aware of

2    the -- of his reputation in the community.  The community in

3    this case could be a business community, but I do agree that

4    the personal experience of Mr. Bagshaw is not relevant.

5              What is relevant for purposes of character testimony

6    is the witness's knowledge of his reputation in the community,

7    so those -- any type of personal anecdotes about, you know, he

8    always treated me fairly or that type of thing is irrelevant

9    for purposes of character testimony.

10             Was there another aspect of the testimony,

11   Mr. Loveland, that needs mention?  I can't recall.

12             *MR. LOVELAND:*  No, I think Your Honor addressed it

13   completely.  I think the Government would submit that his

14   reputation in the community and knowing him in the business

15   community could be proper foundation, but he sold me chicken

16   honestly, he made the weights proper, I've been buying chicken

17   from him, and he's been a good man, family man, religious man,

18   all of that I think is specific instances of conduct, and it

19   goes to the personal relationship, which I think Your Honor has

20   just held is inappropriate, so the Government agrees.

21             *THE COURT:*  Right.  And Ms. Withers indicated that she

22   was not going to ask him any questions about awards, of that

23   nature.  That aspect of the original objection sounds like it's

24   been mooted.

25             All right.  Thank you.

                              2228
                    Bruce Bagshaw – Direct

 1          *MS. WITHERS:*  Can I ask one more question for

 2     clarification?

 3          *THE COURT:*  Sure.

 4          *MS. WITHERS:*  The list that Mr. Loveland just gave off

 5     contained a lot of generalities that are acceptable under

 6     405(a), and as Your Honor ruled in the last trial, Mr. Bagshaw

 7     can testify about the reputation in the community, his personal

 8     opinion, but describing the nature of the award seems like a

 9     specific incident, and that's the transcript at page 137, line

10     19, running through page 138, line 9.

11          So in the list Mr. Loveland gave off, I think that

12     there were some things that do describe specific incidents but

13     also some broad categories of generality that would be

14     appropriate.

15          *THE COURT:*  Once again, to the extent that the witness

16     knows about his reputation in the community on various specific

17     matters, that may be appropriate.  But to the extent that the

18     witness is going to testify about his own personal experiences

19     and business dealings with the -- with Mr. Austin, that's

20     irrelevant, and that's not appropriate character testimony.

21          *MS. WITHERS:*  Can I ask about his personal opinion of

22     Mr. Austin's character?

23          *THE COURT:*  No.  It's only his reputation in the

24     community.

25          *MS. WITHERS:*  Thank you, Your Honor.

2229

Bruce Bagshaw – Direct

| | |
|---|---|
| 1 | THE COURT: All right. Thank you. |
| 2 | (Hearing continued in open court.) |
| 3 | MS. WITHERS: May I proceed, Your Honor? |
| 4 | THE COURT: Yes. Go ahead. |

**DIRECT EXAMINATION**

BY MS. WITHERS:

Q.  Mr. Bagshaw, where do you live?

A.  I live in Hillsboro, Ohio.

Q.  How long have you lived there?

A.  Oh, gosh, 50 years, actually.

Q.  Have you ever worked in the chicken industry?

A.  Yes, ma'am.

Q.  And what did you do in the chicken industry?

A.  We sold Kentucky Fried Chicken for 47 years.

Q.  When you say "we," who are you referring to?

A.  My mom and dad started in 1971, and then my sister and I became second-generation franchisees, and until the last -- until we sold, we were franchisees for over 30 years, my sister and I both were.

Q.  And your family owned the franchises?

A.  Yes, ma'am.

Q.  All right. How old were you when you started working at your first KFC franchise?

A.  Well, at seven years old, I would stand on two milk crates, and I would flour the chicken while my dad cooked it. My

2230

Bruce Bagshaw - Direct

1    sister was nine years old, and she would run the cash register

2    while my mom unpacked the chicken.  So we were definitely a

3    family business.

4    Q.  Did you just have one franchise at that time?

5    A.  Yes, ma'am.

6    Q.  Did your family eventually grow?

7    A.  Yes, ma'am.  At one time, we had up to 33 restaurants; and

8    then in 2018, we had 24.

9    Q.  And where were those restaurants located?

10   A.  Mostly in Ohio and northern Kentucky.

11   Q.  All right.  Did there come a time where your personal

12   responsibilities within the family business grew?

13   A.  Absolutely.  I mean, you go from cooking chicken to washing

14   dishes to packing orders to cleaning the parking lot, and you

15   work your way up the ladder.  You get to be assistant manager

16   and then a manager and then a supervisor.  You get to supervise

17   people.  So, yes, ma'am.

18   Q.  All right.  And did there come a time when you actually ran

19   the family business?

20   A.  Yes, ma'am.

21   Q.  About how old were you when you --

22   A.  Right around 25 is when my sister and I pretty much took

23   over our family business.

24   Q.  Do you still run your family business?

25   A.  No, ma'am, we sold the family business.

2231

Bruce Bagshaw - Direct

1    *Q.*   When did you sell?

2    *A.*   In December of 2018, we sold 24 KFC restaurants.

3    *Q.*   Are you familiar with RSCS?

4    *A.*   Yes, ma'am.

5    *Q.*   And what is RSCS?

6    *A.*   RSCS was a purchasing co-op that the franchisees owned,

7    they had shares in it, and they owned the purchasing co-op.

8    *Q.*   RSCS is owned by the franchisees?

9    *A.*   Yes, ma'am.

10   *Q.*   Does it also negotiate on behalf of franchisees?

11   *A.*   Yes, ma'am.

12   *Q.*   And is it -- is it responsible to the franchisees?

13   *A.*   Say that again, please.

14   *Q.*   Is it responsible to the franchisees?

15   *A.*   Yes, ma'am.

16   *Q.*   And who controls RSCS?

17   *A.*   Well, they had a board of directors, like most companies

18   do, and then in every region -- there were seven KFC regions in

19   the United States, and I belong to the Southeast KFC

20   Franchisee's Association, which made up ten states in the

21   south.  And we would appoint people to be on the board from our

22   association to represent the franchisees, and they would sit on

23   the boards with the other franchisees and some of the RSCS

24   people as well.

25   *Q.*   All right.  So you mentioned you were part of a franchisees

Bruce Bagshaw – Direct

1  organization.  What was the purpose of that organization?

2  *A.*  To share best practices with one another, figure out how

3  we're going to hire enough people to take care of our

4  customers, and get ideas and what is The latest and greatest.

5  We had vendors that came in, such as the chicken processors,

6  the equipment people, the dry goods people that would come in

7  and tell us all about the newest, latest and greatest in

8  support of our business.

9  *Q.*  You said the chicken people?

10  *A.*  Uh-huh.

11  *Q.*  Would that be chicken suppliers?

12  *A.*  Yes, ma'am.

13  *Q.*  Which chicken suppliers would come in?

14  *A.*  You had Tyson, Gold Kist, Pilgrim's, you had Claxton, you

15  had Case, you had Perdue, you had a whole bunch of them there.

16  *Q.*  Mr. Bagshaw, do you know Mr. Austin?

17  *A.*  I do.

18  *Q.*  How long have you known him?

19  *A.*  Over 30-plus years.

20  *Q.*  Do you recall how you met him?

21  *A.*  I met him at -- being a franchisee in the KFC business is

22  where I met him.

23  *Q.*  Did you frequently have contact with Mr. Austin over the

24  years?

25  *A.*  Yes, ma'am.

Bruce Bagshaw – Direct

 1    Q.  Can you describe some of that contact?

 2    A.  Well, early on, before the purchasing co-op came into play,

 3    we would negotiate our own chicken with the chicken processors.

 4    We would typically go so many cents over Georgia Dock, and

 5    that's how we would negotiate that with them.

 6    Q.  Okay.  That was before RSCS started doing the negotiations?

 7    A.  Yes, in 2000, they came in and took over all the purchasing

 8    of the chickens.

 9    Q.  Okay.  Did you have other interaction with Mr. Austin?

10    A.  I did.

11    Q.  Can you describe those, please?

12    A.  Many interaction.  Roger would speak to our association.  I

13    got to know his family, his wife Christie, his son Andy, Sarah.

14    I got to know them all well, because they were all usually

15    there with him, and I got to meet them all.

16    Q.  When he said he would speak to you, your association,

17    that's your franchisee association?

18    A.  Yes, ma'am.

19    Q.  Was he invited to speak?

20    A.  Absolutely.

21    Q.  What sort of topics was he invited to speak on?

22    A.  He would give us an update on where the chicken market was,

23    what was going on in the chicken market, the supply and demand,

24    where we were at, and what our future looked like.

25    Q.  Would he ever tell you things you didn't want to hear?

Bruce Bagshaw – Direct

1    A.   Absolutely.

2    Q.   Do you know where he was employed during that time frame?

3    A.   I'm not sure what you said.

4    Q.   I'm sorry.  Do you know where Mr. Austin was employed

5    during that time frame?

6    A.   I believe when I first met Roger he was with Gold Kist.

7    Q.   That's another poultry supplier?

8    A.   Yes, ma'am.

9    Q.   He was still selling chicken to KFC during that time?

10   A.   Yes, ma'am.

11   Q.   Do you know where he was employed later, after Gold Kist?

12   A.   Yes, at Pilgrim's.

13   Q.   It was --

14   A.   It was ConAgra, then Pilgrim's.

15   Q.   That's three companies?

16   A.   Yeah.

17   Q.   He was selling KFC chicken for all three companies?

18   A.   Yes, ma'am.

19   Q.   Has your business dealings with Mr. Austin and your contact

20   with Mr. Austin given you the opportunity to develop an opinion

21   about his reputation in the community for honesty and

22   integrity?

23   A.   Absolutely.

24   Q.   And what's the basis for your opinion?

25   A.   When a man can come in a meeting and tell you --

Bruce Bagshaw – Direct

1          *MR. LOVELAND:*  Objection, Your Honor.

2          *THE COURT:*  Sustained.

3   *BY MS. WITHERS:*

4   *Q.*  And what's your opinion of Mr. Austin's reputation in the

5   community for honesty and integrity?

6   *A.*  A lot of integrity, great leadership, and his truthfulness

7   is always on spot.

8   *Q.*  Okay.  Mr. Bagshaw, have you reviewed any of the evidence

9   in this case?

10  *A.*  No, ma'am.

11  *Q.*  But, obviously, you're here, you're at a criminal trial,

12  and Mr. Austin is a defendant in this courtroom.  He's charged

13  with entering into an agreement to rig bids and fix prices for

14  chicken sold to KFC franchisees such as yourself.  Does this

15  change your opinion of his character for honesty and integrity?

16  *A.*  Absolutely not.

17  *Q.*  Why not?

18  *A.*  Because I would tell each and every one of you in here

19  that's not the Roger Austin I have known for 30-plus years.

20  *Q.*  Okay.  So you said your grandparents started their first

21  franchise in the '20s or '30s?

22  *A.*  My parents.

23  *Q.*  In the '20s or '30s?

24  *A.*  Back in the '70s.

25  *Q.*  Did you ever have occasion to meet the Colonel?

2236

Bruce Bagshaw - Cross

1    A.   Absolutely.

2    Q.   I noticed your tie.

3    A.   Yes, ma'am.

4    Q.   Did he give you your tie?

5    A.   Yes, ma'am.

6             MS. WITHERS:  No further questions.

7             THE COURT:  All right.  Thank you.

8             Cross-examination.

9             Mr. Loveland, go ahead.

10            MR. LOVELAND:  Thank you, Your Honor.

11                    **CROSS-EXAMINATION**

12   BY MR. LOVELAND:

13   Q.   Mr. Bagshaw, thank you for being here today.

14            Sir, you've been friends with Roger Austin for many

15   years, right?

16   A.   Yes, sir.

17   Q.   Over 30?

18   A.   Yes, sir.

19   Q.   You're good friends, right?

20   A.   Yes, sir.

21   Q.   And you guys would consider yourselves to be close friends,

22   correct?

23   A.   Yes, sir.

24   Q.   Your families know each other?

25   A.   Yes, sir.

Bruce Bagshaw - Cross

1    Q.  You go on hunting trips together?

2    A.  Occasionally.

3    Q.  And you came out here to testify on his behalf you said on

4    direct, right?

5    A.  Yes, sir.

6    Q.  And that meant leaving your family and parts of your life

7    behind, right?

8    A.  Yes, sir.

9    Q.  Because you're good friends with Roger Austin?

10   A.  Yes, sir.

11   Q.  That's what you do for a good friend?

12   A.  Yes, sir.

13   Q.  You did this to help Roger Austin, right?

14   A.  Yes, sir.

15   Q.  Okay.  And you touched on this briefly on the direct.  But

16   I just want to go through a few more questions.  You have not

17   seen any of the text messages that Roger Austin wrote or

18   received in this case, have you?

19   A.  No, sir.

20   Q.  And you haven't seen what any of the other defendants,

21   including Scott Brady, have written or received in text

22   messages, right?

23   A.  No, sir.

24   Q.  Not seen any of the emails in this case?

25   A.  No, sir.

Bruce Bagshaw - Redirect

1    Q.  And that would include emails that Roger Austin was on in

2    some form, correct?

3    A.  Yes, sir.

4    Q.  And you haven't seen any phone records, right?

5    A.  No, sir.

6    Q.  You haven't seen any handwritten notes, have you, sir?

7    A.  No, sir.

8    Q.  You've not heard any of the testimony in this case?

9    A.  Nope.

10   Q.  So you have not seen any of the evidence against Roger

11   Austin, correct?

12   A.  No, sir.

13           MR. LOVELAND:  No further questions, Your Honor.

14           THE COURT:  Thank you.

15           Redirect -- any other cross?

16           Redirect.

17                       **REDIRECT EXAMINATION**

18   BY MS. WITHERS:

19   Q.  Does the fact that you're friends with Roger Austin

20   influence your testimony in any way?

21   A.  Absolutely not.

22           MS. WITHERS:  Thank you.

23           THE COURT:  All right.  Thank you.

24           Is Mr. Bagshaw subject to recall?

25           MR. LOVELAND:  No, Your Honor.

Marcus Shelton – Direct

1       THE COURT:  Thank you, Mr. Bagshaw.  You are excused.

2       THE WITNESS:  Thank you.

3       THE COURT:  Ms. Withers, you may call the next

4   witness.

5       MS. WITHERS:  Mr. Austin calls Marcus Shelton.

6       THE COURT:  Mr. Shelton, if you'll please come forward

7   and stand next to the witness stand there.  Ms. Grimm will

8   administer an oath to you.

9              (**MARCUS SHELTON, DEFENDANTS' WITNESS, SWORN**)

10      COURTROOM DEPUTY:  Please be seated.

11      Please state your name and spell your first and last

12  name for the record.

13      THE WITNESS:  My name is Marcus Shelton, M-A-R-C-U-S,

14  last name S-H-E-L-T-O-N.

15                      **DIRECT EXAMINATION**

16  BY MS. WITHERS:

17  Q.  Good afternoon, Mr. Shelton.  My name is Julie Withers.  I

18  represented Roger Austin.

19  A.  Good afternoon.

20  Q.  Mr. Shelton, where do you live?

21  A.  Live in Danville -- well, excuse me.  I live in

22  Summerfield, North Carolina.  From Danville, Virginia.

23  Q.  Did you just move from Danville?

24  A.  No, ma'am.  I've been there about eight years now.

25  Q.  All right.  And what do you do for a living?

Marcus Shelton - Direct

1    *A.*   I owned and operated KFC restaurants and Taco Bell

2    restaurants.

3    *Q.*   So were you a KFC franchisee?

4    *A.*   I was.

5    *Q.*   Mr. Shelton, I'm not sure that everyone can hear you.  Can

6    you pull your microphone a little closer, please?

7    *A.*   Sure.  How about now?

8    *Q.*   That sounds good.  Thank you.

9    *A.*   Okay.

10   *Q.*   How many KFC franchises did you own and operate?

11   *A.*   By the end of my career, I owned thirteen KFCs and two Taco

12   Bells.

13   *Q.*   And --

14   *A.*   But I didn't start out as an owner of KFC.  I started out

15   cooking at 14 at KFC.

16   *Q.*   How did you start out cooking at KFC at 14?

17   *A.*   My father was a franchisee -- my father and mother.  In

18   1964, actually, the Colonel shook hands with my grandmother and

19   grandfather, so I was actually a third-generation franchisee

20   with KFC.  I started working for my mom and dad at 14.  They

21   paid me $3.25 an hour to do whatever they told me to.

22   *Q.*   What kind of things did they tell you to do?

23   *A.*   I was a cook, hauled trash, did anything they -- that I

24   could in the restaurant.  At that point, we had a couple of

25   pieces of equipment that you could not operate unless you were

Marcus Shelton - Direct

1    18, a mixer, the chopper for slaw.  At one point, we had

2    chicken cutters in the restaurant where chickens came in whole

3    and you actually had to cut it into an eight-piece cut.  I

4    couldn't operate that at 14.

5    *Q.*  Was there a time that your responsibilities grew?

6    *A.*  Yes, ma'am.  I graduated from the University of North

7    Carolina in 1994.  I went to Myrtle Beach, ran a restaurant and

8    bar there for about a year and a half, ended up back -- my dad

9    would call me up about every other week and say, Son, we sure

10   could use your help with the business.  Ended up back around

11   August of '95 and started running one restaurant, progressed

12   from there, did well, progressed from there, ran numerous

13   restaurants, and then from there, ended up being the director

14   of operations of the company, progressed from there to

15   president of the company, then bought other restaurants, so it

16   was a fairly good progression for me.  It worked out.

17   *Q.*  When you say the company, what do you mean?

18   *A.*  Bacon Enterprises, Incorporated, was the name of our

19   company.  My family.  My grandfather's name was Layton Bacon,

20   so everybody is, why is it called Bacon Enterprises?  It's

21   because of his name.

22   *Q.*  Layton Bacon?

23   *A.*  Layton Bacon.

24   *Q.*  Did you ever meet the Colonel?

25   *A.*  I did.  In 1980, the Colonel was turning 90 years old, and

2242

Marcus Shelton - Direct

1    I was privileged to be in Louisville, Kentucky, for his 90th

2    birthday party.  I remember them walking him on stage on a big

3    platform.  He had about a 10-foot tall cake with 90 candles on

4    it, and he blew them out with a hairdryer.  So did that.

5         They had all kinds of things for the kids at that

6    event.  The Colonel was a very kid-friendly guy.  One of the

7    things was, they were making horseshoes; and the child that

8    chose the proper number between one and twenty won the

9    horseshoe, and I won it with the number 17, which was always my

10   number from that point on.

11   Q.  All right.  So as a third-generation franchisee, do you

12   know KFC's secret mix of 11 herbs and spices?

13   A.  I do not.  They had actually different suppliers that

14   provided -- you know, nobody ever housed the entire recipe.

15   Q.  So that is still a secret?

16   A.  I could tell you, but --

17   Q.  You'd have to kill me?

18   A.  I'm just kidding.

19   Q.  All right.  Mr. Shelton, do you know Mr. Austin?

20   A.  I do.

21   Q.  And how did you meet him?

22   A.  I met Roger probably -- prior to me being back in the KFC

23   system.  He worked with my father.  He worked with Gold Kist,

24   ConAgra, and then Pilgrim's.  And throughout those different

25   jobs, director, VP of fresh poultry, we dealt directly with

Marcus Shelton - Direct

1   Roger for some time in negotiations for our --

2          *MR. LOVELAND:*  Objection, Your Honor.

3          *THE COURT:*  Overruled.

4          *THE WITNESS:*  Okay.

5   *BY MS. WITHERS:*

6   *Q.*  You can go ahead.

7   *A.*  We dealt directly with Roger for quite some time for

8   pricing and supply of our need of chicken.  I guess in about

9   early 2000s, the RSCS, which was previously the UFPC, which is

10  a -- it's our purchasing cooperative, owned by the franchisees

11  and incepted by the franchisees, they took over for the

12  majority of franchisees, they took over procurement of chicken,

13  and I still maintained a relationship with Roger, because

14  although I would buy through my commissary and receive chicken

15  from PFG -- excuse me, PFG was my commissary, we'd receive

16  chicken from Mar-Jac, from Pilgrim's, from Tyson, I still was

17  able to call on Roger for any issues that I may have, such as

18  missed cuts --

19         *MR. LOVELAND:*  Objection, Your Honor.

20         *THE WITNESS:*  -- short pieces.

21         *THE COURT:*  Overruled.

22         *THE WITNESS:*  I just had a great relationship.  He was

23  a great partner to us and to many other franchisees throughout

24  our careers.

25

Marcus Shelton - Direct

1    *BY MS. WITHERS:*

2    *Q.*  So even when you started negotiating –– even when RSCS

3    started negotiating for the chicken, you continued to have

4    frequent contact with Mr. Austin; is that right?

5    *A.*  I did.  He attended all of the regional meetings that I

6    attended.  I think –– Roger never missed the national meeting,

7    I don't think he missed one in 40 years.

8    *Q.*  What do you mean by regional meeting?

9    *A.*  So the southeast was the region that I was a part of.  I

10   had restaurants in Virginia and North Carolina, so that was the

11   region that –– actually, I ended up representing.  But there

12   were multiple regions around the country, just based on

13   geography.  In those regional meetings, franchisees came to

14   learn from other franchisees how to better run the business.

15   We fellowshipped with our vendors.  We –– you know, we had an

16   opportunity –– if we had a need for equipment or if there were

17   negotiations going on, we had the opportunity to accomplish

18   that at those meetings.

19   *Q.*  All right.  Were those meetings hosted by a certain

20   organization?

21   *A.*  Well, I mean, the southeast region was typically sponsored

22   by a certain organization, whether it be –– Pilgrim's was

23   always a very good group to the national and the regionals.  In

24   addition to that, you had other vendors like Pepsi that would

25   participate and sponsorship of those meetings.

Marcus Shelton - Direct

1   Q.   Was Mr. Austin involved in any of those meetings?

2   A.   Absolutely.  Roger was the face of Pilgrim's Pride to me

3   and to many other franchisees.

4   Q.   All right.  And what was his particular role in those

5   meetings?

6   A.   I think Roger served in a number of roles.  One, he was

7   representing Pilgrim's Pride at the vendor shows and those type

8   of things, addressing any issues that franchisees may want to

9   come to his booth and talk to him about.  Of course, Pilgrim's

10  was always generous enough to sponsor our meetings.  I don't

11  know -- in addition to that, the southeast region -- the board

12  of directors of the southeast region asked Roger to help us by

13  being a vendor liaison with other groups.  I think he served in

14  that position for seven years, or better, after 2000 --

15  somewhere in the neighborhood of 2010.

16  Q.   Did you have frequent contact with Mr. Austin in his role

17  as a vendor liaison?

18  A.   I -- you know, he dealt primarily with Leslie and the

19  people that were involved more with the vendors.

20  Q.   Who is Leslie?

21  A.   Leslie is another franchisee in the southeast.  I'm sorry.

22  Q.   So she was also a part --

23  A.   She was in charge of vendors, so, yes.  He -- he primarily

24  would deal with Leslie for that objective.

25  Q.   What is the liaison role, what is it that do?

Marcus Shelton - Direct

1   A.  I think Roger's role in that position was to try to help

2   other vendors with any needs they may have and, in addition to

3   that, communicate with franchisees what we could do better to

4   better serve the vendors and vice versa.

5   Q.  And why was Mr. Austin asked to take the liaison role?

6   A.  Because franchisees in the southeast trusted him, trusted

7   him implicitly, felt he was quite a partner to us and would

8   help us in that role.

9   Q.  Why was it felt that he was a partner?

10  A.  Maybe because Roger always participated in the meetings, he

11  was always engaged with franchisees, because I'm not the only

12  franchisee that he helped with problems throughout our careers.

13  You know, if we had issues with quality assurance type things,

14  I never went to KFC's QA, because it was just one more step.

15  All I had to do was call Roger and say, Roger, we've got

16  miscuts on wings, we're short pieces in cases.  The next thing

17  I know, he'd show up, and we'd address the problem, and I think

18  he -- the way they would address the problem is, go inspect the

19  lines at the plants and make sure that everything was -- any

20  little mechanism can get off on those lines and cause an issue,

21  so I think that was, you know, something that he helped me with

22  in particular.

23  Q.  And do you have an opinion of Mr. Austin's reputation in

24  the community for honest and integrity?

25  A.  I do.  In the year that he retired, 2018, he received two

Marcus Shelton - Direct

1    awards --

2    Q.  I'm sorry, going to stop you there.

3          MR. LOVELAND:  Objection, Your Honor.

4          THE COURT:  Sustained.

5          THE WITNESS:  Okay.

6    BY MS. WITHERS:

7    Q.  Can you tell me what your opinion is of his reputation for

8    honesty and integrity?

9    A.  I don't know if this is included as part of the objection.

10   I've seen the man receive standing ovations from the entire

11   national -- we're talking about franchisees from all over the

12   country because of what they thought of him.  I think his

13   reputation is as solid as it comes.  I think that a lot of

14   people felt like Roger was close to family.  I think that, you

15   know, when he retired, a lot of people were sad to see him go.

16   I think that he did an -- more than just his job at taking care

17   of us franchisees.

18   Q.  And what's your opinion of his reputation in the community

19   of franchisees for honesty?

20   A.  I think it's solid.  I think that all of the things I just

21   mentioned apply to honesty as well as integrity.

22   Q.  Mr. Shelton, have you seen any of the evidence in this

23   case?

24   A.  I have not.

25   Q.  But you're here today in this courtroom, this is a criminal

Marcus Shelton - Cross

1   trial, and Mr. Austin is a defendant here, he's charged with

2   entering into an agreement to rig bids or fix prices for

3   chicken sold to KFC franchisees such as yourself.  Does that

4   change your opinion of his character?

5   A.  I'm the supposed victim.  I just flew three-quarters of the

6   way across the country, took time away from my wife, my two

7   small children.  No, ma'am.  I know the man for 30 years now.

8   I know who he is.

9        MS. WITHERS:  Thank you very much.  No further

10  questions.

11       THE COURT:  Thank you.

12       Cross-examination, Mr. Loveland.

13       MR. LOVELAND:  Thank you, Your Honor.

14                   **CROSS-EXAMINATION**

15  BY MR. LOVELAND:

16  Q.  Good afternoon, Mr. Shelton.

17  A.  Good afternoon, sir.

18  Q.  Thank you for being here.

19  A.  Yes, sir.

20  Q.  Sir, I only have a few questions for you.  You're friends

21  with Roger Austin, correct?

22  A.  I am.

23  Q.  Okay.  And you've been friends with Roger Austin for -- did

24  you say 30 years?

25  A.  I said I've known Roger for about 30 years.  I knew him

Marcus Shelton - Cross

1    prior to my management and above experience with Bacon

2    Enterprises, so -- I knew him when he was dealing with my

3    father.

4    Q.   Okay.  And you would consider him to be a good and close

5    friend, right?

6    A.   I would consider him to be a good friend and a good

7    business associate throughout my entire career.

8    Q.   And you know his family, right?

9    A.   I do.  Christie, Sarah, and Andy, all fantastic people.

10   Q.   And you mentioned on your direct that you left your family

11   behind in North Carolina to fly out here to be here for

12   Mr. Austin, right?

13   A.   Correct.

14   Q.   Because you're good friends with Roger Austin, that's why

15   you did that, right?

16   A.   No, sir, it's because I've known the man for 30 years, and

17   I do not believe the charges that are brought against him.

18   Q.   Sir -- I'm sorry, I want to ask you a specific question on

19   that.  I apologize for interrupting you.

20   A.   That's okay.

21   Q.   Okay.  Now, this was touched on briefly in the direct, but

22   I'm just going to go through a few final questions with you,

23   Mr. Shelton.

24   A.   Okay.

25   Q.   You've not seen or read any of the text messages that Roger

Marcus Shelton - Cross

1    Austin wrote or received that were part of this case, correct?

2    A.  I have not.

3    Q.  You haven't seen what the other defendants, including Scott

4    Brady, sent or received in their text messages, right?

5    A.  No, sir.

6    Q.  You've not seen any of the emails in this case, have you?

7    A.  No, sir.

8    Q.  And that would include emails sent and received by Roger

9    Austin, correct?

10   A.  Correct.

11   Q.  And all the other defendants, correct?

12   A.  Correct.

13   Q.  And you've not seen any of the electronic records here

14   either, have you?

15   A.  No, sir.

16   Q.  You've not seen any handwritten notes?

17   A.  No, sir.

18   Q.  And you've not seen -- not heard any testimony in this case

19   either, have you, sir?

20   A.  No, sir.  Wasn't allowed in the courtroom.

21   Q.  You have not seen or heard any of the evidence against

22   Roger Austin, correct, sir?

23   A.  No, sir.

24         MR. LOVELAND:  Thank you.

25         No further questions, Your Honor.

1          THE WITNESS:  Thank you.

2          THE COURT:  Thank you.

3          Redirect.

4                    **REDIRECT EXAMINATION**

5    BY MS. WITHERS:

6    Q.  Mr. Shelton, why did you leave your family and fly here to

7    testify?

8    A.  Because I've known Roger for 30 years now, I've been able

9    to witness his relationship with his family, with his God, with

10   franchisees for a number of years.  I appreciate the man, and I

11   appreciate the partner that I had in business, and I felt

12   like -- I felt compelled to be here for him today.

13   Q.  And does the fact that you are friends with Mr. Austin and

14   that you know his family influence your testimony about his

15   reputation for honesty and integrity?

16   A.  No, ma'am.  I would tell you that I'm a man of integrity

17   too.  So if I felt like there was a question there, I would not

18   have testified the way I did.

19          MS. WITHERS:  Thank you very much.

20          THE COURT:  All right.  Is Mr. Shelton subject to

21   recall?

22          MR. LOVELAND:  No, Your Honor.

23          THE COURT:  All right.  Mr. Shelton, you are excused.

24   Thank you very much.

25          THE WITNESS:  Thank you, Your Honor.

1          THE COURT:  All right.  Next witness.  Mr. Tubach.

2          MR. TUBACH:  Could we have a brief sidebar?

3          (Hearing commenced at the bench.)

4          MR. TUBACH:  We're now intending to introduce some

5     documents without a sponsoring witness.  We have sent a number

6     of those over to Government counsel, late yesterday, and then

7     again today.  I don't know if there are any objections to them.

8     I thought it might be useful to hash that out before we get up

9     and start doing it.

10         THE COURT:  By meaning that, on sidebar, that you want

11    to preview those or just alert everyone to the fact that you

12    are about to in front of the jury move the admission of certain

13    documents?

14         MR. TUBACH:  If the Government doesn't have any

15    objection.  I believe the vast majority of them were admitted

16    in trial 2.  If there is no objection, I would move them into

17    evidence and display a few at this time.

18         THE COURT:  Okay.  Mr. Hart, do you understand what

19    Mr. Tubach is referring to?

20         MR. HART:  I do, Your Honor; however, Mr. Torzilli is

21    the one who is handling this issue.  He's right here, and he

22    can take that.

23         THE COURT:  Okay.  Sure.

24    Mr. Torzilli, can you hear me?

25         MR. TORZILLI:  Yes, Your Honor.

1          THE COURT:  Were you able to follow along with what

2     was being discussed by Mr. Tubach on sidebar, despite the fact

3     that you didn't have the microphone, given the fact that you

4     were able to see the transcript on the computer screen?

5          MR. TORZILLI:  I've now read the transcript realtime,

6     so I'm up-to-speed with what is going on here.

7          THE COURT:  Okay.  And did you get copies of the

8     documents that Mr. Tubach seems to be alluding to?

9          MR. TORZILLI:  We received a list of the exhibit

10     numbers of the documents that I understand Mr. Tubach wants to

11     move into evidence.

12          THE COURT:  Okay.  And any concerns or objections by

13     the United States with his plan on moving the admission of

14     certain of those or maybe all of those documents without a

15     sponsoring witness?

16          MR. TORZILLI:  There are two issues, Your Honor.  One

17     issue is I think we have an objection -- I'll have to look at

18     my notes.  I think we might have one objection on one of the

19     exhibits.  Then for a couple of others, we're going to ask for

20     a limiting instruction because they're being admitted for a

21     limited purpose, so we would want those either as they're

22     admitted and/or as they're published to have a limiting

23     instruction provided to the jury.

24          THE COURT:  Okay.  Well, Mr. Tubach, it sounds like we

25     could proceed and take it -- take up the objections as they

1    arise, unless you have another suggestion.

2         *MR. TUBACH:*  Perhaps -- just excuse the jury for five

3    minutes and try and hash that out or I can simply do it on the

4    record.

5         *THE COURT:*  I don't know how long it might take, but

6    if you're going to display some things too, maybe we could

7    defer some of the objected-to exhibits until the end of the day

8    and then take them up tomorrow.

9         *MR. TUBACH:*  That's fine.  I'm happy to proceed now.

10   One of the documents I'm going to move into evidence is J-234,

11   which is actually a writing that just states that the Court is

12   taking judicial notice that the soybean future contract was

13   $433.20 on August 28.  The Court took judicial notice of that.

14   We didn't file the motion for judicial notice at this time.

15   But I think we gave the Government notice of that.  I believe

16   there is no objection, but I wanted to confirm.

17        *THE COURT:*  Okay.  Mr. Torzilli, are you familiar with

18   that exhibit, and will there be any objection to the admission

19   of J-234 at this -- in this trial?

20        *MR. TORZILLI:*  We don't have an objection to J-234.

21        *THE COURT:*  Okay.  Let's go ahead and we'll have

22   Mr. Torzilli -- sorry, Mr. Tubach proceed, and then we'll see

23   how it goes.  We'll recess at 5:00, of course.  Thank you.

24        *MR. TUBACH:*  Thank you.

25             (Hearing continued in open court.)

1           MR. TUBACH:  At this time, Your Honor, Mr. Penn moves

2    into admission a number of documents.

3           THE COURT:  All right.

4           MR. TUBACH:  Starting, Your Honor, with D-240.

5           THE COURT:  Any objection to the admission of Exhibit

6    D-240?

7           MR. TORZILLI:  No, provided there is a limiting

8    instruction.  I'm happy to elaborate at sidebar.

9           THE COURT:  Let me just take a look at it.

10          Mr. Tubach, is this a multipage exhibit?

11          MR. TUBACH:  It is.  I can provide a copy to the

12   Court.

13          THE COURT:  Yeah, that might be helpful.

14          MR. TUBACH:  I take that back, it's actually one page.

15          THE COURT:  I can see the entire page.  Why don't we

16   do a sidebar so I can hear the concern by Mr. Torzilli.

17          (Hearing commenced at the bench.)

18          THE COURT:  Go ahead, Mr. Torzilli.

19          MR. TORZILLI:  Sure, Your Honor.  So we object or have

20   objected on previous occasions to the admission of this exhibit

21   because it's hearsay.  It's a statement by the defendant, which

22   is inadmissible when offered by the defendant, and I understand

23   the Court has on previous occasions overruled that objection.

24   I'm not asking for reconsideration, but this is not being

25   admitted for the truth of the matter asserted, presumably.  It

2256

 1     is being admitted for the non-truth purpose of establishing in

 2     some form or fashion the defendant's state of mind, and as a

 3     consequence, I would request that the jury be instructed that

 4     this be considered only for the limited purpose of establishing

 5     defendant's state of mind.

 6             THE COURT:  Mr. Tubach, response.

 7             MR. TUBACH:  I could be corrected, I believe in the

 8     last trial the document was admitted without a limiting

 9     instruction.  I don't believe there is any need for a limiting

10     instruction.  I have no intention of spending any time on how

11     Pilgrim's was actually doing in February of 2014.  This

12     limiting instruction is going to be confusing to the jury.

13             THE COURT:  Mr. Torzilli.

14             MR. TORZILLI:  Sounds like Mr. Tubach agrees that it's

15     being admitted only for the purpose of potentially establishing

16     a defendant's state of mind, which is precisely what I'm asking

17     that the Court provide the jury in terms of a limiting

18     instruction.

19             THE COURT:  Mr. Tubach, anything else?

20             MR. TUBACH:  No, Your Honor.

21             THE COURT:  Okay.  I am going to sustain the

22     objection, and I'll provide a limiting instruction that this

23     should be considered only for purposes of determining

24     Mr. Penn's state of mind.  I'm not sure that that may cover it.

25             Mr. Tubach, do you have a suggestion on how that would

1   be worded?

2           MR. TUBACH:  I don't, Your Honor.  Because it's -- I'm

3   afraid I don't as I'm standing here.

4           MR. TORZILLI:  Your Honor, if I may, I don't know if

5   it's been in this trial but certainly my experience in other

6   trials, limiting instruction of, you know, this statement or

7   this document or this exhibit can only be considered by you for

8   purposes of evaluating the defendant or the declarant's state

9   of mind.  Rule 803(3), Your Honor.

10          THE COURT:  I'll give that limiting instruction, but,

11  otherwise, I will admit D-240, and based on the same reasons

12  that I believed it to be appropriate.

13          THE WITNESS:  And admissible at the last trial.

14          MR. TORZILLI:  Thank you, Your Honor.

15          (Hearing continued in open court.)

16          THE COURT:  All right.  So as to D-240, that will be

17  admitted.

18          (Exhibit D-240 admitted.)

19          Ladies and gentlemen -- why don't we go ahead and

20  publish that to the jury.

21          This particular exhibit has a limiting instruction,

22  namely, that the jury may consider this particular email only

23  for purposes of determining Mr. Penn's state of mind.

24          Do you want to scroll down to the bottom?

25          MR. TUBACH:  Yes, we can scroll down.  It's not much

1    to look at, but --

2                THE COURT:  All right.

3                MR. TUBACH:  I neglected to tell the Court, I have a

4    binder of all of the exhibits that may be helpful to the Court

5    as we go through these.

6                THE COURT:  Yes.  That could be.

7                MR. TUBACH:  Next, Your Honor, is F-459.

8                THE COURT:  All right.  Any objection to the admission

9    of F-459?

10                MR. TORZILLI:  It's a similar issue, and I'm happy to

11    elaborate on it.

12                MR. TUBACH:  I don't think there is any need.  We can

13    simply proceed as we did with 240.

14                THE COURT:  Yes.  Any objection with that, with the

15    same limiting instruction as before?

16                MR. TORZILLI:  No objection.

17                THE COURT:  Then F-459 will be admitted.

18                (Exhibit F-459 admitted.)

19                THE COURT:  Ladies and gentlemen, again, once again,

20    the same limiting instruction as the last exhibit, may be

21    considered only for purposes of determining Mr. Penn's state of

22    mind.

23                MR. TUBACH:  If we could publish that to the jury,

24    Your Honor.

25                THE COURT:  Yes, you may.

2259

1          MR. TUBACH:  Perhaps blow it up so it's a little bit

2     easier to read, perhaps at the bottom.

3          Thank you.

4          THE COURT:  All right.

5          MR. TUBACH:  Thank you, Your Honor.  That's the entire

6     document.

7          Next is J-239.

8          THE COURT:  Any objection to the admission of Exhibit

9     J-239?

10          MR. TORZILLI:  No objection, Your Honor.

11          THE COURT:  J-239 will be admitted.

12          (Exhibit J-239 admitted.)

13          MR. TUBACH:  If we could publish that to the jury,

14     Your Honor.

15          THE COURT:  It may be displayed.

16          All right.  Thank you.

17          MR. TUBACH:  Next is J-423.

18          THE COURT:  Any objection to the admission of J-423?

19          MR. TORZILLI:  No, Your Honor.

20          THE COURT:  That exhibit will be admitted and may be

21     displayed.

22          MR. TUBACH:  Thank you, Your Honor.

23          (Exhibit J-423 admitted.)

24          THE COURT:  All right.

25          MR. TUBACH:  Thank you, Your Honor.

1        Mr. Penn would ask the Court to take judicial notice

2   of the fact that the price of soybean meal futures at the close

3   of the market on August 28, 2014, was $433.20.  We have that --

4        THE COURT:  What was it, again?

5        MR. TUBACH:  J-234.

6        THE COURT:  Okay.  Any objection to the admission of

7   J-234?

8        MR. TORZILLI:  No objection.

9        THE COURT:  All right.  J-234 will be admitted and may

10  be published.

11       (Exhibit J-234 admitted.)

12       MR. TUBACH:  Thank you, Your Honor.

13       Next is J-229.

14       THE COURT:  Did you want the jury to have a chance --

15       MR. TUBACH:  Yes, if you could display that, please.

16       THE COURT:  Okay.

17       MR. TUBACH:  Next, Your Honor, is J-229.

18       THE COURT:  Any objection to the admission of J-229?

19       MR. TORZILLI:  Request for a limiting instruction,

20  Your Honor.

21       MR. TUBACH:  Perhaps we could do this on sidebar, Your

22  Honor.

23       THE COURT:  Okay.

24       (Hearing commenced at the bench.)

25       THE COURT:  Go ahead, Mr. Torzilli.

1        *MR. TORZILLI:*  Thank you, Your Honor.

2            So this has been admitted previously, and when it was

3    admitted previously, it was admitted only for the effect on the

4    listener.  So if it's being admitted on that basis, my request

5    would be that the jury be given a limiting instruction

6    indicating that it's admissible only for purposes of its effect

7    on the listener.

8        *THE COURT:*  Mr. Tubach.

9        *MR. TUBACH:*  That's fine, Your Honor.

10       *THE COURT:*  It will be admitted with that limiting

11   instruction.  Thank you.

12           (Hearing continued in open court.)

13       *THE COURT:*  J-229 will be admitted.  It may be

14   published to the jury.

15           (Exhibit J-229 admitted.)

16       *THE COURT:*  Ladies and gentlemen, this comes from with

17   a limiting instruction, namely, that it be considered not for

18   the truth of the matter asserted; but, rather, only for the

19   effect on the listener.

20           All right.

21       *MR. TUBACH:*  Thank you, Your Honor.

22           I'm mindful of the time, so this might be a good time.

23       *THE COURT:*  Ladies and gentlemen, we'll go ahead and

24   recess for the day.  We'll plan on reconvening tomorrow same

25   time, 8:30.  Keep the admonitions in mind.  Once again, don't

2262

1    talk about the case or let them talk to you about it if they

2    seem to think they know something.  And we'll see you tomorrow

3    morning.  Jury is excused.

4           JUROR:  Tomorrow is the parade, where they're

5    expecting a quarter of a million people.  If some of us are a

6    little late.

7           THE COURT:  I would leave early.

8           JUROR:  We all talked about it.

9           THE COURT:  That's good.  The festivities as you know

10   are starting at 9:00, and my anticipation is that there will be

11   a lot of people --

12          JUROR:  Quarter of a million.

13          THE COURT:  -- coming early, people aren't that great

14   about taking public transportation.  So, yeah, try to do your

15   best.  But, obviously, it's been over, like, 20 years, so, you

16   know, we don't know exactly what to expect.  With the Broncos

17   parade last time -- I think there is going to be a lot of

18   people.

19          JUROR:  Just wanted you to know.

20          THE COURT:  I appreciate that.  Jury is excused.

21   Thank you.

22          (Jury out at 4:59 p.m.)

23          THE COURT:  Thank you.  Please be seated.

24          So as we had talked about before, we're going to talk

25   about jury instructions, and we also may talk a little bit

1    about some scheduling issues.

2          Do people want to take a brief break?  Heads are

3    bobbing, that's a good idea.  Why don't we plan on ten minutes,

4    plan on reconvening ten minutes after 5:00, and we'll start

5    doing that.  Thank you.

6          (Recess at 5:00p.m.)

7          (In open court at 5:16 p.m.)

8                    **HEARING ON JURY INSTRUCTIONS**

9          *MR. HART:*  Your Honor, I wanted to introduce the Court

10   to Ms. Cheng.

11         *THE COURT:*  She walked in at 4:30, and I thought, oh,

12   yeah, we're talking about jury instructions.  Yes.

13         Good to have Ms. Cheng here.

14         So let me -- here is what we're going to do.  Let me

15   give you kind of the game plan.  First, I'm going to go through

16   the instructions.  Of course, we don't have too many changes to

17   the set, but because we just had five defendants at this time,

18   some changes that need to be made, and I'll mention a few

19   others, and then we'll get to the more substantive issues

20   raised by both the United States, but also by the defendants as

21   well.

22         And then based on our discussions tonight, I will give

23   you a revised set of instructions sometime tomorrow morning,

24   and you can look them over, you know -- look at them over the

25   weekend, and then we'll have our final jury instruction

2264

1    conference.

2          If you have some proposed changes, even though it is a

3    weekend, file them so that we can be ready to go on Tuesday

4    morning, and people will have a chance to review your

5    suggestions and think about them.

6          Okay.  So the caption, of course, for the jury

7    instructions will omit any numbers.  It will just list the

8    defendants in order, but we won't have any numbers, so that

9    there is -- you know, Mr. Lovette won't appear as No. 8, which

10   would signal to the jury that there is some missing people.

11         Let's take a look at Instruction No. 5 from the last

12   set.  In the second paragraph, the end of that sentence, there

13   is a reference to stipulations, the lawyers agree to and the

14   facts that I've judicially noticed.  Seems like that language

15   should remain the same.  Any disagreement with that?

16         (No response.)

17         Then if you look at the fourth paragraph of this

18   instruction, there is a reference to, And sometimes I ordered

19   you to disregard things that you saw or heard or I struck

20   things from the record.  I can't remember if I've done that in

21   this trial.  Seems to me maybe I did instruct the jury to

22   disregard something, but -- I'm not 100 percent sure.

23         Why don't we do this -- maybe you can do a word search

24   and see if you can, you know, key on the word disregard, and

25   we'll see whether that sentence should remain in, or struck or

 1    strike, something like that.

 2         Instruction No. 10, of course, given the fact that

 3    Mr. Pepper did not testify, I will revise so that it's limited

 4    to Mr. Bryant.

 5         And I would propose -- so Instruction No. 12 is the

 6    instruction that talks about Mr. Austin and reputation

 7    testimony.

 8         And then Instruction No. 13 of the other set, of the

 9    last set, talks about evidence of reputation.  Any -- I would

10    just suggest that we keep these the same, but I'm not sure if

11    there is -- all right.

12         Instruction No. 16, I would propose that we modify

13    this one to strike the third sentence of the first paragraph,

14    since each defendant has his own table.  And also the first

15    sentence of the second paragraph, I'd propose we strike the

16    words after the word -- the first use of the word "together."

17    In other words we'd keep the fact that they worked together,

18    but strike the fact that they've sat together.

19         And then if you turn to Instruction No. 27, I think,

20    believe it or not, we've solved this problem, so I would

21    suggest that we omit Instruction No. 27.

22         Any disagreement with that?  I think we've blotted out

23    or redacted all of the references to -- the litigation-related

24    references to something being confidential.

25         *MR. FAGG:*  Your Honor, the only point on that would be

2266

1    that subject to the parties' ability, if there is a document in

2    there that does say highly confidential, we can make a

3    redaction to make sure before it goes back, that one hasn't

4    slipped through.

5            THE COURT:  When people check over the exhibits before

6    they go back to the jury, I think we should, you know, look out

7    for that problem in addition to others.  But, yes, we should

8    make that redaction if we notice a problem like that, but

9    something that inadvertently slipped through.

10           I think those are some of the what I'll call more

11   minor revisions.  Did anyone notice any others, apart from the

12   ones that were -- more substantive ones, anyone notice -- yes,

13   Ms. Carwile.

14           MS. CARWILE:  Your Honor, I'm sure we'll get to this,

15   No. 32, but I would just note it says the next ten

16   instructions.

17           THE COURT:  Right.  That is another change we made.

18   Obviously, it's going to be referring to the next five.

19           Right.  Instruction No. 32.

20           Anyone else have any -- by the way, I'm not sure this

21   is communicated to you, but if the defendants don't want to

22   stick around for this part of the day, they can -- they are

23   perfectly free to take off, or they can stay, whatever they

24   choose to do.

25           Do the -- regardless of -- well, actually, we'll talk

1    about the theory-of-the-case ones in just a minute, then.

2    Ms. Cheng, did you have something?

3         MS. CHENG:  Briefly, on Instruction No. 5, on

4    disregarding, I believe there is an instance in the certified

5    transcript.  This is at 1353, lines 7 through 16, there was an

6    answer that Your Honor asked the jury to disregard.  So for

7    that reason, I think we should keep that sentence in in

8    Instruction No. 5.

9         THE COURT:  Okay.  Ms. Cheng, what does it say,

10   disregard something they saw --

11        MS. CHENG:  It was an answer I believe the witness

12   started giving before the objection was sustained.

13        THE COURT:  Okay.  Something that they heard?  Because

14   the instruction says saw or heard, but it sounds like I

15   instructed the jury to disregard something that they heard.  Is

16   that right?

17        MS. CHENG:  Simply says it should disregard the last

18   answer.  I'm not quite sure --

19        THE COURT:  It was a live witness.  It would be

20   something that the jury heard, then, presumably.

21        MS. CHENG:  Heard, yes.

22        THE COURT:  Okay.  If you see something, then, you can

23   take a look at the transcript, but if I struck something from

24   the record, we could also make that -- Mr. Beller.

25        MR. BELLER:  Excuse me, I think I was getting right in

1      front of the Court's thought there, and that is, I don't recall

2      but we'll double-check whether you struck anything from the

3      record, but my memory is that you did not, in which case I

4      would propose a period after heard, and simply strike that

5      second clause.

6            THE COURT:  Right.  Yeah, I think that -- we'll go

7      ahead -- I'll go ahead and do that for now, but if you find an

8      instance where I struck something from the record, then we can

9      put that language back in.

10           All right.  Then why don't we -- I'll hand out verdict

11     forms tomorrow.  The verdict form will be pretty much the same

12     except for the caption obviously and the list of defendants.

13           All right.  Why don't we then go in -- why don't we

14     take up the Government's motion, first of all.

15           Ms. Cheng, do you want to lead off?  Why don't we take

16     up the statute of limitations issue first.

17           MS. CHENG:  Sure, Your Honor.  Let me begin first with

18     the necessity for the revision that the Government has

19     suggested.  In the prior trial, we received no fewer than three

20     notes from the jury on this particular instruction, and I think

21     it is just simply worded in a way that has been proven to be

22     extremely confusing for the jury, and it's confusing in three

23     ways.

24           First, as Your Honor pointed out, in the last trial,

25     the jury doesn't know what a statute of limitations is, and

1    that's worth clarifying in the sentence that we proposed.

2              Second, the jury -- it's unclear to the jury who

3    precisely needs to commit an act in order for it to qualify

4    within the limitations period.

5              And then third, the jury asked, you know, what exactly

6    qualifies as performing some acts.  In one of the notes they

7    said, by performing an act, does that include signing of a

8    contract prior to a certain time period.  The Government's

9    revisions are meant to address that.  I actually have printed

10   copies of the red lines for the Court and the defendants if

11   that would be helpful.

12             THE COURT:  Sure.  Go ahead.

13             MS. CHENG:  Your Honor, may I approach?

14             THE COURT:  Yes.

15             MS. CHENG:  Your Honor, just to confirm, the red lines

16   here are identical with one exception, which I'll point out in

17   a second to what the Government submitted in its brief.  And

18   the change here relates to one clause, in the very last

19   sentence, which says, Maintaining fixed prices, and I've

20   included a footnote there to the source for this addition,

21   which is a Sixth Circuit case, *United States v. Hayter Oil*.

22   And it's -- the relevant excerpt is also attached to what we

23   just handed out in hard copy.

24             THE COURT:  Okay.  Why don't -- why don't we go ahead

25   and get some feedback from the defendants on this, and then

1  depending on that, I'll allow the Government to address those

2  concerns.

3       Ms. Pletcher, go ahead.

4       *MS. PLETCHER:*  Thank you, Your Honor.

5       The defendants do not believe there is any basis to

6  reconsider the Court's previous rulings with respect to the

7  statute of limitations instruction, because the Court has twice

8  rejected the Government's attempts to modify the statute in the

9  way that the Government is now proposing.  The jury

10  instruction -- the questions from the jurors in trial 2 went to

11  the definition of statute of limitations.  The Court offered

12  the jury the definition of statute of limitations.  The

13  Government has proposed adding that language into this

14  instruction., we don't propose -- we don't oppose that

15  modification.  We believe it addresses the jury's concerns.

16       But any modification relating to accepting payment,

17  extending the statute of limitations, we oppose for -- for a

18  number of reasons.

19       The big picture problem here is that, to extend the

20  statute of limitations, Government has to prove beyond a

21  reasonable doubt that a defendant or a co-conspirator --

22  alleged co-conspirator is, in fact, a member of the alleged

23  conspiracy and did an act in furtherance of the alleged

24  conspiracy.  Has to be proved beyond a reasonable doubt.

25       In this case, the Government has not done that.  There

1   is no evidence that a defendant accepted any payment that was

2   in furtherance of the conspiracy.  There is no evidence that

3   any alleged co-conspirator did so, and certainly no evidence

4   that any unindicted co-conspirator did so beyond a reasonable

5   doubt.  So to add that into the jury instructions would create

6   a number of problems.  In fact, we believe that they would have

7   to be an extensive explanation, in fact, of the -- of what the

8   jury would have to find, and that's not consistent with the

9   evidence that's been proven in the case so far.

10          So we believe it's unnecessary, would cause a great

11  deal of confusion, and the Court should do what it has done

12  previously, which is reject those proposed modifications.

13          THE COURT:  All right.  Thank you, Ms. Pletcher.

14          MS. PLETCHER:  Thank you.

15          THE COURT:  Anyone else?  Mr. Beller.

16          MR. BELLER:  So as not step on Ms. Pletcher's toes and

17  double an argument, I would simply note that the proposal by

18  the Government specifically in striking the individual listing

19  of the different defendants, rather, by grouping them as a

20  title of the defendants, guilty, risks removing the individual

21  consideration for each one of the defendants and simply reads

22  as though the jury is to find the defendants either guilty or

23  not guilty as a block.  And so to the extent the instruction is

24  modified, while I agree with Ms. Pletcher completely, but to

25  the extent it is modified at all, I would object to the

1    individual defendants being grouped together as defendants.

2         I would also note on the second portion of --

3         THE COURT:  Sorry, Mr. Beller.  Grouped together by

4    referring to them collectively as the defendants as opposed to

5    listing their names.

6         MR. BELLER:  That's exactly right.  That's a more

7    articulate way to characterize my argument.

8         Your Honor, I would also note that the line that the

9    Government has proposed of, it is not necessary that the

10   Government prove that each individual defendant performed some

11   act in furtherance of the conspiracy, I believe as written, and

12   if adopted by the Court, again, is -- risks negating the

13   individual consideration and the other elements that each

14   individual defendant does, in fact, have to knowingly commit a

15   crime or knowingly, rather, satisfy each one of the different

16   elements.  And I believe that that does, again, limit

17   individual consideration for each one of the defendants as to

18   the other elements of the Sherman Act.

19        Thank you.

20        THE COURT:  Thank you, Mr. Beller.

21        Anyone else?

22        Ms. Cheng.

23        MS. NIELSEN:  Your Honor, may I --

24        THE COURT:  Ms. Nielsen, go ahead.

25        MS. NIELSEN:  Your Honor, we would object to all of

1    these revisions.  The Government has pointed out that there was

2    questions in the second trial, that I would note in the first

3    trial the jury had no questions about this particular

4    instruction.  This instruction is clear, and we would object to

5    all of the revisions proposed by the Government.

6            Thank you.

7            THE COURT:  Thank you.

8            Ms. Cheng, go ahead.

9            MS. CHENG:  Your Honor, I'll begin first to address

10   Mr. Beller's comments, then I'll respond to Ms. Pletcher and so

11   on.

12           With regard to Mr. Beller's comment that simply

13   referring to the defendants as the defendants in this

14   particular sentence here somehow means the jury will not

15   separately consider them, I think that concern is not -- I

16   think that concern is obviated because we have a separate

17   entire instruction, which is Instruction No. 15, telling the

18   jury that the -- that you must separately consider evidence

19   against each of the defendants, and the very next line

20   separates out the defendants by name, again, for the relevant

21   limitations period.

22           So for that reason, I think that there is not really a

23   serious concern that purely by the sentence and referring to

24   the defendants as collectively the defendants just in this one

25   sentence is going to create the problem that Mr. Beller has

1    pointed out.

2         With regard to the other point Mr. Beller raised on

3    whether it's confusing if we say that, you know, only one or

4    more members of the conspiracy needed to perform some act

5    within the limitations period, this language is taken from an

6    answer that the Court already gave to the jury in the last

7    trial in response to a question, when it was clear that the

8    jury believed that it needed to be a defendant.  I think this

9    clarification is extremely important, because although we as

10   lawyers can certainly appreciate that this conspirator

11   committing an act or member of the conspiracy, I think when a

12   jury reads this sentence, they believe that it must be an

13   individual defendant who does that, especially because in the

14   prior paragraph, we're giving different time -- different

15   limitations period per defendant.  For that reason, we think

16   this is very important in order to clear up the confusion that

17   we know has occurred as a result of phrasing of the

18   instruction.

19        And, finally, with regard to Ms. Pletcher's points on

20   whether there is enough evidence in the record for a jury to

21   find -- a reasonable jury to conclude beyond a reasonable doubt

22   that there were, in fact, payments being accepted on the

23   contracts, I can give two examples.

24        The first is today, Mr. Finch testified that payments

25   were made on the price fixed Claxton contract through the 2017

2275

1    year.  And Claxton, of course, has been indicted for this exact

2    conspiracy.  And it is clear from the jury's perspective, when

3    you have two employees -- two high-level employees from that

4    company -- and one -- the price fixing is occurring among

5    firms, between competitors themselves, that Claxton is, of

6    course, one of the co-conspirators in this case.

7         And another point, too, the purpose of this statute of

8    limitations and the reason why in cases like *Kemp* and *Evans*,

9    they have found that the receipt of payment is one way to

10   continue the action, is not -- or continue the cause of actions

11   is not because there is, you know, anything uniquely magical

12   about the payments being made to a co-conspirator.  The purpose

13   for the statute of limitations is to ensure in some way that

14   the objectives of the conspiracy are being met.

15        For this reason, in *Kemp*, the Tenth Circuit said, A

16   Sherman Act conspiracy remains actionable, quote, until its

17   purpose has been achieved or abandoned.  In this case, the

18   purposes and objectives of the conspiracy is to give

19   supercompetitive profits to the companies that employed the

20   defendants.  For that reason, because the defendants --

21   sorry -- for that reason, because the companies are continuing

22   to enjoy the fruits of the conspiracy when Claxton receives

23   payment on a price-fixed contract, as the testimony today

24   showed, that in itself extends the conspiracy period.

25        And for that reason -- that's at least one example of

1    how a jury can conclude from the evidence that they have --

2    beyond a reasonable doubt, that there are actions within the

3    limitations period, and one of those actions is accepting

4    payments.

5            And, Your Honor, I'm happy to talk about the addition,

6    maintaining fixed prices, as well as the clause, but I can also

7    pause on that until we get through some of the other points

8    that we've been talking about already.

9            THE COURT:  Why don't you go ahead and mention it

10   right now.

11           MS. CHENG:  Sure, Your Honor.  We've just simply

12   proposed in this addition here, which is taken directly from a

13   criminal price-fixing antitrust conspiracy case where there was

14   a limitations period right in the middle of July, and the Court

15   found because the payments -- the fixed payments were made --

16   the fixed prices were done originally at the start of July, but

17   those prices were maintained through the end of July, that this

18   was sufficient to meet the criteria for the statute of

19   limitations.  And I think that logic very much aligned with

20   what I was just describing and the language in *Kemp*.

21           What is crucial to the cause of action and how it

22   accrues is precisely whether the objectives and the contract

23   itself, the instrument for the price fixing, continues to be in

24   force during this period.  That is how we show that the

25   conspiracy is continuing and has not been abandoned.  And, in

2277

1    fact, many cases have said that we would presume the conspiracy

2    to continue until it has been abandoned.  To take a very narrow

3    view that Claxton or Tyson needed specifically to be identified

4    as the co-conspirator is simply not supported by the case law.

5            THE COURT:  All right.  Ms. Pletcher.

6            MS. PLETCHER:  Thank you, Your Honor.

7            First of all, *Kemp* involved a defendant who was a

8    corporation and an executive of that corporation.  So this

9    question as to whether a corporation accepting a payment could

10   qualify as an act in furtherance of the conspiracy was not at

11   issue in *Kemp*.  And I would maintain that *Kemp* actually teaches

12   the opposite, that in order for the statute of limitations to

13   be extended, there must be proof beyond a reasonable doubt that

14   a defendant actually conducted an act or a co-conspirator

15   conducted an act in furtherance.  And *Kemp* did say that

16   accepting infected payments could qualify as that act.  But

17   because *Kemp* involved a defendant that was a corporation, this

18   issue was not raised.

19           And I contend that in this case there was no evidence

20   that any corporate -- any charged defendant or any corporation

21   was a co-conspirator.  In fact, in the *James* log, and during

22   the *James* hearings, no corporate defendant was ever identified

23   as a co-conspirator.  So Mr. Finch's testimony today -- to say

24   that his testimony today proved that Claxton accepted -- that

25   Claxton was a co-conspirator and that they accepted infected

1    payments as a result of the alleged conspiracy is quite a

2    stretch and very far from beyond-a-reasonable-doubt evidence

3    necessary in order to prove that piece.

4         But more importantly, to even suggest it in the

5    instructions, which were perfectly adequate before, the jury

6    has never expressed any confusion about this particular issue,

7    and should remain the same.

8         THE COURT:  Yeah, I don't think it's a stretch for the

9    jury to infer that, you know, Claxton, for instance, accepted

10   payments.  Obviously, they did.  But on the other hand, Claxton

11   has not been identified as a conspirator.

12        Ms. Cheng.

13        MS. CHENG:  Your Honor, just to respond briefly to the

14   point on *Kemp*.  So *Kemp* and associates involved two firms

15   entering into a -- an effective, you know, market allocation,

16   Sherman Act conspiracy, and it's true that there was an

17   individual tried, and there was a corporation tried.  But the

18   other firm, the co-conspirator company, was not a defendant.

19   And that was the company that was receiving the payment that

20   the Court held extended the limitations period.

21        Crucially, too, in the case, the co-conspirator's

22   firm's CEO pleaded guilty, but the company itself, there is no

23   record of that in the opinion.

24        And so for -- for that reason -- because the factual

25   record there, in fact, is weaker than in our situation, where

1    we have, you know -- for example, Pilgrim's has pleaded guilty.

2    We've had other corporations that have made involvement

3    clearer, but even specific -- I think do -- a second point, if

4    I may take a step back, is that there is enough for the jury to

5    recognize and infer that because the conspiracy is among

6    different competitive firms, that these companies are part of

7    the conspiracy and are co-conspirators for this conspiracy.

8    Throughout, we've had questioning that says, specified which

9    firms were part of this conspiracy.  We have explained the

10   relationships to these companies by these defendants.

11         And I think it's quite clear, including in *Kemp*, that

12   when the firms are reaping the benefits of the conspiracy, that

13   extends the conspiracy period because it shows that the

14   conspiracy continued to be in existence, and that is ultimately

15   the issue that we're trying to resolve here.

16         So I think *Kemp*, in fact, supports the Government's

17   position, regardless whether they're expressly named in an

18   official way at a *James* hearing, whether or not they're a

19   conspirator or not.  Because, regardless, the jury is not going

20   to receive a copy of the rulings of the *James* hearing.  We're

21   going to rely regardless on the jury's ability to figure out

22   for themselves who the conspirators are.  That's with regard to

23   that point.

24         I think with regard to the second issue, too, is, in

25   this case I believe we also have testimony that the defendants

1    continued to profit off these companies, which were in turn

2    profiting off the conspiracy and the fruits of the conspiracy.

3         THE COURT:  All right.

4         I'll -- I'm going to revise this instruction, and,

5    obviously, you'll have to take a look at the revisions to it.

6    But let me just start off with the -- the point that is

7    non-controversial, and that is, I do intend to include a

8    sentence that explains what a statute of limitations is.  I

9    think that that will be helpful to the jury.

10        We'll also -- I'll also make the revisions so that the

11   defendants who have been dismissed are not referred to.

12        I will also include a sentence that, as Ms. Cheng

13   pointed out, comes from the answer that the Court gave to

14   questions asked in the second trial, to the effect that it is

15   not necessary that the Government prove that each defendant

16   performed some act in furtherance of the conspiracy during

17   these periods.  That is the law, and I don't think it

18   diminishes in any way the Government's burden.  The Government

19   doesn't have a burden on that for statute of limitations

20   purposes.  So I think that that's an appropriate clarification.

21        And then -- then related to that, Ms. Nielsen is, of

22   course, quite correct, in the first trial we didn't get the

23   types of questions about this instruction that we got in the

24   second trial.  Nonetheless, I do think it's very likely we will

25   get questions if we do not clarify this particular instruction.

1   So I think it's appropriate that we do so.

2          I am not going to make the -- add language that the

3   Government has in its very last paragraph of its proposed

4   revision to it, because I really don't think it's needed.  The

5   price fixing and the bid rigging, which is referred to in the

6   last sentence of the Government's proposed revision, are

7   obvious.  We don't need to do that.  The maintaining fixed

8   prices I think are really subsets of the first two; therefore,

9   I don't believe that that is needed.

10          And I agree with Ms. Pletcher in terms of accepting

11   payment, to do that -- because we don't have any evidence of

12   the defendants actually accepting payments.  We'd have to get

13   into notions about whether, really, it's the defendants -- the

14   corporations, rather, that the defendants work for, whether

15   they're really the conspirators, and that opens up a

16   complicated issue, both factually and to some extent legally,

17   so because -- at least in the charged conspiracy in this case,

18   which is what we're focused on.

19          The corporations have not been identified.  I don't

20   think it's appropriate to include the language that the

21   Government requests regarding accepting payments.  So as a

22   result, I won't include that language.

23          Any other issues on this instruction that we should

24   take up at this time?  Like I said, you all really won't know

25   what it looks like until I give it, and I'll provide that

1    tomorrow.

2           Did the Government want to talk about the next topic,

3    which was on the theories of the case?

4           *MS. CHENG:*  I did, Your Honor.  And I'll try to be

5    brief on this.  But I'll start first by saying that the

6    theories of the case in this case have really looked like small

7    closing arguments that in some way summarize the evidence or

8    make argument to the jury.  And they're going to go back with

9    that, and they're not going to be able to go back with an

10   Indictment.  So that's where I'd like to start, in saying that

11   there is in -- some inequity there, that the Indictment is not

12   going back, but yet they get a physical copy, along with the

13   rest of the Court's instructions, about particular arguments.

14          In our brief on this issue, in ECF 1346, we talked

15   about several Tenth Circuit cases that repeated -- have held

16   that the instructions are inappropriate if all they do is

17   contain argument or merely summarize the evidence in a light

18   that is favorable to the defense.  And many of the instructions

19   that have been submitted in the past by the defendants have

20   been exactly that.  They talk about particular arguments or

21   contentions or summarize specific arguments -- or summarize

22   specific pieces of evidence, and that's simply inappropriate.

23   The Tenth Circuit has repeatedly held that that is

24   inappropriate to go with the jury.  These are precisely the

25   kinds of instructions the Tenth Circuit has rejected.

1        And we gave some examples in our briefing here, but

2   I'll just give -- if I can have the Court's indulgence on this,

3   I'd like to read one example so we can see how similar they are

4   to some of the instructions that the defendants have put

5   forward.

6        For example, if we look at *United States v. Davis*, 953

7   F.2d 1482, the instruction says, Mr. Davis did not enter into

8   an agreement with -- and it lists some people -- or anyone else

9   to commit criminal acts.  While the Government claims he

10  conspired to control these banks, the evidence clearly showed

11  he was attempting to sell his interest as required by

12  Government regulators.

13       Another example of an instruction held inappropriate

14  is the Government cannot use the move of this person's business

15  as evidence of guilty knowledge if that move could be motivated

16  by a legitimate purpose.

17       Another example of an inappropriate defense theory

18  instruction, defendants contend that he is not guilty of the

19  crimes because the Government has failed to prove that the

20  defendant or any other person arrived in any form to -- of

21  an -- arrived at any form of agreement to distribute marijuana.

22       Like -- and I can give examples, too, how the

23  defendants' theories from the last trial looked like this.  But

24  I think it's fairly clear even from a cursory review of what

25  the defendants have previously submitted that these are

1    extremely similar to the instructions that our juries have seen

2    in the past.  It says things like -- I'll just look quickly at

3    Mr. Austin's instruction.

4           Mr. Austin had many reasons to communicate with other

5    suppliers.  To the extent he did it, it was because Pilgrim's

6    wanted information so it could compete and not collude.  That

7    is nothing but argument.

8           And the final sentence there, too, says, The evidence

9    has not shown that Mr. Austin did not have authority to

10   determine Pilgrim's' prices and that he frequently advocated

11   for lower prices for his customer.  That, again, is argument

12   and is a summary of the evidence in the least light most

13   favorable to the defendants.  I simply don't see how it can be

14   characterized in any other way, because these fall, you know,

15   right in line with the theory-of-defense instructions that have

16   previously been rejected.  The Government would ask that the

17   defendants -- first that the instructions not go back with the

18   jury at all; second, that the instructions be changed in this

19   round so that they comport with Tenth Circuit precedent.

20          THE COURT:  All right.  Thank you, Ms. Cheng.

21          Ms. Pletcher.

22          MS. PLETCHER:  Thank you, Your Honor.

23          The Government has not articulated any basis for the

24   Court to reconsider its prior rulings on this issue.

25          THE COURT:  We're assuming that the theories of the

2285

1    defense are going to be the same.

2            MS. PLETCHER:  Defendants need some time to look at

3    those.  We have to wait until the evidence comes in.

4            THE COURT:  We shall see, but we'll assume it's going

5    to be substantially similar.

6            MS. PLETCHER:  That's true, assuming, again, the

7    Government has articulated no reason why the Court needs to

8    reconsider its prior ruling.  The way the Court resolved this

9    issue in trial 2 was an instruction clarifying that the defense

10   theory instructions were submitted by each individual

11   defendant.  It was very clear that the Court was not sponsoring

12   the instruction.  Defendants agree to keep that the same.  We

13   think that's appropriate and should address the concerns that

14   the Government has.

15           On the merits, it's clear the law entitles defendants

16   to instruct on their theory of defense, provided that it is

17   supported by some evidence and the law.  And the Court has wide

18   discretion in deciding whether that standard is met.

19           In a recent criminal antitrust case, *U.S. v.*

20   *Lischewski*, for example, there were instructions submitted very

21   similar to the ones here.  And some defendants believe that

22   there is no reason to reconsider the prior rulings.  And, of

23   course, we will let the Court know if there are any changes to

24   the defense theory, and we can potentially reconsider this at

25   the time.  But at this moment, we believe defense theories

1       should be admitted as they stand.

2              THE COURT:  Right.  We should talk about that, because

3       the defense theory should be submitted as soon as possible.

4       Obviously, you may want to wait until more evidence has taken

5       place.  If it's possible to submit those, you know, before the

6       start of the day on Tuesday, that would be helpful, if you

7       think that you can do that, because, you know, the -- that can

8       trip us up if there are revisions that need to be made.

9              Any other defendants want to speak to that?

10             All right.  Ms. Cheng, anything else?

11             MS. CHENG:  Thanks, Your Honor.

12             I'll start by saying, *Lischewski* was in the Ninth

13      Circuit, and there appears to be not a lot of responses to the

14      Tenth Circuit cases I cited, which -- there is not, really, an

15      objection in any way that the defense theories are unlike the

16      ones that I've just read.

17             There is also -- I believe Ms. Pletcher mentioned that

18      the addition, saying that these are not from the Court would be

19      sufficient to cure any prejudice to the Government, but that's

20      not the case.  In fact, during the last trial, counsel for

21      Defendant Fries objected when in the Government's rebuttal

22      statement we said, These are not coming from the Court, and

23      counsel said, These are coming from the Court.  I think there

24      is extreme confusion.  And even if counsel had not made that

25      objection, there is real risk that because it's included with

2287

1    this packet that has the imprimatur of the Court, that when the

2    jury receives these instructions, they will believe that in

3    some way they have been vetted and approved and that they

4    provide correct statements of the law, to the extent that they

5    are making those suggestions.

6         I'll give one example of, perhaps, how this influenced

7    some type of confusion.  Defendant Fries' theory of the case,

8    for example, contained this sentence in the last trial, which

9    is, quote The Government has not alleged nor proven that within

10   the five-year statute of limitations Mr. Fries discussed

11   pricing, agreed with anyone, or directed anyone, et cetera.

12        Of course, the Government does not need to allege nor

13   prove that within the five-year statute of limitations

14   Mr. Fries personally did any of those acts.

15        THE COURT:  If I change the jury instruction the way I

16   indicated I would, doesn't that solve that problem?

17        MS. CHENG:  I don't believe it does, because it

18   creates a confusion, even if we have one instruction --

19        THE COURT:  I mean, why -- I mean, first of all, is

20   the statement in his theory inaccurate?

21        MS. CHENG:  It's --

22        THE COURT:  I mean, what your objection to it is the

23   legal significance, it could being confusing, what I'm

24   suggesting is that if I include the same language that I did in

25   the answer to the jury question in trial 2, you know, so what?

1   Mr. Austin makes the statement, and you can contradict it with

2   a jury instruction.

3          MS. CHENG:  That's right, Your Honor.  I do agree.  I

4   believe that would significantly mitigate that problem.  I

5   think this is illustration of the types of issues that can

6   arise.  If there is some type of confusion -- for example, in

7   the last trial, because there was I think the suggestion in

8   Mr. Fries' instruction that, Hey, Mr. Fries needed to prove

9   this, I believe that possibly contributed to the jury's

10  confusion to think it needed to be a particular individual or

11  defendant who committed that act.  So that's one reason that

12  we're especially apprehensive about these type of statements

13  and the theories of the case.

14         THE COURT:  All right.  I'm going to deny that request

15  to revisit the issue.  I haven't pored through the different

16  Tenth Circuit cases that the Government has cited to try to

17  divine, you know, exactly what the circumstances were there.

18         Theories of defense are tricky issues.  But if you

19  require the defendants to strip out all of the facts, and they

20  can't summarize anything, what are you left with?  They're

21  entitled to a theory of the defense; but, you know, what's the

22  theory?  We're not guilty?  You know, there comes a bit of a

23  line-drawing question.  I think that especially with the

24  prefatory instruction that indicates that these were submitted

25  by the defendants, in light of some revisions that we made to

1    them in the first trial, to add in words like contend it is a

2    theory, that type of thing, I don't believe that the jury will

3    be confused as to whether or not these are, you know -- have

4    received the Court's seal of approval, and as a result, I don't

5    think that these pose a danger of confusion to the jury or

6    prejudice to the Government.

7            So I'll overrule that request.

8            Should we switch our attention over to the defendants'

9    suggestions for revisions?

10           Ms. Pletcher, go ahead.

11           MS. PLETCHER:  Thank you, Your Honor.

12           Defendants propose to modify Instruction No. 18 to

13    what it was in the first trial, and relatedly, we propose to

14    make some modifications to Instruction No. 22.  Unfortunately,

15    I don't have a printout of the redline, but it was filed with

16    our papers, and we have not modified that at all.

17           THE COURT:  Yeah, I've got that.

18           MS. PLETCHER:  Okay.  Great.

19           The issue here that we're really concerned about is

20    that this modification, allowing the jury to convict the

21    defendants based on a narrower conspiracy than what is charged,

22    just goes against the case law.  We've looked hard, and we

23    can't find any case that authorizes the Court to instruct a

24    jury that they can find someone guilty based on a subset of a

25    larger conspiracy.

1          Now, there is plenty of cases out there that find

2   variances based on the Government proving a smaller conspiracy

3   than was charged and finding that those variances were not

4   prejudicial.  But what this does -- what this language does is

5   it, in effect, allows the jury to create a variance.  And

6   that's really concerning for two reasons.  One is that it

7   upends the burden of proof, and the other is that there is a

8   notice problem that it creates for the defendants to prepare a

9   case in response to a very wide-ranging conspiracy and yet find

10  that there is just a very narrow conspiracy that has been

11  proven and argued.

12          So we know that we've raised these objections before.

13  But after the Government's closing in trial 2, where they

14  specifically suggested to the jury that they could find a

15  narrow conspiracy, there was a suggestion they could just find

16  defendants guilty based on 2014.  We wanted to bring this again

17  to the Court's attention because we are very concerned that it

18  goes against the case law and could prejudice the defendants.

19          *THE COURT:*  Thank you, Ms. Pletcher.

20          Ms. Cheng.

21          *MS. CHENG:*  Thank you, Your Honor.

22          And I know that we have talked about many of the cases

23  multiple times in the charge conference and in response to jury

24  questions, so I'll try to be as brief as I can.

25          I think that there is no real serious dispute that the

2291

1    jury is not -- that the jury's permitted to find the existence

2    of some conspiracy -- sorry -- some episodes that have been

3    indicted rather than every single one, okay.  That means that

4    the jury can find -- even if they don't find, say, one of the

5    customers or one of the contracting years -- that the

6    Government has still met its burden.  And that is clear from

7    *Mobile Materials*.  And that, in turn, means that the jury can

8    also find a smaller and narrower conspiracy in scope and in

9    time.

10         And as this Court said in its order on the Rule 29,

11   the Government can meet its burden by proving a narrower case,

12   and there is really no serious dispute about that, because

13   that's in all of the cases in the Tenth Circuit, many, many

14   convictions have been upheld when the Government proves a

15   narrower case.

16         It seems, instead, that the defendants' argument here

17   is that somehow because it comes from the law related to

18   variance, that means it doesn't belong in a jury instruction,

19   but that's simply not correct.  It's not true.  The defendants

20   have not cited any cases that because it belongs -- comes from

21   the variance area of law that it somehow has no place in a jury

22   instruction.  In fact, I would ask the defendants, if it

23   doesn't belong in the variance area of law, what other area of

24   law would it belong to?

25         It seems like, you know, if we gave -- one option

1    could be to tell the jury, Hey, jury, you can find a narrower

2    conspiracy that would be a variance but not a constructive

3    amendment.  But, of course, there is no reason to go into these

4    types of confusing legalese points, because the bottom line

5    remains that the jury can convict on a narrower conspiracy.

6    And that's been in many, many cases, but -- that's been said in

7    many cases.

8          But I would like to highlight, once again, *Mobile*

9    *Materials*, which is a Tenth Circuit criminal Sherman Act case,

10   where the Court said that to the extent that the defendants'

11   proposed instruction, quote, attempted to amplify the

12   proposition that if the jury found separate conspiracies,

13   rather than a single conspiracy, and must acquit the

14   appellants.  The Tenth Circuit continued that jury instruction

15   was an incorrect statement of the law, to the extent that it

16   required the jurors to find that every project listed in the

17   bill of particulars supplied by the Government was part of the

18   Sherman Act conspiracy.  As noted, the Government may prove a

19   narrower scheme than alleged, unquote.

20         That's directly from the Tenth Circuit in a criminal

21   antitrust conspiracy case.  And so the black letter law remains

22   that the Government can prove a narrower conspiracy and be able

23   to uphold its conviction on appeal.  And if the Government is

24   permitted to prove a narrower conspiracy, then certainly the

25   jury should be permitted to be instructed on the fact that they

2293

1    can find a narrower conspiracy.  Otherwise, it's odd to keep

2    that -- that right from the jury when the jury has asked in

3    every single trial now -- sorry, in the first trial and the

4    second trial, questions about the relevant time frame and

5    whether they need to find something for the entire time period.

6          We know this is a source of confusion for the jury,

7    and we know what the right answer is in the law as this Court

8    has answered them in the past and as we have already included

9    in the instructions that they can find a narrower conspiracy.

10         Likewise, in *Ailsworth*, the jury asked the Court, can

11   we find a conspiracy if it only occurred on one day with only

12   one other person?  And the Court properly and correctly

13   instructed the jury, yes, and that was a case where the

14   Government charged a one-year period, and the Court told the

15   jury, you can find a one-day conspiracy.  And that was upheld

16   by the Tenth Circuit because that narrows rather than broadens

17   the Indictment.

18         Finally, I'll make a second point here, which is that

19   the defendants cannot say that somehow because it is in the

20   area of variance that it's off limits for the jury

21   instructions.

22         In a 2016 case by the Tenth Circuit -- it's called

23   *Pawelski*, 651 Fed.Appx. 750, the Court says, quote, A jury

24   instruction can narrow the Indictment without running afoul of

25   the defendant's rights.  And in that case, the -- the jury

1    instruction had omitted one of the co-conspirators from the

2    instruction, and the Tenth Circuit upheld the change in that

3    jury instruction.

4         Likewise, in *Portela* in the First Circuit, the

5    District Court *sua sponte* shortened the time frame of the

6    conspiracy by one entire year because it didn't believe that

7    the Government could show that the last year could have been

8    part of the conspiracy.  And the First Circuit also upheld that

9    and said, Jury instructions that constructively amend -- sorry,

10   I apologize.  I quoted an incorrect case.

11        The *Portela* case upheld the instruction *sua sponte* by

12   the judge and said it was not error for the judge to make -- to

13   say that the -- not error for the judge to have reduced the

14   time period by an entire year.

15        And, here, the Court is not even narrowing the scope

16   differently from the way the Indictment is saying; it's just

17   saying that the jury itself can choose if they so wish to find

18   a narrower conspiracy.  And that's exactly what the *Mobile*

19   *Materials* court said was the right answer in a situation like

20   the Sherman Act case, because a Sherman Act case, like this

21   one, involved multiple episodes, and that means that we're

22   talking about different customers and different time periods,

23   and that can sometimes involve different types of pricing terms

24   that are at issue.

25        And the Government's real concern is that we -- it's

1    not correct that the jury needs to find every single one of

2    those episodes to be true in order for there to be a

3    conviction, that's simply not the law, and the fact remains

4    that the Government could prove a narrower conspiracy, and if

5    the Government can do so, then the jury should be instructed

6    that they are able to do so.

7         THE COURT:  Ms. Pletcher, real quick, we -- court

8    security officers are undoubtedly very anxious to go home.

9         MS. PLETCHER:  Thank you, Your Honor.

10        The Government is just wrong on the law.  The Tenth

11   Circuit law is governed by *Evans*, which holds very clearly that

12   the Government has the power to define the scope of the

13   conspiracy as broadly as it thinks the facts justify, but,

14   quote, if it fails to prove the conspiracy as charged, it will

15   fail to obtain a conviction.

16        *Mobile Materials* does not hold otherwise.  In fact,

17   *Mobile Materials* says that the -- *Mobile Materials* approved of

18   the jury instructions there, which said that the defendants --

19   that the jury must find the defendants not guilty of the

20   Sherman Act count if it concludes that the Government has

21   failed to prove the existence of the single continuing

22   conspiracy charged in the Indictment.

23        *Ailsworth*, as well does not say anywhere that a court

24   can instruct affirmatively a jury that they can find a narrower

25   conspiracy.  The fact that a circuit court upholds a conviction

1    based on a variance, finding that it was not prejudicial, does

2    not authorize a court to bake that into the jury instruction by

3    allowing the jury to find a narrower conspiracy.

4         In the case law *Evans*, primarily, *Carnegie*, *Mobile*

5    *Materials*, *Ailsworth* all support that conclusion.

6         *THE COURT:*  All right.  I'm going to deny the

7    defendants' request.  I don't think that it's a notice issue at

8    all, especially given that this is the third trial, and the

9    issue has come up in the -- in previous trials.  But also I do

10   agree with Ms. Cheng that *Mobile Materials* and *Ailsworth*

11   provide the authority to instruct the jury as to what they can

12   do.  It would be -- it would defy common sense to suggest

13   otherwise.  This can be a source of confusion; and I don't

14   believe that the case law would suggest that if the jury's

15   confused, so be it.  If they convict on a narrower conspiracy,

16   may be it's held as a variance.  Instead, I think it's

17   appropriate to instruct the jury on the law.  And the law in

18   the Tenth Circuit, I believe, is clear that the Government can

19   prove a narrower conspiracy without creating any problems like

20   a notice problem.

21        I do -- I reject the defendants' request.

22        Any other issues, Ms. Carwile?

23        *MS. CARWILE:*  Your Honor, I'm obviously mindful of the

24   time.  I would ask if the Court would be willing to take up one

25   additional proposed instruction tomorrow at the break that we

1    have based on evidence that has come out during the trial.

2    Would that be amenable to the Court?

3              THE COURT:  Why don't we do that.  If you could give

4    the Government a heads-up about that issue.  Do you have a

5    proposed instruction?

6              MS. CARWILE:  I do.  I can provide the Court and

7    counsel with the proposal.

8              THE COURT:  Okay.  Why don't we do that.

9              MS. CARWILE:  Thank you, Your Honor.

10             THE COURT:  Mr. Hart.

11             MR. HART:  One last thing, Judge.  The Government is

12   seeking some clarity in terms of timing.  The Court mentioned

13   certain deadlines due on Tuesday.  In the event that things

14   might close tomorrow, obviously, with the normal caveats, are

15   we to assume that closing won't happen tomorrow?  I just want

16   to --

17             THE COURT:  I think you can assume that closing is not

18   going to happen tomorrow.

19             MS. CARWILE:  Your Honor, how should I get this to the

20   Court --

21             THE COURT:  You can hand it up.  Ms. Cheng -- I'm not

22   sure what impediments may be there.

23             We will take a look at this.  We can talk about it at

24   some point, like, for instance, during a break tomorrow.

25             MS. CARWILE:  Thank you, Your Honor.

1          THE COURT:  Anything about the schedule that we should

2     talk about at this time?

3          I mean, we've got two witnesses left.  I think we -- I

4     think that the anticipation is they may go a little bit quicker

5     than the estimates, and what does the Government know about

6     scheduling for tomorrow?  Will it have any rebuttal witnesses

7     ready to go?

8          MR. HART:  Your Honor, we may have a witness ready to

9     go tomorrow.

10         THE COURT:  Okay.  And do you anticipate a witness who

11    will testify in the Government's rebuttal case but not be

12    available tomorrow?

13         MR. HART:  There could be one that is not available

14    until Tuesday, just for the travel.

15         THE COURT:  Okay.  Is it possible that the Government

16    may rest tomorrow?

17         MR. HART:  If I can have a moment to confer.

18         THE COURT:  Sure.

19         (Off-the-record discussion between counsel.)

20         MR. HART:  Your Honor, it is possible.  Again, there

21    is a witness availability issue as it relates to Tuesday.

22         THE COURT:  Okay.  I'll say this, let's assume that

23    the Government rests tomorrow, then I would propose that we let

24    the jury go and that we -- if we have any extra time, we can,

25    you know, talk about things.  But essentially we would then

2299

1  shape up the jury instructions, make sure that they're

2  finalized, and then intend to move into reading of the

3  instructions and closings on Tuesday.

4       If the evidence lapse into Tuesday, we'll play it by

5  ear.  I don't want to have, for instance, just the Government's

6  rebuttal argument on Wednesday morning or something of that

7  nature.  But we'll just have to play it by ear in terms of the

8  schedule.  I think it sounds like we should be able to get some

9  of the closings, probably most of them, done on Tuesday.

10      Mr. Tubach.

11      MR. TUBACH:  Just briefly, to the extent there is

12 going to be another rebuttal witness, we'd like to have

13 disclosure of that before the witness gets on the stand.  Of

14 course, the Government can wait until after direct to turn the

15 material over.  That's going to delay things further.  We had a

16 48-hour rule in effect, which I believe the Government refused

17 to extend to rebuttal witnesses, but we would certainly ask

18 that any rebuttal witnesses be provided to the extent we can

19 know who they are and prepare.

20      THE COURT:  Obviously, we wanted things to go

21 smoothly.  I think the Government is trying to figure out who

22 may be available and who is not.  But to the extent that they

23 can share some information so that things go more smoothly,

24 they will hopefully do so.

25      Mr. Beller.

1              MR. BELLER:  Just as a housekeeping matter, if I may

2    ask the Court, following the testimony of Mr. Eddington, if the

3    Court will allow us a brief recess to check in with our

4    clients, please, before we're asked whether or not we rest.

5              THE COURT:  Yeah.  That's a good point.  I will try to

6    remember to do that, because that's appropriate.

7              MR. BELLER:  Thank you.

8              THE COURT:  I can't remember what we did last time.

9              MR. BELLER:  My memory was ten minutes.  I think it

10   was brief.

11             THE COURT:  That's fine.  Okay.

12             We'll be in recess until 8:30 tomorrow.  Thank you.

13             (Recess at 6:17 p.m.)

14

15                            **I N D E X**

16   **Witness**                                                     **Page**

17       GREGORY FINCH
             Direct Examination Continued By Mr. Beller      1997
18           Cross-examination By Mr. Loveland               2067
             Redirect Examination By Mr. Beller              2154
19       MICHAEL BROWN
             Direct Examination By Mr. Fagg                  2199
20           Cross-examination By Mr. Tubach                 2214
             Cross-examination By Ms. Wulff                  2216
21           Redirect Examination By Mr. Fagg                2222
         BRUCE BAGSHAW
22           Direct Examination By Ms. Withers               2224
             Direct Examination By Ms. Withers               2230
23           Cross-examination By Mr. Loveland               2237
             Redirect Examination By Ms. Withers             2239
24       MARCUS SHELTON
             Direct Examination By Ms. Withers               2240
25           Cross-examination By Mr. Loveland               2249
             Redirect Examination By Ms. Withers             2252

```
 1   HEARING ON JURY INSTRUCTIONS                              2264

 2

 3                         DEFENDANTS' EXHIBITS

 4   Exhibit        Offered   Received  Refused  Reserved  Withdrawn

 5   A-552                    2024
     A-553                    2024
 6   A-645                    2060
     A-646                    2060
 7   D-240                    2258
     F-459                    2259
 8   I-296                    2025
     I-297                    2025
 9   J-229                    2262
     J-234                    2261
10   J-239                    2260
     J-423                    2260

11

12                         REPORTER'S CERTIFICATE

13        I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
14

15        Dated at Denver, Colorado, this 29th day of June,
     2022.
16

17

18

19   _____

20                Therese Lindblom,CSR,RMR,CRR

21

22

23

24

25
```